# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BRIAN BREECE, Individually and on Behalf of All Others Similarly Situated<br><br>        Plaintiff,<br><br>  v.<br><br>UNDER ARMOUR, INC.<br>SERVE ON:<br>The Corporation Trust Incorporated<br>351 West Camden Street<br>Baltimore, Maryland 21201<br><br>KEVIN A. PLANK<br>1020 Hull Street<br>3rd Floor<br>Baltimore, Maryland 21230<br><br>     and<br><br>LAWRENCE P. MOLLOY<br>1020 Hull Street<br>3rd Floor<br>Baltimore, Maryland 21230<br><br>        Defendants. | **No.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES**<br><br>**JURY TRIAL DEMANDED** |

Brian Breece ("Plaintiff"), by and through his attorneys, for his Class Action Complaint against defendants Under Armour, Inc. ("Under Armour" or the "Company"), Kevin A. Plank and Lawrence P. Molloy (together, the "Defendants"), on behalf of Plaintiff and other similarly situated individuals or businesses who purchased common stock, both Class A and Class C, ("Common Stock") of Under Armour between April 21, 2016 and January 30, 2017 (the "Class Period"), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, Plaintiff bases his belief upon

information uncovered through an investigation by Plaintiff's counsel that included: review of Under Armour's public filings with the Securities and Exchange Commission ("SEC"); review of Under Armour's press releases and other public statements; and review of regulatory filings and reports, court filings, securities analyst reports, and media reports about Under Armour.

## NATURE OF THE ACTION

1.      This is a class action on behalf of purchasers of Under Armour Common Stock between April 21, 2016 and January 30, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Under Armour, founded in 1996, is engaged in the manufacturing, development, marketing and distribution of sportswear, performance and casual apparel, footwear and accessories.  Under Armour is headquartered in Baltimore, Maryland, and its shares trade on the NYSE under the ticker symbol "UA" (Class A stock) and "UAA" (Class C stock).

3.      Under Armour has surged over the last twenty years, in a relentless pursuit of other longstanding sports retail companies, including Nike, Reebok and Adidas.  This drive to compete with established companies in the sports retail market has lead Defendants to issue a series of false representations about the Company's revenue, growth and vitality.

4.      Throughout the Class Period, Defendants made false and/or misleading statements as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and misleading statements and failed to disclose that Under Armour's revenue and profit margins would not be able to withstanding the heavy promotions, high inventory levels and ripple effects of numerous department store closures and bankruptcy of The Sports Authority, but nevertheless purported itself as a growth company that would continue to develop and market game-changing products.

5.      Under Armour has historically touted its aspirations to continue growing 20% annually, having set a goal of $7.5 billion in annual revenue by 2018, however overall sales grew just 12% in the fourth quarter of 2016, with revenues in North American only growing 6%, the weakest increase in the past eight years.  Despite continued guidance from April 21, 2016 through October 25, 2016, that the Company would maintain its trend of greater than 20% sales growth, none of these statements had any basis in fact and were false when made.  In point of fact, Under Armour's twenty-six consecutive quarters of greater than 20% sales growth came to a halt on Tuesday, January 31, 2017, when Under Armour announced, prior to the opening of the market, weaker-than-expected fourth quarter earnings, and that its Chief Financial Officer, Lawrence P. "Chip" Molloy ("Molloy"), would be unexpectedly stepping down, despite only serving at the position for thirteen months.

6.      Kevin A. Plank ("Plank"), as Chief Executive Officer of Under Armour, saw the writing on the wall, and, starting in April 2016 – more than nine months before the Company came clean about the actual revenue and earnings – began shifting the Company's capital structure by selling more of his stake to prevent any individual loss, yet maintain control of the Company.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline  in the market value of the Company's securities, Plaintiff and other Class members have suffered  significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)], and SEC Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].  This Court has jurisdiction over the

subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and

28 U.S.C. §§1331 and 1337.  Venue is proper pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b).  Under Armour's corporate headquarters are located in this District, and certain

of the statements alleged herein to be false and misleading originated from this District.

