**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ABERDEEN CITY COUNCIL AS ADMINISTRATING AUTHORITY FOR THE NORTH EAST SCOTLAND PENSION FUND, Individually and on Behalf of All Others Similarly Situated<br>Town House<br>Broad Street<br>Aberdeen AB10 1FY<br>United Kingdom<br><br>    and<br><br>BUCKS COUNTY EMPLOYEES RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated<br>Office of the Commissioners<br>55 East Court Street<br>Doylestown, Pennsylvania 18901<br><br>        Plaintiffs,<br><br>   v.<br><br>UNDER ARMOUR, INC., KEVIN A. PLANK, LAWRENCE P. MOLLOY,<br><br>BRAD DICKERSON<br>15 Eve Lane<br>Rye, New York 10580<br><br>BYRON K. ADAMS, JR.<br>660 Manzanita Way<br>Woodside, California 94062<br><br>GEORGE W. BODENHEIMER<br>95 Hemlock Hill Road<br>New Canaan, Connecticut 06840 | Civil Action No. RDB-17-388<br><br>**[CORRECTED] CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

[Caption continued on following pages.]

Civil Action No. RDB-17-388

DOUGLAS E. COLTHARP
2736 Abingdon Road
Mountain Brook, Alabama 35243

ANTHONY W. DEERING
7765 Fisher Island Drive, #7765
Miami Beach, Florida 33109

KAREN W. KATZ
4369 San Carlos Street
Dallas, Texas 75205

A.B. KRONGARD
1400 West Seminary Avenue
Lutherville Timonium, Maryland 21093
Baltimore County

WILLIAM R. McDERMOTT
1200 Fairview Road
Villanova, Pennsylvania 19085

ERIC T. OLSON
124 Country Club Circle SW
Lakewood, Washington 98498

HARVEY L. SANDERS
355 Wheatley Road
Old Westbury, New York 11568

J.P. MORGAN SECURITIES LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED
CT Corporation System
111 Eighth Avenue
New York, New York 10011

WELLS FARGO SECURITIES, LLC
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

[Caption continued on following page.]

HSBC SECURITIES (USA) INC.
CT Corporation System
208 South Lasalle Street, Suite 814
Chicago, Illinois 60604

PNC CAPITAL MARKETS, LLC
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

BB&T CAPITAL MARKETS, a DIVISION of
BB&T SECURITIES, LLC
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

SUNTRUST ROBINSON HUMPHREY, INC.
Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808

CITIGROUP GLOBAL MARKETS INC.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

GOLDMAN SACHS & CO. LLC
200 West Street
New York, New York 10282

REGIONS SECURITIES LLC
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808
          and
SMBC NIKKO SECURITIES AMERICA, INC.
The Prentice-Hall Corporation System, Inc.
80 State Street
Albany, New York 12207
                    Defendants.

Civil Action No. RDB-17-388

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. - 1 -

II.   SUMMARY OF THE ACTION .......................................................... - 2 -

III.  JURISDICTION AND VENUE ......................................................... - 5 -

IV.  VIOLATIONS OF THE SECURITIES ACT ..................................... - 6 -

    A.     The Securities Act Parties ..................................................... - 7 -

          1.     The Securities Act Plaintiff............................................ - 7 -

          2.     The Securities Act Defendants....................................... - 7 -

               a.     Corporate and Individual Defendants ..................... - 7 -

               b.     Director Defendants ................................................ - 8 -

               c.     Underwriter Defendants........................................... - 9 -

    B.     Under Armour Conducts the Offering ..................................... - 12 -

    C.     The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts ................................. - 12 -

    D.     The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503 ................................. - 15 -

    E.     Class Action Allegations for Securities Claims............................ - 15 -

V.   VIOLATIONS OF THE EXCHANGE ACT ..................................... - 19 -

    A.     The Exchange Act Parties ....................................................... - 19 -

          1.     The Exchange Act Plaintiffs .......................................... - 19 -

          2.     Corporate and Individual Defendants ................................ - 20 -

    B.     Substantive Allegations ......................................................... - 21 -

          1.     Background of the Company ......................................... - 21 -

          2.     Plank Drove Under Armour's Aggressive Growth Strategy ................. - 22 -

          3.     Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined................................. - 23 -

i

**Page**

4.      Declining Apparel Sales Led to Excess Inventory and Liquidations ... - 27 -

5.      Defendants Relied on Footwear and International Sales to Obscure the
        Company's Sales and Margin Declines ................................................. - 29 -

6.      The Company's Stock Price Declined When the Market Learned the
        Truth About the Company's Sales Problems ......................................... - 30 -

7.      Numerous Facts Support Defendants' Knowledge of the Company's
        Undisclosed Sales Problems ................................................................ - 32 -

8.      Defendants Were Motivated to Maintain a Positive Market Perception of
        the Company and the Company's Artificially Inflated Stock Value .... - 37 -

C.   Defendants' False and Misleading Statements and Omissions ........................ - 39 -

    1.      2015 Investor Day ................................................................................ - 40 -

    2.      3Q15 Financial Results ........................................................................ - 44 -

D.   Investors Begin to Learn the Truth but Defendants Continue to Mislead
     the Market ........................................................................................................ - 49 -

    1.      Published Retail Data Exposes Growth, Market Share, and ASP
            Declines at Under Armour .................................................................. - 50 -

    2.      Misleadingly Positive 4Q15 and FY15 Financial Results and Downplay
            of the Morgan Stanley Report .............................................................. - 52 -

    3.      Press Release Reiterating 2016 Financial Outlook Despite Sports
            Authority's Bankruptcy ....................................................................... - 59 -

    4.      Misleadingly Positive 1Q16 Financial Results and Guidance Raise .... - 60 -

    5.      Departures of the Company's Chief Merchandising Officer and Chief
            Digital Officer ..................................................................................... - 65 -

    6.      Reduced Financial Guidance Tied to the Sports Authority Bankruptcy - 67 -

    7.      Bond Offering Materials ....................................................................... - 69 -

    8.      Disappointing 2Q16 Financial Results:  Partial Revelations of a Growth
            Slowdown ............................................................................................. - 70 -

    9.      Goldman Sachs Global Retailing Conference ...................................... - 76 -

    10.     Disappointing 3Q16 Financial Results:  Further Revelations of a Growth
            Slowdown and Compressed Margins .................................................... - 78 -

**Page**

  11. Disappointing 4Q16 & FY16 Financial Results:  Revelations of a Severe
    Growth Slowdown and the Sudden Resignation of CFO Molloy.........- 84 -

E. Post-Class Period Revelations .......................................................................- 91 -

F. Loss Causation and Economic Loss ...............................................................- 96 -

  1. January 10, 2016 Revelations ...............................................................- 97 -

  2. May 3, 2016 Revelations ......................................................................- 97 -

  3. May 31, 2016 Revelations ....................................................................- 98 -

  4. July 26, 2016 Revelations ....................................................................- 98 -

  5. October 25, 2016 Revelations...............................................................- 98 -

  6. January 31, 2017 Revelations ...............................................................- 99 -

  7. August 1, 2017 Revelations .................................................................- 99 -

G. Presumption of Reliance ...............................................................................- 101 -

H. No Safe Harbor .............................................................................................- 104 -

I. Class Action Allegations for Exchange Act Claims .....................................- 106 -

## I.    INTRODUCTION

1.    Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") and Bucks County Employees Retirement Fund ("Bucks County") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.    Plaintiffs bring this federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired publicly traded securities of Under Armour, Inc. ("Under Armour" or "Company") between September 16, 2015 and January 30, 2017, inclusive ("Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants Under Armour, Kevin A. Plank ("Plank"), Lawrence P. (Chip) Molloy ("Molloy"), and Brad Dickerson ("Dickerson") (collectively, "Exchange Act Defendants").

3.    Separately, Plaintiff Bucks County brings this federal class action under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder, on behalf of all persons or entities that purchased or acquired 3.250% senior unsecured notes of Under Armour, Inc. ("Under Armour" or "Company") due June 15, 2026 ("Notes" or "Bonds") pursuant or traceable to the Company's Registration Statement on Form S-3ASR, which was filed with and declared effective by the U.S. Securities Exchange Commission ("SEC") on June 6, 2016 ("Registration Statement").  Bucks County brings these Securities Act claims against Under Armour, Plank, Molloy, the Director Defendants (as defined in ¶37 below), and the Underwriter Defendants (as defined in ¶50 below) (collectively, "Securities Act Defendants" and, together with the Exchange Act Defendants, "Defendants").

4.    Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel,

which included, without limitation:  (a) review and analysis of public filings made by Under Armour and other related parties and non-parties with the SEC; (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Under Armour, the other Defendants, and related non-parties; (e) interviews with factual sources, including individuals formerly employed by the Company and its retail partners; and (f) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.      SUMMARY OF THE ACTION

5.      Under Armour is one of the largest sports apparel companies in the world.  The Company sells branded athletic products, which it divides into three categories:  apparel, footwear, and accessories.  By a wide margin, apparel is the Company's largest selling product, accounting for over two-thirds of net revenue in 2016.  Nearly two-thirds of the Company's sales are made through wholesale channels such as sporting goods chains (*e.g.*, Dick's Sporting Goods ("Dick's"), Foot Locker, Champs, Finish Line).  While Under Armour products are available worldwide, over three-quarters of its sales come from North America.  According to Plank, North American apparel is the Company's "largest and most profitable business by far."

6.      Under Armour faces steep competition in the athletic apparel industry.  The Company's chief rivals, Nike and Adidas, have dominated the sector for decades.  But the Company slowly gained market share since its formation in 1996, capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour surpassed Adidas to become the number two sportswear brand by revenue in the United States, and seemed poised to challenge Nike's supremacy as the top brand.

7.      Defendants knew that growth was critical to keep pace with competitors and perpetuate the market's perception of the Company as a leading sports brand.  For 26 consecutive quarters, spanning from the second quarter of 2010 ("2Q10") to the third quarter of 2016 ("3Q16"), Under Armour reported a compounded annual growth rate of 20% or more.  At every turn, Plank reminded investors of this feat, noting that it was shared by only one other company in the S&P 500, and assured the market that such growth would continue.

8.      Indeed, at the start of the Class Period, during the Company's Investor Day on September 16, 2015 ("2015 Investor Day"), Defendants boasted that "demand for our brand has never been stronger" and led the market to believe that the Company's incredible growth streak would continue.  Defendants projected that net revenue would grow 25% in 2016 and that the Company would achieve $7.5 billion in annual revenue and $800 million in annual operating income by 2018.  This exceptionally rosy outlook *doubled* the 2015 annual results projected by the Company at that time ($3.84 billion in revenue and $405 to $408 million in operating income).

9.      In reality, however, the Company was then experiencing a severe decline in its apparel business due to its "brand heat" dying.  In other words, customer demand for core products that the Company had successfully sold for years had begun to wane.  As Defendants would later admit, the Company failed to compensate for this decline by offering new and fashionable products in line with the latest consumer trends, such as athletic leisure apparel (aka "lifestyle" or "athleisure").  As a result, the Company's apparel sales began to slow, causing it to lose market share to Nike and Adidas.

10.     Faced with declining demand and excess inventory due to unsold products, the Company abandoned its fundamental sales philosophy of competing on brand strength over price.  Instead, the Company resorted to lowering sales prices and offering promotions, and had to

- 3 -

liquidate excess inventory at steep discounts.  This, in turn, contributed to a drop in the Company's average sales prices (ASPs) at a time when competitors in the sports apparel industry, such as the Company's chief rival Nike, were steadily increasing average sales prices.

11.     To preserve the Company's carefully cultivated image as a fast-growing, cutting-edge sports brand and a legitimate challenger to Nike, Defendants concealed these problems during the Class Period.  Rather than explain to the market that "brand heat" for the Company's apparel was dying, Defendants falsely claimed that apparel was stronger than ever.  Defendants trumpeted explosive growth and strong customer demand, while downplaying and concealing the Company's ballooning inventory, liquidations, and gross margin compression.  And, despite these negative trends afflicting the Company's core business, Defendants doubled down on their fraud on April 21, 2016 by *raising* guidance for 2016 net revenues and operating income.

12.     Defendants also attempted to offset the demise of the Company's core apparel business by accelerating investments in lower margin footwear products and international expansion.  This expensive strategy temporarily propped up revenue growth and provided a scapegoat for the Company's margin declines.

13.     As a result, Under Armour's securities prices were artificially inflated throughout the Class Period.  Plank personally cashed in on such artificial inflation by selling shares of his Company stock for total proceeds of $138.2 million during the Class Period.  These sales were suspiciously timed, with a large portion of them ($38.3 million) occurring shortly after the Company raised guidance on April 21, 2016.  Defendants also leveraged their fraud by raising nearly $600 million from the sale of then-investment grade Bonds.

14.     On January 10, 2016, Morgan Stanley published a report questioning the Company's growth, average sales prices, market share, and margins.  In response to this report,

Under Armour's stock declined sharply, which represented the beginning of a decline in Under Armour securities prices as the truth about Defendants' fraud began to emerge. However, Defendants downplayed the report and reassured investors that the Company's financial results and prospects were as strong as ever.

15.     Despite this pushback, the market continued to learn of Under Armour's true financial condition through a series of disclosures, including a dramatic slowdown in growth, compressed margins, excess inventory, and Company executive resignations including the Chief Financial Officer ("CFO"), Defendant Molloy, after only 13 months on the job. The market's reaction to these revelations caused Under Armour's securities prices to drop precipitously, a downgrade of Under Armour's Bonds to junk status, and losses of millions of dollars by Under Armour's investors.

16.     The Company's downward spiral continued after the Class Period, confirming the depth of the problems alleged herein. During the first half of 2017, Under Armour continued to report drastically reduced sales growth, lower margins, and excess inventory. Recently, the Company slashed its annual revenue guidance and announced a massive restructuring in an attempt to restore the Company's "brand heat," including an evolution from Under Armour's traditional performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."

## III.    JURISDICTION AND VENUE

17.     The Securities Act claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, and rules promulgated thereunder by the SEC.

18.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of

the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the

SEC, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331 and 1337, and Section 22 of the Securities Act, 15 U.S.C. §77v, and/or Section 27

of the Exchange Act, 15 U.S.C. §78aa.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 22

of the Securities Act, and/or Section 27 of the Exchange Act, because Under Armour conducts

substantial business in this District, and many of the acts and practices complained of herein

occurred in substantial part in this District.

21.     In connection with the challenged conduct, Defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including, without limitation, the United

States mails, interstate telephone communications, and the facilities of the national securities

markets.

## IV.     VIOLATIONS OF THE SECURITIES ACT

22.     The claims addressed in this section (Counts I and II, below) are brought pursuant

to Sections 11 and 15 of the Securities Act.  Count I is brought against all Securities Act

Defendants and Count II is brought against Plank, Molloy, and the Director Defendants (defined in

Section IV.A.2.b., below).  These claims are, in effect, a separate complaint.  In the allegations and

claims set forth herein, Bucks County asserts strict liability claims pursuant to the Securities Act

on behalf of itself and the Securities Act Class (defined in ¶63 below).  Bucks County's claims are

not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any of

the Defendants.  Bucks County's claims do not, and are not intended to, allege fraud or sound in

fraud, and Bucks County specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A.      The Securities Act Parties

#### 1.      The Securities Act Plaintiff

23.      As shown on the certification attached hereto as **Exhibit A**, Bucks County purchased 710,000 Notes pursuant and/or traceable to the Registration Statement in connection with Under Armour's Bond offering on June 8, 2016 ("Offering").   Bucks County suffered economic losses when true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the price of such Notes.

#### 2.      The Securities Act Defendants

##### a.      Corporate and Individual Defendants

24.      Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230.

25.      Defendant Plank is the founder of Under Armour and served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through present.   Plank was also the Company's largest shareholder throughout the Class Period, beneficially owning approximately 15% of all shares outstanding and controlling approximately 65% of the voting shares.

