# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                                    |       |                                 |
|------------------------------------|-------|---------------------------------|
|                                    | *     |                                 |
| In re  UNDER ARMOUR                |       |                                 |
|         SECURITIES LITIGATION      | *     | Civil Action No.: RDB-17-0388   |
|                                    | *     |                                 |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiffs Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Exchange Act Plaintiff" or "Lead Plaintiff") and Bucks County Employees Retirement Fund ("Securities Act Plaintiff") (collectively, "Plaintiffs") bring this putative class action against Under Armour, Inc. ("Under Armour" or "the Company"), Kevin A. Plank ("Plank"), Lawrence P. (Chip) Molloy ("Molloy"), Brad Dickerson ("Dickerson"), named directors[1] ("Director Defendants"), and named underwriters[2] ("Underwriter Defendants") (collectively, "Defendants") alleging violations of federal securities laws.   (Consol. Am. Compl., ECF No. 30.) Plaintiffs bring this federal class action under the Securities Exchange Act of 1934 ("Exchange Act") §§ 10(b), 20(a), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Under Armour, Plank, Molloy, and Dickerson (collectively, "Exchange Act Defendants").

---

[1]     Byron K. Adams, Jr. ; George W. Bodenheimer; Douglas E. Coltharp; Anthony W. Deering; Karen W. Katz; A.B. Krongard; William R. McDermott; Eric T. Olson; and Harvey L. Sanders.  (ECF No. 30 at ¶¶ 28-36.)

[2]     J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Wells Fargo Securities, LLC; HSBC Securities (USA) Inc.; PNC Capital Markets, LLC; BB&T Capital Markets, a division of BB&T Securities, LLC; SunTrust Robinson Humphrey, Inc.; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; Regions Securities LLC; and SMBC Nikko Securities America, Inc. (ECF No. 30 at ¶¶ 39-49.)

Separately, the Securities Act Plaintiff brings this federal class action under the Securities Act of 1933 ("Securities Act") §§ 11, 15, 15 U.S.C. §§ 77k, 77o, and the rules promulgated thereunder, against Under Armour, Plank, Molloy, the Director Defendants, and the Underwriter Defendants (collectively, "Securities Act Defendants").

Currently pending before this Court are two dismissal motions: (1) the Under Armour Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (ECF No. 51); and (2) Underwriter Defendants' Notice of Motion to Dismiss the Consolidated Amended Complaint (ECF No. 52). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendants' motions shall be GRANTED. Specifically, the Underwriter Defendants' Motion to Dismiss (ECF No. 52) is GRANTED, and Counts I and II of [Corrected] Consolidated Amended Complaint (ECF No. 30) as to all Defendants shall be DISMISSED WITH PREJUDICE. The Under Armour Defendants' Motion to Dismiss (ECF No. 51) is GRANTED, and Counts III and IV of the [Corrected] Consolidated Amended Complaint (ECF No. 30) shall be DISMISSED WITHOUT PREJUDICE.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). The Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a

court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[3]

Under Armour, based in Maryland, is a large sports apparel company that sells branded athletic apparel, footwear, and accessories primarily in North America,[4] although their products are available worldwide.  (ECF No. 30 at ¶¶ 5, 24, 95.)  Since its formation in 1996, Under Armour's market share has grown to compete with the leaders in the sector, Nike and Adidas.  (*Id.* at ¶¶ 6, 93.)  By 2014, Under Armour surpassed Adidas and became the number two sportswear brand by revenue in the United States. (*Id.*)  By capitalizing on its premium brand image and reputation for state-of-the-art fabrics, Under Armour reported 26 consecutive quarters of 20% or more compounded annual growth between 2010 and 2016. (*Id.* at ¶¶ 6, 97.)

Led by its founder, Plank, who also serves as Chief Executive Officer ("CEO") and Chairman of the Board, Under Armour had an aggressive growth strategy, declaring its intent to become the "No. 1" brand.  (*Id.* at ¶¶ 25, 94-96.)  During the Company's Investor Day on September 16, 2015, Plank boasted that "demand for our brand has never been stronger," and Under Armour's net revenue was projected to grow 25% in 2016. (*Id.* at ¶ 8.)

However, Plaintiffs allege that by the fall of 2015, customer demand for Under Armour's apparel products was declining, partly due to the Company's failure to compete early in the athletic leisure apparel trend.  (*Id.* at ¶ 98.)  Excess inventory in Under Armour's

---

[3]    This Court notes the recent decision in *Khoja v. Orexigen Therapeutics, Inc.*, --- F.3d ----, No. 16-56069, 2018 WL 3826298 (9th Cir. Aug. 13, 2018), in which the Ninth Circuit clarified the proper use of judicial notice and incorporation-by-reference in securities litigation.  This Court identifies herein any judicially-noticed facts taken from Defendants' exhibits.

[4]    In 2016, North America contributed 83% of Under Armour's net revenues, (ECF No. 30 at ¶ 91.), and 65% of Under Armour's sales were wholesale sales in North America.  (*Id.* at ¶ 92.)

basic sports apparel, which had historically provided the majority of sales, led the Company to begin competing on price rather than brand strength as it had done in the past. (*Id.* at ¶¶ 99-103, 106.) At the same time, the trend away from consumer sports-apparel purchases at traditional sporting goods stores towards online shopping and large discount chains led to bankruptcies for some of Under Armour's traditional sporting goods customers, which put further pressure on sales and margins. (*Id.* at ¶¶ 104-112.) Under Armour expanded its footwear and international sales, but with lower margins and high promotional expenses, overall margins declined. (*Id.* at ¶¶ 113-115.)

On January 10, 2016, Morgan Stanley issued a detailed report with point-of-sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales price ("ASP"), and market share. (*Id.* at ¶ 117.) The next month, February 2016, Under Armour's Chief Financial Officer ("CFO") Dickerson left the Company. (*Id.* at ¶ 118.) However, the Company's first quarter 2016 financial results, announced in an April 21, 2016 press release, were positive: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%. The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies." (*Id.* at ¶ 188 (quoting the April 21, 2016 press release announcing the Company's first quarter results for 2016).)

In May 2016, the Company's Chief Merchandising Officer, Henry Stafford ("Stafford), and the Chief Digital Officer, Robin Thurston ("Thurston"), abruptly departed. (*Id.*) As Under Armour's sales problems became publicly known, stock prices declined. (*Id.*

at ¶¶ 116-117.) On June 1, 2016, the Company announced a reduced expectation of 2016 revenues related to the bankruptcy of one of its major sporting goods customers, the Sports Authority,[5] which triggered further stock price declines. (*Id.* at ¶ 119.)

On June 6, 2016, Under Armour filed the Registration Statement with the Securities Exchange Commission ("SEC") in connection with its Bond offering ("Bond Offering" or "the Offering"). (*Id.* at ¶¶ 52, 210.) Under Armour offered the Bonds pursuant to the Offering materials, which incorporated Under Armour's 2015 Annual Report on Form 10-K and first quarter 2016 Quarterly Report on Form 10-Q. (*Id.* ¶¶ 52-54.) The Offering was completed on June 8, 2016 with the Company receiving $593.6 million in total net proceeds. (*Id.* at ¶¶ 52, 141.) Each of the Underwriter Defendants allegedly acted as an underwriter of the Offering. (*Id.* ¶¶ 39-49.)

On July 26, 2016, Under Armour reported growth below 20% for the first time in more than seven years and forecast the slowest quarterly growth in over six years. (*Id.* at ¶ 120.) On October 25, 2016, Under Armour revealed a further slowdown in growth in the third quarter. (*Id.*) On January 31, 2017, Under Armour revealed that the 2016 slowdown was more severe than previously reported and also announced the sudden departure of Molloy, who served as CFO after Dickerson. (*Id.* at ¶¶ 57, 89, 120.)

The next day, on February 1, 2017, S&P Global Ratings ("S&P") downgraded the Company's Bonds to junk status, and Moody's Investors Service ("Moody's") changed Under Armour's rating outlook from stable to negative. (*Id.* at ¶ 57.) The Bond price fell in

---

[5] The Sports Authority filed for bankruptcy on March 2, 2016, and on April 26, 2016, it announced closure of all 463 stores. (ECF No. 30 at ¶ 105, 186.) Other key Under Armour retailers also filed for bankruptcy during the period of October 2015 to April 2016. (*Id.* at ¶ 105.)

response and slid further in August 2017 when the Company revealed slow North American growth, reduced its 2017 guidance, and announced a massive restructuring.[6] (*Id.* at ¶¶ 58-59.)

The initial Complaints alleging violations of federal securities law were filed in February and March 2017 and were consolidated on March 23, 2017.[7] A Consolidated Amended Complaint was filed on August 9, 2017. (ECF No. 30.) Plaintiffs claim four causes of action:

> Count I – For Violation of Section 11 of the Securities Act Against All of the Securities Act Defendants
>
> Count II – For Violation of Section 15 of the Securities Act Against Plank, Molloy, and the Director Defendants
>
> Count III – Violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder Against All of the Exchange Act Defendants
>
> Count IV – For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants.[8]

Consol. Am. Compl., ECF No. 30. The Exchange Act Plaintiffs purport to represent a class of all persons or entities that purchased or acquired publicly traded securities of Under Armour between September 16, 2015 to January 30, 2017, inclusive ("Class Period"), and who were damaged thereby. (*Id.* at ¶ 2). The Securities Act Plaintiff purports to represent

---

[6]     The Bonds closed at $94.08 on January 30, 2017, $92.50 on January 31, 2017, and $89.50 on February 1, 2017. (ECF No. 30 at ¶ 58.) The Bonds fell from a close of $93.24 on July 31, 2017 to a close of $92.00 on August 1, 2017. (*Id.* at ¶ 59.)

