**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ABERDEEN CITY COUNCIL AS ADMINISTRATING AUTHORITY FOR THE NORTH EAST SCOTLAND PENSION FUND, and MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiffs,<br><br>     vs.<br><br>UNDER ARMOUR, INC., and KEVIN A. PLANK,<br><br>                        Defendants. | Civil No. RDB-17-388<br><br><u>CLASS ACTION</u> |

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   SUMMARY OF THE ACTION .........................................................................2

III.  JURISDICTION AND VENUE .........................................................................5

IV.  PARTIES ............................................................................................................6

V.   SUBSTANTIVE ALLEGATIONS ....................................................................8

     A.    Background of the Company .................................................................8

     B.    Plank Drove Under Armour's Aggressive Growth Strategy ...............10

     C.    Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined ............................................................................11

     D.    Declining Apparel Sales Led to Excess Inventory and Liquidations ...................14

     E.    Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines ................................16

     F.    The Company's Stock Price Declined When the Market Learned the Truth About the Company's Sales Problems .................................17

     G.    Numerous Facts Support Defendants' Scienter .....................................19

          1.    Defendant Plank's Knowledge or Reckless Disregard of the Company's Undisclosed Fundamental Shift and Sales Problems ............19

          2.    Expert Opinion Confirms the SportScan Data Revealed by Morgan Stanley Was "Materially Consistent" with Under Armour's Internal Data ...............26

          3.    Defendant Plank Was Motivated to Maintain a Positive Market Perception of the Company and the Company's Artificially Inflated Stock Value .............28

          4.    Expert Opinion Confirms that Plank's Class Period Stock Sales Were Highly Suspicious .........................................................33

     H.    The Scienter of Company Executives Is Imputed to Defendant Under Armour ...................................................................37

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................................................................................38

A. 2015 Investor Day ...................................................................................39

B. 3Q15 Financial Results ...........................................................................42

VII. INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS
CONTINUE TO MISLEAD THE MARKET ....................................................46

 A. Published Retail Data Exposes Growth, Market Share, and ASP Declines
at Under Armour .......................................................................................46

 B. Misleadingly Positive 4Q15 and FY15 Financial Results and Downplay of
the Morgan Stanley Report .......................................................................50

 C. Press Release Reiterating 2016 Financial Outlook Despite Sports
Authority's Bankruptcy ............................................................................55

 D. Misleadingly Positive 1Q16 Financial Results and Guidance Raise ....................56

 E. Departures of the Company's Chief Merchandising Officer and Chief
Digital Officer ...........................................................................................61

 F. Reduced Financial Guidance Tied to the Sports Authority Bankruptcy ...............62

 G. Under Armour Bond Offering ...................................................................64

 H. Disappointing 2Q16 Financial Results: Partial Revelations of a Growth
Slowdown ..................................................................................................65

 I. Goldman Sachs Global Retailing Conference .........................................70

 J. Disappointing 3Q16 Financial Results: Further Revelations of a Growth
Slowdown and Compressed Margins........................................................71

 K. Disappointing 4Q16 & FY16 Financial Results: Revelations of a Severe
Growth Slowdown and the Sudden Resignation of CFO Molloy..........................76

VIII. POST-CLASS PERIOD REVELATIONS ........................................................82

IX. VERIFIED DERIVATIVE COMPLAINT................................................................88

X. LOSS CAUSATION AND ECONOMIC LOSS ................................................90

 A. January 10, 2016 Revelations ...................................................................90

 B. May 3, 2016 Revelations ...........................................................................90

 C. May 31, 2016 Revelations .........................................................................91

 D. July 26, 2016 Revelations .........................................................................91

E.    October 25, 2016 Revelations ..................................................................................92

F.    January 31, 2017 Revelations ..................................................................................92

G.    August 1, 2017 Revelations ...................................................................................92

XI.    PRESUMPTION OF RELIANCE ......................................................................................94

XII.    NO SAFE HARBOR ...........................................................................................................96

XIII.    CLASS ACTION ALLEGATIONS ..................................................................................98

COUNT I ...............................................................................................................................100

COUNT II ..............................................................................................................................103

COUNT III.............................................................................................................................104

PRAYER FOR RELIEF .......................................................................................................106

JURY TRIAL DEMANDED .................................................................................................107

1495422_1

## I.        INTRODUCTION

1.        Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") and Monroe County Employees' Retirement System ("Monroe") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.        Plaintiffs bring this federal class action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Under Armour, Inc. ("Under Armour" or "Company") between September 16, 2015 and January 30, 2017, inclusive ("Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants Under Armour and Kevin A. Plank ("Plank") (collectively, "Defendants").[1]

3.        Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel which included, without limitation: (a) review and analysis of public filings made by Under Armour and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties; (e) interviews with factual sources, including individuals formerly employed by the Company and its retail partners; and (f) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1]    In the Court's September 19, 2018, Memorandum Opinion, the Court dismissed with prejudice the Section 11 and 15 claims brought under the Securities Act of 1933.  ECF No. 74 at 2, 50.  As such, Plaintiffs will not re-allege and replead these already rejected claims, but preserve their right to appeal the dismissal.  *See Young v. City of Mount Rainier*, 238 F.3d 567, 572-73 (4th Cir. 2001).

## II.      SUMMARY OF THE ACTION

4.      Under Armour is one of the largest sports apparel companies in the world.  The Company sells branded athletic products, which it divides into three categories: apparel, footwear, and accessories.  By a wide margin, apparel is the Company's largest selling product, accounting for over two-thirds of net revenue in 2016.  Nearly two-thirds of the Company's sales are made through wholesale channels such as sporting goods chains (*e.g.*, Dick's Sporting Goods ("Dick's"), Foot Locker, Champs, Finish Line).  While Under Armour products are available worldwide, over three-quarters of its sales come from North America.  According to Plank, North American apparel is the Company's "largest and most profitable business by far."

5.      Under Armour faces steep competition in the athletic apparel industry.   The Company's chief rivals, Nike and Adidas, have dominated the sector for decades.  But the Company slowly gained market share since its formation in 1996, capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour surpassed Adidas to become the number two sportswear brand by revenue in the United States, and seemed poised to challenge Nike's supremacy as the top brand.

6.      Defendants knew that growth was critical to keep pace with competitors and perpetuate the market's perception of the Company as a leading premium sports brand.  For 26 consecutive quarters, spanning from the second quarter of 2010 ("2Q10") to the third quarter of 2016 ("3Q16"), Under Armour reported a compounded annual growth rate of 20% or more.  At every turn, Plank reminded investors of this feat, noting that it was shared by only one other company in the S&P 500, and assured the market that such growth would continue, and continue as a premium-priced brand.

7.      Indeed, at the start of the Class Period, during the Company's Investor Day on September 16, 2015 ("2015 Investor Day"), Defendants boasted that "demand for our brand has never been stronger" and led the market to believe that the Company's incredible growth streak would continue.

- 2 -

8.     In reality, however, the Company was then experiencing a severe decline in its apparel business due to its "brand heat" dying.  In other words, customer demand for core products that the Company had successfully sold for years had begun to wane.  As Defendants would later admit, the Company failed to compensate for this decline by offering new and fashionable products in line with the latest consumer trends, such as athletic leisure apparel (aka "lifestyle" or "athleisure").  As a result, the Company's apparel sales began to slow, causing it to lose market share to Nike and Adidas.

9.     Faced with declining demand and excess inventory due to unsold products, the Company abandoned its fundamental sales philosophy of competing on brand strength over price. Instead, the Company resorted to lowering sales prices and offering promotions, and had to liquidate excess inventory at steep discounts.  This, in turn, contributed to a drop in the Company's average sales prices (ASPs) at a time when competitors in the sports apparel industry, such as the Company's chief rival Nike, were steadily increasing average sales prices.

10.    To preserve the Company's carefully cultivated image as a fast-growing, premium sports brand and a legitimate challenger to Nike, Defendants concealed these problems during the Class Period.  Rather than explain to the market that "brand heat" for the Company's apparel was dying, Defendants falsely claimed that apparel was stronger than ever.  Defendants trumpeted explosive growth and strong customer demand, while downplaying and concealing the Company's ballooning inventory, liquidations, and gross margin compression.  And, despite these negative trends afflicting the Company's core business, Defendants doubled down on their fraud on January 28, 2016, by repeatedly emphasizing the purportedly continuing premium brand strategy.

11.    Defendants also attempted to offset the decline of the Company's core apparel business by accelerating investments in lower margin footwear products and international expansion. This expensive strategy temporarily propped up revenue growth and provided a scapegoat for the Company's margin declines.

12.    As a result, Under Armour's common stock prices were artificially inflated throughout the Class Period.  In fact, analysts noted that Under Armour stock achieved an

- 3 -

1495422_1

"unprecedented valuation" near the beginning of the Class Period.  Plank personally cashed in on such artificial inflation (and the "unprecedented valuation") by selling a substantial amount of his Company stock for total proceeds of $138.2 million during the Class Period.  As detailed below, and in the attached expert declaration, these sales were suspicious in timing and amount and dramatically out of line with Plank's selling practices before and after the Class Period.  Indeed, over just nine days in November 2015 and April 2016, Plank sold 36% and 42%, respectively, of the shares he had available to sell shortly after making material misstatements and omissions.  Since then, Plank has not sold a single share of his Company stock.  Defendants also leveraged their fraud by raising nearly $600 million from the sale of then-investment grade bonds ("Bonds") during the Class Period.

13.     On January 10, 2016, Morgan Stanley published a report ("Morgan Stanley Report") relying on fact-based industry sales data that revealed declining average sales prices, market share, and margins since spring 2015.  The sales data in the report was materially consistent with Under Armour's own internal sales data available to Defendants through multiple sources.  In response to this report, Under Armour's stock declined sharply, which represented the beginning of a decline in Under Armour common stock prices as the truth began to emerge.  However, Defendants denied the report and reassured investors that the Company's financial results and prospects were as strong as ever and that the Company was and would continue to be a premium brand that would not compete on price.  The market credited the Company's claim with numerous analysts issuing reports stating that Under Armour was now pursuing its premium-priced strategy even more aggressively.

14.     Despite this pushback, the market continued to learn of Under Armour's true financial condition through a series of disclosures, including a dramatic slowdown in growth, compressed margins, excess inventory, and Company executive resignations that included the Chief Financial Officer ("CFO"), Lawrence P. Molloy ("Molloy"), who left after only 13 months on the job.  The

market's reaction to these revelations caused precipitous drops in Under Armour's common stock prices and losses of millions of dollars by Under Armour's investors.

15.     The Company's downward spiral continued after the Class Period ended on January 30, 2017, confirming the depth of the problems alleged herein.  During the first half of 2017, Under Armour continued to report drastically reduced sales growth, lower margins, and excess inventory. The Company also went through a massive restructuring in an attempt to restore the Company's "brand heat," including an evolution from Under Armour's traditional performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."  The Company's common stock has not recovered since the Class Period ended nearly 22 months ago, trading over 50% lower than its artificially inflated Class Period highs.[2]

## III.    JURISDICTION AND VENUE

16.     The Exchange Act claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Under Armour conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

19.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United

---

[2]     On November 15, 2018, Under Armour's publicly traded common stock closed at $22.39 (Class A) and $20.90 (Class C) per share compared to $28.94 and $25.09 per share on the final day of the Class Period (January 30, 2017), and Class Period highs of $52.95 and $46.20 per share on September 17, 2015 and April 21, 2016, respectively.

1495422_1

States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   PARTIES

20.     Plaintiff Aberdeen was appointed to serve as Lead Plaintiff in this action by Order of this Court dated April 26, 2017.  Dkt. No. 13.  As shown in the certification filed with the Court on April 11, 2017 (Dkt. No. 6-3) and attached hereto as Exhibit A, Aberdeen purchased or otherwise acquired 495,441 shares of Class A common stock and 128,037 shares of Class C common stock of Under Armour at artificially inflated prices during the Class Period.[3]

21.     As shown in the certification attached hereto as Exhibit B, Plaintiff Monroe purchased Class A common stock of Under Armour at artificially inflated prices during the Class Period.

22.     Plaintiffs suffered economic losses when true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the prices of such common stock.

23.     Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230.

24.     Defendant Plank is the founder of Under Armour and served as Chief Executive Officer ("CEO") and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through present.  As CEO, Plank spoke on Under Armour's behalf during conference calls, in press releases, and in the media.  Plank was also the Company's

---

[3]     The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common stock outstanding and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

largest shareholder throughout the Class Period, beneficially owning just over 15% of all shares outstanding and controlling approximately 65% of the voting shares. Plank went to great lengths to maintain control of the Company, as demonstrated by a massive recapitalization during the Class Period that solidified Plank's control. Since its Initial Public Offering ("IPO") in 2005, the Company had two classes of stock, Class A and Class B. Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share. Class B Common Stock is non-publicly traded and carries ten votes per share. As of October 28, 2015, Plank held 35,700,000 ten-vote Class B shares and 76,445 one-vote Class A shares, giving him 66.5% of the votes.

25.     In the years following the 2005 IPO, events such as the issuance of new Class A stock and employee stock compensation, among other things, diluted Plank's ownership share and put his voting control of the Company at risk. A provision in Under Armour's charter provides that should Plank's ownership stake fall below 15%, Plank's ten-vote Class B shares would automatically convert to one-vote Class A shares and, thereby, divest Plank of his voting power which would fall from 65% to below 15%. As one analyst noted, "Given there have been two splits in the last three years, his ownership has already been diluted, which is why it is becoming dangerously close to the 15% threshold." In 2015, to prevent that from happening, Plank caused the Company to adopt several amendments to its charter centered on ensuring that Plank would not lose voting control. Specifically, the Company resolved in July 2015 to issue a third class of common stock: Class C. The new Class C stock would have zero votes.

26.     Plank publicly lobbied for the Class C issuance in a June 15, 2015, letter to shareholders. Plank acknowledged that the Company's dual-class structure was designed to ensure he "retain control over significant decisions impacting Under Armour's future." Plank warned the dilution of his ownership stake "could ultimately undermine our current governance structure." And claimed "maintaining our founder-led approach is in the best interests of Under Armour and all of its

- 7 -

stockholders." Plank's letter further touted the benefit of giving him "flexibility of selling these non-voting shares . . . while maintaining our founder-led approach." Importantly, the related amendments to the Company's charter included a provision limiting the amount of shares Plank could sell in any given year to 2.5 million shares, with potential rollover starting in 2017.

27.     On April 7, 2016, the Class C shares were issued as a 1:1 dividend to all holders of Class A and Class B shares. The benefit to Plank was two-pronged. First, the Company could use the zero-vote Class C shares for employee stock-based compensation and financing transactions, *e.g.*, acquisitions involving Company stock, without diluting Plank's voting power. Second, as discussed further below, Plank could sell Class C shares without reducing his voting power – as he did just a few weeks after the Class C shares were issued.

28.     While the Class C issuance demonstrated the lengths Plank would go to maintain control of the company he founded, it was not well received by all. As a July 24, 2015, analyst report issued by Morningstar noted, the "addition of a Class C stock . . . can hardly be an improvement for shareholders as a whole." Likewise, contemporaneous media noted, "the move by Under Armour will no doubt stoke the ire of some corporate governance experts and academics in the field. Any time a single person has more voting power in a publicly traded company than her or his proportional ownership stake in that company, there will be potential conflict."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company

29.     In 1996, Under Armour was founded by Plank, a 23-year-old former University of Maryland football player, who engineered a t-shirt using a synthetic fabric, with moisture-wicking performance fibers that helped keep athletes cool and dry under hot conditions. The Company specializes in highly technical, performance-oriented athletic apparel, such as ColdGear, HeatGear, and AllSeasonGear styles designed to enhance comfort and mobility and regulate body temperature in different types of weather. Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

1495422_1

30.     Over the years, the Company's product lineup has expanded from a single shirt to myriad Under Armour branded athletic products in three categories: apparel, footwear, and accessories.  However, apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in fiscal year 2016 ("FY16").  While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016.  Thus, North American apparel sales are critical to the Company's success.  As Plank admitted at the end of the Class Period, on January 31, 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

31.     During the Class Period, nearly two-thirds of the Company's sales (65% in 2016) are wholesale sales to national and regional sporting goods chains (*e.g*., The Sports Authority, Inc. ("Sports Authority"), Dick's, Foot Locker, Champs), independent and specialty retailers, department store chains, institutional athletic departments, and sports leagues and teams.  Under Amour also owned and operated its own retail locations (called "Brand House" and "Factory House" stores)[4] and retail websites that exclusively sold Under Armour products, which are collectively referred to as the "direct-to-consumer" ("DTC") channel, accounting for 31% of the Company's sales in 2016.

32.     Under Armour has many competitors, including athletic brands such as Nike, Adidas, Reebok, lululemon, Columbia, New Balance, Brooks, and Puma.  However, the Company steadily gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.  As one analyst put it just prior to the Class Period, Under Armour's "brand . . . is sacrosanct."  By protecting that premium brand image, by fall of 2014, Under Armour had become the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on number one – Nike.

---

[4]     At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America.  Brand House stores showcase Under Armour's latest products.  Factory House stores, primarily located in outlet centers, sold excess or undesirable inventory at reduced prices.

**B.**      **Plank Drove Under Armour's Aggressive Growth Strategy**

33.      Since Under Armour's inception in 1996, and even after it went public in 2005, Plank has called the shots, always controlling a majority of stockholder votes and serving as CEO and Chairman of the Board.  In this "founder-led" approach, which Plank went to great lengths to protect, Plank has set the destination and the route.

34.      Plank relished the Company's image as a scrappy, fast-rising upstart from Baltimore. He implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.  In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

35.      Within Under Armour, instructions for determining growth forecasts were very simple: take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with the 20% growth streak drove the Company's revenue-growth-at-all-costs strategy.  For Plank and Under Armour, the overriding objective was growth.

