# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) ) | Civil No. RDB-17-388 <br> <br> CLASS ACTION |
| This Document Relates To: <br>     ALL ACTIONS. | ) ) ) ) ) | |

DECLARATION OF MARK A. COHEN

**I.     Introduction**

    **A.     Mark A. Cohen Background**

I received my BS degree in Electrical Engineering from Columbia University's School of Engineering and Applied Science in 1969. After my undergraduate studies, I enrolled in Columbia University's Graduate School of Business and received an MBA in 1971.

After graduate school, I joined Abraham & Straus' Executive Training Program and became a group buyer of men's furnishings. Abraham & Straus was then a division of Federated Department Stores (which is now part of Macy's), and I was at Abraham and Straus from 1971 to 1977. I then worked for Gap Stores as a General Manager from 1977 to 1979. My next position was at Lord & Taylor as a Divisional Vice President of Menswear from 1979 to 1981.

After Lord & Taylor, I worked for Mervyns Stores, then a division of Dayton Hudson Corporation, from 1981 to 1987, first as a Senior Vice President for their Men's and Boy's divisions, later as President of Mervyns South Central Territory and finally as Executive Vice President of Merchandising, Planning and Analysis.

I rejoined Federated Department Stores as President of its Goldsmith's Division from 1987 to 1988 before moving to become President, and later Chairman/CEO, of Lazarus Stores from 1988 to 1994 when Federated was acquired by Campeau Corporation (later merged with Allied Stores). I then became Chairman/CEO of Bradlees Inc. from 1994 to 1997.

I then joined Sears Roebuck & Co. as General Merchandise Manager of the company's women's footwear, accessories, cosmetics, bedding, bath products, floor covering, mattresses, housewares and tabletop merchandise areas. Shortly after joining Sears Roebuck I became Chief Marketing Officer and also became President of Softlines Merchandise with additional responsibility for all overseas sourcing activities for the company and worked in these positions from 1998 to 2001.

I moved to Toronto in 2001 as Chairman/CEO of Sears Canada Inc., an independent Canadian corporation, until 2004. Sears Canada was a $6.7 billion company doing business throughout Canada in a large network of department stores, specialty stores, quasi-franchise stores, as well as supporting an important catalog and internet-driven, direct to consumer business.

Since 2014, I have been Director of Retail Studies and an Adjunct Professor of Retailing at Columbia's Business School, having also served as a University Professor by contract from 2006-2014.

I maintain an independent consulting practice and have worked for retailers, manufacturers (both domestic and international) and have acted as an expert witness in various litigation actions.

I have been a Forbes Online contributor, as well as a current contributor to Robin Lewis' Robin Reports Newsletter, writing for both on issues relating to retailing. I am also an on-air commentator for CNBC, Bloomberg, Fox Business and CNN with regard to retailing and economic matters and have been regularly quoted in *The Wall Street Journal*, *The New York Times*, *The Washington Post*, *etc*.

I have served on the following corporate boards: Central Trust Corp. (a division of PNC Bank Corp.) (1988-1992), Federated/Allied Stores Corp. (1988- 1992), Bradlees Inc. (as CEO) (1994-1996), Transworld Entertainment Corp. (2002-2008), and Sears Canada Inc. (as CEO) (2001-2004).

I have extensive experience in corporate restructuring, performance remediation, and retail turnarounds, both managed internally and in concert with outside consultants, including McKinsey, Bain, AT Kearney, Zolfo Cooper, Kurt Salmon Associates, and Deloitte, among others.

