# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Civil No. RDB-17-388

<u>CLASS ACTION</u>

# DECLARATION OF PROFESSOR M. TODD HENDERSON

I, M. Todd Henderson, the Michael J. Marks Professor of Law at the University of Chicago Law School, offer this declaration in the above-captioned litigation.  I have taught at the Law School since 2004.  My primary teaching and research interests are in the areas of securities regulation and corporate governance.  I am the author of dozens of books and articles on these topics, including the leading research on insider trading and the use of Rule 10b5-1 trading plans in securities fraud litigation.  A curriculum vitae is attached as Exhibit A to this declaration.

Class counsel asked me to provide my opinion regarding the trading of Defendant Kevin A. Plank, specifically whether the trades were unusual or suspicious considering the amount of profit made, the amount of stock traded, and the portion of stockholdings sold.

To form an opinion, I reviewed the Court's Memorandum Order (ECF No. 74), the Amended Complaint (ECF No. 30), the Motion to Dismiss and Memorandum of Law in Support of the Motion

- 1 -

to Dismiss (ECF No. 51), Mr. Plank's Class Period stock sales, and various Under Amour SEC filings relevant to Mr. Plank's stock sales as detailed below.[1]

Based on my research on executive compensation, securities regulation, and corporate governance, as well as my experience in consulting with companies regarding these issues, my opinion is that Mr. Plank's Class Period stock sales were extremely unusual and suspicious. For instance, during the Class Period, Mr. Plank sold more than one third of the stock he had available to sell (while maintaining voting control). As explained below, the sale of between 36 percent and 42 percent of saleable shares raises serious suspicions about his motives. Moreover, Mr. Plank sold over three times more stock per month during the Class Period than his recent historical average. This dramatic departure from his past trading practice, coupled with the record high prices and the significant stock price declines shortly after his sales, as well as the Plaintiffs' allegations regarding Mr. Plank's informational advantage demonstrates that these stock sales were unusual and suspicious.

## I.    Relevant Facts

The following are the relevant facts that underlie my opinion. During the 16-month Class Period, Mr. Plank sold 2.3 million shares of stock in Under Armour for gross proceeds of almost $140 million.[2] These sales occurred close in time to alleged misrepresentations and omissions about Under Armour's financial condition and shortly before significant stock price declines.

---

[1]    The Class Period is defined as September 16, 2015 to January 30, 2017.

[2]    This includes all shares that Mr. Plank disposed of during the time period according to the Form 4s he filed with the SEC, including shares he gifted. Proceeds from gift shares are not included in my calculations. The inclusion of gifted shares, which either directly or indirectly benefit Mr. Plank, does not meaningfully change the analysis. Removing these gifts from consideration would not materially change the results of the analysis or my opinions set forth in this declaration.

1500510_1

Plaintiffs allege that several misrepresentations and omissions were made during the Fall of 2015, including in late October and early November. Shortly thereafter, in a six-day period from November 17 to November 23, Mr. Plank sold nearly $100 million of stock at prices that preceded a large stock drop.

Then, in April 2016, Mr. Plank sold an additional nearly $40 million. These sales occurred shortly after Under Armour released allegedly misleading positive statements regarding its business and at a time the Company allegedly omitted disclosure of material negative information about its financial condition. According to Plaintiffs, the representations by Under Armour did not adequately account for a series of negative events, such as decelerating sales growth, declining margins in the Company's key North American apparel business, and a fundamental shift in strategy. According to Plaintiffs' Complaint, the statements were materially false and misleading. While these positive statements were in the market, and at a time when Defendants were allegedly aware of other negative information, including declining North American apparel sales growth and declining margins that began in Spring 2015, Mr. Plank sold about 2.3 million shares of his Under Armour stock.

As explained below, Mr. Plank's Class Period stock sales were unusual and suspicious. Mr. Plank sold approximately 36 percent of his available shares in one huge block during just five days in November 2015. These Class Period sales were dramatically out of line with his prior trading. In addition, only a radical plan to recapitalize Under Armour by issuing a dividend of hundreds of millions of non-voting shares in the form of Class C shares enabled Mr. Plank to sell nearly 40 million dollars in additional shares during the Class Period without further diluting his ownership stake. Had Under Armour not done this, Mr. Plank would have sold approximately 67 percent of available shares to achieve the same nearly $140 million in stock sales while maintaining voting

- 3 -

control.  With the issuance of the Class C shares, a charter provision limited the sales Mr. Plank could make in 2016 to 2.5 million shares.  He sold 1,050,000 in April 2016, or 42 percent of his available shares to sell.  This is an extraordinary amount of sales concentrated in a very brief period.  It raises substantial suspicions about his trading behavior.

