# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
|     ALL ACTIONS. | ) ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR RELIEF FROM
THE COURT'S SEPTEMBER 9, 2019 JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................4

    A.   Procedural History ....................................................................................4

    B.   Under Armour Announces Plank Will Step Down from the Role of Chief Executive Officer ......................................................................................6

    C.   *The Wall Street Journal* Reveals that Under Armour Has Been Under Criminal and Civil Investigation Since July 2017 ....................................6

    D.   The Filing of the Related *Patel* Action ...................................................8

    E.   *The Wall Street Journal* Reveals Additional Details About the Government's Investigations and Describes the Fraudulent Sales and Accounting Practices Under Armour Employed During the Class Period in This Case ....................................................................................................8

III. ARGUMENT ....................................................................................................9

    A.   Legal Standards ........................................................................................9

    B.   Plaintiffs Meet the Threshold Conditions Under Rule 60(b) ................10

    C.   Relief from the Court's Judgment Is Warranted Under Rule 60(b)(2) ................13

        1.   The Evidence Is Newly Discovered ...........................................13

        2.   Plaintiffs Could Not Have Discovered the New Evidence with Due Diligence ...............................................................................14

        3.   The Evidence Is Not Cumulative or Impeaching .......................15

        4.   The Newly Discovered Evidence Is Material and Would Likely Have Resulted in the Denial of Defendants' Motion to Dismiss ..............16

    D.   Alternatively, Relief Is Appropriate Under Rule 60(b)(6) .....................22

    E.   Granting Leave to Amend Would Not Be Futile ...................................25

IV.  CONCLUSION ................................................................................................25

Cases\4817-5864-2093.v1-11/18/19

Pursuant to Rule 60(b)(2) and (6) of the Federal Rules of Civil Procedure, Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund and Monroe County Employees' Retirement System ("Plaintiffs") submits this memorandum of law in support of their motion for relief from the Court's September 9, 2019 Order of Judgment ("Judgment") dismissing Plaintiffs' Consolidated Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") with prejudice.  Plaintiffs respectfully request that the Court: (1) vacate the September 9, 2019 Judgment; (2) consolidate the related *Patel* Action (defined herein) with this case; and (3) allow Plaintiffs to file a consolidated third amended complaint.

## I.    INTRODUCTION

For 26 consecutive quarters spanning six years, Under Armour, Inc. ("Under Armour" or "Company") reported 20% year-over-year revenue growth, becoming the number two premium sportswear brand in the United States, second only to Nike.  Kevin Plank ("Plank"), Under Armour's Chief Executive Officer ("CEO") and founder, attributed the Company's stratospheric rise to the strength of Under Armour's "premium" brand image.  The Company's growth streak ended abruptly on January 31, 2017, when Under Armour reported growth of only 12% for the fourth quarter of 2016 ("4Q16"), 40% lower than projected, resulting in the largest single-day stock price decline in the Company's history.

Soon after, the U.S. Department of Justice ("DOJ") and the U.S. Securities and Exchange Commission ("SEC") launched non-public, criminal and civil investigations into Under Armour's accounting and revenue recognition practices, examining whether the Company's unprecedented growth streak was fueled not by the "premium" Under Armour brand, but by improper accounting practices such as shifting sales from quarter to quarter to appear healthier.  Although the Company

began cooperating with investigators in ***July 2017***, the existence of the ongoing DOJ and SEC investigations was kept hidden from investors and the Court for over two years.

On August 19, 2019, this Court dismissed Plaintiffs' SAC with prejudice, concluding that Plaintiffs failed to adequately plead scienter. *In re Under Armour Sec. Litig.*, No. RDB-17-0388, 2019 WL 3892319, at *11 (D. Md. Aug. 19, 2019) ("*Under Armour II*"). Judgment in this case was entered on September 9, 2019.

In the two months since the Court entered Judgment, the following newly discovered evidence has been revealed to Plaintiffs and investors – some of it just days ago:

- Under Armour's Class Period accounting practices and related disclosures, the Company's 2016 results, and the tenure of former Chief Financial Officer ("CFO") Lawrence Molloy ("Molloy") (who resigned in January 2017 after only 13 months on the job) are the subject of ongoing criminal and civil investigations by the DOJ and SEC.

- Although Under Armour began responding to the government's requests for documents and information in July 2017, the Company concealed the federal investigations from investors and the Court until they were revealed by *The Wall Street Journal* ("*WSJ*") on November 3, 2019, at which time Under Armour was forced to confirm the investigations.

- Under Armour used deceptive quarter-end sales and accounting practices, which borrowed business and revenue from future quarters, in order to extend the Company's 20% year-over-year growth streak, meet aggressive quarterly sales targets, and mask slowing demand for Under Armour's core apparel products.

- Under Armour's suspect sales practices included: (i) pulling forward orders from the month after the quarter to ship within the quarter in order to hit  aggressive sales goals or close the gap; (ii) adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; (iii) shipping products earlier than planned; (iv) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes; and (v) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.Maxx, which allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.

- Under Armour continued shipping products to The Sports Authority ("TSA") and booked sales for those goods, even after it became clear TSA was headed to bankruptcy and the goods would be returned.

- Emails show that Plank knew about the Company's efforts to move revenue between quarters.

- Federal investigators are examining Plank's emails that show Plank knew about efforts to move revenue between quarters.

- Plank – once so determined to maintain control of Under Armour that he caused the Company to issue an entirely new class of stock in order to preserve his control – will soon be stepping down from the position of CEO.

