**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | JURY TRIAL DEMANDED |

**CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY OF THE ACTION .............................................................................2

III.  JURISDICTION AND VENUE .............................................................................9

IV.   PARTIES ..............................................................................................................10

V.    SUBSTANTIVE ALLEGATIONS ......................................................................13

    A.    Background of the Company ....................................................................13

    B.    Plank Drove Under Armour's Aggressive Growth Strategy ....................14

    C.    Under Armour's Brand Heat Began to Die, Demand Weakened, and
        Sales Declined..........................................................................................16

    D.    Under Armour Ramps Up Its Promotional Activity .................................18

    E.    Defendants Engaged in Suspect Sales Practices to Further Mask Slowing
        Demand and Maintain the Company's 20% Growth Streak.....................20

        1.    Defendants Pull-Forward Sales and Stuff Channels to Artificially
            Boost Revenues.............................................................................20

        2.    Defendants Induce Retailers to Take Unneeded Product with
            Promises to Buyback Merchandise and Through Discounts and
            Other Sweeteners .........................................................................24

    F.    Defendants' Declining Apparel Sales and Suspect Sales Practices Led to
        Excess Inventory and Liquidations..........................................................26

    G.    Defendants Relied on Footwear and International Sales to Obscure the
        Company's Sales and Margin Declines ....................................................29

    H.    Under Armour's Declining Demand and Unsustainable Business
        Practices Catch Up to Them but Defendants Mislead the Market as to
        the True Reasons Behind the Company's Problems.................................31

    I.    The Market Began to Learn the Truth About the Company's Sales
        Problems, Causing the Stock Price to Decline.........................................33

    J.    The SEC and DOJ Launched Investigations Into Under Armour's
        Accounting Practices and Related Disclosures, Plank Stepped Down as
        the Company's Chief Executive Officer, and the SEC Preliminarily
        Determined to File an Enforcement Action Against Defendants .............35

i

K.     Numerous Facts Support Defendants' Scienter ........................................38

       1.     Numerous Facts Support Plank's Scienter....................................38

            a.     Plank Had Direct Knowledge of, and Was Personally Implicated in, the Fraud ....................................................38

            b.     Plank's Public Statements and Access to the Company's Internal Systems and Data .................................................40

            c.     The SportScan Data Cited in the Morgan Stanley Report Mirrored the Company's Internal Sales Data ...................43

            d.     Plank's Participation in Company Meetings.....................47

            e.     Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value ...................49

       2.     The Scienter of Company Executives Is Imputed to Defendant Under Armour ...............................................................................56

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................................................60

     A.     2015 Investor Day.................................................................................62

     B.     Third Quarter 2015 Financial Results........................................................65

VII.     INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET ................................................71

     A.     Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour .......................................................................72

     B.     Misleadingly Positive Fourth Quarter 2015 and Fiscal Year 2015 Financial Results and Downplay of the Morgan Stanley Report..............75

     C.     Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy ..........................................................................83

     D.     Misleadingly Positive First Quarter 2016 Financial Results and Guidance Raise .....................................................................................84

     E.     Departures of the Company's Chief Merchandising Officer and Chief Digital Officer .......................................................................................91

     F.     Reduced Financial Guidance Tied to the Sports Authority Bankruptcy....93

Page

G.     Under Armour Bond Offering ................................................96

H.     Disappointing Second Quarter 2016 Financial Results: Partial Revelations of a Growth Slowdown ........................................97

I.      Goldman Sachs Global Retailing Conference ........................106

J.      Disappointing Third Quarter 2016 Financial Results: Further Revelations of a Growth Slowdown and Compressed Margins .............108

K.     Disappointing Fourth Quarter 2016 and Fiscal Year 2016 Financial Results: Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy................................................116

L.      The Fallout From the Fraud Continued, but Defendants Conceal the Full Truth From Investors ........................................125

M.    The Company Announces Plank's Resignation as CEO .........................136

N.     Federal Investigations Into the Company's Accounting Practices and Related Disclosures............................................137

VIII.    DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS ................................144

A.     Under Armour Failed to Disclose Its Improper Sales Practices .............145

        1.     The Financial Impact of Channel Stuffing on Under Armour's Quarterly Revenue ................................................148

        2.     The Impact of Channel Stuffing on Future Results ....................149

B.     Under Armour's Continued Growth Was Achieved by Improperly Recognizing Revenue on Contingent Sales and Understating Reserves for Customer Returns, Allowances, Markdowns, and Discounts ...........150

        1.     Improper Contingent Sales ........................................150

C.     Improper Reserves for Customer Returns, Allowances, Markdowns, and Discounts............................................154

D.     Under Armour Overstated Inventory ......................................157

IX.     POST-CLASS PERIOD REVELATIONS ........................................159

X.      LOSS CAUSATION AND ECONOMIC LOSS........................................164

A.     January 10, 2016 Revelations ................................................165

**Page**

B.      May 3, 2016 Revelations ........................................................165

C.      May 31, 2016 Revelations ......................................................166

D.      July 26, 2016 Revelations ......................................................166

E.      October 25, 2016 Revelations ................................................167

F.      January 31, 2017 Revelations .................................................167

G.      August 1, 2017 Revelations ...................................................167

H.      November 3, 2019 Revelations..............................................168

XI.     PRESUMPTION OF RELIANCE ...................................................170

XII.    NO SAFE HARBOR ........................................................................172

XIII.   CLASS ACTION ALLEGATIONS .................................................174

## I.    INTRODUCTION

1.      Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen"), Monroe County Employees' Retirement System ("Monroe"), and KBC Asset Management NV ("KBC") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.      Plaintiffs bring this federal class action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Under Armour, Inc. ("Under Armour" or "Company") between September 16, 2015, and November 1, 2019, inclusive ("Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants Under Armour and the Company's former Chief Executive Officer ("CEO") and Chairman of the Board Kevin A. Plank ("Plank") (collectively, "Defendants").

3.      Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel which included, without limitation: (a) review and analysis of public filings made by Under Armour and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Defendants and related non-parties; (e) interviews with factual sources, including individuals formerly employed by the Company and its retail partners; and (f) consultation with experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    SUMMARY OF THE ACTION

4.    Under Armour is one of the largest sports apparel companies in the world.  The Company sells branded athletic products, which it divides into three categories: apparel, footwear, and accessories.  By a wide margin, apparel is the Company's largest selling product, accounting for over two-thirds of net revenue in 2016.  During the Class Period, nearly two-thirds of the Company's sales were made through wholesale channels such as sporting goods chains (*e.g.*, Dick's Sporting Goods ("Dick's"), Foot Locker, Champs, Finish Line, and The Sports Authority ("Sports Authority" or "TSA")).  While Under Armour products are available worldwide, over three-quarters of its sales come from North America.  According to Plank, North American apparel is the Company's "largest and most profitable business by far."

5.    Under Armour faces steep competition in the athletic apparel industry.  The Company's chief rivals, Nike and Adidas, have dominated the sector for decades.  But the Company slowly gained market share since its formation in 1996, capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour surpassed Adidas to become the number two sportswear brand by revenue in the United States and seemed poised to challenge Nike's supremacy as the top brand.

6.    Defendants knew that growth was critical to keep pace with competitors and to perpetuate the market's perception of the Company as a leading premium sports brand.  For 26 consecutive quarters, spanning from the second quarter of 2010 ("2Q10") to the third quarter of 2016 ("3Q16"), Under Armour reported a compounded annual growth rate of 20% or more.  At every turn, Plank reminded investors of this feat, noting that it was shared by only one other company in the S&P 500, and assured the market that such growth would continue, and continue as a premium-priced brand.

7.      Indeed, at the start of the Class Period, during the Company's Investor Day on September 16, 2015 ("2015 Investor Day"), Defendants boasted that "demand for our brand has never been stronger" and led the market to believe that the Company's incredible growth streak would continue.

8.      In reality, however, the Company was experiencing a severe decline in its apparel business due to its "brand heat" (*i.e.*, customer demand) dying.  In other words, customer demand for core products that the Company had successfully sold for years had begun to wane.  As Defendants would later admit, the Company failed to compensate for this decline by offering new and fashionable products in line with the latest consumer trends, such as athletic leisure apparel (a.k.a. "lifestyle" or "athleisure").  As a result, the Company's apparel sales began to slow, causing it to lose market share to Nike and Adidas.

9.      Although this slowdown in demand was apparent to Defendants in 2015, Plank demanded that Under Armour maintain aggressive sales goals based on its historic 20% growth that were now unrealistic.  However, it was never acceptable within the Company to lower these unrealistic goals – even after the Company's second biggest account, Sports Authority, declared bankruptcy.

10.     Accordingly, the Company abandoned its fundamental sales philosophy of competing on brand strength over price, and resorted to lowering sales prices and offering promotions and liquidating excess inventory.  Defendants' steep discounting, however, contributed to a drop in the Company's average sales prices ("ASPs") at a time when competitors in the sports apparel industry, such as the Company's chief rival Nike, were steadily increasing their own ASPs.  Defendants also attempted to offset the decline of the Company's core apparel business by accelerating investments in lower margin footwear products and international

expansion, which provided a scapegoat for the Company's margin declines.  While these strategies helped to temporarily prop up revenue growth, they were alone insufficient to generate the sales necessary to continue the Company's growth streak of 20%.

11.     As a result, Defendants resorted to a slew of improper and/or concealed sales and accounting practices that violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations.  These practices were used repeatedly in 2015 and/or 2016, with multiple retailers such as the Company's largest customers, Dick's and Sports Authority, and included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, resulting in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) shipping new inventory intended for the Company's own factory stores to off-price seller T.J.X. Co.[1] so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at the Company's own stores; and (f) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy and collectability of the revenue was not probable. These suspect sales practices enabled the Company to increase quarterly revenue, mask slowing demand for Under Armour products, and extend the 26-quarter streak of 20% sales growth. However, these illicit tactics were unsustainable.  Although they helped Under Armour hit the

---

[1]     T.J.X. Co. is an American multinational off-price department store corporation that includes TJ Maxx, Marshalls, HomeGoods, Homesense, and Sierra in the United States.

number and close the gap, they were robbing from future quarters.  As one former Under Armour sales executive explained to *The Wall Street Journal* ("WSJ"), the "[p]roblem is once this starts it doesn't seem to stop.  We found ourselves pulling forward every quarter."[2]

12.     The strains on Under Armour's business were evident inside the Company, as were the Company's suspect sales practices.  Plank and other executives knew of the Company's fading brand heat, excess inventories, steep discounting, pull forwards, and other machinations employed to boost revenue and hit Plank's aggressive sales targets.  Indeed, the U.S. Department of Justice ("DOJ") and SEC are investigating Defendants' involvement in these practices, including emails that show Plank knew about efforts to move revenue between quarters.[3]

13.     However, to preserve the Company's carefully cultivated image as a fast-growing, premium sports brand and a legitimate challenger to Nike, Defendants concealed the Company's problems and improper accounting and sales practices during the Class Period.  Rather than explain to the market that brand heat for the Company's apparel was dying and that the Company was forced to employ improper accounting and sales tricks to maintain a façade of consistent growth, Defendants instead falsely claimed that Under Armour apparel sales were stronger than ever.  Plank trumpeted explosive growth and strong customer demand, while downplaying and concealing the Company's suspect sales practices, declining brand heat, ballooning inventory, liquidations, and gross margin compression.  And, despite these negative trends afflicting the Company's core business, Defendants doubled down on their fraud by repeatedly emphasizing the purportedly continuing premium brand strategy.

---

[2]   Ex. A, Khadeeja Safdar & Aruna Viswanatha, *Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter'*, WALL ST. J., Nov. 14, 2019, at 3.

[3]   *See id.* at 2; *see also* Ex. B, Aruna Viswanatha & Khadeeja Safdar, *Under Armour Is Subject of Federal Accounting Probes*, WALL ST. J., Nov. 3, 2019, at 1.

14.     As a result, Under Armour's common stock prices were artificially inflated throughout the Class Period.  In fact, analysts noted that Under Armour stock achieved an "unprecedented valuation" near the beginning of the Class Period.  Plank personally cashed in on this artificial inflation (and the "unprecedented valuation") by selling a substantial amount of his Company stock for total proceeds of $138.2 million during the Class Period.  As detailed below, these sales were suspicious in timing and amount.  Indeed, over just nine days in November 2015 and April 2016, Plank sold 36% and 42%, respectively, of the shares he had available to sell shortly after making material misstatements and omissions.  Since 2016, Plank has not sold a single share of his Company stock.  Defendants also leveraged their fraud by raising nearly $600 million from the sale of then-investment grade bonds ("Bonds") during the Class Period.

15.     The first cracks in Under Armour's veneer began to appear on January 10, 2016, when Morgan Stanley published a report relying on fact-based industry sales data that revealed declining ASPs, market share, and margins since spring 2015, before the start of the Class Period.[4] The sales data in the report was materially consistent with Under Armour's own internal sales data available to Defendants, through multiple sources.  In response to the Morgan Stanley Report, Under Armour's stock price declined sharply, which represented the beginning of a decline in Under Armour common stock prices as the truth began to emerge.  However, Defendants denied the report and reassured investors that the Company's financial results and prospects were as strong as ever and that the Company was and would continue to be a premium brand that would not compete on price.  The market credited the Company's claim with numerous analysts issuing

---

[4]     Ex. C, Morgan Stanley Research, *Under Armour Inc. Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW* (Jan. 10, 2016) ("Morgan Stanley Report").

reports stating that Under Armour was now pursuing its premium-priced strategy even more aggressively.

16.    Ultimately, the Company was no longer able to keep the charade going.  The Company's illicit and unsustainable sales practices were no longer able to prop up Under Armour's sales, and its purported growth streak came to a crashing halt in the fourth quarter of 2016.  Despite months of pushback from Defendants against the Morgan Stanley Report data and their assurances that Under Armour would continue to grow and that its brand was strong, the market continued to learn of Under Armour's true financial condition through a series of additional disclosures, including a dramatic slowdown in growth, compressed margins, excess inventory, and Company executive resignations that included two of the Company's Chief Financial Officers ("CFO"), Brad Dickerson ("Dickerson") and Lawrence P. Molloy ("Molloy") (who left after only 13 months on the job).  The market's reaction to these partial revelations caused precipitous drops in Under Armour's common stock prices and losses of millions of dollars by Under Armour's investors.

17.    Yet Plank – despite knowing of the Company's efforts to move revenue between quarters and the strains in Under Armour's business – continued to tell investors that that "our demand is still there," that Under Armour's revenue growth and "growth story" were "intact," that its "brand is truly stronger than it's ever been," and that the Company's problems were "due to the function of our extreme growth."   The Company's downward spiral continued thereafter, confirming the depth of the problems alleged herein.  Under Armour continued to report drastically reduced sales growth, lower margins, and excess inventory.  The Company also went through a massive restructuring in an attempt to restore the Company's brand heat, including an evolution from Under Armour's traditional performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."

18.     Defendants continued to conceal the full truth from investors, including the illicit sales practices they had used to buoy sales growth for more than a year and that the DOJ and SEC were investigating the Company's revenue-recognition, accounting and sales practices, Molloy's tenure, and its late 2016 results.

19.     On October 22, 2019, Under Armour announced suddenly that Plank was stepping down as CEO.  This came as a surprise because Plank had repeatedly told shareholders that "maintaining our founder-led approach" was so important that it required recapitalizing the Company, which he did by creating a new class of common shares that allowed him to stay in control of Under Armour.  Defendants again failed to reveal the true reason behind his departure. Less than two weeks later, on November 3, 2019, WSJ surprised the market further by revealing that the DOJ and SEC were conducting criminal and civil securities fraud investigations into whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results "appear healthier" than they actually were.[5]  This article forced the Company to issue a statement confirming the ongoing investigations and admitting that they had hidden them from investors for nearly three years: "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[6]

20.     Under Armour later disclosed that, as a result of the SEC's investigation, the Company, Plank, and Molloy's successor, CFO David E. Bergman ("Bergman"), each received a Wells Notice informing them that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the

---

[5]     Ex. B, at 1.

[6]     *Id.* at 2.

Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters." "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives." Notably, the Wells Notices concern the same time period in which Plank reaped profits of $138.2 million from his sales of Under Armour stock.

21.      Under Armour subsequently provided additional information about the Wells Notices, including that the Wells Notices informed Defendants that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."

## III.    JURISDICTION AND VENUE

22.      The Exchange Act claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

24.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Under Armour conducts substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

25.      In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United

States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

26.    Plaintiff Aberdeen was appointed to serve as Lead Plaintiff in this action by the Orders of this Court dated April 26, 2017 [ECF No. 13] and September 14, 2020 [ECF No. 150]. As shown in the certification filed with the Court on January 6, 2020 and attached hereto as Exhibit D, Aberdeen purchased or otherwise acquired 815,726 shares of Class A and Class C Under Armour common stock at artificially inflated prices during the Class Period.[7]

27.    As shown in the certification attached hereto as Exhibit E, Monroe purchased Class A Common Stock of Under Armour at artificially inflated prices during the Class Period.

28.    As shown in the certification attached hereto as Exhibit F, KBC's funds purchased Class A Common Stock of Under Armour at artificially inflated prices during the Class Period.

29.    Plaintiffs suffered economic losses when true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the prices of such common stock.

30.    Defendant Under Armour is a Maryland corporation with its principal place of business located at 1020 Hull Street, Baltimore, Maryland 21230.

---

[7]    The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common Stock outstanding and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

31.     Defendant Plank is the founder of Under Armour and served as CEO and Chairman of the Board throughout the Class Period, holding these positions from the Company's formation in 1996 through January 1, 2020, when he stepped down as CEO and transitioned to Executive Chairman and Brand Chief.  Plank spoke on Under Armour's behalf during conference calls, in press releases, and in the media.  Plank was also the Company's largest shareholder throughout the Class Period, beneficially owning just over 15% of all shares outstanding and controlling approximately 65% of the voting shares.  Plank went to great lengths to maintain control of the Company, as demonstrated by a massive recapitalization during the Class Period that solidified Plank's control.  Since its Initial Public Offering ("IPO") in 2005, the Company had two classes of stock, Class A and Class B.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded and carries ten votes per share.  As of October 28, 2015, Plank held 35,700,000 ten-vote Class B shares and 76,445 one-vote Class A shares, giving him 66.5% of the votes.

32.     In the years following the 2005 IPO, events such as the issuance of new Class A stock and employee stock compensation, among other things, diluted Plank's ownership share and put his voting control of the Company at risk.  A provision in Under Armour's charter provides that should Plank's ownership stake fall below 15%, Plank's ten-vote Class B shares would automatically convert to one-vote Class A shares and, thereby, divest Plank of his voting power, which would fall from 65% to below 15%.  As one analyst noted, "Given there have been two splits in the last three years, his ownership has already been diluted, which is why it is becoming dangerously close to the 15% threshold."  In 2015, to prevent that from happening, Plank caused the Company to adopt several amendments to its charter centered on ensuring that Plank would

not lose voting control.  Specifically, the Company resolved in July 2015 to issue a third class of common stock: Class C (NYSE: UA).  The new Class C stock would have zero votes.

33.     Plank publicly lobbied for the Class C issuance in a June 15, 2015, letter to shareholders.  Plank acknowledged that the Company's dual-class structure was designed to ensure he "retain control over significant decisions impacting Under Armour's future."  Plank warned that diluting his ownership stake "could ultimately undermine our current governance structure" and claimed that "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders."  Plank's letter further touted the purported benefit of giving him "flexibility of selling these non-voting shares . . . while maintaining our founder-led approach."  Importantly, the related amendments to the Company's charter included a provision limiting the amount of shares Plank could sell in any given year to 2.5 million shares, with potential rollover starting in 2017.

34.     On April 7, 2016, the Class C shares were issued as a 1:1 dividend to all holders of Class A and Class B shares.  The benefit to Plank was two-pronged.  First, the Company could use the zero-vote Class C shares for employee stock-based compensation and financing transactions, *e.g.*, acquisitions involving Company stock, without diluting Plank's voting power.  Second, as discussed further below, Plank could sell Class C shares without reducing his voting power – as he did just a few weeks after the Class C shares were issued.

35.     Although the Class C issuance demonstrated the lengths Plank would go to maintain control of the company he founded, it was not well received by all.  As a July 24, 2015, analyst report issued by Morningstar Equity Research ("Morningstar") noted, the "addition of a Class C stock . . . can hardly be an improvement for shareholders as a whole."  Likewise, contemporaneous media noted, "the move by Under Armour will no doubt stoke the ire of some

corporate governance experts and academics in the field.  Any time a single person has more voting power in a publicly traded company than her or his proportional ownership stake in that company, there will be potential conflict."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company

36.     Under Armour was founded in 1996 by Plank, a 23-year-old former University of Maryland football player, who engineered a t-shirt using a synthetic fabric, with moisture-wicking performance fibers that helped keep athletes cool and dry under hot conditions.  The Company specializes in highly technical, performance-oriented athletic apparel, such as ColdGear, HeatGear, and AllSeasonGear styles designed to enhance comfort and mobility and regulate body temperature in different types of weather.  Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

37.     Over the years, the Company's product lineup has expanded from a single shirt to myriad Under Armour branded athletic products in three categories: apparel, footwear, and accessories.  However, apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in fiscal year 2016 ("FY16").  While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016.  Thus, North American apparel sales are critical to the Company's success.  As Plank admitted on January 31, 2017: "North American apparel is still our largest and most profitable business by far. Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

38.     During the Class Period, nearly two-thirds of the Company's sales were wholesale sales to national and regional sporting goods chains (*e.g.*, Sports Authority, Dick's, Foot Locker, Champs), independent and specialty retailers, department store chains, institutional athletic departments, and sports leagues and teams.  Under Armour also owned and operated its own retail locations (called "Brand House" and "Factory House" stores)[8] and retail websites that exclusively sold Under Armour products, which are collectively referred to as the "direct-to-consumer" ("DTC") channel, accounting for 31% of the Company's sales in 2016.

39.     Under Armour has many competitors, including athletic brands such as Nike, Adidas, Reebok, lululemon, Columbia, New Balance, Brooks, and Puma.  However, the Company steadily gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.  As one analyst put it just prior to the Class Period, Under Armour's "brand . . . is sacrosanct."  By protecting that premium brand image, Under Armour had become, by fall 2014, the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on number one – Nike.

**B.     Plank Drove Under Armour's Aggressive Growth Strategy**

40.     Since Under Armour's inception in 1996, and even after it went public in 2005, Plank called the shots, always controlling a majority of stockholder votes and serving as CEO until January 1, 2020, and as Chairman of the Board throughout the Class Period.  Under this "founder-led" approach, which Plank went to great lengths to protect, Plank set the destination and the route.

---

[8]   Brand House stores showcase Under Armour's latest products.  Factory House stores, primarily located in outlet centers, sell excess or undesirable inventory at reduced prices.  At the end of 2016, Under Armour had 18 Brand House and 151 Factory House stores in North America.  By the end of 2019, Under Armour had added only 1 Brand House store (19 total) but had added 18 Factory House stores (169 total) in North America.

41.     Plank relished the Company's image as a scrappy, fast-rising upstart from Baltimore.  He implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.  In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

42.     For Plank and Under Armour, the overriding objective was growth.  Within Under Armour, instructions for determining growth forecasts were very simple: take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with maintaining Under Armour's 20% growth streak – which he played up on conference calls with analysts, repeatedly referring to Under Armour as a "growth company" – drove the Company's revenue-growth-at-all-costs strategy.  Employees knew that the Company's growth record was extremely important to Plank such that it was never acceptable to lower sales goals.

43.     Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Class Period.  For 26 consecutive quarters (over six years) spanning from 2Q10 to 3Q16, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year-over-year basis).  Plank never missed an opportunity to remind investors of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it *not because we are pushing or pressing, because it's the demand and the app from our consumer*.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And frankly, we have no expectation of that stopping anytime soon.

C.   **Under Armour's Brand Heat Began to Die, Demand Weakened, and Sales Declined**

44.   However, despite many years of successful growth, the Company's product styles had grown stale and its premium brand heat was dying by the start of the Class Period in September 2015.  "Brand heat" was an expression Plank and others at Under Armour used to refer to the demand generated by the Company's brand appeal to consumers.  When the Company failed to offer new and updated products in line with the latest consumer trends, its brand heat declined. One such trend involved athletic leisure apparel (a.k.a. "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Class Period.  Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores.  Many of the Company's competitors, particularly Nike and Adidas, adapted to this trend by expanding their product lines to include athletic leisure apparel. However, Under Armour failed to offer its own line of athletic leisure apparel until late 2016. Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts.  Although historically these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors, and were not as interested in buying them again.  This enabled competitors to capture critical sales volume and market share from Under Armour, and enhance their brand values at the expense of Under Armour.

45.   Declining demand for Under Armour apparel caused progressively worse financial problems at the Company.  This was particularly damaging because apparel sales provided the majority of the Company's sales (67% of net revenue in 2016) and were critical to meeting the Company's aggressive financial projections.  According to SportScan retail data, the Company's core apparel sales began slowing around spring of 2015, causing the Company to lose market share

to rivals like Nike and Adidas.[9]  Compounding these problems, the Company was experiencing a monumental downturn in its primary sales channel, North American wholesale.  Historically, the Company enjoyed strong and profitable sales through its North American wholesale accounts, including traditional sporting goods stores such as Dick's, Sports Authority, City Sports, Sport Chalet, Finish Line, Footlocker, and Champs.  By 2015, however, consumers had begun to eschew these stores in favor of online shopping and large discount chains (*e.g.*, Target, Wal-Mart).  This trend hurt sales of Under Armour's products because the Company sold relatively few products through these alternative channels.  Meanwhile, specialty stores such as Gap, Abercrombie, and lululemon began to offer their own athletic leisure apparel that competed with, and cut into the sales of, apparel sold at traditional sporting goods stores.

46.    This trend worsened over time and a number of the Company's traditional sporting goods customers were forced to declare bankruptcy and close their stores during the Class Period.  On October 5, 2015, City Sports filed for bankruptcy, and subsequently announced that it would liquidate and close all 26 of its stores.  And, on February 9, 2016, CNN reported that Under Armour's second-largest retail customer, Sports Authority, faced bankruptcy after missing a $20 million debt payment.  Sports Authority then filed for Chapter 11 bankruptcy protection on March 2, 2016, and on April 26, 2016, announced that it would liquidate rather than reorganize, shuttering 463 stores.  On April 18, 2016, Vestis Retail Group, the operator of Sport Chalet, Eastern Mountain Sports, and Bob's Stores, filed for bankruptcy, announcing a restructuring plan that would result in the closing of 56 stores, including all 47 Sport Chalet stores.  Losing these customers put

---

[9]    Ex. C, at 1, 4-6.  As discussed below, the SportScan retail data set forth in the Morgan Stanley Report was materially consistent with Under Armour's internal retail data, showing a slowdown in core apparel sales that began around spring of 2015, but Defendants nonetheless publicly downplayed and discredited this report and falsely reassured investors that the Company's sales growth was as strong as ever.

additional pressure on the Company's faltering apparel demand.  Several former Under Armour executives told WSJ, "The strains in Under Armour's business were evident inside the company in 2016."[10]  They further explained to WSJ that this "slowdown was occurring in more places than just [TSA]" and that the TSA bankruptcy "just amplified the issue."[11]

47.     Despite losing these customers – including Sports Authority – Under Armour maintained its now-unrealistic sales goals.  Internally, it was never acceptable to lower these goals even though everyone knew they were unrealistic without Sports Authority – a major account for Under Armour.  Attempting to cover up these sales declines and provide the illusion of financial health, Defendants' abandoned Under Armour's fundamental sales philosophy of competing on brand strength rather than price.  Instead, Defendants resorted to lowering sales prices, including offering heavy discounts and promotions, and engaging in a myriad of suspect sales practices.

### D.     Under Armour Ramps Up Its Promotional Activity

48.     Beginning in 2015, Under Armour lowered sales prices and ramped up its promotional activity.[12]  This resulted in rapidly decelerating average sales prices of the Company's apparel, causing decreased product margins.  This trend compared unfavorably with the sports apparel industry overall and particularly with the Company's chief rival Nike, which was experiencing steadily *increasing* average sales prices.[13]

49.     Under Armour heard all the time from buyers and sales representatives in 2015 and 2016 that the Company's brand heat was dying down.  One notable example of this trend involved Under Armour's "big logo hoodie" – a performance-oriented hooded fleece sweatshirt with a big

---

[10]   Ex. A, at 3.

[11]   *Id.* at 4.

[12]   *See* Ex. C, at 1, 4-5.

[13]   *See id.* at 4.

Under Armour logo on the chest.  This was a top seller and huge business volume driver for years and, thus, Under Armour consistently carried a large inventory in many different colors.  However, as brand heat was dying, sales for this product began to decline significantly.  As a result, the Company decided – for the first time ever – to run sales of the hoodie during Black Friday of 2015 (November 27, 2015).  The Company offered the hoodie for as much as 25% off at numerous stores, including Dick's, Sports Authority, and Macy's.

