# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

    A.     This Court Has Already Held that There Is Enough Evidence of Defendants' Fraud to Satisfy the Pleading Standards ................................................1

    B.     The Evidence of Defendants' Fraud Has Grown Since *UA III* ...............................2

    C.     Defendants' Attacks on Plaintiffs' Well-Pleaded Allegations Fail ........................3

II.     THE TAC ADEQUATELY ALLEGES FALSITY .....................................................5

    A.     This Court Has Already Held that Plaintiffs Adequately Alleged Falsity and Already Credited Plaintiffs' New Allegations ....................................................5

    B.     Plaintiffs' New Allegations Are Well Pleaded and Supported ...............................7

       1.     Plaintiffs' Sources Are Reliable and Corroborating ...................................8

          a.     Government Investigations and Wells Notices ..............................10

          b.     November 3 and 14, 2019 *WSJ* Articles ........................................11

          c.     Defendants' Violations of GAAP and Financial Misstatements ................................................................................14

             (1)     Channel Stuffing and Contingent Sales ............................15

             (2)     Understating Reserves and Overstated Inventory .............16

       2.     The TAC's New Allegations Are Material ................................................20

    C.     Defendants Had a Duty to Disclose the Sales and Accounting Practices ............22

    D.     Plaintiffs Adequately Plead Undisclosed Channel Stuffing ..................................26

    E.     The TAC Cures Deficiencies as to Prior Dismissed Statements ..........................30

       1.     Investor Day and 3Q15 ..............................................................................30

       2.     Partial Disclosures ....................................................................................32

          a.     Under Armour's Publicly Reported Financial Results Were Materially Misleading ................................................................33

          b.     Defendants' Partial Disclosures Are Not Puffery .........................34

**Page**

        c.      The PSLRA's Safe Harbor Does Not Apply Here.........................36

        d.      The TAC Does Not Take Statements Out of Context...................38

    F.      The TAC Pleads New False and Misleading Statements.......................................38

III.    INCORPORATING THE EVIDENCE THIS COURT CITED IN *UA III*, THE TAC SUFFICIENTLY ALLEGES DEFENDANTS' SCIENTER ..................................40

    A.      This Court Previously Ruled that the Evidence Revealed by the *WSJ* Permits a Strong Inference of Scienter ...................................................40

    B.      The TAC Sufficiently Alleges Defendant Plank's Scienter ..................................41

    C.      The TAC Sufficiently Alleges Under Armour's Scienter.....................................47

IV.    THE TAC ADEQUATELY ALLEGES SECTION 20(a) AND 20A CLAIMS...............49

V.    CONCLUSION....................................................................................50

- ii -

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ........................................................................19, 49

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009)...................................................................................22

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).....................................................................15, 19, 33

*Ash v. PowerSecure Int'l, Inc.*,
    2015 WL 5444741 (E.D.N.C. Sept. 15, 2015).........................................................26

*Bartesch v. Cook*,
    941 F. Supp. 2d 501 (D. Del. 2013).........................................................................18

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*,
    929 F.3d 135 (4th Cir. 2019) ...................................................................................9

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ..............................................................................26

*Burt v. Maasberg*,
    2014 WL 1291834 (D. Md. Mar. 28, 2014)........................................................5, 14

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
    __ F. Supp. 3d __, 2020 WL 6270482
    (E.D. Va. Oct. 26, 2020) ............................................................................. *passim*

*Carlucci v. Han*,
    907 F. Supp. 2d 727 (E.D. Va. 2012) .....................................................................10

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
    827 F. Supp. 2d 559 (D.S.C. 2011).........................................................................40

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
    2017 WL 11562247 (D. Md. July 6, 2017)..............................................................42

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)......................................................................27

*City of Omaha Police & Fire Ret. Sys. v. Timberland Co.*,
    2013 WL 1314426 (D.N.H. Mar. 28, 2013) ...............................................18, 29, 30

**Page**

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ................................................43

*Cunha v. Hansen Nat'l Corp.*,,
    2012 WL 12886194 (C.D. Cal. Oct. 22, 2012).........................28

*Direct Benefits, LLC v. TAC Fin. Inc.*,
    2014 WL 671616 (D. Md. Feb. 20, 2014) .........................9, 29

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008) .............................................37

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..................................................45

*Epstein v. World Acceptance Corp.*,
    2015 WL 2365701 (D.S.C. May 18, 2015)............................15

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016)..............................11, 47, 49

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................47

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ...............................................47

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................24

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. 2004)................................17, 29

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)...........................................17, 28, 30

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ..............................................11

*Halford v. AtriCure, Inc.*,
    2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)..................13, 28

*Hirtenstein v. Cempra, Inc.*,
    348 F. Supp. 3d 530 (M.D.N.C. 2018) ...................................44

- iv -

**Page**

*Holwill v. AbbVie Inc.*,
   2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .......................................................................24

*Ibarra v. United States*,
   120 F.3d 472 (4th Cir. 1997) ...............................................................................................38

*In re Akorn, Inc. Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................................41

*In re Am. Serv. Grp., Inc.*,
   2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ..................................................................20

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ......................................................................49

*In re Banc of Cal. Sec. Litig.*,
   2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .......................................................................44

*In re Barclays Bank PLC Sec. Litig.*,
   2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017).......................................................................11

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)..............................................................................13, 28

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. Mar. 31, 2018)....................................................................18

*In re Carter's, Inc. Sec. Litig.*,
   2012 WL 3715241 (N.D. Ga. Aug. 28, 2012) ......................................................................15

*In re CIT Grp., Inc. Sec. Litig.*,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004)...................................................................................17

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
   510 F. Supp. 2d 1187 (N.D. Ga. 2007)..................................................................................29

*In re Conventry Healthcare Sec. Litig.*,
   2011 WL 1230998 (D. Md. Mar. 30, 2011)...........................................................................37

*In re Crocs, Inc. Sec. Litig.*,
   774 F. Supp. 2d 1122 (D. Colo. 2011)...................................................................................17

*In re Cypress Semiconductor Sec. Litig.*,
   891 F. Supp. 1369 (N.D. Cal. 1995) .....................................................................................28

- v -

**Page**

*In re Cytyc Corp. Sec. Litig.*,
  2005 WL 3801468 (D. Mass. Mar. 2, 2005)........................................................................25, 28

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...........................................................................................48

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................................................11

*In re Diamond Foods, Inc.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .....................................................................20

*In re DXC Tech. Co. Sec. Litig.*,
  2020 WL 3456129 (E.D. Va. June 2, 2020) .........................................................................26

*In re Ford Motor Co. Sec. Litig., Class Action*,
  381 F.3d 563 (6th Cir. 2004) .............................................................................................34

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ..................................................................................46

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
  2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019)......................................................................28

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
  2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020) .......................................................................29

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wis. 2009)............................................................................19, 29

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) .............................................................................................37

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
  219 F. Supp. 2d 675 (D. Md. 2002)....................................................................................37

*In re ICN Pharm., Inc., Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) ..............................................................................29

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..............................................................................19

*In re Lions Gate Entm't Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ................................................................................11, 43

4839-5512-0856.v2

**Page**

*In re Loewen Grp. Inc.*,
   2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) ........................................................12

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D. W. Va. 2012)................................................32, 35, 39

*In re Maximus, Inc. Sec. Litig.*,
   2018 WL 4076359 (E.D. Va. Aug. 27, 2018).........................................................25

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................13

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................21, 45

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................20, 27

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
   988 F. Supp. 2d 406 (S.D.N.Y. 2013)....................................................................20

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ...............................................................................44

*In Re PEC Sols. Sec. Litig.*,
   2004 WL 1854202 (E.D. Va. May 25, 2004) ............................................19, 20, 26

*In re Quality Sys. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ...............................................................................23

*In re Salix Pharm., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................13, 28, 36

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016).....................................................................26

*In re Sawtek, Inc. Securities Litigation*,
   2005 WL 2465041 (M.D. Fla. Oct. 6, 2005) .........................................................37

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).....................................................................................43

*In re Sci.-Atlanta Sec. Litig.*,
   239 F. Supp. 2d 1351 (N.D. Ga. 2002)....................................................18, 27, 34

Page

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    669 F.3d 68 (1st Cir. 2012) ............................................................... 35

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ............................................................ 34

*In re Sourcefire, Inc. Sec. Litig.*,
    2008 WL 1827484 (D. Md. Apr. 23, 2008) ....................................... 37

*In re Spectrum Brands, Inc. Sec. Litig.*,
    461 F. Supp. 2d 1297 (N.D. Ga. 2006) ........................................ 17, 29

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ........................... 19, 27, 28, 35

*In re Synchronoss Securities Litigation*,
    705 F. Supp. 2d 367 (D.N.J. 2010) .................................................. 36

*In re Towne Servs., Inc. Sec. Litig.*,
    184 F. Supp. 2d 1308 (N.D. Ga. 2001) .............................................. 12

*In re Trex Co., Inc. Sec. Litig.*,
    212 F. Supp. 2d 596 (W.D. Va. 2002) .............................................. 29

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) .......................................... 18, 21

*In re Under Armour Sec. Litig.*,
    2020 WL 363411 (D. Md. Jan. 22, 2020) ................................. *passim*

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018) .......................................... *passim*

*In re Under Armour Sec. Litig.*,
    409 F. Supp. 3d 446 (D. Md. 2019) ........................................ 5, 6, 50

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................ 31

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................. 45

*In re Viewlogic Sys. Sec. Litig.*,
    1996 U.S. Dist. LEXIS 22371
    (D. Mass. Mar. 13, 1996) ...........................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ......................................................................36

*In re Willis Towers Watson plc Proxy Litig.*,
    937 F.3d 297 (4th Cir. 2019) ....................................................................21

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ........................................................................25

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ......................................................................19

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
    432 F. Supp. 2d 571 (E.D. Va. 2006) ..................................................20, 26

*Jones v. Corus Bankshares, Inc.*,
    701 F. Supp. 2d 1014 (N.D. Ill. 2010) ......................................................18

*Karacand v. Edwards*,
    53 F. Supp. 2d 1236 (D. Utah 1999) .........................................................37

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2016 WL 3981236 (D.S.C. July 25, 2016) ...........................6, 10, 22, 31

*Keeney v. Larkin*,
    306 F. Supp. 2d 522 (D. Md. 2003),
    *aff'd*, 102 F. App'x 787 (4th Cir. 2004) ......................................................9

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................18, 23

*Knurr v. Orbital ATK Inc.*,
    272 F. Supp. 3d 784 (E.D. Va. 2017) .........................................................43

*Knurr v. Orbital ATK Inc.*,
    294 F. Supp. 3d 498 (E.D. Va. 2018) .........................................................47

*Lefkoe v. Jos. A. Bank Clothiers*,
    2007 WL 6890353 (D. Md. Sept. 10, 2007) ..............................................36

**Page**

*Levy v. Maggiore*,
    48 F. Supp. 3d 428 (E.D.N.Y. 2014) ................................................................22

*Lewis v. YRC Worldwide Inc.*,
    2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ....................................................11

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) ...............................................................17

*Luna v. Marvell Tech. Grp. Ltd*,
    2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) .....................................................30

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ...................................................................... *passim*

*Malone v. Microdyne Corp.*,
    26 F.3d 471 (4th Cir. 1994) .........................................................................14, 39

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...........................................................................................22

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..............................................................49

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) .............................................................................22

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008) ................................................................................9

*Morgan v. AXT, Inc.*,
    2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ..................................................17

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ......................................................9, 30

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
    2013 WL 1188050 (D. Conn. Mar. 23, 2013) ...................................................32

*Okla. Firefighters' Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................21, 24, 28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................................24, 34

- x -

**Page**

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)......................................................................25

*Peace Officers' Annuity & Benefit Fund of Ga. v. Davita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019).............................................20, 27

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..............................................19

*Pelletier v. Endo Int'l PLC*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ........................................................47

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ............................................34

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..............................................31

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
    966 F. Supp. 2d 525 (M.D.N.C. 2013) .......................................................37

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).........................................................43

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................................43

*SEC v. Agora, Inc.*,
    2007 WL 9725170 (D. Md. Aug. 3, 2007) ..................................................37

*Shah v. GenVec, Inc.*,
    2013 WL 5348133 (D. Md. Sept. 20, 2013) ...............................................25

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2017) ............................................................ *passim*

*Sunbeam Corp.*,
    Exchange Act Release No. 44305, 2001 WL 616627 (May 15, 2001) ..................15

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ....................................................................47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................10, 14, 40

4839-5512-0856.v2

Page

*Thorpe v. Walter Inv. Mgmt., Corp.*,
 111 F. Supp. 3d 1336 (S.D. Fla. 2015) ..................................................................47

*Troelstrup v. Index Futures Grp., Inc.*,
 130 F.3d 1274 (7th Cir. 1997) ................................................................................1

*Turner v. MagicJack VocalTec, Ltd.*,
 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)............................................................20

*Vancouver Alumni Asset Holdings v. Daimler AG*,
 2017 WL 2378369 (C.D. Cal. May 31, 2017) ................................................13, 27

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
 2020 WL 6118605 (N.D. Ill. Oct. 15, 2020)..........................................................29

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
 28 F. Supp. 3d 93 (D. Mass. 2014) ..................................................................43, 45

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
 321 F. Supp. 3d 1133 (C.D. Cal. 2018) ............................................................29, 44

*Wietschner v. Monterey Pasta Co.*,
 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ..................................................................25

*Willis v. Big Lots*, *Inc.*,
 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ........................................................44

*Woolgar v. Kingstone Cos., Inc.*,
 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020) ........................................................44

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
 780 F.3d 597 (4th Cir. 2015) ..................................................................................40

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
 §78j(b)............................................................................................................ *passim*
 §78t(a)....................................................................................................................49
 §78t-1..............................................................................................................49, 50
 §78u-5(c)(1)............................................................................................................36

17 C.F.R.
 §229.303..................................................................................................................25
 §229.303(a)..............................................................................................................25

Page

Federal Rules of Civil Procedure
    Rule 5-03 ...........................................................................................................16
    Rule 9(b) ........................................................................................................5, 9
    Rule 10(a) ..........................................................................................................29
    Rule 10(b) ..........................................................................................................29
    Rule 10(c) ..........................................................................................................29
    Rule 10b-5 ..........................................................................................18, 22, 25
    Rule 10b-5(a) .....................................................................................................28
    Rule 10b-5(c) .....................................................................................................28
    Rule 12(b)(6) ..........................................................................................9, 14, 18
    Rule 60(b) ....................................................................................................40, 44

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995 ("PSLRA")
    Pub. L. No. 104-67, 109 Stat. 737 (1995) ..................................................... *passim*

# I.     INTRODUCTION

## A.     This Court Has Already Held that There Is Enough Evidence of Defendants' Fraud to Satisfy the Pleading Standards

Reading Defendants' Motion to Dismiss Plaintiffs' Consolidated Third Amended Complaint ("Motion" or "MTD") (ECF No. 159), a casual observer would have no idea that just over a year ago, this Court minced no words in holding that the same evidence now pleaded in the Consolidated Third Amended Complaint for Violations of the Federal Securities Laws ("TAC") (ECF No. 153) "***tips the scale in favor of permitting Plaintiffs' claims to proceed***." *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *7 (D. Md. Jan. 22, 2020) ("*UA III*").[1]  Defendants' wishful thinking, that this Court did not previously hold that the evidence now incorporated into the TAC demonstrates that Plaintiffs' allegations are sufficient to survive dismissal, does not make it so.  *See Troelstrup v. Index Futures Grp., Inc.*, 130 F.3d 1274, 1278 (7th Cir. 1997) (Posner, J.) ("Hamlet's *dictum* that 'there is nothing either good or bad but thinking makes it so' has limited scope in federal litigation.").

