**Robbins Geller**
**Rudman & Dowd** LLP

| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

Robert R. Henssler, Jr.
bhenssler@rgrdlaw.com

May 7, 2021

<u>VIA ECF</u>

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
101 West Lombard Street, Chambers 5D
Baltimore, MD 21201

     Re:    *In re Under Armour Securities Litigation*,
                Civil Action No. 1:17-cv-00388-RDB

Dear Judge Bennett:

     I write on behalf of Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund, Monroe County Employees' Retirement System, and KBC Asset Management NV (collectively "Plaintiffs"). On May 3, 2021, the U.S. Securities and Exchange Commission ("SEC") entered an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("SEC Order"). Accordingly, the SEC imposed a cease-and-desist order for violations of Sections 17(a)(2) and (3) of the Securities Act of 1933 (the "Securities Act") and Section 13(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rules 13a-1, 13a-11, 13a-13, 12b-20 thereunder, including failing to comply with Item 303(a)(3)(ii) of Regulation S-K. SEC Order at 1, 10.[1] The SEC also ordered Under Armour, Inc. to pay a civil penalty of $9,000,000.00, which is more than 45 times the median SEC penalty ordered last year (excluding disgorgements). *Id.*, IV.A-B; SEC Division of Enforcement's 2020 Annual Report.

     On May 4, 2021, Under Armour, Inc. ("Under Armour" or the "Company") submitted a letter to the Court informing it of the SEC Order and Under Armour's settlement with the SEC (ECF No. 171) ("Letter"). The Letter argues that the Court should consider self-selected portions of the SEC Order in Defendants' favor.

---

[1]   The SEC Order is attached hereto as Exhibit 1, and is also publicly available on the SEC's website. *See* https://www.sec.gov/litigation/admin/2021/33-10940.pdf.

655 West Broadway, Suite 1900   San Diego, CA 92101   Tel 619-231-1058   Fax 619-231-7423   rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 2

Plaintiffs agree that the SEC Order is pertinent to these proceedings and should be considered in connection with the pending Motion to Dismiss Plaintiffs' Consolidated Third Amended Complaint (ECF No. 159) ("Motion to Dismiss").  Accordingly, Plaintiffs respectfully request, pursuant to Fed. R. Evid. 201(b), that the Court take judicial notice of the SEC Order for purposes of the Court's consideration of the pending Motion to Dismiss.

Rather than exonerating Defendants, the SEC Order's formal findings, to which Under Armour consented, confirm Plaintiffs' well-pleaded allegations in the Consolidated Third Amended Complaint for Violations of the Federal Securities Laws ("TAC") that the Company and defendant Kevin Plank (together, "Defendants") violated Sections 10(b), 20(a), and Rule 10b-5 promulgated thereunder, including the allegation that Defendants acted with scienter.  Specifically, the SEC found that Under Armour and its "Senior Management"—a term Under Armour used in its Class Period public filings to describe Kevin Plank[2]—knowingly orchestrated and participated in an undisclosed, six-quarter-long scheme designed to conceal the Company's declining revenue and maintain its 26-consecutive-quarter, 20% revenue growth streak by pulling forward future sales, materially misrepresenting its financial results, and making materially misleading statements to investors.  SEC Order at ¶¶1-4.

**I.     THE COURT SHOULD CONSIDER THE SEC ORDER IN CONNECTION
        WITH DEFENDANTS' PENDING MOTION TO DISMISS**

Plaintiffs respectfully request that the Court, pursuant to Federal Rule of Evidence ("FRE") 201 and *Tellabs*, take judicial notice of the SEC Order for purposes of the Court's consideration of the pending Motion to Dismiss.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a court may consider judicially noticeable matters in ruling on a motion to dismiss).

As the Fourth Circuit has explained, facts "found in documents referred to in the [S]AC or 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" are "properly subject to judicial notice" under Federal Rule of Evidence 201.  *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011); *see also Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) ("courts may consider 'relevant facts obtained from the public record'").  Applying this principle, courts routinely take

---

[2]    *See, e.g.*, Under Armour's 2015 Form 10-K filed February 19, 2016, at 16 ("Our future success is substantially dependent on the continued service of our senior management and other key employees, particularly Kevin A. Plank, our founder, Chairman and Chief Executive Officer.").

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 3

judicial notice of SEC cease-and-desist orders like the one at issue here. *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *4 (S.D.N.Y. June 28, 2017) (taking judicial notice of regulatory consent order and cease-and-desist order); *see also In re UBS Auction Rate Sec. Litig.*, No. 08-2967, 2010 WL 2541166, at *13-14 (S.D.N.Y. June 10, 2010) (taking judicial notice of a "SEC Order, which is also available on the SEC website"); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *6 (M.D. Pa. Dec. 7, 2016) (taking judicial notice of a subsequent SEC Order in connection with the court's ruling on pending motions to dismiss in a §10(b)).  And as this Court has made clear, "If a court considers [judicially noticed] facts at the motion to dismiss stage, the facts must be construed in the light most favorable to the plaintiffs."  *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 455 (D. Md. 2019) (internal quotation marks omitted).

Here, the accuracy of the SEC Order cannot reasonably be questioned.  Indeed, Defendants themselves submitted the SEC Order to the Court, and it is publicly available on the SEC's website.[3]  Moreover, the SEC Order may also be incorporated by reference because, as Defendants concede, "Plaintiffs rely extensively on the investigation by the [SEC] and the Wells Notices issued to defendants Under Armour and Kevin A. Plank (and non-party David Bergman) in support of their securities fraud claims" (Letter at 1).  *Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir. 2005) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 388 n. 7 (4th Cir. 2005) ("[W]e are not strictly limited to the four corners of the complaint when examining this complaint: since it relies upon a public document a court may as well without converting the motion to dismiss into a motion for summary judgment."); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (considering documents extrinsic to the complaint at the motion to dismiss stage because "it was integral to and explicitly relied on in the complaint" and the opposing party "do not challenge its authenticity"); *Pa. Transp. Auth.*, 2016 WL 7117455, at *6 (taking judicial notice of a subsequent SEC Order in connection with the court's ruling on pending motions to dismiss in a §10(b) case because "the SEC Order [was] the culmination of the SEC investigation referenced in the SAC" and therefore "clearly" related to matters at issue before the court).

