UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. RDB-17-388 <br><br> <u>CLASS ACTION</u> |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

November 30, 2021

Table of Contents

I.   Qualifications........................................................................................2

II.   Introduction and Summary of Opinions .........................................3

III.   Case Background..............................................................................5

   A. Overview of the Company and Allegations ...................................5

   B. Bases for Opinions on Market Efficiency.....................................7

IV.   Evaluation of Market Efficiency Factors for Under Armour Common Stock 11

   A. *Cammer* Factor 1: Average Weekly Trading Volume ..................11

   B. *Cammer* Factor 2: Analyst Coverage..........................................13

   C. *Cammer* Factor 3: Market Makers ..............................................15

   D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility....................18

   E. *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices .......................................................19

   F. Additional Factor 1: Market Capitalization ................................27

   G. Additional Factor 2: Bid-Ask Spread .........................................28

   H. Additional Factor 3: Public Float................................................29

   I. Additional Factor 4: Institutional Ownership .............................30

   J. Additional Factor 5: Autocorrelation...........................................31

   K. Additional Factor 6: Options Trading..........................................32

V.   Ability to Calculate Damages on a Class-Wide Basis ......................33

VI.   Conclusion.....................................................................................38

Appendix A .............................................................................................40

Appendix B .............................................................................................41

Exhibits ...................................................................................................43

## I.    Qualifications

1.      I am a Ph.D. in Finance, a Senior Fellow at the Berkeley Center for Law and Business and a Visiting Scholar at Vanderbilt Law School. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2.      I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate

and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5.      In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

6.      I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the *Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

## II.      Introduction and Summary of Opinions

7.      I have been asked by Plaintiffs in this matter to determine whether the market for Under Armour, Inc. ("Under Armour" or the "Company") Class A and Class C common stock

("Common Stock")[1] was efficient during the period September 16, 2015 – November 1, 2019, inclusive (the "Class Period").[2] In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology.

8.      The materials I have considered in forming my opinions are summarized in **Appendix B**. My time is billed at a rate of $750 per hour for my work on this matter. I am being assisted by staff at Global Economics Group, who performed work under my direction at rates between $200 and $450 per hour. My compensation is in no way contingent on the outcome of this case. My work is ongoing and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

9.      Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of Under Armour's Common Stock was efficient during the Class Period.

10.     I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology.

11.     The remainder of my report is organized as follows: **Section III** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section IV** presents my analyses of the market efficiency factors

---

[1] Unless otherwise noted, the term "Common Stock" refers to both Class A Common Stock and Class C Common Stock. Class C Common Stock was issued on 4/8/2016, therefore the Class Period for Class C Common Stock covers 4/8/2016 – 11/1/2019.

[2] I understand the Lead Plaintiff to be Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund.   I also understand that there are two additional named plaintiffs in this action, Monroe County Employees' Retirement System, and KBC Asset Management NV.  Collectively I refer to them herein as "Plaintiffs." I understand that the Defendants are Under Armour and the Company's founder and former Chief Executive Officer and Chairman of the Board, Kevin A. Plank ("Plank"). Source: Consolidated Third Amended Complaint, *Under Armour Securities Litigation*, No. RDB-17-388 (the "Complaint") filed with this Court on October 14, 2020.

during the Class Period. **Section V** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section VI** contains my conclusions.

## III.    Case Background

### A.  Overview of the Company and Allegations

12.     Under Armour is a large sports apparel company which sells branded athletic products and divides into three categories: apparel, footwear, and accessories.[3] During the Class Period, almost two-thirds of Under Armour's sales were made through wholesale channels such as Dick's Sporting Goods, Foot Locker, Champs, Finish Line, and The Sports Authority.[4] Under Armour faces steep competition in the apparel industry from companies such as Nike and Adidas. Since its formation in 1996, the company gained market share by capitalizing on a premium brand image and its reputation for its state-of-the-art fabrics design and would eventually surpass Adidas as the number two sportswear brand in 2014.[5]

13.     The following is alleged in this matter: throughout the Class Period, Defendants misled investors to believe that Under Armour's growth would continue and that demand for Under Armour products would remain strong.[6] However, Under Armour was actually experiencing a decline in its apparel business due to its waning brand appeal (known as "brand heat" within Under Armour). This resulted in Under Armour losing market share to Nike and Adidas.[7] Despite the slowdown being apparent as early as 2015, Defendants still required Under Armour to maintain aggressive and unlikely sales goals. The company abandoned its sales philosophy of competing on brand strength and instead lowered prices and offered promotions

---

[3] Complaint ¶4.
[4] *Id.*
[5] Complaint ¶5.
[6] Complaint ¶7.
[7] Complaint ¶8.

and liquidated excess inventory. This steep discounting led to a drop in Under Armour's average sales prices while its competitors were increasing their average sales prices.[8]

14.     Defendants allegedly engaged in false and misleading tactics that in some cases involved improper accounting practices that violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations. These alleged violations included pulling forward orders and manipulating the timing and location of shipments to meet aggressive sales and revenue goals. Additionally, Under Armour also allegedly incentivized retailers to take on products early by adjusting contract terms, offering discounts, and guaranteeing that the Company would buyback a certain amount of products that were not sold.[9] Under Armour also allegedly continued to ship products to Sports Authority and book those sales even after it became clear that Sports Authority was on the verge of bankruptcy.[10]

15.     The Complaint alleges that the relevant truth was revealed through a series of partial corrective disclosures starting in January 2016, through November 3, 2019.[11] These disclosures included revelations about slower growth of North American apparel sales, falling sales prices, reduced market share, and the departure of key executives.[12] The disclosures further included revelations that a slowdown in North American apparel growth and compressed margins led to higher discounts, promotions, and ultimately liquidations.[13] Further disclosures included reduced financial projections that resulted from the slowdown in the North American apparel business, the sudden departure of finance chief Chip Molloy, and a restructuring involving hundreds of job cuts.[14] Furthermore, a Wall Street Journal article revealed on

---

[8] Complaint ¶¶9-10.
[9] Complaint ¶11.
[10] Complaint ¶11.
[11] Complaint ¶¶379-385.
[12] Complaint ¶¶378-379.
[13] Complaint ¶382.
[14] Complaint ¶¶382-384.

November 3, 2019 that Under Armour's revenue recognition practices had come under scrutiny from the SEC and Department of Justice.[15] As a result of the alleged fraud, investors allegedly purchased Under Armour Common Stock at artificially inflated prices during the Class Period and were harmed when the alleged truth was revealed.

16.     As background, **Exhibits 1A, 1B, and 1C** graph the closing stock prices and trading volume for Under Armour's Common Stock shares throughout the Class Period, for Class A shares (split-adjusted), Class A shares (unadjusted), and the Class C shares, respectively.

## B. Bases for Opinions on Market Efficiency

17.     I understand that Plaintiffs are relying on the "fraud-on-the-market" theory, which posits that shareholders rely on the alleged misrepresentations or omissions made by defendants through their effect on stock prices in an open and well-developed market. If a market is efficient, meaning that widely available public information is quickly incorporated into stock prices, then all purchasers of the stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to Section 10(b) claims, and was adopted by the U.S. Supreme Court in its *Basic* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[16]

---

[15] Complaint ¶385.
[16] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

18.     This theory was also reaffirmed by the Supreme Court in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the
> reliance element of the Rule 10b–5 cause of action by invoking a
> presumption that a public, material misrepresentation will distort
> the price of stock traded in an efficient market, and that anyone
> who purchases the stock at the market price may be considered to
> have done so in reliance on the misrepresentation. We adhere to
> that decision and decline to modify the prerequisites for invoking
> the presumption of reliance.[17]

19.     As these decisions indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market. In finance, "semi-strong-form" market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price. Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but-for the misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on a company's misrepresentations or omissions because they are impounded into the stock price at which trades are made.

20.     Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[18] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges.  The fact that Under Armour's Common Stock traded in

---

[17] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).
[18] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

such a well-developed market (under the trading symbols "UAA" and "UA" on the NYSE) leads to a strong presumption of market efficiency.

