IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN RE UNDER ARMOUR SECURITIES LITIGATION | * * * | Civil Action No. RDB-17-0388 |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

The basic allegation in this putative class action is that Defendants Under Armour, Inc. ("Under Armour") and its former Chief Executive Officer Kevin Plank ("Plank") (collectively, "Defendants") misrepresented the level of consumer demand for Under Armour products. The Consolidated Third Amended Complaint ("TAC") (ECF No. 153) alleges violations of Sections 10(b), 20(a), and 20A of the Securities and Exchange Act of 1934 ("Exchange Act"). Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") and Plaintiffs Monroe County Employees' Retirement System ("Monroe") and KBC Asset Management ("KBC") (collectively, "Plaintiffs"), contend that Defendants misled investors and defrauded the market by falsely claiming that consumer demand for the company's products was strong between the third quarter of 2015 and the fourth quarter of 2016. (TAC ¶¶ 20, 81, 126, 160–68.) They further allege that the Defendants manipulated the company's financial results, and otherwise led investors to believe that Under Armour's 26-consecutive quarter year-over-year growth streak was "intact," when demand for the company's products was in decline. (TAC ¶¶ 5–7, 148–68.)

Currently pending is Plaintiffs' Motion for Class Certification (ECF No. 197). Through this motion, Plaintiffs seek certification of a class of Under Armour investors pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), defined as follows:

> All persons and entities who purchased or otherwise acquired Under Armour's Class A and Class C common stock between September 16, 2015, and November 1, 2019, inclusive ("Class Period"). Excluded from the Class are Defendants, present or former executive officers and directors of Under Armour and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

(Pls.' Mem. Supp. Mot. Class Certification 1, ECF Nos. 197-1, 198 *SEALED*.) Defendants challenge the breadth of this class definition, the adequacy of Aberdeen, Monroe, and KBC as class representatives, and the typicality of all three Plaintiffs' claims. (Defs.' Resp. Opp. Mot. Class Certification 1, ECF Nos. 222, 223 *SEALED*.) Specifically, Defendants contend that the putative class must be narrowed to encompass only those class members who traded on the same day as Plank's alleged sales, (*id.* at 31–32), that all three Plaintiffs are subject to unique defenses that are not typical of the proposed class, (*id.* at 8–9), and that KBC's retention of independent counsel brings its interests in conflict with the unnamed class members, (*id.* at 26 (quoting Fed. R. Civ. P. 23(a)(4))).

The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the following reasons, this Court is satisfied that the putative class satisfies all elements of Rule 23(a) and Rule 23(b)(3) and is appropriate for certification. Specifically, this Court is satisfied that Aberdeen, Monroe, and KBC possess claims that are typical of the unnamed class members, and that all three Plaintiffs will "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4). Accordingly, Plaintiffs' Motion for Class Certification (ECF No. 197) is hereby **GRANTED.**

## BACKGROUND

The allegations set forth in Plaintiffs' operative Third Amended Complaint (ECF No. 153) have been addressed in a prior Memorandum Opinion of this Court. *See In re Under Armour Securities Litigation*, 540 F. Supp. 3d 513, 517–18 (D. Md. 2021). This Court recounts those allegations to provide context for the pending Motion for Class Certification.

Plaintiff Brian Breece filed the original class action Complaint against Under Armour, Kevin Plank, and another executive of the company, Lawrence Molloy on February 10, 2017. (ECF No. 1.) After consolidation with other suits filed against Under Armour, Plank, and numerous other defendants, this Court dismissed the Plaintiffs' Consolidated Amended Complaint. (ECF No. 75.) On November 16, 2018 the Lead Plaintiff filed a Consolidated Second Amended Complaint for violations of the federal securities laws (ECF No. 78), naming only Under Armour and Plank as Defendants. That Second Amended Complaint alleged that between September 16, 2015 and January 30, 2017, the Defendants issued a series of false and misleading statements about demand for Under Armour products and the company's financial condition. (ECF No. 78 ¶¶ 2, 14.)

On August 19, 2019, this Court dismissed the Second Amended Complaint with prejudice. (ECF No. 98 at 26.) Judgment was entered on September 9, 2019 (ECF No. 101), and on September 17, 2019, the Plaintiffs filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit (ECF No. 102). Based on the reports of the Wall Street Journal that Under Armour was the subject of SEC investigations, Lead Plaintiff moved on November 18, 2019 for an indicative ruling (ECF No. 105), requesting that this Court grant the Plaintiffs' Motion for Relief from the Court's September 9, 2019 Judgment pursuant

3

to Federal Rule of Civil Procedure 60(b), if the Fourth Circuit remanded for that purpose. (ECF No. 106.) On January 22, 2020, this Court granted such request. (ECF No. 139.) Accordingly, this Court held that it would permit Lead Plaintiff to file a third amended complaint bringing claims against the Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Id.)

On October 14, 2020, the Lead Plaintiff filed the operative Consolidated Third Amended Complaint ("TAC") (ECF No. 153) for violations of the federal securities laws, alleging that Defendants Under Armour and Plank misled investors during the Class Period by falsely claiming that consumer demand for the company's products was strong between the third quarter of 2015 and the fourth quarter of 2016. Plaintiffs allege that the Defendants led investors to believe that Under Armour's 26-consecutive quarter 20% year-over-year revenue growth streak was "safely intact," when in reality demand for the company's products was in decline. (ECF No. 153 ¶¶ 148-168.) They claim that Defendants manipulated the company's financial results by pulling sales forward from future quarters and engaged in other allegedly suspect sales practices. (Id.) The Plaintiffs assert violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder against Defendants Under Armour and Plank (Count I); violations of Section 20(a) of the Exchange Act, again against both Under Armour and Plank (Count II); and violation of Section 20A of the Exchange Act against solely Defendant Plank (Count III). (Id. ¶¶ 412-436.)

On December 4, 2020, the Defendants filed a Motion to Dismiss (ECF No. 159), alleging that the TAC generally failed to plead adequate factual details to support the Plaintiffs' claims. (*Id.*) This Court denied that motion, taking judicial notice of a cease-and-desist order

that was imposed by the Securities and Exchange Commission ("SEC") on May 3, 2021 for

putative violations of Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act").

(ECF No. 173, at 5.) Acknowledging that "the SEC Order does not supply dispositive

evidence in this case," and that the agency's findings "are not binding on any other person or

entity in this or any other proceeding," (*id.* at 11 (citation omitted)), this Court found that the

SEC order made plausible the allegations in the Third Amended Complaint ("TAC") that

"Under Armour's reported financial results . . . did not reflect its natural revenue and revenue

growth, and were not indicative of its future financial results," (*id.* at 12 (citation omitted).)

This Court further concluded that the SEC Order and the allegations in the TAC collectively

supported "a strong inference of scienter" against both Defendants, as required to state a

plausible claim for relief under the Exchange Act. (*Id.* at 12–13.) Finally, this Court emphasized

that the SEC order lent support to Plaintiffs' core allegations of falsity through its findings

that:

> As a result of Under Armour's failure to disclose the impact of its pull forward
> practice on revenue growth, Under Armour's public statements were materially
> misleading. In particular, throughout the Relevant Period, Under Armour
> made positive statements regarding its revenue growth rate and the factors
> contributing to the revenue growth rate without disclosing the significant
> impact on revenue from its use of pull forwards. Under Armour also failed to
> disclose that the sales that had been pulled forward were no longer available in
> the future quarter.

