# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | **REDACTED FOR** |
| This Document Relates To: | ) ) | **PUBLIC FILING** |
| ALL ACTIONS | ) ) ) | |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF ABBREVIATIONS ............................................................................... x

PRELIMINARY STATEMENT ............................................................................... 1

DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS ............... 5

ARGUMENT ........................................................................................................ 18

I.    The Undisputed Facts Show that Defendants Did Not Make a Material
      Misrepresentation or Omission ................................................................. 19

      A.    Plaintiffs Have Not Established any GAAP Violations or Financial
            Statement Errors Based on Pull Forwards .......................................... 20

      B.    Defendants Did Not Omit Material Information or Make Material
            Misstatements Regarding Pull Forwards ............................................. 21

            1.    There Is No Legal Requirement to Disclose Pull-Forward Sales ........... 22

            2.    Item 303 Does Not Create a Duty to Disclose Pull Forwards ................. 23

                  a.    A Violation of Item 303 Does Not Establish a Violation of
                        Section 10(b) or Rule 10b-5 ............................................................ 24

                  b.    The Undisputed Facts Cannot Support a Determination that
                        Defendants Violated Item 303 ........................................................ 26

            3.    Defendants' Affirmative Statements Did Not Create a Duty to
                  Disclose Pull-Forward Sales .............................................................. 30

      C.    Allegations of Affirmative Misrepresentations Fail as a Matter of Law ........ 33

            1.    There Are No Actionable Misstatements Regarding Financial
                  Performance, Revenue Growth, or Consumer Demand .......................... 34

                  a.    Accurate Statements Regarding UA's Financial
                        Performance and Results Are Not Actionable ................................... 34

                  b.    Optimistic Statements Regarding Growth and Demand
                        Were Not Affirmative Misrepresentations ....................................... 35

            2.    Plaintiffs' Accounting Allegations Are Unsupported ............................ 36

                  a.    The Undisputed Facts Do Not Support Plaintiffs'
                        Allegations Regarding UA's Q4 2016 Returns Reserve .................... 38

                  b.    Inventory Write-Down Claims Are Unsupported ............................ 40

                  c.    The ███ Transaction Is Immaterial ........................................ 40

II.   The Undisputed Record Cannot Support A Scienter Determination as a Matter of
      Law ......................................................................................................... 41

|   | A. | The Challenged Pull Forwards Do Not Support a Scienter Determination | 42 |
|   | B. | UA Senior Management Did Not Believe Disclosure of Pull Forwards Was Required | 45 |
| III. | | Summary Judgment Should Be Granted as to Plaintiffs' Claims under Sections 20(A) And 20a of the Exchange Act | 48 |
|   | A. | Defendants Are Not Liable Under Sections 20(a) and 20A Because Plaintiffs Cannot Establish a Primary Violation | 48 |
|   | B. | Mr. Plank Is Not Liable Under Section 20A to Class Members Who Did Not Purchase the Same Class of Securities Contemporaneously with His Sales | 49 |
| IV. | | The Class Period Should Be Shortened | 51 |
|   | A. | The Class Period Should End No Later than August 1, 2017 | 52 |
|   | B. | The Class Period Should Begin No Earlier than October 25, 2016 | 54 |
| CONCLUSION | | | 55 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008)................................................................50

*In re Alcatel Alsthom Sec. Litig.*,
  2000 WL 34217789 (E.D. Tex. June 23, 2000)..........................................................41

*In re Allscripts, Inc. Sec. Litig.*,
  2001 WL 743411 (N.D. Ill. June 29, 2001)............................................................5, 41

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill. 2001) ........................................................................24

*Ash v. PowerSecure Int'l, Inc.*,
  2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)......................................................24, 36

*In re AST Rsch. Sec. Litig.*,
  887 F. Supp. 231 (C.D. Cal. 1995) ............................................................................50

*In re AXIS Cap. Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)........................................................................22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..............................................................................................24, 25

*In re Boston Tech. Sec. Litig.*,
  8 F. Supp. 2d 43 (D. Mass. 1998) ..............................................................................24

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ......................................................................................35

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA)
  LLC*,
  752 F.3d 82 (1st Cir. 2014)...................................................................................53, 54

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................................42

*Brown v. Prince George's Hosp.*,
  2011 WL 2413344 (D. Md. June 9, 2011) ..................................................................19

*Burt v. Maasberg*,
  2014 WL 1291834 (D. Md. Mar. 28, 2014).................................................................51

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................52

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ............................................................24, 25

*Celotex Corp. v. Catretty*,
    477 U.S. 317 (1986).................................................................................18

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
    2023 WL 155861 (D. Ariz. Jan. 11, 2023) .......................................48, 53

*Copland v. Grumet*,
    88 F. Supp. 2d 326 (D.N.J. 1999) .......................................................50

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .....................................28

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ..............................................................42

*Crews v. Rivian Auto., Inc.*,
    2023 WL 3050081 (C.D. Cal. Feb. 16, 2023)......................................44

*In re Cypress Semiconductor Sec. Litig.*,
    891 F. Supp. 1369 (N.D. Cal. 1995) .............................................. *passim*

*In re Cytyc Corp. Sec. Litig.*,
    2005 WL 3801468 (D. Mass. Mar. 1, 2005)................................... *passim*

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................19

*In re DXC Tech. Co. Sec. Litig.*,
    2020 WL 3456129 (E.D. Va. June 2, 2020) ........................................27

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................41

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & ERISA Litig.*,
    503 F. Supp. 2d 25 (D.D.C. 2007).................................................50, 51

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)........................................53

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (D.N.C. 2001)......................................................41

iv

*Galati v. Com. Bancorp, Inc.*,
  220 F. App'x 97 (3d Cir. 2007) ..................................................................34

*In re Gander Mountain Co. Sec. Litig.*,
  2006 WL 140670 (D. Minn. Jan. 17, 2006)................................................33

*Gasner v. Bd. of Sup'rs of the Cnty. of Dinwiddie, Va.*,
  103 F.3d 351 (4th Cir. 1996) ....................................................................32

*Graham v. Dhar*,
  33 F.4th 178 (4th Cir. 2022) .....................................................................51

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)..........................................................3, 22, 42

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019)...................................................25, 27

*In re Ikon Off. Sols., Inc. Sec. Litig.*,
  131 F. Supp. 2d 680 (E.D. Pa. 2001) ........................................................38

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ....................................................22, 32

*In re John Alden Fin. Corp. Sec. Litig.*,
  249 F. Supp. 2d 1273 (S.D. Fla. 2003) .............................................38, 39, 40

*Katyle v. Penn. Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ....................................................................52

*Lawson v. FMR LLC*,
  571 U.S. 429 (2014)..................................................................................49

*Libon v. Infineon Techs., A.G.*,
  2006 U.S. Dist. LEXIS 76430 (E.D. Va. Aug. 7, 2006).................................34

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ................................................................19, 20

*Mallory v. Town of Elkton*,
  2012 WL 6136437 (D. Md. Dec. 10, 2012).................................................19

*Markman v. Whole Foods Mkt., Inc.*,
  2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)..........................................24

*In re Marriott Int'l, Inc.*,
  31 F.4th 898 (4th Cir. 2022) ................................................................20, 31

*Mathews v. Centex Telemanagement, Inc.*,
  1994 WL 269734 (N.D. Cal. June 8, 1994) ............................................38, 39, 40

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ...............................................................42, 48

*In re Maximus, Inc. Sec. Litig.*,
  2018 WL 4076359 (E.D. Va. Aug. 27, 2018) ...........................................24

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ...........................................49, 50, 51

*Minter v. Wells Fargo Bank, N.A.*,
  2013 WL 1795564 (D. Md. Apr. 26, 2013) ...........................................51, 52

*Moab Partners, L.P. v. Macquarie Infrastructure, Corp.*,
  2022 WL 17815767 (2d Cir. Dec. 20, 2022) .........................................25

*Murphy v. Sofamor Danek Grp.*,
  123 F.3d 394 (6th Cir. 1997) ...............................................................24, 34

*In re Mut. Funds Inv. Litig.*,
  590 F. Supp. 2d 741 (D. Md. 2008) .....................................................42

*In re Mut. Funds Inv. Litig.*,
  767 F. Supp. 2d 531 (D. Md. 2010) .....................................................42, 48

*Nardy v. Chipotle Mexican Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar. 29, 2019) ........................................24

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .....................................................3, 23, 24, 25

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ...........................................................24, 25, 53

*In re PEC Sols, Inc. Sec. Litig.*,
  418 F.3d 379 (4th Cir. 2005) ...............................................................52

*Peckey v. Bank of Am.*,
  2016 WL 6951940 (D. Md. Nov. 28, 2016) ...........................................37

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
  11 F.4th 90 (2d Cir. 2021) .....................................................................27

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..................................................40

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. August 14, 2013)..............................................30

*Proter v. Medifast, Inc.*,
2013 WL 1316034 (D. Md. Mar. 28, 2013)..........................................................48

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ...................................................................................36

*Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) .................................................................................48

*San Antonio Fire & Pension Fund v. Syneos Health, Inc.*,
75 F.4th 232 (4th Cir. 2023) .................................................................................32

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016) ..................................................................34

*In re Sanofi-Aventis Sec. Litig.*,
293 F.R.D. 449 (S.D.N.Y. 2013) ..........................................................................54

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019) ..........................................................24

*Schmidt v. Bartech Grp., Inc.*,
620 F. App'x 153 (4th Cir. 2015) .........................................................................19

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
140 S. Ct. 2183 (2020).........................................................................................49

*Shah v. GenVec, Inc.*,
2013 WL 5348133 (D. Md. Sept. 20, 2013) ...................................................24, 25

*Smith & Wesson Holding Corp. Sec. Litig.*,
836 F. Supp. 2d 1 (D. Mass. 2011) .............................................................. *passim*

*Stavroff v. Meyo*,
1997 WL 720475 (6th Cir. Nov. 12, 1997)........................................................5, 39

*Steamfitters Loc. 449 Pension Fund v. Alter*,
2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ......................................................50

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ..............................................................................27

*Stratte-Mcclure v. Stanley*,
776 F.3d 94 (2d Cir. 2015)....................................................................................24

*Svezzese v. Duratek, Inc.*,
    67 F. App'x 169 (4th Cir. 2003) ........................................................48

*Taylor v. First Union Corp. of South Carolina*,
    857 F.2d 240 (4th Cir. 1988) .............................................3, 20, 23, 28

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ........................................................49

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................41

*Thompson v. Potomac Elec. Power Co.*,
    312 F.3d 645 (4th Cir. 2002) ........................................................5, 18

*In re Triangle Cap. Corp. Sec. Litig.*,
    988 F.3d 743 (4th Cir. 2021) ........................................................41

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. Sept. 19, 2018)....................................33, 35

*In re Under Armour Sec. Litig.*,
    540 F. Supp. 3d 513 (D. Md. 2021) ...........................................1, 5, 33, 52

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................51

*Zaluski v. United Am. Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) ........................................................37, 41

**Statutes and Rules**

15 U.S.C. § 78t–1(a) ........................................................49, 51

17 C.F.R. § 210.05-03(b) ........................................................22

17 C.F.R. § 229.101(d) ........................................................22

17 C.F.R. § 229.303(a)........................................................*passim*

17 C.F.R. § 240.10b-5(b) ........................................................31

Fed. R. Civ. P. 23(c)(1)(C) ........................................................51

Fed. R. Civ. P. 56(a) ........................................................18

**Other Authorities**

ASC 105-10-05-06........................................................40

ASC 450-20-25-2 ...................................................................................................................... 38

Exchange Act Release No. 34-26831, 54 Fed. Reg 22427-01 (May 18, 1989) .................... 23, 25

*NASA, NOAA Data Show 2016 Warmest Year on Record Globally*, NASA (Jan. 18, 2017) .................................................................................................................... 7

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION | EXHIBIT |
|---|---|---|
| 10/22/15 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on October 22, 2015 | 29 |
| 11/4/15 10-Q | Under Armour, Inc. Quarterly Report for the three months ending September 30, 2015, filed with the SEC on Form 10-Q on November 4, 2015 | 43 |
| 1/28/16 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on January 28, 2016 | 30 |
| 1/28/16 Call Tr. | Transcript of an earnings call held by Under Armour, Inc. on January 28, 2016 | 48 |
| 2/22/16 10-K | Under Armour, Inc. Annual Report for the fiscal year ending December 31, 2015, filed with the SEC on February 22, 2016 | 41 |
| 4/21/16 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on April 21, 2016 | 31 |
| 4/21/16 Call Tr. | Transcript of an earnings call held by Under Armour, Inc. on April 21, 2016 | 49 |
| 4/29/16 10-Q | Under Armour, Inc. Quarterly Report for the three months ending March 31, 2016, filed with the SEC on Form 10-Q on April 29, 2016 | 44 |
| 5/31/16 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on May 31, 2016 | 32 |
| 7/26/16 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on July 26, 2016 | 33 |
| 7/26/16 Call Tr. | Transcript of an earnings call held by Under Armour, Inc. on July 26, 2016 | 50 |

| | | |
|---|---|---|
| 8/3/16 10-Q | Under Armour, Inc. Quarterly Report for the three months ending June 30, 2016, filed with the SEC on Form 10-Q on August 3, 2016 | 45 |
| 10/25/16 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on October 25, 2016 | 34 |
| 10/25/16 Call Tr. | Transcript of an earnings call held by Under Armour, Inc. on October 25, 2016 | 51 |
| 11/2/16 10-Q | Under Armour, Inc. Quarterly Report for the three months ending September 30, 2016, filed with the SEC on Form 10-Q on November 2, 2016 | 46 |
| 1/31/17 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on January 31, 2017 | 35 |
| 1/31/17 Call Tr. | Transcript of an earnings call held by Under Armour, Inc. on January 31, 2017 | 52 |
| 2/23/17 10-K | Under Armour, Inc. Annual Report for the fiscal year ending December 31, 2016, filed with the SEC on February 23, 2017 | 42 |
| 4/27/17 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on April 27, 2017 | 36 |
| 5/9/17 10-Q | Under Armour, Inc. Quarterly Report for the three months ending March 31, 2017, filed with the SEC on Form 10-Q May 9, 2017 | 47 |
| 8/1/17 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on August 1, 2017 | 37 |
| 10/22/19 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on October 22, 2019 | 38 |
| 7/27/20 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on July 27, 2020 | 39 |
| 5/3/21 8-K | Under Armour, Inc. Current Report, filed with the SEC on Form 8-K on May 3, 2021 | 40 |

Defendants Under Armour, Inc. ("UA," "Under Armour," or the "Company") and Kevin A. Plank (together, "Defendants") respectfully submit this joint memorandum of law in support of their Motion for Summary Judgment.[1]

## PRELIMINARY STATEMENT

In its decision denying Defendants' motion to dismiss the Third Amended Complaint ("TAC"), the Court allowed this case to proceed to discovery on Plaintiffs' theory that a lack of public disclosure about UA's pull-forward sales supposedly left investors with a "misleading impression of how [UA] was meeting or beating analysts' revenue estimates," and that UA's reported financial results "did not reflect its natural revenue and revenue growth, and were not indicative of its future financial results." *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521-22 (D. Md. 2021) ("*UA II*"). Following extensive discovery in this action—including the production and review of nearly 3 million pages of documents, depositions of 54 witnesses, dozens of interrogatories and requests for admission, and voluminous discovery from UA's customers and other non-parties—the undisputed facts demonstrate that Plaintiffs' theory is unsupportable, and their securities fraud claims fail as a matter of law.

