# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 CLASS ACTION |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

April 3, 2023

**CONFIDENTIAL**

# Table of Contents

**Page**

I.  INTRODUCTION .................................................................................. 4

II.  QUALIFICATIONS ............................................................................. 6

III.  SUMMARY OF OPINIONS ................................................................ 8

IV.  OVERVIEW OF UNDER ARMOUR AND PLAINTIFFS' ALLEGATIONS .......... 17

    A.  OVERVIEW OF UNDER ARMOUR.......................................... 17

    B.  PLAINTIFFS' ALLEGATIONS ................................................ 18

V.  IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS ................. 22

    A.  DEFENDANTS' PUBLIC STATEMENTS.................................... 24

    B.  ANALYST COMMENTARY ..................................................... 25

    C.  ECONOMIC AND VALUATION PRINCIPLES ........................... 26

    D.  EVENT STUDY ...................................................................... 27

VI.  LOSS CAUSATION ............................................................................ 29

    A.  INVESTOR LOSSES WERE FORESEEABLE ........................... 29

    B.  THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES ............... 31

VII.  ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS ................................ 31

    A.  JANUARY 11, 2016 ............................................................... 31

    B.  JUNE 1, 2016 ........................................................................ 35

    C.  JULY 26, 2016....................................................................... 39

    D.  OCTOBER 25, 2016 .............................................................. 43

    E.  JANUARY 31, 2017 ............................................................... 46

    F.  AUGUST 1, 2017 .................................................................. 50

    G.  NOVEMBER 4, 2019 ............................................................. 54

VIII.  ANALYSIS OF THE INFLATION CREATING EVENTS .................................... 60

    A.  JANUARY 28, 2016 ............................................................... 60

    B.  APRIL 21, 2016 .................................................................... 63

    C.  APRIL 27, 2017 .................................................................... 65

IX.  CALCULATING ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR UNDER ARMOUR COMMON STOCK ....................... 68

    A.  INFLATION PER SHARE......................................................... 68

B.   SECTION 10(b) DAMAGES ........................................................................................... 73

C.   SECTION 20A DAMAGES ........................................................................................... 78

D.   ADAPTATION TO ALTERNATIVE FINDINGS ..................................................... 81

## I.   INTRODUCTION[1]

1.    On November 30, 2021, I submitted an expert report in this matter (ECF 197-3) ("Efficiency Report" or "Cain Efficiency Report"), in which I concluded that the market for Under Armour, Inc. ("Under Armour" or the "Company") Class A[2] Common Stock[3] and Class C[4] Common Stock[5] ("Common Stock")[6] was efficient from September 16, 2015 through November 1, 2019, inclusive (the "Class Period")[7] and that damages in this matter can be calculated on a class-wide basis subject to a common methodology.[8]   I continue to hold the opinions expressed in my Efficiency Report.

---

[1] All emphasis within this report is added unless otherwise noted.  All times cited in this report are in Eastern Time unless otherwise noted.

[2] Under Armour Class A Common Stock experienced a ticker change during the Class Period.  *See* Under Armour SEC Form 10-K for the fiscal year ended December 31, 2016 ("Class A Common Stock was listed on the NYSE under the symbol 'UA' until December 6, 2016 and under the symbol 'UAA' since December 7, 2016.").

[3] For purposes of consistency throughout this report, all values related to Under Armour Class A Common Stock are adjusted to reflect a two-for-one stock split in April 2016.  *See* "Under Armour Announces Class C Stock Dividend," *PR Newswire*, March 16, 2016, 4:10 PM ("Under Armour, Inc. (NYSE:UA) today announced that its Board of Directors has approved the issuance of the Company's new Class C non-voting common stock. The Class C stock will be issued through a stock dividend on a one-for-one basis to all existing holders of Under Armour's Class A and Class B common stock, which *will have the same effect as a two-for-one stock split*. The shares of Class C stock will be distributed on or about April 7, 2016, to stockholders of record of Class A and Class B stock on March 28, 2016.").

[4] On April 7, 2016, Class C Common Stock was distributed to stockholders of record of Class A Common Stock and Class B common stock as of March 28, 2016 and Class C Common Stock was listed on the NYSE on April 8, 2016. *See* Under Armour SEC Form 10-K for the fiscal year ended December 31, 2016.  Under Armour Class C Common Stock experienced a ticker change during the Class Period.  *See*, Under Armour SEC Form 10-K for the fiscal year ended December 31, 2016: ("Class C Common Stock was listed on the NYSE under the symbol 'UA.C' since its initial issuance on April 8, 2016 and until December 6, 2016 and under the symbol 'UA' since December 7, 2016.").

[5] For purposes of consistency throughout this report, all values related to Under Armour Class C Common Stock are adjusted to reflect a 1.007098 for 1 stock split in June 2016.  *See* "Under Armour Announces Final Ratio For Class C Stock Dividend," *PR Newswire*, June 16, 2016, 9:00 AM ("The Company has determined that the final distribution ratio will be 0.007098 of a share of Class C stock for each share of Class C stock held.").

[6] Unless otherwise noted, the term "Common Stock" refers to both Class A Common Stock and Class C Common Stock.  Under Armour Class B Common Stock was not listed on any stock exchange and was not publicly traded during the Class Period.  *See* Under Armour SEC Form S-3ASR filed February 28, 2019 ("Our Class B Stock is not listed on any stock market or exchange.").

[7] *See In re Under Armour Sec. Litig.*, __F. Supp. 3d__, 2022 WL 4545286, at *4, *17 (D. Md. Sept. 29, 2022).

[8] Cain Efficiency Report ¶¶9-10.

2.     I have been retained as an expert in this matter by Lead Plaintiff Aberdeen City
Council as Administrating Authority for the North East Scotland Pension Fund, Monroe County
Employees' Retirement System, and KBC Asset Management's (collectively, "Plaintiffs")
counsel Robbins Geller Rudman & Dowd LLP.  My time is billed at an hourly rate of $750 per
hour for my work on this matter.  I am being assisted in this matter by staff from Global
Economics Group who have worked under my direction and supervision.  My compensation and
that of the staff of Global Economics Group is in no way contingent on the outcome of this case
or upon any opinions that I express.  The materials I have considered in forming my opinions are
summarized in **Appendix A**, attached hereto.

3.     My assignment in this matter was to assess and offer opinions on: (1) whether the
misstatements and omissions alleged in the Consolidated Third Amended Complaint for
Violations of the Federal Securities Laws (ECF 153) (the "Complaint") in this case contained
value-relevant information that investors would consider material; (2) whether investor losses
were proximately caused by Under Armour and founder and former CEO Kevin A. Plank's
("Plank") (collectively, "Defendants") alleged misrepresentations and/or omissions (*i.e.*, loss
causation); (3) the quantification of investor losses resulting from the revelation of the allegedly
misrepresented and/or omitted facts; (4) the quantification of any artificial inflation per share for
Under Armour Common Stock for each day of the Class Period resulting from the alleged
misrepresentations and/or omissions; and (5) the appropriate method to quantify Rule 10b-5 and
Section 20A class-wide damages in this matter.

4.     The analysis and opinions contained in this report are based on information
available as of the date of the report.  I reserve the right to amend, refine, or supplement this

report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

## II.    QUALIFICATIONS

5.    I hold a Ph.D. in Finance and I am a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley.  I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.  My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism.  I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

6.    I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist.  During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations.  I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

6

7. Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

8. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

9. In addition to teaching at UC Berkeley, Notre Dame, and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached hereto as **Appendix B**.

10. I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis. **Appendix B** further details my publications and previous testimony.

11. In connection with my work, I have called upon the knowledge and experience gained during my professional career. My opinions are based on my experience and expertise in

finance, economics, financial reporting, and my understanding of the allegations and facts set forth in this lawsuit and are not intended to represent legal conclusions or opinions.

## III.   SUMMARY OF OPINIONS

12.   My opinions regarding materiality, loss causation, and damages in this matter arising under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the SEC, are premised upon Defendants being found to have knowingly or recklessly made material misrepresentations or omissions during the Class Period regarding "the level of demand for Under Armour's products"[9] in connection with the Company publicly reporting its quarterly and annual financial results, including quarterly revenue growth, during this time period.  Specifically, Plaintiffs allege that as of the start of the Class Period, Defendants knew, or recklessly ignored, that sales growth was decelerating, and, as a result, resorted to certain sales practices in order to artificially maintain the Company's quarterly revenue growth streak and appear healthier.  Defendants allegedly engaged in a scheme that included: (1) pulling forward orders from future quarters in order to hit current quarterly financial targets (including analysts' consensus revenue estimates) and make Under Armour appear financially healthier; (2) incentivizing retailers to accept products early to facilitate these pull forwards; (3) shipping products earlier than planned in the last days of a quarter in order to book revenues in the current quarter; (4) shipping new inventory targeted for Under Armour's own stores instead to discount retailers in order to immediately book revenues and hit current quarterly financial targets; (5) improperly recording revenue on contingent sales; (6) understating the Company's sales returns and allowances, markdowns, and discounts; and (7) failing to timely

---

[9] *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 516 (D. Md. 2021).

write-down excess and obsolete inventory.[10]  Plaintiffs allege that even after the relevant truth

was partially revealed regarding the real extent to which Under Armour's sales growth was

decelerating and customer demand declining, Defendants continued to make material

misrepresentations or omissions related to the Company's undisclosed engagement in "suspect

sales and accounting practices"[11] to appear healthier, which was not revealed until the end of the

Class Period.[12]

13.    I conclude that the alleged misstatements and omissions in this matter were

important to investors.  I base my opinion of the importance of this information on: (1)

Defendants' own public statements portraying the Company as a leading premium sports brand

with strong customer demand and sales growth that engaged in proper sales practices; (2) analyst

commentary demonstrating that the market relied upon Defendants' statements concerning

Under Armour's customer demand and sales growth in evaluating the Company's ability to

generate revenue and earnings; (3) the application of basic valuation principles to Under

Armour's business; (4) my event study analysis, that establishes a statistically significant decline

in the prices of Under Armour Common Stock on the corrective disclosure dates; and (5) certain

internal Under Armour documents produced in this litigation and provided to me by counsel.

14.    The Complaint alleges that a series of partial corrective disclosures revealed the

relevant truth about the real extent to which Under Armour's customer demand was declining

---

[10] *See* Complaint; Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (ECF 198) ("Opening Class Cert. Brief"), at 5; *Under Armour*, 540 F. Supp. 3d at 517-18, 522-23.

[11] *Under Armour*, 540 F. Supp. 3d at 523.

[12]*See Under Armour*, 540 F. Supp. 3d at 521-22 ("With respect to the Plaintiffs' allegations regarding the pull forward sales practices, or 'channel stuffing,' the SEC Order provides specific factual allegations regarding the amount of the products pulled forward and concludes that because of the undisclosed pull forward tactics used, investors 'were left with a misleading impression of how Under Armour was meeting or beating analysts' revenue estimates.'") (citation omitted).

and sales growth decelerating.  The Complaint also alleges a final corrective disclosure in November 2019 that revealed the relevant truth about Under Armour's engagement in undisclosed, suspect pull-forward sales tactics and accounting practices to appear healthier.  For purposes of this report, I considered and evaluated the corrective disclosures alleged in the Complaint and was not asked to identify additional corrective disclosures.[13]  Based on the event study I performed, there was a statistically significant decline in the market prices of Under Armour Common Stock (after controlling for market and industry movements) in the wake of the release of the corrective disclosures alleged in the Complaint.  The corrective disclosure events partially dissipated artificial inflation from the market prices of Under Armour Common Stock on the following dates (collectively, the "Corrective Disclosure Events"):[14]

> **January 11, 2016:**[15] Morgan Stanley issued a report discussing concerns over Under Armour's sales growth, loss of market share, and declining average sales prices.[16]
>
> **June 1, 2016:**[17] Under Armour announced that 2016 revenue and operating income would be lower than anticipated, due to a bankruptcy court's approval of the liquidation, rather than a restructuring or sale, of The Sports Authority's ("TSA") business.[18]

---

[13] As explained further below, I also evaluated the information environment between the first alleged corrective disclosure on January 11, 2016, and the last ***earnings-related*** alleged corrective disclosure on August 1, 2017, and I identified several inflation-creating events.

[14] I understand from counsel that Plaintiffs are no longer asserting that alleged corrective information was revealed on May 4, 2016, and, as a result I excluded it from my analyses contained herein.

[15] The corrective information was released on Sunday, January 10, 2016 and thus would impact the market prices of Under Armour Common Stock on the next trading day, Monday, January 11, 2016.  Thus, I refer to this Corrective Disclosure Event as the January 11, 2016 Corrective Disclosure Event.

[16] Complaint ¶378; *see also* "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley*, January 10, 2016.

[17] The corrective information was released after the close of trading on May 31, 2016 and thus would impact the market prices of Under Armour Common Stock on the next trading day, June 1, 2016.  Thus, I refer to this Corrective Disclosure Event as the June 1, 2016 Corrective Disclosure Event.

[18] Complaint ¶¶215, 380; *see also* "Under Armour Updates 2016 Outlook," *PR Newswire*, May 31, 2016, 4:15 PM.

**July 26, 2016:** Under Armour announced declines in apparel sales growth, operating income, net income, disappointing guidance, and expansion into Kohls.[19]

**October 25, 2016:** Under Armour announced declines in apparel sales growth and margins due to discounts, promotions, and liquidations.[20]

**January 31, 2017:** Under Armour announced the departure of the CFO, declines in growth, and reduced financial projections related to the North American apparel business.[21]

**August 1, 2017:** Under Armour announced disappointing sales, lower 2017 guidance, and business restructuring including job cuts and charges.[22]

**November 4, 2019:**[23] *The Wall Street Journal* ("*WSJ*") reported that Under Armour was under investigation by the SEC and U.S. Department of Justice ("DOJ") for its revenue recognition practice.[24]

15.   The Complaint alleges that Defendants materially misled investors about the

Company's quarterly revenue growth, gross margin, inventory, and other publicly reported

financial metrics in the context of Under Armour's: (1) declining customer demand and

decelerating sales growth; (2) use of undisclosed, suspect pull-forward sales tactics to meet

and/or exceed external revenue growth guidance (including analyst consensus) and appear

---

[19] Complaint ¶381; "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, July 26, 2016, 7:00 AM; "Under Armour, Inc. NYSE:UAA FQ2 2016 Earnings Call Transcripts," S&P Capital IQ, July 26, 2016, 8:30 AM.

[20] Complaint ¶382; "Under Armour Reports Third Quarter Net Revenues Growth Of 22%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, October 25, 2016, 7:00 AM.

[21] Complaint ¶383 and "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire*, January 31, 2017, 6:00 AM.

[22] Complaint ¶384; "Under Armour Reports Second Quarter Results," *PR Newswire*, August 1, 2017, 6:55 AM.

[23] The corrective information was released on Sunday, November 3, 2019 and thus would impact the market prices of Under Armour Common Stock on the next trading day, Monday, November 4, 2019. Thus, I refer to this Corrective Disclosure Event as the November 4, 2019 Corrective Disclosure Event.

[24] Complaint ¶385. Use of the Internet Archives "Wayback Machine" indicates that a *WSJ* article titled "Under Armour Is Subject of Federal Accounting Probe" was published at 5:23 PM (*see* https://web.archive.org/web/20191103222635/https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835). The "Wayback Machine" only shows the headline and first two paragraphs of the article at 5:23 PM. The article was updated with a final publication time of November 4, 2019 at 7:49 AM (*see* https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835?mod=searchresults&page=1&pos=1).

financially healthier; and (3) utilization of undisclosed, improper accounting practices with respect to revenue recognition, setting reserves, and the writing down of inventory. In sum, the Complaint alleges that Defendants gave investors the misleading impression of a more financially successful Company than Under Armour actually was. The alleged misrepresentations and omissions are economically linked to the foreseeable investor losses that occurred on the Corrective Disclosure Events. If Defendants knew, or recklessly disregarded, that Under Armour's reported financial metrics such as revenue growth, gross margin, and inventory, were impacted by decelerating sales growth and declining customer demand – and concealed these issues from investors by resorting to suspect pull-forward sales tactics and accounting practices to appear healthier – then it was foreseeable at the time of the alleged misstatements and omissions that when the relevant truth was revealed, the prices of Under Armour Common Stock would decline. In other words: (1) the alleged misrepresentations and omissions caused investor losses; and (2) investors who purchased Under Armour Common Stock at prices that were affected by the alleged misrepresentations and omissions suffered losses when the relevant truth was revealed on the Corrective Disclosure Events.

16.    On the Corrective Disclosure Events, I reviewed relevant news, analyst reports, press releases, and conference call transcripts, among other documents. Based on this review, coupled with my event study analysis, I conclude that the corrective information caused the prices of Under Armour Common Stock to decline on the Corrective Disclosure Events. I also analyzed whether there was information released on the Corrective Disclosure Events that was unrelated to the alleged fraud (*i.e.*, "confounding" information). Based on this loss causation analysis, I conclude that the total fraud-related price decline associated with the Corrective

Disclosure Events is $24.55 per share for Under Armour Class A Common Stock and $18.62 per share for Under Armour Class C Common Stock, as shown below:

**Under Armour Class A Common Stock**
**Artificial Inflation per Share Dissipated on the Corrective Disclosure Events**

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| January 11, 2016 | $2.63 |
| June 1, 2016 | $1.67 |
| July 26, 2016 | $2.29 |
| October 25, 2016 | $4.64 |
| January 31, 2017 | $7.65 |
| August 1, 2017 | $1.86 |
| November 4, 2019 | $3.81 |
| **Total** | **$24.55** |

**Under Armour Class C Common Stock**
**Artificial Inflation per Share Dissipated on the Corrective Disclosure Events**

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| June 1, 2016 | $1.54 |
| July 26, 2016 | $1.30 |
| October 25, 2016 | $4.17 |
| January 31, 2017 | $6.04 |
| August 1, 2017 | $2.01 |
| November 4, 2019 | $3.56 |
| **Total** | **$18.62** |

17.    I also considered whether there were events during the Class Period between the first alleged corrective disclosure and the last alleged corrective disclosure relating to Under Armour's declining customer demand (*i.e.*, between January 11, 2016 and August 1, 2017) that clearly bolstered the market's confidence in both the strength of Under Armour's customer

demand and the sustainability of the Company's quarterly revenue growth.[25]  I then relied upon

an event study to determine if there were statistically significant increases in the market prices of

Under Armour Common Stock (after controlling for market and industry movements) in the

wake of the release of such information.  The events I identified that fit these criteria introduced

a portion of the artificial inflation during the Class Period into the market prices of Under

Armour Common Stock on the following dates (collectively, the "Inflation Creating Events"):

> **January 28, 2016:** Under Armour issued better than expected earnings results.[26]
>
> **April 21, 2016:** Under Armour issued better than expected earnings results and raised guidance.[27]
>
> **April 27, 2017:** Under Armour issued better than expected earnings results.[28]

18.    On the Inflation Creating Events, I reviewed relevant news, analyst reports, press

releases, and conference call transcripts, among other documents.  Based on this review, coupled

with my event study analysis, I conclude that the inflation creating information caused the prices

of Under Armour Common Stock to increase on the Inflation Creating Events.  I also analyzed

whether there was information released on the Inflation Creating Events that was unrelated to the

alleged fraud (*i.e.*, "confounding" information).  Based on this loss causation analysis, I conclude

that the total fraud-related price increases associated with the Inflation Creating Events is $12.68

per share for Under Armour Class A Common Stock and $4.92 per share for Under Armour

Class C Common Stock, as shown below:

---

[25] As explained *infra*, I considered events occurring between the first alleged Corrective Disclosure Event (January 11, 2016) and the last earnings announcement-related Corrective Disclosure Event (August 1, 2017).

[26] "Under Armour Reports Fourth Quarter Net Revenues Growth Of 31% And Full Year Net Revenues Growth Of 28%," *PR Newswire*, January 28, 2016, 7:00 AM.

[27] "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire*, April 21, 2016, 7:00 AM.

[28] "Under Armour Reports First Quarter Results," *PR Newswire*, April 27, 2017, 6:55 AM.

