# EXHIBIT 1

# Filed Under Seal

**CONFIDENTIAL**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTICT OF MARYLAND**

|  |  |
|---|---|
| : | |
| : | CIVIL ACTION |
| IN RE UNDER ARMOUR SECURITIES : | No. RDB-17-388 |
| LITIGATION : | |
| : | |
| : | |
| : | |

# Expert Report of Professor Wayne Guay

May 15, 2023

# Table of Contents

I.    Qualifications ................................................................................................. 1

II.   Assignment and Compensation ...................................................................... 2

III.  Summary of Opinions ..................................................................................... 3

IV.   Founder Stock Holdings, Executive Compensation, Incentives, and Trading:
      Literature and Theory ..................................................................................... 5

      A.    Background on Executive Compensation and Founder Stock Holdings .......... 5

      B.    Diversification and Liquidity ................................................................. 6

V.    Under Armour's Dual-Class Structure ........................................................... 8

VI.   Mr. Plank's Share Sales ............................................................................... 12

      A.    Mr. Plank's Class Period Trading Was Consistent With His Trading Prior to
            the Class Period .................................................................................. 12

      B.    Prof. Henderson's Opinion That Mr. Plank's Trading Was "Out of Line with
            His Prior Practices" Is Erroneous and Misleading ..................................... 15

      C.    Prof. Henderson's Conclusion That Mr. Plank's Sales "Are Substantially More
            than the Typical CEO Traded at That Time" Is Contrived and Misleading ............... 20

VII.  Mr. Plank's Under Armour Stockholdings ..................................................... 23

      A.    Mr. Plank's Class Period Trading Comprised a Small Proportion of His Stock
            Holdings ............................................................................................. 23

      B.    Mr. Plank's Economic Interest in Under Armour ....................................... 26

VIII. Mr. Plank's Use of 10b5-1 Plans ................................................................. 29

      A.    Background on Restrictions on Executive Trading ..................................... 29

      B.    The Role of 10b5-1 Trading Plans ......................................................... 31

      C.    Prof. Henderson's "Hallmarks" of "Benign" Trading Plans Are Arbitrary and
            Unnecessary ....................................................................................... 33

            1.    Mr. Plank's 10b5-1 Trading Plans ............................................... 33

            2.    Prof. Henderson's "Hallmarks" ................................................... 35

## I.    Qualifications

1.    I am the Yageo Professor of Accounting at The Wharton School of Business at the University of Pennsylvania, where I have been on the faculty since 1997.  I received my Ph.D. in accounting and an M.S. in business administration with a concentration in applied economics from the University of Rochester in 1998 and 1996, respectively, my MBA from Northeastern University in 1993, and my B.S. in engineering and management from Clarkson University in 1989.

2.    I have published numerous peer-reviewed articles in leading accounting, finance, economics, and law journals.  My research has focused on corporate governance, executive compensation, employee stock options and stock ownership, executive incentives and trading, corporate finance, risk management, firm valuation, and cost of capital.  I have lectured and presented my research at more than one hundred universities and conferences around the world.  I currently serve as an Editor of the *Journal of Accounting & Economics*, a leading academic journal in the field of accounting, and have previously served on the editorial boards of the *Journal of Accounting Research* and *The Accounting Review*.  I also regularly contribute to leading finance journals, such as *The Journal of Finance*, the *Journal of Financial Economics*, and *The Review of Financial Studies*, both as an author and a referee.  I am the winner of the Best Paper Award from *The Accounting Review* and *Australian Journal of Management*, and have won numerous awards for my teaching.

3.    I have served as an expert and testified at deposition, trial, and arbitration on issues related to executive compensation and incentives, employee stock option valuation, insider trading, corporate governance, firm valuation, and financial statement analysis.

4.    A full description of my academic credentials is contained in my curriculum vitae, a copy of which is attached as **Appendix I**.  A list of the cases in which I have testified as an expert in the last four years is provided in **Appendix II**.

## II.    Assignment and Compensation

5.      I have been retained by counsel for Kevin A. Plank.  Mr. Plank founded Under Armour, Inc. ("Under Armour" or the "Company") in 1996,[1] and served as Chief Executive Officer ("CEO") and Chairman of the Board from the Company's inception through 2019, shortly after the end of the Class Period (September 16, 2015 to November 1, 2019).[2,3]  I have been asked to respond to the Expert Report of Professor M. Todd Henderson dated April 3, 2023 ("Henderson Report").  Specifically, I have been asked to respond to Prof. Henderson's opinion that "Plank's Class Period stock sales were extremely unusual and suspicious."[4]

6.      The general basis for my opinions includes my education, training, and experience as a professor, and as an active researcher, author, and consultant on issues of corporate finance, corporate governance, and employee compensation plans.  I cite specific portions of the relevant academic literature in the discussion below in support of my opinions.  Additionally, in formulating my opinions, I have reviewed a variety of materials, including but not limited to Securities and Exchange Commission ("SEC") filings, the transcript of Mr. Plank's deposition in this matter, and other materials produced in this matter.  A full list of the materials I have considered in formulating my opinions is attached as **Appendix III**.

7.      I am being compensated at my standard billing rate of $1,200 USD per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

8.      My work on this matter is ongoing and the opinions presented in this report are based on currently available information.  If new information becomes available that relates to my

---

[1] The Company was first incorporated in 1996 as KP Sports, Inc., before changing its name to Under Armour, Inc. in March 2005.  *See* Under Armour, Inc., SEC Form 424B1, filed November 18, 2005 ("Under Armour Prospectus"), p. 2.

[2] Under Armour, Inc., SEC Form Def 14A, filed April 25, 2006, p. 6.  Mr. Plank announced his decision to step down on October 22, 2019 and was replaced by Chief Operating Officer Patrik Frisk, effective January 1, 2020. *See* "Under Armour Founder Kevin Plank Is Stepping Down as CEO," *CNN Business*, October 22, 2019, available at https://www.cnn.com/2019/10/22/business/under-armour-kevin-plank-ceo/index.html.

[3] Mr. Plank also served as Company President from 1996 through July 2008, and from August 2010 through July 2017.  Upon stepping down as CEO and Chairman of the Board at the end of 2019, Mr. Plank became Executive Chairman and Brand Chief, a position he still holds today.  *See* Under Armour, Inc., SEC Form Pre 14A, filed April 1, 2020, p. 8; "Corporate Governance," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/corporate-governance.html.

[4] Expert Report of Professor M. Todd Henderson, April 3, 2023 ("Henderson Report"), ¶ 6.

analyses or opinions, I reserve the right to amend this report based on additional information that may be obtained before my testimony or if I am asked to perform additional analyses.

## III.    Summary of Opinions

9.    In contrast to Prof. Henderson's assertion that "Plank's Class Period stock sales were extremely unusual and suspicious,"[5] I find that Mr. Plank's trading was consistent with his prior trading practice and that of other founder CEOs, comprised a relatively small proportion of his holdings, and that Mr. Plank retained a large economic interest in Under Armour, even after his Class Period trades.  I also find that Prof. Henderson's analyses contain errors and paint a misleading picture of Mr. Plank's trading.  Specifically:

10.    Mr. Plank held Under Armour's different classes of common stock at different points in time from the Company's Initial Public Offering ("IPO") through the end of the Class Period.  As discussed in **Section V**, dual-class share structures, such as the one Under Armour had at the time of its IPO, are common among founder-led companies and can enable founders to focus on delivering a long-term strategy for the company.  Prof. Henderson asserts that "Plank (and the Company) went to extraordinary lengths … to preserve Plank's personal control over the Company."[6]  However, in a similar time frame to the Class Period, other founder-led dual-class companies issued additional classes of shares that did not include voting rights—as Under Armour did with its Class C share issuance—in part to facilitate their founder-led approach.

11.    Prof. Henderson compares the volume and proceeds from Mr. Plank's Class Period trades to his pre-Class Period trading, as well as trading by other CEOs, and concludes that "Plank's Class Period stock sales were dramatically out of line with his prior trading practices"[7] and "very unusual compared with his peers."[8]  As my analysis in **Section VI** shows, however, Mr. Plank's Class Period trading was consistent with his trading prior to the Class Period in terms of the magnitude of share sales and proceeds, and also consistent with the regular quarterly sales pattern that Mr. Plank started in 2011.  Indeed, Prof. Henderson's conclusion is derived from analyses of the number of shares traded, trading proceeds, trading "profits," and the pattern of Mr. Plank's trading that are conceptually flawed, contain errors,

---

[5] Henderson Report, ¶ 6.
[6] Henderson Report, ¶ 21.
[7] Henderson Report, ¶ 44.
[8] Henderson Report, ¶ 47.

and convey a misleading picture of Mr. Plank's trading.  Likewise, Prof. Henderson's analysis in comparison to other CEOs is contrived and misleading.  By comparing trading by a founder CEO of a multi-billion dollar company to trading by CEOs of all U.S. public companies, and focusing this comparison exclusively on the two months when Mr. Plank traded while ignoring the other 47 months during the Class Period, Prof. Henderson fails to provide a like-for-like comparison.  When Prof. Henderson's analysis is adjusted to include the full Class Period and limited to founder CEOs, Mr. Plank's trading does not appear "very unusual compared with his peers."[9]

12.     Prof. Henderson purports to analyze Mr. Plank's sales relative to his stock holdings. Prof. Henderson asserts that Mr. Plank's Class Period trades were "much greater than his prior historical trading practices and extraordinary compared with the typical trading behavior of executives of large public companies."[10]  However, as discussed in **Section VII**, Prof. Henderson's assertion is derived from comparing Mr. Plank's sales relative to "available-to-sell shares," which is asserted by Prof. Henderson to be an appropriate baseline of 15% of the Company's shares outstanding.  This is a misleading, factually incorrect, and contrived reference point with respect to Mr. Plank's financial interest in the Company, which is also inconsistent with the measure of trading behavior Prof. Henderson references from academic literature.  In fact, Mr. Plank's trades comprised a relatively small proportion of his total Company holdings, were comparable as a proportion of holdings to trading by long-tenure executives and founders, and Mr. Plank retained a large economic interest in the Company, even after his Class Period trades.

13.     Prof. Henderson concludes that Mr. Plank's 10b5-1 plans support an inference of "suspicious" trading because they do not fit the pattern prescribed by seven "hallmarks" of 10b5-1 plans derived by Prof. Henderson.[11]  However, as discussed in **Section VIII**, Prof. Henderson's "hallmarks" are arbitrary, unnecessary, and not required by the SEC's Rule 10b5-1 as it applied during the Class Period, as I understand it.  Moreover, the empirical literature that Prof. Henderson cites does not support the *presumption* of suspicious trading that he makes.  Prof. Henderson's analysis of Mr. Plank's 10b5-1 plans thus provides no support for his assertion that Mr. Plank's trades were "suspicious" or "unusual" by way of how he operationalized his trading.

---

[9] Henderson Report, ¶ 47.
[10] Henderson Report, ¶ 16.
[11] Henderson Report, ¶ 93.

IV.    **Founder Stock Holdings, Executive Compensation, Incentives, and Trading: Literature and Theory**

   A.    **Background on Executive Compensation and Founder Stock Holdings**

14.    Annual pay for executives typically consists of three main types of compensation: (1) base salary; (2) annual cash bonus; and (3) long-term incentive plans that include options and stock grants.  Base salary is the fixed cash component of the compensation package. Annual cash bonus is an annual cash payout to the executive based on the achievement of specific corporate or individual performance objectives.  Long-term incentive plans are periodic grants of restricted stock, stock options, or performance-based payments of cash, stock, or options.  As shown in **Exhibit 1**, as CEO of Under Armour, Mr. Plank received a relatively small annual base salary each year following the Company's IPO in 2005 and, in most years, an annual cash bonus (or non-equity incentive compensation).  As shown in the exhibit, since 2013 Mr. Plank has also earned stock-based compensation in the form of options (with either time-based or performance-based vesting conditions) and/or restricted stock (either time-vesting restricted stock units ("RSUs") or performance stock units ("PSUs")).

15.    Stock options and restricted stock serve multiple roles.  One role of stock-based compensation is to provide executives with compensation for their services.  A second role is to provide executives with incentives to maximize shareholder value.  Stock-based compensation aligns executives' incentives with the price of the company's stock such that executives benefit from actions that increase shareholder value and suffer from actions that reduce shareholder value.  Finance and accounting literature discusses and documents that strong stock-based incentives constitute best practices in corporate governance.[12]

16.    While Mr. Plank received stock and options grants and a relatively small annual base salary as part of his compensation for serving as CEO and Chairman of the Board of Under Armour (as shown in **Exhibit 1**), the vast majority of his stock holdings date back to his holdings at the time of Under Armour's IPO in 2005, and earlier, as founder of the Company.[13]  As shown in **Exhibit 2**, Mr. Plank held 32.3% of the Company's outstanding shares as of December 2005, shortly after the Company's IPO; by February 2015, before the

---

[12] For a review of the literature on executive equity incentives, *see* J. E. Core, W. R. Guay, and D. F. Larcker (2003), "Executive Equity Compensation and Incentives: A Survey," *FRBNY Economic Policy Review*, 9(1), pp. 27–50 ("Core, Guay, and Larcker (2003)").
[13] Under Armour Prospectus, pp. 82–83.

start of the Class Period, he owned 16.8% of outstanding shares, and continued to hold more than 15% of outstanding shares through the end of the Class Period.

17.    It is common for founders to retain a substantial percentage of the shares in their company, particularly while they continue to hold a management or director position.[14]  In addition to providing founders with incentives to drive value for the company's shareholders, and providing compensation for the risk and effort undertaken in building a company, such holdings also allow founders a degree of control over the direction of the company via their voting rights.[15]  At the same time, founders typically hold a very large percentage of their wealth in the stock of their company.[16]

### B.    Diversification and Liquidity

18.    Although vesting restrictions and other implicit and explicit constraints delay executives' ability to cash out their equity positions, firms and shareholders recognize that executives must eventually be allowed to exercise options and sell stock to receive cash and reap the benefits of their work.

19.    Financial economists and personal financial planners agree that an executive (or any individual) should avoid holding a large proportion of his or her wealth in any single risky asset such as their company's stock.[17]  Investors can spread their holdings across a number of different assets and reduce their exposure to firm-specific risks without reducing their expected return.  This fundamental concept of financial economics is known as diversification.[18]

20.    In addition to diversification, executives may also convert some stock-based compensation to cash because they prefer liquidity beyond that afforded by their cash-based

---

[14] D. Hong (2023), "CEO Discretionary Power, Unconstrained Stock Ownership, and Stock Trading: Theory and Evidence," *Advances in Accounting*, 61, Article 100656, pp. 1–16 ("Hong (2023)") at p. 12.  *See also* R. Adams, H. Almeida, and D. Ferreira (2009), "Understanding the Relationship Between Founder–CEOs and Firm Performance," *Journal of Empirical Finance*, 16(1), pp. 136–150 ("Adams, Almeida, and Ferreira (2009)") at p. 139; R. Fahlenbrach (2009), "Founder-CEOs, Investment Decisions, and Stock Market Performance," *The Journal of Financial and Quantitative Analysis*, 44(2), pp. 439–466 ("Fahlenbrach (2009)") at p. 447.

[15] Fahlenbrach (2009) finds that due "to their equity stake and their entrepreneur status, founder-CEOs are likely to have more influence and decision-making power," and "[t]he considerable equity stakes founders hold can potentially reduce the principal-agent problem."  *See* Fahlenbrach (2009) at p. 440.

[16] Hong (2023) notes that "[a]lthough CEOs' personal wealth is typically undisclosed, the literature generally agrees that a large fraction of a CEO's wealth is invested in his own firm through holding stock and options."  *See* Hong (2023) at p. 1.  *See also* J. E. Core and W. R. Guay (2010), "Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework," *Academy of Management Perspectives*, 24(1), pp. 5–19 ("Core and Guay (2010)") at p. 13; J. C. Bettis, J. M. Bizjak, and M. L. Lemmon (2001), "Managerial Ownership, Incentive Contracting, and the Use of Zero-Cost Collars and Equity Swaps by Corporate Insiders," *The Journal of Financial and Quantitative Analysis*, 36(3), pp. 345–370 ("Bettis, Bizjak, and Lemmon (2001)") at pp. 349–350.

[17] *See, e.g.,* Core, Guay, and Larcker (2003) at p. 38.

[18] R. A. Brealey, S. C. Myers, and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin, pp. 156–212.

compensation.[19]  These proceeds might be used for alternative investments outside the company, personal consumption, or charitable activities.

21.      In light of the above, it is not surprising that corporate executives, many of whom have accumulated large stock and options positions, are allowed to, and do, sell equity frequently.[20]  For example, in a study of U.S. CEOs' equity-selling patterns over a seven-year period, Jin and Kothari (2008) examine CEO stock and options holdings, and find that about 42% of CEOs sell stock and/or options from their equity portfolios each year, with the median sales amount comprising 8% of their holdings.  The authors conclude that "many CEOs sell their stock annually and the amount sold represents a non-trivial fraction of their ownership."[21]

22.      Many empirical studies on executive trading patterns, including Jin and Kothari (2008), describe stock and options holdings and sales for "typical" executives.  The trading considerations of founders, however, can differ from those of typical executives.  First, compared to externally hired or internally promoted CEOs, founders often have larger equity positions in their company,[22] and a greater concentration of wealth in their company's stock.[23] This concentrated position in a single risky asset can create strong incentives over time to liquidate a portion of their equity position for diversification purposes.  Second, founders will typically not face the same degree of constraints on their ability to trade because of vesting requirements.  An externally hired or internally promoted CEO often receives most of their equity via periodic compensation grants that are subject to vesting requirements.[24]  By contrast, much of a founder's stock originates with the inception of the firm and is therefore often largely unconstrained by vesting provisions.  Third, potentially as a result of vesting constraints in addition to stock ownership requirements, typical CEOs tend to sell limited amounts of stock early in their tenure.  Empirical studies show that trading increases with

---

[19] T. Hemmer, S. Matsunaga, and T. Shevlin (1998), "Optimal Exercise and the Cost of Granting Employee Stock Options with a Reload Provision," *Journal of Accounting Research*, 36(2), pp. 231–255 at p. 232 fn 5.

[20] The following papers describe the incentives of executives to reduce their firm equity holdings, and some actions taken by executives to reduce or diversify their holdings:  E. Ofek and D. Yermack (2000), "Taking Stock: Equity-Based Compensation and the Evolution of Managerial Ownership," *The Journal of Finance*, 55(3), pp. 1367–1384 ("Ofek and Yermack (2000)"); Bettis, Bizjak, and Lemmon (2001); J. C. Bettis, J. M. Bizjak, and M. L. Lemmon (2005), "Exercise Behavior, Valuation, and the Incentive Effects of Employee Stock Options," *Journal of Financial Economics*, 76(2), pp. 445–470; L. Jin and S. P. Kothari (2008), "Effect of Personal Taxes on Managers' Decisions to Sell Their Stock," *Journal of Accounting and Economics*, 46(1), pp. 23–46 ("Jin and Kothari (2008)").

[21] Jin and Kothari (2008) at p. 32.

[22] *See, e.g.*, Hong (2023) at p. 12; Adams, Almeida, and Ferreira (2009) at p. 139; Fahlenbrach (2009) at p. 447.

[23] Hong (2023) at p. 1; Core and Guay (2010) at p. 13; Bettis, Bizjak, and Lemmon (2001) at pp. 349–350.

[24] *See, e.g.*, A. Edmans, X. Gabaix, and J. Denter (2017), "Executive Compensation: A Survey of Theory and Evidence," in *The Handbook of the Economics of Corporate Governance*, Volume 1, B. E. Hermalin and M. S. Weisbach eds., Amsterdam, Netherlands: North-Holland, pp. 383–539 at pp. 416–419.

tenure,[25] and the average tenure of a CEO is around five years.[26]  By contrast, founders often have substantially longer tenure than typical CEOs.[27]  Overall, Hong (2023) finds that "founder CEOs in general engage in more stock selling and less stock buying than non-founder CEOs."[28]

23.    In terms of the timing of their trades, founders and other executives will generally be more likely to sell stock if there has been a recent increase in the stock price, in part because a large increase in the stock price implies that the value of firm stock will comprise a larger proportion of the executive's wealth (*i.e.*, the executive's overall investment portfolio becomes less diversified).[29,30]  Indeed, this is confirmed by empirical evidence from academic research.[31]

## V.    Under Armour's Dual-Class Structure

24.    As discussed in this section, Under Armour had a dual-class share structure at the time of its IPO (Class A and B), and added an additional class of shares during the Class Period (Class C).  As discussed below, dual-class structures are common among founder-led companies and can enable founders to focus on delivering a long-term strategy for the company.  Moreover, in a similar time frame to Under Armour, other founder-led dual-class companies also issued additional classes of shares, in part to facilitate their founder-led approach.

