# EXHIBIT 49
# [Filed Under Seal]

CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3

4    ----------------------------------)

5    IN RE UNDER ARMOUR SECURITIES      )Civil No.

6    LITIGATION                         )RDB-17-388

7    ----------------------------------)

8

9                    CONFIDENTIAL

10

11       Videotaped Deposition of KEVIN A. PLANK,

12       held at 100 International Drive, Baltimore,

13       Maryland, commencing at 10:03 a.m.,

14       Wednesday, February 15, 2023, before

15       Tina M. Alfaro, a Notary Public within

16       and for the State of Maryland.

17

18

19

20

21    JOB No. 5630283

22    PAGES 1 - 349

                                        Page 1

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.  I think you need to clarify that, but | 10:27:27 |
| 2 | yes. | 10:27:29 |
| 3 | Q.  You understand what I'm referring to when | 10:27:29 |
| 4 | I refer to pull-forwards? | 10:27:31 |
| 5 | MR. REISNER:  Same objection. | 10:27:33 |
| 6 | A.  Your definition I don't think is accurate | 10:27:33 |
| 7 | that you can put that on one side.  I can't | 10:27:34 |
| 8 | delineate between Under Armour's request or a | 10:27:38 |
| 9 | customer's request.  They're the same thing. | 10:27:40 |
| 10 | Q.  One of the definitions of pull-forward at | 10:27:45 |
| 11 | Under Armour included Under Armour reaching out to | 10:27:48 |
| 12 | a customer, asking the customer to take the product | 10:27:50 |
| 13 | in a quarter earlier than they originally requested | 10:27:52 |
| 14 | so that Under Armour could hit certain reported | 10:27:55 |
| 15 | financial metrics, right? | 10:27:57 |
| 16 | MR. REISNER:  Objection to form.  You may | 10:27:59 |
| 17 | answer. | 10:27:59 |
| 18 | A.  Yeah. | 10:27:59 |
| 19 | Q.  And you were aware in that time period | 10:28:00 |
| 20 | that I've been asking about, the third quarter of | 10:28:02 |
| 21 | 2015 through the first quarter of 2017, that Under | 10:28:06 |
| 22 | Armour would ask customers to take product in the | 10:28:09 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1              As the chief executive officer, sir, you      10:38:21
 2    were aware that from time to time some of Under          10:38:22
 3    Armour's pull-forwards were done to help Under           10:38:24
 4    Armour meet a financial objective, right?                10:38:27
 5         A.  Yes.  We've said that a few times now.          10:38:30
 6         Q.  We talked about the North American              10:38:35
 7    business earlier.  During the time period that I've      10:38:37
 8    been asking about, 3Q '15 to 1Q '17, North American      10:38:41
 9    revenue growth was an important financial metric         10:38:45
10    for Under Armour's overall business, right?              10:38:51
11         A.  Growth in any light is important for our        10:38:53
12    business, yeah.                                          10:38:55
13         Q.  In particular growth in the North American      10:38:55
14    business?                                                10:38:57
15         A.  Of course.  It's the largest region.           10:38:57
16         Q.  I'm sorry.  I didn't mean to cut you off.      10:39:00
17         A.  It was our largest region.                      10:39:02
18         Q.  Let's go back to Exhibit 1.  Please open        10:39:07
19    to page 196.  So Exhibit 1, page 196, let's look at      10:39:10
20    line 11.  You were asked "Do you recall the first        10:39:39
21    quarter where -- in 2016 where Under Armour did not      10:39:43
22    reflect greater than 20 percent revenue growth in        10:39:46
```

Page 44

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | aside. | 10:42:48 |
| 2 | During that time, the third quarter of '15 | 10:42:49 |
| 3 | to the first quarter of '17, no one from Under | 10:42:53 |
| 4 | Armour had any discussions with any disclosure | 10:42:58 |
| 5 | experts about whether Under Armour should publicly | 10:42:59 |
| 6 | disclose its use of pull-forwards to hit financial | 10:43:02 |
| 7 | targets, right? | 10:43:04 |
| 8 | MR. REISNER:  Objection to form.  You may | 10:43:05 |
| 9 | answer. | 10:43:07 |
| 10 | A.  Well, we have a disclosure committee, | 10:43:07 |
| 11 | outside auditors, our own experts, legal counsel. | 10:43:10 |
| 12 | So I can't speak factually to whether anyone | 10:43:14 |
| 13 | discussed that or not, but I know it never was a | 10:43:17 |
| 14 | discussion or something that we contemplated as | 10:43:19 |
| 15 | being an option that we should put on the table or | 10:43:21 |
| 16 | even discussed. | 10:43:24 |
| 17 | Q.  Sir, could you please pull Exhibit 1 back | 10:43:30 |
| 18 | out again.  Let's look at page 106.  At page 106 of | 10:43:32 |
| 19 | Exhibit 1 let's look at lines 4 to 13.  Sir, you | 10:43:54 |
| 20 | were asked "Mr. Plank, you mentioned that you | 10:43:58 |
| 21 | didn't recall personally having conversations with | 10:44:00 |
| 22 | any of the disclosure experts about the | 10:44:04 |

Page 48

CONFIDENTIAL

```
1        Q.  You didn't have any role with the        10:47:45

2    disclosure committee, right?                     10:47:46

3            MR. REISNER:  Objection to form.          10:47:48

4        A.  No.                                       10:47:48

5        Q.  And you never raised any issues with the  10:47:50

6    disclosure committee as to whether an issue needed  10:47:53

7    to be disclosed relating to Under Armour's use of  10:47:56

8    pull-forward, right?                             10:47:59

9        A.  I never had that dialogue with the       10:48:00

10   disclosure committee, no.                        10:48:04

11       Q.  Let's talk about the Under Armour board of  10:48:07

12   directors.  You don't recall that the issue of   10:48:11

13   pull-forward was ever raised during any board of  10:48:13

14   directors meeting for the time period I've been   10:48:16

15   asking about, 3Q '15 to 1Q '17, right?           10:48:18

16       A.  Well, we had two industry experts on our  10:48:25

17   board from Harvey Sanders to Karen Katz, and no,  10:48:27

18   that topic would never come up as it's an industry  10:48:32

19   practice.                                        10:48:35

20       Q.  The topic of pull-forwards never came up  10:48:37

21   in any board meetings, right?                    10:48:38

22       A.  I don't believe so.                      10:48:40
```

Page 52

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  You don't recall ever having had any | 10:48:44 |
| 2 | discussions with Under Armour board folks regarding | 10:48:46 |
| 3 | the topic of Under Armour using pull-forward to hit | 10:48:49 |
| 4 | revenue targets during 3Q '16, right? | 10:48:52 |
| 5 | A.  Yeah, I don't believe so. | 10:48:56 |
| 6 | Q.  You don't recall ever having had any | 10:49:03 |
| 7 | discussions with anyone, either internal Under | 10:49:05 |
| 8 | Armour folks or external advisors, about whether | 10:49:09 |
| 9 | Under Armour using pull-forward to hit financial | 10:49:12 |
| 10 | metrics was information that a reasonable investor | 10:49:16 |
| 11 | might have wanted to know when making decisions | 10:49:18 |
| 12 | about whether to purchase Under Armour securities, | 10:49:21 |
| 13 | right? | 10:49:23 |
| 14 | MR. REISNER:  Objection to form.  You may | 10:49:23 |
| 15 | answer. | 10:49:24 |
| 16 | A.  There was no thought that anything we were | 10:49:25 |
| 17 | doing was not transparent or being completely clear | 10:49:27 |
| 18 | on what our reported revenue was. | 10:49:31 |
| 19 | Q.  Let's look at Exhibit 2 and please open to | 10:49:35 |
| 20 | page 490.  This is the March 4th, 2020 testimony. | 10:49:39 |
| 21 | At page 490 let's look at line 11.  You were asked | 10:50:06 |
| 22 | "Okay.  And did you ever have any discussions when | 10:50:09 |

Page 53

CONFIDENTIAL

```
 1   mischaracterizes the reported.                    11:12:03

 2       A.  I believe that was Mr. Bergman's          11:12:04

 3   characterization.  Can we go back and hear that   11:12:06

 4   again?                                            11:12:08

 5       Q.  Yeah.  Can we play it again, please.      11:12:09

 6               (Audio recording played.)             11:12:24

 7   BY MR. HENSSLER:                                  11:12:41

 8       Q.  That was your voice that just said "That's 11:12:41

 9   a clean 9 percent, that's without any additional  11:12:43

10   pull-forwards from Q2," right?                    11:12:43

11           MR. REISNER:  Objection, asked and        11:12:45

12   answered.  You may answer again.                  11:12:45

13       A.  Yes.                                       11:12:47

14           MR. HENSSLER:  Okay.  Let's play again.   11:12:48

15               (Audio recording played.)             11:12:53

16   BY MR. HENSSLER:                                  11:12:54

17       Q.  Who's voice is that?                       11:12:54

18       A.  That's Dave Bergman.                       11:12:56

19               (Audio recording played.)             11:13:07

20   BY MR. HENSSLER:                                  11:13:44

21       Q.  So that was Mr. Bergman who said "No, the 11:13:44

22   natural growth rate would be 4 percent in Q1"?    11:13:46
```

Page 62

CONFIDENTIAL

```
 1        A.  Yes.                                    11:13:53

 2        Q.  And then we heard you say "Why don't we  11:13:53

 3   see what we can take out of Q4 and hold that back,  11:13:56

 4   like to me it's a minimum of 50 million bucks that  11:14:02

 5   gets you naturally to that 9, 10 percent," right?  11:14:06

 6        A.  Yes.                                    11:14:13

 7        Q.  This December 12th, 2016 Under Armour   11:14:13

 8   executive meeting was not the only time that you  11:14:18

 9   and Under Armour executives discussed Under        11:14:19

10   Armour's revenue growth without pull-forward as    11:14:22

11   natural growth, right?                            11:14:26

12        A.  I don't recall.                          11:14:28

13               (Plank Exhibit 6 was marked           11:14:35

14                for identification.)                 11:14:35

15   BY MR. HENSSLER:                                  11:14:35

16        Q.  Okay.  Let's mark the next exhibit.  It's  11:14:35

17   going to be another audio file.  This will be     11:14:37

18   Exhibit 6 to today's deposition.  For the record,  11:14:39

19   Exhibit 6 is UA_00319248 and from the production we  11:14:43

20   understand that this audio is from a December 17,  11:14:51

21   2015 Under Armour executive meeting and another   11:14:56

22   long recording that we will play a part of.  Let's  11:15:00
```

Page 63

CONFIDENTIAL

