IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>IN RE UNDER ARMOUR<br>SECURITIES LITIGATION</td><td>*</td><td>Civil Action No. RDB-17-0388</td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

The basic allegation in this putative class action is that Defendants Under Armour, Inc. ("Under Armour," "UA," or the "Company") and its co-founder and former Chief Executive Officer ("CEO") Kevin Plank ("Plank") (collectively, "Defendants") misrepresented the level of consumer demand for Under Armour products. The Consolidated Third Amended Complaint ("TAC") (ECF No. 153)[1] alleges violations of Sections 10(b), 20(a), and 20A of the Securities and Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 thereunder. Lead Plaintiff Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Aberdeen") and Plaintiffs Monroe County Employees' Retirement System ("Monroe") and KBC Asset Management ("KBC") (collectively, "Plaintiffs") contend that Defendants misled investors and defrauded the market by falsely claiming that consumer demand for the Company's products was strong between the third quarter of 2015 and the fourth quarter of 2016. (ECF No. 153 ¶¶ 20, 81, 126, 160–68.) They further allege that the Defendants manipulated the Company's financial results, and otherwise led investors to

---

[1] For clarity, this Memorandum Opinion cites to the ECF generated page number, rather than the page number at the bottom of the parties' various submissions, unless otherwise indicated. Likewise, this Memorandum Opinion cites to the ECF generated document number, rather than the exhibit number provided by the parties' various submissions.

believe that Under Armour's 26-consecutive quarter year-over-year ("YoY") growth streak was "intact," when demand for the Company's products was in decline.  (*Id.* ¶¶ 5–7, 148–68.)

Ten motions are presently pending in this case: Defendants' Motion for Summary Judgment (ECF No. 299); Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366); three (3) motions to exclude expert testimony and opinions filed by Plaintiffs (ECF Nos. 302, 305, 308); four (4) motions to exclude expert testimony and opinions filed by Defendants (ECF Nos. 309, 311, 314, 316); and Defendant Under Armour, Inc.'s Motion to Seal[2] (ECF No. 364).  This Court heard oral argument from the parties on Friday, February 9, 2024, on Defendants' Motion for Summary Judgment (ECF No. 299) and Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366).  A hearing on the seven (7) motions to exclude expert testimony and opinions (ECF Nos. 302, 305, 308, 309, 311, 314, 316) is presently scheduled for Tuesday, April 9, 2024 and Wednesday, April 10, 2024.  (ECF No. 375.)  Accordingly, the instant Memorandum Opinion addresses only Defendants' Motion for Summary Judgment (ECF No. 299) and Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366).

To prove a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiffs must establish six elements, two of which Defendants challenge through their Motion for Summary Judgment.  Specifically, Defendants challenge whether Plaintiffs can

---

[2]  In connection with this pending Motion to Seal, Under Armour refiled several documents previously filed under seal, (ECF Nos. 357, 358, 359, 360), and refiled with redactions several documents previously filed under seal, (ECF Nos. 361, 362, 363).  This Court will address Defendant Under Armour's Motion to Seal (ECF No. 366) in a separate opinion.  Where documents were previously filed under seal and subsequently refiled or refiled with redactions, this Memorandum Opinion cites to the subsequently filed documents, as such documents are publicly available.

show a genuine issue of material fact as to the requisite material misrepresentation or omission and scienter (i.e., a wrongful state of mind) elements.  With respect to the first element, the circumstances under which the challenged statements were made creates a genuine issue of material fact as to whether such statements were in fact misleading.  Likewise, with respect to scienter, there are genuine issues of material fact that must be addressed by the jury as the finder of fact in this case.  For the reasons that follow, Defendants' Motion for Summary Judgment (ECF No. 299) is hereby **DENIED**; and Plaintiffs' Motion for Leave to File Surreply (ECF No. 366) is hereby **DENIED**.

## BACKGROUND

In ruling on a motion for summary judgment, this Court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### I.      The Parties

### A.  Plaintiffs.

Pursuant to this Court's Order dated September 29, 2022, Plaintiffs Aberdeen, Monroe, and KBC are Class Representatives.  (ECF No. 246.)  Plaintiffs bring this federal class action under Sections 10(b), 20(a), and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of all persons or entities that purchased or acquired common stock of Under Armour between September 16, 2015 and November 1, 2019 (the "Class Period").  (*Id.*; ECF No. 153 ¶ 2.)

### B.  Defendants.

The Consolidated Third Amended Complaint—the operative complaint in this class

3

action—names Under Armour and Plank as the sole Defendants.  (ECF No. 153.)  Under Armour "is a leading inventor, marketer, and distributor of branded athletic performance apparel, footwear, and accessories."  Under Armour, Inc., Quarterly Report (Form 10-Q) (Nov. 8, 2023).  Plank co-founded Under Armour and currently serves as its Executive Chairman and Brand Chief.  (ECF No. 153 ¶ 31.)  Plank served as Under Armour's CEO from 1996 through December 31, 2019, and has served as its Chairman of the Board since Under Armour went public in 2005.  Under Armour, Inc., Current Report (Form 8-K) (Oct. 22, 2019).

## II.    Factual Background

### A. Under Armour's Reported Financial Performance and Disclosures During Relevant Period(Q3 2015–Q1 2017).[3]

#### 1. 2015.

For Q3 2015, Under Armour reported net revenues of $1.2 billion, reflecting year-over-year ("YoY") growth of 28%.  *See* Under Armour, Inc., Current Report (Form 8-K) (Oct. 22, 2015).  Under Armour raised its 2015 net revenue guidance by $70 million.  *Id.*

For Q4 2015, Under Armour reported net revenues of $1.17 billion, reflecting YoY growth of 31%.  *See* Under Armour, Inc., Current Report (Form 8-K) (Jan. 28, 2016).

Net revenues for FY 2015 were $3.963 billion, representing 28% YoY growth.  *See* Under Armour, Inc., Current Report (Form 8-K) (Jan. 28, 2016).

#### 2. 2016.

During Under Armour's January 28, 2016 Earnings Conference Call, the Company

---

[3] Fiscal quarters are referenced in the format of "Q# YYYY," such that the third quarter of 2015 appears as Q3 2015.  Fiscal years are referenced in the format "FY YYYY" such that the fiscal year of 2015 appears as FY 2015.

disclosed 2016 net revenue guidance of $4.95 billion, representing 25% YoY growth.  (ECF No. 301-20.)

For Q1 2016, Under Armour reported net revenues of $1.05 billion, reflecting YoY growth of 30%.  *See* Under Armour, Inc., Current Report (Form 8-K) (Apr. 21, 2016).  Under Armour raised its 2016 net revenue to approximately $5 billion.  *Id.*

On May 31, 2016, Under Armour disclosed a reduction of its FY 2016 net revenue guidance to $4.925 billion related to the bankruptcy proceedings of one of its customers, The Sports Authority.  *See* Under Armour, Inc., Current Report (Form 8-K) (May 31, 2016).

For Q2 2016, Under Armour reported net revenues of $1 billion, reflecting 28% YoY growth.  *See* Under Armour, Inc., Current Report (Form 8-K) (July 26, 2016).

For Q3 2016, net revenues were $1.47 billion, reflecting YoY growth of 22% over Q3 2015.  Under Armour, Inc., Current Report (Form 8-K) (Oct. 25, 2016).

Under Armour did not achieve revenue guidance for Q4 2016 or FY 2016.  Net revenues for Q4 2016 were $1.3 billion, reflecting YoY growth of 12%.  Under Armour, Inc., Current Report (Form 8-K) (Jan. 31, 2017).  Net revenues for FY 2016 were $4.828 billion, reflecting YoY growth of 22%.  *Id.*

Unsurprisingly, the parties' narratives vary significantly from here.  The below provides an overview of the parties' respective positions, beginning with Defendants' narrative.

## B. Defendants' Narrative.

### 1. According to Defendants, Under Armour's Internal Projections Forecasted Robust Revenue Growth in Both 2016 and 2017 Through Mid-to-Late 2016.

Throughout the Relevant Period, Defendants emphasize that Under Armour's internal financial reporting process included developing an annual financial plan for the upcoming

fiscal year and then updating the plan again at or just before the fiscal year began and then updating the plan again after each quarter, which incorporated sales that had been pulled forward. (ECF No. 361-1 at 21 (citing ECF Nos. 357-22, 357-1, 357-3, 361-18).) The Company also prepared monthly updates. (*Id.* (citing ECF No. 557-22).) Defendants emphasize that the Company's internal reporting in mid-to-late 2016 forecasted "robust revenue growth" in both 2016 and 2017 and "consistently indicated that UA would meet or exceed its externally provided [] guidance." (*Id.* at 22 (citing ECF Nos. 357-19, 361-15, 357-21, 361-16, 361-17), 56.)

