# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) | Civil No. RDB-17-388 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AN AWARD TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND
       APPROPRIATE...................................................................................................4

       A.     A Reasonable Percentage of the Fund Recovered Is the Appropriate Method
              for Awarding Attorneys' Fees in Common Fund Cases....................................4

       B.     The *Ex-Ante* Fee Agreement Between Lead Plaintiff and Lead Counsel –
              Agreed to More than Seven Years Ago – Is Entitled to a Presumption of
              Reasonableness........................................................................................7

       C.     Lead Counsel's Fee Request Is Reasonable and Appropriately Compensates
              and Incentivizes Counsel Under Fourth Circuit Authority ...........................9

              1.     The Result Obtained for the Class Supports the Requested Fee.......................9

              2.     The Quality, Skill, and Efficiency of Lead Counsel Supports the
                     Requested Fee ........................................................................11

              3.     The Risk of Nonpayment Supports the Requested Fee ..................................14

              4.     The Lack of Objections by Class Members Supports the Fee Request............21

              5.     Awards Made in Similar Cases Support the Fee Request..............................22

              6.     The Complexity and Duration of the Litigation Support the Requested
                     Fee in this Case.......................................................................24

              7.     Public Policy Favors, and Thus Does Not Undermine, the Requested
                     Fee in This Complex Securities Fraud Case ........................................25

III.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE
       APPROVED .........................................................................................................27

IV.    LEAD PLAINTIFF AND ITS CO-CLASS REPRESENTATIVES' REQUEST FOR
       AWARDS PURSUANT TO 15 U.S.C. §78u-4(a)(4) ARE REASONABLE........................28

V.     CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ................................................14

*Allahpattah Servs. Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................10

*Benson v. DoubleDown Interactive, LLC*,
    2023 WL 3761929 (W.D. Wash. June 1, 2023)......................23

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) ................................................21

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)................................................................4

*Boger v. Citrix Sys., Inc.*,
    2023 WL 1415625 (D. Md. Jan. 31, 2023)..............................5

*Boyd v. Coventry Health Care Inc.*,
    299 F.R.D. 451 (D. Md. 2014).........................................5, 25

*CASA de Md., Inc. v. Arbor Realty Tr., Inc.*,
    2024 WL 1051120 (D. Md. Mar. 11, 2024)............................23

*Christine Asia Co., Ltd. v. Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ..............6, 18, 23

*Dickman v. Banner Life Ins. Co.*,
    2020 WL 13094954 (D. Md. May 20, 2020),
    *aff'd sub nom. 1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*,
    28 F.4th 513 (4th Cir. 2022) .............................................6, 9

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..............................................................14

*Fangman v. Genuine Title, LLC*,
    2017 WL 2591525 (D. Md. June 15, 2017)..............................6

*Fangman v. Genuine Title, LLC*,
    2017 WL 86010 (D. Md. Jan. 10, 2017)........................ *passim*

**Page**

*Feinberg v. T. Rowe Price Grp., Inc.*,
   610 F. Supp. 3d 758 (D. Md. 2022) ...................................................................9, 27, 28

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ....................................................................................20

*Hale v. State Farm Mut.Autos. Ins. Co.*,
   2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)............................................................8

*In re 2U, Inc. Sec. Litig.*,
   2022 WL 22839218 (D. Md. Dec. 9, 2022)........................................................29, 30

*In re Abrams & Abrams, P.A.*,
   605 F.3d 238 (4th Cir. 2010) ....................................................................................9

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006),
   *aff'd*, 272 F. App'x 9 (2d Cir. 2008)........................................................................13

*In re Apollo Grp. Inc. Sec. Litig.*,
   2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ............................................................19

*In re BankAtlantic Bancorp, Sec. Litig.*,
   2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds sub. nom.*
   *Hubbard v. BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ..................................................................................20

*In re BioScrip, Inc. Sec. Litig.*,
   273 F. Supp. 3d 474 (S.D.N.Y. 2017), *aff'd sub nom.*
   *Fresno Cnty. Emps. Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*,
   925 F.3d 63 (2d Cir. 2019)........................................................................................26

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   2000 WL 204112 (N.D. Ill. Feb. 10, 2000) .............................................................24

*In re Broiler Chicken Antitrust Litig.*,
   2021 WL 5709250 (N.D. Ill. Dec. 1, 2021) .............................................................10

*In re Cap. One Consumer Data Sec. Breach Litig.*,
   2022 WL 17176495 (E.D. Va. Nov. 17, 2022)........................................................24

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) .................................................................8, 15

**Page**

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ........................................................24

*In re Celebrex (Celecoxib) Antitrust Litig.*,
  2018 WL 2382091 (E.D. Va. Apr. 18, 2018) ........................................................22

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)..................................................................................7

*In re Charter Commc'ns, Inc., Sec. Litig.*,
  2005 WL 4045741 (E.D. Mo. June 30, 2005) ................................................13, 25

*In re Comput. Scis. Corp. Sec. Litig.*,
  2013 WL 12155436 (E.D. Va. Sept. 20, 2013).....................................................29

*In re Comverse Tech., Inc. Sec. Litig.*,
  2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........................................................8

*In re Daimlerchrysler AG*,
  2004 WL 7351531 (D. Del. Jan. 28, 2004)...........................................................21

*In re Genworth Fin. Sec. Litig.*,
  210 F. Supp. 3d 837 (E.D. Va. 2016) ........................................................... *passim*

*In re Glob. Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................18, 19

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)...................................................................23

*In re Massey Energy Co. Sec. Litig.*,
  2014 WL 12656719 (S.D.W. Va. June 4, 2014).....................................................29

*In re MicroStrategy, Inc. Sec. Litig.*,
  172 F. Supp. 2d 778 (E.D. Va. 2001) ..............................................................25, 27

*In re Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) .................................................................. *passim*

*In re Neustar, Inc. Sec. Litig.*,
  2015 WL 12843191 (E.D. Va. Dec. 3, 2015) ..........................................................8

*In re Neustar, Inc., Sec. Litig.*,
  2015 WL 8484438 (E.D. Va. Dec. 8, 2015) .......................................................4, 27

- iv -

**Page**

*In re NFL "Sunday Ticket" Antitrust Litig.*,
2024 WL 3628118 (C.D. Cal. Aug. 1, 2024) .........................................................................19

*In re Ocean Power Techs., Inc.*,
2016 WL 6778218 (D.N.J. Nov. 15, 2016) .........................................................................14

*In re Peanut Farmers Antitrust Litig.*,
2021 WL 9494033 (E.D. Va. Aug. 10, 2021) .............................................................5, 25, 27

*In re Pfizer Inc. Sec. Litig.*,
2016 WL 11801285 (S.D.N.Y. Dec. 21, 2016) .....................................................................23

*In re SCANA Corp. Sec. Litig.*,
2020 WL 4218231 (D.S.C. July 23, 2020) ...........................................................................30

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
2013 WL 5505744 (D.N.J. Oct. 1, 2013)...............................................................10, 11, 13

*In re Signet Jewelers Limited Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ................................................................ *passim*

*In re Syngenta AG MIR 162 Corn Litig.*,
357 F. Supp. 3d 1094 (D. Kan. 2018).................................................................................23

*In re Tesla Inc., Sec. Litig.*,
2023 WL 4032010 (N.D. Cal. June 14, 2023) .....................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) .......................................................................24

*In re Thornburg Mortg. Sec. Litig.*,
912 F. Supp. 2d 1178 (D.N.M. 2012) .................................................................................18

*In re Titanium Dioxide Antitrust Litig.*,
2013 WL 6577029 (D. Md. Dec. 13, 2013).....................................................................5, 23

*In re Under Armour Sec. Litig.*,
__ F. Supp. 3d __, 2024 WL 811478 (D. Md. Feb. 26, 2024)..............................................20

*In re Under Armour Sec. Litig.*,
__F. Supp. 3d__, 2024 WL 1635680 (D. Md. Apr. 16, 2024)..............................................17

*In re Under Armour Sec. Litig.*,
2020 WL 363411 (D. Md. Jan. 22, 2020) ...........................................................................15

**Page**

*In re Under Armour Sec. Litig.*,
  342 F. Supp. 3d 658 (D. Md. 2018) ...................................................................14

*In re Under Armour Sec. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019) ...................................................................15

*In re Under Armour Sec. Litig.*,
  540 F. Supp. 3d 513 (D. Md. 2021) ...................................................................20

*In re Under Armour Sec. Litig.*,
  631 F. Supp. 3d 285 (D. Md. 2022) ..............................................................12, 16

*In re Urethane Antitrust Litig.*,
  2016 WL 4060156 (D. Kan. July 29, 2016) .......................................................24

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2021 WL 358611 (D.N.J. Feb. 1, 2021), *aff'd in part, dismissing appeal in part sub nom
  TIAA v. Valeant Pharms. Int'l, Inc.*,
  2021 WL 6881210 (3d Cir. 2021)........................................................................7

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  2018 WL 6333657 (S.D.N.Y. Dec. 4, 2018) ......................................................16

*In re Wilmington Tr. Sec. Litig.*,
  2018 WL 6046452 (D. Del. Nov. 19, 2018) .......................................................23

