**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re UNDER ARMOUR SECURITIES LITIGATION | ) ) ) ) | Civil No. RDB-17-388 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

DECLARATION OF ROBERT R. HENSSLER JR. IN SUPPORT OF: (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND THE PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AN AWARD TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)

I, Robert R. Henssler Jr., declare as follows:

1.      I, Robert R. Henssler Jr., am an attorney duly licensed to practice before all courts of the State of California, and have been admitted *pro hac vice* in this action.  I am a partner of the law firm Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Aberdeen City Council as Administrating Authority for the North East Scotland Pension Fund ("Lead Plaintiff" or "NESPF"), Monroe County Employees' Retirement System ("Monroe"), and KBC Asset Management NV ("KBC") (collectively, "Class Representatives" or "Plaintiffs").  I have been actively involved in the prosecution and settlement of this action since 2017 and am closely familiar with its proceedings (the "Litigation").  I have personal knowledge of the majority of the matters set forth herein based upon my active participation in and supervision

- 1 -

of all material aspects of this Litigation.  As to the remaining matters, I have reviewed our litigation files and consulted with other attorneys and support staff who have worked on this case.  I could and would testify competently to the matters set forth herein if called upon to do so.[1]

2.      I submit this declaration in support of Class Representatives' motion for approval of: (a) the settlement of $434,000,000.00 in cash and certain non-monetary benefits reached on behalf of the Class (the "Settlement"); (b) the proposed Plan of Allocation (the "Plan"); (c) Lead Counsel's application for an award of attorneys' fees and expenses ("Fee and Expense Application"); and (d) awards to Class Representatives in accordance with 15 U.S.C. §78u-4(a)(4).

**I.      PRELIMINARY STATEMENT**

3.      This declaration does not seek to – nor could it – detail every event that occurred since the Litigation commenced in 2017.  Rather, it provides the Court with key highlights of the Litigation, the extensive fact and expert discovery, Lead Counsel's unwavering preparation for trial, the events leading up to the Settlement, and the bases upon which Lead Counsel and Class Representatives recommend the Settlement's approval.

4.      The $434,000,000.00 proposed Settlement is the culmination of more than seven years of tireless, hard-fought litigation.  As detailed below, Lead Counsel zealously prosecuted its claims at every stage of the Litigation and successfully defended its claims against Defendants' repeated dismissal attempts before this Court.  The Settlement, which is not only the second-largest settlement ever achieved in a securities class action in this District and in the Fourth Circuit, the largest Private Securities Litigation Reform Act of 1995 ("PSLRA") settlement in this Circuit in over 17 years, and likely one of the top-50 largest securities fraud class action settlements of all time, but also includes significant non-monetary benefits, is an excellent result for the Class.

5.      As detailed herein, proceeding to a jury trial presented substantial risks.  In agreeing to settle the Litigation just weeks before trial, Class Representatives and Lead Counsel were fully

---

[1]    Unless otherwise defined herein, all capitalized terms have the same meaning as set forth in the Settlement Agreement (ECF 430-3).

informed about the various strengths of their case, as well as the substantial risks they would face at trial.  In opting to settle, Class Representatives and Lead Counsel concluded that settlement on the terms they obtained was in the Class's best interest.  Representatives of NESPF, Monroe, and KBC – who supervised Lead Counsel and remained well informed throughout the settlement negotiations – ultimately approved the Settlement.  *See generally* Declaration of Graham Buntain in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement on behalf of NESPF ("NESPF Decl."); Declaration of Michael Grodi in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement on behalf of Monroe ("Monroe Decl."); and Declaration of Bart Elst in Support of Final Approval of Plaintiffs' Proposed Class Action Settlement on behalf of KBC ("KBC Decl."), attached hereto as Exhibits ("Ex(s).") A, B, and C, respectively.

6.    Lead Counsel achieved the proposed Settlement after more than seven years of litigation, during which time Lead Counsel, *inter alia*:

- successfully moved for appointment of NESPF as Lead Plaintiff, Robbins Geller as Lead Counsel, and Silverman Thompson Slutkin & White, LLC as local counsel, in April 2017;

- conducted an extensive investigation, including the review of publicly available information, culminating in the filing of the detailed [Corrected] Consolidated Amended Complaint ("CAC") for Violations of the Federal Securities Laws (ECF 30) filed on August 9, 2017;

- withstood two dismissals, including one with prejudice, by doggedly continuing to fight for their claims, including in an appeal to the Fourth Circuit (ECF 75, 99, 102);

- successfully brought the Litigation back to this Court through a contested motion for indicative ruling under Federal Rule of Civil Procedure ("Rule(s)") 62.1, then successfully moved to reopen the Litigation over Defendants' opposition following the publication of a November 3, 2019 article by *The Wall Street Journal* ("*WSJ*") that revealed additional facts supporting Plaintiffs' claims (ECF 140, 150);

- filed the Consolidated Third Amended Complaint for Violations of the Federal Securities Laws ("TAC") and defeated Defendants' motion to dismiss the same (ECF 153, 174);

- conducted extensive party and non-party fact discovery, including: (a) obtaining over half a million documents (encompassing over 3.4 million pages) from Defendants and over 90 third-parties; (b) taking over 40 fact-witness depositions;

(c) responding to Defendants' various discovery requests; and (d) exchanging hundreds of pages of admissions and sworn interrogatory responses;

- achieved certification, on September 29, 2022, of a class of all persons who purchased or otherwise acquired Class A and Class C common stock of Under Armour between September 16, 2015, and November 1, 2019, inclusive (the "Class");

- moved successfully for appointment of NESPF, Monroe, and KBC as Class Representatives and Robbins Geller as Class Counsel;

- conducted complex expert discovery on a variety of issues (including loss causation, damages, Under Armour's operational condition and sales practices, stock trading plans, Plank's trading, corporate disclosure requirements and processes, and accounting), such as serving and responding to 14 expert reports and preparing for and taking (or defending) 9 expert depositions;

- briefed and defeated Defendants': (a) motion for summary judgment; and (b) motions to exclude the testimony of every single one of Plaintiffs' experts in November 2023; and

- prepared for a twelve-day jury trial by: (a) analyzing and selecting nearly 800 trial exhibits; (b) reviewing and designating deposition testimony; (c) identifying and subpoenaing Lead Counsel's trial witnesses; (d) challenging Defendants' trial exhibit lists and designations of deposition testimony; (e) researching, drafting, and negotiating jury instructions and verdict forms; (f) compiling various witness files and exhibits; (g) creating detailed trial examination outlines; (h) creating numerous trial demonstratives; (i) preparing opening statements; (j) negotiating a joint pretrial statement; and (k) briefing and arguing several additional pretrial motions, including appearing before the Court for a telephonic hearing on Plaintiffs' motion to bifurcate the trial proceedings.

7. The substantial fact and expert discovery, motion practice, and trial preparation outlined herein informed Lead Counsel of both their case's many strengths and its potential weaknesses. Lead Counsel considered this information in determining the best course of action for the Class.

8. The proposed Settlement of $434,000,000.00 and significant non-monetary benefits is the direct product of Class Representatives' and Lead Counsel's efforts over the past seven-plus years, including those described in this declaration. The Settlement is also the product of the parties' numerous arm's-length negotiations and in-person mediation sessions facilitated by

- 4 -

the Honorable Layn R. Phillips (Ret.), one of the nation's foremost mediators. These negotiations were conducted by experienced counsel with an intimate understanding of the case.

9.     Class Representatives also seek approval of the proposed Plan, which Lead Counsel submits is fair and reasonable. Lead Counsel drafted the Plan with the assistance of its damages and loss causation expert, Matthew D. Cain, Ph.D. ("Dr. Cain"). As further described below and in the Notice, the Plan provides formulas for calculating the recognized claim of each Class Member that submits a Proof of Claim based on when the Authorized Claimant purchased and/or sold their Under Armour Class A and/or Class C common stock on the open market. Each Authorized Claimant, including Class Representatives, will receive a *pro rata* distribution pursuant to the Plan, and Class Representatives will be subject to the same formula for distribution of the Net Settlement Fund. Importantly, the Plan does not treat the Class Representatives nor any other Class Member preferentially.

10.     Lead Counsel prosecuted the Litigation on a wholly contingent basis, advancing and incurring substantial litigation expenses, charges, and costs over the years. Lead Counsel shouldered substantial risk in doing so, and, to date, has not received any compensation for its efforts. Accordingly, in consideration of Lead Counsel's extensive efforts on behalf of the Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 25.83% of the Settlement Amount and an award of $4,200,059.31 in litigation expenses, and any interest on such amounts at the same rate and for the same period as earned by the Settlement Fund.

11.     As set forth in the accompanying Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses and an Award to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum"), the requested fee is within the range of fees awarded in large PSLRA securities class action settlements, and is justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of the legal services Lead Counsel performed in this complex litigation. To date, no Class Members have objected. Lead Counsel submits that the Fee and Expense Application is fair to the Class, under all applicable standards, and warrants the Court's approval.

- 5 -

12.     Lead Counsel also seeks an award in the amount of $4,200,059.31 (plus interest accrued thereon) for expenses, costs, and charges reasonably and necessarily committed to the prosecution of the Litigation over the last seven years.  These expenses include: (a) the substantial fees and expenses of experts and consultants whose services were required for the successful prosecution and resolution of this case; (b) the costs of conducting and defending dozens of fact and expert witness depositions over the years, which included court reporter and videographer fees and travel expenses; (c) photocopying, imaging, shipping, and managing a database of over half a million documents; (d) online factual and legal research; and (e) mediation expenses.