9.      In connection with the acts alleged in this Complaint, Defendants directly or

indirectly used the means and instrumentalities of interstate commerce, including without

limitation the mails, interstate telephone communications, and the facilities of the national

securities exchanges.

## THE PARTIES

10.      Plaintiff, a resident of Georgia, purchased Under Armour stock at artificially

inflated prices during the Class Period as described in the certification filed herewith and

attached hereto as Exhibit A, and was damaged thereby.

11.      Defendant Under Armour is a corporation incorporated in Maryland, organized

and existing under the laws of the State of Maryland, and is incorporated at 1020 Hull Street,

Baltimore, Maryland 21230.

12.      Defendant Plank is the Chairman of the Board of Directors and Chief Executive

Officer of Under Armour.

13.      Defendant Molloy was the Chief Financial Officer of Under Armour during the

Class Period, until he ultimately announced his resignation in January 31, 2017.

## DEFENDANT'S FRAUDULENT ACTIONS

14.      On March 4, 2016, Under Armour issued a press release reiterating the

Company's previously issued outlook for 2016 following the recent announcement by The

Sports Authority of a potential pre-arranged Chapter 11 bankruptcy restructuring, namely that

net revenues of 2016 would be approximately $4.95 billion (in line with the financial targets outlined in the Company's recent earnings release issued on January 28, 2016).

15.     On April 21, 2016, upon releasing first quarter earnings for 2016, Under Armour issued a 8-K press release, wherein, Plank stated:

> For the past 24 consecutive quarters or six years we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies.  It also showcases our heightened focus on providing better service across our distribution channels, ensuring that our consumer consistently finds the newest, most premium product from us wherever they shop.

16.     Plank concluded in the April 21, 2016 press release that:

> Our ability to adapt in a rapidly changing environment has been a critical part of our success and fuels our inspiration to create game-changing products that solve problems and enrich consumers' lives.  ***With this unrelenting consumer focus and ongoing investment, we are setting the foundation for our growth story over the next 20 years.***

(Emphasis added.)

17.     However, despite these announcements, starting in April 21, 2016, Plank took steps to shift the Company's capital structure, selling more of his stake to prevent losses, all while trying to keep his voting power.  To that end, in a series of transactions from April 21, 2016 through April 29, 2016 – the time period immediately after the first quarter earnings report – Plank sold approximately 1.05 million shares of his Class C common stock, which have no voting rights (except in limited circumstances).

18.     Plank's stock sales were unusual and departed from his prior purchases.  In April of 2014 and 2015, Plank exercised options and both disposed of and acquired multiple shares of stock, whereas in April 2016, Plan *only disposed* of his stockholdings (all of which were Class C common stock), and sold approximately 1.05 million shares of his personal holdings without exercising any option to acquire.

19.    In the immediate aftermath of any Under Armour first quarter earnings report (or any earning report, for the matter), Plank has not sold such a substantial amount of shares, or disposed of a substantial amount of shares without exercising any option to acquire.

20.    Continuing the trend of releasing positive guidance, on July 26, 2016, the second quarter earnings for 2016 were announced in Under Armour's 8-K press release.  Maintaining confident in the Company's growth, Plank stated that:

> ***The strong broad-based results posted this quarter highlight the continued demand for the Under Armour brand around the world***.  It also underscores the importance of diversifying our business and driving a sharper point of view with our consumers wherever they shop.  In our largest category of apparel we continue to add more dimension with a sport category focus and we remain incredibly proud of the success of our international and footwear growth drivers.

(Emphasis added.)

21.    Plank continued in the July 26, 2016 press release that:

> In 2016, our ability to position the brand to capture the changing expectations of the consumer requires Under Armour to extend and grow in new and different ways.  The authenticity we have gained with the athlete over the past 20 years has positioned Under Armour to widen our access through categories, channels, and geographies.  Starting with our launch this fall of Under Armour Sportswear, which we are calling UAS, ***we will continue to find new opportunities to bring more consumers into the Under Armour Brand***, whether that is through compelling flagship retail, new partners in wholesale, or on a digital platform.  We remain focused on making all athletes better and driving consistent revenue growth quarter after quarter.  ***I am proud of what the team has accomplished so far this year and am incredibly excited about the future of Under Armour for the rest of 2016 and beyond***.