26.      Defendant Molloy served as the Company's CFO from January 2016 until he resigned as CFO effective February 3, 2017.   Molloy left the Company in February 2017 shortly after his CFO resignation took effect.

27.      Plank and Molloy participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Registration Statement and the prospectus set forth in the Registration Statement, as supplemented by Forms 424B5 and

FWP filed with the SEC on June 8, 2016 and Form 424B2 filed with the SEC on June 9, 2016 (collectively, "Offering Materials").   Plank and Molloy signed the Registration Statement, ensuring the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### b. Director Defendants

28.     Byron K. Adams, Jr. served on Under Armour's Board of Directors from September 2003 to June 2017.  Adams also served as the Company's Chief Performance Officer from October 2011 to October 2014.

29.     George W. Bodenheimer has served on Under Armour's Board of Directors from August 2014 to the present.   Bodenheimer also serves on the Company's Compensation Committee.

30.     Douglas E. Coltharp has served on Under Armour's Board of Directors from December 2004 to the present.   Coltharp also serves as Chair of the Company's Finance Committee and as a member of the Company's Audit Committee.

31.     Anthony W. Deering has served on Under Armour's Board of Directors from August 2008 to the present.   Deering also serves on the Company's Audit, Finance, and Compensation Committees.

32.     Karen W. Katz has served on Under Armour's Board of Directors from October 2014 to the present.  Katz also serves on the Company's Finance and Corporate Governance Committees.

33.     A.B. Krongard has served on Under Armour's Board of Directors from July 2005 to the present.  Krongard also serves as Chair of the Company's Audit Committee

34.     William R. McDermott has served on Under Armour's Board of Directors from August 2005 to the present.   McDermott also serves as Chair of the Company's Corporate Governance Committee.

35.     Eric T. Olson has served on Under Armour's Board of Directors from July 2012 to the present.   Olson also serves on the Company's Compensation Committee.

36.     Harvey L. Sanders has served on Under Armour's Board of Directors from November 2004 to the present.   Sanders also serves as Chair of the Company's Compensation Committee.

37.     The Defendants named in ¶¶28-36 are collectively referred to herein as the "Director Defendants."

38.     The Director Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Materials. Each Director Defendant signed the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### c.     Underwriter Defendants

39.     J.P. Morgan Securities LLC ("J.P. Morgan") is an investment bank located in New York, New York that offers securities brokerage, wealth management, and investment advisory services.  J.P. Morgan acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

40.     Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a diversified wealth management and financial services firm located in New York, New York that provides securities brokerage and investment advisory services.   Merrill Lynch acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

41.     Wells Fargo Securities, LLC ("Wells Fargo") is an investment bank located in Charlotte, North Carolina that offers a wide range of services, including financial advisory, mergers and acquisitions, loan syndication, and market analysis services.  Wells Fargo acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

42.     HSBC Securities (USA) Inc. ("HSBC") is an investment bank located in New York, New York that provides, among other services, strategic and financial advisory, mergers and acquisitions, and capital raising services.  HSBC acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

43.     PNC Capital Markets, LLC ("PNC") is an investment bank located in Pittsburgh, Pennsylvania that offers a host of services, including bonds, foreign exchange, and derivative trading services.  PNC acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

44.     BB&T Capital Markets, a division of BB&T Securities, LLC ("BB&T"), is an investment bank located in Richmond, Virginia that focuses on providing middle-market firms with business, initial public offering ("IPO"), and financial advisory services.  BB&T acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

45.     SunTrust Robinson Humphrey, Inc. ("SunTrust") is a full service investment bank located in Atlanta, Georgia that offers an array of services, including recapitalization, debt and equity capital raising, IPO, and valuation advisory services.  SunTrust acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

46.     Citigroup Global Markets Inc. ("Citigroup") is an investment bank located in New York, New York that offers equity and debt financing, asset transaction, private equity, underwriting, institutional sales and trading, and mergers and acquisitions advisory services.

Citigroup acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

47.     Goldman Sachs & Co. LLC ("Goldman") is an investment bank located in New York, New York that provides securities brokerage, underwriting, and investment consulting services.  Goldman acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

48.     Regions Securities LLC ("Regions") is an investment bank located in Birmingham, Alabama that offers business and financial advisory services.  Regions acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

49.     SMBC Nikko Securities America, Inc. ("SMBC") is a securities brokerage and investment firm located in New York, New York that offers underwriting, brokerage, financial, and business advisory services to global institutional clients.  SMBC acted as an underwriter of Under Armour's Offering, helping to draft and disseminate the Offering Materials.

50.     The Defendants named in ¶¶39-49 are collectively referred to herein as the "Underwriter Defendants."

51.     The Underwriter Defendants participated in the drafting and dissemination of the Offering Materials and collectively received discounts and commissions of approximately $6,438,000 in connection with the Offering.  The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Materials were prepared properly, accurately, and free from misstatements or omissions of material fact.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**B.       Under Armour Conducts the Offering**

52.      Under Armour filed the Registration Statement with the SEC on June 6, 2016, which the SEC declared effective on the same date.  The Registration Statement was signed by Plank, Molloy, and the Director Defendants.  Pursuant to the Registration Statement and other Offering Materials, the Company completed the Offering on June 8, 2016, issuing Notes to Securities Act Class members in the aggregate principal amount of $600 million.

**C.       The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts**

53.      The Offering Materials incorporated by reference publicly filed Under Armour documents containing false and misleading statements and omissions of material fact.  One such document was the Company's Form 10-K reporting financial results for the fourth quarter 2015 ("4Q15") and fiscal year 2015 ("FY15"),[1] which was filed with the SEC on February 22, 2016. The Form 10-K falsely and misleadingly stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

54.      The Offering Materials also incorporated by reference the Company's Form 10-Q, reporting financial results for the first quarter of 2016 ("1Q16"), which was filed with the SEC on April 29, 2016.  The Form 10-Q falsely and misleadingly stated that:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf."

---

[1]    Under Armour's fiscal year follows the calendar year, beginning on January 1 and ending on December 31 of each year.

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy, which we expect to continue during the first half of 2016 on a more limited basis."

55. The statements of fact set forth in ¶¶53-54 above were materially false and misleading and omitted material facts for the following reasons:

(a) Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100). This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b) The Securities Act Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's apparel growth remained strong and consistent with historical trends, stating that net revenue growth was driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace" and that the Company was benefitting from an increase in sales being driven by apparel sales. In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶53-54).

(c) The decrease in gross margin percentage was not primarily driven by "our changing inventory management strategy." Rather, gross margin decreases were primarily driven by increased discounting and promotions and lower sales prices (*see* ¶¶99-103, 106-112).

56. In addition, the opinion statement in the Company's Form 10-Q for 1Q16, set forth in ¶54 above, that inventory liquidations were expected to continue on "a more limited basis" during the first half of 2016, had no reasonable basis and was materially false and misleading

because the Securities Act Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory was increasing as a result of slowing sales and demand due to continuing declines in the apparel business, requiring increasing inventory liquidations in 2016 (*see* ¶¶106-112).

57.     On January 31, 2017, the Company surprised investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in ¶¶252-267 below.  The following day, February 1, 2017, S&P Global Ratings ("S&P") downgraded the Bonds to junk status (from BB+ to BBB-) in reaction to the Company's surprising revelations, while Moody's Investors Service ("Moody's") changed Under Armour's rating outlook from stable to negative.

58.     The Company's Bond price fell sharply in response to this news.  The Bonds closed at $94.08 on January 30, 2017 and dropped 1.68% ($1.58 per Note) in a single trading day, closing at $92.50 on January 31, 2017.  The Bonds continued to fall an additional 3.24% ($3.00 per Note) the following trading day (when the Bonds' ratings were downgraded in reaction to the news), closing at $89.50 on February 1, 2017, representing a total decline of 4.87% ($4.58 per Note) over this two-day period.

59.     The Bond price slid further on August 1, 2017 when, as detailed in ¶¶277-283 below, the Company revealed slow North American growth, reduced its 2017 guidance, and a massive restructuring.  The Bonds fell from a close of $93.24 on July 31, 2017 to a close of $92.00 on August 1, 2017 ($1.24 per Note), a decline of 1.33%.

60.     The timing and magnitude of this decline negate any inference that the losses suffered by Bucks County were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Securities Act Defendants' conduct.

**D.     The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503**

61.     The Offering Materials failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made the Offering speculative or risky to investors was the fact that, at the time of the Offering, the Company's apparel business was in severe decline, resulting in reduced revenue and operating income growth, excess inventory, lower average sales prices, increased discounting and promotions, and compressed margins.

62.     Nowhere within the Offering Materials did Under Armour disclose to investors that, as of the date of the Offering, this material known trend was occurring, resulting in a host of financial problems. Accordingly, disclosure of this material fact was required under Item 503.

**E.     Class Action Allegations for Securities Claims**

63.     Bucks County brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 11 and 15 of the Securities Act, and rules promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired the Notes pursuant or traceable to the Registration Statement ("Securities Act Class"). Excluded from the Securities Act Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

64.     Members of the Securities Act Class are so numerous that joinder of all members is impracticable.  The Company has numerous holders of outstanding Notes, which represent an aggregate principal amount of $600 million.  While the exact number of Securities Act Class members can only be determined by appropriate discovery, Bucks County believes that Securities Act Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

65.     Bucks County's claims are typical of the claims of the members of the Securities Act Class because Bucks County and all of the Securities Act Class members sustained damages arising out of the Securities Act Defendants' wrongful conduct complained of herein.

66.     Bucks County will fairly and adequately protect the interests of the Securities Act Class members and have retained counsel experienced and competent in class actions and securities litigation.  Bucks County has no interests that are contrary to, or in conflict with, the members of the Securities Act Class that Bucks County seeks to represent.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Securities Act Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Securities Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Questions of law and fact common to the members of the Securities Act Class predominate over any questions that may affect only individual members in that the Securities Act Defendants have acted on grounds generally applicable to the entire Securities Act Class.  Among the questions of law and fact common to the Securities Act Class are:

     (a)     whether the Securities Act Defendants violated the federal securities laws as alleged herein;

     (b)     whether the Offering Materials contained or incorporated material misrepresentations;

     (c)     whether the Securities Act Defendants failed to convey material facts in the Offering Materials or to correct material facts previously disseminated;

     (d)     whether the prices of the Notes were artificially inflated due to the material nondisclosures and/or misrepresentations contained or incorporated in the Offering Materials; and

     (e)     whether the members of the Securities Act Class have sustained damages as a result of the decline in value of the Notes when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL OF THE SECURITIES ACT DEFENDANTS

69.     Bucks County repeats and realleges the allegations set forth in ¶¶23-68 above as though fully set forth herein.

70.     This Count is brought pursuant to Section 11 of the Securities Act on behalf of the Securities Act Class against all of the Securities Act Defendants.

71.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

72.     The Securities Act Defendants are strictly liable to Bucks County and the other members of the Securities Act Class for the misstatements and omissions.

73.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

74.    By reason of the conduct herein alleged, the Securities Act Defendants each violated, and/or controlled a person who violated, Section 11 of the Securities Act.

75.    Bucks County acquired Notes traceable to the Offering.

76.    Bucks County and the other members of the Securities Act Class have sustained damages.  The value of Notes has declined substantially subsequent to and due to the violations of the Securities Act Defendants.

77.    At the time of their purchases of Notes, Bucks County and the other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time Bucks County discovered or reasonably could have discovered the facts upon which this Complaint is based to the time Bucks County commenced this action.  Fewer than three years has elapsed between the time the Notes upon which this Count is brought were offered to the public and the time Bucks County commenced this action.

## COUNT II

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### AGAINST PLANK, MOLLOY, AND THE DIRECTOR DEFENDANTS

78.    Bucks County repeats and realleges the allegations set forth in ¶¶23-68 above as though fully set forth herein.

79.    This Count is brought pursuant to Section 15 of the Securities Act against Plank, Molloy, and the Director Defendants.

80.     Plank, Molloy, and the Director Defendants each were control persons of Under Armour by virtue of their positions as directors and/or senior officers of Under Armour.  Plank, Molloy, and the Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders and Bond holders of Under Armour.

81.     Plank, Molloy, and the Director Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## V.     VIOLATIONS OF THE EXCHANGE ACT

82.     The claims addressed in this section (Counts III and IV, below) are brought against the Exchange Act Defendants as defined below, pursuant to Sections 10(b) and/or 20(a) of the Exchange Act, for making materially false and misleading statements and omissions with actual knowledge of, or severely reckless disregard for, their false and misleading nature.  Count III is brought against all of the Exchange Act Defendants and Count IV is brought against Plank, Dickerson, and Molloy (collectively, "Individual Defendants").  This section sets forth allegations specific to these Exchange Act claims.

### A.     The Exchange Act Parties

#### 1.     The Exchange Act Plaintiffs

83.     Plaintiff Aberdeen was appointed to serve as Lead Plaintiff in this action by Order of this Court dated April 26, 2017.  Dkt. No. 13.  As shown in the certification filed with the Court on April 11, 2017 [Dkt. No. 6-3] and attached hereto as **Exhibit B**, Aberdeen purchased or

otherwise acquired 495,441 shares of Class A Common Stock and 128,037 shares of Class C

Common Stock of Under Armour[2] at artificially inflated prices during the Class Period.

84.     As shown in the certification attached hereto as **Exhibit A**, Plaintiff Bucks County

purchased or otherwise acquired 3,220 shares of Class A Common Stock and 2,046.4232 shares of

Class C Common Stock of Under Armour at artificially inflated prices during the Class Period.

85.     Plaintiffs suffered economic losses when true facts about the Company's financial

condition were disclosed and the artificial inflation was removed from the prices of such securities.

### 2.     Corporate and Individual Defendants

86.     Defendant Under Armour is a Maryland corporation with its principal place of

business located at 1020 Hull Street, Baltimore, Maryland 21230.

87.     Defendant Plank is the founder of Under Armour and served as CEO and Chairman

of the Board throughout the Class Period, holding these positions from the Company's formation

in 1996 through present.  As CEO, Plank spoke on Under Armour's behalf during conference calls,

in press releases, and in the media.  Plank was also the Company's largest shareholder throughout

the Class Period, beneficially owning approximately 15% of all shares outstanding and controlling

approximately 65% of the voting shares.

88.     Defendant Dickerson served as the Company's CFO and Chief Operating Officer

("COO") during part of the Class Period, holding these positions from 2008 and early 2015,

respectively, until he resigned from both positions in early 2016.  Dickerson left the Company

---

[2]    The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common stock outstanding and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

shortly after his resignation as CFO and COO took effect, in February 2016. As CFO and COO, Dickerson spoke on Under Armour's behalf during conference calls.

89.     Defendant Molloy served as the Company's CFO during part of the Class Period, holding the position from January 2016 until he resigned as CFO effective February 3, 2017. Molloy left the Company in February 2017 shortly after his CFO resignation took effect. As CFO, Molloy spoke on Under Armour's behalf during conference calls.

**B.     Substantive Allegations**

**1.     Background of the Company**

90.     In 1996, Under Armour was founded by Plank, a 23-year-old former University of Maryland football player, who engineered a t-shirt using a synthetic fabric, with moisture-wicking performance fibers that helped keep athletes cool and dry under hot conditions. The Company specializes in highly technical, performance-oriented athletic apparel, such as ColdGear, HeatGear, and AllSeasonGear styles designed to enhance comfort and mobility and regulate body temperature in different types of weather. Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

91.     Over the years, the Company's product lineup has expanded from a single shirt to myriad Under Armour branded athletic products in three categories: apparel, footwear, and accessories. However, apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in fiscal year 2016 ("FY16"). While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016. Thus, North American apparel sales are critical to the Company's success. As Plank admitted at the end of the Class Period, on January 31, 2017: "North American apparel is still our largest and most

profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

92.     Nearly two-thirds of the Company's sales (65% in 2016) are wholesale sales to national and regional sporting goods chains (*e.g.*, The Sports Authority, Inc. ("Sports Authority"), Dick's, Foot Locker, Champs), independent and specialty retailers, department store chains, institutional athletic departments, and sports leagues and teams.  Under Amour also owns and operates its own retail locations (called "Brand House" and "Factory House" stores[3]) and retail websites that exclusively sell Under Armour products, which are collectively referred to as the "direct-to-consumer" (DTC) channel, accounting for 31% of the Company's sales in 2016.