[7]     *Brian Breece v. Under Armour, Inc., et al,* Case No. 17-0388-RDB filed February 10, 2017 (bringing Exchange Act claims); *Jodie Hopkins v. Under Armour, Inc., et al,* Case No. 17-0452-RDB filed February 16, 2017 (bringing Exchange Act claims); and *Ben Stenger v. Under Armour, Inc., et al,* filed March 2, 2017 (bringing Exchange Act claims). No Securities Act claims were brought against any defendant prior to their inclusion in the [Corrected] Consolidated Amended Complaint, ECF No. 30, on August 9, 2017.

[8]     Plank, Dickerson, and Molloy (collectively, "Individual Defendants"). (ECF No. 30 at 82.)

all persons or entities that purchased or acquired 3.250% senior unsecured notes of Under Armour due June 15, 2026 pursuant or traceable to the Registration Statement filed with the SEC on June 6, 2016. (*Id.* at ¶ 3.)

Plaintiffs allege that Defendants concealed their sales and revenue problems during the Class Period, making false claims of explosive growth and strong customer demand while downplaying the ballooning inventory, liquidations, and gross margin compression. (*Id.* at ¶ 11.) They also allege that Plank personally cashed in on the artificial inflation by selling shares of his Company stock for total proceeds of $138.2 million during the Class Period. (*Id.* at ¶ 13.) Further, Plaintiffs allege that the Defendants raised nearly $600 million from the sale of then-investment grade Bonds by making various untrue and misleading statements in the materials provided to the SEC on June 6-9, 2016. (*Id.* at ¶¶ 13, 27, 52.)

By the instant motion, ECF No. 51, the Under Armour Defendants seek dismissal with prejudice of all claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Procedure, and the Private Securities Litigation Reform Act ("PSLRA"). The Underwriter Defendants join in the motion, and separately move this Court to dismiss the claims against them under Section 11 of the Securities Act for the additional reason that the claims are barred by the Securities Act one-year statute of limitations. *See* ECF No. 52-2.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The United States

Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), require that complaints in civil actions be alleged with greater specificity than previously was required. While a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Iqbal*, 556 U.S. at 678. A complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

This Court has noted that a claim for securities fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b). *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 634 (D. Md. 2010). Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances constituting fraud be stated with particularity." Fed. R. Civ. P. 9(b). The rule "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists." *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991). To satisfy the rule, a plaintiff must "identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments." *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 509 (D. Md. 2007). As the United States Court of Appeals for the Fourth Circuit stated in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451 (4th Cir. 2013), the aims of Rule 9(b) are to provide notice to defendants of their alleged misconduct, prevent frivolous suits, eliminate

fraud actions where all the facts are learned after discovery, and protect defendants from harm to their goodwill and reputation. 707 F.3d at 456 (citation omitted).

The PSLRA further requires a securities fraud claim to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(1),(b)(2)).

## ANALYSIS

### I.      Securities Act Claims

Section 11 of the Securities Act addresses liability for registration statements filed with the Securities Exchange Commission. *See* 15 U.S.C. § 77k(a).  Section 11 of the Securities Act imposes liability if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *Id.*  If someone purchases a security for which the registration statement contained a material misstatement or omission, this section allows him to sue "every person who signed the registration statement," every director in the issuer at the time of the statement's filing, and "every underwriter with respect to such a security." *Id.*  There is no state of mind element to a § 11 claim, and liability is "virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

Pursuant to § 15 of the Securities Act, persons in control of any person found liable under § 11 or § 12(a)(2) may be jointly and severally liable. 15 U.S.C. § 77o. Section 15,

therefore, is dependent on an underlying violation of the relevant securities laws, meaning that if this Court finds no violation of Section 11, there is no violation of Section 15. *See In re Constellation Energy*, 738 F. Supp. 2d at 639.

Underwriter Defendants argue that the Section 11 claims against them are time-barred by the statute of limitations and all Securities Act Defendants argue that the complaint fails to allege any actionable misrepresentation or omission in the offering materials issued in connection with the Bond Offering. (ECF No. 52-2 at 1.)

## A. Statute of Limitations

The merits of an affirmative defense, such as limitations, are not considered on a motion to dismiss unless all the facts necessary to establish the defense "clearly appear[] on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)(citations omitted). The application of a limitations period often entails a fact intensive inquiry. *See id.* at 465–66 (reversing dismissal of claim on limitations grounds, on motion to dismiss, because plaintiff's complaint "d[id] not provide facts sufficient to apply the discovery rule"). Further, a defendant bears "the burden of establishing the affirmative defense" predicated on limitations. *Id.* at 464.

The Securities Act's one-year statute of limitations prohibits actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence"—that is, after a plaintiff was on "actual notice" or "inquiry notice." 15 U.S.C. § 77m.

The Underwriter Defendants assert that inquiry notice "is triggered by evidence 'of the possibility' of a claim of misrepresentation and not by complete exposure of the alleged

scam." (ECF No. 52-2 at 12 (quoting *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 819 (D. Md. 2002).) Securities Act Plaintiff argues that in 2010, the Supreme Court altered the legal standard for inquiry notice, holding that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period." (ECF No. 56 at 12 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010).) Rather, the limitation period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." (*Id.* (quoting 28 U.S.C. § 1658(b).) Although *Merck* involved an Exchange Act claim, Plaintiffs argue that it applies equally to Securities Act claims. (*Id.*)

The Fourth Circuit has not yet had occasion to determine whether *Merck* requires a change in the interpretation of Section 13 of the 1933 Act. However in 2012, this Court applied the *Merck* standard to a Section 11 claim, noting:

> While courts in the Fourth Circuit have not yet confronted the inquiry notice standard in a Securities Act case since *Merck*, before *Merck*, courts in the Fourth Circuit applied the inquiry notice standard from *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993), an Exchange Act case, to Securities Act claims.

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 662 n.47 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014)(citing *Cohen v. USEC, Inc.*, 70 F. App'x 679, 686–89 (4th Cir. 2003)). Other courts have agreed that *Merck* applies to Securities Act claims. *See, e.g.*, *Pension Tr. Fund for Operating Engineers v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 274 (3d Cir. 2013)(holding that the discovery standard governs whether Securities Act claims are timely); *see also Fed.*

*Housing Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 319 (S.D.N.Y. 2012) *aff'd* 712 F.3d 136 (2d Cir. 2013) (treating § 77m and § 1658(b) as equivalent)); *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012) ("Given this identity of operation, the Court finds no principled basis for cabining *Merck's* holding to Section 1658(b)."); *but see Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364-65 (S.D.N.Y. 2012) (surveying the conflicting law, the court stated that the "majority of courts in this district declined to apply *Merck* to Section 11 claims," but then noted that it made no difference because of Section 11's more relaxed pleading requirements); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015)("We have never considered whether *Merck* abrogates this circuit's existing "inquiry notice" rule in favor of the discovery rule in Securities Act claims, an issue that divides the district courts in this circuit.")

The *Merck* Court itself described with approval the longstanding practice of adopting the Securities Act's explicit "reasonable diligence" standard for the Exchange Act accrual date, despite "the omission of an explicit provision to that effect." *Merck*, 559 U.S. at 647. At the same time, the Supreme Court also clearly preserved a limited role for the inquiry standard, acknowledging that "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *Id.* at 653.

In this case, it is apparent that a reasonably diligent plaintiff would not only have begun investigating but would have discovered the alleged facts underlying the claim that was pleaded more than one year before this claim was ultimately filed. Securities Act

Plaintiff filed its first complaint in this matter on August 4, 2017.[9]  Therefore, assuming the discovery standard for purposes of this timeliness analysis, the Securities Act Plaintiff must not have had sufficient information about the facts of the claim to adequately plead them in a complaint on August 4, 2016.  *See Mun. Mortg.*, 876 F. Supp. 2d at 654 (citing *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

The Underwriter Defendants contend that the Securities Act Plaintiff knew all of the information they now cite in support of the omissions alleged—and could have pleaded them in a complaint—no later than July 26, 2016.  (ECF No. 52-2 at 15.)  Securities Act Plaintiff, however, contends that the disclosure events occurring on January 31, 2017, resulting in the February 1, 2017 Bonds' rating downgrade, triggered the earliest possible running of limitations.  (ECF No. 56 at 18.)  Securities Act Plaintiff notes that the Bond price was trading above the Offering price on July 26, 2016, and October 26, 2016 was the first date that the Bonds ever closed below their Offering price, so Securities Act Plaintiff could not have alleged damages until that time.  (*Id.* at 20-21.)