36.      Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Class Period.  For 26 consecutive quarters (over six years) spanning from 2Q10 to 3Q16, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year- over-year basis).  Plank never missed an opportunity to remind investors of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And frankly, we have no expectation of that stopping anytime soon.

###### C. Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined

37. However, despite many years of successful growth, the Company's product styles had grown stale and its premium "brand heat" (*i.e.*, customer demand) was dying by the start of the Class Period in September 2015.  The Company failed to offer new and updated products in line with the latest consumer trends.  One such trend involved athletic leisure apparel (aka "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Class Period.  Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores.  Many of the Company's competitors, particularly Nike and Adidas, adapted to this trend by expanding their product lines to include athletic leisure apparel.  However, Under Armour failed to offer its own line of athletic leisure apparel until late in the Class Period.  Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts.  While, historically, these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors, and were not as interested in buying them again.  This enabled competitors to capture critical sales volume and market share from Under Armour, and enhance their brand values at the expense of Under Armour.

38. Declining demand for Under Armour apparel caused progressively worse financial problems at the Company.  This was particularly damaging because apparel provided the majority of the Company's sales (67% of net revenue in 2016) and were critical to meeting the Company's aggressive financial projections.  According to SportScan retail data, the Company's core apparel sales began slowing around spring of 2015, causing the Company to lose market share to rivals like Nike and Adidas.[5]  Attempting to cover up these declines and provide the illusion of financial health,

---

[5]    *See* Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016), at 1, 4-6 ("Morgan Stanley Report").  The Morgan Stanley Report is attached hereto as Exhibit C and incorporated by reference herein.  As discussed in ¶¶64-72, 79-82 below, the SportsScan retail data set forth in this report was materially consistent with Under Armour's internal retail data, but Defendants nonetheless publicly

the Company abandoned its fundamental sales philosophy of competing on brand strength rather than price.  Instead, the Company resorted to lowering sales prices, including discounts and promotions.[6]  This resulted in rapidly decelerating average sales prices of the Company's apparel, causing decreased product margins.  This trend compared unfavorably with the sports apparel industry, and particularly with the Company's chief rival, Nike, which were experiencing steadily *increasing* average sales prices.[7]

39.     One notable example of this trend involved Under Armour's "big logo hoodie" – a performance-oriented hooded fleece sweatshirt with a big Under Armour logo on the chest.  This was a top seller and huge business volume driver for years and, as a result, Under Armour consistently carried a large inventory in many different colors.  However, as brand heat was dying, sales for this product began to decline significantly.  As a result, the Company decided – for the first time ever – to run sales of the hoodie during Black Friday of 2015 (November 27, 2015).  The Company offered the hoodie for as much as 25% off at numerous stores, including Dick's, Sports Authority, and Macy's.

40.     The Company's sales declines opened the promotional floodgates.  After the hoodie was put on sale for the first time ever in November 2015, Under Armour began to run more and more promotions in 2015 and 2016.  For example, in addition to the big-logo hoodie, Under Armour began to sell other staples of its apparel lineup like polo shirts and training t-shirts for 25% off in 2015 and 2016.  Like the big-logo hoodie, these products historically drove large sales volume at premium prices and, unlike any prior time, had to be put on sale during the Class Period because of dying demand for the Company's brand.

---

downplayed and discredited this report and falsely reassured investors that the Company's sales growth was as strong as ever.

[6]   *See id.* at 1, 4-5.

[7]   *See id.* at 4-5.

41.     To incentivize retailers to order certain merchandise, the Company used a buyback program under which sales representatives guaranteed that Under Armour would buy back a certain amount of the merchandise that did not sell.  On the books, the Company's customers bought and owned the merchandise for three or four months, but after six months Under Armour was forced to buy back some of the unsold merchandise.  For instance, Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dicks' thought they needed because Under Armour promised that Dick's could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.  Dick's was allowed to return a seemingly unlimited amount to Under Armour during the Class Period.  This resulted in a massive amount of returns.

42.     For a while, the heavy discounts, promotions, lower sales prices, and buyback arrangements helped the Company continue to report revenue growth, meeting Plank's aggressive 20% growth projections.  But this manufactured price-driven, low quality growth caused lower product margins that damaged the Company's bottom line and eroded the Company's "premium" brand image.

43.     Compounding the Company's declining apparel demand, the Company was also experiencing a monumental downturn in its primary sales channel, North American wholesale. Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (*e.g*., Target, Wal-Mart). This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into the sales of, apparel sold at traditional sporting goods stores.

- 13 -

44.     This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period. Most significantly, on February 9, 2016, CNN reported that one of Under Armour's largest retail customers, Sports Authority, faced bankruptcy after missing a $20 million debt payment. Ultimately, Sports Authority filed for Chapter 11 bankruptcy protection on March 2, 2016, and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering 463 stores. Other key Under Armour retailers were also forced to file bankruptcy and close.  On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  The loss of several of Under Armour's major North American retailers further pressured the Company's struggling sales.

**D.      Declining Apparel Sales Led to Excess Inventory and Liquidations**

45.     Diminishing demand for, and declining sales of, core Under Armour products resulted in excess inventory.  In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins, and, in turn, the Company's gross margins.  This problem occurred at both the Company's own Brand House stores and at the stores of its retail customers.  Excess inventory was a constant problem throughout the Class Period at the Company's Brand House stores, including products from every category.

46.     At one point during the Class Period, for example, Under Armour's planning team bought a very large quantity of one of the Company's t-shirts, around 10,000 units, to be sold at Under Armour's top two Brand House stores, which were supposed to be the pinnacle of the Under Armour product experience.  However, only about 100 units of the t-shirt were actually sold, and the rest became excess inventory.  This excess inventory had to be sent to Under Armour's Factory House stores and other accounts to be liquidated at a discount.  This happened many times with different products throughout the Class Period, and was very common with men's apparel.

47.     Sometimes only about 30% of the inventory at the Company's Brand House stores was considered "productive," meaning only 30% was actually sold to consumers.  The remaining inventory was comprised of "presentation quantity" (inventory allowing the stores to present one or two units of each size on display) or excess inventory that had to be transferred back to Under Armour's distribution houses.

48.     The distribution houses would send the excess inventory to the Company's Factory House stores (*i.e.*, outlet stores) or to liquidation channels like Marshalls and T.J. Maxx, where the products were sold at a discount.  The discount rates at the liquidation channels were the highest, providing the Company with very low product margins.  Sometimes Under Armour was simply trying to make its money back on products sent to the liquidation channels.  In addition to reducing margins (due to the discounted sales prices), distributions to the Factory House stores and liquidation channels resulted in higher expenses due to the extra shipping, processing, and labor costs required to transfer the excess inventory.

49.     Excess inventory was also a problem at the Company's retail customers such as Sports Authority and Dick's.  Facing dwindling sales and ballooning inventory, the Company's merchandising team would collaborate with the sales teams and give suggestions about promotions for the inventory that Under Armour needed to move.  Retailers would also make requests for promotions to rid themselves of the excess inventory, and the Company would then determine whether to allow such promotions.

50.     As with the inventory returned from Brand House stores, discussed above, the Company would attempt to sell the excess inventory returned from retail customers at discounted prices through liquidation channels such as discount stores like Marshalls and T.J. Maxx.  As a last resort, the Company would ship inventory to be liquidated at Costco stores in Mexico.  However, much of the excess inventory just sat around at the Company, not being sold through any channel, because the liquidation channels used by the Company were not enough to handle all of the excess.

51.     The excess inventory was a frequent topic of discussion among sales leaders at the Company, and information on inventory was widely available at the Company.  Indeed, as discussed

- 15 -

in §§V.G-H below, Plank and fellow executives admitted to the excess inventory in their public statements.  However, they misleadingly blamed the rising inventory on benign factors, including a strategic plan to improve the speed of shipments to customers, and reassured investors that the situation was improving.  In reality, this was untrue, as the excess inventory was caused by the Company's dying brand heat, which reduced customer demand and caused the sales declines discussed above.

### E.      Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines

52.     As a result of the Company's declining apparel sales, exacerbated by the collapse of the Company's primary sales channel, Defendants perceived a threat to the Company's carefully cultivated market perception as a fast-growing superstar of the sports brand business.   To compensate, Defendants aggressively expanded their footwear and international sales businesses.  However, as Defendants admitted, these businesses provided much lower margins than the Company's core North American apparel business, and a much smaller percentage of revenue (shoes accounted for only 21% of revenue in 2016).  Moreover, the Company needed to make massive expenditures of time and money in order to undertake such expansion.

53.     An example of the difficulty of this expansion was the rollout of Under Armour's "Curry One" shoe worn by star NBA basketball player Stephen Curry.  Under Armour heavily promoted this shoe.  However, Under Armour was essentially paying to have the shoe placed in stores because the associated expenses were so high and margins were so poor.  The Company's "Curry Two" shoe faced similar problems.  The shoes were badly underpriced in an apparent attempt to boost revenue and capture market share from Nike, at the risk of damaging Under Armour's brand image.  Under Armour also slashed their prices on running shoes in an attempt to compete on price rather than brand image and innovation.

54.     The Company's international and footwear expansion, along with the lowering of apparel prices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) deep into the Class Period, even as the

- 16 -

Company's core apparel and North American businesses were faltering. Defendants used the footwear and international businesses as scapegoats for the Company's declining gross margins (*see, e.g.*, ¶126). At the same time, Defendants misleadingly claimed the Company's footwear and international margins and ASPs were improving and its ***apparel*** margins and ASPs remained strong (*see, e.g.*, ¶127). These misleading statements allowed Defendants to conceal the fact that margin compression was caused, not only by the growing footwear and international businesses, but also by declines in the Company's apparel business, driven by lower sales prices, rampant promotions and discounting, and excess inventory. It was far more palatable for Defendants to blame margin compression on the Company's supposedly expanding footwear and international businesses than to reveal the truth about the declines in its core apparel segment, which accounted for most of the Company's sales.

### F. The Company's Stock Price Declined When the Market Learned the Truth About the Company's Sales Problems

55. The Company's sales problems, including a "fundamental shift" to competing on price rather than a premium product, were ultimately revealed in a series of partial disclosures that caused the Company's common stock prices to gradually decline, as detailed in §§VII-VIII, X below. The declines would have been swifter and steeper, but Defendants attempted to downplay and soften the news with continued misrepresentations and omissions throughout the Class Period.

56. First, on January 10, 2016, Morgan Stanley issued a detailed report with point-of- sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales prices, and market share dating back to spring 2015. This surprising news, which directly contradicted Defendants' carefully cultivated image of the Company, caused Under Armour common stock prices to fall.

57. On the heels of this report and the departure of CFO Brad Dickerson ("Dickerson") in February 2016 – "which came as a surprise" to analysts, who noted that "this transition comes at an inopportune time in the company's history. . . . Losing a key leader at a time like this is a concern" – the Company's Chief Merchandising Officer ("CMO"), Henry Stafford ("Stafford"), suspiciously

- 17 -

departed the Company in May 2016.  Stafford's departure coincided with the departure of another high-level executive, the Company's Chief Digital Officer ("CDO") Robin Thurston ("Thurston"), which was announced on the same day.  These abrupt and suspicious departures of these key executives caused common stock prices to decline again on May 4, 2016.

58.     On June 1, 2016, contrary to prior assurances, Defendants revealed a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional common stock price declines.

59.     Over the next months, a series of increasingly poor quarterly financial results and reduced financial projections caused further declines in the Company's common stock prices after such news was released.  On July 26, 2016, Defendants reported second quarter decreases in operating and net income and a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast the slowest quarterly growth in over six years.  On October 25, 2016, Defendants revealed a further slowdown in growth in the third quarter, attributed to North American apparel and wholesale declines, and compressed margins attributed in part to higher discounts, promotions, and liquidations.  On January 31, 2017, Defendants revealed a slowdown in 2016 growth that was far more severe than previously reported and dramatically reduced financial projections, attributed to problems in the North American apparel business, as well as compressed margins and inventory growth.  On the same day, Defendants surprised investors by revealing the sudden and highly suspicious departure of Molloy.  Finally, on August 1, 2017, the Company cut 2017 guidance and announced a massive restructuring to "evolve" the Company's business and restore "brand heat," including a shift from traditional performance-oriented products to more fashionable products.

60.     Under Armour investors lost millions of dollars as a result of these revelations, which caused the artificial inflation resulting from Defendants' fraud to dissipate from the Company's common stock.

### G.      Numerous Facts Support Defendants' Scienter

61.     Defendants knew of, or at a minimum were severely reckless in disregarding, the problems facing the Company as a result of declines in the apparel business.  This is supported by numerous additional indicia of scienter, including Plank's and other Company executives' statements admitting access to the relevant data and Plank's highly suspicious Class Period sales of $138.2 million of Under Armour stock.

#### 1.      Defendant Plank's Knowledge or Reckless Disregard of the Company's Undisclosed Fundamental Shift and Sales Problems

62.     Plank made numerous public statements in which he discussed the Company's apparel sales growth, sales prices, gross margins, and inventory levels.  In fact, Plank provided a prepared statement on – or was asked and answered detailed questions about – at least one of those matters during every quarterly earnings call with securities analysts throughout the Class Period, as well as the 2015 Investor Day.[8]  Plank echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period.[9]  These statements evidenced Plank's knowledge of such matters.

63.     Plank, and fellow Company executives, also stated that they had systems in place to closely monitor such aspects of the Company's business.  For example, Plank boasted of an SAP (Systems Applications Products) software system that provided point-of-sale information and other detailed business data.  The Company was in the process of enhancing this system during the Class Period.  As Plank stated during the 4Q15 earnings call on January 28, 2016:

> The single view of the consumer is something we're building with the team at SAP that combines *global point-of-sale, e-commerce and transactional information* through a single sign-on capability together with our Connected Fitness business to create an insight engine that will inform and guide our decision to help grow and scale our brand.  This will build on our existing SAP platform as we double down and continue to make big bets with big partners.  We believe that this unique

---

[8]     *See* ¶¶118, 125, 142-143, 148, 150, 161-162, 195, 197, 209, 214, 224, 230.

[9]     *See* ¶¶124, 130, 141-143, 152, 156, 158, 159, 167, 186-187, 194, 207, 212, 218, 221-222.

technological advancement will position UA as a best-in-class real-time digital enterprise.

64.     This statement by Plank confirms that, through "point-of-sale" information available on the Company's SAP system, Plank had actual knowledge of sales data from the Company's retailers.  The SportScan data revealed in the Morgan Stanley Report, attached hereto as Exhibit C, was based on the same point-of-sale data from the Company's retailers.  The sales data showed that, since spring of 2015, the Company's North American apparel growth was in decline, the Company was losing market share, and the Company's ASPs were dropping.[10]  Everyone at Under Armour on the sales team had full visibility into sales data because they had very detailed and up-to-date data available to them through multiple sources, and the data was regularly reviewed.  Multiple reports showing sales data were distributed every Monday.  The sales reports were very detailed, including breakdowns by regions, retail store, and product styles.  Sales management also had a "dashboard" on their computers or iPads to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  Further, Plank repeatedly claimed he had extensive data concerning consumer demand, buying preferences, and product usage through Under Armour's Connected Fitness platform.  As Plank boasted at the end of the Class Period, "I can't think of any companies that would have that amount of data flow to understand their consumer better."  Thus, Plank had knowledge of (or recklessly disregarded) the financial declines first revealed by Morgan Stanley.

65.     The negative financial trends revealed by the Morgan Stanley Report were based, in part, on industry data compiled by SportScan.  Numerous facts establish that the SportScan data cited in the Morgan Stanley Report was a materially accurate depiction of the internal sales data at Under Armour.  Indeed, retail industry participants, including Under Armour, frequently use industry data compiled by SportScan.  For instance, in connection with a 2005 sale of $167 million in stock, Under Armour described SportScan as "a leading market research firm that provides

---

[10]   *See* Morgan Stanley Report at 1, 4-6.

weekly point-of-sale data for the athletic and sporting goods industry" and disclosed that the Company's "[i]nformation regarding the market for compression style clothing is derived from SportsScanINFO."

66.     Furthermore, Plank admitted on multiple occasions that industry data, and SportScan in particular, was reliable and consistent with internal Under Armour data. Prior to and during the Class Period, Under Armour, and Plank in particular, made repeated statements regarding Under Armour's market share. Those statements relied on industry data, including SportScan. For example, during the October 25, 2016, 3Q16 earnings call, Plank boasted that "[i]n the back-to-school window of July through September, [Under Armour's] overall footwear market share nearly doubled according to industry data." As an October 26, 2016, Wall Street Journal article noted, SportScan reported that Under Armour had, "[d]uring the back-to-school period . . . nearly doubled its share of the footwear market, amassing 8.2% of the market for the 13 weeks ended Oct. 1, up from 4.6% a year ago, according to industry tracker SportScanInfo." Other examples include Plank's September 16 and October 22, 2015 statements praising the Company's "40% market share" in football cleats. See also ¶162 ("we are taking share").

67.     Importantly, SportScan captured Under Armour's core sales channel – North American wholesale. As Plank said in January 2017: "North American apparel is still our largest and most profitable business by far. Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate." According to SportScan, its sales data includes sales from 15,000 retail doors across 12 separate retail channels. Under Armour admitted SportScan captures its largest customers like Dick's and Foot Locker. The portions of Under Armour's business that SportScan does not directly capture are lower-priced and less profitable sales that are much less indicative of how Under Armour's overall business is performing. For example,

most of Under Armour's physical retail locations are Factory House stores, which are a liquidation

channel with low-margin sales.  And analyst reports during the Class Period observed Under Armour

"has been increasingly using its website as a clearance channel."