### B. Publications

**Forbes Blogs: Mark Cohen**  (http://blogs.forbes.com/markcohen/)

"LandsEnd: A Victim of Sears Serial Abuse"
9-27-16

"Ralph Lauren: Can It Be That The Emperor Has No Clothes?"
6-8-16

"Macy's: A Candid Assessment Of The Present And A Recipe For The Future"
5-16-16

"Sears Holdings: Retailing's Headless Horseman"
2-29-16

"Amazon And Costco Look Unstoppable. Walmart, Once Unstoppable, Struggles To Regain Momentum. Will It Ever Happen?"
1-28-16

"Some Say That The Apple Guy Would Have Turned JC Penney Around If Given More Time: I Say, No Way!"
1-25-16

"JC Penney To Reenter The Major Appliance Business: Who Do They Think They Are, Sears?"
1-20-16

"Black Friday: The Cure"
1-19-16

"Black Friday: The Disease"
1-18-16

**Robin Report Blogs: Mark Cohen**  (www.therobinreport.com)

"Nordstrom: A Paragon Of Virtue Gone Astray"
8-15-18

"Walmart: A $500 Billion Lawn Dart Desperately Looking For A Patch Of Grass"
7-28-18

"The Transformation Trap"
4-1-17

"A Primer: Retailing Stands On Five Pillars"
12-12-16

"The Store Of The Future"
2-23-16

"Cautionary Tales"
1-18-16

"Is There A Serial Killer In Your Corner Office?"
5-12-15

"Three Strikes And He's Out"
4-12-15

"12 Symptoms Of A Dying Retailer"
3-4-15

"Retailing's Black Hole"
3-4-15

"Are You Trapped In The Past?"
10-26-14

### C. Prior Expert Testimony (Limited to What Can Be Publicly Disclosed)

1. In the Court of Chancery of the State of Delaware

   Petition for Appraisal of Stock,

   Petitioners,

   v.

   PetSmart,

   Respondent.

Case No. 10782  November 2016.

I was engaged by Petitioners, was deposed and testified at trial.

2. In the US District Court for the Northern District of Illinois, Eastern Division

   APS Express,

   Plaintiff,

   v.

   Sears Holdings Corp., Sears Holding Management Corp. and Innovel Solutions Inc.,

   Defendants.

Case 1:15-cv-03275 January 2016 (ongoing)

I have been engaged by the Plaintiff and have been deposed. The case awaits a trial date.

### D. Qualifications to Serve as an Expert in This Matter

I have worked at and led large retail businesses, both in the United States and Canada. I have many years of experience in merchandising and managing large men's, women's and children's active footwear, apparel and accessories in both the United States and Canada. I am well qualified to give the opinions about Under Armour and SSI Data explained below.

I am being compensated at my billing rate of $1000/hour. My compensation is not contingent on the outcome of this matter or my opinions expressed.

I have been asked to explain what SSI Data is, how it is used and how it relates to Under Armour's (or the "Company's") internal corporate data. In particular, I've been asked to give an opinion regarding whether the SSI Data fact-based sales data revealed by the January 10, 2016 Morgan Stanley report was materially consistent with Under Armour's internal corporate data. Based on my experience as a CEO using similar industry data, and analysis of Under Armour detailed below, the answer is an unequivocal "yes."

My analysis and conclusions are explained below. In reaching my opinions I reviewed various Morgan Stanley investment reports (backed by SSI Data's fact-based data) as well as various Under Armour SEC filings and public statements noted below. I also reviewed relevant media and information about SSI Data, also noted below.

## II.     Scope of This Report

### A.     Under Armour Inc.'s Business Model

Under Armour, founded in 1996, is a Baltimore Maryland based company which manufactures athletic oriented apparel, footwear and accessories for men, women and children. The company sells its merchandise primarily as a wholesaler through a network of retail customers and secondarily through its own specialty and outlet stores. The company does business internationally though the majority of its business is North American based.

### B.     Under Armour's Product Line and Position

Under Armour's initial product lines centered around men's athletic apparel followed by women's and children's athletic apparel and then athletic footwear. The company calls out its core brand equity as premium priced and positioned merchandise which is performance oriented and is showcased through a portfolio of celebrity athletes products, and athletic team endorsements.

C. **Under Armour's Performance**

From its inception, up to the time period in question in this action (2015-2017), Under Armour's business grew extremely rapidly. As a result of its premium brand image and consistent positive growth as a premium brand, the company was afforded by investors an extraordinary stock price valuations, *e.g.*, 78x FY 2015 EPS in January 2016.