## II.     Mr. Plank's Trading Was Extraordinary and out of Line with His Prior Practice

Mr. Plank's stock sales during the Class Period were out of line with both industry norms and Mr. Plank's prior practices.  The combination of exquisite timing, massive profits (100 percent), extraordinary sale volumes, and massive sales relative to his available shares for sale raises serious suspicions about Mr. Plank's stock sales.

### A.     Mr. Plank Sold Between 36 Percent and 42 Percent of His Shares Available for Sale – Not 5 Percent

Defendants claim that Mr. Plank sold just 5 percent of his Under Armour stock during the Class Period.[3]  But a more reasonable estimate is more than seven times this amount.  As discussed below, Mr. Plank actually sold approximately 36 percent of the shares he had available to sell while still maintaining control during November 2015, and then sold approximately 42 percent of the shares he had available to sell while still maintaining control during April 2016.

The mistake the Defendants make is by comparing the volume of Mr. Plank's sales during the Class Period to his "overall holdings" at that time.[4]  This is the wrong denominator.  The appropriate denominator for determining how much of his holdings Mr. Plank sold is not his "overall holdings," but rather the shares he could sell while still retaining his position as the controlling shareholder of Under Armour.  For the reasons explained below this far smaller denominator is the

---

[3]    Memorandum Order at 47.

[4]    Memorandum Order at 47.

only reasonable comparison, and it yields a much higher percentage of shares sold by Mr. Plank during the Class Period.  Between six and eight times higher than Defendants suggest.

Under Armour was and is a controlled company.  During the Class Period (prior to April 2016), Under Armour had two classes of stock – Class A shares with one vote and Class B shares with 10 votes.  There were approximately 180 million Class A shares and approximately 36 million Class B shares, owned entirely by Mr. Plank or entities controlled by him.  This meant that Mr. Plank owned about 20 percent of the economics of Under Armour but about 67 percent of its voting power.  According to Under Armour's proxy statements, this was intended to permit Mr. Plank to control Under Armour –" [c]ompanies typically use dual-class stock structures, such as the one that we have in place, so that a company founder or founders may maintain voting control of the company after it becomes a public company, even as the company issues additional shares of its common stock or as the founder or founders sell their shares from time to time."[5]

Under Armour's charter provided that this capital structure and voting control would "unwind" through automatic conversion of super-voting Class B shares to Class A shares on certain triggering events, including that Mr. Plank's ownership of Class A and Class B shares fell below 15 percent of the total outstanding shares.[6]  According to the proxy:

> [I]f the total number of shares of Class A Stock and Class B Stock beneficially owned by Mr. Plank were to drop . . . to just less than 15.0% of total outstanding shares, his voting power would drop from approximately 63.8% of the total votes (assuming substantially all of his holdings were in Class B Stock) to just under 15.0% of the total votes.[7]

---

[5]   Under Armour Schedule 14A for Special Stockholders Meeting on August 26, 2015 filed on July 13, 2015, at 10-11.

[6]   *Id.*

[7]   *Id.*

1500510_1

As the founder and guiding spirit of Under Armour, Mr. Plank would obviously not risk losing the control that he so carefully created. In fact, Mr. Plank (and the Company) went to extraordinary lengths – including creating a new class of common shares (Class C) during the Class Period – to preserve Mr. Plank's personal control over the Company.[8] Mr. Plank argued in favor of the new Class C stock in a June 15, 2015 letter to shareholders, describing it as furthering the critical "founder-led approach" that gave him "flexibility."[9] Mr. Plank stated that the new share class was needed because: "Dilution from regular employee equity-based compensation and other possible dilution, such as stock-based acquisitions or equity financings, as well as any sales of stock by me, bring us closer to this 15% sunset provision and could ultimately undermine our current governance structure."[10] Thus, it is clear that Mr. Plank did not want to lose control.