This newly discovered evidence strengthens and corroborates Plaintiffs' allegations and cures the scienter pleading deficiencies that resulted in dismissal of the SAC with prejudice. Indeed, when considered with all other allegations, the newly discovered evidence paints a striking portrait of Plank's scienter: Plank, although he had access to contradictory information, recklessly told investors that Under Armour's core business was incredibly strong, profitable, and gaining market share. In truth, demand for the Company's core apparel products was diminishing, so Under Armour shifted from a premium brand focus to competing on price, which Plank knew or recklessly disregarded had resulted in declining average sales prices and lost market share. To sustain Under Armour's 20% year-over-year growth streak and mask slowing demand for the Company's core apparel products, Under Armour resorted to suspect quarter-end sales and accounting practices that borrowed business and revenues from future quarters. Emails show Plank was aware of the Company's efforts to move revenue between quarters, but he concealed them from investors and falsely attributed Under Armour's growth to "demand" for the Company's products. Plank was motivated to maintain the public perception of the Company and to keep Under Armour's stock price artificially inflated so that he could sell large quantities of his own stock for $138 million in profit before the truth was revealed. Unfortunately for investors, the practice of pulling sales forward from future quarters was unsustainable and, inevitably, came crashing down when the Company reported revenue growth 40% below their stated expectations for 4Q16.

- 3 -

Plaintiffs now seek relief pursuant to Federal Rule of Civil Procedure 60(b), which provides an exception to the general rule favoring finality and allows the Court to relieve a party from a final judgment for "newly discovered evidence" or for "any other reason that justifies relief." *See* Fed. R. Civ. P. 60(b)(2), (6). Because this case presents precisely the type of exceptional circumstances envisioned by Rule 60(b), justice requires that this case be adjudicated in view of ***all*** the relevant facts and outweighs any considerations of finality. Plaintiffs' motion should be granted.

## II.    BACKGROUND

### A.    Procedural History

The initial complaints alleging violations of federal securities laws were filed in February and March 2017 and were consolidated on March 23, 2017. ECF No. 3. On August 9, 2017, Plaintiffs filed the Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC"), alleging claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") against Under Armour, Plank, Molloy, nine Director defendants, and 11 underwriter defendants, as well as claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"). ECF No. 30.

On September 19, 2018, this Court dismissed Plaintiffs' Securities Act claims with prejudice. *See In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658 (D. Md. 2018) ("*Under Armour I*"). As to Plaintiffs' Exchange Act claims, this Court held that Plaintiffs satisfied the pleading standard for falsity with regard to some statements, including statements about Under Armour's financial outlook for 2016. *Id.* at 685, 688-89. But the Court ultimately dismissed the CAC because Plaintiffs failed to establish a "cogent and compelling" inference of scienter. *See id.* at 694.[1]

For example, although the CAC alleged that defendants had access to detailed data that contradicted their public statements through Under Armour's SAP platform, the Court concluded

---

[1]    Citations, internal quotations, and footnotes omitted and emphasis added unless noted otherwise.

Plaintiffs provided no "corroborating factual allegations" to support the allegations that defendants were in possession of conflicting facts. *Id*. at 691. The Court, crediting defendants' argument, also questioned "the validity of the data" on which the Morgan Stanley report relied. *Id*. And, though Plaintiffs' allegations "provide[d] a plausible inference that Plank had a motive to make false and misleading statements to keep stock prices high before he profited from sales of his holdings[,]" the Court found no "similar motive on the part of any of the other Individual Defendants[,]" which negated the inference of scienter. *Id*. at 693. The Court concluded, "[v]iewed collectively, and taking into account plausible opposing inferences, the factual allegations made by Plaintiffs do not support a strong inference of scienter." *Id*. at 694. The Court dismissed Plaintiffs' Section 10(b) claims without prejudice.

On November 16, 2018, Plaintiffs filed the SAC, which named only Plank and Under Armour as defendants. ECF No. 78. The SAC added allegations demonstrating "that the SportScan data cited in the Morgan Stanley Report was both reliable and materially consistent with Under Armour's internal data." *Under Armour II*, 2019 WL 3892319, at *8. The SAC also included new allegations establishing that Plank's massive Class Period stock sales were suspicious in both amount and timing, particularly when considered in the context of Plank's competing motivations of profiting from the alleged fraud and maintaining control of the Company he founded. *See* ¶¶85-97.[2]

On August 19, 2019, the Court dismissed the SAC with prejudice for failure to adequately plead scienter. *Under Armour II*, 2019 WL 3892319, at *11. Despite the new allegations, the Court concluded that the most reasonable likely inference was that Plank "interpreted the data that was available to him through the lens of the Company's consistent success to date, attributed any non-conforming data to typical retail market challenges, and assumed the Company would continue to

---

[2]    Citations to "¶__" refer to paragraphs of the SAC.

Cases\4817-5864-2093.v1-11/18/19

rise above such challenges as it had always done in the past." *Id.* at *11. Although the Court "accept[ed] that Plaintiffs' allegations may be sufficient to state a facially plausible claim under a typical dismissal standard" and recognized it was possible Plank was "negligent[,]" it found there was "no strong or compelling inference of deliberately intentional misconduct or such severe recklessness that it rises to the level of fraud." *Id*. at *10-11.

On September 9, 2019, the Court entered Judgment in favor of defendants. ECF No. 101. On September 17, 2019, Plaintiffs timely filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit from the Court's Judgment. ECF No. 102. Plaintiffs filed their opening brief with the Fourth Circuit on November 5, 2019.

### B.    Under Armour Announces Plank Will Step Down from the Role of Chief Executive Officer

On October 22, 2019, Under Armour made the surprising announcement that Plank – once so determined to maintain control of Under Armour that he caused the Company to undergo a massive recapitalization – would be stepping down from the role of CEO effective January 1, 2020. *See* Ex. 1. According to the Company's press release, Plank will become the Executive Chairman of Under Armour's Board of Directors and its "Brand Chief," and will be succeeded by Patrik Frisk ("Frisk"), the Company's Chief Operating Officer. *Id*. At the time of the announcement, Plank's decision to step down from the role of CEO was shocking given the lengths he had gone to in order to maintain control of the Company. But the news of the DOJ criminal and SEC civil investigations into his conduct – revealed just weeks later – explain his suspiciously timed "retirement."