50.    The Company's sales declines opened the promotional floodgates.  After the hoodie was put on sale for the first time ever in November 2015, Under Armour began to run more and more promotions in 2015 and 2016.  For example, in addition to the big-logo hoodie, Under Armour began to sell other staples of its apparel lineup like polo shirts and training t-shirts for 25% off in 2015 and 2016.  Like the big-logo hoodie, these products historically drove large sales volume at premium prices and, unlike any prior time, had to be put on sale during the Class Period because of dying demand for the Company's brand.

51.    For a while, the heavy discounts, promotions, and lower sales prices, helped the Company continue to report revenue growth, meeting Plank's aggressive 20% growth projections. But, this manufactured, price-driven, low-quality growth caused lower product margins that damaged the Company's bottom line and eroded the Company's "premium" brand image.  These negative effects were observed by a former Merchandising Manager of the Company, Brock Andersen ("Andersen"), who stated that: "Under Armour's apparel products . . . suffered from reduced customer appeal and demand"; "the Company's ASPs were falling sharply in North America"; and the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing

- 19 -

Company discounts and promotions, and falling ASPs of the Company's products."[14]  Andersen further stated that Plank knew or recklessly disregarded these "true facts" and misled investors about them during the Class Period.[15]

      **E.**     **Defendants Engaged in Suspect Sales Practices to Further Mask Slowing Demand and Maintain the Company's 20% Growth Streak**

            **1.**     **Defendants Pull-Forward Sales and Stuff Channels to Artificially Boost Revenues**

      52.     In addition to the aggressive promotions and discounting described above, Defendants also employed a variety of improper sales and accounting practices to mask slowing demand, enable the Company to appear healthier, and maintain the façade of quarterly growth demanded by Plank.[16]  This false portrayal of growth was unsustainable, however, because the Company was robbing sales from future quarters to portray growth in the current one.

      53.     Defendants engaged in channel stuffing by pulling forward sales from future quarters into the current quarter to artificially boost revenue, enabling the Company to close the gap and hit aggressive sales goals, while feigning continued growth to the market.  As a former Under Armour sales executive told WSJ, "It was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap."[17]  As one former merchandising executive at Under Armour told WSJ, "It was all in the name of hitting the number, and it would happen out in the open."[18]  This scramble to pull in as

---

[14]   *Andersen v. Plank*, No. 1:18-cv-02239-TDC, Verified Shareholder Derivative Complaint, at 75-76 (D. Md. July 23, 2018), ECF No. 1 ("Andersen Complaint").

[15]   *See id.* at 74.

[16]   *See* Ex. A, at 3-5.

[17]   Ex. A, at 3.

[18]   *Id.* at 2.

- 20 -

many orders as possible began as early as the third quarter of 2015 ("3Q15"), and continued at least through the end of 2016, increasing after the TSA bankruptcy.

54.     In some cases, Under Armour backdated shipment dates and moved shipment dates up from the first month of the following quarter to the last month of the current quarter.  Indeed, a former logistics executive at Under Armour explained to WSJ that the Company's shipping plans in the final days of the quarter sometimes contradicted the dates on the boxes.[19]

55.     The practice of pulling forward sales occurred with retailers including Dick's, Under Armour's biggest customer in 2015 and 2016, totaling $400 million dollars of annual sales. The Company leaned on Dick's to boost its revenue.  Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[20] However, as further detailed in Section V.E.2, such sales were contingent on "handshake" deals that allowed Dick's the right to return products it could not sell.

56.     The former sales executive further explained to WSJ that the "[p]roblem is once this starts it doesn't seem to stop . . . .  We found ourselves pulling forward every quarter."[21]  The reason the Company repeatedly pulled sales forward was to sustain its growth record, including its 26-quarter streak of sales growth, which the Company's employees knew was important to Plank.[22] Plank directed the Company's sales organization to maintain the growth streak and frequently bragged about the streak on conference calls with analysts, including on the Company's 3Q16

---

[19] *See id.*

[20] *See id.* at 3.

[21] *Id.*

[22] *See id.* at 1.

- 21 -

earnings call.[23]  Plank played up the Company's growth streak as a sign of its success, repeatedly referring to Under Armour as a "growth company."

57.     Although the sales goals needed to maintain such growth were unrealistic as discussed above, it was never acceptable to lower them.  Indeed, desperate to keep the streak alive during the summer of 2016, despite the loss of TSA, Plank told the sales organization that they needed to hit 20% growth or "heads will roll."  Accordingly, Plank set the tone at the top, and created an atmosphere which emphasized growth as the foremost priority regardless of what it took to get there.  And, critically, as further detailed below in Section V.K.1.a, WSJ reported that ***federal investigators are examining emails that show Plank knew about efforts to move revenue between quarters***.[24]

58.     Indeed, the practice of pulling orders forward was well-known within the Company and discussed at weekly meetings attended by high-level executives.  The Company's demand planning team would send emails to employees passing down directives to pull orders forward after looking to see how far off they were from meeting financial goals.  The sales operation team was also instructed to pull forward orders from future quarters.  The employees were asked to look at the inventory on hand and determine what orders were available to ship so Under Armour could report more sales and revenue in the current quarter.  These requests increased over time, such that the employees were asked to pull more orders forward as 2016 progressed.  The Company tracked the pull-forward orders in massive spreadsheets containing detailed sales and inventory data, including inventory that Under Armour had available to ship and inventory held by Under Armour customers such as Sports Authority.  The spreadsheets were regularly updated and saved in a

---

[23]   *See id.* at 2-3.

[24]   *See id.* at 2.

shared public folder, and anyone who wanted access could review them and identify orders that had been adjusted and pulled forward from one quarter into an earlier quarter.

59.     To further help meet the Company's quarterly targets in 2016, Under Armour also stuffed as much inventory as possible into certain retailers to frontload the recognition of revenue, despite the consequences that followed.  For example, Under Armour began shipping new inventory intended for Factory House stores to T.J.X. Co. discount stores like T.J. Maxx.[25]  A former merchandise executive at the Company explained to WSJ that this practice allowed Under Armour to immediately book the products as revenue instead of having to wait for a customer to buy them at its own stores.[26]  Under Armour ensured its massive inventory shipments to T.J.X. Co. fell just short of triggering the 10% of sales threshold for disclosing the discount outlet as one of its top customers in Under Armour's securities filings.[27]  This would have surely indicated to the market that Under Armour had loss its premium brand status and its ASPs were falling.

60.     Defendants also continued to stuff Under Armour's products into Sports Authority and book revenue for those sales, despite knowing that Sports Authority was having significant issues,[28] might not be able to pay for the products, and the products could be returned *en masse*. As former Under Armour executives in sales, logistics, merchandising, and finance stated to WSJ, Under Armour continued shipping goods to TSA, and booking sales for those goods, even after it was clear that TSA was in trouble.[29]  Indeed, red flags relating to retailer accounts, including TSA, were apparent to the Company's wholesale team as early as 2015.  Yet, Under Armour kept

---

[25]   *See id.* at 4.

[26]   *See id.*

[27]   *See id.*

[28]   *See id.*

[29]   *See id.*

shipping inventory to TSA.  Unsurprisingly, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  The large amount of returns from TSA, Dick's, and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

61.      By stuffing customers with products, pulling forward sales, and shifting sales to discount retailers, Under Armour was able to mask declining sales and waning brand heat and inflate revenues to artificially continue Plank's growth streak.  However, many of these sales were achieved through discounting and premised on retailers' ability to return them.  They were, thus, contingent, illusory, and violated GAAP.

### 2. Defendants Induce Retailers to Take Unneeded Product with Promises to Buyback Merchandise and Through Discounts and Other Sweeteners

62.      To pull-ahead much needed sales to perpetuate the Company's "growth," the Company leaned on retailers such as Dick's to accept early shipments of the Company's products.[30]  To incentivize retailers to accept the shipments early, Defendants adjusted retailers' contract terms or offered them discounts.[31]  As former Under Armour executives explained to WSJ, "Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products" in order to convince retailers to take products before their requested shipping date.[32]

---

[30]   *See id* at 3.

[31]   *See id.*

[32]   *Id.*

63.     Defendants also used a buyback program to incentivize retailers to order certain merchandise, under which sales representatives guaranteed that Under Armour would buy back a certain amount of the merchandise that did not sell.  On the books, the Company's customers bought and owned the merchandise for three or four months, but after six months Under Armour was forced to buy back some of the unsold merchandise.  These buyback or "return to vendor" agreements were regular at Under Armour with its biggest customers and increased in late 2015 and 2016.  Because of low product sell-through, Under Armour wound up having to buy back a lot of product pursuant to these deals.

64.     Indeed, under these arrangements, Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  In early 2016, for example, VP of North America Sales, Brian Cummings ("Cummings"), convinced Dick's to order shoes that Dick's did not want.  Dick's predicted they would have to return 80% of the shoes, but Cummings agreed that Under Armour would take back any unsold product.  Dick's ended up returning 80% or more of the deal later in 2016.

65.     By the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.

- 25 -

66.     Accordingly, many of the Company's sales were illusory because Dick's and other customers accepted them on the condition that Under Armour would buy the products back if the customers could not sell them.  These buyback and contingent sales arrangements violated GAAP, as discussed further below in Section VIII.B.  Moreover, as discussed in the following section, these arrangements came back to haunt Under Armour, leading to excess inventory and liquidations.

**F.      Defendants' Declining Apparel Sales and Suspect Sales Practices Led to Excess Inventory and Liquidations**

67.     The diminishing demand for, and declining sales of, core Under Armour products resulted in excess inventory.  In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  This problem occurred at both the Company's own Brand House stores and at the stores of its retail customers.  Excess inventory was a constant problem throughout the Class Period at the Company's Brand House stores, including products from every category.

68.     At one point during the Class Period, for example, Under Armour's planning team bought a very large quantity of one of the Company's t-shirts, around 10,000 units, to be sold at Under Armour's top two Brand House stores, which were supposed to be the pinnacle of the Under Armour product experience.  However, only about 100 units of the t-shirt were actually sold, and the rest became excess inventory.  This excess inventory had to be sent to Under Armour's Factory House stores and other accounts to be liquidated at a discount.  This happened many times with different products throughout the Class Period, and was very common with men's apparel.

69.     Sometimes only about 30% of the inventory at the Company's Brand House stores was considered "productive," meaning only 30% was actually sold to consumers.  The remaining inventory was comprised of "presentation quantity" (inventory allowing the stores to present one

or two units of each size on display) or excess inventory that had to be transferred back to Under Armour's distribution houses.

70.     The distribution houses would send the excess inventory to the Company's Factory House stores (*i.e.*, outlet stores) or to liquidation channels like Marshalls and T.J. Maxx, where the products were sold at a discount.  The discount rates at the liquidation channels were the highest, providing the Company with very low product margins.  Sometimes Under Armour was simply trying to break even on products sent to the liquidation channels.  In addition to reducing margins (due to the discounted sales prices), distributions to the Factory House stores and liquidation channels resulted in higher expenses due to the extra shipping, processing, and labor costs required to transfer the excess inventory.

71.     Excess inventory was also a problem at the Company's retail customers such as Sports Authority and Dick's.  Facing dwindling sales and ballooning inventory, the Company's merchandising team would collaborate with the sales teams and give suggestions about promotions for the inventory that Under Armour needed to move.  Retailers would also make requests for promotions to rid themselves of the excess inventory, and the Company would then determine whether to allow such promotions.

72.     As with the inventory returned from Brand House stores, discussed above, the Company would attempt to sell the excess inventory returned from retail customers at discounted prices through liquidation channels such as discount stores like Marshalls and T.J. Maxx.  As a last resort, the Company would ship inventory to be liquidated at Costco stores in Mexico.  However, much of the excess inventory just sat around at the Company, not being sold through any channel, because the liquidation channels used by the Company were not enough to handle all of the excess.

73.     In addition, the Company's inventory problems were magnified by returns resulting from its contingent sales pursuant to buyback agreements, and its mass shipment of products in the final days of a quarter.  As detailed above, the Company was able to pull ahead sales by entering into contingent sales arrangements with certain retailers (including Dick's – its biggest customer).  While this gave Under Armour a temporary boost in sales, they were obligated to buy back unsold inventory.  And, since they had overstuffed these retailers with products they did not need and could not sell (particularly where Under Armour's brand heat had diminished), much of that product was being returned to the Company.  As a former logistics executive at Under Armour explained to WSJ, "truckloads" of unopened boxes thus returned unsold to Under Armour in 2016.[33]

74.     Indeed, following TSA's bankruptcy, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  In July 2016, Plank announced a deal with Kohl's Corp. ("Kohl's"), a mid-tier value retailer.  As former executives told WSJ, Kohl's provided hundreds of new locations to stock its goods, including those meant for TSA.[34]  However, Kohl's ran frequent promotions in competition with Dick's and often had lower prices.  This move angered Dick's, who had been holding unsold Under Armour goods.[35]  Dick's then stopped agreeing to take products early, which had enabled the Company's pull forward sales, and took less product from Under Armour, making the Company even more dependent on off-price chains.[36]

75.     The excess inventory was a frequent topic of discussion among sales and planning leaders at Under Armour, and information on inventory was widely available at the Company.  For

---

[33]   *Id.*

[34]   *See id.* at 4.

[35]   *See id.*

[36]   *See id.*

example, the Company's planning team met weekly to discuss excess inventory.  Executives Matt Mirchin (President, North America) ("Mirchin") and Cummings (VP of North American Sales) both had access to sales and inventory reports, and Kevin Eskridge (Senior VP of Global Merchandizing and Planning, subsequently Chief Product Officer) ("Eskridge") talked with Merchandising staff about inventory all the time.  Indeed, Plank and fellow executives admitted to the excess inventory in their public statements.  But, they misleadingly blamed the rising inventory on benign factors, including a strategic plan to improve the speed of shipments to customers, and reassured investors that the situation was improving.  In reality, the Company's dying brand heat reduced customer demand and caused sales declines, preventing it from unloading unwanted inventory.

76.     In order to shed the excess inventory, the Company needed to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  This problem occurred continually from at least September 2015 through November 2016 at both the Company's own Brand House stores and at the stores of its retail customers, across all Under Armour brands.  The sheer amount of excess inventory made it obvious internally that Under Armour would eventually miss its sales goals, and ultimately led to inventory write downs as discussed in Section VIII.D, below.

### G.      Defendants Relied on Footwear and International Sales to Obscure the Company's Sales and Margin Declines

77.     As a result of the Company's declining apparel sales, exacerbated by the collapse of its primary sales channel, Defendants perceived a threat to the Company's carefully cultivated market perception as a fast growing superstar of the sports brand business.  To compensate, Defendants sought to aggressively expand Under Armour's footwear and international sales businesses in 2015 through 2016.  This expansion, along with the lowering of apparel prices and

suspect sales practices discussed above, enabled the Company to continue reporting 20% total revenue growth (as well as strong operating income and earnings) into 2016 even as the Company's core North American apparel business was faltering.   However, as Defendants admitted, the footwear and international businesses provided much lower margins than the North American apparel business, and a much smaller percentage of revenue (shoes accounted for only 21% of revenue in 2016).  Moreover, the Company needed to make massive expenditures of time and money to undertake such expansion.

78.     An example of the difficulty of this expansion was the rollout of Under Armour's "Curry One" shoe worn by star NBA basketball player Stephen Curry in early 2015.   Under Armour heavily promoted this shoe.  However, the Company was essentially paying to have the shoe placed in stores because the associated expenses were so high and margins were so poor.  The Company's "Curry Two" shoe faced similar problems in the third and fourth quarter of 2015.[37] The shoes were badly underpriced in an apparent attempt to boost revenue and capture market share from Nike, at the risk of damaging Under Armour's brand image.[38]  Under Armour also slashed their prices on running shoes in an attempt to compete on price rather than brand image and innovation.[39]

79.     Defendants used the footwear and international businesses as scapegoats for the Company's declining gross margins.   At the same time, Defendants misleadingly claimed the Company's footwear and international margins and ASPs were improving and its *apparel* margins and ASPs remained strong.  These misleading statements allowed Defendants to conceal the fact

---

[37]   *See* Morgan Stanley Report at 8-9.

[38]   *Id.* at 9-10.

[39]   *Id.* at 11.

that margin compression was caused, not only by the growing footwear and international businesses, but also by declines in the Company's apparel business, driven by lower sales prices, rampant promotions and discounting, and excess inventory.  It was far more palatable for Defendants to blame margin compression on the Company's supposedly expanding footwear and international businesses than to reveal the truth about the declines in its core apparel segment, which accounted for most of the Company's sales.

> **H.  Under Armour's Declining Demand and Unsustainable Business Practices Catch Up to Them but Defendants Mislead the Market as to the True Reasons Behind the Company's Problems**

80.     As detailed above, the Company's suspect business practices, including pull-forward sales, channel stuffing, and buyback arrangements, temporarily helped the Company continue its growth streak.  However, as discussed further in Section VIII, these practices violated GAAP and also had significant adverse consequences for the Company's financial results.

81.     Indeed, during the time period that the Company was engaged in pulling sales forward (channel stuffing) and other machinations, the Company experienced explosive growth in its accounts receivables (which are sales made on credit to be paid back to the Company at a later date).  Before the third quarter of 2015, Under Armour's overall sales always eclipsed or grew evenly with its accounts receivables.  But, by the fourth quarter of 2015 ("4Q15"), accounts receivable growth badly outpaced revenue growth (55% accounts receivable growth vs. 31% revenue growth), a trend that continued throughout 2016.  Further, Under Armour's days sales outstanding ("DSO"), the number of days it took the Company to collect its receivables, nearly doubled from 28 days in fourth quarter of 2014 ("4Q14")  to nearly 51 days in first quarter of 2017 ("1Q17").  This shows that the Company was increasingly extending credit to customers and getting paid later and later – consistent with the early shipments and adjusted contract terms.

82.     Likewise, the Company's reserves for returns skyrocketed 55% by the end of 2016 and 68% in 2017, reaching a whopping $247 million.  Demonstrating that it expected large volumes of excess inventory to be returned, the Company drastically increased its reserves for returns, the amount of money Under Armour set aside for markdowns or returns, as discussed in Section VIII.C below.

83.     In addition, Defendants' softening demand, returns, and illicit sales practices led to an accumulation of material amounts of excess and obsolete (*i.e.*, impaired) inventory at the Company.  Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018 due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down inventory, which should have been recorded in 2016.

84.     The excess inventory also caused the Company to take costly measures to liquidate it at extreme discounts that hurt product margins and, in turn, the Company's gross margins.  Gross margins declined from 48.1% in fiscal year 2015 ("FY15"), to 46.5% in FY16, to 45.1% in fiscal year 2017 ("FY17").

85.     As further detailed in Section VII below, Defendants downplayed these negative financial trends, concealing the true reasons for them and attempting to explain them away. However, as the market would later learn, the Company's declining financial condition and inventory problems were the direct result of the Company's waning brand heat, declining demand, and the various suspect practices the Company had undertaken to artificially prop up sales.

### I.     The Market Began to Learn the Truth About the Company's Sales Problems, Causing the Stock Price to Decline

86.     The Company's declining sales problems, "fundamental shift" to competing on price rather than a premium product, and use of suspect sales practices to artificially boost revenue and mask slowing demand, were ultimately revealed in a series of partial disclosures that caused the Company's common stock prices to gradually decline, as detailed in Sections VII and X, below. The declines would have been swifter and steeper, but Defendants attempted to downplay and soften the news with continued misrepresentations and omissions throughout the Class Period.

87.     First, on January 10, 2016, Morgan Stanley issued a detailed report with point-of-sale data from Under Armour's retail customers illustrating declines in the Company's growth, average sales prices, and market share dating back to spring 2015.  This surprising news, which directly contradicted Defendants' carefully cultivated image of the Company, caused Under Armour common stock prices to fall.

88.     Following this report and the departure of the Company's CFO Dickerson in February 2016 – "which came as a surprise" to analysts, who noted that "this transition comes at an inopportune time in the company's history. . . . Losing a key leader at a time like this is a concern" – the Company's Chief Merchandising Officer ("CMO"), Henry Stafford ("Stafford"), suspiciously departed the Company in May 2016.  Stafford's departure coincided with the departure of another high-level executive, the Company's Chief Digital Officer ("CDO") Robin Thurston ("Thurston"), which was announced on the same day.  These abrupt and suspicious departures of these key executives caused common stock prices to decline again on May 4, 2016.

89.     On June 1, 2016, contrary to their prior assurances, Defendants revealed a reduced expectation of 2016 revenues and operating income and an impairment charge related to the Sports Authority bankruptcy, triggering additional common stock price declines.

90.     Over the next year, a series of increasingly poor quarterly financial results and reduced financial projections caused further declines in the Company's common stock prices after such news was released.  On July 26, 2016, Defendants reported second quarter of 2016 ("2Q16") decreases in operating and net income, announced a drop in apparel sales growth below 20% for the first time in more than seven years, and forecast the slowest quarterly growth in over six years. On October 25, 2016, Defendants revealed a further slowdown in growth in 3Q16, attributed to North American apparel and wholesale declines, and compressed margins attributed in part to higher discounts, promotions, and liquidations.   On January 31, 2017, Defendants revealed a slowdown in 2016 growth that was far more severe than previously reported and dramatically reduced financial projections, attributed to problems in the North American apparel business, as well as compressed margins and inventory growth.  On the same day, Defendants surprised investors by revealing the sudden and highly suspicious departure of Molloy.  On August 1, 2017, the Company cut FY17 guidance and announced a massive restructuring, in order to "evolve" the Company's business and restore "brand heat," including a shift from traditional performance-oriented products to more fashionable products.  The Company further announced that it expected $110 to $130 million in restructuring-related charges including "approximately $20 million of inventory related charges."

91.     Despite the drastic measures being implemented, the Company's financial performance never recovered.  Indeed, no longer able to rely on the suspect sales practices that had allowed the Company to report 20% revenue growth and mask slowing demand, Under Armour experienced a severe downtown in its business.  The Company reported total revenue growth of just 3.4% and 4.1% and apparel revenue growth of 1.8% and 5.4% in 2017 and 2018, respectively.   Yet, the Company's stock price remained artificially inflated based on the

concealment of Defendants' improper sales practices, including the pull-forward of sales to boost quarterly revenues and mask slowing demand.

      **J.**      **The SEC and DOJ Launched Investigations Into Under Armour's Accounting Practices and Related Disclosures, Plank Stepped Down as the Company's Chief Executive Officer, and the SEC Preliminarily Determined to File an Enforcement Action Against Defendants**

      92.    As news of the Company's true financial condition was slowly revealed, the DOJ and SEC launched non-public criminal and civil investigations into Defendants' sales and accounting practices, including whether they pulled sales forward during the Class Period in order to make the Company's quarterly revenue appear stronger than it actually was.  Although Defendants began responding to the investigators in July 2017, they concealed these investigations from shareholders for nearly three years.

      93.    While the government investigations were ongoing, the Company suddenly announced on October 22, 2019, that Plank was stepping down as the Company's CEO, effective January 1, 2020, and transitioning to Executive Chairman and Brand Chief.  Less than two weeks later, on November 3, 2019, WSJ revealed the SEC and DOJ investigations, reporting that the probes focused on Under Armour's "accounting practices" and "whether the sportswear maker shifted sales from quarter to quarter to appear healthier."[40]  The article forced the Company to issue a statement admitting that it was under investigation and "began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[41]  The Company's stock price suffered another steep decline in response to this news.

---

[40]  Ex. B, at 1.

[41]  *Id.* at 2.

94.    On November 14, 2019, WSJ released a follow-up article with more information related to the investigations.[42]   The article revealed that the government's criminal and civil securities fraud probes were "into the Company's revenue recognition and whether there were improper tactics used to shift sales," and that investigators were examining "Under Armour's results at the end of 2016 and the tenure of former finance chief Chip Molloy."[43]  The article was based on interviews with former Company executives in four different departments – logistics, sales, merchandising, and finance – who told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel," and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[44]

95.    Before the market opened on July 27, 2020, the Company filed an SEC Form 8-K announcing that, on July 22, 2020, the Company, Plank, and Bergman received Wells Notices from the SEC, which "informed the Company and the Executives [Plank and Bergman] that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws."  The Company explained that the Wells Notices related to the Company's previously-disclosed SEC investigation, and further specified that:

> The Wells Notices relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of "pull forward" sales in connection with revenue during those quarters.  A pull forward generally includes a customer sale that is executed earlier than originally planned.  Specifically, the SEC Staff

---

[42]   Ex. A, at 2.

[43]   *Id.*

[44]   *Id.* at 1.

is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives.[45]

96.     The Company's filing on July 27, 2020, added that "the Company and the Executives . . . expect to engage in a dialogue with the SEC Staff to work toward a resolution of this matter."

97.     On August 6, 2020, Under Armour further disclosed in its second quarter of 2020 ("2Q20") Form 10-Q filing that "[t]he Wells Notices informed the Company" the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act." The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices included," among other things, "civil monetary penalties, as well as, in the case of the Executives, a bar from serving as an officer or director of a public company." The Company also confirmed that the DOJ's separate investigation remained ongoing.

98.     As discussed further below (Sections VII and X), Under Armour investors lost millions of dollars as Defendants' fraud was revealed over time, causing the artificial inflation resulting from the fraud to dissipate from the Company's common stock.

---

[45]   The SEC describes the general Wells Notice process as follows: "If [SEC] Enforcement makes a preliminary determination to recommend enforcement action, it may elect to provide individuals or entities who would be charged in the action with a Wells notice explaining the proposed charges against them and informing them that they can make a voluntary submission setting forth their interests and position. If Enforcement believes (based on the evidence it has compiled and after considering a Wells submission or deciding not to issue a Wells notice) that enforcement action should be taken, Enforcement seeks authorization from the Commission for the SEC to file a civil lawsuit, to commence an administrative proceeding, or, in certain circumstances, to issue a report of investigation. Any enforcement action that the SEC initiates is based on Commission authorization." U.S. Securities and Exchange Commission, *Investor Bulletin: SEC Investigations* (Oct. 22, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_investigations.html.

### K. Numerous Facts Support Defendants' Scienter

99.    Defendants knew of, or at a minimum were severely reckless in disregarding, the problems facing the Company as a result of declines in the apparel business.  As discussed herein, numerous additional indicia of scienter support this, including the fact that federal investigators are examining emails that show Plank knew of the Company's efforts to move revenue between quarters,[46] the DOJ and SEC investigations, the Wells Notices, Plank's and other Company executives' statements admitting access to the relevant data, and Plank's highly suspicious Class Period sales of $138.2 million of Under Armour stock during the same period that is the subject of the SEC's Wells Notices to the Company and Plank.

#### 1.    Numerous Facts Support Plank's Scienter

##### a.    Plank Had Direct Knowledge of, and Was Personally Implicated in, the Fraud

100.    Plank had direct knowledge of the fraudulent conduct alleged herein.  As part of the ongoing DOJ and SEC investigations "into the company's revenue recognition and whether there were improper tactics used to shift sales" during the Class Period, WSJ reported that investigators "are examining *emails that show Under Armour's founder and chief executive, Kevin Plank, knew about efforts to move revenue between quarters*."[47]  Former Under Armour executives also told WSJ that "pulling sales forward helped the sportswear company sustain its growth record, which employees *knew was important to Mr. Plank*" and that "[t]he strains in Under Armour's business were evident inside the company in 2016."[48]  Indeed, Plank drove the

---

[46]    *See Id.* at 2.

[47]    *Id.*

[48]    *Id.* at 3.

Company's aggressive growth strategy, employing a founder-led approach. He set the tone by pressuring employees to achieve 20% growth every quarter.

101.    Plank's direct knowledge of the Company's suspect sales practices is further evidenced by the fact that Plank personally received one of the SEC's Wells Notices. The Wells Notice stated that a preliminary determination had been made to recommend that the SEC bring an enforcement action against him for federal securities law violations relating to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[49]

102.    The suspicious timing of Plank's resignation as CEO – announced on October 22, 2019, following a string of other executive departures as the truth leaked out – also supports his knowledge or reckless disregard of the fraud alleged herein. Just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success. On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of our business" because it "provides for clear accountability and efficient and effective leadership." The Company never explained the abrupt flip-flop.

103.    Less than two weeks after Under Armour announced Plank's resignation, the Company acknowledged that the DOJ and SEC were investigating its accounting and related disclosures. As Morningstar observed:

> The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company. . . .  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began. While Under Armour claims the investigation had nothing to do with Plank's decision, the timing

---

[49]    Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.

104.    Other media also noted the suspicious timing of Plank's departure as CEO.  For example, *Forbes* stated in a November 4, 2019, article that "[i]n light of the recent investigations, it now makes more sense why Plank stepped aside.  There most likely will be serious repercussions related to the dual investigations."

105.    The timing of these events, coupled with the Plank emails and other indicia discussed herein, strongly supports that Plank was directly involved in and responsible for the matters under investigation.