In its *UA III* opinion, this Court agreed with Plaintiffs that the same facts now pleaded in the TAC "'would have produced a different result if present before the original [dismissals].'"  *UA III*, 2020 WL 363411, at *6.  First, the Court echoed its earlier rulings that Plaintiffs had already "adequately pled actionable misrepresentations or omissions."  *Id.* at *7.

Second, going a step further, the Court held that the newly discovered evidence supports a cogent and compelling inference of Defendants' scienter.  *See id.* at *8 ("The only issue this Court must resolve is whether Defendants' alleged awareness of Under Armour's sales activities and

---

[1]     All "¶" and "¶¶" references are to the TAC.  All emphasis is added and all citations and quotations are omitted unless otherwise noted.  Additionally, all defined terms and proper names referenced herein are identical to those defined and described in the TAC.  "SAC" refers to Plaintiffs' Consolidated Second Amended Complaint for Violations of the Federal Securities Laws (ECF No. 78).

- 1 -

accounting practices, which have become the subject of a federal inquiry, generates a 'cogent and compelling' inference of scienter. ***This Court concludes that it does***.").  In support of this conclusion, the Court cited the then-new evidence of federal investigations into Under Armour's accounting and sales practices, along with the November 2019 articles from *The Wall Street Journal* ("*WSJ*") that first exposed these investigations and detailed the underlying alleged fraudulent conduct at the Company.  *See id*. at *5.  The Court held that these facts "support the conclusion that Under Armour and Plank knew that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products."  *Id*. at *7.  Therefore, the Court held, "***The totality of these allegations permit a strong inference of scienter on the part of Under Armour executives and Plank specifically***."  *Id*.[2]  Thus, based on this Court's opinion in *UA III* alone, Defendants' Motion should be denied.[3]

## B.    The Evidence of Defendants' Fraud Has Grown Since *UA III*

When the Court issued its *UA III* opinion, holding that with the addition of the newly discovered evidence, Plaintiffs satisfied the pleading standards for both falsity and scienter, all that Under Armour had publicly disclosed about the federal inquiries was that the DOJ and the SEC were investigating "certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017."  2020 WL 363411, at *5.  Since the issuance of the *UA III* opinion, more evidence of Defendants' fraud has come to light.

---

[2]    Defendants cite to the transcript of a hearing the Court held before issuing its opinion in *UA III*, claiming that "the Court also explained that Plaintiffs still had to meet their pleading burden in their new complaint."  MTD at 3.  But nothing the Court said during the January 14, 2020 hearing undermines its clear holdings in *UA III*, which it issued five days later.  At the hearing, the Court explained the procedure that would occur with respect to the filing of the TAC, in light of the then-undecided issues surrounding case consolidation and the appointment of lead plaintiff and lead counsel.  *See* ECF No. 136 at 80:6-12.

[3]    Defendants' Motion does not contest that the TAC sufficiently alleges loss causation.

On July 27, 2020, Under Armour publicly disclosed that the Company, its former CEO Kevin Plank, and its current CFO David Bergman had received Wells Notices from the SEC for failing to publicly disclose "pull forward" sales tactics they allegedly used to meet revenue and sales objectives during the third quarter of 2015 through December 31, 2016. *See* ¶95. The Wells Notices informed both Defendants and Bergman "that the SEC Staff has made a preliminary determination to recommend that the SEC file an enforcement action against [them] that would allege certain violations of the federal securities laws." *Id*. The issuance of a Wells Notice is more than just the initiation of an investigation; rather, a Wells Notice is only issued if SEC Enforcement makes a "preliminary determination to recommend enforcement action." ¶95 n.45. On August 6, 2020, Under Armour confirmed that the DOJ's separate criminal investigation remained ongoing. *See* ¶97.

### C.    Defendants' Attacks on Plaintiffs' Well-Pleaded Allegations Fail

Faced with these incriminating facts, Defendants attempt to discredit Plaintiffs' new allegations by improperly isolating and attacking each one individually. But Plaintiffs' new allegations, which this Court has already credited, are pleaded with particularity and corroborated by numerous sources. When considered with the totality of the TAC's other allegations – many of which Defendants outright ignore – the TAC more than adequately pleads falsity and scienter, the only two elements of Plaintiffs' §10(b) claim Defendants challenge.

Defendants also raise various red herrings – all of which can be easily rejected. For example, Defendants try to reduce Plaintiffs' allegations to a "fraudulent channel stuffing scheme." MTD at 7-8. But, as this Court has recognized, the channel stuffing allegations – although well-pleaded here, *see infra* §II.C. – are but one part of Plaintiffs' "central allegation" that Under Armour misled investors about demand for its products. *UA III*, 2020 WL 363411, at *1.

Additionally, Defendants argue that Under Armour was never under any duty to disclose the existence of the federal investigations.  *See* MTD at 48, 49.  But Plaintiffs do not allege (nor have they ever alleged) that Under Armour was under a duty to disclose the investigations.  *See*, *e.g.*, ECF No. 127 at 16.  However, the fact that Under Armour intentionally concealed the existence of the DOJ and SEC investigations from investors for three years, combined with the fact that Plank stepped down from his role as CEO just weeks before the *WSJ* revealed the investigations, further demonstrates the falsity of Defendants' statements while strengthening the cogent and compelling inference of their scienter.  *See* ¶¶19, 92-93, 102-105, 299, 306.

Defendants also contend that "the existence of an unresolved investigation or receipt of a Wells Notice is insufficient to establish a strong inference of scienter."  MTD at 38.  Once again, Defendants mischaracterize Plaintiffs' allegations.  Plaintiffs are not relying solely on the Wells Notices to establish scienter.  Rather, the TAC supports Defendants' scienter with numerous other facts, including, among others: (1) the existence of the DOJ and SEC investigations; (2) investigators' review of Plank's emails (which reflect that he had personal knowledge of the questionable sales and accounting strategies); (3) the inculpatory statements of former Under Armour executives in the November 14, 2019 *WSJ* article; (4) pervasive and significant accounting, revenue recognition, and disclosure obligation violations to mask slowing demand; (5) Plank's suspiciously timed $138  million in stock sales; (6) the eyebrow-raising resignations of two Company CFOs; (7) the $600 million Bond offering in June 2016; and (8) the timing of and circumstances surrounding Plank's resignation.[4]  Thus, the Wells Notices are yet another relevant fact that, when considered collectively and holistically with Plaintiffs' other allegations, gives rise to a cogent and compelling inference of scienter.  *See*, *e.g.*, *UA III*, 2020 WL 363411, at *4 n.8 ("[T]he

---

[4]   *See, e.g.*, ¶¶18, 57, 96, 94, 124-139, 142-143, 168, 324-369, 370-371.

4839-5512-0856.v2

existence of such an investigation is relevant to allegations that Plank and Under Armour executives acted with scienter.").

Because Defendants' Motion presents no reason for the Court to depart from its decision in *UA III* that Plaintiffs' allegations, accepted as true, satisfy the pleading standards for both falsity and scienter, the motion should be denied.

## II.    THE TAC ADEQUATELY ALLEGES FALSITY[5]

"All that is necessary" to plead falsity adequately is to allege "sufficient facts and reasons . . . that, if true, would create a plausible claim that . . . Defendants made a false or misleading statement." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 685 (D. Md. 2018) ("*UA I*"). Indeed, this Court has already determined that Plaintiffs have satisfied the standard for pleading falsity. *See id.*; *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 457 (D. Md. 2019) ("*UA II*"). By alleging the who, what, where, when, and why, the TAC also pleads sufficient "new details" that place Plaintiffs' prior allegations "***in a new light***" and show that Defendants made additional false and misleading statements concerning Under Armour's brand health, demand, inventory, sales, and reported financial results. *UA III*, 2020 WL 363411, at *1, *6; *Burt v. Maasberg*, 2014 WL 1291834, at *12 (D. Md. Mar. 28, 2014) ("Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.").

### A.    This Court Has Already Held that Plaintiffs Adequately Alleged Falsity and Already Credited Plaintiffs' New Allegations

In *UA I*, the Court held that Plaintiffs satisfied the pleading standard for falsity by alleging that Defendants' statements – concerning Under Armour's margins, excess inventory, the departures of key personnel, ASPs, market share, the impact of wholesale customers' bankruptcies, and the

---

[5]    Given this Court's prior rulings and its familiarity with the factual allegations now incorporated into the TAC (*see UA III*, 2020 WL 363411, at *2, *5), Plaintiffs do not repeat them again here.

Company's financial outlook – "omitted purportedly material information that was in their possession and were obligated to provide in order to give a truthful picture of the Company's health." 342 F. Supp. 3d at 685.  In *UA II*, the Court held, "As before, there are sufficient allegations pled to move forward."  409 F. Supp. 3d at 457.  Because the TAC repleads these allegations, it again adequately alleges misstatements.  *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *7 (D.S.C. July 25, 2016) (declining "to rule on the sufficiency of every alleged misrepresentation at this stage of the proceedings as all that is required is for Plaintiff to have pled sufficient facts to permit a reasonable person to find a plausible claim").

Moreover, in its *UA III* opinion granting Plaintiffs' motion for an indicative ruling, the Court credited Plaintiffs' new allegations, including that Defendants:

- "shifted sales from quarter to quarter to appear healthier," "engaged in questionable accounting practices to inflate its revenue within the Class Period," and that "Plank's emails reveal that he was personally aware of these practices";

- "engaged in allegedly questionable sales practices with 'retailers' – not just Dick's – and that Dick's 'stopped taking products early' as a result of a July 2016 deal between Under Armour and Kohl's";

- "shipp[ed] goods to retailers even when Under Armour knew the goods would likely never be sold to consumers and would be returned";

- "continued making sales to The Sports Authority even after learning that the retailer was headed towards bankruptcy"; and

- had been responding to investigative requests for documents and information since July of 2017 from the SEC and DOJ, who are investigating Under Armour's Class Period sales and accounting practices for potential civil and criminal violations.

2020 WL 363411, at *1, *2, *5-*7.  Summarizing these new allegations, the Court held that they "support the conclusion that Under Armour and Plank *knew* that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and ***intentionally misrepresented*** the level of demand for their products."  *Id*. at *7.  Since then, Under Armour has revealed that the

SEC's three-year investigation yielded Wells Notices concerning this same Class Period misconduct.

*See* ¶¶20, 95-97, 374.

**B.      Plaintiffs' New Allegations Are Well Pleaded and Supported**

The TAC pleads particularized facts detailing Defendants' specific suspect sales and accounting practices, which they used to increase the Company's quarterly revenue, mask slowing demand for its products, and extend its 26-quarter streak of 20% sales growth (¶11), including:

- Pulling forward orders from the month after the quarter to ship within the quarter to hit aggressive sales goals or close the gap, to appear healthier, and to maintain the façade of quarterly growth demanded by Plank by artificially boosting revenue. This began in 3Q15 and continued every quarter through the end of 2016, including at Dick's. Plank knew about the effort to move revenue between quarters, and he encouraged the practice by threatening the Under Armour sales organization during the summer of 2016 that "heads will roll" if they did not hit 20% growth. The pull-forward orders added at least ***tens of millions in quarterly sales*** from 3Q15-3Q16 (*see* ¶¶52-61, 338);

- Inducing its biggest retailers, like Dick's, to take products early by extending payment terms, offering discounts, and granting a ***right to return*** unsold products. The agreements with Dick's were generally documented in emails. The Company's customers bought and owned the merchandise for 3-4 months, but after six months, Under Armour was forced to buy back some of the unsold merchandise for which it had previously recorded revenue despite the fact that it was a contingent sale. In 2016, Under Armour had to buy back a significant amount of product pursuant to these deals, leading to excess inventory and liquidations. Under these agreements, Dick's returned a large amount of goods, which had to be liquidated at lower prices and margins. Dick's stopped taking goods early in 2016 when it was upset with Under Armour's deal with discount retailer Kohl's (*see* ¶¶55, 61, 62-66, 74);

- Shipping products earlier than planned and in the final days of the quarter, including the backdating of shipping dates, resulting in shipping plans that contradicted the dates on shipping boxes and "truckloads" of returned inventory (*see* ¶¶54, 73);

- Stuffing as much inventory as possible to certain retailers to frontload revenue, including by shifting products intended for the Company's own factory stores to discount retailers, such as T.J.X. Co., in 2016 so that, according to a former merchandising executive at the Company, Under Armour could meet its quarterly targets by immediately booking the goods as revenue instead of having to wait for a customer to buy the items at the Company's own stores (*see* ¶59);

- 7 -

- Continuing to ship products to Sports Authority in 2016 and booking sales for those goods when shipped, even after it became clear that Sports Authority was headed to bankruptcy, might not be able to pay for the products, and that the products could be returned *en masse*.  TSA returned a massive amount of products (*see* ¶60); and

- Improperly recording revenue on contingent sales and understating the Company's sales returns and allowances, markdowns and discounts, and failing to timely record the write-down of excess and obsolete inventory, thus violating GAAP and SEC rules.  As a result of these practices, the following Under Armour financial statements issued to the public and filed with the SEC were materially false and misleading: Form 10-K for the year ended December 31, 2015, and Form 10-Qs for periods ending September 30, 2015, March 31, 2016, June 30, 2016, and September 30, 2016.  These misstatements were also material.  For example, in 3Q16, Under Armour's net income and earnings per share ("EPS") were overstated by an estimated 30% considering only the (a) understated sales reserves for returns, allowances, markdowns, and discounts and (b) inflated inventory (*see* ¶¶325-327).