For these reasons, Plaintiffs respectfully request that the Court take judicial notice of the SEC Order for purposes of the Court's consideration of the pending Motion to Dismiss.

---

[3]    *See* https://www.sec.gov/litigation/admin/2021/33-10940.pdf.

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 4

## II.    THE SEC ORDER CONFIRMS THE TAC'S ALLEGATIONS

As this Court previously recognized, the new facts pleaded in the TAC support "the conclusion that Under Armour and Plank knew that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products." *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *7 (D. Md. Jan. 22, 2020) ("*UA III*") ("The totality of these allegations permit a strong inference of scienter on the part of Under Armour executives and Plank specifically."). The SEC Order confirms this Court's prior holding and directly contradicts Defendants' Motion to Dismiss arguments.

### A.    The SEC Order's Findings

The SEC found that by April and May of 2015, Under Armour's senior management knew that the Company's internal revenue and revenue growth forecasts for the third and fourth quarters of 2015 would fall short of analysts' revenue estimates. SEC Order at 3. "Concerned about the possible negative impact on the company's stock price," Under Armour's senior management began directing its Financial Planning & Analysis group ("FP&A group") and senior sales personnel to pull forward approximately $408 million in orders over the next six consecutive quarters "to close the gap between its internal forecasts and analysts' revenue estimates." *Id.*, ¶2. Without these quarterly pull-forwards, the SEC found, "Under Armour would have missed analysts' revenue estimates throughout the Relevant Period, and would have missed its better than 20% revenue growth streak in the fourth quarter of 2015 and the third quarter of 2016." *Id.*, ¶3.

The SEC also found that Under Armour "knew or should have known that its use of pull forwards concealed its failure to meet analysts' revenue estimates" and "that its increasing reliance on pull forwards to meet analysts' revenue estimates was having, or was reasonably likely to have, a material negative impact on future revenue." *Id.*, ¶41. Further, the SEC Order confirms Plaintiffs' allegations that Under Armour used undisclosed sales incentives, including discounts and extended payment terms, to facilitate the quarterly pull-forward sales. *Id.*, ¶10. And it found that "Under Armour's reported financial results during the Relevant Period did not reflect its natural revenue growth, and were not indicative of its future financial results." *Id.*, ¶41. By failing to disclose the use of pull forward sales, "investors were left with a misleading impression of how Under Armour was meeting or beating analysts' revenue estimates." *Id.*, ¶43.

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 5

The SEC Order quantifies and explains Under Armour's pull-forward fraud with the following findings:

| Quarter | Amount Pulled Forward | But for the Pulled Forward Sales | Other Findings |
|---------|----------------------|----------------------------------|----------------|
| 3Q15 | $45,000,000 | Under Armour's growth rate "would have been below analysts' revenue estimates and the lowest quarterly growth rate in more than two years." *Id.*, ¶16.<br><br>Would not have beat analysts' consensus by $29 million without pull-forward sales. *Id.*, ¶13 | Senior management "***knew***" of $120 million decline in sales projections for North American wholesale apparel before purposely pulling in sales from 4Q15. *Id.*, ¶13.<br><br>Pull-forward sales were 4.5% of total 3Q15 revenue. *Id.* |
| 4Q15 | $99,000,000 | Under Armour's growth rate "would have been less than 20% for the first time in more than five years." *Id.*, ¶20.<br><br>Would not have "beat" consensus estimates by $53 million without pull-forward sales. *Id.*, ¶18 | Senior management "***knew***" decline in projected revenue meant Company could fall far below analysts' revenue estimates so they "***directed***" sales personnel to pull forward approximately $99 million in orders from 1Q16 into 4Q15. *Id.*, ¶¶17-18.<br><br>4Q15 pull-forwards nearly 8.5% of Company's total 4Q15 revenue and approximately 35% of 4Q15 revenue growth. *Id.*, ¶20.<br><br>A "senior Under Under Armour executive" (*i.e.*, Plank) made materially misleading omissions and statements. *Id.*, ¶19. |

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 6

| Quarter | Amount Pulled Forward | But for the Pulled Forward Sales | Other Findings |
|---------|----------------------|----------------------------------|----------------|
| 1Q16 | $17,500,000 | "Under Armour's revenue and growth rate would have been below analysts' revenue estimates." *Id.*, ¶22. | Senior executive sought "enough pull-forwards . . . to close the Q1 gap." *Id.*, ¶21. |
| 2Q16 | $10,000,000 | "Under Armour's second quarter 2016 revenue would have been below analysts' revenue estimates." *Id.*, ¶24. | "Under Armour senior management was aware as early as May 2016 that the forecasted revenue for the quarter had declined by $11 million, and that Under Armour would likely need to use pull forwards to close the gap [with analysts' revenue estimates]." *Id.*, ¶23. |
| 3Q16 | $65,000,000 | "Under Armour's growth rate in the third quarter of 2016 would have been less than 20%, and the company would not have reported revenue and revenue growth that beat analysts' revenue estimates." *Id.*, ¶29. | Found "senior management *directed* the FP&A group and sales personnel" to pull forward $65 million from 4Q16 to 3Q16, to close the gap and avoid breaking 20% growth streak, by offering "price discounts and extended payment terms." *Id.*, ¶25.<br><br>3Q16 pull-forwards 25% of 3Q16 reported revenue growth and 4.5% of total 4Q16 revenue. *Id.*, ¶29.<br><br>Found Plank's statements about "the strength of the Under Armour brand in the marketplace," the 26 consecutive quarters of 20%-plus revenue growth, and that "the growth remains intact," misleading. *Id.*, ¶¶27-28. |

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 7

| Quarter | Amount Pulled Forward | But for the Pulled Forward Sales | Other Findings |
|---------|----------------------|--------------------------------|----------------|
| 4Q16 | $172,000,000 | "[T]here would have been no reportable growth in the fourth quarter of 2016." *Id.*, ¶38. | Internal documents show senior executive acknowledging that "[the customer] doesn't want any of that product in December but we are shipping it and they are absolutely taking it from us as a favor.  If we were a privately held company, we would not ship that product to them in December." *Id.*, ¶30.<br><br>Senior management *knew* that Company was meeting revenue shortfall for 4Q and FY 2016 with increasing amount of pull forwards and would have to pull forward over $160 million in orders to close gap, negatively impacting 1Q17 revenue. *Id.*, ¶31.<br><br>Plank's statements on 4Q16 earnings call were misleading: 1) "'I want to be clear.  Our growth story is intact.  Our brand is truly stronger than it's ever been'"; 2) that Under Armour's "'growth story'" was intact; and 3) that the Company's brand was "'stronger than it's ever been.'" *Id.*, ¶¶37-38.<br><br>Pull forward sales comprised 13% of total 4Q16 revenue. *Id.*, ¶38. |