21.     Numerous academics have studied the pricing behavior of stock markets and some have purported to identify anomalies that call into question the efficiency of markets. However, academics have generally concluded that these anomalies represent random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or are not persistent and have been quickly eliminated by arbitrage trading. For example, Nobel prize winner Eugene Fama summarizes market efficiency as follows:

> The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[19]

Similarly, Kewei Hou, Chen Xue, and Lu Zhang concluded that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance…In all, capital markets are more efficient than previously recognized."[20]

22.     Academic research thus provides a strong presumption for market efficiency. I understand that courts have also developed various tests that attempt to weigh in favor of or against the presumption of market efficiency. None of these tests are individually determinative of market efficiency, but when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-

---

[19] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, *Journal of Financial Economics* 49, at 304.
[20] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at 2071.

the-market theory. These factors include what courts have referred to as the *Cammer* and *Krogman*[21] factors, as well as other additional metrics.

23.     In the following section, I discuss these factors and evaluate them in relation to Under Armour Class A and Class C Common Stock. In doing so, I compare the various factors for Under Armour's Common Stocks against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

24.     One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[22] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[23] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock...Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading

---

[21] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").
[22] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88, at 667-705 ("*MRK Study*").
[23] MRK Study at 678, 681-682.

volumes, and institutional presence but do not show a significant
difference in subsequent performance relative to covered peers.[24]

25.     The authors describe these variables as reflective of investor interest: after losing

analyst coverage, "investor interest characteristics, such as market capitalization, trading volume,

bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to

[analyst-]covered peers."[25] Therefore, I interpret the sample of MRK Covered firms as those

eliciting high investor interest and reflecting the common indicia of firms operating in efficient

markets. I then compare several of Under Armour's market efficiency factors to the samples of

firms in the MRK Study to assess whether Under Armour's characteristics are consistent with

firms operating in efficient markets.

26.     The following section presents my analyses and findings from the evaluation of

various market efficiency factors for Under Armour Class A and Class C Common Stock during

the Class Period.

## IV.     Evaluation of Market Efficiency Factors for Under Armour Common Stock

### A. *Cammer* Factor 1: Average Weekly Trading Volume

27.     Trading volume refers to the number of shares of a security transacted between

market participants. The greater the amount of buying and selling activity of a security, the more

likely it is that new information will be quickly incorporated into the price of that security. Thus,

trading volume is an indicator of how developed, liquid, and efficient the market is for a given

stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility

---

[24] MRK Study at 667.
[25] MRK Study at 681 (footnotes omitted).

standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[26]

28.     Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[27]

29.     **Exhibit 2A and Exhibit 2B** graph Under Armour's Class A and Class C Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[28] The average weekly trading volume was 14.03% and 6.93% for Under Armour's Class A and Class C common shares outstanding respectively over the Class Period. This level of trading volume significantly exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Under Armour's level of stock trading volume throughout the Class Period supports the conclusion that Under Armour's Class A and Class C Common Stock traded in an efficient market throughout the Class Period.

30.     I also note that the average weekly trading volume of Under Armour's Class A Common Stock over the Class Period was 25.97 million shares. The average weekly trading volume for Under Armour Class C Common Stock was 15.45 million shares. According to the

---

[26] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, at 108.
[27] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).
[28] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

authors in the MRK Study, the median *annual* trading volume for the MRK Sample firms was 1.75 million shares while the median for the MRK Covered firms was 11.19 million shares *annually*.[29] Based on Under Armour's average *weekly* trading volume of 25.97 million and 15.45 million shares during the Class Period, Under Armour's trading volume for Class A and Class C Common Stock greatly exceeds the median MRK Sample firm's *annual* level. Moreover, one average week of Under Armour trading volume for both Class A and Class C Common Stock would exceed the median MRK Covered firm's *annual* level. This further supports the conclusion that Under Armour's Class A and Class C Common Stock traded in an efficient market throughout the Class Period.

## B. *Cammer* Factor 2: Analyst Coverage

31.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment

---

[29] MRK Study at 678 (Table 3).

professionals, who would in turn make buy/sell recommendations to client investors.[30]

32.     In **Exhibit 3,** I report the analyst coverage of Under Armour over the Class Period. I identified a total of 1,122 reports issued by analysts at 43 separate firms.[31] These reports included research issued by large, established, and reputable firms such as Morningstar, Wells Fargo, Morgan Stanley, UBS, and Barclays. This is a significant degree of analyst coverage which served to disseminate important new publicly-available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

33.     This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[32] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[33] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. Under Armour's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The significant analyst coverage of Under Armour, quantified by the number of analyst firms providing coverage as well as the volume of analyst reports generated during the Class Period, supports the conclusion that Under Armour's Common Stock traded in an efficient market throughout the Class Period.

---

[30] *Cammer*, 711 F. Supp. at 1286.
[31] I obtained analyst reports covering Under Armour from Investext. These statistics represent a lower bound of the analyst coverage of Under Armour because many analyst reports are provided directly to client investors but are not captured by third-party data vendors such as Investext.
[32] MRK Study at 668.
[33] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, at 336 (*see* Table 1, Panel B – "COV").

34.     In addition to the analyst coverage documented above, investors could access information about Under Armour from a variety of other sources.[34] For example, I conducted a search of press and news articles about Under Armour using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswires, The Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily, and numerous other outlets. This search produced over 1,700 articles throughout the Class Period.[35] Moreover, Under Armour produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Under Armour from a variety of sources during the Class Period. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Under Armour supports the conclusion that Under Armour Common Stock traded in a well-developed and informationally efficient market during the Class Period.

## C. *Cammer* Factor 3: Market Makers

35.     The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[36] Market makers can facilitate market efficiency in an over-the-counter market because they are:

---

[34] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports. For example, there were over 300 reports and articles published during the Class Period on SeekingAlpha.

[35] The articles were identified through a Factiva search using Under Armour's company tag and based on "Major News and Business Sources."

[36] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

> … [P]resumably knowledgeable about the issuing company and
> the stocks' supply and demand conditions (*i.e.*, the "order flow").
> Therefore, it is believed the larger the number of market makers in
> a given security, the more information is available about it and the
> quicker its dissemination in the price.[37]

36.     In evaluating market efficiency by looking at market makers, the *Cammer* court

held:

> For over the counter markets without volume reporting, the
> number of market makers is probably the best single criterion. Ten
> market makers for a security would justify a substantial
> presumption that the market for the security is an efficient one;
> five market makers would justify a more modest presumption.[38]

37.     The court thus stated that market makers can be an important indicator of market

efficiency for stock trading in an over-the-counter market without continuous trading volume

reporting. Under Armour had at least 173 market makers and brokers providing similar activity

for its Class A Common Stock and 180 for its Class C Common Stock over the Class Period.[39] In

addition, both classes of Under Armour's Common Stock traded on the NYSE throughout the

Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and

other trading details which ensure that it remains well-developed, liquid, and efficient. The

*Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption –
> probably conditional for class determination – that certain markets
> are developed and efficient for virtually all the securities traded
> there: the New York and American Stock Exchanges, the Chicago
> Board Options Exchange and the NASDAQ National Market
> System.[40]

---

[37] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of
Common Stocks' Efficiency, *Journal of Corporate Law* 19, at 291.
[38] *Cammer*, 711 F. Supp. at 1293.
[39] Bloomberg "RANK" function.
[40] *Cammer,* 711 F. Supp. at 1292.

38.     I understand that courts view large, established stock exchanges with designated market makers (such as the NYSE and Nasdaq[41]) as being informationally efficient.[42] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading.[43] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in Section IV.I below, both classes of Under Armour's Common Stock were widely held by institutional investors throughout the Class Period and shortly thereafter.[44]

---

[41] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[42] *See, e.g., In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 634 (3d Cir. 2011) ("Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *see also City of Cape Coral Municipal Firefighters' Retirement Plan v. Emergent Biosolutions, Inc., HQ,* 322 F. Supp. 3d 676 (D. Md 2018) ("First, Emergent's stock traded on the NYSE, which creates a presumption of market efficiency."); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69 (S.D.N.Y 2015) ("Courts in this Circuit have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency.").

[43] *See, e.g., In re Countrywide Financial Corp. Sec.urities Litigation,* 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Securities Litigation,* 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.").

[44] Under Armour Common Stock Class A and Class C were held by at least 1,377 and 1,242 institutional investors, respectively, at some point during the Class Period (*see* Exhibit 10A and Exhibit 10B). Institutional ownership fluctuated on a quarterly basis throughout the Class Period and shortly thereafter, from a minimum of 72% and 58% of shares outstanding to a maximum of 98% and 74% of shares outstanding for Class A and Class C Common Stock respectively, according to data from S&P Capital IQ and Under Armour's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

39.     In sum, Under Armour easily satisfies the intent of this *Cammer* factor by virtue of the Common Stocks' highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Under Armour's Common Stocks during the Class Period.