(*Id.* at 13–14 (citation omitted).) Although the SEC's findings were not, and are not, dispositive

in this proceeding, this Court concluded that they lent support to the allegations in the TAC.

(*See id.* at 14 ("The SEC Order and the TAC together 'specify each statement alleged to have

been misleading' and 'the reason or reasons why the statement is misleading.'" (quoting 15

U.S.C. § 78u-4(b)(1)).)

5

Following the denial of Defendants' Motion to Dismiss (ECF No. 159), this Court approved the parties' Joint Motion to Enter Scheduling Order (ECF No. 175), directing Defendants to file their Motion for Class Certification by December 1, 2021, (ECF No. 176). Although discovery remains ongoing in this case, Plaintiffs timely filed the instant motion on December 1, 2021. (ECF No. 197.) This motion is now ripe for review.

## STANDARD OF REVIEW

To obtain class certification, Plaintiffs must satisfy all four requirements of Federal Rule of Civil Procedure 23(a), and at least one of the requirements of Rule 23(b). *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Pursuant to an "implicit threshold requirement" of Rule 23(a), Plaintiffs must also establish that the class is ascertainable. *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). Having met this basic requirement, the plaintiff must then establish the requirements of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). With respect to Rule 23(b), Plaintiffs seek certification of the putative class under Rule 23(b)(3), which requires a finding that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs must then establish that the class certification requirements have been met by a preponderance of the evidence. *Brown v. Nucor Corp.*, 785 F.3d 895, 931–32 (4th Cir. 2015).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citation omitted). "Rule 23

6

does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common issues of law or fact, etc." *Id.* at 351. In ruling on a class certification motion, a court must take a close look at the facts relevant to the certification question, even if those facts "tend to overlap with the merits of the underlying case." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006); *accord Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) ("[W]hile an evaluation of the merits . . . is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits.").

The Supreme Court has noted that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 564 U.S. at 350-51 (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982)) (emphasis added); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" (quoting *Mercantile Nat. Bank v. Langdeau*, 371 U.S. 555, 558 (1963))).

## ANALYSIS

In this putative class action, Plaintiffs seek certification of a potentially nationwide class of Under Armour shareholders, defined as follows:

> All persons and entities who purchased or otherwise acquired Under Armour's Class A and Class C common stock between September 16, 2015, and November 1, 2019, inclusive ("Class Period"). Excluded from the Class are Defendants, present or former executive officers and directors of Under

Armour and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

(Mem. Supp. 1.)

As discussed *supra*, Plaintiffs must satisfy all four requirements of Federal Rule of Civil Procedure 23(a), and the predominance and superiority inquiries imposed by Rule 23(b)(3). Defendants decline to dispute many of the class certification prerequisites. As Plaintiffs note, "Defendants do not challenge that Plaintiffs and the proposed Class satisfy Federal Rule of Civil Procedure 23(a) and (b)(3)'s requirements for numerosity, commonality, predominance and superiority." (Repl. Supp. Mot. Class Certification 1, ECF Nos. 233, 234 *SEALED*.) Nowhere in their Response do Defendants argue that Plaintiffs' proposed class is insufficiently numerous, that there are not questions common to the class members, that individual issues predominate over common questions, or that a class action is not a superior method for the adjudication of this dispute. Instead, Defendants focus squarely on the definition of the class, the adequacy of the class representatives, and the typicality of their claims. As set forth below, Defendants' contentions are unavailing, and Plaintiffs have satisfied all requirements for certification by a preponderance of the evidence.

## I.     Ascertainability

"Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)). "Under this principle, sometimes called 'ascertainability,' '[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria.'" *Id.* (quoting *EQT Prod. Co.*, 764 F.3d at 358). While Plaintiffs 'need not be able to identify every class member at the time of certification,"

certification is inappropriate "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Id.* (quoting *EQT Prod. Co.*, 764 F.3d at 358). Plaintiffs must "ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co.*, 764 F.3d at 358) (alteration in original).

Defendants argue the proposed class should be narrowed on two grounds. First, they contend that membership in the class should be restricted to same-day purchasers of the stock sold by Mr. Plank. (Resp. Opp. 31.) "Section 20A provides for a private right of action to buyers and sellers of securities who trade 'contemporaneously' with an insider in possession of material nonpublic information." *In re MicroStrategy, Inc., Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000); *see also* 15 U.S.C. § 78t-1(a).[1] The statute "does not define 'contemporaneous,' leaving courts to resolve the issue on a case-by-case basis." *Buban v. O'Brien*, 1994 WL 324093, at *2 (N.D. Cal. Jun. 22, 1994). Defendants ask this Court to limit the scope of the proposed class to individuals who bought or sold shares on the same day as the Mr. Plank's alleged sales.[2]

---

[1] "This inquiry into contemporaneity proceeds from a recognition that '[s]ince identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible way to sue insiders.'" *Id.* (quoting *Buban v. O'Brien*, No. C 94-0331 FMS, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994)).

[2] This interpretation is hotly contested. Defendants cite several cases for the proposition that "[t]he same day standard is the only reasonable standard given the way the stock market functions." *In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995); *see, e.g.*, *Steamfitters Loc. 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *13 (E.D. Pa. Sept. 30, 2011) (dismissing § 20A claims for sales not "on the same day," even those "very close in time"); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG), 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008) (adopting same-day standard for "publicly traded company with millions of outstanding shares"). However, "[d]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remains undisclosed.'" *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *3 (S.D. Tex. Jun. 15, 2017) (collecting cases and concluding that "[a]n allegation of a six-day gap . . . does not render [plaintiff] an atypical class representative"); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 272

9

However, contemporaneity relates to the merits of a Section 20A insider trading claim, and is "not relevant to the Court's assessment of whether a class should be certified under Rule 23." *Turocy v. El Pollo Loco Holdings, Inc.*, No. SA CV 15-1343-DOC (KESx), 2018 WL 3343493, at *10 (C.D. Cal. Jul. 3, 2018) (quoting *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. CIV.A 05-1151 SRC, 2013 WL 396117, at *8 (D.N.J. Jan. 30, 2013)). Accordingly, as "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Fangman v. Genuine Title, LLC*, 2016 WL 6600509, at *4 (D. Md. Nov. 8, 2016) (Bennett, J.) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)), this Court declines to select between competing definitions at this early stage of the litigation.[3]

Second, Defendants contend that the class should be narrowed to class members whose loss would not be fully compensated by a Section 10(b) recovery. As the Exchange Act prohibits any litigant from recovering "a total amount in excess of [their] actual damages," 15 U.S.C. § 78bb(a)(1), class members who have recovered the entirety of their damages under Section 10(b) will not be not entitled to further compensation under Section 20A, *In re Storage*

---

(N.D. Cal. 2011) (declining to narrow class). As expressed throughout this opinion, this Court declines to address the merits of this inquiry at the class certification stage. Such considerations are properly reserved for later stages of the litigation, including summary judgment.