During the period from Q3 2015 to Q1 2017 (the "Relevant Period"), the term "pull forward" was generally used at UA to reference a customer sale executed earlier than originally planned. The pull forwards challenged in this case were bona fide sales to advance UA's legitimate business, financial, and strategic goals.

UA's wholesale business was complex and dynamic—neither customer demand nor

---

[1] References to "ECF No. __" are to documents on the electronic docket of this action. References to "Groner Decl. Ex. __" are to the exhibits to the Declaration of Samuel P. Groner, dated October 2, 2023, filed herewith. References to "SUF ¶ __" are to paragraphs of Defendants' Statement of Material Undisputed Facts. Unless otherwise noted, all emphases are added, and internal citations and quotation marks are omitted. Fiscal quarters are represented in a "Q# YYYY" format such that the third quarter of 2015 is represented as "Q3 2015."

UA's sales calendar was ever fixed.  The wholesale sales at issue here were arm's-length transactions with independent retail businesses that made purchasing and order timing decisions based on their own needs and the needs of their customers.  The Company planned its wholesale sales several months in advance of when it actually shipped products to customers. Accordingly—and like many apparel and sporting goods businesses that rely on style trends and seasonal merchandise, and that operate on an international supply chain—UA's business planning required continuous assessment of multiple overlapping manufacturing, logistical, and demand considerations.  Timing shifts and other changes to customer orders (including pull forwards) were a regular part of this dynamic process.  Customers could cancel orders or decline shipments.  And changes to the timing of customer orders—including both shipments that occurred in periods earlier than originally anticipated and shipments that occurred in periods later than originally anticipated—occurred frequently.

It is undisputed that UA's pull-forward sales were real sales, of real products, to real customers, that generated real revenues that were properly recorded by UA in the appropriate financial reporting period.  Indeed, there is no evidence whatsoever that UA improperly recorded revenues from pull forward sales in violation of U.S. Generally Accepted Accounting Principles ("GAAP").  Against this backdrop, the law recognizes that pull-forward sales are "not the nefariously manipulative scheme that [P]laintiffs make them out to be."  *In re Cytyc Corp. Sec. Litig.*, 2005 WL 3801468, at *17 (D. Mass. Mar. 1, 2005).

Nevertheless, Plaintiffs contend that because UA did not provide express disclosure about pull forwards, investors received a misleading impression of UA's growth and financial performance.  For the reasons explained below, there is no material issue of fact to be tried.

*First*, under established law, pull-forward sales are not required to be treated differently

from any other sales for disclosure purposes. *See, e.g.*, *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 189, 202-03 (1st Cir. 1999) (granting summary judgment to defendants related to alleged scheme to accelerate quarter-end sales because "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course").

*Second*, Defendants' affirmative statements during the Relevant Period did not create a duty to disclose pull-forward sales.  The accurate reporting of UA's robust historical financial results and Defendants' optimistic statements regarding UA's growth and "strong" consumer demand were not affirmatively misleading, nor were they made misleading by not reporting specifically on pull forwards. *See Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1, 8-11 (D. Mass. 2011) (granting summary judgment to defendants on claims that statements regarding historical financial results and growth were misleading due to the alleged failure to disclose pull-in sales), *aff'd*, 669 F.3d 68 (1st Cir. 2012).

*Third*, Plaintiffs cannot properly rely on their allegations under Item 303 of SEC Regulation S-K ("Item 303").  Plaintiffs claim that disclosure of pull-forward sales was necessary under Item 303 because pull forwards constituted a material negative trend that Defendants knew would have a material negative effect on future business.  However, Item 303 has a different standard for disclosure than Rule 10b-5.  Accordingly, Item 303 cannot provide a basis for liability under Section 10(b) Rule 10b-5 as a matter of law. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).  In any event, the record does not establish that pull forwards—or their supposed impact on future demand—constituted a material negative trend (much less one that Defendants were aware of) such that disclosure would have been required under Item 303.

*Fourth,* even if Plaintiffs could prove falsity (which they cannot), the undisputed record

does not support a determination of scienter—a mental state embracing the intent to defraud. There is nothing inherently improper or suspicious about making sales earlier than originally anticipated, including for the purpose of meeting a financial objective. And the record does not support an inference that Defendants engaged in pull-forward sales to hide weakening demand or growth, as alleged by Plaintiffs. Although UA executives discussed challenges facing the retail industry in 2016 (which were timely disclosed to investors), there is no evidence that Defendants believed consumer demand was weakening or that growth was decelerating prior to Q4 2016. Moreover, the record evidence demonstrates that the decline in demand in Q4 2016 was caused not by pull forwards, but by a confluence of unanticipated external factors that emerged during that quarter, including aggressive discounting by competitors, unseasonably warm weather, and the acceleration of a trend toward lifestyle-driven products. Indeed, the Company's resulting underperformance in Q4 2016 surprised UA's senior management.

There also is no genuine issue of material fact as to whether Defendants omitted to disclose pull-forward sales with scienter because, after extensive discovery, there is no evidence that any financial or accounting professional at UA ever informed UA senior management that pull-forward sales required any additional disclosure. Nor did UA's Disclosure or Audit Committees recommend such disclosure. Because UA's senior management believed (correctly) that UA had appropriate disclosure controls in place, and since it is undisputed that UA's Disclosure Committee and Audit Committee acted in accordance with their established procedures, the fact that no one identified UA's use of pull forwards as a disclosure issue demonstrates that Plaintiffs cannot satisfy the scienter requirement as a matter of law. Indeed, although Plaintiffs deposed numerous current and former UA executives, none of those witnesses (including the current CFO and two former CFOs) testified that they believed UA's

4

financial reporting was inaccurate or insufficient in any manner.

*Finally*, Plaintiffs cannot prevail on their remaining theory of accounting fraud. Plaintiffs' allegations relate to three isolated and unrelated instances in which UA supposedly failed to follow GAAP.  In two of these instances—relating to UA's returns reserve estimates in Q4 2016 and the timing of UA's Q2 2017 disclosure of future inventory write-downs—Plaintiffs do nothing more than second-guess reasonable accounting judgments by UA management. These are differences of opinion, not evidence of fraud.  *See Stavroff v. Meyo*, 1997 WL 720475, at *6 (6th Cir. Nov. 12, 1997).  In the third, Plaintiffs challenge UA's recognition of revenue from a single transaction that comprised 0.3% of 2016 revenues and was immaterial as a matter of law.  *See In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *10 (N.D. Ill. June 29, 2001).

Plaintiffs have now had ample opportunity to test their theories about pull forwards and declining demand.  *See UA II*, 540 F. Supp. 3d at 518.  Because Plaintiffs cannot meet their "ultimate burden of demonstrating a genuine issue of material fact for trial," summary judgment dismissing their claims should be granted.  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

## DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.    Defendants

1.    UA is "a leading developer, marketer and distributor of branded performance apparel, footwear and accessories."  2/23/17 10-K at 27.

2.    Kevin A. Plank is UA's founder and currently serves as its Executive Chairman and Brand Chief.  Mr. Plank served as UA's Chief Executive Officer from 1996 through December 31, 2019, and has served as its Chairman of the Board since UA went public in 2005. 10/22/2019 8-K, Ex. 99.1 at 1.

### B.     Under Armour's Financial Performance During the Relevant Period

3.      During the Relevant Period, UA identified its international and direct-to-consumer ("DTC") sales channels as "key areas" for which it had implemented "strategic growth initiatives."  2/22/16 10-K at 9; 2/23/17 10-K at 9.  Leading up to and during the Relevant Period, UA experienced seasonal and quarterly variations in financial performance, reflected primarily by increased sales of UA's higher priced cold weather products during the fall and winter months.  2/22/16 10-K at 14.  Accordingly, UA traditionally generated the majority of its annual net revenues during the last two quarters of each year.  *Id.*

4.      On October 22, 2015, UA announced its financial results for Q3 2015.  10/22/15 8-K.  Net revenues were $1.2 billion, reflecting year-over-year ("YoY") growth of 28%.  *Id.*, Ex. 99.1 at 1.  UA also raised its 2015 net revenue guidance by $70 million.  *Id.* at 1-2.  In Q3 2015, international and DTC net revenues grew 52% and 28% YoY, respectively.  *Id.* at 1.

5.      On January 28, 2016, UA announced its Q4 2015 and fiscal year ("FY") 2015 financial results.  1/28/16 8-K.  Q4 2015 net revenues were $1.17 billion, reflecting 31% YoY growth, and FY 2015 net revenues were $3.963 billion, reflecting 28% YoY growth.  *Id.*, Ex. 99.1 at 1, 5.  International and DTC revenues grew 70% and 25% YoY, respectively.  *Id.*

6.      On January 28, 2016, UA held a conference call with investors, in which UA disclosed 2016 net revenue guidance of $4.95 billion, representing 25% YoY growth.  1/28/16 Call Tr. at 7.  UA also stated the following with respect to its 2016 net revenue guidance:

> we currently anticipate the growth rate for the first half of the year to be above our expected full year growth rate. Specifically, looking at the first quarter, we expect the growth rate to be in the high 20%s led by many of the same factors from our fourth quarter, including strength in Footwear and International, higher planned inventory liquidations, and strategies to better service our customers year-over-year.

*Id.* at 8.

7.      On April 21, 2016, UA announced its financial results for Q1 2016.  4/21/16 8-K.

Q1 2016 net revenues were $1.05 billion, reflecting YoY growth of 30%.  *Id.*, Ex. 99.1 at 1.

International and DTC net revenues grew 56% and 33% YoY, respectively.  *Id.*  That day, UA

raised its publicly issued guidance for FY 2016 net revenues to approximately $5.0 billion.  *Id.*

8.      On May 31, 2016, UA disclosed a reduction of its FY 2016 net revenue guidance

to $4.925 billion "following recent developments related to the bankruptcy proceedings of" The

Sports Authority ("TSA"), one of its customers.  5/31/16 8-K, Ex. 99.1 at 1.

9.      On July 26, 2016, UA announced its financial results for Q2 2016.  7/26/16 8-K.

The Company achieved net revenues of $1.0 billion, reflecting YoY growth of 28%.  *Id.*, Ex.

99.1 at 1.  International and DTC net revenues grew 68% and 28% YoY, respectively.  *Id.*

10.     During the back-to-school shopping season in Q3 2016, UA's performance was

ahead of internal projections, as the Company experienced positive sell-through trends at

retailers and in its DTC channel in Q3 2016.  Ex. 71 at -179.

11.     On October 25, 2016, UA announced its financial results for Q3 2016.  10/25/16

8-K.  Q3 2016 net revenues were $1.47 billion, reflecting YoY growth of 22% over 3Q15.  *Id.*,

Ex. 99.1 at 1.  International and DTC net revenues grew 74% and 29% YoY, respectively.  *Id.*

12.     The positive sales trends that UA experienced during the back-to-school season in

Q3 2016 did not continue in Q4 2016.  Ex. 71 at -179.

13.     The weather during Q4 2016 was unseasonably warm, with average temperatures

at near record highs for that period.[2]  The warm Q4 2016 weather had the effect of depressing

sales of UA's fleece and other high-margin cold weather products that had traditionally driven

---

[2] *See NASA, NOAA Data Show 2016 Warmest Year on Record Globally*, NASA (Jan. 18, 2017),
https://www.nasa.gov/press-release/nasa-noaa-data-show-2016-warmest-year-on-record-globally.

strong sales results for UA in the fourth quarter in prior years.  Ex. 71 at -181-82.

14.    During Q4 2016, UA's competitors, including Nike and Adidas, engaged in more extensive promotional activity than UA had expected heading into the period, specifically targeting UA's fleece products, with discounts of up to 50% throughout the holiday shopping season.  *Id.* at -191-92.  On the Black Friday shopping day in November 2016, for example, Nike and Adidas fleece products were offered at 40% off and 50% off, respectively, but Under Armour fleece was only 25% off and only on select styles.  *Id.* at -192.

15.    UA's Black Friday sales performance was negatively impacted by competitors' promotions and did not meet internal expectations.  *Id.*  Jeff Otis, UA's Director of North America Strategy during the Relevant Period, testified: "I remember looking at this in [Q4 2016], especially during, I think, Black Friday, which is a very important time period, I think the traffic estimates did not meet our expectations."  Ex. 14 at 50:2-50:5.

16.    During Q4 2016, consumer preferences shifted more dramatically than expected away from the performance apparel that had historically formed the core of UA's business toward more lifestyle-driven product offerings.  Ex. 71 at -204.

17.    Ultimately, UA did not achieve revenue guidance for Q4 2016 or FY 2016.  Q4 2016 net revenues were $1.3 billion, reflecting YoY growth of 12%, and FY 2016 net revenues were $4.828 billion, reflecting YoY growth of 22%.  1/31/17 8-K, Ex. 99.1 at 1, 5.

**C.    Under Armour Reaction to Q4 2016 Financial Results**

18.    At his deposition, Mr. Plank was asked if, around September 1, 2016, he had "discussions of boosting Q4 2016 in a way that might be harmful to Q1 '17."  Ex. 16 at 344:15-18.  Mr. Plank responded:

> No.  I think we were talking about, we had a great back to school.  I mean, the time frame you're talking in September was there was no concern at this point.  This was before we even had our Q3 earnings call.  This was -- we

had a really healthy back to school, business was doing just fine, and things
just changed quite dramatically once we got into, you know, the beginning
-- beginning, middle of November time frame.