**Under Armour Class A Common Stock**
**Artificial Inflation per Share Introduced on the Inflation Creating Events**

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| January 28, 2016 | $7.41 |
| April 21, 2016 | $3.37 |
| April 27, 2017 | $1.90 |
| **Total** | **$12.68** |

**Under Armour Class C Common Stock**
**Artificial Inflation per Share Introduced on the Inflation Creating Events**

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| April 21, 2016 | $3.31 |
| April 27, 2017 | $1.61 |
| **Total** | **$4.92** |

19.    I understand that Plaintiffs expect to prove that during the Class Period, Defendants materially misled investors about the Company's quarterly revenue growth, gross margin, inventory, and other publicly-reported financial metrics in the context of Under Armour's declining consumer demand and decelerating sales growth. Additionally, I understand that Plaintiffs intend to prove that Defendants misled investors about these metrics through the: (1) use of undisclosed pull-forward sales tactics to meet and/or exceed external revenue growth guidance (including analyst consensus) to appear financially healthier; and (2) utilization of undisclosed, improper accounting practices with respect to revenue recognition, setting reserves, and the writing down of inventory. I am not aware of evidence demonstrating that the economic impact of the alleged misstatements and omissions would have been different had a disclosure of the relevant truth been made earlier in the Class Period. Therefore, I have employed the constant

dollar methodology to evaluate artificial inflation per share of Under Armour Common Stock.

This is summarized in the tables below:

**Under Armour Class A Common Stock**
**Artificial Inflation per Share During the Class Period**

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 16, 2015 – January 10, 2016 | $11.87 |
| January 11, 2016 – January 27, 2016 | $9.24 |
| January 28, 2016 – April 20, 2016 | $16.65 |
| April 21, 2016 – May 31, 2016 | $20.02 |
| June 1, 2016 – July 25, 2016 | $18.35 |
| July 26, 2016 – October 24, 2016 | $16.06 |
| October 25, 2016 – January 30, 2017 | $11.42 |
| January 31, 2017 – April 26, 2017 | $3.77 |
| April 27, 2017 – July 31, 2017 | $5.67 |
| August 1, 2017 – November 1, 2019 | $3.81 |

**Under Armour Class C Common Stock**
**Artificial Inflation per Share During the Class Period**

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 16, 2015 – January 10, 2016 | $9.77 |
| January 11, 2016 – January 27, 2016 | $7.60 |
| January 28, 2016 – April 7, 2016 | $13.70 |
| April 8, 2016 – April 20, 2016 | $13.70 |
| April 21, 2016 – May 31, 2016 | $17.01 |
| June 1, 2016 – July 25, 2016 | $15.47 |
| July 26, 2016 – October 24, 2016 | $14.17 |
| October 25, 2016 – January 30, 2017 | $10.00 |
| January 31, 2017 – April 26, 2017 | $3.96 |
| April 27, 2017 – July 31, 2017 | $5.57 |
| August 1, 2017 – November 1, 2019 | $3.56 |

20.     The remainder of this report is organized as follows: **Section IV** provides an

overview of Under Armour and the allegations in this matter.  **Section V** summarizes my

approach to analyzing the value-relevance of the allegedly misrepresented and omitted facts in this case. **Section VI** discusses loss causation principles. **Section VII** presents my analysis of the Corrective Disclosure Events. **Section VIII** presents my analysis of the Inflation Creating Events. Finally, **Section IX** presents the resulting artificial inflation per share and damages methodology.

## IV.   OVERVIEW OF UNDER ARMOUR AND PLAINTIFFS' ALLEGATIONS

### A.   OVERVIEW OF UNDER ARMOUR

21.    Under Armour is a large sports apparel company which sells branded athletic products and has several main categories, including Apparel, Footwear, Accessories, Licensed products, and its Connected Fitness products.[29]  The Company sells the majority of its products through retail wholesalers, however the Company also sells directly to the public.[30]  During the Class Period, almost two-thirds of Under Armour's sales were made through wholesale channels such as Dick's Sporting Goods, Foot Locker, Champs, Finish Line, and TSA.[31]  Under Armour faces steep competition in the apparel industry from companies such as Nike and Adidas.  Since its formation in 1996, the Company gained market share by capitalizing on a premium brand image and its reputation for its state-of-the-art fabrics design and would eventually surpass Adidas as the number two sportswear brand in 2014.[32]

22.    During the Class Period, Under Armour operated in several product segments, including Apparel, Footwear, Accessories, Licensed products, and Connected Fitness.[33]  For the

---

[29] Complaint ¶4; *see also* Under Armour SEC Form 10-K for fiscal year ended December 31, 2017.

[30] Under Armour SEC Form 10-K for fiscal year ended December 31, 2017.

[31] Complaint ¶4.

[32] Complaint ¶5.

[33] Under Armour SEC Form 10-K for fiscal year ended December 31, 2017.

fiscal years that made up the Class Period (*i.e.*, the fiscal years ending on December 31, 2015, December 31, 2016, December 31, 2017, December 31, 2018, and December 31, 2019), the Apparel segment made up on average 67.24% of the net revenues of the Company, the Footwear segment made up on average 20%, the Accessories made up 8.44%, the Connected Fitness segment made up 1.94%, and the Licensed products segment made up 2.31%.[34]

23.    In addition to the different product segments, Under Armour also operated in four primary regions during the Class Period, including North America, which comprises Canada and the United States, EMEA (Europe, the Middle East, and Africa), Asia-Pacific, and Latin America.[35]  The North America region comprised the majority of Under Armour's net revenue throughout the Class Period, averaging 77.6% of the total.  During the Class Period, EMEA consisted of 8.91% of total revenues, Asia-Pacific amounted to 8.15%, and Latin America was 3.33%.[36]

## B.  PLAINTIFFS' ALLEGATIONS

24.    The Complaint alleges false and misleading statements and omissions of material facts.  Under Armour's Common Stock prices were allegedly artificially inflated on the first day of the Class Period by statements made that day that failed to disclose material facts as set forth in the Complaint.  Defendants' subsequent statements during the Class Period also failed to disclose material facts and continued to inflate Under Armour's Common Stock prices.  The fact that Under Armour's Common Stock prices did not increase in a statistically significant manner on the dates of each of the alleged false statements does not necessarily mean there was no

---

[34] Under Armour SEC Forms 10-K for fiscal years 2015, 2016, 2017, 2018, and 2019.

[35] Under Armour SEC Form 10-K for fiscal year ended December 31, 2017.

[36] Under Armour SEC Forms 10-K for fiscal years 2015, 2016, 2017, 2018, and 2019.

inflation on that day from the misstatements.  In fact, where a misleading statement or omission

maintains market expectations or otherwise prevents a negative market reaction because the

information was withheld from the market, it would not be expected to cause an immediate

increase in the trading price of the stock.

25.    The following is also alleged in this matter: Defendants misled investors into

believing that Under Armour's revenue growth would continue and that demand for Under

Armour products would remain strong.[37]  However, due to its waning customer demand, Under

Armour was actually experiencing a decline in its apparel business and decelerating sales

growth.  Despite the slowdown being apparent within the Company as early as mid-2015,

executives such as Plank still required Under Armour to maintain aggressive and unlikely sales

goals.  The Company abandoned its sales philosophy of competing on brand strength, and

instead lowered prices and offered promotions and liquidated excess inventory.[38]  This steep

discounting led to a drop in Under Armour's average sales prices while its competitors were

increasing their average sales prices.[39]

26.    Defendants also allegedly engaged in undisclosed "suspect sales and accounting

practices"[40] in violation of applicable Generally Accepted Accounting Principles ("GAAP") and

SEC regulations.[41]  These alleged violations included pulling forward orders (sometimes by

---

[37] Complaint ¶7.

[38] Complaint ¶10.

[39] Complaint ¶¶9-10.

[40] *Under Armour*, 540 F. Supp. 3d at 523; *see also id.* at 517-18 ("They claim that Defendants manipulated the company's financial results by pulling sales forward from future quarters and engaged in other allegedly suspect sales practices.").

[41] *See Under Armour*, 540 F. Supp. 3d at 518 (referring to the SEC's Cease and Desist Order's findings with respect to Under Armour for violation of Sections 17(a)(2) and (3) of the Securities Act of 1933 (the "Securities Act") and Section 13(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rules 13a-1, 13a-11, 13a-13, 12b-20 thereunder, including failing to comply with Item 303(a)(3)(ii) of Regulation S-K"); *see also* Complaint ¶¶324-369.

financially incentivizing customers to agree to accept products in an earlier quarter) in order to meet aggressive sales and revenue goals that formed the foundation of the Company's external guidance to investors and analysts.[42]  Additionally, in certain scenarios, Under Armour allegedly incentivized retailers to take on products early by adjusting contract terms, particularly by extending due dates for payment, offering discounts, and guaranteeing that the Company would buy back a certain amount of products that were not sold.[43]  Also unbeknownst to investors, Under Armour allegedly continued to ship products to TSA and book those sales even after it became clear that TSA was on the verge of bankruptcy.[44]

27.    The Complaint alleges that during the Class Period, Defendants, through material misrepresentations and omissions, misled investors who: (1) purchased Under Armour Common Stock and were unaware that they were paying artificially inflated prices for these securities; and (2) were damaged when the truth was revealed through partial disclosures and the stock price ultimately reflected previously concealed information.[45]  For instance, on September 16, 2015, the first day of the Class Period, Under Armour hosted its 2015 Investor Day.[46]  The Complaint alleges that Defendants made multiple material misrepresentations and omissions on this day, including that "demand for our brand has never been stronger."[47]  These statements, and others like it, made during the 2015 Investor Day were allegedly misleading for reasons including that Defendants were internally aware, but concealed from investors, that Under Armour's apparel

---

[42] Opening Class Cert. Brief at 5.

[43] Complaint ¶11.

[44] Complaint ¶11.

[45] Complaint ¶391.

[46] "Under Armour to Provide Live Webcast of Investor Day Meeting," *PR Newswire*, September 9, 2015, 8:00 AM; "Under Armour, Inc. NYSE:UAA Analyst/Investor Day," S&P Capital IQ, September 16, 2015.

[47] "Under Armour, Inc. NYSE:UAA Analyst/Investor Day," S&P Capital IQ, September 16, 2015; Complaint ¶153.

products had been suffering from reduced customer demand since before the start of the Class Period.[48]

28.     The Complaint alleges additional misleading statements and omissions during the Class Period, including the following examples.  On October 22, 2015, Plank referenced "unparalleled demand for the Under Armour brand."[49]  On January 28, 2016, Plank stated that "'[o]ur core business remains incredibly strong,'"[50] and "[o]ur growth story is strong.  We remain a growth company and none of that is wavered."[51]  On that date Defendants also failed to disclose that they inflated quarterly financial results and growth to appear healthier and to mask slowing demand.[52]  On May 31, 2016, Plank stated that "'our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies.'"[53]  These are simply a few examples of the many statements or omissions that are alleged to have created a misleading picture to the market regarding Under Armour's brand strength and customer demand.

29.     Finally, the Complaint alleges that the relevant truth was revealed through a series of partial corrective disclosures starting January 10, 2016 and ending on November 3, 2019.[54]  These disclosures included revelations about slower growth of Under Armour's North American

---

[48] Complaint ¶159.

[49] "Under Armour, Inc. NYSE:UAA FQ3 2015 Earnings Call Transcripts," S&P Capital IQ, October 22, 2015, 8:30 AM; Complaint ¶153.

[50] "Under Armour Reports Fourth Quarter Net Revenues Growth Of 31% And Full Year Net Revenues Growth Of 28%," PR Newswire, January 28, 2016, 7:00 AM; Complaint ¶179.

[51] "Under Armour, Inc. NYSE:UAA FQ4 2015 Earnings Call Transcripts," S&P Capital IQ, January 28, 2016, 8:30 AM; Complaint ¶179.

[52] Complaint ¶178.

[53] "Under Armour Updates 2016 Outlook," PR Newswire, May 31, 2016, 4:15 PM; Complaint ¶313.

[54] Complaint ¶¶378-385.

apparel sales, falling sales prices, slowing rates of growth, and reduced market share.[55]  The disclosures further included revelations that a slowdown in North American apparel growth and compressed margins led to higher discounts, promotions, and ultimately liquidations.[56]  Further disclosures included reduced financial projections that resulted from the slowdown in the North American apparel business, the sudden departure of CFO Lawrence "Chip" Molloy ("Molloy"), and a restructuring involving hundreds of job cuts.[57]  Furthermore, a November 3, 2019 article by *WSJ* revealed that Under Armour's revenue recognition practices had become the focus of civil and criminal investigations from the SEC and DOJ, respectively.[58]  As a result of the alleged fraud, investors allegedly purchased Under Armour Common Stock at artificially inflated prices during the Class Period and were harmed when the alleged truth was revealed through a series of partial disclosures.

## V.   IMPORTANCE OF ALLEGED MISSTATEMENTS AND OMISSIONS

30.    As a financial economist, I consider economic materiality to relate to information, news, announcements, or other events that would impact the valuation of a company and its securities, and thus, investors' demand for those securities.  As such, my opinions in this report regarding materiality are based upon my analysis of such information as it pertains to finance, economics, and valuation, and are not intended to represent legal analyses or conclusions.  An element of the loss causation analysis involves an examination of fundamental valuation principles, public statements, as well as analysts' commentary in order to assess whether the subject matter of the alleged misrepresentations and omissions is economically material, and

---

[55] Complaint ¶¶378-379.

[56] Complaint ¶382.

[57] Complaint ¶¶382-384.

[58] Complaint ¶385.

thus, value-relevant to investors. While I understand that materiality has a legal definition in matters such as this one, for the purposes of my report, the term "economic materiality" means the importance of information to the market (and thus, investors), such that it would affect the valuation of a security and investors' decisions to buy or sell the security.

31. Therefore, the relevant question is whether the allegedly misrepresented and omitted information—that Under Armour's customer demand was declining and sales growth decelerating and the Company masked these issues by repeatedly making misleading claims about its customer demand in connection with reporting financial metrics such as revenue growth, gross margins, and inventory, or engaging in undisclosed pull-forward and suspect sales and accounting practices that violated GAAP and SEC regulations—would have been important to investors. For purposes of evaluating whether the alleged misstatements and omissions are material from an economic and financial perspective, I also consider what information was concealed and would have been disclosed in a hypothetical "but-for" disclosure. In this matter, based on the Complaint's allegations, I understand that the corrective disclosures revealed the relevant truth about Under Armour's true customer demand and use of pull-forward sales practices to appear healthier.[59]

32. For the purposes of my report, I assume that the misrepresentations and omissions the Complaint alleges in this matter misinformed investors about the true strength of Under Armour's customer demand during the Class Period, and therefore, the Company's major revenue streams, as well as the purported reasons behind its year-over-year quarterly revenue growth metrics that exceeded 20% and/or met or beat analyst estimates. Thus, I conclude that

---

[59] I am not suggesting the specific wording of any hypothetical but-for disclosure. Instead, I am describing the relevant economic factors that any such disclosure would convey based upon my understanding of the Complaint's allegations.

the misrepresentations and omissions and the undisclosed information regarding the "suspect sales and accounting practices"[60] alleged in this case were economically material to investors in Under Armour Common Stock.  I base my opinion on: (1) Defendants' own public statements portraying the Company as a leading premium sports brand with strong customer demand and sales growth that engaged in proper sales practices; (2) analyst commentary demonstrating that the market relied upon Defendants' statements concerning Under Armour's customer demand and sales growth in evaluating the Company's ability to generate revenue and earnings; (3) the application of basic valuation principles to Under Armour's business; (4) my event study analysis, that establishes a statistically significant decline in the prices of Under Armour Common Stock on the corrective disclosure dates; and (5) certain internal Under Armour documents produced in this litigation and provided to me by counsel.

### A. DEFENDANTS' PUBLIC STATEMENTS

33.    Under Armour considered information about its growth rate and customer demand for its products to be an important driver of Under Armour's value and the valuation of its stock. This is demonstrated through statements made by Defendants in Under Armour's SEC filings and during conference calls.  The Company also recognized internally that continued customer demand driving high rates of continued growth was an essential contributor to Under Armour's stock price.  A presentation prepared by McKinsey & Company in 2015 concluded that "Under Armour needs to maintain high growth to justify share price."[61] **Appendix C**, attached hereto, provides select quotes from Under Armour SEC filings and conference call transcripts that demonstrate the value-relevance of this type of information.

---

[60] *Under Armour*, 540 F. Supp. 3d at 523.

[61] UA_00453241 (page 6 of slides).  As discussed via internal Under Armour email dated January 28, 2015 (UA_00453240).

34.     As evident from Defendants' statements before and during the Class Period, Under Armour considered its premium brand status, and considerable brand strength, as key in generating revenue growth from its products, and therefore central to the Company's financial performance.  Additionally, as discussed further below, Defendants led analysts to believe that these strengths were also key to the future of Under Armour's growth and performance.

## B.   ANALYST COMMENTARY

35.     As further evidence of the importance of Defendants' misstatements and/or omissions regarding Under Armour's customer demand, growth rates, and brand strength, securities analysts following Under Armour routinely monitored the demand for Under Armour's products, the strength of the brand, and how these factors contributed to Under Armour's expected future earnings and revenue growth.  It is evident from the analyst reports written, as well as from analysts' questions during Under Armour's conference calls prior to and throughout the Class Period, that analysts were focused on these factors.  Viewed as vital to Under Armour's success, the brand strength, premium positioning, and high demand for Under Armour's products were closely examined by analysts as the strength of these factors was viewed as indicative of future financial success for the Company.  **Appendix C** provides select analyst quotes that demonstrate the value-relevance of this type of information.

36.     As documented in **Appendix C**, analysts specifically focused on the brand strength of Under Armour, the customer demand, and the perceived premium status that the brand enjoyed.  They relied upon these elements when providing investment advice, and questioned the Company about it during meetings and calls with Under Armour executives.  In addition, I provide further evidence in **Sections VII** and **VIII** below that analysts focused on Under Armour's customer demand throughout the Class Period in response to the Corrective Disclosure

Events and Inflation Creating Events.  The foregoing provides compelling evidence that the alleged misstatements and omissions were important, value-relevant, and economically material to investors in Under Armour Common Stock.  Therefore, it stands to reason that the Company's knowledge of decreasing customer demand or decelerating revenue growth would be economically material to investors.

### C.  ECONOMIC AND VALUATION PRINCIPLES

37.    A fundamental principle of financial economics holds that the value of a security is equal to the present value of the expected future cash flows to holders of that security.[62]  In other words, a security's value is the sum of the estimated future cash flows discounted at a rate that reflects their riskiness.[63]  All else equal, a decrease in a company's future revenue or future earnings reflects a decrease in the cash flows to the common stockholders, and thus, causes a decrease in the value of the security.  This fundamental valuation principle helps to further explain why customer demand and resulting earnings and revenue growth for Under Armour's products would impact future revenues and earnings, and thus, be value-relevant and economically material to investors.

38.    During the Class Period, the success of the brand, and high customer demand was meaningful to Under Armour's commercial success.  As discussed above in **Section V.A.**, Under Armour understood the importance of its brand strength and customer demand and how these factors impacted the Company's financial success.  It is also evident from analyst commentary above in **Section V.B.** that the market expected that the demand for Under Armour's brand

---

[62] Tim Koller, Marc Goedhart, & David Wessels, "Measuring and Managing the Value of Companies," *John Wiley & Sons*, Sixth Edition, 2015, p. 17.

[63] Tim Koller, Marc Goedhart, & David Wessels, "Measuring and Managing the Value of Companies," *John Wiley & Sons*, Sixth Edition, 2015, p. 42.

would continue to be high based on the Company's public statements. Thus, an investor would consider the declining customer demand or decelerating revenue growth to be important, as this information related to expected future cash flows to be generated by the Company. High customer demand and brand strength impacted Under Armour's revenue growth, which the Company understood that analysts and investors paid close attention to. The analysts' comparison of revenue growth to the Company and analysts' prior estimates were used as an indicator of future financial success for Under Armour.

39.     Basic finance theory demonstrates that all else equal, a reduction in a firm's revenues, profit margins, and earnings will correspondingly reduce the cash flows available to common stockholders. And a reduction in cash flows directly translates into a reduction in firm value based on basic financial valuation principles. Because Defendants' alleged misrepresentations and omissions directly impacted the timing, level, and risk of expected future cash flows (and thus, the value investors put on the stock), the losses Plaintiffs and other investors suffered were a foreseeable consequence of the alleged fraud. If Plaintiffs ultimately prove their allegations, then based on fundamental valuation principles, investors would have viewed the concealed information and the alleged misstatements and omissions to be value-relevant and thus, material, from an economic perspective.