25.    Under Armour became a public company in an IPO that closed on November 23, 2005.[32]  The Company went public with a dual-class share structure consisting of Class A and

---

[25] Hong (2023) finds that "CEOs with longer tenure sell more stock and buy less stock, consistent with them diversifying their wealth when they are closer to the end of career."  *See* Hong (2023) at p. 11.  *See also* Core and Guay (2010) at p. 10.

[26] S. N. Kaplan and B. A. Minton (2012), "How Has CEO Turnover Changed?" *International Review of Finance*, 12(1), pp. 57–87 at p. 57; "CEO Tenure Drops to Just Five Years," *Equilar*, January 19, 2018, available at https://www.equilar.com/blogs/351-ceo-tenure-drops-to-five-years.html.

[27] Adams, Almeida, and Ferreira (2009) at p. 139; Fahlenbrach (2009) at p. 447.

[28] The author finds that "founder CEOs' average net stock selling percentage is 4.4% and they have net positive stock selling in 38.6% firm-years, greater than the corresponding percentages of 2.1% and 18.7% for non-founder CEOs."  The author finds that average stock selling (without netting out purchases) is 5.4% for founders and 4.2% for non-founder CEOs.  *See* Hong (2023) at p. 12.

[29] Core and Guay (2010) at p. 10.

[30] Furthermore, executives' tax burden due on restricted stock as it vests and exercised options is higher when their value increases, thereby potentially making it less feasible for the executives to pay their tax obligations without selling at least a portion of their company stock.

[31] Core and Guay (2010) show that executives' annual stock sales as a share of their holdings increases with higher annual company stock returns.  *See* Core and Guay (2010) at p. 8.  *See also* R. A. Heron and E. Lie (2017), "Do Stock Options Overcome Managerial Risk Aversion? Evidence from Exercises of Executive Stock Options," *Management Science*, 63(9), pp. 3057–3071 ("Heron and Lie (2017)") at p. 3061.

[32] Under Armour, Inc., SEC Form 10-K for FY 2005, filed March 15, 2006, p. 21; Under Armour Prospectus, p. 1.

Class B common stock, both of which still exist today.[33]  Class A common stock began trading publicly on Nasdaq at the time of the Company's IPO in 2005 before moving to the NYSE in December 2006, where it remains publicly traded today.[34]  Class B common stock is not publicly traded but can be converted to Class A common stock on a one-for-one basis.[35] Holders of Class A common stock are entitled to one vote per share, whereas holders of Class B common stock are entitled to ten votes per share.[36]  Except with respect to these differences in conversion and voting rights, the two classes of common stock are identical.

26.     Dual-class structures are common in founder-led companies.  One recent study by Aggarwal et al. (2022) finds that, between 2017 and 2019, nearly 30% of IPOs had dual-class structures, founders were controllers in nearly 50% of all dual-class IPOs, and the proportion of companies with dual-class shares has been increasing in recent years.[37]  Examples of well-known founder-led companies with dual-class structures include the Estée Lauder Companies, Facebook, Fitbit, Google, Groupon, Shake Shack, Snap, and Yelp.[38]

27.     Dual-class structures with differential voting rights, such as that of Under Armour, allow allocation of proportionately greater voting rights to founders relative to their cashflow rights.[39]  As a result, dual-class structures can enable founder shareholders to focus on long-term corporate strategy.[40]  Because dual-class structures can allow founders to maintain

---

[33] Under Armour Prospectus, p. 3; "Stock Information," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/stock-information.html; Under Armour, Inc., SEC Form Def 4A, filed March 24, 2022.

[34] "Stock Information," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/stock-information.html; Under Armour, Inc., SEC Form 10-K for FY 2006, filed February 28, 2007, p. 21; Under Armour Prospectus, p. 4; Under Armour, Inc. Press Release, "Under Armour, Inc. Plans to List on the NYSE," November 16, 2006.

[35] With the exception of a special provision allowing for a share exchange by Mr. Plank and his family entities from Class A stock to Class B stock in connection with the IPO, Class A shares cannot be converted into Class B shares.  *See* Under Armour Prospectus, pp. 3–4 ("After the completion of this offering, our common stock will consist of two classes: Class A common stock and Class B common stock. Purchasers in this offering will acquire Class A common stock. Class A and Class B common stock are identical in all respects, except with respect to voting and conversion rights. Holders of Class A common stock are entitled to one vote per share, and holders of Class B common stock are entitled to 10 votes per share, on all matters to be voted on by our common stockholders. … Except as otherwise noted, all information in this prospectus: … gives effect to … (iii) a share exchange by Kevin A. Plank and two Kevin A. Plank family entities of their shares of Class A common stock for shares of Class B common stock on a one-for-one basis.").

[36] Under Armour Prospectus, p. 3.

[37] D. Aggarwal et al. (2022), "The Rise of Dual-Class Stock IPOs," *Journal of Financial Economics*, 144(1), pp. 122–153 ("Aggarwal et al. (2022)") at pp. 122–124.

[38] "Ownership Profile," *Estée Lauder Companies*, available at https://www.elcompanies.com/en/investors/stock-information/ownership-profile; A. H. Choi (2018), "Concentrated Ownership and Long-Term Shareholder Value," *Harvard Business Law Review*, 8(1), pp. 53–99 ("Choi (2018)") at pp. 53–55.

[39] Aggarwal et al. (2022) at p. 123.

[40] B. D. Jordan, S. Kim, and M. H. Liu (2016), "Growth Opportunities, Short-Term Market Pressure, and Dual-Class Share Structure," *Journal of Corporate Finance*, 41, pp. 304–328 ("Jordan, Kim, and Liu (2016)") at pp. 305–306 ("Among dual-class firms, there are significant variations in the wedge between the percentage of voting rights controlled by insiders and the percentage of cash flow rights controlled by insiders. We find that R&D intensity and sales growth rates are positively related to this wedge, while our measures of short-term market pressure are negatively related to the wedge, within the sample of dual-class firms. The results are consistent with the notion that dual-class shares help insiders implement long term projects while avoiding short-term market pressure.").

voting control, a company may implement this structure to facilitate stability in the company's direction and ensure that the founder's vision can come to fruition as the company grows.[41-42]

28.    In June 2015, a Special Committee of independent directors of Under Armour approved a series of share structure and corporate governance changes for the Company.[43] As stated by the Company, the changes were intended as "an appropriate way to make it more likely that Mr. Plank [would] remain in a position to influence [Under Armour's] direction for many years," an influence that "has been beneficial to [Under Armour's] growth, strategy, and autonomy."[44]  Among the changes approved by the Special Committee was the creation of a new class of non-voting common stock, issued as a stock dividend to holders of outstanding shares of Class A and Class B common stock.[45]  As stated by the Company, the issuance of the non-voting Class C common stock would "provide [Under Armour's] Board with the ability to prolong the period of time during which Mr. Plank may maintain voting control over Under Armour" and "allow Mr. Plank to sell Class C Stock without affecting Mr. Plank's voting control over Under Armour," even as the Company issued additional shares for compensation or other purposes.[46-47]

29.    The dividend issuing Class C common stock was approved by Under Armour's Board of Directors on March 16, 2016 and was issued on April 7, 2016.[48]  Shareholders received one share of Class C common stock for each share of Class A or Class B common stock they

---

[41] *See, e.g.*, Choi (2018) at pp. 53–55; Jordan, Kim, and Liu (2016) at p. 306.

[42] In a similar vein, Cremers, Litov, and Sepe (2017) find that staggered boards can be value-enhancing for companies because they increase executives' incentives to innovate and invest in long-term projects and stakeholder relationships.  *See* K.J. M. Cremers, L. P. Litov, and S. M. Sepe (2017), "Staggered Boards and Long-Term Firm Value, Revisited," *Journal of Financial Economics*, 126(2), pp. 422–444.

[43] Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015, p. ii.

[44] As Under Armour stated in its July 13, 2015 Def 14A, the dual-class stock structure was implemented to allow Mr. Plank to maintain voting control of the Company even in light of the Company issuing additional shares or Mr. Plank making periodic shares sales  *See* Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015 at pp. 10–11, 14–15 ("Companies typically use dual-class stock structures, such as the one that we have in place, so that a company founder or founders may maintain voting control of the company after it becomes a public company, even as the company issues additional shares of its common stock or as the founder or founders sell their shares from time to time. Facilitating such voting control by company founders, so that their votes control the election of directors and significant corporate decisions, allows them to focus on long-term corporate strategies and performance, as they seek to drive the creation of long-term value for the company and its stockholders. With such a structure in place, a company may be subject to less pressure to achieve short-term financial results and it may avoid pressure from activists or other stockholders who focus more on short-term performance than on longer-term objectives.").

[45] Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015, pp. i–iii.

[46] Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015, p. 14.

[47] In conjunction with the Class C common stock issuance, Mr. Plank agreed to a new, five-year non-compete clause and new conversion triggers under which the tiered-class structure would unwind (through the automatic conversion of Class B common stock to Class A common stock) in the event that Mr. Plank sold more than 2.5 million shares in any calendar year or resigned from the Company.  *See* Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015, pp. 7–10.

[48] Under Armour, Inc. Press Release, "Under Armour Announces Class C Stock Dividend," March 16, 2016.

held.[49]  Like Class A common stock, Class C common stock is publicly traded on the NYSE.[50]  Class C common stock is identical to Class A common stock except that Class C common stock holds no voting rights.[51]

30.      Mr. Plank held all three classes of Under Armour stock in varying amounts throughout the Class Period, including all shares outstanding of Class B common stock. **Exhibit 3** shows Mr. Plank's Class A, B, and C holdings on a split-adjusted basis from the IPO through the end of the Class Period.[52]  Until the issuance of Class C common stock, Mr. Plank held the vast majority of his shares in Class B common stock.  As can be seen from the chart, the Class C issuance resulted in a re-distribution of Mr. Plank's total Under Armour stockholdings, such that his holdings were less concentrated in Class B shares.[53]  Following the Class C issuance, Mr. Plank would be able to sell shares of Class C common stock without lowering his voting rights.

31.      Under Armour was not the first company to issue an additional class of stock post-IPO to help maintain its founder-led approach.  Other founder-led companies have similarly introduced new classes of shares post-IPO to preserve the founder's control over the company's vision.[54]  Google, for example, went public in 2004 with a dual-class structure similar to Under Armour's, in which the founders and CEO held a class of shares with ten times the voting power of the other, publicly-traded class of shares.[55]  Google issued a third class of shares in 2014.[56]  The third class, like Under Armour's Class C common stock, had no voting rights, and was designed to prolong the founders' voting majority as the company continued to issue stock related to its acquisitions and executive compensation programs.[57]  As another example, Zillow went public with a dual-class structure in 2011, and in 2015,

---

[49] Under Armour, Inc., SEC Form S-8, filed April 20, 2016.  As part of a settlement agreement in connection with shareholder litigation related to the creation of Class C stock, holders of Class C stock were awarded a dividend at a ratio 0.007098 shares of Class C stock for each Class C stock held as of June 15, 2016.  *See* Under Armour, Inc. Press Release, "Under Armour Announces Final Ratio for Class C Stock Dividend," June 16, 2016; "Under Armour Settles Shareholder Lawsuit," *SGB Media*, October 9, 2015, available at https://sgbonline.com/under-armour-settles-shareholder-lawsuit/.

[50] "Stock Information," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/stock-information.html.

[51] Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015.

[52] *See* ¶ 41 for a discussion on adjusting for stock splits.

[53] Furthermore, as discussed in detail in Section VII, Exhibit 3 shows that Mr. Plank's overall Under Armour stockholdings changed little throughout the Class Period.

[54] For similar reasons, family-led businesses may also choose tiered-class structures.  Comcast, for example, which first sold shares publicly in 1972, had three classes of stock in 2002, including a class owned entirely by the CEO (son of the founder) that carries one-third of the company's voting power, and a third class, which lacks voting rights.  *See* Comcast Corporation, SEC Form 10-K for FY 2002, filed March 20, 2003, pp. 19, 71.

[55] Google Inc., SEC Form S-1, filed April 29, 2004, p. 21.

[56] Google Inc., SEC Form 8-A, filed March 26, 2014, p. 2.

[57] Google Inc., SEC Form Def 14A, filed May 9, 2012, pp. 56, 70.

issued a third class of common stock with no voting rights.[58]  Zillow's CEO described the benefits of the tiered-structure as allowing "founding members of Zillow [to] continue to hold the reins of Zillow Group, and make the calls that allow [the company] to focus on ways to grow [] for the long term."[59]  The company likewise described the issuance as an "extension" of its dual-class structure, designed to "enable[] the company to continue [to] focus on long-term growth" while "maintaining the flexibility to issue additional stock for strategic business decisions."[60]

## VI.    Mr. Plank's Share Sales

32.    In this section, I discuss Mr. Plank's stock sales and address Prof. Henderson's opinions that Mr. Plank's Class Period stock sales were unusual, both as compared to his sales prior to the Class Period and compared to sales by other CEOs.  As discussed in **Section VI.A**, while remaining the Company's single largest shareholder, Mr. Plank sold his Under Armour stock subsequent to the Company's IPO and then in a regular quarterly pattern beginning in 2011.  This analysis shows that Mr. Plank's Class Period trading was consistent with his trading prior to the Class Period and not, by comparison, of "unusual" magnitude.  Indeed, as discussed in **Section VI.B**, Prof. Henderson's assertion that "Plank's Class Period stock sales were dramatically out of line with his prior trading practices,"[61] is based on a series of erroneous and misleading assertions and analyses.  Likewise, as discussed in **Section VI.C**, Prof. Henderson's assertion that Mr. Plank's trading was "very unusual compared with his peers,"[62] is contrived and misleading.

### A.    Mr. Plank's Class Period Trading Was Consistent With His Trading Prior to the Class Period

33.    Below, I describe Mr. Plank's trading from the time of Under Armour's IPO in November 2005 through the end of the Class Period.  To summarize at a high level:  Mr. Plank sold a substantial proportion of his holdings at the time of the IPO and in the subsequent two years, did not sell shares at all between 2008 and 2010, and then traded in a

---

[58] Zillow, Inc., SEC Form 424B4, filed July 20, 2011; Zillow Group, Inc., SEC Form 8-A, filed July 29, 2015.
[59] "Being Public Can Be Great - If You Do It the Right Way," *LinkedIn*, July 15, 2015, available at https://www.linkedin.com/pulse/being-public-can-great-you-do-right-way-spencer-rascoff/.
[60] Zillow Group, Inc. Press Release, "Zillow Group Announces Stock Dividend, Creation of Class C Shares," July 21, 2015.
[61] Henderson Report, ¶ 44.
[62] Henderson Report, ¶ 47.

regular quarterly pattern from 2011 through the second quarter of 2016, in conjunction with a substantial increase in Under Armour's stock price during that period.

34.    First, in connection with Under Armour's IPO, Mr. Plank sold more than 6% of his holdings at the time—1 million of his more than 16 million founder's shares (or 8 million shares of 130 million on a split-adjusted basis).[63]  Following the Company's IPO, Mr. Plank made share sales of a larger magnitude on two occasions between the end of 2005 and 2007, totaling 15.6 million shares on a split-adjusted basis over several days in the second quarter of 2006 and 10.4 million shares on a split-adjusted basis over several days in the fourth quarter of 2007—in combination totaling approximately 20% of the founder's shares he held immediately following the IPO.[64]

35.    Mr. Plank's trades in this period are consistent with findings in academic literature regarding founders' trading behavior post-IPO.  In particular, founders of pre-IPO companies hold highly illiquid stock and, barring any private stock sales, will generally have highly concentrated and undiversified stock holdings tied to the company.[65]  While executives may be allowed to sell stock at the time of the IPO,[66] following IPOs, companies frequently prohibit stock sales by company executives for a period of time known as the "lockup" period.[67]  Academic research has shown that executive equity sales are common after such restrictions have lapsed, as executives and founders sell their previously illiquid stock and reduce the concentration of their holdings.[68]  Indeed, Prof. Henderson does not appear to find Mr. Plank's sales in Under Armour's post-IPO period objectionable.[69]

36.    **Exhibit 4** shows Under Armour's split-adjusted stock price for Class A common stock from its IPO through the end of 2019, and for Class C common stock from the time of its issuance in April 2016 through the end of 2019.  As shown in the chart, between 2008 and

---

[63] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005.

[64] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2007.  Discussion of quarterly trading refers to calendar quarters, which coincided with Under Armour's fiscal quarters during the Class Period.  *See* Under Armour, Inc., SEC Forms Def 14A, filed 2016–2020.

[65] *See, e.g.*, A. Bodnaruk et al. (2008), "Shareholder Diversification and the Decision to Go Public," *The Review of Financial Studies*, 21(6), pp. 2779–2824 at p. 2780.

[66] For example, Mr. Plank was identified as a "Selling Stockholder" in Under Armour's IPO.  *See* Under Armour Prospectus, pp. 82–83.

[67] L. C. Field and G. Hanka (2001), "The Expiration of IPO Share Lockups," *The Journal of Finance*, 56(2), pp. 471–500 at p. 471 ("Field and Hanka (2001)").

[68] For example, Cao, Field, and Hanka (2004) find that the 30-day periods following the end of IPO lockup periods are associated with an elevated amount of trading and that executives tend to sell substantial dollar amounts at this time.  Likewise, Field and Hanka (2001) find overall trading volumes in the company's stock increase abnormally on the day IPO lock-up periods expire.  *See* C. Cao, L. C. Field, and G. Hanka (2004), "Does Insider Trading Impair Market Liquidity? Evidence from IPO Lockup Expirations," *The Journal of Financial and Quantitative Analysis*, 39(1), pp. 25–46 at p. 32; Field and Hanka (2001) at p. 472.

[69] Henderson Report, p. 19 fn 40 ("Although Plank traded in 2005-2007, this period was following Under Armour's Initial Public Offering, and, therefore, these sales can be considered part of that process, rather than equilibrium sales.").

the end of 2010, Under Armour's stock price was relatively low.  Mr. Plank did not sell any of his shares of Under Armour stock during this period.

37.    The Company's stock price began to rise in early 2011, and in particular from early 2013 through late 2015, as shown in **Exhibit 4**.  Over this period, Mr. Plank began regularly executing sales in a quarterly pattern.  From early 2011 and through the second quarter of 2015, Mr. Plank sold shares in each quarter.  Having not made any sales between 2008 and 2010, Mr. Plank sold 2.25 million split-adjusted shares in each quarter of 2011 (for a total of 9.0 million shares during this year).[70]  Between 2014 and the second quarter of 2015, Mr. Plank sold between 0.81 and 1.94 million shares each quarter.[71]  All of these quarterly sales were conducted over the course of multiple consecutive trading days in each quarter.[72]  During this period Mr. Plank also gifted shares once per year.[73]

38.    During the Class Period, Mr. Plank made sales in November 2015 and April 2016.  As discussed in **Section VIII** below, these trades were made pursuant to Rule 10b5-1 plans.  Mr. Plank did not make any sales in the third quarter of 2015, the first quarter in the Class Period.  As discussed in **Section V**, it was around this time that the Special Committee approved the creation of Under Armour's Class C shares.  Mr. Plank entered into a 10b5-1 plan in October 2015.[74]  Pursuant to this plan, and having not made any sales in the third quarter of 2015, Mr. Plank sold 2.25 million split-adjusted shares in November 2015.[75]  In early 2016, Under Armour's stock was trading below the price floor set in Mr. Plank's October 2015 10b5-1 plan, and he amended the plan in February 2016, setting a lower price floor for trades.[76]  The amended plan designated trades of Class C shares in the first quarter of 2016 (subject to Under Armour's Class C stock price being above the price floor) but, as discussed in **Section V**, the Class C shares were ultimately not issued until April 2016.  Consistent with the terms of Mr. Plank's amended 10b5-1 plan,[77] the trades that had been planned for the first quarter of 2016 rolled over to the second quarter, and Mr. Plank sold 0.91 million split-adjusted shares in April 2016.[78]  Consistent with Mr. Plank's practice in each quarter since the start of 2011,

---

[70] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011.
[71] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2015.
[72] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2015.
[73] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2015.
[74] Deposition of Kevin A. Plank, February 15, 2023 ("Plank Deposition"), Exhibit 25.
[75] Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed November 19, 2015 and November 23, 2015.
[76] Plank Deposition, Exhibits 25, 26.  Mr. Plank's October 2015 plan set a price floor of $42.50 for Class C common stock sales in the first three quarters of 2016.  At the time of the plan's amendment, which adjusted the price floor for trades from $42.50 to $37.50, Under Armour had not yet issued its Class C common stock. However, on an expected split-adjusted basis, Under Armour's stock was trading at $41.68 as of February 26, 2016.  *See* Plank Deposition, Exhibits 25, 26; *CRSP*.
[77] Plank Deposition, Exhibit 26.
[78] Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed April 28, 2016 and April 29, 2016.