```
 1        A.  I believe that's what he said.        11:17:28

 2        Q.  And he also said that parts of the 2015    11:17:33

 3   revenue growth that Under Armour was showing isn't  11:17:37

 4   really natural growth, right?                 11:17:40

 5        A.  I don't recall that from that.       11:17:42

 6        Q.  He identified about 90 million in revenue  11:17:50

 7   that isn't really our natural growth, right?   11:17:54

 8        MR. REISNER:  Objection to form.  Are you  11:17:58

 9   asking him whether he remembers that he said that  11:18:02

10   on the excerpt that you just played?          11:18:04

11        MR. HENSSLER:  Yeah.  We just heard      11:18:05

12   Mr. Bergman say that.                         11:18:07

13        A.  Yeah.  That's what he said.          11:18:08

14        Q.  That is what Mr. Bergman said during that  11:18:11

15   meeting to you in December of 2015, right?     11:18:13

16        A.  I don't have the benefit of context.  So  11:18:15

17   I'm trying to just remember exactly what that   11:18:17

18   90-second excerpt I was getting as I was getting a  11:18:20

19   piece of paper.  So...                         11:18:23

20        Q.  Understood.  And they're very long audios.  11:18:24

21   If they want to play the whole things for -- when  11:18:27

22   I'm done questioning, we can go through that.  What  11:18:29
```

Page 65

CONFIDENTIAL

```
 1   we're just trying to do is let the jury know who's    11:18:33

 2   saying what and what they're saying.                  11:18:37

 3          Mr. Bergman on that audio identified           11:18:49

 4   "Increased liquidation above plan, a business model   11:18:51

 5   change called 1220s where January orders were         11:18:54

 6   shipped in December, and pulling January orders       11:18:58

 7   into December as 2015 revenue items totaling around   11:19:01

 8   90 million that isn't really our natural revenue      11:19:06

 9   growth," right?                                        11:19:10

10          MR. REISNER:  Objection to form.  I'm          11:19:12

11   sorry.  What is the question?                          11:19:12

12          MR. HENSSLER:  That's what Mr. Bergman         11:19:15

13   said.                                                  11:19:16

14          MR. REISNER:  Objection to form.  You may      11:19:17

15   answer.                                                11:19:18

16      A.  I trust what you just read back is exactly     11:19:20

17   the transcript of what he said.                        11:19:22

18      Q.  You heard Mr. Bergman's voice state that,      11:19:24

19   right?                                                 11:19:27

20      A.  I did.  I heard him say something.  I          11:19:27

21   imagine it's what you just said.                       11:19:30

22      Q.  During any of the investor conference          11:19:35
```

Page 66

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Off the record 11:23. | 11:23:47 |
| 2 | (Short interruption.) | 11:23:53 |
| 3 | THE VIDEOGRAPHER:  We're back on the | 11:24:55 |
| 4 | record 11:25. | 11:25:11 |
| 5 | BY MR. HENSSLER: | 11:25:16 |
| 6 | Q.  So we'll start that clip over again, | 11:25:16 |
| 7 | Mr. Plank, and, again, this is a December 17th, | 11:25:21 |
| 8 | 2015 audio, which is Exhibit 6 to today's | 11:25:24 |
| 9 | deposition. | 11:25:28 |
| 10 | (Audio recording played.) | 11:25:30 |
| 11 | BY MR. HENSSLER: | 11:25:47 |
| 12 | Q.  We heard your voice and was that | 11:25:47 |
| 13 | Mr. Bergman's voice? | 11:25:49 |
| 14 | A.  I believe that's Mr. Dickerson's voice.  I | 11:25:51 |
| 15 | couldn't really hear the whole thing, though. | 11:25:53 |
| 16 | Q.  We heard your voice say "How did we get | 11:25:55 |
| 17 | into this position," right, and then somebody else | 11:25:59 |
| 18 | says "The inventory position"? | 11:26:01 |
| 19 | A.  I couldn't tell.  I'll take your word for | 11:26:05 |
| 20 | it. | 11:26:09 |
| 21 | Q.  But you think that was Mr. Dickerson's | 11:26:11 |
| 22 | voice was the second voice? | 11:26:13 |

Page 71

CONFIDENTIAL

```
 1        A.  Sounded like Brad and that was the time     11:26:14

 2   frame that Brad was still here.                      11:26:16

 3             MR. HENSSLER:  Play.                        11:26:19

 4                  (Audio recording played.)             11:26:26

 5   BY MR. HENSSLER:                                      11:26:27

 6        Q.  That was you who said "North America is a   11:26:27

 7   fucking disaster," right?                            11:26:31

 8        A.  Yes.                                         11:26:34

 9             MR. HENSSLER:  Play.                        11:26:35

10                  (Audio recording played.)             11:26:36

11   BY MR. HENSSLER:                                      11:27:15

12        Q.  Who is that who said "We made some bets"?   11:27:15

13        A.  David Bergman.                               11:27:22

14        Q.  Thank you.                                   11:27:23

15                  (Audio recording played.)             11:27:24

16   BY MR. HENSSLER:                                      11:28:17

17        Q.  And we heard you at the end of that clip,   11:28:17

18   Mr. Plank, say "We're supposed to be moving away     11:28:19

19   from weather dependency or, more importantly,        11:28:22

20   weather vulnerability," right?                       11:28:26

21        A.  Yes.                                         11:28:27

22        Q.  And then you also said "Us just saying the  11:28:27
```

Page 72

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | weather's not warm is a shitty, lame-ass excuse," | 11:28:30 |
| 2 | right? | 11:28:34 |
| 3 | A.  Yes. | 11:28:38 |
| 4 | (Plank Exhibit 7 was marked | 11:28:44 |
| 5 | for identification.) | 11:28:44 |
| 6 | BY MR. HENSSLER: | 11:28:44 |
| 7 | Q.  Let's mark the next exhibit, which will be | 11:28:44 |
| 8 | Exhibit 7 to today's deposition.  This will be | 11:28:50 |
| 9 | another audio file for the record.  Exhibit 7 is | 11:28:55 |
| 10 | UA_00319251, and from the production we understand | 11:28:59 |
| 11 | this is a meeting from January 5, 2016.  We'll play | 11:29:05 |
| 12 | a clip of a long meeting.  We'll play from 17:24 to | 11:29:08 |
| 13 | 17:47. | 11:29:12 |
| 14 | MR. REISNER:  January 25, 2016? | 11:29:15 |
| 15 | MR. HENSSLER:  January 5, 2016. | 11:29:19 |
| 16 | MR. REISNER:  January 5, 2016.  The court | 11:29:23 |
| 17 | reporter and I heard the same thing. | 11:29:26 |
| 18 | (Audio recording played.) | 11:29:50 |
| 19 | BY MR. HENSSLER: | 11:29:50 |
| 20 | Q.  And that was your voice, right? | 11:29:50 |
| 21 | A.  Yes. | 11:29:52 |
| 22 | Q.  And one of the things we heard you say on | 11:29:52 |

Page 73

CONFIDENTIAL