**2. According to Defendants, the Company's Practice Of Pulling Forward Sales Was Above Board.**

Under Armour operates through an international supply chain, with "virtually all of its products . . . manufactured by unaffiliated manufacturers . . . outside of the United States." (ECF No. 361-1 at 22 (citing Under Armour, Inc., Annual Report (Form 10-K) (Feb. 23, 2017)).) Consequently, the Company's "products had long 'lead times' from the beginning of the manufacturing process . . . to delivery to the [wholesale] customer," (*id.*), with wholesale orders sometimes "[placed] a year in advance." (*Id.* at 23 (citing ECF No. 361-5).) Upon booking, a wholesale order is assigned a "purchase order date," which was Under Armour's "best estimate of when the product will be available and when [the customer] would pick it up." (*Id.*) Any delivery within two weeks of the "purchase order date" was considered "on time." (*Id.*)

According to Under Armour, the term "pull forward" was used to reference a customer sale executed earlier than originally planned. (*Id.* (citing Under Armour, Inc., Current Report (Form 8-K) (July 27, 2020)).) Under Armour concedes that it executed pull forward sales

during the Relevant Period, (*id.* (citing Under Armour, Inc., Current Report (Form 8-K) (May 3, 2021)), but insists that "[p]ull forwards were a commonplace industry mechanism that were done on a regular basis." (*Id.* (citing ECF Nos. 357-6).)

Under Armour emphasizes that it did not coerce its customers to take product early. (ECF No. 300 at 25 \***SEALED**\*.)  In support of this, Under Armour points to the testimony of an Under Armour customer, (*id.* (citing ECF No. 303-12   \***SEALED**\*("If [we] did not want the product that [Under Armour] was offering to ship early, [we] could say no.")))), and internal emails from June 2016 showing a customer reached out "in hopes of pulling forward" purchase orders that were originally anticipated to ship in July 2016 (Q3 2016) such that the order would ship in June 2016 (Q2 2016).  (ECF No. 361-1 at 25 (citing ECF No. 361-20).)

Under Armour emphasizes that "[n]o witness testified that pull forwards Under Armour used during the Relevant Period violated [Generally Accepted Accounting Principles ("GAAP")]," nor is it suggested that the pull forwards "did not involve real sales of real products to real customers." (*Id.* at 26.)  Defendants assert that "[n]o financial or accounting professional informed senior management that [its] financial reporting was improper or that pull forwards must be disclosed," and "[t]here is no evidence that any . . . senior executive . . . believed that [Under Armour]'s financial disclosures were inaccurate or insufficient during the Relevant Period." (*Id.*)

### 3. Defendants Stress that Under Armour Utilized its Independent Auditor, Disclosures, and its Disclosure and Audit Committees During the Relevant Period.

Throughout their briefing, Defendants emphasize that, throughout the Relevant Period, Under Armour utilized its independent auditor, PricewaterhouseCoopers LLP

("PwC"),  (ECF No. 361-1 at 26–27), as well its Disclosure Committee and Audit Committee. (*Id.* at 28–30.)   Defendants further note that, in its public filings with the United States Securities and Exchange Commission ("SEC") during the Relevant Period, it disclosed risk factors that could adversely impact the Company's results of operations and financial conditions, such as "changing consumer preferences," "[increased] competition," "inability to compete successfully against our competitors and maintain our gross margin," "the financial condition of our retail customers," and "[v]ariations in weather conditions," particularly warmer weather.. (*Id.* at 27–28 (citing Under Armour, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2015); Under Armour, Inc., Annual Report (Form 10-K) (Feb. 22, 2016); Under Armour, Inc., Quarterly Report (Form 10-Q) (Apr. 29, 2016); Under Armour, Inc., Quarterly Report (Form 10-Q) (Aug. 3, 2016); Under Armour, Inc., Quarterly Report (Form 10-Q) (Nov. 2, 2016); Under Armour, Inc., Annual Report (Form 10-K) (Feb. 23, 2017); Under Armour, Inc., Quarterly Report (Form 10-Q) (May 9, 2017)).)   According to Defendants, when some of these risks materialized, Under Armour provided updates to investors during earning calls for Q1 2016 to Q4 2016.  (*Id.* at 28 (citing ECF Nos. 301-21, 301-16, 301-23, 301-24).)

### 4.  Kevin Plank Sold Shares of Under Armour Common Stock on "No More Than Nine Days During the Class Period."

Under Armour offers three classes of common stock: Class A, Class B, and Class C, with shares of Class C first distributed on April 7, 2016 through a one-for-one dividend to all holders of Class A and Class B stock.  Under Armour, Inc., Annual Report (Form 10-K) (Feb. 23, 2017).  Defendants emphasize that Plank sold shares of Under Armour common stock on "no more than nine days during the Class Period": Plank sold shares of Class A stock on November 17, 18, 19, 20, and 23, 2015, and sold shares of Class C stock on April 26, 27, 28,

and 29, 2016.  (ECF No. 361-1 at 30.)

### C. Plaintiffs' Narrative.

### 1. According to Plaintiffs, Defendants Continued to Publicly Boast Growth, Drivers, and Demand Despite Internal Recognition that the Company's Core North American Wholesale Business Was Declining.

According to Plaintiffs, the first material misstatement was made by Plank at Under Armour's September 16, 2015 Investor Day, where Plank emphasized the Company's "20%-plus growth streak . . . [over] 21 consecutive quarters, and stated that 'demand for our brand has never been stronger' and the 'drivers' of sales growth were the same as they had been 'over the past 10 years.'"  (ECF No. 361-34 at 15–16 (citing ECF No. 337-10).)  Plaintiffs allege that Defendants continued to make similar statements throughout the Class Period.  (*Id.* at 16.)

Plaintiffs further allege that Under Armour "knew that [it] 'need[ed] to maintain high growth to justify [its] share price.'"  (*Id.* (citing ECF No. 360-18).)  And according to Plaintiffs, internal communications conflict with Defendants' public representations.  (*Id.* at 16–19.)  Plaintiff's opposition cites several notable examples from as early as April 2015 of Under Armour's internal recognition that sales in core North American wholesale business were decelerating.  (*See id.* at 16–17 (citing ECF Nos. 359-26 (discussing "dire situation in US Wholesale Apparel"), 363-22 (noting the situation was "[f]ricking ugly" and "[t]he update for [Plank] will not be fun"), 360-18 (noting meeting "to discuss the [year-end] challenge" and the "obvious . . . need" for additional revenue in 2015 to "mitigate the sales risks that exists [sic] in North America"), 363-25 (circulating a presentation explaining how the Company's North American business relied on declining brick and mortar retail, "making '[a]chieving [the

Company's] growth rate aspirations . . . less and less possible as we have reached our current scale" and noting that "some of our efforts fueling are last miles of growth are manifesting themselves in weaker performance"), 362-17, 360-34[4] (describing the Company's pull forwards and "[i]ncreased liquidation above what we planned" as an amount that "isn't really our natural growth," and noting "North America's a f***ing disaster")).) Significantly, on December 22, 2015, an internal email noted Under Armour would "miss targets in 2015" and summarizing talking points for Plank, including that "[k]ey performance indicators for 2016 are not heading in the right direction," that Plank was "disappointed" by how "the brand is being managed," and indicating that warm weather alone could not explain these results. (*Id.* at 17 (citing ECF No. 360-3).) The next day, an email sent to Plank from another top executive included a presentation that indicated liquidations were up 50% and estimated revenues for 2016 came down by approximately $135 million. (*Id.* at 17–18 (citing ECF No. 363-26).)

According to Plaintiffs, this internal recognition continued into 2016. (*See id.* at 18 (citing ECF Nos. 362-26, 362-4 (noting "a [2016] Net Revenue gap of app[roximately] $100 [million] to our forecast"), 360-9 (replying "[a]fraid so . . . will be 19% for Q2" to internal question "[i]s this apparel number for second quarter real"), 362-38 (noting the numbers "point us to guiding total company Q3 to below 20% [revenue growth]," citing a "wholesale revenue shift"), 363-8, 363-19 (stating the Company had "sliding revenue growth rates since 2014 driven by [North America]" attributed to "declining consumer demand creation specifically in [North America] despite massive investments into retail and ecom[merce]")).)

---

[4] ECF No. 360-34, or Exhibit 194 to the Declaration of Robert R. Henssler, Jr. (ECF No. 337) ("Henssler Declaration"), is a physical exhibit filed with the Clerk's Office.

Notably, in an October 2, 2016 email from then-Chief Financial Officer ("CFO") Chip Molloy ("Molloy") to Plank, Molloy stated: "sales are projected to be missing plan . . . while operating income is expected to be off. . . . Slowing apparel growth. We are missing in [North America] wholesale." (*Id*. at 18–19 (citing ECF No. 360-5).)