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  699 F. Supp. 3d 448 (E.D. Va. 2023) ...........................................................10, 28

*Jaffe Pension Plan v. Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) ................................................................19

*Kanefsky v. Honeywell Int'l Inc.*,
  2022 WL 1320827 (D.N.J. May 3, 2022) ...........................................................18

*Kelly v. Johns Hopkins Univ.*,
  2020 WL 434473 (D. Md. Jan. 28, 2020)...................................................5, 12, 27

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  2015 WL 12843830 (E.D. Pa. Oct. 15, 2015)....................................................24

*Knurr v. Orbital ATK, Inc.*,
  2019 WL 3317976 (E.D. Va. June 7, 2019) .........................................................5

**Page**

*Kruger v. Novant Health, Inc.*,
    2016 WL 6769066 (M.D.N.C. Sept. 29, 2016)..........................................................................6

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
    2016 WL 10571774 (N.D. Ill. Nov. 10, 2016) ......................................................8, 9, 13, 20

*Nieman v. Duke Energy Corp.*,
    2015 WL 13609363 (W.D.N.C. Nov. 2, 2015)..........................................................................6

*Pearlstein v. Blackberry Ltd.*,
    2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)....................................................10, 18, 19, 25

*Phillips v. Triad Guaranty Inc.*,
    2016 WL 2636289 (M.D.N.C. May 9, 2016) .........................................................................26

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    2023 WL 11872699 (N.D. Cal. Sept. 26, 2023) ...................................................................23

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .............................................................................................20

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)..................................................................20, 26

*Shah v. Zimmer Biomet Holdings, Inc.*,
    2020 WL 5627171 (N.D. Ind. Sept. 18, 2020) .....................................................................10

*Shupe v. Rocket Cos.*,
    660 F. Supp. 3d 647 (E.D. Mich. 2023)................................................................................14

*Singleton v. Domino's Pizza, LLC*,
    976 F. Supp. 2d 665 (D. Md. 2013) .............................................................................. *passim*

*Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc.*,
    2006 WL 8446464 (D.S.C. Aug. 15, 2006) ..................................................................5, 6, 22

*Spell v. McDaniel*,
    852 F.2d 762 (4th Cir. 1988) .................................................................................................28

*Sponn v. Emergent Biosolutions*, *Inc.*,
    2019 WL 11731087 (D. Md. Jan. 25, 2019) ........................................................................29

*Starr v. Credible Behav. Health, Inc.*,
    2021 WL 2141542 (D. Md. May 26, 2021) ............................................................................5

**Page**

*Tellabs v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................25

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
    2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) ........................................................7

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    §78u-4(a)(4) ..................................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 23 .....................................................................................................22
    Rule 23(a) .................................................................................................16

17 C.F.R.
    §240.10b-5 ................................................................................................11

Lead Counsel, Robbins Geller Rudman & Dowd LLP ("Lead Counsel" or "Robbins Geller"), respectfully submits this memorandum in support of its motion for approval of: (1) Lead Counsel's application for an award of attorneys' fees and expenses; and (2) Lead Plaintiff and its co-Class Representatives' application for awards pursuant to 15 U.S.C. §78u-4(a)(4).[1]

## I.      INTRODUCTION

In awarding fees, courts consider several factors, including the quality and quantity of work as reflected in the results obtained.  Here, in a case that has been fiercely litigated for over seven years and settled on the brink of trial, Lead Counsel worked tirelessly in devoting over 88,000 hours in order to obtain the second-largest PSLRA recovery ever obtained in the Fourth Circuit (and the largest in over 17 years) for the Class.  The Settlement Fund consists of $434,000,000, plus interest thereon.  The Settlement is an exceptional result.  It is a remarkable *48 times* the $9 million SEC settlement, and is many times greater than the typical recovery in similar cases.  The Settlement also includes important corporate reforms adopted by Under Armour, Inc. ("Under Armour" or the "Company") as a part of the Settlement.  *See* ECF 430-3 at 18, ¶¶2.3-2.4.

The $434 million all-cash recovery was achieved through the skill, experience, and effective advocacy of Lead Counsel in the face of considerable risk and an aggressive defense mounted by Defendants through some of the largest and most sophisticated defense firms in the country.  The Settlement was reached only after Lead Counsel achieved several notable litigation successes, including: (1) bringing the case back from the dead by obtaining a favorable indicative ruling from this Court after two previous dismissals and while the appeal was pending in front of the Fourth Circuit; (2) defeating Defendants' motion to dismiss with respect to the third amended complaint; (3) obtaining class

---

[1]      All capitalized terms not defined herein shall have the same meanings as in the Settlement Agreement dated July 12, 2024. ECF 430-3. Furthermore, all emphasis is added and all internal citations are omitted unless otherwise noted. Lastly, all citations to page numbers of documents filed on the Court's docket will refer to the blue ECF page numbers.

certification; (4) overcoming Defendants' motion for summary judgment; and (5) defeating Defendants' motions to exclude some or all of the opinions from each expert Lead Plaintiff put forward to demonstrate Defendants' liability and damages. The quality and quantity of work by Lead Counsel resulted in an outstanding and significant cash recovery for the Class and important corporate reforms.

As compensation for its efforts, Lead Counsel respectfully requests an award of attorneys' fees of 25.83% of the Settlement Amount and payment of litigation expenses of $4,200,059.31, plus interest on both amounts at the same rate and for the same period of time as that earned on the Settlement Fund. The requested fee is the result of an *ex ante* agreement negotiated by Lead Plaintiff over seven years ago in March 2017, at the outset of the Action when the outcome was highly uncertain but the risks were apparent. In addition, Lead Plaintiff and its co-Class Representatives – three institutional investors who have overseen the Action – approve of and endorse the requested fee. An *ex ante* fee agreement and the approval and endorsement by the other Plaintiffs "enjoys a presumption of reasonableness." *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 261 (E.D. Va. 2009). The endorsement by the Court-appointed Lead Plaintiff is also particularly significant because the PSLRA was passed to encourage more diligent institutional investors to seek lead plaintiff status and oversee securities class actions. A lodestar cross-check also confirms the reasonableness of the requested fee.

Lead Counsel's efforts to date have been without compensation of any kind and the fee has been wholly contingent upon the result achieved. The Action could have been settled at a far lesser amount earlier in the litigation (especially in light of the Court's dismissals of Lead Plaintiff's amended complaints in 2018 and 2019), but Lead Counsel continued to incur risk and expense by litigating to a far more favorable resolution. Lead Counsel demonstrated that it was prepared to take this case through trial and beyond to achieve a tremendous result for the Class, which is especially evident given that this litigation has seen: (1) three amended pleadings; (2) lengthy briefing on successive motions to dismiss; (3) opening

and answering Fourth Circuit appellate briefs; (4) Lead Plaintiff's motions for an indicative ruling and to reopen the judgment previously dismissing the case with prejudice; (5) Lead Plaintiff's motion to lift the PSLRA discovery stay during the pendency of Defendants' third motion to dismiss; (6) extensive briefing on motions for class certification, summary judgment, and to exclude the parties' expert witnesses; (7) Lead Counsel taking and/or defending 55 depositions; (8) Lead Counsel's review of over 560,000 documents (totaling more than 3.4 million pages); (9) Lead Plaintiff's two motions to compel (one against Defendants and one against nonparty Bloomberg L.P.); (10) numerous in-person and telephonic hearings on vigorously contested motions; and (11) four full-day mediation sessions between 2022 and 2024 that did not result in an agreement.

Since fee awards are designed to encourage counsel to get the best possible result for the class, the amount requested in this case is warranted given the excellent recovery obtained and the significant obstacles and risks Lead Counsel faced in bringing and prosecuting this case.  As discussed herein, the recovery is many times greater than recoveries in similar cases, yet the requested 25.83% fee is consistent, indeed at the lower end of, the 25%-33% range for fees awarded in the Fourth Circuit.  Similarly, the lodestar multiplier here of approximately 1.9 falls at the low end of the range of multipliers awarded in the Fourth Circuit, particularly in cases (as here) where the risk was substantial and the recovery was exceptional.  Put simply, "[e]ven though the litigation was exceptionally risky and the recovery is enormous, the fee request falls below the market rate."  Declaration of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees ("Silver Decl."), ¶1, attached to the accompanying Declaration of Robert R. Henssler Jr. ("Henssler Decl."), as Ex. E.

Separately, Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Lead Plaintiff" or "NESPF"), Monroe County Employees' Retirement System ("Monroe County"), and KBC Asset Management NV ("KBC") seek awards of $30,000.00,

$2,160.00, and $13,125.00, respectively, for a total amount of $45,285.00, pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Class. All three Class Representatives support their applications with declarations setting forth the basis for the awards.