13.     Finally, Class Representatives seek awards in the amount of $30,000.00 for NESPF, $2,160.00 for Monroe, and $13,125.00 for KBC, pursuant to 15 U.S.C. §78u-4(a)(4), in connection with their representation of the Class.  Class Representatives actively monitored the Litigation and supervised Lead Counsel.  Class Representatives also dedicated time and resources to discovery, which included gathering documents and information responsive to Defendants' discovery requests, as well as designating representatives to prepare for and sit for depositions as part of the class certification process.  Finally, Class Representatives participated in mediation and approved the ultimate Settlement.

## II.     HISTORY OF THE LITIGATION

14.     The following summarizes the principal events during the Litigation and the legal services Lead Counsel provided to Class Representatives and the Class.

### A.     NESPF Is Appointed Lead Plaintiff and, After Extensive Litigation, Defeats Defendants' Motion to Dismiss

15.     Following the initial filing of this Litigation on February 10, 2017 (ECF 1), the Court consolidated all related cases on March 23, 2017 and re-captioned the Litigation *In re Under Armour Sec. Litig.*, No. RDB-17-388.  ECF 3.  On April 26, 2017, the Court appointed NESPF as lead plaintiff and Robbins Geller as lead counsel, with Silverman Thompson Slutkin & White, LLC as local counsel.  ECF 13.

16.    Lead Counsel conducted an extensive factual investigation prior to filing the CAC, analyzing years of Under Armour's public filings with the Securities and Exchange Commission (the "SEC"), media reports, analyst reports, and trading data.   Following Lead Counsel's investigation, Lead Plaintiff filed the CAC on August 9, 2017.  ECF 30.

17.    The CAC asserted claims on behalf of all persons who purchased or otherwise acquired Under Armour's publicly traded securities between September 16, 2015 and January 30, 2017, inclusive.  *Id.*, ¶2.  The CAC named as defendants Under Armour, Plank, former Under Armour CFOs Lawrence "Chip" Molloy and Brad Dickerson, members of the Company's Board of Directors, and various underwriters.  All the defendants named in the CAC thereafter moved to dismiss on November 10, 2017 (ECF 51-52), which Lead Plaintiff opposed (ECF 55-56), and on September 19, 2018, the Court granted defendants' motions.  *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 694 (D. Md. 2018) ("*UA I*").

18.    Lead Plaintiff filed the Consolidated Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") on November 16, 2018 – less than two months after the Court issued *UA I*.  ECF 78.  The SAC only named Under Armour and Plank as defendants.  Defendants moved to dismiss the SAC on January 17, 2019 (ECF 80), Lead Plaintiff opposed (ECF 86), and, on August 19, 2019, the Court dismissed the SAC with prejudice.  *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 463 (D. Md. 2019) ("*UA II*").

19.    Lead Plaintiff filed a notice of appeal with the Fourth Circuit on September 17, 2019 – just under a month after the Court issued its opinion in *UA II*.  ECF 102, 104.  Lead Plaintiff's opening appellate brief was originally due on November 5, 2019; however, on November 3, 2019 – just two days before the brief was due – the *WSJ* published an article titled "'Under Armour is Subject of Federal Accounting Probe'" which reported that "'Federal law-enforcement officials are investigating Under Armour Inc.'s accounting practices in a probe examining whether the sportswear maker shifted sales from quarter to quarter to appear healthier, according to people familiar with the matter.'"  *In re Under Armour Sec. Litig.*, 2020 WL 363411, at *5 (D. Md. Jan. 22, 2020) ("*UA Indicative Ruling*").   On the following day, Under Armour

- 7 -

publicly filed an 8-K stating that it confirmed to the *WSJ* "'that it has been responding to requests for documents and information from the SEC and DOJ regarding certain of the Company's accounting practices and related disclosures, beginning with submissions to the SEC in July 2017.'" *Id.*

20.     On November 6, 2019, following the revelation of the SEC and DOJ investigations, Kirtan Patel filed a putative securities class action complaint against Under Armour, Plank, Molloy, Frisk, and Bergman for violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of all persons or entities who purchased or otherwise acquired Under Armour securities between August 3, 2016 and November 1, 2019 ("*Patel* Action"). *See Patel v. Under Armour, Inc.*, No. 1:19-cv-03209-RDB (D. Md.).

21.     On November 18, 2019, Lead Plaintiff filed its Motion to Consolidate and Vacate Notice and Lead Plaintiff Deadline – a motion opposed by both the plaintiff in the *Patel* Action and Defendants. ECF 107, 115, 120. Also on November 18, 2019, Lead Plaintiff separately filed its: (a) Request for an Indicative Ruling Under Fed. R. Civ. P. 62.1 (ECF 105) ("Rule 62.1 Motion"); and (b) Motion for Relief from the Court's September 9, 2019 Judgment Pursuant to Fed. R. Civ. P. 60(b) ("Rule 60(b) Motion") (ECF 106). Defendants vigorously opposed both motions. ECF 119, 121. After conducting a hearing, the Court granted Lead Plaintiff's Rule 62.1 Motion on January 22, 2020. *See UA Indicative Ruling*, 2020 WL 363411, at *9.

22.     Prior to the Court's ruling on Lead Plaintiff's Rule 62.1 Motion, individual plaintiffs filed notices seeking appointment as lead plaintiff of this more truncated class period from the *Patel* Action, and NESPF filed a motion to consolidate the *Patel* and other similarly filed actions with this Litigation and appoint it as lead plaintiff in the newly consolidated action. ECF 131; *see also Patel* Action, ECF 8-11. On August 13, 2020, the Fourth Circuit remanded the Litigation back to this Court. *See In re Under Armour Sec. Litig.*, 815 Fed. App'x 748, 749 (4th Cir. Aug. 13, 2020). On September 14, 2020, the Court granted NESPF's Rule 60(b) Motion and also appointed NESPF to serve as lead plaintiff in the newly consolidated action and Robbins Geller to serve as lead counsel. ECF 150.

- 8 -

23.     On October 14, 2020, Lead Plaintiff filed the TAC.  ECF 153.  Defendants moved to dismiss on December 4, 2020 (ECF 159), and Lead Plaintiff filed its opposition on January 29, 2021 (ECF 162).  While the motion to dismiss briefing was pending, Lead Plaintiff moved to partially lift the PSLRA discovery stay to seek the production of documents Under Armour reviewed and produced to the SEC (ECF 156) – a motion that Defendants vehemently opposed (ECF 160).  After conducting a hearing, the Court denied Lead Plaintiff's motion to partially lift the discovery stay on February 18, 2021.  *See In re Under Armour Sec. Litig.*, 2021 WL 633373, at *4 (D. Md. Feb. 18, 2021).  As for Defendants' motion to dismiss the TAC, the Court, on May 18, 2021, denied their dismissal bid in full.  *See In re Under Armour Sec. Litig.*, 540 F. Supp. 3d at 513, 524 (D. Md. 2021).

**B.     Lead Counsel Begins Discovery and Achieves Class Certification**

24.     Shortly after the Court upheld the TAC, pursuant to a May 18, 2021 email from the Court, the parties filed a joint motion to enter a scheduling order setting forth deadlines for class certification briefing, fact and expert discovery, and dispositive motion briefing, which the Court granted on May 27, 2021.  ECF 176.  Pursuant to the schedule, on July 16, 2021, the parties exchanged initial disclosures pursuant to Rule 26(a)(1), and on July 23, 2021, Defendants filed an answer substantially denying Lead Counsel's allegations and raising over 30 affirmative defenses. ECF 185.

25.     The Court's schedule ordered that discovery commence on June 4, 2021.  On the very day discovery began, Lead Counsel drafted and propounded an interrogatory on defendant Under Armour.  Just five days later, on June 9, 2021, Lead Counsel drafted and propounded on Defendants its first set of document requests.  Defendants responded in kind, serving their own document requests and interrogatories on lead plaintiff NESPF and proposed class representatives Monroe and KBC.

26.     In responding to Defendants' requests, Lead Counsel worked closely with NESPF and Monroe in identifying, reviewing, and producing to Defendants documents and information responsive to Defendants' requests.  Similarly, Motley Rice LLC ("Motley Rice"), counsel for

- 9 -

KBC, worked closely with KBC in identifying, reviewing, and producing to Defendants documents and information responsive to Defendants' requests.[2]  Lead Counsel also formulated responses and objections to Defendants' requests, and engaged in written and telephonic conferrals with Defendants regarding various discovery issues.

27.     Lead Counsel drafted and filed a motion to certify the Class, appoint Class Representatives, and approve Class Counsel on December 1, 2021.  ECF 197.  Lead Counsel detailed in its motion why all the requirements of Rule 23(a) were satisfied as well as how all five of the *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) factors – which courts routinely consider in addressing class certification – were met.  *Id.*  Dr. Cain prepared and submitted a report on November 30, 2021, in which he opined the market for Under Armour common stock was efficient during the Class Period.  Lead Counsel served Dr. Cain's expert report in connection with its motion for class certification.

28.     Shortly thereafter, the parties moved for additional time to oppose class certification, which the Court granted.  ECF 204.  The parties conducted depositions in connection with class certification in December 2021 and January 2022.  Lead Counsel prepared for and defended the depositions of NESPF's representative (Graham Buntain) and Monroe's representative (Michael Grodi), as well as the deposition of Dr. Cain.  Similarly, Motley Rice prepared for and defended the deposition of KBC's representative (Bart Elst).