(Emphasis added.)

22.    Molloy, then serving as Chief Financial Officer of Under Armour, added in the second quarter earnings call of Jul6 65, 2016 that:

> Now moving onto our guidance for the remainder of 2016.  Based on our current visibility, we continue to expect 2016 net revenues of approximately $4.925 billion, representing growth of 24***%...[f]or the third quarter, we expect revenues to grow approximately 20% as we begin to lap our strategies to better service our customers and as we navigate through the impact of the Sports Authority liquidation***.

(Emphasis added.)

23.     Nevertheless, in or around August 2016, approximately six months after Plank's April 2016 sell-off, Under Armour's growth began to slow after slew of department store closures and the bankruptcy of The Sports Authority, despite Under Armour's prior positive assurances and indications that the trend of greater than 20% sales growth would be continue.

24.     Around the same time, in August 31, 2016, Plank doubled down on his stock sales and entered into a pre-arranged stock trading plan to sell shares of the Company's common stock; on September 2, 2016, Under Armor issued a press release detailing the trading plan.

25.     Prior to the execution of the trading plan, Plank owned 34,450,000 shares of the Company's Class B common stock, 135,020 shares of the Company's Class A common stock and 33,823,404 shares of the Company's Class C common stock, which have no voting rights except in limited circumstances.  This represents approximately 15.6% of the total shares of Class A, Class B and Class C common stock (outstanding as of June 30, 2016).

26.     The trading plan provided for the sale, over a period of approximately nine months, beginning in October 2016, of up to 1,875,000 shares of the Company's Class C common stock held by Plank personally and up to 200,000 shares of the Company's Class C common stock held by his charitable foundation.

27.     Once the change went through, creating a new class of non-voting common stock, Plank owned approximately 15% of the total shares of Class A, Class B and Class C Common but controlled 65% of the votes.  Indeed, Shares of Class A common stock have one vote and shares of Class B common stock have ten votes. Shares of Class C common stock have no voting rights (except in limited circumstances).  Plank beneficially owned approximately 15.9% of the

Class A and Class B common stock, representing approximately 65.3% of the combined voting power of the Company's outstanding shares.

28.     The trading plan was designed to comply with Rule 10b5-1 under the Exchange Act, but it effectively served as a shield to maintain power when Under Armour would badly underperform, which Defendants were fully expecting to happen.  Thus, while Defendants stated that the reason for sales under the trading plan was for asset diversification, tax and estate planning and charitable giving purposes, these statements had no basis in fact and were false when made.

29.     Plank's decision to sell involved a considerable amount of money – 2,075,000 shares at the then current market price of $39.3 per unit (approximately $81.5 million) – and the timing of his announcement to sell was particularly significant, for at that time Under Armour's stock had been down by approximately 18% over the prior year.

30.     Nevertheless, in the 2016 third quarter earnings report issued in Under Armour's October 25, 2016 8-K press release, Plank discussed the Company's sustained growth and success:

> ***This marks our 26th consecutive quarter of 20+% revenue growth demonstrating the strength of the Under Armour Brand***.  From the Olympic Games in Rio to the launch of Under Armour Sportswear at New York Fashion Week, the Under Armour Brand continues to extend its reach to new consumers while remaining authentic and rooted in sport.  In the third quarter, our key strategies and investments to diversify our portfolio on a global scale were evident across categories, channels, and geographies.

(Emphasis added.)

31.     Plank continued that:

> Over the past twenty years we have established ourselves as a premium global brand with a track record of strong financial results.  ***Looking back over the past nine months, it has never been more evident that we are at a pivotal moment in time, where the investments we are making today will fuel our growth and drive our industry leadership position for years to come.  As a growth company with***

*an expanding global footprint and businesses like footwear and women's each approaching a billion dollars this year, we have never been more focused on the long-term success of our Brand.*

(Emphasis added.)