93.     Under Armour has many competitors, including athletic brands such as Nike, Adidas, Reebok, lululemon, Columbia, New Balance, Brooks, and Puma.  However, the Company steadily gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.  By fall of 2014, Under Armour had become the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on number one – Nike.

## 2.     Plank Drove Under Armour's Aggressive Growth Strategy

94.     Since Under Armour's inception in 1996, and even after it went public in 2005, Plank has called the shots, always controlling a majority of stockholder votes and serving as CEO and Chairman of the Board.  In this "founder-led" approach, Plank has set the destination and the route.

---

[3]    At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America.  Brand House stores showcase Under Armour's latest products.  Factory House stores, primarily located in outlet centers, sell excess or undesirable inventory at reduced prices.

95.     Plank relished the Company's image as a scrappy, fast-rising upstart from Baltimore.  He implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.  In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

96.     Within Under Armour, instructions for determining growth forecasts were very simple:  take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with the 20% growth streak drove the Company's revenue-growth-at-all-costs strategy.  For Plank and Under Armour, the overriding objective was growth.

97.     Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Class Period.  For 26 consecutive quarters (over six years) spanning from 2Q10 to 3Q16, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year-over-year basis).  Plank never missed an opportunity to remind investors of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer. We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means. And frankly, we have no expectation of that stopping anytime soon

### 3.     Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined

98.     However, despite many years of successful growth, it was apparent that the Company's product styles had grown stale and its "brand heat" (*i.e.*, customer demand) was dying down by the start of the Class Period in September 2015.  The Company failed to offer new and updated products in line with the latest consumer trends.  One such trend involved athletic leisure

apparel (aka "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Class Period. Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores. Many of the Company's competitors, particularly Nike and Adidas, cashed in on this trend by expanding their product lines to include athletic leisure apparel. However, Under Armour failed to offer its own line of athletic leisure apparel until late in the Class Period. Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts. While, historically, these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors, and were not as interested in buying them again. This enabled competitors to capture critical sales volume and market share from Under Armour, and enhance their brand values at the expense of Under Armour.

99.     Declining demand for Under Armour apparel caused progressively worse financial problems at the Company. This was particularly damaging because apparel provided the majority of the Company's sales (67% of net revenue in 2016) and were critical to meeting the Company's aggressive financial projections. According to retail data, the Company's apparel sales began slowing around spring of 2015, causing the Company to lose market share to rivals like Nike and Adidas.[4] Attempting to cover up these declines and provide the illusion of financial health, the Company abandoned its fundamental sales philosophy of competing on brand strength, rather than price. Instead, the Company resorted to lowering sales prices, including discounts and

---

[4]     *See* Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016), at 1, 4-6 ("Morgan Stanley Report"). The Morgan Stanley Report is attached hereto as **Exhibit C** and incorporated by reference herein. As discussed in ¶176 below, Defendants publicly downplayed and discredited this report and falsely reassured investors that the Company's sales growth was as strong as ever.

promotions.[5]  This resulted in rapidly decelerating average sales prices of the Company's apparel, causing decreased product margins.  This trend compared unfavorably with the sports apparel industry, and particularly with the Company's chief rival, Nike, which were experiencing steadily **increasing** average sales prices.[6]

100.  One notable example of this trend involved Under Armour's "big logo hoodie" – a performance-oriented hooded fleece sweatshirt with a big Under Armour logo on the chest.  This was a top seller and huge business volume driver for years and, as a result, Under Armour consistently carried a large inventory in many different colors.  However, as brand heat was dying, sales for this product began to decline significantly.  As a result, the Company decided – for the first time ever – to run sales of the hoodie during Black Friday of 2015 (November 27, 2015).  The Company offered the hoodie for as much as 25% off at numerous stores, including Dick's, Sports Authority, and Macy's.

101.  The Company's sales declines opened the promotional floodgates, as Under Armour began to run more and more promotions in 2015 and 2016.  For example, in addition to the big-logo hoodie, Under Armour began to sell other staples of its apparel lineup like polo shirts and training t-shirts for 25% off in 2015 and 2016.  Like the big-logo hoodie, these products historically drove large sales volume at premium prices and, unlike any prior time, had to be put on sale during the Class Period because of dying demand for the Company's brand.

102.  To incentivize retailers to order certain merchandise, the Company used a buyback program under which sales representatives would guarantee that Under Armour would buy back a certain amount of the merchandise that did not sell.  On the books, the Company's customers

---

[5]  *See id.* at 1, 4-5.

[6]  *See id.* at 4-5.

bought and owned the merchandise for three or four months, but after six months Under Armour was forced to buy back some of the unsold merchandise.

103.    For a while, the heavy discounts, promotions, lower sales prices, and buyback arrangements helped the Company continue to report strong revenue growth, meeting Plank's aggressive 20% growth projections.  But this manufactured price-driven growth came at the expense of lower product margins that damaged the Company's bottom line, and a loss of the Company's "premium" brand image.

104.    Compounding the Company's declining apparel demand, the Company was also experiencing a monumental downturn in its primary sales channel, North American wholesale. Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (*e.g.*, Target, Wal-Mart).  This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into the sales of, apparel sold at traditional sporting goods stores.

105.    This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period. Most significantly, on February 9, 2016, CNN reported that one of Under Armour's largest retail customers, Sports Authority, faced bankruptcy after missing a $20 million debt payment. Ultimately, Sports Authority filed for Chapter 11 bankruptcy protection on March 2, 2016 and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering 463 stores.

Other key Under Armour retailers were also forced to file bankruptcy and close.  On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  The loss of several of Under Armour's major North American retailers further pressured the Company's struggling sales.

### 4. Declining Apparel Sales Led to Excess Inventory and Liquidations

106.   Diminishing demand for, and declining sales of, core Under Armour products resulted in excess inventory.  In order to shed the excess inventory, the Company needed to take costly measures to liquidate it, at extreme discounts that hurt product margins, and, in turn, the Company's gross margins.  This problem occurred at both the Company's own Brand House stores and at the stores of its retail customers.  Excess inventory was a constant problem throughout the Class Period at the Company's Brand House stores, including products from every category, including apparel.

107.   At one point during the Class Period, for example, Under Armour's planning team bought a very large quantity of one of the Company's t-shirts, around 10,000 units, to be sold at Under Armour's top two Brand House stores, which were supposed to be the pinnacle of the Under Armour product experience.  However, only about 100 units of the t-shirt were actually sold, and the rest became excess inventory.  This excess inventory had to be sent to Under Armour's Factory House stores and other accounts to be liquidated at a discount.  This happened many times with different products throughout the Class Period, and was very common with men's apparel.

108.    Sometimes only about 30% of the inventory at the Company's Brand House stores was considered "productive," meaning only 30% was actually sold to consumers.  The remaining inventory was comprised of "presentation quantity" (inventory allowing the stores to present one or two units of each size on display) or excess inventory that had to be transferred back to Under Armour's distribution houses.

109.    The distribution houses would send the excess inventory to the Company's Factory House stores (*i.e.*, outlet stores) or to liquidation channels like Marshalls and T.J. Maxx, where the products were sold at a discount.  The discount rates at the liquidation channels were the highest, providing the Company with very low product margins.  Sometimes Under Armour was simply trying to make its money back on products sent to the liquidation channels.  In addition to reducing margins (due to the discounted sales prices), distributions to the Factory House stores and liquidation channels resulted in higher expenses due to the extra shipping, processing, and labor costs required to transfer the excess inventory.

110.    Excess inventory was also a problem at the Company's retail customers such as Sports Authority and Dick's.  Facing dwindling sales and ballooning inventory, the Company's merchandising team would collaborate with the sales teams and give suggestions about promotions for the inventory that Under Armour needed to move.  Retailers would also make requests for promotions to rid themselves of the excess inventory, and the Company would then determine whether to allow such promotions.

111.    As with the inventory returned from Brand House stores, discussed above, the Company would attempt to sell the excess inventory returned from retail customers at discounted prices through liquidation channels such as discount stores like Marshalls and T.J. Maxx.  As a last resort, the Company would ship productions to be liquidated at Costco stores in Mexico.

However, much of the excess inventory just sat around at the Company, not being sold through any channel, because the liquidation channels used by the Company were not enough to handle all of the excess.

112.    The excess inventory was a frequent topic of discussion among sales leaders at the Company, and information on inventory was widely available at the Company.   Indeed, as discussed in Sections V.C.-D. below, Plank, Dickerson, and Molloy each admitted to the excess inventory in their public statements.  However, they misleadingly blamed the rising inventory on benign factors, including a strategic plan to improve the speed of shipments to customers, and reassured investors that the situation was improving.  In reality, this was untrue, as the excess inventory was caused by the Company's dying brand heat, which reduced customer demand and caused the sales declines discussed above.

### 5.    Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines

113.    As a result of the Company's declining apparel sales, exacerbated by the collapse of the Company's primary sales channel, Defendants perceived a threat to the Company's carefully cultivated market perception as a fast-growing superstar of the sports brand business.   To compensate, Defendants aggressively expanded their footwear and international sales businesses.  However, as Defendants admitted, these businesses provided much lower margins than the Company's core North American apparel business, and a much smaller percentage of revenue (shoes accounted for only 21% of revenue in 2016).  Moreover, the Company needed to make massive expenditures of time and money in order to undertake such expansion.

114.    An example of the difficulty of this expansion was the rollout of Under Armour's "Curry One" shoe worn by star NBA basketball player Stephen Curry.  Under Armour heavily promoted this shoe.  However, Under Armour was essentially paying to have the shoe placed in

stores because the associated expenses were so high and margins were so poor. The Company's "Curry Two" shoe faced similar problems. The shoes were badly underpriced in an apparent attempt to boost revenue and capture market share from Nike, at the risk of damaging Under Armour's brand image. Under Armour also slashed their prices on running shoes in an attempt to compete on price rather than brand image and innovation.

115.     The Company's international and footwear expansion, along with the lowering of apparel prices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) deep into the Class Period, even as the Company's core apparel and North American businesses were faltering. Defendants used the footwear and international businesses as scapegoats for the Company's declining gross margins (*see* ¶¶149, 155, 174, 213, 245). At the same time, Defendants misleadingly claimed the Company's footwear and international margins and ASPs were improving and its *apparel* margins and ASPs remained strong (*see* ¶¶156, 177). These misleading statements allowed Defendants to conceal the fact that margin compression was caused, not only by the growing footwear and international businesses, but also by declines in the Company's apparel business, driven by lower sales prices, rampant promotions and discounting, and excess inventory. It was far more palatable for Defendants to blame margin compression on the Company's supposedly expanding footwear and international businesses than to reveal the truth about the declines in its core apparel segment, which accounted for most of the Company's sales.

### 6.     The Company's Stock Price Declined When the Market Learned the Truth About the Company's Sales Problems

116.     The Company's problems were ultimately revealed in a series of partial disclosures that caused the Company's securities prices to gradually decline, as detailed in Sections V.D.-F.

- 30 -

below.  The declines would have been swifter and steeper, but Defendants attempted to downplay and soften the news with continued misrepresentations and omissions throughout the Class Period.

117.    First, on January 10, 2016, Morgan Stanley issued a detailed report with point-of-sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales prices, and market share.  This surprising news, which directly contradicted Defendants' carefully cultivated image of the Company, caused Under Armour securities prices to fall.

118.    On the heels of this report and the departure of CFO Dickerson in February 2016, the Company's Chief Merchandising Officer ("CMO"), Henry Stafford ("Stafford"), suspiciously departed the Company in May 2016.  Stafford's departure coincided with the departure of another high-level executive, the Company's Chief Digital Officer ("CDO") Robin Thurston ("Thurston"), which was announced on the same day.  These abrupt and suspicious departures of these key executives caused securities prices to decline again on May 4, 2016.

119.    On June 1, 2016, contrary to prior assurances, Defendants revealed a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional securities price declines.

120.    Over the next fourteen months, a series of increasingly poor quarterly financial results and reduced financial projections caused further declines in the Company's securities prices after such news was released.  On July 26, 2016, Defendants reported second quarter decreases in operating and net income and a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast the slowest quarterly growth in over six years.  On October 25, 2016, Defendants revealed a further slowdown in growth in the third quarter, attributed to North American apparel and wholesale declines, and compressed margins attributed in part to higher

discounts, promotions, and liquidations.  On January 31, 2017, Defendants revealed a slowdown in 2016 growth that was far more severe than previously reported and dramatically reduced financial projections, attributed to problems in the North American apparel business, as well as compressed margins and inventory growth.  On the same day, Defendants surprised investors by revealing the sudden and highly suspicious departure of Molloy.  Finally, on August 1, 2017, the Company cut 2017 guidance and announced a massive restructuring to "evolve" the Company's business and restore "brand heat," including a shift from traditional performance-oriented products to more fashionable products.

121.    Under Armour investors lost millions of dollars as a result of these revelations, which caused the artificial inflation resulting from Defendants' fraud to dissipate from the Company's securities.

### 7.    Numerous Facts Support Defendants' Knowledge of the Company's Undisclosed Sales Problems

122.    Defendants knew of, or at a minimum were severely reckless in disregarding, the problems facing the Company as a result of declines in the apparel business.  This is supported by numerous additional indicia of Defendants' knowledge, including Defendants' own statements, the importance of apparel as the core business of the Company, and Defendants' close involvement with those businesses.

123.    Each of the Individual Defendants (Plank, Dickerson, and Molloy) made numerous public statements in which he discussed the Company's apparel sales growth, sales prices, gross margins, and inventory levels.  In fact, the Individual Defendants provided prepared statements on, and were asked and answered detailed questions about, at least one of those matters during every quarterly earnings call with securities analysts throughout the Class Period, as well as the 2015

Investor Day.[7]  The Individual Defendants echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period.[8]  These statements evidenced the Individual Defendants' personal knowledge of such matters.

124.    The Individual Defendants also stated that they had systems in place to closely monitor such aspects of the Company's business.  For example, Plank boasted of an SAP (Systems Applications Products) software system that provided point-of-sale information and other detailed business data.  The Company was in the process of enhancing this system during the Class Period. As Plank stated during the 4Q15 earnings call on January 28, 2016:

> The single view of the consumer is something we're building with the team at SAP that combines **global point-of-sale, e-commerce and transactional information** through a single sign-on capability together with our Connected Fitness business to create an insight engine that will inform and guide our decision to help grow and scale our brand.  This will build on our existing SAP platform as we double down and continue to make big bets with big partners.  We believe that this unique technological advancement will position UA as a best-in-class real-time digital enterprise.

125.    This statement by Plank confirms that, through "point-of-sale" information available on the Company's SAP system, the Individual Defendants had actual knowledge of sales data from the Company's retailers.  The SportScan data detailed in the Morgan Stanley Report, attached hereto as **Exhibit C**, was based on the same point-of-sale data from the Company's retailers.  The data showed that, since spring of 2015, the Company's North American apparel growth was in decline, the Company was losing market share, and the Company's sales prices

---

[7]    *See* ¶¶145-150, 155-158, 173-178, 180, 190-193, 214-215, 219-224, 237-238, 255-256.

[8]    *See* ¶¶53-54, 154, 160, 172, 179, 186, 188-189, 195, 205, 209, 212-213, 236, 241-246, 248, 252-253.

were dropping.[9]  Thus, the Individual Defendants had knowledge of (or recklessly disregarded) the same financial declines reported by Morgan Stanley.