Securities Act Plaintiff's focus is misplaced.  To state a claim under Section 11, plaintiffs must allege only that they purchased securities for which the registration statement contained a material misstatement or omission.  15 U.S.C. § 77k(a).  Securities Act Plaintiff alleges that it purchased the Bonds on July 19, 2016, which is before August 4, 2016. (ECF No. 30-1 at 4.)  Therefore, if Securities Act Plaintiff should have discovered facts sufficient to allege that the registration statement contained untrue statements or omissions before

---

[9]     The Consolidated Amended Complaint filed on August 4, 2017 was refiled on August 9, 2017 due to errors in the caption.  *See* ECF Nos. 26, 29.  As previously noted (n.7 infra), no Securities Act claims had been previously filed.  This is also the date that the Underwriter Defendants were first added to the litigation, and it represents the first appearance of Securities Act Plaintiff.

August 4, 2016, the claim is untimely. Securities Act Plaintiff's allegations point directly to information that was publicly available prior to August 4, 2016. For example, Securities Act Plaintiff alleges that "Under Armour's apparel products, which account for most of the Company's sales, suffered from reduced customer appeal and demand (*see* ¶¶98-100)." (ECF No. 30 at ¶ 55(a).) Paragraphs 98-100 specifically reference the Morgan Stanley Report, attached as Exhibit C and incorporated by reference. (*Id.* at 24 n.4.) The date on the Morgan Stanley Report is January 10, 2016. (ECF No. 30-3.)

Securities Act Plaintiff asserts that Under Armour's "countervailing narrative" downplayed the Morgan Stanley Report and related articles, which undercut any questions raised. (ECF No. 56 at 19 (citing cases for support that a ratings downgrade may be an appropriate triggering event for statute of limitations).) Of course, a ratings downgrade may well be a sufficient triggering event, and Under Armour's ratings downgrade is cited in Securities Act Plaintiff's Complaint as additional support for their claim, but that does not mean it is a necessary or sole triggering event.

Importantly, Under Armour's July 26, 2016 announcement of "second quarter decreases in operating and net income and a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast [of] the slowest quarterly growth in over six years" (ECF No. 30 at ¶ 120.) undercuts any earlier Under Armour comments downplaying the negative reports. As part of its factual allegations, Securities Act Plaintiff also cited the negative effect on Under Armour securities prices as a result of the "surprising" news from Morgan Stanley on January 10, 2016, (*Id.* at ¶ 117.), the "suspicious" departures of executives in February and May 2016 causing prices to decline on May 4, 2016 (*Id.* at ¶ 118.), and the

June 1, 2016 revelations of "a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional securities price declines" (*Id.* at ¶ 119.). These earlier disclosures, especially taken in their entirety, were sufficient triggers to allow Securities Act Plaintiff to have investigated, and to reasonably have discovered, prior to August 4, 2016, facts adequate for pleading a Section 11 cause of action against the Underwriter Defendants.

Further, the relation-back doctrine does not save the claim with regard to the Underwriter Defendants because they had no notice of the action prior to the filing of the Consolidated Amended Complaint against them on August 4, 2017. *See* Fed. R. Civ. P. 15(c)(1). Therefore, this Court holds that the Section 11 claims against the Underwriter Defendants, as set forth in Count I, are time-barred and shall be dismissed WITH PREJUDICE.

Securities Act Plaintiff also argues that Under Armour, Plank, and Molloy were on notice of the fact that the initial complaints alleged the falsity of statements made in Under Armour's Form 10-Q for the first quarter 2016, filed with the SEC on April 29, 2016. (ECF No. 56 at 28.) However, the initial complaints made only Exchange Act claims related to the decline in stock prices, the factual allegations regarded statements made in press releases and conference calls with analysts, and there is no mention of Form 10-Q filings or the Bond Offering. Further, the Securities Act Plaintiff was not a plaintiff in the original complaints. Although these Defendants did not formally[10] join the motion to dismiss on

---

[10] There is a brief footnote comment included in the memorandum accompanying the motion to dismiss the Exchange Act claims. (ECF No. 51-2 at 58 n.24.)

statute of limitations grounds, this Court holds that the relation-back doctrine would not apply to save the claim against them from also being time-barred.

Accordingly, this Court holds that the Section 11 claims against *all* the Securities Defendants are time-barred and shall be dismissed WITH PREJUDICE. Section 15 claims "are derivative of the other claims and thus subject to the same time limitation." *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 479 n.3 (S.D.N.Y. 2010). Therefore, Section 15 claims, as set forth in Count II, shall also be dismissed WITH PREJUDICE.

### B.     Failure to State a Claim

Although this Court dismisses the Section 11 claims as being time-barred, resulting in the dismissal of the Securities Defendants with prejudice, this Court also finds that Securities Act Plaintiff has failed to state a claim under Section 11, which would result in the Securities Act claims being dismissed without prejudice.

To state a claim under Section 11, a plaintiff must allege that: (1) the plaintiff purchased the registered security; and (2) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). For a misrepresentation to violate securities law it must be material. *In re USEC*, 190 F. Supp. 2d at 815. "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).

## 1. Pleading Standard

Generally, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) do not apply to a Section 11 claim because it is based in negligence and does not require a showing of scienter. *In re Constellation Energy*, 738 F. Supp. 2d at 640 n.8 (citing *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 402 (D. Md. 2004). However, if the claim sounds in fraud, it must be pleaded with particularity. *Id.* (citing *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008)).

Defendants contend that Securities Act Plaintiff was required to satisfy heightened pleading requirements for the securities claims because they allege "a single, coordinated scheme to defraud investors" and used the same allegations as the basis of all their claims. (ECF No. 51-2 at 52 (quoting *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 554 (M.D.N.C. 2013)). Plaintiffs note that they practically filed two different complaints by placing the Exchange Act claims and the Securities Act claims in separate sections, the Exchange Act claims do not incorporate by reference the allegations supporting the Securities Act claims, the Securities Act claims apply to mostly different defendants, and Securities Act Plaintiff exclusively pleaded "ordinary negligence and strict liability" while "expressly disclaim[ing] that the Securities Act Defendants acted with fraudulent intent or scienter." (ECF No. 55 at 56-57, nn. 37, 39.)

Even though Section 11 claims do not have fraud as an element, allegations may "sound in fraud." *Cozzarelli*, 549 F.3d at 629.[11]  In *Cozzarelli*, "sound in fraud" is described: the plaintiffs' allegations are "part of a single, coordinated scheme to defraud investors" and

---

[11]  "Although claims under Sections 11 . . . may not have fraud as an element, Rule 9(b) refers to 'alleging fraud,' not to causes of action or elements of fraud." *Cozzarelli*, 549 F.3d at 629.

are "exactly the same as plaintiffs' allegations of fraud under the Exchange Act," i.e., the same alleged false statements support the Exchange Act counts, and are specifically alleged elsewhere in the complaint to be fraudulent. *Id.* Whether Securities Act claims sound in fraud requires analyzing the wording and structure of the specific pleading. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011).

In this case, Bucks County Employees Retirement Fund is a separate Securities Act Plaintiff bringing the Securities Act claims, who alleges:

> These claims are, in effect, a separate complaint. In the allegations and claims set forth herein, Bucks County asserts strict liability claims pursuant to the Securities Act on behalf of itself and the Securities Act Class (defined in ¶63 below). Bucks County's claims are not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any of the Defendants. Bucks County's claims do not, and are not intended to, allege fraud or sound in fraud, and Bucks County specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

(ECF No. 30 at ¶ 22.) Yet, within the Securities Act claims allegations, they later allege that an opinion statement "was materially false and misleading because the Securities Act Defendants had knowledge of, or recklessly disregarded, omitted facts . . . ." (*Id.* at ¶ 56.)[12] Also, there is no allegation that the Securities Act Defendants were negligent. The alleged misleading statements or omissions under the Securities Act claims are later alleged under the Exchange Act to be fraudulent. (*See, e.g.*, ECF No. 30 at 164, 284, 294, 319, 322.) Despite the care that Plaintiffs may have taken to keep the claims separate, as in *Cozzarelli*,

---

[12] In almost identical language under the Exchange Act claims, the Plaintiffs allege that the Exchange Act Defendants made "materially false and misleading statements and omissions with actual knowledge of, or severely reckless disregard for, their false and misleading nature." (ECF No. 30 at ¶ 82; *see also id.* at ¶ 163(a) (referring to opinion statements as materially false and misleading, "and lacked a reasonable basis because Defendants had knowledge of, or recklessly disregarded, omitted facts. . . .").)

the alleged misleading statements that form the basis for Plaintiffs' Exchange Act claims are the same as Securities Act Plaintiff's Section 11 claims. Thus, this Court shall apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b).

### 2. Adequacy of Allegations

Securities Act Plaintiff alleges that it purchased the Bonds on July 19, 2016. (ECF No. 30-1 at 4.) There is no dispute that Securities Act Plaintiff has adequately pleaded the purchase of the registered security. Securities Act Defendants contend, however, that Securities Act Plaintiff fails to adequately plead any material misstatement or omission.

There are two aspects to the Securities Act Plaintiff's claims:

(1)     The Offering Materials incorporated by reference publicly filed Under Armour documents containing false and misleading statements and omissions of material fact. (ECF No. 30 at ¶ 53.) These documents included the Company's Form 10-K for the fourth quarter 2015 ("4Q15") and fiscal year 2015 ("FY15"), which was filed with the SEC on February 22, 2016, and the Company's Form 10-Q, reporting financial results for the first quarter of 2016 ("1Q16"), which was filed with the SEC on April 29, 2016. (*Id.* at ¶ 53-54.); and

(2)     The Offering Materials omitted information that was required to be disclosed under Item 503 of Regulation S-K, 17 C.F.R. §229.503(c). (*Id.* at ¶ 61-62.)