68.     Furthermore, Under Armour's financial disclosures corroborate the Morgan Stanley

Report's revelations.  For instance, Under Armour reported inventory growth that outpaced sales in

3Q15 (35% increase) and 4Q15 (46% increase).  Under Armour's gross margins also declined in

4Q15, contracting 1.9 percentage points to 48%.  The extreme inventory increases and gross margins

declines reported by Under Armour on January 28, 2016, for 4Q15, are consistent with the Morgan

Stanley Report's disclosure on January 10, 2016, based on SportScan data, of decelerating sales

growth, loss of market share, and declining ASPs.  In addition, with specific regard to the SportScan

data disclosed in the January 10, 2016, Morgan Stanley Report, which included data for 2015 and

prior, Plank and the Company did not dispute the accuracy of the data for 1Q15, 2Q15, or 3Q15.

69.     Further evidence of the reliability of the SportScan data is found in an April 10, 2016,

Morgan Stanley report.  Therein, Morgan Stanley continued to discuss the declining demand for

Under Armour apparel, particularly in women's.  While Morgan Stanley based that analysis

primarily on SportScan data, Morgan Stanley noted that Under Armour's SEC filings corroborate the

SportScan data.  In particular, Under Armour's disclosures "show sales to its biggest customer . . .

were -8% in 4Q15," which is consistent with the declining apparel demand revealed in the Morgan

Stanley Report.  Morgan Stanley also noted that Dick's SEC filings "show a deceleration in UA

sales growth," which was consistent with the negative trends shown by SportScan.  Indeed, Under

Armour sales to Dick's corroborate the "fundamental shift" of competing on price rather than a

premium brand image.  As demand for Under Armour declined and the Company changed course to

increased promotions and lower ASPs to find revenue, Under Armour sales to Dick's declined

steadily.  As a percentage of Under Armour's revenue, sales to Dick's fell from 14.4% in FY14, to

11.5% in FY15, and finally to 10% in FY16.  As discussed below, Under Armour and Dick's

personnel, including Plank and Dick's CEO, met regularly and exchanged sales data.[11]

70.     In an October 2016 report, Morgan Stanley continued to discuss falling ASPs at

Under Armour and how competing on price rather than "brand image and innovation" evidenced the

"fundamental shift" Morgan Stanley first revealed in January 2016.  Morgan Stanley noted that its

ASP data was based not only on SportScan, but also "on channel checks and conversations with

retailers."   Based on extensive analysis from multiple sources, Morgan Stanley concluded the

SportScan data was "directionally accurate."

71.     In February 2017, Morgan Stanley issued a report lowering its price target for Under

Armour Class A shares from $25 to $20.  As it had in prior reports, Morgan Stanley relied on

SportScan data, among other inputs.  In support of its continued reliance on SportScan data, Morgan

Stanley compared historical SportScan data on total apparel sales growth and ASPs, such as that it

disclosed in the January 2016 Morgan Stanley Report, to Under Armour's actual results during that

same period.  Morgan Stanley concluded: "SportScan data has accurately depicted directional UAA

sales trends . . . and we continue to view it as the best source for understanding UAA's US business

at a micro level."

72.     Additional evidence of Plank's scienter is found in Plank's statement during the 1Q16

call on April 21, 2016 that "probably the thing that drives [North American distribution] for us more

than anything else is just merchandising. . . .   And now we've really gotten to a point where

understanding that merchandising needs to be a core competency for us. . . .  And so we really – we

identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in

---

[11]    Defendants publicly downplayed and discredited the Morgan Stanley Report and SportScan data.
*See* ¶¶38 n.5, 132, 145-150, 260.

2014, we began building the [merchandising] team in 2015." Through these merchandising efforts, Plank had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel). In addition, Plank's statement indicated that the Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

73.     The Company's inventory also received Plank's close attention during the Class Period. As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

> On the working capital front, ***the majority of our focus is going to be on inventory management and the efficiency of inventory management***. Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.
>
> First, on the near term – over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates. This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.
>
> Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory. These initiatives are focused on how we plan and deliver our seasonal products.

74.     Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

> ***Today, we have inventory data in multiple retail, planning, transportation, and distribution systems***. In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is extremely powerful. In fact, very few organizations have been able to achieve this goal.

75.     One system through which inventory data was available to Plank was the SAP system discussed by Plank in the statement quoted above (¶63). The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation

channels), and how much inventory was being sent to liquidation. The SAP system provided inventory information for all Under Armour products sold to consumers. Based on this data, Plank, who was intently focused on inventory, had actual knowledge of, or recklessly disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.

76. Plank's scienter is further evidenced by his attendance and presentation at meetings where Company performance was discussed. Plank presented at quarterly "town hall" meetings throughout the Class Period where Plank discussed the Company's performance. During two "town hall" meetings held close together in August or October 2016, Plank discussed how the Company was having struggles. During the first of those two meetings, Plank discussed having to lower the Company's projections. During the second meeting, Plank tried to ease employee's fears and further explain the situation.

77. Plank also regularly attended one-on-one meetings with the President of Dick's. Monthly meetings with Dick's and Under Armour employees were also held. The monthly meetings typically took place in Pittsburgh, at the offices of Under Armour or Dick's. Sales to Dick's, which was once Under Armour's largest customer, soured heading into the Class Period. During the meetings, as demand for Under Armour products declined, Dick's told Under Armour that sales of Under Armour products at Dick's had begun to downturn significantly. By the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%. Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales. This included telling customers that they could return products later, after Under Armour had booked the sales. Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the

products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.

Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the

Class Period, resulting in a massive amount of returns.

78.     Similarly, prior to the March 2016 announcement that Sports Authority would file for

bankruptcy protection, Sports Authority had been open and clear with Under Armour about the big

problems at Sports Authority.  Throughout the Class Period, Sports Authority had been returning

massive amounts of products, some of which had to be charged off by Under Armour.  The large

amount of returns from Sports Authority, Dick's and other Under Armour customers required

significant amounts of time and expense processing the returns (Under Armour's large customers did

not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

> ## 2. Expert Opinion Confirms the SportScan Data Revealed by Morgan Stanley Was "Materially Consistent" with Under Armour's Internal Data

79.     Professor of Retailing and Director of Retail Studies at Columbia University Business

School Mark A. Cohen, an expert and consultant on a wide range of issues in the retail industry,

reviewed the Morgan Stanley Report, including the SportScan Data cited therein.  After review of

the relevant facts and based on his years of experience in the industry, including use of industry data

similar to SportScan while a retail CEO, Professor Cohen concluded, "[t]he fact-based sales data

from SSI Data disclosed by Morgan Stanley was materially consistent with Under Armour's own

internal corporate data."  Ex. D at 12.

80.     In reaching his conclusion, Professor Cohen noted the Morgan Stanley Report's

disclosures regarding declining ASPs and market share, and the "major concern that the company

was, and had been since at least Spring 2015, engaged in a 'fundamental shift' away from innovative

premium product to product whose appeal was based upon lowered retail prices."  Ex. D at 7-8.

Professor Cohen further noted, "Morgan Stanley based its exhaustive analysis on specific fact-based

industry data, supplied by SSI Data, a leading data aggregator and data analysis group specializing in

active and athletic merchandise categories."  *Id.* at 8.

81.     In assessing the reliability of the SportScan data cited in the Morgan Stanley Report, Professor Cohen noted that "SSI Data's efforts encompass virtually all of Under Armour's core retail selling channels" and that during his time leading large retailers he had relied on similar industry data.  *Id.*  Indeed, "[a]ggregation of source data by independent companies such as SSI Data . . . is a widely adopted and relied upon tool."  *Id.* at 9.  Professor Cohen cited several additional facts in support of his conclusion that "[t]he fact-based sales data from SSI Data disclosed by Morgan Stanley was materially consistent with Under Armour's own internal corporate data."  *Id.* at 12.

- "Under Armour stated that its internal data was consistent with SSI Data sales information when the Company cited to SSI Data in its own SEC filings when trying to sell stock";

- "Under Armour also confirmed that the fact-based sales data from SSI Data was materially consistent with Under Armour's own internal corporate data when it repeatedly touted its market share gains based on SSI Data findings (including during the Class Period).  Stated differently, either SSI Data was materially consistent with Under Armour's own internal data, or the Company was misleading investors by touting the SSI Data's findings of market share gains by the Company.  They can't have it both ways";

- "the Company never disputed the fact-based sales data from SSI Data for 1Q 2015, 2Q 2015, or 3Q 2015";

- "Under Armour admitted that for 4Q 2015, the fact-based sales data from SSI Data captured approximately 40% of Under Armour's business";

- "SSI Data's sales data encompass virtually all of Under Armour's core retail selling channels";

- "the Company did not dispute the accuracy of the approximately 40% of Under Armour's 4Q 2015 business that SSI Data captured";

- "Under Armour's disclosures of dramatically increased inventory levels (that outpaced sales growth), spiking 46% to $783 million in 4Q 2015 after a 36% increase in 3Q 2015 corroborate the SSI Data";

- "Under Armour's disclosures of declining gross margins in 4Q 2015, which contracted 1.9 percentage points to 48% corroborate the SSI Data.  In other words, if the SSI Data disclosing a loss of market share, decelerating sales growth and declining ASP's was accurate you'd expect Under Armour to report increased inventory levels and declining gross margins – exactly what happened";

- "[T]he Company's admissions regarding declining sales at its largest customer, Dick's, further corroborate the SSI Data.  In fact, Under Armour admitted that sales to its largest customer were -8% in 4Q 2015 – the only quarter it called out as a little bit challenged for assessing company performance using SSI Data"; and

- "Morgan Stanley's February 14, 2017, comparison of Under Armour's reported results with what SSI Data had previously reported regarding Under Armour's sales demonstrates that the SSI Data was materially consistent with Under Armour's own internal corporate data.  As Morgan Stanley explained, 'SportScan data has accurately depicted directional UAA sales trends [] and we continue to view it as the linked in best source for understanding UAA's US business at a micro level.'"

Ex. D at 13-14.

82.     Professor Cohen's analysis and conclusion further demonstrate that the SportScan Data revealed in the Morgan Stanley Report was the same as or materially consistent with the internal corporate data defendant Plank and other Under Armour executives had access to and regularly reviewed.

### 3.     Defendant Plank Was Motivated to Maintain a Positive Market Perception of the Company and the Company's Artificially Inflated Stock Value

83.     For years, Plank had carefully cultivated a public perception of the Company as an up-and-coming, fast-growing challenger to Nike's position as the number one sportswear brand. Plank was highly motivated to maintain this public perception and, in turn, the Company's lofty, artificially inflated common stock prices.

84.     Plank stood to gain most from the Company's artificially inflated share prices.  He was the Company's largest shareholder throughout the Class Period, owning just over 15% of the Company's total common stock outstanding.  As of October 28, 2015, Plank beneficially owned 35,700,000 shares of Class B common stock (which were not publicly traded but convertible to Class A common stock) and 76,445 shares of Class A common stock.  With such a massive equity stake in the Company, Plank was highly motivated to keep the share prices artificially inflated.

85.     Plank profited handsomely from the artificial inflation by selling a massive number of Under Armour shares during the Class Period.  Specifically, over nine days in November 2015 and

- 28 -

April 2016, Plank sold a total of 2,300,000 Under Armour shares for $138.2 million. With all of Plank's shares coming from stock grants at no cost to him, that $138.2 million was 100% profit. As discussed further in the Declaration of Professor M. Todd Henderson, attached hereto as Exhibit E, Plank's Class Period stock sales were highly suspicious in several respects.

86. Plank's Class Period stock sales were suspicious in amount. At the start of the Class Period, Plank beneficially owned 35,776,445 shares of Under Armour common stock (Class A and Class B). In order to maintain voting control, as discussed above, Plank's ownership stake in Under Armour could not drop below 15% of outstanding stock. Thus, to maintain voting control, Plank could only sell 3,448,332 shares of Class A and Class B Common Stock. Because Plank made clear that giving up voting control was not an option and went to great lengths to prevent that from happening, those shares of Plank's needed to maintain his 15% ownership were effectively not available to sell. In November 2015, Plank sold 1,250,000 shares of Class B Common Stock for proceeds of $99,968,961 million. That sale amounted to roughly 36% of the shares Plank could sell without losing control of Under Armour. In other words, in one week and while in possession of material negative information (in particular the undisclosed "fundamental shift" of competing on price rather than brand strength), Plank sold 36% of the shares he had available to sell.

87. As discussed above, just prior to the Class Period, Plank enacted a complicated and risky plan to protect his voting control and status as the unchallenged leader of Under Armour. ¶¶24-28. Events such as the Company issuing stock-based compensation had diluted Plank's ownership share since the IPO. To prevent further dilution and protect Plank's control, Plank caused the Company to issue a new class of common stock – Class C Common Stock with zero votes. Plank advocated for the third class of stock and the need for Plank to maintain control in a June 15, 2015, letter to shareholders. Plank made clear that issuing the Class C Common Stock was intended to allow Plank to continue selling millions of dollars in Under Armour stock without losing control of the Company. While Plank told investors "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders," the real beneficiary was Plank. On April 7, 2016, the Class C Common Stock was issued to all holders of Class A and Class B Common Stock.

- 29 -

As of April 18, 2016, Plank beneficially owned 135,020 shares of Class A Common Stock, 34,450,000 shares of Class B Common Stock, and 34,585,020 shares of Class C Common Stock.

88.     With the issuance of the Class C shares, Plank could continue his Class Period selling spree without giving up any more voting power.  He did just that.  Over four days in April 2016, Plank sold 1,050,000 Class C shares for $38.2 million in proceeds.  As with his November 2015 sales, these were 100% profit.  Plank's April 2016 sale of 1,050,000 shares was a remarkable 42% of the shares he could sell in 2016 without ceding control of the Company.[12]  And like the November 2015 sales, the April 2016 sales were made without disclosing the material negative information in Plank's possession.  In particular, at this time, as disclosed by Morgan Stanley, the Company was engaged (and had been engaged) in a "fundamental shift" and had abandoned its oft-stated bedrock principle of not competing on price.

89.     Importantly, had Plank not effectuated the issuance of zero-vote Class C shares, he would have been forced to continue selling ten-vote Class B shares as he did in November.  Had Plank sold 1,050,000 shares of Class A or Class B shares in April 2016, rather than Class C, Plank's Class Period sales would have amounted to approximately 67% of the shares Plank had available to sell without losing control of the Company.

90.     Plank's Class Period stock sales were out of line with his prior trading.  Plank's Class Period sales of 2,300,000 shares for proceeds (and profit) of $138.2 million occurred over 9 days in November 2015 and April 2016.  Therefore, Plank averaged 1,150,000 shares per selling month in the Class Period.  During the three years proceedings the Class Period, Plank sold during 14 separate months.  In those months, Plank averaged 339,911 shares sold per month.  Thus, Plank sold more than three and a half times more shares per selling month during the Class Period than during the prior three years.  Likewise, during the Class Period Plank averaged nearly $70 million in stock sales

---

[12]     Pursuant to a charter amendment made in connection with the creation of the Class C Common Stock, Plank was limited to selling 2,500,000 shares in any given year or his voting control would unwind.  Although the provision allowed for potential rollover of shares if Plank sold less than 2,500,000 shares in a year, thus increasing his annual limit, that did not apply to 2016 because it was the first year the provision was in effect.

per selling month.  During the prior three years, Plank averaged less than $23 million in stock sales per selling month.  Again, Plank's Class Period average monthly proceeds during selling months was three times his average monthly proceeds during selling months for the three years prior to the Class Period.

91.     Plank's $138.2 million Class Period trades were also out of line with Plank's post-Class Period trading.  Indeed, as the truth concealed by Defendants' fraud was revealed and Under Armour's stock price was punished accordingly, Plank stopped selling.  Plank has not sold a single share of Under Armour stock since April 2016.

92.     Plank's Class Period stock sales were also out of line with typical sales by public company executives.  For example, a 2010 study found that "the typical CEO sells only about 1.9% of her equity incentives each year."  Ex. E at 13 & n.24.  In contrast, Plank's November 2015 sales of 36% of the total shares he was able to sell without losing control of the Company were about 18 times the average annual sales of CEOs at large public companies.  Plank's April 2016 sale of 42% of shares available to sell is even more out of line with a typical CEO's behavior.

93.     Plank's Class Period trading was also suspicious in timing.  On September 16, October 25, and November 4, 2015, Plank made a series of misstatements and omissions.  ¶¶118, 124-125, 130-131.  Beginning November 17, 2015, Plank began selling $100 million of Under Armour stock.  Plank's November 2015 sales were made near all-time highs for Under Armour stock.  Less than two months after Plank reaped $100 million in illicit trading proceeds, Morgan Stanley revealed that the Company's core business was in decline, the Company was losing market share, ASPs were falling, key margins were contracting and, unbeknownst to Under Armour investors, the Company was (and had been) engaged in a fundamental shift in Company strategy.

94.     Plank's sales in April 2016 ($38.2 million) were likewise suspicious in timing.  On March 2, 2016, one of Under Armour's biggest customers, Sports Authority, announced it was filing for bankruptcy.  On April 16, 2016, Sport Chalet, another of Under Armour's wholesale customers, announced it was going out of business.  Despite those announcements, during the April 21, 2016 conference call to discuss 1Q16 results, Plank raised 2016 guidance and made a series of other false

- 31 -

and misleading statements and omissions regarding the Company's purportedly strong financial condition, as alleged herein, causing Under Armour stock to continue to trade at artificially inflated prices.