D. **The January 10, 2016, Morgan Stanley Analyst Report**

On January 10, 2016, Morgan Stanley, an investment bank which covers a wide range of public stocks and sectors, including Under Armour, published a highly detailed analysis of Under Armour's historical, current and prospective performance. The report was highly critical of the company's historical performance (dating back to Spring 2015 and even earlier), and, the investment community's premium (and "unprecedented") valuation of the company's stock.

III. **Morgan Stanley's Position with Regard to Under Armour's Performance**

    **(a)** On January 10, 2016, Morgan Stanley downgraded their outlook on Under Armour's stock to "Underweight" and lowered their price estimates for the stock from $103.00 to $62.00.

    **(b)** Morgan Stanley challenged the company's characterization of its performance by pointing out that the company, according to fact-based industry data, was losing market share at its core customer base, and had been since at least Spring 2015.

    **(c)** Morgan Stanley stated that, according to fact-based industry data, the company's ASPs (average selling prices) were declining at an accelerating rate, with regard to its core customer base, and had been since at least Spring 2015.

    **(d)** Morgan Stanley, in examining Under Armour's falling ASPs voiced a major concern that the company was, and had been since at least Spring 2015, engaged in a "fundamental

- 7 -
1500255_1

shift" away from innovative premium product to product whose appeal was based upon lowered retail prices. In other words, while Under Armour was continuing to report growth, it was no longer achieving this growth while adhering to its stated fundamental "premium brand" strategy. As Morgan Stanley summarized, Under Armour "has always competed on brand image and innovation, rarely on price. This change in trend is a major concern . . . ."

      **(e)**    Morgan Stanley based its exhaustive analysis on specific fact-based industry data, supplied by SSI Data, a leading data aggregator and data analysis group specializing in active and athletic merchandise categories.

## IV.    SSI Data and the Data Collection Industry

      **(a)**    SSI Data, formerly known as Sportscan Info, is an organization that collects and analyzes POS (point of sale) data from over (by their characterization), 15,000 retail doors across 12 separate retail channels.[1] A "Retail Door" is a singular retail store. Separate "Retail Channels" by way of example, would include, national sporting goods stores, regional and local sporting goods stores, footwear stores, department stores *etc*. SSI Data's efforts encompass virtually all of Under Armour's core retail selling channels.

      **(b)**    Independent data collection across almost all categories of merchandise, plays a vital role in affording individual manufacturers and retailers as well as related parties such as investors, the opportunity to receive industry data and analysis. This then enables manufacturers and retailers to understand this masked industry data relative to their own actual information. For example, when I was a CEO of several large retailers, we would utilize industry data in conjunction

---

[1] It is still common for analysts, media, and businesses (including Under Armour) to refer to SSI Data as Sportscan. I use the two names interchangeably in this declaration.

with our own internal corporate data to inform investors and/or the Boards of Directors about the performance of our business.

**(c)** Aggregation of source data by independent companies such as SSI Data that specialize in this type of work is a widely adopted and relied upon tool. In fact, Under Armour utilized and credited the accuracy of SSI Data (or SportsScanInfo), when trying to sell Under Armour stock. For example, in connection with a 2005 sale of over $167 million in stock, Under Armour stated: "Information regarding the market for compression style clothing is derived from SportsScanINFO, which is a leading market research firm that provides weekly point-of-sale data for the athletic and sporting goods industry." In other words, Under Armour stated that SSI Data (or SportsScanInfo) could be relied on as consistent with the Company's actual internal sales data. Based on my review, Under Armour repeatedly made similar statements crediting the SSI Data as consistent with the Company's actual internal sales data.