Given the fact that Mr. Plank would not give up his control by dipping below the "sunset provision," the relevant denominator is not his "overall holdings," but rather the amount of shares available to sell without falling below 15 percent ownership.

For the period of time prior to the issuance of the Class C shares, which provided Mr. Plank more opportunities to sell without risking losing control, the relevant denominator is not "outstanding shares" as the Defendants would have the Court believe, but the shares he held that kept him above the 15 percent threshold – "shares available to be sold." Using "shares available to be sold" as the denominator, Mr. Plank sold approximately 36 percent of his shareholdings during the Class Period. This is a radical departure from his prior historical trading practices and

---

[8]  *Id.* at 11-12.

[9]  The June 15, 2015 letter is available at: http://www.uabiz.com/news-releases/news-release-details/letter-kevin-plank-stockholders-regarding-class-c-common-stock?ReleaseID=917986

[10]  *Id.*

extraordinary compared with the typical trading behavior of executives of large public companies. But, before considering this, let me make clear the basis for this calculation.

In a Form 8-K filing on October 28, 2015, Under Armour stated:

Mr. Plank currently beneficially owns 35,700,000 shares of the Company's Class B Common Stock and 76,445 shares of the Company's Class A Common Stock, representing approximately 16.6% of the total shares of Class A and Class B Common Stock outstanding as of September 30, 2015 and approximately 66.5% of the voting power of all shares of Class A and Class B Common Stock outstanding as of September 30, 2015.[11]

If the ownership of 35,776,445 shares constituted 16.6 percent of outstanding Class A or B shares, then we can calculate that there would at that time be 215,520,753 Class A and B shares outstanding.[12] To determine the number of shares Mr. Plank had available to sell, we first calculate the number of shares that he had to own in order to stay above the 15 percent ownership threshold to maintain voting control of Under Armour. To do this, we simply multiply the shares outstanding by 15 percent. Thus, he had to own at least 32,328,113 Class A and Class B shares to maintain his position as the controlling shareholder of Under Armour.

---

[11]    In other places, the number of reported shares owned by Mr. Plank is greater than this figure. If this number is used, the percentage of his available shares sold would drop from 36 percent to 25 percent. This difference is not material to the analysis in this declaration or my opinion about the inference that can be reasonably drawn from Mr. Plank's trading behavior.

[12]    This is a snapshot at one date and only an estimate that does not capture subsequent developments in terms of shares outstanding. Third party estimates are available over the entire Class Period. According to Mergent Online, the average Class A and Class B shares outstanding over the Class Period for Under Armour was 216,501,154. To get an estimate of the total outstanding shares, we can average the Under Armour estimate and the publicly available data. This yields 215,780,697 Class A and Class B shares outstanding. Using this total shares outstanding does not meaningfully change the results.

- 7 -

At the start of the Class Period, Under Armour stated that Mr. Plank owned 35,776,445 shares.[13] Subtracting the shares he had to keep to maintain voting control from the shares he owned yields his available shares, that is, the shares he could possibly sell. This means he had available to sell 3,448,332 shares of Under Armour during the Class Period.[14]

In November 2015, Mr. Plank sold 1,250,000 shares.[15] Compared with the proper denominator – the shares he had available to sell – demonstrates that he sold about 36 percent of his shares during the Class Period: 1,250,000/3,448,332 = 36 percent. This is more than seven times larger than Defendants claimed by comparing his Class Period sales to his total shares outstanding. To get the 5 percent number, Defendants divided the Class Period shares by Mr. Plank's entire share ownership. But Mr. Plank would never had sold most of these shares and thus given up control of Under Armour.

The evidence is overwhelming that Mr. Plank would not sell below 15 percent and give up control. As noted, Mr. Plank organized the Company's charter to allow him to control the Company while only having to own 15 percent of the total number of shares of Class A and Class B stock

---

[13]   Under Armour Schedule 13D filed on November 12, 2015, "[i]f the Reporting Person completes all the planned sales under this trading plan, he would beneficially own 35,700,000 shares of Class B Common Stock and Class A Common Stock, representing approximately 16.6% of the total shares of Class A and Class B Common Stock outstanding as of September 30, 2015 and representing approximately 66.5% of the combined voting power of the Issuer outstanding as of September 30, 2015."