### C.    *The Wall Street Journal* Reveals that Under Armour Has Been Under Criminal and Civil Investigation Since July 2017

On November 3, 2019, the *WSJ* published an article titled, "Under Armour Is Subject of Federal Accounting Probe." *See* Ex. 2. The *WSJ* reported that "Justice Department prosecutors are

conducting a criminal inquiry" into Under Armour's accounting practices and revenue recognition policies "in coordination with civil investigators" at the SEC. According to the *WSJ* article, the DOJ and SEC are examining whether Under Armour "shifted sales from quarter to quarter to appear healthier[.]" The *WSJ* also revealed that, remarkably, the government's investigations have been ongoing since ***July 2017*** and that the Company has, ***for over two years***, been responding to "requests for documents and information relating primarily to its accounting practices and related disclosures[.]" The *WSJ* article reported that Under Armour has been "struggling with weak sales in the last two years," but before then, "had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth." The *WSJ* article noted that Under Armour's growth streak "ended abruptly when Under Armour missed its sales targets in the final quarter of 2016" and reported sales growth of only 12% (or 40% below expectations) on January 31, 2017.

On November 4, 2019, in a Form 8-K filed with the SEC, Under Armour confirmed the DOJ and SEC investigations and stated that the Company "has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC ***in July 2017***." *See* Ex. 3. During the Company's third quarter 2019 earnings conference call held that day, David Bergman ("Bergman"), Under Armour's CFO, reiterated that "we have been fully cooperating with these inquiries for nearly ***2.5 years***. To this effect, we began responding back in July of 2017 to their requests for documents and information." *See* Ex. 4.

In response to the news of the government's investigations, the price of Under Armour stock fell nearly 19%.

D.     **The Filing of the Related *Patel* Action**

On November 6, 2019, following the revelation of the SEC and DOJ investigations, Kirtan Patel filed a putative securities class action complaint against Under Armour, Plank, Molloy, Frisk and Bergman for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons or entities who purchased or otherwise acquired Under Armour securities between August 3, 2016 and November 1, 2019 ("*Patel* Action").  *See Patel v. Under Armour, Inc.*, No. 1:19-cv-03209-RDB (D. Md.).  The *Patel* Action has been assigned to this Court.

E.     ***The Wall Street Journal* Reveals Additional Details About the Government's Investigations and Describes the Fraudulent Sales and Accounting Practices Under Armour Employed During the Class Period in This Case**

On November 14, 2019, the *WSJ* published an exclusive article based on interviews with former Under Armour executives in its sales, logistics, merchandising, and finance divisions.  *See* Ex. 5.  The article, titled, "Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter,'" revealed new, previously unobtainable evidence about Under Armour's **Class Period** sales and accounting practices.  In the article, former Under Armour executives detail the scramble to "meet aggressive sales targets" and the practice of "borrowing business from future quarters to mask slowing demand in 2016 for the company's athletic apparel."  A sales executive told the *WSJ*, "We found ourselves pulling forward [sales] every quarter."  "Former executives said pulling sales forward helped the sportswear company sustain its growth record, which employees knew was important to Mr. Plank."

Specifically, the executives describe a number of suspect practices employed by Under Armour in 2016 to "help extend" the Company's "26-quarter streak of 20% sales growth," including: (i) pulling forward orders from the month after the quarter to ship within the quarter in order to hit

- 8 -

aggressive sales goals or close the gap; (ii) adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; (iii) shipping products earlier than planned; (iv) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes; and (v) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.Maxx, which allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Under Armour also continued shipping products to TSA and booking sales for those goods even after it became clear that the sporting goods retailer was in trouble and headed toward bankruptcy. According to the article, emails show that Plank "**_knew about efforts to move revenue between quarters[.]_**"

The *WSJ* article also confirms that federal investigators are examining events that occurred **_during the Class Period in this case_**, including "Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy," who became the CFO of Under Armour in January 2016 and held the role for only 13 months before his sudden and suspicious resignation in January 2017. And the *WSJ* article confirms that federal investigators are specifically "examining emails that show [Plank] knew about efforts to move revenue between quarters[.]"

## III.    ARGUMENT

### A.    Legal Standards

Plaintiffs seek relief from this Court's September 9, 2019 Judgment pursuant to Fed. R. Civ. P. 60(b). "[Rule 60(b)] provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment." *Liljeberg v. Health Servs. Acquisitions Corp.*, 486 U.S. 847, 863 (1988). The "whole purpose" of Rule 60(b) is to make an exception to the finality of judgments. *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005). In the Fourth Circuit, a party seeking relief from a judgment

under Rule 60(b) must first demonstrate "timeliness, a meritorious position, lack of prejudice to the opposition, and exceptional circumstances." *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 44 (4th Cir. 1990).

Once the movant has met those threshold conditions under Rule 60(b), she must also satisfy one or more of the rule's six grounds for relief from judgment. *Werner v. Carbo*, 731 F.2d 204, 207 (4th Cir. 1984). Because the grounds for relief under Rule 60(b) "often overlap," it is "difficult if not inappropriate in many cases to specify or restrict the claim for relief to a particular itemized ground." *Id.* Accordingly, the "broad phrasing" of the Rule frees "courts to do justice in cases in which the circumstances generally measure up to one or more itemized grounds" for relief. *Id.*

In determining whether relief is appropriate under Rule 60(b), courts "must balance the competing policies favoring the finality of judgments and justice being done in view of ***all*** the facts[.]" *Square Constr. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981). Here, the need to decide this case on the merits in view of "all the facts" outweighs any considerations of finality. *Id.* at 71-72 (The need to "establish finality of judgments . . . should never be used to thwart the objectives of the blind goddess' of justice itself."). Plaintiffs' motion should be granted.