> **b.      Plank's Public Statements and Access to the Company's
>                Internal Systems and Data**

106.    Plank's scienter is further supported by numerous public statements in which Plank discussed the Company's apparel sales growth, sales prices, gross margins, and inventory levels. In fact, Plank provided a prepared statement on – or was asked and answered detailed questions about – at least one of those matters during nearly every (14/16) quarterly earnings call with securities analysts throughout the Class Period, as well as during the 2015 and 2018 Investor Day Meetings.  As detailed herein, Plank echoed these statements in numerous press releases and SEC filings of the Company throughout the Class Period.

107.    Plank and fellow Company executives also stated that they had systems in place to closely monitor such aspects of the Company's business.  For example, Plank boasted of an SAP (Systems Applications Products) software system that provided point-of-sale information and other detailed business data.  The Company enhanced this system during the Class Period.  As Plank stated during the 4Q15 earnings call on January 28, 2016:

> The single view of the consumer is something we're building with the team at SAP that combines ***global point-of-sale, e-commerce and transactional information*** through a single sign-on capability together with our Connected Fitness business to create an insight

engine that will inform and guide our decision to help grow and scale our brand. This will build on our existing SAP platform as we double down and continue to make big bets with big partners. We believe that this unique technological advancement will position UA as a best-in-class real-time digital enterprise.

108.    This statement by Plank confirms that, through "point-of-sale" information available on the Company's SAP system, Plank had actual knowledge of industry sales data from the Company's retailers. As discussed further below, because the SportScan data (a.k.a. SportScanInfo or SSI) revealed in the Morgan Stanley Report was based on the same point-of-sale industry data reported to Plank from the Company's retailers, Plank had actual knowledge of (or recklessly disregarded) the SportScan data revealed in the Morgan Stanley Report.[50] The sales data showed that, since spring of 2015, the Company's North American apparel growth was in decline, the Company was losing market share, and the Company's ASPs were dropping.[51] Everyone at Under Armour on the sales team had full visibility into sales data because they had very detailed and up-to-date data available to them through multiple sources, and the data was regularly reviewed. Multiple reports showing sales data were distributed every Monday. The sales reports were very detailed, including breakdowns by regions, retail store, and product styles. Sales management also had a "dashboard" on their computers or iPads to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business. Under Armour planning and sales employees also had access to inventory and sales-related data in massive and constantly-updated spreadsheets kept in a shared folder and available to anyone who wanted to access them (which also tracked pull-forward orders). Further, Plank repeatedly claimed he had extensive data concerning consumer demand, buying preferences, and product usage through Under Armour's Connected

---

[50]   *See* Ex. C.

[51]   *See id.* at 13.

Fitness platform.  As Plank boasted during the Class Period, "I can't think of any companies that would have that amount of data flow to understand their consumer better."  Thus, Plank had knowledge of (or recklessly disregarded) the financial declines first revealed by Morgan Stanley.

109.    Additional evidence of Plank's scienter is found in Plank's statement during the first quarter of 2016 ("1Q16") conference call on April 21, 2016, that "probably the thing that drives [North American distribution] for us more than anything else is just merchandising. . . . And now we've really gotten to a point where understanding that merchandising needs to be a core competency for us. . . .  And so we really – we identified it in 2014, and again this sounds, may sound a little pedestrian, but we identified it in 2014, we began building the [merchandising] team in 2015."  Through these merchandising efforts, Plank had firsthand knowledge of issues pertaining to the Company's apparel sales, including flagging demand for Under Armour apparel as customers shifted to different styles not provided by Under Armour (most notably, athletic leisure apparel).  In addition, Plank's statement indicated that the Company's formation of a merchandising team was in direct response to a recognized deficiency at the Company.

110.    Plank also paid close attention to the Company's inventory during the Class Period, and therefore Plank knew or recklessly disregarded that the Company had excess inventory caused by declining demand and sales.  As Dickerson stated at the Company's 2015 Investor Day (with Plank also in attendance):

> On the working capital front, ***the majority of our focus is going to be on inventory management and the efficiency of inventory management***.  Our ability to improve inventory is tied to our value chain initiatives which I'll break down to near term and longer term.
>
> First, on the near term – over the course of the rest of this year and through 2016, we are focused on delivering our products to our consumers more timely, specifically on key seasonal floor set dates.  This focus specifically in comparison to some prior years' challenges will result in elevated inventory growth rates over this time frame to flow product earlier.

- 42 -

Longer term beyond 2016, many initiatives are underway which should bring added efficiencies to how we manage our inventory. These initiatives are focused on how we plan and deliver our seasonal products.

111.    Also during the 2015 Investor Day, the Company's Chief Information Officer, Paul Fipps, referenced the availability of inventory data through multiple systems and investments designed to enhance the Company's inventory visibility even more:

> ***Today, we have inventory data in multiple retail, planning, transportation, and distribution systems***.  In the future, the ability to optimize our inventory, combined with the visibility of demand from any channel across the globe, in a single planning system is extremely powerful.  In fact, very few organizations have been able to achieve this goal.

112.    One system through which inventory data was available to Plank was the SAP system discussed by Plank in the statement quoted above.  The Company's SAP system served as an inventory control system and provided reports showing how much inventory was owned by stores in each of the Company's business segments (including retail, wholesale, outlets, and liquidation channels), and how much inventory was being sent to liquidation.  The SAP system provided inventory information for all Under Armour products sold to consumers.  Based on this data, Plank, who was intently focused on inventory, had actual knowledge of, or recklessly disregarded, the excess inventory problems that plagued the Company during the Class Period, resulting from the declining sales of apparel.

### c.    The SportScan Data Cited in the Morgan Stanley Report Mirrored the Company's Internal Sales Data

113.    Numerous facts establish that the SportScan data cited in the Morgan Stanley Report, revealing negative financial trends at Under Armour, was a materially accurate depiction of the Company's internal sales data, thus supporting Plank's knowledge or reckless disregard of such data.  Indeed, retail industry participants, including Under Armour, frequently use industry data compiled by SportScan.  For instance, in connection with a 2005 sale of $167 million in stock, Under Armour described SportScan as "a leading market research firm that provides weekly point-

- 43 -

of-sale data for the athletic and sporting goods industry" and disclosed that the Company's "[i]nformation regarding the market for compression style clothing is **derived from SportScanInfo**."

114.    Furthermore, Plank admitted on multiple occasions that industry data, and SportScan in particular, was reliable and consistent with internal Under Armour data.  Prior to and during the Class Period, Under Armour, and Plank in particular, made repeated statements regarding Under Armour's market share.  Those statements relied on industry data, including data tracked by SportScan, thus supporting Plank's knowledge or reckless disregard of such data.  For example, during the October 25, 2016, 3Q16 earnings call, Plank boasted that "[i]n the back-to-school window of July through September, [Under Armour's] overall footwear market share nearly doubled according to **industry data**."  The following day, on October 26, 2016, WSJ stated that this industry data came from SportScan: "During the back-to-school period, Under Armour . . . nearly doubled its share of the footwear market, amassing 8.2% of the market for the 13 weeks ended Oct. 1, up from 4.6% a year ago, **according to industry tracker SportScanInfo**."  Other examples include Plank's September 16, 2015, and October 22, 2015, statements praising the Company's "40% market share" in football cleats.  *See also* ¶200 ("we are taking share").

115.    Plank's knowledge or reckless disregard of the data reported by SportScan is further supported by the fact that SportScan captured Under Armour's largest sales channel, North American wholesale, which had the greatest impact on the Company's growth, and encompassed virtually all of Under Armour's core sales channels.  As Plank said in January 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."  According to SportScan, its sales data includes sales from 15,000 retail doors across 12 separate retail channels.

Further, when Dickerson addressed the Morgan Stanley Report during the Company's 4Q15 earnings call on January 28, 2016, he admitted that the report's SportScan data captured the Company's largest customers, citing Dick's as an example.  And, neither Dickerson, Plank, nor anyone else at the Company disputed the accuracy of the data reported by SportScan (which included data for all four quarters of 2015 and prior).  The only portions of Under Armour's business that the SportScan data did not directly capture were lower-priced and less profitable sales that were much less indicative of how Under Armour's overall business is performing.  This included, for example, Under Armour's physical retail locations, most of which were Factory House stores, a liquidation channel with low-margin sales.  This also included Under Armour's website, which analyst reports during the Class Period observed "has been increasingly us[ed] . . . as a clearance channel."

116.    Under Armour's financial disclosures corroborate the Morgan Stanley Report's revelations and confirm Plank's knowledge or reckless disregard of the data revealed.  For instance, Under Armour reported inventory growth outpaced sales in 3Q15 (36.0% year-over-year inventory increase vs. 28.4% year-over-year net revenue increase) and 4Q15 (45.9% year-over-year inventory increase vs. 30.8% year-over-year net revenue increase).  Under Armour's gross margins also declined in 3Q15 (from 49.6% to 48.8% year-over-year) and 4Q15 (from 49.9% to 48.0% year-over-year).  The extreme inventory increases and gross margins declines reported by Under Armour on January 28, 2016, for 4Q15, are consistent with the Morgan Stanley Report's disclosure on January 10, 2016, based on SportScan data, of decelerating sales growth, loss of market share, and declining ASPs.  When confronted, however, Defendants continued to mislead the market by falsely denying and downplaying these issues.  *See* Section VII.B.  In addition, with specific regard to the SportScan data disclosed in the Morgan Stanley Report, which included data

for 2015 and prior, Plank and the Company did not dispute the accuracy of the data for first quarter of 2015, second quarter of 2015, or 3Q15.

117.    Further evidence of Plank's knowledge or reckless disregard of the SportScan data is found in subsequent Morgan Stanley reports issued during the Class Period.  In a report dated April 10, 2016, Morgan Stanley continued to discuss the declining demand for Under Armour apparel, particularly in women's apparel, based primarily on SportScan data.  Morgan Stanley noted that Under Armour's SEC filings corroborate the SportScan data.  In particular, Under Armour's disclosures "show sales to its biggest customer . . . were -8% in 4Q15," which is consistent with the declining apparel demand revealed in the earlier Morgan Stanley Report. Morgan Stanley also noted that Dick's SEC filings "show a deceleration in UA sales growth" consistent with the negative trends shown by SportScan.  Indeed, Under Armour sales to Dick's corroborate the "fundamental shift" of competing on price rather than a premium brand image.  As demand for Under Armour declined and the Company changed course to increased promotions and lower ASPs to find revenue, Under Armour sales to Dick's declined steadily.  As a percentage of Under Armour's revenue, sales to Dick's fell from 14.4% in FY14, to 11.5% in FY15, to 10% in FY16, and dropped below 10% in FY17 and thereafter (per Under Armour's Form 10-K filings), declines that were partly attributable to the fact that Under Armour lost business from Dick's in FY16 after entering into an agreement with value retailer Kohl's, angering Dick's.  *See* Section V.F.  As discussed below, Under Armour and Dick's personnel, including Plank and Dick's CEO, met regularly and exchanged sales data.[52]

---

[52]    Nonetheless, Defendants falsely and misleadingly downplayed and discredited the Morgan Stanley Report and SportScan data cited therein.  *See* Section VII.B.

118.    In an October 27, 2016 report, Morgan Stanley continued to discuss falling ASPs at Under Armour and how competing on price rather than "brand image and innovation" evidenced the "fundamental shift" Morgan Stanley first revealed in January 2016.  Morgan Stanley noted that its ASP data was based not only on SportScan but also "on channel checks and conversations with retailers."   Based on extensive analysis from multiple sources, Morgan Stanley concluded the SportScan data was "directionally accurate."

119.    On February 14, 2017, Morgan Stanley issued another report lowering its price target for Under Armour Class A shares from $25 to $20.  As it had in prior reports, Morgan Stanley relied on SportScan data, among other inputs.  In support of its continued reliance on SportScan data, Morgan Stanley compared historical SportScan data on total apparel sales growth and ASPs (including data appearing in the Morgan Stanley Report issued on January 10, 2016) to Under Armour's actual results during that same period.  Morgan Stanley concluded: "SportScan data has accurately depicted directional UAA sales trends . . . and we continue to view it as the best source for understanding UAA's US business at a micro level."

### d.    Plank's Participation in Company Meetings

120.    Plank's scienter is further evidenced by his attendance and presentation at meetings where Company performance was discussed.  Plank presented at quarterly "town hall" meetings during the Class Period where Plank discussed the Company's performance.  During two "town hall" meetings held close together in August 2016 or October 2016, Plank discussed how the Company was having struggles.  During the first of those two meetings, Plank discussed having to lower the Company's projections.  During the second meeting, Plank tried to ease employees' fears and further explain the situation.

121.    Plank also regularly attended one-on-one meetings with the President of Dick's.  Monthly meetings with Dick's and Under Armour employees were also held.  The monthly

meetings typically took place in Pittsburgh, at the offices of Under Armour or Dick's.  Sales to Dick's, which was once Under Armour's largest customer, soured heading into the Class Period. During the meetings, as demand for Under Armour products declined, Dick's told Under Armour that sales of Under Armour products at Dick's had begun to downturn significantly.

122.    As further detailed above, by the end of summer 2016, sales for all categories were nowhere close to Under Armour's projections for Dick's, and Dick's was planning for Under Armour sales to be down by at least 25%.  Nonetheless, Under Armour's senior management pressured sales staff to force unwanted inventory on Under Armour's customers, including Dick's, to pump up sales.  This included telling customers that they could return products later, after Under Armour had booked the sales.  Under Armour made "handshake" or "backdoor" deals with Dick's where Dick's was willing to accept more products from Under Armour than Dick's thought they needed because Under Armour promised Dick's they could return any of the products Dick's did not sell.  Dick's generally wanted these side agreements documented in emails.  Dick's was allowed to return a seemingly unlimited amount of product to Under Armour during the Class Period, resulting in a massive amount of returns.  According to WSJ, former Under Armour executives in sales, finance, logistics, and merchandising stated that Dick's also accepted the Company's products early, thus helping Defendants boost revenue by pulling sales forward from future quarters.[53]  But, Dick's stopped taking products early after Under Armour struck a deal with value retailer Kohl's, who sold many of the same products as Dick's at lower prices, angering Dick's.[54]

---

[53]    *See* Ex. A, at 4.

[54]    *See id.*

123.    Similarly, red flags relating to retailer accounts, including TSA, were apparent to the Company's wholesale team as early as 2015.  Yet, Under Armour kept shipping TSA inventory. Unsurprisingly, TSA returned massive amount of products, some of which had to be charged off by Under Armour.  The large amount of returns from TSA, Dick's, and other Under Armour customers required significant amounts of time and expense processing the returns (Under Armour's large customers did not pay for shipping).  Returned inventory was often liquidated at lower prices and margins.

### e.    Plank's Motivation to Personally Capitalize on the Company's Artificially Inflated Stock Value

124.    For years, Plank had carefully cultivated a public perception of the Company as an up-and-coming, fast-growing challenger to Nike's position as the number one sportswear brand. Plank was highly motivated to maintain this public perception and, in turn, the Company's lofty, artificially inflated common stock prices.

125.    Plank stood to gain most from the Company's artificially inflated share prices.  He was the Company's largest shareholder throughout the Class Period, owning just over 15% of the Company's total Common Stock outstanding.  As of October 28, 2015, Plank beneficially owned 35,700,000 shares of Class B Common Stock (which were not publicly traded but convertible to Class A Common Stock) and 76,445 shares of Class A Common Stock.  With such a massive equity stake in the Company, Plank was highly motivated to keep the share prices artificially inflated.

126.    Plank profited handsomely from the artificial inflation by selling a massive number of Under Armour shares during the Class Period.  Specifically, over nine days in November 2015 and April 2016, Plank sold a total of 2,300,000 Under Armour shares for $138.2 million.  With all of Plank's shares coming from stock grants at no cost to him, that $138.2 million was 100% profit.

Significantly, Plank's Class Period sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company: "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives [Plank and Bergman] that would allege certain violations of the federal securities laws" related to "*the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016*, regarding the use of 'pull forward' sales in connection with revenue during those quarters."[55]

127.    Plank's Class Period stock sales were highly suspicious in several respects.  Just prior to the Class Period, Plank enacted a complicated and risky plan to protect his voting control and status as the unchallenged leader of Under Armour.  Events such as the Company issuing new shares of Class A Common Stock for executive compensation had diluted Plank's ownership share since the IPO.  Thus, Plank was concerned that such compensation, coupled with his own stock sales, would drop his ownership stake below 15%, causing him to lose voting control.  To maintain voting control, Plank could only sell 3,448,332 shares of Class A and Class B Common Stock. Because Plank made clear that giving up voting control was not an option and went to great lengths to prevent that from happening, those shares of Plank's needed to maintain his 15% ownership were effectively not available to sell.  To prevent further dilution and protect his control, Plank caused the Company to undertake an extraordinary recapitalization of the Company's balance sheet by issuing a new class of common stock – Class C Common Stock with zero votes.  Plank advocated for this third class of stock and the need for Plank to maintain control in a June 15, 2015, letter to shareholders.  Plank made clear that the recapitalization was intended to allow Plank to continue selling millions of dollars in Under Armour stock without losing control of the Company.

---

[55]   Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020).

While Plank told investors "maintaining our founder-led approach is in the best interests of Under Armour and all of its stockholders," the real beneficiary was Plank.

128.    Although Plank's $138.2 million in sales were purportedly made pursuant to a Rule 10b-5-1 trading plan ("Plan") providing for his sale of Class B Common Stock and, when issued, Class C Common Stock, this supposed Plan was suspiciously entered into on October 28, 2015, while Plank was already in possession of material, non-public information about the Company - this nullifies the purpose of the Plan.   Moreover, to the extent such a Plan exists, there is no indication that the dates, timing, and price of Class Period sales were pursuant to a written formula in the Plan that were not susceptible to change or influence, or that that trades were in accordance with the unamended Plan.   *See* 17 C.F.R. 240.10b5-1(c).   Thus, any asserted Plan is suspect because it was entered into as a cover for Plank's insider trading at a time he was actively engaged in deceiving investors.

129.    Specifically, in November 2015, Plank sold 1,250,000 shares of Class B Common Stock for proceeds of $99,968,961 million.   That sale amounted to roughly 36% of the shares Plank could sell without losing control of Under Armour.   In other words, in one week and while in possession of material negative information (in particular the Company's undisclosed "fundamental shift" of competing on price rather than brand strength and suspect sales practices), Plank sold 36% of the shares he had available to sell.

130.    On April 7, 2016, pursuant to Plank's recapitalization plan, the Company issued Class C Common Stock to all holders of Class A and Class B Common Stock.   As a result, Plank beneficially owned 135,020 shares of Class A Common Stock, 34,450,000 shares of Class B Common Stock, and 34,585,020 shares of Class C Common Stock.   With the issuance of the Class C shares, Plank could continue his Class Period selling spree without diluting his voting control.

He did just that. Plank liquidated a total of 1,050,000 of his newly-issued Class C shares, for $38,262,467 in proceeds, in a series of trades over four days on April 26-29, 2016. As with his November 2015 sales, these were 100% profit. Plank's April 2016 sales of 1,050,000 Class C shares liquidated a remarkable 42% of the shares he could sell during the entire year without ceding control of the Company.[56] And, like the November 2015 sales, the April 2016 sales were made without disclosing the material negative information in Plank's possession. In particular, at this time, the Company was engaged in the "fundamental shift" away from its oft-stated bedrock principle of not competing on price and was engaged in suspect sales practices including pulling sales forward in order to mask slowing demand and maintain the appearance of growth. And, Plank was aware of the Company's repeated efforts to move revenue between quarters, including by pulling sales forward.[57]

131.    Importantly, had Plank not recapitalized Under Armour's balance sheet, he would have had to convert and sell additional Class B shares (which carried ten votes) in order to achieve the same amount of total Class Period proceeds ($138.2 million), thereby reducing his ownership of the Company's voting shares. The recapitalization allowed Plank to avoid this by selling Class C shares (which carried no votes) instead of Class B shares. Had Plank sold 1,050,000 Class B shares in April 2016 (instead of the 1,050,000 Class C shares he actually sold), his total Class Period sales (2,300,000 shares) would have represented a much larger portion – approximately

---

[56]   Pursuant to a charter amendment made in connection with the creation of the Class C Common Stock, Plank was limited to selling 2,500,000 shares in any given year or his voting control would unwind. Although the provision allowed for potential rollover of shares if Plank sold less than 2,500,000 shares in a year, thus increasing his annual limit, that did not apply to 2016 because it was the first year the provision was in effect.

[57]   *See id.* at 2.

67% – of the shares Plank had available to sell from September 16, 2015, through January 30, 2017, without losing voting control of the Company (3,448,332 shares).

132.    Plank's $138.2 million Class Period trades were out of line with Plank's subsequent trading.  Indeed, as the truth concealed by Defendants' fraud began to be revealed and Under Armour's stock price was punished accordingly, Plank stopped selling.  Plank has not sold a single share of Under Armour stock since 2016.

133.    Plank's Class Period stock sales were also out of line with typical sales by public company executives.  For example, a 2010 study found that "the typical CEO sells only about 1.9% of her equity incentives each year."[58]  In contrast, Plank's November 2015 sales of 36% of the total shares he was able to sell without losing control of the Company were about 18 times the average annual sales of CEOs at large public companies.  Plank's April 2016 sales of 42% of shares available to sell are even more out of line with a typical CEO's behavior.

134.    Plank's Class Period trading was also suspicious in timing.  On September 16, 2015, October 22, 2015, and November 4, 2015, Plank made a series of misstatements and omissions that artificially inflated, or maintained the artificial inflation of, the Company's stock price.  From November 17-23, 2015, Plank took advantage of this artificial inflation by selling approximately $100 million of Under Armour stock.  Plank's November 2015 sales were made near all-time highs for Under Armour stock.  Less than two months after Plank reaped $100 million in illicit trading proceeds, the Morgan Stanley Report revealed that the Company was experiencing a core business decline, losing market share, falling ASPs, and contracting key margins, and the Company was (and had been) engaged in a fundamental shift in strategy.[59]  The Morgan Stanley

---

[58]   John E. Core & Wayne R. Guay, *Is CEO Pay Too High and Are Incentives Too Low?  A Wealth-Based Contracting Framework*,  24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).

[59]   Ex. C.

Report also observed that the Company's shares had reached an "unprecedented valuation," trading at a price 78 times greater than the Company's earnings per share ("EPS") in FY15.[60] Moreover, unbeknownst to Under Armour investors, Defendants were using undisclosed, suspect sales practices to mask slowing demand and make the Company appear healthier, including moving revenue between quarters by, among other things, pulling sales forward.

135.    Plank's sales in April 2016 were likewise suspicious in timing.  On March 2, 2016, one of Under Armour's biggest customers, Sports Authority, announced it was filing for bankruptcy.  On April 16, 2016, Sport Chalet, another of Under Armour's wholesale customers, announced it was going out of business.  Despite those announcements, on April 21, 2016, Plank raised 2016 guidance and made a series of other false and misleading statements and omissions regarding the Company's purportedly strong financial condition, as alleged herein, causing Under Armour's stock prices to continue trading at artificially inflated prices.  A few days later, on April 26, 2016, Sports Authority declared that rather than restructure and continue to operate in some capacity, as it had previously planned to do, it would liquidate.  That very same day, Plank sold 225,000 shares for nearly $10 million in profit.  In total, between April 26, 2016, and April 29, 2016, Plank unloaded 908,570 shares for $38.2 million in profit, taking advantage of the recapitalization plan discussed above.  At that time, Plank knew that the Company was engaged in suspect sales practices when at the same time the Company was losing one of its biggest customers and facing waning demand.[61]

---

[60]   *Id.* at 3.

[61]   In April 2020, Plank belatedly disclosed additional Class Period sales from 2016 that were also suspicious in timing:  these sales occurred during the same period identified in the SEC's Wells Notices to Plank and the Company and while Plank possessed material negative information, including that the Company was engaged in the "fundamental shift" away from its oft-stated bedrock principle of not competing on price and was engaged in suspect sales practices like pulling sales forward to mask slowing demand and maintain the appearance of growth.  Although Plank's

136.    Under Armour's shares began to slide soon after Plank's April 2016 stock sales, as the truth continued to leak out in a series of disclosures from May 3, 2016, through November 3, 2019.

137.    The financial press took note of Plank's "amazing" timing.  A February 7, 2017, article on *TheStreet.com* titled, "Under Armour Founder Kevin Plank Has Been Amazing at Predicting Recent Stock Crashes," noted "it shouldn't come as a shock that Plank's recent stock trades were a good indicator on the company's surprising new challenges, and Wall Street's subsequent brutal response."  Regarding Plank's April 2016 sales, the article stated "[t]he sales were well-timed."

138.    Plank was also motivated to misrepresent and conceal the Company's true financial condition in order to conduct the Bond offering for nearly $600 million in proceeds on June 8, 2016.   On June 6, 2016, Under Armour filed a registration statement on Form S-3ASR ("Registration Statement") with the SEC regarding the Bond offering.  The Company also filed Forms 424B5 and FWP with the SEC on June 8, 2016 (with Registration Statement, "Offering Materials").  Pursuant to the Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million ("Offering").

139.    The Company, and in turn Plank, immediately benefited from the Offering, receiving $593.6 million in total net proceeds.  The Offering terms would have been far less favorable to the Company had the market known the truth about the Company's ailing financial condition.  As the truth concealed by Defendants' Class Period misstatements and omissions was

---

November 2015 and April 2016 trades were purportedly made pursuant to a Rule 10b5-1 trading plan, these belatedly-disclosed 2016 trades were not.

revealed through a series of partial disclosures, the Bonds were downgraded to junk status on February 1, 2017.  Had the Bonds been issued a junk status rating at the time of their issuance, the Offering would have made less financial sense and been less advantageous to Under Armour, particularly because Defendants intended to use the Bond proceeds to repay outstanding debt under its revolving credit facility.  Furthermore, Under Armour reported negative free cash flow in 2015 and 2016.  In fact, the Company's reported negative cash flow from operations of -$44 million in FY15 was its first negative operating cash flow year since FY07 and down from $219 million in FY14.  Under Armour's cash position provided an acute need for the Bond proceeds.  These facts were well known to Plank, serving as additional motive to misrepresent and conceal the Company's true financial condition and suspect sales practices to keep the Bonds above junk status.

### 2.     The Scienter of Company Executives Is Imputed to Defendant Under Armour

140.   Plank's scienter is imputed to Under Armour.   In addition, numerous facts demonstrate that other members of the Company's senior management knew or recklessly disregarded the adverse facts concealed by the Class Period misrepresentations.  The scienter of these Under Armour executives, like that of Plank, is imputed to Under Armour.  Because Plank and other members of Under Armour's senior management had the requisite scienter, Under Armour had the requisite scienter.

141.   In addition to Plank, the extensive information and reporting systems discussed above (¶¶107-108, 111-112) were available to other Company executives.  Everyone at Under Armour on the sales team had full visibility into detailed and regularly updated sales data.  Declining demand, excess inventory, and margin compression were widely discussed throughout Under Armour.  According to former Under Armour executives, as reported by WSJ:  "The strains

in Under Armour's business were evident inside the company in 2016."[62]  And, Under Armour employees in sales and planning relied on massive and constantly-updated spreadsheets with detailed sales and inventory data to track the Company's undisclosed practices of pulling forward sales and determine what inventory to get rid of.

142.    Two of the Company's most senior executives, former CFOs Dickerson and Molloy, made numerous public statements in which they discussed the Company's apparel sales growth, sales prices, inventory levels, and gross margins, evidencing their personal knowledge of such matters.  This included prepared statements on, and detailed answers about, at least one of those matters during every quarterly earnings call with securities analysts during their respective tenures in the Class Period.  During the Company's 2015 Investor Day, for example, Dickerson specifically acknowledged his and the Company's close monitoring of inventory, stating that "the majority of our focus is going to be on inventory management and the efficiency of inventory management."  Dickerson and Molloy also echoed these statements in numerous press releases and SEC filings of the Company during the Class Period.  Along with Plank, Dickerson signed and certified the Company's false and misleading Form 10-Q issued on November 4, 2015, and Molloy signed and certified the Company's false and misleading Form 10-K issued on February 22, 2016, and Forms 10-Q issued on April 29, 2016, August 3, 2016, and November 2, 2016. Dickerson's knowledge of the SportScan data reported by Morgan Stanley is further supported by the fact that he discussed and responded to the Morgan Stanley Report at length during the Company's 4Q15 earnings call on January 28, 2016, as detailed in ¶183.  While he (along with Plank) tried to downplay and discredit the report and reassure the market of the Company's financial strength as to each of the business segments addressed in the report, these statements

---

[62]   Ex. A, at 3.

were simply motivated to keep the Company's stock price afloat, and ultimately proved false and misleading later in the Class Period, when Defendants revealed the same problems reported by Morgan Stanley.

143.    Moreover, in just over a one-year period, as Defendants' fraud was gradually revealed to the market, Dickerson and Molloy both departed the Company.  Molloy's abrupt departure came only 13 months after he had joined the Company, replacing Dickerson.  And, according to WSJ, investigators are examining "the tenure of former finance chief Chip Molloy."[63] These sudden, suspicious departures, under highly questionable circumstances, provide strong additional support that Dickerson and Molloy knew of the fraud detailed herein.