## 1. Plaintiffs' Sources Are Reliable and Corroborating

The TAC incorporates the SAC's well-pleaded allegations and relies on numerous reliable and corroborated sources to support its new allegations, including (but not limited to) the following:

- Under Armour's July 27, 2020 Form 8-K disclosing the Wells Notices, which stated that SEC Staff recommended an enforcement action "covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use of 'pull forward' sales in connection with revenue during those quarters" (*see, e.g.*, ¶95);

- A November 3, 2019 *WSJ* article revealing that the DOJ and SEC have been investigating Defendants civilly and ***criminally*** since 2017 (*see, e.g.*, ¶318);

- A November 14, 2019 *WSJ* article based on interviews with former Company executives detailing how and when Defendants employed a variety of improper sales and accounting practices to artificially boost revenue, "***to mask slowing demand***," and to maintain artificially the quarterly growth demanded by Plank, including by pulling forward sales to Dick's and other retailers in 2016 with inducements, and that federal investigators are examining ***e-mails that show Plank knew about efforts to move revenue between quarters to make the Company appear healthier*** (*see, e.g.*, ¶¶94, 370); and

- Defendants' reported financial results from 3Q15-3Q16, which reflect these practices and violate SEC and GAAP rules (*e.g.*, ¶¶324-369).

Despite the Court's prior ruling, and in the face of these particularized allegations from reliable and corroborating sources, Defendants challenge their adequacy.  All these challenges fail.

***First***, Defendants' efforts to isolate and dispute the TAC's allegations, while asking the Court to draw inferences in their favor, MTD at 12-14, is improper. *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 145, 152 (4th Cir. 2019) ("[w]hen considering the sufficiency of a complaint's allegations under a Rule 12(b)(6) motion, courts must construe the complaint 'liberally so as to do substantial justice'" and "'assume as true all its well-pleaded facts'").

***Second***, despite Defendants' contention (MTD at 1-3, 9, 14), Plaintiffs "are not required to 'plead "detailed evidentiary matter" to survive at motion to dismiss.'" *Direct Benefits, LLC v. TAC Fin. Inc.*, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014); *see Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci.* Corp., 523 F.3d 75, 90 (1st Cir. 2008) ("'[W]e cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'"); *cf. Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *9 n.3 (D. Or. June 27, 2017) ("Plaintiffs are not required to identify specific pull in transactions."). Likewise, Plaintiffs need not plead facts, such as detailed transaction records, "which, because of the lack of discovery, are in the exclusive possession of the Defendants." *Direct Benefits*, 2014 WL 671616, at *8; *see Keeney v. Larkin*, 306 F. Supp. 2d 522, 528 (D. Md. 2003), *aff'd*, 102 F. App'x 787 (4th Cir. 2004) ("[N]either Rule 9(b) nor the PSLRA requires plaintiff to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants."). Moreover, the Court already held that these new facts – analyzed before the Wells Notices – comprise sufficient "***evidence*** [that] requires the judgement to be vacated." *UA III*, 2020 WL 363411, at *6.

***Third***, the coherence and consistency of the TAC's new facts, especially when considered with the facts re-pleaded from the SAC, further support Plaintiffs' allegations, as corroborated by multiple sources, including: (a) the Company's statements in SEC filings disclosing the government

- 9 -

investigations and Wells Notices; (b) the *WSJ* articles based on statements from former Company executives; and (c) Defendants' violations of GAAP and SEC regulations, which made Under Armour's financial reporting in 2015 and 2016 (and its projections for 2016 and 2017) materially false and misleading.[6]  *See Carlucci v. Han*, 907 F. Supp. 2d 727 (E.D. Va. 2012) (considering "the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources"); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("*Makor I*") ("Given the consistency and specificity of the plaintiffs' channel stuffing allegations . . . [the] complaint provided sufficient detail of channel stuffing.").[7]  Defendants' attacks on these sources fail for the reasons below.

### a.   Government Investigations and Wells Notices

Under Armour's SEC filings disclosing the government investigations support Plaintiffs' allegations by "paint[ing] a different picture" than what Defendants told investors during the Class Period. *KBC*, 2016 WL 3981236, at *5.  For example, the day after the *WSJ* revealed the DOJ and SEC investigations, Under Armour confirmed in a Form 8-K that the SEC and the DOJ had been investigating the Company's Class Period sales and accounting practices for over two years.  *See* ¶¶12, 318-319, 321.  And in a July 27, 2020 Form 8-K, the Company further disclosed that the SEC issued Wells Notices recommending an enforcement action "relat[ing] to the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016, regarding the use

---

[6]   These new facts also corroborate allegations repeated from the SAC concerning the Company's declining brand heat, loss of market share, erosion of premium brand image, ramp up of promotional activity and resulting decline in ASPs and gross margins, and its massive restructuring. *See, e.g.*, ¶¶44-50, 90.

[7]   The *Makor I* decision was reversed later by the Supreme Court only on scienter grounds and not as to the falsity of defendants' misstatements. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328-29 (2007) ("*Tellabs*").

4839-5512-0856.v2

of 'pull forward' sales in connection with revenue during those quarters." ¶95.  Defendants' Motion does not deny these allegations but instead pronounces the practices "appropriate."  ¶320.

Courts routinely find such disclosures of government investigations sufficient to establish the falsity of a company's prior statements.  *See Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 676 (D.S.C. 2016) ("the two government investigation disclosures reveal a showing of prior misstatements and fraudulent activity"); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1206 (9th Cir. 2020) (disclosure of SEC investigation revealed the falsity of the defendant's prior statement).  Defendants' argument that they "had no obligation to disclose the SEC and DOJ investigations during the Class Period" is a red herring because Plaintiffs do not allege that Defendants had such a duty.  MTD at 49.  Rather, Defendants' failure to disclose their use of pull forward sales in connection with revenue during the Class Period to meet sales objectives made their public statements implicating these practices misleading.[8]  *See* §II.C., *infra*.

> ### b.  November 3 and 14, 2019 *WSJ* Articles

Two *WSJ* articles further support the TAC's allegations, and Defendants' attempt to discredit allegations based on these articles fails.  The *WSJ*'s November 3, 2019 article disclosed that the DOJ and SEC have been investigating Defendants criminally and civilly since 2017 concerning Under Armour's "accounting practices" and "whether the sportswear maker shifted sales from quarter to quarter to appear healthier."  ¶93.  The *WSJ*'s November 14, 2019 article further disclosed that the investigations concerned "revenue recognition and whether there were improper tactics used to shift

---

[8]   Defendants' cases stand for the irrelevant proposition that there is no "'generalized duty to disclose.'"  *See Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *10 (N.D.N.Y. Mar. 27, 2020) ("'a government investigation, ***without more***, does not trigger a generalized duty to disclose'"); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 912 (W.D. Tex. 2008) (same); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *17 (S.D.N.Y. Sept. 13, 2017) (same); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (same).

- 11 -

sales" during the Class Period "to mask slowing demand," and that investigators are examining emails that show Plank "knew" about the Company's efforts to move revenue between quarters to make it "appear healthier."  ¶¶12, 93-94, 99.

The November 14 *WSJ* article relied on interviews with former Company executives in four different departments (sales, merchandising, logistics, finance, ¶60) in reporting that Defendants:

- used the undisclosed sales and accounting practices to appear healthier and maintain Under Armour's growth record, which was important to Plank (¶¶52, 56);

- "pull[ed] forward orders from the month after the quarter to ship within the quarter in order to hit the number or close the gap" in 2016, including to Dick's, "to mask slowing demand" and "all in the name of hitting the number" (¶¶53, 94);

- incentivized retailers to take shipments early by adjusting the terms of the contract to offer a discount or extend the payment period (¶62);

- backdated shipment dates so shipping plans in the quarter's final days sometimes contradicted the dates on the boxes, resulting in "truckloads" of returns (¶¶54, 73);

- redirected new inventory intended for its own stores to off-price seller T.J.X. Co. so they could book the products as revenue immediately (¶59); and

- continued to sell to TSA and book revenue for those sales, knowing TSA was in trouble, might not be able to pay, and that the sales could be returned *en masse* (¶60).

Consistent with this Court's ruling in *UA III*, other courts have also found similar allegations sourced from the *WSJ* sufficient under the PSLRA.  *See, e.g.*, *In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1321 (N.D. Ga. 2001) ("To the extent this allegation is made on information and belief, it is adequately supported by *The Wall Street Journal* article."); *see also In re Loewen Grp. Inc.*, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004) (holding that media sources can satisfy the PSLRA and describing the *WSJ* as "reliable").

In response, Defendants' Motion mischaracterizes these specific facts as "generalized" and asserts that they are insufficient because the practices were purportedly "legitimate."  MTD at 10-

14.[9] But Plaintiffs need not prove that the undisclosed practices were illegal or improper as a matter of law to adequately plead falsity. *See UA III*, 2020 WL 363411, at *1, *13 (the legality of Under Armour's conduct is "not dispositive at this stage").[10] Regardless, the statements by former Under Armour executives reported in the *WSJ* adequately evince improper conduct and are affirmed by the Wells Notices and ongoing DOJ investigation. *See infra* §II.D.; *see also In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *2 (S.D.N.Y. Apr. 22, 2016) (upholding allegations that defendants misled investors by not disclosing their efforts "to make Salix's financial performance appear stronger than it actually was" by "offering steep price discounts" and other inducements).

The facts detailed by the *WSJ* are also corroborated by Defendants' statements in Under Armour's SEC filings disclosing the Wells Notices and the TAC's numerous other particularized allegations, further demonstrating their sufficiency. *See supra* §II.B.1.a.; *see, e.g.*, ¶¶3, 93-96; *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (a newspaper article that "corroborates plaintiff's own investigation and provides detailed factual

---

[9]   Defendants ignore the expert's statement cited in the November 14, 2019 *WSJ* article that these practices are ***not*** permitted when, as Plaintiffs allege, "there is an explicit or implied favor being involved." MTD at 11; *compare* TAC, Ex. A at 3 *with* ¶¶62-66 (pleading inducements). Defendants also ignore the expert's statement that these practices can hurt investors, as Plaintiffs allege: "[i]f you're mortgaging the future, it's eventually going to catch up." MTD at 11; *compare* TAC, Ex. A. at 3 *with* ¶16 ("The Company's illicit and unsustainable sales practices were no longer able to prop up Under Armour's sales, and its purported growth streak came to a crashing halt in the fourth quarter of 2016.") *and* ¶¶80-85 (same). *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ("*BMS*") is thus inapposite because the TAC is not "conflicted." *Id.* at 566. Defendants' claim that the Company's shipment of goods early to customers was purportedly authorized (*see* MTD at 11-12) fares no better because Plaintiffs allege that the early shipments were done to mislead investors and mask slowing demand.

[10]   *See also Vancouver Alumni Asset Holdings v. Daimler AG*, 2017 WL 2378369, at *13 (C.D. Cal. May 31, 2017) ("As a threshold matter, the Court's findings do not depend on Defendants' technical compliance with a regulatory exception or violation of government regulations. The issue is whether Defendants' made misleading statements as to any material fact."); *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *9 (S.D. Ohio Mar. 29, 2010) ("It is the falsity of Defendants' statements which is critical, not whether the underlying activity is found to be illegal by the DOJ").

allegations" is a "reasonable source of information"); *accord Makor I*, 437 F.3d at 598 ("consistency and specificity" of similar allegations satisfied the PSLRA).   Although Defendants choose to improperly dispute the WSJ facts separately (*see* MTD at 12-14), "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 328-29; *see also Burt*, 2014 WL 1291834, at *11 ("Typically, a motion pursuant to Rule 12(b)(6) '***does not resolve contests surrounding the facts***, the merits of a claim, or the applicability of defenses.'").

> ### c.    Defendants' Violations of GAAP and Financial Misstatements

The TAC also alleges with particularity that Defendants' failure to disclose the suspect sales and accounting practices made Under Armour's financial reporting in 2015 and 2016 (and its projections for 2016 and 2017) materially false and misleading, violating specific GAAP rules and SEC regulations.   *See* ¶¶324 n.90, 330-332.   The Company's SEC filings materially overstated quarterly revenue and misrepresented its past and future growth due to: channel stuffing; improperly recognizing revenue from contingent sales; and understating sales returns, allowances, markdowns, and discounts.   *See* ¶¶324-327.

The TAC quantifies the impact of Defendants' improper practices by alleging that the Company's net income and EPS were overstated by 30% from the understated sales reserves for returns, allowances, markdowns, discounts, and inflated inventory. *See* ¶¶327-338.   The TAC also details the financial impact of Under Armour's channel stuffing on the Company's quarterly revenue, which added tens of millions in improperly recognized revenue quarterly from 3Q15-3Q16 and allowed Under Armour to report an inflated quarterly growth percentage. *Id.*   Thus, as described in more detail below, Plaintiffs adequately allege fraud by showing that particular undisclosed accounting practices materially impacted the accuracy of Under Armour's financial results and violated specific GAAP and SEC rules. *See Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir.

- 14 -

1994) ("The Financial Accounting Standards of GAAP and the antifraud rules promulgated under §10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated."); *In re Carter's, Inc. Sec. Litig.*, 2012 WL 3715241, at *3 (N.D. Ga. Aug. 28, 2012) (same).[11]  Thus, Defendants' argument that Plaintiffs fail to plead GAAP violations with particularity (MTD at 14-20) fails.

### (1)      Channel Stuffing and Contingent Sales

Channel stuffing is "the pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so."  *See Sunbeam Corp.*, Exchange Act Release No. 44305, 2001 WL 616627, at *1 n.4 (May 15, 2001).  Undisclosed channel stuffing that misrepresents a company's financial condition and contingent sales reported as final sales are both fraudulent and violate GAAP.  *See id.* at *10 (inducing customers "to sign purchase orders well in advance of their actual need for product by offering discounts, extended payment terms and storage" violated GAAP revenue recognition requirements); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 80-81 (1st Cir. 2002) (contingent sales adequate to support falsity).

The TAC alleges both channel stuffing and contingent sales with particularity.  *See infra* §II.D.  For example, Defendants materially overstated Under Armour's earnings by recognizing ***tens of millions of dollars*** in revenue on contingent sales and channel stuffing each quarter from 3Q15-2Q16, facilitated by buyback programs with its biggest customers, including Dick's.  *See* ¶¶62-66,

---

[11]    *Cf. Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *6 (D.S.C. May 18, 2015) ("Of course, ***it is clear that Defendants deny the allegations of the Amended Complaint, disagree with Plaintiff's views of the accounting and other issues***, and may have compelling arguments to support their position.  The Court, however, is not in a position to address the truthfulness of these statements versus Defendants' view of the facts at this juncture.  ***All that is required of Plaintiff is to allege facts, that if true, form the basis of relief sought***.  Plaintiff has done so here.").