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 8

**B.     The SEC Order Corroborates the TAC's Allegations and Eviscerates
Defendants' Motion to Dismiss Arguments**

The SEC Order corroborates Plaintiffs' allegations, finding that "[f]or six consecutive quarters from the third quarter of 2015 through the fourth quarter of 2016 (the 'Relevant Period'), Under Armour used pull forwards to help it meet analysts' revenue estimates" and maintain the Company's 20% revenue growth streak, and that "*[a]s a result of Under Armour's failure to disclose the impact of its pull forward practice on revenue growth, Under Armour's public statements were materially misleading*." *Compare* SEC Order, ¶¶3-4 *with* TAC, ¶¶6-11, 13-14, 16, 17, 43, 52-66.  Moreover, the SEC Order confirms that Under Armour's senior management—a cohort that includes Plank according to the Company's own SEC filings (*supra* at 2 n.2)—knew about the pull-forward sales, "knew or should have known" that these sales "concealed its failure to meet analysts' revenue estimates," and "knew that its increasing reliance on pull forwards . . . was having, or was likely to have, a material negative impact on future revenue."  *E.g.*, SEC Order, ¶¶13, 21, 30-34, 40-41, 44.

**1.     The SEC Order Confirms the TAC's Suspect Sales and
Accounting Allegations**

The SEC Order confirms the TAC's allegations that Defendants used "undisclosed sales and accounting practices to appear healthier and maintain Under Armour's growth record."  ECF No. 162 at 12 (citing TAC, ¶¶52, 56); SEC Order, ¶3.  In particular, the TAC alleges that Defendants (1) "pull[ed] forward orders . . . to hit the number or close the gap . . ., to mask slowing demand . . . in the name of hitting the number"; (2) facilitated these pull forward sales by "incentiviz[ing] retailers to take shipments early by adjusting the terms of the contract to offer a discount or extend the payment period"; and (3) that "defendants' failure to disclose the suspect sales and accounting practices made Under Armour's financial reporting in 2015 and 2016 (and its projections for 2016 and 2017)," along with other of its statements, "materially false and misleading, violating specific GAAP rules and SEC regulations."  *Id.*, 12, 14 (citing TAC, ¶¶62, 324 n.90, 330-332).

In the Motion to Dismiss, Defendants characterize their pull forward sales as "benign" and "legitimate" and argue they had no duty to disclose their improper sales practices to investors.  ECF No. 159-1 at 22-26.  Defendants also argue that the TAC lacks the requisite corroboration for its accounting and channel stuffing allegations, "such as the transaction date, quantity, and the amount of of revenue recognized improperly," calling these transactions an "isolated occurrence."  *See* ECF No. 170 at 2-5, 8-12.

**Robbins Geller**
**Rudman & Dowd LLP**

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 9

The SEC Order puts these arguments to rest, confirming the TAC's allegations that Under Armour's sales practices were not benign, common, or legitimate. Rather, Under Armour pulled forward sales "to help it meet analysts' revenue estimates" and maintain its "20% revenue growth streak." SEC Order, ¶3. "Without these pull forwards each quarter," the SEC Order finds, "Under Armour would have missed analysts' revenue estimates throughout the Relevant Period, and would have missed its better than 20% revenue growth streak in the fourth quarter of 2015 and the third quarter of 2016." *Id.* Thus, the SEC Order finds—contrary to Defendants' argument—that by failing to disclose "that a significant portion of [Under Armour's] revenue and revenue growth had resulted from the use of pull forwards," ***investors "were left with a misleading impression of how Under Armour was meeting or beating analysts' revenue estimates***" *Id.*, ¶¶42-43; *see also id.*, ¶3 ("Under Armour's failure to disclose to investors the impact of its pull forward practices was ***misleading***.").

As alleged in the TAC, Under Armour's pull forward sales "added at least tens of millions in sales every quarter." TAC, ¶338. The SEC Order is consistent with and corroborates these allegations, finding that Under Armour pulled forward approximately $408 million in orders over "six consecutive quarters from the third quarter of 2015 through the fourth quarter of 2016," and that a material amount of the Company's total quarterly revenue—including $170 million in the fourth quarter of 2016 alone—resulted from pull forward sales. *See* SEC Order, ¶¶3, 13-38 (breaking these pull-forward orders down by quarter).

The SEC Order also finds that Under Armour convinced customers to take early shipments using (undisclosed) "incentives, such as extended payment terms and discounts," corroborating the TAC's channel stuffing allegations. *Id.*, ¶10; TAC, ¶¶55, 61, 62-66, 74.[4] The SEC Order also further finds that Defendants' reported revenue growth rate for 3Q15, 4Q15, 3Q16, and 4Q16 was achieved by including the undisclosed pull-forward sales, and that "without this information" about the pull forwards, "investors also lacked the ability to evaluate Under Armour's future revenue and ability to meet future guidance and analysts' revenue expectations." SEC Order, ¶¶15-16, 20, 29, 36. Moreover, the SEC Order finds that "Under Armour's reported financial results during the Relevant Period did not reflect its natural revenue and revenue growth, and were not indicative of its future financial results," confirming the TAC's allegations that "defendants' failure to disclose

---

[4]    Defendants' own in-circuit authority, *In re Trex Co. Sec. Litig.*, 212 F. Supp. 2d 596 (W.D. Va. 2002), defines these practices as channel stuffing: "The Court understands the term 'channel stuffing' . . . to mean 'the pulling, forward of revenue from future fiscal periods by inducing customers—through price discounts, extended payment terms or other concessions—to submit purchase orders in advance of when they would otherwise do so.'"

**Robbins Geller**
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 10

the suspect sales and accounting practices made Under Armour's financial reporting in 2015 and 2016 (and its projections for 2016 and 2017) materially false and misleading, violating specific GAAP rules and SEC regulations."  *Id.*, ¶41; TAC, ¶¶330-332.