### D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

40.     The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[45]

41.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[46] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

42.     Not only was Under Armour eligible to file Forms S-3 throughout the Class Period, but in fact did so on multiple occasions.  Specifically, on June 6, 2016, and February 28,

---

[45] *Cammer*, 711 F. Supp. at 1287.
[46] https://www.sec.gov/files/forms-3.pdf.

2019, Under Armour filed a Form S-3ASR with the SEC.[47] A Form S-3ASR is a version of Form S-3 for "a well-known seasoned issuer."[48] Finally, to my knowledge, Under Armour made all required filings with the SEC in a timely manner during the Class Period and met other Form S-3 requirements. As a result, this factor supports the efficiency of the market for Under Armour Common Stock during the Class Period.

### E. *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

43.     The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information. The *Cammer* court held:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[49]

44.     The underlying logic of this test is that in an informationally efficient market, a company's stock price should rapidly incorporate the value of new company-specific information. If, over the course of multiple events, new information becomes public and this information would clearly indicate a significant increase or decrease in firm value, but the company's stock price does not change, this would indicate potential market inefficiency. Alternatively, if the company's stock price does move more on days in which new information was released, this would support a finding of market efficiency. It is important to note that one would only expect to observe this pattern around the release of unexpected and unanticipated value-relevant company news. If investors had already anticipated the value impact of this

---

[47]  https://www.sec.gov/Archives/edgar/data/1336917/000119312519057525/0001193125-19-057525-index.htm; https://www.sec.gov/Archives/edgar/data/1336917/000119312516613432/0001193125-16-613432-index.htm
[48] https://www.sec.gov/files/forms-3.pdf.
[49] *Cammer,* 711 F. Supp. at 1291.

information, then one would not expect to observe a price reaction to the publication of such information in an efficient market.

45.     To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed Under Armour's quarterly and annual earnings announcements and guidance updates during the Class Period. Earnings announcements represent a potential opportunity for the public release of new value-relevant company information to investors. This information can include historical financial and operating performance, forecasts and projections of anticipated future performance of the company, executive statements made during earnings conference calls, analyst reports, other firm-specific news, and some combination and mix of this information. One would not expect every earnings announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. The mix of unanticipated performance, earnings surprises (beyond the earnings forecasted by analysts and investors), forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market. I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods.

46.     I compared the stock returns and trading volume of Under Armour's Class A and Class C Common Stock on the relevant trading days following Company earnings announcements or guidance updates versus those metrics on trading days that contained the least news during the Class Period (the "Least News Trading Days").[50] The Least News Trading Days

---

[50] Least News Trading Days were identified as dates with no Factiva headlines, earnings announcements, SEC filings, or analyst reports during the Class Period.

provide a benchmark measurement of days in which little or no company-specific information was provided to the market. If Under Armour's stock prices tend to move more significantly following earnings announcements and guidance updates than they do on the Least News Trading Days, this would support a conclusion of market efficiency.

47.     In order to study the Common Stock price movements for Under Armour on different trading days, I performed an event study.[51] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (*i.e.*, the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

48.     Here, I performed an event study to evaluate whether Under Armour's Common Stock responded to information disclosed in the Company's earnings announcements and guidance updates. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

---

[51] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.

49.     In an effort to isolate the impact of Company-specific news on Under Armour's stock price during the Class Period, I performed regression analyses to measure the relationship between Under Armour's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Under Armour's industry. By modeling how Under Armour's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

50.     For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (approximately six months). It is common practice to employ a 120-day Estimation Window.[52] For Class C Common Stock, I used a fixed to rolling regression as at the time the stock was issued during the Class Period, there were not 120 days' worth of data to use. To study the relationship between Under Armour's stock price returns and overall market factors, I used the S&P 500 Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Under Armour's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Under Armour's particular industry, I constructed an industry index (the "Industry Index") made up of members of the S&P Apparel, Accessories,

---

[52] *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

and Luxury Goods Index, which Under Armour compared its performance to in its four 10-K SEC filings for the years ending during the Class Period.[53]

51.     I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[54] As shown in **Exhibits 4A and 4B**, the event study models revealed a positive relation between the Company's daily returns and those of the overall stock market and industry throughout the Class Period. In other words, movements of the Market Index and Industry Index help explain movements in Under Armour's stock price. This allowed me to predict the expected daily return of the Company on a date, once I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represented the component of the return that is not attributable to market-wide or industry-wide movements.

52.     Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Under Armour's Common Stock, after controlling for the Market Index and the Industry Index.

---

[53] Under Armour was a member of The S&P Apparel, Accessories, and Luxury Good Index during the Class Period. The industry index was constructed as an equal-weighted peer index comprised of companies that were constituents of the S&P Apparel, Accessories, and Luxury Good Index during the Class Period. The index includes the following members: HanesBrands, PVH Corp., Ralph Lauren, Tapestry Inc., VF Corp., Capri Holdings, and Fossil Group.

[54] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); *see also* Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, at 1597.

**Exhibits 5A and 5B** plot the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period. My rolling regression and fixed to rolling event studies adjust for changing volatility in Under Armour's Common Stock over time.

53.     To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-specific information.[55] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

54.     **Exhibits 6A and 6B** report the event study results of Under Armour's 19 earnings announcement and guidance update dates during the Class Period.[56] The columns list the dates, description of the earnings release, closing stock price, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value for interpretation of statistical significance of the stock movement. Overall, for the Class A

---

[55] David I. Tabak and Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19*, (3d ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

[56] Under Armour Class C Common Stock was not issued until April 8, 2016. Therefore, exhibit 6B only includes 17 earnings announcements and guidance updates.

Common Stock, 18 of the 19 Under Armour earnings announcements (or guidance updates) caused stock price movements that were statistically significant at the 95% level. Meanwhile, for the Class C Common Stock, 15 of the 17 Under Armour earnings announcements (or guidance updates) caused price movements that were statistically significant at the 95% level. Next, I compare this rate against the Least News Trading Days in the following exhibit.

55.     **Exhibits 7A and 7B** summarize the statistical comparison of Under Armour's stock returns and trading volume following the earnings announcements versus those metrics as measured on the Least News Trading Days. The Least News Trading Days for Class A Common Stock include 273 observations, meaning that the tests of statistical significance are based on 292 observations. As shown in **Exhibit 7A**, 94.7% of the earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to just 2.2% of the Least News Trading Days with statistically significant stock price movements. This difference is itself significant at the 99% level. Meanwhile, the Least News Trading Days for Class C Common Stock include 225 observations, meaning that the tests of statistical significance are based on 242 observations. As shown in **Exhibit 7B**, 88.2% of the earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to just 2.7% of the Least News Trading Days with statistically significant stock price movements. This difference is itself significant at the 99% level. This provides strong evidence of a cause-and-effect relationship between information being disclosed and Under Armour Common Stock price movements.

56.     **Exhibit 7A** also shows that the average of the absolute value of abnormal stock price movements following Under Armour's earnings announcements and guidance updates was 11.3% for Class A Common Stock. This compares to an average of only 1.1% on the Least News

Trading Days.  **Exhibit 7B** shows that the average of the absolute value of stock price movements following Under Armour's earnings announcements and guidance updates was 10.3% for Class C Common Stock. This compares to an average of only 1.1% on the Least News Trading Days. These differences are statistically significant at the 99% level. This further supports a finding of a strong cause-and-effect relationship between information and Under Armour Common Stock price movements.

57.     **Exhibit 7A** reports an average daily trading volume of 27.1 million shares for Under Armour's Class A Common Stock following earnings announcements and guidance updates. This compares to an average daily trading volume of 4.6 million shares on the Least News Trading Days. **Exhibit 7B** reports an average daily trading volume of 13.9 million shares for Under Armour's Class C Common Stock following earnings announcements and guidance updates. This compares to an average daily trading volume of 2.4 million shares on the Least News Trading Days. The differences between these two levels are statistically significant at the 99% level, providing further evidence of the cause-and-effect relationship between information and Under Armour's Common Stock price movements.

58.     In summary, relative to other trading days, Under Armour's earnings announcements and guidance updates caused a significantly greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new company-specific information and Under Armour Common Stock price movements. As a result, this price impact analysis supports the conclusion that Under Armour's Common Stock traded in an efficient market during the Class Period.