[3] Defendants insist that Section 20A's "contemporaneity" requirement is a function of Article III standing that this Court must resolve at the class certification stage. (Resp. Opp. 31.) *See Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 552 (E.D. Va. 2018) ("[N]o class may be certified that contains members lacking Article III standing." (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006))); *accord TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring))). This is not so. As several courts have observed, "the contemporaneous trading requirement of Section 20A is a statutory standing requirement that 'delineate[s] the scope' of the cause of action—and it is not a prerequisite of article III standing." *Turocy*, 2018 WL 3343493, at *9 (quoting *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *13 (N.D. Cal. Aug. 14, 2008)). A statutory standing limitation "does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)). Such inquiries are relevant to the merits, not to class certification.

*Tech. Corp. Sec. Litig.*, 804 F. Supp. 1368, 1374 (D. Colo. 1992) ("If the section 20A plaintiffs prove a section 10(b) and 20A claim, the damages they recover may not exceed their actual damages."). However, Plaintiffs openly acknowledge that class members whose damages are completely satisfied under either §§ 10(b) or 20A "would have to choose between the two." (Repl. Supp. 30.) As the damages cap is mandated by statute, and individual damages are subject to classwide proof, "this issue can be resolved on a class-wide basis" at a later stage in the proceedings. *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *10 (N.D. Cal. Dec. 22, 2016).

At bottom, Plaintiffs' proposed class is not difficult to identify. In this case, as in other securities fraud actions, this Court may readily identify putative class members by reference to "objective data about who bought and sold [Under Armour] stock during the class period." *In re Jeld-wen Holding, Inc. Sec. Litig.*, No. 3:20-cv-112-JAG, 2021 WL 1186326, at *9 (E.D. Va. Mar. 29, 2021); *Pope v. Naivent Corp.*, No. 17-8373, 2021 WL 926611, *5 (D.N.J. Mar. 11, 2021) ("Ascertainability is easily demonstrated in securities class actions and this case is no different. The class members will be readily ascertainable through their registered shares or from Defendant's books and records." (citing *In re Urban Outfitters, Inc., Sec. Litig.*, No. CV 13-5978, 2016 WL 1043014, at *4 (E.D. Pa. Feb. 29, 2016); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009)). Considerations such as the proper definition of "contemporaneous" and the likelihood of double recovery are properly reserved for later stages of this litigation— and do not preclude certification of the proposed class. *See Fangman*, 2016 WL 6600509, at *4. Accordingly, this Court concludes that the threshold ascertainability requirement is satisfied in this case.

## II.   Rule 23(a) Requirements

Pursuant to Federal Rule of Civil Procedure 23(a), plaintiffs seeking class certification must first establish—by a preponderance of the evidence—the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Defendants center their attack on the class representatives, arguing that "[c]lass certification is unwarranted here because (i) all three Plaintiffs' claims are atypical of the class; and (ii) all three Plaintiffs are inadequate class representatives." (Resp. Opp. 2.)[4]

A.   <u>Numerosity</u>

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." *Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 284 n.12, 287 (D. Md. 2008). The Fourth Circuit has held that "[n]o specified number is needed to maintain a class action." *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (quoting *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)). "[G]enerally, courts find classes of at least 40 members sufficiently large to satisfy the impracticability requirement," *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D. Md. 1998), and "[c]lasses of as few as 25 to 30 have been found to raise [ ] the presumption that joinder would be impracticable." *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012) (quoting *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991)). "Where 'general knowledge and common sense' indicate the class is so large that joinder of all

---

[4] Defendants do not actually contend that Aberdeen, the Lead Plaintiff, or Robbins Geller Rudman & Dowd LLP, the Lead Counsel, would provide inadequate representation. (Repl. Supp. 1.) Rather, their allegations of inadequacy refer only to KBC and Monroe. (*Id.* at 20; *see* Resp. Opp. 1–2.)

members is impracticable, the numerosity requirement is satisfied." *Id.* (quoting *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006)).

As "thousands of investors purchased or acquired Under Armour common stock during the Class Period, the numerosity prong is easily satisfied in this case." (Mem. Supp. 14.) According to Plaintiffs' expert affidavit, "Under Armour is a publicly traded company listed on the NYSE with as many as 188 million shares of Class A common stock and nearly 229 million shares of Class C common stock issued and outstanding during the Class Period." (Mem. Supp. 14 (citing Cain Rpt. ¶ 60, ECF No. 197-3).) As several courts have observed in analogous securities fraud cases, "given this trading volume, 'common sense dictates that the proposed class is surely sufficiently large to make joinder impracticable.'" *Maiman v. Talbott*, 2011 WL 13065750, at *3 (C.D. Cal. Aug. 29, 2011) (1.32 million shares) (citation omitted); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 378 (N.D. Ga. 2019) (22.5 million shares). "Given the millions of shares that changed hands during the Class Period, it is likely that there are hundreds, if not thousands, of class members. This fact supports numerosity." *Or. Lab. Emps. Pension Tr. Fund v. Maxar Techs. Inc.*, 2021 WL 3021461, at *2 (D. Colo. Jul. 16, 2021). Accordingly, this Court is satisfied that the proposed class is sufficiently numerous to warrant class-wide adjudication.

B. <u>Commonality</u>

Rule 23(a)(2) requires the existence of a question of law or fact common to the class. "A common question is one that can be resolved for each class member in a single hearing," and does not "turn[] on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (internal quotation marks

and citation omitted). "A single common question will suffice, . . . but it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *In re Marriott Int'l, Inc., Consumer Data Sec. Breach Litig.*, 341 F.R.D. 128, 147 (D. Md. 2022) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014)). "Where the injuries complained of by named plaintiffs allegedly result from the same unlawful pattern, practice, or policy of the defendants, the commonality requirement is usually satisfied." *Id.* (quoting *Parker v. Asbestos Processing, LLC*, No. 11-CV-01800, 2015 WL 127930, at *7 (D.S.C. Jan 8., 2015)). "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997); *accord Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006) (Davis, J.) ("Thus, factual differences among the class members' cases will not preclude certification if the class members share the same legal theory." (quoting *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 498 (D. Md. 1998))).

In the case at bar, "Plaintiffs' allegations that investors were defrauded by the same misrepresentations and omissions over the same period of time, and suffered losses as a result, are sufficient to fulfill Federal Rule of Civil Procedure 23(a)'s commonality requirement." (Mem. Supp. 15.) As "the plaintiff alleges that the same misrepresentations or omissions were made to all members of the proposed class," *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010), all members of the proposed class share an interest in the central questions of Exchange Act liability at issue in this case, including:

(i)   whether Defendants violated §§10(b) and 20(a) of the [Exchange] Act;
(ii)  whether Defendant Plank violated §20A of the [Exchange] Act;

    (iii)  whether Defendants publicly misrepresented or omitted material facts;

    (iv)  whether Defendants knowingly or recklessly disregarded that their Class Period statements and omissions were false and/or misleading;

    (v)  whether the price of Under Armour common stock was artificially inflated as a result Defendants' fraudulent conduct; and

    (vi)  whether and to what extent disclosure of the truth regarding Defendants' misstatements and/or omissions of material facts caused Class members to suffer economic loss and damages.