*Id.* at 344:21-345:7.

19.     Mr. Otis testified that, in Q4 2016, UA had to reduce its internal revenue forecast
"in each subsequent month during the quarter, which was, I think, a surprise to most of us that
were in the business."  Ex. 14 at 26:10-14.

20.     On December 29, 2016, UA's Chief Revenue Officer, Charlie Maurath, wrote in
an internal email that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████"  Ex. 63 at -647-648.

**D.      Under Armour's August 2017 Disclosure**

21.     On August 1, 2017, UA disclosed that it expected to incur "$20 million of
inventory related charges" in connection with a restructuring plan that had been approved by the
Company's Board of Directors (the "Board").  8/1/17 8-K.

**E.      Under Armour's Internal Forecasts**

22.     During the Relevant Period, UA's internal financial reporting process included
developing an annual financial plan for an upcoming fiscal year several months before the
beginning of that fiscal year (the "F0"), updating that plan at or just before the fiscal year began
(the "F1"), and then updating the plan again after each quarter (the "F2," "F3," and "F4").  These
financial plans were internally referred to as the "F-Series."  *See* Ex. 62 at -662; Ex. 1 at 56:2-9,
57:6-22; Ex. 3 at 34:25-35:11.  During the Relevant Period, UA prepared a monthly update of
the forecast known as the latest estimate, or the "LE."  *See* Ex. 62 at -662.

23.     During the Relevant Period, the F-Series projections incorporated sales that had
been pulled forward.  *See, e.g.*, Ex. 66.

24.     On July 15, 2016, the F3 projection forecasted net revenues of ███████████ ███████████████ *See* Ex. 56 at -012.

25.     On October 3, 2016, the preliminary F4 projection forecasted net revenues of ███████████████████████ *See* Ex. 58 at -100.

26.     On October 19, 2016, UA's Corporate Controller, Andrew Page, sent an internal email attaching ████████████████████████████ ████████████ *See* Ex. 59.  ███████████████████████████ ███████████████████████████ *See id.* at -430.  UA ultimately did not raise its 2016 net revenue guidance.  *See* 10/25/16 8-K, Ex. 99.1 at 1.

27.     By the end of October 2016, the internal projections forecasted YoY net revenue growth of ████████████████████ Ex. 60 at -951.

28.     On November 11, 2016, Mr. Maurath sent an internal email stating that ██████ ██████████████████ Ex. 61 at -465.  Attached to his email was a November 11, 2016 presentation ████████████████ *Id.* at -468.

**F.     Under Armour's Wholesale Sales Cadence**

29.     UA operates through an international supply chain, and virtually all of its products are manufactured by unaffiliated manufacturers operating outside of the United States. 2/23/17 10-K at 1.  UA products had long "lead times" from the beginning of the manufacturing process through to delivery to the customer.  *Id.* at 10.

30.     Jason LaRose, who served as President of North America beginning in October 2016, testified that, in UA's wholesale sales channel,





Ex. 11 at 96:9-14, 99:2-14.

31.     UA's merchandise was seasonal, with some products specifically developed and marketed for the spring/summer retail selling season and other products specifically developed and marketed for the fall/winter retail selling season.  Additionally, UA introduced new products each season.  James Hardy, who served as UA's Executive Vice President of Global Operations during the Relevant Period, testified that UA "g[o]t to reinvent [its] line every six months" and that UA "had the spring line and fall line, and so those are constantly in churn and being changed to really keep up with trends in the marketplace."  Ex. 9 at 33:24-34:4.

32.     During the Relevant Period, UA's "success depend[ed] on [its] ability to identify and originate product trends as well as to anticipate and react to changing consumer demands in a timely manner."  2/23/17 10-K at 10.

33.     At UA, the term "pull forward" was generally used to reference a customer sale that is executed earlier than originally planned.  7/27/2020 8-K.  UA executed pull-forward sales during the Relevant Period.  5/3/2021 8-K, Ex. 99.1.

34.     Brad Dickerson, UA's Chief Financial Officer ("CFO") from 2008 through January 2016, testified that "[p]ull-forwards were a commonplace industry mechanism that were done on a regular basis."  Ex. 8 at 61:3-4.

35.     Brian Cummings, a UA sales executive during the Relevant Period, testified: "▮

██████████████████████████████████████████████████



" Ex. 7 at 25:6-11.  He also testified that "

" (*id.* 106:15-19) and "

" (*id.* 81:15-17).

36.     Matthew Mirchin, UA's President of North America during a portion of the Relevant Period, testified:



Ex. 13 at 54:4-23.

37.     David Bergman, UA's Senior Vice President ("VP") of Corporate Finance during the Relevant Period and currently UA's CFO, testified, for pull forwards and timing changes, UA "wanted to make sure that we were in accordance with revenue recognition principles."  Ex. 2 at 223:18-21.  Mr. Bergman also testified:



*Id.* at 56:16-57:3.

38.     Mr. Page testified that if a pull forward "was earned in the third quarter, it was earned in the third quarter.  It had met the revenue-recognition criteria."  Ex. 15 at 51:4-6.

39.     Joshua Burke, VP of Financial Planning & Analysis during the Relevant Period,
testified that UA's pull forwards were "legitimate transactions."  Ex. 3 at 201:11-12.

40.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████   Ex. 12 at 117:22-118:8.

41.     In June 2016, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████   Ex. 68 at -695-96.

████████████████████████████████████████████████████████

████████████████████████   *Id.* at -692.

42.     Based on a deceleration in consumer demand that emerged during Q4 2016, ██

████████████████████████████████████████████████████████

██████████████████████████████████   Ex. 16 at 196:7-197-6.

43.     Reports containing sales data extracted from UA's System Applications and
Products ("SAP") system include "Requested Delivery Date" and "Actual GI Date" columns.
The data in the "Actual GI Date" column are the dates in which a North American wholesale
customer accepted shipment of products from UA.  In Q3 2015, ███████████ in sales had an
"Actual GI Date" that occurred in an earlier fiscal quarter than the fiscal quarter of the
"Requested Delivery Date" (for purposes of this paragraph, a "pull forward").  In Q3 2015, ██████
███████ in sales had an "Actual GI Date" that occurred in a later fiscal quarter than the fiscal
quarter of the "Requested Delivery Date" (for purposes of this paragraph, a "push out").  In Q4
2015, the SAP data reflects ██████████ in pull forwards and ███████████ in push outs.  In Q1



2016, the SAP data reflects ███████ in pull forwards and ███████ in push outs.  In Q2

2016, the SAP data reflects ███████ in pull forwards and ███████ in push outs.  In Q3

2016, the SAP data reflects ███████ in pull forwards and ███████ in push outs.  In Q4

2016, the SAP data reflects ███████ in pull forwards and ███████ in push outs.  Ex. 26

at ¶¶ 66-68 & tbl. 6.

44.    No witness testified that the pull forwards UA used during the Relevant Period

violated GAAP.  No witness testified that the pull forwards UA used during the Relevant Period

did not involve real sales of real products to real customers.

45.    No financial or accounting professional informed senior management that UA's

financial reporting was improper or that pull forwards must be disclosed.  There is no evidence

that any UA senior executive (including the current CFO and the former CFOs who provided

deposition testimony) believed that UA's financial disclosures were inaccurate or insufficient

during the Relevant Period.

**G.    Under Armour's Accounting**

46.    PricewaterhouseCoopers LLP ("PwC") served as the Company's outside,

independent auditor during the Relevant Period and through to the present.

47.    PwC issued the following opinion with respect to UA's 2015 financial statements:

> In our opinion, the accompanying consolidated financial statements listed
> in the index appearing under Item 15(a)(1) present fairly, in all material
> respects, the financial position of [UA] at December 31, 2015 and 2014, and
> the results of their operations and their cash flows for each of the three years
> in the period ended December 31, 2015 in conformity with accounting
> principles generally accepted in the United States of America.

2/22/16 10-K at 43.

48.    PwC issued the following opinion with respect to UA's 2016 financial statements:

> In our opinion, the accompanying consolidated financial statements listed
> in the index appearing under Item 15(a)(1) present fairly, in all material

respects, the financial position of [UA] at December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America.

2/23/17 10-K at 47.

49.     UA established reserves for estimated returns throughout the Relevant Period, including in its Q4 2016 financial statements.  2/23/17 10-K at 41; Ex. 67 at -495.

50.     PwC stated as follows in its annual report to UA's Board of Directors in connection with its audit for the 2016 fiscal year:



Ex. 67 at -493.

**H.     Under Armour's Risk Disclosures**

51.     In its public filings with the U.S. Securities and Exchange Commission ("SEC") during the Relevant Period, UA disclosed risk factors that could adversely impact the Company's results of operations and financial condition.  *See* 11/4/15 10-Q at 14; 2/22/16 10-K at 8-18; 4/29/16 10-Q at 13; 8/3/16 10-Q at 13; 11/2/16 10-Q at 14; 2/23/17 10-K at 8-18; 5/9/17 10-Q at 14-15.  Among other business risks, UA cautioned:

> [1] All of our products are subject to changing consumer preferences that cannot be predicted with certainty . . . [2] [increased] competition by existing and future competitors could result in reductions in floor space in retail locations, reductions in sales or reductions in the prices of our products, and if retailers earn greater margins from our competitors'

> products, they may favor the display and sale of those products [3] [o]ur
> inability to compete successfully against our competitors and maintain our
> gross margin could have a material adverse effect. . . [and 4] [i]f the
> financial condition of our retail customers declines, our financial condition
> and results of operations could be adversely impacted.

2/22/16 10-K at 9-12; 2/23/17 10-K at 9-12.  UA also cautioned that: "[v]ariations in weather

conditions may also have an adverse effect on [its] quarterly results of operations" and that

"warmer than normal weather conditions throughout the fall or winter may reduce sales[.]"

2/22/16 10-K at 14.

> 52.    During UA's Q1 2016 earnings call, Defendants alerted investors to the

"changing dynamics among [its] domestic wholesale partner base," noting that the market "saw

[TSA] and just recently Sport Chalet" declare bankruptcy.  4/21/16 Call Tr. at 5, 7.

> 53.    During UA's Q2 2016 earnings call, Defendants stated that UA was continuing to

"navigate through the changing dynamics of the retail landscape."  7/26/16 Call Tr. at 5.

> 54.    During UA's Q3 2016 earnings call, Defendants disclosed that "[t]here's no doubt

that the landscape globally, and certainly in [UA's] North American backyard, is shifting" and

that "North America apparel growth is slowing across the industry."  10/25/16 Call Tr. at 3, 8.

> 55.    During UA's Q4 2016 earnings call, Defendants stated that the combination of

customer bankruptcies, changing consumer preferences, difficulty selling cold-weather products

at full prices (as UA had been able to do in prior years), and aggressive discounting by

competitors had greater than anticipated negative effects on UA's ability to grow the business at

projected levels and would continue to affect UA in 2017.  1/31/17 Call Tr. at 2, 8.

**I.    Under Armour's Disclosure Committee**

> 56.    During the Relevant Period, UA had a Disclosure Committee that included the

Company's CFO, Senior Vice President of Corporate Finance, Corporate Controller, Director of

Investor Relations, and General Counsel, among other financial, accounting and legal

professionals.  *See* Ex. 55; *see also* Ex. 62 at -671.

57.     At the end of each quarter, the Disclosure Committee distributed a "Sub

certification" questionnaire to employees at the VP level or higher, which were "designed to

elicit information that may require disclosure, including significant changes and developments in

business processes," such as "new and changed contractual obligations," "new or changed sales

arrangements," and "other risks/exposures."  *See* Exs. 55, 62 at -671.  After the responses were

received, the Sub Certifications were consolidated into a single document (the "Quarterly

Checklist") for the Disclosure Committee's review.  *See, e.g.*, Ex. 53.

58.     Following the end of each quarter, the Disclosure Committee held two meetings.

*See* Ex. 55.   During the first meeting, the committee reviewed the Sub certifications and

"discussed changes in the business, significant transactions or other items that may cause

changes to disclosures."  *Id.*   During the second meeting, the committee "walk[ed] through the

10-Q and 10-K" prior to the upcoming filing.  *Id.*   After the meetings, members of the Disclosure

Committee completed their own Sub Certifications.  *See, e.g.*, Exs. 65 & 57.

**J.     Under Armour's Audit Committee**

59.     The Audit Committee of UA's Board was responsible for:

> overseeing (a) the quality and integrity of the Company's financial
> statements, the accounting and financial reporting process, and the
> Company's system of internal accounting and financial controls, (b) those
> involved in the preparation and review of the financial statements, (c) the
> performance of the Company's internal audit function and the independent
> auditor and (d) the compliance by the Company with legal and regulatory
> requirements, including the Company's disclosure controls and procedures.

Ex. 54 at -987.

60.     The Audit Committee met twice following the end of each quarter.  *E.g.*, Exs. 72,

73, 64 at -380-81.  Meetings were typically attended by the CFO and other members of UA

senior management, as well as representatives of PwC.  *See* Exs. 72 & 73.

61.     During the first meeting, the Audit Committee reviewed UA's results for the quarter and discussed and commented on UA's draft earnings release (including, in certain instances, updates to UA's publicly issued earnings guidance).  *E.g.*, Exs. 72 & 64 at -386.

62.     During the second meeting, the Audit Committee reviewed, *inter alia*, UA's annual or quarterly financial statements and "analyses prepared by management and/or the independent auditor setting forth the significant financial reporting issues and judgments made in connection with the preparation of the financial statements."  *E.g.*, Exs. 64 at -381; Ex. 73.

**K.     Common Stock Trading**

63.     UA has three classes of common stock: Class A, Class B, and Class C.  2/23/17 10-K at 23.  Shares of Class C stock were first distributed on April 7, 2016 through a one-for-one dividend to all holders of Class A and Class B stock (the "Class C Dividend").  *Id.*

64.     Mr. Plank sold shares of UA common stock on no more than nine days during the Class Period[3]: (a) sales of Class A stock on November 17, 18, 19, 20 and 23, 2015, and (b) sales of Class C stock on April 26, 27, 28, and 29, 2016.  TAC ¶¶ 430, 433.