**D.  EVENT STUDY**

40.     In order to study and opine on the stock price movements for Under Armour over the Class Period and on relevant days, I performed an event study.[64] I also performed an event study in my Efficiency Report and I reached the conclusion that Under Armour traded in an

---

[64] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. *See* A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35 (1997), p. 13.

efficient market; thus, my event study in this matter is valid.[65]  After carefully reviewing and considering the relevant information environment for purposes of assessing loss causation and damages in this report, I have utilized the same event study methodology as that performed in my prior Efficiency Report. [66]  For brevity, I repeat the key parameters of this event study below, but refer to my Efficiency Report for a more lengthy discussion of my event study process.[67]  My event study incorporates a rolling 120-day estimation window,[68] the S&P 500 Total Return Index (the "Market Index"), and the S&P 500 Apparel, Accessories, and Luxury Goods (the "Industry Index").[69]  **Exhibits 1 and 2**, attached hereto, graph the coefficients on these controls for Under Armour Class A and C Common Stock, respectively.  **Exhibits 3 and 4**, attached hereto, plot the standard deviation of the regression errors, also known as Root Mean Squared Error, over the estimation window for the Class A and C Common Stock, respectively.

41.  **Exhibits 5 and 6**, attached hereto, report the event study results for the Corrective Disclosure Events and Inflation Creating Events for the Class A and C Common Stock, respectively.  Overall, the Corrective Disclosure Events and Inflation Creating Events caused stock price movements that were statistically significant at the 95% confidence level or greater. The statistical significance of the stock price declines provides direct scientific evidence of the

---

[65] Cain Efficiency Report ¶84.  The event studies I employ in this report remain unchanged from my Efficiency Report – which was not challenged by Defendants at the class certification stage.  *See Under Armour*, 2022 WL 4545286, at *15.

[66] I also considered controlling for Under Armour's competitors, Nike and Adidas, in my event study.  However, the addition of Nike or Adidas did not consistently contribute to or enhance the predictive power of the event study.  As a result, I did not control for Nike or Adidas separate and apart from my market index and industry index.

[67] *See* Cain Efficiency Report Section IV.E.

[68] For Class C Common Stock, I used a fixed to rolling regression as the stock was issued during the Class Period, and there was not 120 prior days' worth of data to use.

[69] The equal-weighted Industry Index is comprised of members of the S&P Apparel, Accessories, and Luxury Goods Index, excluding Under Armour (*i.e.*, HanesBrands, PVH Corp., Ralph Lauren, Tapestry Inc., VF Corp., Capri Holdings, and Fossil Group).  Under Armour compared its performance to the S&P Apparel, Accessories, and Luxury Goods Index in its four Form 10-K SEC filings for the years ending during the Class Period.

importance of the alleged misstatements and omissions. For the reasons discussed above, a reasonable investor would have viewed the alleged misrepresentations and omissions as having significantly altered the total mix of information available. Thus, I conclude that the alleged misstatements and omissions in this case were important, value-relevant, and economically material to investors.

## VI.   LOSS CAUSATION

42.   I consider loss causation in this matter in the context of a two-prong test: first, would Plaintiffs and the Class have suffered an economic loss "but for" the Defendants' alleged violations? And second, was the economic loss a "foreseeable consequence" of Defendants' alleged violations? In evaluating these two factors, I can assess the economic impact of the allegations and I determine whether there is economic evidence to link any stock price declines to the revelation of the prior alleged misstatements or omissions.

43.   First, I address why there is a foreseeable causal link between Defendants' alleged misrepresentations and omissions and the Corrective Disclosure Events. Second, I explain how the event study methodology I employ demonstrates that the Corrective Disclosure Events caused economic losses to Under Armour shareholders who purchased Class A and/or Class C Common Stock during the Class Period.

### A.   INVESTOR LOSSES WERE FORESEEABLE

44.   As explained previously, the Complaint alleges that Defendants made material misrepresentations and omissions during the Class Period regarding the real extent to which Under Armour's customer demand was declining and revenue growth decelerating, while engaging in (undisclosed) suspect sales and accounting practices in order to appear healthier and meet and/or exceed revenue growth targets. There is a clear economic link between the alleged

misrepresentations and omissions and the foreseeable investor losses that occurred following the Corrective Disclosure Events. As I explain below, it was foreseeable at the time of the alleged misstatements and omissions that when the relevant truth became known through a series of partial corrective disclosures, the respective market values of Under Armour Common Stock would fall. If, as the Complaint alleges, Defendants knew or recklessly disregarded that Under Armour's customer demand was declining and Defendants engaged in (undisclosed) suspect sales and accounting practices to create a misleading impression to investors about the Company's financial health, then it was foreseeable at the time of the alleged misstatements and/or omissions that when the relevant truth would eventually become known, the market values of Under Armour Common Stock would fall. As such, investors who purchased Under Armour Common Stock while Defendants concealed this information, suffered losses as the relevant truth was revealed. Therefore, the misrepresentations and omissions represent the but-for cause of the economic losses that Plaintiffs and other Class members suffered.

45. A generally accepted economic principle is that the value of a security is directly related to expectations about the future cash flows to holders of that security.[70] Because of the economic link between Under Armour's customer demand/growth rates and the Company's future earnings and anticipated future cash flows, and the link between anticipated future cash flows and the market value of Under Armour Common Stock, there is a clear economic link between Under Armour's customer demand/growth rates and the market value of Under Armour Common Stock. Therefore, it is my opinion that there is a direct and foreseeable causal link

---

[70] *See, e.g.*, David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001) ("the price of an efficiently traded stock is equal to the present value of the discounted future stream of free cash flow"); *see also* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (John Wiley & Sons, 1996), at pp. 9-10 ("This [DCF] approach has its foundation in the 'present value' rule, where the value of any asset is the present value of expected future cashflows on it.").

between the alleged material misrepresentations and omissions and the subsequent economic

losses that occurred following the Corrective Disclosure Events.

### B.  THE CORRECTIVE INFORMATION CAUSED ECONOMIC LOSSES

46.   Economists assessing loss causation commonly employ event studies to evaluate

whether there is economic evidence to link corrective information regarding prior misstatements

and/or omissions to price declines in the subject security.

47.   **Exhibits 5 and 6** summarize the results of the event studies I conducted on the

Corrective Disclosure Events, demonstrating that there was a statistically significant negative

price reaction beyond the 95% confidence level on each date.  In the following section, I describe

each of the Corrective Disclosure Events, specifically how new Company-specific information

released to the market was corrective of Defendants' material misrepresentations and omissions

and the impact that the release of this information had on the prices of Under Armour Common

Stock.

## VII.  ANALYSIS OF THE CORRECTIVE DISCLOSURE EVENTS

### A.  JANUARY 11, 2016

48.   On Sunday, January 10, 2016, Morgan Stanley expressed concern over Under

Armour's declining market share and average sales prices according to "SportScan" data.[71]  As a

result, Morgan Stanley downgraded its rating on Under Armour, decreased its price target by

---

[71] "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley*, January 10, 2016.  According to https://www.ssidata.com/: "SSI Data began in 1997 as SportTrendInfo a company that measured sales data for the sporting goods market. The company's name changed to SportScanInfo in 2005 and eventually to SSI Data in 2015 as the company started to receive more data outside of the sporting goods marketplace. The brand name was changed to SSI Data in 2015. After two decades publishing the only weekly trend reporting based on retail point-of-sale data in the active lifestyle market, SSI Data is now providing that same actionable business intelligence in the U.S. consumer products lifestyle market to help manufacturers and retailers in this broader market make more informed decisions. SSI Data is no longer reporting data for the U.S. active lifestyle market after selling that component of the business in April 2019."

nearly 40% from $103 to $62, and lowered some of its financial estimates for the Company.[72] The Morgan Stanley report also noted that "UA sales growth has decelerated on both a one- and two-year basis since spring 2015," which was before the start of the Class Period.[73] Additional commentary from this report is summarized in **Appendix D**, attached hereto.

49.     As also documented in **Appendix D**, numerous media outlets reported on the Morgan Stanley report, both before the opening of trading on the morning of Monday, January 11, 2016, and throughout that day.  These stories connected the decline in Under Armour's stock price to the Morgan Stanley report, stating for example: "[t]he catalyst for the continuation of [UA's] sharp decline is a downgrade from Morgan Stanley,"[74] "[s]hares of Under Armour (UA) slid in morning trading after an analyst from Morgan Stanley downgraded the athletic apparel company's stock, citing data pointing to losses in market shares and eroding pricing power,"[75] and "Under Armour Inc. suffered its worst stock decline in more than three months after Morgan Stanley pointed to a market-share decline for the company, especially among women. The company is losing ground to apparel rivals for the first time in three years and average selling prices are falling at an accelerated pace, according to a report from Morgan Stanley analyst Jay Sole."[76]

---

[72] "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley*, January 10, 2016.  I note that Morgan Stanley documented continuing negative trends in SportScan data in subsequent reports, for example in its April 10, 2016 report titled "Why We're Staying UW Even Though 1Q Looks Solid" (but did not downgrade its rating or price target in the April 10 report).

[73] "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley*, January 10, 2016.

[74] "Morgan Stanley Downgrade Sinks Under Armour," *Benzinga.com*, January 11, 2016, 12:39 PM.

[75] "Under Armour drops after analyst says sell on weaker market share," *Theflyonthewall.com,* January 11, 2016, 10:43 AM.

[76] "Under Armour Tumbles After Analyst Says It Has Woman Problem (1)," *Bloomberg*, January 11, 2016, 4:13 PM.

50.    Furthermore, Defendants themselves attributed the price decline in Under Armour Common Stock on January 11, 2016 to the Morgan Stanley report.  Specifically, on January 11, 2016, Plank emailed Kip Fulks, an executive at Under Armour, stating: "You should ask your guy[s] from MS [Morgan Stanley] about this little piece that has erased $2B [Billion] from our coffers in the last 4.5 hours."[77]  Plank agreed that the Morgan Stanley report that day "caused Under Armour stock price to decline" and "moved the Under Armour stock price" because "[i]t was a downgrade from a major  bank with a really thought-out analysis."[78]  Plank also testified that his January 11, 2016 email about the Morgan Stanley report stated that the report "erased 2B[illion] . . . from our coffers in the last 4.5 hours."[79]

51.    If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier, then the Morgan Stanley report revealed a portion of the relevant truth concealed by the alleged misstatements and omissions.  The information in the Morgan Stanley report is corrective of the alleged misstatements and omissions because it suggests that, despite what Defendants had been publicly touting to investors about the Company's customer demand, Under Armour had been experiencing a decline in sales growth since spring 2015, prior to the start of the Class Period, as well as declining market share and average sales prices.

---

[77] UA_00280474.

[78] February 15, 2023 Deposition Transcript of Kevin A. Plank ("Plank Tr.") at 295:11-22.

[79] Plank Tr. at 297:9-298:1.

52.     However, Under Armour's Common Stock prices remained artificially inflated because Defendants allegedly continued to misrepresent or omit information to the market regarding the strength of customer demand and growth rates, and their engagement in (undisclosed) suspect sales and accounting practices to make the Company appear healthier financially.  As a result, the January 11, 2016 Corrective Disclosure Event represents a partial but incomplete disclosure of the relevant truth, rather than a full disclosure, and as a result, Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

53.     Based on my event study, Under Armour's Class A Common Stock price declined on January 11, 2016 by 7.02%, or $2.63 per share, after controlling for market and industry effects (*see* **Exhibit 5**).[80]  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -4.82.  Additionally, there was relatively high trading volume in Under Armour Class A Common Stock on this date of 29.0 million shares traded, which is at least 5 times greater than the average daily trading volume during the Class Period.[81]  The statistically significant price decline demonstrates that the market reacted quickly and significantly on January 11, 2016 to the news revealed about the Company in the Morgan Stanley report.

54.     I carefully evaluated whether there was any other news outside of the Morgan Stanley report issued on January 10, 2016 that could explain the observed Under Armour

---

[80] Class C Common Stock was listed on the NYSE on April 8, 2016 (*see* Under Armour SEC Form 10-K for the fiscal year ended December 31, 2016) and therefore was not trading at the time of this Corrective Disclosure Event.

[81] The average daily trading volume in Under Armour Class A Common Stock was 5.7 million shares during the Class Period.

Common Stock price decline on January 11, 2016 and found no such confounding information.[82]
As a result of the foregoing, and assuming that Plaintiffs prove that Defendants recklessly or
intentionally made material misstatements or omissions, I find no economic evidence of
information unrelated to the Complaint's claims that needs to be disaggregated from the price
decline on January 11, 2016. Thus, I attribute $2.63 per share of the abnormal dollar decline to
the corrective information released in the Morgan Stanley report on January 10, 2016 and
estimate that $2.63 of artificial inflation per share was dissipated from Under Armour Class A
Common Stock on January 11, 2016.

### B. JUNE 1, 2016

55. After market hours on May 31, 2016, Under Armour issued a press release updating
its previously issued guidance for the fiscal year ("FY16") and second quarter of 2016 ("2Q16")
"following recent developments related to the bankruptcy proceedings of The Sports
Authority."[83] The press release stated that given TSA's court approved liquidation,[84] Under
Armour expected to recognize an impairment charge of $23 million during 2Q16 and the
Company would only be able to recognize $43 million of the originally planned $163 million in

---

[82] The Morgan Stanley report commented on weather and foreign exchange moves as potential contributors to weakness in sales; however, these external factors would be publicly known prior to this report publication date, and also did not appear to adversely impact Under Armour's competitors such as Nike. *See* "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley*, January 10, 2016 ("Nike's sweats/fleece business was up 23% with higher ASPs, so weather didn't seem to affect it much. Furthermore, much of UA's 4Q weakness was in undergarments, which is not a big 4Q business and likely not very sensitive to weather. UA actually performed better in outerwear this year than it did last year."). Separately, during the trading day on January 11, 2016, *Dow Jones* reported that "Under Armour (UA) has signed an exclusive outfitting contract with Yale, the company's first such deal with an Ivy League school as UA expands its roster of NCAA signings." *See* Under Armour Signs 1st Ivy League Deal -- Market Talk, *Dow Jones*, January 11, 2016, 12:32 PM. I am not aware of any evidence suggesting that this information contributed to the stock price decline on January 11, 2016.

[83] "Under Armour Updates 2016 Outlook," *PR Newswire*, May 31, 2016, 4:15 PM.

[84] *Bloomberg* published an article on May 24, 2016 stating that: "Judge overseeing chain's bankruptcy approves sale of remaining inventory, allowing going-out-of-business sales to begin over coming weekend." *See* "Sports Authority Approved to Begin Store Liquidation Sales," *Bloomberg*, May 24, 2016, 4:35 PM.

revenues from TSA in FY16, a shortfall of $120 million.[85]  Under Armour lowered its 2016

guidance as a result.  The FY16 revenue guidance revision to $4.925 billion represented a

decline of $75 million from Under Armour's previously announced $5 billion.[86]  The consensus

analyst estimate for FY16 revenue prior to the press release was $5.026 billion.[87]  Under Armour

had previously issued FY16 operating income guidance of $503 million to $507 million,[88] but its

updated guidance for this metric of $440 million to $445 million represented up to a $67 million

decline.  The consensus analyst estimate for FY16 operating income prior to the press release

was $512.7 million.[89]  Plank also included prepared remarks in the press release which reassured

investors that "'our brand's momentum is stronger than ever as we continue to see growth and

increased demand across all categories and geographies.'"[90]

56.     As documented in **Appendix D**, numerous media outlets and research analysts

reacted to this disclosure and noted that Under Armour's guidance cut caused the price of Under

Armour Common Stock to decline.  Based on this news, many research analysts lowered their

FY16 forecasts, price targets, and estimates for Under Armour, including Credit Suisse,

Deutsche Bank, Evercore ISI, KeyBanc Capital Markets, Oppenheimer, Piper Jaffray,

Susquehanna, BB&T Capital Markets, Brean Capital, Buckingham Research Group, Canaccord

---

[85] "Under Armour Updates 2016 Outlook," *PR Newswire*, May 31, 2016, 4:15 PM.

[86] "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire*, April 21, 2016, 7:00 AM.

[87] The consensus mean revenue estimate for FY16 as of May 30, 2016 obtained from S&P Capital IQ.

[88] "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire,* April 21, 2016, 7:00 AM.

[89] The consensus mean EBIT estimate for FY16 as of May 30, 2016 obtained from S&P Capital IQ.

[90] "Under Armour Updates 2016 Outlook," *PR Newswire*, May 31, 2016, 4:15 PM.

Genuity, Cowen, Sterne Agee, Jefferies, Morgan Stanley, Telsey Advisory Group, UBS, and Wells Fargo.[91]

57.    If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly misrepresenting both customer demand and its growth rates – while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier — then the guidance update revealed a portion of the relevant truth concealed by the alleged misstatements and omissions.  The information in the guidance update is corrective of the alleged misstatements and omissions because it partially revealed the extent to which the Company was continuing to rely on a troubled retailer to sell inventory and it signaled weakness in Under Armour's customer demand.  As one analyst concisely summarized this revelation, "UA's US apparel business is slowing and we think this news confirms it."[92]

58.    However, Under Armour's Common Stock prices remained artificially inflated because Defendants allegedly continued to misrepresent and/or omit information to the market about Under Armour's customer demand, and their engagement in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier.  As a result, the June 1, 2016 Corrective Disclosure Event represents a partial but incomplete disclosure of the relevant truth rather than a full disclosure and Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

59.    Based on my event study, Under Armour's Class A Common Stock price declined on June 1, 2016 by 4.43%, or $1.67 per share, after controlling for market and industry effects

---

[91] *See* Appendix D.

[92] "UA Lowers FY16 Sales Guidance and Drops EBIT $ Outlook 12%; Stay UW," *Morgan Stanley*, June 1, 2016.

(*see* **Exhibit 5**).  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -2.88.  Additionally, there was relatively high trading volume of Under Armour Class A Common Stock on this date of 19.5 million shares traded, which is at least 3 times greater than the average daily trading volume during the Class Period.  Furthermore, Under Armour's Class C Common Stock price declined on June 1, 2016 by 4.42%, or $1.54 per share, after controlling for market and industry effects (*see* **Exhibit 6**).  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -2.71.  The statistically significant price declines in Under Armour Common Stock demonstrate that the market reacted quickly and significantly on June 1, 2016 to the revised outlook.

 60. I carefully evaluated whether there was any other news outside of the corrective information that could explain the observed Under Armour Common Stock price declines on June 1, 2016 and found no such confounding information.[93]  As a result of the foregoing, and assuming Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline on June 1, 2016.  Thus, I attribute the full abnormal dollar declines to the corrective information released on June 1, 2016 and estimate that $1.67 and $1.54 of artificial inflation per share were dissipated from Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, on June 1, 2016.

---

[93] I also considered the extent to which TSA liquidation was negative news that impacted Under Armour's competitors, Nike and Adidas.  For example, *Bloomberg* stated: "Under Armour Inc. and Nike Inc. declined in New York trading after the Sports Authority Inc. liquidation and competition in the footwear market raised concerns about the athletic-apparel giants." *See* "Under Armour, Nike Tumble as Sports Authority Takes Toll (1)," *Bloomberg*, June 1, 2016, 9:55 AM.  I note that the price of Nike declined only marginally by -0.53% and the price of Adidas increased by 1.52% on June 1, 2016 according to prices obtained from S&P Capital IQ.

**C. JULY 26, 2016**

61. On the morning of July 26, 2016 before the opening of trading, Under Armour issued a press release announcing earnings results for 2Q16.[94] The Company reported 2Q16 results and FY16 guidance as shown in the table below along with the respective consensus analyst estimates.[95]

| Metric (in millions except for EPS) | Reported | Consensus Expected | + Surprise / (- Miss) $ | + Surprise / (- Miss) % |
|---|---|---|---|---|
| 2Q16 Results | | | | |
| Revenue | $1,000.8 | $1,002.3 | ($1.5) | -0.1% |
| Operating Income | $19.4 | $19.1 | $0.3 | 1.3% |
| Net Income | $6.3 | $7.9 | ($1.5) | -19.3% |
| EPS Normalized | $0.01 | $0.02 | ($0.01) | -50.0% |
| | | | | |
| FY16 Guidance | | | | |
| Revenue | $4,925.0 | $4,959.0 | ($34.0) | -0.7% |
| Operating Income | $440 - $445 | $452.6 | ($10.1) | -2.2% |

62. The Company noted that operating income for the quarter included the $23 million impairment charge related to the liquidation of TSA,[96] which was previously announced on May 31, 2016.[97] In the press release, Under Armour expanded on revenue within its segments, stating: "Within product categories, apparel net revenues increased 19% to $613 million compared with $515 million in the same period of the prior year, led by growth in men's

---

[94] "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, July 26, 2016, 7:00 AM.