Mr. Plank's Class Period trades were executed over a period of multiple consecutive trading days in each quarter.[79]  Also consistent with Mr. Plank's practice prior to the Class Period, he gifted shares once per year in 2015 and 2016.[80]

39.    **Exhibit 5** shows Mr. Plank's trading from the time of Under Armour's IPO through the end of the Class Period.  As shown in the chart and discussed above, Mr. Plank made relatively large sales in 2005, 2006, and 2007, following the Company's IPO; did not sell any shares from 2008 to 2010; and then, apart from the third quarter of 2015 and first quarter of 2016, sold shares in a regular quarterly pattern starting from 2011 to mid-2016.  In terms of the number of shares traded, the size of Mr. Plank's Class Period trades are consistent with his quarterly trading prior to the Class Period, from 2011 onwards.  **Exhibit 6** shows the same data, but with sales shown in terms of dollar proceeds rather than number of shares.  The chart clearly illustrates how Mr. Plank's trades starting from 2011 coincided with a run up in Under Armour's stock price.  As noted in **Section IV.B**, academic literature has documented that executives tend to trade to a greater extent following appreciation of a company's stock price, in part because a large increase in the stock price implies that the value of the company's stock will comprise a larger proportion of the executive's wealth (*i.e.*, there is a greater need to diversify).[81]  By mid-2016, Under Armour's stock price had begun decreasing, and Mr. Plank did not make any additional trades through the end of the Class Period.[82]

### B.    Prof. Henderson's Opinion That Mr. Plank's Trading Was "Out of Line with His Prior Practices" Is Erroneous and Misleading

40.    Prof. Henderson asserts that "Plank's stock sales during the Class Period were out of line with both industry norms and Plank's prior practices."[83]  However, as I discuss below, Prof. Henderson's observations with respect to (i) the number of shares traded; (ii) trading

---

[79] According to Mr. Plank's 10b5-1 Class Period plans, he was to execute sales of no more than 225,000 shares (or 450,000 split-adjusted Class A shares) on any given trading day.  *See* Plank Deposition, Exhibits 25, 26.
[80] Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed November 19, 2015 and April 28, 2016.
[81] Prof. Henderson acknowledges that executives' sales are commonly "staged to keep the executive's balance of firm stock, securities in other firms, cash, and other investments in some rough balance" and "as percentage of wealth in firm stock rises, executives often sell (or hedge) to keep that amount at a pre-determined level."  *See* Henderson Report, ¶ 81.
[82] From May 2016 onwards, Under Armour's Class C stock price was below the price floor set when Mr. Plank amended his 10b5-1 plan in February 2016 on all but a handful of days and the trades planned for the third quarter of 2016 in that 10b5-1 plan were not executed.  *See* Plank Deposition, Exhibit 26; *CRSP*.  Moreover, in August 2016 Mr. Plank entered into a new 10b5-1 trading plan that called for trades for four quarters starting in the fourth quarter of 2016, but Under Armour's stock price was below the price floor of the 10b5-1 plan throughout this period and thus the trades were not executed.  *See* Kevin A. Plank Sales Plan dated August 30, 2016, UA_00237068–81 at UA_00237074; *CRSP*.  The fact that Mr. Plank did not make further trades during the Class Period after April 2016, when Under Armour's stock price was substantially lower than in earlier years and below the price floor that Mr. Plank had set on his 10b5-1 trading plans, is not surprising in light of the academic literature discussed above, and does not make Mr. Plank's trades in 2015 and 2016 "suspicious" by comparison.
[83] Henderson Report, ¶ 15.

proceeds; (iii) trading "profits;" and (iv) the pattern of Mr. Plank's trading are conceptually flawed, contain errors, and convey a misleading picture of Mr. Plank's trading.

41.      First, to support his conclusion that "Plank's sales are out of line with his prior trading practices,"[84] Prof. Henderson purports to compare the number of shares that Mr. Plank sold during the Class Period to shares sold prior to the Class Period, from 2011 onwards.  He observes that "[d]uring the Class Period, Plank made very large sales in short periods during two months … he sold an average of 1,150,000 during these two months …  In stark contrast, since 2011, he sold during twenty nine separate months [and] [i]n those months, he averaged 476,667 shares sold per month."[85]  However, Prof. Henderson's analysis suffers from a fundamental error:  he grossly understates the number of shares sold prior to the Class Period, and especially prior to April 2014, because he fails to take account of stock splits and the Company's Class C stock dividend (which effectively functioned the same way as a stock split in terms of its impact on the number of outstanding shares).[86]  A stock split occurs when a company awards new shares in company stock in a fixed proportion to existing shares.[87] For example, if a company issues one share for each existing share held, this is known as a "two-for-one" stock split, because each shareholder effectively holds double the number of shares (typically at half the price per share).  Failing to account for stock splits results in distorted comparisons of trading across time.[88,89]

42.      A reliable comparison of trading volume across time requires split-adjusting share counts.  To illustrate the point, **Exhibit 7** shows Mr. Plank's Under Armour split-adjusted

---

[84] Henderson Report, p. 19.

[85] Henderson Report, ¶ 37.

[86] Under Armour underwent two two-for-one stock splits prior to the Class Period, in July 2012 and April 2014. During the Class Period, Under Armour's Class C issuance functioned the same way as a stock split by effectively doubling Under Armour's total common stock outstanding.  *See* Under Armour, Inc. Press Release, "Under Armour Announces a Two-For-One Stock Split," June 11, 2012; Under Armour, Inc. Press Release, "Under Armour Announces a Two-For-One Stock Split," March 17, 2014; Under Armour, Inc. Press Release, "Under Armour Announces Class C Stock Dividend," March 16, 2016.  In June 2016 (after Mr. Plank's Class Period trades), Class C shareholders also received 0.007098 of a share of Class C common stock for each share of Class C common stock held.  *See* Under Armour, Inc. Press Release, "Under Armour Announces Class C Stock Dividend Related to Settlement," June 3, 2016.

[87] W. L. Megginson and S. B. Smart (2009), *Introduction to Corporate Finance*, 2nd ed., Mason, OH: South-Western Cengage Learning, available at http://cws.cengage.co.uk/megginson/, p. 571 ("Stock splits have an effect on a firm's share price similar to that of stock dividends.  When a firm conducts a stock split, its share price declines because the number of outstanding shares increase.  For example, in a 2-for-1 split, the firm doubles the number of shares outstanding.  As in the case of a stock dividend, intuition suggests that stock splits should not create value for shareholders.  After all, if someone offers to give you two $5 bills in exchange for one $10 bill, you are no better off.  A stock split also has no effect on the firm's capital structure; it simply increases the number of shares outstanding and reduces the stock's per-share par value.").

[88] To ensure comparability over time, pre-split stock holdings and trading must be scaled as if the stock split had occurred at the outset.  For example, an investor who sells ten shares before a two-for-one stock split and 20 shares after the split sells the same number of shares on a split-adjusted basis.  Failing to account for this would incorrectly lead to the conclusion that the first sale was half as large as the second sale.

[89] Prof. Henderson acknowledges this issue (Henderson Report, ¶ 30) but fails to account for it in his analysis of the volume of Mr. Plank's share sales.

stock sales volume on an annual basis from 2011 through 2019. As shown in the figure, Mr. Plank's Class Period trades were not of "extraordinary sales volume" or "dramatically out of line with his prior trading" as Prof. Henderson asserts. Rather, as shown in the figure, Mr. Plank sold fewer split-adjusted shares *in total* during the more than four-year Class Period than in *any* single year since 2011. Indeed, while Mr. Plank sold 3.2 million split-adjusted shares *in total* during the Class Period, he sold a *minimum* of 4.3 million split-adjusted shares in each full year prior (from 2011 through 2014).[90] Prof. Henderson further asserts that Mr. Plank "sold more than *two times* as many shares per month during the Class Period than his practice prior to the Class Period."[91] In fact, on a split-adjusted basis, Mr. Plank sold an average of approximately 64,400 shares per month over the 49 months of the Class Period— only *one-sixth* of the approximately 395,000 shares he sold per month in the four-year period preceding the Class Period.[92-93]

43.    Second, with respect to proceeds, Prof. Henderson asserts that "[a] similar picture emerges when looking at the dollar proceeds from Plank's stock sales" and states that the proceeds from Mr. Plank's "Class Period sales were more than four times his historical average."[94] However, Prof. Henderson's comparison to pre-Class Period sales is again misleading. **Exhibit 8** shows the dollar proceeds of Mr. Plank's sales on an annual basis from 2011 to 2019. This chart shows that the proceeds from Mr. Plank's Class Period trades do not appear to be "unusual" in comparison to his earlier trades, despite the Company's stock price having reached an all-time peak in 2015. Indeed, despite a higher average sales price for Mr. Plank's Class Period trades than the average sales price for his trades in 2014,[95] **Exhibit 8** shows that proceeds from his 2014 sales still exceed his *entire* Class Period trading proceeds.[96] Moreover, Prof. Henderson fails to recognize that academic literature shows the

---

[90] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2019.

[91] Henderson Report, ¶ 37 (emphasis added).

[92] Mr. Plank sold a quarterly average of approximately 175,355 shares during the Class Period—under *one-eighth* of the approximately 1.43 million split-adjusted shares that Mr. Plank sold per quarter, on average, from the first quarter of 2011 through the second quarter of 2015. *See* Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2019.

[93] When analyzing the average price of Mr. Plank's Class Period trades, Prof. Henderson claims to have adjusted for stock splits. *See* Henderson Report, ¶ 39, fns 41, 42. However, Prof. Henderson appears to have made a calculation error. On a split-adjusted basis, Mr. Plank's Class Period trades averaged a price of $43.79, not $65.69 as Prof. Henderson claims. *See* Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2019.

[94] Henderson Report, ¶ 38.

[95] Mr. Plank's Class Period trades averaged a price of $43.79, compared to an average price of $30.26 for his trades in 2014. *See* Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2019.

[96] Additionally, Prof. Henderson also asserts that "[s]ince its IPO … Plank has sold about $750 million, or about 57 percent of the total [trades by all Under Armour section 16 officers]," and "Plank's sales accounted for over 80 percent of all trades by Under Armour insiders" during the Class Period. However, Prof. Henderson's analysis is based on *annual* trading proceeds, misleadingly including 8.5 months of 2015 that are outside of the Class Period in his count of "Class Period" trades. Moreover, in making his comparison, Prof. Henderson fails to acknowledge

increased propensity for executives to trade when stock prices increase,[97] and that it is therefore not unusual for trades to occur at a relatively high stock price (and consequently for proceeds to be higher in such periods).

44.    Third, Prof. Henderson asserts that the "massive profits (~100 percent)" of Mr. Plank's Class Period trades "supports [his] opinion that Plank's stock sales were unusal [sic] and suspicious."[98]  Prof. Henderson explains this contention by noting that "[s]ince these were founders' shares with essentially zero cost, Plank earned a nearly 100 percent profit on their sale."[99]  This argument is a red herring.  CEOs and founders rarely purchase stock in their company,[100] and instead the vast majority of their shares comes either from founder shares or stock-based compensation for which they do not "pay" with dollars, but do pay through their entrepreneurship and labor effort.  The "cost" to Mr. Plank of his founder's shares, for example, would include his nearly ten years spent building the Company before its IPO and, therefore it is not only misleading but also incorrect to characterize Mr. Plank's share holdings as having "essentially zero cost."[101]  Further, by Prof. Henderson's flawed logic, *all* of Mr. Plank's trades, both before and during the Class Period, would have earned "nearly 100 percent profit" (as well as the trades for nearly every other founder), and thus it is not clear why this assertion makes Mr. Plank's Class Period trades "suspicious" relative to earlier trades or trades of other CEOs.

45.    Finally, with respect to the pattern of Mr. Plank's trading, Prof. Henderson asserts that Mr. Plank's "trades were not random diversification trades" but "he instead chose to try to time the market by price."[102]  I am not aware of any basis in financial economics that supports Prof. Henderson's inference about Mr. Plank's state of mind with respect to what he "chose" or "tr[ied]" to do with respect to any specific trade.  Setting aside his assertions about Mr.

---

that Mr. Plank held more than 95% of shares held by insiders prior to and during the Class Period.  *See* Henderson Report, ¶ 40; Henderson Report backup materials, HENDERSON_0000001.XLSX; Under Armour, Inc., SEC Form Def 14A, filed April 25, 2006, p. 4; Under Armour, Inc., SEC Form Def 14A, filed March 23, 2007, p. 4; Under Armour, Inc., SEC Form Def 14A, filed March 21, 2008, p. 4; Under Armour, Inc., SEC Form Def 14A, filed March 20, 2009, p. 4; Under Armour, Inc., SEC Form Def 14A, filed March 19, 2010, p. 4; Under Armour, Inc., SEC Form Def 14A, filed March 18, 2011, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 16, 2012, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 15, 2013, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 21, 2014, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 13, 2015, p. 5; Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015, p. 49; Under Armour, Inc., SEC Form Def 14A, filed March 11, 2016, p. 5; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018, p. 5; Under Armour, Inc., SEC Form Def 14A, filed March 27, 2019, p. 5; Under Armour, Inc., SEC Form Def 14A, filed April 14, 2020, p. 5.
[97] *See, e.g.,* Core and Guay (2010) at p. 8; Heron and Lie (2017) at p. 3061.
[98] Henderson Report, ¶ 15.
[99] Henderson Report, ¶ 10.
[100] Ofek and Yermack (2000); D. Jenter (2005), "Market Timing and Managerial Portfolio Decisions," *The Journal of Finance*, 60(4), pp. 1903–1949 at p. 1915.
[101] Henderson Report, ¶ 10.
[102] Henderson Report, ¶¶ 9, 41.

Plank's intentions, Prof. Henderson appears to suggest that, in order for Mr. Plank's Class Period trades to not be "suspicious," Mr. Plank might have "traded every available day" and "spac[ed] out trades evenly across the number of trading days available in a given year or similar period."[103]  There are a number of problems with this assertion.  First, as described in **Section VI.A**, Mr. Plank did, in fact, trade during a large number of days and months between 2011 and 2016, with trades that were neither concentrated during the Class Period nor concentrated in any particular year between 2011 and 2016, and followed a regular quarterly pattern.  Second, I am not aware of any reason that diversification trades would need to take place through "trad[ing] every available day"[104] as Prof. Henderson appears to suggest.  Third, Prof. Henderson's only support for "trad[ing] every available day" as the "way to engage in diversification trading" is that this approach is purportedly used by two other founder CEOs, Marc Benioff (Salesforce) and Mark Zuckerberg (Meta Platforms).[105] To the extent that Prof. Henderson is implying that it is *common* for CEOs or founders to sell stock every trading day of each year, I am not aware of any empirical evidence that has shown this to be the case.[106]  Founders may choose to structure their trading following quarterly or monthly patterns, spread trades out over many days, or trade on a sporadic basis.[107]  All could be valid diversification patterns depending on the founder's risk, organizational and other preferences, and the company's performance and stock price.

46.     Prof. Henderson concludes his report by asserting that "Plank's trading behavior is unusual and demonstrates that his trades were not random diversification trades but, rather, related to securities fraud alleged by the Plaintiffs."[108]  As discussed above, after correcting for obvious errors in Prof. Henderson's analysis, Mr. Plank's trading does not appear unusual relative to his trading prior to the Class Period nor, as discussed below, relative to trading by other CEOs.  As a result, Prof. Henderson's conclusion that Mr. Plank's Class Period "trades

---

[103] Henderson Report, ¶ 41.

[104] Henderson Report, ¶ 41.

[105] Henderson Report, ¶ 41.

[106] Indeed, Prof. Henderson acknowledges that most CEOs do not sell stock every month.  *See* Henderson Report, ¶ 51.

[107] For example, during the Class Period, Lew Cirne, founder and then CEO of New Relic, Inc. traded in each month; Aneel Bhusri, co-founder and CEO of Workday, Inc. traded in each quarter; while other founders (such as Arkadiy Dobkin, co-founder and CEO of EPAM Systems, Inc., and Aart de Geus, co-founder and CEO of Synopsys, Inc.) had sporadic share sales.  *See* New Relic, Inc., SEC Forms 4 and 5 for Lew Cirne, filed 2015–2019; Workday, Inc., SEC Forms 4 and 5 for Aneel Bhusri, filed 2015–2019; Synopsys, Inc., SEC Forms 4 and 5 for Aart de Geus, filed 2015–2019.

[108] Henderson Report, ¶ 108.

were not random diversification trades but, rather, related to securities fraud alleged by the Plaintiffs" is unsupported by his analysis.[109]

### C.    Prof. Henderson's Conclusion That Mr. Plank's Sales "Are Substantially More than the Typical CEO Traded at That Time" Is Contrived and Misleading

47.    In addition to comparing Mr. Plank's Class Period trading to his earlier trading, Prof. Henderson purports to compare Mr. Plank's trading volume and proceeds to "that of every other of the more than 3,300 public company CEOs in the United States."[110]  Based on this analysis, he concludes that "[n]o matter how one slices the data, [Mr. Plank's] trades are very unusual compared with his peers."[111]  As I explain below, Prof. Henderson's analysis does not support that conclusion.  By comparing trading by a founder CEO of a multi-billion dollar company to trading by CEOs of all U.S. public companies (the vast majority of which are not founders and manage smaller companies), and focusing only on the two Class Period months when Mr. Plank traded while ignoring the other 47 months during the Class Period, Prof. Henderson fails to achieve his own stated goal of the analysis—namely to present an "apples to apples" comparison with "contemporaneous trading by other CEOs."[112]  Indeed, when Prof. Henderson's analysis is adjusted to analyze the full Class Period and trading by founder CEOs, Mr. Plank's trading does not appear "very unusual compared with his peers," as Prof. Henderson contends.[113]

48.    Prof. Henderson's approach is as follows.  For the two months during the Class Period when Mr. Plank made trades—namely November 2015 and April 2016—Prof. Henderson states that he obtains trading data from the SEC's EDGAR database "for every stock trade made by a 'covered insider' under Section 16 of the Securities Exchange Act of 1934."[114],[115]

---

[109] Henderson Report, ¶ 9.

[110] Henderson Report, ¶ 46.

[111] Henderson Report, ¶ 47.

[112] Prof. Henderson asserts that "[s]ince there are many factors that can influence the amount of stock sold by a CEO, it may help to contextualize Plank's trades by comparing them with contemporaneous trading by other CEOs … thereby better comparing apples to apples."  *See* Henderson Report, ¶ 45.

[113] Henderson Report, ¶ 47.

[114] Henderson Report, ¶ 48.

[115] Although Prof. Henderson states in his report that he "obtained trading data from the EDGAR database," the source of the supporting data provided in conjunction with his report is insider-monitor.com.  Insider Monitor describes itself as a "website [that] provides various insider trading reports that are created using sophisticated proprietary algorithms to reveal the secrets of insider trading activities."  *See* Henderson Report, ¶ 48; Henderson Report backup materials, HENDERSON_0000001.XLSX; "Watch Insider Trade Stocks," *Insider Monitor*, available at https://www.insider-monitor.com/.  Although I was able to replicate Prof. Henderson's results using EDGAR data, there are several issues in Prof. Henderson's use of the Insider Monitor data.  For example, Prof. Henderson's data appears to be missing 14 CEOs that made trades during November 2015 or April 2016.  Moreover, the daily proceeds measure that Prof. Henderson uses is based on a simple average of trading prices

Prof. Henderson then compares the total sale proceeds of Mr. Plank's sales to those of all other CEOs in the dataset in those two months, for each month separately and then in combination.[116]

49.    Prof. Henderson's analysis is conceptually flawed, inconsistent with his stated goal of comparing trades on an "apples to apples" comparison, and misleading.

50.    First, Prof. Henderson compares trading by founder CEOs to trading by a broad group of CEOs.  However, most CEOs are not founders.[117]  As discussed in **Section IV.B**, founder CEOs are not typical CEOs, and tend to hold a much larger proportion of company equity relative to non-founders.[118]  By pooling all CEOs together, Prof. Henderson fails to control for the fact that founder CEOs tend to have more concentrated holdings in company stock and therefore a greater need to diversify their wealth.[119]  Moreover, as discussed in **Section IV.B**, academic literature finds that CEOs with longer tenure sell a larger share of their holdings each year and, furthermore, founder CEOs tend to have substantially longer tenure than non-founders.[120]  Comparing proceeds of trades from the founder CEO of Under Armour to a broad group of CEOs, including new CEOs who have only been in their roles for a few years, is therefore misleading.  Prof. Henderson appears to acknowledge this distinction and purports to put Mr. Plank's trades "in context" by comparing them to trades by three other "large-company CEO's, all billionaire founders"—the founder CEOs of Salesforce, Tableau Software, and Netflix.[121]  In his summary charts, Prof. Henderson misleadingly cherry picks these three founder CEOs who have lower sale proceeds than Mr. Plank in two specific months (November 2015 and April 2016), although he elsewhere acknowledges other billionaire founder CEOs who have similar or higher sale proceeds than Mr. Plank during the same time:  Larry Page, co-founder of Google, sold more than Mr. Plank in both months; David Liniger, co-founder of RE/MAX, sold more than Mr. Plank in November 2015; and

---

across all trades on a given SEC Form 4 filing, and fails to appropriately weight trading prices by the relative size of transacted shares.