```
 1    that clip from January 5th, 2016 was that "Without    11:29:54

 2    the shitty revenue, 30 percent would have been 25,    11:29:59

 3    26," right?                                           11:30:04

 4        A.  Yes.                                          11:30:07

 5        Q.  So according to your comment that we just     11:30:07

 6    listened to, over 13 percent of the revenue growth    11:30:10

 7    for the fourth quarter of 2015 was shitty revenue,    11:30:13

 8    right?                                                11:30:17

 9            MR. REISNER:  Objection to form.              11:30:18

10        A.  13 percent.  I'm sorry?                       11:30:19

11        Q.  Yeah, so we just heard you say --             11:30:20

12        A.  30 percent.                                   11:30:22

13        Q.  Well, let me reask the question.  We just     11:30:23

14    heard you say that "Without the shitty revenue,       11:30:25

15    30 percent would have been 25 or 26 percent,"         11:30:29

16    right?                                                11:30:31

17        A.  Uh-huh.                                       11:30:32

18        Q.  So without the shitty                         11:30:32

19    revenue -- withdrawn.                                 11:30:33

20            So according to your comment, just doing      11:30:35

21    the math, over 13 percent of the revenue for that     11:30:37

22    quarter was shitty revenue, right?                    11:30:40
```

Page 74

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q. You never disclosed to Under Armour | 11:31:30 |
| 2 | shareholders that during the fourth quarter of 2015 | 11:31:31 |
| 3 | without the shitty revenue 30 percent would have | 11:31:35 |
| 4 | been 25 or 26, right? | 11:31:38 |
| 5 | A. We wouldn't speak like that to | 11:31:46 |
| 6 | shareholders. This is a -- this is a taped | 11:31:47 |
| 7 | conversation that... | 11:31:50 |
| 8 | Q. You don't think shareholders would have | 11:31:55 |
| 9 | known -- would have wanted to know that a material | 11:31:56 |
| 10 | portion of the revenue growth in the quarter was | 11:31:59 |
| 11 | considered shitty revenue by the CEO of the | 11:32:03 |
| 12 | company? | 11:32:04 |
| 13 | MR. REISNER: Objection to form, lacks | 11:32:06 |
| 14 | foundation. You may answer. | 11:32:08 |
| 15 | A. Yeah. No. I think that characterizing, | 11:32:09 |
| 16 | you know, the way that we colloquially talk during | 11:32:12 |
| 17 | meetings and having the benefit of hearing that is | 11:32:16 |
| 18 | the way that people talk and communicate. And so I | 11:32:20 |
| 19 | don't believe that there's anything further, deeper | 11:32:23 |
| 20 | of what that means versus another. I would love to | 11:32:25 |
| 21 | understand, you know, exactly what we're -- maybe a | 11:32:28 |
| 22 | little more detail on what we're qualifying. | 11:32:32 |

Page 76

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  So is that -- is that a yes, you don't | 11:32:41 |
| 2 | think shareholders would have cared to know that | 11:32:43 |
| 3 | without the shitty revenue in the fourth quarter of | 11:32:45 |
| 4 | 2015 30 percent revenue growth would have been 25 | 11:32:48 |
| 5 | or 26? | 11:32:51 |
| 6 | MR. REISNER:  Objection to form, lacks | 11:32:52 |
| 7 | foundation.  You may answer. | 11:32:53 |
| 8 | A.  I believe I'm talking to my team and I'm | 11:32:54 |
| 9 | not sure exactly what we're referring to. | 11:32:56 |
| 10 | Q.  Do you think investors would have wanted | 11:33:04 |
| 11 | to know that without the shitty revenue 30 percent | 11:33:05 |
| 12 | would have been 25 or 26? | 11:33:10 |
| 13 | A.  Yeah.  I don't recall.  I don't recall | 11:33:13 |
| 14 | what this -- I don't recall the conversation. | 11:33:15 |
| 15 | Q.  You're familiar with the phrase "average | 11:33:22 |
| 16 | selling price" from your time at Under Armour? | 11:33:24 |
| 17 | A.  Yes. | 11:33:27 |
| 18 | Q.  It's also referred to as ASP's, correct? | 11:33:27 |
| 19 | A.  Yes. | 11:33:32 |
| 20 | Q.  And that was something that Under Armour | 11:33:32 |
| 21 | tracked in 2015 to 2017, right? | 11:33:34 |
| 22 | A.  Yes. | 11:33:39 |

Page 77

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | "Under Armour top-to-top meeting July 26, 2016," | 11:45:12 |
| 2 | right? | 11:45:16 |
| 3 | A.  Yes. | 11:45:17 |
| 4 | Q.  And top-to-top meeting, that was a | 11:45:17 |
| 5 | meeting -- a regular meeting of Under Armour | 11:45:20 |
| 6 | executives, correct? | 11:45:24 |
| 7 | A.  That's what we called it at Under Armour. | 11:45:25 |
| 8 | I don't know what ███ characterization is. | 11:45:29 |
| 9 | Q.  Okay.  Let's look at page 2 of the ███ | 11:45:33 |
| 10 | presentation, which for the record is UA_00346259. | 11:45:40 |
| 11 | And I don't know if we talked about those Bates | 11:45:46 |
| 12 | numbers, Mr. Plank.  Those are just the numbers at | 11:45:48 |
| 13 | the bottom right of the document.  It may be | 11:45:51 |
| 14 | helpful from time to time as we're going through | 11:45:54 |
| 15 | some of these to refer to those numbers.  So | 11:45:56 |
| 16 | they're just for identification purposes.  And I'll | 11:45:58 |
| 17 | just call out like the last three if we need to | 11:46:01 |
| 18 | going forward.  Is that okay? | 11:46:03 |
| 19 | A.  Yes. | 11:46:12 |
| 20 | Q.  And on page 2 of the ███ presentation | 11:46:12 |
| 21 | the heading reads "UA has lost 7 percent of its ███ | 11:46:14 |
| 22 | athletic apparel market share since peaking in | 11:46:19 |

Page 88

CONFIDENTIAL

```
 1   with my team.  You know, if I'm not proud of all of    12:33:35

 2   it, I'm not proud of that tape with Matt Mirchin or     12:33:40

 3   anything else, but -- but treat people with            12:33:42

 4   respect, they have a voice.  Professionals give        12:33:46

 5   your -- give your opinion and let's -- let's agree     12:33:50

 6   to a number and line up and -- and deliver it.  So     12:33:52

 7   hopefully I captured your answer in the first part     12:33:56

 8   at least."                                             12:33:59

 9           That was your testimony, correct?             12:34:00

10      A.   Yes.                                           12:34:02

11      Q.   And that was truthful testimony, right?       12:34:02

12      A.   Yes.                                           12:34:08

13                   (Plank Exhibit 12 was marked          12:34:08

14                    for identification.)                 12:34:08

15   BY MR. HENSSLER:                                       12:34:08

16      Q.   Let's listen to another audio exhibit.        12:34:08

17   You can put the testimony aside for now.  So this      12:34:12

18   will be Exhibit 12 to today's deposition.  From the    12:34:17

19   production we understand that the following            12:34:28

20   recording is from an August 12th, 1-2, 2016 Under      12:34:29

21   Armour executive meeting and it was Bates-stamped      12:34:35

22   UA_00224210.  Another long recording and we'll play    12:34:36
```

Page 114

CONFIDENTIAL

```
 1    a clip from 1:03:50 to 1:04:49.                12:34:45

 2                    (Audio recording played.)      12:35:08

 3    BY MR. HENSSLER:                               12:35:09

 4        Q.  That's your voice, right?              12:35:09

 5        A.  Yes.                                    12:35:10

 6        Q.  And we heard you say "We're managing   12:35:10

 7    operating income, we shouldn't be doing this," 12:35:13

 8    right?                                          12:35:17

 9        A.  Yes.                                    12:35:17

10                    (Audio recording played.)      12:35:18

11    BY MR. HENSSLER:                               12:36:06

12        Q.  That last voice we heard was Kip Fulks? 12:36:06

13        A.  Yes.                                    12:36:08

14        Q.  And we heard Mr. Fulks say "There's some 12:36:09

15    debate about whether we should be pulling so much 12:36:11

16    out of '17 to prop up '16 when '17 needs it as much 12:36:14

17    as '16," right?                                12:36:20

18        A.  That's what he said.  I'm not aware of the 12:36:22

19    context that he said it all, but...            12:36:27

20        Q.  That's what Mr. Fulks said, though,    12:36:29

21    right?                                          12:36:30

22        A.  In that portion of the audio, yes.     12:36:31
```

Page 115

CONFIDENTIAL

```
 1        Q.  You don't have any recollection of what      12:36:33

 2   Mr. Fulks meant by "There's some debate about         12:36:34

 3   whether we should be pulling so much out of '17 to    12:36:38

 4   prop up '16 when '17 needs it as much as '16,"        12:36:41

 5   right?                                                12:36:46

 6        A.  What's the time -- what's the date of        12:36:46

 7   this?                                                 12:36:48

 8        Q.  This is August 12th, 2016.                   12:36:49

 9        A.  Okay.                                        12:36:51

10        Q.  Do you want me to repeat the question?       12:36:52

11        A.  Sure.                                        12:36:54

12        Q.  You don't have any recollection of what      12:36:56

13   Mr. Fulks meant by "There's some debate about         12:36:57

14   whether we should be pulling so much out of '17 to    12:37:01

15   prop up '16 when '16 needs it as much as '17,"        12:37:04

16   right?                                                12:37:12

17        MR. WAREHAM:  Form, foundation, competence       12:37:12

18   objections.                                           12:37:14

19        A.  Yeah.  I'm not sure what -- so much of        12:37:15

20   what, of marketing, of revenue, of any number of      12:37:22

21   things.                                               12:37:24

22        Q.  You don't know what he meant?                12:37:24
```

Page 116

CONFIDENTIAL

```
1        A.  No.                                      12:37:27

2        Q.  You don't know whether Mr. Fulks was     12:37:29

3   referring to pull-forward when he said "There's   12:37:31

4   some debate about whether we should be pulling so 12:37:33

5   much out of '17 to prop up '16 when '17 needs it as 12:37:36

6   much as '16," right?                              12:37:41

7        A.  Well, there was a lot going on at that   12:37:43

8   time.  We were just opening Kohl's, which was going 12:37:45

9   to be a ████████████████████████████████ and     12:37:49

10  we talked about holding them back until the first 12:37:52

11  quarter of '17.  There was talk about pulling them 12:37:56

12  into Q4 of '16 for a whole host of reasons, get the 12:37:58

13  floor set, get started with them.  That's where a 12:38:02

14  lot of that dialogue, which is what I mean, the   12:38:05

15  context you're referring to is hard to pin into   12:38:07

16  what we're referring to.                          12:38:11

17       Q.  You don't know whether Mr. Fulks was     12:38:12

18  referring to pull-forward, though, when he was    12:38:14

19  talking about pulling so much out of '17 to prop up 12:38:16

20  '16, correct?                                      12:38:19

21       MR. REISNER:  Objection to form, asked and   12:38:20

22  answered.  You may answer.                         12:38:21
```

Page 117

CONFIDENTIAL

```
 1        A.  Are you saying that's what he's referring   12:38:22
 2   to?  Because I can't tell that.                      12:38:23
 3        Q.  No.  I'm asking whether you know whether    12:38:25
 4   Mr. Fulks was referring to pull-forward when he      12:38:28
 5   said "There's some debate about whether we should    12:38:30
 6   be pulling so much out of '17 to prop up '16."       12:38:33
 7        A.  Yeah.  I wouldn't have an opinion on that.  12:38:39
 8        Q.  So you don't know what Mr. Fulks meant      12:38:44
 9   when he talked about pulling out of 2017 to prop up  12:38:46
10   '16, correct?                                         12:38:51
11             MR. REISNER:  Objection to form, asked and 12:38:52
12   answered.  You may answer.                           12:38:53
13        A.  I don't know what he meant.                 12:38:54
14        Q.  At the very end of that audio we heard      12:38:56
15   Mr. Fulks say "We're moving the shell game now,"     12:38:57
16   right?                                               12:39:02
17        A.  Sorry?                                       12:39:03
18        Q.  At the very end of the audio we heard       12:39:04
19   Mr. Fulks say "We're moving the shell game now,"     12:39:05
20   correct?                                             12:39:09
21        A.  I didn't hear that, but I don't know.       12:39:10
22   Maybe he said that.                                   12:39:12
```

Page 118

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. HENSSLER:  Let's play the last five | 12:39:14 |
| 2 | seconds, again, or ten seconds if we need to. | 12:39:15 |
| 3 | (Audio recording played.) | 12:39:24 |
| 4 | BY MR. HENSSLER: | 12:39:24 |
| 5 | Q.  Did you hear him say "We're moving the | 12:39:24 |
| 6 | shell game right now"? | 12:39:27 |
| 7 | A.  Yeah. | 12:39:28 |
| 8 | Q.  Do you recall what Mr. Fulks meant by | 12:39:29 |
| 9 | "We're moving the shell game right now"? | 12:39:31 |
| 10 | A.  I have no idea. | 12:39:33 |
| 11 | (Plank Exhibit 13 was marked | 12:39:37 |
| 12 | for identification.) | 12:39:37 |
| 13 | BY MR. HENSSLER: | 12:39:37 |
| 14 | Q.  Okay.  Let's go back to a paper exhibit. | 12:39:37 |
| 15 | This will be Exhibit 13 to today's deposition.  For | 12:39:40 |
| 16 | the record, Exhibit 13 was previously marked as | 12:40:07 |
| 17 | Government Exhibit 161 and it also has the Bates | 12:40:09 |
| 18 | UA-IE-00035813. | 12:40:12 |
| 19 | And I was going to start in the middle of | 12:40:32 |
| 20 | the page of Exhibit 13.  You can see there's an | 12:40:33 |
| 21 | August 24th, 2016 e-mail from Chip Molloy.  Are you | 12:40:35 |
| 22 | with me, sir? | 12:40:41 |

Page 119

CONFIDENTIAL