   2. **According to Plaintiffs, Plank's Obsession with Growth Created Bad Behavior.**

   According to Plaintiffs, Plank created a "culture of fear" that drove the Company's "f***ing hit the number" growth strategy and behavior. (ECF No. 361-34 at 19–20.) Plaintiffs emphasize that former-CFO Molloy testified that "'[y]ou have to go f***ing hit the number'" was "a common refrain" from Plank and "'there was an overriding obsession in the company to grow at least 20 percent, if not more, in any given period.'" (*Id*. at 19 (citing ECF No. 359-12).) Plaintiffs contend that "[t]his pressure created a constant scramble during the Class Period to make up revenue needed to artificially hit Plank's revenue growth numbers and extend the streak." (*Id*.) Plaintiffs' briefing cites several significant examples of Plank's fixation on growth. (*Id*. (citing ECF Nos. 359-20, 360-31[5] (Plank calling Molloy "motherf***er" after Molloy suggested reducing Q1 2016 revenue guidance and telling another executive "I need you to go get that f***ing number" and "I need you running and driving that f***ing number"), 360-11, 359-12 ("I want us modeling 25%" and "[t]here is no such thing as an approved [three-year] anything that included a growth%# below 25%.")).) Plaintiffs emphasize that "[a]ttempts to push back on Plank's unrealistic financial targets were referred to as 'loser talk' throughout the Company and executives were instead required to

---

[5] ECF No. 360-31, or Exhibit 190 to the Henssler Declaration, is a physical exhibit filed with the Clerk's Office.

'find a way.'"  (*Id.* at 20 (citing ECF Nos. 363-47, 360-41,[6] 363-7, 362-4, 362-7).)

Plaintiffs contend that, by 2014, Under Armour "abandoned" the industry standard of "[b]ottoms up sales planning" in favor of "top down planning," which was "built on what someone wants to happen" and "just cramming the market and hoping."  (*Id.* (citing ECF No. 363-44).)  In support of this position, Plaintiffs highlight the testimony of Under Armour's former-CFO Molloy, who testified that the "culture of fear" he referenced in a July 2016 internal email was based on the tone set by Plank.  (*Id.* at 19 (citing ECF Nos. 363-23, 359-12).)  He further testified that the culture "may be creating bad behavior."  (*Id.* at 20 (citing ECF Nos. 359-20, 359-12).)  "That makes it very disheartening to me in my role if I'm not getting what I would consider a very believable and trustworthy plan from those that actually sell the product, make the product and sell the product."  (*Id.* (citing ECF No. 359-20).)

### 3. According to Plaintiffs, Under Armour Relied on "Unnatural" Business Practices to Conceal Declining Demand and Achieve Revenue Estimates.

According to Plaintiffs, Under Armour did not use pull forwards to achieve revenue targets prior to 2015, fearing that pull forwards could create "a domino effect."  (ECF No. 361-34 at 21 (citing ECF Nos. 362-23, 363-6, 359-24, 359-14).)  Plaintiffs further contend that, from Q3 2015 to Q1 2017, Under Armour "relied on pull forwards to mask its decelerating growth and hit revenue growth targets," pulling forward "at least $387 million in revenue," according to Plaintiffs' proposed expert Paul Regan's ("Regan") calculations.  (*Id.* at 21, 30).  Plaintiffs emphasize that "Plank and other executives admit[] this in sworn testimony," (*id.* (citing ECF Nos. 362-7, 359-12, 359-6, 362-1, 362-4, 359-8)); that Under Armour induced

---

[6] ECF No. 360-41, or Exhibit 204 to the Henssler Declaration, is a physical exhibit filed with the Clerk's Office.

wholesale customers to accept shipments early, offering discounts, extended payment terms, and the right to return unsold product, (*id.* at 21–22 (citing 359-12, 359-8, 359-13, 360-17, 359-5, 362-20, 363-30, 362-6)); and that Under Armour avoided using the term "pull forward" in communications with PwC. (*Id.* at 22 (citing ECF No. 359-27).)

Plaintiffs point to an internal presentation from September 2015 indicating that Under Armour already "[e]xecuted" at least $44.5 million of pull forwards from Q4 2015 into Q3 2015 to close the revenue gap." (*Id.* (citing ECF No. 360-1).) According to Plaintiffs' proposed expert Regan, Under Armour would have missed analyst consensus estimates for the first time ever without the pull forwards in Q3 2015. (*Id.*) When Under Armour reported its Q3 2015 financial results, the Company "hid declining demand and reliance on pull forwards from investors and instead claimed revenue growth was driven by 'a growing interest in performance products and the strength of the Under Armour brand in the marketplace.'" (*Id.* (citing ECF No. 358-2).)

According to Plaintiffs, Under Armour's reliance on pull forwards continued in Q4 2015 "as it again struggled to achieve its forecasted revenue growth and meet consensus revenue estimates." (*Id.* at 23 (citing ECF No. 363-4).) Plaintiffs emphasize that executives internally acknowledged that "'[the Company] would not have hit our 2015 [revenue forecast] without overdriving liquidation and pulling revenue out of 2016.'" (*Id.* (citing ECF No. 363-36).)

Then, in early January 2016, Morgan Stanley published an in-depth report partially revealing the point-of-sale data (the "SportScan data") that Under Armour's demand, market share, and average sale prices ("ASPs") had declined since spring 2015. (*Id.* (citing ECF No.

337-21).)   The following day, an internal email addressed to Plank and other executives highlighted the Morgan Stanley report, noting "[w]e have known about the SportScan data for some time (showing lackluster apparel sell-through trends)."   (*Id.* (citing ECF No. 360-13).) Plank immediately sent an email ordering a "strategy to put our friends in media and other analysts to work to refute [the Morgan Stanley] report" and further stating that the Company was "in a quiet period but this will not go unanswered."   (*Id.* (citing ECF No. 360-21); *see also* ECF Nos. 360-27, 360-24, 360-12.)

According to Plaintiffs, Under Armour downplayed the SportScan data on its January 28, 2016 earnings call for Q4 2015 and FY 2015, and Plank "made materially misleading statements reassuring the market of the Company's financial condition, stating that UA's 'growth story is strong, we remain a growth company, and none of that is wavered'" and "[o]ur brand, our presence, our ability to drive ASPs have never been stronger in North America.'"   (ECF No. 361-34 at 24 (citing ECF No. 337-12; Under Armour, Inc., Current Report (Form 8-K) (Jan. 28, 2016); Under Armour, Inc., Annual Report (Form 10-K) (Feb. 22, 2016)).)   A February 1, 2016 internal email addressed to Plank and other executives summarized analyst reaction to Q4 2015 results:

> "Channel stuffing" was a concern given the high level of year end accounts receivable, which grew 24 points higher than sales growth after single-digit spreads the prior seven quarters.  In other words, did UA pull levers with TJX or other partners to make the top line numbers late in the quarter?

(*Id.* (citing ECF No. 360-14); *see also* ECF No. 363-13.)

According to Plaintiffs, the pull forwards executed in 2015 created gaps in 2016, which Under Armour filled with more pull forwards.  (ECF No. 361-34 at 24–25 (citing ECF No. 359-29); *see also* ECF Nos. 357-28, 363-2, 362-17.)   According to Plaintiffs' proposed expert

Regan, the Company would have missed analysts' estimates in both Q1 and Q2 2016 without these orders.  (ECF No. 361-34 at 25.)

Plaintiffs further emphasize that Defendants took steps to quiet channel stuffing concerns noted by analysts in response to the Company's disparity in revenue growth and accounts receivable growth in Q4 2015.  (*Id.* at 25–26 (citing ECF Nos. 363-13, 360-14, 363-28, 363-21, 363-29, 363-31, 363-3).)  Specifically, Under Armour incentivized one of its largest customer to pay down its accounts receivable balances early to conceal the disparity in revenue growth and accounts receivable growth, who ultimately agreed to prepay $33 million, which "enable[ed] UA to hide its channel stuffing."  (*Id.*)

Plaintiffs further assert that by mid-2016, Under Armour executives, including Plank, understood that actual growth would not come close to 20% during the second half of the year without continuing to manipulate revenue with pull forwards.  (*Id.* at 26.)  Plaintiffs point to internal communications reflecting as much.  (*Id.* (citing ECF Nos. 363-5, 359-28, 363-4, 360-30,[7] 362-7, 362-29, 360-16, 359-12, 360-6, 363-32, 360-29,[8] 362-7).)  Plaintiffs emphasize that, to entice its largest customer to consider additional pull forwards in Q3 2016, Under Armour agreed to a 25% discount and 30 additional days for payment.  (*Id.* at 27 (citing ECF No. 338-26 *SEALED*).)  According to Plaintiffs' proposed expert Regan, Under Armour would not have reached estimates or 20% revenue growth in Q3 2016 without such orders. (*Id.*)

Under Armour's reliance on pull forwards continued into Q4 2016.  (*Id.* at 28 (citing

---

[7] ECF No. 360-30, or Exhibit 189 to the Henssler Declaration, is a physical exhibit filed with the Clerk's Office.
[8] ECF No. 360-29, or Exhibit 188 to the Henssler Declaration, is a physical exhibit filed with the Clerk's Office.