Finally, in accordance with the preliminary approval order, a total of 469,400 copies of the Notice and Proof of Claim have been sent to potential Class Members and nominees. *See* Declaration of Ross D. Murray Regarding Notice Dissemination and Publication ("Murray Decl."), ¶11, attached as Ex. D to the Henssler Decl. The Notice advised potential Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25.83% of the Settlement Amount, payment of litigation expenses in an amount not to exceed $5 million, plus interest earned thereon, and PSLRA awards to the Lead Plaintiff and Class Representatives not to exceed $100,000.00 total. *See* Murray Decl., Ex. A (Notice at 3). The deadline set by the Court to object to the requested attorneys' fees and expenses has not yet passed, but to date, no objections have been received. Lead Counsel respectfully submits that the requested fees, expenses, and Lead Plaintiff and its co-Class Representative awards are fair and reasonable and should therefore be granted.

## II.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND APPROPRIATE

### A.   A Reasonable Percentage of the Fund Recovered Is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases

As is typical in these cases, Lead Counsel seeks a percentage of the fund recovered as attorneys' fees. It is well settled that attorneys who achieve a common settlement fund in securities class actions for the benefit of a class are "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Neustar, Inc.*, *Sec. Litig.*, 2015 WL 8484438, at *6 (E.D. Va. Dec. 8, 2015) (noting the PSLRA provides for "an award of attorneys' fees and costs out of any recovery obtained by plaintiffs in a securities fraud class action"). In common fund settlements like the one here, courts in the Fourth Circuit overwhelmingly prefer to calculate attorneys' fees as a percentage of the

fund (also sometimes referred to as the "percentage of the recovery" method).  *See Kelly v. Johns Hopkins Univ.*, 2020 WL 434473, at *3 (D. Md. Jan. 28, 2020) (Russell, III, J.) ("Within the Fourth Circuit, district courts prefer the percentage method in common-fund cases.  ***It is 'overwhelmingly' preferred***.") (citing cases); *see also Boger v. Citrix Sys., Inc.*, 2023 WL 1415625, at *9 (D. Md. Jan. 31, 2023) (Griggsby, J.); *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 462 (D. Md. 2014) (Chasanow, J.).  The reason: "[t]his method aligns the interests of class counsel and class members because it 'ties the attorneys' award to the overall result achieved.'"  *Starr v. Credible Behav. Health, Inc.*, 2021 WL 2141542, at *5 (D. Md. May 26, 2021) (Messitte, J.); *see also Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 681 (D. Md. 2013) (Chasanow, J.) ("An attractive aspect of the 'percentage of recovery' method is its results-driven nature . . . .").  In sum, "'[t]he percentage method "is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."'"  *In re Peanut Farmers Antitrust Litig.*, 2021 WL 9494033, at *1 (E.D. Va. Aug. 10, 2021).

Determining the appropriate percentage fee is case specific, but district courts in the Fourth Circuit have often awarded attorneys' fees ranging from 25% to 33-1/3% of the recovery in complex class actions, including in cases with nine figure settlements.  *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (Bennett, J.) (awarding 33-1/3% in attorneys' fees from a $163.5 million settlement); *Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc.*, 2006 WL 8446464, at *5 (D.S.C. Aug. 15, 2006) (awarding 25% in attorneys' fees from a $337.5 million cash settlement that, together with the non-cash portion, brought "the total recovery for the class is in excess of $400 million"); *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 846 (E.D. Va. 2016) (awarding 28% in attorneys' fees from a $219 million settlement fund reached as the parties were preparing for trial).[2]

---

[2]     *See also Knurr v. Orbital ATK, Inc.*, 2019 WL 3317976, at *1 (E.D. Va. June 7, 2019) (awarding 28% in attorneys' fees from a $108 million settlement, plus interest); *Peanut Farmers*, 2021 WL 9494033, at *9 (awarding 33-1/3% in attorneys' fees from a $102 million settlement).

Here, the 25.83% requested fee is at the low end of the range of percentage fees approved by courts faced with similarly sized class actions settlements, and it is the product of an *ex ante* agreement negotiated by the Lead Plaintiff.  *See Mills*, 265 F.R.D. at 261 ("a fee request that has been approved and endorsed by properly-appointed lead plaintiffs" in a PSLRA case "enjoys a presumption of reasonableness").[3]

The reasonableness of the fee is also supported by a lodestar crosscheck.  *See Dickman v. Banner Life Ins. Co.*, 2020 WL 13094954, at *5 (D. Md. May 20, 2020), *aff'd sub nom. 1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513 (4th Cir. 2022); *but see Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at *4 (M.D.N.C. Sept. 29, 2016) ("Given that courts in the Fourth Circuit approve of the percentage-of-fund method for awarding fees in common fund cases, '[i]t is not necessary for the Court to conduct a lodestar analysis.'").[4]  As detailed here and in the accompanying declarations of Plaintiffs' Counsel, 89,133 hours of attorney and para-professional time were expended prosecuting the Action for the benefit of the Class for over seven years, through June 2024.  Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the Litigation by each attorney and litigation professional by their current hourly rates, is $59,251,548.00.  Accordingly, the requested fee of 25.83% represents a multiplier of approximately 1.9 to Plaintiffs' Counsel's lodestar – at the low end of the range (between 2 and 4.5) of acceptable multipliers.  *See Fangman II*, 2017 WL 2591525, at *6 ("'Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee.'"); *Spartanburg*, 2006 WL 8446464, at *5 ("Although this [6.0] multiplier is at the high end of the acceptable range, it is justified by the exceptional results achieved in this case."); *Nieman v. Duke Energy Corp.*, 2015 WL

---

[3]     For example, in *Christine Asia Co., Ltd. v. Ma*, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019), the court there approved a $250 million PSLRA settlement and awarded counsel attorneys' fees in the amount of 25%, plus interest.  *Id.* at *17.  The court further noted that "**courts apply a presumption of reasonableness where a fee request is consistent with an ex ante agreement**."  *Id.* at *18.

[4]     This Court has previously held that "'"where the lodestar fee is used as a mere cross-check to the percentage method of determining reasonable attorneys' fees, the hours documented by counsel need not be exhaustively scrutinized by the district court."'"  *Fangman v. Genuine Title, LLC*, 2017 WL 2591525, at *6 (D. Md. June 15, 2017) (Bennett, J.) ("*Fangman II*") (quoting *Singleton*, 976 F. Supp. 2d at 688).

13609363, at *1 (W.D.N.C. Nov. 2, 2015) ("A multiplie[r] of 4.5 would, in the circumstances of this case, be inappropriately too low."). Here, the hours spent to obtain the results are more than reasonable. Lead Counsel obtained a landmark recovery – the second-largest securities recovery in this Circuit and the largest in over 17 years – by pushing the case to the brink of trial. As detailed in the Henssler Decl., there is no question that the hours expended were necessary.

**B.      The *Ex-Ante* Fee Agreement Between Lead Plaintiff and Lead Counsel – Agreed to More than Seven Years Ago – Is Entitled to a Presumption of Reasonableness**

Prior to this Court's appointment of a lead plaintiff in May 2017 (*see* ECF 13), Lead Plaintiff and Lead Counsel entered into a tiered fee structure designed to maximize the ***net*** recovery to the class – which is precisely what it did here. *See* Henssler Decl., Ex. F (Fee Agreement with NESPF). This fee structure, negotiated by the Lead Plaintiff *ex ante*, is entitled to a presumption of reasonableness. Courts in PSLRA cases have highlighted the benefits of an *ex-ante* fee agreement between lead plaintiff and lead counsel, holding that "in light of Congress's intent to empower lead plaintiffs under the PSLRA to select and supervise attorneys on behalf of the class,"[5] these agreements "enjoy a presumption of reasonableness under the PSLRA." *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *7 (S.D.N.Y. Aug. 18, 2017); *see also In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2021 WL 358611, at *5 (D.N.J. Feb. 1, 2021) ("'[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel.'"), *aff'd in part, dismissing appeal in part sub nom. TIAA v. Valeant Pharms. Int'l, Inc.*, 2021 WL 6881210 (3d Cir. 2021) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001)).

---

[5]      *In re Signet Jewelers Limited Sec. Litig.*, 2020 WL 4196468, at *17 (S.D.N.Y. July 21, 2020) (citing cases).

In addition, NESPF's agreement and approval of this fee request is directly in line with Congress's preference when it drafted the PSLRA, to have large sophisticated institutional investors oversee class actions. *See In re Neustar, Inc. Sec. Litig.*, 2015 WL 12843191, at *2 (E.D. Va. Dec. 3, 2015) (approving requested award of attorneys' fees in part due to the fact that it "is consistent with an *ex ante* written fee agreement entered into between Lead Plaintiff . . . and Lead Counsel at the commencement of the Action and has been approved by Lead Plaintiff since the Settlement was reached"); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 758 (S.D. Ohio 2007) ("[T]he PSLRA places lead plaintiff, at least *ex-ante*, in the best position to fix the compensation of lead counsel."); *In re Converse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) ("The court sees no need to impose its own *ex post* assessment of Lead Counsel's value when the retainer and fee agreements speak for themselves.").