29.     Defendants opposed the motion to certify the class, appoint Class Representatives, and approve Lead Counsel on February 22, 2022.  ECF 223.  Lead Plaintiff filed a reply brief on May 12, 2022, which addressed and disputed each of Defendants' arguments against class certification, the appointment of Class Representatives, and the approval of Class Counsel.  ECF

---

[2]     Robbins Geller has agreed to share its portion of any awarded attorneys' fees with Motley Rice.  Any such payment made to Motley Rice by Robbins Geller will in no way increase the amount of fees that are deducted from the Settlement Fund.

234. On September 29, 2022, the Court certified the Class, appointed NESPF, Monroe, and KBC as Class Representatives, and appointed Robbins Geller as Class Counsel.  ECF 245.

30.     Following class certification, Lead Counsel distributed notice of the pendency of the Litigation to potential members of the Class.  ECF 294 (August 24, 2023, order approving a stipulated plan for class notice procedures).  Lead Counsel received 68 requests to opt-out of the Litigation.  ECF 345.

**C.     Lead Counsel Pursues Evidence of the Fraud Through Fact Discovery**

31.     Fact discovery in this Litigation was complex, comprehensive, replete with technical subjects, and always zealously litigated.

32.     Document discovery was voluminous.  Lead Counsel propounded two sets of document requests (totaling 31 requests) on Defendants, collectively seeking various categories of documents necessary for proving the alleged fraud and its impact on Under Armour's share prices. The parties conferred extensively over each set of requests, negotiating over such matters as Defendants' objections to the requests, the temporal and subject matter scope of document discovery with respect to each of the requests, production custodians and search terms, and Defendants' assertions of privilege and work product.

33.     In addition to requests for production to Defendants, Lead Counsel prepared and propounded document request subpoenas on 92 non-parties (not including former Under Armour employees) to obtain additional documentary evidence of the alleged fraud and its impact on the market for Under Armour common stock.  These non-parties included various Under Armour customers, assorted securities and market analysts who followed and reported on Under Armour during the Class Period, vendors who provided relevant services to Under Armour during the Class Period, and Under Armour's auditor, PricewaterhouseCoopers ("PwC").  Lead Counsel identified those non-parties most likely to possess relevant information, crafted document requests, and located and served the non-parties.  Lead Counsel then negotiated the scope of document productions with each non-party and reviewed the extensive information the non-parties produced.

- 11 -

34.     In all, over half a million documents (encompassing over 3.4 million pages) were produced in this Litigation by the parties and non-parties.  To effectively prosecute this complex case, Lead Counsel organized and executed a meticulous review of these documents by a team of skilled attorneys.  These documents featured highly technical, industry jargon, and accounting-related subject matter, amplifying the challenges Lead Counsel faced in efficiently and intelligently analyzing and synthesizing the documents.

35.     This universe of documentary evidence proved critical in Lead Counsel's preparation for the dozens of fact witness depositions taken by Lead Counsel between June 2022 and March 2023.  The deponents in this matter included defendant Plank, various current and former Under Armour employees and officers, and non-parties, such as the Company's lead auditor during the Class Period and journalist Stephanie Ruhle Hubbard.  That many of these deponents were Defendants themselves and/or were represented by Defendants' counsel illustrates the challenges Lead Counsel faced in obtaining testimony supporting their case from these adverse witnesses.

36.     Lead Counsel also successfully sought additional depositions above the number provided for by the Federal Rules of Civil Procedure by negotiating a stipulation with Defendants and moving the Court to exceed the limitations provided in Rule 30.  ECF 238.  Ultimately, Lead Counsel deposed over 40 fact witnesses.  Each of these depositions required extensive preparation on Lead Counsel's part.  This preparation included spending weeks or months searching for, identifying, and analyzing documentary evidence that could be used during depositions or otherwise utilized in preparing for them.  Thus, Lead Counsel capably and efficiently reviewed and analyzed large volumes of documents in compressed timeframes, while preparing to take a host of fact-witness depositions on a variety of complex topics.

37.     Fact discovery also included interrogatories served by both sides.  Plaintiffs ultimately served four sets of interrogatories on Defendants.  As mentioned above, Lead Counsel received and responded to various interrogatories as part of class certification discovery.  Moreover, Lead Counsel received additional interrogatories during fact discovery, including a set

- 12 -

of contention interrogatories in January 2023.  These interrogatories sought a wide breadth of information regarding the false statements alleged in the TAC, including all information supporting Lead Counsel's allegations of falsity, loss causation, and computation of damages. After substantial conferral on these interrogatories, Lead Counsel crafted detailed responses and identified hundreds of documents in response to the interrogatories in April 2023.

38.     There can be no question that the $434,000,000.00 Settlement was, in large part, achieved because Lead Counsel amassed a significant amount of damning evidence, and was prepared to present that evidence at trial.

> ### D.     Lead Counsel Pursues Relevant Documents, Sparring with Defendants over Several Discovery Disputes

39.     Numerous additional fact-discovery disputes arose between the parties, requiring extensive written correspondence, countless telephonic conferrals, and hours upon hours of negotiations between the parties.  A myriad of discovery motions ultimately were exchanged. Further, Lead Counsel engaged in extensive litigation with two non-parties – the SEC and Bloomberg L.P. ("Bloomberg") – opening new cases in additional jurisdictions to file motions to compel pursuing relevant discovery from these entities on behalf of the Class.  Set forth below are examples of some of the significant disputes that arose during fact discovery.

> #### 1.     Disputes with Defendants

40.     The parties briefed multiple disputes concerning Defendants' document production.  The disputes concerned: (a) certain documents provided to and reviewed by PwC in connection with its 2017 audit of Under Armour; (b) Under Armour's reliance on professionals, including legal professionals, to support a "good faith" defense while simultaneously claiming attorney-client privilege and refusing to produce documents allowing Lead Counsel to evaluate this defense; and (c) deficiencies in Under Armour's privilege logs.  Pursuant to Local Rule 104.8, Lead Counsel exchanged briefing on these disputes with Defendants and continued to attempt to resolve them prior to seeking intervention from the Court.

4861-1835-6451.v1

41. As mentioned above, the first motion to compel concerned documents that Under Armour provided to PwC in connection with PwC's 2017 audit of Under Armour. Lead Counsel noted the existence of these documents in its diligent review of various materials produced by Under Armour and PwC, and first requested their production in January 2022. After extensive negotiations with Defendants, Lead Counsel served the first motion to compel on Under Armour in October 2022. The parties were ultimately able to reach a negotiated resolution of this dispute without assistance from the Court.

42. The second motion to compel concerned Under Armour's reliance on the advice of counsel to assert a "good faith" defense, while refusing to produce documents allowing Lead Counsel to evaluate this defense on the basis of attorney-client privilege. Lead Counsel amassed significant examples of both Defendants' use of this defense in the Litigation to date, and pored over Under Armour's privilege log to identify documents relevant to this defense that were withheld on the basis of privilege. After extensive negotiations, Lead Counsel served the second motion to compel on Defendants in December 2022. Defendants each served a memorandum opposing the second motion to compel in January 2023. The parties continued negotiating, but were unable to reach a resolution of the dispute, so in February 2023, Lead Counsel served a reply in support of the second motion to compel on Defendants.

43. Lead Counsel conducted a Local Rule 104.7 conference with Defendants in March 2023. Still unable to reach a resolution, Lead Counsel filed the parties' briefing with the Court on April 6, 2023. The parties appeared before the Court in May 2023 for a telephonic status conference regarding the second motion to compel, and the Court ordered the parties to condense their briefing and re-file. ECF 269. Lead Counsel filed a letter summarizing the dispute on June 2, 2023 (ECF 271), and Defendants responded in kind on June 16, 2023 (ECF 276). The Court ordered a further telephone conference on the second motion to compel. ECF 282. Although the Court denied the second motion to compel and did not order that Defendants' good-faith defense waived their privilege claims, the Court also made very clear at the June 26, 2023 hearing and in its sealed order that Defendants were not to invoke the advice of counsel defense or otherwise rely

- 14 -

on privileged communications at trial, effectively vindicating and addressing Lead Counsel's concerns. ECF 284.

44.    The third motion to compel concerned Under Armour's insufficient justifications for its assertions of privilege. Under Armour produced its privilege log on November 2, 2022, listing the documents withheld on privilege and work product grounds. The log showed that Under Armour withheld 963 documents from production on the basis of attorney-client privilege, work-product protection, or both. Lead Counsel closely evaluated each of the privilege log's entries to assess the propriety of Defendants' asserted claims of privilege and work product. Lead Counsel also identified redactions in over 1,800 documents that Under Armour failed to log or otherwise justify. After extensive negotiations, Lead Counsel was forced to serve the third motion to compel on Defendants in February 2023. Lead Counsel ultimately reached a successful negotiated resolution of the dispute without requiring the Court's assistance.

### 2.    Disputes with Non-Parties

45.    In addition to the discovery disputes with Defendants detailed above, Lead Counsel opened separate actions in three additional jurisdictions to pursue relevant discovery from non-parties on behalf of the Class.