32.     Molloy added in the third quarter earnings call of October 25, 2016 that:

Our ability to deliver another quarter of consistent growth is a direct result of continue investments we have made in the business to meet consumer expectations through categories, channels and geographies.

\* \* \*

Based on our current visibility, *we continue to expect full year 2016 net revenues of approximately $4.925 billion, representing growth of 24%...[f]or the fourth quarter we expect revenues to grow approximately 20%. We believe the strength of our brand and increase breadth of head-to-toe product offerings position us for another quarter of strong growth*…[w]ith strong momentum in footwear and international, we remain focused on delivering key products and assortments for the holiday season.

(Emphasis added.)

33.     While Defendants stated at the October 25, 2016 earnings report that the "ambitions for the Brand have never been higher," and that revenue was expected to grow an additional 20%, the truth was ultimately revealed in the 2016 fourth quarter earnings report released on January 31, 2017 when Under Armour announced weaker-than-expected fourth quarter earnings.

34.     In the January 31, 2017 8-K press release, Plank stated that: "we are incredibly proud that in 2016, we once again posted record revenue and earnings, *however, numerous challenges and disruptions in North American retail tempered our fourth quarter results*."

(Emphasis added.)

35.     Specifically Molloy, stated in the January 31, 2017 earnings call that "starting with our fourth quarter, total Revenue was up *12 percent*" and that "[r]evenues in 2016 grew 22% to *$4.8 billion*."  This was announced by Under Armour despite guidance in October 25,

2016 that "based on current visibility, the Company continues to expect 2016 net revenues *of approximately $4.925 billion*."  (Emphasis added.)

36.     Under Armour further announced on January 31, 2017, that Molloy would be unexpectedly stepping down as Chief Financial Officer due to "personal reasons" even though he was only at the position for approximately thirteen months.  It cannot be overlooked that five of the eight executives at Under Armour have replaced a departed executive within the last twelve months.

37.     On this news, Under Armour's shares dropped 28% in pre-market trading, and ultimately fell $7.41 per share from $28.90 to close on July 31, 2017 at $21.49 per share.  Moreover, that very day, approximately $2.7 billion, or one fifth of Under Armour's market capitalization, vanished.  On February 3, 2016, Standard & Poor's cut its rating on the issuer to BB-plus from BBB-minus, the lowest level of "investment grade," and since the 2016 fourth quarter earnings report a number of investment firms have either downgraded, or at the very least, lowered their respective price targets dramatically.

38.     Despite outward votes of confidence and assurances to Plaintiff and the rest of the investing public that Under Armour would continue as a force in the sports retail market, Defendants, and Plank in particular, were aware of the decreasing growth margins and over surplus of unsold inventory, and knew that would be the last of twenty-six consecutive quarters with greater than 20% revenue growth.  This is precisely why Plank implemented the pre-arranged stock trading plan, as well as selling off 1.05 million shares in April 2016, to effectively shield his losses but to keep his voting power.  Defendants were preaching of Under Armour's strong guidance and outlook, but Plank was doing everything he could to sell his shares and stave off personal losses.

39.     Not coincidentally, the stock has dropped since the trading plan was implemented, and has plummeted since the 2016 fourth quarter earnings reports and unexpected resignation of Under Armour's Chief Financial Officer.  In the end, Defendants' guidance and press releases, starting from April 21, 2016 and continuing through January 31, 2017, were intentionally misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

40.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated concerning the financial well-being of Under Armour were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

## NO SAFE HARBOR

41.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint.  Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false,

and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Under Armour Common Stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein; the officers and directors of the Company, during the Class Period; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Under Armour securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Under Armour or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Under Armour;

c.      whether defendant Plank caused Under Armour to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of Under Armour Common Stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense, and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      Under Armour securities are traded in an efficient market;

d.      the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.      the Company traded on the NYSE and was covered by multiple analysts;

f.      that as a regulated issuer, Under Armour filed periodic public reports with the SEC and the NYSE; and

g.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

h.      that Under Armour regularly communicated with public investors and securities professionals via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and

i.      Plaintiff and members of the Class purchased, acquired, and/or sold Under Armour securities between the time Defendants failed to disclose or misrepresented material

facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in A*ffiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information.