126.    Plank's and Dickerson's knowledge of the SportScan data reported by Morgan Stanley is further supported by the fact that they discussed and responded to the Morgan Stanley Report at length during the Company's 4Q15 earnings call on January 28, 2016, as detailed in ¶176 below.  While both of them tried to downplay and discredit the report, and reassure the market of the Company's financial strength as to each of the business segments addressed in the report, these statements were simply motivated to keep the Company's stock price afloat, and ultimately proved false and misleading later in the Class Period, when Defendants revealed the same problems reported by Morgan Stanley.[10]

127.    In addition, Plank stated during the 1Q16 call on April 21, 2016 that "probably the thing that drives [North American distribution] for us more than anything else is just merchandising. . . . And now we've really gotten to a point where understanding that merchandising needs to be a core competency for us. . . . And so we really – we identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in 2014, we began building the [merchandising] team in 2015."  Through these merchandising efforts, the Individual Defendants had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel).  In addition, Plank's statement indicated that the Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

---

[9]    *See* Morgan Stanley Report at 1, 4-6.

[10]    *See* ¶¶212, 236-238, 252-253, 255-258, 261-263, 271-272, 277-280; *see also, e.g.*, ¶¶270, 274-275 (analysts corroborating trends observed in the Morgan Stanley Report).

128.    The Company's inventory also received the Individual Defendants' close attention during the Class Period.  As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

> On the working capital front, ***the majority of our focus is going to be on inventory management and the efficiency of inventory management***. Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.
>
> First, on the near term -- over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates. This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.
>
> Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory. These initiatives are focused on how we plan and deliver our seasonal products.

129.    Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

> ***Today, we have inventory data in multiple retail, planning, transportation, and distribution systems***. In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is extremely powerful. In fact, very few organizations have been able to achieve this goal.

130.    One system through which inventory data was available to Defendants was the SAP system discussed by Plank in the statement quoted above.  The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation channels), and how much inventory was being sent to liquidation.  The SAP system provided inventory information for all Under Armour products sold to consumers.  Based on this data, the Individual Defendants, who were intently focused on inventory, had actual knowledge of,

or recklessly disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.

131.    The Individual Defendants' knowledge is further supported by the fact that the problems described herein involved the Company's most important product:  apparel.  The Company's SEC filings make this clear, stating that net revenues are primarily from apparel sales (67% in 2016).  Plank acknowledged this on January 28, 2016, stating, "[A] majority of our business 70% plus of our business is still in Apparel.  So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators."  Similarly, on January 31, 2017, Plank stated, "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

132.    Moreover, as Defendants' fraud was gradually revealed to the market, two of the three Individual Defendants and other key executives resigned during the Class Period.  In just over a one-year period, two successive CFOs (Dickerson and Molloy), CMO (Stafford), and CDO (Thurston) were all gone from the Company.  Molloy's abrupt departure came only 13 months after he had joined the Company, replacing Dickerson.  These sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that the Individual Defendants knew of the fraud detailed herein.

133.    The Individual Defendants' scienter is also shown because of the close temporal proximity between Defendants' false statements and material omissions and the revelation of the truth.  For example, during the Company's October 25, 2016 earnings call, Defendants repeated positive statements about the Company's growth, while reporting quarterly net revenue growth of 22% in 3Q16, projecting approximately 20% net revenue growth in the fourth quarter of 2016

("4Q16"), and reiterating FY16 guidance with respect to both net revenue and operating income growth.  During the same call, Defendants stated that "we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward" and the Company was "in really good shape from an inventory perspective."  Yet, just a few months later, on January 31, 2017, Defendants reported dramatically reduced revenue and operating income growth and increased promotions, discounts, and inventory growth, which were cited as primary causes of the Company's margin compression.

### 8. Defendants Were Motivated to Maintain a Positive Market Perception of the Company and the Company's Artificially Inflated Stock Value

134.    For years, Defendants had carefully cultivated a public perception of the Company as an up-and-coming, fast-growing challenger to Nike's position as the number one sportswear brand.  Defendants were highly motivated to maintain this public perception and, in turn, the Company's lofty, artificially inflated securities prices.

135.    Plank stood to gain most from the Company's artificially inflated share prices.  He was the Company's largest shareholder throughout the Class Period, owning approximately 15% of the Company's total common stock outstanding.  Since 2008, Plank has taken a nominal annual salary of $26,000, deriving most of his income from Under Armour stock-based compensation, including incentives connected to the Company's financial performance, the subject of the fraud alleged herein.  As of April 18, 2016, Plank beneficially owned 135,020 shares of Class A Common Stock, 34,450,000 shares of Class B Common Stock (which were not publicly traded but convertible to Class A Common Stock), and 34,585,020 shares of Class C Common Stock.  With such a massive equity stake in the Company, Plank was highly motivated to keep the share prices artificially inflated.

136.    Plank profited handsomely from the artificial inflation by selling a massive number of Under Armour shares during the Class Period.  Specifically, over nine days in November 2015 and April 2016, Plank sold a total of 2,025,000 Under Armour shares for over $138.2 million. With all of Plank's shares coming from stock grants at no cost to him, that $138.2 million was 100% profit.

137.    The portion of Plank's sales that occurred in April 2016 ($38.3 million) was particularly suspicious.  On March 2, 2016, one of Under Armour's biggest customers, Sports Authority, announced it was filing for bankruptcy.  On April 16, 2016, Sport Chalet, another of Under Armour's wholesale customers, announced it was going out of business.  Despite those announcements, during the April 21, 2016 conference call to discuss 1Q16 results, Defendants raised 2016 guidance and made a series of other false and misleading statements and omissions regarding the Company's purportedly strong financial condition and growth prospects, as alleged herein, causing Under Armour stock to continue to trade at artificially inflated prices.

138.    A few days later, on April 26, 2016, Sports Authority declared that rather than restructure and continue to operate in some capacity, as it had previously planned to do, it would liquidate.  That very same day, Plank sold 225,000 shares for nearly $10 million in profit.  In total, between April 26 and April 29, Plank unloaded 908,570 shares for $38.3 million in profit.

139.    The financial press took note of Plank's "amazing" timing.  A February 7, 2017, article on TheStreet.com titled, "Under Armour Founder Kevin Plank Has Been Amazing at Predicting Recent Stock Crashes," noted that "it shouldn't come as a shock that Plank's recent stock trades were a good indicator on the company's surprising new challenges, and Wall Street's subsequent brutal response."  With regard to Plank's April 2016 sales, the article stated:

> The sales were well-timed.  Just six months later, Under Armour's red-hot growth came to a screeching halt in the third quarter amid a fresh wave of department store

closures and the bankruptcy of The Sports Authority. . . . Under Armour's lackluster third quarter along with a major long-term profit warning sent shares plunging by over 20% on Oct[ober] 25[, 2016].

140.     Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016 through August 1, 2017. Significantly, Plank stopped selling shares altogether after April 2016, demonstrating that his sales were timed to capitalize on the Company's artificial stock price inflation, before the truth about the Company was revealed.  As the truth leaked out, and the artificial inflation was removed from the stock, Plank no longer had the same motivation to sell.

141.     Plank and Molloy were also motivated to misrepresent and conceal the Company's true financial condition in order to conduct the Bond Offering on June 8, 2016.  The Company immediately benefited from the Offering, receiving $593.6 million in total net proceeds.  The Offering terms would have been far less favorable to the Company had the market known the truth about the Company's ailing financial condition.  The Bonds likely would have received a junk rating – which the Bonds ultimately received as a result of Defendants' revelations on January 31, 2017 – requiring that they be marketed at a higher interest rate than 3.250%.  In that case, the Offering probably would have made no financial sense, particularly since Defendants intended to use the Bond proceeds to repay outstanding debt under its revolving credit facility.  These facts were well known to Plank and Molloy, serving as additional motive to misrepresent and conceal the Company's true financial condition, keeping the Bonds above junk status.

C.     **Defendants' False and Misleading Statements and Omissions**

142.     Throughout the Class Period, Defendants repeatedly made positive statements and aggressive projections about the Company's purportedly strong growth, sales, and pricing, while downplaying issues related to margins, inventory, and retailer bankruptcies.  However, these statements and projections did not provide a full picture of the true circumstances at Under

Armour.  In reality, the Company's primary product category, apparel, suffered from reduced customer appeal and demand, which hurt the Company's revenue and operating income growth, created excess inventory, forced the Company to drop sales prices, and compressed the Company's margins.

143.    When Defendants elected to make such positive statements and projections, they were under a duty to disclose the additional negative information about the Company and its products that would have made such statements and projections not misleading.  Specifically, they were under a duty to disclose the Company's slower revenue and operating income growth, lower ASPs, increased discounting and promotions, elevated inventory, and compressed margins attributable to the Company's apparel issues during the Class Period.  This information was material because it would have altered the total mix of information made available to reasonable investors.  However, Defendants failed to reveal this information, and, instead, omitted and concealed it from investors.  In addition, many of Defendants' statements about sales, demand, market share, pricing, inventory, and margins were explicitly and materially false and misleading in themselves.  Defendants' material omissions and false and misleading statements are detailed in this section.

### 1.    2015 Investor Day

144.    The Class Period begins on September 16, 2015.  On that day, the Company held its 2015 Investor Day.  Plank and Dickerson, along with other members of Under Armour's senior management, gave presentations on behalf of the Company.

145.    Throughout the meeting, Plank, Dickerson, and other senior executives repeatedly emphasized the Company's continuing growth and demand.  Plank stated that "[t]he demand for our brand has never been stronger."  Dickerson added that "[a]pparel, our largest category, continues to grow over 20% approaching a $5 billion business, doubling the size of the business

since 2014." With respect to women's products, in particular, Vice President of the Women's Division, Kelly Cortina, added, "Demand for our product is growing."

146.   Another Company representative (Susie McCabe, Under Armour's Senior Vice President of Global Retail) made clear that despite its ultra-aggressive growth targets, Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

147.   Defendants aggressively projected that these trends would continue. In their opening remarks, Plank and Dickerson announced bold projections of $7.5 billion revenue in 2018 and $800 million operating income by 2018. These figures represented dramatic increases over the Company's expected performance in 2015 ($3.84 billion in revenue and $405 to $408 million in operating income).

148.   In addition, Plank, Dickerson, and other senior executives made the following projections of continued 20-plus% revenue growth, accelerated apparel growth, and a doubling of the North American business by 2018:

- **Plank**: "we have no expectation of [20-plus% revenue growth] stopping anytime soon."

- **Stafford**: "we see our businesses in . . . apparel . . . set to accelerate, not just grow, but accelerate growth, over the course of the next three years. With apparel approaching $5 billion . . . there is significant runway."

- **Matt Mirchin, President, North America**: "We will more than double our [North American] business by 2018 -- from 2014 through 2018 at a 21% CAGR. Our biggest business is going to more than double through 2014 through 2018. Let me take a step back, let me slowdown and repeat that. Our biggest business will more than double from 2014 to 2018."

- **Dickerson**: "Within North America, as Matt [Mirchin] stated before we continue to expect a 20% plus CAGR and more than double our revenue from just under $2.8 billion in 2014 to almost $6 million in 2018."

149.   Separately, Dickerson stated that margins would be constrained by the Company's growing international and footwear businesses, but failed to disclose that the Company's apparel business – its largest and most important business – was also compressing margins, as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

150.   Regarding inventory, Dickerson misleadingly stated that planned initiatives (rather than slowing apparel sales) would cause elevated inventory growth rates through 2015 and 2016 for the purpose of "flow[ing] product earlier" and "delivering our products to our consumers more timely, specifically on key seasonal floor set dates."

151.   Analysts reacted positively to Defendants' statements made at Under Armour's 2015 Investor Day.  For example:

(a)   in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating and stated, "UA continues to be our #1 pick for long-term growth investors";

(b)   on September 16, 2015, KeyBanc Capital Markets issued a report stating "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and investments should continue to support >20% top-line growth over the next few years.  We think UA's impressive growth demonstrates the power of strong brands.";

(c)   on September 17, 2015, Cowen and Company issued a report raising its estimates and increasing its price target to $120 from $112, stating, "[m]anagement's revenue targets could ultimately be conservative given the acceleration in investments"; and

(d)   on September 17, 2015, BB&T Capital Markets issued a report raising its price target to $115 and commenting, "we came away from UA's Investor Day enthusiastic about the brand's trajectory."

152.    Statements of fact made by Defendants on September 16, 2015, as set forth in ¶¶145-146 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100). This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that apparel growth was continuing and that demand for the Company's products "has never been stronger" (*see* ¶145).

(c)    The Company was not "protect[ing] the band" through controlled use of off-price distribution and refraining from "chas[ing] easy profits"; rather, the Company was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth projections, in an attempt to combat the core apparel declines, which compressed margins (*see* ¶¶99-103).

153.    In addition, opinion statements made by Defendants on September 16, 2015, as set forth in ¶¶147-150 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)    Defendants' aggressive projections of growth in revenue, operating income, and market share were misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in

severe decline, and therefore the continued growth projected by Defendants could not be achieved (*see* ¶¶98-100).

(b)   Defendants' projection of flat gross margins, constrained only by the Company's growing international and footwear businesses, was misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that margins were also being constrained by increasing discounts and promotions and falling ASPs due to continuing declines in the apparel business, and therefore the level of gross margins projected by Defendants could not be achieved (*see* ¶¶99-103).

(c)   Defendants' projection of increased inventory growth, caused only by "flow[ing] product earlier" and "delivering our products to our consumers more timely, specifically on key seasonal floor set date," was misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory was also increasing as a result of slowing sales and demand due to continuing declines in the apparel business (*see* ¶¶106-112).

## 2.   3Q15 Financial Results

154.   On October 22, 2015, the Company issued a press release announcing its financial results for 3Q15.  In the press release, Plank boasted that:  "Our scoreboard in the third quarter not only marked our 22nd straight quarter of at least 20% net revenue growth, but also our first $1 billion quarter."

155.   On the same day, the Company held a conference call to discuss the 3Q15 results. Plank and Dickerson participated in the call on behalf of the Company.  Dickerson admitted that margins had contracted, and a similar decline was expected in 4Q15, but misleadingly blamed such contraction on relatively benign factors including the strength of the U.S. dollar, exchange rates,

and the emerging footwear business (which carried lower margins), rather than declining sales of

apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins.

156.    Dickerson was asked for additional detail on the Company's margin contraction

during the question-and-answer session with analysts, and made clear that margins in the apparel

business were not to blame, and were actually improving:

> **Omar Saad, Evercore ISI**:  [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera. But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that. Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?

> **Dickerson**:  That's really probably more on our core apparel business. Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, most of our core apparel product margins are improving. That's helping offset some of the other pressures we talked about.

> **Saad**:  Is that more generating scale in the business on the cost side? Are you taking price strategically, or is it mixed to more premium products? Maybe just expand a little bit more?

> **Dickerson**:  Yes, it's a little bit across the board. . . .  But, again, you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so that's where we're seeing it right now.

157.    Defendants also continued their aggressive projections in the press release and

during the conference call on October 22, 2015.  Defendants raised the Company's FY15 outlook

for net revenues (27% growth, to approximately $3.91 billion) and operating income (15% growth,

to approximately $408 million).  Dickerson provided a preliminary outlook for 2016 with respect

to net revenue growth (approximately 25%) and operating income growth (approximately 23%), in

line with the Company's bold projections at the 2015 Investor Day.  Plank also reiterated that

"[w]e are confident that the building blocks to reach our Investor Day target of $7.5 billion in net

revenues by 2018 are firmly in place."

158.    Separately, Dickerson admitted that the Company anticipated elevated inventory over the next few quarters, but failed to attribute this to the Company's slowing apparel sales. Instead, he misleadingly blamed this on a strategic plan to flow product to customers in a timelier manner, and stated that inventory "should start to normalize a little bit as we work through 2016 . . . . So, as you start working through Q1 and Q2 of 2016, you should start to normalize that and get back more in line with revenue growth."