### a. False or Misleading Statements

Securities Act Plaintiff alleges that the following statements are false or misleading:

- We believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace. (*Id.* at ¶ 53.)

- We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace. (*Id.* at ¶ 54).

However, Securities Act Defendants aptly note that these two statements are corporate optimism, also referred to as "puffery," and are inactionable statements of opinion. (ECF No. 51-2 at 55.) "Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity." *In re Neustar Sec.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015) (quoting *Carlucci v. Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012)). A reasonable person understands and "recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015). "Reasonable investors do not understand such statements as guarantees, and § 11's omissions clause therefore does not treat them that way." *Id.* Of course, simply adding "I believe" to a statement does not magically transform a statement from being potentially misleading. *Id.* at 1331. However, for such a statement to be properly alleged as misleading, it requires specific factual allegations that the speaker did not in fact hold the stated belief, or the supporting facts supplied by the speaker were untrue. *Id.* at 1332. Opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Id.* [13] Securities Act Plaintiff fails to adequately allege that Securities Act Defendants did not in fact hold the stated opinions. Securities Act Plaintiff also fails to allege facts about how Securities Act Defendants formed

---

[13] The Supreme Court noted that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and added that "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Omnicare*, 135 S. Ct. at 1329. The Court went on to say that a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.*

their opinion, making only a general allegation that "Defendants had knowledge of, or recklessly disregarded, omitted facts." (ECF No. 30 at ¶ 56.)

Securities Act Plaintiff also alleges that these statements are false or misleading:

- The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf. (ECF No. 30 at ¶ 54)

- The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy, which we expect to continue during the first half of 2016 on a more limited basis. (*Id.*)

The statement regarding driving forces behind the increase in net sales is alleged by Securities Act Plaintiff to be untrue because "[i]n reality, demand was shifting away from performance products offered by the Company." (*Id.* at ¶ 55.) Securities Act Defendants assert that the statement is "an accurate recitation of historical financial data." (ECF No. 51-2 at 57.) Securities Act Defendants also note that the full statement in the 10-Q[14] included additional wording that Securities Act Plaintiff omitted, and the full statement was back by numbers supporting the truth of the statement. (*Id.*)

Quite simply, Plaintiffs do not get the benefit of 20/20 hindsight. *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV 1989 PAC, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011), *aff'd in part, rev'd in part and remanded sub nom. Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013) (citing *Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010), *vacated on other grounds*, No. 08 Civ. 8235, 2010 WL 2816259 (S.D.N.Y. July 14, 2010)). "[T]he accuracy of

---

[14]    Form 10-Q filed on April 29, 2016 was attached as Exhibit 31 to the Under Armour Defendants' dismissal motion. (ECF No. 51-34.) The Court takes judicial notice of the document since it contains facts that are not subject to reasonable dispute.

offering documents must be assessed in light of information available at the time they were published." *Id.* (quoting *Yu*, 686 F. Supp. 2d at 377); *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015)("[A] reasonable investor expects that the issuer's statement 'fairly aligns with the information in the issuer's possession at the time.'" (quoting *Omnicare*, 135 S. Ct. at 1328)). Securities Act Plaintiff does not allege that the data supporting the statement is untrue, but rather that, in hindsight, it became apparent that "demand was shifting away from Under Armour performance products to more fashion-oriented products offered by the Company's competitors . . . ." (ECF No. 30 at ¶ 55(b)).

The final statement regards factors behind the decrease in gross margin percentage in 1Q16 and is alleged to be false and misleading because the "gross margin decreases were primarily driven by increased discounting and promotions and lower sales prices" and "inventory was increasing as a result of slowing sales and demand due to continuing declines in the apparel business, requiring increasing inventory liquidations in 2016." (*Id.* at ¶¶ 55, 56.) It also contains an expression of opinion: "we expect to continue . . . ." (*Id.* at ¶ 54.) Here, Securities Act Plaintiff cites the Morgan Stanley Report to support its version of the reasons behind 1Q16 results, but the Morgan Stanley Report was published ten days into 1Q16 so could not contain any information regarding the 1Q16 results. Securities Act Plaintiff alleges no facts to demonstrate that Securities Act Defendants' expectations were not believed as stated. While a court must assume all well-pleaded facts to be true, unwarranted inferences and unreasonable conclusions do not support a finding that the allegations are sufficient to survive a motion to dismiss. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250,

253 (4th Cir. 2009).  Securities Act Plaintiff has failed to identify with any precision any material misstatements or omissions made in the Registration Statement.

### b.  Item 503 Violation

Item 503(c) states that a registration statement, under the caption "Risk Factors," should include "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).  It further directs that the "discussion must be concise and organized logically."  *Id.*   "[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely effect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor."  *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013).

Securities Act Plaintiff simply alleges in two paragraphs that "one of the most significant factors that made the Offering speculative or risky to investors was the fact that, at the time of the Offering, the Company's apparel business was in severe decline," and Under Armour did not disclose that "this material known trend was occurring . . . ." (ECF No. 30 at ¶¶ 61-62.)

Securities Act Plaintiff's allegations are not adequate for this Court to infer that Securities Act Defendants knew, as of the time of the Offering, that any decline it may have identified in the apparel market was severe or would cause the Company major financial problems.   The allegations fail to identify how the omission rises to the level of a "most significant factor[]" requiring inclusion at that time in a discussion of what would make the

Offering speculative or risky. Therefore, Plaintiffs fail to allege a plausible Item 503 violation.

Accordingly, the Securities Act Plaintiff has failed to sufficiently allege a Section 11 violation as to all Defendants in Count I. Therefore, even if this claim was not barred by the statute of limitations, Count I would still be dismissed without prejudice.

### C.     Section 15 Liability

Count Two asserts a claim against Plank, Molloy, and the Director Defendants under Section 15 of the Securities Act, which imposes joint and several liability on persons in control of entities that violate securities laws. 15 U.S.C. § 77o. Because violations of Section 15 depend on an underlying violation of the Securities Act, *id.* at 77o-(a), and Securities Act Plaintiff fails to state a claim for an underlying violation of the Securities Act, Count Two is also subject to dismissal.

## II.     Exchange Act Claims

Counts III and IV set forth claims of Exchange Act violations by Exchange Act Plaintiff against Exchange Act Defendants—Under Armour, Plank, Molloy, and Dickerson. The Exchange Act and its accompanying regulations act to protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Securities fraud actions serve an important purpose—but only when those actions are meritorious. *Cozzarelli*, 549 F.3d at 624 (citing *Tellabs*, 551 U.S. at 313, 322). "The PSLRA balances these concerns by requiring courts to sort out the meritorious claims from the abusive ones early in litigation, and *Tellabs* obligates courts do so with care." *Id.*

## A.    Section 10(b) and Rule 10B-5

Section 10(b) of the Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of a security in violation of SEC rules.  15 U.S.C. § 78j(b).  "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

A typical § 10(b) action requires a plaintiff to prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates*, 744 F.3d at 884 (quoting *Stoneridge*, 552 U.S. at 157).  The Exchange Act Defendants contend that Plaintiffs fail to plead an actionable misrepresentation or omission and also fail to adequately allege scienter.  The PSLRA's heightened pleading standard is applicable to these two elements.  *Singer v. Reali*, 883 F.3d 425, 449 (4th Cir. 2018)(quoting *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007)).

### 1.  Material Misrepresentations or Omissions

"The 'complaint must include each statement alleged to have been misleading, the reason . . . why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting *Teachers'*, 477 F.3d at 172).  Plaintiffs allege

that there were many statements made during the Class Period that constitute material misrepresentations or omissions.  These allegations include:[15]

### a.  September 16, 2015 Investor Day statements

On September 16, 2015, Under Armour held its 2015 Investor Day with senior management making presentations.  (ECF No. 30 at ¶ 144.)

- Plank stated that "[t]he demand for our brand has never been stronger."  (*Id.* at ¶ 145.)

- Dickerson added that "[a]pparel, our largest category, continues to grow over 20% approaching a $5 billion business, doubling the size of the business since 2014."  (*Id.*)

- Vice President of the Women's Division, Kelly Cortina, added, "Demand for our product is growing."  (*Id.*)

- Another Company representative (Susie McCabe, Under Armour's Senior Vice President of Global Retail) made clear that despite its ultra-aggressive growth targets, Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."  (*Id.* at ¶ 146.)

- Projections of continued 20-plus% growth, including:

  o Plank: "we have no expectation of [20-plus% revenue growth] stopping anytime soon."  (*Id.* at ¶ 148.)

  o Stafford: "we see our businesses in . . . apparel . . . set to accelerate, not just grow, but accelerate growth, over the course of the next three years. With apparel approaching $5 billion . . . there is significant runway."  (*Id.*)

  o Matt Mirchin, President, North America: "We will more than double our [North American] business by 2018 -- from 2014 through 2018 at a 21% CAGR. Our biggest business is going to more than double

---

[15]     As found in the [Corrected] Consolidated Amended Complaint, ECF No. 30, and referenced in Plaintiffs' Memorandum of Law in Opposition to Under Armour Defendants' Motion to Dismiss the Consolidated Amended Complaint, ECF No. 55.   The Court has grouped them in four categories for purposes of the discussion.

through 2014 through 2018. Let me take a step back, let me slowdown and repeat that. Our biggest business will more than double from 2014 to 2018." (*Id.*)[16]

    o  Dickerson: "Within North America, as Matt [Mirchin] stated before we continue to expect a 20% plus CAGR and more than double our revenue from just under $2.8 billion in 2014 to almost $6 million [sic] in 2018." (*Id.*)

- Dickerson stated that planned initiatives would cause elevated inventory growth rates through 2015 and 2016 for the purpose of "flow[ing] product earlier" and "delivering our products to our consumers more timely, specifically on key seasonal floor set dates." (*Id.* at ¶ 150).