95.     A few days later, on April 26, 2016, Sports Authority declared that rather than restructure and continue to operate in some capacity, as it had previously planned to do, it would liquidate.  That very same day, Plank sold 225,000 shares for nearly $10 million in profit.  In total, between April 26 and April 29, Plank unloaded 908,570 shares for $38.2 million in profit.

96.     The financial press took note of Plank's "amazing" timing.  A February 7, 2017, article on *TheStreet.com* titled, "Under Armour Founder Kevin Plank Has Been Amazing at Predicting Recent Stock Crashes," noted "it shouldn't come as a shock that Plank's recent stock trades were a good indicator on the company's surprising new challenges, and Wall Street's subsequent brutal response."  With regard to Plank's April 2016 sales, the article stated "[t]he sales were well-timed."

97.     Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016 through August 1, 2017.  Significantly, Plank stopped selling shares altogether after April 2016, demonstrating that his sales were timed to capitalize on the Company's artificial stock price inflation, before the truth about the Company was revealed.  As the truth leaked out, and the artificial inflation was removed from the stock, Plank no longer had the same motivation to sell.

98.     Plank was also motivated to misrepresent and conceal the Company's true financial condition in order to conduct the Bond offering for nearly $600 million in proceeds on June 8, 2016.  On June 6, 2016, Under Armour filed a registration statement on Form S-3ASR ("Registration Statement") with the SEC regarding the Bond offering.  The Company also filed Forms 424B5 and FWP with the SEC on June 8, 2016 (with Registration Statement, "Offering Materials").  Pursuant to the Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million ("Offering").

- 32 -

99.     The Company immediately benefited from the Offering, receiving $593.6 million in total net proceeds.  The Offering terms would have been far less favorable to the Company had the market known the truth about the Company's ailing financial condition.  As the truth concealed by Defendants' Class Period misstatements and omissions was revealed through a series of partial disclosures, the Bonds were downgraded to junk status on February 1, 2017.  Had the Bonds been issued a junk status rating at the time of their issuance, the Offering would have made less financial sense and been less advantageous to Under Armour, particularly because Defendants intended to use the Bond proceeds to repay outstanding debt under its revolving credit facility.  Furthermore, Under Armour reported negative free cash flow in 2015 and 2016.  In fact, the Company's reported negative cash flow from operations of -$44 million in FY15 was its first negative operating cash flow year since FY07 and down from $219 million in FY14.  Under Armour's cash position provided an acute need for the Bond proceeds.  These facts were well known to Plank, serving as additional motive to misrepresent and conceal the Company's true financial condition and keep the Bonds above junk status.

### 4.     Expert Opinion Confirms that Plank's Class Period Stock Sales Were Highly Suspicious

100.     Professor M. Todd Henderson, an expert on securities regulation and corporate governance, including executive compensation and insider trading, reviewed Plank's insider trading during the Class Period.  After review and analysis of the relevant facts, including years of trading history by Plank, Professor Henderson concluded:

> Based on my research on executive compensation, securities regulation, and corporate governance, as well as my experience in consulting with companies regarding these issues, my opinion is that Mr. Plank's Class Period stock sales were extremely unusual and suspicious.  For instance, during the Class Period, Mr. Plank sold more than one third of the stock he had available to sell (while maintaining voting control).  As explained below, the sale of between 36 percent and 42 percent of saleable shares raises serious suspicions about his motives.  Moreover, Mr. Plank sold over three times more stock per month during the Class Period than his recent

- 33 -

historical average.  This dramatic departure from his past trading practice, coupled with the record high prices and the significant stock price declines shortly after his sales, as well as the Plaintiffs' allegations regarding Mr. Plank's informational advantage demonstrates that these stock sales were unusual and suspicious.

Ex. E at 2.

101.     Professor Henderson examined the amount of Under Armour shares beneficially owned by Plank as well as the Company's dual-class stock structure prior to April 2016. Ex. E at 5-6.  Professor Henderson discussed the Company's "sunset provision" whereby Plank would lose voting control of Under Armour if his ownership fell below 15% of total shares outstanding. *Id.* at 6. Professor Henderson further noted, "Mr. Plank (and the Company) went to extraordinary lengths – including creating a new class of common shares (Class C) during the Class Period – to preserve Mr. Plank's personal control over the Company." *Id.*  And that "[t]he evidence is overwhelming that Mr. Plank would not sell below 15 percent and give up control."  *Id.* at 8.  Based on the foregoing, Professor Henderson determined that, in analyzing the percent of holdings Plank sold during the Class Period, the "appropriate denominator . . . is not his 'overall holdings,' but rather the shares he could sell while still retaining his position as the controlling shareholder of Under Armour." *Id.* at 4. "Using 'shares available to be sold' as the denominator, Mr. Plank sold approximately 36 percent of his shareholdings" in November 2015. *Id.* at 6.  Professor Henderson opined, "this amount is extraordinary." *Id.* at 9.

102.     With regard to Plank's April 2016 sales of 1,050,000 shares for $38.2 million, Professor Henderson found "[t]hese sales amounted to 42 percent of all shares Mr. Plank could sell that year without implicating his control over Under Armour." *Id.* at 10.  That was because "[a]ccording to the revised charter after the issuance of the Class C shares, Mr. Plank could sell a maximum of 2.5 million shares in 2016." *Id.* at 10.  Professor Henderson concluded, "[i]t is extraordinary for a CEO to sell such a high percentage of their shareholdings in a given year." *Id.* at 11.

103.     Professor Henderson also analyzed Plank's April 2016 sales in the context of Plank's intent on maintaining control of Under Armour.  *Id.* at 9-12.  Professor Henderson noted Under

- 34 -

Armour's recapitalization to introduce Class C shares.  The recapitalization was motivated by "the concern that sales by Mr. Plank, as well as issuance of new Class A shares for executive compensation, were causing a dilution of Mr. Plank's ownership that was approaching the 15-percent threshold that would 'unwind' his position as controlling shareholder." *Id.* at 9.  Professor Henderson opined, "Under Armour took significant risks to enable" Plank to sell without "implicating his voting control."  *Id.* at 11.  Professor Henderson concluded, "Mr. Plank took immediate and aggressive advantage of the new opportunities to liquidate his shares in Under Armour after receiving the Class C share dividend in April 2016.  Over five days later that month, he sold 1,050,000 Class C shares for proceeds of $38.3 million." *Id.* at 10.

104.    In evaluating the benefit of the Class C issuance, Professor Henderson analyzed the percent of available shares Plank would have sold if the recapitalization had not been effectuated.  Without the Class C share issuance, Plank would have had to sell more Class A or Class B shares in April 2016.  "In that case, Mr. Plank's April 2016 sale of 1,050,000 shares would have, when added to his 1,250,000 shares sold in November 2015, brought his total Class Period sales of Class A shares to 2,300,000." *Id.* at 12.  Had Plank sold 2,300,000 – Class B shares during the Class Period – as he would have had to do without the risky Class C issuance – Plank's Class Period sales "would thus have been approximately 67 percent of the total shares he had available to sell." *Id.* at 12.  Only a "radical plan to recapitalize Under Armour" avoided that outcome.  *Id.* at 3.

105.    Professor Henderson also compared Plank's Class Period trading with Plank's trading history in the three years prior to the Class Period. *Id.* at 13-14.  Professor Henderson observed that, based on Plank's November 2015 and April 2016 sales, Plank "sold an average of 1,150,000 during these two months during the Class Period." *Id.* at 13.  In the three years prior to the Class Period, Plank sold during fourteen separate months.  "In those months, [Mr. Plank] averaged 339,911 shares sold per month.  In other words, he sold almost three and a half times more shares per month during the Class Period than his practice during the prior three years selling Under Armour shares." *Id.* at 13.  Likewise, Professor Henderson observed Plank "averaged sales of nearly $70 million per month" during the Class Period but only "$23 million in proceeds per month in which he sold" in the

- 35 -

three years prior to the Class Period.  *Id.* at 13-14.  Based on these facts, Professor Henderson concluded Plank's "Class Period sales were three times more than his recent historical average" and dramatically out of line with his prior trading practices."  *Id.* at 14.

106.   Professor Henderson further noted that Plank "has not sold a single share of Under Armour stock" since April 2016.  *Id.*  "This strongly undercuts any claim that somehow his base salary was insufficient and therefore excused the earning of abnormal returns from his stock sales during the Class Period.  It also reinforces how unusual [Mr. Plank's] Class Period sales were."  *Id.*

107.   Professor Henderson also compared Plank's Class Period trading with that of "the typical public-company executive."  *Id.* at 12-13.  Professor Henderson cited a 2010 study that concluded, "'the typical CEO sells only about 1.9% of her equity incentives each year.'"  *Id.* at 13 & n.24.  By comparison, Professor Henderson observed, Plank sold "at least 36 percent of his shares in several days during November 2015 – about 18 times more than the typical CEO of a large, public company."  *Id.* at 13.

108.   Based on all of the foregoing, Professor Henderson concluded,

> Based on my research, experience and analysis here, ***Mr. Plank's Class Period stock sales are highly suspicious in timing and amount***.  At a time when Plaintiffs allege Mr. Plank was in possession of material negative information about Under Armour's business, Mr. Plank engaged in massive trades of Under Armour stock that were timed at record high prices.  As detailed herein, the attributes of these trades make them unusual and suspicious.
>
> Mr. Plank sold at least 36 percent of his available shares during one month during the Class Period.  After an extraordinary recapitalization of the stock precipitated in part by this massive selling, in April 2016, Mr. Plank sold 42 percent of his available shares for the year in just a few days.  This large-scale dumping of shares is dramatically out of line with his prior trading practice over the prior three years and atypical for CEOs of large public companies.  The sales during the Class Period were not just unprecedented, they have never been replicated – Mr. Plank has not sold any Under Armour stock in 30 months since that time.
>
> Moreover, the 36 percent number actually understates the relative level of Mr. Plank's selling.  Under Armour undertook a costly and risky recapitalization of its stock in order to permit him to sell more shares without imperiling his voting control.  Had they not done so, Mr. Plank would have had to sell approximately 67 percent of all his available shares during the Class Period to achieve the same $140

million in proceeds. This effective amount is truly extraordinary with respect to his own behavior and that of peer executives.

*Id.* at 14-15.

## H. The Scienter of Company Executives Is Imputed to Defendant Under Armour

109.    Defendant Plank's scienter is imputed to Under Armour. In addition, numerous facts demonstrate that other members of the Company's senior management knew or recklessly disregarded the adverse facts concealed by the Class Period misrepresentations. The scienter of these Under Armour executives, like that of Plank, is imputed to Under Armour. Because Plank and other members of Under Armour's senior management had the requisite scienter, Under Armour had the requisite scienter.

110.    In addition to Plank, the extensive information and reporting systems discussed above (¶¶63-64, 73-75) were available to other Company executives. Everyone at Under Armour on the sales team had full visibility into detailed and regularly updated sales data. Declining demand, excess inventory, and margin compression were widely discussed throughout Under Armour.

111.    Kip Fulks, the Company's co-founder and Chief Product Officer during the Class Period, and Plank's "right-hand man," attended the monthly sales meetings with Dick's. Brian Cummings, Senior Vice President Regional Sales ("Cummings"), also attended these meetings. As noted, the declining demand for Under Armour products at Dick's was discussed at these meetings, and Dick's provided Under Armour with detailed sales reports. Cummings pressured the Under Armour sales team to do whatever they could to get the sales, and the sales team was encouraged to get customers to place orders by telling them that the orders could be cancelled or returned later. For example, Cummings orchestrated a deal with Dick's in early 2016 wherein Cummings convinced Dick's to order shoes that Dick's did not want (Dick's predicted they would have to return 80% of the shoes). But Cummings agreed that Under Armour would take back any unsold product. Dick's ended up returning 80% or more of the deal later in 2016.

- 37 -

112.     Fulks and Cummings also received internal sales reports every Monday.  The sales team also prepared summaries of the sales data for upper management.  In addition, sales management had a "dashboard" on their computers or tablets to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  For example, sales reports in 2016 indicated that the sell-through for Under Armour's athleisure products was only around 1% to 2%, when it should have been closer to 10% to 15%.

113.     The Company's extensive inventory reporting systems were not limited to Plank.  Rather, information about excess inventory was widely available.  Indeed, the Company's inventory problems, including excess inventory across all brands, were topics of frequent discussion.  For example, Matt Mirchin, President North America and later Strategic Advisor Global Revenue ("Mirchin"), Rob Goodwin, Vice President of North American Merchandising, Bill Healy, Director Hunt/Fish & Tactical Sales, Kevin Eskridge, Senior Vice President Global Merchandising and later President Sports Performance, and Cummings discussed excess inventory.  Goodwin noted that Under Armour had the most excess inventory he had ever seen at a company.  The amount of excess inventory grew so large that Under Armour's liquidation channels became flooded and, for some of the inventory, there was nowhere to go.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

114.     Throughout the Class Period, Defendants misrepresented the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies.  Defendants' misstatements and omissions failed to provide a full picture of the true circumstances at Under Armour.  In reality, the Company's primary product category, apparel, suffered from reduced customer appeal and demand, which hurt the Company's revenue and operating income growth, created excess inventory, forced the Company to make a fundamental

strategic shift to competing on price rather than premium strength (*i.e.*, dropping sales prices), and compressed the Company's margins.

115.    When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about the Company and its products that would have made such statements not misleading.   Specifically, they were under a duty to disclose the Company's slower revenue and operating income growth, lower ASPs, increased discounting and promotions, elevated inventory, and compressed margins attributable to the Company's apparel issues and fundamental shift in strategy (competing on price rather than brand strength) during the Class Period.   This information was material because it would have altered the total mix of information made available to reasonable investors.   However, Defendants failed to reveal this information, and, instead, omitted and concealed it from investors.   In addition, many of Defendants' statements about sales, demand, market share, pricing, inventory, and margins were explicitly and materially false and misleading in themselves.   Defendants' material omissions and false and misleading statements are detailed in this section.

116.    Defendant Under Armour is liable for the material misstatements and omissions of its employees alleged herein.   Likewise, as CEO, Chairman, and controlling stockholder throughout the Class Period, Defendant Plank is liable for the material misstatements and omissions of Under Armour employees alleged herein.

### A.    2015 Investor Day

117.    The Class Period begins on September 16, 2015.   On that day, the Company held its 2015 Investor Day.   Plank and other members of Under Armour's senior management gave presentations on behalf of the Company.

118.    Throughout the meeting, Plank and other senior executives repeatedly represented that the Company was experiencing increased demand and sales growth in key categories.   Plank

- 39 -

stated that "[t]he demand for our brand has never been stronger" and represented that the "drivers" of sales growth were the same as they had been "over the past 10 years."  Chief Merchandising Officer Stafford told investors that Under Armour's "men's business is stronger than ever."  With respect to women's products, in particular, Vice President of the Women's Division, Kelly Cortina, added, "[d]emand for our product is growing."  And Peter Ruppe, Senior Vice President Footwear, stated that the Company had "raised margins" in the footwear division.

119.    Dickerson added that "[a]pparel, our largest category, continues to grow over 20%." Stafford told investors that the Company was "increasing our ASPs" in men's apparel.  Defendants failed to disclose that the Company's apparel business – its largest and most important business – was compressing margins as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

120.    Another Company representative, Susie McCabe, Under Armour's Senior Vice President of Global Retail, made clear that Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

121.    With regard to wholesale sales, which accounted for 65% of Under Armour's sales in 2016, Mirchin, President North America, misleadingly stated that "[Under Armour's] relationship and our partnership with Dick's has never been stronger and our business continues to grow." Mirchin stated that the Company had "incredible growth at wholesale."

122.    Analysts reacted positively to Defendants' statements made at Under Armour's 2015 Investor Day.  For example:

(a)      in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating and stated, "UA continues to be our *#1* pick for long-term growth investors."  In support of the positive outlook, the report noted the "company has been patient and methodical in managing the growth of the brand by only entering the proper channels";

(b)      on September 16, 2015, KeyBanc Capital Markets issued a report stating "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and

- 40 -

investments should continue to support >20% top-line growth over the next few years. We think UA's impressive growth demonstrates the power of strong brands";

      (c)    on September 17, 2015, Cowen and Company issued a report raising its estimates and increasing its price target to $120 from $112, stating, "[m]anagement's revenue targets could ultimately be conservative given the acceleration in investments"; and

      (d)    on September 17, 2015, BB&T Capital Markets issued a report raising its price target to $115 and commenting, "we came away from UA's Investor Day enthusiastic about the brand's trajectory."

      123.    Defendants' misstatements and omissions on September 16, 2015, as set forth in ¶¶118-121 above, were materially false and misleading and omitted material facts for the following reasons:

      (a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015. This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

      (b)    Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

      (c)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that apparel growth was continuing and that demand for the Company's products "has never been stronger" (*see* ¶118); and

      (d)    The Company was not "protect[ing] the brand" through controlled use of off-price distribution and refraining from "chas[ing] easy profits"; rather, the Company was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth

- 41 -

projections, in an attempt to combat the core apparel declines, which compressed margins (*see* ¶120).

### B.    3Q15 Financial Results

124.    On October 22, 2015, the Company issued a press release announcing its financial results for 3Q15.   The press released stated gross margin headwinds were "partially offset by favorable product margins."   During a conference call held that same day to discuss the 3Q15 results, Dickerson stated that "[i]nventory for the quarter increased 36% to $867 million."

125.    During the October 22, 2015 conference call, Plank again misrepresented the level of demand for the Company's products, which he would later admit had failed to adapt to changing consumer preferences.¶¶224-225, 230, 241, 251.   Plank stated that the Company was experiencing "unparalleled demand for the Under Armour brand."