**(d)** In addition, during the Class Period, Under Armour specifically stated that the SSI Data was consistent with the Company's actual internal sales data when discussing the Company's financial results on conference calls. For example, during the October 25, 2016, conference call, after disclosing disappointing results, including declining margins due to higher discounts, promotions and liquidations, Mr. Plank, again relying on SSI Data (or SportsScanInfo), stated that the Company's footwear segment was gaining market share: "A large part of that growth in North America will come from footwear as we firmly believe that we are at a tipping point in terms of opportunities to gain market share. In the back-to-school window of July through September, our overall footwear market share nearly doubled according to industry data." A variety of sources confirm that Mr. Plank was specifically referring to – and praising – SSI Data (or SportsScanInfo), when making this statement about the Company's performance on October 25,

2016. *See, e.g.*, *The Wall Street Journal*, "Under Armour Lowers Its Outlook," October 25, 2016 ("During the back-to-school period, Under Armour ramped up its sneaker business and nearly doubled its share of the footwear market, amassing 8.2% of the market for the 13 weeks ended Oct. 1, up from 4.6% a year ago, according to industry tracker SportScanInfo.").

**V.     Under Armour's Business Performance and Characterization of the SSI Data Fact-Based Sales Data**

    **(a)**    According to SSI Data, by Spring 2015 Under Armour's business performance at its core retail sales channel was declining (loss of market share, decelerating sales growth and declining ASP's). And more significantly, this historical sales data demonstrated a fundamental shift in strategy. In recognition of this change, Morgan Stanley published an extremely detailed analysis of Under Armour, which I have made reference to earlier, based on the historical SSI Data sales data. This was the basis of their "Downgrade" recommendation and lowered target stock price.

    **(b)**    Rather than acknowledge what Morgan Stanley had disclosed, Under Armour partially challenged the use of SSI Data's fact-based data as a basis of the Morgan Stanley analysis. On a January 28, 2016, conference call, Under Armour stated that the SportScan data disclosed by Morgan Stanley, "can be challenging" when trying to understand the Company's 4Q 2015 sales. Specifically, Under Armour stated that the SportScan data "is capturing actually less than 40% of our business specifically in the fourth quarter. It's missing key data inputs like our Direct-to-Consumer business, our International business and it's actually extrapolating some of our key accounts that are pretty large like the DICK'S and the Foot Locker."

    **(c)**    Notably, the Company did not comment about the Morgan Stanley reports disclosures that SSI Data fact-based data revealed a loss of market share, decelerating sales growth

and declining ASP's since Spring 2015. Instead, Under Armour only called out 4Q 2015 as potentially "challenging" when assessing the Company's performance through the SportScan data.

**(d)** Moreover, the admission that the SportScan data captured approximately 40% of Under Armour's business in 4Q 2015 is material. As noted, this reflects the Company's core sales channel.

**(e)** In addition, the Company did not dispute the accuracy of the SSI Data regarding the 40% of 4Q 2015 sales that it stated that the SSI Data captured. Instead, Under Armour stated that other channels (not captured by SSI Data "data inputs like our Direct-to-Consumer business, our International business"), led to the Company's "strong quarter" with "Apparel growing over 20%." Importantly, the SSI Data reported by Morgan Stanley did not dispute whether Under Armour was experiencing overall sales growth. The significance of the information revealed by the SSI Data sales data was that Under Armour was enduring a loss of market share, decelerating sales growth and declining ASP's in its core North American retail sales channel. Thus, the SSI Data historical sales data revealed a "fundamental shift" in strategy – the Company was making up the sales in other, lower-end or discounted channels. As Morgan Stanley summarized, Under Armour "has always competed on brand image and innovation, rarely on price. This change in trend is a major concern . . . ."

**(f)** The Company also disclosed that in 4Q 2015 inventory levels continued to outpace sales growth, jumping 46% to $783 million after a 36% increase in 3Q 2015. That resulted in more liquidations in the quarter and weighed on gross margins, which contracted 1.9 percentage points to 48%. These disclosures of Under Armour's own data corroborate the SSI Data disclosed by Morgan Stanley.