[14]   This is 35,776,445 minus 32,328,113.

[15]   If the gift of 125,000 shares is excluded, the percentage of available shares sold falls to 33 percent from 35 percent. As noted above in n.2, removing this gift from consideration would not materially change the results of the analysis - my opinion about the extraordinary magnitude of these sales is the same in either case.

- 8 -

1500510_1

outstanding.  And, just before the Class Period, Mr. Plank re-organized Under Armour's capital structure to avoid dipping under the "15% sunset provision."

As discussed in the next section, after Under Armour recapitalized its stock in April 2016, Mr. Plank made an additional unprecedented sale of over one million shares. Under the revised Under Armour charter, Mr. Plank could sell a maximum of 2.5 million shares in 2016 while still maintaining control. This was the proper denominator for characterizing his transactions in 2016. Accordingly, he sold 36 percent of the shares he had available to sell in 2015 and 42 percent in 2016, not 5 percent, as the Defendants claimed.  And, as explained below, this amount is extraordinary.

**B.  Mr. Plank's Percentage Sold Would Have Been Much Greater Had Under Armour Not Recapitalized**

As discussed above, during the Class Period, Under Armour amended its charter and recapitalized the company in a dramatic way.  As of April 2016, Under Armour now has three share classes with different voting rights.  Approximately 42 percent of the outstanding total shares are Class A, 8 percent are Class B, and 50 percent are Class C shares.  The Class A shares are traded publicly and each have one vote attached to them.  The Class B shares are exclusively held by Kevin Plank but are each worth 10 votes.  The Class C shares also trade publicly but have no voting rights.

The motivation for the recapitalization was the concern that sales by Mr. Plank, as well as issuance of new Class A shares for executive compensation, were causing a dilution of Mr. Plank's ownership that was approaching the 15-percent threshold that would "unwind" his position as controlling shareholder.[16]  The plan adopted by a Special Committee of the board of directors and approved by the shareholders in September 2015 resulted in each holder of Class A or Class B shares

---

[16]    Under Armour Schedule 14A for Special Stockholders Meeting on August 26, 2015 filed on July 13, 2015, at 10-11.

receiving a new Class C share, one for one. The dividend was issued on or about April 7, 2016. The result doubled the number of outstanding shares – effectively a two-for-one stock split – but did not dilute Mr. Plank's ownership control because the Class C shares are non-voting shares. In fact, by giving Mr. Plank a new class of shares that could be publicly traded, it enabled him a mechanism to sell additional shares without giving up his votes. Prior to the issuance of Class C shares, if Mr. Plank wanted to sell shares, he had to convert Class B shares into Class A shares, which were publicly traded. This required him to give up ten votes per share sold. The new Class C shares provided an additional way to do this, since they would be publicly traded and did not carry any votes.

Mr. Plank took immediate and aggressive advantage of the new opportunities to liquidate his shares in Under Armour after receiving the Class C share dividend in April 2016. Over five days later that month, he sold 1,050,000 Class C shares for proceeds of $38.3 million.

These sales amounted to 42 percent of all shares Mr. Plank could sell that year without implicating his control over Under Armour.[17] According to the revised charter after the issuance of the Class C shares, Mr. Plank could sell a maximum of 2.5 million shares in 2016. The charter provided: "Each share of Class B Stock will automatically convert into a share of Class A Stock if Mr. Plank sells, or otherwise disposes of, more than 2.5 million shares of the Company's common stock in any calendar year beginning in the year of the record date for the Class C Dividend."[18] Mr.

---

[17] This is 1,050,000/2,500,000 = 42 percent. If the gift of 150,000 shares is excluded, the percentage of available shares sold falls to 36 percent from 42 percent. As noted above in n.2, removing this gift from consideration would not materially change the results of the analysis – my opinion about the extraordinary magnitude of these sales is the same in either case.

[18] Under Armour, Inc., Pre-14A filed on June 15, 2015 at 5-6.