### B.    Plaintiffs Meet the Threshold Conditions Under Rule 60(b)

Plaintiffs meet each of the threshold conditions required under Rule 60(b). First, Plaintiffs' motion is timely. The DOJ and SEC investigations into Under Armour's accounting practices, and the details of the Company's deceptive, Class Period accounting and sales practices, were only made public within the last few weeks. Accordingly, there can be little dispute that Plaintiffs' Rule 60(b) motion was brought within a "reasonable time." *See, e.g.*, *Werner*, 731 F.2d at 207 (Rule 60(b) motion filed less than 11 weeks after denial of certiorari was made within a reasonable time). Further, Plaintiffs have filed their Rule 60(b) motion within much less than a year of the Court's

entry of Judgment on September 9, 2019, as required for motions seeking relief under Rule 60(b)(2). *See* Fed. R. Civ. P. 60(c) (setting forth timing requirements for motions under Rule 60(b)).

Second, as set forth in more detail below, Plaintiffs' position is meritorious, as the revelation of the nearly two-and-a-half year ongoing criminal and civil investigations into Under Armour's accounting practices, newly discovered evidence of the Company's improper sales practices, which pulled sales forward from future quarters "to mask slowing demand," and the suspiciously timed news that Plank is relinquishing the role of CEO, tip the scales in favor of Plaintiffs on the element of scienter. And because scienter is the only element of Plaintiffs' Section 10(b) and Rule 10b-5 claims the Court previously found lacking, Plaintiffs' consolidated third amended complaint should be upheld.

Third, defendants will suffer no prejudice if Plaintiffs are relieved from the Court's Judgment. *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 265 (4th Cir. 1993) (deeming the prejudice factor "of lesser importance" and remanding with instructions to vacate judgment under Rule 60(b)). First, to the extent that defendants have been concealing information for the past two-and-a-half years, any prejudice resulting from the revelation of their deception is outweighed by their ongoing fraud. Moreover, Under Armour and Plank are named defendants in the *Patel* Action currently pending before this Court, which pleads a class period that overlaps with the Class Period in this case and raises nearly identical legal and factual questions. *See* Ex. 6. Relieving Plaintiffs from the Court's Judgment in this case, consolidating the related *Patel* Action with this one, and permitting Plaintiffs to file a consolidated third amended complaint will actually diminish any prejudice to defendants by eliminating the risk of inconsistent adjudications and reducing the expense of defending multiple lawsuits. *See In re MicroStrategy Inc. Sec. Litig.*, 110 F. Supp. 2d

427, 431 (E.D. Va. 2000) (discussing benefits of consolidating multiple, related securities fraud actions).

Fourth, relief from the Court's Judgment is warranted given the exceptional circumstances present in this case. For over two years, Under Armour has concealed that it is the subject of criminal and civil investigations into the Company's accounting practices. Those investigations were launched *before* the filing of the CAC and relate to events that occurred during the Class Period in this case. Yet, in multiple rounds of motion to dismiss briefing (while defendants were simultaneously cooperating with the DOJ and SEC), defendants adamantly denied Plaintiffs' fraud allegations and argued Plaintiffs failed to establish scienter. And it was only after the SAC was dismissed with prejudice for failure to adequately plead scienter that Plank's resignation, the government's investigations, and the Company's improper sales and accounting practices – which masked slowing demand – became public. Defendants should not be permitted to benefit from their active concealment of the government's investigations, or hide behind the veil of secrecy afforded to them by the Private Securities Litigation Reform Act's ("PSLRA") mandatory discovery stay, while investors are left with no recourse to recover the hundreds of millions of dollars in losses suffered as a result of defendants' fraud.[3] Indeed, rewarding defendants for their concealment strategy would undermine the very purpose of the federal securities laws, which were created to "protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security." *Under Armour I*, 342 F. Supp. 3d at 678.

---

[3] The *Patel* Action provides no recourse for investors who purchased Under Armour stock prior to August 3, 2016, the first day of the class period in that case.

- 12 -

In sum, each of the threshold conditions for relief under Rule 60(b) are met here. As demonstrated below, Plaintiffs also satisfy the grounds for relief under Rule 60(b)(2) and (6). Plaintiffs' motion should be granted.

### C.    Relief from the Court's Judgment Is Warranted Under Rule 60(b)(2)

Rule 60(b)(2) permits courts to relieve a party from a final judgment as a result of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). "The newly discovered evidence provision of Rule 60(b)(2) is aimed at correcting an erroneous judgment stemming from the unobtainability of evidence." *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994). In the Fourth Circuit, a party seeking relief from a judgment under Rule 60(b)(2) must demonstrate the following:

> (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that [it] is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended.

*Boryan v. U.S.*, 884 F.2d 767, 771 (4th Cir. 1989). Here, all of the requirements of Rule 60(b)(2) are met, and relief from the Court's Judgment is warranted.

### 1.    The Evidence Is Newly Discovered

The government's criminal and civil investigations into Under Armour's accounting practices, the deceptive quarter-end sales practices Under Armour employed during the Class Period "to mask slowing demand," emails that show Plank knew about efforts to move revenue between quarters, and Plank's sudden cessation of the role of CEO constitute newly discovered evidence that was not known to Plaintiffs until after the Court's Judgment. *Id.* (movant must show that evidence is newly discovered or unknown to it until after judgment entered). Specifically, on October 22, 2019, over a month ***after*** the Court entered its Judgment, Under Armour announced that Plank would be

- 13 -

stepping down from the position of CEO effective January 1, 2020.  Only weeks later, on November 3, 2019, the *WSJ* revealed, for the first time, the DOJ and SEC investigations into Under Armour's accounting practices.  The next day, on November 4, 2019, Under Armour confirmed the existence of the investigations during an earnings conference call and in a filing with the SEC and stated that the Company has been cooperating with investigators since ***July 2017***.  Then, on November 14, 2019, the *WSJ* revealed previously unobtainable evidence about Under Armour's deceptive ***Class Period*** sales and accounting practices, including the scramble to "meet aggressive sales targets" and the practice of "borrowing business from future quarters ***to mask slowing demand in 2016*** for the company's athletic apparel."  Ex. 5.  In other words, both the investigations and the Company's improper sales practices (and emails demonstrating Plank's knowledge) existed at the time this Court entered its Judgment, even though the *WSJ* articles were the first time Plaintiffs, or investors, were made aware of their existence.