144.    Molloy's replacement as CFO, Bergman, also knew of the fraud detailed herein. Along with Plank, Bergman personally received a Wells Notice from the SEC informing him that SEC Staff made a preliminary determination to recommend that the SEC file an enforcement action against him alleging violations of the federal securities laws.  During the Class Period, Bergman signed and certified the Company's Forms 10-Q issued on May 9, 2017, August 8, 2017, and November 9, 2017; May 10, 2018, August 3, 2018, and November 5, 2018; and May 9, 2019, and August 1, 2019; and the Company's Forms 10-K issued on February 23, 2017, February 28, 2018, and February 25, 2019.

145.    Kip Fulks ("Fulks"), the Company's co-founder and CPO during the Class Period, and Plank's "right-hand man," attended the Company's monthly sales meetings with Dick's. Cummings, Senior VP Regional Sales, also attended these meetings.  As noted, the declining demand for Under Armour products at Dick's was discussed at these meetings, and Dick's provided Under Armour with detailed sales reports.  Cummings pressured the Under Armour sales

---

[63]    Ex. A, at 2.

team to do whatever they could to get the sales, and the sales team was encouraged to get customers to place orders by telling them that the orders could be cancelled or returned later.  For example, Cummings orchestrated a deal with Dick's in early 2016 wherein Cummings convinced Dick's to order shoes that Dick's did not want (Dick's predicted they would have to return 80% of the shoes).  But, Cummings agreed that Under Armour would take back any unsold product.  Dick's ended up returning 80% or more of the deal later in 2016.

146.    Fulks and Cummings also received internal sales reports every Monday.  The sales team also prepared summaries of the sales data for upper management.  In addition, sales management had a "dashboard" on their computers or tablets to access Internet-based data where they could review information such as sales, margins, and inventory turns (including the inventory age by style) for the top lines of business.  For example, sales reports in 2016 indicated that the sell-through for Under Armour's athleisure products was only around 1% to 2%, when it should have been closer to 10% to 15%.

147.    The Company's extensive inventory reporting systems, including information about excess inventory, was widely available.  Indeed, the Company's inventory problems, including excess inventory across all brands, were topics of frequent discussion.  For example, Mirchin, President North America and later Strategic Advisor Global Revenue, Rob Goodwin ("Goodwin"), VP of North American Merchandising, Bill Healy, Director Hunt/Fish & Tactical Sales, Eskridge, Senior VP Global Merchandising and later President Sports Performance, and Cummings discussed excess inventory.  Goodwin noted that Under Armour had the most excess inventory he had ever seen at a company.  The amount of excess inventory grew so large that Under Armour's liquidation channels became flooded and, for some of the inventory, there was nowhere to go.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

148.     Throughout the Class Period, Defendants misrepresented the demand for the Company's products, sales, and pricing while downplaying issues related to margins, inventory, and retailer bankruptcies.  Defendants' misstatements and omissions failed to provide a full picture of the true circumstances at Under Armour.  In reality, the Company's primary product category, apparel, suffered from reduced customer appeal and demand, which hurt the Company's revenue and operating income growth, created excess inventory, caused Defendants to make a fundamental strategic shift to competing on price rather than premium strength (*i.e.*, dropping sales prices), and compressed the Company's margins.  Defendants concealed these problems and employed several fraudulent sales and accounting practices, in violation of GAAP,[64] to inflate Under Armour's quarterly financial results and growth in order to appear healthier and to mask slowing demand. These practices included: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy and the goods would be returned; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could

---

[64]   Defendants' GAAP violations and materially false and misleading financial statements during the Class Period are detailed in Section VIII, below.

immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman alleging violations of the federal securities laws by pulling forward sales during the Class Period.

149.    When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about the Company and its products that would have made such statements not misleading. Specifically, they were under a duty to disclose the Company's slower revenue and operating income growth, lower ASPs, increased discounting and promotions, elevated inventory, and compressed margins attributable to the Company's apparel issues and fundamental shift in strategy (competing on price rather than brand strength) during the Class Period, and their manipulation of quarterly results, including by pulling future sales forward in order to appear healthier and to mask slowing demand. This information was material because it would have altered the total mix of information made available to reasonable investors. However, Defendants failed to reveal this information, and instead they omitted and concealed it from investors. In addition, many of Defendants' statements about sales, demand, market share, pricing, inventory, and margins were explicitly and materially false and misleading in and of themselves. Defendants' material omissions and false and misleading statements are detailed in this section.

150.    Defendant Under Armour is liable for the material misstatements and omissions of its employees alleged herein. Likewise, as CEO, Chairman, and controlling stockholder during

the Class Period, Plank is liable for the material misstatements and omissions of Under Armour employees alleged herein.

### A.     2015 Investor Day

151.    The Class Period begins on September 16, 2015.  On that day, the Company held its 2015 Investor Day.  Plank and other members of Under Armour's senior management gave presentations on behalf of the Company.

152.    Throughout the meeting, Plank and other senior executives repeatedly made false and misleading statements that the Company was experiencing increased demand and sales growth in key categories.  In particular, Defendants failed to disclose that they inflated the Company's financial results and growth to appear healthier and to mask slowing demand for Under Armour by (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  As noted above, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015, which is the same quarter the Investor Day statements were made.

153.    Plank stated that "[t]he demand for our brand has never been stronger" and represented that the "drivers" of sales growth were the same as they had been "over the past 10 years."  CMO Stafford told investors that Under Armour's "men's business is stronger than ever." With respect to women's products, in particular, VP of the Women's Division, Kelly Cortina, added, "[d]emand for our product is growing."  And Peter Ruppe, Senior VP Footwear, stated that the Company had "raised margins" in the footwear division.

154.    Dickerson added that "[a]pparel, our largest category, continues to grow over 20%."  Stafford told investors that the Company was "increasing our ASPs" in men's apparel. Defendants failed to disclose that the Company's apparel business – its largest and most important business – was compressing margins as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

155.    Another Company representative, Susie McCabe, Under Armour's Senior VP of Global Retail, made clear that Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

156.    With regard to wholesale sales, which accounted for 65% of Under Armour's sales in 2016, Mirchin, President North America, misleadingly stated that "[Under Armour's] relationship and our partnership with Dick's has never been stronger and our business continues to grow."  Mirchin stated that the Company had "incredible growth at wholesale."

157.    Analysts reacted positively to Defendants' statements made at Under Armour's 2015 Investor Day.  For example:

(a)    in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating and stated, "UA continues to be our *#1* pick for long-term growth investors."  In support of the positive outlook, the report noted the "company has been patient and methodical in managing the growth of the brand by only entering the proper channels";

(b)    on September 16, 2015, KeyBanc Capital Markets issued a report stating "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and investments should continue to support >20% top-line growth over the next few years. We think UA's impressive growth demonstrates the power of strong brands";

(c)      on September 17, 2015, Cowen and Company issued a report raising its estimates and increasing its price target to $120 from $112, stating, "[m]anagement's revenue targets could ultimately be conservative given the acceleration in investments"; and

(d)      on September 17, 2015, BB&T Capital Markets issued a report raising its price target to $115 and commenting, "we came away from UA's Investor Day enthusiastic about the brand's trajectory."

158.    The Company's Class A Common Stock increased from a closing price of $49.34 per share[65] on September 15, 2015, to $51.68 per share on September 16, 2015, and $52.05 per share on September 17, 2015 (the stock's all-time high closing price).

159.    Defendants' misstatements and omissions on September 16, 2015, as set forth in ¶¶151-156 above, were materially false and misleading and omitted material facts for the following reasons:

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)      Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

---

[65]  The prices of Class A Common Stock on or before April 7, 2016, referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

(c)     the sales growth and demand trumpeted by Defendants were overstated by their undisclosed quarterly practice of shifting sales from quarter to quarter to appear healthier and to mask slowing demand, including by pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

(d)     Defendants failed to disclose these material problems to the market, and instead gave investors the misleadingly positive perception that apparel growth was continuing and that demand for the Company's products "has never been stronger," when in truth Under Armour was experiencing declining demand and using pull-forward sales and contingent sales pursuant to buyback agreements to maintain a façade of growth;

(e)     the Company was not "protect[ing] the brand" through controlled use of off-price distribution and refraining from "chas[ing] easy profits"; rather, the Company was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth projections, in an attempt to combat the core apparel declines, which compressed margins; and

(f)     Under Armour's wholesale business, including with Dick's, was not "stronger" but weaker, and the Company did not have "incredible growth at wholesale." In fact, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale.

## B.     Third Quarter 2015 Financial Results

160.     On October 22, 2015, the Company issued a press release announcing its financial results for 3Q15, followed by a conference call the same day to discuss those results. On November 4, 2015, the Company filed a Form 10-Q with the SEC reporting its financial results for 3Q15. In the press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts. In particular, Defendants

failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016, including in the third quarter of 2015 when they made these statements.

161.    The press release stated gross margin headwinds were "partially offset by favorable product margins."  During the October 22, 2015 conference call, Plank again misrepresented the level of demand for the Company's products, which he would later admit had failed to adapt to changing consumer preferences.  ¶¶275-276, 301-303.   Plank stated that the Company was experiencing "unparalleled demand for the Under Armour brand."  During the conference call, Dickerson stated that "[i]nventory for the quarter increased 36% to $867 million."

162.    Dickerson admitted that margins had contracted, but he misleadingly blamed such contraction on relatively benign factors including the strength of the U.S. dollar, exchange rates, and the emerging footwear business (which carried lower margins), rather than declining sales of apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins:

> Moving on to margins, third quarter gross margins contracted 80 basis points to 48.8%, compared to 49.6% in the prior year's period.  The following factors were the primary drivers during the quarter.  First, the continued strength of the US dollar negatively impacted gross margins by approximately 90 basis points versus the prior year.  Second, sales mix negatively impacted gross margin by approximately 50 basis points in the third quarter versus the prior year, primarily driven by the continued strong performance of our footwear business.
>
> Also, on our ongoing focus to better flow of product to service our business resulted in

higher freight expenses, which negatively impacted gross margin by approximately 20 basis points in the quarter versus the prior year.  Partially offsetting these margin pressures, we continue to see favorable product margins in both our North America and international business, which benefited gross margin by approximately 90 basis points in the third quarter.

163.    Dickerson further represented that "we *continue* to see favorable product margins in both our North America and international businesses" and that "we will *continue* to see improvements in our product margins."   Dickerson was asked for additional detail on the Company's margin contraction during the question-and-answer session with analysts, and made clear that margins in the apparel business were not to blame, and were actually improving "right now":

> **Omar Saad, Evercore ISI:** . . . [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera.  But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that.  Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?

> **Dickerson:** That's really probably more on our core apparel business.  Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, *most of our core apparel product margins are improving*.  That's helping offset some of the other pressures we talked about.

> **Saad:** Is that more generating scale in the business on the cost side? Are you taking price strategically, or is it mixed to more premium products? Maybe just expand a little bit more?

> **Dickerson:** Yes, it's a little bit across the board. . . .  But, again, you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so *that's where we're seeing it right now*.

164.    Separately, Dickerson failed to attribute elevated inventory levels to the Company's slowing apparel sales.  Instead, he misleadingly blamed this on a strategic plan to flow product to customers in a timelier manner, and stated the "bigger driver of" increased inventory levels "is the flow of product."

165.   Analysts reacted positively to Defendants' statements on October 22, 2015, regarding Under Armour's strong 3Q15 financial results.  For example:

(a)   in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results;

(b)   on October 22, 2015, SunTrust maintained its "Buy" rating and commented that Under Armour showed "[s]trength across categories" and its guidance should prove "conservative"; and

(c)   on October 23, 2015, Telsey Advisory Group ("TAG") issued a report maintaining its "Outperform" rating and saying the results "marked another solid beat and raise quarter" for Under Armour.

166.   On November 4, 2015, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q15, which were also discussed in the Company's press release and during its earnings call on October 22, 2015.  The Form 10-Q stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

167.   Plank signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating, in relevant part:

1.   I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

\*      \*      \*

- 68 -

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

168.    Defendants' misstatements and omissions on October 22, 2015, and November 4, 2015, as set forth in ¶¶160-164, 166-167 above, were materially false and misleading and omitted material facts for the following reasons:

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)      Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)      the net revenue growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap;

(d)     Defendants failed to disclose these material problems to the market, and instead gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and contingent sale pursuant to buyback agreements to maintain a façade of growth;

(e)     the Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline.  Rather, they were narrowing due to increasing Company discounts and promotions, falling ASPs of the Company's products, and increasing liquidations;

(f)     the "bigger driver of" the Company's increasing inventory was not a strategic plan concerning "the flow of product" but, rather, the declining apparel sales and reduced demand for Under Armour's products;

(g)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing.  Under Armour only maintained the false appearance of growth by engaging in the suspect sales practices described herein; and

(h)     the Company's Form 10-Q for 3Q15 failed to disclose to the market (in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

## VII.   INVESTORS BEGIN TO LEARN THE TRUTH BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

169.   Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins.  The truth was ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's common stock prices.  The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the true state of the Company's financial condition and by concealing Defendants' improper sales and accounting practices, which inflated its quarterly financial results and growth to appear healthier and to mask slowing demand for its products, including by: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the

Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.  By continuing to mislead the market in this manner, Defendants kept the Company's common stock prices artificially inflated throughout the remainder of the Class Period.  This section details the partial revelations of truth regarding Defendants' fraud, the resulting Under Armour common stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's common stock prices artificially inflated even as the truth began to leak out.

A.   **Published Retail Data Exposes Growth, Market Share, and ASP Declines at Under Armour**

170.   On Sunday, January 10, 2016, Morgan Stanley issued a report downgrading the Company, reducing its sales and EPS growth forecasts for the Company, and significantly reducing its price target for the Company's stock from $103 to $62 per share.[66]  Based on analysis of several data points, including fact-based sales data capturing Under Armour's core sales channel provided by SportScan, Morgan Stanley revealed a "fundamental shift" at Under Armour whereby the Company had, unbeknownst to investors, began competing on price rather than its premium brand image.[67]  Citing retail data, the report explained that the Company's North American apparel business was slowing, leading to market share and average sales price declines:

> Data indicates near-term earnings uncertainty is more than just weather: Recent SportScan data shows [Under Armour] is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace.  Both trends are more pronounced in women's apparel, despite major marketing investment in this division last year.  Though warm weather surely explains some of this, we think [Under Armour] may be reaching maturity in US apparel faster than previously thought.  Though we remain constructive on [Under Armour]'s int'l opportunity, we don't think the shares are priced

---

[66]   Ex. C, at 1.

[67]   *Id.* at 2.

for a US slowdown.[68]

171.    According to the retail data disclosed in the report, the declines were occurring

since at least spring of 2015 (prior to the Class Period):

> Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests [Under Armour] is losing apparel market share (Exhibit 5).  Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single- digit growth this year.  This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs (Exhibit 6).[69]

172.    In particular, the report concluded, based on the retail data, that the Company's

sales of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth,

falling ASPs, and market share losses cited above have been more pronounced in women's apparel.

Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher

ASP declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share

loss in women's has been larger and happening for 5 months, while Nike continues to take share

(Exhibit 7)."[70]  This was "concerning because Under Armour invested nearly $15M in a major

marketing campaign in 2014 targeted toward women. . . .  To continue its growth story, [Under

Armour] must excel in women's apparel."[71]

173.    The report also raised concerns about Under Armour's potential distribution deal

with Kohl's.  "Entering Kohl's would seem like Under Armour is risking some of its brand equity

to find growth . . . [and] would imply there may not be as much growth in these other channels as

previously thought."[72]  Expansion to Kohl's would be further evidence of a "fundamental shift" at

---

[68]  *Id.* at 1.

[69]  *Id.* at 4.

[70]  *Id.* at 6.

[71]  *Id.*

[72]  *Id.* at 7.

Under Armour because it "risks eroding the premium image of the UA brand" in order to try and maintain revenue growth with higher volume lower priced sales.[73]  Morgan Stanley further noted that the move to Kohl's "was not part of UA's 2018 plan given at its investor day" and expansion into Kohl's would signal that "growth is becoming harder to find for UA than previously thought."[74]  In subsequent reports, Morgan Stanley explained further that a move by Under Armour into mid-tier stores "changes the UA investment thesis.  One main reason to own UA is it is a premium brand.  Premium brands have reputations for having higher margins, holding price better, and having more sustainable cash flows long-term.  The market, in turn, would likely not perceive the same growth or margin story that it used to and send the P/E lower."  Put another way, "adding more mid-tier doors is really UA just taking its brand down – essentially trading on its premium brand image in exchange for sales growth."

174.    In addition to the apparel problems, the Morgan Stanley Report, citing the fact-based retail data, noted that "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . .  [Under Armour] has always competed on brand image and innovation, rarely on price.  This change in trend is a major concern because this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."[75]  The report also noted that, with respect to the Company's Curry Two

---

[73]    *Id.*

[74]    *Id.* at 4.  As other analysts at the time noted, Under Armour made clear at Analyst Day that its focus was on "premium distribution" and "premium locations" in order "to maintain brand strength."  *See* Brean Capital, LLC, UA: Initiating with a Buy; As Good of A Growth Story As There Is, October 15, 2015.

[75]    Ex. C, at 1.

basketball shoes, Under Armour appeared to be "trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."[76]

175.     In response to the Morgan Stanley Report, the Company's Class A Common Stock price fell sharply.  After closing at $37.50 per share on Friday, January 8, 2016, the stock closed at $34.98 per share on Monday, January 11, 2016 (the first trading day after the report was issued), a decline of 6.72% ($2.52 per share), on unusually high trading volume of over 29 million shares.

176.     In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example:

(a)     on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS";

(b)     in a report dated January 25, 2016, Cowen and Company lowered its estimates and reduced its price target to $95 from $110; and

(c)     on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that product discounting was "likely worse than expected."

**B.     Misleadingly Positive Fourth Quarter 2015 and Fiscal Year 2015 Financial Results and Downplay of the Morgan Stanley Report**

177.     On January 28, 2016, Defendants issued a press release announcing the Company's 4Q15 and FY15 financial results.  The press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 90 basis points from sales mix, specifically from strong footwear growth, approximately 80 basis points from the continued

---

[76]   *Id.* at 10.

strength of the U.S. Dollar, and approximately 30 basis points from higher liquidations." Defendants held a conference call that same day to discuss the 4Q15 and FY15 results.  During the January 28, 2016 conference call, Dickerson stated that "[i]nventory for the quarter increased 46% to $783 million compared to $537 million at December 31, 2014."  On February 22, 2016, the Company filed a Form 10-K with the SEC reporting its financial results for 4Q15 and FY15.

178.    In the 4Q15 and FY15 press release, on the subsequent conference call, and in the Form 10-K, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand for Under Armour by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; and (b) making contingent sales pursuant to buyback agreements. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

179.    In the January 28, 2016, press release and conference call, Plank continued to represent to investors that Under Armour's core products were in high demand and Under Armour was and would continue to be a premium brand.  Plank stated "'[o]ur core business remains incredibly strong'" and that Under Armour's "growth story is strong, we remain a growth company, and none of that is wavered."  Although he would later admit the Company's apparel offerings had failed to change with consumer preferences, Plank led investors to believe the Company's revenue growth was based on high demand for core apparel.  Plank stated that "[i]n

the fourth quarter, Apparel growth of 22% show cases that our brand has products for all seasons and temperatures."  And that "[o]ur brand, our presence, our ability to drive ASPs have never been stronger in North America."

180.   Defendants also discussed the declining margins and increasing inventory, but pinned the blame on relatively benign and short-term factors (faster growing but lower margin footwear and international business, the strength of the U.S. dollar, and higher freight expenses) rather than declines in the Company's apparel business.

181.   Dickerson tied excess inventory and liquidations to a designed strategy to deliver products to customers earlier, as well as recent weather trends, rather than any sales problems caused by the declining apparel business:

> This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . .  In addition, the recent weather trends have led to some excess inventory creation, which we will continue to work through across our normal liquidation channels during the first half of 2016.

182.   Following Dickerson's opening remarks, an analyst questioned Defendants about the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP reductions, as detailed in Sections V.C-D above and in Exhibit C attached hereto.  Dickerson downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data), claiming the data was too focused on the Company's large accounts, citing Dick's as an example.  In response to the same question, Dickerson also reassured investors that, notwithstanding such data, apparel growth was robust:

> **Matthew J. McClintock, Barclays**: My question is, Kevin, there seems to be a lot of debate in the marketplace on several of your strategies, and you kind of hit upon some of this in your prepared remarks.  But in particular, the competitive positioning of both your Footwear and your Women's business, and then also the potential maturity of the domestic business.  I was just wondering if you can give us your updated thoughts on those topics?  Have there been any strategic changes that we should be thinking about?  Thanks.

> **Dickerson**: . . .  So utilizing that [SportScan] data as a proxy for our success, especially in

- 77 -

the fourth quarter, it can be little bit challenged, as we've seen obviously, because we posted another strong quarter and our Apparel growing over 20%. So I just wanted to start an answer with just, let's be careful on some of those data sets that are out there, and understand how they relate to our business in particular.

183.    In discussing the Company's gross margin contraction, Dickerson omitted any mention of the Company's declining ASPs in apparel and increased promotions and liquidations, all of which, unbeknownst to investors, were negatively impacting Under Armour's gross margins:

> Moving on to margins. Fourth quarter gross margins contracted 190 basis points to 48% compared to 49.9% in the prior year's period. The following factors were the primary drivers during the quarter: First, sales mix negatively impacted gross margin by approximately 90 basis points in the fourth quarter versus the prior year, primarily driven by the continued strong performance of our Footwear business. Second, the continued strength of the U.S. dollar negatively impacted gross margin by approximately 80 basis points versus the prior year. Third, higher inventory liquidations negatively impacted gross margin by approximately 30 basis points.

184.    In discussing 2015 gross margin headwinds, Dickerson stated that "we were able to offset most of the non-currency related [gross margin] pressure through **_more favorable product margins in_** both our **_North America_** and International businesses."

185.    Defendants were asked specifically about ASPs of apparel and gross margins, and Plank and Dickerson responded as follows:

> **Omar Saad, Evercore ISI**: You kept mentioning premiumization, I think specifically to Footwear. Can you just dig a little bit deeper there, and then talk about does this translate over to Apparel at some point, we sort of see ASPs going up there? And then Brad, maybe you could comment on premiumization, maybe how it might flow-through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag and what are the really underlying gross margins going to do over time? Thanks.
>
> **Plank**: . . . So first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel. So it is our focus, it's our largest team here, and frankly it's where we've built our brand as innovators.
>
> *       *       *
>
> As we look forward into 2017, we really see the ability to drive efficiency of really looking at pricing, and really looking at the ability for us to maximize and optimize things like margin. . . . **_We continue to drive and demonstrate that premium position in the marketplace_**.

\*       \*       \*

**Dickerson**: And we were able to offset a lot of that [gross margin contraction] just through ***our general increase and improvement in product margins, specifically on the Apparel side***.

So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins. . . .

So I think in all aspects of our business, you will see that improve over time. . . .  And our ability to improve margins in Apparel is not only possible, but it's happening right now as we speak.

186.    Further attempting to allay gross margin concerns, Dickerson represented that "we're definitely seeing improvements in Footwear margins in general" and that "Footwear margins . . . have improved."

187.    Plank later added, "we do see the ability to *continue* to drive ASPs and improve margin by – through premium products as the way that we'll build it out."

188.    Analysts reacted positively to Defendants' statements on January 28, 2016 regarding Under Armour's strong 4Q15 and FY15 financial results.  For example:

(a)    in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders";

(b)    on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness;

(c)    on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73;

- 79 -

(d)     on January 28, 2016, Deutsche Bank issued a report noting Under Armour's representations that, contrary to the Morgan Stanley Report, the Company remained a premium brand: "UA m[anagement] made it clear today that they are now pursuing premiumization more aggressively";

(e)     on January 28, 2016, Cowen and Company issued a report titled "*Sentiment Normalizes Post 'Sportscan' Fear*" that noted the importance of "the introduction of evermore premium price points in footwear and apparel [to] improve[] prospects for long-term margin enhancement; and

(f)     on January 28, 2016, Evercore ISI issued a report noting UA's purported "increasing success in more premium products."

189.    On February 22, 2016, the Company filed with the SEC a Form 10-K reporting financial results for 4Q15 and FY15, which were also discussed in the Company's press release and earnings call on January 28, 2016.  The Form 10-K stated that "[w]e believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

190.    The Company's Form 10-K also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

191.    Defendants' misstatements and omissions on January 28, 2016, and February 22, 2017, as set forth in ¶¶178-187, 189-190 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including

declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the growth and demand reported by Defendants were overstated by their undisclosed quarterly practice of pulling sales forward in order to make the current quarter to appear healthier than it actually was and to mask slowing demand, including by pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap, and making contingent sales subject to buyback agreements;

(d)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, when, in truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using pull-forward sales and making contingent sales subject to buyback agreements to maintain a façade of growth;

(e)     Plank's assertion that the Company's ability "to drive ASPs have never been stronger in North America" was false because the Company's ASPs were falling sharply in North America as Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices, increase promotions and discounts (*e.g.*, offering its key products on sale for the first time during Black Friday, 2015), and liquidate more products;

(f)      Defendants' attempts to downplay the January 10, 2016 Morgan Stanley Report were false and misleading because the Company was, in fact, as the report stated, experiencing lower apparel sales growth, increasing ASPs, and a loss of market share;

(g)      the Company's inventory growth was not "largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates" or simply due to "recent weather trends have led to some excess inventory creation." Rather, it was a symptom of reduced sales and market share due to the Company's declining apparel business and buying back unsold products pursuant to buyback agreements;

(h)      Defendants were not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was and had been diminishing since at least spring 2015.  As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and pulling sales forward and making contingent sales subject to buyback agreements to try to compensate for its declining brand heat, creating a façade of growth and the false appearance of interest in its products;

(i)      the Company was not "able to offset a lot of that [gross margin contraction] just through our general increase and improvement in product margins, specifically on the Apparel side" and improvement in apparel margins was not "happening right now as we speak."  Rather, apparel margins were deteriorating as a result of reduced ASPs, discounting, promotions, and increased liquidations as Defendants' scrambled to maintain lofty growth projections artificially in the face of monumental declines in the Company's apparel business; and

(j)     the Company's Form 10-K for FY15 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### C.     Press Release Reiterating 2016 Financial Outlook Despite Sports Authority's Bankruptcy

192.    On March 4, 2016, the Company issued a press release confirming its previously released net revenue and operating income projections for 2016, notwithstanding the bankruptcy of Sports Authority, one of Under Armour's largest retail customers, filed on March 2, 2016.

193.    The March 4, 2016 press release stated that the Company planned to offset the impact of the bankruptcy on the Company's full year 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

194.    Defendants' March 4, 2016 press release was materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth, including shipping new inventory intended for the Company's own factory

stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at a higher price at its own stores;

(c)     the Company's net revenue and operating income were being inflated by Defendants' suspect sales and accounting practices designed to make Under Armour's financial results and growth to appear healthier and to mask slowing demand for its products; and

(d)     Defendants failed to disclose these material problems to the market and instead gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and using suspect sales practiced, as detailed herein, to create a façade of growth.

### D.     Misleadingly Positive First Quarter 2016 Financial Results and Guidance Raise

195.     On April 21, 2016, Defendants issued a press release announcing the Company's 1Q16 financial results.  The press release stated a decline in gross margins "primarily reflect[ed] negative impacts of approximately 100 basis points from higher liquidations and approximately 70 basis points from foreign currency exchange rates, partially offset by approximately 60 basis points from improved product cost margins."  During a conference call held that same day to discuss the 1Q16 results, Molloy stated that "[i]nventory for the quarter increased 44% to $834 million compared to $578 million at March 31, 2015."  On April 29, 2016, the Company filed a Form 10-Q with the SEC reporting its financial results for 1Q16.

196.     In the 1Q16 press release, on the conference call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose improper sales and accounting practices, which inflated the Company's quarterly financial results and growth to appear healthier and to mask slowing demand

for Under Armour, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products early; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores. Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters. And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

197.    In the April 21, 2016 press release, Plank continued his exceedingly positive messaging: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%. The strong results posted this quarter truly demonstrate *the balanced growth of our brand across product categories*, channels and geographies."

198.    Plank was similarly optimistic as to Under Armour's future growth. Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company *raised* its outlook for FY16

net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

199.    During the question-and-answer session of the April 21, 2016 conference call, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand:

> **Camilo Lyon, Canaccord Genuity**: Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel.  There's a lot of moving parts and some of your bigger customers have been shutting doors, some of the tertiary players are going away.  Can you talk about the health of that channel and what that could lead to from a channel expansion opportunity and how do you think about segmentation, within that strategy?

> *                *                *

> **Plank**: I mean, posting 30% growth in a quarter where . . . one of our largest customers, one of our top two or three customers just a few years ago filed for bankruptcy.  I think putting that kind of number up is something that just continues to demonstrate the strength of the brand and how strong our portfolio ultimately is.

> We do believe that there is still an underlying very strong wholesale market out there.  And we expect to continue to be iconic, to be a destination.

> *                *                *

> So . . . *our growth is effectively coming from everywhere*.  And North America is something that we feel incredibly strong about.