- 15 -

338, 343-351.  In written side-agreements, Under Armour allowed Dick's to return seemingly unlimited amounts of product, resulting in massive returns after Defendants had booked the sales as revenue.  *See* ¶¶64-66.

As additional support for these allegations, the TAC avers that Under Armour was not collecting on its accounts receivable because customers did not have to pay for the merchandise unless it was sold, as demonstrated by the massive spike in the Company's days sales outstanding during the Class Period.  *See* ¶¶349-350 (the growth in its accounts receivable balance outpaced net revenue growth beginning in 4Q15 until 4Q17, and its days sales outstanding increased during the Class Period, a trend the SEC identifies as a "telltale sign that a company's receivables are impaired").  Moreover, the TAC alleges that Defendants' recording of revenue from contingent sales, as well as their failure to disclose channel stuffing and the corresponding negative financial impact in the Company's financial footnotes, violated GAAP under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 605-15-25-1, ASC 275, and ASC 235-10-50.  *See* ¶¶334-335, 339-342, 344, 351.  Thus, Defendants' assertion that the TAC does not plead "corroborating details" about channel stuffing and contingent sales (MTD at 16) is untrue.

### (2)      Understating Reserves and Overstated Inventory

The TAC also alleges that Defendants violated GAAP and the SEC rules and inflated the Company's revenues and earnings by failing to reduce revenue properly for estimated customer returns, markdowns, and discounts.  *See* ¶¶352-360.  Defendants violated SEC Reg. S-X Rule 5-03 by not reporting its "net sales of tangible products (gross less discounts, returns, and allowances)" and violated ASC 605 by recognizing revenue without reducing sales revenue and cost of sales to reflect $34 million in known and estimable returns, discounts, markdowns, and allowances by the end of 3Q16.  *See id.*  This caused Under Armour to materially overstate net sales (2%), net income

- 16 -

(17%), and EPS (18%) during 3Q16.  ¶360.  And the Company had to increase its reserves for customer returns, allowances, markdowns, and discounts by 109% in 2017 to 5.2% of net product sales, versus 2.5% in 2015, suggesting Under Armour was under-reserved in 2016.  *See* ¶360.[12]

The TAC further alleges that Under Armour accumulated material amounts of excess and impaired inventory caused by softening demand and increased buybacks from contingent sales, which it failed to write down in 2016 (violating FASB ASC 330-10-35 and 330-10-20).  *See* ¶¶361-362, 364.  Indeed, Under Armour's inventory balance was overstated from 2016 through 2018 by as much as 3%, violating Under Armour's own policy and GAAP FASB ASC 330, which is material given that the Company overstated its operating and net income in 3Q16 by 13% by failing to take the impairment charge that quarter and would have missed its operating income guidance had it taken the full charge in 3Q16.  *See* ¶¶362-369.  As support, the TAC alleges that Under Armour had two to four times more inventory than in its plan, and that its inventory growth rate significantly outpaced its revenue growth rate from 3Q15 through 2Q16.[13]  Thus, the Company's nearly $26 million write down of inflated inventory in 2017 should have been recorded in 2016.  ¶369.[14]

---

[12]   Defendants' reserve cases (*see* MTD at 19-20) concern scienter or lack the TAC's particularized facts about the reserves.  *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999) (no facts pleaded about "past return rates, the size of its reserve for returns, or how the reserve changed over time"); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *14 (S.D.N.Y. 2004) (the only fact pleaded supporting ***scienter*** concerning high reserves was "'extremely high levels of returns'"); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010) (similar); *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1311-13 (N.D. Ga. 2006) (did not plead that reserves were understated); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (comparing loan loss reserves over a three-week period, not year-over-year).

[13]   Plaintiffs thus plead "comparisons to historical inventory levels [and] 'normal' inventory levels." *Cf.* MTD at 9 (arguing the TAC does not "plead any facts" about inventory levels).

[14]   Defendants' inventory cases (*see* MTD at 21) lack these facts or concern scienter.  *See In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1150 (D. Colo. 2011) (no ***scienter*** based on allegation of inventory write-down); *Morgan v. AXT, Inc.*, 2005 WL 2347125, at *14 (N.D. Cal. Sept. 23,

- 17 -

Because Plaintiffs have "stated what the unreasonable accounting practice was and how the defendants distorted the disclosed data," they have pleaded "violations of the GAAP [that] constitute false or misleading statements of material fact in violation of Rule 10b-5." *In re Sci.-Atlanta Sec. Litig.,* 239 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2002); *see also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. Mar. 31, 2018) (same); *accord In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (financial reports inaccurate when revenue recognized "before sales were actually completed").

In response to Plaintiffs' well-pleaded GAAP allegations, Defendants improperly demand proof in the form of witnesses and internal documents and again raise factual disputes. *See* MTD at 14-21.  But, Plaintiffs are "'not required to **prove** the falsity of the alleged misrepresentations at the pleading stage,'" and the TAC's factual allegations must be accepted as true and construed in Plaintiffs' favor. *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015); *see also Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1021 (N.D. Ill. 2010) ("[F]or purposes of a Rule 12(b)(6) motion to dismiss, plaintiff is not required to prove the truth of his allegations, and it would be inappropriate to weigh the parties' factual bases for their respective positions.").  Defendants' request for witnesses and internal documents also fails because "requiring plaintiffs to identify the personal or documentary sources of the facts they allege in an 'information and belief' complaint is not always necessary to further the object of the heightened pleading standards under the PSLRA" when, as here, the facts alleged "are detailed enough to support a reasonable belief that the defendant's statements identified by the plaintiffs were false or

---

2005) (same); *City of Omaha Police & Fire Ret. Sys. v. Timberland Co.*, 2013 WL 1314426, at *8 (D.N.H. Mar. 28, 2013) (holding the allegation that write-offs were improperly deferred insufficient because no subsequent write-off was adequately alleged); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 510 (D. Del. 2013) (plaintiffs "allege nothing in support of this claim" that write-down should have been recorded earlier).

misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102 (10th Cir. 2003).  Here, the SEC

Wells Notices, the *WSJ* articles, and Defendants' SEC filings all sufficiently corroborate the TAC's

GAAP allegations.  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 261 (3d Cir. 2009)

(considering "the corroborative nature of other facts alleged" and the "coherence and plausibility of

the allegations").[15]

Defendants' next argument, that Plaintiffs cannot establish GAAP violations without a

restatement and without challenging the opinions of Defendants' auditor, is also unavailing.  As

numerous courts have held:

> [T]he fact that the financial statements for the year in question were not restated does
> not end [the plaintiff's] case when he has otherwise met the pleading requirements of
> the PSLRA.  To hold otherwise would shift to accountants the responsibility that
> belongs to the courts.  It would also allow officers and directors of corporations to
> exercise an unwarranted degree of control over whether they are sued, because they
> must agree to a restatement of the financial statements.

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008), quoting *Aldridge*, 284

F.3d at 80-81.  Here, that Under Armour did not restate its previous financial results does not mean

that there was no securities fraud.  *See Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *21

(S.D.N.Y. Jan. 26, 2021) (rejecting argument that the lack of a restatement precluded a finding of

securities fraud); *see also In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 892 (D. Minn.

2011) (same).   Nor are Plaintiffs required to "challenge the opinions" of Under Armour's

independent auditor.  MTD at 15.  Indeed, the TAC alleges that Under Armour's quarterly financial

statements were false (¶¶324-327), and auditors do not audit quarterly financial statements and have

---

[15]   In Defendants' cases on this point (*see* MTD at 14-15) unlike here, the complaints pleaded "no
facts to support their claims" and even asked the court to infer channel stuffing from loans.  *In Re
PEC Sols. Sec. Litig.*, 2004 WL 1854202, at *12 (E.D. Va. May 25, 2004); *In re Harley-Davidson,
Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 988 (E.D. Wis. 2009).

no opinion on the quarters.[16] *See In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *51 (M.D. Tenn. Mar. 31, 2009) (the scope and focus of an audit are "fact issues that cannot be resolved on a motion to dismiss"); *see also In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) ("At this stage in the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements.").[17]

### 2.   The TAC's New Allegations Are Material

Defendants' Motion erroneously contends that because the TAC does not allege that Defendants' fraudulent conduct was illegal, their misleading statements cannot be material.  MTD at 8.  Notwithstanding that the DOJ and SEC are still investigating Defendants and may still charge them criminally or civilly, as the Fourth Circuit held in *Singer v. Reali*, 883 F.3d 425, 441 (4th Cir. 2017), "the duty to disclose may extend to ***uncharged and unadjudicated*** illegal conduct."  *See also Peace Officers' Annuity & Benefit Fund of Ga. v. Davita Inc.*, 372 F. Supp. 3d 1139, 1152 (D. Colo. 2019) (holding that Defendants' argument that "Plaintiffs have not alleged facts sufficient to support a claim of illegal steering . . . is unavailing because it is premised on identifying conduct related to an illegal scheme and, as just discussed, Plaintiffs' allegations related to certain steering statements are in fact not all predicated on an underlying illegal scheme"); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) ("Mylan's Rebate Statements and Regulatory Risk

---

[16]   *Cf. In re Diamond Foods, Inc.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) ("Senior management at Diamond had an independent duty to ensure compliance with GAAP and maintain effective internal controls.  This duty cannot be delegated to [the auditor].").

[17]   Defendants' restatement and auditor cases are thus inapposite and otherwise distinguishable. *Compare Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 588 (E.D. Va. 2006) ("[p]laintiff fails to allege the amount that should have been reserved at any particular time during the Class Period") *with* ¶360 (alleging Defendants failed to reserve $34 million during 3Q16); *see also Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *9 (S.D.N.Y. Feb. 3, 2014) ("[c]ompany disclosed the write-down" alleged to be misleading); *PEC Sols.*, 2004 WL 1854202, at *12 ("Plaintiffs state no facts to support their claims").

- 20 -

Statements need not be illegal to be materially misleading.").[18]   Moreover, materiality arguments

raise issues that are "inherently fact-specific" and, as a result, "peculiarly ones for the trier of fact"

and therefore inappropriate for resolution at the pleading stage.   *In re Willis Towers Watson plc

Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019).

   Regardless, the TAC's new allegations are material.  The purpose of Defendants' undisclosed

practices was – as this Court, former executives interviewed by the *WSJ*, and the SEC have noted –

to "hit the number[s] or close the gap," mask slowing demand, and was "in connection with

revenue."  *UA III*, 2020 WL 363411, at *7; *see also* ¶¶53, 93-96.  Given that Plank frequently touted

Under Armour's growth streak (*see* ¶¶42, 56), a reasonable investor would have found it important

that Under Armour only kept this streak alive by the undisclosed suspect sales and accounting

practices.  *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 657 (E.D. Va. 2000)

(misstatements concerning revenue are material); s*ee also Cambridge Ret. Sys. v. Jeld-Wen Holding,

Inc.*, __ F. Supp. 3d __, 2020 WL 6270482, at *5 (E.D. Va. Oct. 26, 2020) (statements attributing

company's success to its pricing strategy and quality products, given its failure to disclose

anticompetitive conduct, would have misled a reasonable investor); *Okla. Firefighters' Pension &

Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) ("a reasonable investor

would likely to have found it significant that printer supplies revenues were driven by inflated

channel inventory and not increased end-user demand").[19]   Defendants also ignore that the

---

[18]   Importantly, the majority in *Singer* implicitly rejected the argument by the dissent that when "the Company settled a related False Claims Act lawsuit with the United States, nowhere did the settlement agreement 'indicate that using multiple codes, in and of itself, [was] inappropriate.' Neither *Singer* nor the majority cites to a statute, regulation, or case that establishes this practice to be either illegal or fraudulent."  888 F.3d at 452 (Agee, J., dissenting) (alteration in original).

[19]   *See also Twinlab*, 103 F. Supp. 2d at 202 (E.D.N.Y. 2000) ("accelerating the recognition of revenues into an earlier financial quarter; and therefore portraying the company's current performance as more robust than it actually was" was misleading and "undoubtedly a fact that a

Company's stock price plummeted when Defendants' undisclosed practices caught up to them, further evidencing the materiality of the previously concealed information.  *See* ¶¶86-93, 377-389; *see also KBC*, 2016 WL 3981236, at *6 (negative market reaction supports materiality); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days . . . .").

### C.   Defendants Had a Duty to Disclose the Sales and Accounting Practices

Under §10(b) and Rule 10b-5, disclosure of "material facts" is required when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 47 (2011) (alterations in original).  Thus, "companies can control what they have to disclose under [the securities laws] by controlling what they say to the market." *Singer*, 883 F.3d at 440.  And "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.*, quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).  Here, even if Defendants' sales and accounting practices were legitimate (and they were not), Defendants still had a duty to disclose them because the failure to do so rendered Defendants' Class Period statements materially misleading.

Throughout the Class Period, Defendants repeatedly spoke about the purportedly strong demand for Under Armour products, the "drivers" of its growth and revenue, the strength and growth of its wholesale sales, its partnership with Dick's, its inventory, its premium brand status and

---

reasonable investor would have considered important"); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 446 (E.D.N.Y. 2014) ("Because a reasonable investor would have considered the undisclosed fact that IBG was including consignment shipments of goods to retailers in determining whether to invest, the omission of this fact . . . was materially misleading within the meaning of §10(b).").

strategy, its status as a "growth company," its product margins, its promotions and liquidations, its sales to Kohl's, the TSA bankruptcy and its sales to TSA, and its sales and revenues.[20]   The TAC adequately alleges that these statements were misleading because Defendants used a bevy of undisclosed sales and accounting practices in 2015 and 2016 to conceal a decline in demand for Under Armour's products.[21]

Thus, when Defendants spoke about Under Armour's brand heat and prospects, they misled investors by omitting the sales and accounting practices their statements implicated, concealing declining demand and creating an "'an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'"  *In re Quality Sys. Sec. Litig*., 865 F.3d 1130, 1144 (9th Cir. 2017) (alteration in original); *see also Kiken*, 155 F. Supp. 3d at 604 ("Failure to disclose negative information about the products at issue can create a "misleading impression" to investors about the success of the company.").  In *Singer*, the Fourth Circuit considered a similar circumstance when defendants chose to publicly discuss the company's "legal policies regarding reimbursements for medical procedures" but simultaneously failed to disclose "that it also relied on a fraudulent reimbursement scheme to generate a large portion of its revenues."  *Jeld-Wen*, 2020 WL 6270482, at *3, citing *Singer*, 883 F.3d at 432-33.  As the court in *Singer* held, "by choosing to inform the market about its plan to legally obtain reimbursements for doctors who used its product, [defendant] 'was obliged to further disclose its fraudulent reimbursement scheme.'"  *Jeld-Wen*, 2020 WL 6270482, at *4, quoting *Singer*, 883 F.3d at 440.  Following *Singer*, the court in *Jeld-Wen* similarly held that because the company there "chose to speak about its pricing strategy, it had a duty to 'tell[]

---

[20]   *See, e.g.*, ¶¶151-156, 160-164, 166-167, 177-187, 189-190, 192-193, 195-203, 206-207, 209, 215, 219, 225-231, 235-240, 242-243, 245-247, 249-253, 256-260, 262-263, 265-278, 282.