### 2.     The SEC Order Confirms the Falsity of the TAC's Statements

The SEC Order undercuts Defendants' other falsity arguments, including that: (1) Under Armour's September 2015 Investor Day and 3Q15 Results statements were not false (ECF No. 159-1 at 41); (2) accurate statements of historical data are not actionable (*Id.*, 42); (3) their "growth" and "demand" statements are puffery (*Id.*, 43); and (4) certain forward-looking statements are protected by the PSLRA safe harbor (*Id.*, 44-46, 48).  For example, the SEC Order finds that:

- Under Armour's public statements and omissions were ***materially*** misleading;

- By "mid-2015" Under Armour's North American wholesale sales channel had declined by $120 million compared to internal projections, and "[s]tarting in the third quarter of 2015, Under Armour's internally projected company-wide revenue began to fall short of analysts' revenue estimates."  SEC Order, ¶¶13, 9.

- By the third quarter of 2015, Under Armour knew that its full-year internal projections for company-wide revenue had declined from its late 2014 forecast, including a $120 million decline in sales projections for its largest market category, North American wholesale apparel.  SEC Order, ¶13.

- The Company's pull forward sales "raised significant uncertainty that Under Armour would meet its revenue guidance in future quarters."  SEC Order, ¶4.

- "Under Armour's reported financial results during the Relevant Period did not reflect its natural revenue growth, and were not indicative of its future financial results."  SEC Order, ¶41.

### 3.     The SEC Order Confirms the TAC's Strong Inference of Scienter

As this Court has previously recognized, events now incorporated into the TAC already "support the conclusion that Under Armour and Plank ***knew*** that demand for their products was waning, resorted to risky sales tactics to keep the numbers intact, and intentionally misrepresented the level of demand for their products."  *UA III*, 2020 WL 363411, at *7.  And contrary to Defendants' claims, the SEC Order confirms the Court's prior scienter finding.

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 11

By way of example, the SEC Order found that:

> Under Armour **knew or should have known** that its use of pull forwards concealed its failure to meet analysts' revenue estimates without such pull forward sales. Under Armour also **knew** that its increasing reliance on pull forwards to meet analysts' revenue estimates was having, or was reasonably likely to have, a material negative impact on future revenue.

SEC Order, ¶41; *see Singer v. Reali*, 883 F.3d 425, 443 (4th Cir. 2018) (holding that "[t]he reckless conduct sufficient to engender the mandatory strong inference of scienter" may involve conduct that "present a danger of misleading the plaintiff to the extent that the danger was either ***known to the defendant or so obvious that the defendant must have been aware of it***") (internal quotes omitted).

The SEC also found that Under Armour's senior executives were well aware of the decline in projected revenue and, in response, directed the pulling forward of orders to meet financial targets despite knowing that it would have an adverse impact on the Company's future revenue. *See, e.g.*, ¶¶17 (finding "*[s]enior management knew*"), 21 (describing a "***senior executive['s] acknowledge[ment]***"), 23 (noting "***senior management['s] . . . aware[ness]***"), 25 (explaining how "***senior management directed***" the pulling forward of sales"), 30 (detailing a "***senior executive['s] acknowledge[ment]***"), 33 (recounting a "***top executives['s]" admission***"), 43 (noting "***senior management['s] implicit[] admi[ssion]***"). These findings are fatal to defendants' argument that the TAC does not plead Under Armour's scienter. *See, e.g.*, *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007) (recognizing that "if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to ***at least one authorized agent*** of the corporation"); *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 516 (E.D. Va. 2008) (upholding §10(b) claim against the corporate defendant).

Such detailed findings defeat Defendants' contention that the TAC's lacks "'***specific facts***' that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" ECF No. 170 at 14. In fact, the SEC Order specifically identified the millions of dollars pulled forward each quarter and the facts demonstrating intent: "to close the gap between its internal forecasts and analysts' revenue estimates" and avoid "miss[ing] its better than 20% revenue growth streak." SEC Order, ¶¶2-3; *see also supra* at 5-7 (chart identifying value of pulled forward sales by quarter and motive underlying each). Nor can Defendants continue to rely on the erroneous contention that "'government investigations cannot bolster allegations of scienter'" (ECF No. 170 at 20) given the SEC's findings that were as meticulous in their detail as they were incriminating for Defendants.

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 12

And Under Armour's argument that its Sections 17(a)(2) and (3) violations cannot support the TAC's claims because they "do[] not require scienter" is without merit. Similar arguments are routinely rejected. *See, e.g.*, *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 (9th Cir. 2012) ("We draw no inference from the SEC's decision not to plead scienter or charge defendants with fraud. The district court erred in concluding that 'the SEC's decision not to plead scienter hurts plaintiffs' ability to plead a strong inference of scienter.'"); *Pa. Transp. Auth.*, 2016 WL 7117455, at *6 (upholding §10(b) claims and finding that an SEC cease-and-desist order for violations of §§17(a)(2) and (a)(3) supported an inference of scienter); *Omanoff v. Patrizio & Zhao LLC*, 2015 WL 1472566, at *5 (D.N.J. Mar. 31, 2015) (finding scienter adequately pled and rejecting argument that the SEC's initiation of an action "premised upon negligence, not fraud, demonstrates that Defendants did not engage in fraud"). Moreover, even allegations of "misconduct" may support a finding of scienter. *See Singer*, 883 F.3d at 443 ("A complaint's '[a]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss'").

Defendants' effort to further downplay the significance of the SEC's Order as to Plank's scienter also fails. That the SEC's investigation concluded without enforcement action against Plank provides no cover for him here. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2014 WL 4823876, at *3-*4 (W.D. Ark. Sept. 26, 2014) (finding strong inference of scienter as to corporation and its chief executive officer despite the SEC ultimately not charging executive); *Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011) (finding CEO's scienter adequately pled where only the company was the subject of an SEC investigation and observing it was "difficult to grasp the thought" that the CEO and CFO "had no idea" of the company's financial problems).[5] Indeed, given that the findings in the SEC Order are made "[o]n the basis" of Under Armour's "Offer of Settlement," and therefore crafted by Under Armour, it is unsurprising that the SEC took no action against Plank or made no findings that revenue from Under Armour's pull forward sales was not recorded in accordance with Generally Accepted Accounting Principles.