### F.  Additional Factor 1: Market Capitalization

59.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[57] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[58] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[59] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[60] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

60.     **Exhibits 8A, 8B, and 8C** report Under Armour's market capitalization throughout the Class Period. The market capitalization for Class A common stock (unadjusted) exceeded $2.1 billion throughout this time frame and averaged $5.9 billion over the Class Period. The Market Capitalization for Class C Common stock exceeded $2.3 billion throughout this time frame and averaged $4.7 billion over the Class Period. On both an individual and a combined basis, the Under Armour Class A and Class C Common Stock market capitalization greatly

---

[57] *Cammer*, 711 F. Supp. at 1287.
[58] *Krogman,* 202 F.R.D. at 478.
[59] MRK Study at 678 (Table 3).
[60] *Id.*

exceeded the median market capitalization value for the MRK Sample and Covered firms.[61] Moreover, Under Armour's number of shares outstanding ranged from 179.96 million shares to 188.20 million shares during the Class Period for Class A Common Stock. The number of shares outstanding ranged from 217.59 million shares to 228.91 million shares for Class C Common Stock.[62] As a result, Under Armour's market capitalization supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G. Additional Factor 2: Bid-Ask Spread

61.     The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[63] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

62.     I analyzed the bid-ask spread of Under Armour's Common Stock during the Class Period. **Exhibits 9A and 9B** report the monthly average bid-ask spread as a percentage of the

---

[61] Under Armour's market capitalization also significantly exceeds these levels on an inflation-adjusted basis.
[62] Shares outstanding obtained from Under Armour SEC filings during the Class Period.
[63] *Krogman*, 202 F.R.D. at 478.

bid-ask midpoint over this time period.[64] This spread fluctuated between 0.007% and 0.07% for

the Class A Common Stock from October 2015 through October 2019 and for the Class C

Common stock from May 2016 through October 2019.[65]

63.     By way of comparison, the MRK Study found that the MRK Sample firms had a

median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of

1.69%.[66] Under Armour's bid-ask spreads were significantly smaller than both of these values,

indicating that investors could trade Under Armour's Common Stock at very low relative cost.

As a result, Under Armour's bid-ask spreads support the conclusion that the Common Stock

traded in an efficient market during the Class Period.

**H. Additional Factor 3: Public Float**

64.     The *Krogman* court also considered the public float of a company in weighing

market efficiency.[67] The public float represents the number of shares outstanding that are

available for trading and not held by corporate insiders. Even if a company has a large market

capitalization, if the majority of the equity is held by its CEO and/or other insiders, then

---

[64] The bid-ask spread was calculated by taking the average of the difference between the ask price and the bid price during trading hours on the primary exchange of the security, the NYSE, weighted by the amount of time each quote prevailed in the market. I calculated the weighted average quote, with the weight being the number of seconds between a given quote and the next quote that was reported. The bid-ask spread is calculated as the difference between the ask price and bid price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.

[65] I also examined the dates from September 2015, April 2016 and November 2019 that were part of the Class Period and report them in **Exhibit 9A** and **Exhibit 9B**. The Class Period dates from September 2015 had an average bid-ask spread of 0.042% for Class A Common Stock, the Class Period dates from April 2016 had an average bid-ask spread of .039% for Class C Common Stock, and the Class Period date from November 2019 had an average bid-ask spread of 0.003% for Class A and Class C Common Stock. I noted, however, that neither of these figures was computed using a full month of data. Quote Data for Under Armour's Common Stock was obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[66] MRK Study at 678 (Table 3).

[67] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

65.     **Exhibits 10A and 10B** report the shares outstanding, public float, and shares held by insiders for Under Armour Common Stock during the Class Period. As shown in **Exhibit 10A**, Under Armour insiders held less than 1% of the Class A Common Stock throughout the Class Period (average = 0%). Thus, approximately 100% of Under Armour's Class A common shares were held by institutions and other outside investors. **Exhibit 10B** shows that during the Class Period, Under Armour Insiders held about 16% of the Class C Common Stock (average = 16%). Thus, approximately 84% of Under Armour's Class C common shares were held by institutions and other outside investors. This large degree of public float for Under Armour's Common Stock supports the conclusion that it traded in an efficient market during the Class Period.

## I.   Additional Factor 4: Institutional Ownership

66.     Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

67.     I also report the total institutional ownership of Under Armour Common Stock in **Exhibits 10A** and **10B,** which show that at least 1,377 institutions held Class A Common Stock and 1,242 institutions held Class C Common Stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine

institutional investors while the MRK Covered firms had a median of 40 institutional investors.[68] Under Armour's institutional ownership base greatly exceeds both of these levels. Thus, the significant institutional ownership base for Under Armour Common Stock supports the conclusion that the Class A and Class C Common Stock traded in an efficient market during the Class Period.

### J.   Additional Factor 5: Autocorrelation

68.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period, such as several quarters, and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

---

[68] MRK Study at 678 (Table 3).

69.     I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Under Armour's Common Stock returns.[69] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[70] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

70.     **Exhibits 11A** and **11B** present the results from the autocorrelation test for Under Armour's Common Stock during the Class Period. The autocorrelation coefficients for Class A and Class C Common Stock over the full Class Period are not statistically significant. Moreover, the quarterly autocorrelation coefficients alternate between negative and positive throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. Thus, I find no evidence of persistent autocorrelation in Under Armour's Common Stock returns. This finding supports the conclusion that Under Armour's Common Stock traded in an efficient market during the Class Period.

## K.  Additional Factor 6: Options Trading

71.     Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated

---

[69] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (IV.E).

[70] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at 95-101.

by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[71] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to iVolatility, Under Armour Class A Common Stock had 7,053,832 call option contracts and 5,706,331 put option contracts traded during the Class Period while Under Armour Class C stock had 1,755,072 call option contracts and 1,044,690 put option contracts. This presence of outstanding options and trading supports the conclusion that Under Armour's Common Stock traded in an efficient market during the Class Period.

## V.    Ability to Calculate Damages on a Class-Wide Basis

72.    I have been asked by Counsel to evaluate whether per-share damages can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all class members and consistent with Lead Plaintiff's theory of liability. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[72] This limit on damages can also be applied class-wide. I

---

[71] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53. *See also*: Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

[72] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

understand that this out-of-pocket methodology has been widely accepted for use across §10(b) matters.

73.     The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) matters such as this is well-established and formulaic across all Class members.

74.     The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

75.     Event studies are widely-employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[73] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Under Armour securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned

---

[73] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

76.     A loss causation analysis must also document how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

77.     I describe these calculations using several hypothetical examples that illustrate how damages could be calculated in light of the Class C issuance during the Class Period. Consider a purchaser who buys a number of Class A Common stock at a price of $80 during the Class Period and sells before the issuance of Class C Common stock on April 8, 2016. The difference between the inflation at purchase and inflation at sale can be calculated as the difference between the price drops resulting from the corrective disclosures prior to the issuance

of Class C Common Stock on April 8, 2016 at the time of purchase and the time of sale. The purchase price is $80 and the sale price will be the recorded sale price of the transaction.

78.      If, however, the purchaser sells these shares after the issuance of Class C Common Stock on April 8, 2016, then for the purposes of inflation backcasting to the purchase date, the investor can be viewed as having bought one share of Class A Common Stock and one share of Class C common Stock, each at roughly 50% of the original purchase price.[74] That is, under this hypothetical example, the investor can be viewed as having purchased Class A shares at roughly $40 and Class C shares at roughly $40. If this purchaser sells Class A Common Stock, then the inflation at purchase will be the inflation resulting from any corrective disclosures on or after April 8, 2016, plus roughly 50% of the inflation resulting from any corrective disclosures prior to April 8, 2016. The selling price will be the price at which the sale transaction occurred and the inflation at sale will be the inflation resulting from the price drops of the corrective disclosures after April 8, 2016 at the time of sale.

79.      If this investor sells Class C shares obtained during the issuance of the stock dividend on April 8, 2016, then inflation at purchase will be the inflation relating to Class C share price impacts from the corrective disclosures after April 8, 2016 plus roughly 50% of the inflation relating to any Class A share price impacts from corrective disclosures prior to April 8, 2016. The selling price will be the price at which the Class C shares are sold and the inflation at sale will be the inflation resulting from any corrective disclosures after the sale date.