(Mem. Supp. 15.) Each of these questions are subject to common class-wide proof, such that the "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. Defendants do not challenge this element, and this Court finds commonality is satisfied in the case at bar.

C.  <u>Typicality</u>

Rule 23(a)(3) mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," ordinarily requiring that the class representatives' claims arise from the same event, practice, or course of conduct as the putative class members. At its core, the typicality requirement ensures that "only those plaintiffs . . . who can advance the same factual and legal arguments may be grouped together as a class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997)); *accord Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (noting that typicality ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."). To establish typicality, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Broussard*, 155 F.3d at 338 (quoting *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *accord Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) ("The essence of

the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so goes the claims of the class.'" (quoting *Broussard*, 155 F.3d at 340)).

Plaintiffs, the Aberdeen City Council ("Aberdeen"), the Monroe County Employees' Retirement System ("Monroe County"), and KBC Asset Management NV ("KBC") bring claims that are identical to those of the class, as required to satisfy the typicality requirement. All three proposed representatives claim they purchased Under Armour stock during the Class Period, that "they purchased [Under Armour] stock at an artificially inflated price because the defendants lied," and that the specific information they allege to be fraudulent "is the same information that would be used by other class members to prove their case." (Mem. Supp. 16–17 (quoting *In re Jeld-wen Holding, Inc. Sec. Litig.*, 2021 WL 1186326, at *3.) Accordingly, this Court is satisfied that all three representatives possess the same securities fraud claims as the class, and will be required to "advance the same factual and legal arguments" as its members. *Broussard*, 155 F.3d at 340 (quoting *Mace*, 109 F.3d at 341).

Defendants nonetheless argue that the three class representatives are subject to several unique defenses that render them atypical. (Resp. Opp. 8–9, 14, 22.) Ordinarily, "where a purported class representative is subject to a unique defense that cannot be asserted against other members of the class (other than minor discrepancies), typicality may be lacking." *Ostrof v. State Farm Mut. Auto Ins. Co.*, 200 F.R.D. 521, 529 (D. Md. 2001). However, while "typicality can be defeated by the existence of a unique defense that is not ultimately successful, '[a] unique defense will render the proposed class representative's claims atypical only if it is likely to be a major focus of the litigation.'" *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 204 (D. Md. 2022) (citing *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007); quoting 1

Newberg § 3.43 (5th Ed. 2021)) (alteration in original). "To defeat class certification, a defendant must show some degree of likelihood that a unique defense will play a significant role at trial." *Id.* (quoting *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021)); *see also Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (reasoning that the unique defense must be "meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense" (quoting *Hallet v. Li & Fung Ltd.*, No. 95-cv-8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997))).

In this case, Defendants argue that all three class representatives are subject to a variety of unique defenses that render their claims atypical. Specifically, Defendants contend that:

- Aberdeen and KBC are not eligible for the presumption of reliance as they "continued to purchase significant amounts of Under Armour stock" following the partial corrective disclosures alleged in the TAC, and the filing of this action.

- The investments made by Aberdeen and Monroe "were managed by an external investment advisor whose internal analysis of Under Armour contradicts core theories of Plaintiffs' case."

- Aberdeen "did not buy shares of Class C stock contemporaneously with Mr. Plank's sales," but "in fact, . . . <u>sold</u> Class C stock in April 2016 right alongside Mr. Plank."

(Resp. Opp. 1–2.) All three arguments fail. As set forth below, this Court is satisfied that the Plaintiffs bring claims that are typical of the class members, and that these defenses are unlikely to be a "major focus of the litigation." *Cf. Fernandez*, 341 F.R.D. at 204 (quoting 1 Newberg § 3.43).

### 1. *Post-Disclosure Purchases of Under Armour Stock*

First, Defendants rely on several out-of-circuit decisions for the proposition that "putative class representatives who purchase additional shares of defendants' stock <u>after</u> the

alleged disclosure of the supposed fraud fail to satisfy the requirements of Rule 23(a)." (Resp. Opp. 9 (emphasis in original).) *See, e.g., In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005); *In re World Access, Inc.*, 310 F. Supp. 2d 1281, 1300 (N.D. Ga. 2004); *In re Safeguard Scis.*, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003). The rationale behind this rule is that post-disclosure purchases vitiate the element of reliance: "A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533(KBF), 2013 WL 3357170, at *6 (S.D.N.Y. Jul. 3, 2013); *see also Cardinal Health*, 226 F.R.D. at 310 ("The timing of [Plaintiff's] purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury.").

Defendants note that Aberdeen and KBC purchased a large volume of Under Armour shares between April 2017 and May 2017, "after all but two of the alleged partial corrective disclosures in the TAC," and after Plaintiffs' first Complaint was filed on February 10, 2017. (Resp. Opp. 11 (citing TAC ¶¶ 170–74 (Jan. 10, 2016); ¶¶ 177–87 (Jan. 28, 2016); ¶ 215 (May 31, 2016); ¶¶ 225–41 (July 26, 2016); ¶¶ 249–60 (Oct. 25, 2016); ¶¶ 265–78 (Jan. 31, 2017)).) Aberdeen purchased approximately 191,340 shares of Class A stock during this period, for a total of approximately $4,000,000.00. (Groner Decl. 2–3; ECF No. 222-1, 223-1 *SEALED*; Movant's Purchases and Losses, ECF No. 222-2.) Similarly, KBC through its various Funds bought some 320,968 additional Under Armour shares between March 2017 and April 2, 2019. (ECF No. 221-1, at 3–6.) Defendants insist that both representatives' pattern of purchasing "exposes [them] to the defense that the alleged misrepresentations and omissions were 'not a

factor in,' and indeed were 'irrelevant' to, the [representatives'] purchasing decisions." (Repl.

Opp. 13–14 (quoting *China Auto.*, 2013 WL 337170, at *6).)

However, as several courts have observed, a stock purchase after a partial corrective

disclosure "is not *per se* evidence that a class representative is atypical and did not rely on the

alleged fraudulent representations." (Repl. Supp. 9–10.) In *In re Computer Sciences Corp. Securities

Litig.*, 288 F.R.D. 112 (E.D. Va. 2012), the defendant in a securities fraud class action alleged

that the plaintiffs were subject to a unique defense, having purchased as much as 24.8% of its

shares following partial corrective disclosures. 288 F.R.D. at 123. The defendant corporation

alleged that these purchases rendered plaintiffs atypical, as that they demonstrated that the

plaintiffs "did not rely on the allegedly fraudulent statements and would have purchased . . .

stock in any event." *Id.* The district court rejected this argument, reasoning that "the substantial

majority of these cases hold that post-disclosure purchases do not disqualify a potential class

representative," as they may reflect sound investment strategy:

> [P]ost-disclosure purchases may well make sound economic sense in an efficient
> market because the market reflects news of any corrective disclosures in the
> stock price, typically lowering the stock price. The purchase of the stock at the
> lower post-corrective disclosure price in no way indicates that plaintiff would
> have purchased the stock at the pre-disclosure, inflated price absent the
> allegedly fraudulent statements. Therefore, post-disclosure purchases do not
> demonstrate that [plaintiff] failed to rely on the market and hence do not defeat
> the fraud-on-the-market theory or subject [plaintiff] to a unique defense by
> refuting their claim that [defendant] deceived them.