65.     Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") did not purchase any shares of Class A common stock from November 17-23, 2015, and did not purchase any shares of Class C common stock from April 26-29, 2016.  Aberdeen acquired shares of Class C common stock on April 8, 2016 as part of the Class C Dividend.  *See* TAC Ex. D at 5.

**ARGUMENT**

Summary judgment is appropriate where "there is no genuine issue as to any material fact[,] and [] the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v.*

---

[3] The Class Period is September 16, 2015 to November 1, 2019, inclusive.

*Catretty*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a).  "Conclusory or speculative allegations do not suffice" to defeat summary judgment, "nor does a mere scintilla of evidence in support of [the nonmoving party's] case."  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).  "A district court should grant summary judgment unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented."  *Schmidt v. Bartech Grp., Inc.*, 620 F. App'x 153, 154 (4th Cir. 2015).  Importantly, "[i]n assessing a summary judgment motion, a court may consider only evidence that would be admissible at trial."  *Brown v. Prince George's Hosp.*, 2011 WL 2413344, at *4 (D. Md. June 9, 2011) (Titus, J.), *aff'd*, 458 F. App'x 260 (4th Cir. 2011); *see also Mallory v. Town of Elkton*, 2012 WL 6136437, at *5 (D. Md. Dec. 10, 2012) (Blake, J.) ("Because [plaintiff] cannot show that any evidence he might use to create a material dispute of fact at summary judgment will be admissible at trial, the court must grant [defendant]'s motion for summary judgment.").

Count One of the TAC asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 thereunder.  To prove a violation of Section 10(b) and Rule 10b-5, Plaintiffs bear the burden of proving all of the following six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Summary judgment is appropriate here because Plaintiffs cannot show a genuine issue of material fact as to the first and second elements.

## I.   THE UNDISPUTED FACTS SHOW THAT DEFENDANTS DID NOT MAKE A MATERIAL MISREPRESENTATION OR OMISSION

To be actionable under the Exchange Act, an alleged misstatement or omission must be "factual . . . that is, one that is demonstrable as being true or false."  *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (emphasis in original).  The challenged statement or omission

must also be "<u>material</u>," meaning there is "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* at 682-83 (emphasis in original).  Finally, the plaintiff must prove that the defendant either said something that is "<u>false</u> or left something out that renders <u>misleading</u> the public statements the defendant made." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022) (emphases in original).

With respect to an alleged omission, the plaintiff must establish that disclosure of the omitted fact is "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.*  "[S]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 243 (4th Cir. 1988).  In other words, "an omission is actionable only if—absent the fact omitted—a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision." *Marriott*, 31 F.4th at 902.

### A. Plaintiffs Have Not Established any GAAP Violations or Financial Statement Errors Based on Pull Forwards

Plaintiffs claim that UA's pull-forward sales "violated GAAP."  TAC ¶ 61; *see also* TAC ¶¶ 80, 324.  After extensive discovery, there is no evidence to support this claim.

The undisputed evidence demonstrates that UA's pull forwards involved real sales of real products to real customers who agreed to accept the products and made real payments.  Multiple witnesses confirmed that UA ensured that the pull forwards were legitimate sales that complied with GAAP.  *See, e.g.*, SUF ¶¶ 37-39.  No witness testified otherwise.

There is no genuine issue of material fact that could establish any GAAP violation or financial statement error based on the challenged pull forwards.  Indeed, Plaintiffs' own

accounting expert, D. Paul Regan, stated unequivocally in his reports that he "did not assert . . . that the pull forwards in question did not involve real products or were improperly recorded under GAAP." Ex. 28 ¶ 20. During his deposition, Regan confirmed multiple times that he has not opined that UA's pull forwards violated GAAP:

> Q: Mr. Regan, you are not asserting an opinion in this case that the pull-forwards in question were improperly recorded under GAAP, correct?
>
> A. That's correct.
>
> Q. And you're not asserting an opinion that the alleged pull-forward sales violated GAAP revenue recognition principles, correct?
>
> A. That's correct.
>
> Q. And you have not offered an opinion that revenue from the alleged pull-forward sales was not recorded in the appropriate reporting period, correct?
>
> A. Correct.
>
> Q. And you are not asserting an opinion that the pull-forwards at issue did not involve real sales of real products for which real payment was received by [UA], correct?
>
> A. I'm not asserting that, no.

Ex. 17 at 10:6-11:3. Regan similarly acknowledged that he has not opined that UA was required to issue a restatement of any of its financial statements. *Id.* at 12:2-13:6.

Ultimately, UA's pull forwards were "actual sales which are treated no differently than any other sale, *i.e.*, revenue [was] recognized upon shipment to the customer." *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1381 (N.D. Cal. 1995); *see also Smith & Wesson*, 836 F. Supp. 2d at 10. Plaintiffs have not shown any GAAP violations or financial statement errors in connection with UA's pull forwards. *See Cytyc*, 2005 WL 3801468, at *17 (pull forwards "do not result in the improper recognition of revenue under [GAAP]").

### B.   Defendants Did Not Omit Material Information or Make Material Misstatements Regarding Pull Forwards

Plaintiffs' disclosure-based theory, based on UA's alleged omission of the challenged pull forwards, fares no better than Plaintiffs' GAAP-based theory. Under established law, there

is no affirmative legal obligation to disclose pull forwards.  Nor was UA under a duty or otherwise required to disclose pull forwards by virtue of its affirmative statements.

## 1.    There Is No Legal Requirement to Disclose Pull-Forward Sales

Where, as here, a company accurately reports revenues in accordance with GAAP, there is no legal requirement to disclose that a portion of revenue was generated from pull-forward sales.  *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 582 (E.D. Va. 2006) (no duty to disaggregate revenues beyond what is required by GAAP); *see also Cypress*, 891 F. Supp. 2d at 1380-81 (rejecting allegation that failure to disclose impact of "pull-in" sales rendered public filings misleading).  Nor is there any SEC rule requiring companies to separately disclose revenue from sales that occurred earlier than the originally anticipated shipment date.  *See In re AXIS Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (no affirmative disclosure duty to break out particular types of revenue).[4]

For example, in *City of Omaha Police & Fire Retirement System v. Timberland Co.*, the court dismissed claims that Timberland allegedly inflated revenue in violation of the securities laws by failing to disclose pull-forward sales because the sales in question were "real sales to real customers."  2013 WL 1314426, at *9-11, *16-18 (D.N.H. Mar. 28, 2013).  Similarly, in *Smith & Wesson*, the court granted defendants' motion for summary judgment and dismissed Section 10(b) claims arising from an alleged failure to disclose pull-in sales that allegedly masked declining demand, explaining that pull forwards "are treated no differently than any

---

[4] Notably, SEC regulations and GAAP rules do dictate how other, specific subcategories of revenues must be disclosed in income statements or MD&A.  *See, e.g.*, 17 C.F.R. § 229.101(d) (requiring issuers to disclose certain geographic revenue information); 17 C.F.R. § 229.303(a)(3)(iii) and (iv) (requiring MD&A disclosure of material net sales increases attributable to prices, volumes, new products/services, and the impact of inflation/changing prices on net sales); 17 C.F.R. § 210.05-03(b) (requiring income statement presentation of sales of tangible products, public utilities revenues, rental revenues, and services revenues that comprise 10% or more of total revenues).

other sale."  836 F. Supp. 2d at 8-11; *see also Greebel*, 194 F.3d at 189, 202-03 (rejecting securities fraud claims based on allegations that defendants accelerated quarter-end sales by offering customers significant discounts); *Cytyc*, 2005 WL 3801468, at *17-19 (rejecting claims alleging improper "pull in" scheme to meet unrealistic revenue targets, and noting that pull-in sales are no different from other sales in the absence of GAAP violations).

Here, as in those cases, UA had no affirmative duty to disclose its pull-forward sales— which represented real sales to real customers and did not violate GAAP.

## 2.    Item 303 Does Not Create a Duty to Disclose Pull Forwards

Item 303 of Regulation S-K is an SEC disclosure rule.  During the Relevant Period, Item 303 required companies to provide Management Discussion and Analysis of a registrant's "financial condition, changes in financial condition and results of operations."  17 C.F.R. § 229.303(a) (2017 version).  Item 303 focused "specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of <u>future</u> operating results or of future financial condition."  *Id.*, Instructions to ¶ 303(a)(3).  Item 303's "requirements are intentionally flexible and general," and focus on material business trends as seen "through the eyes of management."  Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 34-26831, 54 Fed. Reg 22427-01, at 22436 (May 18, 1989).

Here, Plaintiffs claim that (a) UA was required under Item 303 to disclose its use of pull forwards in the MD&A sections of its Forms 10-K and 10-Q between Q3 2015 and Q1 2017, and (b) UA's supposed failure to do so violated Section 10(b) and Rule 10b-5.  TAC ¶¶ 332, 339-42, 168(h), 191(j), 208(j), 244(l), 264(h).  Summary judgment in favor of Defendants on this claim is appropriate for two primary reasons.  *First*, a violation of Item 303 cannot provide a basis for liability under Section 10(b) or Rule 10b-5 as a matter of law.  *See, e.g.*, *NVIDIA*, 768 F.3d at

1054.  *Second*, even assuming an Item 303 violation could be a basis for securities fraud liability (which it cannot), the undisputed evidence does not support a determination that disclosure of UA's pull forwards was required under Item 303.

**a.      A Violation of Item 303 Does Not Establish
a Violation of Section 10(b) or Rule 10b-5**

"Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5." *NVIDIA*, 768 F.3d at 1054, 1056.  Accordingly, a violation of Item 303 is not actionable by private plaintiffs under Section 10(b) and Rule 10b-5.  *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1330-31 (11th Cir. 2019); *see also Oran v. Stafford*, 226 F.3d 275, 287-88 (3d Cir. 2000) (Alito, J.) (similar); *In re Sofamor Danek Grp.*, 123 F.3d 394, 403 (6th Cir. 1997) (same).

Although the Fourth Circuit has not ruled on this issue, district courts in the Circuit have declined to allow Item 303 to be used as "a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5."  *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *11 (E.D.N.C. Sept. 15, 2015); *see also In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *11 (D.S.C. Mar. 29, 2019) ("failure to comply with Item 303 does not give rise to liability under Section 10(b) or Rule 10b-5"); *In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *16 (E.D. Va. Aug. 27, 2018) (similar); *Shah v. GenVec, Inc.*, 2013 WL 5348133, at *15 n.16 (D. Md. Sept. 20, 2013) (similar).[5]

Item 303 does not create a duty to disclose under Rule 10b-5 because the Item 303

---

[5] Several district courts in districts where a Circuit Court has not addressed the issue have also determined that a violation of Item 303 does not create a duty to disclose under Rule 10b-5.  *See, e.g.*, *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016); *Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467, at *9 (D. Colo. Mar. 29, 2019); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001); *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 67 (D. Mass. 1998).

24

standard "varies considerably from the general test for securities fraud materiality set out by the Supreme Court in *Basic Inc. v. Levinson*." *Oran*, 226 F.3d at 288; *see also NVIDIA*, 768 F.3d at 1054-55.[6]  Under Rule 10b-5, disclosure is required when there is "a <u>substantial likelihood</u> that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988); *see also Oran*, 226 F.3d at 282.  By contrast, Item 303 requires disclosure of information that is "<u>reasonably likely</u> to have a material effect."  Exchange Act Release No. 34-26831, 54 Fed. Reg 22427-01, at 22430 n.27 (explaining that the *Basic* test "is inapposite to Item 303 disclosure standards"); *see also Carvelli*, 934 F.3d at 1331; *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 568 (W.D. Pa. 2019).  As such, "[m]anagement's duty to disclose under Item 303 is much broader than what is required under the standard pronounced in *Basic*." *NVIDIA*, 768 F.3d at 1054-55; *see also Oran*, 226 F.3d at 288.

Because the disclosure requirements are "much broader" under Item 303 than under Rule 10b-5, a "demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5." *Oran*, 226 F.3d at 288.  As such, even if Plaintiffs could prove an Item 303 violation (and, as explained below, they cannot), that violation would not give rise to Rule 10b-5 liability.  *See id.*; *NVIDIA*, 768 F.3d at 1054-55; *Carvelli*, 934 F.3d at 1331-32; *Shah*, 2013 WL 5348133, at *15 n.16.

---

[6] Even the Second Circuit, which is the only Circuit to hold that Item 303 may "in appropriate cases, give rise to liability under . . . Rule 10b-5," has clarified that an Item 303 omission is "actionable only if it satisfies the materiality requirements outlined in *Basic*."  *Stratte-Mcclure v. Stanley*, 776 F.3d 94, 100, 102 (2d Cir. 2015).  The U.S. Supreme Court recently granted a Writ of Certiorari in a case challenging the Second Circuit's view that a violation of Item 303 can give rise to liability under Rule 10b-5 as inconsistent with the position of every other Circuit to have considered the issue.  *See Moab Partners, L.P.* v. *Macquarie Infrastructure, Corp.*, 2022 WL 17815767 (2d Cir. Dec. 20, 2022), *cert. granted, Macquarie Infrastructure* v. *Moab Partners, L.P.*, 2023 WL 6319659 (U.S. Sept. 29, 2023).

25

**b.      The Undisputed Facts Cannot Support a
Determination that Defendants Violated Item 303**

Plaintiffs' Item 303 claim fails for a second, independent reason:  Plaintiffs cannot prove

a violation of this rule.  The undisputed facts cannot support a determination that pull forwards

materially impaired future sales such that UA's current period results were not indicative of

future performance.  *See* 17 C.F.R. § 229.303(a)(3) (2017 version).

Plaintiffs allege that UA violated Item 303 by failing to disclose pull-forward sales in its

Forms 10-Ks and 10-Qs during the Relevant Period.  They challenge statements in UA's MD&A

disclosures regarding the Company's historical performance, including statements discussing the

factors driving UA's historical growth.  According to Plaintiffs, it was misleading to discuss the

factors driving UA's past growth without also disclosing the use of pull forwards.  They attempt

to prove their Item 303 claim through their accounting expert.  In particular, they rely on Regan's

analysis to attempt to show that "[UA]'s net revenues and revenue growth for the quarters Q3

2015 to Q1 2017 were materially impacted by the Company's use of pull forwards," and thus

disclosure of pull forwards was required under Item 303.  *See, e.g.*, Ex. 27 ¶¶ 11(a) & (b), 68-

186.  Regan's analysis—and therefore Plaintiffs' Item 303 theory—falls far short of establishing

that disclosure of pull forwards (or their impact on future demand) was required under Item 303.