[95] "Reported" figures were obtained from "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, July 26, 2016, 7:00 AM. "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of July 25, 2016 for the fiscal periods listed in the table according to S&P Capital IQ. Throughout this report, "EPS" refers to earnings per share for Under Armour Class A Common Stock unless otherwise noted.

[96] "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, July 26, 2016, 7:00 AM.

[97] "Under Armour Updates 2016 Outlook," *PR Newswire*, May 31, 2016, 4:15 PM.

training, women's training and golf."[98] Shortly thereafter, at 8:30 AM, Under Armour hosted a

conference call to discuss its earnings announcement in greater detail.[99]  On the call, Plank

announced a new partnership that would involve the brand selling its products in Kohl's stores in

2017, and Molloy discussed Company expectations for revenue growth of 20% for the third

quarter. [100]

63.    As summarized in **Appendix D**, during the question-and-answer portion of the call,

analysts interacted with Molloy and Plank about Under Armour's gross margins, guidance,

reasons for the decline in operating profit outlook, the impact of the Company's shipments in

light of TSA's bankruptcy, and guidance for the remainder of the fiscal year.  A number of

research analysts and media articles expressed disappointment and concern following these

disclosures, and many analysts further reduced their price targets and estimates on Under

Armour as a result.  Summaries of this sentiment included: the Company's third quarter forecast

of sales growth is the "slowest rate in over six years,"[101] the realized second quarter "apparel

sales rose 18.9 percent, growth dropped below 20 percent for the first time in more than seven

years in the business, which accounts for nearly two-thirds of revenue,"[102] and "some analysts

worried that a move to value department chains would erode Under Armour's brand."[103]

---

[98] "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, July 26, 2016, 7:00 AM.

[99] "Under Armour, Inc. NYSE:UAA FQ2 2016 Earnings Call Transcripts," S&P Capital IQ, July 26, 2016, 8:30 AM.

[100] "Under Armour, Inc. NYSE:UAA FQ2 2016 Earnings Call Transcripts," S&P Capital IQ, July 26, 2016, 8:30 AM.

[101] "BUZZ-Under Armour Inc: Forecasts slowest sales growth in 6 years," *Reuters*, July 26, 2016, 11:33 AM.

[102] "UPDATE 3-Under Armour forecasts slowest quarterly sales growth in 6 years," *Reuters*, July 26, 2016, 10:28 AM.

[103] "Under Armour Plants 'Flag' With New Moves, But Stock Reverses," *Investor's Business Daily*, July 26, 2016.

64.     However, other analysts were reassured by Defendants' assurances and expressed confidence in the Company's growth prospects.[104]

65.     Under Armour internally recognized that analysts and investors were disappointed by news in the earnings announcement and conference call.  For example, an email to Plank from the Director of Investor Relations discussed analyst reactions to the Company's announcements, highlighting that some analysts were concerned about the Kohls expansion being "already contemplated in our long-term plans and growth rate" as opposed to representing any incremental revenue.[105]

66.     Based on my event study, after controlling for market and industry effects Under Armour's Class A Common Stock price declined on July 26, 2016 by 5.25%, or $2.29 per share (*see* **Exhibit 5**).  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -3.45.  Additionally, there was relatively high trading volume of Under Armour Class A Common Stock on this date of 17.9 million shares traded, which is at least three times greater than the average daily trading volume during the Class Period.  Furthermore, Under Armour's Class C Common Stock price declined on July 26, 2016 by 3.35%, or $1.30 per share, after controlling for market and industry effects (*see* **Exhibit 6**).  This price decline is statistically significant at the 95% confidence level with a t-statistic of -2.05.  Additionally, there was relatively high trading volume of Under Armour Class C Common Stock on this date of 3.7 million shares traded, which is greater than the average daily trading volume during the Class Period.[106]  The statistically significant price declines in

---

[104] *See* Appendix D.

[105] UA_00246205.

[106] The average daily trading volume in Under Armour Class C Common Stock was 3.1 million shares during the Class Period.

Under Armour Common Stock demonstrate that the market reacted quickly and significantly on July 26, 2016 to the disappointing earnings information.

67. If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the earnings release revealed a portion of the relevant truth concealed by the alleged misstatements and omissions. The information in the earnings release is corrective of the alleged misstatements and omissions because it revealed disappointing guidance and sales mix headwinds, as well as expansion into a value retailer (Kohl's) in order to target continuing sales growth. However, Under Armour's Common Stock prices remained artificially inflated because Defendants allegedly continued to misrepresent Under Armour's customer demand, revenue growth, and financial health to investors through the use of (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier. As a result, the July 26, 2016 Corrective Disclosure Event represents a partial, yet incomplete, disclosure of the relevant truth and because it was not a full disclosure, Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

68. I carefully evaluated whether there was any other news outside of the corrective information that could explain the observed Under Armour Common Stock price declines on

July 26, 2016 and found no such confounding information.[107]  As a result of the foregoing, and

assuming that Plaintiffs prove their allegations, I find no economic evidence of information

unrelated to the Complaint's claims that needs to be disaggregated from the price decline on July

26, 2016.  Thus, I attribute the full abnormal dollar decline to the corrective information released

on July 26, 2016 and estimate that $2.29 and $1.30 of artificial inflation per share were

dissipated from Under Armour Class A Common Stock and Under Armour Class C Common

Stock, respectively, on July 26, 2016.

### D.   OCTOBER 25, 2016

69.   On the morning of October 25, 2016, before the opening of trading, Under Armour

issued a press release announcing earnings results for the third quarter of 2016 ("3Q16").[108]  The

Company reported 3Q16 results and FY16 guidance as shown in the table below along with the

respective consensus analyst estimates.[109]

---

[107] I noted that foreign exchange movements had a minor adverse impact on gross margins for the quarter (30bps per J.P. Morgan's model). *See* "In-Line 2Q w/ 2H Maintained; Walking Through The Moving Pieces; Neutral – ALERT," *J.P. Morgan*, July 26, 2016.  Yet daily FX movements are public information and thus not new information as of the earnings announcement.  Additionally, my review of the information environment indicates that analysts and investors did not view this as confounding information that caused the stock price decline on this date.  *See* Appendix D.

[108] "Under Armour Reports Third Quarter Net Revenues Growth Of 22%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, October 25, 2016, 7:00 AM.

[109] "Reported" figures were obtained from "Under Armour Reports Third Quarter Net Revenues Growth Of 22%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire*, October 25, 2016, 7:00 AM. "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of October 24, 2016 for the fiscal periods listed in the table according to S&P Capital IQ.

| Metric (in millions except for EPS) | Reported | Consensus Expected | + Surprise / (- Miss) $ | + Surprise / (- Miss) % |
|---|---|---|---|---|
| **3Q16 Results** | | | | |
| Revenue | $1,471.6 | $1,454.7 | $16.9 | 1.2% |
| Operating Income | $199.3 | $184.6 | $14.8 | 8.0% |
| Net Income | $128.2 | $110.9 | $17.3 | 15.6% |
| EPS Normalized | $0.29 | $0.25 | $0.04 | 16.0% |
| | | | | |
| **FY16 Guidance** | | | | |
| Revenue | $4,925.0 | $4,935.0 | ($10.0) | -0.2% |
| Operating Income | $440 - $445 | $450.2 | ($7.7) | -1.7% |

70.    At 8:15 AM, Under Armour filed a Form 8-K with the SEC, which included two exhibits: (1) the previously issued earnings press release; and (2) a portion of the script for the upcoming conference call to discuss the earnings announcement in greater detail.[110] The second exhibit included prepared remarks from Molloy indicating that the Company was reiterating its long-term revenue guidance but cutting its long-term operating income outlook. Under Armour then held a conference call at 8:30 AM and provided responses to multiple inquiries from analysts regarding the slowing operating income growth. A summary of these disclosures is provided in **Appendix D**. As also reflected in **Appendix D**, numerous media articles and analyst reports covered this disappointing earnings news. Many analysts also downgraded their ratings, price targets, and forecasts of Under Armour in reaction to this news, including William Blair, Stifel, Canaccord Genuity, Evercore ISI, Barclays, Morningstar, Guggenheim, Jefferies, Wells Fargo, Cowen, Deutsche Bank, Telsey Advisory Group, Brean Capital, Buckingham Research Group, and Morgan Stanley.

71.    Based on my event study, Under Armour's Class A Common Stock price declined on October 25, 2016 by 12.25%, or $4.64 per share, after controlling for market and industry

---

[110] Under Armour SEC Form 8-K, filed October 25, 2016, 8:15 AM.

effects (*see* **Exhibit 5**).  This price decline is statistically significant at the 95% confidence level

(as well as beyond the 99% confidence level) with a t-statistic of -9.09.  Additionally, there was

relatively high trading volume of Under Armour Class A Common Stock on this date of 58.2

million shares traded, which is at least 10 times greater than the average daily trading volume

during the Class Period.  Furthermore, Under Armour's Class C Common Stock price declined

on October 25, 2016 by 12.69%, or $4.17 per share, after controlling for market and industry

effects (*see* **Exhibit 6**).  This price decline is statistically significant at the 95% confidence level

(as well as beyond the 99% confidence level) with a t-statistic of -8.66.  Additionally, there was

relatively high trading volume of Under Armour Class C Common Stock on this date of 6.8

million shares traded, which is at least 2 times greater than the average daily trading volume

during the Class Period.  The statistically significant price declines in Under Armour Common

Stock demonstrate that the market reacted quickly and significantly on October 25, 2016 to the

disappointing earnings information.

72.    If Plaintiffs prove that Defendants knew or recklessly disregarded that Under

Armour's customer demand was declining yet masked this by repeatedly making material

misrepresentations or omissions regarding customer demand and its growth rates — while

engaging in (undisclosed) suspect sales and accounting practices to make the Company appear

financially healthier – then the earnings release revealed a portion of the relevant truth concealed

by the alleged misstatements and omissions.  The information in the earnings release is

corrective of the alleged misstatements and omissions because it revealed additional information

about Under Armour's reduced growth outlook, constrained margins, and reliance on discounts

and promotions.  However, Under Armour's Common Stock prices remained artificially inflated

because Defendants allegedly continued to misrepresent Under Armour's customer demand,

revenue growth, and financial health to investors through the use of (undisclosed) suspect sales and accounting practices to make the Company appear healthier financially. As a result, the October 25, 2016 Corrective Disclosure Event represents a partial, but incomplete disclosure of the relevant truth, rather than a full disclosure. As a result, Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

73.    I carefully evaluated whether there was any other news outside of the corrective information that could explain the observed Under Armour Common Stock price declines on October 25, 2016. I found no such confounding information.[111] As a result of the foregoing, and assuming that Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline on October 25, 2016. Thus, I attribute the full abnormal dollar declines to the corrective information released on October 25, 2016 and estimate that $4.64 and $4.17 of artificial inflation per share were dissipated from Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, on October 25, 2016.

**E.   JANUARY 31, 2017**

74.    On the morning of January 31, 2017, before the opening of trading, Under Armour publicly issued a press release announcing earnings results for both the fourth quarter of 2016

---

[111] I noted that foreign exchange movements had a minor adverse impact on gross margins for the quarter (similar in magnitude to the prior quarter). Yet daily FX movements are public information and thus not new information as of the earnings announcement. Additionally, my review of the information environment indicates that analysts and investors did not view this as confounding information that caused the stock price decline on this date. *See* Appendix D.

("4Q16") and FY16.[112]  The Company reported 4Q16 results and fiscal year 2017 ("FY17")

guidance as shown in the table below along with the respective consensus analyst estimates.[113]

| Metric<br>(in millions except for EPS) | Reported | Consensus<br>Expected | + Surprise /<br>(- Miss)<br>$ | + Surprise /<br>(- Miss)<br>% |
|---|---|---|---|---|
| 4Q16 Results | | | | |
| Revenue | $1,308.1 | $1,408.6 | ($100.5) | -7.1% |
| Operating Income | $166.8 | $189.7 | ($22.9) | -12.1% |
| Net Income | $104.9 | $113.2 | ($8.2) | -7.3% |
| EPS Normalized | $0.23 | $0.25 | ($0.02) | -8.0% |
| | | | | |
| FY17 Guidance | | | | |
| Revenue | $5,400.0 | $6,055.5 | ($655.5) | -10.8% |
| Operating Income | $320.00 | $517.0 | ($197.0) | -38.1% |

75.    The press release also announced that Molloy would be leaving the company "due

to personal reasons."[114] At 8:16 AM, Under Armour filed a Form 8-K with the SEC, which

included two exhibits: (1) the previously issued earnings press release; and (2) a portion of the

script for the upcoming conference call to discuss the earnings announcement in greater detail.[115]

In the prepared remarks, Molloy stated that "'numerous challenges and disruptions in North

American retail tempered our fourth quarter results.'"[116] At 8:17 AM, Under Armour filed

another Form 8-K with the SEC, describing the announced departure of Molloy.  At 8:30 AM,

---

[112] "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire*, January 31, 2017, 6:00 AM.

[113] "Reported" figures were obtained from "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire*, January 31, 2017, 6:00 AM.  "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of January 30, 2017 for the fiscal periods listed in the table according to S&P Capital IQ.

[114] "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire*, January 31, 2017, 6:00 AM.

[115] Under Armour SEC Form 8-K, filed January 31, 2017, 8:16 AM.

[116] "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire*, January 31, 2017, 6:00 AM.

Under Armour hosted its conference call.[117]  A summary of these disclosures is provided in **Appendix D**.

76.    As also reflected in **Appendix D**, numerous media articles and analyst reports covered this disappointing earnings news.  Many analysts also downgraded their ratings, price targets, and forecasts for Under Armour in reaction to this news, including Susquehanna, Canaccord Genuity, Piper Jaffray, Credit Suisse, Wells Fargo, Raymond James, B. Riley, FBR, BofA Merrill Lynch, Evercore ISI, Cowen, J.P. Morgan, William Blair, Deutsche Bank, and SunTrust.  Standard & Poor's also lowered its credit rating for Under Armour, [118] and Moody's Investor Services reduced its ratings outlook to negative as a result.[119] *Reuters* summarized much of this fallout: "24 out of 35 analysts slash price targets, while 8 downgrade the stock as company's disappointing Q4 and outlook spurs a sharp revision to analyst views."[120]

77.    If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the earnings release, lowered FY17 guidance update, and CFO departure news revealed a portion of the relevant truth concealed by the alleged misstatements and omissions.  The information in the earnings announcement is corrective of the alleged misstatements and omissions because it revealed disappointing growth and margins for 4Q16 and

---

[117] "Under Armour, Inc. NYSE:UAA FQ4 2016 Earnings Call Transcripts," S&P Capital IQ, January 31, 2017, 8:30 AM.

[118] "*S&PGR Downgrades Under Armour Inc. To 'BB+'; Outlook Negative," *Dow Jones*, February 1, 2017, 10:32 AM.

[119] "Moody's changes Under Armour's rating outlook to negative," *Moody's Investor Services*, February 1, 2017, 11:17 AM.

[120] "BUZZ-Under Armour: analysts scramble after stock's worst-ever day," *Reuters*, February 1, 2017, 8:17 AM.

FY16, a reduced financial outlook for FY17, and the abrupt departure of the CFO. However, Under Armour's Common Stock prices remained artificially inflated because Defendants allegedly continued to misrepresent Under Armour's customer demand, revenue growth, and financial health to investors through the use of (undisclosed) suspect sales and accounting practices to make the Company appear healthier financially. As a result, the January 31, 2017 Corrective Disclosure Event represents a partial, but incomplete disclosure of the relevant truth, rather than a full disclosure. As a result, Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

78.     Based on my event study, Under Armour's Class A Common Stock price declined on January 31, 2017 by 26.45%, or $7.65 per share, after controlling for market and industry effects (*see* **Exhibit 5)**. This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -22.21. Additionally, there was substantially higher trading volume of Under Armour Class A Common Stock on this date of 54.1 million shares traded, which is at least 9 times greater than the average daily trading volume during the Class Period. Furthermore, Under Armour's Class C Common Stock price declined on January 31, 2017 by 24.07%, or $6.04 per share, after controlling for market and industry effects (*see* **Exhibit 6**). This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -15.30. The statistically significant price declines in Under Armour Common Stock demonstrate that the market reacted quickly and significantly on January 31, 2017 to the disappointing earnings news and the departure of Molloy.

79.     I carefully evaluated whether there was any other news outside of the corrective information that could explain the observed Under Armour Common Stock price declines on

January 31, 2017.  I found no such confounding information.[121]  As a result of the foregoing, and assuming that Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline on January 31, 2017.  Thus, I attribute the full abnormal dollar declines to the corrective information released on January 31, 2017 and estimate that $7.65 and $6.04 of artificial inflation per share were dissipated from Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, on January 31, 2017.

## F.   AUGUST 1, 2017

80.   On the morning of August 1, 2017 before the opening of trading, Under Armour issued a press release announcing earnings results for the second quarter of 2017 ("2Q17").[122] The Company reported 2Q17 results and FY17 guidance as shown in the table below along with the respective consensus analyst estimates.[123]

---

[121] I noted that, similar to the prior two quarters, foreign exchange movements were expected to have a continued minor adverse impact on gross margins for 2017.  Yet daily FX movements are public information and thus not new information as of the earnings announcement.  Additionally, my review of the information environment indicates that analysts and investors did not view this as confounding information that caused the stock price decline on this date.  *See* Appendix D.

[122] "Under Armour Reports Second Quarter Results," *PR Newswire*, August 1, 2017, 6:55 AM.

[123] "Reported" figures (with the exception of FY2017 Revenue Guidance) were obtained from "Under Armour Reports Second Quarter Results," *PR Newswire*, August 1, 2017, 6:55 AM.  Under Armour did not report a number for FY17 Revenue Guidance, but rather reported: "Net revenues expected to grow 9 to 11 percent."  $5,311.0 million is calculated as the midpoint of the $5,262.72 million and $5,359.29 million revenue guidance range imputed by S&P Capital IQ as of August 1, 2017.  "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of July 31, 2017 for the fiscal periods listed in the table according to S&P Capital IQ.  S&P Capital IQ reports the FY17 Operating Income Guidance as excluding the impact of the restructuring plan.

| Metric (in millions except for EPS) | Reported | Consensus Expected | + Surprise / (- Miss) $ | + Surprise / (- Miss) % |
|---|---|---|---|---|
| 2Q17 Results | | | | |
| Revenue | $1,088.2 | $1,077.1 | $11.1 | 1.0% |
| Operating Income | -$4.8 | -$24.5 | $19.7 | 80.5% |
| Net Income | -$12.3 | -$28.6 | $16.3 | 57.0% |
| EPS Normalized | -$0.03 | -$0.06 | $0.03 | 50.0% |
| | | | | |
| FY17 Guidance | | | | |
| Revenue | $5,311.0 | $5,346.3 | ($35.3) | -0.7% |
| Operating Income | $280 - $300 | $316.2 | ($26.2) | -8.3% |

81.    In the press release, Under Armour also announced a restructuring plan which would include charges of $110-$130 million relating to employee severance costs, contract terminations, inventory-related charges, and other restructuring costs.[124] The Company also lowered its guidance for FY17, including reduced revenue growth to 9%-11% (down from 11%-12%) and reduced gross margins to 46.4% on impacts from restructuring, changes in foreign currency, and inventory management efforts.[125]

82.    At 8:30 AM, Under Armour hosted a conference call to discuss the press release in greater detail.[126] As summarized in **Appendix D**, Plank and David Bergman ("Bergman") provided additional discussion regarding the restructuring plan, reduced revenue growth outlook for the year, and decline in gross margins expected for 2017, including during the question-and-answer portion of the call with analysts. As also summarized in **Appendix D**, numerous analysts expressed disappointment following these disclosures, and many lowered their estimates price targets, or forecasts regarding Under Armour as a result, including Susquehanna, Deutsche Bank,

---

[124] "Under Armour Reports Second Quarter Results," *PR Newswire*, August 1, 2017, 6:55 AM.