[116] Prof. Henderson also compares Mr. Plank's trades to those of other CEOs in terms of the number of shares traded.  *See* Henderson Report, ¶¶ 49, 54.  However, a comparison of the number of traded shares across executives provides no insight into the relative magnitude of sales, as the same number of shares may comprise a vastly different proportion of holdings or dollar value for different executives, and is therefore not meaningful from an economic perspective.

[117] Among a sample of around 3000 CEOs from S&P 1500 firms during 1996 to 2014, only 11% of CEOs are founders.  *See* Hong (2023) at p. 12.

[118] *See, e.g.*, Hong (2023) at p. 12.

[119] *See, e.g.*, Ofek and Yermack (2000) at pp. 1367–1368.

[120] *See, e.g.*, Hong (2023) at p. 11; Core and Guay (2010) at p. 10.  *See also* Adams, Almeida, and Ferreira (2009) at p. 139; Fahlenbrach (2009) at p. 447.

[121] Henderson Report, ¶ 53.

Robert Sands, second generation founder of Constellation Brands, sold more than Mr. Plank in April 2016.[122]

51.     Second, Prof. Henderson's analysis ignores the 47 months during the 49-month Class Period when Mr. Plank did not trade, and instead focuses entirely on the two months during the Class Period that Mr. Plank is known to have traded—November 2015 and April 2016. These months are effectively random with respect to trading by CEOs at companies other than Under Armour.  By failing to consider trading by other CEOs in other months of the Class Period, Prof. Henderson presents a misleading and skewed comparison.[123]  Prof. Henderson's selective approach ignores CEOs that may have made small or no trades during the two months he focuses on but had similar or larger sale proceeds than Mr. Plank in other months during the Class Period.  For example, if other CEOs happened to make large trades in October or December of 2015 rather than November 2015, Prof. Henderson's analysis would misleadingly conclude that Mr. Plank's 2015 stock sales look unusual compared to other CEOs simply because the other CEOs happened to trade during a different month in the fourth quarter of 2015.[124]  Comparing the stock sales of the only two months during the Class Period during which Mr. Plank traded to two random months with respect to the other CEOs that Prof. Henderson analyzes provides no insight about the CEOs' overall trading patterns, or even their trading patterns during the years comprising the Class Period.

52.     To illustrate Prof. Henderson's misleading approach, **Exhibit 9** analyzes Mr. Plank's aggregate trades during the entire Class Period as compared to other CEOs during the same time period.[125]  Prof. Henderson identifies 13 "prominent founders and CEOs" who traded in November 2015 and April 2016 that he contends "provide[] a control group that can provide the Court with the background facts about CEO trading at the particular time in question in

---

[122] Henderson Report, Figures 3–5, ¶ 57.  The market capitalizations of Google and RE/MAX were around $311 billion and $438 million, respectively, as of June 2015.  The market capitalization of Constellation Brands was around $21 billion as of February 2016.  *See* Google Inc., SEC Form 10-K for FY 2015, filed February 11, 2016; RE/MAX Holdings, Inc., SEC Form 10-K for FY 2015, filed February 26, 2016; Constellation Brands, Inc., SEC Form 10-K for FY 2016, filed April 25, 2016.

[123] As noted above, Prof. Henderson acknowledges that most CEOs do not sell stock every month.  *See* Henderson Report, ¶ 51.  Indeed, during the 49 months of the Class Period, Mr. Plank did not sell shares in 47 of those months (*i.e.*, 96% of the months comprising the Class Period).

[124] As an illustration of this point, Safra Catz, CEO of Oracle, sold $162.7 million worth of her shares in a single trade in March 2016, and had total sale proceeds of approximately $900 million during the Class Period as a whole, higher than Mr. Plank's proceeds of $138 million.  *See* Oracle Corporation, SEC Forms 4 for Safra Catz, filed 2016–2019.  However, because Ms. Catz did not make any trades during either November 2015 or April 2016, she is not included in any "slices" of Prof. Henderson's analysis.

[125] Following Prof. Henderson's approach, the analysis shows the sum of proceeds from sales by all CEOs, defined as insiders whose title contains "Chief Executive" or "CEO," who made sales on any day during the Class Period.  Also consistent with Prof. Henderson's data, the analysis does not account for purchases or the strike price of options when exercised and sold, although netting out from sale proceeds the value of any purchases or shares obtained through option exercises yields qualitatively similar results.  *See* Henderson Report backup materials, HENDERSON_0000001.XLSX.  CEOs in the chart are ranked ordinally by the size of proceeds from their sales, from smallest to largest.

this case."[126]  These "prominent founders and CEOs" are marked as the "Henderson Control Group" in **Exhibit 9**.  As shown in this exhibit, when comparing trading by CEOs across the entire Class Period—rather than the two isolated months—Mr. Plank's trade proceeds do not appear "extraordinary and remarkable,"[127] either relative to the Henderson Control Group or all CEOs.  For additional context, **Exhibit 10** focuses on founder CEOs, which enforces this conclusion.  In sum, the findings from a comparison to more similarly-situated CEOs (*i.e.*, other founders) during the Class Period are inconsistent with Prof. Henderson's ungrounded and misleading conclusion that "[n]o matter how one slices the data, [Mr. Plank's] trades are very unusual compared with his peers."[128]

## VII.    Mr. Plank's Under Armour Stockholdings

53.    In addition to discussing the magnitude of and proceeds from Mr. Plank's Class Period trades, Prof. Henderson also analyzes Mr. Plank's sales relative to his stock holdings.  Prof. Henderson asserts that, relative to his stock holdings, Mr. Plank's Class Period trades were "much greater than his prior historical trading practices and extraordinary compared with the typical trading behavior of executives of large public companies."[129]  However, as discussed in **Section VII.A**, Prof. Henderson's assertion is derived from comparing Mr. Plank's sales relative to a baseline of 15% of Company shares outstanding, which is a misleading and contrived reference point with respect to Mr. Plank's financial interest in the Company.  In fact, Mr. Plank's trades comprised a small proportion of his total stock holdings.  Moreover, as discussed in **Section VII.B**, Mr. Plank's stock holdings in the Company were relatively stable throughout the Class Period, comprised a substantial proportion of the Company's total shares, and Mr. Plank retained a large economic interest in the Company, even after his Class Period trades.

### A.    Mr. Plank's Class Period Trading Comprised a Small Proportion of His Stock Holdings

54.    Mr. Plank's Class Period trades constituted a small percentage of his economic interest in Under Armour.  Prof. Henderson's conclusion that Mr. Plank undertook "massive sales" is based on a comparison relative to Prof. Henderson's contrived and factually

---

[126] Henderson Report, ¶ 48.
[127] Henderson Report, ¶ 51.
[128] Henderson Report, ¶ 47.
[129] Henderson Report, ¶ 16.

incorrect measure of Mr. Plank's "available-to-sell" shares, rather than a measure of Mr. Plank's total stock holdings.[130]

55.     Specifically, Prof. Henderson asserts that "[t]he appropriate denominator for determining the relative size of the holdings Plank sold is not his 'overall holdings,' but, rather, the shares he could sell while still retaining his position as the controlling shareholder of Under Armour."[131]  Prof. Henderson analyzes Mr. Plank's Class Period trades relative to an "ownership floor" of 15% of Company shares outstanding, below which Mr. Plank could cease to hold a majority of voting rights in the Company.[132]  For example, if Mr. Plank held 10,000 shares in the Company but only 500 of these were above the 15% ownership threshold, and he sold 100 shares, Prof. Henderson would represent this as sales of 20% of "available-to-sell shares" (*i.e.*, 100 divided by 500), rather than 1% of total stock holdings (*i.e.*, 100 divided by 10,000).

56.     Analyses of the economic magnitude of executive trading behavior in academic literature typically consider executive trading relative to an executive's total equity holdings or total wealth.[133,134]  Total equity holdings provide perspective on the proportion of an executive's total wealth held in company stock (and therefore their potential need to diversify), the extent to which an executive's economic interests remain aligned with the company's shareholders, and allow for comparability across executives.  As discussed in **Section VI.C**, a "like-for-like" comparison of executive trading may also control for other characteristics of executives, such as tenure or founder status.

57.     Comparison relative to "available-to-sell" shares provides an artificial baseline, which misleadingly makes Mr. Plank's trades look more economically meaningful, and is irrelevant to understanding either the proportion of Mr. Plank's total wealth held in the Company (and therefore his potential need to diversify) or the degree of alignment of his incentives with the Company's shareholders.  It is also factually incorrect for Prof. Henderson to claim that his measure represents Mr. Plank's "available to sell" shares.[135]  Moreover, Prof. Henderson's

---

[130] Henderson Report, ¶ 15.

[131] Henderson Report, ¶ 18.

[132] Henderson Report, ¶¶ 19–25.  According to Under Armour's Articles of Incorporation, if Mr. Plank were to hold in aggregate less than 15% of total number of shares of Class A and Class B Common Stock outstanding, each share of Class B Common Stock (with ten votes per share) would be automatically converted to Class A Common Stock (with one vote per share).  *See* "Amended and Restated Articles of Incorporation," *Under Armour, Inc.*, July 2020, available at https://about.underarmour.com/content/dam/ua/investor-relations/Under%20Armour%20Inc.%20-%20Articles%20of%20Incorporation.pdf, pp. 2, 6.

[133] *See, e.g.*, Jin and Kothari (2008) at pp. 30–32; Core and Guay (2010) at pp. 8–10; Hong (2023) at pp. 7–8.

[134] Moreover, in his discussion of 10b5-1 plans, Prof. Henderson appears to acknowledge that it is relevant to consider sale "amounts relative to total stock holdings."  *See* Henderson Report, ¶ 81.

[135] Apart from a small proportion of Mr. Plank's stock holdings made up of RSUs/PSUs and unvested options, *all* of Mr. Plank's shares were "available to sell" at his discretion.  Further, as Prof. Henderson acknowledges, even

contrived measure of "available-to-sell" shares is misleading because trades will mechanically comprise a larger percentage of "available-to-sell" shares as Mr. Plank's holdings approaches the 15% share threshold required to retain his position as the controlling shareholder.  At the extreme, if Mr. Plank held one share above the 15% threshold and sold that share, he would have sold 100% of his "available-to-sell" shares (but would have sold a very small dollar amount of stock, and still remain highly economically invested in the Company).[136]

58.    Using his contrived measure of Mr. Plank's trades, Prof. Henderson goes on to provide a distorted and misleading comparison of Mr. Plank's trading relative to the academic literature.  He finds that Mr. Plank's November 2015 and April 2016 sales constituted 36% and 42%, respectively, of Mr. Plank's "available to sell shares."[137]  He concludes that "[i]t is extraordinary for a CEO to sell such a high percentage of their available-to-sell shareholdings in a given year," and "the typical CEO sells more than twenty times less—only about 2 percent—in a given year."[138]  The "about 2 percent" figure that Prof. Henderson quotes is a citation to a paper I coauthored in 2010.[139]  Critically, that paper analyzes annual sales as a proportion of *all* stock holdings at the start of the year for CEOs of S&P500 firms from 1993 to 2008.[140]  Taking Mr. Plank's sales relative to an "available-to-sell" shares figure that constitutes only a small *fraction* of his holdings, and comparing it to a finding in academic literature of executive sales relative to *all* of their equity holdings provides an "apples to oranges" comparison that is distortive and misleading.[141]

59.    When analyzed relative to a baseline of total holdings, Mr. Plank's Class Period trades constituted a relatively small percentage of his economic interest in Under Armour.  In fact, as shown as **Exhibit 11**, Mr. Plank's November 2015 and April 2016 trades made up

---

without the Class C stock issuance, Mr. Plank's Class Period trades would not have caused his stock holdings to decline below 15% of share ownership.  *See* Henderson Report, ¶ 35.

[136] Further, while I disagree with the premise that Mr. Plank's sales should be analyzed relative to the 15% "threshold," to the extent that control issues limited Mr. Plank from selling more than a small fraction of the economic value of his shares, any financial incentive "related to securities fraud alleged by the Plaintiffs" would also be limited, because the potential gain from sales above the 15% threshold would be dwarfed by losses on Mr. Plank's remaining holdings when the Company's share price declined.  *See* Henderson Report, ¶ 9.

[137] Henderson Report, ¶¶ 25, 32.

[138] Henderson Report, ¶ 32.

[139] Henderson Report, ¶¶ 32, 45; Core and Guay (2010) at pp. 8–10.

[140] Core and Guay (2010) at pp. 8–10.

[141] Moreover, other companies, such as Workday, Inc., also have share structures that could be unwound if the holdings of certain insiders, including the founder, fall below a particular ownership threshold.  However, in purportedly analyzing an "apples to apples" comparison, Prof. Henderson does not even attempt to compare Mr. Plank's trading relative to his "available to sell" shares to the trading of other such CEOs relative to their "available to sell" shares.  *See* Workday, Inc., SEC Form 424B4, filed October 15, 2012, p. 113; Henderson Report, ¶ 45.

approximately 3.1% and 1.3% of his Under Armour stock holdings, respectively.[142]  In combination, they made up approximately 4.4% of his stock holdings as of the start of the Class Period.  Put differently, over the entire Class Period (consisting of slightly more than four years), Mr. Plank's sales, on an annualized basis, comprised approximately 1.1% of his stock holdings.[143]  By comparison, in Core and Guay (2010), my coauthor and I find that executives with tenure in excess of ten years sell 3% of their holdings each year (at the median).[144]  Hong (2023) finds that "founder CEOs' average net stock selling percentage is 4.4% and they have net positive stock selling in 38.6% firm-years, greater than the corresponding percentages of 2.1% and 18.7% for non-founder CEOs."[145]  Thus, contrary to Prof. Henderson's claim that "the typical CEO sells less (as a percentage of holdings) than Mr. Plank did,[146] Mr. Plank's Class Period trades are in fact comparable to or less than findings from academic literature about average annual share sales as a percentage of holdings.[147]

### B.    Mr. Plank's Economic Interest in Under Armour

60.    Consistent with Mr. Plank's Class Period sales comprising a relatively small proportion of his stock holdings, his split-adjusted stock holdings in the Company were relatively stable throughout the Class Period.  Thus, in contrast to Prof. Henderson's assertion that Mr. Plank took "aggressive advantage of the new opportunities to liquidate his shares in Under Armour,"[148] Mr. Plank in fact retained a large economic interest in the Company throughout the Class Period.

61.    Mr. Plank's holdings in terms of the number of split-adjusted shares on a quarterly basis from 2005 through 2019 are shown in **Exhibit 12**.  In addition to his founder's shares and a small RSU grant at the time of Under Armour's IPO that was given to all employees of a certain minimum tenure,[149] Mr. Plank earned performance-based stock or options each year from 2013 through the end of the Class Period, and time-based options awards from 2017

---

[142] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2016.  Mr. Plank testified in deposition that "I would have had about probably 40 million shares or so. So selling a million of 40 would not be a lot. That would be selling about 2.5 percent of my holdings."  *See* Plank Deposition, 244:18–21.
[143] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2019.
[144] Core and Guay (2010) at p. 10.
[145] Hong (2023) at p. 12.
[146] Henderson Report, ¶ 32.
[147] Core and Guay (2010) at p. 10; Hong (2023) at p. 12.
[148] Henderson Report, ¶ 31.
[149] Under Armour, Inc., SEC Form SC 13D for Kevin A. Plank, filed December 5, 2005, p. 3 ("In addition, upon the consummation of the Issuer's initial public offering, the Issuer granted to each full-time employee of the Issuer who had been continuously employed by the Issuer since April 30, 2005, including the Reporting Person, 100 shares of the Issuer's Class A Common Stock.").

through the end of the Class Period.[150]  As shown in **Exhibit 12**, these grants constituted a small proportion of Mr. Plank's holdings prior to and during the Class Period, and the vast majority of his holdings were comprised of common stock, predominantly dating back to his founder's shares at the time of Under Armour's IPO.

62.    Mr. Plank's stock holdings in the Company were relatively stable throughout the Class Period and comprised a substantial proportion of the Company's total shares.  In percentage terms over the Class Period, Mr. Plank's holdings declined from 16.7% of Under Armour shares outstanding as of October 2015 to 15.5% of shares outstanding as of December 2019.[151]  As shown in **Exhibit 12**, Mr. Plank's holdings decreased by substantially more in the four years leading up to the Class Period than during the Class Period.  Indeed, in the four-year period from 2011 to 2014, Mr. Plank's holdings declined by 21.8% relative to his holdings at the beginning of the period; the equivalent calculation for the Class Period is a decline of only 3.2%.[152]  In all years, Mr. Plank's holdings dwarfed the Company's stock ownership requirement that the CEO hold ten times his/her annual base salary in Company stock.[153,154]  Moreover, consistent with Under Armour's founder-led approach, Mr. Plank was the largest shareholder in each year of the Class Period,[155] and in fact had holdings in excess of the average for founders, as documented in academic literature.[156]

63.    **Exhibit 13** shows the dollar value of Mr. Plank's holdings over the same period.  One point that can be observed from the chart is the extent to which the value of Mr. Plank's

---

[150] The performance-based awards were dependent on Company performance over the following year or two years and, if earned, vested in between two and four equal annual installments.  With the exception of 2016 and 2017 performance-based awards, Mr. Plank earned at least some portion of the target amount granted each year, and in some years, earned past the target.  *See* Under Armour, Inc., SEC Forms Def 14A, filed 2006–2020.

[151] Under Armour, Inc., SEC Form 10-K for FY 2019, filed February 26, 2020; Under Armour, Inc., SEC Form 10-Q for Q3 2015, filed November 4, 2015.

[152] Mr. Plank's holdings declined from approximately 92.4 million shares on September 16, 2011 to approximately 72.2 million shares at the start of the Class Period on September 16, 2015, a decline of 21.8% over four years.  By contrast, over the course of the subsequent four years, *i.e.*, the Class Period, Mr. Plank's holdings declined to approximately 69.9 million shares on November 1, 2019, a decline of 3.2%.  *See* Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2019.

[153] For example, at the end of the Class Period, Mr. Plank held 2,630 times his salary in Company stock.  *See* Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Form Def 14A, filed April 14, 2020.

[154] *See, e.g.* Under Armour, Inc., SEC Form Def 14A, filed March 13, 2015, p. 14 ("Our Board of Directors has adopted stock ownership guidelines to further align the financial interests of the company's executives and non-management directors with the interests of our stockholders. The guidelines provide that executive officers should own company stock with a value at least equal to ten times annual base salary for the CEO, three times annual base salary for Executive Vice Presidents and one time annual base salary for all other executive officers.").

[155] Under Armour, Inc., SEC Forms Def 14A, filed 2006–2020.

[156] Hong (2023) finds that founder CEOs' mean (median) vested stock is 7.2% (3.1%) of their firms' total shares, relative to stock ownership of 1.2% (0.2%) for non-founder CEOs.  Adams, Almeida, and Ferreira (2009) find that CEO ownership is about 5% of company shares for founders and about 1% for non-founders.  Fahlenbrach (2009) finds that founder CEOs have mean (median) stock ownership of 11% (6.7%) while that of non-founder CEOs is 2.1% (0.4%).  *See* Hong (2023) at p. 12; Adams, Almeida, and Ferreira (2009) at p. 139; Fahlenbrach (2009) at p. 447.

holdings in Under Armour stock increased as the Company's stock price increased. Indeed, although the number of shares that Mr. Plank held in the Company *decreased* from 2011 to 2014, as shown in **Exhibit 12** and discussed above, the value of his holdings *increased* substantially during this time. As shown in **Exhibit 13**, the value of Mr. Plank's holdings increased from around $760 million in 2011 to a peak of around $3.5 billion in 2015, before declining to around $2.5 billion in the third quarter of 2016, after Mr. Plank's Class Period sales.[157] The proceeds from Mr. Plank's stock sales between 2011 and 2016 totaled approximately $592 million (of which, approximately $138 million was from Class Period trades—see **Exhibit 8**). Thus, the proceeds from Mr. Plank's stock sales between 2011 and 2016 comprised approximately 24% of the value Mr. Plank retained in Under Armour stock holdings following his Class Period trades (*i.e.*, $592 million divided by $2.5 billion). As discussed in **Section IV.B,** this is consistent with the tendency discussed in academic literature for executives to diversify their holdings in the context of company stock price appreciation as their holdings in company stock become a more concentrated portion of their wealth.[158]

64.     Conversely, the other point that can be observed from **Exhibit 13** is the extent to which the value of Mr. Plank's holdings in Under Armour stock decreased as the Company's stock price decreased starting from late 2015. As discussed above, Mr. Plank was Under Armour's largest shareholder and held the vast majority of his shares throughout the duration of the Class Period; those shares experienced a substantial decline in value when Under Armour's stock price decreased during this period. The value of Mr. Plank's holdings declined by 63.0% over the course of the Class Period as the Company's stock price declined.[159] Indeed, as a reflection of the relatively small fraction of his shares sold during the Class Period, had Mr. Plank not sold *any* shares during the Class Period, the value of his holdings would still have declined by 59.2%.[160]

---

[157] In other words, Mr. Plank experienced a net increase in the value of his Company equity holdings (net of his sales) of approximately $1.74 billion from 2011 to the quarter following his final Class Period sales (*i.e.*, $2.5 billion less $760 million).