```
 1        A.  I believe so.                          13:49:19

 2        Q.  Another reason why you decided to not do  13:49:22

 3   additional pull-forwards in December of 2016 was  13:49:25

 4   because Under Armour was going to miss its guidance  13:49:29

 5   even with more pull-forwards, right?             13:49:32

 6        A.  I'm sorry.  Say that again.            13:49:36

 7        Q.  Sure.  Another reason why in December of  13:49:37

 8   2016 you decided to not have Under Armour do      13:49:41

 9   additional pull-forwards was because even with    13:49:45

10   those additional pull-forwards Under Armour would  13:49:48

11   have still missed its guidance for the quarter and  13:49:50

12   the year, right?                                 13:49:53

13        A.  I don't believe that statement's accurate.  13:49:54

14        Q.  Let's mark the next exhibit -- we already  13:50:04

15   marked this one.  We're going to do some more audio  13:50:06

16   out of Exhibit 5, which was 12/12/16,            13:50:09

17   December 12th, 2016 audio, and, again, just for the  13:50:12

18   record, that was UA_00405786.  We'll play from 5:36  13:50:17

19   to 5:52.                                         13:50:27

20                  (Audio recording played.)        13:50:35

21   BY MR. HENSSLER:                                 13:50:50

22        Q.  That was Mr. Maurath talking, right?    13:50:50
```

Page 152

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.  Yes. | 13:50:52 |
| 2 | Q.  And one of the things we just heard | 13:50:52 |
| 3 | Mr. Maurath say on that December 12th, 2016 audio | 13:50:54 |
| 4 | was that the "Normalized growth rate if you take | 13:50:58 |
| 5 | off pull-forwards would be 12 percent," right? | 13:51:01 |
| 6 | A.  Did he say "natural" or "normalized"? | 13:51:07 |
| 7 | Q.  I heard him to say "normalized." | 13:51:09 |
| 8 | A.  Okay.  That's not -- yeah. | 13:51:12 |
| 9 | Q.  Do you agree with me that's what he said? | 13:51:13 |
| 10 | A.  Yeah. | 13:51:15 |
| 11 | Q.  Let's talk about -- some more about the | 13:51:19 |
| 12 | pull-forward that Under Armour did in the fourth | 13:51:22 |
| 13 | quarter of 2016.  Isn't it true that during | 13:51:25 |
| 14 | December 2016 you were questioning whether Under | 13:51:29 |
| 15 | Armour should be doing additional pull-forward if | 13:51:33 |
| 16 | Under Armour were going to miss the revenue | 13:51:35 |
| 17 | guidance anyway? | 13:51:37 |
| 18 | MR. REISNER:  Objection to form. | 13:51:38 |
| 19 | A.  I don't recall.  I know we made a very key | 13:51:41 |
| 20 | decision in December of 2016, though, that I | 13:51:45 |
| 21 | thought was important. | 13:51:48 |
| 22 | Q.  One of the reasons you made that decision | 13:51:51 |

Page 153

CONFIDENTIAL

```
1    was because you had recognized that even with        13:51:53

2    additional pull-forwards Under Armour were going to   13:51:56

3    miss the revenue guidance anyway, right?              13:51:59

4         A.  I don't think that's true.                   13:52:01

5              MR HENSSLER:  Let's play another clip from  13:52:05

6    this same Exhibit 5.  This will be 51 to 51:42.       13:52:07

7                    (Audio recording played.)             13:52:12

8    BY MR. HENSSLER:                                       13:52:55

9         Q.  That was your voice we just heard,           13:52:55

10   right?                                                13:52:58

11        A.  Yes.                                          13:52:58

12        Q.  One of the things we just heard you say on   13:52:58

13   this audio recording from December 12th, 2016 was     13:53:00

14   "If we don't have a chance of hitting the number      13:53:06

15   and we're going to miss the number anyway, why are    13:53:08

16   we sacrificing the ability to add another 80          13:53:10

17   million into '17 at this point," right?               13:53:13

18        A.  That's one of the things I said in that      13:53:15

19   same statement, including cold weather and other      13:53:17

20   things that could happen.  What's the date of that    13:53:19

21   audio?                                                13:53:22

22        Q.  December 12th, 2016.                         13:53:23
```

Page 154

CONFIDENTIAL

1      Q.  No.  We're -- we're all set.  I was just      15:23:15

2    conversing with your counsel.                         15:23:17

3          You don't recall whether you were               15:23:18

4    referring to performance-enhancing drugs for the      15:23:21

5    pull-forward needle metaphor, correct?                15:23:22

6      A.  I don't recall.  Heroin,                        15:23:25

7    performance-enhancing drugs, elixir, I don't know,    15:23:28

8    but there's lots of analogies there probably.         15:23:32

9      Q.  Might have been referring to some elixir        15:23:36

10   by the pull-forward needle metaphor?                  15:23:39

11          MR. REISNER:  Objection to form.               15:23:45

12     A.  I don't know.                                    15:23:46

13     Q.  You also said on that audio that we just        15:23:47

14   listened to from April 6, 2017 that "Under Armour     15:23:49

15   built up this muscle memory of pull-forwards,         15:23:55

16   right, and all of a sudden we got in the fourth       15:24:00

17   quarter and we came up short," correct?               15:24:02

18     A.  That's what it said, yes.                       15:24:04

19     Q.  That's what you said, right?                    15:24:05

20     A.  That's what the tape said, yes.                 15:24:06

21     Q.  And you also said on that audio we              15:24:09

22   listened to from April 6, 2017 that "Under Armour     15:24:12

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1    was guilty of still pulling 7 million total out of    15:24:17

 2    2Q '17 into 1Q '17, but it changed the culture of     15:24:21

 3    pull-forward," right?                                 15:24:25

 4         A.  That's what it said.                         15:24:26

 5         Q.  That's what you said, right?                 15:24:28

 6         A.  That's what I said on the audio, yes.        15:24:29

 7         Q.  And someone else jumped in and said that     15:24:31

 8    Under Armour did 11 million in pull-forward in 1Q     15:24:34

 9    '17, right?                                           15:24:38

10         MR. REISNER:  Objection to form.                 15:24:39

11         A.  I don't know what the definition of those    15:24:39

12    pull-forwards were.  Every pull-forward is            15:24:42

13    different and to group them all into some negative    15:24:43

14    light is not accurate.  So it sounds like a very      15:24:46

15    reasonable number to me on a billion-something        15:24:49

16    quarter.                                              15:24:52

17         Q.  11 million in pull-forward in the first      15:24:52

18    quarter of '17 sounds like a reasonable number; is    15:24:55

19    that your testimony?                                  15:24:58

20         A.  It does.                                     15:24:58

21         Q.  And that person who jumped in and said       15:24:59

22    that Under Armour did 11 million in pull-forward in   15:25:02
```

Veritext Legal Solutions
866 299-5127

```
 1    that we did in -- I guess it was around 2016, yes.      15:47:34

 2         Q.  What do you mean by "staple"?                  15:47:40

 3         A.  Well, it was the stock split that we had       15:47:42

 4    that gave me the dual class, that created the           15:47:46

 5    two-stock structure we have today with both Class A     15:47:51

 6    and class C.                                            15:47:55

 7         Q.  And that class C structure was created to      15:47:56

 8    help ensure that you maintained control of Under        15:47:58

 9    Armour, right?                                          15:48:00

10         A.  It was to maintain the same control that       15:48:02

11    we'd had through the first 20-some years of the         15:48:05

12    company that led to a lot of the success that we've     15:48:09

13    seen, yes.                                              15:48:11

14         Q.  So yes, helped ensure that you maintained      15:48:13

15    control of Under Armour, right?                         15:48:16

16         MR. REISNER:  Objection to form.                   15:48:17

17         A.  Yeah.                                          15:48:18

18         Q.  In a June 15th, 2015 letter to Under           15:48:20

19    Armour shareholders about the class C offering --       15:48:24

20    withdrawn.  Let me restate the question.                15:48:28

21         In a June 15th, 2015 letter that you sent          15:48:30

22    to the Under Armour shareholders about the class C      15:48:33
```

Page 238

CONFIDENTIAL

```
 1    common stock you wrote that "Maintaining our        15:48:37

 2    founder-led approach is in the best interests of    15:48:40

 3    Under Armour and all of its stockholders."  Do you  15:48:44

 4    recall that?                                         15:48:47

 5        A.  I do.                                        15:48:48

 6        Q.  So rolling out the Class C shares was done   15:48:48

 7    so that you could sell stock and still maintain      15:48:53

 8    control of the company, right?                       15:48:55

 9        A.  It was done to maintain the ownership        15:48:57

10    structure that we had from the previous 20 years as  15:49:01

11    we looked out to the future, yes.                    15:49:05

12        Q.  And so that you could sell stock and you     15:49:07

13    would keep that structure?                           15:49:09

14            MR. REISNER:  Objection to form.             15:49:10

15        A.  That's one of the -- one of the reasons,     15:49:11

16    yes.                                                 15:49:14

17        Q.  In November of 2015 you sold over a          15:49:16

18    hundred million dollars of your Under Armour         15:49:19

19    shares, correct?                                     15:49:20

20        A.  I don't recollect, but...                    15:49:25

21        Q.  We'll look at some documents in a minute.    15:49:28

22                                                         15:49:56
```