ECF Nos. 359-30, 363-19, 360-8, 363-35, 362-18).)  As one executive put it, "[they do not] want any of that product in [Q4 2016] but we are shipping it to them and they are absolutely taking it from us as a favor.  If we were a privately held company, we would not ship that product to them in December."  (*Id* (citing Ex. 191 to the Henssler Decl.[9] **SEALED**, ECF No. 360-2).)

Under Armour planned significant pull forwards from Q1 2017 into Q4 2016, (*id.* (citing ECF No. 363-4)), but ultimately realized that there were not enough additional pull forwards to meet consensus estimates or 20%+ revenue growth.  (*Id.* (citing ECF Nos. 363-4, 362-36).)  On December 15, 2016, Plank explained internally:

> We've been living in this bubble for a while. Pulling ahead [$]40-50M ahead each quarter. I don't think that's healthy.  It's going to be a cold shower in January. . . . We're not going to compromise 2017. . . . And if we're going to miss, we're going to miss gloriously.  But we're not going to take from next year.  To save what, a burning house?

(*Id.* at 28–29 (citing ECF No. 362-36).)  Just days before, however, Plank signed off on the decision to pull forward $11 million of footwear business "to secure higher footwear growth number in Q4."  (*Id.* at 29 (citing ECF No. 362-25).)

Plaintiffs further assert that Under Armour overdrove liquidations to "offset softness" in its North American wholesale business, then manipulated accounts receivable to avoid public disclosure.  (*Id.* at 30–33 (citing ECF Nos. 363-46, 363-38, 363-40).)  Under Armour executives referred to this practice as "overdriving" and acknowledged the Company "would not have hit our 2015 [forecast] without overdriving liquidation and pulling revenue out of 2016."  (*Id.* at 31 (ECF No. 363-36).)

---

[9] Exhibit 191 to the Henssler Declaration, is a physical exhibit filed under seal with the Clerk's Office.

Internally, executives discussed the need to keep liquidation retailers below 10% of the Company's accounts receivable "in order to stay out of disclosure concerns." (*Id.* at 32 (citing ECF Nos. 363-41, 362-16).)  To stay below this threshold and avoid disclosure, executives asked one liquidator to pay down approximately $30 million of its accounts payable early, which the liquidator agreed to do in exchange for an "anticipation" discount. (*Id.* (citing ECF No. 363-27).)  To further avoid hitting the 10% disclosure threshold for such customers, Under Armour began selling to additional major discount chains. (*Id.* at 32–33 (citing ECF Nos. 363-24, 362-13, 363-49, 362-12).)

As one Under Armour executive put it: "we massively missed sales in North American wholesale, we made up for it in liquidation." (*Id.* at 33 (citing ECF Nos. 360-42,[10] 360-15, 363-19, 338-28 \***SEALED**\*, 363-20).)  As of December 16, 2016, Under Armour's liquidation sales grew "+56% in 2016." (*Id.* (citing ECF No. 363-20).)

### 4. According to Plaintiffs, Plank Profited While Investors Suffered as Reality of Under Armour's Financial Condition Partially Revealed.

According to Plaintiffs, the "truth regarding [Under Armour]'s operational and financial condition" slowly leaked out "in a series of partial disclosures that resulted in statistically significant stock price declines and investor losses as the artificial inflation in the Company's stock price dissipated." (ECF No. 361-34 at 33.)  "Defendants, however, concealed this grim reality from investors," and "Plank cashed in on the fraud with $138 million in all profit stock sales." (*Id.*)  "The market did not learn the full truth until the [*Wall Street Journal* ("*WSJ*")] published an article on November 3, 2019, revealing that both the SEC

---

[10] ECF No. 360-42, or Exhibit 205 to the Henssler Declaration, is a physical exhibit filed with the Clerk's Office.

and [Department of Justice ("DOJ")] were investigating whether Under Armour 'shifted sales from quarter to quarter to appear healthier.'"[11]  (*Id.*)

### III.   Procedural History.

This class action was initiated on February 10, 2017 upon Plaintiff Brian Breece filing a complaint against Under Armour, Plank, and Molloy.  (ECF No. 1.)  After consolidation with other suits filed against Under Armour, Plank, and numerous other defendants, this Court dismissed the Plaintiffs' Consolidated Amended Complaint on September 19, 2018.  (ECF No. 75.)  On November 16, 2018, Lead Plaintiff Aberdeen filed a Consolidated Second Amended Complaint for violations of the federal securities laws (ECF No. 78), naming only Under Armour and Plank as Defendants.  That Second Amended Complaint alleged that between September 16, 2015 and January 30, 2017, the Defendants issued a series of false and misleading statements about demand for Under Armour products and the company's financial condition.  (*Id.* ¶¶ 2, 14.)

On August 19, 2019, this Court dismissed the Second Amended Complaint with prejudice.  (ECF No. 98 at 26.)  Judgment was entered on September 9, 2019 (ECF No. 101), and on September 17, 2019, the Plaintiffs filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit (ECF No. 102).  Based on the reports of the *WSJ* that Under Armour was the subject of SEC investigations, Lead Plaintiff moved on November 18, 2019 for an indicative ruling (ECF No. 105), requesting that this Court grant the Plaintiffs' Motion for Relief from the Court's September 9, 2019 Judgment pursuant to Federal Rule of Civil

---

[11]  Aruna Viswanatha & Khadeeja Safdar, *Under Armour Is Subject of Federal Accounting Probes*, WALL ST. J. (Nov. 3, 2019), available at https://www.wsj.com/articles/under-armour-is-subject-of-federal-accounting-probe-11572819835.

Procedure 60(b), if the Fourth Circuit remanded for that purpose.  (ECF No. 106.)   On January 22, 2020, this Court granted the Lead Plaintiff's request.  (ECF No. 139.)  Accordingly, this Court held that it would permit Lead Plaintiff to file a third amended complaint bringing claims against the Defendants for violations of the Exchange Act.  (*Id.*)

On October 14, 2020, the Lead Plaintiff filed the operative Consolidated Third Amended Complaint (ECF No. 153) for violations of the federal securities laws, alleging that Defendants Under Armour and Plank misled investors during the Class Period by falsely claiming that consumer demand for the Company's products was strong between the third quarter of 2015 and the fourth quarter of 2016.  Plaintiffs allege that the Defendants led investors to believe that Under Armour's 26-consecutive quarter 20% year-over-year revenue growth streak was "safely intact," when in reality demand for the company's products was in decline.  (ECF No. 153 ¶¶ 148–168.)  They claim that Defendants manipulated the Company's financial results by pulling sales forward from future quarters and engaged in other allegedly suspect sales practices.  (*Id.*)  The Plaintiffs assert violations of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder against Defendants Under Armour and Plank (Count I); violations of Section 20(a) of the Exchange Act, again against both Under Armour and Plank (Count II); and violation of Section 20A of the Exchange Act against Defendant Plank (Count III).  (*Id.* ¶¶ 412–436.)

On May 31, 2021, this Court denied Defendants' Motion to Dismiss the TAC (ECF No. 159).  (ECF No. 173); *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513 (D. Md. 2021).  On December 1, 2021, Plaintiffs filed their Motion for Class Certification (ECF No. 197), which was granted on September 29, 2022.  (ECF No. 245); *In re Under Armour Sec. Litig.*, 631

F. Supp. 3d 285 (D. Md. 2022).

Discovery in this matter has now concluded, (ECF No. 280), and a twelve-day jury trial is scheduled to begin on July 15, 2024.  (ECF No. 295.)  Pursuant to the Scheduling Order in this case, deadline to file dispositive motions and challenges to experts was October 2, 2023. Defendants have moved for summary judgment (ECF No. 299) and to exclude or limit the opinions and testimony of Professor M. Todd Henderson (ECF No. 309), D. Paul Regan (ECF No. 311), Professor Mark A. Cohen (ECF No. 314), and Matthew D. Cain, Ph.D. (ECF No. 316).  Plaintiffs have moved to exclude or limit the opinions and testimony of Paul A. Gompers (ECF No. 302), Wayne Guay (ECF No. 305), and Laurie Wilson (ECF No. 308). Also pending is Defendant Under Armour, Inc.'s Motion to Seal (ECF No. 364) and Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366).

This Court heard oral argument from the parties on Friday, February 9, 2024, on Defendants' Motion for Summary Judgment (ECF No. 299) and Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366.)  A hearing on the seven (7) motions to exclude expert testimony and opinions (ECF Nos. 302, 305, 308, 309, 311, 314, 316) is presently scheduled for Tuesday, April 9, 2024 and Wednesday, April 10, 2024. (ECF No. 375).  Thus, the instant Memorandum Opinion addresses only Defendants' Motion for Summary Judgment (ECF No. 299) and Plaintiffs' Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (ECF No. 366).[12]

---

[12] This Court will address on Defendant Under Armour's Motion to Seal (ECF No. 366) in a separate opinion.

## STANDARD OF REVIEW

### I.      Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243,

248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility.  *See Tolan v. Cotton*, 572 U.S. 650, 656–60 (2014).