As University of Texas School of Law Professor Charles Silver states, "claimants negotiate fees when litigation starts, not when it ends.  Upfront, the participants see the risks that lie ahead and the virtue of paying fees that encourage lawyers to bear them."  Silver Decl., ¶29.  And this is especially true for "sophisticated clients and sophisticated class representatives," such as large institutional investors, who "regularly agree to pay 33.33% or more in risky, complex litigation, even when potential rewards are very large."  *Hale v. State Farm Mut. Autos. Ins. Co.*, 2018 WL 6606079, at *8 (S.D. Ill. Dec. 16, 2018) (citing Professor Silver); *see also* Silver Decl., ¶34 ("One also discovers . . . that clients, including sophisticated corporate clients that hire lawyers to handle large commercial cases, typically agree to pay contingent fees of 30 percent to 40 percent.").

Here, the *ex-ante* fee agreement deserves the same presumption of reasonableness applied by numerous other courts, and is further support for why the Court should approve the requested fee in this case.  For example in *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2016 WL 10571774 (N.D. Ill. Nov. 10, 2016) ("*Household III*"), the court there, in approving an almost 25%, plus interest, award of

attorneys' fees (*i.e.*, 24.68%) from a $1.575 billion securities case settled on the eve of trial, noted that "the requested fee is consistent with the fee agreement negotiated" between the lead plaintiff and lead counsel more than 11 years earlier "in April 2005 when the ultimate outcome of the case was highly uncertain," and further, that the "agreement is evidence of the market rate for legal services at that time." *Id.* at \*1.

### C.     Lead Counsel's Fee Request Is Reasonable and Appropriately Compensates and Incentivizes Counsel Under Fourth Circuit Authority

"Although the United States Court of Appeals for the Fourth Circuit 'has not yet identified factors for district courts to apply when using the "percentage of recovery" method,' . . . .  District courts in this circuit have analyzed the following seven factors:"

> "(1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy."

*Fangman v. Genuine Title, LLC*, 2017 WL 86010, at \*3-\*4 (D. Md. Jan. 10, 2017) ("*Fangman I*") (Bennett, J.) (alteration in original) (quoting *Singleton*, 976 F. Supp. 2d at 682); *see also Feinberg v. T. Rowe Price Grp., Inc.*, 610 F. Supp. 4 758, 771 (D. Md. 2022) (Bredar, J.) (same); *cf. Dickman*, 2020 WL 13094954, at \*5 (analyzing request for attorneys' fees using "all the factors set forth in Singleton" and awarding 39.5% of the common settlement fund).

As demonstrated below, when the Court analyzes these factors and applies them to the specific circumstances of this litigation, they all weigh in favor of finding that the requested fee is fair and reasonable and, as a result, should be approved.

### 1.     The Result Obtained for the Class Supports the Requested Fee

Both the Fourth Circuit and this Court "have noted that 'the most critical factor in determining the reasonableness of a fee award is the degree of success obtained.'" *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 247 (4th Cir. 2010); *see also Fangman I*, 2017 WL 86010, at \*4 (same).  This makes logical sense, because as courts recognize, clients care most about results and would willingly pay, and are financially

better off paying, a larger fee for a great result than a lower fee for a poor outcome and, as a result, "want to incentivize their counsel to pursue every last settlement dollar." *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5709250, at *3 (N.D. Ill. Dec. 1, 2021); *see also Allahpattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, [this] approach creates the perverse incentive for Class Counsel to settle too early for too little."); *Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at *11 (N.D. Ind. Sept. 18, 2020) (similar) (citing cases and Professor Silver).

Here, the $434,000,000 cash recovery (in addition to corporate governance reforms) is a superb result for the Class by any measure. The recovery is certain and has been obtained through the considerable efforts of Lead Counsel without the expense, delay, and uncertainty of continued litigation (*i.e.*, a trial, followed by what would assuredly be one or more appeals following a verdict). *See* Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and the Plan of Allocation, §I; *see also Mills*, 265 F.R.D. at 256 ("In support of this uncertainty, particularly at the damages phase, Lead Counsel cites to several cases in which substantial jury verdicts were later overturned."); *Pearlstein v. Blackberry Ltd.*, 2022 WL 4554858, at *3 (S.D.N.Y. Sept. 29, 2022) ("Even if Plaintiffs prevailed at trial, '[d]elay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value.'"). Throughout the seven-year duration of this litigation, "Defense counsel zealously represented the interests of their respective clients and were fully prepared to try and appeal this case to the very end." *In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744, at *27 (D.N.J. Oct. 1, 2013) ("*Schering II*"); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 699 F. Supp. 3d 448, 459 (E.D. Va. 2023) ("[T]he nearly five-year record in this case suggests that the parties would have continued to vigorously litigate beyond the trial.").

- 10 -

In the end, the Class cares most about getting a great result, and after seven years of hard-fought litigation against some of the best law firms in the country, Lead Counsel was able to achieve a great result that monetarily benefits Class Members and, with the corporate reforms, benefits current (and future) Under Armour shareholders as well. *See Schering II*, 2013 WL 5505744, at *27 ("Faced with this experienced, formidable, and well-financed opposition who aggressively litigated the . . . Action, [Lead] Counsel stood toe-to-toe and achieved an outstanding result for the Class."). It is the second-largest settlement in a securities class action ever in this Circuit, and the largest in over 17 years. The largest PSLRA settlement in this Circuit during the past ten years was $219 million, or 50% of the recovery obtained here. *See Genworth*, 210 F. Supp. 3d at 842. Indeed, this recovery is more than 1,000% of the median percentage recovery for cases settled with estimated damages of $1 billion or more in 2023.[6] And if Defendants' arguments at summary judgment, requesting this Court significantly shorten the Class Period from over four years to a time period of less than a year, were successful at trial (*see, e.g.*, ECF 361-1 at 64-67), the percentage recovery of the Settlement would be approximately 62% of damages.

This outstanding result obtained for the Class, a $434,000,000 cash settlement plus important corporate changes, supports Lead Counsel's fee request and merits an appropriate fee that encourages counsel to seek excellent results.

### 2.    The Quality, Skill, and Efficiency of Lead Counsel Supports the Requested Fee

The quality of Lead Counsel's representation throughout the last seven years further supports the reasonableness of the requested fee. After two prior dismissals at the pleading stage (the second dismissal being with prejudice), Lead Counsel successfully convinced the Court to grant Lead Plaintiff's motions for

---

[6]    *See* Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* at 6, 15 (Cornerstone Research 2022) (finding median settlements as a percentage of estimated damages was 2% in 2023 for Rule 10b-5 cases involving over $1 billion in damages and 7.1% for cases of all sizes between 2019 and 2023 in cases settled after a ruling on summary judgment motions), available at www.cornerstone.com/wp-content/uploads/2024/03/Securities-Class-Action-Settlements-2023-Review-and-Analysis.pdf.

an indicative ruling and to reopen judgment.  As Professor Silver observes, "I have followed class actions

as an academic and a consultant for decades, but never before have I seen one that involved [a motion to

reopen the litigation and a motion for an indicative ruling].  The litigation seemed to be 'dead as a

doornail,' having been dismissed with prejudice by the Court, but Class Counsel revived it, and eventually

the class members' claims posed a threat so dire that the Defendants felt compelled to offer a mega-fund

settlement."  Silver Decl., ¶24.  Lead Counsel went on to rack up several more victories, defeating

Defendants' third motion to dismiss and overcoming Defendants' opposition to Lead Plaintiff's motion for

class certification.  Lead Counsel also prevailed over Defendants' motion for summary judgment and to

exclude (part or all of) the opinions of Lead Plaintiff's experts.  Additionally, Lead Counsel went toe-to-toe

against five nationally recognized law firms with highly regarded securities litigation practices, and after

four unsuccessful prior mediation attempts, took the case to the brink of trial forcing settlement just weeks

before the July 15, 2024 trial was set to begin.  *See Kelly*, 2020 WL 434473, at *4 ("With an opponent that

is a 'sophisticated corporation with sophisticated counsel,' such as here, additional skill is necessary, as

Class Counsel herein has been found to be."); *Mills*, 265 F.R.D. at 262 ("Counsel further engaged in

extensive successful motion practice and reached a favorable Settlement after numerous mediation sessions

with a knowledgeable and sophisticated retired judge against experienced and sophisticated defense

attorneys.").

   Lead Counsel is a nationally recognized leader in securities class actions and complex litigation.

*See* www.rgrdlaw.com; *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 308-09 (D. Md. 2022) ("*UA*

*Class Cert*") ("Courts nationwide have recognized Robbins Geller's expertise in this field of litigation. . . .

In light of Robbins Geller's history of diligent advocacy in class action litigation, this Court is satisfied that

Plaintiffs have selected attorneys who are 'qualified, experienced and able to conduct the litigation.'").

Robbins Geller has 200 lawyers in 10 offices nationwide, with hundreds of dedicated, highly skilled

attorneys and employees, including forensic accountants, economists, damage analysts, among many others.  Robbins Geller has a track record of trying cases, or settling cases at a premium on the eve of trial after moving trial teams and support personnel around the country.  *See, e.g.*, *Household III*, 2016 WL 10571774, at \*1-\*2.  Clients retain Robbins Geller to benefit from its experience and resources in order to obtain the largest possible recovery for the class in question.  Here, Lead Counsel's skill and experience brought about an exceptional result against five of the most respected law firms in the Country, further supporting the requested fee award.