46.    First, Lead Counsel opened an action in the District Court for the District of Columbia and filed a motion to compel production from the SEC in March 2022, which had failed to respond to Lead Plaintiff's subpoena. The SEC eventually agreed to produce documents in response to the subpoena, making several significant productions and rendering judicial resolution of the motion to compel unnecessary.

47.    Lead Counsel also opened an action in the District Court for the Southern District of New York and filed a motion to compel production from Bloomberg, which had refused to produce documents in response to Lead Plaintiff's subpoena, citing the reporter's privilege. Lead Counsel argued the privilege did not apply because the journalist in question, Stephanie Ruhle Hubbard, was acting in a personal capacity in her reporting on Under Armour and not as an independent journalist under Second Circuit law. Specifically, Lead Counsel argued that Hubbard

- 15 -

is a close friend and confidante of defendant Plank, and covered a January 2016 analyst report – the alleged first corrective disclosure in the case – at the direction of Plank and other Under Armour executives.   After extensive negotiations with Bloomberg led to an impasse, Lead Counsel amassed a significant body of evidence from documents produced by Defendants and by MSNBC (Hubbard's employer subsequent to Bloomberg) to support its arguments and filed the motion to compel in March 2023.

48.     The litigation was hard-fought, involving five briefs on the merits (Bloomberg filed an opposition and a sur-reply, and Lead Plaintiff filed a reply and sur-sur-reply in addition to the motion) and additional briefs regarding Under Armour's request to maintain many of the documents at issue under seal.  Finally, months after the motion to compel was filed, Magistrate Judge Gorenstein of the Southern District of New York denied the motion in August 2023, holding the reporter's privilege applied under the Second Circuit's stringent standards, despite the suspiciously close connections between Plank and Hubbard.  Judge Gorenstein also held, however, that many of the documents Under Armour sought to keep under seal must be filed on the public docket – a ruling that proved helpful in later stages of the Litigation before the Court as Lead Counsel challenged many of Defendants' claims of confidentiality.  ECF 322.

### E.     Testifying Experts and Lead Counsel's Forensic Accountants

49.     Due to the complex and esoteric nature of the facts underlying Plaintiffs' claims in this case, Lead Counsel employed numerous experts, including both testifying experts and in-house forensic accountants.   These experts were instrumental in allowing Lead Counsel to effectively prosecute Plaintiffs' claims and obtain a favorable result on behalf of the Class.

#### 1.     The Parties Engage in Extensive Expert Discovery

50.     During the spring and summer of 2023, the parties conducted expert discovery covering a wide range of areas, including loss causation, damages, Under Armour's operational condition and sales practices, stock trading plans in general and Plank's trading during the Class Period, corporate disclosure requirements and processes, and accounting.

- 16 -

51.     Expert discovery began in April 2023 when Plaintiffs disclosed five opening expert reports to Defendants.  Defendants, correspondingly, disclosed five reports to Plaintiffs in May 2023, and – after one of Plaintiffs' experts tragically died in early June 2023 – Plaintiffs disclosed four rebuttal reports in June 2023.[3]

52.     Plaintiffs' experts are described below:

(a)     *Matthew D. Cain, Ph.D.*  Plaintiffs retained Dr. Cain as an expert on market efficiency, economic materiality, loss causation, and damages.  Dr. Cain holds a Ph.D. in finance from Purdue University and teaches at the Berkeley Center for Law and Business at the University of California, Berkeley as a Senior Fellow.  Dr. Cain worked at the SEC between 2014 and 2018 as a Financial Economist and advisor to Commissioner Robert J. Jackson, Jr.  He has also researched and published extensively on various finance, legal, accounting, and economic topics.

(b)     *Mark A. Cohen.*  Plaintiffs retained Professor Cohen to opine on the operational condition of Under Armour during the Class Period, and in particular the Company's growth in 2015 and 2016 and whether its sales practices were industry accepted practices. Professor Cohen served as the Director of Retail Studies and an Adjunct Professor of Retailing at Columbia University's Business School, and has over 30 years of experience working for and leading large retail businesses in both the United States and Canada, including over a decade of collective experience serving as the Chairman and CEO of three different companies.

(c)     *M. Todd Henderson.*  Plaintiffs retained Professor Henderson as an expert on stock trading and the use of Rule 10b5-1 plans in this case.  Professor Henderson has taught at the University of Chicago Law School since 2004.  He also teaches at the University of Chicago Booth School of Business, and is a fellow of the Becker-Friedman Institute at the University of Chicago and a visiting fellow at the Hoover Institution at Stanford University.  Professor Henderson's primary teaching and research interests are in the areas of securities regulation and

---

[3]     Following Plaintiffs' expert's passing, Defendants agreed to withdraw their expert who was to serve as a rebuttal to Plaintiffs' deceased expert.

corporate governance, and he has published extensively on these topics, including research on Rule 10b5-1 trading plans that has been presented at the SEC, the National Bureau of Economic Research, and dozens of universities around the world. Professor Henderson's research on Rule 10b5-1 was cited repeatedly by the SEC in a recent rulemaking amending Rule 10b5-1.

(d)     *D. Paul Regan, CPA/CFF*. Plaintiffs retained Mr. Regan to provide expert accounting opinions regarding the impact of pull-forwards on the Company's revenues and revenue growth during the Class Period, Under Armour's disclosure obligations related to pull-forwards under Item 303 of Regulation S-K, various issues related to returns reserves and excess inventory, and the Company's internal controls. Mr. Regan has over 50 years of relevant accounting and auditing experience, including serving as the engagement partner and concurring partner on audits of public companies and providing accounting and/or auditing consulting services in more than 750 complex litigation matters.

53.     Defendants' experts are described below:

(a)     *Paul A. Gompers*. Under Armour retained Professor Gompers to review and respond to Dr. Cain's expert opinions on loss causation and damages. Professor Gompers is the Eugene Holman Professor of Business Administration at the Harvard Business School.

(b)     *Wayne Guay*. Plank retained Professor Guay to respond to Professor Henderson's expert opinion that Plank's Class Period stock sales were extremely unusual and suspicious. Professor Guay is the Yageo Professor of Accounting at The Wharton School of Business at the University of Pennsylvania.

(c)     *Michael F. Maloney, CPA, CFF, CFE*. Under Armour retained Mr. Maloney to respond to Mr. Regan's expert opinions regarding Under Armour's accounting and disclosures. Mr. Maloney is a forensic accountant who currently serves as a Senior Managing Director with FTI Consulting, Inc.

(d)     *Laurie Wilson*. Under Armour retained Ms. Wilson to evaluate and opine on Under Armour's internal sales and financial planning processes and sales practices during the

- 18 -

Class Period, and to respond to Professor Cohen's expert opinions.  Ms. Wilson is the Chief Supply Chain Officer and head of Planning, Allocation, and Pricing at JCPenney.

54.     Between July and August 2023, Lead Counsel deposed four of Defendants' experts, and defended the depositions of Plaintiffs' four remaining experts.  Lead Counsel also exchanged and analyzed thousands of documents the experts cited in their reports or relied upon in forming their opinions.  Lead Counsel's undertaking during expert discovery was notable considering the sheer volume of Defendants' experts' opinions.  Defendants' expert reports spanned 661 pages (including exhibits and appendices), and overflowed with wide-ranging opinions on the issues listed above.  Lead Counsel were tasked with understanding and cross-examining each of Defendants' experts' opinions during their depositions.

55.     Certain of Defendants' experts' reports were particularly lengthy.  Defense expert Paul Gompers' report, for instance, contained 430 footnotes and spanned over 200 pages, including a 43-page list of materials he considered in forming his opinions on damages and loss causation.

56.     The examples above merely illustrate the breath of materials Lead Counsel waded through in its overall efforts to dissect the experts' reports, unpack their conclusions, and prepare to effectively depose Defendants' experts.  These examples also demonstrate the sheer volume of expert opinions and testimony that Defendants intended to present to jurors during the six-week trial.

### 2.     Lead Counsel's Forensic Accountants

57.     To conduct effective discovery and prepare for trial, Lead Counsel employs highly specialized in-house forensic accounting professionals to provide investigative forensic accounting, auditing, and financial expertise to Lead Counsel throughout the pendency of the Litigation.   Andrew Rudolph, CPA, CFE, CFF and Heather Jennette, CPA, CFE, CFF (collectively, the "Forensic Accountants"), provided the majority of forensic accounting services in this case.  They worked side-by-side with Robbins Geller attorneys in many facets of the case, including, but not limited to, case investigation and evaluation, developing and drafting complaint allegations, responding to motions, and assisting with document discovery, depositions, summary

- 19 -

judgment, hearing preparation, trial preparation including assistance with trial examination of accounting, auditing and accounting expert witnesses.

58.     Mr. Rudolph is the National Director of Lead Counsel's forensic accounting department.  He is a Certified Public Accountant (CPA) licensed to practice in California and has been designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics (CFF).  He is also a Certified Fraud Examiner (CFE).  Mr. Rudolph has approximately 37 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations of national and foreign companies, and began his career as an auditor for the public accounting firm of PriceWaterhouse LLP.  Mr. Rudolph has over 30 years of forensic accounting experience related to the investigation of securities fraud.  Mr. Rudolph is an active member of the AICPA, the California Society of Certified Public Accountants ("CalCPA"), and the Association of Certified Fraud Examiners ("ACFE").