## LOSS CAUSATION/ECONOMIC LOSS

51.     The market for Under Armour Common Stock was open, well-developed, and efficient at all relevant times.   As a result of Defendants' materially false and misleading statements and failures to disclose, Under Armour stock traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Under Armour Common Stock relying upon the integrity of the market of Under Armour and market information related to the Company, and have been damaged thereby.

52.     The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants materially misled the investing public, thereby inflating the price of Under Armour stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make their own statements not false and misleading.

53.     The materially false and/or misleading statements made by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing and/or owning the

Company's Common Stock at artificially inflated prices, thus causing the damages complained of herein.

54.     As a result of their purchases of Under Armour Common Stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered damages, under the federal securities laws.

55.     The timing and magnitude of the price decline in Under Armour stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## COUNT ONE

### Against All Defendants for Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5

56.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

57.     Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Defendants, for the time defendant Plank was CEO of the Company.

58.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.      Employed devices, schemes and artifices to defraud;

b.      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Under Armour Common Stock during the Class Period.

60.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for, and/or held, Under Armour Common Stock at artificially inflated prices.  Plaintiff and the Class would not have purchased or maintained Under Armour Common Stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO

### Against Defendants Plank and Molloy for Controlling
### Personal Liability under Section 20(a) of the Exchange Act

61.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

62.     Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against defendants Plank and Molloy.

63.     Defendants Plank and Molloy, by virtue of their respective leadership positions in Under Armour, had the power and authority to cause Under Armour to engage in the wrongful conduct complained of herein.

64.     Defendants Plank and Molloy possessed the power and authority to control the contents of Under Armour's SEC filings and press releases.

65.     Defendants Plank and Molloy violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

66.     By reason of their control of Under Armour, defendants Plank and Molloy are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) and Rule 10b-5 that occurred during the time that such Defendant was CEO of the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding Plaintiff such equitable/injunctive or other relief in Lead Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: February 10, 2017                **BROWER PIVEN**
                                          **A Professional Corporation**

                                          _____/s/ Charles J. Piven_____
                                          Charles J. Piven (00967)
                                          piven@browerpiven.com
                                          Yelena Trepetin (28706)
                                          trepetin@browerpiven.com
                                          1925 Old Valley Road
                                          Stevenson, Maryland 21153
                                          Tel: 410-332-0030
                                          Fax: 410-685-1300

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Jacob E. Lewin
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

*Counsel for Plaintiff*

# EXHIBIT A

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
### PURSUANT TO THE FEDERAL SECURITIES LAWS

I, _Brian Breece_ certify that:

1.      I have reviewed the complaint and authorized its filing.

2.      I did not purchase the security that is the subject of this action (Under Armour, Inc. (NYSE: UA or UAA)) at the direction of plaintiff's counsel (Gardy & Notis, LLP), or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

**Purchases:**

| Date | Shares Bought | Price Per Share |
|------|---------------|-----------------|
| U/o/a/y | 100 | 100.00 20 |

＊ Please reference screenshots

**Sales (if any):**

| Date | Shares Sold | Price Per Share |
|------|-------------|-----------------|

＊ Please reference screenshots.

5.      I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: _____

| 08/22/16 Bought | -1987.88 |
| | 46 of UA @ $42.9975 (Order #5) |

| 08/26/16 Bought | -986.97 |
| | 23 of UA @ $42.4775 (Order #6) |

| 09/12/16 Bought | -1003.71 |
| | 26 of UA @ $38.22 (Order #7) |

| 10/14/16 Bought | -2629.86 |
| | 68 of UA @ $38.5275 (Order #13) |

| 11/10/16 Bought | -1057.34 |
| | 33 of UA @ $31.7378 (Order #17) |

| 11/14/16 Sold | 6092.13 |
| | 196 of UA @ $31.134 (Order #18) |

| 12/08/16 Bought | -8307.75 |
| | 300 of UA @ $27.6592 (Order #22) |

| 12/12/16 Bought | -625.66 |
| | 22 of UA @ $27.985 (Order #23) |