159.    Analysts reacted positively to Defendants' statements on October 22, 2015 regarding Under Armour's strong 3Q15 financial results.  For example:

(a)    in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results;

(b)    also on October 22, 2015, SunTrust maintained its "Buy" rating and commented that Under Armour showed "[s]trength across categories" and its guidance should prove "conservative"; and

(c)    on October 23, 2015, Telsey Advisory Group issued a report maintaining its "Outperform" rating and saying the results "marked another solid beat and raise quarter" for Under Armour.

160.    On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15, which were also discussed in the Company's press release and during its earnings call on October 22, 2015.  The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

161.    Plank and Dickerson each signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating, in relevant part:

1.  I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*       *       *

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

162.   Statements of fact made by Defendants on October 22 and November 4, 2015, as set forth in ¶¶154-156 above, were materially false and misleading and omitted material facts for the following reasons:

(a)   Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100).  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶¶154-156).

(c)     The Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline.  Rather, they were narrowing due to increasing Company discounts and promotions and falling ASPs of the Company's products (*see* ¶¶99-103).

(d)     The Company's inventory increases were not "primarily due to earlier purchases to better service consumer demand for our peak season" or "delivering our products to our consumers more timely," but, rather, were due to declining sales of apparel (*see* ¶¶98-100, 106-112).

(e)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(f)     The Company's Form 10-Q for 3Q15 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the materially adverse conditions described in this paragraph.

163.    In addition, opinion statements made by Defendants on October 22 and November 4, 2015, as set forth in ¶¶157-158 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)     Defendants' aggressive projections of growth in revenue and operating income were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in severe

decline, and therefore the continued growth projected by Defendants could not be achieved (*see* ¶¶98-100).

(b)     Defendants' projection that gross margin declines would continue to be offset by North American products throughout the remainder of 2015 was misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that North American products were also being constrained by increasing discounts and promotions and falling ASPs due to continuing declines in the Company's apparel sales demand (*see* ¶¶99-103).

(c)     Defendants' projection that growing inventory "should start to normalize a little bit as we work through 2016" was misleading because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory was also increasing as a result of continuing declines in the Company's apparel sales demand (*see* ¶¶98-100, 106-112).

### D.     Investors Begin to Learn the Truth but Defendants Continue to Mislead the Market

164.     Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins. The Company's problems were ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's securities prices. The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the state of the Company's financial condition. By continuing to mislead the market in this manner, Defendants kept the Company's securities prices artificially inflated throughout the remainder of the Class Period. This section details the partial revelations of truth regarding Defendants' fraud, the resulting Under Armour securities price declines, and Defendants'

continued misrepresentations and omissions that kept the Company's securities prices artificially inflated even as the truth began to leak out.

### 1. Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour

165.   On Sunday, January 10, 2016, Morgan Stanley issued a report downgrading the Company, reducing its sales and earnings per share ("EPS") growth forecasts for the Company, and significantly reducing its price target for the Company's stock from $103 to $62 per share.[11] Citing retail data, the report explained that the Company's North American apparel business was slowing, leading to market share and average sales price declines:

> Data indicates near-term earnings uncertainty is more than just weather: Recent SportScan data shows [Under Armour] is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace. Both trends are more pronounced in women's apparel, despite major marketing investment in this division last year. Though warm weather surely explains some of this, we think [Under Armour] may be reaching maturity in US apparel faster than previously thought. Though we remain constructive on [Under Armour]'s int'l opportunity, we don't think the shares are priced for a US slowdown.[12]

166.   According to the report, the declines were occurring since at least spring of 2015 (prior to the Class Period):

> Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests [Under Armour] is losing apparel market share (Exhibit 5). Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single-digit growth this year. This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs (Exhibit 6).[13]

167.   In particular, the report concluded that the Company's sales of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth, falling ASPs, and market

---

[11]   *See* Morgan Stanley Report at 1.

[12]   *See id.*

[13]   *See id.* at 4.

share losses cited above have been more pronounced in women's apparel.  Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share loss in women's has been larger and happening for 5 months, while Nike continues to take share (Exhibit 7)."[14]  This was "concerning because Under Armour invested nearly $15M in a major marketing campaign in 2014 targeted toward women. . . . To continue its growth story, [Under Armour] must excel in women's apparel."[15]

168.    The report also raised concerns about Under Armour's potential distribution deal with Kohl's, a mid-tier department store that ran frequent promotions.  "Entering Kohl's would seem like Under Armour is risking some of its brand equity to find growth. . . . [and] would imply there may not be as much growth in these other channels as previously thought."[16]

169.    In addition to the apparel problems, the report noted that "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . . [Under Armour] has always competed on brand image and innovation, rarely on price.  This change in trend is a major concern because this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."[17]  The report also noted that, with respect to the Company's Curry Two basketball shoes, Under Armour appeared to be

---

[14]   *See id.* at 6.

[15]   *See id.*

[16]   *See id.* at 7.

[17]   *See id.* at 1.

- 51 -

"trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."[18]

170.    In response to the Morgan Stanley Report, the Company's Class A Common Stock price fell sharply.  After closing at $37.50 per share[19] on Friday, January 8, 2016, the stock closed at $34.98 per share on Monday, January 11, 2016 (the first trading day after the report was issued), a decline of 6.72% ($2.52 per share), on unusually high trading volume of over 29 million shares.

171.    In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example:

(a)    on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS";

(b)    in a report dated January 25, 2016, Cowen and Company lowered its estimates and reduced its price target to $95 from $110; and

(c)    on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that product discounting was "likely worse than expected."

### 2.    Misleadingly Positive 4Q15 and FY15 Financial Results and Downplay of the Morgan Stanley Report

172.    On January 28, 2016, Defendants issued a press release announcing the Company's 4Q15 and FY15 financial results.  Plank stated: "Our core business remains incredibly strong and our 31% net revenue growth in the fourth quarter is clear evidence of the continued expansion in

---

[18]    *See id.* at 10.

[19]    The prices of Class A Common Stock on or before April 7, 2016 referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

the breadth and depth of our Brand.  We delivered our 25th consecutive quarter of more than 20%

net revenues growth in our largest product category of apparel . . . ."

173.    On the same day, Defendants held a conference call with analysts to discuss the

Company's financial results.  Plank, Dickerson, and Molloy participated in the call on behalf of the

Company.  In his opening remarks, Plank continued to boast of the Company's explosive growth,

particularly with respect to the apparel business:  "In the fourth quarter, Apparel growth of 22%

show cases that our brand has products for all seasons and temperatures."

174.    Plank also discussed declining margins and increasing inventory, but pinned the

blame on relatively benign and short-term factors (faster growing but lower margin footwear and

international business, the strength of the U.S. dollar, and higher freight expenses) rather than

declines in the Company's apparel business.

175.    Similarly, Dickerson tied excess inventory and liquidations to a designed strategy to

deliver products to customers earlier, as well as recent weather trends, rather than any sales

problems caused by the declining apparel business:

> This growth is largely a result of our strategy to focus on delivering our products to
> our consumers in a more timely manner and thus drive higher fill rates. . . . In
> addition, the recent weather trends have led to some excess inventory creation, which
> we will continue to work through across our normal liquidation channels during the
> first half of 2016.

176.    Following Dickerson's opening remarks, an analyst questioned Defendants about

the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP

reductions, as detailed in ¶¶165-169 above and in **Exhibit C** attached hereto.  Dickerson

downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data), claiming the data

was too focused on the Company's large accounts like Dick's and Foot Locker.  In response to the

same question, Dickerson and Plank also reassured investors that, notwithstanding such data,

apparel growth was robust and the Company was still on track to meet Defendants' ultra-aggressive growth projections:

> **Matthew J. McClintock, Barclays**:  My question is, Kevin, there seems to be a lot of debate in the marketplace on several of your strategies, and you kind of hit upon some of this in your prepared remarks. But in particular, the competitive positioning of both your Footwear and your Women's business, and then also the potential maturity of the domestic business. I was just wondering if you can give us your updated thoughts on those topics?  Have there been any strategic changes that we should be thinking about?  Thanks.

> **Dickerson**:  . . . . So utilizing that [SportScan] data as a proxy for our success, especially in the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%. So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular.

> **Plank**:  . . . . And in the fourth quarter with 31% growth and frankly marking our 23rd consecutive quarter of 20% plus top line revenue growth, our growth story is strong, we remain a growth company, and none of that is wavered.

> *       *       *

> Our brand, our presence, our ability to drive ASPs have never been stronger in North America.

> *       *       *

> In the third quarter in North America, we grew 25%. In the fourth quarter in North America, we grew 26%. I don't know if I'd call that accelerating, but I'd certainly call it strong.

> *       *       *

> So to be clear about North America, we still see abundant opportunities across the continent. And as we said at our Investor Day in September, we believe that we will double this business by 2018.

177.    Defendants were asked specifically about ASPs of apparel and gross margins, and Plank and Dickerson responded as follows:

> **Omar Saad, Evercore ISI**:   You kept mentioning premiumization, I think specifically to Footwear. Can you just dig a little bit deeper there, and then talk about does this translate over to Apparel at some point, we sort of see ASPs going up there? And then Brad, maybe you could comment on premiumization, maybe how it

might flow-through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag and what are the really underlying gross margins going to do over time? Thanks.

**Plank**:  So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel. So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators.

\*      \*      \*

As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . . We continue to drive and demonstrate that premium position in the marketplace.

**Dickerson**:  And we were able to offset a lot of that [gross margin increase] just through our general increase and improvement in product margins, specifically on the Apparel side.

So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins.

So I think in all aspects of our business, you will see that improve over time. . . . And our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak.

178.    Plank later added that "we do see the ability to continue to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

179.    The Company's earnings release on January 28, 2016 also claimed that the Company's FY16 financial targets continued to be in line with the aggressive financial targets Defendants provided at the Company's 2015 Investor Day:  net revenues of approximately $4.95 billion (25% growth over FY15) and operating income of approximately $503 million (23% growth over FY15).

180.    During the subsequent conference call, Plank projected that "we continue to expect inventory growth rates to be slightly elevated above revenue growth rates, in the front half of 2016, with growth rates expected to level off and be in line with revenue growth in the back half of

2016," which was misleadingly blamed on a strategy to focus on delivering products to customers in a more timely manner, rather than apparel sales declines.

181.    Analysts reacted positively to Defendants' statements on January 28, 2016 regarding Under Armour's strong 4Q15 and FY15 financial results.  For example:

(a)    in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders";

(b)    on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness; and

(c)    also on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73.

182.    On February 22, 2016, the Company filed with the SEC a Form 10-K reporting financial results for 4Q15 and FY15, which were also discussed in the Company's press release and earnings call on January 28, 2016.  The Form 10-K stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

183.    The Company's Form 10-K also contained SOX certifications by Plank and Molloy that were materially similar to those identified above in ¶161.

184.    Statements of fact made by Defendants on January 28 and February 22, 2016, as set forth in ¶¶172-180, 182-183 above, were materially false and misleading and omitted material facts for the following reasons:

- 56 -

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100).  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)      Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶¶172-180, 182-183).

(c)      Plank's assertion that the Company's ability "to drive ASPs have never been stronger in North America" was false because the Company's ASPs were falling sharply in North America as Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices (*see* ¶¶98-115, 125).

(d)      Defendants' attempts to downplay the January 10, 2016 Morgan Stanley Report were false and misleading, as the Company was, in fact, experiencing lower apparel sales growth, increasing ASPs, and a loss of market share (*see* ¶¶98-115, 125).

(e)      The Company's inventory growth was not "largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates" or simply due to "recent weather trends have led to some excess inventory creation."  Rather, it was a symptom of reduced sales and market share due to the Company's declining apparel business (*see* ¶¶106-112).

(f)      Defendants were not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more

fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(g)     The Company was not "able to offset a lot of [margin compression] just through our general increase and improvement in product margins, specifically on the Apparel side" and improvement in apparel margins was not "happening right now as we speak." Rather, apparel margins were deteriorating as a result of reduced ASPs, discounting, and promotions as Defendants' scrambled to maintain lofty growth projections in the face of declines in the Company's apparel business (*see* ¶¶98-115, 125).

(h)     The Company's Form 10-K for FY15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

185.    In addition, opinion statements made by Defendants on January 28 and February 22, 2016, as set forth in ¶¶176-178, 180 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)     Defendants' aggressive projections of growth in revenue and operating income, including the projection "we will double this business by 2018" (with net revenues of approximately $4.95 billion and operating income of approximately $503 million in 2018), were misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in severe decline, and, therefore, the continued growth projected by Defendants could not be achieved (*see* ¶¶98-115, 122-131).

(b)     Defendants' projection that the Company would improve apparel and footwear product margins in 2016 and beyond was misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that such products

- 58 -

were also being constrained by increasing discounts and promotions and falling ASPs due to continuing declines in the apparel business (*see* ¶¶98-115, 122-131).

(c)     Defendants' projections that inventory would only be "slightly elevated" in the first half of 2016, caused only by a strategy to deliver inventory to customers in a more timely manner and temporary factors such as the weather, and that inventory was expected to "level off and be in line with revenue growth in the back half of 2016" were misleading and had no reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory was also increasing as a result of slowing apparel demand (*see* ¶¶106-112, 122-131).

### 3.     Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy

186.     On March 4, 2016, the Company issued a press release confirming its previously released net revenue and operating income projections for 2016, notwithstanding the bankruptcy of Sports Authority, one of Under Armour's largest retail customers, filed on March 2, 2016.  The press release stated that the Company planned to offset the impact of the bankruptcy on the Company's full year 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

187.     Opinion statements made by Defendants on March 4, 2016, as set forth in ¶186 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)     Defendants' net revenue and operating income projections for 2016 were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing severe declines in the Company's apparel business, rendering such projections unreasonable (*see* ¶¶122-131).

(b)     Defendants' projection that the Company would offset the impact of the Sports Authority bankruptcy through continued sales to Sports Authority and sales through other channels and customers was misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing severe declines in the Company's apparel business, rendering such projection unreasonable (*see* ¶¶122-131).

### 4.     Misleadingly Positive 1Q16 Financial Results and Guidance Raise

188.     On April 21, 2016, Defendants issued a press release announcing the Company's 1Q16 financial results.  In the release, Plank continued his exceedingly positive messaging:  "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies."

189.     Plank was similarly optimistic as to Under Armour's future growth.  Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company *raised* its outlook for FY16 net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

190.     The Company conducted a conference call the same day, April 21, 2016, to discuss its 1Q16 financial results.  Plank and Molloy participated in the call on behalf of the Company.  During the question-and-answer session, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand:

**Camilo Lyon, Canaccord Genuity**:  Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel. There's a lot of moving parts and

some of your bigger customers have been shutting doors, some of the tertiary players are going away. Can you talk about the health of that channel and what that could lead to from the channel expansion opportunities and how do you think about segmentation, but within that strategy?

**Plank**:  I mean, posting 30% growth in a quarter where one of our largest customers, one of our top two or three customers just a few years ago, filed for bankruptcy. I think putting that kind of number up is something that just continues to demonstrate the strength of the brand, and how strong our portfolio ultimately is.

We do believe that there is still an underlying very strong wholesale market out there and we expect to continue to be iconic, to be a destination.

*       *       *

So . . . our growth is effectively coming from everywhere.  And North America is something that we feel incredibly strong about . . . .

191.    In response to a separate question, Plank emphasized that "[a]nd again, we are to be clear, driving massive growth, and we are taking share."  Later in the call, Plank projected that "[t]his year, we expect every quarter to top $1 billion in revenues based on our updated outlook of $5 billion U.S., an important milestone for our brand."

192.    During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to inventory, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  As to gross margins, Molloy blamed "higher liquidations to clear through excess inventory and foreign currency exchange rates," but stated that product margins were favorable (offsetting the overall gross margin declines), rather than disclosing that apparel product margins were declining as a result of reduced customer demand, prompting lower sales prices, discounting, and promotions.  Molloy projected flat gross margins for FY16.

193.    In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned and expected to "creep away" during 2016:

**Camilo Lyon, Canaccord Genuity**: If you could just disaggregate the composition of inventory between planned inventory increases and any sort of excesses that you have given the liquidations they had during the quarter? And coupled with the expectations for flat gross margins in Q2. So if you could just help us understand, it seems like we're shifting more towards that planned increase, if I'm reading that correctly, but just any detail there would be great?