Plaintiffs allege that all of these statements of fact were false and misleading because the Exchange Act Defendants knew that "under Amour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand" at that time, and they "carried out a plan, scheme, and course of conduct which was intended to . . . deceive the investing public." (*Id.* at ¶¶ 152(a), 318.) Although it is sometimes difficult to piece together Plaintiffs' allegations, it appears that they base the falsity of these statements on the January 10, 2016 Morgan Stanley Report, which indicated that customer demand for the Company's brand was declining. (*Id.* at 153(a) (citing ¶¶ 98-100).) Plaintiffs also allege that Under Armour's first discount sale on Black Friday 2015 (November 27, 2015) evidences Exchange Act Defendants' knowledge at that time that its "brand heat was dying." (*Id.* at ¶ 100.) Following this sale were further discount promotions in 2015 and 2016, and the institution of a buyback program at some unknown point in time, which Plaintiffs allege were an attempt to combat the declines in the apparel market. (*Id.* at ¶¶ 101-102, 152(c).)

---

[16]    CAGR is the initialism for compound annual growth rate.

Plaintiffs' allegations of misrepresentations on the Investor Day held September 16, 2015 fall short of the requirement to plead with specificity some reason why the statements were false. The only indications that the statements were false at the time they were made are a third-party report that was issued months later stating that the customer demand for the Under Armour brand was declining and company discount sales also occurring months later. "Mere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). Further, predictions of future growth "not worded as guarantees are generally not actionable under the federal securities laws." *Id.* at 211 (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)). Statements such as "demand for our product have never been stronger" are typical expressions of corporate optimism, which are not actionable. *In re Constellation Energy*, 738 F. Supp. 2d at 625 (quoting *In re USEC*, 190 F. Supp. 2d at 822).

Additionally, Exchange Act Defendants note that forward-looking statements are protected under PSLRA. (ECF No. 51-2 at 2, 43-49.) Under the PSLRA, a "forward-looking statement" is defined to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer", and "a statement of future economic

performance." 15 U.S.C. § 77z–2(i)(1); 15 U.S.C. § 78u–5(i)(1). Even if an unidentified forward-looking statement by a business entity has no accompanying cautionary language, liability only attaches if the plaintiff proves that the statement was "(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. 77z–2(c)(1)(B)(ii); 15 U.S.C. § 78u–5(c)(1)(B)(ii). Plaintiffs fail to allege particularized facts to support their contention that any of the Exchange Act Defendants had actual knowledge that the statements made during the fall of 2015 were false or misleading.[17]

### b. Third Quarter 2015 Results Reporting

On October 22, 2015, Under Armour issued a press release announcing its financial results for the third quarter of 2015 ("3Q15"). (ECF No. 30 at ¶ 154.) Plank and Dickerson participated in a conference call to discuss the results. (*Id.* at ¶ 155.) On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15. (*Id.* at ¶ 160.)

- In the press release, Plank stated: "Our scoreboard in the third quarter not only marked our 22nd straight quarter of at least 20% net revenue growth, but also our first $1 billion quarter." (*Id.* at ¶ 154.)

- Dickerson admitted that margins had contracted, and a similar decline was expected in 4Q15, and when asked for additional detail, stated that "most of our core apparel product margins are improving." (*Id.* at ¶ 155-56.) He also admitted that the Company anticipated elevated inventory over the next few quarters, blaming it on a strategic plan to flow products to customers in a timelier manner, stating that inventory "should start to normalize a little bit as we work through 2016." (*Id.* at ¶ 158.)

---

[17] The Court notes that although Plaintiffs refer to having based the Complaint, in part, upon interviews with factual sources, including individuals formerly employed by the Company and its retail partners (ECF No. 30 at ¶ 4.), there are no factual allegations of such information where it might be expected, such as to support an inferences of knowledge.

- Defendants raised the Company's Fiscal Year 2015 outlook for net revenues of 27% growth and operating income of 15% growth, and provided a preliminary outlook for 2016 of net revenue growth of approximately 25% and operating income growth of approximately 23%. (*Id.* at ¶ 157.)

- Plank reiterated confidence that "the building blocks to reach our Investor Day target of $7.5 billion in net revenues by 2018 are firmly in place." (*Id.*)

- The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace." (*Id.* at ¶ 160.)

Plaintiffs allege that all of these statements were materially false and omitted material facts that made the statements misleading. (*Id.* at ¶ 162.) Again, it appears that they base the falsity of these statements largely on the January 10, 2016 Morgan Stanley Report. (*Id.* at ¶ 162(a) (citing ¶¶ 98-100).) Plaintiffs also allege that the Company's Form 10-Q for 3Q15 failed to disclose to the market the actual materially adverse conditions. (*Id.* at ¶ 162(f).) Plaintiffs also allege that the projections were misleading because Exchange Act Defendants had knowledge that the Company was in severe decline. (*Id.* at ¶ 163(a) (citing ¶¶ 98-100).)

The reporting of actual third quarter 2015 results is not alleged to be inaccurate or false. The statements regarding predictions of future growth, including the Form 10-Q statement, may be considered expressions of puffery or corporate optimism, which are not actionable misrepresentations. *In re Constellation Energy*, 738 F. Supp. 2d at 625 (quoting *In re USEC*, 190 F. Supp. 2d at 822). The Form 10-Q statement is also an opinion statement that included cautionary language. Further, actual results for the fourth quarter of 2015 and fiscal 2015 were strong and consistent with the projections.

### c. Partial Disclosures

Plaintiffs allege that the Exchange Act Defendants ultimately made partial disclosures that downplayed the negative news about Under Armour's financial condition and kept the securities prices artificially inflated. (*Id.* at ¶ 164.)

- On January 28, 2016, in a press release announcing fourth quarter 2015 and fiscal year 2015 financial results, Plank stated: "Our core business remains incredibly strong and our 31% net revenue growth in the fourth quarter is clear evidence of the continued expansion in the breadth and depth of our Brand. We delivered our 25th consecutive quarter of more than 20% net revenues growth in our largest product category of apparel . . . ." (*Id.* at ¶ 172.)

- On January 28, 2016, in the conference call with analysts to discuss the Company's financial results, Plank boasted: ""In the fourth quarter, Apparel growth of 22% show cases [sic] that our brand has products for all seasons and temperatures." (*Id.* at ¶ 173.)

- On January 28, 2016, in the conference call with analysts to discuss the Company's financial results, Dickerson explained the strategy behind excess inventory and liquidations by saying: "This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . . In addition, the recent weather trends have led to some excess inventory creation, which we will continue to work through across our normal liquidation channels during the first half of 2016." (*Id.* at ¶ 175.)

- During the same January 28, 2016 conference call, Plank and Dickerson downplayed the point-of-sale retail data cited in the Morgan Stanley Report. Dickerson stated: "So utilizing that [SportScan] data as a proxy for our success, especially in the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%. So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular." Plank stated: "And in the fourth quarter with 31% growth and frankly marking our 23rd consecutive quarter of 20% plus top line revenue growth, our growth story is strong, we remain a growth company, and none of that is wavered. . . . Our brand, our presence, our ability to drive ASPs have never been stronger in North America. . . . In the third quarter in North America, we grew 25%. In the fourth quarter in North

America, we grew 26%. I don't know if I'd call that accelerating, but I'd certainly call it strong. . . . So to be clear about North America, we still see abundant opportunities across the continent. And as we said at our Investor Day in September, we believe that we will double this business by 2018." (*Id.* at ¶ 176.)

- During the same January 28, 2016 conference call, Plank and Dickerson responded to questions about ASPs and gross margins. Plank stated: "So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel. So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators. . . . As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . . We continue to drive and demonstrate that premium position in the marketplace." Dickerson added: "And we were able to offset a lot of that [gross margin increase] just through our general increase and improvement in product margins, specifically on the Apparel side. So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins. So I think in all aspects of our business, you will see that improve over time. . . . And our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak." (*Id.* at ¶ 177.) Plank also stated that "we do see the ability to continue to drive ASPs and improve margin by – through premium products as the way that we'll build it out." (*Id.* at ¶ 178.)

- During the same January 28, 2016 conference call, Plank projected that "we continue to expect inventory growth rates to be slightly elevated above revenue growth rates, in the front half of 2016, with growth rates expected to level off and be in line with revenue growth in the back half of 2016." (*Id.* at ¶ 180.)

- On February 22, 2016, Under Armour filed with the SEC a Form 10-K reporting financial results for the fourth quarter of 2015 and fiscal year 2015, which included this statement: "We believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace." (*Id.* at ¶ 182.)

- The July 26, 2016 press release announced disappointing second quarter 2016 results, with apparel sales rising only 18.9% over the prior year (dropping below 20% for the first time in nearly seven years) and a gross margin of 47.7% compared to the prior year's 48.4% and reduced earnings per share was explained as "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international,

partially offset by approximately 50 basis points from improved product cost margins." (*Id.* at ¶ 212-213.)