126.    Dickerson admitted that margins had contracted, but misleadingly blamed such contraction on relatively benign factors including the strength of the U.S. dollar, exchange rates, and the emerging footwear business (which carried lower margins), rather than declining sales of apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins:

> Moving on to margins, third quarter gross margins contracted 80 basis points to 48.8%, compared to 49.6% in the prior year's period.   The following factors were the primary drivers during the quarter.   First, the continued strength of the US dollar negatively impacted gross margins by approximately 90 basis points versus the prior year.   Second, sales mix negatively impacted gross margin by approximately 50 basis points in the third quarter versus the prior year, primarily driven by the continued strong performance of our footwear business.
>
> Also, on our ongoing focus to better flow of product to service our business resulted in higher freight expenses, which negatively impacted gross margin by approximately 20 basis points in the quarter versus the prior year.   Partially offsetting these margin pressures, we continue to see favorable product margins in both our North America and international business, which benefited gross margin by approximately 90 basis points in the third quarter.

127.    Dickerson further represented that "we *continue* to see favorable product margins in both our North America and international businesses" and that "we will *continue* to see improvements in our product margins."   Dickerson was asked for additional detail on the Company's

- 42 -

margin contraction during the question-and-answer session with analysts, and made clear that margins in the apparel business were not to blame, and were actually improving "right now":

> **Omar Saad, Evercore ISI:** . . . [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera. But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that. Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?

> **Dickerson:** That's really probably more on our core apparel business. Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, *most of our core apparel product margins are improving*. That's helping offset some of the other pressures we talked about.

> **Saad:** Is that more generating scale in the business on the cost side? Are you taking price strategically, or is it mixed to more premium products? Maybe just expand a little bit more?

> **Dickerson:** Yes, it's a little bit across the board. . . . But, again, you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so *that's where we're seeing it right now*.

128.    Separately, Dickerson failed to attribute elevated inventory levels to the Company's slowing apparel sales. Instead, he misleadingly blamed this on a strategic plan to flow product to customers in a timelier manner, and stated the "bigger driver of" increased inventory levels "is the flow of product."

129.    Analysts reacted positively to Defendants' statements on October 22, 2015 regarding Under Armour's strong 3Q15 financial results. For example:

(a)    in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results;

(b)    on October 22, 2015, SunTrust maintained its "Buy" rating and commented that Under Armour showed "[s]trength across categories" and its guidance should prove "conservative"; and

(c)      on October 23, 2015, Telsey Advisory Group issued a report maintaining its "Outperform" rating and saying the results "marked another solid beat and raise quarter" for Under Armour.

130.    On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15, which were also discussed in the Company's press release and during its earnings call on October 22, 2015.  The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

131.    Plank signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating, in relevant part:

1.      I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*      *      *

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

- 44 -

132.    Defendants' misstatements and omissions on October 22 and November 4, 2015, as set forth in ¶¶124-128, 130, 131 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)    Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

(c)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶125);

(d)    The Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline.  Rather, they were narrowing due to increasing Company discounts and promotions and falling ASPs of the Company's products (*see* ¶127);

(e)    The "bigger driver of" the Company's increasing inventory was not a strategic plan concerning "the flow of product" but, rather, the declining sales of apparel (*see* ¶128);

(f)    The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶130); and

- 45 -

(g)     The Company's Form 10-Q for 3Q15 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the materially adverse conditions described in this paragraph.

## VII.   INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

133.     Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins.  The truth was ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's common stock prices.  The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the state of the Company's financial condition.  By continuing to mislead the market in this manner, Defendants kept the Company's common stock prices artificially inflated throughout the remainder of the Class Period.  This section details the partial revelations of truth regarding Defendants' fraud, the resulting Under Armour common stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's common stock prices artificially inflated even as the truth began to leak out.

### A.     Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour

134.     On Sunday, January 10, 2016, Morgan Stanley issued a report downgrading the Company, reducing its sales and earnings per share ("EPS") growth forecasts for the Company, and significantly reducing its price target for the Company's stock from $103 to $62 per share.[13]  Based on analysis of several data points, including fact-based sales data capturing Under Armour's core sales channel provided by SportScan, Morgan Stanley revealed a "fundamental shift" at Under Armour whereby the Company had, unbeknownst to investors, began competing on price rather than

---

[13]   *See* Morgan Stanley Report at 1.

its premium brand image.[14]   Citing retail data, the report explained that the Company's North

American apparel business was slowing, leading to market share and average sales price declines:

> Data indicates near-term earnings uncertainty is more than just weather: Recent
> SportScan data shows [Under Armour] is losing market share for the first time in 3
> years in apparel and, more surprisingly, ASPs are falling at an accelerating pace.
> Both trends are more pronounced in women's apparel, despite major marketing
> investment in this division last year.  Though warm weather surely explains some of
> this, we think [Under Armour] may be reaching maturity in US apparel faster than
> previously thought.  Though we remain constructive on [Under Armour]'s int'l
> opportunity, we don't think the shares are priced for a US slowdown.[15]

135.    According to the retail data disclosed in the report, the declines were occurring since

at least spring of 2015 (prior to the Class Period):

> Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one-
> and two-year basis since spring 2015 and recently, the data suggests [Under Armour]
> is losing apparel market share (Exhibit 5).  Plus, ASP growth has been steadily
> decelerating, from positive low-single-digits gains in 2014 to negative low-single-
> digit growth this year.  This compares unfavorably to the industry and Nike, which
> have both experienced steadily increasing ASPs (Exhibit 6).[16]

136.    In particular, the report concluded, based on the retail data, that the Company's sales

of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth, falling

ASPs, and market share losses cited above have been more pronounced in women's apparel.

Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP

declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share loss in

women's has been larger and happening for 5 months, while Nike continues to take share (Exhibit

7)."[17]  This was "concerning because Under Armour invested nearly $15M in a major marketing

---

[14]   *See id.* at 2.

[15]   *See id.* at 1.

[16]   *See id.* at 4.

[17]   *See id.* at 6.

campaign in 2014 targeted toward women. . . .  To continue its growth story, [Under Armour] must excel in women's apparel."[18]

137.     The report also raised concerns about Under Armour's potential distribution deal with Kohl's, a mid-tier department store that ran frequent promotions.  "Entering Kohl's would seem like Under Armour is risking some of its brand equity to find growth . . . [and] would imply there may not be as much growth in these other channels as previously thought."[19]  Expansion to Kohl's would be further evidence of a "fundamental shift" at Under Armour because it "risks eroding the premium image of the UA brand" in order to try and maintain revenue growth with higher volume lower priced sales.[20]  Morgan Stanley further noted that the move to Kohl's "was not part of UA's 2018 plan given at its investor day" and expansion into Kohl's would signal that "growth is becoming harder to find for UA than previously thought."[21]  In subsequent reports, Morgan Stanley explained further that a move by Under Armour into mid-tier stores "changes the UA investment thesis.  One main reason to own UA is it is a premium brand.  Premium brands have reputations for having higher margins, holding price better, and having more sustainable cash flows long-term.  The market, in turn, would likely not perceive the same growth or margin story that it used to and send the P/E lower."  Put another way, "adding more mid-tier doors is really UA just taking its brand down – essentially trading on its premium brand image in exchange for sales growth."

---

[18]    *See id.*

[19]    *See id.* at 7.

[20]    *See id.*

[21]    *See id.* at 4.  As other analysts at the time noted, Under Armour made clear at Analyst Day that its focus was on "premium distribution" and "premium locations" in order "to maintain brand strength."  *See* Brean Capital's October 15, 2015 report.

- 48 -

138.    In addition to the apparel problems, the Morgan Stanley Report, citing the fact-based retail data, noted that "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . .  [Under Armour] has always competed on brand image and innovation, rarely on price.  This change in trend is a major concern because this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."[22]  The report also noted that, with respect to the Company's Curry Two basketball shoes, Under Armour appeared to be "trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."[23]

139.    In response to the Morgan Stanley Report, the Company's Class A common stock price fell sharply.  After closing at $37.50 per share[24] on Friday, January 8, 2016, the stock closed at $34.98 per share on Monday, January 11, 2016 (the first trading day after the report was issued), a decline of 6.72% ($2.52 per share), on unusually high trading volume of over 29 million shares.

140.    In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example:

(a)    on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS";

(b)    in a report dated January 25, 2016, Cowen and Company lowered its estimates and reduced its price target to $95 from $110; and

(c)    on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that product discounting was "likely worse than expected."

---

[22]    *See id.* at 1.

[23]    *See id.* at 10.

[24]    The prices of Class A common stock on or before April 7, 2016 referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

**B.      Misleadingly Positive 4Q15 and FY15 Financial Results and Downplay of the Morgan Stanley Report**

141.    On January 28, 2016, Defendants issued a press release announcing the Company's 4Q15 and FY15 financial results.  The press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 90 basis points from sales mix, specifically from strong footwear growth, approximately 80 basis points from the continued strength of the U.S. Dollar, and approximately 30 basis points from higher liquidations."  Defendants held a conference call that same day to discuss the 4Q15 and FY15 results.  During the January 28, 2016 conference call, Dickerson stated that "[i]nventory for the quarter increased 46% to $783 million compared to $537 million at December 31, 2014."

142.    In the January 28, 2016, press release and conference call, Plank continued to represent to investors that Under Armour's core products were in high demand and Under Armour was and would continue to be a premium brand.  Plank stated "'[o]ur core business remains incredibly strong'" and that Under Armour's "growth story is strong, we remain a growth company, and none of that is wavered."  Although he would later admit the Company's apparel offerings had failed to change with consumer preferences, Plank led investors to believe the Company's revenue growth was based on high demand for core apparel.  Plank stated that "[i]n the fourth quarter, Apparel growth of 22% show cases that our brand has products for all seasons and temperatures."  And that "[o]ur brand, our presence, our ability to drive ASPs have never been stronger in North America."

143.    Defendants also discussed the declining margins and increasing inventory, but pinned the blame on relatively benign and short-term factors (faster growing but lower margin footwear and international business, the strength of the U.S. dollar, and higher freight expenses) rather than declines in the Company's apparel business.

144.    Dickerson tied excess inventory and liquidations to a designed strategy to deliver products to customers earlier, as well as recent weather trends, rather than any sales problems caused by the declining apparel business:

This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . .   In addition, the recent weather trends have led to some excess inventory creation, which we will continue to work through across our normal liquidation channels during the first half of 2016.

145.   Following Dickerson's opening remarks, an analyst questioned Defendants about the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP reductions, as detailed in ¶¶134-138 above and in Exhibit C attached hereto.  Dickerson downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data), claiming the data was too focused on the Company's large accounts like Dick's and Foot Locker.  In response to the same question, Dickerson and Plank also reassured investors that, notwithstanding such data, apparel growth was robust:

> **Matthew J. McClintock, Barclays:** My question is, Kevin, there seems to be a lot of debate in the marketplace on several of your strategies, and you kind of hit upon some of this in your prepared remarks.  But in particular, the competitive positioning of both your Footwear and your Women's business, and then also the potential maturity of the domestic business.  I was just wondering if you can give us your updated thoughts on those topics?  Have there been any strategic changes that we should be thinking about?  Thanks.

> **Dickerson:** . . .   So utilizing that [SportScan] data as a proxy for our success, especially in the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%.  So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular.

146.   In discussing the Company's gross margin contraction, Dickerson omitted any mention of the Company's declining ASPs in apparel and increased promotions and liquidations, all of which, unbeknownst to investors, were negatively impacting Under Armour's gross margins:

> Moving on to margins.  Fourth quarter gross margins contracted 190 basis points to 48% compared to 49.9% in the prior year's period.  The following factors were the primary drivers during the quarter: First, sales mix negatively impacted gross margin by approximately 90 basis points in the fourth quarter versus the prior year, primarily driven by the continued strong performance of our Footwear business.  Second, the continued strength of the U.S. dollar negatively impacted gross margin by approximately 80 basis points versus the prior year.   Third, higher inventory liquidations negatively impacted gross margin by approximately 30 basis points.

147.    In discussing 2015 gross margin headwinds, Dickerson stated that "we were able to offset most of the non-currency related [gross margin] pressure through ***more favorable product margins in*** both our ***North America*** and International businesses."

148.    Defendants were asked specifically about ASPs of apparel and gross margins, and Plank and Dickerson responded as follows:

> **Omar Saad, Evercore ISI**: You kept mentioning premiumization, I think specifically to Footwear.  Can you just dig a little bit deeper there, and then talk about does this translate over to Apparel at some point, we sort of see ASPs going up there?  And then Brad, maybe you could comment on premiumization, maybe how it might flow-through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag and what are the really underlying gross margins going to do over time?  Thanks.

> **Plank**: . . .  So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel.  So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators.

> \*        \*        \*

> As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . .  ***We continue to drive and demonstrate that premium position in the marketplace***.

> \*        \*        \*

> **Dickerson**: And we were able to offset a lot of that [gross margin contraction] just through ***our general increase and improvement in product margins, specifically on the Apparel side***.

> So as you look forward in 2016 and beyond, you should see ***continued improvement in places . . . like our Apparel product margins***. . . .

> So I think in all aspects of our business, you will see that improve over time. . . .  And ***our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak***.

149.    Further attempting to allay gross margin concerns, Dickerson represented that "we're definitely seeing improvements in Footwear margins in general" and that "Footwear margins . . . have improved."

- 52 -

150.    Plank later added, "we do see the ability to **continue** to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

151.    Analysts reacted positively to Defendants' statements on January 28, 2016 regarding Under Armour's strong 4Q15 and FY15 financial results.  For example:

(a)    in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders";

(b)    on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness;

(c)    on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73;

(d)    on January 28, 2016, Deutsche Bank issued a report noting Under Armour's representations that, contrary to the Morgan Stanley Report, the Company remained a premium brand: "UA m[anagement] made it clear today that they are now pursuing premiumization more aggressively";

(e)    on January 28, 2016, Cowen and Company issued a report titled "*Sentiment Normalizes Post 'Sportscan' Fear*" that noted the importance of "the introduction of evermore premium price points in footwear and apparel [to] improve[] prospects for long-term margin enhancement; and

(f)    on January 28, 2016, Evercore ISI issued a report noting UA's purported "increasing success in more premium products."

152.    On February 22, 2016, the Company filed with the SEC a Form 10-K reporting financial results for 4Q15 and FY15, which were also discussed in the Company's press release and earnings call on January 28, 2016.  The Form 10-K stated that "[w]e believe that our growth in net

- 53 -

revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

153.   The Company's Form 10-K also contained SOX certifications by Plank that were materially similar to those identified above in ¶131.

154.   Defendants' misstatements and omissions on January 28 and February 22, 2016, as set forth in ¶¶141-150, 152-153 above, were materially false and misleading and omitted material facts for the following reasons:

(a)   Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)   Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

(c)   Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶142);

(d)   Plank's assertion that the Company's ability "to drive ASPs have never been stronger in North America" was false because the Company's ASPs were falling sharply in North America as Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices (*see* ¶148);

(e)   Defendants' attempts to downplay the January 10, 2016 Morgan Stanley Report were false and misleading, as the Company was, in fact, experiencing lower apparel sales growth, increasing ASPs, and a loss of market share (*see* ¶145);

- 54 -

(f)     The Company's inventory growth was not "largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates" or simply due to "recent weather trends have led to some excess inventory creation."  Rather, it was a symptom of reduced sales and market share due to the Company's declining apparel business (*see* ¶144);

(g)     Defendants were not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶152);

(h)     The Company was not "able to offset a lot of that [gross margin contraction] just through our general increase and improvement in product margins, specifically on the Apparel side" and improvement in apparel margins was not "happening right now as we speak."  Rather, apparel margins were deteriorating as a result of reduced ASPs, discounting, and promotions as Defendants' scrambled to maintain lofty growth projections in the face of declines in the Company's apparel business (*see* ¶148); and

(i)     The Company's Form 10-K for FY15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

### C.     Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy

155.     On March 4, 2016, the Company issued a press release confirming its previously released net revenue and operating income projections for 2016, notwithstanding the bankruptcy of Sports Authority, one of Under Armour's largest retail customers, filed on March 2, 2016.

156.     The March 4, 2016 press release stated that the Company planned to offset the impact of the bankruptcy on the Company's full year 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

157.    Defendants' misstatements and omissions on March 4, 2016, as set forth in ¶¶155-156 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)    Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138); and

(c)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.

### D.    Misleadingly Positive 1Q16 Financial Results and Guidance Raise

158.    On April 21, 2016, Defendants issued a press release announcing the Company's 1Q16 financial results.  The press release stated a decline in gross margins "primarily reflect[ed] negative impacts of approximately 100 basis points from higher liquidations and approximately 70 basis points from foreign currency exchange rates, partially offset by approximately 60 basis points from improved product cost margins."  During a conference call held that same day to discuss the 1Q16 results, Molloy stated that "[i]nventory for the quarter increased 44% to $834 million compared to $578 million at March 31, 2015."

159.    In the April 21, 2016 press release, Plank continued his exceedingly positive messaging: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate ***the balanced growth of our brand across product categories***, channels and geographies."

160.    Plank was similarly optimistic as to Under Armour's future growth.  Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company *raised* its outlook for FY16 net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

161.    During the question-and-answer session of the April 21, 2016 conference call, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand:

> **Camilo Lyon, Canaccord Genuity**: Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel.  There's a lot of moving parts and some of your bigger customers have been shutting doors, some of the tertiary players are going away.  Can you talk about the health of that channel and what that could lead to from a channel expansion opportunity and how do you think about segmentation, within that strategy?

> \*       \*       \*

> **Plank**: I mean, posting 30% growth in a quarter where . . . one of our largest customers, one of our top two or three customers just a few years ago filed for bankruptcy.  I think putting that kind of number up is something that just continues to demonstrate the strength of the brand and how strong our portfolio ultimately is.

> We do believe that there is still an underlying very strong wholesale market out there.  And we expect to continue to be iconic, to be a destination.