(g) And, Under Armour admitted that Dick's, a Pittsburgh-based national sporting goods chain, was a "pretty large" customer in 4Q15. This is an understatement. According to Under Armour SEC filings, Dick's was the Company's largest customer in each year from 2014 – 2016, accounting for 14.4% of net revenues in 2014, 11.5% of net revenues in 2015, and 10% of net revenues in 2016. According to Under Armour SEC filings, no other customers accounted for 10% or more of net revenues in any of these years. And, Under Armour's SEC filings show that sales to its largest customer were -8% in 4Q 2015. Thus, Under Armour's own data about sales to Dick's during the relevant time period further corroborates the SSI Data disclosed in the January 10, 2016 Morgan Stanley report.

## VI. After the Class Period, Morgan Stanley Noted that the Sportscan Data Was Correct About Under Armour All Along

On February 14, 2017, Morgan Stanley published a research report detailing its analysis of Under Armour's historical, current and future business. As with other reports, Morgan Stanley relied on Sportscan data to support its analysis. Notably, Morgan Stanley compared Under Armour's reported results for total apparel sales growth and apparel ASP's for 2014-2016 with the Sportscan data it had previously analyzed from that time period. In comparing the two sets of data (Under Armour's reported results vs. Sportscan's data), Morgan Stanley concluded: "SportScan data has accurately depicted directional UAA sales trends [] and we continue to view it as the best source for understanding UAA's US business at a micro level." Put another way, the SportScan data was correct all along.

## VII. Conclusion

The fact-based sales data from SSI Data disclosed by Morgan Stanley was materially consistent with Under Armour's own internal corporate data. As explained, this is confirmed by numerous facts and consistent with my experience using similar industry data as a CEO. ***First***,

Under Armour stated that its internal data was consistent with SSI Data sales information when the Company cited to SSI Data in its own SEC filings when trying to sell stock. *Second*, Under Armour also confirmed that the fact-based sales data from SSI Data was materially consistent with Under Armour's own internal corporate data when it repeatedly touted its market share gains based on SSI Data findings (including during the Class Period). Stated differently, either SSI Data was materially consistent with Under Armour's own internal data, or the Company was misleading investors by touting the SSI Data's findings of market share gains by the Company. They can't have it both ways. *Third*, the Company never disputed the fact-based sales data from SSI Data for 1Q 2015, 2Q 2015, or 3Q 2015. *Fourth*, Under Armour admitted that for 4Q 2015, the fact-based sales data from SSI Data captured approximately 40% of Under Armour's business. *Fifth*, SSI Data's sales data encompass virtually all of Under Armour's core retail selling channels. *Sixth*, the Company did not dispute the accuracy of the approximately 40% of Under Armour's 4Q 2015 business that SSI Data captured. *Seventh*, Under Armour's disclosures of dramatically increased inventory levels (that outpaced sales growth), spiking 46% to $783 million in 4Q 2015 after a 36% increase in 3Q 2015 corroborate the SSI Data. *Eighth*, Under Armour's disclosures of declining gross margins in 4Q 2015, which contracted 1.9 percentage points to 48% corroborate the SSI Data. In other words, if the SSI Data disclosing a loss of market share, decelerating sales growth and declining ASP's was accurate you'd expect Under Armour to report increased inventory levels and declining gross margins – exactly what happened. *Ninth*, the Company's admissions regarding declining sales at its largest customer, Dick's, further corroborate the SSI Data. In fact, Under Armour admitted that sales to its largest customer were -8% in 4Q 2015 – the only quarter it called out as a "little bit challenged" for assessing Company performance using SSI Data. *Tenth*, Morgan Stanley's February 14, 2017, comparison of Under Armour's reported results with what SSI Data had

previously reported regarding Under Armour's sales demonstrates that the SSI Data was materially consistent with Under Armour's own internal corporate data. As Morgan Stanley explained, "SportScan data has accurately depicted directional UAA sales trends [] and we continue to view it as the best source for understanding UAA's US business at a micro level."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 11th day of November, 2018, at New York, NY.

_____
MARK A. COHEN