1500510_1

Plank sold 1,050,000, or 42 percent of this amount in April of 2016.[19]  It is extraordinary for a CEO to sell such a high percentage of their shareholdings in a given year.  As noted below, the typical CEO sells more than twenty times less – only about 2 percent – in a given year.[20]

Mr. Plank's sales were remarkable in another respect.  The unprecedented size of his sales forced Under Armour to recapitalize its balance sheet and impose a large dividend of non-voting shares on shareholders.  This permitted Mr. Plank's April 2016 shares to proceed without implicating his voting control because they were not voting shares.  Under Armour took significant risks to enable this, and this risk is relevant to giving his sales context.

In theory shareholders should be indifferent to a stock split – after all, having one share out of 100 is the same as having two shares out of 200, all else being equal.  But this stock split was unusual in its complexity and the fact that Under Armour was issuing non-voting stock and would therefore have three different types of stock outstanding.  One observer called the stock split "controversial" and noted the recapitalization "triggered a shareholder revolt."[21]  The risks of the split were evident not just in the comments of market observers but also in the prices of shares – as of the end of 2016, the Class C shares were trading at a substantial discount (nearly 20 percent)

---

[19]   The charter provision provided that in subsequent years Mr. Plank might be able to sell more than 2.5 million shares, because any unsold shares below 2.5 million in one year would roll over into the following year.  But, since Mr. Plank's April 2016 sales were in the same month as the "record date for the Class C Dividend," the maximum he could sell was 2.5 million.  *See id.*

[20]   *See* Section C.

[21]   https://www.fool.com/investing/2017/06/05/under-armour-incs-worst-moves-in-2017-so-far.aspx.

compared with Class A shares, despite the fact that voting power could not account for any difference because of the fact that Mr. Plank had voting control.[22]

Yet, had Under Armour not engaged in a three-headed recapitalization that sowed some confusion among its shareholders, the amount of shares sold by Mr. Plank during the Class Period would have been a much larger portion of his available shares to sell while still maintaining control. To see this, imagine that Under Armour had not undertaken the recapitalization.  In that case, Mr. Plank's April 2016 sale of 1,050,000 shares would have, when added with his 1,250,000 shares sold in November 2015, brought his total Class Period sales of Class A shares to 2,300,000.  As noted above, to stay above the 15-percent ownership threshold and thus maintain control, Mr. Plank could sell only 3,448,332 shares.  His sale of 2.3 million shares would thus have been approximately 67 percent of the total shares he had available to sell.[23]  This is more than 13 times larger than Defendants claim, and, as discussed in the next two sections, it is extraordinary compared with Mr. Plank's prior and subsequent practice, as well as with other industry executives.

## C.     Mr. Plank's Sales Were Extraordinary for Public Company Executives

It is extremely unusual for a CEO to sell 36 percent of their stockholdings in such a short period, as Mr. Plank did here.  Mr. Plank sold nearly 36 percent of his available Under Armour stock in a few days in November 2015, and then millions more shares in another few days in April 2016 after a radical change to Under Armour's capital structure.  This is significantly more than the typical public-company executive, as demonstrated by leading research in the area.

---

[22]   The economic rights of Class A and Class C shares are identical.

[23]   This is $2,300,000/3,448,332 = 67$ percent.

Several research papers examine this issue by collecting data about how the executives at large, public companies behave regarding stock sales. The results vary somewhat depending on the methodologies, time periods, and data sets. But the bottom line is that a CEO selling 36 percent or more of one's holdings in a concentrated period is highly unusual.

For instance, John Core and Wayne Guay studied the incentives of CEOs of large companies. They find "the typical CEO sells only about 1.9% of her equity incentives each year."[24] Just two percent. Here, Mr. Plank sold at least 36 percent of his shares in several days during November 2015 – about 18 times more than the typical CEO of a large, public company.[25]

### D.    Mr. Plank's Sales Were Highly Unusual Compared with His Prior Trading Practice

During the Class Period, Mr. Plank made very large sales in short periods during two months: in November 2015, he sold 1,250,000 shares; then, in April 2016, he sold an additional 1,050,000 shares. Thus, he sold an average of 1,150,000 during these two months during the Class Period. In stark contrast, during the prior three years, he sold during fourteen separate months. In those months, he averaged 339,911 shares sold per month. In other words, he sold almost three and a half times more shares per month during the Class Period than his practice during the prior three years selling Under Armour shares.