### 2. Plaintiffs Could Not Have Discovered the New Evidence with Due Diligence

Rule 60(b)(2) requires that the newly discovered evidence "could not with reasonable diligence" have been discovered prior to the entry of judgment.  *Boryan*, 884 F.2d at 771 ("Evidence that is available to a party prior to entry of judgment" is not a basis for granting a Rule 60(b)(2) motion.).  Here, Plaintiffs could not have discovered the news of Plank's departure from the position of CEO, the government's criminal and civil investigations, or the specifics of Under Armour's deceptive Class Period sales practices prior to the entry of the Court's Judgment, even with the exercise of reasonable diligence.  Before the publication of the *WSJ* articles, Under Armour had hidden the DOJ and SEC investigations for over two years.  *See* Ex. 2 (reporting that the probe previously "hasn't been made public").  Indeed, ***none*** of the Company's SEC filings disclosed the investigations.  Under Armour's failure to do so has left analysts and investors questioning why the

- 14 -

Company violated established protocols for the disclosure of such information and why investors are "just hearing about [the investigations] now." Ex. 4. On November 4, 2019, CNBC financial analyst Jim Cramer put it bluntly: "I am really aghast about Under Armour. There is a protocol. [I]t is well known. [I]t was violated here."[4]

Moreover, because this case is governed by the PSLRA, all discovery was stayed during the pendency of defendants' motions to dismiss. *See* 15 U.S.C. §78u-4(a)(9)(B). As a result, Plaintiffs were prohibited from serving document requests or interrogatories that may have obligated defendants to disclose that Plank will be stepping down, the government's investigations, the Company's deceptive sales practices, including the borrowing of business and sales from future quarters "to mask slowing demand," or the internal emails that show Plank's knowledge of efforts to move revenue between quarters. In short, there is no way Plaintiffs could have discovered this evidence prior to the entry of the Court's Judgment.

### 3.    The Evidence Is Not Cumulative or Impeaching

To prevail on a motion under Rule 60(b)(2), the newly discovered evidence must not be "cumulative or impeaching." *Boryan*, 884 F.2d at 771. Evidence that Plank will soon be relinquishing the role of CEO and that Under Armour's accounting practices have been the subject of ongoing criminal and civil investigations is not cumulative of the allegations in the SAC, nor does it merely constitute impeachment evidence. Additionally, while the newly discovered evidence regarding Under Armour's deceptive sales practices corroborates Plaintiffs' buyback allegations (*see, e.g.*, ¶¶41, 77, 111), it is qualitatively different than, and therefore not cumulative of, the allegations in the SAC. For example, the *WSJ* describes the practice of "pull[ing] forward orders

---

[4]    Jim    Cramer    (@jimcramer),    TWITTER    (Nov.    4,    2019,    6:46    AM), https://twitter.com/jimcramer/status/1191366096659603456.

Cases\4817-5864-2093.v1-11/18/19

from the month after the quarter to ship within the quarter in order to hit the number or close the gap," details the shipment of products to TSA, even after it was clear the sporting goods retailer was in trouble, in order to book sales for those goods, and explains that according to former executives in "sales, logistics, merchandising and finance," this was done "to mask slowing demand" during the Class Period.  And, critically, the *WSJ* reports that emails show Plank "knew about efforts to move revenue between quarters[.]"  Ex. 5.

### 4.    The Newly Discovered Evidence Is Material and Would Likely Have Resulted in the Denial of Defendants' Motion to Dismiss

A party seeking relief from a judgment under Rule 60(b)(2) must show that the newly discovered evidence is of "such a material and controlling nature as [would] probably [have] change[d] the outcome[.]"  *Schulz*, 24 F.3d at 631.  Here, the "outcome" in question is the Court's dismissal of the SAC with prejudice for failure to adequately plead scienter.  In determining whether the newly discovered evidence would have changed the outcome of defendants' Rule 12(b)(6) motion, this Court must accept Plaintiffs' factual allegations as true.  *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373 (MBM), 1997 WL 167043, at *5 (S.D.N.Y. Apr. 9, 1997) (applying Rule 12(b)(6) standard to plaintiffs' newly discovered evidence on a Rule 60(b)(2) motion).  Additionally, Supreme Court precedent requires this Court to consider the allegations in their "entirety" to determine whether the facts alleged, "taken collectively," give rise to an inference of scienter that is "***at least as likely as*** any plausible opposing inference."  *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325-26, 328 (2007) (emphasis in original).  The newly discovered evidence adds critical, previously missing pieces to the scienter puzzle, renders Plaintiffs' scienter allegations cogent and compelling, and cures the pleading deficiencies that resulted in dismissal of the SAC. And because scienter is the only element of Plaintiffs' Section 10(b) claims this Court found lacking,

it is likely that the newly discovered evidence "probably" would have resulted in the denial of defendants' motion to dismiss.

The newly discovered evidence bolsters Plaintiffs' allegations that Plank, "although he had access to contradictory information, recklessly told investors that Under Armour's core business was incredibly strong, profitable, and gaining market share, while the Company was shifting from a premium brand focus to competing on price, which Plank knew would result in a decline in the Company's market share and stock price." *Under Armour II*, 2019 WL 3892319, at *9. Specifically, the newly discovered evidences establishes that, in order to meet Plank's aggressive, "revenue-growth-at-all costs" sales targets (¶35), "mask slowing demand in 2016 for the company's athletic apparel," and extend the 26-consecutive quarter 20% year-over-year growth streak Plank regularly touted (¶36), the Company engaged in deceptive, unsustainable, accounting and sales practices that pulled sales forward from future quarters.