200.    In response to a separate question, Plank emphasized that "[a]nd again we are, to be clear, driving massive growth.  *We are taking share*."  As to footwear, Plank stated "[w]e are a premium Footwear brand that's *driving ASPs meaningfully higher*. . . ."

201.    During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to rising inventory levels, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  Molloy stated further: "As previously mentioned, the strategy

to improve wholesale, customer service levels resulted in elevated inventory investments beginning in the second quarter of last year."

202.    In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned:

> **Camilo Lyon, Canaccord Genuity**: If you could just disaggregate the composition of inventory between planned inventory increases and any sort of excesses that you have, given the liquidations they had during the quarter?  And coupled with the expectations for flat gross margins in Q2.  If you could just help us understand.  It seems like we're shifting more towards that planned increase, if I'm reading that correctly.  But just any detail there would be great.

> **Molloy**: . . .  [M]ajority of the growth is planned.  But we did have slightly excess. . . .  But we are working through that.  ***As you can see we worked through it*** through liquidation.  We're continuing to manage through that. . . .  So we were working through it.  But the majority of it is planned.

203.    As to gross margins, Molloy blamed "higher liquidations to clear through excess inventory and foreign currency exchange rates," but stated that product margins were "favorable" (offsetting the overall gross margin declines), rather than disclosing that apparel product margins were declining as a result of reduced customer demand, prompting lower sales prices, discounting, and promotions.  In response to an analyst's question on gross margins, Molloy highlighted "product margin improvements we've seen."

204.    Analysts reacted positively to Defendants' statements on April 21, 2016.  For example:

(a)    in a report dated April 21, 2016, Deutsche Bank Market Research raised its price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but so did gross & operating margins and EPS" and also noted that the Company's management "reiterated that inventories would normalize in 2Q";

(b)    on April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is

experiencing across categories, channels, and geographies, and moreover should allay concerns around its growth outlook and opportunities"; and

(c)     on April 22, 2016, TAG issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

205.   The Company's Class A Common Stock rose from a closing price of $43.95 per share on April 20, 2016, to a closing price of $46.93 on April 21, 2016.  The Company's Class C Common Stock rose from a closing price of $42.46 per share on April 20, 2016, to a closing price of $45.41 per share on April 21, 2016.

206.   On April 29, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 1Q16, which were also discussed in the Company's press release and during its earnings call on April 21, 2016.  The Form 10-Q also stated:

- "We believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

- "The increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf."

- "The decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy. . . ."

207.   The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

208.   Defendants' misstatements and omissions on April 21, 2016 and April 29, 2016, as set forth in ¶¶196-203, 206-207 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the

Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the purportedly "massive" and "balanced" net revenue growth "effectively coming from everywhere" was inflated by Defendants' (undisclosed) improper sales and accounting practices, which inflated quarterly financial results and growth to appear healthier and to mask slowing demand, including pulling sales forward from future quarters; adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates; guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; shipping products earlier than planned and in the final days of the quarter; continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)     Defendants failed to disclose these material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing declining demand and created a façade of growth using the suspect sales practices

detailed herein.  Further, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing;

(e)     the decrease in gross margin percentage was not primarily driven by Under Armour's "changing inventory management strategy."  Rather, gross margin decreases were primarily driven by increased discounting and promotions, including discounts offered to incentivize retailers to take products before their requested ship dates, increased liquidations, and selling new inventory intended for the Company's own factory stores to off-price sellers to book that inventory as revenue immediately, and corresponding lower sales prices;

(f)     the Company was not "driving massive growth, and . . . taking share." Rather, its growth and market share were falling as a result of the Company's apparel sales declines, and Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, that it obscured using the suspect sales practices detailed herein;

(g)     the Company's rising inventory was not merely a result of "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," and the majority of the inventory growth was not part of a strategic plan.  Rather, it was largely attributable to declining apparel sales and diminishing demand, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess inventory, which it failed to write down in 2016 (*see* Section VIII.D);

(h)     the Company's gross margin declines were not caused by strategically planned inventory increases and offset by "favorable" product margins.  Rather, declining product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, discounts and other promotions, including those offered to retailers as incentives to take products before their requested ship dates, and increased liquidations due to lower consumer demand for the Company's apparel;

(i)     the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was, and had been, diminishing since at least spring 2015.  As a result, Under Armour was experiencing a monumental downturn in its primary sales channel, North American wholesale, and was covering this up by engaging in the suspect sales practices described herein; and

(j)     the Company's Form 10-Q for 1Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### E.     Departures of the Company's Chief Merchandising Officer and Chief Digital Officer

209.     After the market closed on May 3, 2016, the Company surprised investors by filing a Form 8-K with the SEC announcing the departures of two key executives, CMO Stafford and CDO Thurston, both of whom spoke glowingly about the Company's financial results and outlook at the Company's 2015 Investor Day.  The Company provided no reason for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming

on the heels of former CFO Dickerson's departure and Morgan Stanley's downgrade and exposure of problems affecting the Company's revenue and operating income growth, gross margins, and market share, and the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

210.    As a result of this news, the price of Under Armour's Class A Common Stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the stock dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

211.    The Company's Class C Common Stock, which was issued to Class A common stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

212.    The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

213.    Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example:

(a)      in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent";

(b)      on May 4, 2016, Brean Capital, LLC lowered its rating to "Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations; and

(c)      on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

214.    Defendants' misstatements and omissions regarding the Stafford and Thurston departures on May 3, 2016, as set forth in ¶209 above, were materially misleading because they failed to disclose problems at the Company that contributed to such departures.

**F.      Reduced Financial Guidance Tied to the Sports Authority Bankruptcy**

215.    On May 31, 2016, the Company issued a press release titled, "Under Armour Updates 2016 Outlook," which lowered the Company's 2016 financial guidance, after Defendants had provided strong reassurances as to the Company's financial health and raised 2016 financial guidance just a month earlier.  The Company's updated projection included: (a) FY16 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY16 operating income in a range of $440 million to $445 million (down from the previously projected $503 million to $507 million).  The Company also announced an impairment charge of $23 million and FY16 revenues of $43 million from Sports Authority (instead of the originally planned $163 million) "given the recent decision of the bankruptcy court to approve the liquidation of The Sports Authority's business rather than a restructuring or sale of the ongoing business."

216.    As a result of this announcement, the Company's stock fell from $37.73 at the close of trading on May 31, 2016, to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.

217.    Similarly, the Company's Class C Common Stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

218.    In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to the bankruptcy.  For example:

(a)    on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35;

(b)    on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)";

(c)    on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target from $43 to $35, citing the Company's $23M impairment charge in 2Q16 and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million; and

(d)    On June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range from $38-$42 to $34-$38.

219.   The stock declines on June 1, 2016, would have been larger had Defendants revealed the full truth to investors regarding the Company's financial problems.  However, Plank continued to mislead the market in the May 31, 2016 press release, stating "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."  This statement was materially false and misleading and omitted material facts because growth in and demand for the Company's apparel business were in decline, not increasing. Moreover, the Company's apparent growth and demand were overstated by Defendants' concealed sales and accounting practices, which inflated its financial results and growth quarterly to make the Company to appear healthier and to mask slowing demand for its products, including: (a) pulling orders forward from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy; and (f) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank,

and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

220.     As Defendants continued to mislead, the market continued to be deceived.  Indeed, despite the partial revelation of the truth on May 31, 2016, a Deutsche Bank report stated, "[n]otably, m[anagement] reiterated 2Q's rev[enue] plan of 'growth in high 20%s', allaying palpable fears that trends slowed since 1Q."

### G.     Under Armour Bond Offering

221.     On June 6, 2016, Under Armour filed the Registration Statement with the SEC concerning the Bond offering.  The Company filed additional Offering Materials, Forms 424B5 and FWP with the SEC on June 8, 2016.  Pursuant to the Registration Statement and Offering Materials, the Company completed the Bond offering of 3.250% senior unsecured notes of Under Armour, due June 15, 2026, on June 8, 2016, issuing notes in the aggregate principal amount of $600 million.

222.     The Offering Materials incorporated by reference the Company's Form 10-K for 4Q15 and FY15 and Form 10-Q for 1Q16, which contained the false and misleading statements and omissions of material fact detailed in ¶¶177-187, 189-190 above.

223.     One month after the Bond offering was completed, on July 8, 2016, Morgan Stanley issued a report with additional analysis regarding Under Armour's strategy and fundamental shift to competing on price rather than brand strength, which the Company had not disclosed and indeed refuted.  Morgan Stanley again analyzed Under Armour's declining ASPs, noting that although wholesale sales are up, "the sales increase can be explained by the ASP decline."  The report recognized that historically and, according to Defendants' Class Period misrepresentations to date, Under Armour "is a premium brand."  But, based on SportScan data, Morgan Stanley stated that, "seven straight quarters of 2.5% ASP declines, on average, challenges that notion."  Morgan

Stanley also analyzed women's apparel, as it had in January, concluding that "UA's women's apparel sales growth rate in the US wholesale channel has decelerated."  With regard to footwear, Morgan Stanley noted that "two low priced styles . . . drove 9% of the FY15 growth in running footwear. . . .  We believe selling low priced footwear threatens to erode UA premium brand image and limit its long-term growth potential."

224.    The report issued by Morgan Stanley on July 8, 2016 also looked at the impact of a potential move by Under Armour into Kohl's.  The report noted "UA knows there is risk in entering this channel" and "UA has not pursued [Kohl's] or [JCPenney] until now because a) these channels may cause erosion of UA's premium brand image and UA didn't want to take the risk, and b) it had so many other growth avenues.  We think the reason UA is preparing to enter Kohl's or JC Penney now is it needs to find new avenues to maintain the sales growth rates the market expects.  Otherwise, it probably wouldn't want to take the risk."  This risk materialized almost immediately thereafter, when unbeknownst to investors, Dick's stopped taking Under Armour products early because it was angered by Under Armour's decision to sell at Kohl's.[77]  Overall, Morgan Stanley viewed the declining ASPs, emphasis on low-priced footwear, decelerating women's wholesale apparel, and a potential move into a mid-tier store like Kohl's and concluded that the "strategies UA is using to stimulate sales growth jeopardize its brand equity."

### H.    Disappointing Second Quarter 2016 Financial Results: Partial Revelations of a Growth Slowdown

225.    On July 26, 2016, just three months after raising guidance, the Company issued a press release announcing disappointing 2Q16 financial results.  The Company reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from

---

[77]    Ex. A, at 4.

the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

226.   The Company also reported 2Q16 gross margin of 47.7%, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  Earnings were only $0.01 per share, $0.03 lower than the year-ago quarter.

227.   On the same day, July 26, 2016, Under Armour hosted a conference call to discuss its 2Q16 financial results.  On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16

228.   In the 2Q16 press release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; (e) continuing to ship products to Sports Authority, and booking sales for those goods when shipped, even after it became clear that TSA was headed to bankruptcy; and (f) shipping new inventory

intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

229.    In his opening remarks on the conference call, Molloy stated that the Company expected its gross margin percentage to decline slightly for both 3Q16 and FY16.

230.    During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY16.  Molloy stated that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . .  It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

231.    Separately, the Company forecast 3Q16 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

232.    On this news, the Company's Class A Common Stock fell from a close of $43.59 per share on July 25, 2016, to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares.  The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares per day, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

233.     The Company's Class C Common Stock also fell on this news, dropping from $38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6 million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1 million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

234.     The stock declines would have been larger had the Company revealed the full truth to investors.  But Defendants continued to mislead investors and downplayed the negative news.

235.     The July 26, 2016 press release stated that a decline in gross margins "primarily reflect[ed] negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins."  In a conference call to discuss the 2Q16 results that same day, Molloy reported "[i]nventory for the quarter increased 30% to $1.1 billion compared to $837 million at June 30, 2015."

236.     Plank continued to insist that Under Armour remained "a growth company" and falsely stated that "[o]ur second-quarter results are strong evidence that **demand for Under Armour has never been higher**."

237.     Echoing this message, in his opening earnings call comments, Molloy emphasized "the **consistent growth across our diverse product lines and channels** [that] delivered another quarter of strong results," including growth in apparel revenues.

238.     During the question-and-answer session that followed, an analyst inquired about "athletic inventory in the channel today" and whether Plank was comfortable with the promotional backdrop.  Plank admitted to a high level of promotion as well as a shifting retail environment, but

misleadingly stated that the level of promotion was the same as in prior years, and that the

Company's core base of apparel was growing, notwithstanding shifting fashion trends such as

athletic leisure:

> **Matthew Robert Boss, JPMorgan**: Kevin, can you talk about athletic inventory in the channel today? It sounds like inventory for you guys will be in line with sales by the end of this quarter. Nike expects to be clean by August. I guess are you comfortable with the promotional backdrop you see out there today? And then larger picture, what would you say to those calling for a top in the athletic cycle out there?

> **Plank**: Yes, I'm not going to say I'm comfortable with the promotion out there in the market today, but ***I don't know if that's different than what we've seen in the last several years, either***.

> \*      \*      \*

> I think there's a shift happening. I think the way the people are dressing is changing, and it's altering. And so I don't know if it'll be as extreme as just women's buying black tights and whether people can make a career out of that, and obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend. But the good news is that we're not grounded in trend, we're grounded in sport. That'll keep us here, and the trends will come and go. But ***we're also watching our core base continue to grow*** for us, as well.

239.   With regard to the Company's deteriorating margins, Molloy again falsely

attributed the declines largely to benign factors, concealing the margin declines caused by reduced

demand for apparel, increased promotions and liquidations, and declining ASPs. Molloy instead

falsely represented that the Company's product margins were improving.

> Moving on to margins, second quarter gross margins decreased 70 basis points to 47.7% compared to 48.4% in the prior year's period. Sales mix negatively impacted the second quarter by approximately 130 basis points, ***primarily driven by the continued strength of our footwear and international growth***. Partially offsetting this negative impact were ***continued favorable product margins***, benefiting gross margin by approximately 50 basis points.

240.   Plank also announced that the Company was expanding its wholesale distribution

to include Kohl's. Plank falsely represented that there was "nothing reactionary about Kohl's" a

mid-tier department store with frequent steep discounting but rather, "[t]his was a proactive move for us."

241.    Despite Defendants' continued false and misleading statements, a number of analysts reacted negatively to Defendants' statements on July 26, 2016, regarding Under Armour's 2Q16 financial results and declining average sales prices.  For example:

(a)    on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target to $40 from $47; and

(b)    on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "[s]ales are growing solidly, but ASPs are fading.  UA competes on brand image and innovation, rarely on price.  This trend change is a concern because it suggests a fundamental shift in the UA story."  With regard to the Company's expansion into Kohl's, which Morgan Stanley had discussed in prior reports, the report noted it "is not a positive in our view," voicing concern that "it is potentially brand dilutive."

242.    On August 3, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 2Q16, which were also discussed in the Company's press release and during its earnings call on July 26, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

243.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

244.    Defendants' misstatements and omissions on July 26, 2016, and August 3, 2016, as set forth in ¶¶228-230, 234-240, 242-243 above, were materially false and misleading and omitted material facts for the following reasons:

(a)      Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)      Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)      the "continued" and "consistent" growth and high demand Defendants reported were overstated by Under Armour's suspect quarterly practices, designed to make the Company to appear healthier and to mask slowing demand for its products, including: pulling sales forward, adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates, making contingent sales pursuant to buyback agreements, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)      Defendants failed to disclose these improper practices and material problems to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing an ongoing monumental downturn in its primary

sales channel, North American wholesale, and covering up declining demand and sales by engaging in the suspect sales practices described herein to create a façade of growth;

(e)     Molloy's statement that "we did ship product in the first quarter and the second quarter to [Sports Authority]. . . . It is about 300 basis points to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority]" omitted that Under Armour continued to ship products to Sports Authority, and booked sales for those goods when shipped, even after it knew that TSA was headed to bankruptcy and the goods would be returned;

(f)     the statement that "demand for Under Armour has never been higher" was false and misleading because customer demand for the Company's apparel products, which accounted for the majority of sales, was suffering and in decline, and Defendants obscured this decline using improper and undisclosed sales practices to appear healthier and to mask slowing demand, as detailed herein;

(g)     the Company was not experiencing consistent growth across all product lines and channels. Rather, growth was slowing due to the declining apparel business. Under Armour was covering up this decline and creating the false appearance of growth engaging in the suspect sales practices described herein;

(h)     the Company's promotions were growing and were not the same as "the last several years," as Plank misleadingly implied, but much higher, as the Company ran an increasing number of promotions of apparel products during the Class Period;

(i)     the statement that Under Armour was "watching our core base continue to grow" despite changing fashion trends was misleading because the Company's failure to capitalize on changing fashion trends, such as the athletic leisure trend, was reducing demand for the Company's products and thus reducing the Company's core base. Further, Under Armour was

experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and creating a façade of growth to appear healthier and to mask slowing demand by engaging in suspect sales practices, as detailed herein;

(j)    the statements indicating that the gross margin decline was temporary due to rising product margins, and driven by the footwear and international businesses, were misleading because they implied that apparel margins were strong and failed to disclose that gross margin declines were also driven by slower apparel sales and a monumental decline in Under Armour's primary North American wholesale sales channel, resulting in promotions, discounts (including adjusted contract terms or discounts offered to retailers to incentivize them to take products before their requested ship dates), lower sales prices, increased liquidations, and shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(k)    the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace." In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing. Further, any growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices to manipulate its quarterly results; and

(l)    the Company's Form 10-Q for 2Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

- 105 -

I.      **Goldman Sachs Global Retailing Conference**

245.    On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference.  Defendants made false and misleading statements at the conference. In particular, Defendants failed to disclose that they inflated the Company's financial results and growth quarterly in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping products earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes of inventory and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

246.    Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained.  When asked how Molloy would "characterize inventory levels at retail levels, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved, and that

despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> Yeah, for us *we're in a really good position [with inventory levels]*.  We feel really healthy and it's our understanding that the marketplace is in a healthy position, too.  Came out of the winter season, there was a lot of excess inventory.  You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies.  It was flush with inventory.  It was a promotional environment.  *We didn't participate – have to participate too much in that promotional environment*.

> But from what we can understand that as of the end of August that most of the domestic retail partners are in really good inventory positions.  *We know we are*.

247.   In response to additional questions on inventory, Molloy stated that "retail is pretty good and inventories are clean" and that "we feel really good about – and I think everyone's encouraged that the inventory positions got cleaned up a lot sooner than many expected."

248.   Molloy's September 7, 2016, misstatements and omissions set forth in ¶¶245-247 above were materially false and misleading and omitted material facts for the following reasons:

(a)   the Company's inventory levels were not healthy, clean, in a good position, or "cleaned up a lot sooner than many expected."  Rather, inventory levels were inflated and continued to grow due to declining customer demand for, and declining sales of, the Company's apparel, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's shipping products in the final days of a quarter, resulting in "truckloads of unopened boxes [that] would come back to Under Armour" in 2016.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016.  *See* Section VIII.D.  Moreover, Defendants were indeed participating in and creating a "promotional environment" by running heavy and increasing promotions and discounts in response to the Company's apparel sales declines and inflated inventory levels, which had to be liquidated at a steep discount, and by offering discounts to incentivize retailers to take products before their requested ship dates.  Further, the Company was shipping new inventory intended for the

Company's own factory stores directly to off-price sellers like T.J.X. Co., which allowed Under Armour to book the inventory as revenue immediately (instead of having to wait for a customer to buy the items at its own stores) but at a lower prices and thus lower margins;

(b)    In truth, Under Armour was experiencing an ongoing monumental downturn in its primary retail sales channel, North American wholesale, and any retail growth was because the Company manipulated its quarterly sales to appear healthier and to mask slowing demand, including by making contingent sales pursuant to buyback agreements with its biggest retailers (including Dick's), pulling forward sales from future quarters, adjusting contract terms and offering discounts that incentivized retailers to take products before their requested ship dates, shipping products in the final days of the quarter to hit numbers, and shipping new inventory intended for the Company's own factory stores to off-price sellers so that Under Armour could book the inventory as revenue immediately instead of having to wait for a customer to buy the items at its own stores.

**J.     Disappointing Third Quarter 2016 Financial Results: Further Revelations of a Growth Slowdown and Compressed Margins**

249.    On October 25, 2016, the Company issued its 3Q16 earnings release.  Defendants surprised investors by reporting 3Q16 gross margin of only 47.5%, compared with 48.8% in the prior year's period.  On the same day, Under Armour hosted a conference call to discuss its 3Q16 financial results.  On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16.

250.    In the 3Q16 earnings release, on the earnings call, and in the Form 10-Q, Defendants made materially false and misleading statements and omitted material facts.  In particular, Defendants failed to disclose that they inflated the Company's quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including

by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

251.    Plank and Molloy participated in the call on behalf of the Company.  In his opening remarks, Molloy stated that the Company's margins "declined more than planned" due to factors including higher discounts, promotions, and liquidations.  Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year driven by the same factors that we have experienced through the year."

252.    During the conference call, Molloy further revealed that apparel growth would be less than projected at the Company's 2015 Investor Day: "[T]he landscape for our business and our industry continues to evolve . . . .  North America apparel growth is slowing across the industry.

- 109 -

While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

253.    Molloy also revealed that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years."   In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it's a place that provided incredible air cover for our brand for a very long time and I think like we're seeing in a lot of places that, that is modifying, it's changing. . . .  [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar-for-dollar in our immediate distribution."

254.    The Company's stock fell sharply as a result of this negative news.   Under Armour's Class A Common Stock dropped from a close of $37.90 per share on October 24, 2016, to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.   The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per day, as the market continued to digest the news.   The total stock price decline over this four-day period was 18.36% ($6.96 per share).

255.    The Company's Class C Common Stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016, to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.   The stock dropped an additional 8.67% ($2.46 per

share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

256.    The stock declines would have been larger had Defendants revealed the full truth regarding the Company's problems.   Instead, Defendants continued to mislead investors and downplay the negative news.  In an October 25, 2016 press release, Defendants stated that a decline in gross margins "primarily reflect[ed] negative impacts from the timing of liquidation, increased promotions, and foreign exchange rates, partially offset by continued product cost margin improvements."   During the October 25, 2016, conference call to discuss 3Q16 results, Molloy stated that "[i]nventory for the quarter increased 12% to $971 million."

257.    Plank boasted during the October 25, 2016, earnings call that "*[w]e are a growth company*.  And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter-after-quarter.  Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."  Plank insisted that "*our demand is still there*" and that "*[revenue] growth remains intact*."

258.    Plank also stated during the earnings call that "with *apparel remaining incredibly profitable* . . . there's not an end to the North American apparel story.  That continues to march on for us as well."

259.    Defendants continued to conceal the full extent and causes of the Company's deteriorating margins and operating income, pointing investors to the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as

opposed to the declining apparel business being a source of the margin and operating income issues).  Molloy also represented that "*we're already seeing improvements in our footwear margins.*"

260.    With regard to inventory, Molloy assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, *we now believe that our inventory position is healthier.*"  In response to an analyst question later in the call, Molloy falsely stated that the Company was "*in really good shape from an inventory perspective*" and "growth rates [have] come down, but *the inventory is in great shape.*"

261.    Notwithstanding Defendants' attempts to put a positive spin on the disappointing 3Q16 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example:

(a)    on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak," noting "UA's entry into low-end channels has raised the risk its brand equity erodes";

(b)    on October 25, 2016, Wells Fargo Equity Research issued a report stating the Company's new 2017/2018 outlook was "far worse than expected";

(c)    on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal";

(d)    on October 25, 2016, Piper Jaffray issued a report in response to the Company's disclosures, commenting "[c]learly we and the Street were blindsided by m[anagement]'s update to its long-term guidance on the call";

(e)     on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM"; and

(f)     on October 27, 2016, Morgan Stanley issued a report in response to the Company's October 25, 2016, disclosures.  The report noted that although the market had been led to believe Under Armour's contracting margins were due to investment for future growth, the poor results and margin guidance "suggests UA is increasing discounting and pursuing business in lower-margin channels to meet its sales goals."   Morgan Stanley concluded, "UA's brand momentum is slowing."  The report further noted, with the recent announcement of an expansion into Kohl's alongside worsening margins and falling ASPs, "Under Armour's brand strategy seems increasingly risky.  On one hand the company tries to elevate the brand . . . [o]n the other hand, it allows its brand to be sold at deep discounts."  The report warned, "[i]f the brand equity erodes, it will be almost impossible to get back and growth will be increasingly hard to come by."

262.    On November 2, 2016, Under Armour filed a Form 10-Q with the SEC reporting its financial results for 3Q16, which were also discussed in the Company's press release and during its earnings call on October 25, 2016.  The Form 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

263.    The Company's Form 10-Q also contained SOX certifications by Plank that were materially similar to those identified above in ¶167.

264.     Defendants' misstatements and omissions on October 25, 2016, and November 2, 2016, as set forth in ¶¶250, 256-260, 262-263 above, were materially false and misleading and omitted material facts for the following reasons:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting, promotions, and liquidations, and compressed margins;

(b)     Under Armour was undergoing a "fundamental shift" and was competing on price rather than brand strength and a premium product, and as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)     the "intact" net revenue growth and "incredible" financial results reported by Defendants were inflated by the Company's suspect sales and accounting practices, which manipulated its quarterly growth and financial results to appear healthier and to mask slowing demand, including by: pulling sales forward from future quarters, making contingent sales pursuant to buyback agreements with its biggest customers like Dick's, adjusting contract terms or offering discounts to incentivize retailers to take products before their requested ship dates, shipping products earlier than planned and in the final days of the quarter, and shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores;

(d)      Defendants failed to disclose these material problems and suspect practices to the market, and, instead, gave investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends.  In truth, Under Armour was experiencing an ongoing monumental downturn in its primary sales channel, North American wholesale, and covering up declining demand and sales by using the suspect sales practices detailed herein to create a façade of growth;

(e)      the pressure on the Company's margins and operating income was not driven solely by the footwear and international businesses becoming greater sources of revenue and the need for additional investment to take advantage of growth opportunities, as Defendants misleadingly stated.  Such pressure was also a function of the declining apparel business, which reduced sales and ASPs, while increasing promotions, liquidations, inventory, discounts, including discounts offered to retailers to incentivize them to take products before their requested ship dates, and lowering sales prices, including by shipping new inventory intended for the Company's own factory stores directly to off-price sellers, who sold the goods at lower prices and thus lower margins;

(f)      the Company's inventory position was not "healthier" or in "great shape." Rather, inventory was a major problem and continued to get worse, causing increased levels of inventory that the Company was forced to liquidate at discounted prices and to offer discounts to incentivize retailers to take products before their requested ship dates, as demand for the Company's apparel products continued to suffer.  The Company's elevated inventory levels were exacerbated by diminishing demand and sales of Under Armour's core products, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter resulting in "truckloads" of unopened

boxes of inventory returned to Under Armour.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016;

(g)    the Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace."  In reality, demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing.  Indeed, purported growth in Under Armour's revenue was driven by the Company's undisclosed suspect sales practices, a detailed herein; and

(h)    the Company's Form 10-Q for 3Q16 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph, and reported materially false and misleading financial statements (in violation of GAAP), for the reasons discussed in Section VIII, below.

### K.    Disappointing Fourth Quarter 2016 and Fiscal Year 2016 Financial Results: Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy

265.    The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017.  On that day, Under Armour stunned investors with a press release announcing dramatically lower-than-expected growth and other financial problems during the fourth quarter of 2016 ("4Q16") and FY16.  During a conference call with analysts on the same day, Defendants elaborated on the news revealed in the Company's earnings release.  Defendants made false and misleading statements in the 4Q16 earnings release and on the 4Q16 earnings call. In particular, Defendants failed to disclose that they inflated quarterly financial results and growth in order to appear healthier and to mask slowing demand for Under Armour, including by: (a) pulling forward orders from the month after the quarter to ship within the quarter in order to hit aggressive sales goals or close the gap; (b) leaning on retailers to take products early, including by

adjusting contract terms, offering discounts, and guaranteeing that Under Armour would buy back a certain amount of the products that did not sell; (c) shipping goods earlier than planned; (d) shipping products in the final days of the quarter, which resulted in the return of truckloads of unopened boxes and shipping plans that sometimes contradicted the dates on the boxes; and (e) shipping new inventory intended for the Company's own factory stores to off-price sellers T.J.X. Co. so that Under Armour could immediately book the goods as revenue instead of having to wait for a customer to buy the items at its own stores.  Additionally, investigators from the DOJ and SEC are examining emails that show Plank knew about the efforts to move revenue between quarters.  And, Under Armour disclosed on July 27, 2020, that the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company, Plank, and CFO Bergman that would allege they violated the federal securities laws by pulling forward sales in 2015 and 2016.

266.    In the press release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results."  Specifically, the Company revealed that:

- Net revenues grew only 12% (to $1.3 billion) in 4Q16 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth. Net revenues in FY16 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

- Operating income dropped 6% to $167 million in 4Q16 and increased only 3% to $420 million in FY16 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY16).