[21]   *See, e.g.*, ¶¶11-13, 52-66, 92-95, 318, 324-369, 370-374.

- 23 -

the whole, material truth' about it, regardless of the level of detail it used to discuss the topic." *Jeld-Wen*, 2020 WL 6270482, at *4 (alteration in original).[22]

Defendants' failure to disclose the Company's suspect sales practices, including the use of pull-forward sales, also rendered Under Armour's publicly reported financial results false and misleading.  The TAC alleges that Defendants only met their sales and financial targets and extended the Company's 26-quarter streak of 20%+ growth, which Plank said reflected demand for Under Armour's products, through the undisclosed and improper practices, which violated GAAP and SEC regulations.  *See*, *e.g.*, ¶¶11, 43, 324-369; *supra* §II.B.1.c.  As a result, Under Armour's net income and EPS were overstated by an estimated 30% in 3Q 2016, excluding the impact of contingent sales and channel stuffing, which added tens of millions of dollars quarterly in improperly recognized revenue from 3Q15 to 3Q16.  *See* ¶¶327, 336-338.  Thus, contrary to Defendants' argument (MTD at 22), their failure to disclose the suspect sales and accounting practices ***did*** cause the Company's reported financial results and statements to be materially false and misleading.  *See Lexmark*, 367 F. Supp. 3d at 16 (statements omitting that "revenue reports reflected excessive 'sales' into channel inventory" were misleading); *cf. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 192 (2015) ("An issuer must as well desist from misleading investors by saying one thing and holding back another.").

Defendants also contend they had no general duty to disclose the impact of the Company's suspect sales practices, including the use of pull-forward sales, on Under Armour's future financial

---

[22]  *See also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (when a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the course of its success, since reasonable investors would find that such information would significantly alter the mix of available information"); *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (defendant corporation had a duty to disclose a kickback scheme because it attributed its product's success to its sales and marketing practices and programs).

4839-5512-0856.v2

results.  MTD at 23-24.  Their argument is unavailing.  First, the TAC alleges that these practices made the Company's reported financial results misleading.  Thus, Defendants had a duty to disclose them.

Second, Plaintiffs allege that disclosure was specifically required by Item 303.  ¶¶339-342. Although Item 303 does not create a private right of action, a "'failure to comply with Item 303 . . . **can** give rise to liability under Rule 10b-5 so long as the omission is **material** under *Basic*.'"  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 n.7 (2d Cir. 2016) (emphasis in original).[23]  Here, the TAC alleges that Defendants' undisclosed sales practices pulled-in tens of millions of dollars in revenue per quarter to mask slowing demand, and that this "cause[d] reported financial information" in Under Armour's SEC filings "not to be . . . indicative of future operating results."  17 C.F.R. §229.303.[24]  Defendants' failure to disclose such a "known trend" and its financial impact made Under Armour's reported financial results and Defendants' related statements misleading and violated Item 303.[25]  17 C.F.R. §229.303(a).

---

[23]   Defendants mischaracterize *Shah* as this Court's case, but it involves a different judge and inapposite facts, as do the rest of their Item 303 cases.  *See Shah v. GenVec, Inc.*, 2013 WL 5348133, at *15 n.16 (D. Md. Sept. 20, 2013) ("Where 'plaintiffs have failed to plead any actionable misrepresentation or omission under [Rule 10b-5], SK-303 cannot provide a basis for liability.'"); *see also Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (same); *In re Viewlogic Sys. Sec. Litig.*, 1996 U.S. Dist. LEXIS 22371, at *39 n.19 (D. Mass. Mar. 13, 1996) (similar); *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *16 (E.D. Va. Aug. 27, 2018) (failed "to adequately allege scienter or materiality"); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) ("Plaintiffs have failed to plead a proper factual basis for their channel stuffing allegations . . . ."); *In re Cytyc Corp. Sec. Litig.*, 2005 WL 3801468, at *19 (D. Mass. Mar. 2, 2005) (defendants disclosed the discount inducements).

[24]   *See also* ¶¶52, 57-58, 64, 75-76, 324-333, 338, 342, 366-368.

[25]   *See, e.g.*, ¶¶160, 166-167, 177-178, 189-190, 195-196, 206-207, 227-228, 242-243, 249-250, 262-263, 326, 332.

Third, contrary to Defendants' argument (MTD at 25), Plaintiffs **have** alleged that Defendants expected pull-in sales to negatively impact future periods.  For example, Defendants knew or were reckless in not knowing that the Company's induced quarter-end sales to retailers did not reflect real demand, were not sustainable, and were causing its inventories to balloon due to "truckloads" of returns pursuant to buyback deals and other contingent sales, leading to inventory write downs.  *See* ¶¶73-76.  The TAC also alleges that Defendants' undisclosed practices caused decreased sales in subsequent quarters: on January 31, 2017, April 27, 2017, August 1, 2017, and throughout 2018 and 2019, with net revenue plummeting from 2017-2019, including year-over-year decreases in North America.  *See* ¶¶265-283, 289-291, 300-309.  Correspondingly, inventory levels increased in 2017 and 2018, requiring write downs and increased liquidations.  *See* ¶311.  These facts also support Plaintiffs' allegations that Defendants' statements materially misled investors about demand.[26]

### D.      Plaintiffs Adequately Plead Undisclosed Channel Stuffing

Although not necessary to sustain Plaintiffs' falsity allegations, the TAC also adequately alleges undisclosed channel stuffing, which violated GAAP.  ¶¶334-335; *see supra* §II.B.1.c. Channel stuffing is actionable when, as here, it "creates a short-term illusion of increased demand"

---

[26]   Defendants' authorities affirm that a duty to disclose arises when, as here, "'silence would make other statements misleading or false.'"  *Iron Workers*, 432 F. Supp. 2d at 582.  Defendants' other cases concerning the duty to disclose, MTD at 21-25, are mostly repeated from their channel stuffing arguments and are factually inapposite for the same reasons stated *infra* n.30. *See also PEC Sols*, 2004 WL 1854202, at *6 (no allegations that defendants misrepresented demand and no liability for statement made in October that relied on fact that did not exist until December); *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *7 (E.D. Va. June 2, 2020) (no allegations challenging any sales or accounting practices as misleading); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (statements alleged to be misleading did not implicate the undisclosed conduct); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (no allegations that earnings were manipulated); *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *10 (E.D.N.C. Sept. 15, 2015) (no allegations of inaccurate financials or GAAP violations).

for a company's products so that its statements about revenue, earnings, financial condition, or future earnings become materially false or misleading or omit a material fact.  *Makor I*, 437 F.3d at 598.[27]

Defendants do not deny that they relied on undisclosed incentives like buyback agreements and discounts to pull in future sales and hit its quarterly numbers.  *See* ¶¶52-66; MTD at 12.  And the TAC alleges that Defendants improperly recorded revenue from contingent sales and did not properly account for discounts and incentives given to distributors, violating GAAP.  *See* ¶¶328-360, 361-369; *see supra* §II.B.1.c.  This is textbook channel stuffing, and Defendants' failure to disclose it made their statements misleading by "misrepresent[ing] the level of demand for the Company's products" and the reasons for its subsequent problems when these practices caught up with them.[28] *UA III*, 2020 WL 363411, at *1; *see also Makor I*, 437 F. 3d at 598 ("While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, ***providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them***.").  Moreover, failing to disclose pull-in sales is misleading when reliance on those practices is alleged, as here, to "depress future sales."  *Sci-Atlanta*, 239 F. Supp. 2d at 1362-64; *St. Jude*, 836 F. Supp. 2d at 893-94; *see, e.g.*, ¶¶12, 52, 339-342.[29]

---

[27]   *See also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 416 (S.D.N.Y. 2020) (upholding allegations "that Evoqua engaged in improper 'channel stuffing' practices, 'which had the effect of concealing the extent to which Evoqua was struggling to grow organically'"); *Sci.-Atlanta*, 239 F. Supp. 2d at 1363 ("Plaintiffs allege that the Company misrepresented its financial condition by failing to disclose its channel stuffing activity. Such allegations are sufficient to state a claim.").

[28]   *See e.g.*, ¶¶153-154, 156, 160-164, 166-167, 178-187, 189-190, 192-193, 196-203, 206-207, 215, 219, 225-231, 235-240, 242-243, 246-247, 249-253, 256-260, 262-263, 265-278, 282, 289-291, 306, 309-311, 315, 326.

[29]   Defendants' argument that their undisclosed practices were legitimate, MTD at 8, is irrelevant. *See UA III*, 2020 WL 363411, at *8 ("[T]his Court takes no position as to the legality of Under Armour's sales strategies or revenue recording practices.  These issues are not dispositive at this stage."); *see also Davita*, 372 F. Supp. 3d at 1152; *Mylan*, 2018 WL 1595985, at *12; *Daimler AG*,

- 27 -

Accordingly, courts routinely sustain §10(b) claims for failure to disclose channel-stuffing practices like those alleged here.  For example, the defendants in *Salix* "'stuff[ed] the channel'" "in order to make Salix's financial performance appear stronger than it actually was," using undisclosed "steep price discounts" as inducements.  2016 WL 1629341, at *2.  Even though these sales tactics were not necessarily illegal, and the plaintiff did not (as here) allege a right of return or mass returns, the court held that defendants' statements misled investors by concealing them.  *Id.* at *3-*4.  In *Lexmark*, defendants failed to disclose that Lexmark had flooded its distributors with printer supply products.  367 F. Supp. 3d at 16.  Even though Lexmark's revenue recognition was not necessarily fraudulent – and no mass returns or right of return – the court held that "Defendants misrepresented the impetus behind Lexmark's printer supplies revenue growth during the Class Period by attributing the growth to 'robust,' or 'good,' or 'strong' end-user demand[s]."  *Id.* at 32; *see also Cunha V. Hansen Nat'l Corp.*, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (defendants misled investors by "push[ing] an excessive quantity of [its product] to distributors in order to make investors think there was sustainably higher demand for [its] products"); *St. Jude*, 836 F. Supp. 2d at 891 ("engaging in an unsustainable pattern of channel stuffing and not properly accounting for its sales" held actionable).[30]

_____

2017 WL 2378369, at *13; *Halford*, 2010 WL 8973625, at *9.  The relevant questions are whether what Defendants omitted from their public statements to investors was material, and whether those omissions made Defendants' statements false or misleading.  The answer to both is a resounding yes. *See UA III*, 2020 WL 363411, at *7-*8 (finding falsity and scienter sufficiently demonstrated).

[30]   Only two of defendants' channel stuffing cases allege both government investigations and GAAP violations, and those concern scienter and scheme liability, respectively.  *See BMS*, 312 F. Supp. 2d at 566 (analyzing channel stuffing as to scienter and noting that plaintiffs conceded "there was no right of return"); *In re The Hain Celestial Grp. Inc. Sec. Litig.*, 2019 WL 1429560, at *14 (E.D.N.Y. Mar. 29, 2019) (analyzing ***Rule 10b-5(a) and (c)*** claims).  Defendants' other authorities lack the TAC's corroborating and particularized facts.  *See In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1380-81 (N.D. Cal. 1995) (no overstated revenues, consignment transactions not reported as sales, and company accounted for "revenues lost to the fourth quarter as a result of 'pull

- 28 -

Defendants nonetheless argue that Plaintiffs must plead detailed evidence of specific transactions. MTD at 8-9. But the PSLRA does not require plaintiffs to plead evidence. *See Direct Benefits*, 2014 WL 671616, at *8. Regardless, the TAC does allege specific transactions and all the other facts that Defendants incorrectly assert are required to state a channel stuffing claim (*see* MTD at 7-26) but purportedly missing here. *See* ¶¶324-369 (alleging tens of millions in channel stuffing and contingent sales and improper revenue recognition per quarter from 3Q15-3Q16); ¶¶52-76 (alleging pull-forward sales facilitated by inducements to retailers to accept early goods, including buyback agreements with Dick's); ¶64 (alleging a specific transaction).[31] *See* ¶¶63-64; *supra* §II.D.;

---

ins'"); *Cytyc*, 2005 WL 3801468, at *17-*18 (no returns, "contingent sales," "take back guarantees or reported revenue from fictitious sales" and "the discounting was adequately disclosed"); *Greebel*, 194 F.3d at 204 ("complete absence" of "basic details" including the name of the customer); *Timberland*, 2013 WL 1314426, at *9 (did not specifically allege GAAP violations, improper revenue recognition, sales decreases, inventory build up, unusual sales or transactions, or an increase in returns); *Gavish*, 2004 WL 2210269, at *16 (no "specific allegation of monetary consequence at all"); *Spectrum*, 461 F. Supp. 2d at 1313  (no "allegations of any specific returns . . . or improper revenue recognition"); *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 611 (W.D. Va. 2002) (no government investigation, GAAP violations, or transactions alleged); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *9 (N.D. Ill. Oct. 15, 2020) ("Plaintiffs do not allege any facts about returns," GAAP violations, or government investigations); *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1147 (C.D. Cal. 2018) (no government investigation, GAAP violations, or specific retailers alleged and sales not unusual); *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (plaintiffs failed "to provide any corroborating details"); *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1198 (N.D. Ga. 2007) (no "indication of the amount of revenue that was improperly recognized"); *Harley-Davidson*, 660 F. Supp. 2d at 988 (asked the court to infer channel stuffing from purportedly "high risk loans"); *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2020 WL 1676762, at *12 (E.D.N.Y. Apr. 6, 2020) ("*Hain II*") (no specific customers alleged and the SEC concluded the transactions were proper). In *Hain II*, which is on appeal, the court also appears to confuse Rule 10(a) and 10(c) with Rule 10(b), conflates the scienter and falsity analyses, states incorrectly that Rule 10(a) and (c) are the only bases for Rule 10(b) liability, and improperly requires plaintiffs to plead evidence. *Id.* at *11. Thus, the case is unpersuasive.