Despite this, the SEC Order directly implicates Plank, even if not by name. For example, the SEC found that, rather than disclose the use of pull forward sales, "a senior Under Armour executive," *i.e.* Plank, told investors during the Company's 3Q16 earnings call, "'I want to be clear . . . that the growth remains intact.'" SEC Order, ¶28. The SEC Order confirms that those statements were "***materially misleading***," just as Plaintiffs allege in the TAC. *Compare* SEC Order, ¶28 *with* TAC, ¶257 (alleging Plank insisted that "our demand is still there" and that

---

[5]    https://www.sec.gov/litigation/admin/2019/34-86159.pdf.

Robbins Geller
Rudman & Dowd LLP

The Honorable Richard D. Bennett
United States District Court
for the District of Maryland
May 7, 2021
Page 13

"[revenue] **growth remains intact**").  In truth, without pulling forward "approximately $65 million in orders from the fourth quarter of 2016 into the third quarter of 2016," Under Armour's growth rate would have been "less than 20%, and the company would not have reported revenue and revenue growth that beat analysts' revenue estimates."  SEC Order, ¶29; *compare* SEC Order, ¶37 (finding that a "senior Under Armour executive" stated during the Company's 4Q16 earnings call, "'I want to be clear.  Our growth story is intact.  Our brand is truly stronger than it's ever been.") *with* TAC, ¶282 (alleging that "Plank claimed in his prepared remarks that Under Armour's 'brand is truly stronger than it's ever been" and that the Company's growth is "intact").

Finally, the SEC Order's findings paint Plank's Class Period stock sales in November 2015 and April 2016 for over $138.2 million in an even more suspicious light as they confirm that his Rule 10b5-1 trading plan was entered *after* "Under Armour's internal revenue and growth forecasts" began to "indicate shortfalls from analysts' revenue estimates."  SEC Order, ¶2.  *See Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (a 10b5-1 trading plan "provides no defense to scienter allegations" when entered into during the Class Period). Simply put, the SEC Order confirms that Plank traded on inside information.

## III.    CONCLUSION

The SEC Order confirms the TAC's allegations with respect to falsity and scienter and renders incredible Defendants' arguments about the sufficiency of Plaintiffs' detailed allegations. Plaintiffs therefore request that the court consider the SEC Order in connection with Defendants' Motion to Dismiss and deny the motion in its entirety.  Alternatively, Plaintiffs seek leave to amend the TAC to include the newly discovered evidence outlined in the SEC Order should the Court deny Plaintiffs' request for judicial notice.

Respectfully submitted,

ROBERT R. HENSSLER, JR.

RRH:mmh

EXHIBIT 1

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 10940 / May 3, 2021**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 91741 / May 3, 2021**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4220 / May 3, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20278**

| | |
|---|---|
| **In the Matter of**<br><br>**UNDER ARMOUR, INC.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Under Armour, Inc. ("Under Armour" or "Respondent").

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which is admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Exchange Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

**<u>Summary</u>**

1.      This matter concerns Under Armour's failure to disclose material information about its revenue management practices that rendered statements it made misleading. Since becoming a publicly traded company, Under Armour has emphasized its consistent revenue growth, and regularly reported revenue and revenue growth that exceeded analysts' consensus estimates ("analysts' revenue estimates"). For 26 consecutive quarters, beginning in the second quarter of 2010, Under Armour's reported year-over-year revenue growth exceeded 20%, and Under Armour repeatedly highlighted this growth streak in earnings calls and earnings releases.

2.      By the second half of 2015, Under Armour's internal revenue and revenue growth forecasts for the third and fourth quarters of 2015 began to indicate shortfalls from analysts' revenue estimates. Concerned about the possible negative impact on the company's stock price that could result from missing these estimates, Under Armour sought to accelerate, or "pull forward," existing orders that customers had requested be shipped in future quarters that could be completed in the current quarter to close the gap between its internal forecasts and analysts' revenue estimates. To effectuate this, Under Armour typically asked customers to accept shipment of certain products in the current quarter that they had already ordered for delivery in the next quarter.

3.      For six consecutive quarters from the third quarter of 2015 through the fourth quarter of 2016 (the "Relevant Period"), Under Armour used pull forwards to help it meet analysts' revenue estimates. During the Relevant Period, Under Armour pulled forward approximately $408 million in orders. Under Armour's failure to disclose to investors the impact of its pull forward practices was misleading.[2] Without these pull forwards each quarter, Under Armour would have missed analysts' revenue estimates throughout the Relevant Period, and would have missed its better than 20% revenue growth streak in the fourth quarter of 2015 and the third quarter of 2016. On January 31, 2017, the day Under Armour announced that it missed analysts' revenue estimates for the fourth quarter and full-year 2016, the company's stock price dropped by approximately 23%. Under Armour's year-over-year growth rate for each quarter has remained in the single digits or negative since that time.

4.      As a result of Under Armour's failure to disclose the impact of its pull forward practice on revenue growth, Under Armour's public statements were materially misleading. In particular, throughout the Relevant Period, Under Armour made positive statements regarding its revenue growth rate and the factors contributing to the revenue growth rate, without disclosing the significant impact on revenue from its use of pull forwards. Under Armour also failed to

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

[2] This Offer does not make any findings that revenue from these sales was not recorded in accordance with generally accepted accounting principles ("GAAP").

2

disclose that the sales that had been pulled forward were no longer available in the future quarter. This practice raised significant uncertainty that Under Armour would meet its revenue guidance in future quarters.

5.　　As a result of such conduct, and as described in more detail below, Under Armour violated Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder.

## Respondent

6.　　**Under Armour, Inc.**, a Maryland corporation headquartered in Baltimore, is primarily engaged in the development, marketing, and wholesale and retail distribution of branded performance apparel, footwear, and accessories. Under Armour is a reporting company with two classes of common stock registered with the Commission under Section 12(b) of the Exchange Act. Both classes of common stock are listed on the New York Stock Exchange under the current ticker symbols "UA" and "UAA."

### Under Armour Used Pull Forwards to Meet Analysts' Revenue Estimates

7.　　For 26 consecutive quarters, beginning in the second quarter of 2010 through the third quarter of 2016, Under Armour reported year-over-year revenue growth in excess of 20%.