80.      Should an investor buy Class A shares after the issuance of Class C shares, then the purchase and sale price will be considered the price of the purchase and sale at the time of the transaction. The purchase and sale inflation will be the inflation that resulted from any price

---

[74] The actual percentage breakdown can be assessed based on the relative closing prices of Class A and C shares immediately after the stock dividend of C shares on April 8, 2016.

impacts on Class A Common Stock resulting from corrective disclosures after April 8, 2016.

Should the purchaser buy Class C Common Stock after the issuance of Class C Common Stock,

then the purchase and sale price will be considered the price of the purchase and sale at the time

of the transaction. The purchase and sale inflation will be the inflation that resulted from any

price impacts on Class C Common Stock from any corrective disclosures after April 8, 2016.[75]

81.     I have also been asked by Counsel to evaluate whether per-share damages, with

respect to defendant Plank's alleged violations of §20A of the Exchange Act, can be assessed on

a class-wide basis utilizing a common methodology that is consistent with Plaintiffs' theory of

liability. §20A assesses losses among investors who purchased securities contemporaneously

with Defendants who sold securities while in possession of material, nonpublic information. The

formula and statutory limitation on §20A damages is provided in the statute:

> Any person who violates any provision of this title [15 USCS §§78a et seq.] or the
> rules or regulations thereunder by purchasing or selling a security while in
> possession of material, nonpublic information shall be liable in an action in any
> court of competent jurisdiction to any person who, contemporaneously with the
> purchase or sale of securities that is the subject of such violation, has purchased
> (where such violation is based on a sale of securities) or sold (where such
> violation is based on a purchase of securities) securities of the same class.[76]

> The total amount of damages imposed under subsection (a) shall not exceed the
> profit gained or loss avoided in the transaction or transactions that are the subject
> of the violation.[77]

82.     Calculating §20A damages involves identifying losses avoided and/or profits

gained by defendant Plank. Losses avoided for each transaction can be calculated as the number

of shares sold multiplied by the price decline between the date of such sale and after inflation has

---

[75] On June 13, 2016, Under Armour issued a stock dividend of Under Armour, Inc. (UA.C) Class C Common Shares.
The distribution ratio was approximately 0.007098 of Class C Common shares for each Class C Common share held.
Therefore, transaction prices and inflation will be multiplied by 1.007098 for Class C Common Stock between its
issuance on April 8, 2016 and June 13, 2016. *See* https://boxoptions.com/assets/BOXOnnMemo203850.pdf. Damages
assessment for any shares retained beyond the Class Period will follow the PSLRA 90-day-lookback rules.
[76] 15 U.S.C. §78t-1(a).
[77] 15 U.S.C. §78t-1(b)(1).

dissipated upon later corrective disclosures.[78] Similarly, damages attributable to investors can be calculated as losses on investments based on the decline in value of Under Armour Common Stock between the purchase and sale dates, or later corrective disclosures.[79] If the sum of defendant Plank's losses avoided and profits gained is less than aggregate § 20A losses suffered and deprived profits for class members, then the aggregate sum of § 20A damages can be allocated among class members on a *pro rata* basis. The allocation does not depend on individual investor circumstances, but rather can be calculated formulaically in a manner that is common to all class members.

83.     To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis could depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VI.     Conclusion

84.     In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Under Armour Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

---

[78] Alternatively, the Court may calculate losses avoided based on the difference in artificial inflation at the time of sale versus the amount following corrective disclosures. Profit gained can be calculated as the difference in Defendants' sales price and purchase price, multiplied by the number of shares, if the sales price exceeds the purchase price. Alternatively, the Court may calculate profit gained based on the difference between inflation at the time of sale versus the time of purchase.

[79] Losses can also be calculated as explained previously, based on differences in artificial inflation at the time of purchase and sale. Deprived profits can be calculated if an investor closed a short position contemporaneously with a Defendant opening a short position.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 30, 2021

Matthew D. Cain

**Appendix A**

**Matthew D. Cain, Ph.D.**  November 2021

E-mail: mdcain@outlook.com  Homepage
Mobile: 574-485-8065  SSRN

<u>**Education**</u>

Ph.D., Finance, August 2007  Purdue University, West Lafayette, IN
B.S., Finance, May 2001  Grove City College, Grove City, PA

<u>**Professional and Academic Experience**</u>

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present; *Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Scholar*, Vanderbilt Law School, 2021-Present

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

<u>**Publications**</u>

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics*, forthcoming.

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

Purdue University, 2021
Arizona State University College of Law, 2020
U.C. Berkeley School of Law, 2019; 2018
Vanderbilt University Law School, 2019
Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015

Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014
The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009
American Law and Economics Association, Stanford Law School, 2012
George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010
American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007
University of Kentucky, 2007
Western Finance Association, annual meeting, 2006

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
    LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020-2021

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al*., Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al*., Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Appendix B**

# Documents Considered

**Court Documents:**

- Consolidated Third Amended Complaint, *Under Armour Securities Litigation,* No. RDB-17-388 (D. Md.).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).
- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 283-84 (2014).
- *In re DVI, Inc. Sec. Litig*., 639 F.3d 623, 634 (3d Cir. 2011).
- *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676 (D. Md. 2018).
- *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69 (S.D.N.Y. 2015).
- *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).
- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

**Academic Literature:**

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61.
- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19.
- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50.
- Eugene F. Fama, 1998, Market Efficiency, Long-term Returns, and Behavioral Finance, *Journal of Financial Economics* 49.
- Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33.
- Roger D. Huang and Hans R. Stoll, 1996, Dealer Versus Auction Markets: A Paired Comparison of Execution Costs on NASDAQ and the NYSE, *Journal of Financial Economics* 41.
- Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6.
- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124.
- A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35.
- Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49.
- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88.
- Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT, (3d ed. 2001).
- Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63.

**Data Sources:**

- Factiva News
- Investext Analyst Reports
- iVolatility Historical Options data
- SEC Edgar Online
- S&P Capital IQ Historical Stock Data
- Under Armour Press Releases
- TICK Data for Stock Quotes
- Bloomberg Terminal

**Other:**

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.
- https://www.sec.gov/files/forms-3.pdf.
- https://www.nyse.com/market-model
- https://www.sec.gov/Archives/edgar/data/1336917/000119312519057525/0001193125-19-057525-index.htm
- https://www.sec.gov/Archives/edgar/data/1336917/000119312516613432/0001193125-16-613432-index.htm
- https://boxoptions.com/assets/BOXOnnMemo203850.pdf
- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess

**Exhibit1A**



**Exhibit 1A**
**Adjusted Class A Common Stock Price and Volume**
**9/16/2015 - 11/30/2019**

Data Source: S&P Capital IQ
Note: Price and Volume are Split adjusted to account for the price drop of Class A stock resulting from the 1:1 stock dividend issuance of Class C stock.

**Exhibit 1B**



**Exhibit 1B**
**Unadjusted Class A Common Stock Price and Volume**
**9/16/2015 - 11/30/2019**

**Exhibit 1C**



**Exhibit 1C**
**Class C Common Stock Price and Volume**
**4/8/2016 - 11/30/2019**

Data Source: S&P Capital IQ

**Exhibit 2A**



Data sources: S&P Capital IQ and SEC Filings.

**Exhibit 2B**



Data sources: S&P Capital IQ and SEC Filings.

**Exhibit 3**

**Exhibit 3**
**Analyst Coverage**
**Class Period: 9/16/2015 - 11/1/2019**

| # | Analysts | Reports Published |
|---|---|---|
| 1 | Morningstar, Inc. | 72 |
| 2 | CFRA Research | 63 |
| 3 | Macquarie Research | 62 |
| 4 | Jefferies | 61 |
| 5 | PiperJaffray | 51 |
| 6 | Telsey Advisory Group | 50 |
| 7 | William Blair & Company | 48 |
| 8 | Cannacord Genuity | 48 |
| 9 | UBS Research | 44 |
| 10 | Deutsche Bank | 42 |
| 11 | Susquehanna Financial Group | 42 |
| 12 | Suntrust Robinson Capital Markets | 39 |
| 13 | Cowen & Company | 39 |
| 14 | Barclays | 38 |
| 15 | Wedbush Securities, Inc. | 37 |
| 16 | Buckingham Research Group, Inc. | 37 |
| 17 | Morgan Stanley | 36 |
| 18 | Credit Suisse | 30 |
| 19 | Zack's Equity Research | 29 |
| 20 | JP Morgan | 27 |
| 21 | Wells Fargo Securities, LLC | 26 |
| 22 | Oppenheimer & Co. | 26 |
| 23 | Evercore ISI | 24 |