*Id.* at 124 (citing 1 Newberg on Class Actions § 3:41 (5th ed.)); *accord Pelletier v. Endo Int'l PLC*,

338 F.R.D. 446, 476 (E.D. Pa. 2021) ("Investors frequently purchase stocks in response to

price decreases, doing so does not make them atypical or subject to unique defenses."); *see also*

*GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013) ("[P]ost-

disclosure purchases will not prevent an investor from relying on the integrity of the market for pre-disclosure purchases." (quoting *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 (E.D. Pa. 2008).). The Court further reasoned that such "post-disclosure purchases will not destroy a lead plaintiff's typicality unless they threaten to become the focus of the litigation, which they do not in this case." *Computer Sciences*, 288 F.R.D. at 124.

Like the United States District Court for the Eastern District of Virginia, this Court finds the majority approach persuasive. As in *Computer Sciences*, Plaintiffs allege they purchased Under Armour common shares in an efficient marketplace, suggesting that "the price they paid reflected their reliance on Defendants' [alleged] misrepresentations and omissions." (Repl. Supp. 9.) Crucially, Defendants only allege Plaintiffs purchased shares after Under Armour's <u>partial</u> disclosures in 2016 and 2017—not following the <u>final</u> corrective disclosure in November 2019, when "the full truth ha[d] been disclosed to the markets." (Repl. Supp. 6–8 (quoting *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 48 (S.D.N.Y. 2018)) (alteration in original).) Accordingly, these purchases do not establish that the Plaintiffs would have continued to purchase Under Armour stock at an inflated price despite the alleged fraud. *Cf. Computer Sciences*, 288 F.R.D. at 124 ("The decision to purchase after a post-disclosure drop . . . does not carry the inference that [plaintiff] would have purchased at the inflated pre-disclosure price had it known the truth.").[5] In any event, Defendants cite no evidence

---

[5] The distinction between a partial corrective disclosure and a full corrective disclosure is essential: Partial disclosures do not charge the market with notice of the putative fraud, and do not necessarily preclude reliance. *See also Malone v. Microdyne Corp.*, 148 F.R.D. 153, 159 (E.D. Va. 1993) ("An investor may hold the conviction that the marketplace has inaccurately predicted the earning potential of a company, and yet still enter a transaction relying, in part, on the assumption that the market has not been artificially inflated or depressed by material, false information disseminated by corporate insiders."); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985, at *3 (S.D.N.Y. May 15, 2017) ("[E]ven though Lead Plaintiff's final purchase of

suggesting that the Aberdeen and KBC are the only class members who made such purchases, and fail to establish that these purchases would become "a major focus of the litigation." *Fernandez*, 341 F.R.D. at 204 (quoting 1 Newberg § 3.43).

### 2. *Reliance on Investment Managers*

Second, Defendants claim that Aberdeen and Monroe outsourced their investments to "sophisticated external investment managers," who based their decisions on internal analyses, "rather than relying on Under Armour's alleged misrepresentations or omissions to the market." (Resp. Opp. 14–22.) There is some authority for the proposition that when a class representative "wholly outsources [its] decision making to an investment adviser who acts as [its] agent, that agent's decision-making calculus is relevant to the reliance inquiry." *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 410–11 (S.D.N.Y. 2019). Defendants offer evidence that Aberdeen's investments were "solely done" by investment firm BGC, which retained "completed discretion" to control Aberdeen's investments. (Buntain Dep. 36:13–14, 92:9-93:15, ECF Nos. 222-3, 223-2 *SEALED*.) Similarly, they indicate that Monroe's investments were conducted exclusively by Winslow, which "discretion to make all investment decisions for [Monroe's] assets placed under [Winslow's] control." (Grodi Dep. 112:1–7.) Accordingly, these firms' views are relevant to the issue of the class representatives' reliance on the putative market fraud.

---

Vitus stock occurred just 16 days after news of F-Squared's Wells Notice, that purchase preceded the time in May 2015 when the truth was fully revealed to the market.").

Defendants note that both firms' internal projections <u>disagreed</u> with some of the initial partial disclosures and the resultant projections regarding Under Armour's stock prospects, and that both firms encouraged their clients to invest further. (*See, e.g.*, November 2016 Emails, ECF No. 222-16, 223-15 *SEALED* (recounting that Winslow disagreed with 2016 Morgan Stanley & Co. Report and partial disclosure); November 2016 Meeting Notes at BGC 00022777, ECF Nos. 222-13, 223-12 *SEALED* (opining that "the market's (over)reaction" was an "opportunity" to invest).) They claim that this discrepancy is highlighted by the firms' analyses, which focused primarily on "issues that have nothing to do with Plaintiffs' allegations regarding the purportedly improper sales and accounting practices at the core of the TAC." (Resp. Opp. 17 (citing Meeting Notes, ECF Nos. 222-11, 223-10 *SEALED*; BGC Meeting Doc Email, ECF No. 222-12, 223-11 *SEALED*.) Consequently, Defendants claim Aberdeen and Monroe continued to purchase Under Armour stock after accepting appointment as class representatives in a case litigating alleged fraud in the valuation of that stock. (Repl. Opp. 21–22.) They claim that both representatives made these purchases in reliance on assurances by external investment managers that Under Armour's outlook was good, and that the partial disclosures were inaccurate. (*Id.*) And they further argue that these distinctions undercut the reliance element of the proposed class representatives' misrepresentation claims, rendering Aberdeen and Monroe atypical of the proposed class. (*Id.* at 22.)

This argument is unavailing. Large institutional investors routinely rely on investment managers to counsel their investment decisions. Such relationships do not automatically render Plaintiffs atypical, or vitiate their reliance on alleged market fraud. *See, e.g.*, *In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *14 (E.D. Va.

Sept. 4, 2020) ("[N]either Plaintiff's stock purchases nor the views of its investment advisors sufficiently undercut the 'typicality' of Plaintiff's claim to disqualify Plaintiff from acting as a class representative."). Investment managers' trading strategies regularly "rely on the integrity of the market price to reflect all publicly available information," and may thus themselves be influenced by the putative fraud. *Computer Sciences*, 288 F.R.D. at 122–23. Accordingly, "the fact that [each] Plaintiff's investment advisor used its own valuation analysis—to '[p]urchase stocks at a discount' and 'sell[] stocks as they approach full valuation'—does not necessarily mean that the advisor did not rely on the integrity of the market in making purchasing decisions." *In re Advance Auto Parts, Inc. Sec. Litig.*, No. 18-212-RGA, 2020 WL 6544637, at *5 (D. Del. Nov. 6, 2020) (citation omitted). Defendants do not refute that BGC and Winslow relied on Under Armour's common stock price to conduct their analyses. Nor do they show that these external investors would have purchased Under Armour stock at pre-disclosure, inflated prices with full knowledge of the alleged misrepresentations. (Repl. Supp. 13–14.) Accordingly, Plaintiffs' mere reliance on investment managers does not conclusively establish that Plaintiffs did not rely on the alleged misrepresentations. Plaintiffs are not subject to a unique defense on this ground.