As a threshold matter, under both Item 303 and Section 10(b), courts have rejected

allegations that GAAP-compliant pull-forward sales must be disclosed in order for investors to

understand a company's financial results.  *See Cytyc*, 2005 WL 3801468, at *13, *17-19, *22;

*Smith & Wesson*, 836 F. Supp. 2d at 8-11; *Cypress*, 891 F. Supp. at 1380-81.  Notably, in *Cytyc*,

the court specifically rejected claims that defendants' MD&A disclosures "mischaracterized

current financial growth" by failing to disclose that "pull-in" sales were allegedly a key driver of

that growth and that customer incentives had enabled current period sales at the expense of

future growth.  2005 WL 3801468, at *13, *17-19, *22.  Under these precedents, evidence that pull forwards contributed (even significantly) to UA's reported revenues does not support a determination that disclosure was required under Item 303.[7]

Plaintiffs cannot establish that disclosure of pull forwards was required under Item 303 because there is no evidence that Defendants <u>knew</u> that pull forwards were <u>reasonably likely</u> to have a <u>material negative effect</u> on UA's future business.  *See* 17 C.F.R. § 229.303(a)(1) (2017 version); *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297 (9th Cir. 1998) ("Item 303 . . . mandates not only knowledge of an adverse trend . . . and material impact . . . but also that the future material impacts are <u>reasonably likely to occur</u> from the present-day perspective.") (emphasis in original); *Arconic*, 395 F. Supp. 3d at 569 (management must have "<u>actual knowledge</u>" of alleged trends at the time of the filing).  Plaintiffs cannot make this showing.

Item 303 permits management to exercise reasonable judgment when determining whether a trend, uncertainty, or event should be disclosed in the MD&A.  *See* 17 C.F.R. § 229.303(a)(3)(ii) (2017 version).  Plaintiffs' expert acknowledged as much at his deposition. *See* Ex. 17 at 27:12-23 (testifying that "[m]anagement judgment is required" under Item 303). Thus, Item 303 is a "principles-based" disclosure requirement that permits management to undertake a comprehensive view of the business when exercising its judgment as to what should be disclosed in a company's MD&A disclosures.  *See* SEC Financial Reporting Manual, updated

---

[7] For the same reasons, the alleged omission of pull forwards did not render Defendants' statements regarding UA's historical financial results (including statements regarding net revenues, revenue growth, and the primary factors driving that growth) misleading under Section 10(b) or Rule 10b-5.  *See In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *6-9 (E.D. Va. June 2, 2020) (statements about current period and historical financial performance were not false or misleading by failing to disclose how defendant obtained its results), *aff'd sub nom. KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021); *see also Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 99 (2d Cir. 2021) (similar); *Cytyc*, 2005 WL 3801468, at *17-19, *22; *Smith & Wesson*, 836 F. Supp. 2d at 8-11.

as of September 30, 2008, Topic 9 - Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), 9100 MD&A Objectives, at 9110.2.  Properly viewed through this lens, the record does not support a determination that UA's pull forwards constituted a material adverse trend that was, from a present day perspective at the time of the challenged disclosures, reasonably likely to negatively impact UA's business.

*First*, UA's use of pull forwards did not constitute a material trend, much less one known to UA management.  Negative trends must be sufficiently clear and well-established to require disclosure under Item 303.  *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7, 2016 (S.D.N.Y. Mar. 29, 2016) ("Plaintiffs' allegations fail to demonstrate that the decline in growth rate occurred sufficiently in advance of the Registration Statement that it required disclosure as a negative material trend under Item 303.").  Even assuming for the purposes of this motion that Plaintiffs' pull forward quantifications (Ex. 27 ¶¶ 68-186) are correct and supported by the record (and they are not), their analysis is insufficient to demonstrate any adverse trend created by the challenged pull forwards:

| Quarter | UA Reported Net Revenues ($ in millions) | UA Reported Net Revenue Growth | Regan Calculated Pull Forwards ($ in millions) | Regan's Growth Rate Calculations Assuming No Pull Forwards[8] |
|---------|---------|---------|---------|---------|
| Q3 2015 | $1,204.1 | 28.4% | ■ | ■ |
| Q4 2015 | $1,170.7 | 30.8% | ■ | ■ |
| Q1 2016 | $1,047.7 | 30.2% | ■ | ■ |
| Q2 2016 | $1,000.8 | 27.7% | ■ | ■ |
| Q3 2016 | $1,471.6 | 22.2% | ■ | ■ |
| Q4 2016 | $1,308.1 | 11.7% | ■ | ■ |
| Q1 2017 | $1,117.3 | 6.6% | ■ | ■ |

Pull forwards occurred in each quarter and the amounts varied considerably.  Indeed, revenue

---

[8] The data in this column were sourced from Schedules 4.2 and 5 of the Regan Report.

growth remained strong into Q4 2016 even if the revenues from pull forwards are artificially excluded (as Plaintiffs propose).  Notably, despite Plaintiffs' allegations that UA pulled forward ███████ from Q1 2016 into Q4 2015, UA experienced net revenue growth of 30% in Q1 2016 and 28% in Q2 2016 (with much smaller quantities of pull forwards during those quarters).

*Second*, pull forwards did not actually have a material negative impact on UA's future performance such that its current period results were not indicative of future performance. Again, UA's performance in Q1 2016 is instructive.  Assuming that Plaintiffs are correct and that ███████ in sales were shifted out of Q1 2016 and into Q4 2015 (Ex. 27 ¶ 97), UA's Q1 2016 revenues still grew 30% YoY over Q1 2015 revenues.  Stated differently, UA's Q1 2016 performance was consistent with (if not ahead of) its performance in earlier periods—even if ██ ███████ in sales originally anticipated to ship in that period actually shipped in Q4 2015.

Similarly, the undisputed evidence shows that, when UA updated its internal financial forecasts (the "F-Series" forecasts), the updated forecasts took into account changes in the timing of sales that were pulled forward.  SUF ¶ 23.  Crucially, after they were updated to reflect changes based on pull-forward sales, UA's internal forecasts well into Q4 2016 projected robust revenue growth in both 2016 and 2017 (SUF ¶¶ 24-28), further establishing that pull forwards did not negatively impact future growth.  *See Cypress*, 891 F. Supp. at 1380-81 (no liability for failure to disclose pull forwards where internal forecast showing current quarter revenue growth "took into account revenues lost to" a prior quarter "as a result of" the pull forwards).

Ultimately, Plaintiffs' theory ignores the complex and dynamic nature of UA's wholesale business.  During the Relevant Period, UA's products were seasonal in nature and were updated regularly in an attempt to anticipate and react to consumer demand and changing preferences. SUF ¶ 31.  Most wholesale orders were placed months before anticipated shipment to the

customer.  SUF ¶ 30.  Given potential changes in consumer demand, and the amount of time it took to manufacture, transport, package and deliver merchandise to retail customers through UA's international supply chain, anticipated shipment dates for customer orders were estimates—they were not fixed or determinate at the time they were initially set.  SUF ¶¶ 29-30; *see also* Ex. 22 ¶ 37 (Plaintiffs' retail industry expert acknowledging that, in the wholesale business, shipping windows "may be subject to change").  Furthermore, customers had the ability to cancel orders after they were initially placed through the date of shipment.  SUF ¶ 36.  Accordingly, getting a customer's agreement to accept product earlier not only increased revenues, but also avoided the risk of cancellation.  *Id.*

Given the dynamic nature of UA's sales calendar and cadence, changes to shipment timing (*i.e.*, orders shipping earlier or later than initially planned) were commonplace. Undisputed evidence illustrates the fluidity of shipping windows: at the same time pull forwards were shifting orders from later into earlier quarters, large amounts of orders were simultaneously pushed out from earlier into later quarters.  SUF ¶ 43.  For example, ███████ in sales with initially requested delivery dates in 3Q15 were shipped in 4Q15, as compared with ████████ in sales with initially requested delivery dates in 4Q15 that shipped earlier.  *Id.*  Against this backdrop, the timing shifts associated with pull forwards did not signal a trend, change, or uncertainty that should have been disclosed in the Company's MD&A.  *See Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 558 (M.D.N.C. August 14, 2013) (dismissing Section 11 claims premised on violations of Item 303(a) because the complaint did not allege "that the identified facts were uncertain or changed over time").

### 3.    Defendants' Affirmative Statements Did Not Create a Duty to Disclose Pull-Forward Sales

Plaintiffs' omission theory under Rule 10b-5 fares no better.  Because Defendants had no

affirmative duty to disclose the challenged pull-forward sales (*see supra* Sec. I.B.1), disclosure of those sales would be required under Rule 10b-5 <u>only</u> if necessary to make "statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b); *see also Marriott*, 31 F.4th at 901-02 (same).  Plaintiffs cannot make such a showing based on the undisputed factual record here.

Plaintiffs allege that Defendants' statements between Q3 2015 and Q2 2016 regarding UA's "growth story" and "strong" demand for UA's brand and products were rendered misleading by the alleged omission of pull forwards.  TAC ¶¶ 153, 161, 179, 199, 236-38.  For example, Plaintiffs challenge statements such as "[t]he demand for our brand has never been stronger" (TAC ¶ 153), "[o]ur core business remains incredibly strong," (TAC ¶ 179), and Under Armour's "growth story is strong, we remain a growth company, and none of that is wavered" (TAC ¶ 179).  According to Plaintiffs, these optimistic statements supposedly gave investors a misleading impression of consumer demand and UA's ability to continue its growth trajectory.  The undisputed record does not support Plaintiffs' claims.

As explained above, UA's pull forwards were real sales to real customers that generated real revenues recorded in the appropriate period.  *See supra* Secs. I.A & I.B.2.b; *Timberland*, 2013 WL 1314426, at *9 (dismissing claim that defendant violated securities laws by failing to disclose pull-forward sales that allegedly inflated revenue because the revenue reflected "real sales to real customers").  Accordingly, Defendants' optimistic statements did not give investors a misleading impression of consumer demand or UA's prospects for growth.  *See, e.g.*, *Smith & Wesson*, 836 F. Supp. 2d at 8-11 (statement that "demand has been strong" not actionable under Section 10(b), despite not disclosing significant pull-in sales allegedly masking declining demand); *see also Cytyc*, 2005 WL 3801468, at *8 (references to "fifteen consecutive quarters of

revenue growth" were not rendered misleading by non-disclosure of defendant's reliance on pull

forwards); *Cypress*, 891 F. Supp. at 1380-81 (use of pull forwards "did not seriously undermine"

optimistic statements regarding growth); *Iron Workers*, 432 F. Supp. 2d at 575, 586 (dismissing

Section 10(b) claim based on implicit representation that revenues would continue; plaintiff must

allege that defendants "guaranteed that revenues would continue").

Further, Defendants' optimistic statements regarding growth and demand "must be

considered in the full context in which they were made" (*Gasner v. Bd. of Sup'rs of the Cnty. of

Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996)), including UA's risk disclosures and

warnings about its business and the industry. *See San Antonio Fire & Pension Fund v. Syneos

Health, Inc.*, 75 F.4th 232, 245 (4th Cir. 2023) (emphasizing that alleged misstatements are

"contextual" and should be considered "in a broader frame").

The undisputed facts show that Defendants consistently warned investors that continued

growth was not guaranteed and specifically identified market and competitive risks.  Throughout

2015 and 2016, Defendants expressly cautioned that consumer demand for UA's products could

be "adversely affected" due to, among other things, "changing consumer preferences,"

"[increased] competition by existing and future competitors," and the "financial condition" of its

customers.  SUF ¶ 51.  Furthermore, Defendants regularly updated investors regarding

headwinds facing the Company and the retail industry:

- When UA issued its Q1 2016 results, Defendants alerted investors to the "changing dynamics among [its] domestic wholesale partner base," noting that the market "saw [TSA] and just recently Sport Chalet declare bankruptcy."  SUF ¶ 52.

- In May 2016, UA reduced its publicly-issued net revenue guidance in light of TSA's decision to liquidate its business rather than pursue a sale through bankruptcy.  SUF ¶ 8.

- When issuing UA's Q2 2016 results, Defendants disclosed that UA was continuing to "navigate through the changing dynamics of the retail landscape."  SUF ¶ 53.

- When UA issued its Q3 2016 results, Defendants disclosed that "[t]here's no doubt that the landscape globally, and certainly in [UA's] North American backyard, is shifting" and that "North America apparel growth is slowing across the industry," leading the Company to reduce its long-term operating income guidance.  SUF ¶ 54.

- When UA issued its Q4 2016 results, Defendants disclosed that the combination of customer bankruptcies, changing consumer preferences, difficulty selling cold-weather products at full prices (as UA had been able to in prior years), and aggressive discounting by competitors had greater than anticipated negative effects on UA's ability to grow the business at projected levels and would continue to affect UA in 2017.  SUF ¶ 55.

Consistent with these disclosures, this Court found in an earlier ruling that Defendants' Class Period statements "were not simply overt optimism but were modified over time with added caveats and cautions." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 692 (D. Md. Sept. 19, 2018) ("*UA I*").  In light of these undisputed disclosures, Defendants' optimistic statements regarding consumer demand and growth cannot have been rendered misleading by the omission of additional disclosures regarding pull forwards.  *See In re Gander Mountain Co. Sec. Litig.*, 2006 WL 140670, at *12 (D. Minn. Jan. 17, 2006) (allegations that defendants "fail[ed] to warn investors that [] sales were unsustainable" were not actionable in light of disclosures that new business strategy "might not be successful" and that "past results might not be indicative of future results"); *see also Cypress*, 891 F. Supp. at 1380 (granting summary judgment on claim that defendants failed to disclose impact of discounting on future results where defendants warned investors of pricing pressure).

### C.    Allegations of Affirmative Misrepresentations Fail as a Matter of Law

While the Court allowed this case to proceed to discovery on an omission theory (*see UA II*, 540 F. Supp. 3d at 521-22), the TAC also alleges certain affirmative misrepresentations.  In particular, Plaintiffs claim that Defendants' statements regarding UA's performance, brand, and demand were false because they concealed sales problems caused by declining growth rates and a slowdown in UA's North American wholesale sales channel.  *E.g.*, TAC ¶¶ 153, 155-56.

Plaintiffs also claim that UA's accounting practices violated GAAP and, therefore, its financial statements contained material misrepresentations.  TAC ¶¶ 343-69.  Summary judgment in favor of Defendants should be granted on these claims because there is no genuine issue of material fact regarding the truth of these purported misrepresentations.