[125] "Under Armour Reports Second Quarter Results," *PR Newswire*, August 1, 2017, 6:55 AM.

[126] "Under Armour, Inc. NYSE:UAA FQ2 2017 Earnings Call Transcripts," S&P Capital IQ, August 1, 2017, 8:30 AM.

Cowen, Wells Fargo, Barclays, Buckingham Research Group, Telsey Advisory Group, Oppenheimer, and Credit Suisse.

83.     If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the earnings release, announcement of job cuts and restructuring, and further lowering of 2017 guidance revealed a portion of the relevant truth concealed by the alleged misstatements and omissions.  This information is corrective of the alleged misstatements and omissions because it revealed the extent of the decline in Under Armour's customer demand, the restructuring steps required to align the Company's resources with the reality of its retail outlook, and lowered growth outlook going forward.  However, Under Armour's Common Stock prices remained artificially inflated because Defendants allegedly continued to misrepresent or omit information to the market about the historical steps taken by Company executives to engage in (undisclosed) suspect sales and accounting practices to make the Company appear healthier financially.  As a result, the August 1, 2017 Corrective Disclosure Event represents a partial, but incomplete disclosure of the relevant truth, rather than a full disclosure.  As a result, Under Armour Common Stock remained artificially inflated after the alleged corrective information was released on this date.

84.     Based on my event study, Under Armour's Class A Common Stock price declined on August 1, 2017 by 9.30%, or $1.86 per share, after controlling for market and industry effects (*see* **Exhibit 5**).  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -5.68.  Additionally, there was

substantially higher trading volume of Under Armour Class A Common Stock on this date of 22.3 million shares traded, which is at least 3 times greater than the average daily trading volume during the Class Period. Furthermore, Under Armour's Class C Common Stock price declined on August 1, 2017 by 11.08%, or $2.01 per share, after controlling for market and industry effects (*see* **Exhibit 6**). This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -6.44. There was also substantially higher trading volume of Under Armour Class C Common Stock on this date of 23.2 million shares traded, which is at least 7 times greater than the average daily trading volume during the Class Period. The statistically significant price declines in Under Armour Common Stock demonstrate that the market reacted quickly and significantly on August 1, 2017 to the disappointing earnings news.

85. I carefully evaluated whether there was any other news outside of corrective information that could explain the observed Under Armour Common Stock price declines on August 1, 2017. I found no such confounding information.[127] As a result of the foregoing, and assuming that Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price decline on August 1, 2017. Thus, I attribute the full abnormal dollar declines to the corrective information released on August 1, 2017 and estimate that $1.86 and $2.01 of artificial inflation per share were dissipated from Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, on August 1, 2017.

---

[127] Similar to prior quarters, I noted a minor adverse impact to margins from foreign currency impacts, as well as a minor impact from airfreight costs. My review of the information environment indicates that analysts and investors did not view these factors as confounding information that caused the stock price decline on this date. *See* Appendix D.

### G.  NOVEMBER 4, 2019

86.    On the evening of Sunday, November 3, 2019, the *WSJ* published an article titled

"Under Armour Is Subject of Federal Accounting Probe." The lead paragraphs stated:

> Federal law-enforcement officials are investigating Under Armour Inc.'s
> accounting practices in a probe examining whether the sportswear maker
> shifted sales from quarter to quarter to appear healthier, according to people
> familiar with the matter.
>
> As part of the probe, which hasn't been made public, investigators
> questioned people in Baltimore, where the company is based, as recently as
> last week, one of the people said.[128]

87.    When pre-market trading began on the morning of Monday, November 4, 2019, at

4:00 AM, the prices of Under Armour Common Stock began to decline in response to the *WSJ's*

news of the DOJ and SEC probes.  For example:

> *Bloomberg:* "Under Armour's Class A shares plunge 15% in U.S. pre-
> market trading after the company disclosed that federal officials have been
> probing its accounting practices for more than two years."[129]
>
> *Dow Jones:* "Under Armour shares are down 18% in premarket trading after
> WSJ revealed yesterday that the company is being probed by federal
> authorities for its accounting practices."[130]

88.    At 6:55 AM on November 4, 2019, Under Armour issued its previously-scheduled

press release announcing earnings results.[131]  The Company reported results for the third quarter

---

[128] Use of the Internet Archives "Wayback Machine" indicates that a *WSJ* article titled "Under Armour Is Subject of Federal Accounting Probe" was published at 5:23 PM (*see* https://web.archive.org/web/20191103222635/https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835).  The "Wayback Machine" only shows the headline and first two paragraphs of the article at 5:23 PM.  The article was updated with a final publication time of November 4, 2019 at 7:49 AM (*see* https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835?mod=searchresults&page=1&pos=1).

[129] "Under Armour Plunges 15% Pre-Market on Accounting Probe," *Bloomberg*, November 4, 2019, 4:20 AM.

[130] "Under Armour Slides Ahead of Earnings on Probe Report -- Market Talk," *Dow Jones*, November 4, 2019, 6:48 AM.

[131] "Under Armour Reports Third Quarter Results; Updates 2019 Full Year Outlook," *PR Newswire*, November 4, 2019, 6:55 AM.

of 2019 ("3Q19") and fiscal year 2019 ("FY19") guidance as shown in the table below along with the respective consensus analyst estimates.[132]  In other words, the Company reported better-than-anticipated results for the metrics shown above for the third quarter of 2019, but a lowered revenue outlook for FY19.

| Metric<br>(in millions except for EPS) | Reported | Consensus<br>Expected | + Surprise /<br>(- Miss)<br>$ | + Surprise /<br>(- Miss)<br>% |
|---|---|---|---|---|
| 3Q19 Results | | | | |
|    Revenue | $1,429.5 | $1,415.5 | $14.0 | 1.0% |
|    Operating Income | $138.9 | $117.8 | $21.1 | 17.9% |
|    Net Income | $102.3 | $83.2 | $19.2 | 23.0% |
|    EPS Normalized | $0.23 | $0.19 | $0.04 | 21.1% |
| | | | | |
| FY19 Guidance | | | | |
|    Revenue | $5,297.1 | $5,354.2 | ($57.1) | -1.1% |
|    Operating Income | $235.00 | $232.2 | $2.8 | 1.2% |

89.    At 8:30 AM, Under Armour hosted a conference call to discuss the earnings announcement in greater detail.[133]  Following these disclosures, numerous analysts expressed concern regarding both the disappointing earnings results and the DOJ and SEC accounting investigations.  These disclosures, excerpts from Under Armour executives' discussions with analysts during the call, and subsequent reactions from analysts and the media are summarized in **Appendix D**.  The Company also internally attributed the stock price decline as primarily driven by the SEC and DOJ investigations, with Under Armour's SVP of Investor Relations

---

[132] "Reported" figures (with the exception of FY19 Revenue Guidance) were obtained from "Under Armour Reports Third Quarter Results; Updates 2019 Full Year Outlook," *PR Newswire*, November 4, 2019, 6:55 AM.  Under Armour did not report a number for FY19 Revenue Guidance, but rather reported: "Revenue is now expected to be up about 2 percent . . . ."  $5,297.05 million is imputed by S&P Capital IQ as of November 4, 2019.  "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of November 3, 2019 for the fiscal periods listed in the table according to S&P Capital IQ.

[133] "Under Armour, Inc. NYSE:UAA FQ3 2019 Earnings Call Transcripts," S&P Capital IQ, November 4, 2019, 8:30 AM.

commenting in an internal email: "Without the SEC/DOJ news, many investors believed our stock may have only been down 5-7 percent" in contrast to the 20% that it did fall.[134]

90.     If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the disclosure of the regulators' accounting probe into Under Armour revealed a portion of the relevant truth concealed by the alleged misstatements and omissions. The information in the accounting probe disclosure is corrective of the alleged misstatements and omissions because it revealed additional information to the market about the historical steps taken by Company executives to hide Under Armour's declining customer demand and revenue growth by engaging in (undisclosed) suspect sales and accounting practices to make the Company appear healthier financially.

91.     Based on my event study, Under Armour's Class A Common Stock price declined on November 4, 2019 by 20.65%, or $4.37 per share, after controlling for market and industry effects (*see* **Exhibit 5**).  This price decline is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -12.23.  Additionally, there was substantially higher trading volume of Under Armour Class A Common Stock on this date of 43.6 million shares traded, which is at least 7 times greater than the average daily trading volume during the Class Period.  Furthermore, Under Armour's Class C Common Stock price declined on November 4, 2019 by 20.11%, or $3.80 per share, after controlling for market and industry effects (*see* **Exhibit 6**).  This price decline is statistically significant at the 95% confidence level

---

[134] UA_01071066.

(as well as beyond the 99% confidence level) with a t-statistic of -12.87. There was also substantially higher trading volume of Under Armour Class A Common Stock on this date of 18.7 million shares traded, which is at least 6 times greater than the average daily trading volume during the Class Period.

92.    To obtain a reasonable and reliable measure of the artificial inflation that was dissipated from Under Armour Common Stock on this day, I also considered and analyzed the degree to which information arguably unrelated (*i.e.*, confounding information) to the corrective information impacted the price of Under Armour Common Stock on November 4, 2019. As described above, the *WSJ* article announcing the DOJ and SEC accounting probes was released on Sunday, November 3, 2019 (which represents corrective information), and the Under Armour earnings announcement took place before market hours on Monday, November 4, 2019 (which represents confounding information).[135] As such, both of these pieces of information would affect Under Armour's stock price on Monday, November 4, 2019. Thus, it is necessary to disaggregate the impact of the confounding information (*i.e.*, the earnings announcement) from the price declines in Under Armour Common Stock on November 4, 2019.

93.    The analyst commentary and news articles I reviewed and summarize in **Appendix D** emphasized the accounting investigations as the primary cause of the price declines in Under Armour Common Stock on November 4, 2019. However, the earnings information could have contributed to the stock price declines as well. To isolate the portion of the price movements

---

[135] I do not consider UA earnings announcements and guidance updates after August 1, 2017 to represent potentially corrective information, for two reasons. First, Plaintiffs do not allege any earnings announcement- or guidance update-related Corrective Disclosure Events after August 1, 2017. Second, as explained above, the August 1, 2017 Corrective Disclosure Event revealed the extent of the decline in UA's customer demand, the restructuring steps required to align the Company's resources with the reality of its retail outlook, and its lowered growth outlook going forward. However, that event did not reveal information about the suspect sales and accounting practices to make the Company appear financially healthier that UA executives had engaged in historically.

attributable to the *WSJ* article, I analyzed the price movements of Under Armour Common Stock from the close of trading on Friday, November 1, 2019 through 6:54 AM on Monday, November 4, 2019 (one minute prior to the earnings press release). I note that this is a conservative estimate, as it is likely that the corrective information contained in the *WSJ* article continued to contribute to the price movements of Under Armour Common Stock throughout the day on November 4, 2019 after 6:55 AM; however, this methodology excludes any impact that the earnings information may have had on the stock price movements on November 4, 2019.

94.   **Exhibit 7**, attached hereto, displays the intraday price and volume in Under Armour Class A Common Stock on November 4, 2019. The raw return in Under Armour Class A Common Stock from the close of trading on Friday, November 1, 2019 through 6:54 AM on Monday, November 4, 2019 (one minute prior to the earnings press release) was –16.51%.[136] As shown in **Exhibit 5**, the raw return in Under Armour Class A Common Stock from close on Friday, November 1, 2019 to close on Monday, November 4, 2019 was –18.92%. As a result, the stock price decline before the earnings press release accounted for 87.26% of the total daily price decline.[137] This 87.26% serves as a reasonable proxy for the portion of the price decline attributable to the corrective information released in the *WSJ* article. As shown in **Exhibit 5**, the total abnormal dollar decline on November 4, 2019 was $4.37, after controlling for market and industry effects. Applying the portion of the price decline attributable to the corrective information (*i.e.*, 87.26%) to the total abnormal dollar change ($4.37) results in $3.81. Thus, I attribute $3.81 to the corrective information released in the *WSJ* article on November 3, 2019

---

[136] –16.51% is calculated as the percentage change from $21.14 (the November 1, 2019 close price according to S&P Capital IQ) and $17.65 (the volume weighted average trade price at 6:54 AM on November 4, 2019 based on intraday trades data for Under Armour Class A Common Stock obtained from Tick).

[137] –16.51% / –18.92% = 87.26%.

and estimate that $3.81 of artificial inflation per share was dissipated from Under Armour Class A Common Stock on November 4, 2019.

95.    I use the same methodology for Under Armour Class C Common Stock. **Exhibit 8**, attached hereto, displays the intraday price and volume in Under Armour Class C Common Stock on November 4, 2019. The raw return in Under Armour Class C Common Stock from the close of trading on Friday, November 1, 2019 through 6:54 AM on Monday, November 4, 2019 (one minute prior to the earnings press release) was –17.19%.[138] As shown in **Exhibit 6**, the raw return in Under Armour Class C Common Stock from close on Friday, November 1, 2019 to close on Monday, November 4, 2019 was –18.35%. As a result, the stock price decline before the earnings press release accounted for 93.68% of the total daily price decline.[139] This 93.68% serves as a reasonable proxy for the portion of the price decline attributable to the corrective information released in the *WSJ* article. As shown in **Exhibit 6**, the total abnormal dollar decline on November 4, 2019 was $3.80, after controlling for market and industry effects. Applying the portion of the price decline attributable to the corrective information (*i.e.*, 93.68%) to the total abnormal dollar decline ($3.80) results in $3.56. Thus, I attribute $3.56 to the corrective information released in the *WSJ* article on November 3, 2019 and estimate that $3.56 of artificial inflation per share was dissipated from Under Armour Class C Common Stock on November 4, 2019.

---

[138] –17.19% is calculated as the percentage change from $18.91 (the November 1, 2019 close price according to S&P Capital IQ) and $15.66 (the volume weighted average trade price at 6:53 AM on November 4, 2019 based on intraday trades data for Under Armour Class C Common Stock obtained from Tick). Tick does not indicate that there were any trades of Under Armour Class C Common Stock at 6:54 AM, thus I use the volume weighted average trade price as of one minute prior, at 6:53 AM.

[139] –17.19% / –18.35% = 93.68%.

## VIII. ANALYSIS OF THE INFLATION CREATING EVENTS

### A. JANUARY 28, 2016

96.    On the morning of January 28, 2016, before the opening of trading, Under Armour

issued a press release announcing earnings results for the fourth quarter of 2015 ("4Q15") and

the full fiscal year.[140]  The Company reported 4Q15 results and FY16 guidance as shown in the

table below along with the respective consensus analyst estimates.[141]

| Metric (in millions except for EPS) | Reported | Consensus Expected | + Surprise / (- Miss) $ | + Surprise / (- Miss) % |
|---|---|---|---|---|
| 4Q15 Results | | | | |
|    Revenue | $1,170.7 | $1,118.7 | $52.0 | 4.6% |
|    Operating Income | $177.6 | $176.0 | $1.6 | 0.9% |
|    Net Income | $105.6 | $101.5 | $4.1 | 4.0% |
|    EPS Normalized | $0.24 | $0.23 | $0.01 | 4.3% |
| | | | | |
| FY16 Guidance | | | | |
|    Revenue | $4,950.0 | $4,902.7 | $47.3 | 1.0% |
|    Operating Income | $503.0 | $505.2 | ($2.2) | -0.4% |

97.    At 8:30 AM, Under Armour hosted a conference call to discuss the earnings

announcement in greater detail.[142]  Brad Dickerson ("Dickerson") provided details on the results

for the quarter, and he also addressed the SportScan data (the data cited in the Morgan Stanley

report issued on the January 11, 2016 Corrective Disclosure Event).  Specifically, he stated:

> I think one of the things that's important, there's a lot of noise this time of
> year with the weather and so forth in the fourth quarter. And I think it was

---

[140] "Under Armour Reports Fourth Quarter Net Revenues Growth Of 31% And Full Year Net Revenues Growth Of 28%," *PR Newswire*, January 28, 2016, 7:00 AM.

[141] "Reported" figures were obtained from "Under Armour Reports Fourth Quarter Net Revenues Growth Of 31% And Full Year Net Revenues Growth Of 28%," *PR Newswire*, January 28, 2016, 7:00 AM.  "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of January 27, 2016 for the fiscal periods listed in the table according to S&P Capital IQ. EPS Normalized is split-adjusted to reflect the two-for-one stock split in April 2016 (Reported EPS Normalized was $0.48 compared to Consensus Expected of $0.46, on a split unadjusted basis).

[142] "Under Armour, Inc. NYSE:UAA FQ4 2015 Earnings Call Transcripts," S&P Capital IQ, January 28, 2016, 8:30 AM.

important, especially in Kevin's prepared remarks, around the track record
we've had with 23 straight quarters above 20% growth and then even in the
fourth quarter, in the last 6 years, a CAGR in the fourth quarter of about
32% growth and then planning our business in 2016 at 25%. There's a lot of
growth in multitude of places. And I think there's – we've talked about this
in the past too. I think there's a little bit of a danger in looking at some of
the data sets that are out there, specifically a data set like SportScan. And it
can be challenging looking at our business relative to something like
SportScan where that data is only -- is capturing actually less than 40% of
our business, specifically in the fourth quarter. It's missing key data inputs
like our Direct-to-Consumer business, our international business, and it's
actually extrapolating some of our key accounts that are pretty large like the
Dick's and the Foot Locker. And it obviously also includes accounts that we
do not service. So utilizing that data as a proxy for our success, especially in
the fourth quarter, it can be a little bit challenged, as we've seen obviously,
because we posted another strong quarter in our apparel growing over 20%.
So I just want to start that answer with just – let's be careful on some of
those data sets that's out there and understand how they relate to our
business in particular.[143]

98.    Analysts reacted positively to the earnings announcement on January 28, 2016, and

some included commentary that the positive results eased investor concerns and/or reaffirmed

their views on Under Armour's customer demand, growth, and brand strength.  Numerous media

articles provided additional positive views.  These disclosures and subsequent analyst and media

views are summarized in **Appendix D**.

99.    If Plaintiffs prove that Defendants knew or recklessly disregarded that Under

Armour's customer demand was declining yet masked this by repeatedly making material

misrepresentations or omissions regarding customer demand and its growth rates — while

engaging in (undisclosed) suspect sales and accounting practices to make the Company appear

financially healthier – then the earnings release represents new fraud-related information and

increased confidence in Under Armour's customer demand and revenue growth.  As a result, the

---

[143] "Under Armour, Inc. NYSE:UAA FQ4 2015 Earnings Call Transcripts," S&P Capital IQ, January 28, 2016, 8:30
AM.

fraud-related information revealed on this date introduced artificial inflation into the price of Under Armour Common Stock.

100. Based on my event study, Under Armour's Class A Common Stock price increased on January 28, 2016 by 21.60%, or $7.41 per share, after controlling for market and industry effects (*see* **Exhibit 5**).[144] This price increase is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of 13.62. Additionally, there was relatively high trading volume in Under Armour Class A Common Stock on this date of 37.2 million shares traded, which is at least 6 times greater than the average daily trading volume during the Class Period. The statistically significant price increase demonstrates that the market reacted quickly and significantly on January 28, 2016 to the news revealed about the Company in the earnings announcement.

101. I carefully evaluated whether there was any information released that was unrelated to the fraud on January 28, 2016 that could explain the observed Under Armour Common Stock price increase on January 28, 2016 and found no such confounding information. As a result of the foregoing, and assuming Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price increase on January 28, 2016. Thus, I attribute $7.41 per share of the abnormal dollar increase to the fraud-related information released on January 28, 2016 and estimate that $7.41 of artificial inflation per share was introduced into Under Armour Class A Common Stock on January 28, 2016.

--------

[144] Class C Common Stock was listed on the NYSE on April 8, 2016 (*see* Under Armour SEC Form 10-K for the fiscal year ended December 31, 2016) and therefore was not trading at the time of this Inflation Creating Event.