[158] In Mr. Plank's deposition and in an SEC Form 8-K filing about Mr. Plank's October 2015 10b5-1 trading plan, the stated purpose of Mr. Plank's trading was diversification, among other reasons. *See* Plank Deposition, 251:14–252:2; Under Armour, Inc., SEC Form 8-K, filed November 3, 2015.

[159] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2019.

[160] Under Armour, Inc., SEC Forms 3, 4, and 5 for Kevin A. Plank, filed 2005–2019.

## VIII.   Mr. Plank's Use of 10b5-1 Plans

65.    In this section, I discuss how Mr. Plank's Class Period trades were operationalized through the use of 10b5-1 plans, and address Prof. Henderson's assertion that those 10b5-1 plans "cast[] serious doubt on whether Plank's trading plans were valid and legitimate."[161]  As context for the discussion of Mr. Plank's Class Period 10b5-1 plans, in **Sections VIII.A** and **VIII.B** below, I provide background on restrictions to executive trading and the SEC's Rule 10b5-1, respectively.  As discussed in **Section VIII.C**, Prof. Henderson concludes that Mr. Plank's 10b5-1 plans support an inference of "suspicious" trading because they do not fit the pattern prescribed by seven "hallmarks" of 10b5-1 plans derived by Prof. Henderson.[162]  As discussed below, Prof. Henderson's "hallmarks" are arbitrary, unnecessary, and not required by the SEC's Rule 10b5-1 as it applied during the Class Period, as I understand it, and the empirical literature he cites does not support the *presumption* of suspicious trading that Prof. Henderson makes.  Prof. Henderson's analysis of Mr. Plank's 10b5-1 plans thus provides no support for his assertion that Mr. Plank's trades were "suspicious" or "unusual" by way of how he operationalized his trading.

### A.    Background on Restrictions on Executive Trading

66.    Executives face legal restrictions on insider trading imposed by federal securities laws, as well as company-mandated blackout periods.  I understand that federal securities laws, SEC regulations, and certain principles of common law prohibit stockholders from trading in a company's stock at any time when the stockholder is in possession of material non-public information.  Consistent with these legal restrictions, many corporations institute policies restricting their executives and directors from trading their company's stock during periods when these individuals are, or are presumed to be, in possession of material non-public information.  For example, the majority of corporations impose blackout periods for a period of several weeks leading up to, including, and immediately following the announcement of quarterly earnings, or in anticipation of announcements of other major corporate events such as mergers.[163]  These blackout periods are often longer and more frequent for high-level employees (who may be aware, for instance, of pending acquisition

---

[161] Henderson Report, ¶ 8.
[162] Henderson Report, ¶ 93.
[163] J. C. Bettis, J. L. Coles, and M. L. Lemmon (2000), "Corporate Policies Restricting Trading by Insiders," *Journal of Financial Economics*, 57(2), pp. 191–220 ("Bettis, Coles, and Lemmon (2000)").

plans) than for other employees.  It is important to note that each corporate blackout period is not intended to designate times when employees and directors are necessarily in possession of material non-public information.  Rather, these are periods when there is a heightened concern that some employees or directors may be in possession of such information.[164]

67.    As a result of these blackout periods, executives and directors are constrained to trade company stock, or to make arrangements for future stock trades, during so-called "open trading windows."  These are periods during which insiders and other employees are expected generally not to be in possession of material non-public information.[165]  Such trading windows are typically periods of several days or weeks beginning a few days after a quarterly or annual earnings announcement.[166]  Open trading windows are sometimes shortened or eliminated in cases where corporations are engaged in activities that might put executives and directors in possession of material non-public information (*e.g.*, merger discussions).

68.    As a further internal control over employee and director trading, most corporate insider trading policies include a provision that requires trades by executives and directors to be pre-approved by a compliance officer, such as the corporate general counsel.[167]  Given that corporations monitor a large number of employees, this requirement serves to ensure that each employee understands his/her obligations with respect to compliance with insider trading regulations.  Empirical evidence indicates that pre-approval requirements effectively reduce the risk that insiders trade while in the possession of non-public information.[168]

69.    Consistent with the above, Under Armour had an insider trading policy that prohibited trading while in possession of material non-public information and described to employees what types of information might constitute material non-public information.[169]  The policy also prohibited trading during specified blackout windows—both quarterly blackout periods structured around the Company's quarterly and annual financial reporting, and "special" blackout periods designated by the Company.[170]  Additionally, Under Armour's insider trading policy required executives to obtain clearance from the Corporate Secretary before

---

[164] Bettis, Coles, and Lemmon (2000).
[165] Bettis, Coles, and Lemmon (2000) at p. 193.
[166] Bettis, Coles, and Lemmon (2000) at p. 197.
[167] A. D. Jagolinzer, D. F. Larcker, and D. J. Taylor (2011), "Corporate Governance and the Information Content of Insider Trades," *Journal of Accounting Research*, 49(5), pp. 1249–1274 ("Jagolinzer, Larcker, and Taylor (2011)") at pp. 1249–1251.
[168] Jagolinzer, Larcker, and Taylor (2011) at p. 1249.
[169] Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835 at UA_01108763–5.
[170] Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835 at UA_01108765–6.

enacting any trades (or entering into a 10b5-1 plan to do so).[171]  Accordingly, Mr. Plank's Rule 10b5-1 plans were signed by Under Armour's Senior Vice President General Counsel.[172]

### B.    The Role of 10b5-1 Trading Plans

70.    To receive the benefits from equity compensation, as well as to execute diversification plans, executives require mechanisms by which to sell portions of their company securities over time.  At the same time, the regulatory restrictions and blackout periods described above constrain executives in both the amount and timing of their trades.  To facilitate executives' ability to sell stock while complying with these trading restrictions, executives can put in place structured trading plans called "10b5-1 plans" that specify, in advance, the amount and timing of future stock sales.

71.    A 10b5-1 plan is an individual stock trading plan that designates stock sales or purchases in advance.  10b5-1 plans were introduced after the SEC enacted Rule 10b5-1 in October 2000.[173]  I understand that Rule 10b5-1 permits executives to trade when in possession of insider information as long as that information is not instrumental to their decision to trade, with the objective of reducing concerns that trading decisions are made while in the possession of material non-public information.[174]

72.    The SEC's Rule 10b5-1 describes the features that such a trading plan should have to qualify for "safe harbor" from insider trading allegations.  To summarize the three key SEC requirements of 10b5-1 plans during the Class Period, as I understand them:

    i.    The plan should be established when the individual is not in possession of material non-public information;

    ii.    The individual should enter into a binding plan to purchase or sell securities, or instruct another person to purchase or sell securities on the individual's behalf, and the plan or instructions should specify either the amount, price, and dates of stock sales or purchases or provide a formula for determining these trading details, or should delegate these details to another party such that the individual setting up the plan cannot influence the amount or timing of the trades; and

---

[171] Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835 at UA_01108767.
[172] Plank Deposition, Exhibits 25, 26.
[173] "Final Rule: Selective Disclosure and Insider Trading," *SEC*, August 21, 2000, available at https://www.sec.gov/rules/final/33-7881.htm.
[174] "Final Rule: Selective Disclosure and Insider Trading," *SEC*, August 21, 2000, available at https://www.sec.gov/rules/final/33-7881.htm.

iii. Transactions that are ultimately executed pursuant to 10b5-1 plans should not deviate from the terms specified by the plan or instruction, nor should the individual have entered into a corresponding hedging position on the plan.[175]

73. Although not relevant to Mr. Plank's at-issue trades, and in fact acknowledged by Prof. Henderson as not applicable,[176] Prof. Henderson discusses certain changes to the SEC's Rule 10b5-1 that were announced after the end of the Class Period, on December 14, 2022.[177] As I understand them, the amendments that the SEC announced in December 2022 include: (i) a requirement for executives and directors of a 90-day cooling-off period after adopting a 10b5-1 plan but before trading pursuant to that plan can begin (or, if later, trades not to occur until two days after financial results have been reported for the quarter in which the plan was adopted); (ii) a limit for executives and directors to one operative 10b5-1 plan for the same period, and a limit for executives and directors of one 10b5-1 plan calling for a single-trade per 12-month period; and (iii) revised certifications by executives and directors, and increased company disclosures.[178,179]

74. A key aspect of Rule 10b5-1, as I understand it, is that the insider is not precluded from having material non-public information at the time the securities are traded, but rather that the insider must not have material non-public information at the time the plan is established.[180]  Given the needs of corporate executives to sell company stock over time, a 10b5-1 plan can be a helpful way to reduce holdings in company securities without running afoul of SEC rules about insiders trading while in possession of material non-public

---

[175] "Final Rule: Selective Disclosure and Insider Trading," *SEC*, August 21, 2000, available at https://www.sec.gov/rules/final/33-7881.htm.  Prof. Henderson acknowledges these requirements of a 10b5-1 plan in his report.  *See* Henderson Report, ¶ 62.

[176] Henderson Report, ¶ 88 ("On December 14, 2022, the SEC adopted amendments to Rule 10b5-1 based in part on the academic research cited above and consistent with its main findings. … [T]hese amendments do not apply to Plank's Class-Period trades.").

[177] Henderson Report, ¶ 88.

[178] "Final Rule: Insider Trading Arrangements and Related Disclosures," *SEC*, December 14, 2022, available at https://www.sec.gov/rules/final/2022/33-11138.pdf.

[179] Prof. Henderson asserts that the recent amendments to the SEC's Rule 10b5-1 include a "limit of … one plan per year."  *See* Henderson Report, ¶ 89.  As I understand them, the amendments limit executives and directors to one single-trade plan per year, not one plan per year.  *See* "Final Rule: Insider Trading Arrangements and Related Disclosures," *SEC*, December 14, 2022, available at https://www.sec.gov/rules/final/2022/33-11138.pdf.

[180] For example, assume an insider establishes a plan on January 1, 2010 to sell a certain amount of company stock on March 1, 2010.  Further, assume that on January 1, 2010, the insider is not in possession of any material non-public information about his/her company.  If this individual subsequently comes into possession of material non-public information at a later date, say on February 1, 2010, there is no requirement, as I understand it, that the individual halt the sale of shares or the 10b5-1 plan.  In fact, the very purpose of a 10b5-1 plan, as I understand it, is to allow an insider peace of mind (and safe harbor from insider trading allegations) in structuring a future stock sales plan while not in possession of material non-public information, but recognizing that at some future date during the plan they might come into possession of material non-public information.

information.  Not surprisingly, corporate insiders at hundreds of firms have set up 10b5-1 trading plans.[181]

### C.  Prof. Henderson's "Hallmarks" of "Benign" Trading Plans Are Arbitrary and Unnecessary

75.    Mr. Plank's Class Period trades were made pursuant to 10b5-1 plans.  Prof. Henderson asserts that Mr. Plank's plans were purportedly not consistent with "best practices" and that "his use of Rule 10b5-1 did not have the hallmarks of benign, diversification trading plans."[182]  However, Prof. Henderson's "hallmarks" of "proper plan usage"[183] are arbitrary, his own personal creation and, as I understand it, were not a requirement of Rule 10b5-1 during the Class Period.

### 1.  Mr. Plank's 10b5-1 Trading Plans

76.    Mr. Plank's Class Period trades in November 2015 and April 2016 were made pursuant to a 10b5-1 plan that Mr. Plank entered into in October 2015 and amended in February 2016.[184]  As discussed below, Mr. Plank's 10b5-1 plan and amendment were entered into during open trading windows and specified, in advance, the parameters of trades pursuant to the plan.  Moreover, in contrast to Prof. Henderson's speculative assertion that "Plank used a Rule 10b5-1 [plan] to try to shield his enormous trades from scrutiny,"[185] Under Armour disclosed Mr. Plank's 10b5-1 plan in an SEC 8-K filing.[186]

77.    Mr. Plank's 10b5-1 plan dated October 28, 2015 set out planned trades for each quarter from the fourth quarter of 2015 through the third quarter of 2016.[187]  Under Mr. Plank's October 2015 plan (and the February 2016 amendment discussed below), trades under the plan were contingent on the Company's stock price being above a specified price,

---

[181] A. D. Jagolinzer (2009), "SEC Rule 10b5-1 and Insiders' Strategic Trade," *Management Science*, 55(2), pp. 224–239 ("Jagolinzer (2009)") at pp. 227–228.  Trading by insiders in the absence of a 10b5-1 trading plan does not imply that the trades are made inappropriately.  Many corporate executives and directors buy and sell company stock without instituting a 10b5-1 plan.  As I understand it, those insiders must simply ensure that their trades are not made while in possession of material non-public information.
[182] Henderson Report, ¶¶ 8, 93.
[183] Henderson Report, ¶ 77.
[184] Plank Deposition, Exhibits 25, 26.
[185] Henderson Report, ¶ 75.
[186] Under Armour, Inc., SEC Form 8-K, filed November 3, 2015.  During the Class Period there was no SEC requirement for 10b5-1 plans to be disclosed by companies, as I understand it.  The amendment to Mr. Plank's October 2015 10b5-1 plan in February 2016 was not reported in an 8-K filing.  As discussed in ¶ 78, that amendment only changed the price floor for trades under the plan.
[187] Plank Deposition, Exhibit 25.

often known as a "limit price."[188] Specifically, the plan called for 1,125,000 Class A shares to be sold in the fourth quarter of 2015, between November 17 and December 31, 2015 at a price of no less than $85.00;[189] and, following the issuance of Under Armour's Class C shares, 450,000 Class C shares to be sold in each of the next three quarters at a price of no less than $42.50.[190-191] As discussed in **Section VI.A** above, after trading in each consecutive quarter from the first quarter of 2011, Mr. Plank had not sold any shares in the third quarter of 2015, the quarter prior to entering into this 10b5-1 plan. The October 2015 plan limited sales to no more than 225,000 shares per trading day and any trades not executed in a given quarter would be carried over to the next quarter, with any remaining trades not executed by the end of the plan's term cancelled.[192] Consistent with Under Armour's insider trading policy, Mr. Plank's October 2015 10b5-1 plan was entered into outside of a quarterly blackout window.[193]

78.     Mr. Plank's 10b5-1 plan dated February 26, 2016 amended the October 2015 plan with respect to trades for the first three quarters of 2016. As with the October 2015 plan, the amended plan called for 450,000 Class C shares to be sold in each of the first three quarters of 2016.[194] While the Class C shares had not yet been issued, the Company's Class A stock price at the time when the February 2016 amendment was adopted was below the price floor for the Class C trades specified in the October 2015 plan;[195] the amendment reduced the price floor for trades in the first three quarters of 2016 to $37.50.[196] The plan was otherwise

---

[188] Under such a plan, the executive specifies an explicit price floor, with the implication that any planned trades will not occur if the company's stock price is below the specified price. *See* "Limit Orders," *SEC*, March 10, 2011, available at https://www.sec.gov/answers/limit.htm.

[189] As discussed in Section VI.A, on an expected split-adjusted basis, this is equivalent to 2.25 million split-adjusted shares at a limit price of $42.50.

[190] Plank Deposition, Exhibit 25. Consistent with Prof. Henderson, share sales by Cupid Foundation are excluded from the discussion. *See* Henderson Report, p. 4 fn 1.

[191] The limit price of Class C share sales according to the plan appeared to account for the anticipated effect of the Class C Stock Issuance, which was expected to reduce Under Armour common stock prices by half. *See* Under Armour, Inc., SEC Form Def 14A, filed July 13, 2015.

[192] Plank Deposition, Exhibit 25.

[193] "The four quarterly Trading Blackout Periods begin, respectively, on March 15, June 15, September 15, and December 15 of each year, and end, respectively, at the close of trading on the second full trading day after issuance of our quarterly earnings release for the corresponding concluded fiscal quarter." *See* Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835 at UA_01108765–6. The October 2015 plan was entered into four trading days after Under Armour's third quarter 2015 earnings release on October 22, 2015. *See* Plank Deposition, Exhibit 25; Under Armour, Inc., Press Release, "Under Armour Reports Third Quarter Net Revenues Growth of 28%; Raises Full Year Outlook," October 22, 2015.

[194] The February 2016 plan called for trades to occur between February 2 and February 18, 2016. Although those dates had passed at the time the plan was amended, any unsold shares could be rolled into the next quarter's trading under the plan's terms. *See* Plank Deposition, Exhibit 26.

[195] As of February 26, 2016, Under Armour's Class A stock was trading at a price of $83.81, which would be expected to be below the split-adjusted $42.50 limit price set out in the October 2015 plan for Mr. Plank's 2016 sales. *See* CRSP.

[196] Plank Deposition, Exhibit 26.

unchanged relative to the October 2015 plan.[197]  In common with the October 2015 plan, Mr. Plank's February 2016 10b5-1 amendment was entered into outside of a quarterly blackout window.[198]

## 2.    Prof. Henderson's "Hallmarks"

79.    In his report, Prof. Henderson outlines "seven hallmarks of proper plan usage" and finds that "Plank's plan appears to have had few or none of the hallmarks of an effective Rule 10b5-1 plan."[199]  The "hallmarks" that Prof. Henderson emphasizes are:

> (1) a significant time lag between adoption and first trade; (2) regularly scheduled trades; (3) sales over long periods of time; (4) sales of relatively consistent size and relatively small amounts compared with overall share holdings; (5) sales at a range of stock prices; (6) no changes or cancellations of plans; and (7) a high level of board and general counsel involvement in adoption, alteration, and termination decisions.[200]

80.    Prof. Henderson's "hallmarks" of "proper plan usage" were not necessary conditions to be compliant with Rule 10b5-1, as I understand it, at the time that Mr. Plank entered into the October 2015 plan or the February 2016 amendment to that plan.  In fact, none of Prof. Henderson's "hallmarks" were a requirement of Rule 10b5-1 during the Class Period, as I understand it.  As described in **Section VIII.B** above, the SEC set forth (only) three specific requirements for 10b5-1 plans:  (1) the plan should be established when the individual is not in possession of material non-public information; (2) the individual should enter into a binding plan to purchase or sell securities and the plan should specify or provide a formula for the amount, price, and dates of stock sales or purchases, or delegate these details to another party; and (3) transactions that are ultimately executed pursuant to 10b5-1 plans should not deviate from the terms specified by the plan.  *None* of these elements of the SEC's Rule 10b5-1 as it applied during the Class Period require 10b5-1 plans to embody any of the "hallmarks" that Prof. Henderson emphasizes.

---

[197] While Prof. Henderson describes the February 2016 amendment as a way "to enable more shares to be sold under [the 10b5-1 plan]," this is a misleading characterization.  The amended plan did not adjust the number of shares that could be sold under the plan.  *See* Henderson Report, ¶ 12; Plank Deposition, Exhibits 25, 26.

[198] "The four quarterly Trading Blackout Periods begin, respectively, on March 15, June 15, September 15, and December 15 of each year, and end, respectively, at the close of trading on the second full trading day after issuance of our quarterly earnings release for the corresponding concluded fiscal quarter."  *See* Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835 at UA_01108765–6.  The February 2016 10b5-1 amendment was entered into four trading days after Under Armour's fourth quarter 2015 10-K was filed February 22, 2016.  *See* Plank Deposition, Exhibit 26; Under Armour, Inc., SEC Form 10-K for FY 2015, filed February 22, 2016.

[199] Henderson Report, ¶¶ 77, 87.

[200] Henderson Report, ¶ 77.

81.    Prof. Henderson's assertion that "benign" trading plans should have particular characteristics (which were not required by the SEC during the Class Period) and even follow particular trading patterns also ignores the legitimate but diverse motivations and risk preferences of different individuals.  As discussed in **Section IV.B**, there are a variety of reasons why an executive might trade shares in his/her own company.  Moreover, as discussed in **Section VI.B**, different trading patterns could be consistent with a diversification rationale for executives who are differently situated or have different preferences.  In other words, there is no required or one-size-fits-all pattern of executive trading that is both economically optimal for all individuals and consistent with the SEC's requirements.