Page 239

CONFIDENTIAL

```
 1        A.  Apparently, yes.                        15:57:57

 2        Q.  Why?                                    15:57:57

 3        A.  I don't recall.                         15:57:58

 4        Q.  Let's go to page 086.  Similar setup here.   15:57:59

 5   We've got the first amendment, "Amended Annex A" at   15:58:12

 6   the top of the page, right, and then a chart in the   15:58:17

 7   middle showing prospective stock sales, right?        15:58:19

 8        A.  Yes.                                     15:58:25

 9        Q.  And similar to the last exhibit we looked   15:58:25

10   at, Exhibit 25, Mr. Stanton approved this one?        15:58:29

11        A.  Yes.                                     15:58:33

12        Q.  And he didn't ask you any questions about   15:58:33

13   Under Armour's business at this time in February of   15:58:39

14   2016, did he?                                    15:58:42

15        MR. REISNER:  Objection to form.            15:58:43

16        MR. WAREHAM:  It's a yes-or-no answer if    15:58:46

17   you can recall.                                  15:58:48

18        MR. REISNER:  Or I don't recall.            15:58:49

19        A.  I don't recall, but we'd be in regular   15:58:50

20   conversation about the business on a daily basis   15:58:53

21   and John was a member of our top-to-tops and        15:58:58

22   everything else.                                 15:59:01
```

Page 248

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | percent profit when you sold that hundred million | 16:11:19 |
| 2 | in stock, right? | 16:11:21 |
| 3 | A.  Virtually. | 16:11:22 |
| 4 | MR. HENSSLER:  Let's go off the record. | 16:11:27 |
| 5 | THE VIDEOGRAPHER:  Off the record, | 16:11:29 |
| 6 | 16:11. | 16:11:30 |
| 7 | (A break was had.) | 16:23:39 |
| 8 | THE VIDEOGRAPHER:  We're back on the | 16:29:49 |
| 9 | record 16:29. | 16:29:50 |
| 10 | BY MR. HENSSLER: | 16:29:53 |
| 11 | Q.  Welcome back, sir.  You understand you're | 16:29:53 |
| 12 | still under oath? | 16:29:56 |
| 13 | A.  Yes. | 16:29:58 |
| 14 | Q.  Okay.  Let's talk about what's referred to | 16:29:59 |
| 15 | as a quiet period. | 16:30:00 |
| 16 | A.  Do we need this on?  Okay. | 16:30:02 |
| 17 | Q.  Let's talk about what's referred to as a | 16:30:04 |
| 18 | quiet period.  You're familiar with that phrase | 16:30:06 |
| 19 | from your time as the CEO of Under Armour, right? | 16:30:08 |
| 20 | A.  Yes. | 16:30:11 |
| 21 | Q.  And the quiet period refers to the time | 16:30:11 |
| 22 | between the end of a financial quarter and the | 16:30:14 |

Page 259

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | company announcing financial results, right? | 16:30:17 |
| 2 | A.  Yes. | 16:30:22 |
| 3 | Q.  And is it your understanding that during | 16:30:22 |
| 4 | the quiet period a public company like Under Armour | 16:30:25 |
| 5 | must avoid selective disclosure of material | 16:30:27 |
| 6 | information? | 16:30:30 |
| 7 | MR. REISNER:  Objection to form, calls for | 16:30:31 |
| 8 | a legal conclusion.  You may answer. | 16:30:33 |
| 9 | A.  Ask that again. | 16:30:35 |
| 10 | Q.  Happy to. | 16:30:37 |
| 11 | Is it your understanding that during a | 16:30:39 |
| 12 | quiet period a public company like Under Armour | 16:30:40 |
| 13 | must avoid selective disclosure of material | 16:30:43 |
| 14 | information? | 16:30:46 |
| 15 | MR. REISNER:  Same objection. | 16:30:48 |
| 16 | A.  Yeah.  Yes. | 16:30:49 |
| 17 | Q.  And the quiet period is something that you | 16:30:57 |
| 18 | were well aware of during the 2015 to 2017 time | 16:30:59 |
| 19 | period as a CEO, right? | 16:31:04 |
| 20 | A.  It's been consistent since we went public | 16:31:05 |
| 21 | in November of 2005, yes. | 16:31:08 |
| 22 | Q.  And you understood that as a public | 16:31:10 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | company Under Armour had to comply with SEC rules | 16:31:11 |
| 2 | relating to the quiet period? | 16:31:15 |
| 3 | A.  Of course. | 16:31:16 |
| 4 | Q.  Let's talk about the first quarter 2016 | 16:31:18 |
| 5 | quiet period.  The investor call for the first | 16:31:22 |
| 6 | quarter of 2016 was -- | 16:31:27 |
| 7 | A.  Excuse me.  There's a cable in front of | 16:31:28 |
| 8 | the picture up there -- there you go.  Perfect.  It | 16:31:30 |
| 9 | might give me two chins or something.  Thank you. | 16:31:38 |
| 10 | Q.  Let's talk about the quiet period as it | 16:31:42 |
| 11 | relates to the first quarter of 2016.  Okay.  The | 16:31:44 |
| 12 | investor call -- the Under Armour investor call in | 16:31:50 |
| 13 | the first quarter of 2016 was April 21, 2016.  So | 16:31:52 |
| 14 | the quiet period for that quarter would have been | 16:31:55 |
| 15 | April 1, 2016 through April 21, 2016, right? | 16:31:58 |
| 16 | A.  Yes. | 16:32:05 |
| 17 | (Plank Exhibit 28 was marked | 16:32:05 |
| 18 | for identification.) | 16:32:05 |
| 19 | BY MR. HENSSLER: | 16:32:05 |
| 20 | Q.  Let's listen to the next exhibit.  This | 16:32:05 |
| 21 | will be Exhibit 28, 2-8, to today's deposition. | 16:32:08 |
| 22 | This is Bates-stamped UA_00308192, and from the | 16:32:12 |

Page 261

CONFIDENTIAL

```
1    production we understand that this is an audio      16:32:19

2    recording from April 15, 1-5, 2016.  We'll play     16:32:22

3    from 4 minutes to 5 minutes and 10 seconds.         16:32:27

4              (Audio recording played.)                 16:32:33

5    BY MR. HENSSLER:                                     16:33:46

6        Q.  That was your voice we heard talking         16:33:46

7    there, right?                                        16:33:47

8        A.  Yes.                                         16:33:50

9        Q.  Have you heard that audio before?            16:33:50

10       A.  I have.                                       16:33:51

11       Q.  Did you listen to it yesterday?              16:33:52

12       A.  I listened to it over the course of our      16:33:55

13   preparation, yes.                                    16:33:57

14       Q.  So you listened to it with your lawyers in   16:33:58

15   preparation for today's testimony?                   16:34:00

16       A.  Yes.                                         16:34:03

17       Q.  On that audio we just listened to we heard   16:34:03

18   you call CFO Chip Molloy a motherfucker for saying   16:34:05

19   that Under Armour should take the quarter down 10    16:34:10

20   million, right?                                      16:34:12

21           MR. REISNER:  Objection to form.             16:34:12

22       A.  Yes.  In the context of how it was listed,   16:34:13
```

Page 262

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | yes. | 16:34:18 |
| 2 | Q.  During the first quarter of 2016 | 16:34:18 |
| 3 | Mr. Molloy told you that Under Armour needed to go | 16:34:19 |
| 4 | public with the impact that the TSA bankruptcy | 16:34:22 |
| 5 | would have on Under Armour and drop guidance for | 16:34:24 |
| 6 | the first quarter of 2016, right? | 16:34:27 |
| 7 | A.  Yeah.  Maybe I can clarify within that | 16:34:29 |
| 8 | question. | 16:34:32 |
| 9 | Q.  Well, could you answer the question, | 16:34:33 |
| 10 | please, first. | 16:34:34 |
| 11 | MR. WAREHAM:  He's answering the question, | 16:34:35 |
| 12 | Counsel.  I don't think that's appropriate.  You | 16:34:38 |
| 13 | cut him off.  I'd like to hear the answer myself, | 16:34:39 |
| 14 | not your answer. | 16:34:42 |
| 15 | Q.  Let me reask the question.  During the 1Q | 16:34:43 |
| 16 | '16 -- | 16:34:48 |
| 17 | A.  I got -- I got -- | 16:34:48 |
| 18 | MR. REISNER:  I think the witness is | 16:34:48 |
| 19 | trying to answer your question. | 16:34:48 |
| 20 | Q.  During 1Q '16 -- | 16:34:48 |
| 21 | A.  I'd like -- | 16:34:49 |
| 22 | MR. REISNER:  Are you not permitting the | 16:34:49 |

Page 263

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | witness to answer the question? | 16:34:50 |
| 2 | MR. HENSSLER:  Well, there's -- now | 16:34:51 |
| 3 | there's been chatter from Mr. Wareham and now from | 16:34:52 |
| 4 | yourself.  I think for the record's sake, for the | 16:34:56 |
| 5 | clarity of the record, I know that's one of your | 16:34:57 |
| 6 | concerns, Lorin, we should just reask the question. | 16:34:59 |
| 7 | MR. REISNER:  Well, if you want to | 16:35:03 |
| 8 | interrupt the witness and pose a new question, go | 16:35:03 |
| 9 | ahead. | 16:35:06 |
| 10 | MR. HENSSLER:  It's going to be the same | 16:35:07 |
| 11 | question. | 16:35:08 |
| 12 | During 1Q '16, Mr. Plank, Mr. Molloy told | 16:35:10 |
| 13 | you that Under Armour needed to go public with the | 16:35:14 |
| 14 | impact that the TSA bankruptcy would have on Under | 16:35:17 |
| 15 | Armour and drop guidance for 1Q '16 by 10 million, | 16:35:19 |
| 16 | right. | 16:35:23 |
| 17 | MR. REISNER:  Objection to form. | 16:35:23 |
| 18 | A.  I don't -- | 16:35:25 |
| 19 | MR. WAREHAM:  Misstates the evidence as | 16:35:26 |
| 20 | well, objection. | 16:35:27 |
| 21 | THE WITNESS:  Yeah.  I don't recall that, | 16:35:29 |
| 22 | but what I do recall, what I'm specifically | 16:35:29 |