## II.      Motion for Leave to File Surreply

In general, parties are not permitted to file surreplies.  Local Rule 105.2(a) (D. Md. 2023) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed.").  A surreply is permitted when the moving party would be unable to contest any matters raised by the opposing party in their reply for the first time.  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).

## ANALYSIS

## I.      Defendants' Motion for Summary Judgment (ECF No. 299)

Through their TAC (ECF No. 153), Plaintiffs assert violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Under Armour and Plank (Count I); violations of Section 20(a) of the Exchange Act against Under Armour and Plank (Count II); and violation of Section 20A of the Exchange Act against solely Defendant Plank (Count III).  (*Id.* ¶¶ 412–436.)  Through their Motion for Summary Judgment (ECF No. 299), Defendants contend that summary judgment should be granted on all counts. With respect to Count I, Defendants assert that they are entitled to summary judgment because the undisputed facts show that Defendants did not make a material misrepresentation or omission, (ECF No. 361-1 at 31–53), and the undisputed record cannot support a scienter determination as a matter of law, (*id.* at 53–60).  With respect to Counts II and III, Defendants assert that Defendants are not liable under Sections 20(a) and 20A of the Exchange Act

because, to the extent summary judgment is granted as to Count I, Plaintiffs cannot establish a primary violation.  (*Id.* at 60–61.)  With respect to Count III, Defendants assert that Plank is not liable under Section 20A of the Exchange Act to class members who did not purchase the same class of securities contemporaneously with his sales.   (*Id.* at 61–63.)   If summary judgment is not granted in full, Defendants submit that the Court should modify the class definition by shortening the Class Period, which currently is September 16, 2015 through November 1, 2019, to begin no earlier than October 25, 2016, and end no later than August 1, 2017.  (*Id.* at 63–67.)

**A.  According to Defendants, Count I, Which Alleges Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Under Armour and Plank (ECF No. 153 ¶¶ 412–423), Must Fail Because Plaintiffs Cannot Show a Genuine Issue of Material Fact as to the Requisite Material Misrepresentation or Omission Element and the Record Cannot Support a Scienter Determination as a Matter of Law.**

To prove a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiffs must establish: (1) a material misrepresentation (or omission); (2) scienter (i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) economic loss; and (6) loss causation (i.e., a causal connection between the material misrepresentation and the loss).  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (internal citations omitted).  Defendants assert that they are entitled to summary judgment because the undisputed facts show that Defendants did not make a material misrepresentation or omission, (ECF No. 361-1 at 31–53), and the undisputed record cannot support a scienter determination as a matter of law, (*id.* at 53–60).

**1. Material Misrepresentation or Omission.**

The first element of a Section 10(b) and Rule 10b-5 securities fraud requires an actionable misstatement or omission. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Matrix Cap. Mgmt. Fund v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009); *see also Hillson Partners, Ltd. v. Adage, Inc.*, 42 F.3d 204, 208–09 (4th Cir. 1994) (explaining that there are two components of this requirement: (1) the statement must be false, or the omission must be misleading, and (2) the statement or omission must be material). To satisfy this element, the plaintiff must point to "a *factual* statement or omission—that is, one that is demonstrable as being true or false." *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–96 (1991); 7 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 3423 (3d ed. 1991)). The challenged statement or omission must also be "*material*." *Id.* at 683 ("[T]here [must be] a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996))). "And the plaintiff must establish that the defendant either said something that is 'false' or left something out that renders '*misleading*' the 'public statements' the defendant made." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022) (citing *Longman*, 197 F.3d at 682).

With respect to an alleged omission, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, "[d]isclosure is required . . . only when necessary 'to

make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). The Supreme Court has recognized that "silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. Simply stated, an omission is actionable only if—absent the fact omitted—"a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999).

Defendants advance several challenges with respect to this first element. (ECF No. 361-1 at 32–53.) Defendants argue that Plaintiffs have not established any GAAP violations or financial statement errors based on pull forwards, (*id.* at 32–33); that Under Armour did not omit any material information or make material misstatements regarding pull forwards, (*id.* at 33–45); and that Plaintiffs' allegations of affirmative misstatements fail as a matter of law (*id.* at 45–53). While Plaintiffs concede that they have not established any GAAP violations based on pull forwards and that a failure to disclose under Item 303 of Regulation S-K cannot support their claim, this Court finds that the circumstances under which the challenged statements were made creates a genuine issue of material fact as to whether such statements were in fact misleading. As such, summary judgment is inappropriate on this basis.

### i. Plaintiffs' Failure to Establish a Violation of GAAP Based on Defendants' Pull Forward Sales Is Not Fatal to Their Claims

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' GAAP-based theory must fail. (ECF No. 361-1 at 32–33.) Defendants emphasize that "[t]he undisputed evidence demonstrates that [the Company]'s pull forwards involved real sales of real products to real customers who agreed to accept the products and make real payments," and "[m]ultiple

witnesses confirmed that [Defendants] ensured that the pull forwards were legitimate sales that complied with GAAP." (*Id.* at 32.)  In support of this position, Defendants cite to *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1381 (N.D. Cal. 1995) ("[W]hile they may be emblematic of American business' habitual tendency toward short-term views, 'pull-ins' are not the nefariously manipulative scheme that plaintiffs make them out to be.  'Pull-ins' do not result in the improper recognition of revenue under [GAAP].  They are actual sales which are treated no differently than any other sale."); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1, 10 (D. Mass. 2011) (same); *In re Cytyc Corp. Sec. Litig.*, No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166, at *65 (D. Mass Mar. 1, 2005) (same).

While Plaintiffs counter that they "uncovered a series of GAAP violations that also rendered Defendants' financial statements false and misleading in 2016 and 2017," (ECF No. 361-34 at 48–51), Plaintiffs concede that Defendants' pull forwards did not violate GAAP. Nevertheless, Defendants' purported compliance with GAAP does not shield Defendants from liability.  As other courts have observed, "[a] defendant could employ a GAAP-approved accounting standard in preparing its financial reports, but nonetheless violate the securities laws by failing to disclose additional information necessary to render its financial reports fair and accurate." *In re Michaels Stores, Inc. Sec. Litig.*, No. 3:03-CV-0246-M, 2004 U.S. Dist. LEXIS 33558, at *14–15 (N.D. Tex. Dec. 13, 2004) (citing *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339–41 (S.D.N.Y. 2004)).  Plaintiffs do not claim that Defendants' use of pull forwards in and of itself violated the securities laws; rather, Plaintiffs argue that Defendants acted fraudulently when they failed to disclose—and took steps to conceal (i.e., pull forwards, increased sales to liquidators, manipulating accounts receivable)—declining demand.  As such,

Plaintiffs' failure to establish that Defendants' practice of pull forwards violated GAAP is not fatal to Plaintiffs' claims.

> **ii.   While There Is No Affirmative Duty to Disclose Pull Forward Sales Exists, This Does Not Address Plaintiffs' Theory that Defendants' Statements Created a Duty to Tell the Whole Truth**

In their Motion for Summary Judgment, Defendants contend that there is no legal requirement to disclose pull forward sales.   (ECF No. 361-1 at 34–35.)   To be clear, Defendants correctly note that there is no affirmative duty to disclose pull forward sales. *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 582 (E.D. Va. 2006); *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1380–81 (N.D. Cal. 1995); *In re AXIS Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006); *City of Omaha Police & Fire Ret. Sys. v. Timberland Co.*, No. 11-cv-277-SM, 2013 U.S. Dist. LEXIS 44652, at *25 (D.N.H. Mar. 28, 2013); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1, 10 (D. Mass. 2011); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202–03 (1st Cir. 1999); *In re Cytyc Corp. Sec. Litig.*, No. 02-12399-NMG, 2005 U.S. Dist. LEXIS 6166, at *65 (D. Mass Mar. 1, 2005).   Nevertheless, this does not address Plaintiffs' theory that Defendants' statements created a duty to tell the whole truth.

> **iii.   Plaintiffs' Claims Do Not Rise or Fall on the Basis of an Item 303 Violation**

In their Motion for Summary Judgment, Defendants contend that a violation of Item 303 of Regulation S-K does not establish a violation of Section 10(b) or Rule 10b-5. (ECF No. 361-1 at 36–37 (citing *Oran v. Stafford*, 226 F.3d 275, 287–88 (3d Cir. 2000); *In re Sofamor Danek Grp.*, 123 F.3d 394, 403 (6th Cir. 1997); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054, 1056 (9th Cir. 2014); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1330–31 (11th Cir.

2019); *Ash v. PowerSecure Int'l, Inc.*, No. 4:14-CV-92-D, 2015 U.S. Dist. LEXIS 122692, at *28 (E.D.N.C. Sept. 15, 2015); *In re SCANA Corp. Sec. Litig.*, No. 3:17-2616-MBS, 2019 U.S. Dist. LEXIS 54176, at *35 (D.S.C. Mar. 29, 2019); *In re Maximus, Inc. Sec. Litig.*, No. 1:17-cv-0884 (AJT/IDD), 2018 U.S. Dist. LEXIS 146068, at *45 (E.D. Va. Aug. 27, 2018); *Shah v. GenVec, Inc.*, No. DKC 12-0341, 2013 U.S. Dist. LEXIS 134997, at *50 n.16 (D. Md. Sept. 20, 2013)).) Item 303 requires companies to make a disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also* 17 C.F.R. § 229.303.