The standing of opposing counsel should also be weighed because such standing reflects the challenge faced by Lead Counsel.  *See Signet*, 2020 WL 4196468, at \*20 ("'The fact that the settlements were obtained from defendants represented by "formidable opposing counsel from some of the best defense firms in the country" also evidences the high quality of lead counsels' work.'") (quoting *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at \*3 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 F. App'x 9 (2d Cir. 2008)).  Defendants chose nationally recognized and highly capable representation from Fried, Frank, Harris, Shriver & Jacobson LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Kramer Levin Naftalis & Frankel LLP; Venable LLP; and Hogan Lovells US LLP.  *See In re Charter Commc'ns, Inc., Sec. Litig.*, 2005 WL 4045741, at \*17 (E.D. Mo. June 30, 2005) ("The quality and vigor of opposing counsel is important in evaluating the services rendered by Lead Counsel."). These firms spared no effort or expense on behalf of defendants Under Armour and Kevin Plank in their zealous defense.  Lead Plaintiff's ability to obtain a favorable result for the Class while litigating against these formidable defense firms and their well-financed clients further evidences the quality of Lead Counsel's work and weighs in favor of awarding the requested fee.  *See Schering II*, 2013 WL 5505744, at \*27 ("In a securities class action of this potential magnitude, and given the caliber of the opposition, a top-tier team like this was needed."); *Charter*, 2005 WL 4045741, at \*17 ("Given the vigor with which Lead

Counsel . . . investigated claims, briefed the motions to dismiss, and negotiated the settlement, it is reasonable for Lead Counsel . . . [to] be as well paid as their adversaries who did not work on a contingency basis.").

### 3.    The Risk of Nonpayment Supports the Requested Fee

As this Court held in *Fangman I*, ""[i]n determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis."" 2017 WL 86010, at *5. And, courts in and outside this Circuit continually recognize, "[t]he very nature of a securities fraud case demands a difficult level of proof to establish liability" and "[p]roving damages further implicate[s] complex economic modeling at the hands of sophisticated experts, who . . . necessarily engage[] in complex measurements of stock valuation and price movement." *Mills*, 265 F.R.D. at 263; *see also In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *19 (D.N.J. Nov. 15, 2016) ("The Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and the subsequent cases interpreting *Dura* have made proving loss causation even more difficult and uncertain than it was in the past."). Quite frankly, "[t]o be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (*per curiam*); *see also Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 677-78 (E.D. Mich. 2023) ("Congress enacted the PSLRA to place an 'elephant-sized boulder' before private securities-fraud cases . . . .").

***Risks faced at the pleading stage***. The fact that this Court, rigorously applying the strictures of the PSLRA and thoroughly scrutinizing the allegations of the first two pleadings, dismissed this case not once, but twice, demonstrates firsthand how difficult these cases are to successfully navigate through the pleading stage. *See, e.g.*, *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 689 (D. Md. 2018) ("*UA I*") ("[A] plaintiff must satisfy the exacting pleading requirements set forth in the PSLRA as well as Rule 9(b) of the

Federal Rules of Civil Procedure.  Indeed, pleading a 'strong inference' of scienter is no small burden."); *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 457-58 (D. Md. 2019) ("*UA II*") (same); *Cardinal Health*, 528 F. Supp. 2d at 768 ("Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.").  In fact, the dismissal rate in securities cases is 61% as they are well known to be complex and difficult due to the heightened pleading standards.  *See, e.g.*, Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024), at 16, Fig. 14 (report from NERA Economic Consulting noting that 61% of securities class actions filed between January 2014 and December 2023 had motions to dismiss granted, some without prejudice).

After Lead Plaintiff successfully moved this Court to issue an indicative ruling and reopen the judgment previously dismissing the litigation (motions that were both vigorously objected to by Defendants),[7] Defendants continued to forcefully argue that Lead Plaintiff failed to allege any actionable misstatements or omissions and that any allegations of misrepresentations lacked sufficient evidence of scienter.  For example, throughout the litigation, Defendants continually emphasized how "channel stuffing" related cases like this one are often dismissed[8] and, further, that neither Defendants' public statements nor Under Armour's purported compliance with Generally Accepted Accounting Principles ("GAAP") created an affirmative duty to publicly disclose this practice to investors.  *See, e.g.*, ECF 361-1 at 34 ("Where, as here, a company accurately reports revenues in accordance with GAAP, there is no legal requirement to disclose that a portion of revenue was generated from pull-forward sales.") (citing cases); *id.* at 35 ("Here, as in those cases, UA had no affirmative duty to disclose its pull-forward sales – which represented real sales to real customers and did not violate GAAP.").  Defendants also zealously argued at

---

7    *See In re Under Armour Sec. Litig.*, 2020 WL 363411, at *9 (D. Md. Jan. 22, 2020).

8    *See* ECF 159-1 at 20 ("Courts have long held that '[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course.'") (citing cases).

both the motion to dismiss and summary judgment stages that Lead Plaintiff failed to establish the scienter of either Under Armour or Kevin Plank. *See, e.g.*, ECF 159-1 at 38-52; ECF 361-1 at 53-60. Notwithstanding those contentions, Lead Plaintiff prevailed at both junctures.

*Risks faced at class certification*. Defendants also strenuously opposed Lead Plaintiff's motion for class certification on numerous grounds. Defendants argued that the Court should refuse to appoint any of the Plaintiffs as class representatives on both adequacy and typicality grounds. For example, as for typicality, Defendants claimed that this prong of Rule 23(a) was not met because Plaintiffs continued to purchase Under Armour stock after the issuance of a partial corrective disclosure and/or because they relied on outside investment managers "'whose internal analysis of Under Armour contradicts core theories of Plaintiffs' case.'" *UA Class Cert*, 631 F. Supp. 3d at 303. Defendants further argued that Lead Plaintiff's transactions in Under Armour stock made its claims atypical of other Class Members with §20A claims because, according to Defendants: (1) NESPF did not sell the same class of securities defendant Plank sold in April 2016; and (2) NESPF was a net seller of the Company's stock in April and May 2016 and therefore sold in the same direction as defendant Plank. *See id.* at 304, 306-07. Ultimately, Lead Plaintiff prevailed, and the Court certified this case as a class action in September 2022.

*Risks faced at summary judgment*. At summary judgment, aside from raising similar arguments from the pleading stage (but this time supported by documents produced and deposition testimony given during discovery), Defendants also sought to exclude some or all of the opinions proffered by Lead Plaintiff's four liability experts. That Defendants moved to exclude the entirety of Lead Plaintiff's loss causation and damages expert, Dr. Matthew D. Cain, Ph.D. ("Cain"), creating a heightened risk that if the Court granted their motion, Lead Plaintiff would be without crucial expert testimony needed to convince the jury that Lead Plaintiff met its burden of proof for two necessary elements of §10(b). *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2018 WL 6333657, at *2 (S.D.N.Y. Dec. 4, 2018) (expert testimony required

in securities fraud class actions with respect to materiality, scienter, loss causation, and damages).  In April 2024, the Court denied Defendants' motions to exclude the opinions of Dr. Cain and Lead Plaintiff's three other liability experts.  *See In re Under Armour Sec. Litig.*, __F. Supp. 3d__, 2024 WL 1635680, at *9 (D. Md. Apr. 16, 2024).

    ***Risks faced by Defendants' motions in limine***.  Defendants' motion *in limine* seeking to bar any reference to the government investigations mentioned in the November 3, 2019 article by *The Wall Street Journal* ("*WSJ*") also presented a risk at trial if the Court granted this motion.[9]  The information contained in this article was Lead Plaintiff's final alleged corrective disclosure and, more importantly, a centerpiece of Dr. Cain's loss causation and damages analyses.  Had the Court granted Defendants' motion and precluded any reference to these investigations, this would have created a tangible risk that the jury would not have connected the remaining unredacted information in the *WSJ* article to Lead Plaintiff's allegations regarding Defendants' alleged failure to disclose Under Armour's pull-forward activity and the allegedly misleading picture this non-disclosure painted about the Company's financial health during the Class Period. Therefore, the jury could have potentially found that the November 3, 2019 *WSJ* article was not a corrective disclosure at all, and that the Class Period must end in August 2017 (at the latest) – further negatively impacting the available recoverable damages for the entire Class.[10]

    ***Risks faced at trial***.  There was also a real risk that Defendants could have convinced a jury that Defendants did not have a duty to disclose any pull-forward activity and also that the alleged misrepresentations were either not actionable (*e.g.*, "truth-on-the-market" defense, immaterial puffery, and/or protected by the PSLRA safe harbor) or were not misleading because, for example, they were

---

[9]    *See* ECF 406-1 at 2 ("Consistent with the Court's prior ruling and guidance to the parties, this motion seeks to preclude any reference at trial to the SEC or DOJ investigations, including references to those investigations in the *WSJ* Article, which Plaintiffs allege is a partial corrective disclosure.").