59.     Ms. Jennette is a forensic accountant in Lead Counsel's forensic accounting department.  She is a Certified Public Accountant (CPA) licensed to practice in the states of California and New Jersey.  She has been designated by the AICPA as Certified in Financial Forensics (CFF).  She is also a Certified Fraud Examiner (CFE).  Ms. Jennette has 30 years of public accounting and consulting experience, including 26 years of forensic accounting experience directly related to the investigation of securities fraud.  Prior to joining the firm, she was an auditor for the public accounting firm of Deloitte & Touche LLP where she primarily audited large international public companies.  She is an active member of the AICPA, the CalCPA, and the ACFE.

60.     The Forensic Accountants were an integral part of Lead Counsel's litigation team. They provided valuable and expedient accounting and auditing expertise throughout the entire seven-year lifespan of this Litigation.  More specifically, they assisted in the initial filing of the CAC, the discovery process (including preparing attorneys in taking depositions), the filing of Plaintiffs' opposition to Defendants' summary judgment motion, and finally with trial preparation

- 20 -

which included assisting Lead Counsel in examination of Under Armour's accounting and financial personnel, and the Company's outside auditor, PwC. Lead Counsel's ability to draw on the expertise of its in-house forensic accountants kept costs down and allowed Lead Counsel to avoid paying the substantially greater fees charged by outside accounting and auditing experts for this same assistance. As a result of using in-house forensic accountants, accounting and auditing expert costs were limited to expenses related to a testifying expert – everything else was done in-house.

61.    The Forensic Accountants were instrumental throughout the discovery phase of this case. They assisted in developing and drafting document discovery requests germane to the accounting and auditing issues in the Litigation. They also were involved in discovery negotiations and motion practice, including determining the sufficiency of Defendants' and non-parties' accounting and audit-related document productions. The Forensic Accountants were critical in unraveling and quantifying the thousands of pull-forward transactions that Under Armour recorded over seven fiscal quarters, which involved analyzing and summarizing voluminous spreadsheets, hundreds of emails, and customer documentation produced by non-parties. As neither Under Armour nor its auditors provided the underlying quantification or explanation for the pull-forward transactions, the Forensic Accountants spent thousands of hours analyzing, reconstructing, and quantifying the pull-forwards recorded from the third quarter of 2015 to the first quarter of 2017. They also discovered and summarized the Generally Accepted Accounting Principles ("GAAP") violations alleged by Lead Counsel.

62.    The Forensic Accountants reviewed and analyzed the voluminous productions of accounting and finance-related documents obtained from Under Armour, PwC, and numerous non-party retailers. The results of their analysis and forensic review were critical to developing evidence for the accounting and audit issues in the case. After a detailed analysis of the documents produced in this case, the Forensic Accountants were instrumental in building the factual record evidencing that Under Armour defrauded investors. For example, the Forensic Accountants were able to identify and quantify the amount of pull-forwards recorded by Under Armour each quarter.

They verified the nature and extent of the pull-forward transactions from emails, spreadsheets, and other related accounting documentation.  They also were able to verify that Under Armour did not share that information contemporaneously with PwC.  This information was critical to the case and was also used by Plaintiffs' testifying accounting/audit expert and would have been used at trial to demonstrate that Under Armour recorded material amounts of undisclosed pull-forwards.

63.     Lead Counsel also deposed numerous accounting, auditing, and finance professionals employed by Under Armour and PwC.  The Forensic Accountants played a critical role in this process.  They assisted by identifying key deponents, clarifying deposition objectives, explaining complex audit and accounting principles, selecting deposition exhibits, developing deposition outlines, and attending depositions to evaluate testimony and confer with Lead Counsel in real time.  As a result, Lead Counsel was more effective during depositions, eliciting significant testimony helpful to Plaintiffs' case.

64.     The Forensic Accountants spent a significant amount of time assisting and preparing Lead Counsel and Plaintiffs' testifying experts on key accounting and auditing issues for expert reports and depositions.  Specifically, the Forensic Accountants worked extensively with Plaintiffs' accounting/auditing expert, Paul Regan, CPA, CFF to assist with the preparation of his reports and his deposition.  The Forensic Accountants spent hundreds of hours reviewing, analyzing, and ultimately assisting Lead Counsel in deposing Defendants' accounting expert, including reviewing prior case testimony and publications, selecting deposition exhibits, attending the depositions, and assisted in preparing motions *in limine* and replying to Defendants' *Daubert* motions.

65.     In addition, the Forensic Accountants assisted with summary judgment and trial preparation.  They provided valuable assistance with the selection of potential trial exhibits and deposition testimony excerpts for both summary judgment and trial purposes.

66.     The Forensic Accountants' substantial efforts in this case were instrumental in achieving the outstanding Settlement of the Litigation.

- 22 -

F.      **Lead Counsel Prevails at Summary Judgment**

67.     Summary judgment was hard fought.  On October 2, 2023, Defendants moved for summary judgment on all the Class's claims.  ECF 299.  Concurrently, Defendants moved to exclude two of Plaintiffs' experts in their entirety, and certain testimony from Plaintiffs' two other experts, under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.  ECF 309, 311, 313, and 316.  On the same day, Plaintiffs also moved to exclude certain testimony from two of Defendants' experts, and to exclude one of Defendants' experts in her entirety.  ECF 304, 306, and 310.

68.     Defendants moved to file many of their over 70 exhibits and large portions of their summary judgment and *Daubert* briefs under seal.  ECF 317.  Lead Counsel opposed that motion to seal on October 19, 2023.  ECF 322.  Shortly thereafter, the parties jointly proposed that all sealing issues arising in connection with summary judgment and *Daubert* motions be briefed together, which the Court ordered on October 27, 2023.  ECF 327.  Defendants filed their opening brief in support of sealing, including two appendices, on December 22, 2023.  ECF 364.  Lead Counsel filed a 27-page opposition, specifically discussing each document sought to be filed under seal that Plaintiffs challenged and the reasons why sealing was not appropriate, on January 12, 2024.  ECF 368.  Defendants replied on January 26, 2024.  ECF 373.

69.     Lead Counsel opposed Defendants' summary judgment motion on November 6, 2023, supporting its 54-page opposition brief with just over 200 exhibits.  ECF 336.  Lead Counsel's opposition brief was laden with evidence regarding Defendants' concealment and misrepresentations of the deceleration in demand for the Company's core products and its substantial impact on Under Armour's business and stock price.  Concurrently, Lead Counsel opposed Defendants' four *Daubert* motions.  ECF 332, 335.

70.     On December 18, 2023, Defendants filed a reply in support of their summary judgment.  ECF 346.  Defendants also filed replies in support of their *Daubert* motions.  ECF 349, 352.  Plaintiffs filed replies in support of their *Daubert* motions on the same day.  ECF 353, 355.

- 23 -

71.     On January 9, 2024, Plaintiffs filed a motion for leave to file a sur-reply to Defendants' motion for summary judgment, attaching the proposed brief, concerning Defendants' argument on reply that the Court should disregard the SEC's May 3, 2021 Order Instituting Cease-and-Desist Proceedings Pursuant to §8A of the Securities Act of 1933 and §21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (ECF 172, Exhibit 1) (the "SEC Order").  ECF 366.  Defendants opposed the motion on January 16, 2024. ECF 370.

72.     On February 9, 2024, Lead Counsel appeared before the Court in Baltimore to argue the merits of Defendants' summary judgment motion.  On February 26, 2024, the Court issued a 44-page opinion denying Defendants' motion for summary judgment in its entirety, and denying Plaintiffs' motion for leave to file a sur-reply.  ECF 377.

73.     On April 9, 2024, Lead Counsel again appeared before the Court in Baltimore to argue the merits of its *Daubert* motions, while simultaneously preparing for trial set for July 15, 2024.  ECF 375.  The Court denied each of the parties' *Daubert* motions on April 16, 2024.  ECF 388.

### G.      Lead Counsel Prepares for a Twelve-Day Trial

74.     Lead Counsel continued preparations for the twelve-day jury trial up to the eleventh hour, when the parties reached an agreement to settle the Litigation.  Per the Court's order at the February 9, 2024 hearing on Defendants' motion for summary judgment, Lead Counsel negotiated a proposed pre-trial schedule with Defendants and submitted the same to the Court on March 8, 2024.  ECF 380.  The Court approved the proposed schedule on March 12, 2024, setting deadlines for the exchange of witness and exhibit lists, motions *in limine*, jury instructions, verdict forms, and the joint pretrial statement.  ECF 381.  The final pretrial conference was set for July 9, 2024. *Id.*

75.     Lead Counsel dedicated considerable time and effort to building its trial exhibit and witness lists, as well as formulating objections to documents on Defendants' exhibit lists.  Lead Counsel analyzed thousands of documents in arriving at its final list of nearly 800 trial exhibits, as

4861-1835-6451.v1

well as in analyzing and formulating objections to the 1,700-plus documents Defendants included on their trial exhibit list.

76.     Lead Counsel poured over dozens of deposition transcripts in preparing for trial. With regard to trial witnesses who were not expected to appear live at trial, Lead Counsel designated portions of deposition transcripts that it planned to play for the jury in lieu of the witnesses' live testimony.  Additionally, Lead Counsel formulated objections to those portions of deposition transcripts that Defendants had designated to play at trial.  Meanwhile, with regard to those trial witnesses who were expected to appear live at trial, Lead Counsel evaluated those witnesses' deposition transcripts in order to prepare to examine, and if necessary, impeach those witnesses at trial.