**Molloy**: Majority of the growth is planned.  But we did have slightly excess . . . . But we are working through that. . . . So it'll start to creep away as we go through the year.  So we're working through it, but the majority of it is planned.

194.    Analysts reacted positively to Defendants' statements on April 21, 2016 regarding Under Armour's strong 1Q16 financial results and bright outlook for the remainder of 2016.  For example:

(a)    in a report dated April 21, 2016, Deutsche Bank Market Research raised its price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but so did gross & operating margins and EPS" and also noted that the Company's management "reiterated that inventories would normalize in 2Q";

(b)    on April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is experiencing across categories, channels, and geographies, and moreover should allay concerns around its growth outlook and opportunities"; and

(c)    also on April 22, 2016, Telsey Advisory Group issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

195.    On April 29, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 1Q16, which were also discussed in the Company's press release and during its earnings call on April 21, 2016.  The Form 10-Q stated that:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf"

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy, which we expect to continue during the first half of 2016 on a more limited basis"

196.    The Company's Form 10-Q also contained SOX certifications by Plank and Molloy that were materially similar to those identified above in ¶161.

197.    Statements of fact made by Defendants on April 21 and April 29, 2016, as set forth in ¶¶127, 137, 188-193, 195-196 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100). This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, stating that net revenue growth was driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace" and that an increase in sales was being driven by apparel sales. In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(c)     The decrease in gross margin percentage was not primarily driven by "our changing inventory management strategy."  Rather, gross margin decreases were primarily driven by increased discounting and promotions and lower sales prices (*see* ¶¶98-115, 125).

(d)     The Company was not "driving massive growth, and . . . taking share." Rather, growth and market share were falling as a result of the Company's apparel sales declines (*see* ¶¶98-115, 125).

(e)     The Company's rising inventory was not merely a result of "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and the majority of the inventory growth was not part of a strategic plan.  Rather, it was largely attributable to declining apparel sales, which led to excess inventory (*see* ¶¶106-112).

(f)     The Company's gross margin declines were not caused by strategically planned inventory increases and offset by "favorable product margins."  Rather, product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, and liquidations due to lower consumer demand for the Company's apparel (*see* ¶¶98-115, 125).

(g)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(h)     The Company's Form 10-Q for 1Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

198.    In addition, opinion statements made by Defendants on April 21 and April 29, 2016, as set forth in ¶¶191-192, 195 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)    Defendants' "updated outlook of $5 billion U.S., an important milestone for our brand" lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing severe declines in its apparel and North American wholesale businesses, rendering such projections unreasonable (*see* ¶¶98-115, 122-133).

(b)    Defendants' projections of flat gross margins for the remainder of the year, and excess inventory that would be worked off as the year progressed, were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that gross margins were being compressed by lower ASPs, discounting, and promotions, and excess inventory levels were rising, rendering such projections unreasonable (*see* ¶¶98-115, 122-131).

(c)    Defendants' statement that inventory liquidations were expected to continue on "a more limited basis" during the first half of 2016 had no reasonable basis and was materially false and misleading because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory was increasing as a result of slowing sales and demand due to continuing declines in the apparel business, requiring increasing inventory liquidations in 2016 (*see* ¶¶106-112, 122-131).

### 5.    Departures of the Company's Chief Merchandising Officer and Chief Digital Officer

199.    After the market closed on May 3, 2016, the Company surprised investors by filing a Form 8-K with the SEC announcing the departures of two key executives, CMO Stafford and CDO Thurston, both of whom spoke glowingly about the Company's financial results and outlook

at the Company's 2015 Investor Day.  The Company provided no reason for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming on the heels of former CFO Dickerson's departure and Morgan Stanley's downgrade and exposure of problems affecting the Company's revenue and operating income growth, gross margins, and market share, and the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

200.    As a result of this news, the price of Under Armour's Class A Common Stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the stock dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

201.    The Company's Class C Common Stock, which was issued to Class A Common Stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

202.    The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

203.    Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example:

(a)    in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent";

(b)    on May 4, 2016, Brean Capital, LLC lowered its rating to "Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations; and

(c)    also on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

204.    Defendants' statements of fact regarding the Stafford and Thurston departures on May 3, 2016, as set forth in ¶199 above, were materially misleading because they failed to disclose problems at the Company that contributed to such departures, namely the declines in the Company's apparel business resulting from lower customer demand.

**6.    Reduced Financial Guidance Tied to the Sports Authority Bankruptcy**

205.    On May 31, 2016, the Company issued a press release titled, "Under Armour Updates 2016 Outlook," which lowered the Company's 2016 financial guidance, after Defendants had provided strong reassurances as to the Company's financial health and raised 2016 financial guidance just a month earlier.  The Company's updated projection included:  (a) FY16 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY16 operating income in a range of $440 million to $445 million (down from the previously

projected $503 million to $507 million).  The Company also announced an impairment charge of $23 million and FY16 revenues of $43 million from Sports Authority (instead of the originally planned $163 million) "given the recent decision of the bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business."

206.    As a result of this announcement, the Company's stock fell from $37.73 at the close of trading on May 31, 2016 to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.

207.    Similarly, the Company's Class C Common Stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

208.    In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to the bankruptcy.  For example:

(a)    on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35;

(b)    on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)";

(c)    also on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target from $43 to $35, citing the Company's $23M impairment charge in 2Q16

and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million; and

(d)    On June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range from $38-$42 to $34-$38.

209.    The stock declines on June 1, 2016 would have been larger had Defendants revealed the full truth to investors regarding the Company's financial problems.  However, Plank continued to mislead the market in the May 31, 2016 press release, stating that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."  This statement was materially false and misleading and omitted material facts because growth in and demand for the Company's apparel business were in decline, not increasing (*see* ¶¶98-115, 125).  In addition, the projection that the Company "expects 2016 net revenues of approximately $4.925 billion, representing growth of 24% over 2015, and 2016 operating income of approximately $440 million to $445 million" was materially false and misleading and had no reasonable basis because Defendants omitted known, or recklessly disregarded, material facts regarding the Company's declining apparel sales, which showed that such projections could not be achieved (*see id.*).

### 7.    Bond Offering Materials

210.    On June 6, 2016, Under Armour filed the Registration Statement with the SEC in connection with the Bond Offering.  Additional Offering Materials were filed by the Company on June 8 and June 9, 2016.

211.    The Offering Materials incorporated by reference the Company's Form 10-K for 4Q15 and FY15 and Form 10-Q for 1Q16, which contained the false and misleading statements and omissions of material fact detailed in ¶¶53-55 above.

### 8.   Disappointing 2Q16 Financial Results:  Partial Revelations of a Growth Slowdown

212.    On July 26, 2016, just three months after raising guidance, the Company issued a press release announcing disappointing 2Q16 financial results.  The Company reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

213.    The Company also reported 2Q16 gross margin of 47.7%, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  Earnings were only $0.01 per share, $0.03 lower than the year-ago quarter.

214.    On the same day, Under Armour hosted a conference call to discuss its 2Q16 financial results.  In his opening remarks, Molloy added that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

215.    During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY16.  Molloy stated that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . . It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

216.    Separately, the Company forecast 3Q16 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

217.    On this news, the Company's Class A Common Stock fell from a close of $43.59 per share on July 25, 2016 to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares. The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares per day, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

218.    The Company's Class C Common Stock also fell on this news, dropping from $38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6 million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1 million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

219.    The stock declines would have been larger had the Company revealed the full truth to investors.  But Defendants continued to mislead investors and downplayed the negative news. The Company reported revenue growth of 28% (its 25th consecutive quarter of 20%+ net revenue growth).  Plank stated in his opening earnings call remarks on July 26, 2016 that "[o]ur second quarter results are strong evidence that demand for Under Armour has never been higher."

220.    Echoing this message, in his opening earnings call comments, Molloy emphasized "the consistent growth across our diverse product lines and channels [that] delivered another quarter of strong results," including growth in apparel revenues.

221.    During the question-and-answer session that followed, an analyst inquired about "athletic inventory in the channel today" and whether Plank was comfortable with the promotional

backdrop.  Plank admitted to a high level of promotion as well as a shifting retail environment, but misleadingly stated that the level of promotion was the same as in prior years, and that the Company's core base of apparel would continue to grow, notwithstanding shifting fashion trends such as athletic leisure:

> **Matthew Robert Boss, JPMorgan**:  Kevin, can you talk about athletic inventory in the channel today? It sounds like inventory for you guys will be in line with sales by the end of this quarter. Nike expects to be clean by August. I guess are you comfortable with the promotional backdrop you see out there today? And then larger picture, what would you say to those calling for a top in the athletic cycle out there?

> **Plank**:  Yeah, I'm not going to say I'm comfortable with the promotion out there in the market today, but I don't know if that's different than what we've seen in the last several years either.

> I think there's a shift happening. I think the way the people are dressing is changing, and it's altering. And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend.

> But the good news is that we're not grounded in trend, we're grounded in sport. That'll keep us here, and the trends will come and go. But we're also watching our core base continue to grow for us as well.

222.    Defendants also reiterated the Company's FY16 net revenue outlook of $4.925 billion (24% growth) and operating income outlook of $440 to $445 million (8-9% growth). Molloy stated that "[b]ased on our current visibility, we continue to expect 2016 net revenues of approximately $4.925 billion, representing growth of 24% . . . . [F]or the third quarter, we expect revenues to grow approximately 20% as we begin to lap our strategies to better service our customers and as we navigate the impact of the Sports Authority liquidation."

223.    Later in the call, Plank was asked about how the slowdown in growth would impact projections going forward.  Plank reassured analysts that the brand remained strong and explosive revenue growth would continue:  "[W]e're 25 quarters north of 20% in a row.  Over six years of

doing that, we see that trend continuing for us, number one.  We do continue to see it to project 25% plus growth for the full year."

224.    In response to an analyst question, Molloy also indicated that the gross margin inflection was temporary ("we will see notable improvements in the actual product margins in Q4"), and gave the misleading impression that it was caused by the footwear and international businesses, rather than any margin compression associated with apparel.

225.    Despite Defendants' continued false and misleading statements, a number of analysts reacted negatively to Defendants' statements on July 26, 2016 regarding Under Armour's 2Q16 financial results and declining average sales prices.  For example:

(a)    on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target to $40 from $47; and

(b)    on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "Sales are growing solidly, but ASPs are fading.  UA competes on brand image and innovation, rarely on price.  This trend change is a concern because it suggests a fundamental shift in the UA story."

226.    On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16, which were also discussed in the Company's press release and during its earnings call on July 26, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

227.    The Company's Form 10-Q also contained SOX certifications by Plank and Molloy that were materially similar to those identified above in ¶161.

228.    Statements of fact made by Defendants on July 26 and August 3, 2016, as set forth in ¶¶212-216, 219-224, 226-227 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100).  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶¶216, 219-223).

(c)    The statement that "demand for Under Armour has never been higher" was false and misleading because customer demand for the Company's apparel products, which accounted for the majority of sales, was suffering and in decline (*see* ¶¶98-105).

(d)    The Company was not experiencing consistent growth across all product lines and channels.  Rather, growth was slowing due to the declining apparel business (*see* ¶¶98-105).

(e)    The Company's promotions were growing and were not the same as "the last several years," as Plank misleadingly implied; rather, they were much higher, as the Company ran an increasing number of promotions of apparel products throughout the Class Period (*see* ¶¶99-103, 110, 115).

(f)    The statements that Under Armour was "watching our core base continue to grow" despite changing fashion trends was misleading because the Company's failure to capitalize

on changing fashion trends, such as the athletic leisure trend, was reducing demand for the Company's products and thus reducing the Company's core base (*see* ¶¶98-100).

(g)     The statements indicating that the gross margin decline was temporary due to rising product margins, and driven by the footwear and international businesses, were misleading because they implied that apparel margins were strong and failed to disclose that gross margin declines were also driven by slower apparel sales, promotions, discounts, lower sales prices, and liquidations (*see* ¶¶98-115, 125).

(h)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(i)     The Company's Form 10-Q for 2Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

229.   In addition, opinion statements made by Defendants on July 26 and August 3, 2016, as set forth in ¶¶223-224 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)     Defendants' projections of continued growth in revenue and operating income, including Plank's projection of continued 25%-plus growth in 2016, were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in severe decline, and, therefore, the continued growth projected by Defendants could not be achieved (*see* ¶¶122-131).

(b)     Defendants' projection of improving margins by 4Q16 due to improving project margins was misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that margins were also being constrained by increasing discounts and promotions and falling ASPs due to continuing declines in the apparel business, and, therefore, the gross margin improvements projected by Defendants could not be achieved (*see* ¶¶122-131).

### 9.     Goldman Sachs Global Retailing Conference

230.    On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference.   Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained.   When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved, and that despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> Yeah, for us we're in a really good position. We feel really healthy and it's our understanding that the marketplace is in a healthy position, too. Came out of the winter season, there was a lot of excess inventory. You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies. It was flush with inventory. It was a promotional environment. We didn't participate – have to participate too much in that promotional environment.

> But it from what we can understand and as of the end of August that most of the domestic retail partners are in really good inventory positions. We know we are.

231.    In response to a separate question later in the call, Molloy stated that "retail is pretty good and inventories are clean."

232.    Regarding a question about inventory expectations in the second half of 2016, relative to 2Q16, Molloy stated that "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected."

Separately, Molloy stated that inventory growth in the second half of 2016 would generally be in line with sales growth.

233. The statements of fact made by Molloy set forth in ¶¶230-232 above were materially false and misleading and omitted material facts because the Company's inventory levels were not healthy, clean, in a good position, or "cleaned up a lot sooner than many expected." Rather, inventory levels were inflated and continued to grow due to declining customer demand for, and declining sales of, the Company's apparel (*see* ¶¶106-112). Moreover, Defendants were indeed participating in, and creating, a "promotional environment" by running heavy and increasing promotions and discounts in response to the Company's apparel sales declines and inflated inventory levels, which had to be liquidated at a steep discount (*see* ¶¶99-103, 106-112).

234. In addition, Molloy's positive opinion statements regarding the Company's inventory expectations for the second half of 2016, set forth in ¶¶230-232 above, were materially false and misleading and lacked a reasonable basis because Molloy omitted facts going to the basis of such opinion, showing that Company's inventory levels were inflated, and that such inflation was worsening as the year progressed (growing at a greater rate than the Company's sales), as a result of the Company's continuing declines in apparel sales demand and sales growth (*see* ¶¶98-115, 125).

235. Defendants' projections of continued growth in revenue and operating income, including Plank's projection of continued 25%-plus growth in 2016, were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in severe decline, and, therefore, the continued growth projected by Defendants could not be achieved (*see* ¶¶98-115, 122-131).

### 10. Disappointing 3Q16 Financial Results:  Further Revelations of a Growth Slowdown and Compressed Margins

236.    On October 25, 2016, the Company issued its 3Q16 earnings release.  Defendants surprised investors by reporting 3Q16 gross margin of only 47.5%, compared with 48.8% in the prior year's period.  On the same day, Under Armour hosted a conference call to discuss its 3Q16 financial results.  Plank and Molloy participated in the call on behalf of the Company.  In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations.  Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year."

237.    During the conference call, Molloy further revealed that apparel growth would be less than projected at the Company's 2015 Investor Day:  "[T]he landscape for our business and our industry continues to evolve . . . . North America apparel growth is slowing across the industry. While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

238.    Molloy also signaled that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years."  In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . . [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution."

239.     The Company's stock fell sharply as a result of this negative news.   Under Armour's Class A Common Stock dropped from a close of $37.90 per share on October 24, 2016 to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.   The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per day, as the market continued to digest the news.   The total stock price decline over this four-day period was 18.36% ($6.96 per share).