- In the conference call on July 26, 2016, Molloy responded to a question about the impact of the Sports Authority bankruptcy, stating that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . . It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority]. We have made up some of that, but not all of it." (*Id.* at ¶ 215.) Reporting revenue growth of 28%, Plank stated that ""[o]ur second quarter results are strong evidence that demand for Under Armour has never been higher." (*Id.* at ¶ 219.) Molloy added that "the consistent growth across our diverse product lines and channels delivered another quarter of strong results." (*Id.* at ¶ 220.)

- In the same conference call on July 26, 2016, Plank responded to a question about shifting fashion trends: "Yeah, I'm not going to say I'm comfortable with the promotion out there in the market today, but I don't know if that's different than what we've seen in the last several years either. I think there's a shift happening. I think the way the people are dressing is changing, and it's altering. And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend. But the good news is that we're not grounded in trend, we're grounded in sport. That'll keep us here, and the trends will come and go. But we're also watching our core base continue to grow for us as well." (*Id.* at ¶ 221.)

- At the September 7, 2016 Goldman Sachs Global Retailing Conference, Molloy responded to questions about inventory: "Yeah, for us we're in a really good position. We feel really healthy and it's our understanding that the marketplace is in a healthy position, too. Came out of the winter season, there was a lot of excess inventory. You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies. It was flush with inventory. It was a promotional environment. We didn't participate – have to participate too much in that promotional environment. But it from what we can understand and as of the end of August that most of the domestic retail partners are in really good inventory positions. We know we are." (*Id.* at ¶ 230.) He also stated that "retail is pretty good and inventories are clean." (*Id.* at ¶ 231.) Also, "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected." (*Id.* at ¶ 232.)

Plaintiffs allege that these statements were false and misleading because, according to the Morgan Stanley Report, Under Armour's apparel products suffered from reduced customer appeal and demand, which led to a host of financial problems, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins. (*Id.* at ¶¶ 184(a),(c), 233-35 (citing ¶¶ 98-115, 125).) Plaintiffs allege that Exchange Act Defendants failed to disclose material problems, and their statements gave investors a misleadingly positive perception on the Company's growth. (*Id.* at ¶ 184(b).) Plaintiffs also allege that the attempts to downplay the Morgan Stanley Report and explain their corporate growth strategies were false and misleading. (*Id.* at ¶¶ 184(d)-(g).) Further, Plaintiffs allege that the opinion statements were false and misleading and had no reasonable basis because they had knowledge of, or recklessly disregarded, omitted facts that showed the Company was in severe decline, apparel demand was slowing, and inventories were increasing. (*Id.* at ¶ 185.) Plaintiffs allege that the statements were material, as evidenced by the analysts' reactions. (*Id.* at ¶¶ 181, 194.) Plaintiffs also note that the statements were often in response to an analyst's inquiry, which takes them beyond puffery. (ECF No. 55 at 32.)

There are no allegations that the actual results reported were inaccurate or false. Again, some of the predictions of future growth can be considered puffery or corporate optimism. However, Plaintiffs have alleged material statements of opinion or present fact that were misleading because the statements were inconsistent with Exchange Act Defendants' data and information. For example, the statement "our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak," and

various statements regarding inventory, such as "retail is pretty good and inventories are clean," are alleged to be inconsistent with the underlying data in Exchange Act Defendants' possession. Plaintiffs have alleged that Exchange Act Defendants omitted purported material information that was in their possession and were obligated to provide in order to give a truthful picture of the Company's health. For example, Plaintiffs allege that Exchange Act Defendants failed to explain departures of key personnel, and failed to relay facts about lower ASPs, loss in market share, excess inventory, and impact of wholesale customers' bankruptcies. All that is necessary at this stage is to determine whether there are sufficient facts and reasons alleged that, if true, would create a plausible claim that Exchange Act Defendants made a false or misleading statement. *Teachers'*, 477 F.3d at 173. Plaintiffs have satisfied that requirement.

### d. Statements Regarding Financial Outlook for 2016

Plaintiffs allege that statements made regarding the Company's 2016 financial outlook were materially false and misleading based on omissions of material facts going to the basis of the opinions:

- The March 4, 2016 press release stated that Under Armour would be able to offset the impact of the bankruptcy of one of its largest retail customers on March 2, 2016 "through continued sales to The Sports Authority and sales through other channels and customers." (*Id.* at ¶ 186.)

- The April 21, 2016 press release announcing first quarter 2016 results included this statement by Plank: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%. The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies." (*Id.* at ¶ 188.)

- In a conference call held on April 21, 2016 to discuss the first quarter 2016 results, Plank responded to a question regarding the health of Under Armour's North American wholesale channel by stating that it was "obviously a tough quarter for some of our partners in sporting goods," but "I mean, posting 30% growth in a quarter where one of our largest customers, one of our top two or three customers just a few years ago, filed for bankruptcy. I think putting that kind of number up is something that just continues to demonstrate the strength of the brand, and how strong our portfolio ultimately is. We do believe that there is still an underlying very strong wholesale market out there and we expect to continue to be iconic, to be a destination. . . . So . . . our growth is effectively coming from everywhere. And North America is something that we feel incredibly strong about. . . ." (*Id.* at ¶ 190.) Plank emphasized that "[a]nd again, we are to be clear, driving massive growth, and we are taking share." He later projected that "[t]his year, we expect every quarter to top $1 billion in revenues based on our updated outlook of $5 billion U.S., an important milestone for our brand." (*Id.* at ¶ 191.)

- In the same April 21, 2016 conference call, Molloy explained the rising inventory was caused by "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and declining gross margins were due to "higher liquidations to clear through excess inventory and foreign currency exchange rates." (*Id.* at ¶ 192.) In response to a question about the inventory, he stated: "Majority of the growth is planned. But we did have slightly excess . . . . But we are working through that. . . . So it'll start to creep away as we go through the year. So we're working through it, but the majority of it is planned." (*Id.* at ¶ 194.)

- The April 29, 2016 Form 10-Q filed with the SEC reporting its financial results for the first quarter of 2016 included these statements: ""We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace. . . . The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf. . . . The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy, which we expect to continue during the first half of 2016 on a more limited basis." (*Id.* at ¶ 195.)

- On May 31, 2016, Under Armour lowered its 2016 projections in a press release, announcing an impairment charge and reduced revenues as a result of the Sports Authority liquidation, stating: "given the recent decision of the

bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business." (*Id.* at ¶ 205.) In the press release, Plank stated that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies." (*Id.* at ¶ 209.)

- In the July 26, 2016 conference call, Molloy stated that "[b]ased on our current visibility, we continue to expect 2016 net revenues of approximately $4.925 billion, representing growth of 24% . . . . [F]or the third quarter, we expect revenues to grow approximately 20% as we begin to lap our strategies to better service our customers and as we navigate the impact of the Sports Authority liquidation." (*Id.* at ¶ 222.) He added that "we will see notable improvements in the actual product margins in Q4." (*Id.* at ¶ 224.)

- Also in the July 26, 2016 conference call, Plan reassured that revenue growth would continue: ""[W]e're 25 quarters north of 20% in a row. Over six years of doing that, we see that trend continuing for us, number one. We do continue to see it to project 25% plus growth for the full year." (*Id.* at ¶ 223.)

- On August 3, 2016, Under Armour filed a Form 10-Q with the SEC stating that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace." (*Id.* at ¶ 226.)

- On October 25, 2016, Under Armour hosted a conference call to discuss its third quarter 2016 financial results. In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations. Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year." (*Id.* at ¶ 236.) He also stated that "the landscape for our business and our industry continues to evolve . . . . North America apparel growth is slowing across the industry. While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015." (*Id.* at ¶ 237.) Molloy projected that "we expect annual operating income growth in the mid-teens each of the next two years." (*Id.* at ¶ 238.) He added that the Company expected "full-year 2016 net revenues of approximately $4.925 billion, representing growth of 24%. And operating income in the range of approximately $440 million to $445 million, representing growth of 8% to 9%" and fourth quarter revenues expected to "grow approximately 20%. . . . We believe the strength of our brand and increased breadth of head-to-toe product offerings position us for another quarter of strong growth in what has

been a challenging North American retail environment." (*Id.* at ¶ 243.) Molloy also stated during the conference call that "[a]t our 2015 Investor Day, we announced our goals of achieving $7.5 billion of revenues and $800 million of operating income by 2018. We are on track to achieve our 2018 revenue goal of $7.5 billion and expect to grow full-year revenues consistently in the low 20%s in both 2017 and 2018." (*Id.* at ¶ 244.) Molloy also assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward." In response to an analyst question later in the call, Molloy stated that the Company was "in really good shape from an inventory perspective" and "growth rates [have] come down, but the inventory is in great shape." (*Id.* at ¶ 246.)

- During the October 25, 2016 conference call, Plank stated that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . . [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution." (*Id.*) Plank also downplayed the negative news: "We are a growth company. And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter. Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business." (*Id.* at ¶ 241.) He added that the apparel business was "incredibly profitable and still growing at the tune of 18% in just the third quarter for us. So, there's not an end to the North American apparel story. That continues to march on for us as well. We just have other opportunities that are outpacing some of that growth." (*Id.* at ¶ 242.)