> \*       \*       \*

> So . . . *our growth is effectively coming from everywhere*.  And North America is something that we feel incredibly strong about.

162.    In response to a separate question, Plank emphasized that "[a]nd again we are, to be clear, driving massive growth.  *We are taking share*."  As to footwear, Plank stated "[w]e are a premium Footwear brand that's *driving ASPs meaningfully higher*. . . ."

163.    During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to rising inventory levels, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  Molloy stated further: "As previously mentioned, the strategy to improve

- 57 -

wholesale, customer service levels resulted in elevated inventory investments beginning in the second quarter of last year."

164.    In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned:

> **Camilo Lyon, Canaccord Genuity**: If you could just disaggregate the composition of inventory between planned inventory increases and any sort of excesses that you have, given the liquidations they had during the quarter?  And coupled with the expectations for flat gross margins in Q2.  If you could just help us understand.  It seems like we're shifting more towards that planned increase, if I'm reading that correctly.  But just any detail there would be great.

> **Molloy**: . . .  [M]ajority of the growth is planned.  But we did have slightly excess. . . . But we are working through that. ***As you can see we worked through it*** through liquidation.  We're continuing to manage through that. . . .  So we were working through it.  But the majority of it is planned.

165.    As to gross margins, Molloy blamed "higher liquidations to clear through excess inventory and foreign currency exchange rates," but stated that product margins were "favorable" (offsetting the overall gross margin declines), rather than disclosing that apparel product margins were declining as a result of reduced customer demand, prompting lower sales prices, discounting, and promotions.  In response to an analyst's question on gross margins, Molloy highlighted "product margin improvements we've seen."

166.    Analysts reacted positively to Defendants' statements on April 21, 2016.  For example:

(a)    in a report dated April 21, 2016, Deutsche Bank Market Research raised its price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but so did gross & operating margins and EPS" and also noted that the Company's management "reiterated that inventories would normalize in 2Q";

(b)    on April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is experiencing across categories, channels, and geographies, and moreover should allay concerns around its growth outlook and opportunities"; and

(c)      on April 22, 2016, Telsey Advisory Group issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

167.     On April 29, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 1Q16, which were also discussed in the Company's press release and during its earnings call on April 21, 2016.  The Form 10-Q also stated:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf."

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy. . . ."

168.     The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶131.

169.     Defendants' misstatements and omissions on April 21 and April 29, 2016, as set forth in ¶¶158-165, 167-168 above, were materially false and misleading and omitted material facts for the following reasons:

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)      Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

- 59 -

(c)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶¶159-161).  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing;

(d)     The decrease in gross margin percentage was not primarily driven by Under Armour's "changing inventory management strategy."  Rather, gross margin decreases were primarily driven by increased discounting and promotions and lower sales prices (*see* ¶167);

(e)     The Company was not "driving massive growth, and . . . taking share." Rather, growth and market share were falling as a result of the Company's apparel sales declines (*see* ¶¶162);

(f)     The Company's rising inventory was not merely a result of "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and the majority of the inventory growth was not part of a strategic plan.  Rather, it was largely attributable to declining apparel sales, which led to excess inventory (*see* ¶162);

(g)     The Company's gross margin declines were not caused by strategically planned inventory increases and offset by "favorable" product margins.  Rather, product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, and liquidations due to lower consumer demand for the Company's apparel (*see* ¶165);

(h)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶167); and

(i)     The Company's Form 10-Q for 1Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

- 60 -

### E. Departures of the Company's Chief Merchandising Officer and Chief Digital Officer

170.     After the market closed on May 3, 2016, the Company surprised investors by filing a Form 8-K with the SEC announcing the departures of two key executives, CMO Stafford and CDO Thurston, both of whom spoke glowingly about the Company's financial results and outlook at the Company's 2015 Investor Day.  The Company provided no reason for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming on the heels of former CFO Dickerson's departure and Morgan Stanley's downgrade and exposure of problems affecting the Company's revenue and operating income growth, gross margins, and market share, and the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

171.     As a result of this news, the price of Under Armour's Class A common stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the stock dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

172.     The Company's Class C common stock, which was issued to Class A common stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

173.     The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

174.    Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example:

(a)    in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent";

(b)    on May 4, 2016, Brean Capital, LLC lowered its rating to "Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations; and

(c)    on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

175.    Defendants' misstatements and omissions regarding the Stafford and Thurston departures on May 3, 2016, as set forth in ¶¶170, 173 above, were materially misleading because they failed to disclose problems at the Company that contributed to such departures, namely the declines in the Company's apparel business resulting from lower customer demand.

**F.    Reduced Financial Guidance Tied to the Sports Authority Bankruptcy**

176.    On May 31, 2016, the Company issued a press release titled, "Under Armour Updates 2016 Outlook," which lowered the Company's 2016 financial guidance, after Defendants had provided strong reassurances as to the Company's financial health and raised 2016 financial guidance just a month earlier.  The Company's updated projection included: (a) FY16 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY16 operating income in a range of $440 million to $445 million (down from the previously projected $503 million to $507 million).  The Company also announced an impairment charge of $23 million and FY16 revenues of $43 million from Sports Authority (instead of the originally planned $163

- 62 -

million) "given the recent decision of the bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business."

177.    As a result of this announcement, the Company's stock fell from $37.73 at the close of trading on May 31, 2016 to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.

178.    Similarly, the Company's Class C common stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

179.    In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to the bankruptcy.  For example:

(a)    on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35;

(b)    on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)";

(c)    on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target from $43 to $35, citing the Company's $23M impairment charge in 2Q16 and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million; and

(d)    On June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range from $38-$42 to $34-$38.

180.    The stock declines on June 1, 2016 would have been larger had Defendants revealed the full truth to investors regarding the Company's financial problems.  However, Plank continued to mislead the market in the May 31, 2016 press release, stating "our brand's momentum is stronger

than ever as we continue to see growth and increased demand across all categories and geographies." This statement was materially false and misleading and omitted material facts because growth in and demand for the Company's apparel business were in decline, not increasing (*see* ¶¶37-51, 134-138).

181.    As Defendants continued to mislead, the market continued to be deceived.  Indeed, despite the partial revelation of the truth on May 31, 2016, a Deutsche Bank report stated, "[n]otably, m[anagement] reiterated 2Q's rev[enue] plan of 'growth in high 20%s', allaying palpable fears that trends slowed since 1Q."

### G.    Under Armour Bond Offering

182.    On June 6, 2016, Under Armour filed the Registration Statement with the SEC concerning the Bond offering.  The Company filed additional Offering Materials, Forms 424B5 and FWP with the SEC on June 8, 2016.  Pursuant to the Registration Statement and Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million.

183.    The Offering Materials incorporated by reference the Company's Form 10-K for 4Q15 and FY15 and Form 10-Q for 1Q16, which contained the false and misleading statements and omissions of material fact detailed in ¶¶152, 167 above.

184.    One month after the Bond offering was completed, on July 8, 2016, Morgan Stanley issued a report with additional analysis regarding Under Armour's strategy and fundamental shift to competing on price rather than brand strength, which the Company had not disclosed and indeed refuted.  Morgan Stanley again analyzed Under Armour's declining ASPs, noting that although wholesale sales are up, "the sales increase can be explained by the ASP decline."  The report recognized that historically and, according to Defendants' Class Period misrepresentations to date, Under Armour "is a premium brand."  But, based on SportScan data, Morgan Stanley stated that, "seven straight quarters of 2.5% ASP declines, on average, challenges that notion."  Morgan Stanley also analyzed women's apparel, as it had in January, concluding that "UA's women's apparel sales growth rate in the US wholesale channel has decelerated."  With regard to footwear, Morgan Stanley noted that "two low priced styles . . . drove 9% of the FY15 growth in running footwear. . . .  We

- 64 -

believe selling low priced footwear threatens to erode UA premium brand image and limit its long-term growth potential."

185.    The July 8, 2016, Morgan Stanley report also looked at the impact of a potential move by Under Armour into Kohl's.  The report noted "UA knows there is risk in entering this channel" and "UA has not pursued [Kohl's] or [JCPenney] until now because a) these channels may cause erosion of UA's premium brand image and UA didn't want to take the risk, and b) it had so many other growth avenues.  We think the reason UA is preparing to enter Kohl's or JC Penney now is it needs to find new avenues to maintain the sales growth rates the market expects.  Otherwise, it probably wouldn't want to take the risk."  Overall, Morgan Stanley viewed the declining ASPs, emphasis on low-priced footwear, decelerating women's wholesale apparel, and a potential move into a mid-tier store like Kohl's and concluded that the "strategies UA is using to stimulate sales growth jeopardize its brand equity."

### H.    Disappointing 2Q16 Financial Results: Partial Revelations of a Growth Slowdown

186.    On July 26, 2016, just three months after raising guidance, the Company issued a press release announcing disappointing 2Q16 financial results.  The Company reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

187.    The Company also reported 2Q16 gross margin of 47.7%, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  Earnings were only $0.01 per share, $0.03 lower than the year-ago quarter.

188.   On the same day, Under Armour hosted a conference call to discuss its 2Q16 financial results.  In his opening remarks, Molloy added that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

189.   During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY16.  Molloy stated that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

190.   Separately, the Company forecast 3Q16 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

191.   On this news, the Company's Class A common stock fell from a close of $43.59 per share on July 25, 2016 to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares.  The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares per day, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

192.   The Company's Class C common stock also fell on this news, dropping from $38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6 million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1 million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

193.   The stock declines would have been larger had the Company revealed the full truth to investors.  But Defendants continued to mislead investors and downplayed the negative news.

194.   The July 26, 2016 press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 130 basis points from sales mix driven by strong

growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  In a conference call to discuss the 2Q16 results that same day, Molloy reported "[i]nventory for the quarter increased 30% to $1.1 billion compared to $837 million at June 30, 2015."

195.    Plank continued to insist that Under Armour remained "a growth company" and falsely stated that "[o]ur second-quarter results are strong evidence that *demand for Under Armour has never been higher*."

196.    Echoing this message, in his opening earnings call comments, Molloy emphasized "the *consistent growth across our diverse product lines and channels* [that] delivered another quarter of strong results," including growth in apparel revenues.

197.    During the question-and-answer session that followed, an analyst inquired about "athletic inventory in the channel today" and whether Plank was comfortable with the promotional backdrop.  Plank admitted to a high level of promotion as well as a shifting retail environment, but misleadingly stated that the level of promotion was the same as in prior years, and that the Company's core base of apparel was growing, notwithstanding shifting fashion trends such as athletic leisure:

> **Matthew Robert Boss, JPMorgan**: Kevin, can you talk about athletic inventory in the channel today? It sounds like inventory for you guys will be in line with sales by the end of this quarter.  Nike expects to be clean by August.  I guess are you comfortable with the promotional backdrop you see out there today?  And then larger picture, what would you say to those calling for a top in the athletic cycle out there?

> **Plank**: Yes, I'm not going to say I'm comfortable with the promotion out there in the market today, but *I don't know if that's different than what we've seen in the last several years, either*.

> <div align="center">*      *      *</div>

> I think there's a shift happening.  I think the way the people are dressing is changing, and it's altering.  And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend.  But the good news is that we're not grounded in trend, we're grounded in sport.  That'll keep us here, and the trends will come and go.  But *we're also watching our core base continue to grow* for us, as well.

<div align="center">- 67 -</div>

198.     With regard to the Company's deteriorating margins, Molloy again falsely attributed the declines largely to benign factors, concealing the margin declines caused by reduced demand for apparel, increased promotions and liquidations, and declining ASPs.   Molloy instead falsely represented that the Company's product margins were improving.

> Moving on to margins, second quarter gross margins decreased 70 basis points to 47.7% compared to 48.4% in the prior year's period.   Sales mix negatively impacted the second quarter by approximately 130 basis points, ***primarily driven by the continued strength of our footwear and international growth***.   Partially offsetting this negative impact were ***continued favorable product margins***, benefiting gross margin by approximately 50 basis points.

199.     Plank also announced that the Company was expanding its wholesale distribution to include Kohl's.   Plank falsely represented that there was "nothing reactionary about Kohl's" a mid-tier department store with frequent steep discounting but rather, "[t]his was a proactive move for us."

200.     Despite Defendants' continued false and misleading statements, a number of analysts reacted negatively to Defendants' statements on July 26, 2016, regarding Under Armour's 2Q16 financial results and declining average sales prices.   For example:

(a)     on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target to $40 from $47; and

(b)     on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "[s]ales are growing solidly, but ASPs are fading.   UA competes on brand image and innovation, rarely on price.   This trend change is a concern because it suggests a fundamental shift in the UA story."   With regard to the Company's expansion into Kohl's, which Morgan Stanley had discussed in prior reports, the report noted it "is not a positive in our view," voicing concern that "it is potentially brand dilutive."

201.     On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16, which were also discussed in the Company's press release and during its earnings call on July 26, 2016.   The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- 68 -

202.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶131.

203.    Defendants' misstatement and omissions on July 26 and August 3, 2016, as set forth in ¶¶186-190, 194-199, 201-202 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)    Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

(c)    Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶195);

(d)    The statement that "demand for Under Armour has never been higher" was false and misleading because customer demand for the Company's apparel products, which accounted for the majority of sales, was suffering and in decline (*see* ¶195);

(e)    The Company was not experiencing consistent growth across all product lines and channels.  Rather, growth was slowing due to the declining apparel business (*see* ¶196);

(f)    The Company's promotions were growing and were not the same as "the last several years," as Plank misleadingly implied; rather, they were much higher, as the Company ran an increasing number of promotions of apparel products throughout the Class Period (*see* ¶197);

(g)    The statement that Under Armour was "watching our core base continue to grow" despite changing fashion trends was misleading because the Company's failure to capitalize

- 69 -

on changing fashion trends, such as the athletic leisure trend, was reducing demand for the Company's products and thus reducing the Company's core base (*see* ¶197);

(h)     The statements indicating that the gross margin decline was temporary due to rising product margins, and driven by the footwear and international businesses, were misleading because they implied that apparel margins were strong and failed to disclose that gross margin declines were also driven by slower apparel sales, promotions, discounts, lower sales prices, and liquidations (*see* ¶¶194-198);

(i)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶201); and

(j)     The Company's Form 10-Q for 2Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

**I.     Goldman Sachs Global Retailing Conference**

204.     On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference.  Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained.  When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved, and that despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> Yeah, for us ***we're in a really good position [with inventory levels]***.  We feel really healthy and it's our understanding that the marketplace is in a healthy position, too. Came out of the winter season, there was a lot of excess inventory.  You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies.  It was flush with inventory.  It was a promotional environment.  ***We didn't participate – have to participate too much in that promotional environment***.

- 70 -

But from what we can understand that as of the end of August that most of the domestic retail partners are in really good inventory positions. ***We know we are***.

205.    In response to additional questions on inventory, Molloy stated that "retail is pretty good and inventories are clean" and that "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected."

206.    Molloy's September 7, 2016 misstatements and omissions set forth in ¶¶204-205 above were materially false and misleading and omitted material facts because the Company's inventory levels were not healthy, clean, in a good position, or "cleaned up a lot sooner than many expected."  Rather, inventory levels were inflated and continued to grow due to declining customer demand for, and declining sales of, the Company's apparel.  Moreover, Defendants were indeed participating in, and creating, a "promotional environment" by running heavy and increasing promotions and discounts in response to the Company's apparel sales declines and inflated inventory levels, which had to be liquidated at a steep discount (*see* ¶¶37-51, 134-138).

**J.      Disappointing 3Q16 Financial Results: Further Revelations of a
          Growth Slowdown and Compressed Margins**

207.    On October 25, 2016, the Company issued its 3Q16 earnings release.  Defendants surprised investors by reporting 3Q16 gross margin of only 47.5%, compared with 48.8% in the prior year's period.  On the same day, Under Armour hosted a conference call to discuss its 3Q16 financial results.  Plank and Molloy participated in the call on behalf of the Company.  In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations.  Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year."

208.    During the conference call, Molloy further revealed that apparel growth would be less than projected at the Company's 2015 Investor Day: "[T]he landscape for our business and our industry continues to evolve . . . .  North America apparel growth is slowing across the industry.

While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

209.    Molloy also revealed that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years."   In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . . [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution."

210.    The Company's stock fell sharply as a result of this negative news.  Under Armour's Class A common stock dropped from a close of $37.90 per share on October 24, 2016, to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.  The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per day, as the market continued to digest the news.  The total stock price decline over this four-day period was 18.36% ($6.96 per share).

211.    The Company's Class C common stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016, to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.  The stock dropped an additional 8.67% ($2.46 per share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

212.    The stock declines would have been larger had Defendants revealed the full truth regarding the Company's problems.   Instead, Defendants continued to mislead investors and

- 72 -

downplay the negative news.  In an October 25, 2016 press release, Defendants stated that a decline in gross margins "primarily reflect[ed] negative impacts from the timing of liquidation, increased promotions, and foreign exchange rates, partially offset by continued product cost margin improvements."  During the October 25, 2016 conference call to discuss 3Q16 results, Molloy stated that "[i]nventory for the quarter increased 12% to $971 million."

213.   Plank boasted during the October 25, 2016 earnings call that "*[w]e are a growth company*.  And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter.  Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."  Plank insisted that "*our demand is still there*" and that "*[revenue] growth remains intact*."

214.   Plank also stated during the earnings call that "with *apparel remaining incredibly profitable* . . . there's not an end to the North American apparel story.  That continues to march on for us as well."

215.   Defendants continued to conceal the full extent and causes of the Company's deteriorating margins and operating income, pointing investors to the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as opposed to the declining apparel business being a source of the margin and operating income issues).  Molloy also represented that "*we're already seeing improvements in our footwear margins*."