A similar picture emerges when looking at the dollar proceeds from Mr. Plank's stock sales. During two months in the Class Period, he sold nearly $140 million worth of shares. He averaged sales of nearly $70 million per month in which he sold. During the fourteen months of sales during

---

[24]    John E. Core and Wayne R. Guay, "Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework," Academy of Management Perspectives Vol. 24, No. 1 (February 2010), at 5-19.

[25]    *Id.*

- 13 -

the preceding three years, he averaged less than $23 million in proceeds per month in which he sold. Again, the Class Period sales were three times more than his recent historical average.

Mr. Plank's Class Period sales look even more unusual when considering his recent behavior. During the past 30 months (from April 2016 to present), Mr. Plank has not sold a single share of Under Armour stock. This strongly undercuts any claim that somehow his base salary was insufficient and therefore excused the earning of abnormal returns from his stock sales during the Class Period. It also reinforces how unusual his Class Period sales were.

In sum, by any measure, Mr. Plank's Class Period stock sales were dramatically out of line with his prior trading practices.

## III.    Conclusion

Based on my research, experience and analysis here, Mr. Plank's Class Period stock sales are highly suspicious in timing and amount. At a time when Plaintiffs allege Mr. Plank was in possession of material negative information about Under Armour's business, Mr. Plank engaged in massive trades of Under Armour stock that were timed at record high prices. As detailed herein, the attributes of these trades make them unusual and suspicious.

Mr. Plank sold at least 36 percent of his available shares during one month during the Class Period. After an extraordinary recapitalization of the stock precipitated in part by this massive selling, in April 2016, Mr. Plank sold 42 percent of his available shares for the year in just a few days. This large-scale dumping of shares is dramatically out of line with his prior trading practice over the prior three years and atypical for CEOs of large public companies. The sales during the Class Period were not just unprecedented, they have never been replicated – Mr. Plank has not sold any Under Armour stock in 30 months since that time.

- 14 -

1500510_1

Moreover, the 36 percent number actually understates the relative level of Mr. Plank's selling. Under Armour undertook a costly and risky recapitalization of its stock in order to permit him to sell more shares without imperiling his voting control. Had they not done so, Mr. Plank would have had to sell approximately 67 percent of all his available shares during the Class Period to achieve the same $140 million in proceeds. This effective amount is truly extraordinary with respect to his own behavior and that of peer executives.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of November, 2018 at Chicago, Illinois.

_____
                Professor M. Todd Henderson

- 15 -

EXHIBIT A

# M. Todd Henderson

Michael J. Marks Professor of Law
The University of Chicago Law School
773.383.1700
toddh@uchicago.edu

**Academic positions:**

| | |
|---|---|
| 2004-Present | **The University of Chicago Law School**<br>Michael J. Marks Professor of Law<br>Aaron Director Teaching Scholar (2013-2015)<br>Professor of Law (2009-2014)<br>Assistant professor (2004-2009) |
| 2016-Present | Founder and director, Hopi Law Clinic<br>(a clinic that has students serve as law clerks to justices on the Hopi supreme court) |
| 2017-Present | Fellow, Cambridge University Judge School of Business |
| 2017-Present | Board Member, The Latin American Journal of Law & Economics |
| 2016 | Visiting Professor, Université de Paris Ouest Nanterre la Défense |
| 2014 | Visiting Professor, University of California, Berkeley |
| 2012-2017 | Visiting Professor, University of Bergen, Norway |
| 2011-2014 | Member, National Adjudicatory Council, Financial Industry Regulatory Association ("FINRA") |
| 2011-2014 | Fresco Chair in Corporate Law at the University of Genoa, Italy |
| 2011 | Roger J. Traynor Summer Professor in Corporate Law at the University of California, Hastings School of Law |

**University service:**

| | |
|---|---|
| 2018-Present | Co-chair, Law & Economics Workshop |
| 2017-Present | Member, Disciplinary Committee for University |
| 2016-Present | Chair, Alumni in Entrepreneurship Engagement Committee |
| 2016-Present | Member, Legal Writing Committee |
| 2013-Present | Member, Individual Conflict of Interest Committee, University of Chicago |