In addition to the "handshake" buyback agreements detailed in the SAC (¶¶41, 77, 111), which are corroborated by the newly discovered evidence, Under Armour's improper Class Period sales practices included: (i) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (ii) adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; (iii) shipping products earlier than planned; (iv) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes; and (v) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.Maxx, which allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  As the *WSJ* explained, this is all corroborated by former executives in Under Armour's sales, logistics, merchandising, and finance divisions.  Under Armour also continued

shipping products to TSA even after it became clear that the sporting goods retailer was headed to bankruptcy. These precise practices – the shifting of sales "from quarter to quarter to appear healthier" – are a key focus of the government's investigations. And, these practices violate Section 10(b) when they are used, as here, "to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) (upholding allegations that defendants pressured customers to acquire large quantities of products at quarter-end so as to artificially inflate revenues and earnings for a particular quarter); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health" is fraud).

Moreover, Plank did not just recklessly disregard these improper sales practices, but according to emails that federal investigators are examining "***knew about efforts to move revenue between quarters***" and was aware of the "strains in Under Armour's business" in 2016, while at the same time falsely attributing Under Armour's "growth" to "the strength of the brand." *See, e.g.*, ¶¶161, 180. This incriminating piece of newly discovered evidence, in particular, establishes that Plank acted with scienter and addresses defendants' prior criticism that Plaintiffs failed to plead "internal documents" to "suggest that at the time Plank made the statements claimed to be misleading, he was aware that he was withholding vital information." *Under Armour II*, 2019 WL 3892319, at *10.

The newly discovered evidence also cements Plaintiffs' allegations that Plank was motivated to "maintain the public perception of the Company" and keep Under Armour's "stock price artificially inflated so that he could sell large quantities of his own stock for $138 million in profit before the truth was revealed[.]" *Id.* at *9. In granting defendants' motion to dismiss the SAC, the

- 18 -

Court found the "inference that Plank sold shares during the Class Period as he'd previously announced was his plan" more compelling than "the inference that Plank's stock sales during the Class Period were carefully timed to capitalize on deliberately inflated stock prices[.]" *Id.* at *11. But Plank's ***$138.2 million*** in stock sales is highly suspicious when juxtaposed with the revelation that Under Armour is being ***criminally*** investigated for its revenue-recognition practices, as well as the newly discovered evidence of the Company's improper Class Period sales practices, which former executives told the *WSJ* were done "every quarter" "to mask slowing demand" during the Class Period. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (finding scienter adequately plead where company was the subject of an SEC investigation and defendants engaged in significant insider trading).

In addition to establishing Plank's motive to commit fraud, the newly discovered evidence corroborates other allegations in the SAC. For example, the newly discovered evidence bolsters the allegations regarding the excess inventory Under Armour was forced to liquidate at steep discounts (¶¶45-51) and the problems facing wholesale accounts like TSA (¶¶43, 78). The newly discovered evidence also remedies Plaintiffs' corporate scienter allegations. *Under Armour II*, 2019 WL 3892319, at *11 (finding corporate scienter not adequately plead). As specifically alleged in the SAC, during the Class Period, Under Armour's senior management orchestrated deals with Dick's Sporting Goods ("Dick's") to offload the excess inventory caused by diminishing demand for, and declining sales of, Under Armour's core products. ¶¶45-51. Under these handshake deals, Dick's agreed to accept more product than it needed with the agreement that Dick's could return any products it did not sell, allowing Under Armour to recognize "revenue" but resulting in a massive amount of returns. ¶¶41, 77-78, 111. The newly discovered evidence confirms that Plank "knew about efforts to move revenue between quarters," thereby establishing Under Armour's scienter.

- 19 -

And the newly discovered evidence adds that – according to Under Armour executives – Dick's was holding unsold Under Armour goods for the Company.

The two-and-a-half year, ongoing criminal and civil investigations into Under Armour's accounting practices and related disclosures also represent another "piece of the [scienter] puzzle when taking a holistic view" of Plaintiffs' allegations. *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (finding that "so many different governmental" investigations supported an inference of scienter). Indeed, the government is examining events and conduct that occurred ***during*** the Class Period in this case, including "Under Armour's results at the end of 2016" and the tenure of former CFO Molloy (January 2016 through January 2017). The inference of scienter is strengthened by the fact that Under Armour's over two-year concealment of the government's investigations is extremely unusual, particularly because it is commonplace for companies to tell investors when they are the subject of criminal and civil investigations. *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (finding scienter adequately pled where defendants "knew about the SEC-DOJ Investigation" but "waited to disclose its potential impact" until after the *WSJ* published an article about the investigation). As CNBC financial analyst Jim Cramer put it: "I am really aghast about Under Armour. There is a protocol. [I]t is well known. [I]t was violated here."

Plank's recently announced decision to "retire," especially when considered against the backdrop of the government's investigations, also contributes to an inference of scienter. *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-72 (D.S.C. 2016) (resignation of three most senior executive officers supported inference of scienter). Indeed, just months before Under Armour announced that Plank would be stepping down from the position of CEO, the Company touted the benefit of Plank serving as both CEO and Chairman of the Board and lauded Plank as "the

- 20 -

appropriate person to lead both our Board and the management of our business." *See* Ex. 7. After the government's ongoing criminal and civil investigations were revealed, Forbes reported that, "in light of the recent investigations, it now makes more sense why Plank stepped aside."[5] And, though Plank's departure from the position of CEO occurred after the current Class Period in this case, it is well-settled that post-Class Period events can support an inference of scienter. *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period."). The government is also investigating Molloy's tenure as CFO (January 2016-January 2017), which calls into question the real reason behind his sudden and highly suspicious departure from Under Armour after only 13 months on the job. ¶¶14, 59; *UTStarcom*, 617 F. Supp. 2d at 976 (finding that the proximity of high-ranking officers' departures to SEC investigations adds "one more piece to the scienter puzzle").