- FY16 gross margin dropped from 48.1% to 46.5%.

- 4Q16 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

- FY16 inventory increased 17%.

267.     Moreover, the press release provided a surprisingly negative outlook for 2017.  Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters.  In addition, gross margin was "expected to be slightly down compared to the prior year," and operating margin was expected to fall to approximately $320 million.

268.     Coupled with the negative financial results and outlook, the Company announced that Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he had only been at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Molloy was replaced by Bergman, the Company's Senior VP of Corporate Finance, who was Under Armour's third CFO in the 2016-2017 period.

269.     Plank, Molloy, and Bergman participated in the January 31, 2017 conference call on behalf of the Company.  In his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.
>
> *           *           *
>
> So first, I'd like to explain a few things: what happened, what we learned and what we're doing about it.  So let's start with what happened.  ***In the fourth quarter, slower traffic caused significant promotional activities earlier, deeper and broader than expected.  This commoditized some of our more basic core product that had previously sold through for us in years past***.
>
> This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment.  ***So we lost top line volume as we worked to adapt [through]***

*our mix and pricing*.  Now, to be fair, we did comp positively in the quarter in both our own retail stores and our e-commerce channel, but ultimately the result was below original plan.

There was also lower channel recapture of bankruptcy volume that we'd expected, as *pricing came down in the points of distribution that we serve*.  Finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full price sales.

                                    *        *        *

We learned that when we play in a discounted environment, we can drive volume and win, but the role both we and our retailers expect us to play is as a premium full-price brand.

270.    While Plank couched these issues as having emerged in 4Q16, in reality, this was a continuation of problems known, or recklessly disregarded, by Defendants during the Class Period.  Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

271.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today."  He emphasized that "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

272.    Molloy also stated that "[f]ourth quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior year's period.  The decrease includes a negative impact of approximately 230 basis points, driven by higher discounts and promotions," as well as lower margins resulting from footwear and international sales.  As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory including discounting, especially in the back half of the year."

273.     Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call, and proactive actions to manage inventory levels down in the marketplace, we expect full year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017."  Regarding 1Q17, Bergman stated:

> We anticipate the first quarter to grow at a mid-single digit rate as fourth quarter conditions in North America carry over and we will have not yet lapsed some of the significant bankruptcies we saw in 2016.  We're expecting first quarter gross margin to be down almost 100 basis points year-over-year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

274.     Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

275.     During a question-and-answer session with analysts, Plank confirmed the shift in consumer preference towards more fashion-oriented athletic apparel and referenced increased competition and heavy discounting in Under Armour's "core basic" performance-oriented athletic apparel:

> **Omar Saad, Evercore ISI**: [M]aybe if you could expand on a comment you made I think in the prepared remarks around some trends going on in the apparel business, maybe moving away from performance more to fashion or lifestyle?  I know the UA Sportswear line is still kind of pretty nascent, but maybe elaborate on what you're seeing from that standpoint.
>
> Is there something pretty deep going on at the consumer level?  A shift towards more fashion-oriented athletic apparel versus performance oriented?  Obviously, Under Armour is known for its technical performance.  And if this is the case, how do you evolve the brand a little bit to be really relevant on both sides of that fence?
>
> **Plank**: Yes. . . .
>
> ***We need to become more fashionable with the products that we have out there***.  And one of the things we found is that some of the core basics were some of the challenges that we saw, is that we were counting on core basics as we have in years past to do more work for

us.  ***But the consumer today frankly has more options.***

***[F]rankly most of those options are from good brands that we compete with, that are heavily discounting as well***.  So what you'll see is that I don't think it's one shift of abandoning one for the other.  Obviously, with things like the investment we're making in [Under Armour Sportswear] in sport lifestyle in general, but we need to become more fashion.  The consumer wants it all.

276.    Plank responded to a separate question by stating that the retail market for apparel was being "disrupted" and that "promotions and the consumer environment, all those things are very, very real, but we could have done a better job with our merchandising mix to be more proactive and more thoughtful about where they were going."

277.    Separately, an analyst from UBS inquired about 2017 gross margins as to the North American market:

I would've thought . . . that would largely be down next year due to more markdowns.  And then your guidance and inventory seems to sound like it will be improving through the year relative to the rate of revenue growth.  What do you think is the realistic near term recapture rate for the gross margin after 2017 after some inventory clearing?

278.    Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

279.    On this news, the price of Under Armour stock plummeted.  After closing at $28.94 per share on January 30, 2017, shares of Class A Common Stock dropped *25.74%* ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares.  This represented the largest single-day stock price decline in the Company's history.  The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued

to digest the news.  The total stock price decline over this three-day period was *28.65%* ($8.29 per share).

280.    Shares of Under Armour's Class C Common Stock also fell sharply as a result of this news.  After closing at $25.09 per share on January 30, 2017, shares of Class C Common Stock dropped **23.40%** ($5.87 per share) in a single trading day, closing at $19.22 per share on January 31, 2017, on unusually high trading volume of approximately 57 million shares.  The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of **27.78%** ($6.97 per share) over this three-day period.

281.    In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy.  For example:

(a)    on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario";

(b)    on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story";

(c)    on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.'  Wall Street often assumes that an executive leaving for 'personal reasons' is a sign that a company is in trouble

and that someone needs to take the fall.  Under Armour (UAA) tanked on this trifecta of bad news.

Shares plunged nearly 25% in early trading Tuesday.  That put the stock on track for its worst one-

day drop ever";

    (d) on January 31, 2017, Reuters released an article titled, "Under Armour's

founder-led approach wears thin."  The article observed that the Company "reported its slowest

top- line growth in eight years and signaled more challenges ahead.  Its chief financial officer is

also bailing.  The news wiped a quarter off the company's market value.  Chief Executive Kevin

Plank's strategy of maintaining power [by controlling the Company's voting stock] is

underperforming badly. . . . revenue growth slowed dramatically to 12 percent because of deep

discounting caused by slower foot traffic";

    (e) on February 1, 2017, TAG issued a report stating that "the magnitude of the

miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide- down for 2017

came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment

thesis as estimates and multiples are revised downwards";

    (f) on February 1, 2017, Oppenheimer issued a report calling Under Armour's

announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus

far"; and

    (g) on February 3, 2017, Sporting Goods Monitor issued a report expressing its

disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue

growth at half of the rate we, and Wall Street, expected" and Under Armour's management

"*severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent*

*earnings calls*."

282.    Defendants continued to mislead investors on the 4Q16 earnings call by concealing the full truth, attributing Under Armour's poor performance to "extreme growth" while continuing to tout the Company's "incredible brand strength."  Plank claimed in his prepared remarks that Under Armour's "brand is truly stronger than it's ever been," that the Company's "growth strategy is intact," and that "there is no change to our growth strategy."  In response to an analyst question about Under Armour's purported "22% top line growth," Plank said that "there's acceleration there," assuring investors that "you'll see 20% growth from this company."  Molloy said on the January 31, 2017 conference call that "total revenue was up 12%," that "sales to wholesale customers were up 5%," and that "North American revenues . . . increased 6%."

283.    Defendants' misstatements and omissions on January 31, 2017, as set forth in ¶¶269-271, 282 above, were materially false and misleading and omitted material facts for the following reasons:

(a)    Under Armour's "top line" apparel products, which accounted for most of the Company's sales, had been suffering from reduced customer appeal and demand since at least spring 2015.  This led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, increased liquidations, and compressed margins;

(b)    Under Armour had undergone a "fundamental shift" and was competing on price rather than brand strength and a premium product; as part of the "fundamental shift," the Company was pursuing high volume low-priced sales to achieve sales targets and maintain the appearance of growth;

(c)    Defendants failed to disclose these material problems and improper sales and accounting practices to the market (practices they used to appear healthier and to mask slowing

demand), but instead they gave investors the misleadingly positive perception that the Company's brand was "stronger than it's ever been" and that the Company was seeing acceleration in "top-line" apparel that was leading back to 20% growth ("there's acceleration there"), consistent with historical trends.  In truth, Under Armour had been covering up declining demand and sales by using contingent sales pursuant to buyback agreements, pull-forward sales, adjusted contract terms or discounts that incentivized retailers to take products before their requested ship dates, shipments in the final days of the quarter, and shipments of new inventory intended for the Company's own factory stores to off-price sellers (so that Under Armour could book the inventory as revenue immediately instead of having to wait for a customer to buy the items at its own stores) to create a façade of growth and brand health; and

        (d)     Under Armour's inventory increases were not part of a strategic plan or a result of the Company's "efforts to manage the brand appropriately for the marketplace.  Rather the excess inventory was a result of diminishing demand and sales, contingent sales pursuant to buyback agreements with its largest retailers, including Dick's, and the Company's practice of shipping products in the final days of a quarter, which resulted in "truckloads" of unopened boxes of inventory returned to Under Armour in 2016.  As a result, Under Armour had accumulated material amounts of excess and obsolete inventory, which it failed to write down in 2016.

    **L.**     **The Fallout From the Fraud Continued, but Defendants Conceal the Full Truth From Investors**

    284.    The fallout from the fraud continued.  Defendants attempted a massive restructuring and other dramatic actions to revive the Company, but without the ability to rely on suspect sales practices to meet sales targets, they were never able to turn the tide, as the Company's sales continued to struggle.

285.     On February 9, 2017, The Motley Fool published an article titled, "5 Signs Under

Armour Inc. Needs New Management," which stated that:

> ***Under Armour needs a leader who makes realistic promises***.  At the end of fiscal 2015,
> [Under Armour] estimated its annual revenue would rise 25% to $4.95 billion in 2016.
> However, its 2016 revenue actually rose just 22% to $4.8 billion, and [Under Armour] now
> expects sales to rise just 11-12% in 2017.
>
> That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5 billion
> in annual revenues in fiscal 2018.  Plank insists that the company is still on track to hit that
> target, but that would require its top line growth to accelerate to over 40% in 2018 – which
> hardly seems realistic.

286.     A February 14, 2017, Morgan Stanley report recognized that – according to the

Company's own data – 2016 sales growth rates were "overstated," due to the increased reliance

on "low quality" sales that caused days sales outstanding to increase to a nine year high.  The

report stated:

> Plus UAA accounts receivable increased 44% in FY16 on top of 55% growth in FY15
> (Exhibit 11).  Day sales outstanding increased to 47 days (Exhibit 12), a nine year high,
> and this is even more surprising considering DTC makes up a much bigger percentage of
> sales than it did nine years ago.  These data points signal some of UAA's recent sales may
> have been low quality and thus recent sales growth rates may be overstated.

287.     The Company data discussed by Morgan Stanley further corroborates Plank's

admission that 2016 growth was achieved by driving volume in a "discounted environment," and

not by sticking to the role the market expected Under Armour to continue to "play" "as a premium

full-price brand."

288.     On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's

rating to underperform and slashed the Company's Class A Common Stock price target from $20

to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear

analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war

with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause

UA apparel growth/margins to be worse than expected."

289.    On April 27, 2017, the Company announced its 1Q17 results in a press release and then discussed those results on an earnings call with analysts later the same day.  The 1Q17 press release announced total net revenue growth of only 7%, a far cry from the consistent 20% growth Defendants reported and projected previously.  Net revenue growth from the Company's apparel business also grew only 7%, the North American business was down 1%, gross margin was down 70 basis points (to 45.2%) "due to continued inventory management efforts," and inventory increased 8%.

290.    On the 1Q17 earnings call the same day, Plank and Bergman (the new CFO following Molloy's suspicious departure) discussed the Company's struggles.  Much of the call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.  Plank stated that the Company was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products. Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

291.    Nonetheless, Defendants continued to mislead the market.  Defendants concealed that the Company had used suspect sales practices to appear healthier and to mask slowing demand from 3Q15 through the end of FY16 and failed to disclose that the Company was still grappling with the consequences of those practices, such as elevated inventories, which it was desperately trying to clear.  Yet, Plank misleadingly told investors that the Company's "inventory levels are appropriate."

292.    Evercore issued an analyst report on April 27, 2017, following the Company's 1Q17 results.  The report noted "North America was negative for first time in the history of the

company - despite N[orth ]A[merican] store count up 8% and initial shipments into Kohl's, both of which should have contributed to growth."

293.    An April 27, 2017, report from Susquehanna noted the Company's "hasty distribution strategy" was reactionary to declines in Under Armour's wholesale business and "hurt the sanctity of the Under Armour brand:"

> We continue to raise flags about Under Armour's expanded distribution into the moderate/family channel (KSS, DSW, Famous Footwear, SCVL).  It is true, as CEO Plank pointed out on the earnings call, that Under Armour has about 10,000 fewer points of distribution vs. Nike.  Nike has successfully done business in the moderate/family channel for years without hurting its brand.  However, Under Armour has yet to build out the product depth, grassroots expertise, and overall marketing prowess that allows for a successfully segmented business across channels.  A proper strategy takes time and resources, yet UAA is moving quickly and hastily down-market.  We believe that the decision to expand into the moderate channel is a result of the liquidation of TSA and Sport Chalet, the pending liquidations of Gander Mountain & MC Sports. As a result, the sanctity of the Under Armour brand is being put at risk.

> We believe that the reason North American revenue was only down 1.1% is because of the initial orders sold into Kohl's.  The assortment sold into Kohl's was, in our view, too broad, lacked appropriate segmentation, and will do more harm than good to the Under Armour brand.

294.    On June 20, 2017, David Butler published an article on SeekingAlpha.com titled, "Underperforming Under Armour."  Butler stated that "[e]verything really peaked in 2014 when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in net income.  Ever since, things have been slowing.  It's not a trendy shift either.  We've seen almost two and half years of decreasing business growth.  The company isn't maneuvering to maintain margins in spite of the slowdown either."

295.    On June 26, 2017, Kenra Investors published an article on SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."  The article discussed continual declines in the Company's brand power and customer interest dating back to 2015, stating,

> There are several datasets that show ongoing weakness for Under Armour. . . .   Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an

idea of how digital sales are evolving. . . . *[T]here is a strong downtrend [that] started in mid-2015, and search interest [in Under Armour] actually became negative since a few months ago*.

296.    The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive, and search interest is in a sharp downtrend. . . . *So many negative signs make me think the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015*."

297.    Another June 26, 2017, article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."  The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think.  In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand.  For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times.  On Friday morning's call, Under Armour was mentioned just once. . . . and it was a part of a broader discussion regarding multiple brands.

298.    On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is Down 30% This Year."  The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling this year, with the sportswear stock down 30% . . . . The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways."  Specifically, the article noted that wholesale revenue was up just 5% in 4Q16 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand."  The article concluded that "Under Armour's slowing growth is a sign that

the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . .
The company needs to establish itself as a fashion brand as well as a performance one."

299.   In July 2017, unbeknownst to investors, Under Armour began responding to
requests for documents and information from federal investigators at the DOJ and SEC in
connection with Defendants' practice of pulling future sales forward to inflate quarterly financial
results.  But, Defendants concealed both the issues under investigation and the existence of the
investigations from investors.

300.   News from the Company worsened on August 1, 2017, when it reported financial
results for the second quarter of 2017.  The Company issued a press release reporting total net
revenue growth and apparel net revenue growth of 9% and 11%, respectively, far below the
quarterly 20%+ growth previously reported and projected by Defendants.  Footwear also
performed surprisingly poorly, with net revenue declining 2%.  The Company blamed the revenue
declines on a "dynamic and promotional retail environment in North America [that] continued to
temper results."  The Company also reported an operating loss of $5 million, a net loss of $12.3
million, and $0.03 decline in diluted EPS.  Gross margin declined 190 basis points (to 45.8%)
based in part on "inventory management initiatives" with inventory again increasing 8%.

301.   In conjunction with this negative news, the Company also announced on August 1,
2017, that it was implementing a massive restructuring plan "to more closely align its financial
resources to support the [C]ompany's efforts to better serve the evolving needs of the changing
consumer and customer landscape."  As a result, the Company announced expected "restructuring
and related charges" of $110 to $130 million in 2017, including "approximately $20 million of
inventory related charges and approximately $40 million of intangibles and other asset related

impairments." The restructuring would involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

302. During the August 1, 2017, earnings call that followed, Plank discussed the restructuring in more depth. He stated that, "The landscape is evolving quickly. Therefore, we too must evolve quickly. This evolution requires a pivot, and we're doing just that." He later explained that "we are clearly operating in a different environment, particularly in our largest market, North America. With our largest growth drivers including international, footwear and DTC continuing to scale but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

303. Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends especially the top line, can you just give us an update where you think the brand health is and the vision for the business today?" He acknowledged that "*we're not pleased with where we're positioned right now*" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear." To that end, he later added that:

> [W]e've adjusted the balance of product we've had, which is *decreas[ing] many of the core and key items that we've had*. We used to have – we're a very much a key item focused, a big logo hoodie and things in-store, and now we've got a lot of balance of that around versatility, layering, and newness . . . . We will be telling our story in the back half of this year, and *you'll see increased brand heat coming from us*, frankly spending against that.

304. The Company's negative news on August 1, 2017 also involved a reduction in guidance for FY17. Total net revenue was expected to grow only 9%-11% (vs. previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American business," while adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

305.     As a result of this news, the Company's Common Stock prices fell precipitously. After closing at $20.02 per share on July 31, 2017, the Company's Class A Common Stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C Common Stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high trading volume of over 23 million shares.

306.     Under Armour's stock price would have fallen further had its true financial condition been fully revealed.  Instead, Plank continued to mislead the market, touting Under Armour's "rapid growth" and the achievement of "more than doubl[ing] our revenue from $2.3 billion to $4.8 billion" over "the last three years" while concealing that the Company had engaged in suspect sales practices to appear healthier and mask slowing demand from 3Q15 through the end of 2016.  Plank also concealed that a month earlier, Under Armour had begun responding to requests for documents and information from the DOJ and SEC in connection with the criminal and civil investigations into the Company's accounting practices and related disclosures.

307.     Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . .  [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US . . . [and] US customers are abandoning the brand because it lacks a clear

identity."  The article further noted that "Plank has previously acknowledged [on January 31, 2017]

that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

308.    Susquehanna issued a report following the Company's second quarter of 2017

("2Q17") results on August 1, 2017.  The report noted that despite expansion into more mid-tier

retailers, "2Q17 North American revenue only increased 0.3%.  2Q17 wholesale revenue increased

3.1%, which implies a material drop in North American revenue."  The report further stated the

"problem . . . is that incremental shipments in the moderate retail channel . . . are being more than

offset by order cancellations from Under Armour's best, and most brand appropriate retailers, such

as Dick's Sporting Goods."  Susquehanna concluded "the heart of UAA current problems stem

from the decision to open distribution to the moderate channel prior to having a broad enough

product assortment in order to appropriately execute a segmentation strategy."

309.    Defendants continued to conceal the truth regarding the depth of the problems

Under Armour was facing.  Although they had propped up the Company's financial results and

growth in 2015 and 2016, they never disclosed this to investors.  No longer able to rely on suspect

sales practices to inflate the numbers, the Company's revenue growth continued to decline from

2017 through 2019.  During that period, total year-over-year ("YOY") net revenue growth

plummeted from 20%+ growth to low single digit % growth, while North American and apparel

revenues suffered even steeper declines:

| $ in thousands | Total Net Revenue | North America Net Revenue | Apparel Net Revenue |
|---|---|---|---|
| **FY17** | $4,989,244 (3.2% YOY increase) | $3,802,406 (5.1% YOY decrease) | $3,284,652 (1.7% YOY increase) |
| **FY18** | $5,193,185 (4.1% YOY increase) | $3,735,293 (1.8% YOY decrease) | $3,464,120 (5.5% YOY increase) |
| **FY19** | $5,267,132 (1.4% YOY increase) | $3,658,353 (2.1% YOY decrease) | $3,470,285 (0.2% YOY increase) |

310.   Nonetheless, Plank continued to tout Under Armour's "rapid growth"; the "hyper-growth" the Company had enjoyed "for several years"; the achievement of doubling the business by 2013 "and then doubl[ing] again from 2013 to 2016[] [f]ueled by strategic growth in North America"; and the Company's "26-quarter streak of 20% sales growth," while omitting that such growth had been fueled not by Under Armour's premium brand image (which had lost heat), but by discounting and myriad suspect sales practices.

311.   And, while Defendants struggled to deal with the Company's elevated inventory levels resulting in part from the suspect sales practices detailed herein, including the ramifications of buybacks (*see* Sections V.E-F), Defendants failed to disclose the true cause of the Company's inventory problems and continued to assure investors that Under Armour's inventory levels were "appropriate." Then, beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory. *See* Section VIII.D. Despite the Company's inventory write downs, however, Under Armour continued to experience bloated inventory levels that were exacerbated by its suspect sales practices. In 2017 and 2018, Under Armour took aggressive measures to reduce its inflated inventory levels by liquidating product to off-price sales channels like its own Factory House outlet stores and third-party off-price partners, continuing to devalue its brand and drive margins down. It ultimately took Under Armour approximately 1.5 years to "really clean up the marketplace," which had been flooded with excess inventory.

312.   On July 23, 2018, Andersen, along with shareholder Balraj Paul, filed a verified derivative complaint on behalf of Under Armour "against certain current and former officers and directors of the Company for breaches of fiduciary duties, insider selling, and unjust enrichment."[78] Andersen worked at Under Armour for nearly all of the Class Period (September

---

[78]   Andersen Complaint, at 1.

2015 through November 2016) as a Merchandising Manager.  Andersen's job duties included, among others, "[i]nitiat[ing] seasonal business plans for all Outdoor categories across Outdoor/Action Sports Specialty, Sporting Goods, Department Stores, & Mall channels focusing on strategic initiatives, revenue targets, local market characteristics, style/SKU efficiencies, demand, forecasts, current inventory levels, segmentation/differentiation, & distribution" and "[a]nalyz[ing], understand[ing], & clearly communicat[ing] sales history, market trends/forces."

313.     The Andersen Complaint alleges Plank and other defendants caused Under Armour to issue materially false and misleading statements, including many of the statements alleged herein to be false and misleading.  For example, the Andersen Complaint alleges Plank's September 16, 2015 statement that "demand for our brand has never been stronger" and Dickerson's October 22, 2015, statement that "most of our core apparel product margins are improving" were materially false and misleading when made.[79]  Other examples include Plank's January 28, 2016 statement that "[o]ur core business remains incredibly strong,"[80] April 21, 2016, statement that Under Armour was "driving massive growth," and "*[w]e are taking share*,"[81] and May 31, 2016, statement that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."[82]

314.     The Andersen Complaint alleges that Plank and the other defendants concealed the "true facts, which were known or recklessly disregarded by" Plank.[83]  Those "true facts" alleged in the Andersen Complaint to have been concealed include, among others, that: "Under Armour's

---

[79]   Andersen Complaint, at 3, 38.

[80]   *Id.* at 42.

[81]   *Id.* at 48.

[82]   *Id.* at 35.

[83]   *Id.* at 74.

apparel products . . . suffered from reduced customer appeal and demand"; the "Company's apparel and North American margins were not 'improving' or 'offset[ing]' other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products"; the "Company's inventory increases . . . were due to declining sales of the Company's apparel"; "the Company's ASPs were falling sharply in North America"; and "growth and market share were falling as a result of the Company's apparel sales declines."[84]

315.    Defendants' misstatements and omissions continued.  In December 2018 - over a year into the government's non-public criminal and civil investigations into Under Armour - Plank blamed the Company's performance at the end of 2016 on "a number of internal and external factors" that "conspired" against Under Armour, while concealing both that the Company had been engaged in suspect sales practices and the existence of the investigations.

316.    Meanwhile, suspicious executive departures continued to plague the Company.  On April 18, 2019, the Company reported that Jason LaRose, the head of its North American business since October 2016, would leave the Company at the end of the month.  On May 1, 2019, the Company disclosed that its Senior VP and Principal Accounting Officer, Andrew Page, had left the Company after serving in that position for only three months.  Yet, Defendants never disclosed the ongoing SEC and DOJ investigations into Defendants' suspect business practices and disclosures.

M.    **The Company Announces Plank's Resignation as CEO**

317.    Then, on October 22, 2019, Under Armour announced Plank's resignation as CEO, effective January 1, 2020, but again remained silent on the SEC and DOJ investigations he and the

---

[84]    *Id.* at 75-77.

Company were facing.  At the time, media and analysts linked the move to Under Armour's ongoing financial problems discussed herein, including a dramatic slowdown in growth, lost market share, and severe stock price declines.  For example, in an article released the same day, *The New York Times* observed that the Company "has faltered while the revenues of its rivals Nike and Adidas have grown thanks to surging consumer interest in athleisure wear.  The company . . . has seen its once-robust profit turn into net losses of more than $46 million in each of the last two fiscal years.  Last year, it cut around 400 jobs to streamline a business suffering from slowing growth.  Under Armour's stock peaked around $52 in September 2015, but is currently trading around $20."  *Forbes* released an article two days later, on October 24, 2019, observing that Plank's move was "perhaps not surprising" given the Company's "financial troubles," including a dramatic slowdown in growth after years of 20%-plus annual revenue increases, and the Company's severe stock price decline since reaching its all-time high in September 2015.  Moreover, just months before announcing Plank was abandoning the CEO position, Under Armour told investors (yet again) that his serving as CEO was critical to the Company's success.  On March 27, 2019, Under Armour stated in its Proxy Statement that Plank was "the appropriate person to lead both our Board and the management of our business" because this "provides for clear accountability and efficient and effective leadership."

### N.   Federal Investigations Into the Company's Accounting Practices and Related Disclosures

318.    On November 3, 2019, less than two weeks after the Plank announcement, WSJ surprised the market by revealing that the DOJ and SEC were investigating whether Under Armour "shifted sales from quarter to quarter" during the Class Period in order to make its financial results

appear healthier than they actually were.[85]  According to the article, the investigators were in the process of questioning people in the Company's hometown of Baltimore, and had done so within the week prior to the article's release.[86]  The article noted that "[w]hen examining what are known as revenue-recognition practices, authorities generally focus on whether companies record revenue before it is earned or defer the dating of expenses to make earnings appear stronger, among other possible infractions."[87]  The article further linked the investigation to the Company's apparent success (26 straight quarters of 20% revenue growth), followed by sales problems at the Company that emerged publicly in January 2017, causing the stock price to plummet:

> The company [Under Armour], which is scheduled to report third-quarter [2019] results on Monday, has been restructuring its operations and struggling with weak sales in the past two years.  Until then, it had been among the fastest-growing apparel makers, riding 26 straight quarters of at least 20% year-over-year revenue growth.  That streak ended abruptly when Under Armour missed its sales targets in the final quarter of 2016.  On Jan. 31, 2017, the company's shares plunged after it reported sales growth of 12% in the holiday quarter and cut its growth forecasts for the next year.  That day, Under Armour also said its then-finance chief [Molloy] was leaving after a year on the job.[88]

319.    After the release of the WSJ article, Defendants were forced to issue a statement confirming the investigations and revealing that they had been ongoing for well over two years: "The company began responding in July 2017 to requests for documents and information relating primarily to its accounting practices and related disclosures."[89]

320.    Before the market opened on the following day, on November 4, 2019, the Company filed an SEC Form 8-K reiterating that "[t]he Company confirmed to *The Wall Street*

---

[85]   Ex. B, at 1.

[86]   *See id.*

[87]   *Id.* at 2.

[88]   *Id.*

[89]   *Id.*

*Journal* that it has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017." The Company added that it "continues to believe its accounting practices and related disclosures were appropriate" but "does not intend to comment further on the status of this investigation except to the extent required by law."

321. Similar statements were made by Bergman during the Company's earnings call that took place before the market opened on November 4, 2019. Bergman stated in his opening remarks that he was "break[ing] from our typical company policy of not discussing any regulatory or litigation matters" in order to address the SEC and DOJ investigations revealed by WSJ. Bergman stated that "[w]e have been fully cooperating with these inquiries for nearly 2.5 years. To this effect, we began responding back in July of 2017 to their request for documents and information. We firmly believe that our accounting practices and disclosures were appropriate." Later in the call, Bergman was asked for comments on the investigations and why the market was "just hearing about it now" after two-and-a-half years. Bergman declined to provide any additional information.

322. In response to the news that the Company's accounting practices and related disclosures were under investigation, calling into question the propriety of such practices and disclosures, the Company's Class A Common Stock price fell 18.92% ($4.00 per share), from a closing price of $21.14 per share on Friday, November 1, 2019, to a closing price of $17.14 per share on Monday, November 4, 2019, on unusually high volume of 43.42 million shares. The Company's Class C Common Stock price fell 18.35% ($3.47 per share), from a closing price of $18.91 per share on Friday, November 1, 2019, to a closing price of $15.44 per share on Monday, November 4, 2019, on unusually high volume of 18.69 million shares.