[31]   In early 2016, VP of North America Sales Brian Cummings convinced Dick's to order shoes that Dick's did not want by agreeing to take back any unsold Under Armour product. ¶64. Under Armour recorded the 2016 shoes transaction to Dick's as a sale, part of the tens of millions of dollars in revenue Under Armour recognized on contingent sales and channel stuffing that quarter, but Dick's returned 80% or more of the shoes later in 2016 (contributing to the "massive amount" of

*see also Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *9 (N.D. Cal. Oct. 12, 2016) ("the details of specific transactions are not required"); *Murphy*, 2017 WL 3084274, at *9 n.3 ("[p]laintiffs are not required to identify specific pull in transactions"); *accord Makor I*, 437 F.3d at 598 ("Given the consistency and specificity of the plaintiffs' channel stuffing allegations . . . [the] complaint provided sufficient detail of channel stuffing . . . .").[32]

### E.   The TAC Cures Deficiencies as to Prior Dismissed Statements

As this Court noted, the "new details" about Under Armour's sales practices "place[] the[] original allegations *in a new light*." *UA III*, 2020 WL 363411, at *1, *6. These new facts demonstrate how misstatements previously dismissed by the Court (and realleged in the TAC), materially misled investors.

#### 1.   Investor Day and 3Q15

Because the TAC sufficiently alleges that Under Armour's undisclosed sales and accounting practices misled investors concerning demand for its products (*see supra* §II.C.), the TAC adequately pleads actionable misstatements during the Company's 2015 Investor Day and regarding

---

returns that resulted from these deals).  ¶¶64, 338.  That this transaction was to Under Armour's biggest customer and is corroborated by other reliable allegations of pulled-forward sales and inducements overcomes Defendants' implied argument that it is immaterial.  *See* ¶¶52-66; MTD at 17.  That the TAC ties specific percentage of returns to this exact transaction (80%) rebuts Defendants' argument that it is "vague" (MTD at 17-18); additional allegations of "truckloads" and "massive amount[s]" of returns from both TSA and Dick's corroborate it.  ¶¶60, 64, 73.

[32]  Even Defendants' own authorities do not require all the evidence Defendants demand (MTD at 16-17).  *See Greebel*, 194 F.3d at 204 ("We do not say that each of these particulars must appear in a complaint, but their complete absence in this case is indicative of the excessive generality of these allegations."); *see also Timberland*, 2013 WL 1314426, at *9-*14 (listing as variously sufficient to show channel stuffing: GAAP violations, contingent sales or other measures to limit customer risk, improper revenue recognition, statements that strong financial results inflated by channel stuffing demonstrated "growth," an increase in customer returns or inventory in the quarters after channel stuffing, a subsequent drop in sales after channel stuffing, alleging specific customers, unusual sales tactics or discounts and transactions, and details alleging specific transactions); compare with, *e.g.*, ¶¶52-76, 324-369 and *infra* §II.D.

- 30 -

its 3Q15 results.  *See* ¶¶151-168.  For example, Defendants told investors that "demand for our brand has never been stronger" and was "growing," that the "drivers" of its sales growth remained the same as during "the past 10 years," that "growth in net revenues has been driven by . . . the strength of the Under Armour brand," that the Company had "incredible growth at wholesale," that apparel "***continues to grow over 20%***," and that "***demand . . . from our consumer," not "pushing or pressing***," was driving "20-plus% revenue growth."[33]  Defendants also attributed the Company's declining margins to benign factors, claiming that "core apparel product margins are improving" while blaming inventory increases on a strategic plan to increase product flow.  ¶¶162-164.

By choosing to speak on these topics, Defendants undertook the "'duty to tell the whole truth.'"  *Singer*, 883 F.3d at 440; *see also Jeld-Wen*, 2020 WL 6270482, at \*4-\*5 (same).  The TAC alleges that Defendants breached this duty by not disclosing that the Company's purported growth and demand, and its 3Q15 financial results, were inflated by pull-forward and contingent sales used to hit quarterly numbers and conceal declining demand, violating GAAP.[34]  The TAC also alleges that Plank knew about these practices.  *See* ¶¶57, 100.  Accordingly, Plaintiffs' new evidence demonstrates that these statements are actionable.  *See, e.g.*, ¶¶93-97; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*9 (S.D.N.Y. Apr. 14, 2020) (statements about "strong demand" and "growth drivers" misleading given known but undisclosed sales tactics of moving orders into earlier quarters to cover faltering demand and resulting inventory); *KBC*, 2016 WL 3981236, at \*5 (statements attributing inventory increases to benign reasons misleading due to failure to inform investors of its inventory-related difficulties that eventually resulted in write-off); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 647

---

[33]   *See* ¶¶153-154, 156, 161, 166, 336.

[34]   *See* ¶¶52-76, 324-351, 357-359, 366.

4839-5512-0856.v2

(E.D. Pa. 2015) (statements about the "strength" of sales trends false due to undisclosed "decrease in sales growth and an increase in markdowns").[35]

Although the Court previously dismissed some of these statements as puffery on fewer facts, Plaintiffs' new allegations show the statements implicated then-existing facts, such as sales and inventory "drivers."[36]  Thus, Defendants made measurable claims, "demonstrable as being true or false." *Jeld-Wen*, 2020 WL 6270482, at *5.  Such "factual and material" statements are actionable. *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618 (S.D. W. Va. 2012).  The statements the Court initially held to be opinions are now actionable for the same reason.[37]  Plaintiffs' new allegations show that Defendants had no reasonable basis to opine that "the strength of the Under Armour brand in the marketplace" was driving the Company's growth because ***they knew*** Under Armour was using undisclosed and suspect sales and accounting practices to meet its sales goals and to mask slowing demand.  *See* ¶¶52-66, 166; MTD at 42 n.20; *see also UA I*, 342 F. Supp. 3d at 676 ("Opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading . . . .").

### 2. Partial Disclosures

The Court has already determined that many of Defendants' "partial disclosure" statements are adequately pleaded because they "omitted purported[ly] material information that was in their possession and were obligated to provide in order to give a truthful picture of the Company's health." *UA I*, 342 F. Supp. 3d at 685.  However, the Court initially concluded, on fewer facts, that

---

[35]  Defendants' reliance on *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050 (D. Conn. Mar. 23, 2013), is misplaced because, unlike here, the plaintiff's allegations lacked "any reference to a time period" in which the alleged problems occurred.  *Id*. at *28.

[36]  *See* ¶¶153, 164, 166, 326-327, 344-345.

[37]  *See, e.g.*, ¶¶166, 189, 206, 242, 262.

some of these statements were puffery because "[t]here are no allegations that the actual results reported were inaccurate or false." *Id.* But, as set forth below, Plaintiffs now adequately allege that Under Armour's reported results were inaccurate or false due to channel stuffing, contingent sales, and other GAAP violations. Plaintiffs also allege that Defendants' demand statements referred to existing and material facts and therefore can no longer be considered puffery. *See, e.g.*, ¶¶324-369. Thus, all of Defendants' "partial disclosure" statements (¶¶177-263) are now actionable.[38]

### a. Under Armour's Publicly Reported Financial Results Were Materially Misleading

In arguing that Plaintiffs have not adequately pleaded that Under Armour's reported financial results were false, Defendants mischaracterize this Court's prior decision in *UA I*. MTD at 42. There, the Court observed only that the SAC ***did not allege*** that the actual reported results were inaccurate or false. *UA I*, 342 F. Supp. 3d at 685. Here, the TAC ***does allege*** that Under Armour's financial statements and reported results were materially false and misleading because Defendants inflated revenue by pulling in sales, improperly recorded revenue on contingent sales, understated the Company's reserves, and overstated inventory.[39] The TAC further alleges that Defendants overstated Under Armour's net income and EPS in 3Q16 by over 30% and its inventory balance from 2016 through 2018 by as much as 3%. *See* ¶¶327, 369. These allegations are more than sufficient to establish that the statements Defendants challenge concerning quarterly revenues and growth[40] and changes in inventory levels[41] were inaccurate or false. *See Aldridge*, 284 F.3d at 80-81

---

[38]   The TAC sets forth the who, what, where, when, and why for each misleading statement. *See* ¶191 (¶¶178-187, 189-190); ¶194 (¶¶192-193); ¶208 (¶¶195-203, 206-207); ¶214 (¶209), ¶219 (¶215), ¶244 (¶228-231, 234-240, 242-243), ¶248 (¶¶245-247), ¶264 (250-253, 256-260, 262-263).

[39]   *See, e.g.*, ¶¶178, 196, 228, 250, 324-326.

[40]   *See* ¶¶179, 182, 197, 225, 257.

[41]   *See* ¶¶177, 195, 235, 256.

- 33 -

(allegations that defendant violated GAAP by failing to disclose contingent sales adequate to support falsity); *see also Sci.-Atlanta*, 239 F. Supp. 2d at 1363-64 (falsity based on GAAP violations alleged by "state[ing] what the unreasonable accounting practice was and how the defendants distorted the disclosed data").

Defendants' statements about quarterly changes in Under Armour's gross margins,[42] even if accurate, are adequately alleged to be misleading for reasons the Court already held: because Defendants blamed margin declines on "sales mix" or "planned inventory increases" while omitting "facts about lower ASPs . . . [and] excess inventory." *UA I*, 342 F. Supp. 3d at 685; ¶¶177, 208(h). These statements also omitted, as newly alleged, that Defendants sold goods intended for the Company's own stores directly into low-margin, off-price channels like T.J.X., which further contributed to gross margin declines. *See, e.g.*, ¶¶59, 169, 196, 244(c), 250, 264; *see also Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough").[43]

### b.    Defendants' Partial Disclosures Are Not Puffery

Although the Court previously held that only "*some*" of the Partial Disclosure statements in the SAC predicting "*future growth* can be considered puffery," *UA I*, 342 F. Supp. 3d at 685, Plaintiffs' new allegations show that these statements were particular and misleading references to then existing and material facts and therefore actionable. *See Jeld-Wen*, 2020 WL 6270482, at *6 ("The parties can prove the truth or falsity of the omissions at issue here, and a reasonable investor would certainly consider information about JELD-WEN's anticompetitive conduct important when

---

[42]  *See* ¶¶177, 183-187, 191(i), 208(h), 226, 239, 251, 256, 259.

[43]  Defendants' cases on this point, *see* MTD at 42-43, are thus inapt. *See In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) ("plaintiffs have not alleged the historical inaccuracy of [defendants'] financial and earnings' statements"); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997) (same); *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *9 (E.D.N.C. Mar. 22, 2013) (same).

deciding to buy or sell the company's stock.  Thus, the omissions are factual, material, and, therefore, actionable, even if the statements are opinion or puffery."); *Massey Energy*, 883 F. Supp. 2d at 618 (holding that "'factual and material'" puffery is actionable); *see also supra* §II.B.  Indeed, the statements Defendants challenge do not predict future growth.[44]  Instead, they attribute the Company's then-current and purportedly "strong results," "financial results," and "massive growth," including its "20% growth streak" to the "strength of the brand," stating that ***"[o]ur second-quarter results are strong evidence that demand for Under Armour has never been higher*."  *See, e.g.*, ¶¶197, 199-200, 236, 257.  The TAC alleges that it was not Under Armour's brand strength or demand that drove these results, but rather its undisclosed suspect sales and accounting practices used to mask declining demand (*see supra* §II.C.).  Thus, these statements are actionable according to Defendants' own authority because they misleadingly implied the numbers "reflected strong demand." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68, 74 (1st Cir. 2012).  Further, many of these statements were responses to analysts' questions and thus not puffery.  *St. Jude*, 836 F. Supp. 2d at 888 ("[T]he line between mere 'puffery' and an actionable misrepresentation often depends on the context of a statement, ***particularly the fact that it was made in response to either 'investors' frequently asked questions' or an analyst's specific inquiry*."), quoting *Makor I*, 437 F.3d at 597-598.[45]

---

[44]   ¶¶153, 155-156, 161, 179, 185, 197, 199, 236-238, 257-258.

[45]   Defendants claim that some statements are inactionable opinions.  *See* MTD at 20 n.21.  But the omitted facts about questionable sales and accounting practices used to mask slowing demand show that Defendants ***knew*** demand was not responsible for its financial results; thus their opinions are actionable because they had no reasonable basis to make them.  *Supra* §II.B.  ¶¶52-66.

4839-5512-0856.v2

c.      The PSLRA's Safe Harbor Does Not Apply Here

Defendants assert that the PSLRA safe harbor immunizes dozens of statements.[46] But many of these statements are not forward looking: (1) "we *continue to see* favorable product margins," "our core apparel product margins are improving. . . . *right now*"; (2) "[w]e *continue to drive* and demonstrate that premium position in the marketplace"; (3) "we *do see* the ability to continue to drive ASPs and improve margin"; (4) "*continued* sales to The Sports Authority"; and (5) "margins '*declined* more than planned.'"  ¶¶162-163, 185, 187, 193, 251.  And any legitimately forward-looking statements are not protected because Plaintiffs have adequately alleged that Defendants *knew* their 2016 financial outlook projections were false and contained material omissions (*see, e.g.*, ¶¶12, 52-61).  *See* 15 U.S.C. §78u-5(c)(1) (safe harbor does not protect statements made "with actual knowledge" of their falsity); *UA III*, 2020 WL 363411, at *7 (Plaintiffs' new facts "support the conclusion that Under Armour and Plank *knew* that demand for their products was waning"); *accord Salix*, 2016 WL 1629341, at *9 ("[t]he safe harbor also does not protect material omissions").[47]

Moreover, none of these statements were accompanied by meaningful cautionary language. MTD at 44-45.  First, "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss."  *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007).  Second, the purported cautions – that demand for the Company's products might slow and affect its business or that excess inventory might result if supply exceeds demand (MTD at 45) – are "garden-variety business concerns that could affect any company's financial well-being," which courts have held insufficient.  *In re Vivendi, S.A. Sec. Litig.*,

---

[46]   *See* ¶¶163, 184-185, 187, 192-193, 198, 215, 229, 231, 251-253, 267, 270, 273-274, 278, 304.

[47]   In *In re Synchronoss Securities Litigation*, 705 F. Supp. 2d 367, 402 (D.N.J. 2010), the plaintiffs pleaded no facts showing actual knowledge.