8.　　However, by mid-2015, Under Armour's Financial Planning & Analysis group ("FP&A group") identified that the revenue growth rate in the company's largest market, North America, was not as strong as in previous years. For example, in April and May 2015, the FP&A group alerted senior management that sales projections for the year in wholesale apparel, which was Under Armour's largest product category in North America, had declined by $120 million compared to the internal projections generated in late 2014. By the third quarter of 2015, Under Armour's senior management also understood that warmer weather was negatively impacting sales of higher priced cold weather apparel within North America.

9.　　Starting in the third quarter of 2015, Under Armour's internally projected company-wide revenue began to fall short of analysts' revenue estimates. To close the emerging revenue gap, Under Armour's senior management directed the FP&A group and senior sales personnel, among other things, to identify existing orders that customers had requested be shipped in the next quarter that could instead be shipped in the current quarter.

10.　　For each quarter during the Relevant Period, Under Armour's projected revenue growth from sales for which shipment was originally requested in the quarter continued to miss analysts' revenue estimates, and senior management reacted by directing the FP&A group and sales personnel to execute additional pull forward sales to meet analysts' revenue estimates. This resulted in, among other things, Under Armour's periodic use of sales incentives, such as extended payment terms and discounts, to convince customers to agree to take Under Armour product the quarter before the customer had requested shipment.

11.     During each quarter of the Relevant Period, Under Armour would have missed analysts' revenue estimates without its use of pull forwards. In addition, without the use of pull forwards, Under Armour's year-over-year revenue growth would not have exceeded 20% in the fourth quarter of 2015, the first time this would have occurred since 2010, and the third quarter of 2016.

12.     Under Armour used pull forwards in the following quarters, and in the following ways:

### Third Quarter 2015

13.     By the third quarter of 2015, Under Armour knew that its full-year internal projections for company-wide revenue had declined from its late 2014 forecast, including a $120 million decline in sales projections for its largest market category, North American wholesale apparel. In September 2015, senior management and the FP&A group decided to close the gap between internally forecasted revenue and analysts' revenue estimates, in part, by using pull forwards, so the FP&A group directed sales personnel to reach out to customers to request that they take delivery of product earlier than originally scheduled.

14.     Ultimately, Under Armour pulled forward approximately $45 million in orders from the fourth quarter of 2015 into the third quarter of 2015. On October 22, 2015, Under Armour announced revenue of $1.204 billion for the third quarter of 2015, beating analyst consensus by $29 million.

15.     In its third quarter 2015 earnings call, earnings release (included in the Form 8-K Under Armour filed with the Commission on October 22, 2015), and Form 10-Q, Under Armour highlighted its reported 28% revenue growth that beat analysts' revenue estimates, attributing the growth primarily to innovative new product offerings, "a growing interest in performance products and the strength of the Under Armour brand in the marketplace," and increased sales in footwear and apparel.

16.     Under Armour did not disclose that it used pull forwards, despite the fact that nearly 4% of its total revenue for the third quarter of 2015 (approximately $45 million) resulted from the practice. Without the pull forwards from the fourth quarter of 2015, Under Armour's growth rate for the third quarter of 2015 would have been below analysts' revenue estimates and the lowest quarterly growth rate in more than two years.

### Fourth Quarter 2015

17.     During the fourth quarter of 2015, Under Armour's internal projections for quarterly and full-year company-wide revenue continued to decline. Senior management knew that this decline in projected revenue meant the company could fall below analysts' revenue estimates, and directed sales personnel to pull forward 2016 orders into 2015.

18.     Ultimately, Under Armour pulled forward approximately $99 million in orders from the first quarter of 2016 into the fourth quarter of 2015, again representing the largest

amount Under Armour had pulled forward in one quarter to date. On January 28, 2016, Under Armour announced revenue of $1.171 billion for the fourth quarter of 2015, beating consensus estimates by $53 million.

19.     In its fourth quarter 2015 earnings call and earnings release, and 2015 Form 10-K, Under Armour highlighted its 31% revenue growth that beat consensus estimates, attributing it primarily to "growth in training, running, golf and basketball," and increased sales and new offerings in footwear and apparel, but did not mention the significant impact of pull forwards. In its earnings call, Under Armour highlighted its streak of quarters with 20%-plus revenue growth, stated that its growth drivers had not changed since it went public ten years prior, and denied that warmer weather was materially impacting its revenue. Downplaying the revenue impact of warmer weather in the earnings call, a senior Under Armour executive stated that weather had only impacted the company's business by a couple percentage points, while another senior executive stated: "Did [weather] affect our business in the way some thought it would? No, it did not. . . . Our business is more diversified than it has ever been, we do not let weather play a decisive role in dictating our success." These statements and omissions were misleading. In December 2015, Under Armour senior management discussed internally that the company was going to finish with lower-than-expected revenue for the year, and that warmer weather had negatively impacted revenue.

20.     Under Armour did not disclose the fact that it used pull forwards, despite the fact that pull forwards accounted for nearly 8.5% of its total fourth quarter 2015 revenue (approximately $99 million) and approximately 35% of its fourth quarter of 2015 revenue growth. Without the pull forwards from the first quarter of 2016, Under Armour's growth rate in the fourth quarter of 2015 would have been less than 20% for the first time in more than five years.

### First Quarter 2016

21.     In January 2016, the FP&A group advised Under Armour senior management that the company's internal revenue forecast for the first quarter of 2016 was lower than analysts' revenue estimates due, in part, to the pull forwards into 2015. By February 2016, the gap between internal forecasts and external revenue guidance was so significant that Under Armour considered revising its public revenue guidance for the quarter – something the company had never done before. An Under Armour senior executive acknowledged the challenges caused by the 2015 pull forwards by stating in an email: "Let's see how of [sic] this goes and if we can get enough pull-forwards or extra business to close the Q1 gap. The issue is that we pulled forward a lot in Q4 and there is not as much room in Q2 but we will see."

22.     Ultimately, Under Armour pulled forward $17.5 million in orders from the second quarter of 2016 into the first quarter of 2016. On April 21, 2016, Under Armour announced revenue of $1.048 billion for the first quarter of 2016, beating analyst consensus by $12 million. Under Armour did not disclose that $17.5 million of its total first quarter 2016 revenue was comprised of pull forwards. Without these pull forwards, Under Armour's revenue and growth rate would have been below analysts' revenue estimates.