**Exhibit 3 cont.**

**Exhibit 3**
**Analyst Coverage**
**Class Period: 9/16/2015 - 11/1/2019**

| # | Analysts | Reports Published |
|---|----------|-------------------|
| 24 | Buysellsignals Research | 21 |
| 25 | Trefis | 19 |
| 26 | Pivotal Research Group | 18 |
| 27 | CRT Capital | 15 |
| 28 | Guggenheim Securities, LLC | 13 |
| 29 | Brean Captial, LLC | 12 |
| 30 | Keybanc Capital Market | 11 |
| 31 | Argus Institutional Partners | 11 |
| 32 | BB&T Capital Markets | 10 |
| 33 | Corporate Watchdog Reports | 5 |
| 34 | Forward View | 5 |
| 35 | Fubon Securities Investment Services | 2 |
| 36 | Tematica Research | 2 |
| 37 | Marktfeld | 1 |
| 38 | PriceTarget Research | 1 |
| 39 | Probes Reporter | 1 |
| 40 | Moody's Investors Services | 1 |
| 41 | Thescreener | 1 |
| 42 | Blueshift Research | 1 |
| 43 | Kailash Concepts | 1 |
| | **Total** | **1122** |

Data Source: Investext.
Note: Some sources published reports for Under Armour Class A Common Stock and Class C common stock on the same date. These instances are counted as publishing just one report.

**Exhibit 4A**



**Exhibit 4A**
**Coefficients from Rolling Event Study Regressions for Class A Common Stock**
**9/16/2015 - 11/1/2019**

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and an Equal -Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Apparel, Accessories, and Luxury Goods Index during the Class Period; Under Armour compares its stock performance to the S&P 500 Apparel, Accessories, and Luxury Goods Index in the Company's 10K SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosure, and two outlier dates (4/8/2016, Under Armour issues Class C Stock; 11/28/2016, Under Armour files 8K regarding ticker change). Data from S&P Capital IQ.

**Exhibit 4B**



**Exhibit 4B**
**Coefficients from Rolling Event Study Regressions for Class C Common Stock**
**4/11/2016 - 11/1/2019**

Note: The results are based on a fixed-to-rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and an Equal -Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Apparel, Accessories, and Luxury Goods Index during the Class Period; Under Armour compares its stock performance to the S&P 500 Apparel, Accessories, and Luxury Goods Index in the Company's 10K SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosure, and two outlier dates (4/8/2016, Under Armour issues Class C Stock; 11/28/2016, Under Armour files 8K regarding ticker change). Data from S&P Capital IQ.

**Exhibit 5A**

**Exhibit 5A**
**Root Mean Squared Error (RMSE) for Rolling Event Study Regressions for Class A Common Stock**
**9/16/2015-11/1/2019**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and an Equal -Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Apparel, Accessories, and Luxury Goods Index during the Class Period; Under Armour compares its stock performance to the S&P 500 Apparel, Accessories, and Luxury Goods Index in the Company's 10K SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosure, and two outlier dates (4/8/2016, Under Armour issues Class C Stock; 11/28/2016, Under Armour files 8K regarding ticker change). Data from S&P Capital IQ.

**Exhibit 5B**

**Exhibit 5B**
**Root Mean Squared Error (RMSE) for Rolling Event Study Regressions for Class C Common Stock**
**4/11/2016 - 11/1/2019**



Note: The results are based on a fixed-to-rolling regression of the previous 120 trading days. The regression model controls for the S&P 500 Total Return Index and an Equal -Weighted Peer Index. The Peer Index consists of the members of the S&P 500 Apparel, Accessories, and Luxury Goods Index during the Class Period; Under Armour compares its stock performance to the S&P 500 Apparel, Accessories, and Luxury Goods Index in the Company's 10K SEC filings for the years ending during the Class Period. Returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcement dates, the alleged Corrective Disclosure, and two outlier dates (4/8/2016, Under Armour issues Class C Stock; 11/28/2016, Under Armour files 8K regarding ticker change). Data from S&P Capital IQ.

**Exhibit 6A**

**Exhibit 6A**
**Class A Event Study Analysis of Under Armour Earnings Announcements and Updated Guidance During the Class Period**

| Date | Market Date | Event | Price | Raw Return | Abn. Return | Abn. Dollar | T-Stat | P-Value |
|---|---|---|---|---|---|---|---|---|
| 10/22/2015 | 10/22/2015 | FY 2015 Q3 Earnings <br> *Source: PR Newswire* | $46.91 | -5.39% | -7.23% | -$3.59 | -5.31 | 0.00 |
| 1/28/2016 | 1/28/2016 | FY 2015 Q4 Earnings <br> *Source: PR Newswire* | $42.04 | 22.59% | 21.60% | $7.41 | 13.62 | 0.00 |
| 4/21/2016 | 4/21/2016 | FY 2016 Q1 Earnings <br> *Source: PR Newswire* | $46.93 | 6.78% | 7.67% | $3.37 | 4.83 | 0.00 |
| 6/1/2016 | 6/1/2016 | Updated 2016 Guidance <br> Source: PR Newswire | $36.25 | -3.92% | -4.43% | -$1.67 | -2.88 | 0.00 |
| 7/26/2016 | 7/26/2016 | FY 2016 Q2 Earnings <br> *Source: PR Newswire* | $41.36 | -5.12% | -5.25% | -$2.29 | -3.45 | 0.00 |
| 10/25/2016 | 10/25/2016 | FY 2016 Q3 Earnings <br> *Source: PR Newswire* | $32.89 | -13.22% | -12.25% | -$4.64 | -9.09 | 0.00 |
| 1/31/2017 | 1/31/2017 | FY 2016 and Q4 Earnings <br> *Source: PR Newswire* | $21.49 | -25.74% | -26.45% | -$7.65 | -22.21 | 0.00 |
| 4/27/2017 | 4/27/2017 | FY 2017 Q1 Earnings <br> *Source: PR Newswire* | $21.67 | 9.94% | 9.63% | $1.90 | 7.20 | 0.00 |
| 8/1/2017 | 8/1/2017 | FY 2017 Q2 Earnings <br> *Source: PR Newswire* | $18.30 | -8.59% | -9.30% | -$1.86 | -5.68 | 0.00 |
| 10/31/2017 | 10/31/2017 | FY 2017 Q3 Earnings <br> *Source: PR Newswire* | $12.52 | -23.71% | -22.90% | -$3.76 | -12.80 | 0.00 |

**Exhibit 6A cont.**

**Exhibit 6A**
**Class A Event Study Analysis of Under Armour Earnings Announcements and Updated Guidance During the Class Period**

| Date | Market Date | Event | Price | Raw Return | Abn. Return | Abn. Dollar | T-Stat | P-Value |
|---|---|---|---|---|---|---|---|---|
| 2/13/2018 | 2/13/2018 | FY 2017 Q4 Earnings<br>*Source: PR Newswire* | $16.70 | 17.36% | 15.78% | $2.25 | 6.83 | 0.00 |
| 5/1/2018 | 5/1/2018 | FY 2018 Q1 Earnings<br>*Source: PR Newswire* | $18.03 | 1.52% | 3.69% | $0.66 | 1.56 | 0.12 |
| 7/26/2018 | 7/26/2018 | FY 2018 Q2 Earnings<br>*Source: PR Newswire* | $22.04 | 4.55% | 4.40% | $0.93 | 2.09 | 0.04 |
| 9/20/2018 | 9/20/2018 | Updated 2018 Restructuring Plan and Full Year 2018 Outlook<br>*Source: PR Newswire* | $20.00 | 6.61% | 5.56% | $1.04 | 2.86 | 0.01 |
| 10/30/2018 | 10/30/2018 | FY 2018 Q3 Earnings<br>*Source: PR Newswire* | $23.23 | 27.71% | 25.68% | $4.67 | 14.38 | 0.00 |
| 12/12/2018 | 12/12/2018 | Initial FY 2019 Guidance, Updated FY 2018, FY 2023 Plan<br>*Source: PR Newswire* | $19.81 | -10.44% | -11.23% | -$2.49 | -6.45 | 0.00 |
| 2/12/2019 | 2/12/2019 | FY 2018 and Q4 Earnings<br>*Source: PR Newswire* | $22.21 | 6.88% | 5.65% | $1.17 | 3.40 | 0.00 |
| 5/2/2019 | 5/2/2019 | FY 2019 Q1 Earnings<br>*Source: PR Newswire* | $22.82 | 3.54% | 3.56% | $0.78 | 2.35 | 0.02 |
| 7/30/2019 | 7/30/2019 | FY 2019 Q2 Earnings<br>*Source: PR Newswire* | $24.08 | -12.24% | -11.95% | -$3.28 | -7.21 | 0.00 |

Data sources: S&P Capital IQ and Factiva.
Notes: The results are based on a rolling regression of the previous 120 trading days as described in Exhibits 4 and 5.