### 3. *Aberdeen's Net Sales of Securities*

Third, Defendants contend Aberdeen has no claim under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1(a), as it sold Class C on the dates that Mr. Plank allegedly sold his shares. (Resp. Opp. 22–26.) Section 20A provides a cause of action for insider trading only to a "person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold

(where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a); *see also Buban*, 1994 WL 324093, at **2–3 (highlighting that this requirement serves to protect investors who "might, in fact, have traded with the defendant").

During the Class Period, two classes of Under Armour common stock were traded on the New York Stock Exchange: (1) Class A, which "is publicly traded (NYSE: UAA) and carries one vote per share;" and (2) Class C, which "is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances." (TAC ¶ 26 n.7.) Plaintiffs assert a Section 20A claim against Mr. Plank on behalf of putative class members who purchased stock contemporaneous with Mr. Plank's sales on November 17 through 23, 2015, and April 26 through 29, 2016. (*Id.* ¶¶ 427–436.) However, while Mr. Plank is alleged to have sold Class C stock on those dates, Defendants produce evidence that Aberdeen only purchased Class A stock, and in fact sold Class C stock during this period without purchasing any of the same. (*See* Resp. Opp. 24–25 (charting Aberdeen's holdings). *Compare* TAC ¶ 130 (Plank's sales), *with* Movant's Purchases and Losses (Aberdeen's transactions).) Accordingly, Defendants claim that Aberdeen was a "net seller" of Under Armour stock during the relevant period, and that this trading activity would become "the focus of the Section 20A claim here," detracting from the classwide litigation. (Resp. Opp. 25–26.)

Nevertheless, Aberdeen is a "net seller," not a "net gainer." Even assuming Aberdeen sold more Class C stock than it purchased, Plaintiffs adduce evidence that Aberdeen operated at a loss during the Class Period. (Repl. Supp. 19–20.) This distinction is crucial for the purpose of this motion, as a plaintiff who sold stock but suffered a net loss may still have been injured by the alleged fraud. "Whereas a net gainer achieves a net profit from its Class Period shares,

a net seller merely sells more shares than it purchased during the Class Period and may well still suffer a loss." *In re MGM Mirage Sec. Litig.*, 2010 WL 4316754, at *4 (D. Nev. Oct. 25, 2010). "While there is wisdom in the rule that net sellers who are also net gainers should not be lead plaintiffs; there is no good reason not to recognize losses which a net seller has incurred." *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 479 (S.D.N.Y. 2011); *cf. Gordon*, 92 F. Supp. 3d at 201 (finding lead plaintiff atypical where he was "subject to the unique defense that he suffered no economic loss," as his "gains and avoided losses during the various class periods exceeded any losses he may have suffered during those periods"); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1259–60 (11th Cir. 2014) ("Regions has not pointed us to any evidence suggesting that District 9's gains during the period might arguably offset its losses under any generally accepted accounting method. Its argument that District 9's sales render it atypical is thus misguided.").

Here, Plaintiffs argue that Aberdeen acquired more Class C common stock than it sold during the Class Period through "a one-for-one stock dividend." (Repl. Supp. 18.) Moreover, "Defendants' own exhibit shows that [Aberdeen] acquired 128,946 shares of Under Armour Class C stock on April 8, 2006 and ultimately sold all of those shares between April 15, 2016, and May 4, 2016, *at a loss of nearly $450,000*—a fact which the Opposition does not refute." (*Id.* at 19 (citing Movant's Purchases and Losses 3) (emphasis in original).) This evidence suggests that, regardless of whether Aberdeen is classified as a "net seller," it has suffered a net loss in its acquisition and sale of Under Armour stock throughout the class period. (*Id.* at 19–20.) Accordingly, this Court is satisfied that Aberdeen's trading activity is unlikely to become "a

major focus of the litigation" and detract from the classwide issues at trial. *Fernandez*, 341 F.R.D. at 204 (quoting 1 Newberg § 3.43).[6]

D. Adequacy

The final prerequisite under Rule 23(a) is that the persons representing the proposed class must be able "fairly and adequately to protect the interests" of all members of the class. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing *Falcon*, 457 U.S. at 157–58 n. 13). As this Court has previously ruled, the adequacy of a class representative is chiefly determined by whether its interests are "opposed to those of other class members." *Fidelity Res., Inc.*, No. RDB-17-1447, 2019 WL 4141015, at *10 (D. Md. Aug. 30, 2019) (Bennett, J.). Rule 23(a)(4) has two components: (1) the interests of the proposed class representatives and class members must coincide; and (2) the plaintiffs' attorneys must be qualified, experienced, and able to conduct the litigation. *Cuthie v. Fleet Reserve Ass'n*, 743 F. Supp. 2d 486, 499 (D. Md. 2010).

Both requirements are readily satisfied here. First, for the same reasons the typicality requirement is met, this Court is satisfied that the representatives' interests are in alignment with the proposed class. "Like other members of the Class, [Aberdeen], Monroe County, and

---

[6] Secondarily, this Court is not convinced that Aberdeen's purchase of Class A stock is irrelevant to this analysis. As other courts have recognized, the language "securities of the same class" is not necessarily delimited to "the exact same type of security." *Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV 14-2004-DOC (JCGx), 2015 WL 7352005, at *8 (C.D. Cal. Nov. 9, 2015) (noting that "Defendants fail to provide any persuasive legal authority for this narrow interpretation of the insider trading laws"). As Plaintiffs note, the only substantial difference between Under Armour's Class A and Class C stock is the voting rights accorded to the former. (Repl. Supp. 3.) Similar distinctions, such as stock options, have been found to fall within "securities of the same class" for the purpose of Section 20A. *See Basile*, 2015 WL 7352005, at *9. Accordingly, by overlooking Aberdeen's Class A purchases, Defendants' argument takes too narrow a view of Section 20A.

KBC all purchased or acquired Under Armour common stock at market prices during the class period and were injured by the same alleged material misrepresentations and omissions." (Mem. Supp. 18.) Accordingly, the representatives' legal and factual positions are in alignment with the class, indicating they are well-positioned to litigate on behalf of the class members. Moreover, Plaintiffs are institutional investors, precisely the type of litigant Congress intended to serve as class representative in securities cases. *See Local 703,* 762 F.3d at 1260 ("[B]oth Congress and the courts have recognized that these sorts of investors are generally preferred as class representatives in securities litigation."); *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 294 (S.D.N.Y. 2020) ("The PSLRA was designed to 'increase the likelihood that institutional investors will serve as lead plaintiffs.'" (quoting *In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003))).

Second, Plaintiffs have selected Robbins Geller Rudman & Dowd, LLP ("Robbins Geller"), an experienced class action litigation firm, to serve as class counsel. "Robbins Geller has been appointed class counsel in hundreds of securities class actions and has competently met its obligations under Rule 23 in those cases. The Court has no doubt that Robbins Geller will meet its obligation here to vigorously pursue this litigation." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 693 (D. Md. 2018) (Titus, J.). Courts nationwide have recognized Robbins Geller's expertise in this field of litigation. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y. 2019); *Knurr v. Orbital ATK, Inc.*, 220 F. Supp. 3d 653, 663 (E.D. Va. 2016). "Plaintiffs' chosen counsel have committed, and are willing to commit, considerable resources to prosecuting this action, and have vigorously represented the interests of the Class in this action to date." (Mem. Supp.