### 1.   There Are No Actionable Misstatements Regarding Financial Performance, Revenue Growth, or Consumer Demand

#### a.   Accurate Statements Regarding UA's Financial Performance and Results Are Not Actionable

"[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Sofamor Danek*, 123 F.3d at 401 n.3; *see also Galati v. Com. Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007); *Smith & Wesson*, 836 F. Supp. 2d at 11; *Libon v. Infineon Techs., A.G.*, 2006 U.S. Dist. LEXIS 76430, at *18 (E.D. Va. Aug. 7, 2006). Here, Plaintiffs cannot prove the falsity of any of Defendants' statements regarding UA's financial results, all of which disclosed accurate historical data.

For example, Plaintiffs challenge numerous statements reporting UA's net revenues and revenue growth rate—such as "[f]or the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%" (TAC ¶ 197) and "[a]pparel, our largest category, continues to grow over 20%." (TAC ¶ 154)—as well as other similar statements from that period reporting on UA's actual financial results (TAC ¶¶ 161, 177, 182, 199, 212, 219, 225, 249, 256).  These statements report accurate information from UA's financial statements.  Because Plaintiffs cannot prove that the information in UA's financial statements was false (*see infra* Sec. I.C.2), they likewise cannot prove that public statements reporting that information were false.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404-05 (S.D.N.Y. 2016) ("A violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data . . ." such as eleven

34

"consecutive quarters of double-digit growth.").

Plaintiffs also challenge statements describing the primary drivers of reported changes to UA's margins and inventory. For example, Plaintiffs claim that, in UA's Q1 2016 results, Defendants falsely attributed gross margin decline primarily to "impacts of approximately 100 basis points from higher liquidations and approximately 70 basis points from foreign currency exchange rates, partially offset by approximately 60 basis points from improved product cost margins" (TAC ¶ 195) and falsely attributed increased inventory levels primarily to "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers" (TAC ¶ 201). *See also* TAC ¶¶ 161-64, 177, 180-81, 183-87, 195, 201-03, 206, 226, 235, 239, 246, 251, 256, 259-60. Plaintiffs cannot prove that these statements were false because there is no contemporaneous evidence showing that the primary causes for the reported changes to gross margins and inventory were factors other than those disclosed by Defendants.

### b. Optimistic Statements Regarding Growth and Demand Were Not Affirmative Misrepresentations

Plaintiffs also allege that Defendants' optimistic statements between Q3 2015 and Q2 2016 regarding the Company's "growth story" and "strong" demand for its brand and products were false. TAC ¶¶ 153, 161, 179, 199, 236-38. Plaintiffs cannot prove that the challenged statements contained any misrepresentations.

As an initial matter, many of these statements are not objective factual statements, but instead are inactionable puffery. In a prior ruling, the Court recognized that "[i]ndefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity." *UA I*, 342 F. Supp. 3d at 676. The Court specifically identified statements such as "demand for our product have never been stronger" as "typical" inactionable puffery. *Id.* at 680. These statements remain inactionable now. *See id.*; *see also Boykin v. K12*,

*Inc.*, 54 F.4th 175, 183–84 (4th Cir. 2022) ("[T]he law recognizes that not all self-promotion is actionable, nor does Rule 10b-5 exist to 'purge the market of all optimism.'"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (statement that company was "poised to carry the growth and success . . . well into the future" was immaterial); *Ash*, 2015 WL 5444741, at *7 (statements about "stronger position" or "momentum" are "precisely the kind of mere expressions of optimism . . . that are not actionable under the federal securities laws").

In any event, the undisputed facts show that the challenged statements regarding growth and demand are consistent with UA's actual sales results between Q3 2015 and Q2 2016. During this four-quarter period, UA achieved net revenue growth rates of 28%, 31%, 30%, and 28%, respectively. *See* SUF ¶¶ 4-5, 7, 9.[9]  UA's growth and the increase in consumer demand during this period was highlighted by the performance of its international and DTC channels, which UA had specifically identified as "key areas" for which it had implemented "strategic growth initiatives."  SUF ¶¶ 3-5, 7, 9.  The international and DTC channels grew over 50% and 25%, respectively, each quarter between Q3 2015 and Q2 2016.  *See* SUF ¶¶ 4-5, 7, 9.

Because UA's growth and consumer demand continued to grow between Q3 2015 and Q2 2016, Defendants' optimistic statements regarding growth and demand are inactionable.  *See Smith & Wesson*, 836 F. Supp. 2d at 8 (granting summary judgment in favor of defendants where defendants' statements that "demand had been strong" and touting "increased demand" were consistent with the company's reported sales results).

### 2.     Plaintiffs' Accounting Allegations Are Unsupported

To prove a securities fraud claim predicated on accounting errors, Plaintiffs must show

---

[9] UA's growth rates during this period remain consistent with the challenged disclosures even if revenues from pull-forward sales are (artificially) removed.  Based on Plaintiffs' own calculations, revenue growth after excluding pull forwards would have been ███ (Q3 2015), ███ (Q4 2015), ███ (Q1 2016) and ███ (Q2 2016).  Ex. 27 ¶¶ 89, 102, 115, 123.

not only that the challenged accounting treatments violated GAAP, but also that the errors were material. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008).

The TAC asserts that UA's financial statements violated GAAP in each fiscal quarter between Q3 2015 and Q3 2016.  TAC ¶¶ 324-69; *see also* TAC ¶¶ 168(c), 191(j), 208(g) & (j), 244(e) & (l), 264(h).  Plaintiffs claim that, during this period, UA materially overstated (a) revenues, income, and EPS (by understating its returns reserves and improperly recognizing revenue from contingent sales) and (b) the value of its inventory.  TAC ¶¶ 343-69.  Despite extensive discovery, evidence supporting these wide-ranging claims never materialized.  In fact, Plaintiffs' accounting expert acknowledged that he did not find any GAAP violations in the periods between Q3 2015 and Q3 2016.  Ex. 17 at 56:3-57:23.  Accordingly, summary judgment on all of the TAC's accounting claims should be granted.  *See Peckey v. Bank of Am.*, 2016 WL 6951940, at *2 (D. Md. Nov. 28, 2016) (Bennett, J.) (where plaintiff raised allegations but "point[ed] to no <u>evidence</u>" supporting them, summary judgment on behalf of defendants was appropriate) (emphasis in original).

Nevertheless, Plaintiffs are now pursuing an entirely <u>new</u>—and considerably narrower—set of GAAP claims that were not pled in the TAC, claiming that UA: (i) overstated its Q4 2016 revenues by at least ██████████ by failing to reserve for planned returns in its Q4 2016 returns reserve (Regan Rpt. ¶¶ 201-25); (ii) overstated its Q4 2016 revenues by an additional $14.8 million by prematurely recognizing revenue from a transaction with a customer named ██████ (*id.* ¶¶ 245-60); and (iii) omitted to disclose, in Q1 2017, the possibility that $20 million of potentially excess inventory would be written down in the future (*id.* ¶¶ 265-88).  These new theories (like those alleged in the TAC) ignore that PwC, UA's outside auditor, issued unqualified audit opinions at all relevant times during the Relevant Period and concluded that

UA's financial statements were prepared in accordance with GAAP.  SUF ¶¶ 46-50.  In any event, the undisputed facts cannot support Plaintiffs' new accounting fraud theories.

### a.    The Undisputed Facts Do Not Support Plaintiffs' Allegations Regarding UA's Q4 2016 Returns Reserve

Plaintiffs challenge UA's accounting for customer returns that UA agreed to accept in Q2 2017.  According to Plaintiffs, under GAAP, UA should have recorded an estimate of those returns in its Q4 2016 returns reserve—rather than booking the returns in Q2 2017, when UA agreed to accept them.  Ex. 27 ¶¶ 217-25.  Because Plaintiffs do nothing more than second-guess the judgment of UA management, their claim cannot succeed.

ASC 450 sets forth the GAAP standards for the accrual and disclosure of loss contingencies, including the recording of returns reserves.  ASC 450 requires the accrual of a returns reserve when a return is both "probable" and "reasonably estimable."  ASC 450 450-20-25-2.  UA's returns reserve estimate was a "critical accounting estimate."  Ex. 27 ¶ 200; Ex. 17 at 69:11-14.  A "critical accounting estimate" involves "levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change." Ex. 27 ¶ 200 n. 259 (citing AS 1301).  Given the subjectivity and judgment inherent in accounting estimates, such estimates are "considered fraudulent only if [p]laintiffs can show that the company lacked a reasonable basis for the determination."  *In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003); *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *2 (N.D. Cal. June 8, 1994); *see also In re Ikon Off. Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 702 (E.D. Pa. 2001) (GAAP "tolerates a range of reasonable treatments, leaving the choice among alternative[s] to management"), *aff'd*, 277 F.3d 658 (3d Cir. 2002).

Here, Plaintiffs do not dispute that UA booked a reserve for estimated returns in Q4 2016.  SUF ¶ 49.  Instead, Plaintiffs claim that UA should have increased its Q4 2016 reserve

due to the potential for additional returns in 2017.  Ex. 27 ¶¶ 201-25.  They contend that, in late

2016, management was aware of excess inventory at customers' stores as the result of UA's Q4

2016 underperformance.  *Id.* ¶¶ 201-06.  They then assert that, when updating UA's 2017

forecasts in January 2017, management discussed this excess inventory and "align[ed] . . . to

increase its planned return[s] . . . by at least ███████" to clean up that inventory.  *Id.* ¶ 221;

*id.* ¶¶ 207-20.  Regan reviewed this evidence and, with the benefit of hindsight, opines that UA

should have recorded at least ███████ in additional reserves for these potential returns by

February 2017, when UA issued its 2016 annual financial statements.  *Id.* ¶¶ 221, 225.

    However, the undisputed evidence shows that UA management <u>did</u> consider both its

2016 performance and changes to its 2017 forecasts when setting the Q4 2016 reserves.  As

explained in PwC's 2016 audit report, UA management "████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████" SUF ¶ 50.  Plaintiffs' view that UA should have looked at this evidence

and booked a higher reserve is nothing more than a difference in business judgment.  *See Centex*,

1994 WL 269734, at *5-6 (granting summary judgment for defendants because claims about how

reserves should have been calculated were "only differences in business judgment viewed from

hindsight").  Accordingly, Plaintiffs cannot establish any GAAP violation.  *See id.*; *see also John

Alden*, 249 F. Supp. 2d at 1278 (granting summary judgment for defendants where there was "no

issue of material fact with respect to whether [defendant] had a reasonable basis for setting its

reserve"); *Stavroff*, 1997 WL 720475, at *6 ("[D]ifferences of opinion in the use of GAAP do

not constitute material omissions or misstatements").

### b.      Inventory Write-Down Claims Are Unsupported

When issuing its Q2 2017 results in August 2017, UA disclosed that it planned to take "$20 million of inventory related charges." SUF ¶ 21.  According to Plaintiffs, UA should have disclosed the possibility of the write-down a few months earlier when it issued its Q1 2017 results in April 2017.  Ex. 27 ¶¶ 265-88.  They point to documents discussing UA's excess inventory and █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████  *Id.*  ¶¶ 266-80.  Regan reviewed this evidence and, with the benefit of hindsight, opined that UA should have disclosed a potential future inventory write-down "no later than during Q1 2017." *Id.* ¶ 288.  Relying on Regan, Plaintiffs argue that UA's "failure" to disclose a possible write-down in Q1 2017 violated GAAP disclosure rules.

Like their challenge to UA's Q4 2016 returns reserves, Plaintiffs' allegations regarding the timing of UA's inventory write-down disclosure merely second guess the reasonable judgments of UA management.  *See Centex*, 1994 WL 269734, at *2; *John Alden*, 249 F. Supp. 2d at 1278.  Their after-the-fact claim that UA should have disclosed the possibility of a future inventory write-down in April 2017, rather than August 2017, fails as a matter of law.  *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) ("If all that is involved is a dispute about the timing of the writeoff . . . we do not have fraud; we may not even have negligence.").

### c.      The ███████ Transaction Is Immaterial

Summary judgment on Plaintiffs' claim that UA improperly recognized $14.8 million in revenue in Q4 2016 from a sale to ███████ (Ex. 27 ¶¶ 245-60) should be granted because the transaction is immaterial as a matter of law.

GAAP does not apply to immaterial items.  *See* ASC 105-10-05-06.  And, to prove a

securities fraud claim based on an accounting error, Plaintiffs must show that the error was

material.  *See Zaluski*, 527 F.3d at 576.  By Plaintiffs' own calculations, the $14.8 million in

revenues from the ███████ sale represented only <u>1.1%</u> of UA's Q4 2016 revenues and only <u>0.3%</u>

of UA's 2016 revenues.  Ex. 27, Sch. 5.2.[10]  "Given these modest numbers, the alleged

improperly recognized sum cannot as a matter of law be material."  *Allscripts*, 2001 WL 743411,

at *10 (collecting cases in support of conclusion that transaction that was 4% of quarterly net

revenues was immaterial); *see also In re Alcatel Alsthom Sec. Litig.*, 2000 WL 34217789, at *11

(E.D. Tex. June 23, 2000) (collecting cases in support of conclusion that overstatements of 2%-

10% were immaterial); *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase*

*Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (no misrepresentation where alleged error did not "even

come close" to presumptive 5% materiality threshold); *In re First Union Corp. Sec. Litig.*, 128 F.

Supp. 2d 871, 895 (D.N.C. 2001) (understatement of losses "amount[ed] to a mere 2.1 percent of

operating earnings," which could not "be material for a company of this size").

## II.    THE UNDISPUTED RECORD CANNOT SUPPORT A SCIENTER DETERMINATION AS A MATTER OF LAW

To establish their securities fraud claims, Plaintiffs must establish that each defendant

acted with scienter—*i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud."

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *see also In re Triangle*

*Cap. Corp. Sec. Litig.*, 988 F.3d 743, 751 (4th Cir. 2021).  Plaintiffs' burden is to prove

"intentional misconduct or such severe recklessness that the danger of misleading investors was

either known to the defendant or so obvious that the defendant must have been aware of it."

*Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008); *In re Mut. Funds Inv. Litig.*,

---

[10] These revenues were also below the materiality threshold UA's outside auditor used for its annual audits.  *See* Regan Rpt. Sch. 5.2; *see also* Regan Tr. 153:19-24.