**B.  APRIL 21, 2016**

102.  On the morning of April 21, 2016, before the opening of trading, Under Armour issued a press release announcing earnings results for the first quarter of 2016 ("1Q16").[145]  The Company reported 1Q16 results and FY16 guidance as shown in the table below along with the respective consensus analyst estimates.[146]

| Metric<br>(in millions except for EPS) | Reported | Consensus Expected | + Surprise /<br>(- Miss)<br>$ | + Surprise /<br>(- Miss)<br>% |
|---|---|---|---|---|
| 1Q16 Results | | | | |
| Revenue | $1,047.7 | $1,037.1 | $10.6 | 1.0% |
| Operating Income | $34.9 | $25.6 | $9.3 | 36.5% |
| Net Income | $19.2 | $9.7 | $9.5 | 97.9% |
| EPS Normalized | $0.04 | $0.02 | $0.02 | 100.0% |
| | | | | |
| FY16 Guidance | | | | |
| Revenue | $5,000.0 | $4,995.5 | $4.5 | 0.1% |
| Operating Income | $503 - $507 | $508.2 | ($3.2) | -0.6% |

103.  The press release contained prepared remarks from Plank, which emphasized the Company's continued revenue growth and that the "'strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies.'"[147] Under Armour hosted a conference call the same morning at 8:30 AM to discuss the earnings results.  Molloy explained that the Company was increasing revenue and operating income guidance for FY16:

---

[145] "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire*, April 21, 2016, 7:00 AM.

[146] "Reported" figures were obtained from "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire*, April 21, 2016, 7:00 AM. "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of April 20, 2016 for the fiscal periods listed in the table according to S&P Capital IQ.

[147] "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire*, April 21, 2016, 7:00 AM.

> Now moving on to our guidance for the remainder of 2016. Based on our
> current visibility, we are slightly raising both our revenue expectations to
> approximately $5.0 billion, representing growth of 26% and our operating
> income expectations to a range of approximately $503 million to $507
> million, representing growth of 23% to 24%.[148]

104.   Analysts generally expressed continued confidence in Under Armour's growth, customer demand, and brand strength following these disclosures.  Media articles also reaffirmed this view.  These disclosures, analyst commentary, and media coverage are summarized in **Appendix D**.

105.   If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the earnings release represents new fraud-related information and increased confidence in the strength of Under Armour's customer demand and revenue growth. As a result, the fraud-related information revealed on this date introduced artificial inflation into the prices of Under Armour Common Stock.

106.   Based on my event study, Under Armour's Class A Common Stock price increased on April 21, 2016 by 7.67%, or $3.37 per share, after controlling for market and industry effects (*see* **Exhibit 5**).  This price increase is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of 4.83.  Additionally, there was relatively high trading volume of Under Armour Class A Common Stock on this date of 15.1 million shares traded, which is at least 2 times greater than the average daily trading volume

---

[148] "Under Armour, Inc. NYSE:UAA FQ1 2016 Earnings Call Transcripts," S&P Capital IQ, April 21, 2016, 8:30 AM.

during the Class Period.  Furthermore, Under Armour's Class C Common Stock price increased on April 21, 2016 by 7.79%, or $3.31 per share, after controlling for market and industry effects (*see* **Exhibit 6**).  This price increase is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of 4.78.

107.  I carefully evaluated whether there was any information released that was unrelated to the fraud on April 21, 2016 that could explain the observed Under Armour Common Stock price increases on April 21, 2016 and found no such confounding information.  As a result of the foregoing, and assuming Plaintiffs prove their allegations, I find no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price increase on April 21, 2016.  Thus, I attribute the full abnormal dollar increase to the fraud-related information released on April 21, 2016 and estimate that $3.37 and $3.31 of artificial inflation per share were introduced into the prices of Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, on April 21, 2016.

## C.  APRIL 27, 2017

108.  On the morning of April 27, 2017, before the opening of trading, Under Armour issued a press release announcing earnings results for the first quarter of 2017 ("1Q17").[149]  The Company reported 1Q17 results and FY17 guidance as shown in the table below along with the respective consensus analyst estimates.[150]

---

[149] "Under Armour Reports First Quarter Results," *PR Newswire*, April 27, 2017, 6:55 AM.

[150] "Reported" figures were obtained from "Under Armour Reports First Quarter Results," *PR Newswire*, April 27, 2017, 6:55 AM. "Consensus" figures are the consensus mean of Revenue, EBIT, Net Income (Excl. Excep), and EPS Normalized as of April 26, 2017 for the fiscal periods listed in the table according to S&P Capital IQ.

| Metric (in millions except for EPS) | Reported | Consensus Expected | + Surprise / (- Miss) $ | + Surprise / (- Miss) % |
|---|---|---|---|---|
| 1Q17 Results | | | | |
|   Revenue | $1,117.3 | $1,107.0 | $10.3 | 0.9% |
|   Operating Income | $7.5 | -$12.8 | $20.3 | 159.0% |
|   Net Income | -$2.3 | -$17.5 | $15.2 | 87.0% |
|   EPS Normalized | -$0.01 | -$0.04 | $0.03 | 75.0% |
| | | | | |
| FY17 Guidance | | | | |
|   Revenue | $5,400.0 | $5,350.3 | $49.7 | 0.9% |
|   Operating Income | $320.00 | $319.3 | $0.7 | 0.2% |

109.  The press release contained prepared remarks from Plank, including:

> "Our first quarter results were in line with our expectations and we're off to a solid start in 2017," said Under Armour Chairman and CEO Kevin Plank. "By proactively managing our growth to deliver superior innovative product, continuing to strengthen our connection with consumers and increasing our focus on operational excellence - we have great confidence in our ability to drive toward our full year targets."[151]

110.  The Company hosted a conference call at 8:30 AM on the same morning.  During the call, Bergman clarified that there would be no change to the FY17 guidance figures already provided during the earnings announcement on January 31, 2017.[152]  Many analysts noted that the Company's results had exceeded expectations, while noting continued challenges that remained.  News outlets also connected an increase in Under Armour's stock prices to the positive earnings results.  These disclosures, analyst commentary, and media coverage are summarized in **Appendix D**.

111.  If Plaintiffs prove that Defendants knew or recklessly disregarded that Under Armour's customer demand was declining yet masked this by repeatedly making material

---

[151] "Under Armour Reports First Quarter Results," *PR Newswire*, April 27, 2017, 6:55 AM.

[152] "Under Armour, Inc. NYSE:UAA FQ1 2017 Earnings Call Transcripts," S&P Capital IQ, April 27, 2017, 8:30 AM.

misrepresentations or omissions regarding customer demand and its growth rates — while engaging in (undisclosed) suspect sales and accounting practices to make the Company appear financially healthier – then the earnings release represents new fraud-related information and increased confidence in the strength of Under Armour's customer demand and revenue growth. As a result, the fraud-related information revealed on this date introduced artificial inflation into the prices of Under Armour Common Stock.

112.   Based on my event study, Under Armour's Class A Common Stock price increased on April 27, 2017 by 9.63%, or $1.90 per share, after controlling for market and industry effects (*see* **Exhibit 5**). This price increase is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of 7.20. Additionally, there was relatively high trading volume of Under Armour Class A Common Stock on this date of 21.4 million shares traded, which is at least 3 times greater than the average daily trading volume during the Class Period. Furthermore, Under Armour's Class C Common Stock price increased on April 27, 2017 by 8.90%, or $1.61 per share, after controlling for market and industry effects (*see* **Exhibit 6**). This price increase is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of 5.09. There was also relatively high trading volume of Under Armour Class C Common Stock on this date of 15.2 million shares traded, which is at least 4 times greater than the average daily trading volume during the Class Period.

113.   I carefully evaluated whether there was any information released that was unrelated to the fraud on April 27, 2017 that could explain the observed Under Armour Common Stock price increases on April 27, 2017 and found no such confounding information. As a result of the foregoing, and assuming that Plaintiffs prove their allegations, I find no economic evidence of

information unrelated to the Complaint's claims that needs to be disaggregated from the price

increase on April 27, 2017.  Thus, I attribute the full abnormal dollar increase to the fraud-related

information released on April 27, 2017 and estimate that $1.90 and $1.61 of artificial inflation

per share were introduced into the prices of Under Armour Class A Common Stock and Under

Armour Class C Common Stock, respectively, on April 27, 2017.

## IX.   CALCULATING ARTIFICIAL INFLATION PER SHARE AND DAMAGES FOR UNDER ARMOUR COMMON STOCK

### A.   INFLATION PER SHARE

114.  The analysis in **Section VII** quantifies the artificial inflation dissipated from the

prices of Under Armour Common Stock on the Corrective Disclosure Events and the analysis in

**Section VIII** quantifies the artificial inflation introduced into the price of Under Armour

Common Stock on the Inflation Creating Events.  This is summarized below in **Table A** and

**Table B**:

**Table A**
**Under Armour Class A Common Stock**
**Artificial Inflation per Share Dissipated and Introduced**

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| January 11, 2016 | $2.63 |
| June 1, 2016 | $1.67 |
| July 26, 2016 | $2.29 |
| October 25, 2016 | $4.64 |
| January 31, 2017 | $7.65 |
| August 1, 2017 | $1.86 |
| November 4, 2019 | $3.81 |

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| January 28, 2016 | $7.41 |
| April 21, 2016 | $3.37 |
| April 27, 2017 | $1.90 |

**Table B**
**Under Armour Class C Common Stock**
**Artificial Inflation per Share Dissipated and Introduced**

| Date | Artificial Inflation Per Share Dissipated |
|---|---|
| June 1, 2016 | $1.54 |
| July 26, 2016 | $1.30 |
| October 25, 2016 | $4.17 |
| January 31, 2017 | $6.04 |
| August 1, 2017 | $2.01 |
| November 4, 2019 | $3.56 |

| Date | Artificial Inflation Per Share Introduced |
|---|---|
| April 21, 2016 | $3.31 |
| April 27, 2017 | $1.61 |

115.   However, these analyses do not establish how inflation evolved over the Class Period.  One standard method commonly relied upon to evaluate the level of artificial inflation in a stock price is the "constant dollar" method.[153]  This method assumes that the amount of artificial stock inflation dissipated on the Corrective Disclosure Events was present in the stock price going back to the beginning of the Class Period (adjusted for any days on which inflation was introduced).  Put another way, this means that barring an intervening event that is related to the fraud (*i.e.*, a Corrective Disclosure Event or an Inflation Creating Event), the inflation per share on day *t-1* is the same as the inflation on day *t*.  I note that the constant dollar methodology is used by a wide variety of experts in matters such as this, and in my experience, is often advocated by defense experts.[154]

---

[153] *See, e.g.*, Jeff G. Hammel & B. John Casey, "Sizing Securities Fraud Damages: 'Constant Percentage' on Way Out?," *New York Law Journal* (2009), available at https://www.law.com/newyorklawjournal/almID/1202427590818/.

[154] *See, e.g.*, Jeff G. Hammel & B. John Casey, "Sizing Securities Fraud Damages: 'Constant Percentage' on Way Out?," *New York Law Journal* (2009), available at https://www.law.com/newyorklawjournal/almID/1202427590818/.

116. Based on my understanding of Plaintiffs' allegations, coupled with my review of the documents and information identified in **Appendix A**, I conclude that constant dollar inflation is appropriate in this matter. My opinion is based on the fact that the nature of the misrepresented and/or omitted information did not change during the Class Period. Specifically, I understand that Plaintiffs expect to prove that Defendants knew, or recklessly disregarded, that both prior to and during the Class Period Under Armour's customer demand was declining and revenue growth decelerating. I also understand that Plaintiffs expect to ultimately prove that Defendants masked (and misrepresented) this important issue to investors by presenting them with a misleading impression of the Company's financial results. Finally, it is my understanding that Plaintiffs intend to prove that Defendants concealed Under Armour's use of suspect pull-forward sales practices or accounting practices to appear financially healthier.[155]

117. Basic principles of finance and valuation analysis, *e.g.*, discounted cash flow ("DCF") analysis, dictate that the value of a company is derived from the earnings and cash flows generated by that company from the present time into the future. If the growth rate of a company's revenues, and thus the expected growth of its cash flows, is lower than what has been represented by company executives, then the value of that company would be lower than the valuation based upon such public misstatements. A similar logic applies to a company's financial margins, and ultimately all financial operating performance metrics that are driven by a company's brand strength and customer demand. Properly disclosing such vital information about Under Armour's growth, margins, and customer demand would have revealed value-relevant information to investors in Under Armour Common Stock. Basic principles of finance

---

[155] *See, e.g., Under Armour*, 540 F. Supp. 3d at 517-18, 522-23.

and valuation analysis dictate that such disclosures would have had the same effect upon Under Armour's Common Stock prices at any point during the Class Period.

118.  As a result of the foregoing, I find no economic reason to believe that the financial impact of the misstatements and/or omissions would have been any different earlier in the Class Period and thus I find no economic reason to deviate from the standard constant dollar methodology.  In my view, the most widely accepted and reliable proxy for evaluating how the market would have reacted to such a disclosure at the beginning of the Class Period is to rely upon the abnormal market price decline observed upon the later disclosure of such information.[156]  I also consider the Inflation Creating Events, where information was released that bolstered the market's confidence in the strength of Under Armour's customer demand and growth and therefore logically introduced a portion of the artificial inflation in the prices of Under Armour Common Stock.  In other words, I also consider the possibility that some of the artificial inflation dissipated on the Corrective Disclosure Events did not extend all the way back to the beginning of the Class Period, and therefore *reduce* the artificial inflation prior to the Inflation Creating Events, which is a conservative assumption.

119.  By applying the constant dollar methodology described above and taking the analyses of the Corrective Disclosure Event and the Inflation Creating Event into account,

---

[156] *See, e.g.*, David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001), at p. 3 ("Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences. This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed. As a result, an event study is a common method that serves as the basis for quantifying damages in securities fraud cases.") (citations omitted); *id.* at p. 19 ("[E]vent studies can be useful in quantifying damages in cases ranging from securities fraud to other commercial litigation requiring the calculation of lost profits. In some areas, such as securities fraud, stock price reactions are already a standard method for quantifying damages").

**Tables C and D** below summarize how the total artificial inflation per share for Under Armour

Common Stock evolved during the Class Period:[157]

### Table C
### Under Armour Class A Common Stock
### Artificial Inflation per Share During the Class Period

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 16, 2015 – January 10, 2016 | $11.87 |
| January 11, 2016 – January 27, 2016 | $9.24 |
| January 28, 2016 – April 20, 2016 | $16.65 |
| April 21, 2016 – May 31, 2016 | $20.02 |
| June 1, 2016 – July 25, 2016 | $18.35 |
| July 26, 2016 – October 24, 2016 | $16.06 |
| October 25, 2016 – January 30, 2017 | $11.42 |
| January 31, 2017 – April 26, 2017 | $3.77 |
| April 27, 2017 – July 31, 2017 | $5.67 |
| August 1, 2017 – November 1, 2019 | $3.81 |

---

[157] As discussed *supra*, on April 7, 2016, Class C Common Stock was distributed to stockholders of record of Class A Common Stock and Class B common stock as of March 28, 2016 and Class C Common Stock was listed on the NYSE on April 8, 2016. Artificial inflation for implied purchase dates of Class C Common Stock (based on original Class A purchases) is back-cast prior to April 8, 2016 using the percentage changes in Class A artificial inflation: January 28, 2016 – April 7, 2016 = $16.65/$16.65-1 = 0%; $13.70*(1-0%) = $13.70; January 11, 2016 – January 27, 2016 = $9.24/$16.65-1 = -44.5%; $13.70*(1-44.5%) = $7.60. September 16, 2015 – January 10, 2016 = $11.87/$9.24-1 = 28.5%; $7.60*(1+28.5%) = $9.77.

**Table D**
**Under Armour Class C Common Stock**
**Artificial Inflation per Share During the Class Period**

| Date Range | Artificial Inflation Per Share |
|---|---|
| September 16, 2015 – January 10, 2016 | $9.77 |
| January 11, 2016 – January 27, 2016 | $7.60 |
| January 28, 2016 – April 7, 2016 | $13.70 |
| April 8, 2016 – April 20, 2016 | $13.70 |
| April 21, 2016 – May 31, 2016 | $17.01 |
| June 1, 2016 – July 25, 2016 | $15.47 |
| July 26, 2016 – October 24, 2016 | $14.17 |
| October 25, 2016 – January 30, 2017 | $10.00 |
| January 31, 2017 – April 26, 2017 | $3.96 |
| April 27, 2017 – July 31, 2017 | $5.57 |
| August 1, 2017 – November 1, 2019 | $3.56 |

## B. SECTION 10(b) DAMAGES

120.   The standard and well-settled formula for assessing damages for each Class member under Section 10(b) is the "out-of-pocket" method.[158] This method measures damages as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale (or the artificial inflation at the time of purchase if the share was not ultimately sold).[159] If the security was sold at a time before any of the artificial inflation had dissipated— that is, prior to the first Corrective Disclosure Event, which in this case is January 11, 2016— then there are no damages. However, if the security was purchased after alleged misstatements and/or omissions were made, and then sold after the artificial inflation was dissipated, then

---

[158] *See* Opening Class Cert. Brief at 30 (citing cases and Cain Efficiency Report ¶¶72-80); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972).

[159] *See* Opening Class Cert. Brief at 30 (citing cases and Cain Efficiency Report ¶¶72-80); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972).

damages would be equal to the artificial inflation at the time of purchase minus the artificial inflation at the time of sale.

121.  For example, assume that Investor A purchased a share of Under Armour Class A Common Stock on February 1, 2016 and sold it on November 1, 2016.  As shown in **Table C**, there was $16.65 of artificial inflation in the price of Under Armour Class A Common Stock at the time of purchase and $11.42 of artificial inflation in the price of Under Armour Class A Common Stock at the time of sale.  Thus, Investor A's damages on the share of Under Armour Class A Common Stock would be equal to $5.23 ($16.65-$11.42).

122.  Investor A also would have received one share of Under Armour Class C Common Stock that began trading on April 8, 2016 in connection with its share of Under Armour Class A Common Stock purchased on February 1, 2016.  Assume Investor A also sold this share of Class C Common Stock on November 1, 2016.  As shown in **Table D**, there was $13.70 of implied artificial inflation in the price of Under Armour Class C Common Stock at the time of purchase and $10.00 of artificial inflation in the price of Under Armour Class C Common Stock at the time of sale.  Thus, Investor A's damages on the share of Under Armour Class C Common Stock would be equal to $3.70 ($13.70-$10.00).

123.  As another example, assume that Investor C purchased a share of Under Armour Class C Common Stock on July 1, 2016 and sold it on November 1, 2016.  As shown in **Table D**, there was $15.47 of artificial inflation in the price of Under Armour Class C Common Stock at the time of purchase and $10.00 artificial inflation in the price of Under Armour Class C Common Stock at the time of sale.  Thus, Investor C's damages would be equal to $5.47 ($15.47-$10.00).

124.  In addition, the calculation of damages incorporates the application of a statutory cap on recovery in federal securities cases brought under Section 10b and Rule 10(b)-5 (the 90-day lookback provision of the Private Securities Litigation Reform Act of 1995 codified at 15 U.S.C. §78u–4(e)(1)).   The limitation provides that damages calculated on Under Armour Common Stock purchased during the Class Period and sold during the 90-day lookback period cannot exceed the difference between the purchase price paid during the Class Period and the average closing price from date of the last corrective disclosure to the date of sale.  **Tables E** and **F** below shows the 90-day lookback price for Under Armour Class A Common Stock and Under Armour Class C Common Stock, respectively, for each day starting on the last Corrective Disclosure Event (*i.e.*, November 4, 2019).

125.  For example, if Investor A purchased a share of Under Armour Class A Common Stock for $40.00 and then sold that share on December 20, 2019, during the 90-day lookback period, when the average closing price from November 4, 2019 through December 20, 2019 was $18.50 as shown in **Table E**, Investor A's damages could not exceed $21.50 ($40.00 - $18.50) per share under the 90-day lookback provision.  Furthermore, Under Armour Class A Common Stock purchased during the Class Period and either never sold or sold after the 90-day lookback period cannot have per share damages that exceed the difference between the purchase price paid and the average price of Under Armour Class A Common Stock during the 90-day lookback period, which is $19.57 as shown in the last row in **Table E** below.