82.    Prof. Henderson's "hallmarks" also appear to be based primarily on his own personal inference.[201]  Moreover, while Prof. Henderson points to the SEC's recent amendment to Rule 10b5-1 requiring a cooling-off period of 90 days or more, he acknowledges that "these amendments do not apply to Plank's Class-Period trades."[202]

83.    Further issues with respect to the specific "hallmarks" are:

a. Prof. Henderson states that Mr. Plank's trades were "suspicious and inconsistent with trades pursuant to a proper trading plan" because they were not "regularly scheduled trades" or "sales over long periods of time."[203]  First and foremost, as discussed in **Section VI.A** above, Mr. Plank's trades between 2011 and 2016 were, in fact, made on a regular basis and over a multi-year period of time.  Second, irrespective of Mr. Plank's trades, these "hallmarks" are arbitrary and, as I understand them, not required by SEC rules before or during the Class Period (nor by current rules).  Trades under a 10b5-1 plan can occur all at once, sporadically, or following a regular schedule.  When executives hold vested stock and options for which there is no other holding requirement, there is no compelling diversification-related reason for executives to sell such equity in regularly scheduled increments, or at any specific frequency, over time.

b. Sales of small amounts and sales at a range of stock prices are not necessary for 10b5-1 plans to comply with the SEC's requirements.[204]  First and foremost, Mr. Plank's trades between 2011 and 2016 were in fact made at a

---

[201] Henderson Report, ¶ 76.
[202] Henderson Report, ¶¶ 78, 88–89.
[203] Henderson Report, ¶¶ 77, 79, 98.
[204] Henderson Report, ¶¶ 81–82.

range of stock prices,[205] and, as discussed in **Section VII.A**, Mr. Plank's Class Period trades comprised a relatively small fraction of Mr. Plank's stock holdings.  Second, irrespective of Mr. Plank's trades, these "hallmarks" are arbitrary and, as I understand, not required by SEC rules before or during the Class Period (nor by current rules).  I am also not aware of a compelling reason why executives need to address their diversification and liquidity needs by breaking up their stock sales into small trades, and executives can establish a single price target or multiple targets for trades under a given 10b5-1 plan, and at a target stock price higher or lower than the current stock price, to address these needs.  Likewise, there is no compelling reason why executives need to address their diversification and liquidity needs by breaking up their stock sales over long periods of time.[206]

c.  Prof. Henderson also claims that a "key" hallmark of "valid" 10b5-1 plans is making no changes to the plan once executed.[207]  Under the SEC rules before and during the Class Period as well as the current rules, as I understand them, 10b5-1 plans can generally be changed or cancelled at any time when the executive is not in possession of material non-public information about the firm.[208]  Moreover, his broad statement ignores the number of reasons an executive with a 10b5-1 plan could choose to cancel or amend the plan, such as in light of unexpected market events, diversification needs, or stock price changes.[209]  As an example, an executive with a 10b5-1 plan in place to execute trades at the market price in a certain timeframe might reasonably choose to cancel the 10b5-1 plan in the event of unexpected financial market volatility, such as the financial crisis that occurred in 2008–2009.

84.  Prof. Henderson appears to believe that 10b5-1 trading plans that do not have these "hallmarks" can be *presumed* to be suspicious.  For example, he states that Mr. Plank's "plans did not comply with the hallmarks of legitimate plans, and, therefore, are

---

[205] Under Armour, Inc., SEC Forms 4 and 5 for Kevin A. Plank, filed 2011–2016.
[206] Henderson Report, ¶ 80.
[207] Henderson Report, ¶¶ 70, 83.
[208] Indeed, Prof. Henderson concedes that "Rule 10b5-1 permits insiders to alter plans after their formation" as long as "any change to a plan [is] made under the same scrutiny as when a plan is started."  *See* Henderson Report, ¶ 83.
[209] In his deposition, Mr. Plank explained that an amendment to his 10b5-1 plan was made in February 2016 lowering the limit price for trades for the purposes of "diversification, estate planning" and philanthropy, "part of a broader plan."  *See* Plank Deposition, 251:14–252:2.

suspicious."[210-211] He likewise asserts, without any empirical support, that "[t]here are a series of best practices that were known at the time of Plank's trades that help differentiate legitimate from illegitimate trading plans."[212] Moreover, although Prof. Henderson asserts that "concerns about misuse of Rule 10b5-1 are not theoretical or speculative, but, rather, documented by a large and growing body of empirical data and results,"[213] it is notable that the three empirical papers that Prof. Henderson discusses do *not* support the *presumption* of suspicious trading that he makes in his report, for several reasons.

85.     First, the type of study cited by Prof. Henderson allows (at best) for a general conclusion about average behavior for large groups of executives across different firms. Specifically, all three of the studies he cites examine broad panels of executives and analyze how company stock returns perform following trades pursuant to 10b5-1 plans.[214] The average results from such broad sample studies do not provide evidence about whether specific executives at a specific company have traded in a way that was unusual or suspect.

86.     Second, the average returns results shown in these papers are not necessarily indicative of unlawful behavior. Indeed, one of the studies cited by Prof. Henderson, Jagolinzer (2009), states in its concluding remarks: "It is important to note that evidence described in this study is not necessarily indicative of illegal behavior. Regulators generally consider many factors when determining whether particular trade patterns appear to violate insider trading laws. Perhaps the most important factor is that of materiality, and it is not clear that the patterns and returns described herein are material enough to warrant regulatory concern."[215-216]

87.     Finally, Prof. Henderson posits that if insider trading under 10b5-1 plans is not informed, there should be no systematic relationship between the execution of a 10b5-1 plan

---

[210] Henderson Report, ¶ 104.
[211] Further, he states that "at the time Plank used a Rule 10b5-1 *to try to shield* his enormous trades from scrutiny, there was abundant evidence that executives using these plans were more likely to be engaged in suspicious trading conduct than executives not using them." *See* Henderson Report, ¶ 75 (emphasis added). I am not aware of any basis in financial economics that supports Prof. Henderson's inference about Mr. Plank's state of mind with respect to what he "tr[ied]" to do through his 10b5-1 plan.
[212] Henderson Report, ¶ 61.
[213] Henderson Report, ¶ 71.
[214] Henderson Report, ¶¶ 71–75; Jagolinzer (2009); M. T. Henderson, A. D. Jagolinzer, and K. A. Muller (2014), "Offensive Disclosure: How Voluntary Disclosure Can *Increase* Returns from Insider Trading," *The Georgetown Law Journal*, 103(5), pp. 1275–1306 ("Henderson, Jagolinzer, and Muller (2014)"); E. M. Fich, R. Parrino, and A. L. Tran (2015), "Timing Stock Trades for Personal Gain: Private Information and Sales of Shares by CEOs," Working Paper.
[215] Jagolinzer (2009) at p. 237.
[216] Prof. Henderson also states that "[t]rading within Rule 10b5-1 is more likely to be informed trading than diversification trading." *See* Henderson Report, p. 38 fn 71. The Jagolinzer paper does not show this. As stated by the author, his results show that "trading within the rule does not solely reflect uninformed diversification." *See* Jagolinzer (2009) at p. 224.

and subsequent company stock returns.[217]  He cites to a paper that he co-authored, pointing to negative average returns after company insiders execute trades under disclosed 10b5-1 plans as evidence that "insiders can and do abuse Rule 10b5-1 by using it to shield otherwise illegal informed trades."[218]  However, Prof. Henderson's analysis ignores the potential for insiders to cancel trades (which is fully permissible under SEC Rule 10b5-1, as I understand it).[219]  Crucially, to the extent that the negative average stock returns observed following the execution of 10b5-1 plans *are* driven by informed cancellations by insiders, that pattern says nothing about whether insiders who *actually* execute trades under 10b5-1 plans were informed *at the time that they established* their plans.

88.     In summary, Prof. Henderson's "hallmarks" are arbitrary and unnecessary, and his analysis of Mr. Plank's 10b5-1 plans provides no support for his assertion that Mr. Plank's trades were "suspicious" or "unusual" by way of how he operationalized his trading.


Executed this 15th day of May, 2023

_____

Wayne Guay, Ph. D

---

[217] Henderson Report, p. 38 fn 71.
[218] Henderson Report, ¶ 73; Henderson, Jagolinzer, and Muller (2014) at pp. 1288–1291.
[219] Henderson, Jagolinzer, and Muller (2014) analyzes trading patterns of insiders following the disclosure of 10b5-1 plans—data which are inherently limited to trades that were actually executed.  In other words, the study is missing any planned trades that were canceled. *See* Henderson, Jagolinzer, and Muller (2014) at pp. 1275–1306.  An insider might cancel a trade if she/he expects the stock price to subsequently increase, so the omission of canceled trades from the analysis (by virtue of only focusing on trades *executed* under 10b5-1 plans) would skew Prof. Henderson's average stock returns calculation downward.

**Appendix I**

# WAYNE R. GUAY

| **Office** | **Home** |
|---|---|
| 1329 Steinberg Hall - Dietrich Hall | 2031 Locust Street, Apt. #2001 |
| Philadelphia, PA  19104-6365 | Philadelphia, PA  19103 |
| Phone: (215) 898-7775 | (215) 546-3657 |
| guay@wharton.upenn.edu | |

## EDUCATION

**University of Rochester, William E. Simon Graduate School of Business**
Ph.D., Accounting, 1998.
M.S., Business Administration, Concentration in Applied Economics, 1996.

**Northeastern University**
Masters in Business Administration, 1993.

**Clarkson University**
B.S., Engineering and Management, 1989.

## ACADEMIC APPOINTMENTS

**The Wharton School of Business, University of Pennsylvania, 1997-Present**
Yageo Professor of Accounting, 2010-Present
Associate Professor of Accounting, 2004-2010
Assistant Professor of Accounting, 1997-2004

## PROFESSIONAL SERVICE

Editor, *Journal of Accounting & Economics*, 2012-Present

## PUBLICATIONS

Refereed papers

"Busy Directors and Shareholder Satisfaction," with Kevin Chen, *Journal of Financial and Quantitative Analysis* 55 (2020): 2181-2210.

"The Role of Executive Cash Bonuses in Providing Individual and Team Incentives," with John Kepler and David Tsui, *Journal of Financial Economics* 133, (2019): 441-471.

"Tax Aggressiveness and Corporate Transparency," with Karthik Balakrishnan and Jennifer Blouin, *The Accounting Review* 94 (2019): 45-69.

"Conservative Disclosure," with Ro Verrecchia, *Journal of Financial Reporting* 3, (2018): 73-91.

"Guiding Through the Fog: Financial Statement Complexity and Voluntary Disclosure," with Delphine Samuels and Daniel Taylor, *Journal of Accounting & Economics* 62, (2016): 234-269.

"Do Independent Directors Cause Improvements in Firm Transparency?," with Christopher Armstrong and John Core, *Journal of Financial Economics* 113, (2014): 383-403.

"Are US CEOs Paid More Than UK CEOs? Inferences From Risk-Adjusted Pay?," with John Core and Martin Conyon, *Review of Financial Studies* 24, (2011): 402-438.

"Properties of Implied Cost of Capital Using Analysts' Forecasts," with S.P. Kothari and Susan Shu, *Australian Journal of Management* 36, (2011): 125-149.
    Best Paper Award – *Australian Journal of Management* Article of the Year, 2011

"Have the tax benefits of debt been overestimated?," with Jennifer Blouin and John Core, *Journal of Financial Economics* 98, (2010): 195-213.

"The Role of the Business Press as an Information Intermediary," with Brian Bushee, John Core, and Sophia Hamm, *Journal of Accounting Research* 48, (2010): 1-19.

"The Power of the Pen and Executive Compensation," with John Core and David Larcker, *Journal of Financial Economics* 88, (2008): 1-25.

"Is Accruals Quality a Priced Risk Factor?," with John Core and Rodrigo Verdi, *Journal of Accounting & Economics* 46, (2008): 2-22.

"Agency Problems of Excess Endowment Holdings in Not-For-Profit Firms," with John Core and Rodrigo Verdi, *Journal of Accounting & Economics* 41, (2006): 307-333.

"Does Weak Governance Cause Weak Stock Returns?  An Examination of Firm Operating Performance and Investors' Expectations," with John Core and Tjomme Rusticus, *Journal of Finance* 56, (2006): 655-687.

"Stock Market Anomalies: What Can We Learn from Repurchases and Insider Trading?," with John Core, Scott Richardson and Rodrigo Verdi, *Review of Accounting Studies* 11 (2006): 49-70.

"Price versus Non-Price Performance Measures in Optimal CEO Compensation Contracts," with John Core and Ro Verrecchia, *The Accounting Review* 78, (2003): 957-981.

"Market Valuations in the New Economy: An Investigation of What Has Changed," with John Core and Andy Van Buskirk, *Journal of Accounting & Economics* 34, (2003): 43-67.
    Best Paper Award – second prize, *Journal of Accounting & Economics Conference*, 2001.

"How Much Do Firms Hedge with Derivatives?," with S.P. Kothari, *Journal of Financial Economics* 70, (2003): 423-461.

"The Economic Dilution of Employee Stock Options: Diluted EPS for Valuation and Financial Reporting," with John Core and S.P. Kothari, *The Accounting Review* 77, (2002): 627-652.
    Best Paper Award – *The Accounting Review* Article of the Year 2002, selected by the Financial Executive Research Foundation.

"Estimating the Value of Employee Stock Option Portfolios and Their Sensitivities to Price and Volatility," with John Core, *Journal of Accounting Research* 40, (2002): 613-630.

"Stock Option Plans for Non-Executive Employees," with John Core, *Journal of Financial Economics* 61, (2001): 253-287.
    All Star Paper Award, *Journal of Financial Economics*, 2005.

"The Usefulness of Long-Term Accruals," with Baljit K. Sidhu, *Abacus* 37, (2001) 110-131.

"The Cash-Flow Permanence and Information Content of Dividend Increases vs. Repurchases," with Jarrad Harford, *Journal of Financial Economics* 57, (2000): 385-415.

"The Use of Equity Grants to Manage Optimal Equity Incentive Levels," with John Core, *Journal of Accounting & Economics* 28, (1999): 151-184.

"The Sensitivity of CEO Wealth to Equity Risk: An Analysis of the Magnitude and Determinants," *Journal of Financial Economics* 53, (1999): 43-78.

"The Impact of Derivatives on Firm Risk: An Empirical Examination of New Derivatives Users," *Journal of Accounting & Economics* 26, (1999): 319-351.

"A Market-Based Evaluation of Discretionary-Accruals Models," with S.P. Kothari and Ross L. Watts, *Journal of Accounting Research* 34, Supplement (1996): 83-105.

Invited papers

"Identification and generalizability in accounting research: A discussion of Christensen, Floyd, Liu, and Maffett (2017)," with Stephen Glaeser, *Journal of Accounting & Economics* 64, (2017): 305-312.

"The Role of Financial Reporting and Transparency in Corporate Governance," with Christopher Armstrong, Hamid Mehran, and Joseph Weber, *Economic Policy Review* 22 No.1, (2016): 107-128.

"The Role of Information and Financial Reporting in Corporate Governance and Debt Contracting," with Christopher Armstrong and Joseph Weber, *Journal of Accounting & Economics* 50, (2010): 179-234.

**Appendix I**

"Is There a Case for Regulating Executive Pay in the Financial Services Industry?," with John Core, in *After the Crash: The Future of Finance: Chapter 5*, published by Brookings Institution Press (2010): 115-140.

"Is CEO Pay Too High and Are Incentives Too Low: A Wealth-Based Contracting Framework," with John Core, *Academy of Management Perspectives* 24 (Feb. 2010): 5-19.

"Discussion of Ramanna and Roychodhury (2010): Elections and Discretionary Accruals: Evidence from 2004," *Journal of Accounting Research* 48, (2010): 477-487.

"Conservative Financial Reporting, Debt Covenants, and the Agency Costs of Debt," *Journal of Accounting & Economics* 45 (2008): 175-180.

"Discussion of Accounting Discretion, Corporate Governance, and Firm Performance," *Contemporary Accounting Research* 25 (Summer 2008): 407-413.

"Discussion of an Economic Framework for Conservative Accounting and Bushman and Piotroski," with Ro Verrecchia, *Journal of Accounting & Economics* 42, (2006): 149-165.

"Discussion of Ball and Shivakumar: The Role of Accruals in Asymmetrically Timely Gain and Loss Recognition," *Journal of Accounting Research* 44, (2006): 243-255.

"Is U.S. CEO Compensation Broken," with John Core and Randall Thomas, *Journal of Applied Corporate Finance* 17 No. 4, (2005): 97-104.

"Accounting for Employee Stock Options," with S.P. Kothari and Richard Sloan, *American Economic Review* 93 No. 2, (2003): 405-409.

"Executive Equity Compensation and Incentives: A Survey", with John Core and David Larcker. *Economic Policy Review* 9, (2003): 27-50.

"Discussion of: Real Investment Implications of Employee Stock Option Exercises," *Journal of Accounting Research* 40, (2002): 395-406.

"Discussion of Value Investing:  The Use of Historical Financial Statement Information to Separate Winners from Losers," *Journal of Accounting Research* 38, Supplement (2000): 43-51.

<u>Other articles</u>

"Is U.S. CEO Compensation Inefficient Pay without Performance? A review of *Pay without Performance: The Unfulfilled Promise of Executive Compensation*, by Lucian Bebchuk and Jesse Fried," with John Core and Randall Thomas, *Michigan Law Review* 103, No. 6 (2005): 1142-1185.

"Equity Incentives," with John Core and David Larcker, in *Top Pay and Performance: International and Strategic Approach: Chapter 8*, published by Elsevier Butterworth-Heinemann (2005): 157-172.

## WORKING PAPERS

"Determinants of Insider Trading Windows" with Shawn Kim and David Tsui

"Relative Performance Evaluation and the Peer Group Opportunity Set" with Matthew Bloomfield and Oscar Timmermans

"Contextual Corporate Governance" with Kevin Chen and John Core

"Multidimensional Corporate Governance" with Kevin Chen and Richard Lambert

"Why Do CEOs Hold Equity?," with Chris Armstrong and John Core.

"When are Executive Compensation and Incentives Appropriately Measured by Their Market Values?," with John Core.

"The Other Side of the Trade-Off: The Impact of Risk on Executive Compensation: A Revised Comment," with John Core.