Page 264

CONFIDENTIAL

```
 1    referring to there I'm not clear.  But what I do      16:35:32

 2    know is that I've been able to ascertain from        16:35:35

 3    listening to the audio that a CFO is asking us to    16:35:38

 4    restate a quarter $10 million on a                   16:35:42

 5    1.3-billion-dollar quarter.  That sounds like        16:35:46

 6    rearranging chairs on a -- on a deck that isn't      16:35:51

 7    going to make a lick of difference.  So that's       16:35:56

 8    where I was saying that's what we want to notify     16:36:00

 9    the Street about is a 10-million-dollar change in    16:36:02

10    our outlook?  That was probably what made me         16:36:04

11    colorful at 8:30 p.m. on a Friday night drinking     16:36:07

12    whiskey and having cigars with someone that I've     16:36:12

13    known for 20 years who's from the state of New       16:36:14

14    Jersey, which would explain some of the colloquial   16:36:16

15    language that I'm using there.                       16:36:20

16         Q.  You were talking to Mr. Mirchin on that     16:36:21

17    recording we just listened to?                       16:36:23

18         A.  That's correct.                             16:36:25

19         Q.  You don't recall whether CFO Molloy came    16:36:25

20    to you during the first quarter of 2016 and told     16:36:28

21    you that Under Armour needed to go public with the   16:36:31

22    impact that the Sports Authority bankruptcy would    16:36:35
```

Page 265

```
 1    have on Under Armour and drop guidance for the      16:36:38

 2    quarter by 10 million?                              16:36:40

 3          MR. REISNER:  Objection to form.  You may     16:36:41

 4    answer.                                             16:36:42

 5       A.  You're talking about like a                  16:36:43

 6    pre-announcement?  I'm sorry.  I'm not familiar     16:36:44

 7    with what you're talking about.                     16:36:46

 8       Q.  Sure.  No.  Thanks for saying that.          16:36:47

 9    Mr. Molloy has testified and Mr. Molloy said        16:36:49

10    that --                                             16:36:53

11       A.  I've no visibility into his testimony.       16:36:53

12       Q.  Well, that's what I'm going to make a        16:36:56

13    representation for you.  Mr. Molloy testified that  16:36:57

14    he came to you during the first quarter of 2016 and 16:36:59

15    said we need to go to the Street, we need to reduce 16:37:03

16    guidance for the first quarter by 10 million        16:37:06

17    because of The Sports Authority issues.  Do you     16:37:08

18    recall that happening?                              16:37:11

19          MR. WAREHAM:  Object to the form.  It         16:37:14

20    grossly mischaracterizes Mr. Molloy's testimony     16:37:15

21    which I do have the benefit of having read and      16:37:17

22    attended.                                           16:37:19
```

Page 266

CONFIDENTIAL

```
 1        A.  Are you suggesting Mr. Molloy -- I'm      16:37:20

 2   trying to understand the question.  So you're      16:37:23

 3   suggesting that Mr. Molloy came to me and said     16:37:25

 4   outside of our normal earnings cadence of four     16:37:28

 5   times per year to go to the Street to make this    16:37:30

 6   announcement about The Sports Authority, that was  16:37:33

 7   public information that they were going to be going 16:37:36

 8   bankrupt?  Is that what you're saying, sir?        16:37:38

 9        Q.  I think we're talking past each other.    16:37:41

10   So --                                              16:37:42

11        A.  No.                                       16:37:43

12        MR. REISNER:  I think he was asking you do    16:37:44

13   you recall anything like that.                     16:37:46

14        THE WITNESS:  But I'm just trying to          16:37:47

15   understand like why someone who has any basic      16:37:48

16   understanding of being a public company would ask  16:37:50

17   that question because it sounds really out of      16:37:52

18   context of are you asking me if he said go to the  16:37:54

19   Street means outside of our normal cadence of an   16:37:58

20   earnings call?  That would be highly unusual for us 16:38:00

21   to restate our outlook in the middle of a          16:38:04

22   quarter.                                           16:38:07
```

Page 267

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  Mr. Molloy testified that he told you | 16:38:10 |
| 2 | Under Armour needed to go public with the impact | 16:38:13 |
| 3 | the Sports Authority bankruptcy was having and drop | 16:38:17 |
| 4 | guidance for 1Q '16 by 10 million, and he said in | 16:38:19 |
| 5 | response you said "Who the hell do you think you | 16:38:23 |
| 6 | are, we're Under Armour, we're not doing that."  Is | 16:38:26 |
| 7 | that what you told Mr. Molloy when he told you that | 16:38:29 |
| 8 | Under Armour needed to go public with the impact of | 16:38:31 |
| 9 | the Sports Authority bankruptcy? | 16:38:36 |
| 10 | MR. WAREHAM:  Objection -- | 16:38:37 |
| 11 | MR. REISNER:  Objection to form, | 16:38:37 |
| 12 | foundation -- | 16:38:37 |
| 13 | MR. WAREHAM:  -- foundation, distorts | 16:38:38 |
| 14 | Mr. Molloy's -- | 16:38:39 |
| 15 | THE REPORTER:  Guys. | 16:38:41 |
| 16 | MR. WAREHAM:  -- extensive testimony on | 16:38:41 |
| 17 | this point. | 16:38:42 |
| 18 | MR. HENSSLER:  You can answer. | 16:38:42 |
| 19 | A.  Maybe I can sort of reset the calendar. | 16:38:45 |
| 20 | The Sports Authority filed for bankruptcy around | 16:38:48 |
| 21 | February or so or March. They were -- | 16:38:50 |
| 22 | Q.  Are you going to answer that question, | 16:38:51 |

Page 268

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | though? | 16:38:53 |
| 2 | A.  I'm trying to answer your question | 16:38:53 |
| 3 | because -- I'm trying to answer your question | 16:38:55 |
| 4 | because I don't understand your timeline here. | 16:38:56 |
| 5 | You're asking me if Mr. Molloy came to me and said | 16:39:00 |
| 6 | we should go to the Street.  I don't know what that | 16:39:04 |
| 7 | means, number one.  You'll have to -- you'll have | 16:39:06 |
| 8 | to expand on that for me.  And ask the Street to | 16:39:08 |
| 9 | tell them we're going to take our year down because | 16:39:11 |
| 10 | of Sports Authority, which we have to disclose as | 16:39:14 |
| 11 | our top three customers, that the world knows is | 16:39:17 |
| 12 | our second largest customer. | 16:39:19 |
| 13 | I'm not clear on us doing that outside of | 16:39:26 |
| 14 | a normal earnings cadence as well as Sports | 16:39:28 |
| 15 | Authority was being solicited by someone to have a | 16:39:31 |
| 16 | buyer for them as well.  So there was nothing firm. | 16:39:34 |
| 17 | And they didn't -- I don't think secured their | 16:39:37 |
| 18 | bankruptcy until the middle of the year.  So him | 16:39:39 |
| 19 | coming to me in the first quarter can only be filed | 16:39:41 |
| 20 | until maybe the end of the first quarter.  So I | 16:39:46 |
| 21 | don't understand how his testimony would be | 16:39:50 |
| 22 | accurate.  I could be wrong.  I don't have the | 16:39:51 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | facts in front of me, but that doesn't sound | 16:39:53 |
| 2 | accurate, no. | 16:39:55 |
| 3 | And no, I don't recall him ever coming to | 16:39:56 |
| 4 | me and saying let's go to the Street because he | 16:39:58 |
| 5 | thinks there's something we should be concerned | 16:40:01 |
| 6 | about and me saying absolutely not and the reason | 16:40:02 |
| 7 | being is because we're Under Armour?  No. | 16:40:06 |
| 8 | Q.  So Mr. Molloy is not testifying truthfully | 16:40:12 |
| 9 | when he testified that you said to him in a meeting | 16:40:14 |
| 10 | "Who the hell do you think you are, we're Under | 16:40:18 |
| 11 | Armour, we're not doing that"? | 16:40:20 |
| 12 | MR. REISNER:  Objection to form. | 16:40:22 |
| 13 | A.  And what is that in response to? | 16:40:23 |
| 14 | Q.  In response to Mr. Molloy presenting to | 16:40:25 |
| 15 | you that Under Armour needed to go to the Street, | 16:40:27 |
| 16 | drop the guidance by 10 million because of the | 16:40:31 |
| 17 | impact of The Sports Authority bankruptcy? | 16:40:34 |
| 18 | MR. REISNER:  Same objection.  I don't | 16:40:35 |
| 19 | even know that there's a question. | 16:40:36 |
| 20 | A.  I need you to explain what "go to the | 16:40:38 |
| 21 | Street" means.  I don't know what that -- I don't | 16:40:39 |
| 22 | know what I'd be disagreeing with.  When he says | 16:40:42 |

Page 270

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | "go to the Street" does that mean in our next | 16:40:44 |
| 2 | earnings call or does it mean call a press | 16:40:46 |
| 3 | conference?  Which? | 16:40:49 |
| 4 |    Q.  Do you recall -- | 16:40:50 |
| 5 |    A.  What is "go to the Street"? | 16:40:52 |
| 6 |    Q.  Do you recall whether you said to | 16:40:55 |
| 7 | Mr. Molloy "Who the hell do you think you are, | 16:40:58 |
| 8 | we're Under Armour, we're not doing that"? | 16:41:02 |
| 9 |    A.  In response to what? | 16:41:04 |
| 10 |    Q.  Did you ever say that to Mr. Molloy? | 16:41:06 |
| 11 |    A.  I don't think so, especially not answering | 16:41:10 |
| 12 | a financial question.  Now, if he's asking me | 16:41:11 |
| 13 | something about -- I wouldn't know.  I won't | 16:41:15 |
| 14 | speculate, but no, I don't know.  I don't believe | 16:41:18 |
| 15 | so.  I don't think I would talk to someone that | 16:41:20 |
| 16 | way. | 16:41:23 |
| 17 |    Q.  He says you did.  So you're calling him a | 16:41:23 |
| 18 | liar? | 16:41:26 |
| 19 |      MR. REISNER:  Objection to form. | 16:41:26 |
| 20 |    A.  I don't -- I don't recognize the comment | 16:41:29 |
| 21 | that you're trying to ascribe to me that I said to | 16:41:31 |
| 22 | Mr. Molloy, no. | 16:41:34 |