While the United States Court of Appeals for the Second Circuit has held that a failure to disclose under Item 303 can amount to an actionable omission for a Section 10(b) claim, *Stratte-McClure*, 776 F.3d at 103–04, the Third, Sixth, Ninth, and Eleventh Circuits have held plaintiffs to a higher standard, requiring them to show, for example, that the issuer had an independent duty to disclose the information allegedly withheld.  *Oran*, 226 F.3d at 287–88; *In re Sofamor Danek Grp.*, 123 F.3d at 403; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1054, 1056; *Carvelli*, 934 F.3d at 1330–31.  In September 2023, the Supreme Court granted certiorari in in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 216 L. Ed. 2d 1312 (U.S. 2023), to resolve this circuit split.  While the case remains pending, oral argument was heard on January 16, 2024.  Defendants assert that "the Supreme Court [appears] poised to rule that an Item 303 violation does not give rise to a duty to disclose under Rule 10b-5."  (ECF No. 361-35 at 11.)

Plaintiffs, however, are not advancing an Item 303 claim absent an underlying violation

of Section 10(b) Rule 10b-5.  (ECF No. 361-34 at 45 n.39.)  In other words, Plaintiffs claims

do not rise or fall on the basis of an Item 303 violation or a potential ruling by the Supreme

Court in a pending case.  As such, this Court need not further address the issue of whether

Defendants violated Item 303, and whether such a violation supports Plaintiffs' claim.

iv.   **The Circumstances Under Which Defendants' Statements Were Made Creates
      a Genuine Issue of Material Fact as to Whether Challenged Statements Were in
      Fact Misleading**

Plaintiffs contend that certain statements made by Defendants created an obligation to

"tell the whole truth."  (ECF No. 361-34 at 35 (citing *Singer v. Reali*, 883 F.3d 425, 440 (4th

Cir. 2018)).)  Plaintiffs emphasize that:

> From the first day of the Class Period, Defendants continuously misrepresented
> [its] revenue growth and drivers (saying they had not changed), including by
> attributing its results to demand for its brand (saying it had never been stronger),
> its status as a premium and full-price brand (saying it was intact), and growth in
> its core apparel business (saying it was continuing).  Defendants also led
> investors to believe that UA would continue 20%+ revenue growth and achieve
> consensus estimates when they knew they could not without the pull forwards.
>
> Thus, in every quarter of the Class Period, UA's statements about the drivers of
> its quarterly financial results and growth (including touting its 20% growth
> streak) were misleading because Defendants used pull forwards to
> "manipulate," inflate, and achieve these results.  By concealing the pull
> forwards, these statements made UA appear healthier than it was by
> misrepresenting UA's natural revenue and growth and masking slowing demand
> in its core North American wholesale business, and concealing material drivers
> of UA's revenue and results.

(*Id.* at 35–36 (internal citations omitted).)   Plaintiffs further contend that Defendants'

statements about the Company's use of liquidations and the state of its inventory were

misleading.  (*Id.* at 36–37.)

Defendants argue summary judgment should be granted because Defendants had no

affirmative duty to disclose the challenged pull forward sales, because disclosure of such sales

would be required under Rule 10b-5 only if necessary to make "'statements made, in the light of the circumstances under which they were made, not misleading.'" (ECF No. 361-1 at 43 (citing 17 C.F.R. § 240.10b-5(b); *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901–02 (4th Cir. 2022).) According to Defendants, "Plaintiffs cannot make such a showing based on the undisputed factual record here." (*Id.*)   In short, Defendants argue that summary judgment should be granted because Under Armour's statements were true, (*id.* at 43–44), and further because the statements must be considered in the full context in which they were made, including risk disclosures and warnings. (*Id.* at 44–45.)

"Not all material omissions are actionable.  Although investors would surely prefer to know everything about a company, Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'" *Marriott*, 31 F.4th at 901–02 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).   "Rather, '[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.*; *see also* 17 C.F.R. § 240.10b-5(b).  "In other words, an omission is actionable only if—absent the fact omitted 'a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision.'" *Marriott*, 31 F.4th at 902 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999)).

"In several instances," courts in this Circuit "ha[ve] found that even in the absence of a specific false statement, when a company officer made statements giving a positive impression of the company's prospects, the failure to disclose related adverse information could constitute a material omission under the Exchange Act." *Sinnathurai v. Novavax, Inc.*, 645

F. Supp. 3d 495, 518 (D. Md. 2022).  Plaintiffs aver "[t]hat is exactly what happened here: Defendants' failure to disclose their pull-forward tactics 'to investors while touting positive revenue results misled investors into believing that the revenue results they touted were caused by other factors . . . created an inaccurate impression as to the financial health of the Company.'"  (ECF No. 361-34 at 40 (quoting *In re Plantronics, Inc. Sec. Litig.*, No. 19-cv-07481-JST, 2022 U.S. Dist. LEXIS 152745, at *32–33 (N.D. Cal. Aug. 16, 2022)).)

Plaintiffs challenge several of Defendants' statements during the Relevant Period as materially misleading in support of their Exchange Act Claims, with the first challenged statement occurring during Under Armour's September 16, 2015 Investor Day meeting.  (*See* ECF No. 361-34 at 35–44.)  Therein, Plank boasted about the Company's revenue growth: "We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an[d] quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer."  (ECF No. 337-10.)  "We are a growth company led by five growth drivers that remain effectively the same over the past ten years."  (*Id.*)  "The demand for our brand has never been stronger."  (*Id.*)  According to Plaintiffs, "Defendants['] misrepresentations [throughout the Class Period] were like an unending drumbeat," pointing to Defendants' statements about the drivers of the Company's growth; statements about demand for Under Armour's brand; statements about the strength of Under Armour's core, premium full-price wholesale business; statements about Under Armour's growth company status; statements that Under Armour was limiting liquidation and that increased liquidation and inventory were planned or resulted from benign causes; and statements that Under Armour's inventory was

healthy.  (ECF No. 361-34 at 37–39.)

The "case at hand is not one of 'simply an omission of fact in the ether.'"  *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 580 (D.S.C. 2011).  Rather, Plaintiffs theory is that the Defendants needed to disclose their dependence on pull forward sales, overdriving sales to liquidators, and manipulating accounts receivable to achieve revenue expectations in order to make Under Armour's statements about its financial performance and results not misleading.  Indeed, the record substantiates Plaintiffs' claims that Under Armour's public statements throughout the Class Period did not align with the Company's internal communications.  Internal emails and presentations during the Relevant Period acknowledge that the Company would not have hit its external guidance "without overdriving liquidation and pulling [forward] forward revenue," (ECF Nos. 363-4, 363-36, 360-6, 359-26), and executives, including Plank, testified that Under Armour utilized pull forwards to meet financial objectives, including external guidance.  (ECF Nos. 359-12, 362-7.)  The record further makes clear that the Company internally recognized the need to mitigate market speculation about "channel stuffing."  (ECF Nos. 360-14, 363-13.)  Specifically, internal emails show that Under Armour took strategic steps to better balance its accounts receivable to the Company's revenue growth, (ECF Nos. 363-28, 363-21, 363-3, 363-31, 363-49), and avoid disclosure of sales to liquidators.  (ECF Nos. 363-41, 362-16, 363-27, 363-24, 363-34, 362-31.)

In sum, Plaintiffs contend that the affirmative statements made by Defendants regarding the drivers of the Company's growth; demand for Under Armour's brand; the strength of Under Armour's core, premium full-price wholesale business; Under Armour's growth company status; liquidation; and inventory required Defendants to make full disclosure

of the facts to avoid making its statements misleading.  Defendants argue that their statements about the Company's financial performance and results were not misleading because they involved "accurate historical data."  (ECF No. 361-1 at 46–47.)  However, "literal accuracy is not enough: [a]n issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Labs. Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).  Considering Defendants' argument that the statements must be considered in the full context in which they were made, including risk disclosures and warnings, (ECF No. 361-1 at 44–45), this Court finds there is a question of fact considering whether the disclosures and warnings accompanying Defendants' statements were meaningful.  *See Sonoco*, 827 F. Supp. 2d at 576 (citing *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2007 U.S. Dist. LEXIS 98777, at n.10 (D. Md. Sept. 10, 2007)).

The statements about the drivers of Under Armour's growth, about demand for Under Armour's brand, about the strength of Under Armour's core, premium full-price wholesale business, about Under Armour's growth company status, about limiting liquidation and the causes for increased liquidation, and about the status of inventor—all create genuine issues of material fact as to whether these statements were misleading.  Therefore, Defendants' Motion for Summary Judgment on this basis is denied.