[10]    The litigation was settled seven days before the Court was to hear arguments on the parties' unresolved motions *in limine*. *See* ECF 418.

literally accurate reports of historical financial data. *See Christine Asia*, 2019 WL 5257534, at \*12 ("Plaintiffs faced the further risk of proving to a jury that Defendants made . . . material omission[s] or false statement[s] in Alibaba's Registration Statement or otherwise during the Class Period. Defendants marshalled a series of arguments in favor of [their] position."); *Signet*, 2020 WL 4196468, at \*10 (same).

Moreover, even if Lead Plaintiff had proven that Defendants made at least one actionable, material misrepresentation, the jury could have nonetheless concluded that scienter had not been sufficiently proven. *See Christine Asia*, 2019 WL 5257534, at \*12 ("Even if Plaintiffs convinced a jury that the failure to disclose the July 2014 Meeting was a material omission, Plaintiffs also faced the risk that a jury would conclude that Defendants did not act with the requisite scienter. ***Proving scienter is hard to do***."); *see also In re Thornburg Mortg. Sec. Litig.*, 912 F. Supp. 2d 1178, 1255 (D.N.M. 2012) (similar). And even if Lead Plaintiff was successful in proving that Defendants made material misrepresentations with scienter, there would nonetheless be the risk that the jury could find that "the alleged misstatements had no price impact and the alleged corrective disclosures were not, in fact, 'corrective.'" *Pearlstein*, 2022 WL 4554858, at \*5; *see also Signet*, 2020 WL 4196468, at \*11 (same).

Additionally, at trial, the case would have turned largely on expert testimony concerning highly complex and technical subject matters (*e.g.*, compliance with GAAP, loss causation, and damages) and the credibility of fact witnesses – most of whom were represented by defense counsel, or attorneys paid for and provided by Under Armour, or were still employed at Under Armour. *See Kanefsky v. Honeywell Int'l Inc.*, 2022 WL 1320827, at \*5 (D.N.J. May 3, 2022) ("[T]here is no guarantee that Plaintiffs would be successful in convincing a jury to hold Honeywell liable. Plaintiffs would need to present expert testimony of expensive financial economic experts using complex methodologies and would face significant risks in trying to prove falsity, materiality, scienter, loss causation, and damages."); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) ("Calculation of damages is a 'complicated and

uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud.").  In order to prevail, Defendants needed only to defeat one element of Lead Plaintiff's §10(b) claims to be victorious, and there was a significant risk the jury would agree with Defendants' experts and find no liability, no damages, or award far less than the Class sought to recover.  *See Glob. Crossing*, 225 F.R.D. at 459.

Even if Lead Plaintiff obtained a favorable verdict at the liability phase (which was far from guaranteed),[11] Defendants would have likely sought the opportunity during the second phase of the trial to challenge the presumption of reliance and the damages due to the Class as to many Class Members (including the reliance by Lead Plaintiff NESPF and its fellow Class Representatives Monroe County and KBC).  *See* ECF 399 & 421.[12]

**Risks faced with post-trial motions and on appeal**.  Had Lead Plaintiff and the Class's claims survived the second phase of trial, there nonetheless remained a real risk of partial or complete reversal in post-trial proceedings.  *See In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *1 (D. Ariz. Apr. 20, 2012) ("On January 16, 2008, a jury verdict was entered in favor of lead Plaintiff.  On August 4, 2008, this Court granted Defendants' motion for judgment as a matter of law and entered judgment in favor of Defendants."); *Pearlstein*, 2022 WL 4554858, at *3 ("Even very large judgments recovered after lengthy litigation and trial can be completely lost on appeal or because of post-trial motion practice.  This is especially true of securities class actions, where intervening shifts in legal standards have undermined trial victories."); *In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *1 (C.D. Cal. Aug. 1, 2024) (granting defendants' motion for judgment as a matter of law after class action plaintiffs obtained a jury

---

[11]   *See, e.g.*, *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *1 (N.D. Cal. June 14, 2023) (awarding defendants a verdict on all counts even though plaintiffs were granted summary judgment on certain §10(b) elements).

[12]   *Cf. Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 930 (N.D. Ill. 2010) ("Accordingly, Phase II shall address the issue of defendant's rebuttal of the presumption of reliance as to particular individuals as well as the calculation of damages as to each plaintiff.  **In creating a Phase II protocol, this Court receives very little guidance from other courts because securities fraud class actions have rarely proceeded to trial, let alone reached subsequent proceedings**.").

verdict for more than $4.6 billion after nearly nine years of litigation). For example, in the *Household* securities class action, Robbins Geller obtained a verdict for the plaintiff class which was subsequently partially overturned and remanded by the Seventh Circuit for a new trial. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 412-13 (7th Cir. 2015). *See also, e.g.*, *In re BankAtlantic Bancorp, Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (overturning jury verdict and granting defendants judgment as a matter of law on basis of loss causation), *aff'd on other grounds sub. nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same). Thus, there existed a significant risk that class-wide recoverable damages would have been far less than $434 million (and even potentially zero).

> **The SEC's efforts did not lessen these risks**. For multiple reasons, the SEC's action did not eliminate or even lessen the risk Lead Counsel faced in litigating this case for the past seven years. *Fangman I*, 2017 WL 86010, at *5. First, the SEC's tag-along action resulted in a $9 million settlement with no admission of liability three years ago – nor was there any financial restatement either during the Class Period or accompanying the settlement with the SEC. *See In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 518 (D. Md. 2021) ("The SEC Order is based upon the consent of the Defendants without the admission or denial of any findings. **Furthermore, the Order is not dispositive of the issues in this case**."); *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *29 (N.D. Tex. Nov. 8, 2005). As a result, the Court not only refused to consider the SEC Order when it denied Defendants' motion for summary judgment, but it also made it abundantly clear that it did not envision a scenario where this evidence would be admissible at trial. *See In re Under Armour Sec. Litig.*, __ F. Supp. 3d __, 2024 WL 811478, at *20 (D. Md. Feb. 26, 2024).

> Second, despite the fact that it conducted an investigation into Defendants, the United States Department of Justice ("DOJ") never formally charged either Under Armour or Kevin Plank. As

Defendants themselves previously argued in one of their motions *in limine*, "the fact that the SEC and DOJ conducted investigations is not relevant and not being offered for any proper purpose" and "[t]hese investigations prove nothing about Defendants' conduct." ECF 406-1 at 4-5; *see also id.* at 6.

Therefore, when the totality of the risks undertaken by Lead Counsel in the seven years it prosecuted this litigation are taken into consideration, the $434 million Settlement (in addition to notable corporate reforms that could not be awarded at trial) achieved in the face of these significant risks and on the brink of trial, amply supports the requested 25.83% fee award. *See In re Daimlerchrysler AG*, 2004 WL 7351531, at *17 (D. Del. Jan. 28, 2004) ("Unlike a case where an early settlement allows the attorneys to reap a significant windfall, this case did not settle until after the close of discovery and in the midst of trial preparation.").

### 4. The Lack of Objections by Class Members Supports the Fee Request

The Notice informed Class Members that Lead Counsel would move the Court for an award of attorneys' fees in an amount not to exceed 25.83% of the Settlement Amount, for payment of litigation expenses not to exceed $5 million, and for statutory awards to Lead Plaintiff and its co-Class Representatives not to exceed an aggregate amount of $100,000, pursuant to 15 U.S.C. §78u-4(a)(4). Class Members were also advised of their right to object to the fee and expense request. While the October 17, 2024, deadline to object has not yet passed, to date, not a single objection has been received. *See Berry v. Schulman*, 807 F.3d 600, 619 (4th Cir. 2015) ("Th[e] almost complete lack of objection to the fee request provides additional support for the district court's decision to approve it.") (citing cases). Should any objections be received, Lead Counsel will address them in its reply papers.

As this Court previously noted in *Fangman I*, "'[t]he lack of objections tends to show that at least from the class members' perspective, the requested fee is reasonable for the services provided and the benefits achieved by class counsel.'" 2017 WL 86010, at *6; *see also Genworth*, 210 F. Supp. 3d at 843

(same).  Given that sophisticated institutional investors – who each have their own in-house and/or outside counsel and duty to protect their respective beneficiaries – make up a substantial portion of the Class, the lack of objections, to date, to any aspect of the Settlement and the fee and expense requests provides even more support for the requested fee.  *See*, *e.g.*, *Spartanburg*, 2006 WL 8446464, at *3 ("Given that a substantial portion of the class is composed of sophisticated business entities, this absence of objections to the requested fee award further indicates the reasonableness of the award and the class members' appreciation of Lead Class [Counsel's] extensive efforts in this litigation."); *Signet*, 2020 WL 4196468, at *6 ("'It is significant that no institutional investors . . . have objected to the Settlement.'").