77.     In addition, Lead Counsel raised the issue of bifurcating the trial into two phases with Defendants and managed to reach agreement with Defendants on everything except for the scope of the evidence that could be shown in the first phase, which the parties agreed to argue in letter briefs to the Court.  ECF 394, 396.  Lead Counsel appeared telephonically before the Court on May 16, 2024 to argue the merits of Plaintiffs and the Class's position, and obtained an order from the Court bifurcating the proceedings.  ECF 399.

78.     In anticipation of trial, the parties briefed a total of 14 motions *in limine*.  ECF 406, 407, 409.  The motions required extensive efforts from Lead Counsel, from formulating a list of potential motions *in limine* and exclusion, to researching and drafting various memoranda of law in support of Lead Counsel's motions (and in opposition to Defendants'), and finally, to preparing for oral argument on the motions.  The parties continued meeting and conferring regarding the motions while preparing for trial, eventually resolving several additional motions without the need for the Court's assistance.  ECF 412, 413.

79.     Lead Counsel also dedicated considerable time to drafting and conferring with Defendants over the various sections of the parties' joint pretrial statement, proposed jury instructions, and proposed verdict forms.  Indeed, as Defendants' objections to the inclusion of many challenged statements in Plaintiffs' proposed verdict form would have significantly

- 25 -

impacted both sides' preparation for trial, Lead Counsel convinced Defendants to withdraw half of these objections and raised the remaining objections to the Court. ECF 419.

80. Lead Counsel's trial-preparation efforts included various other tasks not listed above, including: (a) identifying, subpoenaing Lead Counsel's trial witnesses; (b) conducting several mock jury studies to gauge the potential reaction to Lead Counsel's trial themes and evidence; (c) briefing the parties' joint submission on the use of leading questions with witnesses; (d) compiling various witness files and exhibits; (e) drafting detailed trial examination outlines for the various fact and expert witnesses who were expected to testify live; (f) preparing extensive expert demonstratives; (g) preparing proposed juror questionnaires and preparing for *voir dire*; and (h) preparing opening statements.

81. In short, Lead Counsel prepared intensely at each and every step of the Litigation, all with the goal of achieving a jury verdict in the Class's favor.

## III.    THE SETTLEMENT

82. The Settlement of $434,000,000.00 was the result of extensive arm's-length negotiations between the parties over a period of nearly three years. The Settlement unquestionably provides the Class with a substantial benefit and eliminates the significant risks of a jury trial. Lead Counsel believes that the Settlement is fair, reasonable, and an excellent result for Class Members, considering the risk of recovering much less, or even nothing, after a jury trial and any appeals. Further, even if a verdict in favor of Plaintiffs was obtained and ultimately upheld on appeal, this post-trial process would have taken years and would substantially delay any recovery for the Class.

### A.    Non-Monetary Settlement Benefits

83. In addition to the $434,000,000.00 monetary recovery, the Settlement provides significant non-monetary benefits, detailed below.

#### 1.    Separation of Chair and CEO Roles

84. The Company's Board of Directors first elected to separate the roles of Chair and Chief Executive Officer as of January 1, 2020, and the Company has operated with a separate

Chair and Chief Executive Officer since that time.  The Company shall continue the separation of these roles for at least three years from the date the Judgment becomes Final.

> ### 2.    Compensation

85.    All restricted stock units granted by the Company to its Chief Executive Officer, Chief Financial Officer, and Chief Legal Officer during the period beginning on the date the Judgment becomes Final and ending on the three-year anniversary thereof will include a performance-based vesting condition requiring performance based on achievement of specific financial, stock price (relative or otherwise) or business or strategic performance measures to be set by the Human Capital and Compensation Committee of the Company's Board of Directors. For the avoidance of doubt, the Human Capital and Compensation Committee retains discretion and authority to also make such performance-based awards subject to additional vesting conditions, including time-based vesting triggers.

> ## B.    Reaching the Settlement

86.    The parties engaged the Honorable Layn R. Phillips (Ret.) in direct settlement discussions during the course of the Litigation.  Lead Counsel met with Judge Phillips and counsel for Defendants on four separate occasions and convened multiple teleconferences with Judge Phillips.

87.    The parties attended the first of four full-day meditation sessions on September 28, 2022.  In advance of that session, Lead Counsel drafted and provided to Defendants and Judge Phillips a comprehensive mediation statement outlining the alleged fraud and citing numerous exhibits produced by Defendants and non-parties in discovery which supported Lead Counsel's claims.  Defendants, meanwhile, submitted their own mediation statement, emphasizing what they perceived to be the strengths of their case and the weaknesses in Lead Counsel's case.  The parties also prepared reply mediation statements.   The September 2022 mediation session was unsuccessful, and fact discovery continued.

88.    The parties' next full-day mediation session occurred on November 1, 2022.  This session, like the preceding session in September 2022, ended without a resolution.

89.     The parties convened for another full-day mediation session with Judge Phillips on November 10, 2023.  By this time, the parties were in the midst of briefing summary judgment and various *Daubert* motions.  The November 2023 session, like the sessions the previous year, ended without a resolution.

90.     Weeks before trial was scheduled to begin, the parties again engaged with Judge Phillips in a fourth full-day mediation session on June 6, 2024.  Despite their efforts, the parties were unable to reach a resolution, and both sides continued to prepare for trial.  Notwithstanding their unsuccessful attempts to resolve the Litigation, the parties remained in contact with Judge Phillips in an ongoing effort to reach a resolution.

91.     On June 15, 2024, Judge Phillips presented the parties with a mediator's proposal, and shortly thereafter, the parties agreed to settle the Litigation for $434,000,000.00 and the non-monetary benefits described above.  On the night of June 20, 2024, the parties signed and executed a binding Memorandum of Understating.  The parties promptly informed the Court of their agreement in principle to settle the Litigation.  The Court held a telephonic hearing on June 24, 2024, and at the conclusion of the hearing, the Court ordered that the parties move for preliminary approval of the Settlement by July 15, 2024 – the date trial had been scheduled to begin – and reserved time on July 22, 2024 for an in-person hearing on that motion.  ECF 423.

92.     Thereafter, the parties negotiated a Settlement Agreement and filed it along with its exhibits on July 15, 2024.  ECF 430-3.  That same date, Lead Counsel filed their unopposed motion for preliminary approval of the Settlement.  ECF 430.  On July 22, 2024, the Court held a hearing and granted preliminary approval of the parties' Settlement Agreement, approved the form and manner of notice to the Class, and scheduled the final approval hearing for November 7, 2024. ECF 434.

### C.     Reasons for the Settlement

93.     Class Representatives and Lead Counsel both strongly endorse the Settlement. Lead Plaintiff is a sophisticated institutional investor who has actively overseen the prosecution of this Litigation since 2017; Monroe and KBC are likewise sophisticated institutional investors who

- 28 -

have actively overseen the prosecution of this Litigation since the TAC was filed in 2020.  Lead Counsel specializes in complex securities litigation and is highly experienced in such litigation.  *See* Exhibit G to the Declaration of Robert R. Henssler Jr. Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), attached hereto as Ex. G.  Based on their experience and intimate knowledge from litigating this case for over seven years, Lead Counsel and Class Representatives determined that the Settlement is in the best interest of the Class.

94.    Lead Counsel faced numerous risks throughout the Litigation, including up to the date it agreed to settle.  One such risk concerned the amount of damages that could be recovered at trial.  Dr. Cain, Lead Counsel's trial expert on market efficiency, loss causation, and damages, provided specific estimates of the total damages per share for both Class A and Class C Under Armour stock.  However, even assuming Lead Counsel prevailed at trial, a jury could have awarded much less than the Class's estimated total damages, or no damages at all.  Under prevailing case law, damages under §10(b) may be reduced or eliminated if a portion (or all) of the damages are attributable to causes other than the misstatements or omissions.  In this case, Defendants repeatedly contended that Dr. Cain's analysis did not accurately reflect damages per share, and thus the Class's losses.

95.    Defendants undoubtedly planned to press this defense at trial.  Paul Gompers, Ph.D., Defendants' damages and loss causation expert, was prepared to testify at trial that Dr. Cain failed to specify what hypothetical but-for disclosures Defendants could and should have made at any point during the Class Period, did not provide any analysis to establish whether and by how much these disclosures would have affected investors' expectations of future cash flows, did not show that any alleged corrective disclosure conveyed new information to the market that could and should have been revealed in a hypothetical but-for disclosure earlier during the Class Period, and did not link specific alleged misrepresentations with specific alleged corrective disclosures.  Presented with this testimony, a jury may well have concluded that the Class was entitled to far less than their estimated damages – or no damages at all.

- 29 -

96.     In addition to challenging loss causation and damages at trial, Lead Counsel expected Defendants to argue that there was never a legal obligation to disclose the Company's use of pull-forwards during the Class Period, that pull-forwards were real sales to real customers, and that many of the alleged misstatements were too amorphous and vague to be misleading. Further, Lead Counsel expected Defendants to argue that the decline in demand for Under Armour's products was known to the market prior to the close of the Class Period (just as they did in their summary judgment motion), and therefore that the jury should find that the truth was in the market.  In addition, Lead Counsel expected that Defendants would have claimed that their pull-forward practice was not illegal or in violation of GAAP, and therefore, Defendants did not act with scienter in failing to disclose this practice to investors.  This argument dovetails with another argument Defendants could raise at trial that Under Armour and Plank could not have had scienter given the fact that the Company, for at least the first part of the Class Period, was still achieving impressive revenue growth even if one removed the financial impact of pull-forwards. Defendants would have also likely argued to the jury that Plank's stock sales were pursuant to a prearranged trading plan and therefore could not be indicative of scienter.