240.     The Company's Class C Common Stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016 to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.   The stock dropped an additional 8.67% ($2.46 per share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

241.     The stock declines would have been larger had the Company revealed the full truth regarding the Company's problems.   Instead, Defendants continued to mislead investors and downplayed the negative news.   The Company reported net revenue growth of 22% for 3Q16.   Plank boasted during the October 25, 2016 earnings call that "[w]e are a growth company.   And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter.   Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."

242.     Plank also stated during the earnings call that the apparel business was "incredibly profitable and still growing at the tune of 18% in just the third quarter for us.  So, there's not an end to the North American apparel story.  That continues to march on for us as well.  We just have other opportunities that are outpacing some of that growth."

243.     During the same call, Molloy emphasized the Company's growth, including growth in apparel revenues.  Molloy gave similarly positive guidance with respect to revenue and operating income growth, expecting "full-year 2016 net revenues of approximately $4.925 billion, representing growth of 24%.  And operating income in the range of approximately $440 million to $445 million, representing growth of 8% to 9%" and fourth quarter revenues expected to "grow approximately 20%."  He added that "[w]e believe the strength of our brand and increased breadth of head-to-toe product offerings position us for another quarter of strong growth in what has been a challenging North American retail environment."

244.     Molloy also stated during the conference call that "[a]t our 2015 Investor Day, we announced our goals of achieving $7.5 billion of revenues and $800 million of operating income by 2018.  We are on track to achieve our 2018 revenue goal of $7.5 billion and expect to grow full-year revenues consistently in the low 20%s in both 2017 and 2018."

245.     During the call, Plank also referenced future pressure on margins and operating income, but blamed it on the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as opposed to the declining apparel business being a source of the margin and operating income issues).  Similarly, Molloy admitted that gross margins would be flat over the next couple of years, but blamed this on a mix shift based on fast growing footwear rather than apparel sales issues.

246.     Molloy also assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward."  In response to an analyst question later in the call, Molloy falsely stated that the Company was "in really good shape from an inventory perspective" and "growth rates [have] come down, but the inventory is in great shape."

247.     Notwithstanding Defendants' attempts to put a positive spin on the disappointing 3Q16 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example:

(a)     on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak";

(b)     Equity Research issued a report on October 25, 2016 stating the Company's new 2017/2018 outlook was "far worse than expected";

(c)     also on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal"; and

(d)     on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM."

248.     On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16, which were also discussed in the Company's press release and during its earnings call on October 25, 2016.  The Form 10-Q stated that "[w]e believe that the growth in

our business has been driven by a growing interest in performance products and the strength of the

Under Armour brand in the marketplace."

249.    The Company's Form 10-Q also contained SOX certifications by Plank and Molloy

that were materially similar to those identified above in ¶161.

250.    Statements of fact made by Defendants on October 25 and November 2, 2016, as

set forth in ¶¶236-238, 241-246, 248-249 above, were materially false and misleading and omitted

material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the

Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100).  This led to a

host of financial problems experienced by the Company, including declining revenue and operating

income growth, reduced market share, excess inventory, lower ASPs, increased discounting and

promotions, and compressed margins (*see* ¶¶99-103, 106-112).

(b)    Defendants failed to disclose these material problems to the market, and,

instead, gave investors the misleadingly positive perception that the Company's growth, including

apparel growth, remained strong and consistent with historical trends (*see* ¶¶216, 219-223).

(c)    The pressure on the Company's margins and operating income was not driven

solely by the footwear and international businesses becoming greater sources of revenue and the

need  for  additional  investment  to  take  advantage  of  growth  opportunities,  as  Defendants

misleadingly stated.  Such pressure was also a function of the declining apparel business, which

reduced sales and ASPs, while increasing promotions, discounts, inventory, and liquidations (*see*

¶¶98-115, 125).

(d)    The Company's inventory position was not "healthier" or in "great shape."

Rather, inventory was a major problem and continued to get worse, causing a high level of inventory

that the Company was forced to liquidate at discounted prices, as demand for the Company's apparel products continued to suffer (*see* ¶¶106-112).

(e)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶¶98-100).

(f)     The Company's Form 10-Q for 3Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

251.    In addition, opinion statements made by Defendants on October 25 and November 2, 2016, as set forth in ¶¶244-246 above, were materially false and misleading based on omissions of the following material facts going to the basis of the opinions:

(a)     Defendants' projections of continued revenue and operating income growth for the remainder of 2016 through 2018 were misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that the Company's apparel business was in severe decline, and, therefore, the continued growth projected by Defendants could not be achieved (*see* ¶¶98-115, 122-131).

(b)     Defendants' projection of flat gross margins "[o]ver the course of the next couple years" due to the growing footwear business was misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that margins were also being constrained by increasing discounts and promotions and falling ASPs due to continuing declines in the apparel business, and, therefore, the level of gross margins projected by Defendants could not be achieved (*see* ¶¶98-115, 122-131).

(c)     Defendants' projection that liquidations "should not have the same negative impact moving forward" was misleading and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts showing that inventory continued to increase as a result of slowing apparel sales, resulting in increased liquidations that were negatively impacting, and would continue to negatively impact, the Company's margins (*see* ¶¶106-112, 122-131).

### 11.     Disappointing 4Q16 & FY16 Financial Results:  Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy

252.    The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017.  On that day, Under Armour stunned investors with a press release announcing dramatically lower-than-expected growth and other financial problems during 4Q16 and FY16.  In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results."  Specifically, the Company revealed that:

- Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth.  Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

- Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

- FY16 gross margin dropped from 48.1% to 46.5%.

- 4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

- FY16 inventory increased 17%.

253.    Moreover, the press release provided a surprisingly negative outlook for 2017.  Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue

achieved by the Company for 26 consecutive quarters.  In addition, gross margin was "expected to be slightly down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

254.    Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he was only at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Plank was replaced by Dave Bergman ("Bergman"), the Company's SVP of Corporate Finance.

255.    During a conference call with analysts on the same day, January 31, 2017, Defendants elaborated on the news revealed in the Company's earnings release.  Plank, Molloy, and Bergman participated in the call on behalf of the Company.  In his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.
>
> *            *            *
>
> So first, I'd like to explain a few things.  What happened, what we learned and what we're doing about it. So let's start with what happened. ***In the fourth quarter, slower traffic caused significant promotional activities earlier, deeper and broader than expected. This commoditized some of our more basic core product that had previously sold through for us in years past.***
>
> This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment. ***So we lost top line volume as we work to adapt through our mix and pricing.*** Now, to be fair, we did comp positively in the quarter in both our own retail stores and our e-commerce channel, but ultimately the result was below original plan.

There was also lower channel recapture of bankruptcy volume that we had expected, as pricing came down in the points of distribution that we serve.  And finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full price sales.

256.    While Plank couched these issues as having emerged in 4Q16, in reality, this was a continuation of problems known, or recklessly disregarded, by Defendants throughout the Class Period.  Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

257.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today."  He emphasized that "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

258.    Molloy also stated that "[f]ourth quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior year's period.  The decrease includes a negative impact of approximately 230 basis points, driven by higher discounts and promotions," as well as lower margins resulting from footwear and international sales.  As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory including discounting, especially in the back half of the year."

259.    Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call, and proactive actions to manage inventory levels down in the marketplace, we expect full year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017."  Regarding the first quarter of 2017 ("1Q17"), Bergman stated:

We anticipate the first quarter to grow at a mid-single digit rate as fourth quarter conditions in North America carry over and we will have not yet lapsed some of the significant bankruptcies we saw in 2016.  We're expecting first quarter gross margin to be down almost 100 basis points year-over-year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

260.    Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

261.    During a question-and-answer session with analysts, Plank confirmed the shift in consumer preference towards more fashion-oriented athletic apparel and referenced increased competition and heavy discounting in Under Armour's "core basic" performance-oriented athletic apparel:

**Omar Saad, Evercore ISI**:  [M]aybe if you could expand on a comment you made I think in the prepared remarks around some trends going on in the apparel business, maybe moving away from performance more to fashion or lifestyle? I know the UA Sportswear line is still kind of pretty nascent, but maybe elaborate on what you're seeing from that standpoint.

Is there something pretty deep going on at the consumer level? A shift towards more fashion-oriented athletic apparel versus performance oriented?  Obviously, Under Armour is known for its technical performance. And if this is the case, how do you evolve the brand a little bit to be really relevant on both sides of that fence?

**Plank**:  Yes. . . .

***We need to become more fashionable with the products that we have out there.***  And one of the things we found is that some of the core basics were some of the challenges that we saw, is that we were counting on core basics as we have in years past to do more work for us. ***But the consumer today frankly has more options***.

***[F]rankly most of those options are from good brands that we compete with, that are heavily discounting as well.*** So what you'll see is that I don't think it's one shift of abandoning one for the other. Obviously, with things like the investment we're making in [Under Armour Sportswear] in sport lifestyle in general, but we need to become more fashion. The consumer wants it all.

- 87 -

262.    Plank responded to a separate question by stating that the retail market for apparel was being "disrupted" and that "promotions and the consumer environment, all those things are very, very real, but we could have done a better job with our merchandising mix to be more proactive and more thoughtful about where they were going."

263.    Separately, an analyst from UBS inquired about 2017 gross margins as to the North American market:  "I would've thought . . . that would largely be down next year due to more markdowns.  And then your guidance and inventory seems to sound like it will be improving through the year relative to the rate of revenue growth.  What do you think is the realistic near term recapture rate for the gross margin after 2017 after some inventory clearing?"  Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

264.    On this news, the price of Under Armour stock plummeted.  After closing at $28.94 per share on January 30, 2017, shares of Class A Common Stock dropped **_25.74%_** ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares.  This represented the largest single-day stock price decline in the Company's history.  The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued to digest the news.  The total stock price decline over this three-day period was **_28.65%_** ($8.29 per share).

265.    Shares of Under Armour's Class C Common Stock also fell sharply as a result of this news.  After closing at $25.09 per share on January 30, 2017, shares of Class C Common Stock dropped **_23.40%_** ($5.87 per share) in a single trading day, closing at $19.22 per share on

January 31, 2017, on unusually high trading volume of approximately 57 million shares. The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of ***27.78%*** ($6.97 per share) over this three-day period.

266.   Under Armour's Bond prices also declined in response to this news, as well as Bond downgrades resulting from this news that were issued by S&P (from investment grade (BB+) to junk status (BBB-)) and Moody's (from stable to negative outlook) on February 1, 2017. The Bonds closed at $94.08 on January 30, 2017 and dropped 1.68% ($1.58) in a single trading day, closing at $92.50 on January 31, 2017. The Bonds continued to fall an additional 3.24% ($3.00) the following trading day, closing at $89.50 on February 1, 2017 (the day of the downgrades), representing a total decline of 4.87% ($4.58) over this two-day period.

267.   In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy. For example:

(a)    on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario";

(b)    on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story";

(c)     on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.' Wall Street often assumes that an executive leaving for 'personal reasons' is a sign that a company is in trouble and that someone needs to take the fall. Under Armour (UAA) tanked on this trifecta of bad news. Shares plunged nearly 25% in early trading Tuesday. That put the stock on track for its worst one-day drop ever";

(d)     on January 31, 2017, Reuters released an article titled, "Under Armour's founder-led approach wears thin." The article observed that the Company "reported its slowest top-line growth in eight years and signaled more challenges ahead. Its chief financial officer is also bailing. The news wiped a quarter off the company's market value. Chief Executive Kevin Plank's strategy of maintaining power [by controlling the Company's voting stock] is underperforming badly. . . . revenue growth slowed dramatically to 12 percent because of deep discounting caused by slower foot traffic";

(e)     on February 1, 2017, Telsey Advisory Group issued a report stating that "the magnitude of the miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide-down for 2017 came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment thesis as estimates and multiples are revised downwards";

(f)     on February 1, 2017, Oppenheimer issued a report calling Under Armour's announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus far"; and

(g)     on February 3, 2017, Sporting Goods Monitor issued a report expressing its disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue

growth at half of the rate we, and Wall Street, expected" and Under Armour's management "*severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent earnings calls*."

### E.     Post-Class Period Revelations

268.    Following the Class Period, Defendants' financial downturn continued and additional revelations came out about the nature and severity of the problems experienced by Defendants throughout the Class Period.

269.    For example, on February 9, 2017, The Motley Fool published an article titled, "5 Signs Under Armour Inc. Needs New Management," which stated that:

> *Under Armour needs a leader who makes realistic promises.*  At the end of fiscal 2015, [Under Armour] estimated its annual revenue would rise 25% to $4.95 billion in 2016.  However, its 2016 revenue actually rose just 22% to $4.8 billion, and [Under Armour] now expects sales to rise just 11-12% in 2017.
>
> That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5 billion in annual revenues in fiscal 2018.  Plank insists that the company is still on track to hit that target, but that would require its top line growth to accelerate to over 40% in 2018 -- which hardly seems realistic.

270.    On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's rating to underperform and slashed the Company's Class A Common Stock price target from $20 to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause UA apparel growth/margins to be worse than expected."

271.    On April 27, 2017, the Company announced 1Q17 results including total net revenue growth of only 7%, a far cry from the consistent 20% growth Defendants reported and projected throughout the Class Period.  Net revenue growth from the Company's apparel business also grew only 7%, the North American business was down 1%, gross margin was down 70 basis points (to 45.2%) "due to continued inventory management efforts," and inventory increased 8%.

272.    On the same day, April 27, 2017, Plank and Bergman (the new CFO following Molloy's suspicious departure) discussed the Company's struggles during an earnings call with analysts on the same day.   Much of the call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.   Plank stated that the Company was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products.   Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

273.    On June 20, 2017, David Butler published an article on SeekingAlpha.com titled, "Underperforming Under Armour."   Butler stated that "[e]verything really peaked in 2014 when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in net income. Ever since, things have been slowing. It's not a trendy shift either. We've seen almost two and half years of decreasing business growth. The company isn't maneuvering to maintain margins in spite of the slowdown either."

274.    On June 26, 2017, Kenra Investors published an article on SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."   The article discussed continual declines in the Company's brand power and customer interest dating back to 2015, stating, "There are several datasets that show ongoing weakness for Under Armour. . . . Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an idea of how digital sales are evolving. . . . *[T]here is a strong downtrend [that] started in mid-2015, and search interest [in Under Armour] actually became negative since a few months ago.*"   The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive, and search interest is in a sharp downtrend. . . . *So many negative signs make me think*

*the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015.*"

275.     Another June 26, 2017 article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."   The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think. In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand. For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times. On Friday morning's call, Under Armour was mentioned just once. . . . and it was a part of a broader discussion regarding multiple brands.

276.     On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is down 30% This Year."   The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling this year, with the sportswear stock down 30% . . . . The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways."  Specifically, the article noted that wholesale revenue was up just 5% in 4Q16 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand."   The article concluded that "Under Armour's slowing growth is a sign that the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . . The company needs to establish itself as a fashion brand as well as a performance one."

277.     News from the Company worsened on August 1, 2017, when it reported financial results for the second quarter of 2017.  The Company issued a press release reporting total net

revenue growth and apparel net revenue growth of 9% and 11%, respectively, far below the quarterly 20%+ growth reported and projected by Defendants throughout the Class Period. Footwear also performed surprisingly poorly, with net revenue declining 2%. The Company blamed the revenue declines on a "dynamic and promotional retail environment in North America [that] continued to temper results." The Company also reported an operating loss of $5 million, a net loss of $12.3 million, and $0.03 decline in diluted EPS. Gross margin declined 190 basis points (to 45.8%) based in part on "inventory management initiatives" with inventory again increasing 8%.