- On November 2, 2016, Under Armour filed a Form 10-Q with the SEC stating that ""[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace." (*Id.* at ¶ 248.)

Plaintiffs allege that these statements lacked a reasonable basis because Exchange Act Defendants had knowledge of, or recklessly disregarded, omitted facts showing severe declines that made the projections unreasonable. (*Id.* at ¶¶ 187, 198, 250-51.) Plaintiffs allege that the statements made were false because they differed from the information provided by the Morgan Stanley Report. (*Id.* at ¶ 197, 209, 228, 250-51 (citing ¶¶ 98-115,

125).)  Plaintiffs also cite a July 27, 2016 Morgan Stanley report that stated: "Sales are growing solidly, but ASPs are fading. [Under Armour] competes on brand image and innovation, rarely on price. This trend change is a concern because it suggests a fundamental shift in the [Under Armour] story."  (*Id.* at ¶ 225(b).)  Plaintiffs allege that the Company's positive projections were misleading because, in reality, demand was shifting away from performance products to more fashion-oriented products, and Under Armour's brand strength was diminishing.  (*Id.* at ¶ 250.)

Plaintiffs also point to Under Armour's actual results reported on January 31, 2017, revealing that net revenues grew only 12% in the fourth quarter of 2016, breaking the streak of 26 consecutive quarters with greater than 20% growth, fiscal year gross margin dropped from 48.1% to 46.5%, fiscal year inventory increased 17%, and fiscal year net revenues were $4.8 billion, which was lower than the Company's October 25, 2016 guidance of $4.925 billion.  (*Id.* at ¶ 252.)  Plaintiffs allege that the reasons for the disappointing performance that Plank and others provided on the conference calls in January 2017 indicate that Exchange Act Defendants knew, or recklessly disregarded the issues and problems that were occurring during 2016.  (*Id.* at ¶¶ 255-63, 271-72, 278-80.)

Similar to the previous categories of statements, there are some statements here that can be considered as typical expressions of corporate optimism, which are not actionable. Exchange Act Defendants also assert that their forward-looking statements are protected by the PSLRA's safe harbor.  Some statements may fall in that category.  However, as with some of the partial disclosure statements, there are also alleged omissions, and alleged false statements or opinions that satisfy the pleading requirement.  For example, Plaintiffs allege

that the statements regarding inventory and "we are taking share" are inconsistent with data and information in Exchange Act Defendants' possession at that time. While certainly not all alleged statements satisfy the pleading requirement for material misrepresentations or omissions, there are some, and that is sufficient to move forward to the second of the six elements that a typical § 10(b) action requires plaintiffs to adequately allege: scienter.

### 2. Scienter

To establish scienter, a plaintiff must prove that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. Although pleading either intentional or severely reckless conduct is sufficient to allege scienter, *Yates*, 744 F.3d at 884, a plaintiff must satisfy the exacting pleading requirements set forth in the PSLRA as well as Rule 9(b) of the Federal Rules of Civil Procedure. *Tellabs*, 551 U.S. at 313. Indeed, pleading a "strong inference" of scienter is no small burden. *See id.* at 322-23 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").

"To survive a motion to dismiss in a § 10(b) complaint, the inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 2027 (2018)(citation omitted). The plaintiff must "plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328; *see also Yates*, 744 F.3d at 885 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only

allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009))).

In sum, a court, while accepting all factual allegations as true,[18] must consider the complaint in its entirety, determine whether the alleged facts, taken collectively, give rise to an inference of scienter, compare the strength of that inference to opposing inferences that could also be drawn from the facts alleged, and determine whether the inference of scienter is at least as strong as any opposing inference.

A reckless act, in the context of a § 10(b) claim, is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Yates*, 744 F.3d at 884 (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)). "Reckless conduct sufficient to establish a strong inference of scienter is described as 'severe.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003)),

Plaintiffs contend that their pleading of factual allegations of an undisclosed fundamental shift in Under Armour's business is sufficient to make the strong showing that Exchange Act Defendants had the requisite scienter, summarized as follows:

- Defendants admitted knowledge of both the North American apparel segment and Under Armour's extensive data information systems, and therefore, they

---

[18]    However, unlike the typical analysis in a motion to dismiss, the PSLRA does not require all reasonable inferences to be construed in the light most favorable to plaintiffs, but rather requires plaintiffs to plead sufficient facts to raise a strong inference of scienter. *Teachers'*, 477 F.3d at 172.

made public statements that they knew were not accurate. (ECF No. 55 at 34-36.)

- While giving repeated public assurances that Under Armour's data showed that the ability to drive ASPs had "never been stronger in North America," and that the Company was actually "taking [market] share," Defendants knew or recklessly disregarded their own internal data showing that their sales growth had decelerated, it was losing apparel market share, footwear prices were down more than the industry average. (*Id.* at 35-36 (quoting ECF No. 30 at ¶ 176, 191).)

- While declaring that demand for their brand has never been higher, Defendants, for the first time ever, ran sales of the big logo hoodie during Black Friday 2015, discounting the top seller for as much as 25% off, and began to sell other staples for 25% off in 2015 and 2016 because the demand for the Company's brand was dying. (*Id.* at 36-37.) They also began a buyback program for merchandise that did not sell and were required to buy back some of the unsold merchandise. (*Id.* at 37.)

- Defendants' misleading statements and omissions related to core operations and the Company's largest and most important business segment, and the Individual Defendants held senior positions and were personally involved in the operations. (*Id.*) These Defendants regularly spoke about core operations, providing prepared statements, and answering detailed questions about the Company's sales growth, sales prices, gross margins, and inventory levels. (*Id.* at 38.)

- Departures of key personnel were highly suspicious, in particular, Molloy, the fourth high-level senior executive to leave during the Class Period. (*Id.* at 38-39.) "According to analysts, Molloy's departure 'after just one year' was part of the 'trifecta of bad news' that 'tanked' the Company's share price." (*Id.* at 40 (quoting ECF No. 30 at ¶ 266(b)-(c)).)

- On October 25, 2016, with nearly a month of 4Q16 complete, Defendants assured investors that 4Q16 revenue would "grow approximately 20%" and that the "inventory position is healthier and that liquidation should not have the same negative impact moving forward." (*Id.* at 41 (quoting ECF No. 30 at ¶¶ 242-246).) Defendants then revealed on January 31, 2017 that they had missed their 4Q16 forecast by 40% and disclosed that inventory was not in "great shape" and had grown by 17% in FY16 and would "be higher than revenue growth for the first three quarters of 2017." (*Id.* at 41-42 (quoting ECF No. 30 at ¶¶ 246, 258, 260).)

- After the Morgan Stanley Report caused a near 7% drop in Under Armour's stock price, Defendants publicly questioned the reliability of the point-of-sale retail data and reassured investors as to the performance of each of the business segments addressed in the report.  (*Id.* at 42-43.)

- Plank sold over 2 million shares for more than $138 million at a time when the Company's stock price was near record highs, and he has not sold any more stock since April 2016.  (*Id.* at 43-45.)  Each of the sales was suspiciously timed, shortly after he made misleading statements and the stock price was inflated.  (*Id.* at 44.)  For the majority of his trades, Plank gave up significant (10-to-1) voting control to cash in.  (*Id.*)  Plank also instituted his 10b5-1 trading plan after the start of the Class Period, just six days after making a series of misleading statements and omissions, and less than a month later, he sold 1,125,000 shares, the maximum that he could sell under his plan.  (*Id.* at 48.)

- Defendants had a motive to issue false and misleading statements in order to preserve the Company's investment grade debt rating in advance of the June 2016 Bond Offering.  (*Id.* at 50.)

Exchange Act Defendants contend that the Plaintiffs rely on speculative conclusions, faulty inferences, and lack of support for any "fundamental shift" or "internal awareness that the Company's results or prospects differed from Defendants' public statements."  (ECF No. 63 at 1.)  While evidence is certainly not required at the pleading stage, it is necessary for Plaintiffs to state with particularity the facts giving rise to a strong inference of scienter.  *See* 15 U.S.C. § 78u–4(b)(1).  When evaluating whether the factual allegations give rise to a strong inference of scienter, a court must determine if the allegation permits an inference and the persuasiveness of the inference, "affording their allegations the inferential weight warranted by context and common sense."  *Matrix*, 576 F.3d at 183 (citing *Cozzarelli*, 549 F.3d at 625-26).

Plaintiffs contend that Exchange Act Defendants have admitted knowledge of the Company's sales growth, ASPs, and market share, so this Court can infer that they knew

their representations about these things were misleading.  (ECF No. 55 at 34-35.)  "[T]he PSLRA requires particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)(citation omitted).  Plaintiffs allege that Exchange Act Defendants had detailed data available to them through their existing SAP platform, which gives rise to a strong inference that they knew facts or had access to information that would suggest that their public statements were not accurate.  (ECF No. 55 at 35-36.)  However, Plaintiffs provide no corroborating factual allegations to support the allegation that Exchange Act Defendants were in possession of conflicting facts; Plaintiffs simply state the allegation, point to the Morgan Stanley Report for support that inconsistent data was available, and assume that the corporate data was the same.  Exchange Act Defendants' statements about the data used by the Morgan Stanley Report question the validity of the data that Morgan Stanley relied upon.  The Morgan Stanley Report, itself, acknowledged that "no industry data source is perfectly correlated to a company's results."  (ECF No. 30-3 at 16.)  While it is certainly possible that Exchange Act Defendants had corporate data that reflected dying demand for the brand as early as 2015, it is also possible that the reports that were reviewed by the Individual Defendants from corporate data supported their statements at the time they made them.  Without more, this Court does not find the inference persuasive that Exchange Act Defendants engaged in conscious or reckless behavior with an intent to deceive.