216.   With regard to inventory, Molloy assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier*."  In response to an analyst question later in the call, Molloy falsely stated that the Company was "*in really good shape from an inventory perspective*" and "growth rates [have] come down, but *the inventory is in great shape*."

- 73 -

217.    Notwithstanding Defendants' attempts to put a positive spin on the disappointing 3Q16 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example:

(a)    on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak," noting "UA's entry into low-end channels has raised the risk its brand equity erodes";

(b)    on October 25, 2016, Wells Fargo Equity Research issued a report stating the Company's new 2017/2018 outlook was "far worse than expected";

(c)    on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal";

(d)    on October 25, 2016, Piper Jaffray issued a report in response to the Company's disclosures, commenting "[c]learly we and the Street were blindsided by m[anagement]'s update to its long-term guidance on the call";

(e)    on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM"; and

(f)    On October 27, 2016, Morgan Stanley issued a report in response to the Company's October 25, 2016 disclosures.  The report noted that although the market had been led to believe Under Armour's contracting margins were due to investment for future growth, the poor results and margin guidance "suggests UA is increasing discounting and pursuing business in lower-margin channels to meet its sales goals."  Morgan Stanley concluded, "UA's brand momentum is slowing."  The report further noted, with the recent announcement of an expansion into Kohl's alongside worsening margins and falling ASPs, "Under Armour's brand strategy seems increasingly risky.  On one hand the company tries to elevate the brand . . . [o]n the other hand, it allows its brand

to be sold at deep discounts." The report warned, "[i]f the brand equity erodes, it will be almost impossible to get back and growth will be increasingly hard to come by."

218.  On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16, which were also discussed in the Company's press release and during its earnings call on October 25, 2016. The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

219.  The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶131.

220.  Defendants' misstatements and omissions on October 25 and November 2, 2016, as set forth in ¶¶207-209, 212-216, 218-219 above, were materially false and misleading and omitted material facts for the following reasons:

(a)  Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015. This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins (*see* ¶¶37-51, 134-138);

(b)  Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth (*see* ¶¶134-138);

(c)  Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends (*see* ¶¶213-214);

(d)  The pressure on the Company's margins and operating income was not driven solely by the footwear and international businesses becoming greater sources of revenue and the need for additional investment to take advantage of growth opportunities, as Defendants

- 75 -

misleadingly stated.  Such pressure was also a function of the declining apparel business, which reduced sales and ASPs, while increasing promotions, discounts, inventory, and liquidations (*see* ¶¶212, 215);

(e)     The Company's inventory position was not "healthier" or in "great shape." Rather, inventory was a major problem and continued to get worse, causing a high level of inventory that the Company was forced to liquidate at discounted prices, as demand for the Company's apparel products continued to suffer (*see* ¶216);

(f)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing (*see* ¶218); and

(g)     The Company's Form 10-Q for 3Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

### K.     Disappointing 4Q16 & FY16 Financial Results: Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy

221.     The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017.  On that day, Under Armour stunned investors with a press release announcing dramatically lower-than-expected growth and other financial problems during 4Q16 and FY16.  In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results."  Specifically, the Company revealed that:

- Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth. Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

- Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

- FY16 gross margin dropped from 48.1% to 46.5%.

- 4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

- FY16 inventory increased 17%.

222.     Moreover, the press release provided a surprisingly negative outlook for 2017.  Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters.  In addition, gross margin was "expected to be slightly down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

223.     Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he was only at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Molloy was replaced by Dave Bergman ("Bergman"), the Company's SVP of Corporate Finance.

224.     During a conference call with analysts on the same day, January 31, 2017, Defendants elaborated on the news revealed in the Company's earnings release.  Plank, Molloy, and Bergman participated in the call on behalf of the Company.  In his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.

*        *        *

- 77 -

So first, I'd like to explain a few things: what happened, what we learned and what we're doing about it. So let's start with what happened. *In the fourth quarter, slower traffic caused significant promotional activities earlier, deeper and broader than expected. This commoditized some of our more basic core product that had previously sold through for us in years past*.

This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment. *So we lost top line volume as we worked to adapt [through] our mix and pricing*. Now, to be fair, we did comp positively in the quarter in both our own retail stores and our e-commerce channel, but ultimately the result was below original plan.

There was also lower channel recapture of bankruptcy volume that we'd expected, as *pricing came down in the points of distribution that we serve*. Finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full price sales.

*          *          *

We learned that when we play in a discounted environment, we can drive volume and win, but the role both we and our retailers expect us to play is as a premium full-price brand.

225.    While Plank couched these issues as having emerged in 4Q16, in reality, this was a continuation of problems known, or recklessly disregarded, by Defendants throughout the Class Period. Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

226.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today." He emphasized that "North American apparel is still our largest and most profitable business by far. Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

227.    Molloy also stated that "[f]ourth quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior year's period. The decrease includes a negative impact of approximately 230 basis points, driven by higher discounts and promotions," as well as lower

margins resulting from footwear and international sales. As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory including discounting, especially in the back half of the year."

228.    Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call, and proactive actions to manage inventory levels down in the marketplace, we expect full year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017." Regarding the first quarter of 2017 ("1Q17"), Bergman stated:

> We anticipate the first quarter to grow at a mid-single digit rate as fourth quarter conditions in North America carry over and we will have not yet lapsed some of the significant bankruptcies we saw in 2016. We're expecting first quarter gross margin to be down almost 100 basis points year-over-year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

229.    Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

230.    During a question-and-answer session with analysts, Plank confirmed the shift in consumer preference towards more fashion-oriented athletic apparel and referenced increased competition and heavy discounting in Under Armour's "core basic" performance-oriented athletic apparel:

> **Omar Saad, Evercore ISI**: [M]aybe if you could expand on a comment you made I think in the prepared remarks around some trends going on in the apparel business, maybe moving away from performance more to fashion or lifestyle? I know the UA Sportswear line is still kind of pretty nascent, but maybe elaborate on what you're seeing from that standpoint.
>
> Is there something pretty deep going on at the consumer level? A shift towards more fashion-oriented athletic apparel versus performance oriented? Obviously, Under Armour is known for its technical performance. And if this is the case, how do you evolve the brand a little bit to be really relevant on both sides of that fence?
>
> **Plank**: Yes. . . .

- 79 -

*We need to become more fashionable with the products that we have out there*. And one of the things we found is that some of the core basics were some of the challenges that we saw, is that we were counting on core basics as we have in years past to do more work for us. *But the consumer today frankly has more options.*

*[F]rankly most of those options are from good brands that we compete with, that are heavily discounting as well*. So what you'll see is that I don't think it's one shift of abandoning one for the other. Obviously, with things like the investment we're making in [Under Armour Sportswear] in sport lifestyle in general, but we need to become more fashion. The consumer wants it all.

231. Plank responded to a separate question by stating that the retail market for apparel was being "disrupted" and that "promotions and the consumer environment, all those things are very, very real, but we could have done a better job with our merchandising mix to be more proactive and more thoughtful about where they were going."

232. Separately, an analyst from UBS inquired about 2017 gross margins as to the North American market:

I would've thought . . . that would largely be down next year due to more markdowns. And then your guidance and inventory seems to sound like it will be improving through the year relative to the rate of revenue growth. What do you think is the realistic near term recapture rate for the gross margin after 2017 after some inventory clearing?

Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

233. On this news, the price of Under Armour stock plummeted. After closing at $28.94 per share on January 30, 2017, shares of Class A common stock dropped *25.74%* ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares. This represented the largest single-day stock price decline in the Company's history. The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued to digest the news. The total stock price decline over this three-day period was *28.65%* ($8.29 per share).

- 80 -

234.     Shares of Under Armour's Class C common stock also fell sharply as a result of this news.  After closing at $25.09 per share on January 30, 2017, shares of Class C common stock dropped *23.40%* ($5.87 per share) in a single trading day, closing at $19.22 per share on January 31, 2017, on unusually high trading volume of approximately 57 million shares.  The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of *27.78%* ($6.97 per share) over this three-day period.

235.     In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy.  For example:

(a)     on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario";

(b)     on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story";

(c)     on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.'  Wall Street often assumes that an executive leaving for 'personal reasons' is a sign that a company is in trouble and that someone needs to take the fall.  Under Armour (UAA) tanked on this trifecta of bad news.  Shares plunged nearly 25% in early trading Tuesday.  That put the stock on track for its worst one-day drop ever";

(d)     on January 31, 2017, Reuters released an article titled, "Under Armour's founder-led approach wears thin."  The article observed that the Company "reported its slowest top-line growth in eight years and signaled more challenges ahead.  Its chief financial officer is also

- 81 -

bailing.  The news wiped a quarter off the company's market value.  Chief Executive Kevin Plank's strategy of maintaining power [by controlling the Company's voting stock] is underperforming badly. . . . revenue growth slowed dramatically to 12 percent because of deep discounting caused by slower foot traffic";

(e)    on February 1, 2017, Telsey Advisory Group issued a report stating that "the magnitude of the miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide-down for 2017 came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment thesis as estimates and multiples are revised downwards";

(f)    on February 1, 2017, Oppenheimer issued a report calling Under Armour's announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus far"; and

(g)    on February 3, 2017, Sporting Goods Monitor issued a report expressing its disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue growth at half of the rate we, and Wall Street, expected" and Under Armour's management "*severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent earnings calls*."

## VIII.   POST-CLASS PERIOD REVELATIONS

236.    Following the Class Period, Defendants' financial downturn continued and additional revelations came out about the nature and severity of the problems experienced by Defendants throughout the Class Period.

237.    For example, on February 9, 2017, The Motley Fool published an article titled, "5 Signs Under Armour Inc. Needs New Management," which stated that:

*Under Armour needs a leader who makes realistic promises*.  At the end of fiscal 2015, [Under Armour] estimated its annual revenue would rise 25% to $4.95 billion in 2016.  However, its 2016 revenue actually rose just 22% to $4.8 billion, and [Under Armour] now expects sales to rise just 11-12% in 2017.

That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5 billion in annual revenues in fiscal 2018.  Plank insists that the company is still on track to hit that target, but that would require its top line growth to accelerate to over 40% in 2018 – which hardly seems realistic.

238.     A February 14, 2017, Morgan Stanley report recognized that – according to the Company's own data – 2016 sales growth rates were "overstated," due to the increased reliance on "low quality" sales that caused Day sales outstanding to increase to a nine year high.  The Morgan Stanley report stated:

> Plus UAA accounts receivable increased 44% in FY16 on top of 55% growth in FY15 (Exhibit 11).  Day sales outstanding increased to 47 days (Exhibit 12), a nine year high, and this is even more surprising considering DTC makes up a much bigger percentage of sales than it did nine years ago.  These data points signal some of UAA's recent sales may have been low quality and thus recent sales growth rates may be overstated.

The Company's data further corroborates Plank's admission that 2016 growth was achieved by driving volume in a "discounted environment," and not by sticking to the role the market expected Under Armour to continue to "play" "as a premium full-price brand."

239.     On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's rating to underperform and slashed the Company's Class A common stock price target from $20 to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause UA apparel growth/margins to be worse than expected."

240.     On April 27, 2017, the Company announced 1Q17 results including total net revenue growth of only 7%, a far cry from the consistent 20% growth Defendants reported and projected throughout the Class Period.  Net revenue growth from the Company's apparel business also grew only 7%, the North American business was down 1%, gross margin was down 70 basis points (to 45.2%) "due to continued inventory management efforts," and inventory increased 8%.

241.     On the same day, April 27, 2017, Plank and Bergman (the new CFO following Molloy's suspicious departure) discussed the Company's struggles during an earnings call with analysts.   Much of the call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.  Plank stated that the Company

- 83 -

was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products.  Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

242.     Evercore issued an analyst report on April 27, 2017, following the Company's 1Q17 results.  The report noted "North America was negative for first time in the history of the company - despite N[orth ]A[merican] store count up 8% and initial shipments into Kohl's, both of which should have contributed to growth."

243.     An April 27, 2017, report from Susquehanna noted the Company's "hasty distribution strategy" was reactionary to declines in Under Armour's wholesale business and "hurt the sanctity of the Under Armour brand:"

> We continue to raise flags about Under Armour's expanded distribution into the moderate/family channel (KSS, DSW, Famous Footwear, SCVL).  It is true, as CEO Plank pointed out on the earnings call, that Under Armour has about 10,000 fewer points of distribution vs. Nike.  Nike has successfully done business in the moderate/family channel for years without hurting its brand.  However, Under Armour has yet to build out the product depth, grassroots expertise, and overall marketing prowess that allows for a successfully segmented business across channels.  A proper strategy takes time and resources, yet UAA is moving quickly and hastily down-market.  We believe that the decision to expand into the moderate channel is a result of the liquidation of TSA and Sport Chalet, the pending liquidations of Gander Mountain & MC Sports. As a result, the sanctity of the Under Armour brand is being put at risk.

> We believe that the reason North American revenue was only down 1.1% is because of the initial orders sold into Kohl's.  The assortment sold into Kohl's was, in our view, too broad, lacked appropriate segmentation, and will do more harm than good to the Under Armour brand.

244.     On June 20, 2017, David Butler published an article on SeekingAlpha.com titled, "Underperforming Under Armour."  Butler stated that "[e]verything really peaked in 2014 when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in net income. Ever since, things have been slowing.  It's not a trendy shift either.  We've seen almost two and half

- 84 -

years of decreasing business growth.  The company isn't maneuvering to maintain margins in spite of the slowdown either."

245.    On June 26, 2017, Kenra Investors published an article on SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."  The article discussed continual declines in the Company's brand power and customer interest dating back to 2015, stating,

> There are several datasets that show ongoing weakness for Under Armour. . . . Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an idea of how digital sales are evolving. . . .  ***[T]here is a strong downtrend [that] started in mid-2015, and search interest [in Under Armour] actually became negative since a few months ago***.

The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive, and search interest is in a sharp downtrend. . . . ***So many negative signs make me think the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015***."

246.    Another June 26, 2017 article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."  The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think.  In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand.  For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times.  On Friday morning's call, Under Armour was mentioned just once. . . . and it was a part of a broader discussion regarding multiple brands.

247.    On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is Down 30% This Year."  The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling this year, with the sportswear stock down 30% . . . .

- 85 -

The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways." Specifically, the article noted that wholesale revenue was up just 5% in 4Q16 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand." The article concluded that "Under Armour's slowing growth is a sign that the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . . The company needs to establish itself as a fashion brand as well as a performance one."

248.    News from the Company worsened on August 1, 2017, when it reported financial results for the second quarter of 2017. The Company issued a press release reporting total net revenue growth and apparel net revenue growth of 9% and 11%, respectively, far below the quarterly 20%+ growth reported and projected by Defendants throughout the Class Period. Footwear also performed surprisingly poorly, with net revenue declining 2%. The Company blamed the revenue declines on a "dynamic and promotional retail environment in North America [that] continued to temper results." The Company also reported an operating loss of $5 million, a net loss of $12.3 million, and $0.03 decline in diluted EPS. Gross margin declined 190 basis points (to 45.8%) based in part on "inventory management initiatives" with inventory again increasing 8%.

249.    In conjunction with this negative news, the Company also announced on August 1, 2017 that it was implementing a massive restructuring plan "to more closely align its financial resources to support the [C]ompany's efforts to better serve the evolving needs of the changing consumer and customer landscape." As a result, the Company announced expected "restructuring and related charges" of $110 to $130 million in 2017, including "approximately $20 million of inventory related charges and approximately $40 million of intangibles and other asset related impairments." The restructuring will involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

250.    During the August 1, 2017 earnings call that followed, Plank discussed the restructuring in more depth. He stated that "[t]he landscape is evolving quickly. Therefore, we too must evolve quickly. This evolution requires a pivot, and we're doing just that." He later explained

- 86 -

that "we are clearly operating in a different environment, particularly in our largest market, North America.  With our largest growth drivers including international, footwear and DTC continuing to scale but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

251.   Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends especially the top line, can you just give us an update where you think the brand health is and the vision for the business today?"  He acknowledged that "*we're not pleased with where we're positioned right now*" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."  To that end, he later added that:

> [W]e've adjusted the balance of product we've had, which is ***decreas[ing] many of the core and key items that* we've *had*.  We used to have – we're a very much a key item focused, a big logo hoodie and things in-store, and now we've got a lot of balance of that around versatility, layering, and newness . . . .  We will be telling our story in the back half of this year, and ***you'll see increased brand heat coming from us***, frankly spending against that.

252.   The Company's negative news on August 1, 2017 also involved a reduction in guidance for FY17.  Total net revenue was expected to grow only 9%-11% (vs. previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American business," while adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

253.   As a result of this news, the Company's common stock prices fell precipitously.  After closing at $20.02 per share on July 31, 2017, the Company's Class A common stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C common stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high trading volume of over 23 million shares.

- 87 -

254.     Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . . [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US . . . [and] US customers are abandoning the brand because it lacks a clear identity."  The article further noted that "Plank has previously acknowledged [on January 31, 2017] that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

255.     Susquehanna issued a report following the Company's 2Q17 results on August 1, 2017.  The report noted that despite expansion into more mid-tier retailers, "2Q17 North American revenue only increased 0.3%. 2Q17 wholesale revenue increased 3.1%, which implies a material drop in North American revenue."  The report further stated the "problem . . . is that incremental shipments in the moderate retail channel . . . are being more than offset by order cancellations from Under Amour's best, and most brand appropriate retailers, such as Dick's Sporting Goods."  Susquehanna concluded "the heart of UAA current problems stem from the decision to open distribution to the moderate channel prior to having a broad enough product assortment in order to appropriately execute a segmentation strategy."