M. Todd Henderson

**University service (cont.):**

| | |
|---|---|
| 2014-2016 | Chair of Bigelow research and writing program at University of Chicago Law School |
| 2014-2016 | Chair, Employee Benefits Committee, University of Chicago |
| 2012-2014 | Member, Council of the University Senate, University of Chicago (elected by university-wide faculty vote) |
| 2013-2014 | Appointments Committee, University of Chicago Law School |
| 2012-2013 | Chair, JSD Committee, University of Chicago Law School |
| 2011-2013 | Clinical Law Program Committee, University of Chicago Law School |
| **Awards:** | Aaron Director Teaching Scholar (2013-2015) |
| | Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service awarded by the Federalist Society (2009) |
| | Faculty Hooder, as elected by students of the Class of 2007 |

**Prior Experience:**

| | |
|---|---|
| 2001-2004 | **McKinsey & Company**, Washington, D.C., Boston, Mass. Engagement manager (corporate governance, telecommunications, private equity) |
| 1999-2001 | **Kirkland & Ellis**, Washington, D.C. Associate (regulatory & governance, appellate litigation) |
| 1998-1999 | **Judge Dennis Jacobs**, Second Cir. Ct. of Appeals Law clerk |

**Education:**

| | |
|---|---|
| 1995-1998 | **The University of Chicago Law School**, Chicago, Ill. J.D. with high honors Order of the Coif Editor, University of Chicago Law Review |
| 1989-1993 | **Princeton University**, Princeton, N.J. B.S.E. Civil Engineering & Operations Research, cum laude J. Rich Steers Award for Academic Excellence Elected to Sigma Xi honor society |

2

M. Todd Henderson

**Select academic publications:**

"Do Lawyers Make Better CEOs than MBAs?" Harvard Business Review

"Lawyer CEOs," (with Irena Hutton) under review at peer review journal

"CEO Traits and Firm Outcomes: Does Birth Order Matter?," (with Irena Hutton) under review at peer review journal

"A New Market-Based Approach to Securities Regulation," *University of Chicago Law Review* (forthcoming)

"Making a Market for Corporate Disclosures," *Yale Journal of Regulation* (forthcoming)

"Mining Manne's Vein," *Journal of Law, Economics & Policy* (2017)

"Taking Systemic Risk Seriously in Financial Regulation," *Indiana Law Journal* (2017)

"The Regulation of Information Dissemination," *Cornell Law Review* (2016) (with Kevin Haeberle)

"Offensive Disclosure: How Rule 10b5-1 Plans Can *Increase* Insider Trading Returns," *Georgetown Law Journal* (2014)

"Boards-R-Us: Reconceptualizing Corporate Boards," *Stanford Law Review* (2014)

"Becoming the Fifth Branch," *Cornell Law Review* (2013)

"Reverse Regulatory Arbitrage: An Auction Approach to Regulatory Assignments," *Iowa Law Review* (2013)

"Voice and Exit in Health Care Policy," *Pathology Case Reviews*, (2012) reprinted in *Regulation*

"Pay for Regulator Performance," *University of Southern California Law Review* (2012)

"Paying Bank Examiners for Performance," *Regulation*, (2012)

"Insider Trading and CEO Pay," *Vanderbilt Law Review* (2011) (selected as one of the best securities law articles of 2011 and included in the *Securities Law Review 2012*, Donald Langevoort, ed.)

"Hiding in Plain Sight: Can Disclosure Enhance Insiders' Trade Returns?," (with Alan Jagolinzer and Karl Muller)

3

M. Todd Henderson

**Select academic publications (cont.):**

"Do Accounting Rules Matter: The Dangerous Allure of Mark to Market" *Journal of Corporation Law* (with Richard Epstein) (2011)

"Justifying Jones." 77 *University of Chicago Law Review* 1027 (2010)

"Predicting Crime." 52 *Arizona Law Review* 15 (2010)

"Credit Derivatives Are Not 'Insurance'." 16 *Connecticut Insurance Law Journal* 1 (2009)

"The Nanny Corporation." 76 *University of Chicago Law Review* 1517 (2009)

"Introduction to *The Going Private Phenomenon: Causes and Implications.*" 76 *University of Chicago Law Review* 1 (2009) (with Richard Epstein)

"The Impotence of Delaware's Taxes: A Response to Barzuza's Delaware's Compensation." 95 *Virginia Law Review In Brief* 49 (2009)