Additionally, the newly discovered evidence eviscerates the "innocent" competing inferences advanced by defendants and credited by the Court: "that the Company, which had experienced years of robust growth continuing late into the Class Period, hit an unexpected slowdown" and that Plank "attributed any non-conforming data to typical retail market challenges, and assumed the Company would continue to rise above such challenges as it had always done in the past." *Under Armour II*, 2019 WL 3892319, at *10-11. To the contrary, the Company's purportedly "unexpected slowdown" – reporting a 40% miss on year-over-year growth for 4Q16 – was the inevitable result of Under Armour's inability to sustain into perpetuity the Company's improper and deceptive sales practices.

---

[5]    Jack Kelly, *First, Under Armour CEO Kevin Plank Resigns – Now, The Company Is Under Investigation By The Justice Department And SEC*, FORBES, Nov. 4, 2019, https://www.forbes.com/sites/jackkelly/2019/11/04/first-under-armour-ceo-kevin-plank-resignsnow-the-company-is-under-investigation-by-the-justice-department-and-sec/#1c80a1d960fd.

According to former executives the truth was that demand was slowing and Under Armour was "pulling [sales] forward every quarter" to "mask slowing demand" during the Class Period.  And, emails show that Plank "knew about efforts to move revenue between quarters[.]"  Ex. 5.

In sum, the newly discovered evidence, when considered collectively with Plaintiffs' other allegations, supports the cogent and compelling inference that Plank and Under Armour were not merely "negligent," but that their conduct crossed the line into "deliberately intentional misconduct or such severe recklessness" that "rises to the level of fraud."  *Under Armour II*, 2019 WL 3892319, at *11.  Because the newly discovered evidence would likely result in a denial of defendants' motion to dismiss, Plaintiffs' Rule 60(b) motion should be granted.  *Kurzweil*, 1997 WL 167043, at *9 (granting Rule 60(b)(2) motion in securities case because court probably would not have dismissed plaintiffs' complaint with the new evidence); *In re Aveo Pharm. Inc. Sec. Litig.*, No. 1:13-cv-11157, Electronic Order (D. Mass. Jan. 3, 2017), ECF No. 110 (granting Rule 60(b)(2) motion in securities case).

### D.     Alternatively, Relief Is Appropriate Under Rule 60(b)(6)

Rule 60(b)(6) is a "catchall provision which allows a court to grant relief for any reason." *Gray*, 1 F.3d at 266.  It has been described as a "grand reservoir of equitable power to do justice in a particular case."  *Id*.  Although Rule 60(b)(6) requires a showing of exceptional circumstances, the "Rule does not particularize the factors that justify relief" and "provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."  *Liljeberg*, 486 U.S. at 863-64.  The exceptional circumstances present in this case "cries out for the [Court's] exercise of that equitable power to do justice."  *Gray*, 1 F.3d at 266 (finding exceptional circumstances under Rule 60(b)(6) present).

First, the dismissal of the SAC with prejudice was not an adjudication of the merits based on *all* the facts in this case. *Square Const.*, 657 F.2d at 71 (Rule 60(b) requires courts to balance "competing policies favoring the finality of judgments and justice being done in view of all the facts"). Plaintiffs now know the following additional facts: (i) Plank will be stepping down from the position of CEO; (ii) Under Armour's accounting practices are the subject of ongoing criminal and civil investigations; (iii) the Company has been cooperating with investigators since *July 2017* and has provided both documents and witness testimony in response to requests for information; (iv) investigators are examining conduct and events that occurred during the Class Period, including whether the Company engaged in improper revenue recognition practices like shifting sales from quarter to quarter to appear healthier; (v) Under Armour concealed the existence of the government's investigations for over two years; (vi) the Company engaged in myriad improper sales practices that borrowed business from future quarters in order to meet aggressive sales targets, extend Under Armour's 26-quarter growth streak of 20% year-over-year growth, and mask slowing demand for the Company's core apparel products; (vii) emails show that Plank knew about the Company's efforts to move revenue between quarters; and (vii) federal investigators are examining emails that show Plank knew about the Company's efforts to move revenue between quarters.

These additional facts, when considered collectively with the SAC's allegations, cure the scienter pleading deficiencies identified in the Court's August 19, 2019 dismissal opinion. Relieving Plaintiffs from the Court's Judgment and allowing Plaintiffs to file a consolidated third amended complaint adding these new allegations is "appropriate to accomplish justice" in this case. *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009) (recognizing "federal policy in favor of resolving cases on their merits").

- 23 -

Second, relief is particularly appropriate in this case in light of the policy considerations underlying the federal securities laws, a "fundamental purpose" of which "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963); *Under Armour I*, 342 F. Supp. 3d at 678 (noting that the federal securities laws were designed to "protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security"). Defendants should not be permitted to benefit from their concealment strategy or hide behind the PSLRA's discovery stay, which kept the new evidence hidden until after the SAC was dismissed with prejudice. Rather, justice requires that Plaintiffs be allowed to file a third amended complaint, so that this case is fairly adjudicated based on ***all*** the relevant facts.

Finally, the related *Patel* Action currently pending before this Court also constitutes exceptional circumstances that justify reopening this case. *Werner*, 731 F.2d at 207 (reminding courts not to "specify or restrict the claim for relief to a particular itemized ground" under Rule 60(b)). As set forth in the attached Motion to Consolidate and Vacate Notice and Lead Plaintiff Deadline, the *Patel* Action involves an overlapping class period and virtually identical legal and factual issues. Relieving Plaintiffs from the Court's Judgment, consolidating the related *Patel* Action with this one, and allowing Plaintiffs to file a consolidated third amended complaint will result in substantial judicial economy, eliminate the risk of inconsistent or conflicting rulings, and "avoid the inconvenience, expense, and prejudice from having the parties litigate two identical class actions." *In re CenturyLink Sales Practices & Sec. Litig.*, 2018 WL 1902725, at *4 (D. Minn. Apr. 20, 2018).