323.     Securities analysts and media took note of the surprising news regarding the Under Armour investigations, the serious misconduct being investigated, and the resulting stock price decline.  For example:

(a)     in a November 4, 2019, article titled, "Under Armour's Stock Tanks as Troubles Pile Up," *The New York Times* wrote that the Company's stock sank over 18% following news that the federal authorities were investigating "whether Under Armour had shifted sales results from quarter to quarter to appear healthier," coupled with the announcement of a fifth straight quarterly revenue decline and reduced annual revenue forecast;

(b)     WSJ released an article on November 4, 2019, titled, "Under Armour Shares Slide on News of Accounting Probe," observing the Company's stock price decline "after the company confirmed it was the subject of a federal investigation into its accounting practices," and noting that "[e]xecutives declined on an earnings call Monday to provide details about the probe or explain why Under Armour hadn't previously disclosed its existence, even though they had been responding to document requests for more than two years";

(c)     the *Baltimore Business Journal* released an article on November 4, 2019 stating that "Wall Street analysts wanted to know why they are just now learning about a federal investigation into Under Armour Inc.'s accounting practices that has been going on for more than two years . . . . In a move that deviated from Under Armour's usual policy, CFO David Bergman confirmed the Baltimore-based sportswear maker began responding to inquiries from the federal agencies in July 2017 and has been fully cooperating with the probe" although "[t]he inability to answer questions about the probe and Under Armour's North American sales outlook caused the company's stock price to get hammered";

(d)      an article by *Fortune* on November 4, 2019, observed that: "Under Armour Inc. shares plunged after the company disclosed that federal officials have been probing its accounting practices for more than two years, bringing a fresh headache to investors just as the sports brand prepares for a CEO transition. . . . Investigators from the Justice Department and SEC were questioning people at the sports apparel's base in Baltimore as recently as last week [*The Wall Street Journal*] reported, citing people familiar with the matter.  The probe is focused on whether Under Armour inflated sales from quarter to quarter, the newspaper said";

(e)      on November 4, 2019, CNBC released an article stating that news regarding the federal probe into Under Armour's accounting practices, along with lowered 2018 guidance, "sent the retailer's shares plunging more than 18%. . . .  Under Armour says it has been responding to requests for documents related to its accounting practices since 2017, which is about when an incredible sales streak came to an end.  Until the end of 2016, it had reported more than 20 consecutive quarters of sales growth topping 20%, making it one of the fastest growing retailers in the U.S.";

(f)      on November 4, 2019, analyst Susquehanna released a report titled, "Under Armour, Inc.: Weak Guidance Post 3Q Beat Further Marred by Federal Investigations," stating in part that the "[f]ailure of management, on the earnings call, to address why the investigation was not disclosed prior to last night is disconcerting" and that, among other factors, "we expect the overhang of the federal investigations . . . to cast shadows over UAA's results and stock performance for quite some time[]";

(g)      on November 4, 2019, Morningstar released a report stating that, along with a reduced outlook, "news of an investigation into its revenue recognition practices by the SEC and [DOJ], caus[ed] shares to drop by a midteen percentage. . . .  The timing is notable, as Under

Armour's business began to deteriorate in late-2016, in part because of the bankruptcy of retail partner Sports Authority.  Moreover, former CFO James Molloy resigned in January 2017 for personal reasons after just over one year in the position.  We view news of this investigation as potentially serious.  Investigations of this type can lead to fines and earnings re-statements and, less commonly, criminal charges. . . . The news of an ongoing investigation into Under Armour's accounting practices affirms our Poor stewardship rating on the company.  Under Armour has been hit with bad publicity and management turnover in recent years.  Unless quickly resolved, news of this investigation will certainly draw more negative attention.  Meanwhile, as previously announced, Kevin Plank has decided to give up the CEO role he has held since the firm began. While Under Armour claims the investigation had nothing to do with Plank's decision, the timing looks suspicious, especially since the firm did not disclose an investigation that is more than two years old.  Although companies are not legally required to disclose SEC investigations, we think Under Armour should have done so[]";

(h)     also on November 4, 2019, PiperJaffray released a report observing: "UAA shares closed down ~19% today despite sound execution & encouraging trends on the call as the WSJ article flagging the DOJ/SEC accounting investment pressured the stock[]";

(i)     analyst TAG also released a report on November 4, 2019, stating that "Under Armour's better-than-expected 3Q19 result was overshadowed by the cut to its 2019 revenue outlook and the WSJ story that emerged yesterday about an ongoing investigation by the SEC and DOJ into the company's accounting practices[]";

(j)     analyst William Blair noted the effect the Company's disclosures had in its November 4, 2020, report, stating that "Under Armour's stock is down nearly 20% as investors digest the lower-than-expected fourth-quarter outlook and accounting investigation[]";

(k)      CFRA's November 4, 2019, report likewise emphasized the effect the belated disclosure of the investigations had on Under Armour stock: "We also expect increased awareness about regulatory and litigation matters regarding UAA's accounting practices to weigh on shares and further adds to our negative view[]";

(l)      a report by Oppenheimer on November 4, 2019, stated that "the real issue for UAA and its shares is likely to prove reports from WSJ over the weekend that the company is subject to a federal criminal investigation over its accounting practices and efforts to make trends appear more upbeat."   The report went on to say that "indications of potential accounting irregularities at the [Under Armour] brand further cloud an already shaky fundamental story[]";

(m)      on November 5, 2019, the *Baltimore Sun* released an article on the investigation noting that the Company's stock price was "pummeled" nearly 19% in "reaction to news of the investigation," and including the following comments from financial consultant Timothy Spence, who advises companies on SEC matters: "Public companies must follow strict rules regarding the way revenue is recognized, including proper timing . . . . There appear to be two questions here.  The first is, was this a smoothing of revenue to make quarterly revenue recognition more consistent?   Another question would be whether the company recognized revenue in advance and expected to make it up in the next quarter, he said.  Both practices are highly questionable accounting if not outright fraud[]"; and

(n)      Argus published a report on November 13, 2019, stating that Under Armour's disclosure of the DOJ and SEC investigations "overshadowed the company's 3Q19 results", which were reported on the same day, and noted that "UAA shares dropped 19% on news that the SEC and the Justice Department were investigating the company's revenue recognition

practices, including the potential manipulation of revenues to make them appear stronger and steadier."

## VIII.   DEFENDANTS' GAAP VIOLATIONS AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

324.    In order to demonstrate continued revenue growth during the Class Period, Plank and the Company engaged in a scheme to inflate revenue by pulling in – channel stuffing – sales into earlier quarters.  This practice violated GAAP[90] and SEC disclosure rules.

325.    Defendants, in violation of GAAP, also improperly recorded revenue on contingent sales and understated the Company's sales returns and allowances, markdowns and discounts, and failed to timely record the write-down of excess and obsolete inventory.

326.    As a result of the above, the following Under Armour financial statements issued to the public and filed with the SEC were materially false and misleading: Form 10-K for the year ended December 31, 2015, and Form 10-Q's for periods ending September 30, 2015, March 31, 2016, June 30, 2016, and September 30, 2016.

| ($ in thousands, except EPS) | 3Q15 | 4Q15 | FY15 | 1Q16 | 2Q16 | 3Q16 |
|---|---|---|---|---|---|---|
| Net Revenues | $ 1,204,109 | $ 1,170,686 | $ 3,963,313 | $ 1,047,702 | $ 1,000,783 | $ 1,471,573 |
| Net Income | $     100,477 | $     105,602 | $     232,573 | $       19,180 | $         6,344 | $     128,225 |
| Earnings Per Share - Diluted | $            0.45 | $            0.48 | $            1.05 | $            0.04 | $            0.15 | $            0.29 |
| Inventories | $     867,082 | $     783,031 | $     783,031 | $     834,287 | $ 1,086,749 | $     970,621 |

327.    The misstatements were material.  For example, in 3Q16, Under Armour's net income and EPS were overstated by an estimated 30% considering only the impact of the (a) understated sales reserves for returns, allowances, markdowns and discounts and (b) inflated

---

[90]   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).

inventory.  This does not even include the impacts of contingent sales and channel stuffing, which further inflated net income and EPS in each relevant quarter as described herein.

### A.    Under Armour Failed to Disclose Its Improper Sales Practices

328.    During the Class Period, Under Armour pulled sales into the current fiscal quarter to boost its reported revenue and artificially report continued revenue growth of 20%+.[91]   The premature recognition of sales that would have otherwise been recognized in a subsequent period is commonly referred to as "channel stuffing."  The SEC has defined channel stuffing as follows: [T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[92]

329.    As pled herein, Under Armour engaged in severe channel stuffing practices routinely in order to meet sales growth and earnings targets communicated to the market, and "sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the product" to convince retailers to take products before their requested shipping date.[93]  This practice of pulling forward orders occurred regularly in 2015 and 2016.[94]  Indeed, investigators are examining emails that show Plank knew about efforts to move revenue between quarters.[95]

---

[91]   *See* Ex. A, at 1.

[92]   *In re Sunbeam Corp.*, SEC Release No. 7976, Exchange Act Release No. 44305, SEC Order Instituting Public Administrative Proceedings (May 15, 2001).

[93]   Ex. A, at 3.

[94]   *See id.*

[95]   *See id.* at 2.

330.     The SEC is very clear that channel stuffing practices and their financial impact are required to be disclosed under Item 303.  The SEC affirmed this position when it filed claims of earnings management against the Sunbeam Corporation ("Sunbeam").  The SEC specifically cited that Sunbeam's "undisclosed or inadequately disclosed acceleration of sales through 'channel stuffing' . . . materially distorted the Company's reported results of operations."[96]

331.     Subsequent speeches made by SEC staff further support these requirements.  For example, former Chief Accountant with the SEC, Lynn Turner, noted the following:

> The *Sunbeam* case highlights . . . ***channel stuffing*** abuses, among others, and sends a message to registrants and their auditors – the SEC will aggressively attack fraudulent revenue recognition practices. . . . Sunbeam failed to disclose that it offered discounts and other inducements to customers to sell merchandise immediately that otherwise would have been sold in later periods, which threatened to depress Sunbeam's future results of operations.  [SEC Staff Accounting Bulletin ("SAB") 101] notes that disclosure in [Management's Discussion & Analysis of Financial Condition ("MD&A")] is required of shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period. MD&A disclosures also are required of the impact of granting extended payment terms to customers that will result in a longer collection period for accounts receivable and, thus, slower cash inflows from operations, ultimately impacting a registrant's liquidity and capital resources.[97]

332.     The SEC expressly states that disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations.  Item 303 (and Instruction No. 3 to Paragraph (a) of Item 303) requires companies to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

*          *          *

---

[96]   *Supra*, n.93, at 1.

[97]   Lynn Turner, Chief Accountant, *Speech by SEC Staff: Revenue Recognition* (May 31, 2001).

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .[98]

333.    The undisclosed pull-in of revenue from future periods to the current period "*cause[d] reported financial information*" contained in Under Armour's SEC filings to "*not . . . be . . . indicative of future operating results*."

334.    Defendants also violated GAAP by failing to disclose the Company's channel stuffing practices and their financial impact in the Company's financial footnotes.  Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 275, *Risks and Uncertainties*, focuses primarily on disclosures arising from risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term.  In particular, it also calls for financial statement disclosure in certain circumstances, if the volume of business transacted with particular customers could be severely impacted in the near term.[99]  ASC 605, *Revenue Recognition*, requires that companies provide both qualitative and quantitative information about their revenue arrangements and about significant judgments that may significantly affect the timing or amount of revenue recognition.[100]  Thus, significant channel

---

[98]    17 C.F.R. §229.303.   Similarly, SAB 114 Topic 13 requires the MD&A to contain "a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

[99]    FASB ASC 275-10-05-2, FASB ASC 275-10-50-16, FASB ASC 275-10-50-18.

[100]    FASB ASC 605-25-50-1.

stuffing would also trigger the need for such footnote disclosure in an entity's financial statements under ASC 275 and ASC 605.

335.    By failing to make required disclosures in accordance with GAAP and SEC disclosure rules, Under Armour's revenue growth, earnings, and inventory reported in the Company's SEC filings were materially misstated during the Class Period, from 3Q15 through 3Q16.

### 1.    The Financial Impact of Channel Stuffing on Under Armour's Quarterly Revenue

336.    From the beginning of the Class Period through 3Q16, Under Armour stressed the importance of quarterly revenue growth by touting that the Company had more than 20 consecutive quarters of revenue growth of at least 20%.  For example, during the Company's 2015 Investor Day, Plank stated:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an [sic] quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And, frankly, we have no expectation of that stopping anytime soon.

337.    And Plank stated on the Company's 2Q16 earnings call held on July 26, 2016:

> And we're still projecting; we're 25 quarters north of 20% in a row.  Over six years of doing that, we see that trend continuing for us, number one.  We do continue to see it to project 25% plus growth for the full year.

338.    Unbeknownst to investors, Defendants achieved Under Armour's 20%+ revenue growth by stuffing the channel with premature sales taken from future quarters.[101]  Without channel stuffing, which added at least tens of millions in sales every quarter, the Company's quarterly growth percentage would have been materially less than reported.

---

[101]  *See* Ex. A, at 1.

## 2.     The Impact of Channel Stuffing on Future Results

339.   The significant financial impact of channel stuffing on Under Armour's future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules, *i.e.*, Item 303.

340.   The MD&A should give investors an analysis of the registrant's financial condition and results of operations, "with particular emphasis on the registrant's prospects for the future,"[102] and:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information *not to be necessarily indicative of future operating performance* or of future financial condition.
>
> *     *     *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the *likelihood that past performance is indicative of future performance.* [103]

341.   SAB 114 Topic 13 also provides the following specific example of a required disclosure pertaining to the Company's recognition of revenue: Shipments of product at the end of a reporting period that significantly reduce customer backlog and that *reasonably might be expected to result in lower shipments and revenue in the next period.*[104]  This is exactly what Under Armour was doing, but failing to disclose to investors.[105]

---

[102]  SEC Interpretation: *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, SEC Release Nos. 33-6835; 34-26831; IC-16961; FR-36 (May 18, 1989).

[103]  SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-48960; FR-72, (effective Dec. 29, 2003).

[104]  SAB 114, Topic 13.B.

[105]  Under Armour attempted to conceal the impact on a future quarter by repeating the practice at the end of each quarter (*e.g.*, at the second quarter Under Armour made up for the second quarter revenue that had been artificially pulled into the first quarter by repeating the practice and

342.     By pulling-in or taking revenue from future quarters, Under Armour was aware that revenue in subsequent quarters would be adversely impacted.  As a result, the Company was required to warn investors that its reported revenue was not indicative of future revenue.

**B.     Under Armour's Continued Growth Was Achieved by Improperly Recognizing Revenue on Contingent Sales and Understating Reserves for Customer Returns, Allowances, Markdowns, and Discounts**

343.     As pled herein, Defendants assured investors through 3Q16 that the Company's trend of 20%+ revenue growth would continue.  Continuing this growth, however, came at a cost. In order to achieve 20%+ revenue growth, Defendants engaged in two accounting schemes: (a) improperly recognizing revenue on contingent sales; and (b) improperly understating reserves for product returns, allowances, markdowns, and discounts.  Both of these schemes violated GAAP.

**1.     Improper Contingent Sales**

344.     Defendants, in violation of GAAP, inflated revenues and earnings in the Company's Forms 10-Q and 10-K, press releases and investor conference calls from 3Q15 through 3Q16 by recognizing revenue on contingent sales.[106]  Contingent sales are transactions in which payment to the seller is contingent upon the buyer's ability to resell the merchandise.  The recognition of revenue for contingent sales is not permissible under GAAP.  When an entity sells its product but gives the buyer the right to return the product, revenue from the sales transaction may only be recognized at the time of sale if certain conditions are met, including that "[t]he buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is ***not contingent***

---

artificially pulling the third quarter revenue into the second quarter).  However, the practice of channel stuffing is unsustainable and will eventually impact future revenues.  Indeed, Under Armour shocked the market with revenue growth of only 11.5% for 4Q16 – far below the touted 20%+ guidance.  Since then, the Company has been unable to achieve even low double-digit growth, and has even experienced revenue decreases in some quarters.

[106] Correspondingly, Under Armour's accounts receivable balance, which is a direct function of revenue but appears on the balance sheet instead of the income statement, was also overstated.

on resale of the product."[107]  Revenue for such contingent sales may not be recognized until the return privilege has substantially expired.[108]

345.     Defendants falsely assured investors that the Company was complying with GAAP and not recording revenue on contingent sales transactions.  Specifically, the Company's Forms 10-Q stated that Under Armour's financial statements were:

> [p]resented in accordance with the rules and regulations of the Securities and Exchange Commission . . . and accounting principles generally accepted in the United States of America for interim consolidated financial statements. In the opinion of management, all adjustments consisting of normal, recurring adjustments considered necessary for a fair statement of the financial position and results of operations were included. . . .[109]

346.     Defendants further claimed in Under Armour's revenue recognition policy that "[n]et sales are recognized upon transfer of ownership, including passage of title to the customer and transfer of risk of loss related to those goods."[110]

347.     Contrary to Defendants' statements, Under Armour's financial statements were ***not*** prepared in accordance with GAAP and SEC requirements and were ***not*** a fair representation of the Company's operations.

348.     Through the end of 2016, to incentivize buyers/accounts to order certain merchandise, Under Armour utilized a buyback program under which Under Armour sales representatives ***guaranteed*** that Under Armour would buy back a certain amount of unsold merchandise (*i.e.*, these sales were contingent upon resale) (*see* Section V.E).  On the books, the

---

[107]  FASB ASC 605-15-25-1.

[108]  *Id.*

[109]  Similarly, the Company's Forms 10-K disclosed that Under Armour's consolidated financial statements were "presented in accordance with principles generally accepted in the United States of America."

[110]  *See, e.g.*, Under Armour's 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

accounts bought and owned the inventory temporarily, but after six months Under Armour would buy back some of the unsold inventory. The number of buybacks increased over time throughout 2016.

349. In addition, Under Armour was not collecting on its accounts receivable because customers did not have to pay for the merchandise unless (if ever) it was sold. Beginning with 4Q15, the rate of growth of Under Armour's accounts receivable balance over prior year was consistently outpacing net revenue growth until the fourth quarter of 2017.[111] As a result of the increased receivables from the contingent sales, Under Armour's DSO[112] nearly doubled from 28 days in the fourth quarter of 2014 ("4Q14") to nearly 51 days in 1Q17. At the end of 2015, Under Armour's DSO of 40 equaled the median DSO of the Textiles, Apparel & Footwear industry.[113] However, Under Armour's DSO increased 18% during 2016 while the industry median DSO *decreased* 9% during the same period.[114] Similarly, beginning in 1Q16, Under Armour's DSO was consistently higher than that of direct competitor Nike, when it had been comparable previously.[115] Further, Under Armour's DSO had historically been better than that of rival Adidas.

---

[111] In 2018, in an effort to help reduce the bloated receivables balance on its balance sheet resulting from the Company's elusive accounting schemes in these earlier periods, Under Armour entered into contracts with two financial institutions to sell selected receivables (up to $290 million) on a recurring, non-recourse basis. Despite this, receivables growth still outpaced sales growth throughout 2018.

[112] DSO is a common financial measure for assessing the age and quality of accounts receivable. DSO represents the average number of days it takes a company to collect its receivables. It is a measure of collectability and serves as a useful measure of cash flow efficiency and revenue quality. A DSO of 30, for example, means that it takes a company 30 days on average to convert a credit sale (*i.e.*, an account receivable) into cash.

[113] The Hackett Group, 2017 US Working Capital Survey.

[114] *Id.*

[115] Nike has a May 31 fiscal year end. The quarterly periods referenced here are Under Armour's fiscal quarter and Nike's nearest fiscal quarter (closest in time; one month difference). For

But, Adidas' DSO was slightly improving during the Class Period, while Under Armour's DSO was worsening and higher (worse) than Adidas by 2017. Thus, Under Armour's rising DSO was not attributable to industry conditions but rather to Defendants' fraud.

350. By the first quarter of 2018 ("1Q18"), as a result of the Company's accounting practices, Under Armour's DSO had swollen to 62 days – more than double what it had been back in 4Q14 and 55% more than the median DSO in 2017 for the Textiles, Apparel & Footwear industry.[116] Moreover, the DSO figure of 62 in 1Q18 does not even include the $55.6 million of receivables that the Company had sold to a financial institution that quarter, all of which remained outstanding. If Under Armour had not factored these receivables, its true 1Q18 DSO would have been 66 days (approximately 65% more than the 2017 industry median). An increasing DSO is a sign that receivables are at risk of collection and may indicate problems with a company's collection process.[117] The significance of this measure has been noted by the SEC: "A growing DSO figure is often a telltale sign that a company's receivables are impaired."[118] Similarly, Ernst & Young, a Big Four accounting firm, has noted the significance of a DSO spike: "The higher the number, the greater should be the concern over customers not paying the bills." The older a

---

example, 1Q16 refers to Under Armour's quarter ended March 31, 2016 and Nike's closest quarter ended February 29, 2016.

[116] The Hackett Group, 2018 US Working Capital Survey.

[117] *See* David C. Hammer, *Performance is reality, how is your revenue cycle holding up?*, HEALTHCARE FIN. MGMT. ASSOC. (July 1, 2005); *see also* Michael D. Carpenter & Jack E. Miller, *A Reliable Framework for Monitoring Accounts Receivable*, 8 FIN. MGMT., 37-40 (Winter 1979); Scott Blakeley, Esq., *The Credit Professional's Duty and Protection with Disclosing Corporate Fraud at the Public Company*, CREDIT RES. FOUND., at 2 (Nov. 2002) ("A company's DSO is, at least on Wall Street, an important indicator of the condition of its accounts receivable, and therefore a gauge of asset quality.").

[118] *See SEC v. Korkuc*, No. 2:03-cv-03017-LDW-WDW, Complaint at ¶28 (E.D.N.Y. June 19, 2003); *see also* SEC Accounting and Auditing Enforcement Release No. 1673A (Nov. 25, 2002), http://www.sec.gov/litigation/litreleases/lr17859a.htm.

receivable becomes, the less likely it is to be collected.  This is consistent with Under Armour's increasing DSO resulting from its practice of booking contingent sales for which accounts receivable would never be collected.

351.    Defendants improperly overstated revenue by recording contingent sales, which caused the Company's net revenue, net income, and EPS to be materially overstated.  In addition, throughout the Class Period, Defendants failed to make MD&A and financial footnote disclosures describing the Company's contingent sales from the buyback program and resulting financial impacts, as required by SEC and GAAP.  *See* Section VIII.A, above.[119]

### C.    Improper Reserves for Customer Returns, Allowances, Markdowns, and Discounts

352.    Defendants, in violation of GAAP, also inflated the Company's revenues and earnings reported in Forms 10-Q and Forms 10-K, press releases, and investor conference calls from 3Q15 through 3Q16, by failing to properly reduce revenue for estimated customer returns, allowances, markdowns, and discounts given to customers.

353.    SEC Reg. S-X Rule 5-03 requires companies to report "net sales of tangible products (gross less discounts, returns and allowances)."  17 C.F.R. §210.5-03.

---

[119] Under Armour was also required to disclose the impact of contingent revenue transactions. *See* Section VIII.A, above.  FASB ASC 235-10-50, *Notes to Financial Statements*, states that "[i]nformation about the accounting policies adopted by an entity is essential for financial statement users," and that the "[d]isclosure of accounting policies shall identify and describe the accounting principles followed by the entity and the methods of applying those principles that materially affect the determination of financial position, cash flows, or results of operations . . . [and] shall encompass important judgments as to appropriateness of principles relating to recognition of revenue."  Contingent transactions were not allowed under GAAP to be recognized as revenue as discussed herein.  However, since Under Armour improperly recognized revenue and decreased inventory as a result of contingent transactions – which materially affected Under Armour's financial position and results of operations by overstating revenue and earnings and understating inventory – this accounting practice was required to be, but was not, disclosed by Defendants.

354.   GAAP, specifically ASC 605-50-45-1, allows that a vendor may give a customer a sales incentive or other consideration, where such consideration is either:

a.  An adjustment of the selling prices of the vendor's products or services and therefore characterized as a reduction of revenue when recognized in the vendor's income statement.

b.  A cost incurred by the vendor for assets or services received from the customer and therefore characterized as a cost or expense when recognized in the vendor's income statement.

355.   GAAP also requires that revenue may only be recognized if the amount of future returns can be reasonably estimated.[120]   FASB Statement No. 48, Revenue Recognition When Right of Return Exists, ¶7 states: "If sales revenue is recognized . . ., any costs or losses that may be expected in connection with any returns shall be accrued in accordance with FASB Statement No. 5, Accounting for Contingencies.  *Sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns*."[121]

356.   Defendants falsely assured investors that the Company was complying with GAAP, as discussed above, and that the Company was properly accounting for estimated allowances, markdowns, discounts, and returns.   Specifically, they stated in Under Armour's revenue recognition policy in its SEC filings:

We record reductions to revenue for estimated customer returns, allowances, markdowns and discounts. We base our estimates on historical rates of customer returns and allowances as well as the specific identification of outstanding returns, markdowns and allowances that have not yet been received by us.  The actual amount of customer returns and allowances, which is inherently uncertain, may differ from our estimates.  *If we determine that actual or expected returns or allowances are significantly higher or lower than the reserves we established, we would record a reduction or increase, as appropriate, to net sales in the period in which we make such a determination.*  Provisions for customer specific discounts are based on contractual obligations with certain major customers.  Reserves for returns, allowances, markdowns and discounts are recorded as an offset to accounts

---

[120]  FASB ASC 605-15-25-1.

[121]  *See also* FASB ASC 605-15-25-2.

receivable as settlements are made through offsets to outstanding customer invoices
. . . .[122]

357.   Under Armour had excess inventory across all brands from at least 3Q15 through

4Q16.   The Company's core apparel sales began slowing by at least spring 2015.   To increase

sales, Under Armour had to give incentives and promotions such as selling products for 25% off.

But the Company's inventory problems persisted.   The bankruptcy of TSA in 2016 further

increased excess inventory.   One of the top reasons Under Armour missed its financial goals at the

end of 2016 was because of inventory management.

358.   As a result, Under Armour sold excess inventory at heavy discounts and even

shipped some to Mexico just to get its money back (*see* Section V.F).   But overall there was so

much inventory in the latter half of 2016 that Under Armour's liquidation channels were already

flooded and there was nowhere to go with some of the inventory.

359.   Further, in order to clear the inventory and meet its sales and profit projections

(including continued 20%+ growth), during 2015 and 2016, Under Armour began offering deeper

and broader price discounts and allowances; increasing sales promotions to many of its customers;

and accepting the returns of more products (in addition to the increased buybacks as discussed

above) (*see* Sections V.D-F).   These known and anticipated discounts and allowances, along with

destocking and sales returns, should have reduced Under Armour's reported net sales, margin, and

income as discussed above (*see* ¶¶353-357).

360.   However, Under Armour failed to adequately account for these known and

estimable returns, discounts, markdowns, and allowances.   Defendants, who authorized this

scheme, knew that the Company's results would be false and misleading as a result.   By the end

---

[122]   *See, e.g.*, Under Armour 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, 2Q19 Form 10-Q, 3Q19 Form 10-Q.

of 3Q16, Under Armour failed to properly recognize approximately $34 million in sales returns, allowances, markdowns, and discounts.[123]  This scheme alone caused the Company to materially overstate net sales, net income, and EPS during 3Q16 by as much as over 2%, 17%, and 18%, respectively.  The Company ultimately increased its reserves for customer returns, allowances, markdowns and discounts to more than 5.2% of net product sales in 2017 whereas previously at the end of 2015, these reserves represented just 2.5% of net product sales – a 109% increase.  These large increases in 2017 support that Under Armour had under-reserved in 2016.

### D.     Under Armour Overstated Inventory

361.    As a result of poor planning, softening demand, returns, and increased buybacks from contingent sale transactions, Under Armour accumulated material amounts of excess and obsolete (*i.e.*, impaired) inventory, which it failed to write down during 2016.

362.    GAAP mandates that inventory:

Be measured at the lower of cost and net realizable value.[124]  When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs.  That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes.[125]

363.    Similarly, Under Armour disclosed to the public in its SEC filings:

Market value[126] is estimated based upon assumptions made about future demand and retail market conditions.  If the Company determines that the estimated market value of its

---

[123]  $34 million was calculated by applying and comparing the 2017 percentage of reserves for customer returns, allowances, markdowns, and discounts (5.2%) to 3Q16 net product sales, assuming the percentage actually used by the Company during 3Q16 was the average of the percentages used at year end 2015 (2.5%) and year end 2016 (3.1%).

[124]  Net realizable value is determined as the estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation.  FASB ASC 330-10-20.

[125]  FASB ASC 330-10-35-1B.

[126]  "As used in the phrase lower of cost or market, the term market means current replacement cost (by purchase or by reproduction, as the case may be) provided that it meets both of the

inventory is less than the carrying value of such inventory, it records a charge to cost of goods sold to reflect the lower of cost or market . . .[127]

364.    Contrary to GAAP and Defendants' policy, Under Armour's inventory was overstated from at least 2016 through 2018.  This was due to Under Armour's massive amount of excess inventory that could not be sold without providing incentives such as heavy discounts.  Such incentives reduced the net realizable value of inventory.  At any given time, Under Armour had at least twice as much, and even three to four times as much, inventory than the Company's plan.