838 F.3d 223, 247 (2d Cir. 2016); *see also Singer*, 883 F.3d at 442 ("'A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'"); *SEC v. Agora, Inc.*, 2007 WL 9725170, at *9 (D. Md. Aug. 3, 2007) (statements must contain "'detailed and meaningful cautionary language tailored to the specific risks'" the company faces).[48]   Third, the TAC alleges that the main risks purportedly disclosed in the FY15 Form 10-K on February 22, 2016 (*see* MTD at 45) had already occurred: Under Armour's primary business had stopped growing, and its inventory had exceeded customer demand, impairing its margins and brand image.  *See* ¶¶42-66, 67-76; *see also In re Sourcefire, Inc. Sec. Litig.*, 2008 WL 1827484, at *5 (D. Md. Apr. 23, 2008) ("In short, there is a difference between language bespeaking caution of hopeful corporate predictions and the failure to disclose known material facts and data."); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015) ("As this court noted in *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008), ***there is an important difference between warning that something 'might' occur and that something 'actually had' occurred***.").[49]

---

[48]   *Cf. In re Conventry Healthcare Sec. Litig.*, 2011 WL 1230998, at *13 (D. Md. Mar. 30, 2011) ("While the statement contains assertions of present and historical fact, some puffery, and forward-looking statements, it does not appear that the statement contains any cautionary language to alert the public about the statement's deficiencies.").

[49]   Unlike here, the risks in Defendants' cases had not occurred and the warnings contained "'substantive information about factors that realistically could cause results to differ materially from those projected.'"  *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 550 (M.D.N.C. 2013); *see also In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (same); *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999) (same).  In *In re Sawtek, Inc. Securities Litigation*, 2005 WL 2465041 (M.D. Fla. Oct. 6, 2005), the plaintiffs "made no effort to address the content of the Defendants' purportedly meaningful cautionary language." *Id.* at *11.

### d.    The TAC Does Not Take Statements Out of Context

Defendants' argument that three statements have been taken out of context misses the point. MTD at 46.  First, the TAC's well-pleaded allegations are accepted as true, and the facts and any reasonable inferences derived from them are construed in Plaintiffs' favor.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Here, the statements Defendants challenge plausibly concern more than footwear given Plank's statement to the analyst that he was going to "use Footwear as an example."  ECF No. 159-23 at 10; ¶200.  And even if the statements about "taking share" and "driving massive growth" (¶200) were limited to footwear, they are nonetheless misleading because Defendants did not tell investors that the Company's footwear growth involved pursuing high-volume, low-price sales – inconsistent with its statement in the same answer that it is "premium footwear brand" – as part of its undisclosed "fundamental shift" to competing on price.  *See e.g.*, ¶¶77-79, 86, 117-118, 200.  Defendants also assert that its statement that "[t]he increase in net sales . . . was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf" was not misleading.  MTD at 46.  Although the Court previously credited it as "'an accurate recitation of historical financial data,'" *UA I*, 342 F. Supp. 3d at 677, the TAC now alleges that the numbers the Court relied on as "supporting the truth of the statement" were inaccurate and false.  ¶¶324-326; *see supra* §II.B.1.c.

### F.    The TAC Pleads New False and Misleading Statements

The TAC also adequately pleads new false and misleading statements made on or after January 31, 2017.  *See* ¶¶282-317.[50]  Here, Defendants chose to speak about Under Armour's severe late-2016 slowdown, discussing the Company's declining apparel sales and revenue growth,

---

[50]    The TAC sets forth the who, what, where, when, and why for each misleading statement grouped by date.  *See* ¶¶265-276, 282-283 (4Q16 and FY16); ¶¶289-291 (1Q17); ¶¶300-304, ¶¶306, 310-311 (2Q17); ¶315 (Dec. 2018); ¶317 (Oct. 2019).

declining brand strength and margins, and increased inventory and discounting.[51]  They blamed these poor results on "challenges and disruptions in North American retail," including: Under Armour's "hyper" and "extreme growth," its merchandise assortment, store bankruptcies and price decreases in "the points of distribution that we serve," other brands' discounting, and its "actions to better manage our inventory."  ¶¶266-272, 275, 282, 310.  But Defendants did not disclose the Company's illicit and unsustainable sales practices, which they used in 2015 and 2016 to mask declining demand.[52]  By choosing to speak, Defendants had an "obligation to speak truthfully," which they violated by omitting these material facts.  *Singer*, 883 F.3d at 440.[53]

Defendants again challenge as puffery statements touting Under Armour's "incredible brand strength," asserting that the Company's "growth strategy is intact," claiming an "acceleration" in top-line growth, and assuring that "you'll see 20% growth from this company."  ¶¶282, 310.  But like similar statements, *supra* §II.C.n.20, these make measurable claims about past or present facts, "demonstrable as being false" given the TAC's new allegations, and also include a guarantee of future performance.  Thus, they are actionable.  *See Malone*, 26 F.3d at 470; *Jeld-Wen*, 2020 WL 6270482, at *5; *Massey Energy*, 883 F. Supp. 2d at 618.  Defendants' argument that Plaintiffs have not alleged that any of the historical data concerning Under Armour's 4Q16 results was false (MTD at 47) is untrue and irrelevant.  The TAC pleads that the SEC's Wells Notices concern the Company's revenue through December 31, 2016.  *See* ¶95.  Further, the challenged statements discuss margins (*see* ¶¶266, 272, 289, 300), and Plaintiffs allege that Under Armour's inventory

---

[51]   ¶¶266-276, 282, 289-291, 300-304, 306, 310-311, 315.

[52]   ¶¶16, 52-76, 324-351, 357-359, 366.

[53]   Thus, Defendants' argument that they had no duty to disclose these practices is incorrect.  MTD at 48-49; *supra* §II.C.

surplus impacted margins beyond 2016.  *See* ¶¶361-369.   Regardless, "a statement may be technically true, but in light of the circumstances in which it was made, . . . misleading."  *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 583 (D.S.C. 2011).[54]

## III.   INCORPORATING THE EVIDENCE THIS COURT CITED IN *UA III*, THE TAC SUFFICIENTLY ALLEGES DEFENDANTS' SCIENTER

As this Court previously recognized, a §10(b) plaintiff must plead a "cogent and compelling" inference of a defendant's scienter that is "at least as likely as any plausible opposing inference." *UA III*, 2020 WL 363411, at *7 (emphasis in original), quoting *Tellabs*, 551 U.S. at 328; *see also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).  Moreover, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *UA III*, 2020 WL 363411, at *7 (alteration in original).   The TAC more than adequately pleads a cogent and compelling inference of Defendants' scienter.

### A.   This Court Previously Ruled that the Evidence Revealed by the *WSJ* Permits a Strong Inference of Scienter

Defendants argue against this Court's clear ruling in *UA III* that the evidence revealed by the *WSJ* "support[s] the conclusion that Under Armour and Plank knew that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products"; and that, as a result, "***[t]he totality of these allegations permit a strong inference of scienter on the part of Under Armour executives and Plank specifically***."  *UA III*, 2020 WL 363411, at *7; *see also id.*, at *5 (listing the "new evidence" presented by Plaintiffs to "support their motion for relief from Judgment under Rule 60(b)").   The

---

[54]   Defendants' argument that some of these statements were protected by the PSLRA safe harbor provision, MTD at 47-48 (¶¶267, 273-74, 278, 304), fails for the reasons *supra* §II.E.2.c.

Court's *UA III* analysis is both factually and legally sound, and nothing in Defendants' Motion demonstrates otherwise.  This is especially true in light of the fact that, since the opinion, Under Armour publicly disclosed that the Company, Plank, and Bergman each received a Wells Notice from the SEC.  *See* ¶95.  These Wells Notices concern allegations that the Company deceived investors through the use of "pull forward" sales between the third quarter of 2015 and the end of December 31, 2016 "to meet sales objectives."  *Id*.; *see also supra* §II.B.1.a.  Under Armour also publicly admitted that Defendants "expect to engage in a dialogue with the SEC Staff to work toward a resolution of this matter."  ¶96; *cf. UA III*, 2020 WL 363411, at *4 n.8 ("[T]he existence of such an investigation is relevant to allegations that Plank and Under Armour executives acted with scienter."); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and DOJ initiated investigations provides additional support for finding that scienter has been adequately pleaded.").  And, Under Armour also admitted that the Wells Notices delivered to the Executives "also reference[d] potential charges related to the Executives' participation in the Company's violations, as well as control person liability under the Exchange Act."  ¶97.

Because this Court already held that there was a cogent and compelling inference of scienter that "tips the scale in favor of permitting Plaintiffs' claims to proceed," and the TAC pleads even more facts bolstering this already strong inference, Defendants' Motion should be denied.  *UA III*, 2020 WL 363411, at *7.

## B.   The TAC Sufficiently Alleges Defendant Plank's Scienter

If Defendants had their way, this Court would ignore binding precedent (not to mention its own previous decision in *UA III*) and instead review every allegation of Plank's scienter in isolation. *See UA III*, 2020 WL 363411, at *7 (allegations of scienter must be reviewed holistically and not in isolation); *see also Jeld-Wen*, 2020 WL 6270482, at *9 ("[T]he Supreme Court has cautioned courts

- 41 -

against scrutinizing each allegation supporting scienter in isolation.").  But analyzed holistically, the TAC meets the standard set out by the Supreme Court in *Tellabs*.  *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 2017 WL 11562247, at *1 (D. Md. July 6, 2017) ("In analyzing claims of this nature and specifically, the scienter requirement, courts are required to look at the scienter allegations holistically and accord those allegations the inferential weight warranted by context and common sense.").

First, this Court has already held that, based on some of the same evidence alleged in the TAC, "Defendants' alleged awareness of Under Armour's sales activities and accounting practices, which have become the subject of a federal inquiry, generates a 'cogent and compelling' inference of scienter" "on the part of Under Armour executives and **Plank specifically**."  *UA III*, 2020 WL 363411, at *7-*8.  Granting Plaintiffs' 60(b) motion, this Court held that this evidence "clearly would have produced a different result if present before" its prior dismissals.  *Id*. at *6.  As the Court observed, this evidence included allegations that "Plank's emails reveal that he was personally aware" of the sales and accounting practices the DOJ and SEC are investigating.  *Id*. at *7; *see also id.* at *5 (the November 14, 2019 *WSJ* article "further states that '*[i]nvestigators are examining emails that show Under Armour's founder and chief executive, Kevin Plank, knew about efforts to move revenue between quarters*'") (alteration in original).[55]

Second, that the SEC issued Wells Notice to Plank, after reviewing internal Under Armour documents, adds to the already strong inference of scienter the Court found existed in its *UA III* decision.  *See, e.g.*, ¶319 ("After the release of the *WSJ* article, Defendants were forced to issue a statement confirming the investigations and revealing that they had been ongoing for well over two

---

[55]   *See* ¶¶12, 57, 99-100, 105, 148, 152, 160, 169, 178, 196, 219, 228, 245, 250, 265, 329.

years").[56]  Issuing a Wells Notice significantly escalates the SEC's investigation and, as a result, is relevant to a holistic analysis of the TAC's scienter allegations.  *Cf. UA III*, 2020 WL 363411, at *4 n.8 ("[T]he existence of such an investigation is relevant to allegations that Plank and Under Armour executives acted with scienter."); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter").  Indeed, as Under Armour admitted in an August 2020 filing, the SEC preliminarily recommended an enforcement against Plank ***personally*** for, *inter alia*, violating the 1934 Act – just as the TAC alleges.  *See* ¶97.[57]

Third, Plank's resignation – in light of his Wells Notice from the SEC – bolsters the TAC's allegations of his scienter.  *See* ¶¶101-102.  While this Court previously noted that Plank's resignation as CEO appeared "benign,"[58] it did so ***before*** Under Armour publicly announced that the SEC Staff was recommending an enforcement action against Plank in connection with the Company's alleged use and nondisclosure of "pull forward" sales and accounting related practices; an enforcement action Under Armour admitted that both it and Plank were working to resolve with

---

[56]  That Plaintiffs do not have access to the documents and internal Company communications reviewed by the SEC prior to issuing a Wells Notice to defendant Plank (and preliminarily recommending an enforcement action be brought against him, defendant Under Armour and its current CFO) does not undermine the TAC's scienter allegations.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("we do not require the pleading of detailed evidentiary matter in securities litigation").

[57]  Defendants' authorities support a finding of scienter here.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) ("The SEC provides a target of an investigation with a Wells Notice 'whenever the Enforcement Division staff decides, even preliminarily, to recommend charges.'"); *Lions Gate*, 165 F. Supp. 3d at 12 (same).  Because the TAC adequately alleges Plank's knowledge (¶100), *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *13 (S.D.N.Y. Jan. 18, 2018), is inapt.  Defendants' other cases are inapposite because they do not mention "Wells Notice." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618 (4th Cir. 2008) (no mention of Wells Notice); *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784 (E.D. Va. 2017) (same).

[58]  ECF No. 136 at 47:18-24.

the SEC.  *See* ¶¶95-97, 101.  Therefore, the timing of Plank's resignation as CEO just weeks before

the first *WSJ* article disclosing the federal criminal and civil investigations, combined with the fact

that the SEC Staff has now recommended an enforcement action against him, add to the already

cogent and compelling inference of scienter this Court recognized in *UA III*.  *See Willis v. Big Lots*,

*Inc.*, 2016 WL 8199124, at \*34 (S.D. Ohio Jan. 21, 2016) (after "viewing the evidence as a whole,"

the commencement of federal criminal and civil investigations combined with fact that the CEO

"resigned a few months later in the wake of the DOJ investigation" helped create a strong inference

of scienter); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at \*8 (C.D. Cal. Sept. 6, 2017) ("Here,

[the CEO] resigned on the very same day that Banc issued a statement announcing an SEC

investigation. And Plaintiffs' alleged evidence to support an inference of scienter isn't limited to [the

CEO's] resignation. . . .  So the Court need not decide if the timing of [the CEO's] resignation is

***enough*** to support a strong inference of scienter.  Rather, the Court finds that this allegation 'adds

one more piece to the scienter puzzle.'") (emphasis in original).[59]

Fourth, Plaintiffs' new evidence reveals that Plank's Class Period insider sales of 2,300,000

shares at artificially inflated prices, which pocketed him more than $138.2 million, were executed ***at***

***the exact same time*** as the misconduct detailed by the SEC's Wells Notices, as publicly admitted by

the Company: "the ***third quarter of 2015 through the period ending December 31, 2016***."  ¶¶95,

---

[59]   Defendants rely on the Court's prior ruling in arguing that Plank's unexpected departure "adds
nothing" to the scienter analysis.  MTD at 32.  But Defendants ignore that the Court was considering
whether Plank's departure was "new evidence" pursuant to the Rule 60(b) analysis and overlook the
subsequent Wells Notices.  *See* ECF No. 106.  The import of these facts changes under a holistic
scienter analysis.  Here, the TAC connects Plank's resignation with the government investigations, a
connection bolstered by the subsequent Wells Notices.  *See, e.g.*, ¶¶101-103.  Defendants' cases,
MTD at 33, lack these investigations and Wells Notices.  *See Woolgar v. Kingstone Cos., Inc.*, 2020
WL 4586792, at \*26 (S.D.N.Y. Aug. 10, 2020) (no government investigation or Wells Notice);
*Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 561 (M.D.N.C. 2018) (same); *In re NVIDIA Corp.
Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) (same); *Mattel*, 321 F. Supp. 3d at 1133 (same).