***Second Quarter 2016***

23.     Under Armour also pulled forward revenue into the second quarter of 2016 to meet analysts' revenue estimates. Under Armour senior management was aware as early as May 2016 that the forecasted revenue for the quarter had declined by $11 million, and that Under Armour would likely need to use pull forwards to close the gap.

24.     Under Armour pulled forward $10 million in orders from the third quarter of 2016 into the second quarter of 2016. On July 26, 2016, Under Armour announced revenue of $1.001 billion for the second quarter of 2016 that met analysts' revenue estimates. Under Armour did not disclose that $10 million of its total second quarter 2016 revenue was comprised of pull forwards. Without these pull forwards from the third quarter of 2016, Under Armour's second quarter 2016 revenue would have been below analysts' revenue estimates.

***Third Quarter 2016***

25.     Throughout the third quarter of 2016, Under Armour senior management directed the FP&A group and sales personnel to use pull forwards to close an increasing gap between internal revenue forecasts and analysts' revenue estimates. In July 2016, the FP&A group forecast that Under Armour would need to pull forward approximately $65 million in orders to meet analysts' revenue estimates and achieve a revenue growth rate of greater than 20%. At that point, senior management emphasized that a growth rate of less than 20% "would be an extremely difficult story," and urged the FP&A group and sales personnel to continue to press customers to accept shipment of product earlier than originally requested.

26.     Under Armour's increasing reliance on pull forwards often resulted in it making multiple requests each quarter to its largest wholesale customers, and periodically offering sales incentives such as price discounts and extended payment terms. For example, in September 2016, Under Armour requested additional pull forwards from a key customer, after already having asked to move more than $30 million in sales from the fourth quarter of 2016 to the third quarter of 2016. The customer responded by saying: "We just brought a bunch of your goods in early to help out your quarter. . . Now you want more. . . More..More..more..30% [price discount] please." Under Armour ultimately agreed to a 25% price discount and an extra 30 days to pay to secure an additional $6.7 million of pull forwards.

27.     Under Armour pulled forward approximately $65 million in orders from the fourth quarter of 2016 into third the quarter of 2016. On October 25, 2016, Under Armour announced revenue of $1.472 billion for the third quarter of 2016, beating analysts' revenue estimates by $18 million. Under Armour did not disclose that $65 million of its total third quarter 2016 revenue was comprised of pull forwards.

28.     In its third quarter 2016 earnings call, earnings release, and Form 10-Q, Under Armour highlighted its reported 22% revenue growth that beat analysts' revenue estimates, attributing the growth primarily to "growth in men's training, women's training, golf and team sports," "strong growth in running and basketball," "growing interest in performance products and the strength of the Under Armour brand in the marketplace," and increased sales in footwear

and apparel. In its earnings call, Under Armour highlighted its streak of 26 consecutive quarter of 20%-plus revenue growth, and a senior Under Armour executive stated: "I want to be clear . . . that the growth remains intact."

29.     Under Armour did not disclose the fact that it engaged in pull forwards, despite the fact that nearly 4.5% of its total third quarter of 2016 revenue ($65 million) or approximately 25% of its third quarter of 2016 revenue growth was attributable to pull forwards. Without these pull forwards from the fourth quarter of 2016, Under Armour's growth rate in the third quarter of 2016 would have been less than 20%, and the company would not have reported revenue and revenue growth that beat analysts' revenue estimates.

### Fourth Quarter 2016

30.     Anticipating a revenue shortfall in the fourth quarter 2016, in September 2016 Under Armour senior management discussed a plan to ship a large dollar amount (ultimately over $50 million) of orders to a new customer in December 2016, rather than in 2017 as the customer had initially contemplated. An Under Armour senior executive acknowledged that the desire to ship the product early was being driven by pressure to meet analysts' revenue estimates, saying that the customer "isn't setting [Under Armour product in its stores] until February, so whether we thought it was $20 or $53 [million] or whatever, really [the customer] doesn't want any of that product in December but we are shipping it and they are absolutely taking it from us as a favor. If we were a privately held company, we would not ship that product to them in December."

31.     By mid-October 2016, Under Armour's senior management knew that a significant and increasing revenue shortfall for both the fourth quarter and full-year of 2016 was being met with an increasing amount of pull forwards. The FP&A group estimated to senior management that the company would have to pull forward over $160 million of orders to close this gap, and that the pull forwards would negatively impact first quarter 2017 revenue.

32.     During the remainder of the fourth quarter, Under Armour's sales increasingly lagged prior forecasts. By mid-December 2016, despite having already pulled forward approximately $170 million in sales, senior management realized the company would not be able to meet analysts' revenue estimates for the fourth quarter of 2016, or meet its full year revenue guidance of $4.925 billion. Under Armour's senior management also was becoming more concerned about the negative impact additional pull forwards would have on revenue for the first quarter of 2017.

33.     Because Under Armour could not meet analysts' revenue estimates even with the $170 million in pull forward sales, a senior Under Armour executive made the decision to limit additional pull forwards from 2017 into 2016. Notes from a December 15, 2016 meeting of the company's top executives reflect that, while discussing his decision, the senior executive stated that the company had "been living in this bubble for a while," that pulling forward revenue in each quarter was not healthy, and that the company was "not going to compromise 2017 . . . we're not going to take from next year."

7

34.     After additional internal discussions, Under Armour senior management reversed some planned pull forwards, (*e.g.*, by pushing some apparel sales back to the first quarter of 2017), but moved ahead with pull forwards of footwear orders because it was a high visibility product segment where the company sought to demonstrate strong revenue growth. This fine-tuning of pull forwards was reflected in a December 2016 internal email between senior management which noted that footwear, along with international sales, "are the big growth drivers we have talked about over and over and are the only areas giving people confidence in our future."

35.     Although Under Armour did not pull forward enough sales to meet analysts' revenue estimates and sustain its better than 20% year-over-year revenue growth streak, it still pulled forward approximately $172 million (approximately 13% of its quarterly revenue) in orders from the first quarter of 2017 into the fourth quarter of 2016.