Exhibit 6B

## Exhibit 6B
## Class C Event Study Analysis of Under Armour Earnings Announcements and Updated Guidance During the Class Period

| Date | Market Date | Event | Price | Raw Return | Abn. Return | Abn. Dollar | T-Stat | P-Value |
|---|---|---|---|---|---|---|---|---|
| 4/21/2016 | 4/21/2016 | FY 2016 Q1 Earnings<br>*Source: PR Newswire* | $45.41 | 6.95% | 7.79% | $3.31 | 4.78 | 0.00 |
| 5/31/2016 | 6/1/2016 | Updated 2016 Guidance<br>Source: PR Newswire | $33.48 | -3.57% | -4.42% | -$1.54 | -2.71 | 0.01 |
| 7/26/2016 | 7/26/2016 | FY 2016 Q2 Earnings<br>*Source: PR Newswire* | $37.50 | -3.30% | -3.35% | -$1.30 | -2.05 | 0.04 |
| 10/25/2016 | 10/25/2016 | FY 2016 Q3 Earnings<br>*Source: PR Newswire* | $28.37 | -13.77% | -12.69% | -$4.17 | -8.66 | 0.00 |
| 1/31/2017 | 1/31/2017 | FY 2016 and Q4 Earnings<br>*Source: PR Newswire* | $19.22 | -23.40% | -24.07% | -$6.04 | -15.30 | 0.00 |
| 4/27/2017 | 4/27/2017 | FY 2017 Q1 Earnings<br>*Source: PR Newswire* | $19.82 | 9.26% | 8.90% | $1.61 | 5.09 | 0.00 |
| 8/1/2017 | 8/1/2017 | FY 2017 Q2 Earnings<br>*Source: PR Newswire* | $16.23 | -10.38% | -11.08% | -$2.01 | -6.44 | 0.00 |
| 10/31/2017 | 10/31/2017 | FY 2017 Q3 Earnings<br>*Source: PR Newswire* | $11.53 | -21.78% | -20.98% | -$3.09 | -12.17 | 0.00 |
| 2/13/2018 | 2/13/2018 | FY 2017 Q4 Earnings<br>*Source: PR Newswire* | $15.29 | 16.01% | 14.24% | $1.88 | 5.91 | 0.00 |
| 5/1/2018 | 5/1/2018 | FY 2018 Q1 Earnings<br>*Source: PR Newswire* | $16.15 | 5.21% | 7.43% | $1.14 | 2.93 | 0.00 |

**Exhibit 6B cont.**

**Exhibit 6B**
**Class C Event Study Analysis of Under Armour Earnings Announcements and Updated Guidance During the Class Period**

| Date | Market Date | Event | Price | Raw Return | Abn. Return | Abn. Dollar | T-Stat | P-Value |
|---|---|---|---|---|---|---|---|---|
| 7/26/2018 | 7/26/2018 | FY 2018 Q2 Earnings<br>*Source: PR Newswire* | $20.55 | 4.10% | 3.99% | $0.79 | 1.89 | 0.06 |
| 9/20/2018 | 9/20/2018 | Updated 2018 Restructuring Plan and Full Year 2018 Outlook<br>*Source: PR Newswire* | $18.15 | 5.03% | 3.96% | $0.68 | 2.08 | 0.04 |
| 10/30/2018 | 10/30/2018 | FY 2018 Q3 Earnings<br>*Source: PR Newswire* | $20.97 | 24.75% | 22.87% | $3.84 | 13.38 | 0.00 |
| 12/12/2018 | 12/12/2018 | Initial FY 2019 Guidance, Updated FY 2018, FY 2023 Plan<br>*Source: PR Newswire* | $19.01 | -8.91% | -9.66% | -$2.02 | -5.52 | 0.00 |
| 2/12/2019 | 2/12/2019 | FY 2018 and Q4 Earnings<br>*Source: PR Newswire* | $20.01 | 4.49% | 3.22% | $0.62 | 1.86 | 0.07 |
| 5/2/2019 | 5/2/2019 | FY 2019 Q1 Earnings<br>*Source: PR Newswire* | $20.39 | 3.61% | 3.65% | $0.72 | 2.26 | 0.03 |
| 7/30/2019 | 7/30/2019 | FY 2019 Q2 Earnings<br>*Source: PR Newswire* | $21.05 | -13.69% | -13.39% | -$3.27 | -8.21 | 0.00 |

Data sources: S&P Capital IQ and Factiva.
Notes: The results are based on a fixed to rolling regression of the previous 120 trading days as described in Exhibits 4 and 5.

**Exhibit 7A**

**Exhibit 7A**

**Statistical Comparison of Under Armour Class A Returns and Volume on
Earnings Announcements and Guidance Updates vs. Least News Trading Days**

|  | Earnings Announcements and Guidance Updates | Least News Trading Days | P-Value for Differences | Significance Level |
|---|---|---|---|---|
| N | 19 | 273 |  |  |
| # of Significant Days at 95% Level | 18 | 6 |  |  |
| % of Significant Days at 95% Level | 94.7% | 2.2% | 0.00 | >99% |
| Average Absolute Abnormal Return | 11.3% | 1.1% | 0.00 | >99% |
| Average Volume (Millions) | 27.1 | 4.6 | 0.00 | >99% |

Notes: The 19 earnings announcements, guidance updates and market trading days are listed in the previous exhibit. Least News Trading Days were identified as dates with no Factiva headlines, earnings announcements, SEC filings, annual meetings, or analyst reports during the Class Period. Data from S&P Capital IQ, SEC EDGAR, Factiva, and Investext.

**Exhibit 7B**

**Exhibit 7B**

**Statistical Comparison of Under Armour Class C Returns and Volume on
Earnings Announcement and Guidance Updates vs. Least News Trading Days**

|  | Earnings Announcements and Guidance Updates | Least News Trading Days | P-Value for Differences | Significance Level |
|---|---|---|---|---|
| N | 17 | 225 |  |  |
| # of Significant Days at 95% Level | 15 | 6 |  |  |
| % of Significant Days at 95% Level | 88.2% | 2.7% | 0.00 | >99% |
| Average Absolute Abnormal Return | 10.3% | 1.1% | 0.00 | >99% |
| Average Volume (Millions) | 13.9 | 2.4 | 0.00 | >99% |

Notes: The 17 earnings announcements, guidance updates and market trading days are listed in the previous exhibit. Least News Trading Days were identified as dates with no Factiva headlines, earnings announcements, SEC filings, annual meetings, or analyst reports during the Class Period. Data from S&P Capital IQ, SEC EDGAR, Factiva, and Investext.

**Exhibit 8A**



Exhibit 8A
Unadjusted Class A Market Capitalization
9/16/2015 - 11/30/2019

Class Period: 9/16/2015  -11/1/2019
Average Market Capitalization Over the
Class Period: $5.9 billion

4/8/2016
Class C Stock issued

Data sources: S&P Capital IQ and SEC filings.

**Exhibit 8B**



**Exhibit 8B**
**Unadjusted Class C Market Capitalization**
**4/8/2016 - 11/30/2019**

Class Period: 4/8/2016  -11/1/2019
Average Market Capitalization Over the
Class Period: $4.7 billion

Data sources: S&P Capital IQ and SEC filings.

**Exhibit 8C**



Data sources: S&P Capital IQ and SEC filings.
Note: While the price of Class A stock dropped after the issuance of Class C stock as a stock dividend, the true market capitalization is reflected in the combined market capitalization of Class A and Class C stock.

**Exhibit 9A**



Data Source: TICK Data
Notes: September 2015 and November 2019 dates analyzed are limited to the Class Period.

**Exhibit 9B**



Data Source: TICK Data

Notes: April 2016 and November 2019 dates analyzed are limited to the Class Period.