18.) In light of Robins Geller's history of diligent advocacy in class action litigation, this Court is satisfied that Plaintiffs have selected attorneys who are "qualified, experienced and able to conduct the litigation." *Cuthie*, 743 F. Supp. 2d at 499.

Defendants contest the adequacy of representation on two grounds, arguing (1) that KBC "has placed the interests of its separate counsel over the putative class" by engaging two independent law firms; and (2) that "Monroe also has improperly sought to evade the party sanctions regime" imposed by the PSLRA by entering an indemnification agreement with Robins Geller. (Resp. Opp. 2.) Both arguments fail.[7]

First, Defendants challenges KBC's adequacy as class representative, noting that KBC "has had no direct interaction with Robbins Geller other than in the context of preparing for KBC's deposition," and has retained Motley Rice, LLC, and Sturman, LLC as independent counsel. (Resp. Opp. 27; *see* Elst Dep. 222:10–14.) According to KBC's corporate counsel, Bart Elst, these firms serve as counsel to KBC and liaison to Robbins Geller. (Elst Decl. ¶ 5, ECF No. 197-24.) Their role appears to be relaying information and correspondence between KBC and lead counsel. (*Id.*) Despite this limited arrangement, KBC's retainer with Motley Rice and Sturman provides that their fees "will be paid from the entire Class settlement amount and not from KBC's share of the net Class settlement amount." (*See* Retention Letter, ECF Nos. 222-22, 223-21 *SEALED*.) Consequently, Defendants argue that KBC "placed the

---

[7] As several courts have noted, a defendant's efforts to challenge the adequacy of class counsel should be viewed with skepticism. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 326 F.R.D. 619, 628 (N.D. Cal. 2018) ("[T]o state the obvious, Twitter's interests in this litigation are not aligned with those of the class. Thus, it is unlikely that Twitter has the class's interests in mind when it argues against the appointment of additional counsel."); *In re Pfizer, Inc. Sec. Litig.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012) ("[P]ermitting defendants to police the adequacy of class representatives and their counsel is like 'permitting a fox . . . to take charge of the chicken house.'" (citation omitted)); *Computer Sciences*, 288 F.R.D. at 125 n.14 ("The energy devoted to the attack reflects the fact that [defendant] actually considers [plaintiff] to be a strong and potentially effective opponent.").

interests of [its] counsel ahead of those of the class," *In re Allergan PLC Sec. Litig.*, 2020 WL 5796763, at *7 (S.D.N.Y. Sept. 29, 2020), by permitting separate counsel to engage in duplicative work, with fees to be paid by the class.

This arrangement does not suggest that KBC's interests are opposed to the common interests of the class. (Repl. Supp. 21-22.) Several courts in similar securities fraud cases have recognized it is "wholly proper for [institutional investors] to retain and rely on outside counsel in fulfilling their duty to protect the interests of the class by monitoring Robbins Geller." *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 292 F.R.D. 515, 522 (N.D. Ohio 2013); *see also Wallace v. IntraLinks,* 302 F.R.D. 310, 316 (S.D.N.Y. 2014) ("For an entity like [plaintiff], delegating management of securities litigation to trusted external counsel is not unreasonable."). More pertinently, courts have authorized Robbins Geller and Motley Rice to proceed in tandem as class counsel, indicating that these firms have collaborated to manage class actions in the past. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 326 F.R.D. 619, 628–29 (N.D. Cal. 2018); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 287 (D. Minn. 2018); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 513 (D. Kan. 2014). And to the extent Defendants are concerned about the propriety of awarding Motley Rice and Sturman any portion of a classwide settlement in this case, such concerns may be properly litigated and addressed at a later stage. *See, e.g.*, *Beach v. Healthways, Inc.*, 2010 WL 1408791, at *4 (M.D. Tenn. Apr. 2, 2010) ("Any attorneys' fees awarded in this case will have to be Court-approved, and issues concerning those fees may be raised at that time.").[8]

---

[8] Defendants contend that this arrangement "has already led to duplication of work and increased legal fees," as KBC was represented by as many as "<u>five</u> lawyers from <u>three</u> law firms" at its deposition. (Resp. Opp. 29 (emphasis in original).) Some courts have noted that "the involvement of multiple firms tends to inflate legal

Second, Defendants contend that Monroe and Robbins Geller violated the PSLRA by arranging for Robbins Geller to indemnify Monroe for any sanctions imposed in this action. (Resp. Opp. 29–31.) The PSLRA expands upon the requirements of Rule 11 by imposing mandatory sanctions against any attorney or representative plaintiff found to have engaged in abusive litigation practices in a securities fraud action. 15 U.S.C. § 78u-4(c); *see Sik-Lin Huang v. Acterna Corp.*, 220 F.R.D. 255, 256–57 (D. Md. 2004) ("The PSLRA was intended to prevent 'lawyer-driven' litigation, and to ensure that 'parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel.'" (quoting *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 43–44 (S.D.N.Y. 1998))). However, as other courts have observed, "the PSLRA permits an allocation of the risk of sanctions between an attorney and a party," and "does not expressly bar attorneys and parties from addressing that risk through contract." *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d at 296. Accordingly, "[i]t does not follow inexorably from the indemnification agreements that the Lead Plaintiffs will not represent the class adequately." *Id.* Therefore, Monroe's indemnification agreement with Robbins Geller does not violate the requirements of the PSLRA, and does not represent a conflict with the interests of the class. Absent evidence that Monroe is not qualified to serve as class representative in this case, or that its interests are "opposed to those of other class

---

fees to the detriment of the other class members." *Allergan*, 2020 WL 5796763, at *6; *accord In re Century Bus. Servs. Sec. Litig.,* 202 F.R.D. 532, 541 (N.D. Ohio 2001) ("[T]he potential for duplicative services and the concomitant increase in attorneys' fees works against the approval of multiple lead counsel." (quoting *In re Milestone Sci. Sec. Litig.*, 183 F.R.D. 404, 418 (D.N.J. 1998))). Nevertheless, this Court is persuaded by those cases reasoning that "representation by the outside law firm will ensure that the [plaintiff] will fulfill its duty adequately to monitor class counsel." *Burges v. Bancorpsouth, Inc.*, No. 3:14-cv-1564, 2017 WL 2772122, at *6 (M.D. Tenn. June 26, 2017). As mentioned above, this Court will safeguard against concerns regarding excessive fees at the appropriate stage in the litigation.

members," Defendants fail to demonstrate that Monroe would be an inadequate class representative. *Jones*, 2019 WL 4141015, at *10. Accordingly, this Court concludes that all three proposed class representatives would "fairly and adequately to protect the interests," and all four Rule 23(a) prerequisites are satisfied in this case.

## III.   Rule 23(b) Requirements

Rule 23(b)(3) requires a determination that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Generally, "[s]ecurities fraud cases are thought to be particularly appropriate for treatment under Rule 23(b)(3) because the elements of the claim tend to relate to the conduct of the defendants, not to the individual plaintiffs." *Cape Coral*, 322 F. Supp. 3d at 685–86. Such is the case here. Plaintiffs' claims arise entirely from a single alleged course of conduct by the Defendants, with alleged damages susceptible to common proof. Additionally, a class action is the only suitable vehicle for litigating a case of this volume. Accordingly, class certification is appropriate under Rule 23(b)(3).