767 F. Supp. 2d 531, 533 (D. Md. 2010).  To prove that a corporate defendant acted with the requisite level of scienter, a plaintiff must show that "an agent of the corporation . . . act[ed] with the appropriate state of mind, 'since corporate liability derives from the actions of its agents.'" *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 749 (D. Md. 2008) (Motz, J.); *see also Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009).

The undisputed record here cannot support a scienter determination as a matter of law.

## A. The Challenged Pull Forwards Do Not Support a Scienter Determination

As an initial matter, pull forwards do not support scienter because "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course."  *Greebel*, 194 F.3d at 189, 202-03 (rejecting securities fraud claims relating to scheme to accelerate quarter-end sales in exchange for significant discounts); *see also Cypress*, 891 F. Supp. at 1381 (rejecting securities fraud claims based on theory that defendant "encourage[d] buyers who had placed orders for future delivery to take delivery in the current quarter so that [defendant] could show the revenue in that quarter"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004) (no scienter where "(i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real customers who paid real money").  Plaintiffs' theory is that scienter can be established because Mr. Plank and members of UA senior management supposedly were aware, by no later than Q3 2015, that pull forwards were obscuring declining demand.  Scienter cannot be proven on this basis.

Furthermore, the record evidence that has been developed cannot support a finding that, at any time before late Q4 2016, Defendants believed that UA was experiencing declining demand that would negatively impact its 2015 or 2016 performance or long-term growth.  The

holding in *Smith & Wesson* is instructive.  There, the plaintiffs claimed that defendants'
optimistic statements about revenue growth "misrepresented the level of demand" for the
company's products, citing undisclosed promotions and pull-forward sales supposedly "intended
by defendants to camouflage declining demand."  836 F. Supp. 2d at 1, 10-11.  Defendants
moved for summary judgment on the issue of scienter, relying on record evidence of "substantial
sales growth" in the periods described in the challenged statements.  *Id.* at 15.  In response,
plaintiffs pointed to documents supposedly demonstrating "signs of decreasing demand" at the
time the challenged statements were issued, including regular reports by sales managers
identifying sales problems, missed internal sales targets, and pull-forward sales.  *Id.* at 14-16.
The court held that, while the plaintiffs had presented "scraps of information suggest[ing] the
beginnings of a possible decline in demand at the time the statements were made," this evidence
was "far below the standard of proof for scienter" when viewed alongside evidence of the
company's sales growth, defendants' "simultaneous expressions of hopeful anticipation," and
defendants' "surprise" when sales results came in lower than expected.  *Id.*  Accordingly, the
court granted summary judgment in favor of defendants on the issue of scienter.  *Id.*

The same result is warranted here.  Like in *Smith & Wesson*, the undisputed evidence
demonstrates that UA's business was experiencing strong demand and revenue growth consistent
with public statements before an unexpected decline in demand in Q4 2016.  It is undisputed that
UA exceeded externally communicated expectations throughout 2015 and into 2016:

- Following a strong Q3 2015, in which net revenues grew by more than $260 million
  (28%) to $1.2 billion, UA raised its 2015 revenue guidance by $70 million to $3.91
  billion, projecting 27% growth over 2014.  SUF ¶ 4.

- UA ultimately finished 2015 with net revenues of $3.963 billion (reflecting 28% growth).
  SUF ¶ 5.

- Following its strong Q4 2015 performance, UA issued guidance for Q1 2016 and Q2
  2016 net revenues of "high 20%s" growth.  SUF ¶ 6.

- UA achieved its projected guidance in both periods, with net revenues growing by more than 30% in Q1 2016 (SUF ¶ 7) and by 28% in Q2 2016 (SUF ¶ 9).

Furthermore, it is undisputed that UA's internal projections through Q3 2016 and into late November 2016 consistently indicated that UA would meet or exceed its externally provided 2016 guidance of $4.925 billion (as provided to investors on May 31, 2016):

- In July 2016, UA's internal projections forecasted 2016 net revenues of ██████████ ████████████████████  SUF ¶ 24.

- UA experienced a strong back-to-school selling season in Q3 2016, exceeding the Company's internal expectations.  SUF ¶ 10.

- Three months later, in October 2016, UA internal projections forecasted 2016 net revenues of ████████████████████████████  SUF ¶ 25. ████ ██████████████████████████████████████████ ██████████████  SUF ¶ 26.

- Internal projections in November 2016 forecasted that 2016 net revenues would be consistent with UA's publicly issued guidance of $4.925 billion.  SUF ¶ 28.[11]

Crucially, UA's internal projections late into the Relevant Period also forecasted robust revenue growth in 2017 (undercutting any notion that Defendants expected 2016 pull forwards to erode future demand).  For example, in November 2016, UA's internal projections forecasted net ████████████  SUF ¶ 28.

Ultimately, encouraging sales trends during the back-to-school season did not continue into Q4 2016 as expected, and UA's performance ultimately declined from historical levels in Q4 2016.  But this downturn was not caused by pull forwards.  Rather, a confluence of

---

[11] The fact that UA's internal projections were consistent with its publicly issued guidance also undermines any claim that UA's forward-looking statements (TAC ¶¶ 198, 215, 229-31, 251-53) are actionable.  This warrants summary judgment for defendants on claims based on those statements.  *See, e.g.*, *Cypress*, 891 F. Supp. at 1375 (no falsity where publicly-disclosed revenue projection "was entirely consistent with [] internal projections"); *Crews v. Rivian Auto., Inc.*, 2023 WL 3050081, at *11 (C.D. Cal. Feb. 16, 2023) (no falsity where public statement was "not inconsistent" with internal projections).

unforeseen, external factors arose in Q4 2016 and negatively impacted UA's sales, including aggressive discounting by competitors, record warm weather, and acceleration in the trend towards more lifestyle-focused products that depressed demand for the performance products that historically drove UA's business.  SUF ¶¶ 13-16.  Plaintiffs cannot show Mr. Plank or other members of senior management knew, prior to Q4 2016, that these factors would arise during the period or that they would have the impact on UA's business that they did.

To the contrary, it was not until after disappointing sales results from the Black Friday shopping period in November 2016 that internal projections began to indicate that UA would not meet or exceed externally-communicated guidance.  SUF ¶ 15.  The undisputed evidence demonstrates that Mr. Plank and other members of UA management were genuinely surprised by the deceleration in demand that emerged in Q4 2016, as well as the resulting underperformance.  *E.g.*, SUF ¶¶ 18-20.  And, after UA senior management assessed UA's business and the sales environment after Black Friday, █████████████████████████████████████████ ███████████████████████████████████████████  SUF ¶¶ 42, 55.  This decision ████████████████ reflected a realization in Q4 2016 that—unlike earlier periods, where demand was robust and continued to support internal projections and external guidance—UA's business would not continue to grow at historical rates.  *Id.*  Defendants promptly disclosed these changes and their impact on UA's business to investors in its Q4 2016 earnings call, and explained that the same factors would continue to affect the business in 2017.  SUF ¶ 55.

Based on these undisputed facts, the evidence here is "far below the standard of proof for scienter" required to defeat summary judgment.  *Smith & Wesson*, 836 F. Supp. 2d at 1, 15-16.

### B.   UA Senior Management Did Not Believe Disclosure of Pull Forwards Was Required

Scienter also cannot be established because there is <u>no</u> evidence that any financial or

accounting professional at UA ever informed senior management that additional disclosure

concerning pull forwards was required.  SUF ¶¶ 44-45. Plaintiffs' expert confirmed this very

point at his deposition (Ex. 17 at 22:4-23:7):

> Q. Are you aware of the CFO of [UA] or any financial or accounting professional at [UA] ever informing [UA] management that disclosure of pull-forwards was required under what you call relevant SEC accounting-related disclosure rules?
>
> A. I don't recall that type of communication occurring within [UA].
>
> Q. And you're unaware of any such communication based on your review of the record, correct?
>
> A. Correct.
>
> Q. That never happened, as far as you know, based on your review of the record, correct?
>
> A. Based on the documents that I've seen and that I refer to in my [reports], I've not seen that that occurred.

The absence of evidence indicating that any member of UA senior management or

financial or accounting professional viewed pull forwards as a disclosure issue precludes a

determination that Defendants acted with scienter.  That is particularly true here because it is

undisputed that senior management believed that UA maintained robust financial reporting and

disclosure controls and procedures throughout the Relevant Period.  It is also undisputed that UA

did, in fact, maintain robust financial reporting and disclosure controls and procedures

throughout the Relevant Period.  There is no evidence that any former or current UA financial

executive believed that UA's financial reporting was inaccurate or insufficient during the

Relevant Period.

One of the primary internal controls relating to disclosures was the Company's

Disclosure Committee.  There is no material dispute of fact with regard to the Disclosure

Committee's membership and procedures:

- The committee was comprised of UA's most senior financial, accounting and legal

professionals, including, the CFO, SVP of Global Finance, Corporate Controller, Director of Investor Relations, and General Counsel.  SUF ¶ 56.

- At the end of each quarter, the committee distributed a "Sub certification" questionnaire to "key employees at the Vice President level and above," which was "designed to elicit information that may require disclosure, including significant changes and developments in business processes," such as "new and changed contractual obligations," "new or changed sales arrangements," and "other risks/exposures."  SUF ¶ 57.  After the responses were received, the Sub Certifications were consolidated into a single document (the "Quarterly Checklist") for the Disclosure Committee's review.  SUF ¶ 57.

- Following the end of each quarter, the Disclosure Committee held two meetings.  SUF ¶ 58.  During the first meeting, the committee reviewed the Quarterly Checklist to determine if disclosures of the reported information were required.  SUF ¶ 58.  During the second meeting, the committee reviewed and discussed the draft of UA's upcoming Form 10-Q or Form 10-K filing.  SUF ¶ 58.

- The committee members then completed their own Sub Certifications, attesting to, amongst other items, their review of disclosures, their accuracy and completeness, and that the Company's disclosure controls and procedures were suitably designed and operating in an effective manner to ensure that material information requiring disclosure was reported to the CFO on a timely basis.  SUF ¶ 58.

Further, the Audit Committee of the Board of Directors was responsible for overseeing UA's disclosure controls and procedures.  SUF ¶ 49.  The Audit Committee's process is likewise undisputed.  The committee met twice at the end of each fiscal quarter.  SUF ¶ 60. During the first meeting, the committee reviewed UA's financial performance during the recently completed quarter and it reviewed and commented on a draft of the upcoming earnings release.  SUF ¶ 61. During the second meeting, it reviewed a draft of the upcoming Form 10-Q or Form 10-K filing, along with a memo from the Corporate Controller reviewing the prior quarter's results and any new disclosures.  SUF ¶ 62.  These meetings were typically attended by members of UA's senior management team (including the Company's CFO) as well as representatives of PwC.  SUF ¶ 60.

There is no dispute that both the Disclosure Committee and Audit Committee followed established procedures in connection with UA's disclosures for each quarter between Q3 2015 and Q1 2017.  *See* Ex. 28 ¶¶ 36-40 & Schs. 2, 3, 3.1.  Plaintiffs try to undermine these control

procedures by arguing that neither committee expressly considered whether UA should have disclosed pull forwards. *See id.* But that is insufficient to raise a genuine issue of material fact as to Defendants' scienter. *See Proter v. Medifast, Inc.*, 2013 WL 1316034, at *9 (D. Md. Mar. 28, 2013) ("plaintiffs must do more than merely demonstrate that defendants should or could have done more"). Because senior management believed (correctly) that UA had appropriate disclosure controls and procedures in place, and because the Disclosure Committee and the Audit Committee acted in accordance with those procedures, the fact that disclosure of pull forwards was not considered or recommended by these committees demonstrates that Plaintiffs cannot establish scienter. *See In re Mut. Funds Inv. Litig.*, 767 F. Supp. 2d 531, 542 (D. Md. 2010) (granting summary judgment on scienter grounds where undisputed evidence showed that defendants attempted to utilize procedures to prevent violations, even though their efforts failed); *see also Matrix*, 576 F.3d at 185 n.6, 189 (affirming dismissal of securities fraud claim against executives who reasonably relied on internal reporting and disclosure controls).

## III.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFFS' CLAIMS UNDER SECTIONS 20(A) AND 20A OF THE EXCHANGE ACT

### A.  Defendants Are Not Liable Under Sections 20(a) and 20A Because Plaintiffs Cannot Establish a Primary Violation

It is black-letter law that claims for secondary liability under Section 20(a) of the Exchange Act require a "primary violation of the securities laws." *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003); *see also Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 391 (4th Cir. 2023) ("In affirming the district court's dismissal of Plaintiffs' § 10(b) and Rule 10b-5 claims, we must also affirm its dismissal of Plaintiffs' derivative § 20(a) claims."). Liability under Section 20A of the Exchange Act likewise requires a "predicate" violation. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) (affirming dismissal of Section 20A claims because "the complaint fails

to allege . . . any misleading statement or omission in violation of § 10(b) and Rule 10b-5. . . .").

Accordingly, to the extent summary judgment is granted as to Plaintiffs' claims under Section 10(b) and Rule 10b-5 (Count One), summary judgment should also be granted for Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act (Counts Two and Three).

### B.    Mr. Plank Is Not Liable Under Section 20A to Class Members Who Did Not Purchase the Same Class of Securities Contemporaneously with His Sales

The Court should also grant summary judgment dismissing Plaintiffs' Section 20A claim against Mr. Plank to the extent that class members, including Lead Plaintiff Aberdeen, did not purchase UA securities contemporaneously with Mr. Plank's sales of the same class of securities.

Section 20A provides a cause of action only to shareholders who "<u>contemporaneously with the . . . sale of securities that is the subject of [the alleged] violation . . . purchased . . . securities of the same class</u>."  15 U.S.C. § 78t–1(a).  When interpreting federal statutes, courts look first to the "plain language" and give "the words used their ordinary meaning."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020); *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014).  Under the plain language of Section 20A, summary judgment should be granted as to the claims of all class members who did not (1) purchase UA securities (2) contemporaneously with (3) Mr. Plank's sales of the same class of securities.