126.  Similarly, if Investor C purchased a share of Under Armour Class C Common Stock for $30.00 and then sold that share on December 6, 2019, during the 90-day lookback period when the average closing price from November 4, 2019 through December 6, 2019 was $16.20 as shown in **Table F**, Investor C's damages could not exceed $13.80 ($30.00 - $16.20) per share

under the 90-day lookback provision.  Furthermore, Under Armour Class C Common Stock

purchased during the Class Period and never sold or sold after the 90-day lookback period cannot

have per share damages that exceed the difference between the purchase price paid and the

average price of Under Armour Class C Common Stock during the 90-day lookback period,

which is $17.63 as shown in the last row in **Table F** below.

**Table E**
**Under Armour Class A (UAA) Closing Price and Average Closing Price**
**November 4, 2019 - February 1, 2020**

| Date | Closing Price | Average Closing Price Between November 4, 2019 and Date Shown | Date | Closing Price | Average Closing Price Between November 4, 2019 and Date Shown |
|---|---|---|---|---|---|
| 11/4/2019 | $17.14 | $17.14 | 12/18/2019 | $21.04 | $18.32 |
| 11/5/2019 | $17.90 | $17.52 | 12/19/2019 | $21.16 | $18.41 |
| 11/6/2019 | $18.17 | $17.74 | 12/20/2019 | $21.50 | $18.50 |
| 11/7/2019 | $17.59 | $17.70 | 12/23/2019 | $21.55 | $18.58 |
| 11/8/2019 | $17.56 | $17.67 | 12/24/2019 | $21.64 | $18.67 |
| 11/11/2019 | $17.57 | $17.66 | 12/26/2019 | $21.80 | $18.75 |
| 11/12/2019 | $17.29 | $17.60 | 12/27/2019 | $21.45 | $18.82 |
| 11/13/2019 | $17.23 | $17.56 | 12/30/2019 | $21.28 | $18.89 |
| 11/14/2019 | $17.12 | $17.51 | 12/31/2019 | $21.60 | $18.96 |
| 11/15/2019 | $17.79 | $17.54 | 1/2/2020 | $21.78 | $19.02 |
| 11/18/2019 | $17.33 | $17.52 | 1/3/2020 | $21.85 | $19.09 |
| 11/19/2019 | $17.33 | $17.50 | 1/6/2020 | $20.44 | $19.12 |
| 11/20/2019 | $16.99 | $17.46 | 1/7/2020 | $20.70 | $19.16 |
| 11/21/2019 | $16.99 | $17.43 | 1/8/2020 | $20.42 | $19.19 |
| 11/22/2019 | $17.43 | $17.43 | 1/9/2020 | $19.79 | $19.20 |
| 11/25/2019 | $17.36 | $17.42 | 1/10/2020 | $19.77 | $19.21 |
| 11/26/2019 | $17.99 | $17.46 | 1/13/2020 | $20.17 | $19.23 |
| 11/27/2019 | $19.10 | $17.55 | 1/14/2020 | $21.12 | $19.27 |
| 11/29/2019 | $18.89 | $17.62 | 1/15/2020 | $21.18 | $19.31 |
| 12/2/2019 | $18.44 | $17.66 | 1/16/2020 | $21.19 | $19.35 |
| 12/3/2019 | $18.11 | $17.68 | 1/17/2020 | $20.39 | $19.37 |
| 12/4/2019 | $18.61 | $17.72 | 1/21/2020 | $20.20 | $19.38 |
| 12/5/2019 | $18.78 | $17.77 | 1/22/2020 | $20.52 | $19.40 |
| 12/6/2019 | $18.96 | $17.82 | 1/23/2020 | $21.23 | $19.44 |
| 12/9/2019 | $19.27 | $17.88 | 1/24/2020 | $20.99 | $19.46 |
| 12/10/2019 | $19.24 | $17.93 | 1/27/2020 | $20.65 | $19.48 |
| 12/11/2019 | $19.20 | $17.98 | 1/28/2020 | $20.89 | $19.51 |
| 12/12/2019 | $19.29 | $18.02 | 1/29/2020 | $21.00 | $19.53 |
| 12/13/2019 | $19.53 | $18.08 | 1/30/2020 | $20.86 | $19.56 |
| 12/16/2019 | $20.43 | $18.15 | 1/31/2020 | $20.18 | $19.57 |
| 12/17/2019 | $20.56 | $18.23 | | | |

**Table F**
**Under Armour Class C (UA) Closing Price and Average Closing Price**
**November 4, 2019 - February 1, 2020**

| Date | Closing Price | Average Closing Price Between November 4, 2019 and Date Shown | Date | Closing Price | Average Closing Price Between November 4, 2019 and Date Shown |
|---|---|---|---|---|---|
| 11/4/2019 | $15.44 | $15.44 | 12/18/2019 | $19.03 | $16.66 |
| 11/5/2019 | $16.31 | $15.88 | 12/19/2019 | $19.01 | $16.73 |
| 11/6/2019 | $16.51 | $16.09 | 12/20/2019 | $19.30 | $16.81 |
| 11/7/2019 | $16.08 | $16.09 | 12/23/2019 | $19.37 | $16.88 |
| 11/8/2019 | $15.88 | $16.04 | 12/24/2019 | $19.40 | $16.95 |
| 11/11/2019 | $15.96 | $16.03 | 12/26/2019 | $19.55 | $17.02 |
| 11/12/2019 | $15.58 | $15.97 | 12/27/2019 | $19.25 | $17.08 |
| 11/13/2019 | $15.67 | $15.93 | 12/30/2019 | $18.99 | $17.13 |
| 11/14/2019 | $15.56 | $15.89 | 12/31/2019 | $19.18 | $17.18 |
| 11/15/2019 | $15.97 | $15.90 | 1/2/2020 | $19.24 | $17.23 |
| 11/18/2019 | $15.72 | $15.88 | 1/3/2020 | $19.27 | $17.28 |
| 11/19/2019 | $15.61 | $15.86 | 1/6/2020 | $18.37 | $17.31 |
| 11/20/2019 | $15.43 | $15.82 | 1/7/2020 | $18.59 | $17.33 |
| 11/21/2019 | $15.24 | $15.78 | 1/8/2020 | $18.16 | $17.35 |
| 11/22/2019 | $15.66 | $15.77 | 1/9/2020 | $17.78 | $17.36 |
| 11/25/2019 | $15.67 | $15.77 | 1/10/2020 | $17.77 | $17.37 |
| 11/26/2019 | $16.47 | $15.81 | 1/13/2020 | $18.04 | $17.38 |
| 11/27/2019 | $17.49 | $15.90 | 1/14/2020 | $18.76 | $17.41 |
| 11/29/2019 | $17.30 | $15.98 | 1/15/2020 | $18.90 | $17.44 |
| 12/2/2019 | $16.87 | $16.02 | 1/16/2020 | $19.02 | $17.47 |
| 12/3/2019 | $16.63 | $16.05 | 1/17/2020 | $18.37 | $17.49 |
| 12/4/2019 | $17.01 | $16.09 | 1/21/2020 | $18.09 | $17.50 |
| 12/5/2019 | $17.20 | $16.14 | 1/22/2020 | $18.31 | $17.52 |
| 12/6/2019 | $17.44 | $16.20 | 1/23/2020 | $18.78 | $17.54 |
| 12/9/2019 | $17.69 | $16.26 | 1/24/2020 | $18.61 | $17.56 |
| 12/10/2019 | $17.69 | $16.31 | 1/27/2020 | $18.45 | $17.57 |
| 12/11/2019 | $17.51 | $16.36 | 1/28/2020 | $18.68 | $17.59 |
| 12/12/2019 | $17.51 | $16.40 | 1/29/2020 | $18.68 | $17.61 |
| 12/13/2019 | $17.78 | $16.44 | 1/30/2020 | $18.55 | $17.63 |
| 12/16/2019 | $18.59 | $16.52 | 1/31/2020 | $17.96 | $17.63 |
| 12/17/2019 | $18.69 | $16.59 | | | |

## C.  SECTION 20A DAMAGES

127.  As discussed in my Efficiency Report, Section 20A assesses losses among investors who purchased securities contemporaneously with Defendants who sold securities while in

possession of material, nonpublic information.[160]  The formula and statutory limitation on

Section 20A damages is provided in the statute:

> Any person who violates any provision of this chapter [15 U.S.C. §§78a et seq.] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.[161]

> The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.[162]

128.  Calculating Section 20A damages involves identifying losses avoided and/or profits

gained by Plank.  For example, on November 20, 2015, Plank sold 80 shares of Under Armour

Class A Common Stock for $92.72 per share, among other transactions in Under Armour

Common Stock.[163]  There are four reasonable methodologies to calculate Section 20A damages:

(1) losses avoided based on market prices; (2) losses avoided based on artificial inflation; (3)

profits gained based on market prices; and (4) profits gained based on artificial inflation.  I will

discuss each methodology in turn below using Plank's November 20, 2015 transaction of 80

shares as an example.

129.  First, losses avoided based on market prices for each transaction can be calculated

as the number of shares sold multiplied by the difference between the sale price and the price of

Under Armour Common Stock on the last Corrective Disclosure Event after all artificial inflation

---

[160] *See* Cain Efficiency Report ¶¶81-82.

[161] 15 U.S.C. §78t-1(a).

[162] 15 U.S.C. §78t-1(b)(1).

[163] SEC Form 4, dated November 23, 2015
(https://www.sec.gov/Archives/edgar/data/1336917/000124636015003623/xslF345X03/form.xml).

dissipated from the stock (*i.e.*, $17.14 for Under Armour Class A Common Stock and $15.44 for Under Armour Class C Common Stock). Thus, losses avoided based on market prices for this transaction would be $6,046.40 which is calculated as 80 shares sold multiplied by $75.58 ($92.72 minus $17.14). This same calculation would be done for each sale of Under Armour Common Stock made by Plank during the Class Period to compute total losses avoided based on market prices.

130. Second, losses avoided based on artificial inflation for each transaction can be calculated as the number of shares sold multiplied by the difference between artificial inflation at the time of sale and artificial inflation on the last Corrective Disclosure Event after all artificial inflation dissipated from the stock (*i.e.*, $0.00). As shown above in **Table C**, artificial inflation at the time of sale on November 20, 2015 was $11.87. Thus, losses avoided based on artificial inflation for this transaction would be $949.60, which is calculated as 80 shares sold multiplied by $11.87 ($11.87 minus $0.00). This same calculation would be done for each sale of Under Armour Common Stock made by Plank during the Class Period to compute total losses avoided based on artificial inflation.

131. Third, profits gained based on market prices for each transaction can be calculated as the number of shares sold multiplied by the difference between the purchase price and the sale price, if the sales price exceeds the purchase price. Assume for sake of this example that the 80 shares of Under Armour Class A Common Stock that Plank sold on November 20, 2015 were acquired before the Class Period for $0.[164] Thus, profits gained based on market prices for this

---

[164] All of Plank's transactions could be matched using two of the most common inventory methods, First-In First-Out ("FIFO") and Last-In First-Out ("LIFO"). The FIFO method assumes that shares purchased first are the first shares to be subsequently sold, while the LIFO method assumed that shares purchased most recently are the first shares to be subsequently sold.

transaction would be $7,417.60, which is calculated as 80 shares sold multiplied by $92.72 ($92.72 minus $0.00). This same calculation would be done for each sale of Under Armour Common Stock made by Plank during the Class Period to compute total profits gained based on market prices.

132. Finally, profits gained based on artificial inflation for each transaction can be calculated as the number of shares sold multiplied by the difference between the purchase price and the sale price, if the sales price exceeds the purchase price. As shown above in **Table C**, artificial inflation at the time of sale on November 20, 2015 was $11.87. Assume for sake of this example that the 80 shares of Under Armour Class A Common Stock that Plank sold on November 20, 2015 were acquired before the Class Period when inflation was $0.00. Thus, profits gained based on artificial inflation for this transaction would be $949.60, which is calculated as 80 shares sold multiplied by $11.87 ($11.87 minus $0.00). This same calculation would be done for each sale of Under Armour Common Stock made by Plank during the Class Period to compute total profits gained based on artificial inflation.

### D. ADAPTATION TO ALTERNATIVE FINDINGS

133. The damages methodologies I have laid out above for Section 10(b) and Section 20A are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodologies I have described above to calculate Section 10(b) and Section 20A can be modified based on alternative findings the finder of fact may determine, including, but not limited to any: (1) confounding information versus corrective information; and (2) how to back-cast inflation over the Class Period. Below I describe additional details concerning each of these potential variations.

134. First, irrespective of what the ultimate finder of fact, *i.e.*, the jury determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. For example, as described in **Section VII.G.**, I estimate that 87.26% of the abnormal price movement in Under Armour Class A Common Stock on November 4, 2019 is attributable to the corrective information. Assume, for purely illustrative purposes, that the jury determines that instead, 75% of the of the abnormal price movement in Under Armour Class A Common Stock on November 4, 2019 is attributable to the corrective information. This would translate into $3.28 of inflation being dissipated from Under Armour Class A Common Stock on this day (75% of $4.37) as opposed to the $3.81 that I estimate (87.26% of $4.37). The daily inflation table could easily be updated for this alternative finding. Regardless of how the jury weighs evidence, whether they find that my disaggregation analysis is the most appropriate, or they determine that based upon the evidence, a different percentage is more appropriate, this finding can simply be incorporated into the damages calculation.

135. Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis. In a hypothetical example, assume the jury concludes that before November 4, 2015, inflation was only half of the value I have calculated. As shown above in **Table C**, I have estimated $11.87 of artificial inflation was present in Under Armour Class A Common Stock from the start of the Class Period through January 10, 2016. If the jury determines that inflation was only half that amount from September

16, 2015 through November 3, 2015, then the inflation table I presented above can be adjusted to $5.94 for that initial period (*i.e.*, 50% of $11.87).

136.  In the hypothetical case I have presented above, purchasers during this initial part of the Class Period would have purchased shares with $5.94 of artificial inflation, while purchasers beginning November 4, 2015, would be purchased at the full amount of artificial inflation I calculated ($11.87).  Damages calculations using the out-of-pocket method (inflation at the time of purchase minus inflation at the time of sale) will still result in an appropriate and accurate assessment of damages.  This hypothetical example illustrates how artificial inflation need not be constant during the Class Period for the out-of-pocket damages methodology to be applied on a class-wide basis.  This same logic could be applied for different dates as well as for Under Armour Class C Common Stock.

137.  In addition, should the jury decide that the first actionable misstatement and/or omission happened at a date later than September 16, 2015, prior to that date, inflation could simply be set to zero.  The examples I have described above clearly demonstrate the flexibility of the out-of-pocket damages model.  If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 3, 2023

Matthew D. Cain



**Exhibit 1**
**Coefficients from Class A (UAA) Event Study**
**9/16/2015 - 11/1/2019**



**Exhibit 2**
**Coefficients from Class C (UA) Event Study**
**4/11/2016 - 11/1/2019**



**Exhibit 3**
**Root Mean Squared Error from Class A (UAA) Event Study**
**9/16/2015 - 11/1/2019**



Exhibit 4
Root Mean Squared Error from Class C (UA) Event Study
4/11/2016 - 11/1/2019

**Exhibit 5**
**Event Study Analysis of the Corrective Disclosure Event**
**For Under Armour Class A (UAA) Common Stock**

| # | Event Type | Market Date | Closing Price | Raw Return | Volume (millions) | Abnormal Return | Abnormal Dollar Change | t-Statistic | Significance Level[2] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Event Study Results [1] | | |
| 1 | Corrective Disclosure | 1/11/16 | $34.98 | -6.72% | 29.0 | -7.02% | -$2.63 | -4.82 | *** |
| 2 | Inflation Creating | 1/28/16 | $42.04 | 22.59% | 37.2 | 21.60% | $7.41 | 13.62 | *** |
| 3 | Inflation Creating | 4/21/16 | $46.93 | 6.78% | 15.1 | 7.67% | $3.37 | 4.83 | *** |
| 4 | Corrective Disclosure | 6/1/16 | $36.25 | -3.92% | 19.5 | -4.43% | -$1.67 | -2.88 | *** |
| 5 | Corrective Disclosure | 7/26/16 | $41.36 | -5.12% | 17.9 | -5.25% | -$2.29 | -3.45 | *** |
| 6 | Corrective Disclosure | 10/25/16 | $32.89 | -13.22% | 58.2 | -12.25% | -$4.64 | -9.09 | *** |
| 7 | Corrective Disclosure | 1/31/17 | $21.49 | -25.74% | 54.1 | -26.45% | -$7.65 | -22.21 | *** |
| 8 | Inflation Creating | 4/27/17 | $21.67 | 9.94% | 21.4 | 9.63% | $1.90 | 7.20 | *** |
| 9 | Corrective Disclosure | 8/1/17 | $18.30 | -8.59% | 22.3 | -9.30% | -$1.86 | -5.68 | *** |
| 10 | Corrective Disclosure | 11/4/19 | $17.14 | -18.92% | 43.6 | -20.65% | -$4.37 | -12.23 | *** |

Sources: S&P Capital IQ, Complaint, and Cain Efficiency Report.
Notes:
(1) The results are based on the event study described in the Cain Efficiency Report, Section IV.E.
(2) *** and ** indicate statistical significance at the 99% and 95% confidence levels or greater, respectively.

**Exhibit 6**
**Event Study Analysis of the Corrective Disclosure Event**
**For Under Armour Class C (UA) Common Stock**

| # | Event Type | Market Date | Closing Price | Raw Return | Volume (millions) | Abnormal Return | Abnormal Dollar Change | t-Statistic | Significance Level[2] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Event Study Results [1] | | | |
| 1 | Inflation Creating | 4/21/16 | $45.41 | 6.95% | 3.3 | 7.79% | $3.31 | 4.78 | *** |
| 2 | Corrective Disclosure | 6/1/16 | $33.48 | -3.57% | 3.1 | -4.42% | -$1.54 | -2.71 | *** |
| 3 | Corrective Disclosure | 7/26/16 | $37.50 | -3.30% | 3.7 | -3.35% | -$1.30 | -2.05 | ** |
| 4 | Corrective Disclosure | 10/25/16 | $28.37 | -13.77% | 6.8 | -12.69% | -$4.17 | -8.66 | *** |
| 5 | Corrective Disclosure | 1/31/17 | $19.22 | -23.40% | 57.0 | -24.07% | -$6.04 | -15.30 | *** |
| 6 | Inflation Creating | 4/27/17 | $19.82 | 9.26% | 15.2 | 8.90% | $1.61 | 5.09 | *** |
| 7 | Corrective Disclosure | 8/1/17 | $16.23 | -10.38% | 23.2 | -11.08% | -$2.01 | -6.44 | *** |
| 8 | Corrective Disclosure | 11/4/19 | $15.44 | -18.35% | 18.7 | -20.11% | -$3.80 | -12.87 | *** |

Sources: S&P Capital IQ, Complaint, and Cain Efficiency Report.
Notes:
(1) The results are based on the event study described in the Cain Efficiency Report, Section IV.E.
(2) *** and ** indicate statistical significance at the 99% and 95% confidence levels or greater, respectively.



**Exhibit 7**
**Under Armour Class A (UAA) Common Stock Intraday Price and Volume**
**11/4/2019**

Source: TICK Data, Bloomberg, Factiva, S&P Capital IQ.

**Exhibit 8**
**Under Armour Class C (UA) Common Stock Intraday Price and Volume**
**11/4/2019**



Source: TICK Data, Bloomberg, Factiva, S&P Capital IQ.

Appendix A

# Documents Considered

### Prior Reports and Depositions in this Matter:
- Market Efficiency Report of Matthew D. Cain, Ph.D., dated November 30, 2021, including all data and all documents included in the Appendices of that report.
- Deposition of Kevin Plank, dated February 15, 2023.

### Court Documents:
- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, *Under Armour Securities Litigation,* No. RDB-17-388 (D. Md.)
- *In re Under Armour Sec. Litig.,* 540 F.Supp.3d (D. Md. 2021)
- *In re Under Armour Sec. Litig.*, __F.Supp.3d__, 2022 WL 4545286, (D. Md. Sept. 29, 2022)
- Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (ECF 198)
- ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER, Admin Proc. 3-20278

### Court Decisions and Securities Law:
- 15 U.S.C. §78t-1(a)
- 15 U.S.C. §78t-1(b)(1)
- *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)

### Academic Literature:
- Tim Koller, Marc Goedhart, & David Wessels, "Measuring and Managing the Value of Companies," John Wiley & Sons, Inc., Sixth Edition, 2015.
- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature,* Vol. 35 (1997).
- David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, (3d ed. 2001).
- Aswath Damodaran, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, (John Wiley & Sons, 1996).
- Jeff G. Hammel & B. John Casey, "Sizing Securities Fraud Damages: 'Constant Percentage' on Way Out?," *New York Law Journal* (2009), available at https://www.law.com/newyorklawjournal/almID/1202427590818/.