## INVITED UNIVERSITY PRESENTATIONS

Boston College, 2013, 2021
Chinese University of Hong Kong, 2021
University of Utah, 2005, 2021
University of California at Berkeley, 2021
University of Texas at Dallas, 2008, 2021
Stanford University, 2005, 2006, 2014, & 2020
Rice University, 2020
University of Miami, 2020
University of Frankfurt, 2019, 2018 (Metzler Bank Visiting Professor)
Tulane University, 2018
University of Melbourne, 2018
University of Sydney, 2018
Michigan State University, 2017
Southern Methodist University, 2008 & 2016
University of Chicago, 2000, 2006, 2016
Cornell University, 2002, 2016
University of Southern California, 2002 & 2015
University of Zurich, 2015
Bocconi University, 2014
Columbia University, 1999, 2014
Singapore Management University, 2014

University of Washington, 2000 & 2013
Ohio State University, 2004 & 2013
University of Missouri, 2013
Massachusetts Institute of Technology, 1999, 2001, & 2012
Northwestern University, 2000 & 2012
Tilburg University, 2011
University of Auckland, 2010
University of Melbourne, 2010
Australian National University, 2010
University of New South Wales, 2010
University of Queensland, 2010
University of Western Australia, 2010
Vanderbilt University, 2009
Dartmouth College, 2009
University of Toronto, 2008
Erasmus School of Economics, Rotterdam, 2008
University of Amsterdam, 2008
Drexel University, 2007
Penn State University, 2006
Washington University, 2006
Baruch College, 1997 & 2005
Rutgers University, 2005
George Washington University, 2005
Arizona State University, 2004
University of Maryland, 2004
University of Technology, Sydney, 2004
University of Delaware, 2004
University of Oregon, 1999 & 2003
University of Rochester, 1999 & 2003
Cranfield School of Management, 2002
Syracuse University, 2002
University of Illinois, 2002
Rutgers University, 2001
University of Arizona, 2000
Northeastern University, 1999
University of British Columbia, 1999
University of Chicago, Economics and Law Workshop, 1997

## INVITED ADDRESSES, LECTURES, PAPER DISCUSSIONS AND PANEL SESSIONS

2022 International Consortium for Values-Based Governance Conference - Plenary Speaker
2022 Drexel Annual Corporate Governance Conference (Best Discussant Award)
2021 Society for Financial Studies Cavalcade
2020 Financial, Organizations and Markets Conference
2019 American University in Cairo, Distinguished Visiting Researcher Address
2019 Emerging Technologies Conference at USC - Keynote Address

2018 HKUST Accounting Research Symposium - Keynote Address
2018 Metzler Bank Visiting Professor Lecture
2017 FARS Doctoral Consortium (Talk on "How to Become an Accounting Scholar")
2016 Journal of Accounting and Economics Conference
2015 Directors Roundtable – Morgan, Lewis & Bockius, LLP
2015 Drexel Conference on Corporate Governance
2015 FARS Midyear Meeting, Panel Discussion on Executive Compensation
2014 Bar Ilan University, Ackerman Conference on Corporate Governance
2014 Singapore Management University, Public Lecture
2014 Utah Winter Financial Accounting Conference
2014 Arizona State University Sonoran Winter Finance Conference
2013 European Accounting Association Annual Congress: Symposium on the Regulation and
       Disclosure of Executive Compensation
2012 Financial Economics & Accounting Conference at USC – Keynote Address
2012 Colorado Summer Accounting Research Conference
2011 Vanderbilt Law and Business Annual Conference
2011 Conference on Governance and Risk Management, Federal Reserve Bank of New York
2010 Conference on Governance, Executive Compensation and Excessive Risk in the
       Financial Services Industry, Columbia Business School
2009 LeBow College of Business, Annual Corporate Governance Conference
2008 IIEF, Global Shareholder Activism Conference
2008 Institute of Corporate Directors: Governance and Financial Markets Conference
2007 Journal of Accounting and Economics Conference
2007 Wharton Economic Summit: "Current Controversies in Executive Compensation"
2007 Wharton Joint Finance/Law Seminar Series
2006 Journal of Accounting and Economics Conference
2006 Financial Research Association Conference
2006 Contemporary Accounting Research Conference
2006 Washington University Corporate Finance Conference
2005 Utah Winter Financial Accounting Conference
2004 Journal of Accounting and Economics Conference
2004 Financial Management Association Annual Meeting
2004 National Bureau of Economic Research, Corporate Finance Conference
2004 Western Finance Association Annual Meeting
2004 University of Delaware, Corporate Governance Center, Executive Compensation Panel
2004 Vanderbilt Law and Business Conference
2003 American Accounting Association Annual Meeting
2003 Western Finance Association Annual Meeting
2003 Conference on Financial Economics and Accounting, Indiana University
2003 Featured presenter at "Accounting for Stock Options" Conference, Temple University
2001 European Finance Association Annual Meeting
2001 American Accounting Association Annual Meeting
2000 European Finance Association Annual Meeting

**INVITED CONFERENCE PAPER PRESENTATIONS**

2020 Drexel Conference on Corporate Governance
2016 Yale Fall Research Conference
2016 University of Minnesota Empirical Research Conference
2015 Journal of Accounting & Economics Conference
2015 Colorado Summer Accounting Research Conference
2014 Bar Ilan University, Ackerman Conference on Corporate Governance
2013 London Business School Accounting Symposium
2010 Federal Reserve Bank Conference on Bank Structure and Competition
2009 *Journal of Accounting & Economics* Conference
2009 Brookings - Tokyo Club - Wharton, Future of Financial Services Industry Conference
2008 Financial Research Association Conference
2006 University of Minnesota Empirical Research Conference
2006, 2005, 2004, 2003, 2001, 2000, 1999, 1996 American Accounting Association meetings
2006 Utah Winter Financial Accounting Conference
2005 NYU Summer Camp
2004 Governance in Not-For-Profit Organizations Conference, Federal Reserve Bank of NY
2004 National Bureau of Economic Research Corporate Governance Conference
2004 Financial Management Association Annual Meeting
2004 European Accounting Association Annual Congress
2003 American Economic Association Annual Meeting.
2002, 2000 American Finance Association Annual Meeting.
2002 Business Management and Assurance Services Conference.
2001 European Finance Association meetings.
2001 *Journal of Accounting & Economics* Conference.
2001, 2000 European Finance Association Annual Meeting.
2000 Harvard University Financial Decisions and Control Workshop.
2000 AAA-BAA Globalization conference.
2000 UNC/Duke Fall Camp.
1998 *Journal of Accounting & Economics* Conference.
1998 Western Finance Association Annual Meeting.
1998 Australian Graduate School of Management Summer Conference.

**DOCTORAL PROGRAM RESEARCH COURSES AND LECTURES**

American University in Cairo, Masters Class, 2019
University of Melbourne, Masters Class, 2018
University of Frankfurt (Germany), 2018, Metzler Bank Visiting Professor
   Outstanding Teaching Award – Graduate School of Economics, Finance and Management
University of Zurich (Switzerland), 2015
London Business School (UK), 2011
Tilburg University (Netherlands), 2011
University of Utah, 2011
Australian National University (Australia), 2010
University of New South Wales (Australia), 2010

University of Technology Sydney (Australia), 2004
Cranfield School of Management (UK), 2002
Massachusetts Institute of Technology, 2001
University of Pennsylvania, 1999-2022

## HONORS AND AWARDS

Best Discussant Award – Drexel Annual Corporate Governance Conference, 2022
Wharton Teaching Excellence Award, 2018, 2019, 2020, 2021, 2022
Wharton MBA Core Curriculum Teaching Award, 2015, 2016, 2017.
Best Paper Award – *Australian Journal of Management*, 2011.
Best Paper Award – *The Accounting Review* Article of the Year 2002.
Wharton Undergraduate Excellence in Teaching Award, 2002.
Best Paper Award – second prize, *Journal of Accounting & Economics Conference*, 2001.
*American Compensation Association* Research Grant, 1997-98.
Deloitte & Touche Doctoral Fellow, 1997.

## PROFESSIONAL SERVICE

Academic Journal Service:
  *Journal of Accounting & Economics*, Editor, 2012-present, Associate Editor, 2003-2011
  *Australian Journal of Management*, Editorial Board, 2011-present
  *Journal of Accounting Research*, Editorial Board, 2001-2011
  *Accounting Review*, Editorial and Advisory Board, 1999-2007
  *Journal of Derivatives Accounting*, Associate Editor, 2004-2005

Service:
  Univ of Colorado Summer Accounting Conference, Program Committee, 2013-present
  Univ of Utah Winter Accounting Conference, Program Committee, 2012-present
  Financial Research Association Conference, Program Committee, 2005-present
  AAA New Faculty Consortium, Group Leader, 2005 & 2006
  Financial Management Association Annual Meeting, Program Committee, 2004
  Financial Executives Research Foundation, Academic Advisory Council, 2003
  Western Finance Association Annual Meeting, Program Committee, 2003
  AAA/FASB Financial Reporting Issues Conference, Program Committee, 2002.

Ad hoc reviewer for:
  *Accounting Horizons; American Accounting Association Annual and Mid-year Meetings;
  Financial Management; Journal of Accounting, Auditing and Finance; Journal of
  Accounting and Public Policy; Journal of Business; Journal of Business Finance and
  Accounting; Journal of Contemporary Accounting Research; Journal of Corporate
  Finance; Journal of Economics and Business; Journal of Finance; Journal of Financial
  Economics; Journal of Financial Intermediation; Journal of Financial and Quantitative
  Analysis; Journal of Futures Markets; Journal of International Financial Management &
  Accounting; Journal of Law and Economics; Journal of Management Accounting
  Research; Journal of Political Economy; Management Science; MIT Sloan Management*

*Review; Review of Accounting Studies; Review of Corporate Finance Studies; Review of
Financial Studies; The Financial Review; The International Journal of Accounting*

## UNIVERSITY SERVICE

Accounting PhD Coordinator: 2011-present.

Dissertation committee: Shawn Kim, 2023; Kevin Chen (chair), 2022; Tanya Paul, 2021;
Chongho Kim, 2020; Stephen Glaeser, 2018; Jessica Kim-Gina, 2018; Delphine Samuels,
2017 (co-chair); Jason Xiao, 2016 (chair); Jacky Chau, 2016; David Tsui, 2015 (chair);
Terrence Blackburne, 2014 (co-chair); Sophia Hamm, 2010 (chair); Tjomme Rusticus,
2006; Andrew Van Buskirk, 2005; Ying Li (MIT), 2002.

Summer paper advisor: Shawn Kim, 2019-2020; Kevin Chen, 2019; Stephen Glaeser, 2015;
Delphine Samuels, 2015; Michael Carniol, 2014; Jessica Kim, 2013, 2014; Jason Xiao,
2012, 2013; Jacky Chau, 2012, 2013; David Tsui, 2012; Terrence Blackburne, 2010,
2011; Michael Willis, 2009; Jeffrey Ng, 2005; Zili Zhuang, 2004; Rodrigo Verdi,
2003; Gus De Franco, 2000.

Wharton Doctoral Executive Committee, 2011-present.

Wharton Personnel Committee, 2015-2017 (Chair, 2016-2017).

Wharton Undergraduate Curriculum Committee, 1997-1998, 2000-2003, 2005-2008.

Beta Alpha Psi Accounting Awards Committee, 1998-2001.

Wharton Technology Committee, 1998-2000.

Penn Reading Project, Summer 2000, 2002.

Wharton Undergraduate Executive Committee, 2001-2002.

Contributor: Knowledge@Wharton, Knowledge@Wharton High School, *Wharton Magazine.*

Wharton Graduate Division Core Faculty Advisory Committee, 2003-2006.

Wharton Executive Education: Pension Accounting (2004-2005), Deferred Compensation &
Benefits (2005)

WRDS Advisory Committee, 2005-2019.

Quinquennial Review Committees: Risk Management and Decision Processes Center, 2005;
Human Resources Center, 2009; Operations and Information Mgmt. Department, 2010;
Zell-Lurie Real Estate Center, 2012; Leadership Center, 2020.

*Wharton Connect: On Campus* Program: Alumni presentation, Fall 2007.

*Wharton Women in Business* Conference, Panel Moderator, Fall 2008.

Wharton New Faculty Orientation: Research Panel, Fall 2008 and Fall 2011.

Wharton MBA and Undergraduate Curriculum Committee, 2008-2010.

Dean's Advisory Council, 2009-2010.

## OTHER PROFESSIONAL EXPERIENCE

### Consulting Practice, 2001-Present

Expert testimony on executive compensation and incentives, stock options, insider trading,
corporate governance, valuation, and general analysis of finance and accounting issues.

### Northeastern University, 1992-1993

Program Manager, High Technology MBA.

**Appendix I**

**Raytheon Company, 1989-1991**
  Procurement Management Program, Electronics Group.

**Appendix II**

## Sworn Testimony of Wayne R. Guay in Past Four Years

**Arbitration**

The Baha Community Property v. Jeffrey Gundlach and DoubleLine Capital GP, JAMS Case No. 1220064308 (2021)

**Deposition**

Arthurs et al. v. AIG Financial Products Corp., Superior Court of Connecticut, NO: X08-FST-CV19-6046057-S (2022)

David Duquette et al. v. Lux Capital Management, LLC, American Arbitration Association, No. 01-20-0019-3259 (2022)

Aaron Katzel v. American International Group, Inc., U.S. District Court, Southern District of New York, No. 20-cv-07220-AKH (2022)

Burke America Parts Group LLC v. F3C Parts LLC, Court of Chancery of the State of Delaware, No. 2021-0245-JTL (2022)

Robert A Davidow and Howard Marks v. Dov Seidman et al., Court of Chancery of the State of Delaware, No. 2019-0150-MTZ (2021)

Kelly & Kelley, LLC v. Patricia Hemingway Hall et al. and Health Care Service Corporation, Circuit Court, St. Clair County, Illinois, No. 15-CH-695 (2021)

Sean Rad et al. v. IAC/Interactive Corp and Match Group, Inc., Supreme Court of the State of New York, County of New York, No. 654038/2018 (2021)

SEB Investment Management AB v. Symantec Corporation, U.S. District Court, Northern District of California, No. 3:18-cv- 02902 -WHA (2021)

In re: The Allstate Corporation Securities Litigation, U.S. District Court, Northern District of Illinois, Eastern Division, No. 16-cv-10510 (2020)

NECA-IBEW Pension Trust Fund v. Precisions Castparts Corp., U.S. District Court, District of Oregon, Portland Division, No. 3:16-cv-01756-YY (2020)

Cambridge Retirement System v. Willis Towers Watson plc., U.S. District Court, Eastern District of Virginia, Alexandria Division, No. 1:17-cv-01338 (2020)

Levy v. Thomas Gutierrez, Apple, Inc. et al., U.S. District Court, District of New Hampshire, No. 1:14-cv-00443-JL. (2019)

Shenwick v. Twitter, Inc. et al., U.S. District Court, Northern District of California, No. 3:16-cv-05314-JST. (2019)

**Appendix III**

# Materials Considered List

## Academic Articles

- A. Bodnaruk et al. (2008), "Shareholder Diversification and the Decision to Go Public," *The Review of Financial Studies*, 21(6), pp. 2779–2824.

- A. D. Jagolinzer (2009), "SEC Rule 10b5-1 and Insiders' Strategic Trade," *Management Science*, 55(2), pp. 224–239.

- A. D. Jagolinzer, D. F. Larcker, and D. J. Taylor (2011), "Corporate Governance and the Information Content of Insider Trades," *Journal of Accounting Research*, 49(5), pp. 1249–1274.

- A. H. Choi (2018), "Concentrated Ownership and Long-Term Shareholder Value," *Harvard Business Law Review*, 8(1), pp. 53–99.

- B. D. Jordan, S. Kim, and M. H. Liu (2016), "Growth Opportunities, Short-Term Market Pressure, and Dual-Class Share Structure," *Journal of Corporate Finance*, 41, pp. 304–328.

- C. Cao, L. C. Field, and G. Hanka (2004), "Does Insider Trading Impair Market Liquidity? Evidence from IPO Lockup Expirations," *The Journal of Financial and Quantitative Analysis*, 39(1), pp. 25–46.

- D. Aggarwal et al. (2022), "The Rise of Dual-Class Stock IPOs," *Journal of Financial Economics*, 144(1), pp. 122–153.

- D. Hong (2023), "CEO Discretionary Power, Unconstrained Stock Ownership, and Stock Trading: Theory and Evidence," *Advances in Accounting*, 61, Article 100656, pp. 1–16.

- D. Jenter (2005), "Market Timing and Managerial Portfolio Decisions," *The Journal of Finance*, 60(4), pp. 1903–1949.

- E. M. Fich, R. Parrino, and A. L. Tran (2015), "Timing Stock Trades for Personal Gain: Private Information and Sales of Shares by CEOs," Working Paper.

- E. Ofek and D. Yermack (2000), "Taking Stock: Equity-Based Compensation and the Evolution of Managerial Ownership," *The Journal of Finance*, 55(3), pp. 1367–1384.

- J. C. Bettis, J. L. Coles, and M. L. Lemmon (2000), "Corporate Policies Restricting Trading by Insiders," *Journal of Financial Economics*, 57(2), pp. 191–220.

- J. C. Bettis, J. M. Bizjak, and M. L. Lemmon (2001), "Managerial Ownership, Incentive Contracting, and the Use of Zero-Cost Collars and Equity Swaps by Corporate Insiders," *The Journal of Financial and Quantitative Analysis*, 36(3), pp. 345–370.

- J. C. Bettis, J. M. Bizjak, and M. L. Lemmon (2005), "Exercise Behavior, Valuation, and the Incentive Effects of Employee Stock Options," *Journal of Financial Economics*, 76(2), pp. 445–470.

**Appendix III**

- J. E. Core and W. R. Guay (2010), "Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework," *Academy of Management Perspectives*, 24(1), pp. 5–19.

- J. E. Core, W. R. Guay, and D. F. Larcker (2003), "Executive Equity Compensation and Incentives: A Survey," *FRBNY Economic Policy Review*, 9(1), pp. 27–50.

- K.J. M. Cremers, L. P. Litov, and S. M. Sepe (2017), "Staggered Boards and Long-Term Firm Value, Revisited," *Journal of Financial Economics*, 126(2), pp. 422–444.

- L. C. Field and G. Hanka (2001), "The Expiration of IPO Share Lockups," *The Journal of Finance*, 56(2), pp. 471–500.

- L. Jin and S.P. Kothari (2008), "Effect of Personal Taxes on Managers' Decisions to Sell Their Stock," *Journal of Accounting and Economics*, 46(1), pp. 23–46.

- M. T. Henderson, A. D. Jagolinzer, and K. A. Muller (2014), "Offensive Disclosure: How Voluntary Disclosure Can *Increase* Returns from Insider Trading," *The Georgetown Law Journal*, 103(5), pp. 1275–1306.

- R. Adams, H. Almeida, and D. Ferreira (2009), "Understanding the Relationship Between Founder–CEOs and Firm Performance," *Journal of Empirical Finance*, 16(1), pp. 136–150.

- R. A. Heron and E. Lie (2017), "Do Stock Options Overcome Managerial Risk Aversion? Evidence from Exercises of Executive Stock Options," *Management Science*, 63(9), pp. 3057–3071.

- R. Fahlenbrach (2009), "Founder-CEOs, Investment Decisions, and Stock Market Performance," *The Journal of Financial and Quantitative Analysis*, 44(2), pp. 439–466.

- S. N. Kaplan and B. A. Minton (2012), "How Has CEO Turnover Changed?" *International Review of Finance*, 12(1), pp. 57–87.

- T. Hemmer, S. Matsunaga, and T. Shevlin (1998), "Optimal Exercise and the Cost of Granting Employee Stock Options with a Reload Provision," *Journal of Accounting Research*, 36(2), pp. 231–255.

**Books and Book Chapters**

- A. Edmans, X. Gabaiz, and D. Jenter (2017), "Executive Compensation: A Survey of Theory and Evidence," in *The Handbook of the Economics of Corporate Governance*, Volume 1, B. E. Hermalin and M. S. Weisbach eds., Amsterdam, Netherlands: North-Holland, pp. 383–539.

- R. A. Brealey, S. C. Myers, and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin.

- W. L. Megginson and S. B. Smart (2009), *Introduction to Corporate Finance*, 2nd ed., Mason, OH: South-Western Cengage Learning, available at http://cws.cengage.co.uk/megginson/.

**Data Sources**

- *CRSP*
- EDGAR Insider Transactions Data Sets, *SEC*, available at https://www.sec.gov/dera/data/form-345
- Insider Monitor
- *S&P Capital IQ*

**Depositions**

- Deposition of Kevin A. Plank, February 15, 2023, and Exhibits.

**Expert Reports**

- Expert Report of Professor M. Todd Henderson, April 3, 2023, and Backup Materials.

**Legal Documents**

- Consolidated Third Amended Complaint for Violations of the Federal Securities Laws, *In re Under Armour Securities Litigation*, United States District Court for the District of Maryland, Civil Action No. RDB-17-388, October 14, 2020.
- Memorandum Opinion, *In re Under Armour Securities Litigation*, United States District Court for the District of Maryland, Civil Action No. RDB-17-388, May 18, 2021.

**Press Releases**

- Under Armour, Inc. Press Release, "Under Armour, Inc. Plans to List on the NYSE," November 16, 2006.
- Under Armour, Inc. Press Release, "Under Armour Announces a Two-For-One Stock Split," June 11, 2012.
- Under Armour, Inc. Press Release, "Under Armour Announces a Two-For-One Stock Split," March 17, 2014.
- Under Armour, Inc. Press Release, "Under Armour Reports Third Quarter Net Revenues Growth of 28%; Raises Full Year Outlook," October 22, 2015.
- Under Armour, Inc. Press Release, "Under Armour Announces Class C Stock Dividend," March 16, 2016.
- Under Armour, Inc. Press Release, "Under Armour Announces Class C Stock Dividend Related to Settlement," June 3, 2016.
- Under Armour, Inc. Press Release, "Under Armour Announces Final Ratio for Class C Stock Dividend," June 16, 2016.

- Zillow Group, Inc. Press Release, "Zillow Group Announces Stock Dividend, Creation of Class C Shares," July 21, 2015.

**Produced Documents**

- "Plank and Related Entities Sell More than $57 Million of Under Armour Stock," *The Baltimore Sun*, November 19, 2015, available at http://www.baltimoresun.com/business/under-armour-blog/bs-bz-plank-sells-shares-20151119-story.html, SV00000038–9.

- Email chain from Bradford Shusman to Phil Akins, "RE: 10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," November 23, 2015, SV00000032–3.

- Email chain from Bradford Shusman to Phil Akins, "RE: 10b5-1 Summary: 250,000 UA shares sold on 4/29/16 @ $40.85/share," April 29, 2016, SV00000252–3.

- Email chain from Bradford Shusman to Tom Geddes, "FW: 10b5-1 Summary: 250,000 UA Class C shares sold on 4/26/16 @ $44.15/share," April 26, 2016, SV00000244–5.

- Email chain from Bradford Shusman to Tom Geddes, "RE: 10b5-1," November 17, 2015, SV00000018.

- Email chain from Bradford Shusman to Tom Geddes, "RE: 10b5-1," November 17, 2015, SV00000022–3.

- Email chain from Bradford Shusman to Tom Geddes, "RE: 10b5-1," April 24, 2016, SV00000239.

- Email chain from Kevin Plank to Tom Geddes, "Re: 10b5-1," April 26, 2016, SV00000241.

- Email chain from Kristi Adkins to Tom Geddes, "RE: 10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," December 2, 2015, SV00000042–3.