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  Because you wouldn't talk to somebody like | 16:41:35 |
| 2 | that? | 16:41:37 |
| 3 | MR. REISNER:  Objection to form. | 16:41:38 |
| 4 | MR. HENSSLER:  We just heard you call him | 16:41:41 |
| 5 | motherfucker to Matt Mirchin, the head of Under | 16:41:42 |
| 6 | Armour's North American business, right? | 16:41:46 |
| 7 | MR. REISNER:  Objection to form, | 16:41:47 |
| 8 | argumentative. | 16:41:48 |
| 9 | A.  I think I was speaking very colorfully on | 16:41:48 |
| 10 | a Friday evening to someone in confidence, right, | 16:41:50 |
| 11 | that was meant to be maybe highlighting something | 16:41:54 |
| 12 | that had frustrated me about taking the quarter | 16:41:59 |
| 13 | down $10 million on a billion three-quarter. | 16:42:01 |
| 14 | Q.  So you said to another Under Armour | 16:42:06 |
| 15 | executive that the CFO of the company was a | 16:42:08 |
| 16 | motherfucker, right? | 16:42:10 |
| 17 | MR. REISNER:  Objection to form. | 16:42:12 |
| 18 | A.  I said that.  I'm not proud of that audio, | 16:42:13 |
| 19 | but yes, it's true. | 16:42:15 |
| 20 | Q.  Mirchin was the head of -- | 16:42:17 |
| 21 | A.  I was much too -- I was much too casual in | 16:42:19 |
| 22 | my conversation. | 16:42:21 |

Page 272

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.  You didn't get his permission to record | 16:44:10 |
| 2 | him, right? | 16:44:12 |
| 3 | A.  No, I did not. | 16:44:13 |
| 4 | MR. REISNER:  Objection, asked and | 16:44:14 |
| 5 | answered. | 16:44:14 |
| 6 | Q.  You understand that's the law in Maryland, | 16:44:14 |
| 7 | you have to get someone's permission to record a | 16:44:16 |
| 8 | conversation like that? | 16:44:18 |
| 9 | A.  Yeah, but as I said, I don't believe I | 16:44:20 |
| 10 | proactively recorded that conversation with an | 16:44:22 |
| 11 | intent. | 16:44:25 |
| 12 | Q.  Why did you secretly record that | 16:44:28 |
| 13 | conversation with Mr. Mirchin? | 16:44:30 |
| 14 | MR. REISNER:  Objection, misstates the | 16:44:32 |
| 15 | evidence. | 16:44:33 |
| 16 | A.  I feel like I've said this a few times. | 16:44:33 |
| 17 | We could be in disagreement if you'd like, but I | 16:44:36 |
| 18 | didn't secretly record that conversation with | 16:44:38 |
| 19 | Mr. Mirchin.  I might have had my phone on, I might | 16:44:41 |
| 20 | have put it down because we were sitting on my back | 16:44:44 |
| 21 | deck and we were, as I said, drinking whiskey.  I | 16:44:46 |
| 22 | might have rested my glass on it, I might have put | 16:44:49 |

Page 275

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | an ashtray on it because you can hear there's a | 16:44:51 |
| 2 | click with a lighter going off as well.  I don't | 16:44:53 |
| 3 | know what happened or how it got recorded.  As I | 16:44:56 |
| 4 | said, I don't have a practice of doing that.  You | 16:44:58 |
| 5 | all have thousands of hours of every inch of audio | 16:45:00 |
| 6 | that we've ever had as a company and there's not a | 16:45:02 |
| 7 | stitch of that happening anywhere else.  So I was | 16:45:05 |
| 8 | as surprised as you were as I stated earlier.  So | 16:45:08 |
| 9 | no, secretly recording was not an intention of | 16:45:13 |
| 10 | mine. | 16:45:14 |
| 11 | Q.  It was your intention to send that | 16:45:15 |
| 12 | recording to someone else outside the company, | 16:45:17 |
| 13 | though, right? | 16:45:19 |
| 14 | MR. REISNER:  Objection, asked and | 16:45:20 |
| 15 | answered. | 16:45:20 |
| 16 | A.  Yeah.  I was characterizing it's 8:45 or | 16:45:20 |
| 17 | 8:30 at night, I've had a long night, I'm trying to | 16:45:24 |
| 18 | go home, and Matt's holding me here hostage talking | 16:45:27 |
| 19 | about the business. | 16:45:30 |
| 20 | Q.  The audio that we just listened to where | 16:45:36 |
| 21 | you said that the Under Armour CFO, Mr. Molloy, | 16:45:38 |
| 22 | told you that Under Armour should take the quarter | 16:45:41 |

Page 276

CONFIDENTIAL

```
 1          MR. WAREHAM:  Form and foundation         16:48:03

 2   objections.                                       16:48:03

 3          MR. REISNER:  Objection to form and asked 16:48:03

 4   and answered four times now.                      16:48:04

 5          MR. HENSSLER:  You can answer.             16:48:07

 6      A.  Yeah.  I wouldn't know why that would need 16:48:08

 7   to be disclosed to anyone, to be honest with you. 16:48:10

 8   So no, I'm not aware of any public disclosure      16:48:12

 9   that's occurred about that $10 million on the      16:48:15

10   1.3-billion-dollar quarter.                        16:48:19

11      Q.  And you sent that audio that we just        16:48:27

12   listened to to Stephanie Ruhle, right?             16:48:30

13      A.  I did.  And to Jen Smith.                   16:48:34

14      Q.  And to Jen Smith also?                      16:48:35

15      A.  Yes.                                        16:48:38

16      Q.  Anyone else?                                16:48:38

17      A.  I don't believe.  So.                       16:48:39

18      Q.  So you shared nonpublic information about   16:48:41

19   Under Armour's business with Stephanie Ruhle at    16:48:45

20   that time, right?                                  16:48:47

21          MR. REISNER:  Objection to form.           16:48:48

22          MR. WAREHAM:  Form objection,              16:48:50
```

Page 280

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | foundation. | 16:48:50 |
| 2 | A.  Well, she's a confidant. | 16:48:50 |
| 3 | Q.  What does that mean, confidant? | 16:48:52 |
| 4 | A.  She's someone I can get counsel from. | 16:48:53 |
| 5 | Q.  Did you have a nondisclosure agreement | 16:48:55 |
| 6 | that you'd executed with Ms. Ruhle? | 16:48:58 |
| 7 | A.  No. | 16:49:01 |
| 8 | Q.  Handshake deal? | 16:49:01 |
| 9 | A.  Yeah.  It was an understanding of trust. | 16:49:04 |
| 10 | Q.  And was that something you guys had a | 16:49:06 |
| 11 | conversation about? | 16:49:07 |
| 12 | A.  No, not in detail I don't believe. | 16:49:10 |
| 13 | Q.  So it was just your assumption that you | 16:49:12 |
| 14 | could provide her with nonpublic information about | 16:49:13 |
| 15 | Under Armour's business and she wouldn't mention it | 16:49:17 |
| 16 | to anyone else? | 16:49:19 |
| 17 | MR. REISNER:  Objection to form.  You may | 16:49:20 |
| 18 | answer. | 16:49:21 |
| 19 | A.  Yeah.  It was understanding the context is | 16:49:21 |
| 20 | that I would give her counsel on her career and she | 16:49:24 |
| 21 | would give me counsel on things I was dealing with | 16:49:26 |
| 22 | that were either banking or media or human nature | 16:49:28 |

Page 281

CONFIDENTIAL

```
 1    and put in one place so it wouldn't be violating a    17:12:52

 2    quiet period and make sure the people have the        17:12:55

 3    facts of just something that we can say.              17:12:57

 4         Q.  You wanted this sent to everyone, right,     17:12:59

 5    that's why you put it in all caps?                    17:13:02

 6              MR. REISNER:  Objection to form.            17:13:04

 7         A.  I don't recall.                              17:13:04

 8         Q.  When you put something in all caps like      17:13:05

 9    that with an exclamation point, you're adding         17:13:07

10    emphasis, right?                                      17:13:09

11         A.  Perhaps.                                     17:13:11

12         Q.  And Darren, Camile, Robbie, and Omar, are    17:13:14

13    those financial analysts that covered Under Armour    17:13:19

14    at the time?                                          17:13:21

15         A.  Camilo.  No.  Darren is Darren Rovell,       17:13:23

16    Omar was independent, Robbie may have been between    17:13:31

17    banks.  I don't know.  Maybe he was still at Bank     17:13:34

18    of America, but he was an analyst at one time for     17:13:37

19    sure.                                                 17:13:39

20         Q.  Cramer refers to Jim Cramer from CNBC?       17:13:40

21         A.  Yeah.                                        17:13:43

22         Q.  And then did you personally send these       17:13:46
```

Page 305

CONFIDENTIAL

```
 1    acted on, just simply to give reaction to myself.    17:50:00

 2         Q.  The answer's yes?                           17:50:04

 3             MR. WAREHAM:  Form, foundation,             17:50:05

 4    competence, legal conclusion objections.            17:50:07

 5         A.  Yeah.  Good job.                            17:50:09

 6         Q.  At some point, Mr. Frank, your             17:50:18

 7    relationship with Ms. Ruhle was brought to the      17:50:20

 8    attention of the Under Armour board of directors,   17:50:23

 9    correct?                                            17:50:25

10         A.  My relationship, yes.                      17:50:25

11         Q.  And do you know who alerted the Under      17:50:27

12    Armour board of directors to your relationship with 17:50:29

13    Ms. Ruhle?                                          17:50:33

14         A.  No.                                        17:50:33

15         Q.  You never heard anything about who that    17:50:36

16    might have been?                                    17:50:37

17         A.  This isn't a topic that I was -- I'm       17:50:40

18    interested in.                                      17:50:42

19         Q.  Someone at Under Armour uncovered certain  17:50:44

20    e-mails between you and Ms. Ruhle, right?           17:50:47

21         A.  I'm not aware.                             17:50:49

22         Q.  Did the board of directors see the e-mails 17:50:53
```