### 2.  Scienter.

The second element of a Section 10(b) and Rule 10b-5 securities fraud requires a plaintiff to establish that each defendant acted with scienter, or a mental state embracing intent to deceive, manipulate, or defraud investors. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)).  An award

of summary judgment is "seldom appropriate" in disputes where state of mind is a decisive element, *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005), but "summary judgment on this issue is sometimes appropriate." *SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008); *see also SEC v. Jakubowski*, 150 F.3d 675, 682 (7th Cir. 1998) (upholding summary judgment on scienter where what was said on behalf of a defendant could not persuade a reasonable trier of fact).

"Proof of scienter need not be direct, but may be inferred from circumstantial evidence." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "To evaluate the strength of the scienter inferences, courts engage in a comparative analysis." *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).

"A plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 623 (4th Cir. 2008). This "'severe recklessness' is, in essence, 'a slightly lesser species of intentional misconduct.'" *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). A showing of mere negligence cannot establish the necessary mental state. *Cozzarelli*, 549 F.3d at 623. "To establish scienter as to a corporation, an agent of the corporation must act with the appropriate state of mind, 'since corporate liability derives from the actions of its agents.'" *In re Mut. Funds Inv. Litig.*, 590 F. Supp. 2d 741, 749 (D. Md. 2008) (quoting *Tchrs' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172

(4th Cir. 2007)).

Defendants contend that the record here cannot support a scienter determination as a matter of law. (ECF No. 361-1 at 53–60.) Specifically, Defendants note that the pulled forwards do not support a scienter determination (*id.* at 54–57) and senior management did not believe that disclosure of pull forwards was required (*id.* at 57–60.) Plaintiffs counter that the evidence demonstrates Defendants' scienter, (ECF No. 361-34 at 51–57), pointing to Plank's actual knowledge of waning demand in Under Armour's core North American wholesale business and reliance on pull forwards and other manipulative sales practices to hit financial targets during the Class Period, as well as Plank's alleged affirmative steps to prevent the disclosure of the Company's true operational condition. (*Id.*)

Based on the evidence of record, there is a genuine issue of material fact on the element of scienter. Plaintiffs have established a question of fact concerning whether Defendants intended to deceive the market when it issued the challenged statements. Simply stated, this is a matter for the jury to decide. This Court finds that the Defendants' alleged omission of the information, coupled with internal communications demonstrating Plank's knowledge of pull forwards and increased sales to liquidators, create a genuine issue of fact on the question of scienter.

**B. According to Defendants, to the Extent Summary Judgment Is Granted as to Plaintiffs' Claims Under Section 10(b) and Rule 10b-5 (Count I), Summary Judgment Should also Be Granted for Plaintiffs' Claims Under Sections 20(a) and 20A of the Exchange Act (Counts II and III).**

Count II and III of the TAC assert claims under Sections 20(a) and 20A of the Securities Exchange Act of 1934. Section 20(a) of the Exchange Act imposes liability on every person who, directly or indirectly, controls any person liable under any provision of the

chapter, 15 U.S.C.S. § 78t(a), while § 20A of the Exchange Act creates a private right of action against those who engage in insider trading, 15 U.S.C.S. § 78t-1(a).  To successfully establish a claim under either section, a plaintiff must first establish a predicate violation of securities fraud under Section 10(b) of the Exchange Act or Rule 10b-5.  *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 236 (4th Cir. 2023) (quoting *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003)); *Tchrs' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007)).

As such, Defendants assert that, should summary judgment be granted as to Count I, summary judgment should also be granted as to Plaintiffs' claims under Sections 20(a) and 20A of the Exchange Act (Counts II and III).  (ECF No. 361-1 at 60–61.)  Having found that summary judgment is inappropriate for Count I, this Court further finds that summary judgment is also inappropriate with respect to Counts II and III on this basis.

### C. With Respect to Count III, Which Alleges Violation of Section 20A of the Exchange Act Against Plank (ECF No. 153 ¶¶ 427–436), Defendants Assert that Plank Is Not Liable to Class Members Who Did Not Purchase the Same Class of Securities Contemporaneously with his Sales.

To state a claim under Section 20A(a), a plaintiff must: (1) plead a predicate insider trading violation of the Exchange Act; and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff.  15 U.S.C. § 78t-1(a); *In re MicroStrategy, Inc., Sec. Litig.*, 115 F. Supp. 2d 620, 662 (E.D. Va. 2000).  "This inquiry into contemporaneity proceeds from a recognition that '[s]ince identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible way to sue insiders.'"  *In re MicroStrategy, Inc.*, 115 F. Supp. 2d at 662 (quoting *Buban v. O'Brien*, No. C 94-0331 FMS, 1994 U.S. Dist. LEXIS 8643, at *6 (N.D. Cal. June 22, 1994)).  The statute "does

not define 'contemporaneous,' leaving courts to resolve the issue on a case-by-case basis." *Buban*, 1994 U.S. Dist. LEXIS 8643, at *6.

With respect to Count III, Defendants assert that Plank is not liable under Section 20A of the Exchange Act to class members who did not purchase the same class of securities contemporaneously with Plank's sales.  (ECF No. 361-1 at 61–63.)  Defendants emphasize that "where, as here, public-company securities allegedly trade in a 'highly efficient and automated market,' courts properly define 'contemporaneous' to mean a purchase and sale on the same day."  (*Id.* at 61–62 (citing *In re MicroStrategy, Inc.*, 115 F. Supp. 2d at 664; *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., & ERISA Litig.*, 503 F. Supp. 2d 25, 46–47 (D.D.C. 2007)).)[13]

During the Class Period, Plank sold shares of Class A stock on November 17, 18, 19, 20, and 23, 2015, and sales of Class C stock on April 26, 27, 28, and 29, 2016.  Defendants encourage this Court to find that "to have a private right of action under Section 20A, a plaintiff must have purchased Under Armour's Class A stock on November 17–23, 2015 or [] Class C stock on April 26–29, 2016."  (ECF No. 361-1 at 62.)  Defendants argue that "[n]one of Aberdeen's transactions in UA securities satisfy Section 20A," as Aberdeen did not purchase any shares of Class A common stock from November 17–23, 2015 and did not

---

[13] Defendants cite several cases for the proposition that the same day standard is the only reasonable standard given the way the stock market functions.  These cases include *Steamfitters Loc. 449 Pension Fund v. Alter*, No. 09-4730, 2011 U.S. Dist. LEXIS 112499, at *44 (E.D. Pa. Sept. 30, 2011) (dismissing § 20A claims for sales not "on the same day," even those "very close in time"); *In re Able Labs. Sec. Litig.*, No. 05-2681 (JAG), 2008 U.S. Dist. LEXIS 23538, at *102 (D.N.J. Mar. 24, 2008) (adopting same-day standard for "publicly traded company with millions of outstanding shares"); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) ("[T]o satisfy the 'contemporaneous' requirement," plaintiff must have "bought stock on the same dates on which the defendant's sales took place."); *In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) ("The same day standard is the only reasonable standard given the way the stock market functions.")  However, "[d]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remains undisclosed.'"  *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 U.S. Dist. LEXIS 91938, at *11 (S.D. Tex. Jun. 15, 2017).

purchase any shares of Class C common stock from April 26–29, 2016. (*Id.*)

Plaintiffs' respond that Defendants are "rehashing [] the same arguments they made at class certification." (ECF No. 361-34 at 60–62.) Plaintiffs first contend that this Court should reject Defendants' same-day trading requirement, citing cases in other circuits recognizing that a trading gap of four to six days can be considered contemporaneous. (*Id.* at 61 (citing *Lamartina v. VMware, Inc.*, No. 20-cv-02182-EJD, 2023 U.S. Dist. LEXIS 57673, at *52–53 (N.D. Cal. Mar. 31, 2023) (four days); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 U.S. Dist. LEXIS 91938, at *11 (S.D. Tex. Jun. 15, 2017) (six days); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 508–09 (S.D.N.Y. 2011) (five days)).) Plaintiffs further contend that Defendants' argument that only a Class Member who purchased Under Armour Class A shares contemporaneously with Plank's sale of Class A shares (or purchased Class C shares contemporaneously with Plank's sale of Class C shares) has standing to bring a § 20A claim against Plank was rejected by this Court at class certification. (ECF No. 361-34 at 61–62 (citing *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 307 n.6 (D. Md. 2022)).)[14] "Because Defendants fail to cite to any new facts or legal authority supports this argument, the Court should reaffirm its previous ruling." (*Id.* at 62.)

---

[14] That footnote read:

> [T]his Court is not convinced that Aberdeen's purchase of Class A stock is irrelevant to this analysis. As other courts have recognized, the language "securities of the same class" is not necessarily delimited to "the exact same type of security." *Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV 14-2004-DOC (JCGx), 2015 U.S. Dist. LEXIS 158055, at *25–26 (C.D. Cal. Nov. 9, 2015) (noting that "Defendants fail to provide any persuasive legal authority for this narrow interpretation of the insider trading laws"). As Plaintiffs note, the only substantial difference between Under Armour's Class A and Class C stock is the voting rights accorded to the former. . . . Similar distinctions, such as stock options, have been found to fall within "securities of the same class" for the purpose of Section 20A. *Id.* Accordingly, by overlooking Aberdeen's Class A purchases, Defendants' argument takes too narrow a view of Section 20A.