Finally, Lead Plaintiff and its co-Class Representatives, sophisticated institutional investors with substantial stakes in the litigation, have approved the requested fee.  *See Mills*, 265 F.R.D. at 261 ("Further, as other courts have held, in a PSLRA case in which a fee request that has been approved and endorsed by properly-appointed lead plaintiffs, such as IPERS and MPERS here, enjoys a presumption of reasonableness."); *cf. In re Celebrex (Celecoxib) Antitrust Litig.*, 2018 WL 2382091, at *4 (E.D. Va. Apr. 18, 2018) ("The letters of support from these three large sophisticated Class members are an indication that the fee sought in this matter is akin to what would have been privately negotiated outside the context of Rule 23.").  This is as Congress intended when it enacted the PSLRA.  *See Signet*, 2020 WL 4196468, at *17; Declaration of Graham Buntain on behalf of NESPF ("NESPF Decl."), ¶5; Declaration of Michael Grodi on behalf of Monroe County ("Monroe County Decl."), ¶5; Declaration of Bart Elst on behalf of KBC ("KBC Decl."), ¶5 (attached to the Henssler Decl. as Exs. A-C, respectively).

### 5.    Awards Made in Similar Cases Support the Fee Request

In the Fourth Circuit, "'[a]ttorneys' fees awarded under the "percentage of recovery" method are generally between twenty-five (25) percent and thirty (30) percent of the fund.'"  *Fangman I*, 2017 WL 86010, at *6 (quoting *Singleton*, 976 F. Supp. 2d at 684); *Mills*, 265 F.R.D. at 264 ("Though varied, it is worth noting as a starting point that percentage awards are 'often between 25% and 30% of the fund.'").

"In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter." *Singleton*, 976 F. Supp. 2d at 685. However, "it is also useful to examine the attorneys' fees awards approved in similar class actions as a comparison." *CASA de Md., Inc. v. Arbor Realty Tr., Inc.*, 2024 WL 1051120, at *7 (D. Md. Mar. 11, 2024) (Chasanow, J.).

In analyzing and comparing the fee request here to awards from nine-figure settlements of securities class actions or other complex litigations (especially those lasting several years and/or in the pretrial stage), the end result is the same: Lead Counsel's 25.83% fee request is well within the range (or indeed, at the low end) of percentage fees that courts both in and outside this Circuit have awarded from other complex class action settlements above $100 million. *See, e.g.*, §II(A) at 5 n.2, *supra* (citing decisions in the Fourth Circuit, including this Court's decision in *Titanium Dioxide*); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33.33% in attorneys' fees from a $510 million securities settlement reached after nearly eight years of litigation); *In re Pfizer Inc. Sec. Litig.*, 2016 WL 11801285, at *1 (S.D.N.Y. Dec. 21, 2016) (awarding 28% in attorneys' fees from a $486 million securities settlement, plus interest, reached after nearly 12 years of litigation); *Purple Mountain Tr. v. Wells Fargo & Co.*, 2023 WL 11872699, at *4-*5 (N.D. Cal. Sept. 26, 2023) (awarding 25% in attorneys' fees from a $300 million securities settlement, plus interest, reached as the parties were preparing for trial after nearly five years of litigation); *Christine Asia*, 2019 WL 5257534, at *17 (awarding 25% in attorneys' fees from $250 million securities settlement, plus interest, reached after over four years of litigation); *Genworth*, 210 F. Supp. 3d at 840, 846 (awarding 28% in attorneys' fees from a $219 million settlement reached as the parties were less than two months away from trial); *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *7-*8, *10 (D. Del. Nov. 19, 2018) (awarding 28% in attorneys' fees from a $210 million securities settlement, plus interest, reached after eight years of litigation); Silver Decl., ¶37 (collecting cases).[13]

---

[13] *See also Benson v. DoubleDown Interactive, LLC*, 2023 WL 3761929, at *1-*3 (W.D. Wash. June 1, 2023) (awarding 29.3% in attorneys' fees from $415 million settlement); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1110 (D. Kan.

**6.      The Complexity and Duration of the Litigation Support the Requested Fee in this Case**

As this Court noted in *Fangman I*, """In evaluating the complexity and duration of the litigation, courts consider not only the time between filing the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery."""" 2017 WL 86010, at *6 (quoting *Singleton*, 976 F. Supp. 2d at 686).

This case was vigorously litigated for over seven years and settled at an advanced stage, meeting every one of these non-exclusive factors. *See In re Cap. One Consumer Data Sec. Breach Litig.*, 2022 WL 17176495, at *2 (E.D. Va. Nov. 17, 2022) ("Here, Class Counsel has, *inter alia*, defeated Capital One's motion to dismiss; completed discovery and litigated related issues; and briefed and argued class certification, *Daubert* challenges, and summary judgment motions.  Accordingly, this factor reflects well upon Class Counsel."); *Cf.* Silver Decl., ¶25 ("Time-to-close is another measure of risk, and by class action standards, seven years is a long time for a securities lawsuit to be actively litigated.  According to Cornerstone Research, a consulting firm that tracks these cases, the median time from filing date to settlement hearing was 3.7 years for cases that resolved in 2023.").[14]  All told, Plaintiffs' Counsel devoted more than 89,130 hours litigating this case up to the brink of trial against large teams of attorneys from very large, sophisticated corporate defense firms.  *See* §II(C)(2) at 12, *supra*.

Not only was the litigation hard-fought, but so were the settlement negotiations.  Between September 2022 and June 2024, the parties engaged in four separate full-day mediations with a highly

---

2018) (awarding one third in attorneys' fees from a $1.51 billion settlement); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) (awarding 27.5% in attorneys' fees of $576.75 million settlement); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *1, *8 (D. Kan. July 29, 2016) (awarding 33.33% in attorneys' fees from a $835 million settlement); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (awarding 27.5% in attorneys' fees, plus interest, from a $512 million settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7–*8 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% in attorneys' fees from a $1.08 billion settlement); *Checking Acct. Overdraft*, 830 F. Supp. 2d 1330. 1350, 1359 (S.D. Fla. 2011) (awarding 30% in attorneys' fees from a $410 million settlement); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, at *1, *3 (N.D. Ill. Feb. 10, 2000) (awarding 25% in attorneys' fees from $696.66 million settlement).

[14]      *See also* §II(C)(3) at 14-22 (detailing the "risk of nonpayment" factor discussed in *Fangman I*), *supra*.

respected and experienced mediator, former United States District Judge, Layn R. Phillips. *See* ECF 430-1 at 24-25; *see also Boyd*, 299 F.R.D. at 465-66 (Chasanow, J.) ("In a settlement context, courts consider whether negotiations were 'hard fought,' 'complex,' or 'arduous.'").  The Settlement was only reached as Lead Counsel were preparing to move to Baltimore days ahead of the June 27, 2024 hearing on the parties' motions *in limine* which would have been quickly followed by the jury trial on July 15th. *See Genworth*, 210 F. Supp. 3d at 844 ("The complexity of the case and the duration of the litigation also support a significant attorneys' fees award. . . .  The plaintiffs' attorneys undertook significant efforts in this case through every stage of the litigation, including discovery concerning these elements, consultation with necessary experts, briefing issues before the Court, and preparing for trial.").

As amply demonstrated, the complexity and the seven year duration of this litigation supports Lead Counsel's requested fee.

### 7. Public Policy Favors, and Thus Does Not Undermine, the Requested Fee in This Complex Securities Fraud Case

"Public policy 'generally favors attorneys' fees that will induce attorneys to act and protect individuals who may not be able to act for themselves but also will not create an incentive to bring unmeritorious actions.'" *Peanut Farmers*, 2021 WL 9494033, at *5.  And as the Supreme Court has emphasized, "private securities actions such as this Action are 'an essential supplement to criminal prosecutions and civil enforcement actions' by the SEC." *Signet*, 2020 WL 4196468, at *15 (quoting *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007)); *see also Pearlstein*, 2022 WL 4554858, at *10 (same).[15]  Courts in this Circuit recognize that "one central factor in fixing the amount of attorneys' fees is 'to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case.'" *Mills*, 265 F.R.D. at 260 (quoting *In re*

---

[15]     *See also Charter*, 2005 WL 4045741, at *18-*19 ("Moreover, the federal securities laws are remedial in nature.  To effectuate their purpose of protecting investors, the courts must encourage private lawsuits. . . .  Indeed, lawyers that pursue private suits such as this on behalf of investors augment the overburdened SEC by 'acting as "private attorneys general."'").

*MicroStrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001)); *see also Phillips v. Triad Guaranty Inc.*, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016) (same).

Given that Lead Plaintiff and Lead Counsel filed the first consolidated complaint in this Action more than two years before it was publicly disclosed in November 2019 that Under Armour was the subject of an SEC investigation and continued for more than three years after the Company settled with the SEC (with no admission of liability), and that this seven-year litigation was resolved following, *inter alia*, three rounds of contested motion practice related to dismissal under Federal Rule of Civil Procedure 12(b)(6), class certification, summary judgment, and the exclusion of experts, and settled for $434 million and corporate changes (ones that could have never been awarded at trial) less than a month before a jury trial was scheduled to begin, are all public policy considerations that support awarding the requested fee in this case. *See In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 502 (S.D.N.Y. 2017) ("Specifically in this case, however, the Court finds that it is important to incentivize counsel to accept representations that, as a result of complex factual and legal issues, are less likely to settle immediately – and may instead present complex challenges and extensive motion practice."), *aff'd sub nom. Fresno Cnty. Emps. Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63 (2d Cir. 2019). Furthermore, the fact that the Settlement here, returning hundreds of millions of dollars to Under Armour shareholders, is ***48 times*** what the SEC was able to obtain (and the second-largest PSLRA settlement ever in this Circuit and the largest in over 17 years) is a public policy factor that also supports the requested fee. *See TXU*, 2005 WL 3148350, at *23 ("The proposed settlement in this case serves the public interest. The settlement requires Defendant TXU to implement a number of corporate governance improvements as well as compensate Class Members for their contested damages now, rather than prolonging a recovery until after a trial and appeal, if at all.").