97.     Lead Counsel expected Defendants to rely heavily on these and other themes at trial, posing a risk that one or more of those themes would gain traction with a jury and result in a verdict in Defendants' favor.

98.     The fact that nearly all the parties' trial witnesses remained employed by Under Armour, remained loyal to the Company, and/or were represented by Defendants' counsel, posed another considerable risk to bringing this case to trial.  Lead Counsel expected these adverse witnesses to attempt to exculpate Defendants at trial.

99.     For example, Dave Bergman, a central fact witness in this Litigation, was Under Armour's CFO at the time trial was scheduled to commence.  Among other things, Lead Counsel expected Mr. Bergman to testify that pull-forwards were common industry practice, that the targets referred to in much of Plaintiffs' evidence were intentionally aggressive internal targets, and that the Company was still achieving impressive growth throughout the beginning of the Class Period,

- 30 -

even with the impact of the pull-forwards removed.  Such testimony, if credited by a jury, could have considerably undermined Lead Counsel's claim that Defendants fraudulently used pull-forwards to conceal decelerating demand in the Company's core business.

100.    Similarly, Plank – the only Individual Defendant and Under Armour's CEO during the Class Period – was expected to vigorously defend his statements as accurate and testify that he only noticed a deceleration in the Company's growth in the fourth quarter of 2016, and that Defendants timely disclosed this deceleration once it became known internally.  In short, Lead Counsel had every reason to believe that these and other trial witnesses would have, if provided the opportunity, offered testimony favorable to the defense.

101.    The Settlement eliminates these and other risks, enabling the Class to recover a substantial sum of money, while avoiding continued litigation and the unpredictability of a jury trial.

**D.     Notice to the Class Meets the Requirements of Due Process and Federal Rule of Civil Procedure 23**

102.    In accordance with the Court's July 22, 2024, Preliminary Approval Order (ECF 434), beginning on August 12, 2024, Lead Counsel, through Gilardi & Co. LLC ("Gilardi" or the "Claims Administrator"), caused a copy of the Notice and Proof of Claim, substantially in the forms annexed to the Court's Preliminary Approval Order, to be emailed or mailed via First-Class Mail to all Class Members who could be identified with reasonable effort.  In total, Gilardi has disseminated 469,400 copies of the Notice and Proof of Claim to potential Class Members and their nominees as of October 2, 2024.  *See* Declaration of Ross D. Murray Regarding Notice Dissemination and Publication, ¶11, attached hereto as Ex. D.

103.    On August 19, 2024, Gilardi caused the Summary Notice to be published in the national edition of the *WSJ* and over *Business Wire*.  *See id.*, ¶12.

104.    In addition, Gilardi caused a copy of the Notice and Proof of Claim to be posted on the Settlement Website, www.UnderArmourSecuritiesLitigation.com.  *Id.*, ¶14.  This multi-faceted method of providing notice to the Class, previously approved by the Court, is wholly

appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e)(1)(B).

105.   Among other things, the Notice advises Class Members of the essential terms of the Settlement, the proposed Plan of Allocation, the general terms of the Fee and Expense Application, the procedure for objecting to the Settlement, and specifics on the date, time, and place of the Settlement Hearing.

106.   As set forth in the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and the Plan of Allocation, the Notice fairly apprises Class Members of their rights and options with respect to the Settlement, is the best notice practicable under the circumstances, and complies with the Court's July 22, 2024 Preliminary Approval Order (ECF 434), Federal Rule of Civil Procedure 23, the PSLRA, and due process.

**E.   The Plan of Allocation Is Fair and Reasonable**

107.   Lead Counsel has proposed a Plan of Allocation to govern the method by which Class Members' claims will be calculated, and the proceeds of the Settlement will be allocated among Class Members who submit valid Proofs of Claim and suffered economic losses because of the alleged fraud.

108.   Lead Counsel engaged Dr. Cain to develop the Plan of Allocation based upon the event study and analyses Dr. Cain performed in this Litigation.  In summary, Dr. Cain employed generally accepted and widely used methodologies to determine how much artificial inflation resided in Under Armour's stock prices on each day of the Class Period.  Dr. Cain reached this determination by measuring how much the stock prices: (a) were inflated by the alleged misrepresentations and omissions; and (b) declined as a result of disclosures that corrected the alleged misrepresentations and omissions.

109.   Under the Plan, for each Class Period purchase of Under Armour Class A and/or Class C common stock that is properly documented, a "Recognized Loss Amount" will be calculated according to the formulas described in the Notice.  As set forth in greater detail in the Notice, the calculation of a Claimant's Recognized Loss Amount is based upon a formula that

takes into account such information as: (a) when a Claimant's Under Armour Class A and/or Class C common stock was purchased and if and when it was sold; (b) the amount of the alleged artificial inflation per share; (c) the purchase price of the share; and (d) the purchase price minus the average closing price for Under Armour Class A and/or Class C common stock during the 90-day look-back period described in §21(D)(e)(1) of the Exchange Act.  Because the alleged corrective disclosures reduced the artificial inflation in stages over the course of the Class Period, the damages suffered by any particular Claimant will vary.

110.    In sum, the Plan of Allocation represents a reliable method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund.  To date, there have been no objections filed to the Plan of Allocation.

## IV.    THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

111.    The successful prosecution of this Litigation required Plaintiffs' Counsel and their para-professionals to perform more than 89,130 hours of work and incur $4,200,059.31 in expenses, as detailed in the Robbins Geller Decl., Declaration of Christopher F. Moriarty Filed on Behalf of Motley Rice LLC in Support of Application for Award of Attorneys' Fees and Expenses ("Motley Rice Decl."), and Declaration of William N. Sinclair Filed on Behalf of Silverman Thompson Slutkin & White, LLC in Support of Application for Award of Attorneys' Fees and Expenses ("Silverman Declaration"), attached hereto as Exs. G, H, and I, respectively.

112.    Based on Lead Counsel's extensive efforts on behalf of the Class, including those described herein, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis in the amount of 25.83% of the Settlement Amount, and for $4,200,059.31 in litigation expenses, plus interest at the same rate and for the same time as that earned on the Settlement Fund.  In addition, Class Representatives seek awards in the amount of $30,000.00 for NESPF, $2,160.00 for Monroe, and $13,125.00 for KBC, pursuant to 15 U.S.C. §78u-4(a)(4), for reasonable costs and expenses directly relating to their representation of the Class.

113.   For the reasons set forth herein and in the Fee Memorandum, Lead Counsel and Class Representatives respectfully submit that the Fee and Expense Application described above should be granted.

    A.    **Application for Attorneys' Fees**

        1.    **The Requested Fee of 25.83% of the Settlement Fund Is Fair and Reasonable**

114.   For its extensive efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy and the PSLRA, has been recognized as appropriate by the U.S. Supreme Court for cases of this nature, and represents the prevailing trend in the Fourth Circuit.

115.   The fact Lead Counsel was able to obtain such an exceptional result for the Class supports the requested fee.  As explained in the Fee Memorandum, the $434,000,000.00 cash Settlement is the largest PSLRA settlement in the Fourth Circuit in over 17 years, the second largest settlement ever achieved in a securities class action in this District and in the Fourth Circuit, and is more than 48 times larger than the $9,000,000.00 settlement the SEC reached with Under Armour in 2021.  It will likely rank within the top-50 largest settlements ever achieved in a securities fraud class action.  The Settlement also includes significant non-monetary benefits.  *See supra*, §III.A.

116.   A 25.83% fee is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within the range of the percentages typically awarded in securities class actions in the Fourth Circuit.  *See* Fee Memorandum, §II.B., C.  In fact, as University of Texas School of Law Professor Charles Silver states: "Even though the litigation was exceptionally risky and the recovery is enormous, the fee request falls below the market rate."  *See* Declaration of Professor

- 34 -

Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees, ¶1, attached hereto as Ex. E.  Professor Silver, who has "followed class actions as an academic and consultant for decades," observes that "sophisticated corporate clients that hire lawyers to handle large commercial cases[] typically agree to pay contingent fees of 30 percent to 40 percent." *Id.* at ¶¶24, 34.

117.    It bears noting that, at the time they retained Lead Counsel, Lead Plaintiff negotiated a fee structure designed to maximize the Class' recovery and align Lead Counsel's interests with those of the Class.  *See* Fee Agreement with NESPF (March 29, 2017), attached hereto as Ex. F.  The sophisticated institutional investor Lead Plaintiff, who negotiated this fee grid, as well as the other Class Representatives, who supervised Lead Counsel and remained well informed throughout the Litigation and settlement negotiations, approve of Lead Counsel's fee request.  *See* NESPF Decl., ¶5; Monroe Decl., ¶5; KBC Decl., ¶5.

### 2.    The Complexity and Risk Inherent in the Litigation

118.    The requested fee is also reasonable in light of the various risks Lead Counsel faced over the years, as well as the complexity of the Litigation.