278.    In conjunction with this negative news, the Company also announced on August 1, 2017 that it was implementing a massive restructuring plan "to more closely align its financial resources to support the [C]ompany's efforts to better serve the evolving needs of the changing consumer and customer landscape." As a result, the Company announced expected "restructuring and related charges" of $110 to $130 million in 2017, including "approximately $20 million of inventory related charges and approximately $40 million of intangibles and other asset related impairments." The restructuring will involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

279.    During the August 1, 2017 earnings call that followed, Plank discussed the restructuring in more depth. He stated that "[t]he landscape is evolving quickly. Therefore, we too must evolve quickly. This evolution requires a pivot, and we're doing just that." He later explained that "we are clearly operating in a different environment, particularly in our largest market, North America. With our largest growth drivers including international, footwear and DTC continuing to scale but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

280.     Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends especially the top line, can you just give us an update where you think the brand health is and the vision for the business today?"  He acknowledged that "***we're not pleased with where we're positioned right now***" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."  To that end, he later added that "we've adjusted the balance of product we've had, which is ***decreas[ing] many of the core and key items that we've had***.  We used to have – we're a very much a key item focused, a big logo hoodie and things in-store, and now we've got a lot of balance of that around versatility, layering, and newness . . . .  We will be telling our story in the back half of this year, and ***you'll see increased brand heat coming from us***, frankly spending against that."

281.     The Company's negative news on August 1, 2017 also involved a reduction in guidance for FY17.  Total net revenue was expected to grow only 9-11% (vs. previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American business," while adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

282.     As a result of this news, the Company's securities price fell precipitously.  After closing at $20.02 per share on July 31, 2017, the Company's Class A Common Stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C Common Stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high

trading volume of over 23 million shares.  The Bonds also declined, falling from a close of $93.24 on July 31, 2017 to a close of $92.00 on August 1, 2017 ($1.24 per Note), a decline of 1.33%.

283.    Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . . [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US. . . . [and] US customers are abandoning the brand because it lacks a clear identity."  The article further noted that "Plank has previously acknowledged [on January 31, 2017] that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

### F.    Loss Causation and Economic Loss

284.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Under Armour's securities and operated as a fraud or deceit on Class Period purchasers of Under Armour's securities.  When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the prices of Under Armour's securities fell as the prior artificial inflation came out.  The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of Defendants' Class Period statements. As a result of their purchases of Under Armour's securities during the Class Period, Plaintiffs and the other members of the Exchange Act Class (defined in ¶311 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### 1. January 10, 2016 Revelations

285. The truth began to emerge on Sunday, January 10, 2016, when, as detailed in ¶¶165-171 above, Morgan Stanley issued a report detailing slower growth of the Company's North American apparel sales, falling sales prices, and reduced market share. As a result of the information revealed to the market, the Company's Class A Common Stock dropped approximately 6.72% on unusually high trading volume. At the Company's next earnings call on January 28, 2016, the Company downplayed the report and reassured investors of the Company's strong financial growth.

### 2. May 3, 2016 Revelations

286. The truth continued to emerge after the market closed on May 3, 2016, when, as detailed in ¶¶199-204 above, the Company surprised investors by announcing the sudden departures of key executives Stafford and Thurston. These departures, coming on the heels of Dickerson's departure, the Morgan Stanley Report exposing problems at the Company, and three major retail customer bankruptcies, were viewed by investors as a signal that there were undisclosed problems at the Company. As a result, the Company's Class A Common Stock dropped approximately 7.54% on unusually high trading volume. The Company's Class C Common Stock, which was issued to Class A Common Stock holders on a one-for-one basis after the market closed on April 7, 2016, also experienced a price decline as a result of this news, falling approximately 6.80% on unusually high trading volume. The declines would have been more dramatic had the Exchange Act Defendants disclosed the declines in sales demand and resulting financial problems that led to the departures of Stafford and Thurston. Instead, the Exchange Act Defendants were completely silent on the reasons for their departures.

### 3.     May 31, 2016 Revelations

287.    As detailed in ¶¶205-209 above, the Company surprised investors on May 31, 2016 by revealing that, contrary to the Company's positive statements and guidance raise just a month earlier, 2016 revenue and operating income would be much lower than projected, citing the Sports Authority bankruptcy.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 3.92% and 3.57%, respectively, on unusually high trading volume. The drops would have been more dramatic had the Exchange Act Defendants disclosed the true extent of the financial difficulties facing the Company.   Instead, the Exchange Act Defendants misleadingly stated that Under Armour's momentum was stronger than ever, and that the Company continued to experience growth and increased demand across all product categories and geographies.

### 4.     July 26, 2016 Revelations

288.    The truth continued to emerge on July 26, 2016, when, as detailed in ¶¶212-229 above, the Company surprised investors by revealing slowdowns in apparel sales growth, operating income, and net income.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 5.12% and 3.56%, respectively, on unusually high trading volume.  The drops were tempered by the Exchange Act Defendants' attempts to blunt the negative results by making misleadingly positive statements regarding the Company's sales demand and revenue growth, and their failure to disclose the true extent of financial difficulties facing the Company.

### 5.     October 25, 2016 Revelations

289.    As detailed in ¶¶236-251 above, on October 25, 2016, the Company revealed a slowdown in North American apparel growth and compressed margins attributed to higher discounts, promotions, and liquidations.  As a result of the information, Under Armour's Class A

Common Stock and Class C Common Stock prices dropped approximately 18.36% and 21.25%, respectively, on unusually high trading volume.  The drops would have been more dramatic had the Exchange Act Defendants disclosed the true extent of the sales declines and associated financial difficulties facing the Company.  But the Exchange Act Defendants failed to do so, and, instead, reassured investors that the Company's overall growth was still strong, reiterated the Company's revenue guidance, and stated that the Company's inventory position was healthier and should not have the same negative impact moving forward.

### 6.    January 31, 2017 Revelations

290.    On January 31, 2017, the Company shocked investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in ¶¶252-267 above.  As a result, the Company's Class A Common Stock and Class C Common Stock prices plummeted approximately 28.65% and 27.78%, respectively, on unusually high trading volume.  Under Armour's Bond price also declined approximately 4.87% in response to this news and the resulting downgrades of the Bonds by S&P and Moody's.

### 7.    August 1, 2017 Revelations

291.    On August 1, 2017, the Company's securities prices fell precipitously when the Company reported another quarter of poor North American sales, lowered 2017 guidance, and announced a massive restructuring including hundreds of job cuts, as detailed further in ¶¶277-283 above.  The Company's Class A Common Stock and Class C Common Stock prices dropped 8.59% and 10.38%, respectively, on unusually high trading volume.  Under Armour's Bond price also dropped 1.33% in response to this news.

292.     As a result of their purchases of Under Armour securities during the Class Period, Plaintiffs and the other members of the Exchange Act Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to disclose to investors the adverse facts detailed herein, the Exchange Act Defendants presented a misleading picture of Under Armour's business and prospects.  The Exchange Act Defendants' false and misleading statements had the intended effect and caused Under Armour securities to trade at artificially inflated levels throughout the Class Period.

293.     When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of Under Armour's securities declined.  These declines removed the inflation from the prices of Under Armour's securities, causing real economic loss to investors who had purchased Under Armour's securities during the Class Period.

294.     The declines in the prices of Under Armour's securities after the revelations came to light were a direct result of the nature and extent of the Exchange Act Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Under Armour securities negate any inference that the losses suffered by Plaintiffs and the other members of the Exchange Act Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.  This is evidenced by the chart below, which demonstrates the clear divergence of the Company's Class A Common Stock prices from the Company's benchmark indices and peer company stock prices[20] as the revelations of the truth became known to the market:

---

[20]   Under Armour has identified the S&P 500 Index and S&P Apparel, Accessories and Luxury Good Index as benchmarks for its Class A Common Stock performance in its FY16 Form 10-K, filed with the SEC on February 23, 2017.  In addition, the peer comparison above is based on the



295.    The economic losses, *i.e.*, damages, suffered by Plaintiffs and the other members of the Exchange Act Class were a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the prices of Under Armour securities and the subsequent significant declines in the value of Under Armour securities when the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were revealed.

### G.    Presumption of Reliance

296.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants'

---

stock prices of the following publicly traded industry competitors identified in the Company's FY16 Form 10-K: Nike, Inc. (NKE US Equity), Adidas AG (ADDYY US Equity), Lululemon Athletica Inc. (LULU US Equity), Columbia Sportswear Company (COLM US Equity), and Puma SE (PMMAF US Equity).

material omissions.  Because this action involves the Exchange Act Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that the Exchange Act Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Exchange Act Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

297.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of the Exchange Act Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Exchange Act Class (defined in ¶311 below) purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Under Armour, and have been damaged thereby.

298.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    As a regulated issuer, Under Armour regularly made public filings with the SEC and related press releases.

(b)    Under Armour regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services.

(c)     Under Armour was followed by several securities analysts employed by major brokerage firms, such as Morgan Stanley, Deutsche Bank, Canaccord Genuity, Wells Fargo, Credit Suisse, Barclays, UBS, Jeffries, Cowen and Company, and Piper Jaffray, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

(d)     Certain of the Company's securities, Class A Common Stock and Class C Common Stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

299.     As a result of the foregoing, the market for the Company's securities promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of the Company's securities.

300.     Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

301.     At the times they purchased or otherwise acquired the Company's securities, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

302.     As a result of the above circumstances, the presumption of reliance applies.

303.     In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     the Exchange Act Defendants made public misrepresentations during the Class Period;

(b)      the misrepresentations were material;

(c)      the Company's securities traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      Plaintiffs and other members of the Exchange Act Class purchased or otherwise acquired the Company's securities between the time the Exchange Act Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

### H.      No Safe Harbor

304.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Under Armour's Class Period filings.

305.    For example, Under Armour's 2014 Form 10-K, filed with the SEC on February 20, 2015, contained the following boilerplate "caution":

> ***A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth.***

(Emphasis in original.)

306.    The generic nature of this disclosure is illustrated by the fact that it was simply repeated verbatim from the Company's 2013 Form 10-K, filed with the SEC on February 21, 2014,

and was again repeated in the Company's 2015 and 2016 Form 10-Ks filed with the SEC on February 22, 2016 and February 23, 2017, respectively, when the problems plaguing the Company were well known internally.

307.    Similarly, Under Armour issued the following risk warning in both its 2013 and 2014 Form 10-Ks concerning the decline of brand image, net revenues, and profitability:

> ***If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of a global business and as a result our brand image, net revenues and profitability may decline.***

(Emphasis in original.)

308.    A substantially similar warning appeared in the Company's 2015 and 2016 Form 10-Ks:

> ***We must continue to effectively manage our growth and the increased complexity of a global business or we may not achieve our long-term growth targets and our brand image, net revenues and profitability may decline.***

(Emphasis in original.)

309.    The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of the Exchange Act Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield the Exchange Act Defendants from liability.  The risk warnings were false and misleading because they did not disclose that the Exchange Act Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

310.     Moreover, to the extent that any statements pleaded herein are forward-looking, the Exchange Act Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew it was false or misleading when made.

I.      **Class Action Allegations for Exchange Act Claims**

311.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded securities of Under Armour during the Class Period, and who were damaged thereby ("Exchange Act Class").  Excluded from the Exchange Act Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

312.     Members of the Exchange Act Class are so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of January 31, 2017, Under Armour had more than 183 million shares of Class A Common Stock and more than 220 million shares of Class C Common Stock outstanding.  The Company also has numerous holders of outstanding Notes, which represent an aggregate principal amount of $600 million.  While the exact number of members of the Exchange Act Class can only be determined by appropriate discovery, Plaintiffs believe that members of the Exchange Act Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

313.    Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class because Plaintiffs and all of the members of the Exchange Act Class sustained damages arising out of the Exchange Act Defendants' wrongful conduct complained of herein.

314.    Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Exchange Act Class that Plaintiffs seek to represent.

315.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Exchange Act Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Exchange Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

316.    Questions of law and fact common to the members of the Exchange Act Class predominate over any questions that may affect only individual members in that the Exchange Act Defendants have acted on grounds generally applicable to the entire Exchange Act Class.  Among the questions of law and fact common to the Exchange Act Class are:

(a)     whether the Exchange Act Defendants violated the federal securities laws as alleged herein;

(b)     whether the Exchange Act Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether the Exchange Act Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether the Exchange Act Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)      whether the Exchange Act Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)      whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Exchange Act Class have sustained damages as a result of the decline in value of the Company's securities when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT III

### VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL OF THE EXCHANGE ACT DEFENDANTS

317.    Plaintiffs repeat and reallege the allegations set forth in ¶¶83-316 above as though fully set forth herein.  This claim is asserted against the Exchange Act Defendants.

318.    During the Class Period, the Exchange Act Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (a) deceive the investing public, the Exchange Act Plaintiffs, and other Exchange Act Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded securities; and (c) cause the Exchange Act Plaintiffs and other members of the Exchange Act Class to purchase the Company's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

319.    The Exchange Act Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Under Armour, as alleged below.

320.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

321.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

322.    The Exchange Act Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts,

practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

323.   The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others:  (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

324.   Each of the Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were

available to each of them.  Such Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Exchange Act Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, the Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

325.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, the Exchange Act Defendants, but not disclosed in public statements by the Exchange Act Defendants during the Class Period, Plaintiffs and other members of the Exchange Act Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the securities price declines above.

326.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Exchange Act Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and other members of the Exchange Act Class and the marketplace known of the

Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by the Exchange Act Defendants, Plaintiffs and other members of the Exchange Act Class would not have purchased or otherwise acquired their Under Armour publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

327.    By virtue of the foregoing, the Exchange Act Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

328.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the securities price declines discussed above, when the artificial inflation was removed from the Company's securities.

## COUNT IV

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

329.    Plaintiffs repeat and reallege the allegations set forth in ¶¶83-316 above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

330.    The Individual Defendants acted as controlling persons of Under Armour within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the

- 112 -

content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

331.   In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

332.   As set forth above, the Exchange Act Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the securities price declines discussed above, when the artificial inflation was released from the Company's securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bucks County, on its own behalf and on behalf of the Securities Act Class, and Plaintiffs Aberdeen and Bucks County, on their own behalf and on behalf of the Exchange Act Class, pray for relief and judgment, as follows:

A.   Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff Bucks County as representative of the Securities Act Class, certifying Plaintiffs Aberdeen and Bucks County as representatives of the Exchange Act

Class, and designating Plaintiffs' counsel as Class Counsel for both the Securities Act Class and the Exchange Act Class;

B.      Awarding compensatory damages in favor of Plaintiff Bucks County and the other members of the Securities Act Class against all Securities Act Defendants, jointly and severally, for all damages sustained as a result of the Securities Act Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding compensatory damages in favor of Plaintiffs Aberdeen and Bucks County and the other members of the Exchange Act Class against all Exchange Act Defendants, jointly and severally, for all damages sustained as a result of the Exchange Act Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding Plaintiffs, the Securities Act Class, and the Exchange Act Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.      Awarding rescission or a rescissionary measure of damages; and

F.      Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  August 9, 2017                    SILVERMAN THOMPSON SLUTKIN
                                            & WHITE LLC

                                          _____
                                                  s/ Steven J. Kelly
                                          _____
                                          Andrew C. White, Federal Bar No. 0821
                                          awhite@mdattorney.com
                                          Steven J. Kelly, Federal Bar No. 27386
                                          skelly@mdattorney.com
                                          Pierce C. Murphy, Federal Bar No. 30030
                                          pmurphy@mdattorney.com
                                          201 North Charles Street, 26th Floor
                                          Baltimore, MD  21201
                                          Telephone:  410/385-2225
                                          410/547-2432 (fax)

                                          *Local Counsel for Plaintiffs*

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          PAUL J. GELLER
                                          JACK REISE
                                          MARK J. DEARMAN
                                          120 East Palmetto Park Road, Suite 500
                                          Boca Raton, FL  33432
                                          Telephone:  561/750-3000
                                          561/750-3364 (fax)
                                          pgeller@rgrdlaw.com
                                          jreise@rgrdlaw.com
                                          mdearman@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          MARK SOLOMON
                                          ROBERT R. HENSSLER JR.
                                          AUSTIN P. BRANE
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          marks@rgrdlaw.com
                                          bhenssler@rgrdlaw.com
                                          abrane@rgrdlaw.com

                                          *Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 9, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*s/ Steven J. Kelly*
STEVEN J. KELLY