Plaintiffs contend that the repeated misrepresentations about core operations over the course of a year suggest a strong inference of scienter.  (ECF No. 55 at 38-39.)  Certainly,

allegations that the Individual Defendants were senior executives and their misleading statements and omissions related to the Company's core business, are relevant to the scienter analysis. *Yates*, 744 F.3d at 890. However, such allegations, without additional support, are not sufficient. *Id.* Plaintiffs add that the Individual Defendants repeatedly spoke about core operations at conferences, on conference calls, and in press releases, and asked and answered detailed questions during every quarterly earnings call. (ECF No. 55 at 38 (citing allegations by paragraph number).) This Court also finds relevant that the statements made by the Individual Defendants, as alleged, were not simply overt optimism but were modified over time with added caveats and cautions, accepting as true that these statements were only partial disclosures.

Plaintiffs allege that the departure of key personnel, especially Molloy, and the timing of the departures, bolsters the inference of scienter. (ECF No. 55 at 39-40.) The unexplained departures and the timing may contribute to an inference of scienter. *Yates*, 744 F.3d at 889. However, without factual allegations that provide explanations that support any suspicion related to the departures or the timing, the inference is weak.

Plaintiffs allege that the close proximity of misrepresentations in late 2016 and the contradictory disclosures in early 2017 also bolsters the inference of scienter. (ECF No. 55 at 41-42.) Plaintiffs add that the magnitude[19] of the miss in Under Armour's failure to achieve its fourth quarter 2016 projections further supports the inference. It is also possible, however, that Exchange Act Defendants' failure to achieve their projections is

---

[19]    Exchange Act Defendants note that the alleged "miss" is improperly stated as 40%, when in actuality, net revenues were 7% below projections. (ECF No. 63 at 11 n.9.)

attributable to a number of external forces rather than fraud.[20]  Failure to achieve projections, even within a short period of time, without more, does not support a strong inference of fraud.

Plaintiffs make an effort to demonstrate scienter by showing that the Exchange Act Defendants had a motive to commit securities fraud.  According to the Fourth Circuit, "[t]o support a claim of motive based on the benefit a defendant derives from an increase in the value of his holding, a plaintiff must demonstrate some sale of 'personally-held stock' or 'insider trading' by the defendant."  *Phillips v. LCI Int'l*, Inc., 190 F.3d 609, 622 (4th Cir. 1999).  "[I]nsider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'"  *Teachers'*, 477 F.3d at 184.  Whether an insider's sale of stock is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006).

Plaintiffs provide factual allegations regarding stock sales by Plank at suspicious times and for huge profits.  (ECF No. 30 at ¶¶ 13, 135-140.)  The sales occurred during the Class Period, and he sold over 2 million shares for over $138 million. (*Id.*)  However, Plaintiffs also note that "[s]ince 2008, Plank has taken a nominal annual salary of $26,000, deriving most of his income from Under Armour stock-based compensation, including incentives connected to the Company's financial performance . . . ."  (ECF No. 30 at ¶ 135.)  Exchange Act

---

[20]    Exchange Act Defendants note: "In the fourth quarter of 2016, the Company experienced "only" 12% net revenue growth, and it missed its FY16 net revenue projections by 2%. This stock-drop lawsuit quickly followed.  As is typical in such suits, Plaintiffs insist that it must have been fraud (rather than macroeconomic conditions, changes in the retail market, or any of the other reasons that sometimes cause companies to fall short of revenue projections) that caused lower than expected growth." (ECF No. 51-2 at 1.)

Defendants add that the sales represented less than 5% of Plank's overall holdings, were consistent with his historical trading, and were sold pursuant to a pre-scheduled Rule 10b5-1 trading plan. (ECF No. 63 at 12-14.) Plank's trading plan was entered into on October 28, 2015, which is within the Class Period. (*See* ECF No. 55 at 48.)[21]

"Under Rule 10b5–1, corporate insiders can set up trading plans to sell company shares at predetermined times and amounts to avoid accusations of illegal insider trading." *Yates*, 744 F.3d at 891. However, instituting the plan after the start of the class period "does less to shield" the insider from suspicion. *Id.* Plaintiffs' allegations provide a plausible inference that Plank had a motive to make false and misleading statements to keep stock prices high before he profited from sales of his holdings. However, there are no factual allegations to suggest a similar motive on the part of any of the other Individual Defendants or that the other Individual Defendants would have made false and misleading statements to aid Plank in profiteering.[22] Further, Plaintiffs allegations of statements that Plank made during the fall of 2015 were corporate optimism and predictions of growth that were consistent with actual results. While the allegations demonstrate that Plank sold stock when prices were at record highs, there are no allegations that the selling pattern was dramatically out of line with prior trading practices, there are alternate explanations for the stock sales, and Plank continues to hold the lion's share of Under Armour stock. One insider's well-

---

[21]    The date was established by one of Defendants' exhibits attached to the dismissal motion and was accepted by Plaintiffs as referenced here. There are no allegations related to this date or to Plank's trading plan.

[22]    Plaintiffs add in their opposition to the dismissal motion that Dickerson also sold shares during the Class Period – 10,000 shares for $955,660 on November 5, 2015, just two weeks after claiming that core apparel product margins were improving and just before the Morgan Stanley Report revealed that apparel margins had been declining at an accelerating pace since spring 2015. (ECF No. 55 at 49 (citing ECF No. 55-4).) The Complaint contains no allegations regarding insider trading by Dickerson.

timed sales do not support a "strong inference" that the Exchange Act Defendants knew that they were making false or misleading statements.

Plaintiffs contend that Plank and Molloy were motivated to issue false and misleading statements in order to preserve Under Armour's investment grade debt rating in advance of the June 2016 Bond Offering. (ECF No. 55 at 50 (citing ECF No. 30 at ¶¶ 141, 209). Plaintiffs allege that had the truth been revealed before the offering, it would have been aborted because the "Bonds *likely* would have received a junk rating . . . requiring that they be marketed at a higher interest rate . . . . [and] *probably* would have made no financial sense." (ECF No. 30 at ¶ 141 (emphasis added).) Plaintiffs' conjecture, unsupported by any factual allegations suggesting an unusual corporate need for the proceeds of the Offering other than repaying outstanding debt, does not support a strong inference of scienter.

Viewed collectively, and taking into account plausible opposing inferences, the factual allegations made by Plaintiffs do not support a strong inference of scienter. Additionally, Plaintiffs allegations are not sufficiently particular as to the Individual Defendants for this Court to parse whether any one of them may be found to have made a material misrepresentation or omission with scienter. Plaintiffs frequently group Defendants together, especially when pleading knowledge or recklessness,[23] which fails to satisfy the PSLRA's heightened pleading standard applicable to the first two elements of the Section 10(b) cause of action. The Court will not perform the detailed matching necessary to

---

[23]     *See, e.g.*, ECF No. 30 at ¶¶ 122-23, 153, 163, 185. Defendants also note that Dickerson was not with the Company after February 3, 2016, and Molloy only arrived in January 2016, so statements cannot be attributed to them outside those parameters. (ECF No. 51-2 at 51 n. 21.)

perform this analysis for each Individual Defendant. However, Plaintiffs will be given leave to amend if they can do so.

In sum, Plaintiffs fail to plead sufficient facts to establish a cogent and compelling inference that Under Armour or any of the Individual Defendants acted knowingly or recklessly with "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. Accordingly, Count III shall be dismissed without prejudice.

## B.     Section 20(a)

Count IV asserts a claim against the Individual Defendants, who are alleged to have had the power to influence and control Under Armour's decision making, including the content and dissemination of the alleged false and misleading statements, as well as the power to control the particular transactions giving rise to the alleged securities violations. (ECF No. 30 at ¶ 330-31.) Plaintiffs contend that by virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. (*Id.* at ¶ 332.)

Section 20(a) provides for derivative liability for those who control others found to be primarily liable under the Act. 15 U.S.C. § 78t(a). A claim of control person liability must allege a predicate violation of Section 10(b). *Mun. Mortg.*, 876 F. Supp. 2d at 647. Plaintiffs have failed to adequately plead a viable underlying 10(b) or Rule 10b–5 violation. Therefore, they have not pleaded a predicate offense on which to base control person liability. Accordingly, Count IV shall be dismissed without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' motions are GRANTED. The Under Armour Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (ECF No. 51) is GRANTED, and Counts III and IV of the [Corrected] Consolidated Amended Complaint (ECF No. 30) are DISMISSED WITHOUT PREJUDICE. The Underwriter Defendants' Notice of Motion to Dismiss the Consolidated Amended Complaint (ECF No. 52) is GRANTED, and Counts I and II of [Corrected] Consolidated Amended Complaint (ECF No. 30) as to all Defendants are DISMISSED WITH PREJUDICE.

A separate order follows.


Dated: September 19, 2018          _____/s/_____

                                   Richard D. Bennett
                                   United States District Judge