## IX.     VERIFIED DERIVATIVE COMPLAINT

256.     On July 23, 2018, former Under Armour employee Brock Anderson, along with shareholder Balraj Paul, filed a verified derivative complaint on behalf of Under Armour "against certain current and former officers and directors of the Company for breaches of fiduciary duties, insider selling, and unjust enrichment."  Mr. Anderson worked at Under Armour for nearly all of the Class Period (September 2015 through November 2016) as a Merchandising Manager.  Mr. Anderson's job duties included, among others, "[i]nitiat[ing] seasonal business plans for all Outdoor

categories across Outdoor/Action Sports Specialty, Sporting Goods, Department Stores, & Mall channels focusing on strategic initiatives, revenue targets, local market characteristics, style/SKU efficiencies, demand, forecasts, current inventory levels, segmentation/differentiation, & distribution" and "[a]nalyz[ing], understand[ing], & clearly communicat[ing] sales history, market trends/forces."

257. The Anderson Complaint alleges Plank and other defendants caused Under Armour to issue materially false and misleading statements, including many of the statements alleged herein to be false and misleading. For example, the Anderson Complaint alleges Plank's September 16, 2015 statement that "demand for our brand has never been stronger" and Dickerson's October 22, 2015 statement that "most of our core apparel product margins are improving" were materially false and misleading when made. Other examples include Plank's January 28, 2016 statement that "[o]ur core business remains incredibly strong," April 21, 2016, statement that Under Armour was "driving massive growth, and *we are taking share*," and May 31, 2016, statement that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."

258. The Anderson Complaint alleges that Plank and the other defendants concealed the "true facts, which were known or recklessly disregarded by" Plank. Those "true facts" alleged in the Anderson Complaint to have been concealed include, among others, that: "Under Armour's apparel products . . . suffered from reduced customer appeal and demand"; the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products"; the "Company's inventory increases . . . were due to declining sales of the Company's apparel"; "the Company's ASPs were falling sharply in North America"; and "growth and market share were falling as a result of the Company's apparel sales declines."

- 89 -

## X.       LOSS CAUSATION AND ECONOMIC LOSS

259.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Under Armour's common stock and operated as a fraud or deceit on Class Period purchasers of Under Armour's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the prices of Under Armour's common stock fell as the prior artificial inflation came out.  The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of Defendants' Class Period statements.  As a result of their purchases of Under Armour's common stock during the Class Period, Plaintiffs and the other members of the Class (defined in ¶286 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.       January 10, 2016 Revelations

260.     The truth began to emerge on Sunday, January 10, 2016, when, as detailed in ¶¶134-138 above, Morgan Stanley issued a report detailing slower growth of the Company's North American apparel sales, falling sales prices, and reduced market share.  As a result of the information revealed to the market, the Company's Class A common stock dropped approximately 6.72% on unusually high trading volume.  At the Company's next earnings call on January 28, 2016, the Company downplayed the report and reassured investors of the Company's strong financial condition.

### B.       May 3, 2016 Revelations

261.     The truth continued to emerge after the market closed on May 3, 2016, when, as detailed in ¶170 above, the Company surprised investors by announcing the sudden departures of key executives Stafford and Thurston.  These departures, coming on the heels of Dickerson's departure, the Morgan Stanley Report exposing problems at the Company, and three major retail customer bankruptcies, were viewed by investors as a signal that there were undisclosed problems at

- 90 -

the Company.  As a result, the Company's Class A common stock dropped approximately 7.54% on unusually high trading volume.  The Company's Class C common stock, which was issued to Class A common stock holders on a one-for-one basis after the market closed on April 7, 2016, also experienced a price decline as a result of this news, falling approximately 6.80% on unusually high trading volume.  The declines would have been more dramatic had Defendants disclosed the declines in sales demand and resulting financial problems that led to the departures of Stafford and Thurston.  Instead, Defendants were completely silent on the reasons for their departures.

### C.   May 31, 2016 Revelations

262.    As detailed in ¶176 above, the Company surprised investors on May 31, 2016 by revealing that, contrary to the Company's positive statements and guidance raise just a month earlier, 2016 revenue and operating income would be much lower than projected, citing the Sports Authority bankruptcy.  As a result of the information revealed to the market, the Company's Class A common stock and Class C common stock prices dropped approximately 3.92% and 3.57%, respectively, on unusually high trading volume.  The drops would have been more dramatic had Defendants disclosed the true extent of the financial difficulties facing the Company.  Instead, Defendants misleadingly stated that Under Armour's momentum was stronger than ever, and that the Company continued to experience growth and increased demand across all product categories and geographies.

### D.   July 26, 2016 Revelations

263.    The truth continued to emerge on July 26, 2016, when, as detailed in ¶¶186-190 above, the Company surprised investors by revealing slowdowns in apparel sales growth, operating income, and net income.  As a result of the information revealed to the market, the Company's Class A common stock and Class C common stock prices dropped approximately 5.12% and 3.56%, respectively, on unusually high trading volume.  The drops were tempered by Defendants' attempts to blunt the negative results by making misleadingly positive statements regarding the Company's sales demand and revenue growth, and their failure to disclose the true extent of financial difficulties facing the Company.

E.   **October 25, 2016 Revelations**

264.   As detailed in ¶¶207-209 above, on October 25, 2016, the Company revealed a slowdown in North American apparel growth and compressed margins attributed to higher discounts, promotions, and liquidations.   As a result of the information, Under Armour's Class A common stock and Class C common stock prices dropped approximately 18.36% and 21.25%, respectively, on unusually high trading volume.   The drops would have been more dramatic had Defendants disclosed the true extent of the sales declines and associated financial difficulties facing the Company.   But Defendants failed to do so and, instead, reassured investors that the Company's overall growth and demand were strong and stated that the Company's inventory position was healthier.

F.   **January 31, 2017 Revelations**

265.   On January 31, 2017, the Company shocked investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in ¶¶221-232 above.   As a result, the Company's Class A common stock and Class C common stock prices plummeted approximately 28.65% and 27.78%, respectively, on unusually high trading volume.

G.   **August 1, 2017 Revelations**

266.   On August 1, 2017, the Company's common stock prices fell precipitously when the Company reported another quarter of poor North American sales, lowered 2017 guidance, and announced a massive restructuring including hundreds of job cuts, as detailed further in ¶¶248-252 above.   The Company's Class A common stock and Class C common stock prices dropped 8.59% and 10.38%, respectively, on unusually high trading volume.

267.   As a result of their purchases of Under Armour common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.   By failing to disclose to investors the adverse facts detailed herein,

Defendants presented a misleading picture of Under Armour's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Under Armour common stock to trade at artificially inflated levels throughout the Class Period.

268.    When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of Under Armour's common stock declined.  These declines removed the inflation from the prices of Under Armour's common stock, causing real economic loss to investors who had purchased Under Armour's common stock during the Class Period.

269.    The declines in the prices of Under Armour's common stock after the revelations came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Under Armour common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This is evidenced by the chart below, which demonstrates the clear divergence of the Company's Class A common stock prices from the Company's benchmark indices and peer company stock prices[25] as the revelations of the truth became known to the market:

---

[25]    Under Armour has identified the S&P 500 Index and S&P Apparel, Accessories and Luxury Good Index as benchmarks for its Class A Common Stock performance in its FY16 Form 10-K, filed with the SEC on February 23, 2017.  In addition, the peer comparison above is based on the stock prices of the following publicly traded industry competitors identified in the Company's FY16 Form 10-K: Nike, Inc. (NKE US Equity), Adidas AG (ADDYY US Equity), Lululemon Athletica Inc. (LULU US Equity), Columbia Sportswear Company (COLM US Equity), and Puma SE (PMMAF US Equity).

1495422_1



270.    The economic losses, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Under Armour common stock and the subsequent significant declines in the value of Under Armour common stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## XI.    PRESUMPTION OF RELIANCE

271.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

- 94 -

272.     A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiffs and other members of the Class (defined in ¶286 below) purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Under Armour, and have been damaged thereby.

273.     At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     As a regulated issuer, Under Armour regularly made public filings with the SEC and related press releases;

(b)     Under Armour regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     Under Armour was followed by several securities analysts employed by major brokerage firms, such as Morgan Stanley, Deutsche Bank, Canaccord Genuity, Wells Fargo, Credit Suisse, Barclays, UBS, Jeffries, Cowen and Company, and Piper Jaffray, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace; and

(d)     Certain of the Company's securities, Class A common stock and Class C common stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

274.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of the Company's common stock.

- 95 -

275.     Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

276.     At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

277.     As a result of the above circumstances, the presumption of reliance applies.

278.     In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations during the Class Period;

(b)      the misrepresentations were material;

(c)      the Company's common stock traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)      Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XII.   NO SAFE HARBOR

279.     The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Under Armour's Class Period filings.

1495422_1

280.     For example, Under Armour's 2014 Form 10-K, filed with the SEC on February 20, 2015, contained the following boilerplate "caution":

> *A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth*.

281.     The generic nature of this disclosure is illustrated by the fact that it was simply repeated verbatim from the Company's 2013 Form 10-K, filed with the SEC on February 21, 2014, and was again repeated in the Company's 2015 and 2016 Form 10-Ks filed with the SEC on February 22, 2016 and February 23, 2017, respectively, when the problems plaguing the Company were well known internally.

282.     Similarly, Under Armour issued the following risk warning in both its 2013 and 2014 Form 10-Ks concerning the decline of brand image, net revenues, and profitability:

> *If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of a global business and as a result our brand image, net revenues and profitability may decline*.

283.     A substantially similar warning appeared in the Company's 2015 and 2016 Form 10-Ks:

> *We must continue to effectively manage our growth and the increased complexity of a global business or we may not achieve our long-term growth targets and our brand image, net revenues and profitability may decline*.

284.     The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

- 97 -

285.     Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew it was false or misleading when made.

## XIII.   CLASS ACTION ALLEGATIONS

286.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded common stock of Under Armour during the Class Period, and who were damaged thereby ("Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

287.     Members of the Class are so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of January 31, 2017, Under Armour had more than 183 million shares of Class A common stock and more than 220 million shares of Class C Common stock outstanding.  While the exact number of members of the Class can only be determined by appropriate discovery, Plaintiffs believe that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

288.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the members of the Class sustained damages arising out of Defendants' wrongful conduct complained of herein.

289.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class that Plaintiffs seek to represent.

- 98 -

1495422_1

290.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

291.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)    whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)    whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

1495422_1

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Under Armour and Plank

292.   Plaintiffs repeat and reallege the allegations set forth in ¶¶1-291 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

293.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Plaintiffs and other members of the Class to purchase the Company's publicly traded common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

294.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendant Plank is also sued as a controlling person of Under Armour, as alleged below.

295.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.)* and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market

- 100 -

prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

296.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

297.    Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

298.    Defendant Plank's primary liability and controlling person liability arise from the following facts, among others: (a) Plank was a high-level executive at the Company during the Class Period; (b) Plank, by virtue of his responsibilities and activities as CEO and Chairman was privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) Plank enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) Plank was aware of the Company's dissemination of information to the investing public which he knew, or recklessly disregarded, was materially false and misleading.

299.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each

1495422_1

failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

300.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's common stock were artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired the Company's common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the common stock price declines above.

301.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Under Armour publicly traded common stock during the Class Period; or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

- 102 -

302.    By virtue of the foregoing, Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

303.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was removed from the Company's common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendants Under Armour and Plank

304.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-291 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Amour.

305.    Defendant Plank acted as a controlling person of Under Armour within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Plank had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Plank was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In addition, Plank had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.  Under Armour controlled Plank and the Company's other officers and employees.

- 103 -

306.     As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their control, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## COUNT III

### For Violation of Section 20A of the Exchange Act
### Against Defendant Plank

307.     Plaintiffs repeat and reallege the allegations set forth in ¶¶1-291 above as though fully set forth herein.  This claim is asserted against Defendant Plank on behalf of Plaintiffs who were damaged by Defendant Plank's insider trading.

308.     As detailed herein, Plank was in possession of material, non-public information concerning Under Armour.  Plank took advantage of his possession of material, non-public information regarding Under Armour to obtain millions of dollars in insider trading profits during the Class Period.

309.     Defendant Plank's sales of Under Armour stock were made contemporaneously with Plaintiffs Aberdeen's and Monroe's purchases, and other Class Members' purchases, of Under Armour stock during the Class Period.

310.     For example, in November 2015, Plank sold the following shares of Under Armour common stock for total proceeds of $99,968,961.

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 11/23/2015 | $92.46 | *199,920* | $18,484,603 |
| 11/23/2015 | $93.00 | 80 | $7,440 |
| 11/23/2015 | $92.46 | 24,991 | $2,310,668 |
| 11/23/2015 | $93.00 | 9 | $837 |
| 11/20/2015 | $92.72 | 80 | $7,418 |
| 11/20/2015 | $92.04 | 68,917 | $6,343,121 |
| 11/20/2015 | $91.24 | 131,003 | $11,952,714 |

- 104 -

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/20/2015 | $92.72 | 9 | $834 |
| 11/20/2015 | $92.04 | 8,615 | $792,925 |
| 11/20/2015 | $91.24 | 16,376 | $1,494,146 |
| 11/19/2015 | $89.60 | 320 | $28,672 |
| 11/19/2015 | $88.89 | 158,001 | $14,044,709 |
| 11/19/2015 | $88.42 | 41,679 | $3,685,257 |
| 11/19/2015 | $89.60 | 40 | $3,584 |
| 11/19/2015 | $88.89 | 19,751 | $1,755,666 |
| 11/19/2015 | $88.42 | 5,209 | $460,580 |
| 11/18/2015 | $85.39 | 89,002 | $7,599,881 |
| 11/18/2015 | $87.09 | 10,838 | $943,881 |
| 11/18/2015 | $86.42 | 100,160 | $8,655,827 |
| 11/18/2015 | $85.39 | 11,125 | $949,964 |
| 11/18/2015 | $87.09 | 1,355 | $118,007 |
| 11/18/2015 | $86.42 | 12,520 | $1,081,978 |
| 11/17/2015 | $87.31 | 1,200 | $104,772 |
| 11/17/2015 | $86.17 | 28,676 | $2,471,011 |
| 11/17/2015 | $85.42 | 170,124 | $14,531,992 |
| 11/17/2015 | $87.31 | 151 | $13,184 |
| 11/17/2015 | $86.17 | 3,584 | $308,833 |
| 11/17/2015 | $85.42 | 21,265 | $1,816,456 |

311.    Plaintiff Monroe purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/20/2015 | 91.62 | 676 | $61,935 |

312.    In addition, Defendant Plank sold the following shares of Under Armour common stock in April 2016 for total proceeds of $38,262,467.

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 4/29/2016 | $40.84 | 197,680 | $8,073,251 |
| 4/29/2016 | $41.58 | 2,320 | $96,466 |
| 4/29/2016 | $40.84 | 24,709 | $1,009,116 |
| 4/29/2016 | $41.58 | 291 | $12,100 |
| 4/28/2016 | $42.92 | 48,446 | $2,079,302 |
| 4/28/2016 | $42.45 | 151,554 | $6,433,467 |
| 4/28/2016 | $42.92 | 6,056 | $259,924 |
| 4/28/2016 | $42.45 | 18,944 | $804,173 |
| 4/27/2016 | $43.00 | 33,762 | $1,451,766 |
| 4/27/2016 | $42.39 | 166,238 | $7,046,829 |
| 4/27/2016 | $43.00 | 4,220 | $181,460 |

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 4/27/2016 | $42.39 | 20,780 | $880,864 |
| 4/26/2016 | $44.15 | 200,000 | $8,830,000 |
| 4/26/2016 | $44.15 | 25,000 | $1,103,750 |

313.    Plaintiff Aberdeen purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 5/4/2016 | $40.07 | 43,317 | $1,735,712 |
| 5/3/2016 | $42.76 | 9,953 | $425,590 |
| 5/2/2016 | $43.67 | 5,119 | $223,547 |
| 4/29/2016 | $43.70 | 2,997 | $130,969 |
| 4/27/2016 | $45.07 | 3,014 | $135,841 |
| 4/26/2016 | $46.75 | 15,641 | $731,217 |
| 4/25/2016 | $46.48 | 2,275 | $105,742 |
| 4/22/2016 | $46.74 | 3,413 | $159,524 |
| 4/20/2016 | $43.93 | 11,375 | $499,704 |
| 4/19/2016 | $43.96 | 2,958 | $130,034 |

314.    Plaintiffs and other Class members, who purchased shares of Under Armour common stock contemporaneously with sales by Plank suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Aberdeen and Monroe, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

1495422_1

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D. Awarding rescission or a rescissionary measure of damages; and

E. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: November 16, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK SOLOMON
ROBERT R. HENSSLER JR.
AUSTIN P. BRANE
CHRISTOPHER R. KINNON

/s/ Robert R. Henssler Jr.
ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
bhenssler@rgrdlaw.com
abrane@rgrdlaw.com
ckinnon@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
PAUL J. GELLER
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com

*Lead Counsel for Plaintiff*

SILVERMAN THOMPSON SLUTKIN
   & WHITE LLC
Andrew C. White, Federal Bar No. 0821
awhite@mdattorney.com
William Sinclair, Federal Bar No. 28833
bsinclair@mdattorney.com
Pierce C. Murphy, Federal Bar No. 30030
pmurphy@mdattorney.com
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)

*Local Counsel for Plaintiffs*

1495422_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2018, I electronically filed the foregoing

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL

SECURITIES LAWS with the Clerk of the Court using CM/ECF, which will deliver the document

to all counsel of record who have appeared in the action.

<div style="text-align:right;">

/s/ Robert R. Henssler Jr.
_____
ROBERT R. HENSSLER JR.

</div>