"Corporate Philanthropy and the Market for Altruism." 109(5) *Columbia Law Review* 571 (2009) (with Anup Malani)

"One Hat Too Many? Investment Desegregation in Private Equity." 76(1) *University of Chicago Law Review* 45 (2009) (with William Birdthistle)

"Two Visions of Corporate Law." 77(3) *George Washington Law Review* 708 (2009)

"Citing Fiction." 11 *Green Bag 2nd* (2008)

"From 'Seriatim' to Consensus and Back Again: A Theory of Dissent." *Supreme Court Review* (2008)

"Other People's Money." 60 *Stanford Law Review* (2008) (with Douglas Baird)

"Deconstructing Duff and Phelps." 74 *University of Chicago Law Review* 1739 (2007) (Special Issue: Commemorating Twenty-Five Years of Judge Richard A. Posner)

"Paying CEOs in Bankruptcy: Executive Compensation When Agency Costs Are Low." 101 *Northwestern University Law Review* 1543 (2007)

"Prediction Markets for Corporate Governance." 82 *University of Notre Dame Law Review* 1343 (2007) (with Michael Abramowicz)

"Corporate Heroin: A Defense of Perks, Executive Loans, and Conspicuous Consumption." 93 *Georgetown Law Journal* 1835 (2005) (with James C. Spindler)

M. Todd Henderson

"The Influence of F. A. Hayek on Law: An Empirical Analysis." *NYU Journal of Law and Liberty* (2005)

**Books:**

Hacking Trust: How Technology Is Revolutionizing Our Politics

Securities Regulation (13th Edition) (with Jack Coffee & Hillary Sale)

Securities Regulation, Statutes & Forms (responsible for editing new volume)

Securities Regulation Teachers' Manual

Limited Liability: A Legal and Economic Analysis (with Stephen Bainbridge), Elgar

Boards-R-Us: Outsourcing the Board of Directors (with Bainbridge), Cambridge

The Future of Classical Liberalism (under contract), Cambridge

Compliance in the Financial Services Industry (with Charles Senatore) (under contract)

**Book Chapters:**

"The Law and Economics of Minority Investor Protection" (for a Law & Economics book for Brazil market)

Current Issues in Corporate Law (for a Coase-Sandor Institute-sponsored book for the Chinese market)

 "Firms Without Boards: Unleashing the Hayekian Firm," in *Austrian Law and Economics*, 2012

"The Changing Demand for Insider Trading Regulation," in *Insider Trading Anthology*, Edgar Elgar, 2012

"Insider Trading and Executive Compensation: What We Can Learn from the Experience with Rule 10b5-1." in *Executive Pay Handbook.* Edgar Elgar, forthcoming 2012

"Everything Old Is New Again: Lessons from *Dodge v. Ford Motor Company*," in *Corporate Law Stories.* Foundation (2009)

**Select presentations:**

American Law and Economics Association, "Lawyer CEOs," Annual Meeting 2017 (accepted paper)

American Law and Economics Association, "Paying Regulators for Performance,"

M. Todd Henderson

Annual Meeting 2012 (accepted paper)

**Select presentations (cont.):**

Coase Lecture, University of Chicago Law School, 2012

Stanford Directors' Roundtable, Invited Faculty, 2006-08

Chicago Booth School of Business Directors' Consortium, Faculty, 2005-Present (executive compensation)

Investment Management Consultants Association, Chartered Private Wealth Advisor program, Invited Faculty, 2009 (executive compensation, valuation of closely held businesses)

European Financial Management 2009 Symposium: Corporate Governance and Control, "Scienter Disclosure" (accepted paper)

NBER Summer Workshop, "Scienter Disclosure," 2008 (accepted paper)

Conference on Empirical Legal Studies, "Scienter Disclosure," 2008 (accepted paper)

American Law and Economics Association, "Paying CEOs in Bankruptcy," Annual Meeting 2005 (accepted paper)

**Professional affiliations:**

American Law and Economics Association

Referee: Journal of Legal Studies; Journal Law & Economics

**Bar admissions:**

Maryland (inactive)

**Personal:**

Married to Tara Henderson, a pediatric oncologist

Three children (Ages 13, 10 & 7)