Cases\4817-5864-2093.v1-11/18/19

### E.    Granting Leave to Amend Would Not Be Futile

Federal Rule of Civil Procedure 15(a)(2) "directs that leave to amend shall be freely given when justice so requires." *Matrix*, 576 F.3d at 193 (observing that a post-judgment motion to amend is evaluated under the same legal standard as a motion filed before judgment was entered). "This directive gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Id*. Leave to amend should be denied "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Id.* None of the factors that would justify denial of Plaintiffs' request for leave to amend are present here.

First, as set forth above in Section III.B., allowing Plaintiffs to file a third amended complaint would actually reduce any prejudice to defendants by eliminating the risk of inconsistent judgments and reducing the expense of defending multiple lawsuits. Second, there has been no bad faith or delay on the part of Plaintiffs in seeking leave to amend, as the new evidence supporting Plaintiffs' allegations was only made public in the last few weeks. Finally, although the Court previously concluded that amendment would be futile in light of Plaintiffs' failure to plead scienter, as demonstrated herein, the new evidence cures the pleading deficiencies identified in the Court's August 19, 2019 dismissal opinion. In light of the new evidence, leave to amend would not be futile. *Matrix*, 576 F.3d at 196 (amendment not futile where new allegations could "affect the analysis of whether plaintiffs can satisfy the heightened pleading requirements for scienter under the PSLRA").

## IV.    CONCLUSION

Given the exceptional circumstances present in this case, the policy of justice being done in view of all the relevant facts outweighs considerations of finality. Plaintiffs thus respectfully request

that the Court: (1) vacate the September 9, 2019 Judgment; (2) consolidate the related *Patel* Action

with this case; and (3) allow Plaintiffs to file a consolidated third amended complaint.

DATED:  November 18, 2019                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             MARK SOLOMON
                                             ROBERT R. HENSSLER JR.
                                             CHRISTOPHER R. KINNON


                                                    s/ Robert R. Henssler Jr.
                                             ─────────────────────────────
                                             ROBERT R. HENSSLER JR.

                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)
                                             marks@rgrdlaw.com
                                             bhenssler@rgrdlaw.com
                                             ckinnon@rgrdlaw.com

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             PAUL J. GELLER
                                             JACK REISE
                                             MARK J. DEARMAN
                                             120 East Palmetto Park Road, Suite 500
                                             Boca Raton, FL  33432
                                             Telephone:  561/750-3000
                                             561/750-3364 (fax)
                                             pgeller@rgrdlaw.com
                                             jreise@rgrdlaw.com
                                             mdearman@rgrdlaw.com

                                             *Lead Counsel for Plaintiff*

SILVERMAN THOMPSON SLUTKIN
  & WHITE LLC
Andrew C. White, Federal Bar No. 0821
awhite@mdattorney.com
William Sinclair, Federal Bar No. 28833
bsinclair@mdattorney.com
Pierce C. Murphy, Federal Bar No. 30030
pmurphy@mdattorney.com
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)

*Local Counsel*

- 27 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 18, 2019, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Robert R. Henssler Jr.
ROBERT R. HENSSLER JR.

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: bhenssler@rgrdlaw.com

# Mailing Information for a Case 1:17-cv-00388-RDB In re Under Armour Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Abelson**
  aabelson@zuckerman.com,dvermilye@zuckerman.com,creilly@zuckerman.com,cvandergriff@zuckerman.com

- **Stephen R Astley**
  sastley@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Austin P Brane**
  abrane@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Amanda F Davidoff**
  davidoffa@sullcrom.com,amanda-davidoff-7764@ecf.pacerpro.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com,9825585420@filings.docketbird.com,tseymore@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Eric Robert Delinsky**
  edelinsky@zuckerman.com

- **Adam Heider Farra**
  FarraA@gilbertlegal.com,efilings@cohenmilstein.com

- **Samuel P Groner**
  samuel.groner@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com

- **Scott R Haiber**
  scott.haiber@hoganlovells.com,james.tansey@hoganlovells.com

- **Robert R Henssler , Jr**
  bhenssler@rgrdlaw.com

- **Christopher R Kinnon**
  ckinnon@rgrdlaw.com

- **Thomas Joseph Minton**
  tminton@charmcitylegal.com

- **Pierce Christopher Murphy**
  pmurphy@mdattorney.com,dlawal@mdattorney.com,e_file@mdattorney.com,dfarmer@mdattorney.com

- **Charles J Piven**
  piven@browerpiven.com

- **Nicholas Ian Porritt**
  nporritt@zlk.com

- **Jack Reise**
  jreise@rgrdlaw.com,e_file_fl@rgrdlaw.com,mmueller@rgrdlaw.com

- **Steven Mark Salky**
  ssalky@zuckerman.com

- **Elizabeth A Shonson**
  eshonson@rgrdlaw.com

- **William Nelson Sinclair**
  bsinclair@mdattorney.com,rscaffidi@mdattorney.com,dlawal@mdattorney.com,e_file@mdattorney.com

- **Daniel Stephen Sommers**
  dsommers@cohenmilstein.com,efilings@cohenmilstein.com

- **Michael P Sternheim**
  michael.sternheim@friedfrank.com

- **Jon Myer Talotta**
  jon.talotta@hoganlovells.com,albert.hagovsky@hoganlovells.com

- **Steven J Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

- **Yelena Trepetin**
  trepetin@browerpiven.com

- **James D Wareham**
  James.Wareham@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com

- **G Stewart Webb , Jr**
  gswebb@venable.com,dmvermette@venable.com

- **Andrew C White**
  awhite@mdattorney.com,rscaffidi@mdattorney.com

- **Michael Jackman Wilson**
  MJWilson@Venable.com,BBLaFavors@Venable.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)