365.    As noted above, TSA's bankruptcy in 2016 added to the excess inventory problem because full categories and seasons of apparel had been allocated to TSA before it closed, and the inventory had to go back to Under Armour, including apparel from old seasons (*see* ¶¶60, 74, 123). Moreover, Under Armour did not cancel TSA orders before the bankruptcy or reduce its sales goals after it, thus exacerbating its excess inventory problem (*see id.*).

366.    This is consistent with the Company's inventory growth rate, which significantly outpaced its revenue growth rate from 3Q15 through 2Q16, indicating that demand for Under Armour products was slowing and the Company was not able to sell as much of its burgeoning supply of inventory as anticipated.

367.    Despite Defendants' knowledge regarding excess inventory as described herein, Under Armour continued the charade by misleading investors during the 3Q16 earnings call on October 25, 2016, when Malloy stated: "Despite liquidations having been a headwind on margin rates for most of this year, ***we now believe that our inventory position is healthier and that liquidation should not have the same negative impact moving forward***."  Malloy also reiterated

---

following conditions: a. Market shall not exceed the net realizable value [and] b. Market shall not be less than net realizable value reduced by an allowance for an approximately normal profit margin."  FASB ASC 330-10-20.

[127]  Under Armour, Inc., Annual Report (Form 10-K) (Feb. 20, 2015), at 47.

the expectation for revenues to grow approximately 20% in 4Q16, and explicitly told an analyst,

"*We feel like we're in really good shape from an inventory perspective*."

368.    Under Armour's positive statements regarding inventory were misleading because, unbeknownst to investors, the Company's inventory was impaired.  Projected sales growth and corresponding attrition of inventory could only be achieved through the Company's unprecedented promotions and discounts, which impacted margins well beyond 2016, and undisclosed contingent sales and channel stuffing.

369.    Beginning in 3Q17, the Company belatedly recorded total charges of $25.878 million to write down its inflated inventory.  These charges to reduce the overstated inventory balance should have been recorded in 2016.  Under Armour's inventory balance was overstated from 2016 through 2018 by as much as 3%.  This was a material overstatement, as demonstrated by the fact that, by failing to take the impairment charge in 3Q16, Under Armour's operating income and net income for that quarter were both overstated by approximately 13%.  Moreover, Under Armour would have missed its operating income guidance had the full charge been taken in 3Q16.

## IX.    POST-CLASS PERIOD REVELATIONS

370.    Following the Class Period, additional facts were revealed concerning the nature and severity of Defendants' fraud.  As discussed above, on November 14, 2019, WSJ released an article titled, "Inside Under Armour's Sales Scramble: 'Pulling Forward Every Quarter,'" which was based on interviews with several former Company executives in sales, logistics, merchandising, and finance, and referenced emails obtained by federal investigators showing Plank's direct knowledge of the efforts to move revenue between quarters.[128]   The former

---

[128] Ex. A, at 2.

executives told WSJ that Defendants "scrambled to meet aggressive sales targets, borrowing business from future quarters to mask slowing demand in 2016 for its athletic apparel" and "frequently leaned on retailers to take products early and redirected goods intended for its factory stores to off-price chains to book sales in the final days of a quarter."[129]   According to WSJ, a former sales executive said "[i]t was a pretty common practice to pull forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap."[130] According to these former executives, WSJ reported, Defendants used these tactics every quarter "to help extend a 26-quarter streak of 20% sales growth," a streak that "employees knew was important to Mr. Plank," which "came to an abrupt end in late 2016."[131]

371.    A former merchandising executive at the Company explained to WSJ that these practices were "all in the name of hitting the number."[132]   These former executives also explained to WSJ how if "retailers declined to take products before their requested ship date, Under Armour sometimes adjusted the terms of the contract to offer a discount or extend the period in which retailers could pay for the products."[133]   And a former logistics executive further revealed to WSJ that "[s]hipping plans in the final days of the quarter sometimes contradicted the dates on the boxes, and truckloads of unopened boxes would come back to Under Armour."[134]   WSJ also reported that the former executives observed that the "strains in Under Armour's business were evident inside the company in 2016," that Under Armour continued shipping products and booking

---

[129]   *Id.* at 1.

[130]   *Id.* at 3.

[131]   *Id.* at 1-2.

[132]   *Id.* at 2.

[133]   *Id.* at 3.

[134]   *Id.*

sales to Sports Authority even "[a]fter it was clear Sports Authority was in trouble," and that Dick's (which was holding unsold Under Armour goods) stopped taking products early because it was "angered" by Under Armour's deal with discount value retailer Kohl's, who often offered the same products but with more discounts.[135]  Additionally, WSJ reported, a former merchandise executive said that, "[t]o help meet its quarterly targets, Under Armour in 2016 shipped new inventory intended for its own factor stores to off-price seller TJX Cos.," which "allowed Under Armour to immediately book the goods as revenue instead of having to wait for a customer to buy the item at its own stores."[136]  But "[t]his executive and another former employee said Under Armour was careful to avoid shipping too much inventory to TJX so that it wouldn't have to disclose that the discounter was among its major customers in its securities filings," according to WSJ.[137]

372.    On November 15, 2019, the *Baltimore Business Journal* released an article discussing accounting irregularities at the Company that were likely being reviewed by the SEC and DOJ.  In particular, the article focused on the Company's rising accounts receivable that began in the final quarter of 2015 – when it jumped 55% vs. sales growth of 31% - and continued through the end of 2016, along with a rising number of days sales outstanding.  The article stated in part:

> The revelation of a federal probe, [Plaintiffs'] lawsuit and claims by former executives of aggressive sales tactics offer a glimpse into what may have been behind Under Armour's stumbles after so much success.  The company says no accounting irregularities occurred and that it was just an unfortunate mix of market forces – Sports Authority's demise, the retail industry's free fall and a trend toward athleisure apparel that Under Armour declined to embrace.

> The shareholders' allegations and past executives quoted in the Wall Street Journal story point to ***something more nefarious***.  Whether done intentionally by UA executives or driven by market pressure, some accountants and university professors called on by the Baltimore Business Journal to review the numbers say something was amiss that caused

---

[135]  *Id.* at 3-4.

[136]  *Id.* at 4.

[137]  *Id.*

unusual patterns in the company's financials.

*        *        *

Under Armour's financial statements show a pattern of rising accounts receivable and sales that couldn't keep up as the company struggled to keep pace in an increasingly competitive industry.

373.    On January 6, 2020, the *Baltimore Business Journal* reported that Under Armour had

> "quietly hired a chief accounting officer [Aditya Maheshwari] in November, filing a key C-suite position for the sportswear maker whose accounting practices are at the center of a federal probe. . . . Maheshwari was brought on three weeks after Under Armour confirmed a Wall Street Journal report that its accounting practices are being investigated by the SEC and the [DOJ].

*        *        *

> While the investigation continues, he will be responsible for cooperating with regulators and ensuring Under Armour is following all of the rules." By not issuing a press release or submitting a filing with the SEC announcing Maheshwari's hiring, the article noted, Under Armour departed from the usual corporate practice of notifying shareholders by of an executive appointment.

374.    On July 27, 2020, Under Armour disclosed in their SEC Form 8-K that "the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company and each of the Executives that would allege certain violations of the federal securities laws." These "Wells Notices," Under Armour's filing stated, "relate to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters." "Specifically," Under Armour explained, "the SEC staff is focused on the Company's disclosures regarding the use of pull forward sales in order to meet sales objectives."

375.    On August 6, 2020, Under Armour further disclosed in its 2Q20 Form 10-Q that "[t]he Wells Notices informed the Company" that the SEC "would allege certain violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 and certain rules promulgated

- 162 -

thereunder" and "also reference potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."  The 2Q20 Form 10-Q also disclosed that "[t]he potential relief to be sought referenced in the Wells Notices included," among other things, "civil monetary penalties, as well as in the case of the Executives, a bar from serving as an officer or director of a public company."

376.    Securities analysts and media took note of the additional news regarding the Under Armour investigations, the seriousness of the misconduct being investigated, and the SEC's preliminary decision to file an enforcement action.  For example:

(a)    on November 18, 2019, UBS released an analyst report stating that the investigations created an "overhang" on the stock.  The report interviewed an expert on DOJ and SEC investigations, who explained that it was "routine" for companies to disclose such investigations in their SEC filings;

(b)    on January 6, 2020, J.P.Morgan released a report "applying a 20% haircut for accounting investigation overhang";

(c)    On January 20, 2020, Zack's published an analyst report looking back on 2019 and observing that, despite "better-than-expected third-quarter 2019 results," "a federal accounting probe and trimming of 2019 revenue growth forecast hurt investor sentiment"; and

(d)    Jefferies' February 11, 2020 report emphasized how "the accounting investigation is an item for investors to contend with" even months after Under Armour belatedly disclosed the nearly three-year old DOJ and SEC investigations;

(e)    in a July 27, 2020 article, WSJ quoted a partner at Arthur Andersen, who called the Wells Notices "the declaration of war" and said they mean "Enforcement is locked and loaded, ready to go."  WSJ further noted the "serious" nature of the Notices, noting that "[t]he SEC

issues a so-called Wells Notice when it believes it can establish a violation and is prepared to recommend the commission file a civil lawsuit[]"

       (f)    on July 28, 2020, Bloomberg Tax published an article emphasizing shareholder implications, stating that "the SEC inquiry is focused on what the athletic apparel company disclosed to shareholders about [pulling sales from the next quarter into the current period]." The Bloomberg article noted that "[c]ompanies are supposed to disclose how they make material accounting estimates, including whether their policy is to recognize revenue by pulling forward sales." Explaining how these practices are unsustainable, Bloomberg quoted an auditor, who said: "At some point, the music is going to stop and you're not going to have a chair . . . . You don't have any more sales to pump up into that quarter." The auditor explained that "[a]ll of this really relates to revenue smoothing. . . . They are trying to provide consistent, recurring, smooth numbers that meet or beat analyst expectations instead of just reporting what really happened[]" Bloomberg further noted that pull-forward sales "often come[ ] with incentives to the customer in the form of discounts, rebates or buy-back guarantees, all of which impact revenue[,]" and "can also disguise sham transactions known as channel stuffing."

## X.    LOSS CAUSATION AND ECONOMIC LOSS

     377.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated (or maintained the artificial inflation of) the prices of Under Armour's common stock and operated as a fraud or deceit on Class Period purchasers of Under Armour's common stock. When the relevant truth was revealed and became apparent to the market, the prices of Under Armour's common stock fell as the prior artificial inflation came out. The truth was not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations of truthful information. As a result of their purchases of Under Armour's common

stock during the Class Period, Plaintiffs and the other members of the Class (defined in ¶407 below) suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.      January 10, 2016 Revelations

378.    The truth began to emerge on Sunday, January 10, 2016, when, as detailed in Section VII.A above, Morgan Stanley issued a report detailing slower growth of the Company's North American apparel sales, falling sales prices, and reduced market share.  As a result of the information revealed to the market, the Company's Class A Common Stock dropped approximately 6.72% on unusually high trading volume.  At the Company's next earnings call on January 28, 2016, the Company rejected and denied the Morgan Stanley Report's revelations and reassured investors of the Company's strong financial condition.

### B.      May 3, 2016 Revelations

379.    The truth continued to emerge after the market closed on May 3, 2016, when, as detailed in Section VII.E above, the Company surprised investors by announcing the sudden departures of key executives Stafford and Thurston.  These departures, coming on the heels of Dickerson's departure, the Morgan Stanley Report exposing problems at the Company, and three major retail customer bankruptcies, were viewed by investors as a signal that there were undisclosed problems at the Company.  As a result, the Company's Class A Common Stock dropped approximately 7.54% on unusually high trading volume.  The Company's Class C Common Stock, which was issued to Class A Common Stock holders on a one-for-one basis after the market closed on April 7, 2016, also experienced a price decline as a result of this news, falling approximately 6.80% on unusually high trading volume.  The declines would have been more dramatic had Defendants disclosed the declines in sales demand, the suspect sales practices used

to mask slowing demand, and the resulting financial problems that led to the departures of Stafford and Thurston.  Instead, Defendants were completely silent on the reasons for their departures.

### C.    May 31, 2016 Revelations

380.    As detailed in Section VII.F above, the Company surprised investors on May 31, 2016, by revealing that, contrary to the Company's positive statements and guidance raise just a month earlier, 2016 revenue and operating income would be much lower than projected, citing the Sports Authority bankruptcy.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 3.92% and 3.57%, respectively, on unusually high trading volume.  The drops would have been more dramatic had Defendants disclosed the suspect sales practices used to mask slowing demand and the true extent of the financial difficulties facing the Company.  Instead, Defendants misleadingly stated that Under Armour's momentum was stronger than ever, and that the Company continued to experience growth and increased demand across all product categories and geographies.

### D.    July 26, 2016 Revelations

381.    The truth continued to emerge on July 26, 2016, when, as detailed in Section VII.H above, the Company surprised investors by revealing slowdowns in apparel sales growth, operating income, and net income.  As a result of the information revealed to the market, the Company's Class A Common Stock and Class C Common Stock prices dropped approximately 5.12% and 3.56%, respectively, on unusually high trading volume.  The drops were tempered by Defendants' attempts to blunt the negative results by making misleadingly positive statements regarding the Company's sales demand and revenue growth, and their failure to disclose the suspect sales practices used to mask slowing demand and the true extent of financial difficulties facing the Company.

### E.    October 25, 2016 Revelations

382.    As detailed in Section VII.J above, on October 25, 2016, the Company revealed a slowdown in North American apparel growth and compressed margins attributed to higher discounts, promotions, and liquidations.   As a result of the information, Under Armour's Class A Common Stock and Class C Common Stock prices dropped approximately 18.36% and 21.25%, respectively, on unusually high trading volume.   The drops would have been more dramatic had Defendants disclosed the true extent of the sales declines, the suspect sales practices used to mask slowing demand, and the associated financial difficulties facing the Company.   But Defendants failed to do so and, instead, reassured investors that the Company's overall growth and demand were strong and stated that the Company's inventory position was healthier.

### F.    January 31, 2017 Revelations

383.    On January 31, 2017, the Company shocked investors by announcing a severe slowdown in growth and dramatically reduced financial projections attributed to problems in the North American apparel business, as well as compressed margins, inventory growth, and the sudden departure of Molloy, as detailed further in Section VII.K above.   As a result, the Company's Class A Common Stock and Class C Common Stock prices plummeted approximately 28.65% and 27.78%, respectively, on unusually high trading volume.   The share price declines would have been larger had Defendants disclosed the suspect sales practices used to mask slowing demand and the true state of the Company's financial condition.   But, Defendants continued to hide these facts and made misleading statements about the reasons for the reported financial results.

### G.    August 1, 2017 Revelations

384.    On August 1, 2017, the Company's common stock prices fell precipitously when it announced another quarter of poor North American sales, lowered 2017 guidance, and a massive restructuring involving hundreds of job cuts and $110 to $130 million in expected restructuring-

related charges, including "approximately $20 million of inventory related charges," as detailed further in Section VII.L above.  The Company's Class A Common Stock and Class C Common Stock prices dropped 8.59% and 10.38%, respectively, on unusually high trading volume.

### H.     November 3, 2019 Revelations

385.     As detailed in Section VII.N above, WSJ revealed on November 3, 2019 that Under Armour's revenue recognition practices were subject to ongoing civil and criminal investigations by the SEC and DOJ, and that Under Armour had been responding to requests for documents and information since July 2017.  The Company released a statement later that day confirming the investigations.  As a result, the Company's Class A Common Stock and Class C Common Stock prices fell 18.92% and 18.35%, respectively, on unusually high trading volume.

386.     As a result of their purchases of Under Armour common stock during the Class Period, Plaintiffs and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Under Armour's business and prospects. Defendants' false and misleading statements had the intended effect and caused Under Armour common stock to trade at artificially inflated levels throughout the Class Period.

387.     When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the prices of Under Armour's common stock declined.  These declines removed the inflation from the prices of Under Armour's common stock, causing real economic loss to investors who had purchased Under Armour's common stock during the Class Period.

388.     The declines in the prices of Under Armour's common stock after the revelations came to light were a direct result of the partial disclosures of truthful information relating to Defendants' misrepresentations.  The timing and magnitude of the price declines in Under Armour

common stock negate any inference that the losses suffered by Plaintiffs and the other members

of the Class were caused by changed market conditions, macroeconomic or industry factors, or

Company-specific facts unrelated to Defendants' fraudulent conduct.  This is evidenced by the

chart below, which demonstrates the clear divergence of the Company's Class A Common Stock

prices from the Company's benchmark indices and peer company stock prices[138] as the revelations

of the truth became known to the market:



389.    The economic losses, i.e., damages, suffered by Plaintiffs and the other members

of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices

of Under Armour common stock and the subsequent significant declines in the value of Under

---

[138]  Under Armour identified the S&P 500 Index and S&P Apparel, Accessories and Luxury Good
Index as benchmarks for its Class A Common Stock performance in its FY15 through FY19 Forms
10-K.

Armour common stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## XI.    PRESUMPTION OF RELIANCE

390.    A class-wide presumption of reliance is appropriate with respect to the Exchange Act claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.    All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.    Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

391.    A class-wide presumption of reliance is also appropriate with respect to the Exchange Act claims in this action under the fraud-on-the-market doctrine.    As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.    Plaintiffs and other members of the Class (defined in ¶286 below) purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Under Armour, and have been damaged thereby.

392.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     as a regulated issuer, Under Armour regularly made public filings with the SEC and related press releases;

(b)     Under Armour regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     Under Armour was followed by several securities analysts employed by major brokerage firms, such as Morgan Stanley, Deutsche Bank, Canaccord Genuity, Wells Fargo, Credit Suisse, Barclays, UBS, Jeffries, Cowen and Company, and Piper Jaffray, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace; and

(d)     certain of the Company's securities, Class A Common Stock and Class C Common Stock, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.

393.    As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding Under Armour from all publicly available sources and reflected such information in the prices of the Company's common stock.

394.    Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices.

395.    At the times they purchased or otherwise acquired the Company's common stock, Plaintiffs and other members of the Exchange Act Class were without knowledge of the facts

concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

396.    As a result of the above circumstances, the presumption of reliance applies.

397.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XII.    NO SAFE HARBOR

398.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Under Armour's Class Period filings.

399.    For example, Under Armour's 2014 Form 10-K, filed with the SEC on February 20, 2015, contained the following boilerplate "caution":

*A decline in sales to, or the loss of, one or more of our key customers could result in a material loss of net revenues and negatively impact our prospects for growth*.

400.     The generic nature of this disclosure is illustrated by the fact that it was simply repeated verbatim from the Company's 2013 Form 10-K, filed with the SEC on February 21, 2014, and was again repeated in the Company's 2015, 2016, 2017, 2018, and 2019 Forms 10-K filed with the SEC on February 22, 2016, February 23, 2017, February 28, 2018, February 25, 2019, and February 26, 2020, respectively, when the problems plaguing the Company were well known internally.

401.     Similarly, Under Armour issued the following risk warning in both its 2013 and 2014 Forms 10-K concerning the decline of brand image, net revenues, and profitability:

*If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of a global business and as a result our brand image, net revenues and profitability may decline*.

402.     A substantially similar warning appeared in the Company's 2015 and 2016 Forms 10-K:

*We must continue to effectively manage our growth and the increased complexity of a global business or we may not achieve our long-term growth targets and our brand image, net revenues and profitability may decline*.

403.     A substantially similar warning appeared in the Company's 2017, 2018, and 2019 Forms 10-K:

*We must successfully manage the increasingly complex operations of our global business, or our business and results of operations may be negatively impacted. . . . If we experience difficulties in supporting the growth of our business, we could experience an erosion of our brand image and a decrease in net revenues and net income.*

404.     The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions"

were untethered to the known problems at hand, rendering them meaningless.  Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

405.    Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of Under Armour who knew it was false or misleading when made.

## XIII.   CLASS ACTION ALLEGATIONS

406.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, on behalf of all persons or entities that purchased or acquired publicly traded common stock of Under Armour during the Class Period, and who were damaged thereby ("Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

407.    Members of the Class are so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of October 31, 2019, Under Armour had more than 188 million shares of Class A Common Stock and more than 228 million shares of Class C Common Stock outstanding.  While the exact number of members of the Class can only be

determined by appropriate discovery, Plaintiffs believe that members of the Class number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

408.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the members of the Class sustained damages arising out of Defendants' wrongful conduct complained of herein.

409.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel experienced and competent in class actions and securities litigation. Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class that Plaintiffs seek to represent.

410.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

411.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the federal securities laws as alleged herein;

        (b)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein in violation of the Exchange Act;

(e)     whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts in violation of the Exchange Act;

(f)     whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Under Armour and Plank

412.     Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

413.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Plaintiffs and other members of the Class to purchase the Company's publicly traded common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

414.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Plank is also sued as a controlling person of Under Armour, as alleged below.

415.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.)* and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

416.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

417.    Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

418.   Plank's primary liability and controlling person liability arise from the following facts, among others: (a) Plank was a high-level executive at the Company during the Class Period; (b) Plank, by virtue of his responsibilities and activities as CEO and Chairman was privy to, and participated in, the creation, development, and reporting of the Company's projections and financial condition; (c) Plank enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) Plank was aware of the Company's dissemination of information to the investing public which he knew, or recklessly disregarded, was materially false and misleading.

419.   Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the

- 178 -

Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

420.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired the Company's common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the common stock price declines above.

421.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their Under Armour publicly traded common stock during the Class Period; or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

422.    By virtue of the foregoing, Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

423.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was removed from the Company's common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendants Under Armour and Plank

424.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Defendants Plank and Under Armour.

425.    Plank acted as a controlling person of Under Armour within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Plank had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Plank was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and

- 180 -

other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.   In addition, Plank had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.  Under Armour controlled Plank and the Company's other officers and employees.

426.    As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their control, Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## COUNT III

### For Violation of Section 20A of the Exchange Act
### Against Plank

427.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-411 above as though fully set forth herein.  This claim is asserted against Plank on behalf of Plaintiffs who were damaged by Plank's insider trading.

428.    As detailed herein, Plank was in possession of material, non-public information concerning Under Armour.  Plank took advantage of his possession of material, non-public information regarding Under Armour to obtain millions of dollars in insider trading profits during the Class Period.

429.    Plank's sales of Under Armour stock were made contemporaneously with Aberdeen's, Monroe's, and one of KBC's fund's purchases, and other Class Members' purchases, of Under Armour stock during the Class Period.

430.    For example, in November 2015, Plank sold the following shares of Under Armour common stock for total proceeds of $99,968,961.

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 11/23/2015 | $92.46 | 199,920 | $18,484,603 |
| 11/23/2015 | $93.00 | 80 | $7,440 |
| 11/23/2015 | $92.46 | 24,991 | $2,310,668 |
| 11/23/2015 | $93.00 | 9 | $837 |
| 11/20/2015 | $92.72 | 80 | $7,418 |
| 11/20/2015 | $92.04 | 68,917 | $6,343,121 |
| 11/20/2015 | $91.24 | 131,003 | $11,952,714 |
| 11/20/2015 | $92.72 | 9 | $834 |
| 11/20/2015 | $92.04 | 8,615 | $792,925 |
| 11/20/2015 | $91.24 | 16,376 | $1,494,146 |
| 11/19/2015 | $89.60 | 320 | $28,672 |
| 11/19/2015 | $88.89 | 158,001 | $14,044,709 |
| 11/19/2015 | $88.42 | 41,679 | $3,685,257 |
| 11/19/2015 | $89.60 | 40 | $3,584 |
| 11/19/2015 | $88.89 | 19,751 | $1,755,666 |
| 11/19/2015 | $88.42 | 5,209 | $460,580 |
| 11/18/2015 | $85.39 | 89,002 | $7,599,881 |
| 11/18/2015 | $87.09 | 10,838 | $943,881 |
| 11/18/2015 | $86.42 | 100,160 | $8,655,827 |
| 11/18/2015 | $85.39 | 11,125 | $949,964 |
| 11/18/2015 | $87.09 | 1,355 | $118,007 |
| 11/18/2015 | $86.42 | 12,520 | $1,081,978 |
| 11/17/2015 | $87.31 | 1,200 | $104,772 |
| 11/17/2015 | $86.17 | 28,676 | $2,471,011 |
| 11/17/2015 | $85.42 | 170,124 | $14,531,992 |
| 11/17/2015 | $87.31 | 151 | $13,184 |
| 11/17/2015 | $86.17 | 3,584 | $308,833 |
| 11/17/2015 | $85.42 | 21,265 | $1,816,456 |

431.    Monroe purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|

| 11/20/2015 | 91.62 | 676 | $61,935 |

432.     One of KBC's fund's purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 11/20/2015 | 92.01 | 11,161.00 | $1,026,923.60 |

433.     In addition, Plank sold the following shares of Under Armour common stock in April 2016 for total proceeds of $38,262,467.

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 4/29/2016 | $40.84 | 197,680 | $8,073,251 |
| 4/29/2016 | $41.58 | 2,320 | $96,466 |
| 4/29/2016 | $40.84 | 24,709 | $1,009,116 |
| 4/29/2016 | $41.58 | 291 | $12,100 |
| 4/28/2016 | $42.92 | 48,446 | $2,079,302 |
| 4/28/2016 | $42.45 | 151,554 | $6,433,467 |
| 4/28/2016 | $42.92 | 6,056 | $259,924 |
| 4/28/2016 | $42.45 | 18,944 | $804,173 |
| 4/27/2016 | $43.00 | 33,762 | $1,451,766 |
| 4/27/2016 | $42.39 | 166,238 | $7,046,829 |
| 4/27/2016 | $43.00 | 4,220 | $181,460 |
| 4/27/2016 | $42.39 | 20,780 | $880,864 |
| 4/26/2016 | $44.15 | 200,000 | $8,830,000 |
| 4/26/2016 | $44.15 | 25,000 | $1,103,750 |

434.     Aberdeen purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|------|-------------|---------------|----------|
| 5/4/2016 | $40.07 | 43,317 | $1,735,712 |
| 5/3/2016 | $42.76 | 9,953 | $425,590 |
| 5/2/2016 | $43.67 | 5,119 | $223,547 |
| 4/29/2016 | $43.70 | 2,997 | $130,969 |
| 4/27/2016 | $45.07 | 3,014 | $135,841 |
| 4/26/2016 | $46.75 | 15,641 | $731,217 |
| 4/25/2016 | $46.48 | 2,275 | $105,742 |
| 4/22/2016 | $46.74 | 3,413 | $159,524 |
| 4/20/2016 | $43.93 | 11,375 | $499,704 |
| 4/19/2016 | $43.96 | 2,958 | $130,034 |

435.    KBC's funds purchased the following shares of Under Armour common stock, among others:

| Date | Share Price | No. of Shares | Proceeds |
|---|---|---|---|
| 4/29/2016 | 43.94 | 5,185.00 | $227,828.90 |

436.    Plaintiffs and other Class members, who purchased shares of Under Armour common stock contemporaneously with sales by Plank suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding rescission or a rescissionary measure of damages.

E.    Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

  Plaintiffs hereby demand a trial by jury.

DATED:  October 14, 2020    ROBBINS GELLER RUDMAN
                 & DOWD LLP
             MARK SOLOMON
             ROBERT R. HENSSLER JR.
             MATTHEW I. ALPERT
             JUAN CARLOS SANCHEZ
             CHRISTOPHER R. KINNON

               *s/ Robert R. Henssler Jr.*
             ROBERT R. HENSSLER JR.

             655 West Broadway, Suite 1900
             San Diego, CA  92101
             Telephone:  619/231-1058
             619/231-7423 (fax)
             marks@rgrdlaw.com
             bhenssler@rgrdlaw.com
             malpert@rgrdlaw.com
             jsanchez@rgrdlaw.com
             ckinnon@rgrdlaw.com

             ROBBINS GELLER RUDMAN
               & DOWD LLP
             PAUL J. GELLER
             JACK REISE
             STEPHEN R. ASTLEY
             ELIZABETH A. SHONSON
             MAUREEN E. MUELLER
             ANDREW T. REES
             120 East Palmetto Park Road, Suite 500
             Boca Raton, FL  33432
             Telephone:  561/750-3000
             561/750-3364 (fax)
             pgeller@rgrdlaw.com
             jreise@rgrdlaw.com
             sastley@rgrdlaw.com
             eshonson@rgrdlaw.com
             mmueller@rgrdlaw.com
             arees@rgrdlaw.com

             *Lead Counsel for Plaintiffs*

MOTLEY RICE LLC
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for KBC Asset Management NV*

SILVERMAN THOMPSON SLUTKIN
   & WHITE LLC
ANDREW C. WHITE (Federal Bar No. 0821)
WILLIAM SINCLAIR (Federal Bar No. 28833)
PIERCE C. MURPHY (Federal Bar No. 30030)
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)
awhite@mdattorney.com
bsinclair@mdattorney.com
pmurphy@mdattorney.com

*Local Counsel for Plaintiffs*

- 186 -

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 14, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


*s/ Robert R. Henssler Jr.*
ROBERT R. HENSSLER JR.