124-138.[60]  Plank dumped nearly $100 million-worth of Under Armour shares **one quarter after** the Company's illicit sales practices began, and just after telling investors during Under Armour's 2015 Investor Day, "The demand for our brand has never been stronger." ¶¶129, 153.[61]  Plank then sold over 900,000 shares in April 2016, pocketing $38.2 million in profits.  This windfall was just days after Defendants raised the Company's guidance and made false and misleading statements and omissions about the Company's financial condition.  ¶¶135, 195-203, 206-207.  Further, Plank's November 2015 sales represented roughly 36% of the shares he could sell without losing control of Under Armour, and his April 2016 sales represented a remarkable 42% of the shares he could sell that year without ceding control of the Company.  ¶¶129-130.  And investigators are examining emails that show Plank knew about the Company's efforts to move revenue between quarters to mask slowing demand.  These allegations therefore add to the already cogent and compelling inference of scienter the Court recognized in *UA III*.  *See* ¶¶20, 126; *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (scienter adequately pleaded where company was the subject of an SEC investigation and defendants engaged in significant insider trading).

Fifth, additional scienter allegations further contribute to the inference of Plank's scienter. For example, the TAC's well-pleaded allegations that Plank knew about the Company's efforts to

---

[60]   Defendants' attempt to impose a *per se* rule that class period sales can never be "suspicious if they are smaller than pre-class period sales," MTD at 34-35, is contrary to law.  *See MicroStrategy*, 115 F. Supp. 2d at 644 (noting there is "no bright line test as to the amount or percentage of stock that must be sold to constitute a 'suspicious amount'").

[61]   Defendants' challenge to the timing of Plank's trades by invoking his purported October 2015 trading plan (MTD at 35-36) backfires.  The Wells Notices concern conduct from the "third quarter of 2015," which is **before** October 2015 and thus plausibly explain the timing of Plank's sales and trading plan.  ¶100.  These inferences are construed in Plaintiffs' favor.  *Singer,* 883 F.3d at 437. Moreover, a 10b5-1 trading plan "provides no defense to scienter allegations" when entered into during the Class Period.  *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).

move revenue between quarters (¶¶12, 94) corroborate prior allegations that his Class Period statements demonstrate his knowledge of Under Armour's internal data.  ¶¶106-112; *accord UA III*, 2020 WL 363411, at \*7 ("Plank ***knew*** that demand for their products was waning").  The TAC's new allegations that the Company's pull-forward orders were common knowledge in the Company – tracked in massive spreadsheets containing ***detailed sales and inventory data*** in a shared public folder ***available to any employee***, and resulted in "truckloads" of inventory returns – further corroborate Plank's knowledge of this data (¶¶52-61, 64, 73-74, 338).  Together, these facts also corroborate Plaintiffs' allegation that Plank was aware of the data cited in the Morgan Stanley Report showing declining demand for Under Armour's products from spring 2015.  ¶¶15, 113-120.

The new allegations also demonstrate that Plank knew the Company was using suspect sales and accounting tactics to mask declining demand ***at the same time*** he was raising money critical to the Company's operations via the June 2016 bond offering.  *See, e.g.*, ¶¶52, 138-139.  Had this been revealed prior to the 2016 bond offering, the offering's terms would have been far less favorable.  *See* ¶139 (once Under Armour's growth streak came to an end, Under Armour's bonds were downgraded to junk status).  Thus, the TAC adequately alleges that Plank was also motivated to mislead the public about Under Armour's true financial condition to raise $600 million in the June 2016 bond offering.  *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 786 (E.D. Va. 2015) (temporal relationship between alleged misrepresentations and bond offering supported scienter).  Finally, the TAC's allegations that Plank knew of the Company's pull-in sales (*e.g.*, ¶100), including to Dick's, bolster earlier allegations that he attended and presented at meetings where the Company's undisclosed struggles were discussed and further evidences his scienter.  ¶¶120-123.

When the allegations are analyzed holistically and in context, these facts plead a strong

inference of Plank's scienter. *See UA III*, 2020 WL 363411, at \*7-\*8; *Jeld-Wen*, 2020 WL 6270482,

at \*9; *see also Epstein*, 203 F. Supp. 3d at 669-70.

### C. The TAC Sufficiently Alleges Under Armour's Scienter

This Court held in *UA III* that the allegations (now incorporated into the TAC) sufficiently

create a cogent and compelling inference of **Under Armour's** scienter.  2020 WL 363411.  *See id.* at

\*7 ("The totality of these allegations permit a strong inference of scienter on the part of **Under

Armour executives** and Plank specifically.").  The Court's implicit holding that Under Armour's

scienter derives from the state of mind of its executives – including that of Plank – directly aligns

with authority from this Circuit.  For example, the Fourth Circuit holds that facts supporting a strong

inference of scienter "with respect to at least one authorized agent of the corporation" is enough to

impute a fraudulent or severely reckless state of mind to the entire company, "since corporate

liability derives from the actions of its agents."  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162,

184 (4th Cir. 2007); *see also Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 516 (E.D. Va. 2018)

("Because the AC alleges facts that warrant a strong inference of scienter with respect to lower-level

employees who furnished information for misleading statements, plaintiffs have adequately stated a

§10(b) claim against the corporate defendant").

Here, Plank's scienter is imputed to the company he founded and helmed for nearly the entire

Class Period.  *See Frank v. Dana Corp.*, 646 F.3d 954, 963 (6th Cir. 2011) (citing cases).[62]  Having

---

[62]   *See also Pelletier v. Endo Int'l PLC,* 439 F. Supp. 3d 450, 469 (E.D. Pa. 2020) ("Especially
given Lead Plaintiff's allegations that the CEOs closely controlled generic drug pricing, the CEOs'
and CFO's intents can be imputed to Endo.  Lead Plaintiff therefore has sufficiently alleged
corporate scienter."); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 556
(S.D.N.Y. 2017) ("Because the SAC alleges scienter against four key officers of comScore, it
necessarily alleges scienter against comScore itself.") (citing cases); *Thorpe v. Walter Inv. Mgmt.,
Corp.*, 111 F. Supp. 3d 1336, 1380 (S.D. Fla. 2015) ("Because the Court has found that Plaintiffs

- 47 -

no answer for the Court's ruling, Defendants resort to quibbling about the DOJ and SEC investigations' relevance. For example, in regards to allegations of Bergman's scienter, Defendants argue that "unresolved investigation or receipt of a Wells Notice is insufficient to establish a strong inference of scienter." MTD. at 38. Defendants' argument is unavailing not only because it analyzes Plaintiffs' scienter facts in isolation, but also because it contradicts the Court's reasoning that "the existence of such an investigation is relevant to allegations that Plank and Under Armour executives acted with scienter." *UA III*, 2020 WL 363411, at *4 n.8. This argument further ignores the SEC's independent conclusion that sufficient evidence exists, based on a review of evidence produced by Under Armour, of Bergman's scienter to preliminary recommend an enforcement action against him, Plank, and Under Armour **for securities fraud** related to "the Company's disclosures covering the third quarter of 2015 through the period ending December 31, 2016" – allegations at the heart of the TAC. ¶126.

Defendants' attempt to undermine allegations as to Under Armour's former CFOs Dickerson and Molloy's scienter rings similarly hollow. The scienter of these former CFOs is corroborated by, *inter alia*, their personal knowledge of Under Armour's sales and inventories evidenced by their discussion of such matters at great lengths and detail; their close monitoring of inventory and SportScan data; and their abrupt departures from the Company in just over a one-year period.[63] ¶¶142-144. The TAC's detailed allegations of pervasive GAAP and disclosure obligation violations

---

adequately alleged scienter for Defendants [COO and CCO], Plaintiffs have also adequately plead scienter against Walter Investment.").

[63] *See Singer*, 883 F.3d at 443-44 (finding defendants knew about, or recklessly disregarded, changes in law for reimbursement of medical procedure where defendants spoke in detail about the company's strategy for dealing with the new law); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (admissions from top executives that they monitored portions of the company's database are factors in favor of inferring scienter); ECF No. 74 at 45 ("unexplained departures and the timing may contribute to an inference of scienter").

(*see supra* §II.B.1.c.) are further indicia of their scienter and, as a result, Under Armour's scienter. *See Epstein*, 203 F. Supp. 3d at 670 ("[T]he Fourth Circuit has held that certain GAAP violations may help support an inference of scienter for pleading purposes."); *Kinder-Morgan*, 340 F.3d at 1106 (holding that alleged GAAP violations strengthened the inference that CFO signed financial statements with intent to deceive); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (same). And as revealed by the *WSJ*, investigators are examining "the tenure of former finance chief Chip Molloy" (¶143) – a fact, despite Defendants' argument to the contrary (MTD at 38), the Court has previously recognized is relevant to allegations that Plank and **Under Armour executives** acted with scienter. *UA III*, 2020 WL 363411, at *4 n.8.

Moreover, the Company's executives' decision to hide the investigation for nearly three years (¶92) contributes to an inference of scienter when considered with the timing of the disclosure. *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC,* 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (scienter adequately pled when defendants "knew about the SEC-DOJ Investigation" but "waited to disclose its potential impact" until after the *WSJ* published an article about the investigation). These executives' resignations, in light of the government investigations, further contributes to this inference. *Epstein*, 203 F. Supp. 3d at 671-72.

## IV.   THE TAC ADEQUATELY ALLEGES SECTION 20(a) AND 20A CLAIMS

Defendants contest control person liability under §20(a) and insider trading liability under §20A only on the ground that there is purportedly no primary violation of the Exchange Act. MTD at 50. But because the preceding sections herein demonstrate that the TAC pleads a predicate violation of §10(b), its §20(a) claim is adequately alleged and there is a predicate violation for its §20A claim. Moreover, Plaintiffs purchased Under Armour stock during the Class Period contemporaneously – on some of the same days – with Plank's trades, when he was in possession of

material, non-public information concerning Under Armour's suspect sales and accounting practices. *See* ¶¶57, 100, 428-435; *see also UA II*, 409 F. Supp. 3d at 463 ("Section 20A provides for a private right of action to buyers and sellers of securities who trade 'contemporaneously' with an insider in possession of material nonpublic information.").

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

DATED:  January 29, 2021                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
ROBERT R. HENSSLER JR.
MATTHEW I. ALPERT
JUAN CARLOS SANCHEZ
CHRISTOPHER R. KINNON

s/ ROBERT R. HENSSLER JR.
ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
jsanchez@rgrdlaw.com
ckinnon@rgrdlaw.com

4839-5512-0856.v2

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
MAUREEN E. MUELLER
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
mmueller@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Plaintiffs*

MOTLEY RICE LLC
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for KBC Asset Management NV*

SILVERMAN THOMPSON SLUTKIN
  & WHITE LLC
ANDREW C. WHITE, Bar No. 0821
WILLIAM SINCLAIR, Bar No. 28833
PIERCE C. MURPHY, Bar No. 30030
201 N. Charles Street, 26th Floor
Baltimore, MD  21201
Telephone:  410/385-2225
410/547-2432 (fax)
awhite@mdattorney.com
bsinclair@mdattorney.com
pmurphy@mdattorney.com

*Local Counsel*

- 51 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 29, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ ROBERT R. HENSSLER JR.
ROBERT R. HENSSLER JR.

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  bhenssler@rgrdlaw.com

# Mailing Information for a Case 1:17-cv-00388-RDB In re Under Armour Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Abelson**
  aabelson@zuckerman.com,dvermilye@zuckerman.com,creilly@zuckerman.com,cvandergriff@zuckerman.com

- **Matthew I Alpert**
  malpert@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Stephen R Astley**
  sastley@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Austin P Brane**
  abrane@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Amanda F Davidoff**
  davidoffa@sullcrom.com,amanda-davidoff-7764@ecf.pacerpro.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com,9825585420@filings.docketbird.com,tseymore@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Eric Robert Delinsky**
  edelinsky@zuckerman.com

- **Aitan Goelman**
  agoelman@zuckerman.com

- **Samuel P Groner**
  samuel.groner@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com

- **Scott R Haiber**
  scott.haiber@hoganlovells.com,james.tansey@hoganlovells.com

- **Robert R Henssler , Jr**
  bhenssler@rgrdlaw.com,cbarrett@rgrdlaw.com,MarkS@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher R Kinnon**
  ckinnon@rgrdlaw.com,CKinnon@ecf.courtdrive.com

- **Thomas Joseph Minton**
  tminton@charmcitylegal.com

- **Maureen E Mueller**
  mmueller@rgrdlaw.com

- **Pierce Christopher Murphy**
  pmurphy@mdattorney.com,efiling@silvermanthompson.com,dcaimona@silvermanthompson.com

- **Kirtan Patel**
  nikoletta.mendrinos@murphyfalcon.com

- **Charles J Piven**
  piven@browerpiven.com

- **Nicholas Ian Porritt**
  nporritt@zlk.com,Files@zlk.com

- **Jack Reise**
  jreise@rgrdlaw.com,cmontelione@rgrdlaw.com,e_file_fl@rgrdlaw.com,mmueller@rgrdlaw.com

- **Juan Carlos Sanchez**
  JSanchez@rgrdlaw.com,jsanchez@ecf.courtdrive.com

- **Elizabeth A Shonson**
  eshonson@rgrdlaw.com

- **William Nelson Sinclair**
  bsinclair@mdattorney.com,efiling@silvermanthompson.com,dcaimona@silvermanthompson.com

- **Daniel Stephen Sommers**
  dsommers@cohenmilstein.com,efilings@cohenmilstein.com

- **Michael P Sternheim**
  michael.sternheim@friedfrank.com

- **Jon Myer Talotta**
  jon.talotta@hoganlovells.com

- **Steven J Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

- **Yelena Trepetin**
  yelena@samek-law.com

- **James D Wareham**
  James.Wareham@friedfrank.com,ManagingAttorneysDepartment@friedfrank.com

- **G Stewart Webb , Jr**
  gswebb@venable.com,dmvermette@venable.com

- **Andrew C White**
  awhite@mdattorney.com,rscaffidi@mdattorney.com

- **Michael Jackman Wilson**
  MJWilson@Venable.com,BALitigationDocketing@venable.com,SABurke@Venable.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)