36.     On January 31, 2017, Under Armour announced revenue of $1.308 billion for the fourth quarter of 2016, which reflected year-over-year revenue growth of 12%. Under Armour did not meet analysts' revenue estimates for the fourth quarter of 2016, and it did not report year-over-year revenue growth of over 20%. That day, the company's stock price dropped by approximately 23%.

37.     In its fourth quarter 2016 earnings call and earnings release, and 2016 Form 10-K, Under Armour highlighted its 12% revenue growth, attributing it primarily to "growth in training, running, golf and basketball," growing interest in performance products, the strength of the Under Armour brand in the marketplace, and increased sales and new offerings in footwear and apparel. In its fourth quarter 2016 earnings call, a senior Under Armour executive stated: "I want to be clear. Our growth story is intact. Our brand is truly stronger than it's ever been."

38.     Under Armour did not disclose the fact that it engaged in pull forwards, despite the fact that approximately 13% of its total fourth quarter of 2016 revenue ($172 million) was derived from pull forwards. Moreover, Under Armour's statements about its "growth story" being intact and its brand being "stronger than it's ever been" were made misleading by omitting disclosure of pull forwards because without its aggressive use of pull forwards there would have been no reportable growth in the fourth quarter of 2016.

### Under Armour's Use of Pull-Forwards Was Having or Was Reasonably Expected to Have an Adverse Impact on Under Armour's Future Revenue

39.     Under Armour's reliance on pull forwards to meet financial targets was compromising the company's future revenue and revenue growth rate. When Under Armour convinced customers to accept shipment of product earlier than forecasted, Under Armour could record the sale as occurring in the earlier quarter but, all things being equal, would lose that particular sale in the later quarter when it had been originally scheduled.

40.     The impact of these shifting sales was especially pronounced for Under Armour because prior reported revenue, particularly in the third and fourth quarters of 2015, included a significant amount of pull forwards. Therefore, to meet analysts' revenue estimates for 2016,

Under Armour had to replace the sales it had previously taken from 2016 through additional customer demand and new products, but also demonstrate the same percentage revenue growth when compared to the 2015 revenue totals (which in turn had been enhanced with pull forwards). In internal emails, Under Armour acknowledged this "double impact on the growth rate" resulting from pull forwards because they "take the base up" in the earlier year and down in the later year. Compared to the same quarters in 2015, Under Armour greatly increased pull forwards during the third and fourth quarters of 2016 in an attempt to continue to meet analysts' revenue estimates.

41.     Under Armour knew or should have known that its use of pull forwards concealed its failure to meet analysts' revenue estimates without such pull forward sales. Under Armour also knew that its increasing reliance on pull forwards to meet analysts' revenue estimates was having, or was reasonably likely to have, a material negative impact on future revenue. Under Armour's reported financial results during the Relevant Period did not reflect its natural revenue and revenue growth, and were not indicative of its future financial results.

**Investors Were Misled by Under Armour**

42.     Under Armour reported its financial results for the Relevant Period in earnings calls and in reports filed with the Commission, identifying various factors as responsible for its sustained and consistent revenue growth, but without disclosing that a significant portion of its revenue and revenue growth had resulted from the use of pull forwards.

43.     By failing to disclose this information during the Relevant Period, investors were left with a misleading impression of how Under Armour was meeting or beating analysts' revenue estimates. Internally, Under Armour knew that the company relied heavily on pull forwards to meet analysts' revenue estimates, and the company's senior management implicitly admitted the unsustainability of this practice by describing pull forward revenue as "bad," "unnatural," and "unhealthy." Without the same information, investors did not have the ability to fully evaluate Under Armour's financial results in context and compare results across periods.

44.     Under Armour's misleading statements and omissions were material.  Investors were unaware that Under Armour's use of pull forwards was compromising its future revenue by shifting revenue from future quarters to the current quarter, and causing the company to report strong revenue growth results that Under Armour knew were increasingly difficult to replicate in the future. Without this information, investors also lacked the ability to evaluate Under Armour's future revenue and ability to meet future guidance and analysts' revenue expectations. Investors also were unaware of the reasonable likely negative impact Under Armour's pull forward practices would have on future periods.

**Under Armour Offered and Sold Securities During the Relevant Period**

45.     During the Relevant Period, Under Armour offered and sold securities, including selling discounted stock under the company's employee stock purchase plan and issuing shares as compensation to certain employees under its employee incentive plan.

## Violations

46.     As a result of the conduct described above, Under Armour violated Section 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sale of securities. A violation of these provisions does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

47.     Also as a result of the conduct described above, Under Armour violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require reporting companies to file with the Commission complete and accurate annual, current, and quarterly reports. Under Armour also violated Rule 12b-20 of the Exchange Act, which requires an issuer to include in a statement or report filed with the Commission any information necessary to make the required statements in the filing not materially misleading.

48.     In addition, Section 13(a) of the Exchange Act requires issuers such as Under Armour to file periodic reports with the Commission containing such information as the Commission prescribes by rule. Form 10-K and Form 10-Q requires registrants to comply with Regulation S-K Item 303. Item 303(a)(3)(ii) of Regulation S-K requires that reports describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its annual report on Form 10-K. In addition, this Item requires that reports describe "any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations." Instruction 3 to Item 303(a) of Regulation S-K requires that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Item 303(b) of Regulation S-K requires discussion of material changes in such known trends or uncertainties in quarterly reports on Form 10-Q. Under Armour's use of pull forwards created an uncertainty or event that was known to Under Armour's senior management and was reasonably expected to have a material effect on the registrant's future revenues. Under Armour's failure to attribute growth in revenue to the use of pull forwards did not provide investors with material information about its revenue necessary for an understanding of its results of operations. As a consequence, Under Armour violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) and (a)(3) of the Securities Act and Section 13(a) of the Exchange Act  and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder.

B.      Respondent shall, within 10 days of the entry of this Order, pay a civil penalty of $9,000,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, interest shall accrue pursuant to 31 U.S.C. § 3717.

Payments must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Service Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Under Armour, Inc. as a Respondent in these proceedings, and the file number of these proceedings. A copy of the cover letter and check or money order must be sent to Associate Director Jason Burt, Division of Enforcement, Denver Regional Office, Securities and Exchange Commission, 1961 Stout Street, 17th Floor, Denver, CO 80294.

C.      Amounts ordered to be paid as civil money penalties in this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent

11

by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary

12