Exhibit 10A

**Exhibit 10A**
**Under Armour Class A Common Stock Public Float, Insider Holdings, and Institutional Ownership**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Ownership (in 000s) | Institutional Ownership % of Shares Outstanding | Institutional Ownership % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 9/30/2015 | 180,116 | 798 | 889 | 14,474 | 193,701 | 0% | 141,350 | 78% | 73% |
| 12/31/2015 | 181,646 | 830 | 848 | 22,912 | 203,710 | 0% | 150,885 | 83% | 74% |
| 3/31/2016 | 183,141 | 823 | 1,025 | 27,642 | 209,759 | 1% | 155,404 | 85% | 74% |
| 6/30/2016 | 183,389 | 756 | 1,263 | 50,488 | 232,614 | 1% | 166,486 | 91% | 72% |
| 9/30/2016 | 183,739 | 727 | 1,390 | 41,628 | 223,977 | 1% | 158,186 | 86% | 71% |
| 12/31/2016 | 183,739 | 710 | 1,451 | 46,352 | 228,641 | 1% | 141,654 | 77% | 62% |
| 3/31/2017 | 184,667 | 642 | 1,144 | 46,241 | 229,764 | 1% | 132,464 | 72% | 58% |
| 6/30/2017 | 184,939 | 611 | 814 | 50,786 | 234,911 | 0% | 138,653 | 75% | 59% |
| 9/30/2017 | 184,950 | 581 | 762 | 55,618 | 239,806 | 0% | 140,537 | 76% | 59% |
| 12/31/2017 | 185,131 | 573 | 756 | 51,560 | 235,935 | 0% | 153,358 | 83% | 65% |
| 3/31/2018 | 185,280 | 588 | 810 | 62,383 | 246,854 | 0% | 173,597 | 94% | 70% |
| 6/30/2018 | 185,977 | 631 | 651 | 59,888 | 245,214 | 0% | 169,580 | 91% | 69% |
| 9/30/2018 | 186,066 | 624 | 651 | 38,675 | 224,089 | 0% | 174,541 | 94% | 78% |
| 12/31/2018 | 187,710 | 632 | 663 | 31,636 | 218,683 | 0% | 180,883 | 96% | 83% |
| 3/31/2019 | 187,789 | 639 | 668 | 28,731 | 215,852 | 0% | 177,129 | 94% | 82% |
| 6/30/2019 | 188,015 | 643 | 660 | 32,274 | 219,629 | 0% | 179,121 | 95% | 82% |
| 9/30/2019 | 188,201 | 595 | 649 | 37,501 | 225,053 | 0% | 184,289 | 98% | 82% |
| 12/31/2019 | 188,290 | 564 | 649 | 35,190 | 222,830 | 0% | 181,830 | 97% | 82% |
| **Total Institutions over Class Period:** | | **1,377** | | | **Average:** | **0%** | | **88%** | **72%** |

Data Sources: S&P Capital IQ and SEC Filings.

65

**Exhibit 10B**

**Exhibit 10B**
**Under Armour Class C Common Stock Public Float, Insider Holdings, and Institutional Ownership**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Ownership (in 000s) | Institutional Ownership % of Shares Outstanding | Institutional Ownership % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 6/30/2016 | 219,454 | 608 | 34,485 | 9,318 | 194,288 | 16% | 134,010 | 61% | 69% |
| 9/30/2016 | 219,963 | 614 | 34,908 | 8,311 | 193,366 | 16% | 137,073 | 62% | 71% |
| 12/31/2016 | 219,963 | 616 | 35,011 | 7,555 | 192,508 | 16% | 132,200 | 60% | 69% |
| 3/31/2017 | 221,149 | 580 | 35,491 | 13,318 | 198,976 | 16% | 128,517 | 58% | 65% |
| 6/30/2017 | 221,534 | 561 | 35,173 | 25,304 | 211,665 | 16% | 138,086 | 62% | 65% |
| 9/30/2017 | 221,588 | 538 | 35,612 | 35,120 | 221,095 | 16% | 144,810 | 65% | 65% |
| 12/31/2017 | 222,117 | 534 | 35,739 | 34,863 | 221,241 | 16% | 147,985 | 67% | 67% |
| 3/31/2018 | 222,443 | 543 | 35,375 | 36,854 | 223,921 | 16% | 162,228 | 73% | 72% |
| 6/30/2018 | 224,225 | 544 | 34,920 | 28,023 | 217,328 | 16% | 156,509 | 70% | 72% |
| 9/30/2018 | 224,424 | 556 | 35,950 | 17,698 | 206,172 | 16% | 155,787 | 69% | 76% |
| 12/31/2018 | 226,422 | 552 | 35,936 | 12,469 | 202,955 | 16% | 157,012 | 69% | 77% |
| 3/31/2019 | 226,515 | 562 | 35,273 | 8,909 | 200,152 | 16% | 154,010 | 68% | 77% |
| 6/30/2019 | 228,547 | 564 | 35,025 | 10,737 | 204,258 | 15% | 160,133 | 70% | 78% |
| 9/30/2019 | 228,881 | 529 | 36,248 | 10,434 | 203,068 | 16% | 166,849 | 73% | 82% |
| 12/31/2019 | 229,028 | 540 | 36,309 | 11,192 | 203,910 | 16% | 169,879 | 74% | 83% |
| **Total Institutions over Class Period:** | | **1,242** | | | **Average:** | **16%** | | **67%** | **73%** |

Data Sources: S&P Capital IQ and SEC Filings.

**Exhibit 11A**

**Exhibit 11A**
**Under Armour Common Stock Class A**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Value |
|---|---|---|---|
| Q3 2015 | 0.11 | 0.34 | 0.74 |
| Q4 2015 | 0.00 | -0.03 | 0.98 |
| Q1 2016 | 0.02 | 0.12 | 0.91 |
| Q2 2016 | -0.03 | -0.23 | 0.82 |
| Q3 2016 | -0.03 | -0.21 | 0.84 |
| Q4 2016 | 0.19 | 1.51 | 0.14 |
| Q1 2017 | -0.03 | -0.25 | 0.81 |
| Q2 2017 | 0.26 | 2.07 | 0.04 |
| Q3 2017 | -0.10 | -0.75 | 0.45 |
| Q4 2017 | 0.02 | 0.12 | 0.90 |
| Q1 2018 | 0.02 | 0.19 | 0.85 |
| Q2 2018 | 0.02 | 0.19 | 0.85 |
| Q3 2018 | 0.02 | 0.18 | 0.85 |
| Q4 2018 | -0.11 | -0.90 | 0.37 |
| Q1 2019 | -0.15 | -1.19 | 0.24 |
| Q2 2019 | -0.04 | -0.29 | 0.77 |
| Q3 2019 | 0.19 | 1.50 | 0.14 |
| Q4 2019 | -0.21 | -1.03 | 0.31 |
| **Class Period** | **0.01** | **0.43** | **0.67** |

Data Source: S&P Capital IQ
Notes: The autocorrelation testing period is September 16, 2015 through November 1, 2019. I
performed a regression each quarter and over the full Class Period with event study daily abnormal
returns as the dependent variable and the event study daily abnormal returns lagged by one trading
day as the independent variable.

**Exhibit 11B**

**Exhibit 11B**
**Under Armour Common Stock Class C**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Value |
|---|---|---|---|
| Q2 2016 | -0.09 | -0.71 | 0.48 |
| Q3 2016 | -0.08 | -0.63 | 0.53 |
| Q4 2016 | 0.26 | 2.11 | 0.04 |
| Q1 2017 | 0.08 | 0.62 | 0.54 |
| Q2 2017 | 0.20 | 1.60 | 0.11 |
| Q3 2017 | -0.20 | -1.59 | 0.12 |
| Q4 2017 | -0.04 | -0.34 | 0.73 |
| Q1 2018 | 0.06 | 0.46 | 0.65 |
| Q2 2018 | 0.00 | -0.01 | 0.99 |
| Q3 2018 | 0.12 | 0.93 | 0.36 |
| Q4 2018 | -0.10 | -0.77 | 0.44 |
| Q1 2019 | -0.18 | -1.44 | 0.16 |
| Q2 2019 | -0.01 | -0.11 | 0.91 |
| Q3 2019 | 0.10 | 0.83 | 0.41 |
| Q4 2019 | -0.09 | -0.42 | 0.68 |
| **Class Period** | **0.02** | **0.70** | **0.48** |

Data Source: S&P Capital IQ
Notes: The autocorrelation testing period is April 8, 2016 through November 1, 2019. I performed a regression each quarter and over the full Class Period with event study daily abnormal returns as the dependent variable and the event study daily abnormal returns lagged by one trading day as the independent variable.