### E.   Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3), even though some other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v.*

*Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted); *accord Krakauer*, 925 F.3d at 658

("The entire notion of predominance implies that the plaintiffs' claims need not be identical.").

This balancing is qualitative in nature, not quantitative. *Gunnells v. Healthplan Servs., Inc.*, 348

F.3d 417, 429 (4th Cir. 2003). Accordingly, predominance may be satisfied even when some

individualized inquiry is required. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th

Cir. 2013) (unpublished) (citing *Gunnells*, 348 F.3d at 429).

 In this case, the central question of Defendants' liability is common to the entire class,

as it is predicated on a single alleged course of conduct by the Defendant. (Mem. Supp. 21.)

"The alleged misrepresentations and omissions, whether material or immaterial, would be

equally so for all investors composing the class." *Amgen*, 568 U.S. at 459–60. At issue is the

element of reliance. Often, "the predominance requirement can be a sticking point in securities

class action certifications where fraud is alleged because individual issues of reliance on

fraudulent misrepresentations may be such as to undercut a showing of predominance."

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004).

 Plaintiffs invoke a presumption of reliance on a class-wide basis through a theory of

fraud on the market. As the Supreme Court held in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988),

"a person who traded a corporation's shares on a securities exchange after the issuance of a

materially misleading statement by the corporation [is entitled to] a rebuttable presumption

that, in trading, he relied on the integrity of the price set by the market." 485 U.S. at 226. "[A]

plaintiff satisfies [the predominance requirement] by proving the prerequisites for invoking

[this] presumption." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). "To

gain the benefit of the presumption, a plaintiff must prove '(1) that the defendant made public

misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market'; and (4) that the plaintiff purchased the shares after the misrepresentation but before the truth was revealed." *Gariety*, 368 F.3d at 362 (quoting *Basic*, 485 U.S. at 248 n.27).

For the limited purpose of class certification, all four requirements are satisfied here. First, Under Armour's alleged material misrepresentations were public. (TAC ¶¶ 148–264.) Second, Plaintiffs adequately allege that Under Armour's misrepresentations related to the demand for its products and were thus material to the price of its shares. (Cain Rpt. ¶¶ 81-82.) Third, it is undisputed that "[t]hroughout the Class Period, Under Armour's stock was listed and traded on the [New York Stock Exchange], one of the largest and most developed securities markets in the world." (Mem. Supp. 23 (citing TAC ¶ 393(d); Cain Rpt. ¶¶ 20, 37-38).) *Cf. Computer Sciences*, 288 F.R.D. at 119 ("[D]efendant has cited no case, and none has been found, holding that the NYSE is not an efficient market for shares of common stock traded, as here, in substantial volumes."). Finally, the proposed class is properly delimited to individuals and entities who bought Under Armour common stock between September 16, 2015, the date of the first alleged misrepresentations and omissions, and November 3, 2019, the date of complete disclosure. (TAC ¶¶ 377–89; *accord* ECF Nos. 131-4, 153-5, 153-6.) Although this Court does not make any findings at the class certification stage, Plaintiffs have demonstrated their entitlement to the *Basic* presumption of fraud on the market for the purpose of Rule 23(b)(3).

The possibility of individualized damages calculations does not vitiate predominance. "To satisfy predominance, Plaintiffs' damages must be 'capable of measurement on a classwide

basis.'" *Marriott*, 341 F.R.D. at 161 (quoting *Comcast*, 569 U.S. at 34). "However, there is no requirement that Plaintiffs' damages 'must be *calculated* on a class-wide basis.'" *Id.* (quoting *Parker v. Asbestos Processing, LLC*, No. 11-cv-1800-JFA, 2015 WL 127930, at *14 (D.S.C. Jan. 8, 2015)) (emphasis in original). Instead, it is sufficient to demonstrate "a common, classwide *method* for determining individual damages." *Id.* (citing 4 Newberg § 12:4) (emphasis in original).

Such is the case here. As Plaintiffs correctly observe, each class member's damages may be calculated by "determining the difference between inflation on the security purchase or acquisition date and inflation on the security sale date." (Mem. Supp. 30-31 (citing Cain. Rpt. ¶¶ 72–80).) Several courts have sanctioned the use of similar "out-of-pocket" methodologies in analogous securities fraud cases. *See, e.g., City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 691 (D. Md. 2018); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-2393-MGL, 2017 WL 4297450, at *7 (D.S.C. Sep. 28, 2017) ("The Supreme Court long ago agreed with this approach when it held 'the correct measure of damages . . . is the difference between the fair value of all [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.'" (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)) (alteration in original)). Under this method, "even though the per-share damages for each member of the Class may vary based on the timing of stock purchases and sales, the methodology used to identify the damages will be the same for all Class members." (Mem. Supp. 30-31.) Accordingly, this Court concludes that the common questions of liability predominate, notwithstanding the possibility that individual damages may vary.

F.  Superiority

The final requirement of Rule 23(b)(3) is that a class action be superior to other methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) requires courts to consider four factors when assessing this requirement:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *accord Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224, 228 (D. Md. 2011). "Ultimately, the 'determination of superiority necessarily depends greatly on the circumstances surrounding each case.'" *Marriott*, 341 F.R.D. at 165 (quoting *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010)); *accord Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 316 (3d Cir. 1998) (requiring the court "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication" (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996)).

"Based on these factors, the Court finds that proceeding as a class action in this action, as in public traded securities claims generally, is the superior mechanism to adjudicate the Class's claims." *In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *11 (E.D. Va. 2020). Plaintiffs seek to certify a class of potentially thousands of buyers who purchased millions of Under Armour common stock. Individual litigation would be burdensome for the class members, who may be geographically dispersed, and "whose individual damages likely are small enough to keep individual litigation from being

economically worthwhile." (Mem. Supp. 33.) Comparatively, centralizing litigation in the district where Under Armour is headquartered will "eliminat[e] the risk of inconsistent adjudication and promot[e] the fair and efficient use of the judicial system." (*Id.*) Accordingly, this Court concludes that "certification of the case as a class action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, but it also appears to be the sole method for fairly and efficiently litigating claims on behalf of all members of the proposed class." (*Id.*)

## IV.   Class Counsel

This Court finds that Robbins Geller satisfies all of the requirements under Federal Rule of Civil Procedure 23(g)(1)(A), and is capable of serving as class counsel in this matter. As Judge Titus recently observed, "Robbins Geller has been appointed class counsel in hundreds of securities class actions and has competently met its obligations under Rule 23 in those cases." *Cape Coral*, 322 F. Supp. 3d at 693; *accord Villella*, 333 F.R.D. at 59 (concluding that Robbins Geller "has extensive experience in securities class actions and complex litigation, . . . indicating its ability to manage this litigation and ably apply the applicable law"). Accordingly, this Court hereby appoints Robbins Geller Rudman & Dowd, LLP, to serve as Class Counsel pursuant to Rule 23(g).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Class Certification (ECF No. 197), is hereby **GRANTED.** A separate Order follows.

Dated: September 29, 2022

_____/s/_____
___
Richard D. Bennett
United States Senior District Judge