These requirements ensure that only those plaintiffs who could have actually been the counterparty to a trade with an insider can assert claims.  *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000); *see also In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & ERISA Litig.*, 503 F. Supp. 2d 25, 46 (D.D.C. 2007) (private right of action under Section 20A is available only to those who "may have actually traded with the alleged insider").  Accordingly, the plaintiff must have "contemporaneously" "purchased" securities of the "same class" that the insider sold.  And where, as here, public-company securities allegedly trade in a

"highly efficient and automated market" (TAC ¶¶ 392-93), courts properly define "contemporaneous" to mean a purchase and sale on the same day. *See, e.g.*, *MicroStrategy*, 115 F. Supp. 2d 620 at 664 ("[O]ne-day contemporaneity period is appropriate," and trades made three days apart are not "contemporaneous"); *Fed. Nat'l Mortg.*, 503 F. Supp. 2d at 46-47 ("[T]o expand the reach of Section 20A beyond same day trades would, in effect, permit plaintiffs to assert claims where it is implausible that they traded with defendants.").[12]

Mr. Plank is alleged to have sold UA stock on only nine days during the Class Period: (a) sales of Class A stock on November 17-20 and 23, 2015, and (b) sales of Class C stock on April 26-29, 2016.  TAC ¶¶ 430, 433; *see also* SUF ¶ 64.  Therefore, to have a private right of action under Section 20A, a plaintiff must have purchased UA's Class A stock on November 17-23, 2015 or UA's Class C stock on April 26-29, 2016.

None of Aberdeen's transactions in UA securities satisfy Section 20A.  Aberdeen did not purchase any UA Class A stock at all in November 2015, let alone on any of the days that month that Mr. Plank sold shares of Class A stock.  And Aberdeen did not purchase any shares of UA Class C stock in April 2016, let alone on any of the days that month that Mr. Plank sold shares of Class C stock.  While Aberdeen did purchase shares of <u>Class A</u> stock in April 2016, those purchases cannot satisfy Section 20A because Mr. Plank's April 2016 sales were in a different class of stock (Class C stock).  Class A stock and Class C stock are not securities "of the same

---

[12] S*ee also Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *13 (E.D. Pa. Sept. 30, 2011) (dismissing Section 20A claim because sales and purchases were not "on the same day"); *In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *27 (D.N.J. Mar. 24, 2008) (adopting same-day standard for publicly-traded securities); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) ("[T]o satisfy the 'contemporaneous' requirement," plaintiff must have "bought stock on the same dates on which the defendant's sales took place."); *In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) ("The same day standard is the only reasonable standard given the way the stock market functions.").

class," as Section 20A's plain language requires.  Allowing Section 20A claims to proceed based

on purchases of a <u>different class</u> of securities than Mr. Plank sold would ignore the statute's plain

language and purpose, rendering the "same class" requirement superfluous.  *See Graham v.*

*Dhar*, 33 F.4th 178, 182 (4th Cir. 2022) ("[E]very section, clause, word or part of the statute

must, if possible, be given significance and effect, so that no term is rendered superfluous"); *Burt*

*v. Maasberg*, 2014 WL 1291834, at *28 (D. Md. Mar. 28, 2014) (similar).[13]

Accordingly, summary judgment should be granted dismissing the Section 20A claims of

all Class members (including Aberdeen) who did not purchase Class A stock during the period

from November 17-23, 2015 or Class C stock during the period from April 26-29, 2016.

## IV.    THE CLASS PERIOD SHOULD BE SHORTENED

In the event that summary judgment is not granted in full, Defendants respectfully submit

that the Court should modify the Class definition by shortening the Class Period based on

undisputed facts.  Federal Rule 23 provides that "an order that grants or denies class certification

may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C); *see also Minter*

*v. Wells Fargo Bank, N.A.*, 2013 WL 1795564, at *2 (D. Md. Apr. 26, 2013) (Nickerson, J.)

("An order granting class certification is not an untouchable determination.").

As a matter of law, a class period cannot begin before a material misrepresentation or

omission occurs.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 240 (S.D.N.Y.

2006) (shortening class period where first alleged misrepresentations were not actionable).  And

---

[13] Aberdeen's "acquisition" of Class C shares through the Class C Dividend on April 7, 2016 cannot serve as a basis for a 20A claim here.  Aberdeen did not purchase those shares, as required by Section 20A.  *See* 15 U.S.C. § 78t–1(a) (where alleged violation is "based on a sale of securities," liability can only be to someone who "purchased" securities)).  Furthermore, Aberdeen acquired those shares <u>weeks before</u> Mr. Plank's April 2016 stock sales.  *See Fed. Nat'l Mortg.*, 503 F. Supp. 2d at 47 (plaintiff's trade must "take place *after* the insider trading transaction") (citing cases); *MicroStrategy*, 115 F. Supp. 2d at 664 (requiring trades to occur on the same day for Section 20A liability).

a class period necessarily "ends when the truth has been disseminated to the market."

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015).

Here, the Class Period should be shortened to the period from October 25, 2016 to August 1,

2017 because (i) Plaintiffs admit that the truth was revealed to the market by August 1, 2017, and

(ii) there is no material dispute of material fact that there was no actionable misrepresentation or

omission before October 25, 2016.  By shortening the Class Period in this way, the resulting

Class will "best mirror[] the central core of Plaintiffs' theories and arguments."  *Minter*, 2013

WL 1795564, at *5-6 (decertifying "[o]verbroad" class, in part, and creating a "more narrowly-

tailored class" that was "consistent with . . . Plaintiffs' central theory").

### A.    The Class Period Should End No Later than August 1, 2017

The "basic allegation" of Plaintiffs' case is that "Defendants . . . misrepresented the level

of demand for [UA] products" between Q3 2015 and Q4 2016.  *UA II*, 540 F. Supp. 3d at 516;

*see also* TAC ¶ 148 ("Throughout the Class Period, Defendants misrepresented the demand for

the Company's products, sales, and pricing . . . ."); ECF No. 293-1 ¶ 6 (in class notice,

describing the Complaint as alleging that Defendants "misled investors during the Class Period

by falsely claiming that consumer demand for the Company's products was strong between [Q3]

2015 and [Q4] 2016 when in reality demand was in decline").  As Plaintiffs admit, the supposed

"truth" regarding the alleged decline in demand was fully revealed to the market by August 1,

2017.  Accordingly, Plaintiffs cannot establish any losses caused by disclosures subsequent to

that date.  The Class Period should thus end no later than August 1, 2017.

To demonstrate loss causation, Plaintiffs must establish that corrective information was

revealed causing a decline in stock price.  *See Katyle v. Penn. Nat'l Gaming, Inc.*, 637 F.3d 462,

472 (4th Cir. 2011); *see also In re PEC Sols, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005).

Plaintiffs' loss causation expert, Dr. Matthew D. Cain, has admitted that the full extent of the

alleged decline in demand for UA's products was disclosed to the market by August 1, 2017. *See* Ex. 19 ¶ 92 n.135 ("[T]he August 1, 2017 Corrective Disclosure Event revealed the extent of the decline in [UA's] customer demand."); *id.* ¶ 17 (referring to the August 1, 2017 disclosure as "the last alleged corrective disclosure relating to [UA']'s declining demand"); Ex. 20 ¶ 48 (same); Ex. 5 at 325:15-19 ("[I]n terms of sort of that customer demand and growth outlook, my assessment is that . . . that relevant truth was revealed in those corrective disclosures through August 1st, 2017."); *id.* at 220:20-221:5 (similar).

In light of these concessions by Plaintiffs' loss causation expert, as well as Plaintiffs' pleading that UA stock traded in a "highly efficient and automated market" (TAC ¶¶ 392-93), all "corrective" information regarding the alleged decline in demand for UA products was revealed and reflected in UA's stock price by August 1, 2017.  Therefore, the Class Period should end no later than that date.  *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014) ("[O]nce a misstatement or corrective disclosure is publicly known in an efficient market, courts will assume that the stock price reacts immediately[.]"); *see also City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861, at *5 (D. Ariz. Jan. 11, 2023) (subsequent disclosure not corrective where "[t]he market already knew" the corrective information); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017) ("An efficient market is said to digest or impound news into the stock price in a matter of minutes."); *Oran*, 226 F.3d at 282 (similar).

Plaintiffs erroneously seek to extend the Class Period through November 4, 2019, when UA's stock price declined after the *Wall Street Journal* published an article on governmental investigations of UA.  TAC ¶¶ 318-22.  Dr. Cain opines that the November 4, 2019 disclosure "is corrective of the alleged misstatements and omissions because it revealed additional information

to the market about the historical steps taken by Company executives to hide [UA]'s declining

customer demand and revenue growth[.]"  Ex. 19 ¶ 90.  However, Dr. Cain admitted that

declining demand was fully revealed by August 1, 2017 and that the "historical steps" to hide

that demand all occurred prior to that date.  Ex. 5 at 28:16-22.  Because the alleged declining

demand for UA's products was publicly known no later than August 1, 2017, the supposed

"disclosure" in November 2019 of these supposed "historical steps" that occurred prior to

August 1, 2017 is not corrective of any of the alleged misstatements or omissions.  *See*

*Bricklayers*, 752 F.3d at 89, 95-97 (affirming grant of summary judgment because "while the

disclosures made on the event dates did not merely parrot previously released information, they

did no more than to provide gloss on public information[.]").[14]

> **B.     The Class Period Should Begin No Earlier than October 25, 2016**

A class period "begins on the date of the first misstatement, as it is the injection of

misinformation into the marketplace that distorts the price of the stock."  *In re Sanofi-Aventis*

*Sec. Litig.*, 293 F.R.D. 449, 459 n.12 (S.D.N.Y. 2013).  Based on this principle and on the

undisputed record, the Class Period should begin no earlier than October 25, 2016—the day that

UA issued its Q3 2016 earnings release.  TAC ¶ 249.

Plaintiffs do not contest the accuracy of UA's financial results, nor allege any GAAP

violations, during the period before the October 25, 2016 earnings release (*i.e.*, between Q3 2015

and Q2 2016).  Furthermore, even if the Court accepts Plaintiffs' quantification of UA's pull

forwards between Q3 2015 and Q2 2016, the evidence does not suggest declining demand for

UA products during those periods.  Instead, UA experienced massive year-over-year revenue

---

[14] Plaintiffs concede that no claim is premised on the non-disclosure of the governmental
investigations.  *See* ECF No. 162 at 4 ("Plaintiffs do not allege (nor have they ever alleged) that
[UA] was under a duty to disclose the investigations.").

growth in each quarter, consistent (if not above) historical trends: 28% in Q3 2015, 31% in Q4 2015, 30% in Q1 2016, and 28% in Q2 2016.  SUF ¶¶ 4-5, 7, 9.  And, as explained above, UA's growth during that time was not the result of pull forwards, and the challenged pull forwards did not impair future demand.  *See supra* Sec. I.B.2.b.  It is not until Q3 2016 that Plaintiffs allege that UA would have missed its 20% revenue growth streak without using pull-forward sales (Ex. 27 ¶ 140), and it is not until Q4 2016 that UA's performance missed externally communicated guidance (TAC ¶¶ 265-78).  Accordingly, there is no basis to begin the Class Period before UA's Q3 2016 earnings release.

The holding in *Luna v. Marvell Technology Group* is instructive.  The court there shortened the front end of a class period under similar circumstances.  *See* 2017 WL 4865559, at *7 (N.D. Cal. Oct. 27, 2017).  In *Luna*, the plaintiffs alleged that the class period should have begun in Q3 2015 because defendants' pull-forward sales practices were used during that quarter to achieve revenue targets and removed revenues from the following period.  *Id.*  The court disagreed, holding that allegations that pull forwards were used to hit revenue targets or "lessen[ed] sales . . . in the next quarter" did not render the company's results misleading, and thus was an insufficient basis for starting the class period during that quarter.  *Id.*  Here, as in *Luna*, the Court should shorten the Class Period by excluding periods where there is no evidence that pull forwards gave investors a misleading sense of demand for UA products.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment.

DATED:  October 2, 2023　　　　　　Respectfully submitted,

By: _____/s/ G. Stewart Webb, Jr. _____

VENABLE LLP
G. Stewart Webb, Jr. (Bar No. 00828)
William B. King (Bar No. 19643)
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Telephone:  410/244-7565
410/244-7742 (fax)
gswebb@venable.com
wbking@venable.com

FRIED, FRANK, HARRIS,
    SHRIVER & JACOBSON LLP
JAMES D. WAREHAM (Bar No. 22890)
801 17th Street, NW
Washington, DC 20006
Telephone:  202/639-7000
202/639-7003 (fax)
james.wareham@friedfrank.com

SAMUEL P. GRONER (*pro hac vice*)
MICHAEL P. STERNHEIM (*pro hac vice*)
ANNE S. AUFHAUSER (*pro hac vice*)
One New York Plaza
New York, NY  10004
Telephone:  212/859-8000
212/859-4000 (fax)
samuel.groner@friedfrank.com
michael.sternheim@friedfrank.com
anne.aufhauser@friedfrank.com

*Counsel for Defendant Under Armour, Inc.*

Dated: October 2, 2023          By:    /s/ Scott R. Haiber
                                    (signed with permission of Scott R. Haiber)
                                        Scott R. Haiber (Bar No. 25947)

HOGAN LOVELLS US LLP
100 International Drive
Suite 2000
Baltimore, MD 21202
Telephone:  410/659-2700
410/659-2701 (fax)
scott.haiber@hoganlovells.com

*Counsel for Defendant Kevin A. Plank*

56

HOGAN LOVELLS US LLP
Jon M. Talotta (*pro hac vice*)
8350 Broad Street
17th Floor
Tysons, VA 22102
Telephone: 703/610-6100
703/610-6200 (fax)
jon.talotta@hoganlovells.com

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
THEODORE V. WELLS, JR. (*pro hac vice*)
LORIN L. REISNER (*pro hac vice*)
HARRIS FISCHMAN (*pro hac vice*)
1285 Avenue of the Americas
New York, NY  10019
Telephone:  212/373-3306
212/492-0306 (fax)
twells@paulweiss.com
lreisner@paulweiss.com
hfischman@paulweiss.com

*Of Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 2, 2023, I filed a copy of the foregoing Memorandum in Support of Defendants' Motion for Summary Judgment, the supporting Declaration of Samuel P. Groner, and Exhibits 1-28 & 53-73 thereto **UNDER SEAL** via the Court's CM/ECF electronic filing system and served a copy of same on all counsel of record via e-mail.

I FURTHER CERTIFY that courtesy copies of these documents will be delivered to the Clerk's office within 2 business days of filing.


                                        /s/ William B. King
                                       William B. King

58