### SEC Filings:
- Under Armour SEC Form 10-K's for Fiscal Years 2015, 2016, 2017, 2018, and 2019.
- Under Armour SEC Form S-3ASR filed February 28, 2019
- Under Armour SEC Form 8-K, filed October 25, 2016, 8:15 AM
- Under Armour SEC Form 8-K, filed January 31, 2017, 8:16 AM
- Under Armour SEC Form 8-K, filed August 1, 2017, 7:15 AM

- Under Armour SEC Form 8-K, filed November 4, 2019, 6:55 AM

**Under Armour Press Releases:**
- "Under Armour to Provide Live Webcast of Investor Day Meeting," *PR Newswire,* September 9, 2015, 8:00 AM.
- "Under Armour Reports Fourth Quarter Net Revenues Growth Of 31% And Full Year Net Revenues Growth Of 28%," *PR Newswire,* January 28, 2016, 7:00 AM.
- "Under Armour Announces Class C Stock Dividend," *PR Newswire,* March 16, 2016, 4:10 PM.
- "Under Armour Reports First Quarter Net Revenues Growth Of 30%; Raises Full Year Net Revenues Outlook To $5.0 Billion," *PR Newswire,* April 21, 2016, 7:00 AM.
- "Under Armour Updates 2016 Outlook," *PR Newswire,* May 31, 2016, 4:15 PM.
- "Under Armour Announces Final Ratio For Class C Stock Dividend," *PR Newswire,* June 16, 2016, 9:00 AM.
- "Under Armour Reports Second Quarter Net Revenues Growth Of 28%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire,* July 26, 2016, 7:00 AM.
- "Under Armour Reports Third Quarter Net Revenues Growth Of 22%; Reiterates Full Year Net Revenues Outlook Of $4.925 Billion," *PR Newswire,* October 25, 2016, 7:00 AM.
- "Under Armour Reports Fourth Quarter and Full Year Results; Announces Outlook for 2017," *PR Newswire,* January 31, 2017, 6:00 AM.
- "Under Armour Reports First Quarter Results," *PR Newswire,* April 27, 2017, 6:55 AM.
- "Under Armour Reports Second Quarter Results," *PR Newswire,* August 1, 2017, 6:55 AM.
- "Patrik Frisk To Become Chief Executive Officer Of Under Armour On January 1, 2020," *PR Newswire,* October 22, 2019, 6:55 AM.
- "Under Armour Reports Third Quarter Results; Updates 2019 Full Year Outlook," *PR Newswire,* November 4, 2019, 6:55 AM.

**Conference Calls:**
- "Under Armour, Inc. NYSE:UAA FQ2 2015 Earnings Call Transcripts," S&P Capital IQ, July 23, 2015, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA Analyst/Investor Day," S&P Capital IQ, September 16, 2015.
- "Under Armour, Inc. NYSE:UAA FQ3 2015 Earnings Call Transcripts," S&P Capital IQ, October 22, 2015, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ4 2015 Earnings Call Transcripts," S&P Capital IQ, January 28, 2016, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ1 2016 Earnings Call Transcripts," S&P Capital IQ, April 21, 2016, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ2 2016 Earnings Call Transcripts," S&P Capital IQ, July 26, 2016, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ3 2016 Earnings Call Transcripts," S&P Capital IQ, October 25, 2016, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ4 2016 Earnings Call Transcripts," S&P Capital IQ, January 31, 2017, 8:30 AM.

- "Under Armour, Inc. NYSE:UAA FQ1 2017 Earnings Call Transcripts," S&P Capital IQ, April 27, 2017, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ2 2017 Earnings Call Transcripts," S&P Capital IQ, August 1, 2017, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ3 2017 Earnings Call Transcripts," S&P Capital IQ, October 31, 2017, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ1 2018 Earnings Call Transcripts," S&P Capital IQ, May 1, 2018, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ2 2018 Earnings Call Transcripts," S&P Capital IQ, July 26, 2018, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ4 2018 Earnings Call Transcripts," S&P Capital IQ, February 12, 2019, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA  FQ1 2019 Earnings Call Transcripts," S&P Capital IQ, May 2, 2019, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ2 2019 Earnings Call Transcripts," S&P Capital IQ, July 30, 2019, 8:30 AM.
- "Under Armour, Inc. NYSE:UAA FQ3 2019 Earnings Call Transcripts," S&P Capital IQ, November 4, 2019, 8:30 AM.

**Bates Documents:**
- UA_00453240
- UA_00453241
- UA_00280474
- UA_00246205
- UA_01071066

**Analyst Reports:**
- "Declining Share and ASPs Dual Threat to Premium Valuation, Downgrade to UW," *Morgan Stanley,* January 10, 2016.
- "Why We're Staying UW Even Though 1Q Looks Solid," *Morgan Stanley*, April 10, 2016.
- "4Q13 Earnings Preview," *Telsey Advisory Group*, January 24, 2014.
- "Stars Align in 4Q for UA; Raise Ests and Target Price," *Buckingham Research Group*, January 30, 2014.
- "Raising Estimates on Strong Fourth Quarter and Increased Outlook for 2014," *William Blair*, January 30, 2014.
- "UA & GILT Rekindle Partnership," *Macquarie Research*, February 18, 2014.
- "UA: Takeaways From Management Meeting at Headquarters," *Wells Fargo*, March 31, 2014.
- "UA and VFC EPS Reports Likely Meet Expectations Despite Tough Environment," *Morgan Stanley*, April 21, 2014.
- "Apparel to drive solid Q3 sales growth; raising estimates, reiterating BUY with new PT of $130," *Canaccord Genuity*, October 14, 2015.

- "Defending UA," *SunTrust,* January 11, 2016.

- "Growth Drivers on Fire; F4Q Beats and F16 Outlook Better Than Feared," *SunTrust*, January 28, 2016.

- "UA: 4Q – Impressive Growth in a Difficult Environment," *KeyBanc Capital Markets*, January 28, 2016.

- "Strong results despite tough weather. Adjusting estimates," *Sterne Agee CRT*, January 28, 2016.

- "4Q15 First Look - UA Finishes Strong," *Buckingham Research Group,* January 28, 2016.

- "Quick Read: UA Overcomes Weather Challenge," *Oppenheimer,* January 28, 2016.

- "Solid 4Q Clears Reduced Hurdle; Footwear + Intl Opportunity w/ Ongoing Margin Debate," *J.P. Morgan,* January 28, 2016.

- "Taking no prisoners; reiterate BUY, $130 PT," *Canaccord Genuity,* January 28, 2016.

- "4Q15 Results - First Look at a strong quarter," *Sterne Agee,* January 28, 2016.

- "UA: Back on Track, + Starting to Unlock Latent Gross Margin Opportunity," *Evercore ISI,* January 28, 2016.

- "Q4 first look: Solid results and guidance should dispel growth fears; reiterate BUY," *Canaccord Genuity,* January 28, 2016.

- "Under Armour, Inc.: 4Q Sigh Of Relief; Where Do We Go From Here?," *Susquehanna,* January 28, 2016.

- "Sentiment Normalizes Post 'Sportscan' Fear," *Cowen,* January 28, 2016.

- "Robust Growth Continues... Great Long-Term Story," *Jefferies,* January 28, 2016.

- "Women's Apparel and Running Footwear Still Threaten Premium Valuation; Reiterate UW," *Morgan Stanley,* January 29, 2016.

- "Strong quarter & conservative outlook. Fundamentals continue to improve. Raising Estimates.," *Sterne Agee,* April 21, 2016.

- "UA: Q1 Review - 'Tomorrow's Benchmark' Resets Higher," *BB&T Capital Markets*, April 21, 2016.

- "Scoreboard: UA 2," *Barclays,* April 21, 2016.

- "UA: Standing out in the Crowd," *Evercore ISI,* April 21, 2016.

- "UA: 1Q – Strong Brand, Momentum," *KeyBanc Capital Markets,* April 21, 2016.

- "Q1 first look: Solid start to year with more to come; reiterate BUY," *Canaccord Genuity,* April 21, 2016.

- "Under Armour, Inc.: Growth Drivers Back In Focus," *Susquehanna,* April 21, 2016.

- "Raising PT and Est. on UA, but Concerns Remain; Reiterate Neutral," *Piper Jaffray,* April 21, 2016.

- "Scoring On Topline Growth, But Taking Bigger Risks," *Credit Suisse*, April 21, 2016.

- "The Growth Story Continues to Roll On…," *Jefferies*, April 21, 2016.

- "Under Armour's growth is remarkably consistent, causing investors to bid the stock over our FVE," *Morningstar*, April 22, 2016.

- "The Sports Authority Liquidation Dampens 2Q, FY16 Outlook," *Credit Suisse,* May 31, 2016.

- "Adjusting our UA model for The Sports Authority liquidations," *Deutsche Bank,* May 31, 2016.

- "UA: TSA Liquidation Impact Sized, Overhang Removed," *Evercore ISI,* May 31, 2016.

- "UA: TSA Bankruptcy Headwinds, Lowering Estimates," *KeyBanc Capital Markets,* May 31, 2016.

- "Adjusting Estimates on TSA; Valuation Leaves Little Room for Error," *Oppenheimer,* May 31, 2016.

- "UA Lowers FY16 Guidance On The Heels Of TSA Bankruptcy; Reducing Ests. & PT; Neutral," *Piper Jaffray,* May 31, 2016.

- "Under Armour, Inc.: TSA Tarnishes the Armour," *Susquehanna,* May 31, 2016.

- "UA: TSA Liquidation to Impact FY'16 Top Line and EBIT, Reducing Estimates," *BB&T Capital Markets,* June 1, 2016.

- "UA: Updated Guide Reflects TSA/Industry Liquidation Risks; Maintain Hold," *Brean Capital,* June 1, 2016.

- "FY16 Outlook Revised for Sports Authority Bankruptcy; L-T Story Unchanged," *Buckingham Research Group,* June 1, 2016.

- "TSA liquidation creates a speed bump; long-term growth thesis intact; reiterate BUY," *Canaccord Genuity,* June 1, 2016.

- "Working Capital Drags Continue: Sell Side Estimates Need A Cut Through 2018," *Cowen,* June 1, 2016.

- "UA lowers FY16 guidance due to TSA bankruptcy: Long-term story remains intact. Reducing estimates - Maintain Buy.," *Sterne Agee,* June 1, 2016.

- "Sports Authority Shouldn't Be a Big Deal But...," *Jefferies,* June 1, 2016.

- "UA: Revising Estimates and Price Tgt for TSA Impact," *Telsey Advisory Group,* June 1, 2016.

- "Sports Authority Liquidation Surprises UA; Lowering 2016 Estimates, Maintain Neutral Rating," *UBS,* June 1, 2016.

- "UA: Reducing Estimates To Reflect Sports Authority Liquidation On The Bright side, At Least The Warriors Made The Finals Again," *Wells Fargo,* June 1, 2016.

- "UA Lowers FY16 Sales Guidance and Drops EBIT $ Outlook 12%; Stay UW," *Morgan Stanley,* June 1, 2016.

- "Under Armour: Look At Nike To Understand Why There Isn't Much Upside," *Seeking Alpha,* June 2, 2016, 2:49 AM.

- "In-Line 2Q w/ 2H Maintained; Walking Through The Moving Pieces; Neutral – ALERT," *J.P. Morgan,* July 26, 2016.

- "2Q Highlights Brand Strengths…And The Risks Associated With Aggressive Growth Targets," *Credit Suisse,* July 26, 2016.

- "UA: Slower Growth Algorithm or Temporary Pause?," *Evercore ISI,* July 26, 2016.
- "1st Take: 2Q in Line, as Expected, but Issues Remain; Stay Underweight," *Morgan Stanley,* July 26, 2016.
- "A Slightly Slower Path to Recovery for UA's Algo Despite Solid Long-Term Growth Drivers," *UBS,* July 26, 2016.
- "A Tough Quarter Against a High Bar; Is GM Pressure Contained to 2Q?," *UBS,* July 26, 2016.
- "Playing with Heart and Soul," *Barclays*, July 26, 2016.
- "2Q16 First Look - Solid 2Q Growth Amid Industry Disruptions," *Buckingham Research Group,* July 26, 2016.
- "Despite TSA bumps, growth opportunities abound; reiterate BUY, $65 PT," *Canaccord Genuity,* July 26, 2016.
- "This Armour is Strong, but Valuation Makes It Too Heavy For Us," *Jefferies,* July 26, 2016.
- "UA: 2Q – Strong Brand Drives Momentum," *KeyBanc Capital Markets,* July 26, 2016.
- "In-Line Second Quarter and Reiterated 2016 Outlook; Announces Distribution Through Kohl's in 2017," *William Blair*, July 26, 2016.
- "UA: With OI/EPS Upside Relatively Constrained, Onus on Further Mult. Expansion," *Brean Capital,* July 27, 2016.
- "UA: Q2 Review - Product and Channel Expansions Support LT Growth," *BB&T Capital Markets,* July 27, 2016.
- "UA: Strong Sales in 2Q16 but Lack of Guidance Raise Disappoints," *Telsey Advisory Group,* July 27, 2016.
- "New Distribution And Sportswear Launch Create New Angles," *Cowen,* July 27, 2016.
- "Sell-Off Overdone, LT Fundamentals Intact; Buyers on Weakness," *SunTrust,* July 27, 2016.
- "UA 3Q16 Earnings Preview," *Telsey Advisory Group*, October 21, 2016.
- "Sell-Off In Shares Appears Overdone; Highlights From 8-K This Morning," *Piper Jaffray,* October 25, 2016.
- "Downgrading Stock to Market Perform as Investments Will Curtail EPS Growth Through 2018," *William Blair,* October 25, 2016.
- "CEO call elucidates how investments will bolster future growth trajectory: BUY the weakness," *Canaccord Genuity,* October 25, 2016.
- "Unpacking UA's Algorithm: Brand Growth Ahead, but Profitability Takes a Step Backwards," *UBS,* October 25, 2016.
- "Investing or Over Investing?," *Macquarie Research,* October 25, 2016.
- "1st Take: Major Guidedown; Reiterate UW," *Morgan Stanley,* October 25, 2016.
- "UA: Choppy Transition as Growth Shifts from High-Margin Apparel to Newer Categories," *Evercore ISI,* October 25, 2016.
- "Investing for the Future," *Barclays,* October 25, 2016.

- "Under Armour's Reduced Profit Outlook Concern, but Investment Priorities Should Expand Brand Reach," *Morningstar,* October 25, 2016.

- "UA - BUY - A Pivotal Moment in Time; Lowering Price Target," *Guggenheim,* October 25, 2016.

- "LISTEN UP!!! Clouds Forming Over Baltimore... Lower PT to $34," *Jefferies,* October 25, 2016.

- "Under Armour, Inc.: UA is Now On Sale: Reiterate Positive - Reducing Estimates and PT," *Susquehanna,* October 25, 2016.

- "UA: Q3 Beats, But Lowers 2018 Profit Target Substantially Rebased Expectations May Result In a Better Setup From Here," *Wells Fargo,* October 25, 2016.

- "Downgrade: Get Big Fast Puts Too Much Pressure On Margins, Returns, Cash Flow," *Cowen,* October 26, 2016.

- "Stock has pulled back before, but new profit profile thwarts u/s. D/G to Hold.," *Deutsche Bank,* October 26, 2016.

- "UA: 3Q16 Exceeds, but Long-Term Guidance Weighed Down by Investments; Moving to the Sidelines," *Telsey Advisory Group,* October 26, 2016.

- "UA: Reset Bar/Investing for LT Sound, Just Jarring to NT Model; Maintain Hold," *Brean Capital,* October 26, 2016.

- "Margin Inflection Delayed by Heavy Spending but Growth Story Intact; Reit. BUY," *Buckingham Research Group,* October 26, 2016.

- "First Margins, Next Sales; Reiterate Underweight," *Morgan Stanley,* October 27, 2016.

- "Under Armour, Inc.: 4Q16 Result & Guidance Disappoint - Downgrading to Neutral - Cut estimates & PT," *Susquehanna,* January 31, 2017.

- "Rebasing and resetting in 2017; downgrading to HOLD, lowering estimates, PT to $20," *Canaccord Genuity*, January 31, 2017.

- "Downgrading Shares To Neutral; CFO Departure (Again) Further Clouds Visibility," *Piper Jaffray,* January 31, 2017.

- "Price Being Paid for Accelerated Low-ROIC Investment; Downgrade to Underperform," *Credit Suisse,* January 31, 2017.

- "UA: Downgrade To Market Perform--This Is A Game-Changer N.A. Wholesale Apparel Decelerating Far Faster Than Expected," *Wells Fargo,* January 31, 2017.

- "Disruption Throughout N. America Wholesale Channel Continues," *Cowen,* January 31, 2017.

- "4Q Miss w/ FY17 EPS Set ~40% Below Street; CFO Follow-Up Takes; Remain Neutral w/ PT to $19," *J.P. Morgan,* January 31, 2017.

- "Fourth Quarter Misses on Top and Bottom Lines; Very Disappointing Outlook for 2017," *William Blair,* January 31, 2017.

- "A painful reset, but risk remains to the downside," *Deutsche Bank,* January 31, 2017.

- "Severe Reset, but Compelling Valuation on Strategic Initiatives Keep Us at Buy," *SunTrust,* January 31, 2017.

- "Never One Cut in Retail; Thoughts Post Management Conversation," *Oppenheimer,* February 1, 2017.

- "4Q16 First Look - 90 Day DL For Sure, Season in Doubt," *Buckingham Research Group,* January 31, 2017.

- "Under Armour's 2017 Outlook Concerning, but Long-Term Investment Story Exists; Shares Under Review," *Morningstar,* January 31, 2017.

- "Storm In Baltimore Not Over; Lower PT to $19," *Jefferies,* January 31, 2017.

- "Ripping off the Second Bandaid," *Macquarie Research,* January 31, 2017.

- "Pierced; Reiterate Underweight," *Morgan Stanley,* January 31, 2017.

- "Path to Prosperity Ahead, PT to $28," *Jefferies,* April 27, 2017.

- "Refreshing Results Following 1Q Reset," *SunTrust,* April 27, 2017.

- "UAA - Standing Up On 'The Rock,'" *Guggenheim,* April 27, 2017.

- "Not as Bad as Feared, but North America and Footwear Stepdown Concerning," *Evercore ISI,* April 27, 2017.

- "Footwear Challenges Suggest Continued Caution In Order," *Credit Suisse,* April 27, 2017.

- "Reiterate Neutral Following Conference Call; Questions Regarding Back Half Remain," *Piper Jaffray,* April 27, 2017.

- "Slowing Growth and Footwear Headwinds Support Less Lofty Valuation," *Buckingham Research Group,* April 27, 2017.

- "Under Armour, Inc.: Hockey Stick Guidance + Brand Risk = Negative Rating," *Susquehanna,* April 27, 2017.

- "Q1 beat is nice change of pace, but headwinds remain: raising PT $1 to $21, maintain HOLD," *Canaccord Genuity,* April 27, 2017.

- "Maintaining 2017 Estimate; Second-Quarter Guidance Largely in Line With Expectations," *William Blair,* April 27, 2017.

- "UA: Consider The Low Bar Cleared, But Red Flags Still Abound Planned Reacceleration In Footwear Seems The Biggest Risk," *Wells Fargo,* April 27, 2017.

- "Under Armour, Inc.: Lowering estimates & PT. Reduced guidance does not reflect base case scenario," *Susquehanna,* August 1, 2017.

- "UAA: Growth Trajectory Continues Its Slide; Reduce PT to $16," *Deutsche Bank,* August 1, 2017.

- "Q4 Guide Sets Too Steep A Hurdle, Continuing Sentiment Overhang," *Cowen,* August 1, 2017.

- "UAA: An 'Under'Whelming Print, Holes Keep Getting Poked in the 'Armour'," *Wells Fargo,* August 1, 2017.

- "Smarter and Leaner Can't Come Faster," *Barclays,* August 1, 2017.

- "Waiting For Better Visibility to Sales Inflection as Entry Point," *Buckingham Research Group,* August 2, 2017.