- Email chain from Lucy Campbell to Phil Akins, "RE: shares sales," November 12, 2015, SV00000011–2.

- Email chain from Lucy Campbell to Phil Akins, "RE: shares sales," November 13, 2015, SV00000015–6.

- Email chain from Phil Akins to Bradford Shusman, "Re: 10b5-1 Summary: 250,000 UA shares sold on 11/17/15 @ $85.54/share," November 18, 2015, SV00000024.

- Email chain from Phil Akins to Bradford Shusman, "Re: 10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," November 23, 2015, SV00000030–1.

- Email chain from Phil Akins to Bradford Shusman, "Re: 10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," November 24, 2015, SV00000034–6.

- Email chain from Phil Akins to Bradford Shusman, "Re: 10b5-1 Summary: 250,000 UA shares sold on 4/29/16 @ $40.85/share," April 29, 2016, SV00000250–1.

**Appendix III**

- Email chain from Phil Akins to Kristi Adkins, "FW: Presentation Materials," with attachments "Plank, Kevin A. - Asset Allocation and Performance Presentation - Feb. 1….pdf; Plank, Kevin A. - February 1, 2016.pdf," January 31, 2016, SV00000123–4.

- Email chain from Phil Akins to Lucy Campbell, "Re: shares sales," November 12, 2015, SV00000013–4.

- Email chain from Tom Geddes to Bradford Shusman, "Re: 10b5-1," November 17, 2015, SV00000020–1.

- Email chain from Tom Geddes to Kevin Plank, "RE: 10b5-1," April 26, 2016, SV00000242.

- Email chain from Tom Geddes to Kristi Adkins, "FW: 10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," December 2, 2015, SV00000040–1.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA Class C shares sold on 4/26/16 @ $44.15/share," April 26, 2016, SV00000243.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA Class C shares sold on 4/27/16 @ $42.49/share," April 27, 2016, SV00000246.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA Class C shares sold on 4/28/16 @ $42.57/share," April 28, 2016, SV00000247.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 11/17/15 @ $85.54/share," November 17, 2015, SV00000019.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 11/18/15 @ $86.00/share," November 18, 2015, SV00000025.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 11/19/15 @ $88.79/share," November 19, 2015, SV00000026.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 11/20/15 @ $91.52/share," November 20, 2015, SV00000027.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 11/23/15 @ $92.46/share," November 23, 2015, SV00000028–9.

- Email from Bradford Shusman to Kevin Plank, "10b5-1 Summary: 250,000 UA shares sold on 4/29/16 @ $40.85/share," April 29, 2016, SV00000248–9.

- Email from Bradford Shusman to Tom Geddes and Phil Akins, "review them in-person," with attachments "Plank, Kevin A. - Asset Allocation and Performance Presentation - Feb. 1….pdf; Plank, Kevin A. - February 1, 2016.pdf," January 31, 2016, SV00000044.

- Email from Lucy Campbell to Phil Akins, "shares sales," November 12, 2015, SV00000009.

- Email from Samuel Hoyle to Tom Geddes, "Estate planning," with attachment "SKMBT_C36015112303120.pdf," November 24, 2015, SV00000037.

- Email from Tom Geddes to Bradford Shusman, "10b5-1," November 17, 2015, SV00000017.

- Email from Tom Geddes to Bradford Shusman, "10b5-1," April 24, 2016, SV00000238.

- Email from Tom Geddes to Kevin Plank, "10b5-1," April 26, 2016, SV00000240.

- Goldman Sachs Presentation, "Kevin A. Plank," February 1, 2016, SV00000046–122.

- Goldman Sachs Presentation, "Kevin A. Plank," February 1, 2016, SV00000126–202.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for February 2015, PLANK_00001941–2142.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for March 2015, PLANK_00002143–578.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for December 2015, PLANK_00001191–610.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for February 2016, PLANK_00000099–554.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for June 2016, PLANK_00000555–874.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for August 2016, PLANK_00002579–852.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for October 2016, PLANK_00000875–1190.

- Kevin A. Plank Monthly Merrill Lynch Portfolio Statement for November 2016, PLANK_00001611–940.

- Kevin A. Plank Sales Plan dated August 30, 2016, UA_00237068–81.

- Plank Industries Presentation, "Monthly Financial Reporting Package," November 2015, SV00000204–37.

- SEC Testimony of Kevin A. Plank, Volume 1, March 3, 2020, KP00004570–900.

- SEC Testimony of Kevin A. Plank, Volume 2, March 4, 2020, KP00004901–5213.

- SEC Testimony of Kevin A. Plank, Volume 3, March 5, 2020, KP00005214–412.

- Under Armour Insider Trading Policy, UA_00686332–5.

- Under Armour Insider Trading Policy last revised August 3, 2018, UA_00686328–31.

- Under Armour Stock Sales in 2015, SV00000347.

- Under Armour Stock Sales in April 2016, SV00000344.

- Under Armour Stock Sales in November 2015 and April 2016, SV00000334–41.

- Under Armour Teammate Handbook updated September 1, 2015, UA_01108746–835.

**Public Press and Social Media**

- "Being Public Can Be Great – If You Do It the Right Way," *LinkedIn*, July 15, 2015, available at https://www.linkedin.com/pulse/being-public-can-great-you-do-right-way-spencer-rascoff/.

- "CEO Tenure Drops to Just Five Years," *Equilar*, January 19, 2018, available at https://www.equilar.com/blogs/351-ceo-tenure-drops-to-five-years.html.

- "Under Armour Founder Kevin Plank Is Stepping Down as CEO," *CNN Business*, October 22, 2019, available at https://www.cnn.com/2019/10/22/business/under-armour-kevin-plank-ceo/index.html.

- "Under Armour Settles Shareholder Lawsuit," *SGB Media*, October 9, 2015, available at https://sgbonline.com/under-armour-settles-shareholder-lawsuit/.

**SEC Filings**

- Comcast Corporation, SEC Form 10-K for FY 2002, filed March 20, 2003.

- Constellation Brands, Inc., SEC Form 10-K for FY 2016, filed April 25, 2016.

- Google Inc., SEC Form 8-A, filed March 26, 2014.

- Google Inc., SEC Form 10-K for FY 2015, filed February 11, 2016.

- Google Inc., SEC Form Def 14A, filed May 9, 2012.

- Google Inc., SEC Form S-1, filed April 29, 2004.

- New Relic, Inc., SEC Forms 4 and 5 for Lew Cirne, filed 2015–2019.

- Oracle Corporation, SEC Forms 4 for Safra Catz, filed 2016–2019.

- RE/MAX Holdings, Inc., SEC Form 10-K for FY 2015, filed February 26, 2016.

- Synopsys, Inc., SEC Forms 4 and 5 for Aart de Geus, filed 2015–2019.

- Under Armour, Inc., SEC Form 3 for Kevin A. Plank, filed November 17, 2005.

- Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2007, 2011–2019.

- Under Armour, Inc., SEC Forms 4/**A** for Kevin A. Plank, filed 2005, 2016–2017.

- Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2011–2014.

- Under Armour, Inc., SEC Form 8-K, filed November 3, 2015.

- Under Armour, Inc., SEC Form 10-K for FY 2005, filed March 15, 2006.

- Under Armour, Inc., SEC Form 10-K for FY 2006, filed February 28, 2007.

- Under Armour, Inc., SEC Form 10-K for FY 2015, filed February 22, 2016.

- Under Armour, Inc., SEC Form 10-K for FY 2019, filed February 26, 2020.

- Under Armour, Inc., SEC Form 10-Q for Q3 2015, filed November 4, 2015.

- Under Armour, Inc., SEC Form 424B1, filed November 18, 2005.

- Under Armour, Inc., SEC Forms Def 14A, filed 2006–2020.

- Under Armour, Inc., SEC Form Def 14A, filed March 24, 2022.

- Under Armour, Inc., SEC Form Pre 14A, filed April 1, 2020.

- Under Armour, Inc., SEC Form S-8, filed April 20, 2016.

- Under Armour, Inc., SEC Form SC 13D for Kevin A. Plank, filed December 5, 2005.

- Workday, Inc., SEC Forms 4 and 5 for Aneel Bhusri, filed 2015–2019.

- Workday, Inc., SEC Form 424B4, filed October 15, 2012.

- Zillow, Inc., SEC Form 424B4, filed July 20, 2011.

- Zillow Group, Inc., SEC Form 8-A, filed July 29, 2015.

**Websites and Other Online Content**

- "Amended and Restated Articles of Incorporation," *Under Armour, Inc.*, July 2020, available at https://about.underarmour.com/content/dam/ua/investor-relations/Under%20Armour%20Inc.%20-%20Articles%20of%20Incorporation.pdf.

- "Corporate Governance," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/corporate-governance.html.

- "Final Rule: Insider Trading Arrangements and Related Disclosures," *SEC*, December 14, 2022, available at https://www.sec.gov/rules/final/2022/33-11138.pdf.

- "Final Rule: Selective Disclosure and Insider Trading," *SEC*, August 21, 2000, available at https://www.sec.gov/rules/final/33-7881.htm.

- "Limit Orders," *SEC*, March 10, 2011, available at https://www.sec.gov/answers/limit.htm.

- "Ownership Profile," *Estée Lauder Companies*, available at https://www.elcompanies.com/en/investors/stock-information/ownership-profile.

- "Stock Information," *Under Armour, Inc.*, available at https://about.underarmour.com/en/investors/stock-information.html.

- "Watch Insider Trade Stocks," *Insider Monitor*, available at https://www.insider-monitor.com/.

**Exhibit 1**

## Under Armour, Inc.
## Kevin A. Plank's Annual Compensation by Type
### 2005–2019

| | Cash-Based Compensation | | Equity-Based Compensation | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Base Salary | Non-Equity Incentive Compensation[1] | Conditional Equity Grants (RSU/PSU)[2] | Conditional Option Grants (Performance- and Time-Based) | All Other Compensation[3] | Value of Equity-Based Compensation | Total Compensation | Equity Share of Total Compensation |
| | [A] | [B] | [C] | [D] | [E] | [F]=[C]+[D] | [G]=[A]+[B]+[E]+[F] | [H]=[F]/[G] |
| 2005 | $500,000 | $1,000,000 | $2,380 | $0 | $24,873 | $2,380 | $1,527,253 | 0.2% |
| 2006 | $500,000 | $0 | $378 | $0 | $22,920 | $378 | $523,298 | 0.1% |
| 2007 | $500,000 | $1,000,000 | $346 | $0 | $28,310 | $346 | $1,528,656 | 0.0% |
| 2008 | $26,000 | $0 | $0 | $0 | $4,002 | $0 | $30,002 | 0.0% |
| 2009 | $26,000 | $718,575 | $0 | $0 | $3,486 | $0 | $748,061 | 0.0% |
| 2010 | $26,000 | $1,289,750 | $0 | $0 | $3,259 | $0 | $1,319,009 | 0.0% |
| 2011 | $26,000 | $1,100,000 | $0 | $0 | $3,417 | $0 | $1,129,417 | 0.0% |
| 2012 | $26,000 | $1,500,000 | $0 | $0 | $3,623 | $0 | $1,529,623 | 0.0% |
| 2013 | $26,000 | $2,375,000 | $784,226 | $0 | $3,262 | $784,226 | $3,188,488 | 24.6% |
| 2014 | $26,000 | $1,921,500 | $1,600,000 | $0 | $8,690 | $1,600,000 | $3,556,190 | 45.0% |
| 2015 | $26,000 | $400,000 | $0 | $2,000,000 | $8,209 | $2,000,000 | $2,434,209 | 82.2% |
| 2016 | $26,000 | $0 | $0 | $2,000,000 | $7,575 | $2,000,000 | $2,033,575 | 98.3% |
| 2017 | $26,000 | $0 | $0 | $4,000,000 | $8,341 | $4,000,000 | $4,034,341 | 99.1% |
| 2018 | $26,000 | $2,520,000 | $0 | $4,000,000 | $10,629 | $4,000,000 | $6,556,629 | 61.0% |
| 2019 | $26,000 | $1,920,000 | $0 | $4,000,000 | $8,169 | $4,000,000 | $5,954,169 | 67.2% |
| Average (2005–2019) | $120,800 | $1,049,655 | $159,155 | $1,066,667 | $9,918 | $1,225,822 | $2,406,195 | 31.8% |

Source:  Under Armour, Inc., SEC Forms Def 14A, filed 2006–2020

Note:
[1] In 2005, non-equity incentive compensation comes solely from a cash bonus.  After 2005, it reflects the amounts paid pursuant to the annual incentive and deferred compensation plans discussed in the Def 14A for each year.
[2] This table excludes performance-based stock units that were not expected to be earned as of the date the respective Def 14A was filed.
[3] Includes compensation such as matching contributions under Under Armour's 401(k) plan, insurance premiums for disability and life insurance, tax reimbursements on insurance premiums, and personal use of a company-leased car.

**Exhibit 2**



## Under Armour, Inc.
## Percentage of Outstanding Shares Beneficially Owned by Kevin A. Plank
### 12/31/05–3/6/20

Source:  Under Armour, Inc., SEC Forms Def 14A, filed 2006–2020

Note:  Percentage of shares beneficially owned by Kevin A. Plank includes all Class A, B, and C common stock held directly or indirectly by Mr. Plank, and also includes options that are exercisable within 60 days from the reporting date.  Values shown are as reported in Under Armour's SEC Form Def 14A "Statement of Beneficial Ownership."  Under Armour's first SEC Def 14A was filed April 25, 2006 and reports Mr. Plank's ownership as of December 31, 2005.  Under Armour's subsequent SEC Form Def 14As report Mr. Plank's ownership in February or March as of the year filed.  The Class Period is from September 16, 2015, to November 1, 2019.

# Under Armour, Inc.
# Number of Common Shares Held by Kevin A. Plank as of Quarter End
## Q4 2005–Q4 2019



Source:  Under Armour, Inc., SEC Form 3 for Kevin A. Plank, filed November 17, 2005; Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019;  "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016;  Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017;  Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note:  Holdings include common stock owned indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) and directly by Mr. Plank on the last day of each quarter.  Mr. Plank's holdings begin on November 17, 2005, the date his Form 3 was filed.  Volume is adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding.  During several quarters, Mr. Plank held small amounts of Class A common stock (ranging approximately from 800 to 270,000 shares) which are included in the chart but not always visible.  The Class Period is from September 16, 2015 to November 1, 2019.



# Under Armour, Inc.
## Class A and Class C Closing Stock Prices
### 11/18/05–12/31/19

Source: *CRSP*; Kevin A. Plank, SEC Form 4 at Under Armour, Inc., filed August 2, 2012, May 1, 2014, and April 28, 2016; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note:  Prices of Under Armour Class A and Class C are adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding.  Under Armour began publicly trading on November 18, 2005.

# Under Armour, Inc.
## Number of Common Shares Sold by Kevin A. Plank in the Quarter
### Q4 2005–Q4 2019



Source:  Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019 ; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note:  Trade volume includes trades of securities owned directly and indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) by Mr. Plank. Volume is adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding.  Shares surrendered on vesting stock are shares surrendered to cover tax due on restricted stock when it vests.  The Class Period is from September 16, 2015 to November 1, 2019. Aggregate Pre-Class Period Sales and Aggregate Class Period Sales include sales made by Mr. Plank in the 18 quarters prior to and during the Class Period, respectively, and do not include gifts or shares surrendered on vesting stock.  On average, Mr. Plank sold 1.4 million shares per quarter in the Pre-Class Period and 0.2 million shares per quarter during the Class Period.

**Exhibit 6**



## Under Armour, Inc.
## Proceeds from Sales by Kevin A. Plank in the Quarter
### Q4 2005–Q4 2019

Source: *CRSP;* Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note: Proceeds includes trades of securities made indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) and directly by Mr. Plank. Shares surrendered on vesting stock are shares surrendered to cover tax due on restricted stock when it vests. Proceeds from sales are valued using sales price. Value of gifts and shares surrendered on vesting stock are valued using common stock price if sales price is not available. The Class Period is from September 16, 2015 to November 1, 2019. Aggregate Pre-Class Period Sales and Aggregate Class Period Sales include sales made by Mr. Plank in the 18 quarters prior to and during the Class Period, respectively, and do not include gifts or shares surrendered on vesting stock. On average, Mr. Plank sold $25.2 million per quarter in the Pre-Class Period and $7.7 million per quarter during the Class Period.

**Exhibit 7**

# Under Armour, Inc.
## Class A and C Common Stock Sales Volume By Kevin A. Plank By Year
### 2011–2019



Source:  Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019;  "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016;  Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017;  Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note:  Sales volume includes sales of securities made indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) and directly by Mr. Plank.  Gifts and surrender of shares to cover tax on vesting restricted stock are not included.  Sales volume is adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding.  The Class Period is from September 16, 2015 to November 1, 2019.



## Under Armour, Inc.
## Class A and C Common Stock Annual Proceeds from Sales By Kevin A. Plank
### 2011–2019

Source:  *CRSP*; Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms Def 14A, filed 2017–2018; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016

Note:  Proceeds includes sales of securities made indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) and directly by Mr. Plank.  Gifts and surrender of shares to cover tax on vesting restricted stock are not included.  The Class Period is from September 16, 2015 to November 1, 2019.

**Exhibit 9**

## Proceeds from CEO Trading during the Class Period
## All CEOs
### 9/16/15–11/1/19



Source: EDGAR Insider Transactions Data Sets, *SEC* , available at https://www.sec.gov/dera/data/form-345

Note: Following Prof. Henderson's methodology, CEOs are defined as insiders whose title contains "Chief Executive" or "CEO." Out of the 2,798 CEOs in this analysis, Kevin Plank had the 56th largest trading proceeds, with proceeds of $138,231,428.

**Exhibit 10**



## Proceeds from CEO Trading during the Class Period
## Founder CEOs
9/16/15–11/1/19

Source:  EDGAR Insider Transactions Data Sets, *SEC*, available at https://www.sec.gov/dera/data/form-345; *S&P Capital IQ*

Note:  Following Prof. Henderson's methodology, CEOs are defined as insiders whose title contains "Chief Executive" or "CEO."  Founders are identified using CapIQ.  Out of the 170 total founder CEOs in this analysis, Kevin Plank had the 21st largest trading proceeds, with proceeds of $138,231,428.

# Under Armour, Inc.
## Kevin A. Plank's Sales as a Percentage of Holdings at Quarter Beginning
### Q4 2005–Q4 2019



Source:  Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note:  Holdings include securities owned directly and indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) by Mr. Plank on the first day of each quarter, with the exception of Q4 2005 which reflects holdings as of November 17, 2005, the first day of Under Armour's initial public offering.  Sales include securities sold directly and indirectly by Mr. Plank over the quarter.  Volume is adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding.  The Class Period is from September 16, 2015 to November 1, 2019.

## Under Armour, Inc.
## Number of Securities Held by Kevin A. Plank as of Quarter End
### Q4 2005–Q4 2019



Source: Under Armour, Inc., SEC Form 3 for Kevin A. Plank, filed November 17, 2005; Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note: Holdings include securities owned directly and indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) by Mr. Plank on the last day of each quarter. Mr. Plank's holdings begin on November 17, 2005, the date his Form 3 was filed. Volume is adjusted for two-for-one stock splits that occurred on July 10, 2012 and on April 15, 2014; the Class C dividend on April 7, 2016, whereby shareholders received one share of Class C common stock for each share of Class A and Class B common stock outstanding; and the "Adjustment Payment Dividend" on June 29, 2016, whereby shareholders received 0.007098 of a share of Class C common stock for each share of Class C common stock outstanding. The Class Period is from September 16, 2015 to November 1, 2019. "Other" includes vested options, unvested options, unvested performance stock units, and unvested restricted stock units.



## Under Armour, Inc.
## Value of Securities Held by Kevin A. Plank as of Quarter End
### Q4 2005–Q4 2019

Source: *CRSP;* Under Armour, Inc., SEC Form 3 for Kevin A. Plank, filed November 17, 2005; Under Armour, Inc., SEC Forms 4 for Kevin A. Plank, filed 2005–2019; Under Armour, Inc., SEC Forms 5 for Kevin A. Plank, filed 2005–2019; "Under Armour Announces Class C Stock Dividend Related to Settlement," Under Armour, Inc., June 3, 2016; Under Armour, Inc., SEC Form Def 14A, filed April 13, 2017; Under Armour, Inc., SEC Form Def 14A, filed March 28, 2018

Note: Holdings include securites owned directly and indirectly (through KD Plank, LLC; KD Plank #2, LLC; and Plank Family Trust) by Mr. Plank on the last day of each quarter. Mr. Plank's holdings begin on November 17, 2005, the date his Form 3 was filed. "Other" includes vested options, unvested options, unvested performance stock units, and unvested restricted stock units. Options are valued based on intrinsic value (*i.e.*, market price at the end of the quarter less strike price). The Class Period is from September 16, 2015 to November 1, 2019.