Page 330

| | | |
|---|---|---|
| 1 | that we have just looked at where you shared | 17:50:56 |
| 2 | information on Under Armour with Ms. Ruhle during | 17:50:59 |
| 3 | various quiet periods? | 17:51:01 |
| 4 | MR. REISNER:  Objection to form, | 17:51:02 |
| 5 | foundation, competence. | 17:51:03 |
| 6 | A.  Yeah, they did. | 17:51:04 |
| 7 | Q.  And then did they question you about the | 17:51:06 |
| 8 | e-mails that we've just looked at where you shared | 17:51:07 |
| 9 | confidential Under Armour information with | 17:51:10 |
| 10 | Ms. Ruhle during various quiet periods? | 17:51:13 |
| 11 | MR. WAREHAM:  Form, foundation, | 17:51:15 |
| 12 | competence, legal conclusion, objections. | 17:51:17 |
| 13 | A.  I spoke with our lead director, yes. | 17:51:17 |
| 14 | Q.  Who's that? | 17:51:19 |
| 15 | A.  It was Buzzy Krongard at the time. | 17:51:20 |
| 16 | Q.  And did he ask you questions about those | 17:51:23 |
| 17 | e-mails that you sent Ms. Ruhle? | 17:51:25 |
| 18 | A.  Yeah. | 17:51:27 |
| 19 | Q.  What did he ask you? | 17:51:29 |
| 20 | A.  I explained to him the nature of our | 17:51:30 |
| 21 | relationship and the mutual understanding of | 17:51:32 |
| 22 | respect and confidence that we had. | 17:51:36 |

Page 331

CONFIDENTIAL

```
 1        Q.  What else did he ask you?              17:51:41

 2        A.  I don't recall.                        17:51:43

 3        Q.  Do you recall about when that was?     17:51:46

 4        A.  I don't recall.  Was it '18?  '18 or 19?  17:51:52

 5   '17, '18, '19.  I don't remember.              17:51:59

 6        Q.  So it was just a one-on-one with the head  17:52:02

 7   of the board?                                   17:52:04

 8        A.  The conversations I had, yes, in depth was  17:52:05

 9   with Buzzy Krongard --                          17:52:08

10        Q.  Did the --                             17:52:10

11        A.  -- our lead director.                  17:52:10

12        Q.  I'm sorry.                             17:52:11

13            Did the Under Armour board of directors  17:52:13

14   take any further actions about what they uncovered  17:52:14

15   about the e-mails to Ms. Ruhle?                 17:52:17

16        A.  I think they wrote -- they wrote a note  17:52:19

17   for a file for me I believe is what happened.   17:52:21

18        Q.  Did they ask you to stop doing that?   17:52:25

19        A.  Yeah.  They asked to -- that they wouldn't  17:52:29

20   look fondly on sharing that information.  I     17:52:32

21   explained the mutual understanding, and they    17:52:35

22   understood it and just said, yep, as a result of  17:52:38
```

Page 332

CONFIDENTIAL

```
 1    that we're advising you not to do that.  I said      17:52:41

 2    thanks very much, that's really helpful, but we      17:52:46

 3    didn't feel any obligation -- we checked with        17:52:49

 4    counsel.  We didn't feel any obligation to           17:52:51

 5    disclose, to notify anyone, and there was no breach  17:52:53

 6    or any evidence of anybody doing anything outside    17:52:56

 7    of other than just exchanging information with one   17:52:58

 8    another from time to time.                           17:53:01

 9        Q.  So the board instructed you to stop that     17:53:02

10    practice?                                            17:53:06

11        A.  What practice?                               17:53:07

12        Q.  Sharing company inside information with      17:53:08

13    Stephanie Ruhle.                                     17:53:10

14            MR. REISNER:  Objection to form.             17:53:11

15        A.  No.  They simply just asked -- there         17:53:12

16    wasn't anything to go to that level of detail, but   17:53:15

17    yeah, they asked please don't e-mail, don't share    17:53:17

18    back.  You'll have your advisors, talk to who you    17:53:20

19    need to talk to.  That was it.                       17:53:25

20        Q.  Did they say it's okay to continue sharing   17:53:27

21    nonpublic information about the company with         17:53:29

22    Stephanie Ruhle?                                     17:53:32
```

Page 333

CONFIDENTIAL

```
 1        A.  I don't think that was the view.  I think    17:53:33
 2    the ask was -- yeah, the sending the e-mail over      17:53:37
 3    the script was one that I didn't have a               17:53:41
 4    recollection of that either and that's one that was   17:53:46
 5    pretty arresting to me, but yeah, because I could     17:53:50
 6    see how that would be perceived and it would make     17:53:53
 7    people uncomfortable and it would really press        17:53:56
 8    the -- you know, the confidence from Ms. Ruhle too.   17:53:58
 9    So I don't think that put her in a very fair          17:54:01
10    position and I don't think it was the right thing     17:54:03
11    for our board or myself.  And so I acknowledged.  I   17:54:05
12    agreed with, you know, Mr. Krongard and said I        17:54:07
13    wouldn't do that again.                               17:54:09
14        Q.  And did you then after that conversation      17:54:12
15    with Mr. Krongard stop sharing inside company         17:54:15
16    information with Ms. Ruhle?                            17:54:20
17            MR. REISNER:  Objection to form, assumes      17:54:21
18    facts not in evidence.  You may answer.               17:54:23
19        A.  I mean, we continued to talk, I continued     17:54:25
20    to use Ms. Ruhle as an advisor -- I mean, as          17:54:27
21    someone that I would share information with.          17:54:30
22        Q.  So you disregarded Mr. Krongard's             17:54:33
```

Page 334

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | advice? | 17:54:35 |
| 2 | MR. WAREHAM:  Form, foundation. | 17:54:36 |
| 3 | A.  That wasn't his -- his advice was asking | 17:54:37 |
| 4 | about an earnings script.  This was the majority of | 17:54:40 |
| 5 | the nature of our conversation with Mr. Krongard. | 17:54:43 |
| 6 | Q.  So you stopped sending earnings scripts to | 17:54:46 |
| 7 | Ms. Ruhle? | 17:54:49 |
| 8 | A.  Well, I believe I only sent one.  So that | 17:54:50 |
| 9 | was the only time that it happened. | 17:54:54 |
| 10 | Q.  And you've stopped doing that? | 17:54:56 |
| 11 | A.  Sharing earnings scripts?  I believe I | 17:54:57 |
| 12 | only sent one. | 17:55:00 |
| 13 | Q.  And you haven't done it since the one that | 17:55:01 |
| 14 | we've looked at, correct? | 17:55:03 |
| 15 | A.  I believe that to be the case, yes. | 17:55:05 |
| 16 | Q.  The Wall Street Journal reported that the | 17:55:11 |
| 17 | Under Armour board of directors questioned you | 17:55:15 |
| 18 | about the nature of your relationship with | 17:55:16 |
| 19 | Ms. Ruhle, right? | 17:55:18 |
| 20 | A.  That's not necessarily accurate reporting | 17:55:19 |
| 21 | and that was all something that was in-house with | 17:55:24 |
| 22 | me and my board. | 17:55:27 |

Page 335

CONFIDENTIAL

```
 1    you're talking about in September was there was no    18:05:32

 2    concern at this point.  This was before we even had   18:05:34

 3    our Q3 earnings call.  This was -- we had a really    18:05:36

 4    healthy back to school, business was doing just       18:05:42

 5    fine, and things just changed quite dramatically      18:05:45

 6    once we got into, you know, the beginning --          18:05:49

 7    beginning, middle of November time frame.             18:05:52

 8         Q.  You were aware in the time period that we    18:06:22

 9    were talking about today, third quarter '15 to the    18:06:25

10    first quarter of 2017, that Under Armour would ask    18:06:29

11    customers to take product in the quarter earlier      18:06:31

12    than it had been requested in order for Under         18:06:34

13    Armour to hit certain reported financial metrics,     18:06:38

14    right, sir?                                           18:06:39

15         MR. REISNER:  Objection, asked and              18:06:41

16    answered.                                             18:06:41

17         A.  I'm sorry.  Say that one more time.  It's    18:06:44

18    getting late.                                         18:06:45

19         Q.  Happy to.                                    18:06:46

20         You were aware in the time period that          18:06:48

21    we've been talking about, 3Q '15 to 1Q '17, that     18:06:50

22    Under Armour would ask customers to take product in  18:06:56
```

Page 345

CONFIDENTIAL

```
 1    the quarter earlier than it had been requested in      18:06:58

 2    order for Under Armour to hit certain reported         18:07:02

 3    financial metrics, right?                              18:07:05

 4         MR. REISNER:  Objection, form.                    18:07:06

 5         A.  That may have been one of the reasons as      18:07:07

 6    to why we would do that, but it was a consistent       18:07:10

 7    practice at Under Armour to utilize pull-forwards      18:07:12

 8    for a number of different reasons, one of which,       18:07:15

 9    yes, was to hit a financial objective.                 18:07:18

10         MR. HENSSLER:  Let's go off the record.           18:07:21

11         THE VIDEOGRAPHER:  Off the record 18:07.          18:07:23

12              (A break was had.)                           18:07:25

13         THE VIDEOGRAPHER:  Back on the record at          18:15:01

14    18:15.                                                 18:15:02

15         MR. HENSSLER:  Mr. Plank, thanks for your         18:15:04

16    time today.  Absent any questions from your            18:15:06

17    counsel, that's all we have for now.  We do reserve    18:15:10

18    the right to recall Mr. Plank for good cause or        18:15:12

19    should additional evidence be produced after this      18:15:15

20    date.  Thank you, sir.                                 18:15:17

21         THE WITNESS:  Thank you.                          18:15:19

22         MR. WAREHAM:  No questions from the               18:15:20
```

Page 346

CONFIDENTIAL

```
 1              C E R T I F I C A T E

 2

 3          I, TINA M. ALFARO, Registered Professional

 4   Reporter, Certified Realtime Reporter, and

 5   Registered Merit Reporter, the officer before whom

 6   the foregoing deposition was taken, do hereby

 7   certify that the foregoing transcript is a true and

 8   correct record of the testimony given; that said

 9   testimony was taken by me stenographically and

10   thereafter reduced to typewriting under my

11   direction; that reading and signing was requested;

12   and that I am neither counsel for, related to, nor

13   employed by any of the parties to this case and

14   have no interest, financial or otherwise, in its

15   outcome.

16          IN WITNESS WHEREOF, I have hereunto set my

17   hand on this 16th day of February, 2023.

18

19

20

21

22   Tina M. Alfaro, RPR, CRR, RMR
```

Page 349