*In re Under Armour Sec. Litig.*, 631 F. Supp. 3d at 307 n.6.

As Plaintiffs correctly note, this Court previously addressed Defendants' argument that only a Class Member who purchased Under Armour Class A shares contemporaneously with Plank's sale of Class A shares (or purchased Class C shares contemporaneously with Plank's sale of Class C shares) has standing to bring a § 20A claim against Plank. *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d at 307 n.6.  "[B]y overlooking Aberdeen's Class A purchases, Defendants' argument takes too narrow a view of Section 20A." *Id.*

However, this Court reserved consideration of the contemporaneity requirement "for later stages of the litigation, including summary judgment. *Id.* at 298 n.2.  "[D]ifferent courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remains undisclosed.'" *Id.* (citing *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 91938, at *11; *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 272 (N.D. Cal. 2011)).

Courts that have required a plaintiff asserting a Section 20A claim to have traded on the same day as the defendant state that the underlying purpose behind Section 20A is "to serve 'as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants.'" *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (quoting  *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 233 (C.D. Cal. 1995)). "Accordingly, the 'contemporaneous' time frame between an insider's sale and a plaintiff's purchase is relatively short because it is possible that the plaintiff purchased the actual shares sold by the insider.  As the time between the insider's sale and plaintiff's purchase increases, the likelihood that the shares purchased by the plaintiff are the same shares the insider sold

decreases substantially." *Id.*

However, this is not the only interpretation of the purpose behind Section 20A. In *In re American Business Computers Corp. Securities Litigation*, MDL No. 913 (CLB), 1994 U.S. Dist. LEXIS 21467 (S.D.N.Y. Feb. 24, 1994), the United States District Court for the Southern District of New York explained that "the better rule with respect to standing seems to be that a class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information." *Id.* at 11.

This Court is satisfied that Aberdeen has established contemporaneity. While Aberdeen did not purchase any shares of Class A common stock from November 17–23, 2015 and did not purchase any shares of Class C common stock from April 26–29, 2016, Aberdeen acquired nearly 500,000 shares of Under Armour Class A common stock in 2016, including 15,641 shares on April 26, 2016, 3,014 shares on April 27, 2016, and 2,997 shares on April 29, 2016. (*See* ECF No. 153-4.) These trades are clearly contemporaneous under any standard.

**D. According to Defendants, the Class Period Should Be Shortened to October 25, 2016 to August 1, 2017.**

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." "In the event that summary judgment is not granted in full, Defendants [] submit that the Court should modify the Class definition by shortening the Class Period [to end no later than August 1, 2017 and begin no earlier than October 25, 2016]" because "Plaintiffs admit that the truth was revealed to the market by August 1, 2017" and "there is no material dispute of material fact

that there was no actionable misrepresentation or omission before October 25, 2016." (ECF No. 361-1 at 63–67.)

### 1.  When the Class Period Should End.

This Court has previously analyzed the issue of when to close the class period have held that "in a securities class action based on material misrepresentations and omissions to the investing public the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Kirschner Med. Corp. Sec. Lit.*, 139 F.R.D. 74, 82 (D. Md 1991) (citing cases). Where the parties dispute the curative effect of a release, such as here, the court should determine whether there is a "substantial question of fact as to whether the release had cured the market or was itself misleading." *Id.*

According to Defendants, "Plaintiffs cannot establish any losses caused by disclosures subsequent to [August 1, 2017], as Plaintiffs admit the truth regarding the deceleration in demand was fully revealed to the market by August 1, 2017." (ECF No. 361-1 at 64.) However, there is a substantial question of fact as to whether any disclosure prior to the November 3, 2019 *WSJ* article constituted a corrective disclosure. Therefore, this Court will not shorten the Class Period to end no later than August 1, 2017.

### 2.  When the Class Period Should Begin.

Typically, the class period begins on the date of the first misstatement, as it is the injection of misinformation into the marketplace that distorts the price of the stock." *In re Sanofi-Aventis Secs. Litig.*, 293 F.R.D. 449, 459 n.12 (S.D.N.Y. 2013) (citing *In re Bank of Am. Corp. Secs.*, 281 F.R.D. 134, 148 (S.D.N.Y. 2012) (beginning the class period in a securities class action on the date of the first alleged misstatement)).

According to Defendants, the Class Period should begin no earlier than October 25, 2016—the day that the Company issued its Q3 2016 earnings release. (ECF No. 361-1 at 66–67.) However, Plaintiffs have proffered evidence that suggests that the Defendants' first alleged misrepresentation and omission occurred during Under Armour's September 16, 2015 Investor Day. As such, this Court finds no reason to adjust the Class Period.

## II.    Plaintiffs' Motion for Leave to File Surreply (ECF No. 366)

In their Reply Memorandum of Law in Support of Motion for Summary Judgment, Defendants assert "[Plaintiffs] are precluded from relying on the SEC Order to support their liability claims at summary judgment." (ECF No. 361-35 at 37–38.) In support of this position, Defendants note that Federal Rule of Evidence 408(a) precludes the introduction of settlements "to prove or disprove the validity or amount of a disputed claim." FED. R. EVID. 408(a). Defendants further argue that the SEC Order is also inadmissible at summary judgment under Rule 403, as its probative value is substantially outweighed by the danger of unfair prejudice. (ECF No. 361-35 at 37 (citing FED. R. EVID. 403).)

In response, Plaintiffs filed the pending Motion for Leave to File Surreply (ECF No. 366) to refute Defendants argument that this Court should not consider the SEC Order at summary judgment. (ECF No. 366-1 at 4.) According to Plaintiffs, Defendants' argument is premature, unnecessary, and legally incorrect. (*Id.* at 4–7.) In short, Plaintiffs contend that the SEC Order is admissible as a public record under Rule 803(8). (*Id.* at 5.)

In general, parties are not permitted to file surreplies. Local Rule 105.2(a) (D. Md. 2023) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be

filed."). A surreply is permitted when the moving party would be unable to contest any matters raised by the opposing party in their reply for the first time. *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).

While it is true that Defendants raised the admissibility of the SEC Order for the first time in their reply, the admissibility of the SEC Order has no bearing on this Court's determination of the pending Defendants' Motion for Summary Judgment (ECF No. 299). As such, Plaintiffs' Motion for Leave to File Surreply (ECF No. 366) is DENIED.

Nevertheless, this Court finds it prudent to address the admissibility of the SEC Order. As shown by the parties' respective positions, two competing federal rules of evidence are in play: Rule 408, which generally prohibits the admission of settlement information for purposes of establishing liability; and Rule 803(8)(C), which allows the admission of public records of public agencies setting forth factual findings resulting from a lawful investigation. *Compare Option Res. Grp. v. Chambers Dev. Co.*, 967 F. Supp. 846, 849 (W.D. Pa. 1996) (finding that the SEC's factual findings, including its opinions and conclusions, contained in the settled administrative orders were admissible under Rule 803(8)(C)), *with Carpenter's Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838-WBH, 2008 U.S. Dist. LEXIS 112503, at *19–20 (N.D. Ga. Apr. 23, 2008) (finding that SEC cease and desist order against the defendant was not admissible under Rules 408 and 803(c)), *and SEC v. Pentagon Cap. Mgmt. PLC*, No. 08 Civ. 3324, 2010 U.S. Dist. LEXIS 25092, at *2–4 (S.D.N.Y. 2010) (finding that factual findings contained in SEC settled orders relating to third-parties were admissible under Rule 803(c)); *see also Wilson v. Parisi*, No. 3:CV-04-1737, 2009 U.S. Dist. LEXIS 3970, at *6–7 (M.D. Pa. Jan. 21, 2009) ("Courts generally agree that Rule 408 applies to consent decrees." (citations

omitted)).

 The two competing categories are clearly presented to this Court.  The Defendants note that the SEC Order is expressly inadmissible based on Rule 408's prohibition against allowing into evidence statements made in the course of compromise and settlement.  The Plaintiffs contend that such a settlement agreement should be admissible under Rule 803(8)'s "public records and report" hearsay exception.  While this issue may await further briefing prior to trial, this Court expressly notes that "Rule 408 exists to protect a party that settles one claim from having that settlement used against it to establish liability (or the extent of liability) of that same party in another lawsuit for the same claim." *Pentagon Cap. Mgmt.*, 2010 U.S. Dist. LEXIS 25092, at *2–4.  This Court does not envision the SEC Order being admissible at the trial of this case.

## CONCLUSION

 For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 299) is hereby **DENIED**; and Plaintiffs' Motion for Leave to File Surreply (ECF No. 366) is hereby **DENIED**.  A separate Order follows.

Dated: February 26, 2024

         /s/
         Richard D. Bennett
         United States Senior District Judge