### III.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE APPROVED

Lead Counsel further requests an award in the amount of $4,200,059.31 from the common fund for litigation expenses and charges incurred in prosecuting and resolving the Action on behalf of the Class.  As courts in this Circuit continuously recognize, "'[i]t is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award.'"  *Peanut Farmers*, 2021 WL 9494033, at *7 (quoting *Singleton*, 976 F. Supp. 2d at 689); *see also Feinberg*, 610 F. Supp. 3d at 773 ("'The prevailing view is that expenses are awarded in addition to the fee percentage.'") (quoting *Kelly*, 2020 WL 434473 at *7); *Genworth*, 210 F. Supp. 3d at 845 ("'There is no doubt that costs, if reasonable in nature and amount, may appropriately be reimbursed from the common fund.'") (quoting *MicroStrategy*, 172 F. Supp. 2d at 791).

The expenses are detailed in the accompanying counsel declarations and include expenses associated with, among other things, experts and consultants, service of process, online legal and factual research, travel, and mediation.  *See Feinberg*, 610 F. Supp. 3d at 773 (citing cases).  A large component of Lead Counsel's expenses is for the costs of experts and consultants, all of whom were qualified and necessary to litigate this Action.  *See Genworth*, 210 F. Supp. 3d at 845-46 ("Notably, over three million dollars, or 82% of the total requested costs, stem from payments to experts retained by counsel. . . .  These costs are eminently reasonable in light of the complexity of this case."); *Neustar*, 2015 WL 8484438, at *10 ("The expenses appear to be reasonable, given the case's complexity, the time and effort required, and the fact that no class member objected to the notice . . . .").  Another significant expense was document management/ litigation costs – including charges for hosting and processing the approximately 3.4 million pages of documents received in discovery – which total $354,441.51, or approximately 8.4% of the total expenses.  *See Signet*, 2020 WL 4196468, at *22 (approving more than $3.1 million in charges for hosting

- 27 -

and processing 3.6 million pages of documents, totaling more than $442,000 or approximately 14% of the total expenses).

The amount sought is less than the $5 million amount stated in the Notice, to which no Class Member has objected to date.  *See* Murray Decl., Ex. A, Notice.  The expenses sought are also of the type that are routinely charged to hourly paying clients and, therefore, are properly paid out of the common fund.  *See Feinberg*, 610 F. Supp. 3d at 773 ("Costs that may be charged include 'those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services.'") (quoting *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988)); *Zetia*, 699 F. Supp. 3d at 463 ("These expenses include the types of normal expenses that would be charged to a fee-paying client in the course of litigation, such as necessary travel, depositions and transcripts, postage, court costs, and photocopying.").

## IV.   LEAD PLAINTIFF AND ITS CO-CLASS REPRESENTATIVES' REQUEST FOR AWARDS PURSUANT TO 15 U.S.C. §78u-4(a)(4) ARE REASONABLE

Lead Plaintiff NESPF, and its co-Class Representatives, Monroe County and KBC, seek an award of $45,285.00, collectively, pursuant to 15 U.S.C. §78u-4(a)(4), in connection with their representation of the Class, as detailed in the accompanying Class Representative Declarations.  The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but it also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. §78u-4(a)(4).

As set forth in the accompanying declaration, Lead Plaintiff NESPF seeks an award of $30,000.00 for the time its employees devoted to supervising and participating in the Action.  NESPF Decl., ¶¶6-7. The declaration identifies the time spent on activities directly related to representing the Class, including:

(a) consulting and corresponding with counsel regarding pleadings, briefs, discovery, court orders, attempted mediations, and other case developments; (b) reviewing significant pleadings and briefs filed in the case and various orders entered by the Court; (c) assembling and producing documents to the Defendants; (d) providing deposition testimony; and (e) discussing the parameters for an appropriate resolution of the case and ultimately agreeing to the Settlement. *Id.*

District courts in the Fourth Circuit have approved such awards under 15 U.S.C. §78u-4(a)(4) to compensate institutional class representatives for the "hours of employee-time related to the supervision of this action." *Genworth*, 210 F. Supp. 3d at 846; *see also Sponn v. Emergent Biosolutions, Inc.*, 2019 WL 11731087, at *2 (D. Md. Jan. 25, 2019) (Titus, J.); *In re 2U, Inc. Sec. Litig.*, 2022 WL 22839218, at *4 (D. Md. Dec. 9, 2022) (Chuang, J.); *In re Massey Energy Co. Sec. Litig.*, 2014 WL 12656719, at *2 (S.D.W. Va. June 4, 2014). Lead Plaintiff NESPF requests that its application be approved as well.

In addition, as set forth in their accompanying declarations, Class Representatives Monroe County and KBC seek awards of $2,160.00 and $13,125.00, respectively, for the time their employees devoted to supervising and participating in the Action. Monroe County Decl., ¶¶6-7; KBC Decl., ¶¶6-7. The declarations identify the time spent on activities directly related to representing the Class, including: (a) consulting and corresponding with counsel regarding pleadings, briefs, discovery, court orders, and other case developments; (b) reviewing significant pleadings and briefs filed in the case and various orders entered by the Court; (c) assembling and producing documents to the Defendants; and (d) providing deposition testimony. *Id.*

Like the expenses in this case, the requested awards of $30,000.00 for NESPF, $2,160.00 for Monroe County, and $13,125.00 for KBC, are substantially less than awards in similar cases. *See, e.g., In re Comput. Scis. Corp. Sec. Litig.*, 2013 WL 12155436, at *2 (E.D. Va. Sept. 20, 2013) (awarding more than $60,000 to two plaintiffs for time relating to supervision of the action); *Emergent*, 2019 WL

11731087, at *2 (awarding more than $48,000 to three different plaintiffs "for the time they spent directly related to their representation of the Settlement Class"); *2U*, 2022 WL 22839218, at *4 (awarding more than $35,000 to two plaintiffs); *In re SCANA Corp. Sec. Litig.*, 2020 WL 4218231, at *2 (D.S.C. July 23, 2020) (awarding more than $41,000 to two plaintiffs). The awards sought are also substantially lower than the amount set forth in the Notice, which stated that Plaintiffs would seek an aggregate award not to exceed $100,000, and there has been no objection to date. Lead Plaintiff and its co-Class Representatives respectfully request the awards be approved.

## V.    CONCLUSION

Lead Counsel, after seven years of hard fought litigation, overcame significant risks in obtaining an exceptional result for the Class. Based on the foregoing and the entire record, Lead Plaintiff and Lead Counsel respectfully request that the Court: (i) award Lead Counsel attorneys' fees of 25.83% of the Settlement Amount and payment of $4,200,059.31 in litigation expenses, plus interest on both amounts at the same rate as earned by the Settlement Fund, and (ii) award Lead Plaintiff and its co-Class Representatives an aggregate amount of $45,285.00, as permitted by the PSLRA.

DATED:  October 3, 2024                    Respectfully submitted,

                                           ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           MICHAEL J. DOWD
                                           THEODORE J. PINTAR
                                           MARK SOLOMON
                                           X. JAY ALVAREZ
                                           SAM S. SHELDON
                                           ROBERT R. HENSSLER JR.
                                           MATTHEW I. ALPERT
                                           CHRISTOPHER R. KINNON
                                           T. ALEX B. FOLKERTH


                                                  s/ Robert R. Henssler Jr.
                                           ROBERT R. HENSSLER JR.

- 30 -

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
miked@rgrdlaw.com
tedp@rgrdlaw.com
marks@rgrdlaw.com
jaya@rgrdlaw.com
ssheldon@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
ckinnon@rgrdlaw.com
afolkerth@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
ANDREW T. REES
LUKE GOVEAS
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
lgoveas@rgrdlaw.com

*Lead Counsel for Plaintiffs*

MOTLEY RICE LLC
JOSHUA C. LITTLEJOHN
CHRISTOPHER F. MORIARTY
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for KBC Asset Management NV*

VANOVERBEKE, MICHAUD
 & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Monroe County Employees'
Retirement System*

SILVERMAN THOMPSON SLUTKIN
 & WHITE LLC
ANDREW C. WHITE, Bar No. 0821
WILLIAM SINCLAIR, Bar No. 28833
PIERCE C. MURPHY, Bar No. 30030
400 E. Pratt Street, Suite 900
Baltimore, MD 21201
Telephone: 410/385-2225
410/547-2432 (fax)
awhite@mdattorney.com
bsinclair@mdattorney.com
pmurphy@mdattorney.com

*Local Counsel*