119.    The Litigation was highly complex, both procedurally and factually, which rendered the path to resolution long, time-consuming, extremely challenging, and fraught with risk.  As set forth above, Lead Counsel vigorously prosecuted the Class's claims for seven years against five top-tier law firms – plus additional trial counsel added six years after the Litigation began – with virtually unlimited resources to defend the case.  In doing so, Lead Counsel engaged in substantial briefing of complex legal and factual issues on, *inter alia*, motions to dismiss, to compel, for class certification, for summary judgment, to exclude experts, and *in limine*.

120.    Lead Counsel conducted an extensive pre-filing investigation, filed three comprehensive complaints, engaged in complex document discovery and discovery disputes, deposed dozens of fact and expert witnesses, and prepared to relocate nearly two dozen lawyers and professional staff to Baltimore to prepare for a jury trial.  The Litigation settled weeks before trial, only after Lead Counsel overcame a relentless stream of complex legal and factual challenges.

- 35 -

121.    The requested fee is also reasonable considering the substantial risks Lead Counsel faced.  Defendants were given various opportunities to chip away at, or defeat entirely, the Class's claims, including at the pleadings stage from 2017 to 2021 and the summary judgment stage in 2023-2024.  Class certification also presented a challenge – one Lead Counsel overcame despite Defendants' vigorous opposition.

122.    Jury trials are notoriously unpredictable, and Lead Counsel expected a bevy of risks at trial.  As discussed above, during the liability portion of the trial, Lead Counsel expected Defendants to present to the jury a variety of defenses, a lineup of friendly witnesses, and a squad of highly qualified experts.  Moreover, Lead Counsel knew that Defendants had to defeat only a single element of the Class's §10(b) claim to prevail.  Further, even if Lead Counsel prevailed in proving fraud at trial, a jury could have awarded damages that paled in comparison to the damages Lead Counsel sought.  And the trial itself was planned to be bifurcated – meaning even if Plaintiffs succeeded at the "Phase One" (liability) portion of the trial and met their burdens with respect to falsity, materiality, scienter, class-wide reliance under the "fraud on the market" presumption, loss causation, the measure of per-share damages (if any), the §20A claim against Plank, and control person liability, the case would still be far from over.  In this respect, during the "Phase Two" component of the case, Defendants would have had the opportunity to challenge an individual Class Member's membership in the Class, challenge the presumption of reliance as to each Class Member (including Plaintiffs), and challenge the amount of damages due each Class Member. *See, e.g.*, ECF 399 at 1.  Such a process would have been lengthy, complex, and extremely costly. Finally, any favorable verdict could have been reversed on appeal.

123.    In light of the uncertain nature and prolonged extent of the Litigation, the complexity of the factual and legal issues presented at all stages of the Litigation, the substantial risks that Lead Counsel overcame at the pleading, class certification, fact discovery, expert discovery, and pretrial phases of the Litigation, and the other factors described in the accompanying Fee Memorandum, Lead Counsel submits that the requested 25.83% fee is fair, reasonable, and should be approved.

- 36 -

3.      The Contingent Nature of the Fee and the Financial Burden
        Carried by Lead Counsel

124.    Lead Counsel prosecuted this Litigation on an "at-risk" contingent-fee basis.  At the outset in 2017, Lead Counsel knew it was embarking on complex and expensive litigation with no guarantee of compensation for the time, resources, and effort it poured into this case over its seven-year lifespan.  Accordingly, Lead Counsel fully assumed the risk of an unsuccessful result and has received no compensation to date for services rendered or the significant expenses incurred in litigating this action.

125.    In undertaking the responsibility for prosecuting the Litigation, Lead Counsel assured that sufficient attorney resources were dedicated to advancing the Class's claims over the years, and that sufficient funds were available to advance the expenses required to zealously pursue such complex litigation.  Lead Counsel received no compensation and, in total, incurred $4,200,059.31 in litigation expenses in prosecuting this Litigation for the benefit of the Class.

126.    Lead Counsel also shouldered the risk that no recovery would be achieved.  Lead Counsel knows from experience that success in contingent-fee litigation is never assured, and that the commencement of a securities class action in no way guarantees a recovery.  Instead, it takes diligence, commitment, and years of tireless work by skilled counsel to develop the facts, theories, and evidence necessary to prevail on the merits.  The Class's claims could have been – and, in fact, were – dismissed at the pleadings stage or at summary judgment.  Instead, their claims ultimately survived as a result of Lead Counsel's vigorous and unwavering efforts and litigation expertise.

127.    Courts have repeatedly held it is in the public's interest to have experienced and able counsel enforce the securities laws.  Vigorous private enforcement of the federal securities laws can occur only if private plaintiffs – particularly institutional investors like Class Representatives – can obtain some parity in representation with that available to large corporate defendants.  If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiffs' counsel, while accounting for the enormous risks inherent in prosecuting securities class actions on a contingent-fee basis.

### 4.      The Standing and Expertise of Lead Counsel

128.    Lead Counsel is among the most experienced and skilled securities litigation law firms in the field, as illustrated by Lead Counsel's firm biography.  *See* ECF 197-4.  Indeed, Lead Counsel have consistently obtained significant recoveries for defrauded investors, including (among many others) in: *In re Enron Corp. Sec. Litig.*, No. 4:01-cv-03624 (S.D. Tex.) (recovering in excess of $7.2 billion for investors); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill.) (largest securities class action settlement following a trial: $1.575 billion); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.) (recovering $1.21 billion for investors); *In re Am. Realty Cap. Props., Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (recovering $1.025 billion); *In re UnitedHealth Group, Inc. PSLRA Litig.*, No. 0:06-cv-01691 (D. Minn.) (recovering over $925 million); *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314 (N.D. Cal.) (recovering $809.5 million); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03-cv-01500 (N.D. Ala.) (obtaining a combined recovery of $671 million); *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio) (recovering $600 million); *In re Citigroup Inc. Sec. Litig.*, 1:07-cv-09901 (S.D.N.Y.) ($590 million settlement).

129.    The quality of work Lead Counsel provided in attaining the Settlement should also be evaluated by considering the quality of opposing counsel in this Litigation.  Over the course of the Litigation, Defendants were well represented by teams of experienced attorneys from the well-regarded and prestigious law firms of Kramer Levin Naftalis & Frankel LLP; Fried, Frank, Harris, Shriver & Jacobson LLP; Venable LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; and Hogan Lovells US LLP.  Faced with knowledgeable, experienced, and zealous opposing counsel, Lead Counsel was nonetheless able to develop a strong case that proceeded to the eve of trial and persuaded Defendants to settle the Litigation for $434,000,000.00.

### 5.      The Class's Reaction to the Settlement

130.    The Notice advises the Class that Lead Counsel intends to request an award of attorneys' fees in an amount not to exceed 25.83% of the Settlement Amount, for payment of litigation expenses reasonably incurred not to exceed $5,000,000.00, plus interest, and for awards

to Class Representatives (pursuant to 15 U.S.C. §78u-4(a)(4)) not to exceed $100,000.00 in the aggregate. The Notice provides Class Members until October 17, 2024, to submit objections to Lead Counsel's Fee and Expense Application.

131.    While the time to object to the Fee and Expense Application has not passed, it is our understanding that to date, no Class Members have objected to the fee amount.

### B.    Application for Litigation Expenses, Charges, and Costs

132.    Lead Counsel requests $4,200,059.31 for expenses, charges, and costs reasonably and necessarily incurred in prosecuting the Class's claims for the past seven years. Lead Counsel respectfully submits that this amount is appropriate, fair, and reasonable and should be approved.

133.    Since 2017, Lead Counsel has known it may never recover any of the expenses incurred in prosecuting this Litigation. Lead Counsel also understood that, even assuming the Litigation was ultimately successful, an award of expenses would not compensate them for the lost use of the funds dedicated to this Litigation. Accordingly, Lead Counsel was motivated to, and did, take steps to minimize expenses where practicable without jeopardizing the vigorous and efficient prosecution of this Litigation.

134.    As set forth in the Robbins Geller Decl., Motley Rice Decl., and Silverman Decl., the expenses, charges, and costs incurred were necessary and appropriate in light of the complex nature of the Litigation and were associated with, among other things, hiring experts and consultants, service of process, reporting services for depositions, travel, online legal and factual research, trial preparation, and mediation.

135.    Class Representatives also seek awards in the amount of $30,000.00 for NESPF, $2,160.00 for Monroe, and $13,125.00 for KBC, pursuant to 15 U.S.C. §78u-4(a)(4), for their time and expenses directly relating to their representation of the Class. In addition to monitoring the developments in the Litigation, Class Representatives dedicated time and resources to gathering documents and information responsive to Defendants' discovery requests, prepared representatives to sit for depositions to obtain class certification, and participated in mediations and other settlement negotiations. *See* NESPF Decl., ¶3, Monroe Decl., ¶3, and KBC Decl., ¶3.

## V.      CONCLUSION

136.     In light of the $434,000,000.00 and significant non-monetary benefits obtained by the Settlement, the substantial risks Lead Counsel faced, the exceptional quality of Lead Counsel's work, the contingent nature of the requested fee, and the substantial complexity of the Litigation, as described above and in the accompanying memoranda in support of their motions, Class Representatives and Lead Counsel respectfully submit that the Court should: (a) approve the Settlement and Plan of Allocation as fair, reasonable, and adequate; (b) approve Lead Counsel's Fee and Expense Application; and (c) approve the awards to Class Representatives for their time and expenses pursuant to 15 U.S.C. §78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 3, 2024, at San Diego, California.

s/ Robert R. Henssler Jr.
_____
ROBERT R. HENSSLER JR.

- 40 -